IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------ x
                                 :

In re:                         :    Chapter 11

                               :

PINE GATE RENEWABLES, LLC, *et al.*,    :    Case No. 25-90669 (CML)

                               :

            Debtors.[1]      :    (Joint Administration Requested)

                               :

------------------------------------------------------------ x

## DECLARATION OF RAY SHEM,
## PRESIDENT AND CHIEF FINANCIAL OFFICER OF THE DEBTORS,
## IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST-DAY RELIEF

I, Ray Shem, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1. I am a co-founder and the President and Chief Financial Officer of Debtor Pine Gate Renewables, LLC ("**PGR**") and certain of its affiliates (the above-captioned debtors, the "**Debtors**"; their non-debtor affiliates, the "**Non-Debtor Affiliates**";[2] and the Debtors and Non-Debtor Affiliates together, "**Pine Gate**" or the "**Company**"), as well as a member of the board of Debtor PGR Holdco GP, LLC. I submit this declaration to familiarize the Court with PGR's business and operations and to provide context in connection with the circumstances that led to the commencement of the Chapter 11 Cases.

---

[1] A complete list of each of the Debtors in these chapter 11 cases (the "**Chapter 11 Cases**") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/PGR. The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

[2] As described further herein, the Non-Debtor Affiliates generally include (i) the Company's O&M (operations and maintenance) segment, which operates through Non-Debtor Affiliate ACT Power Services Holding Company and (ii) subject to certain exceptions, solar project companies and related affiliates, which did not have the ability or need to file these Chapter 11 Cases. The Non-Debtor Affiliates are, however, part of the Debtors' sale process, via the Debtors' equity in such Non-Debtor Affiliates.

2.      PGR is a fully integrated developer and owner-operator of utility-scale solar power facilities throughout the United States.  In addition, through its wholly-owned subsidiaries, Debtor Blue Ridge Power, LLC and Non-Debtor Affiliate ACT Power, the Company performs both engineering, procurement, and construction ("**EPC**") services and operations and maintenance ("**O&M**") services for third party customers and for its own projects.

3.      I have significant personal knowledge of the matters discussed in this declaration (this "**Declaration**").  Among other responsibilities, I manage the Company's finances, monitor corporate financial risk, and lead project financing efforts to raise funding for project monetization. I have more than 12 years of experience in capital raising, financial management, and strategic planning in the renewable energy industry.  I also work closely with the Company's various advisors, including Latham & Watkins LLP ("**Latham**"), Lazard Frères & Co. LLC ("**Lazard**"), and Alvarez & Marsal North America, LLC ("**A&M**").[3]  Prior to PGR, I served as the Chief Financial Officer of FLS Energy Inc.  I have a bachelor's degree from Yale University and a Masters in Business Administration from the University of North Carolina at Chapel Hill.

4.      I have significant knowledge of the Debtors, their businesses, and the circumstances that led to the commencement of the Chapter 11 Cases, as well as the Debtors' financial affairs, capital structure, operations, and related matters.  Accordingly, I am authorized on behalf of the Debtors to submit this Declaration in support of the Debtors' voluntary petitions for relief.  Unless otherwise indicated, the statements in this Declaration are based on my personal knowledge and diligence.  If called to testify, I would testify honestly and competently to the facts herein.

---

[3]    Hunton Andrews Kurth LLP ("**Hunton**") is also advising the Debtors in these Chapter 11 Cases, and Omni Agent Solutions is the Debtors' proposed claims and noticing agent.

## PRELIMINARY STATEMENT

5.     The Company was founded in 2016 in response to an opportunity in the renewable energy market to finance, develop, construct, operate, and sell solar power projects, capitalizing on our team's expertise in project development, tax equity structuring, and power purchase agreement ("**PPA**") negotiations.   We started small, with just a few solar plants, but grew significantly—increasing the size of our projects, the number of projects across our portfolio, and our workforce.



6.     At its peak, the Company employed over 1,000 employees who provided a wide array of services.   As further described herein, the Company currently has approximately (a) $2 billion of construction period funded debt and permanent funded debt, primarily at non-Debtor project companies, (b) $1.4 billion of corporate-level funded debt, across various different facilities at various Debtor entities, and (c) $1 billion of outstanding preferred equity.

7.     Unfortunately, due to increased interest rates, changes in the regulatory environment, and inflationary pressures, among other things, the renewable energy industry began to experience significant challenges starting in 2024 and accelerating in 2025. Increasing headwinds in the renewable energy sector and rising project costs have also significantly reduced the appetite for investment in solar assets, decreasing the value of PGR's fleet and impairing PGR's ability to sell projects in order to raise additional capital. For the same reasons, additional capital investment into the Company itself has been elusive as well.

8.     The Company's EPC business, Debtor Blue Ridge Power, LLC ("**_BRP_**"), further contributed to challenges the Company was facing overall. In addition to the issues faced more broadly by solar EPC companies, including increased costs, supply chain disruptions, and other market factors, BRP faced additional problems. Specifically, BRP has experienced challenges estimating and managing project costs and meeting project construction schedules, which, in addition to mounting disputes with customers and subcontractors, have resulted in an acute capital need to support outstanding payables to vendors.

9.     The combination of accelerating losses at BRP and the slowdown in the renewable energy industry unfortunately left the Company unable to raise sufficient capital to support the losses at BRP.

10.     The Company tried to find solutions. Throughout 2024 and 2025, the Company solicited interest from hundreds of potential project buyers, none of which materialized into any transactable proposals. In addition, while ultimately unsuccessful, the Company worked extensively with its existing investors on potential additional corporate investments. It became clear that the Company would run out of money in the latter half of 2025 absent further financing. Accordingly, in mid-2025, the Company hired A&M, Lazard, and Latham to evaluate other

4

potential and more holistic solutions.  To address the Company's liquidity shortfalls, Lazard promptly reached out to dozens of potential sources of out-of-court or in-court financing.  Among those approached were the Company's primary "corporate-level" secured lenders (Brookfield, Carlyle, and Fundamental (each as defined below)).

11.    Lazard's process yielded two proposals from new third parties for DIP financing, but neither was large enough to fund a full chapter 11 case.  Around that same time, however, the Company received proposals from Brookfield, Carlyle, and Fundamental (the "***Bridge/DIP Lenders***" and each, a "***Bridge/DIP Lender***") for combined out-of-court and in-court financing. Each Bridge/DIP Lender's proposal was contingent on the others', and they collectively envisioned the Company using the prepetition runway to engage with the financing sources, tax equity investors, offtakers, and other counterparties for the lenders' solar project portfolios ahead of any chapter 11 filing.

12.    The Company began negotiating in earnest with the Bridge/DIP Lenders in early September 2025.  Those hard-fought, arm's-length negotiations culminated on October 6, 2025, when the Company simultaneously closed on three separate financings, one with each Bridge/DIP Lender.

13.    Immediately prior to the closing of the Bridge/DIP Lenders' financing, the Company had only approximately $8.5 million of cash on hand.  The Bridge/DIP Lenders provided the Company with a total financing commitment in the amount of $412 million, consisting of approximately $208 million in out-of-court financing and $204 million in DIP financing commitments (plus amounts not lent in the out-of-court financing).  Each Bridge/DIP Lender also agreed to serve as a stalking horse bidder for the projects that served as its collateral (whether

directly or indirectly), including (with respect to Fundamental) the Company's independent power producer platform and substantially all of its development pipeline.

14.     In exchange for this financing and go-forward commitments, the Company granted the Bridge/DIP Lenders guarantees and liens from (a) previously unencumbered entities that sat above (i.e., were structurally junior to) the Bridge/DIP Lenders' borrowers in the Company's corporate structure and (b) previously unencumbered entities that sat between the Bridge/DIP Lenders' borrowers and the solar power projects (i.e., were structurally senior to the Bridge/DIP Lenders and junior to project financing).

15.     The Company's Board, its independent Special Committee, its management, and its advisors unanimously believed that the Bridge/DIP Lenders' proposals presented the best and most value-maximizing path available to the Company under the circumstances and justified the granting of new liens and guarantees.  Among other things, the financing provided the Company with sufficient and committed liquidity to preserve asset value, including the continuation and culmination of a competitive sale process and consummation of a chapter 11 plan—a crucial condition of the Debtors' decision to accept the financing on its terms.  Without the financing, the Company would have had to either file chapter 7 or file insufficiently funded chapter 11 cases with the attendant risk of conversion to chapter 7.  Rather than that disorderly and destructive result, the Company has, as expected, used the last several weeks to engage meaningfully with project-level stakeholders across its portfolios with the aim of minimizing potential disruption and risk to the value of these Chapter 11 Cases and the Debtors' estates.

16.     The Company realizes that the financing and go-forward commitments from the Bridge/DIP Lenders will not last indefinitely.  For that reason, consistent with the DIP budget and milestones, the Debtors must proceed efficiently.  Indeed, following the commencement of these

Chapter 11 Cases on the date hereof (the "**Petition Date**"), the Debtors must move swiftly toward consummating the sales of their assets by year end and consummating a chapter 11 plan in January 2026.



17.     The balance of this Declaration consists of three parts:

(a)     Part I describes the Company's business, its history, its current operations, and its organizational and capital structures;

(b)     Part II describes the events leading to the filing of the Chapter 11 Cases, including the Debtors' efforts to identify strategic alternatives; and

(c)     Part III summarizes the Debtors' objectives for the Chapter 11 Cases.

## I.     COMPANY BACKGROUND

### A.     Corporate Structure

18.     Headquartered in Asheville, North Carolina, Pine Gate is a solar energy company focused on the development, construction, operation, and financing of utility-scale solar farms across the United States.  The Company has a complex corporate structure, consisting of a total of 880 entities, but only 119 have filed for chapter 11 protection.  To simplify, and as further described herein, the Company's corporate structure generally consists of six main segments:

(i)     top-level holding companies, including Pine Gate Renewables, LLC, PGR Holdco, LP, and PGR Holdco GP (all of which are Debtors);

(ii)    secondary-level entities that are the borrowers under the Company's "corporate-level" debt facilities with the Bridge/DIP Lenders (all of which are Debtors);

(iii)   a joint venture with John Hancock that consists of a portfolio of operating projects managed by PGR Signature Fund 1 Manager, LLC (which is a Debtor, but the other entities within the John Hancock portfolio are <u>not</u> Debtors);

(iv)    project-level entities, including their intermediate holding companies and related affiliates (the project-level entities are generally <u>not</u> Debtors subject to certain exceptions);

(v)     the Company's EPC (engineering, procurement, and construction) segment, which operates through Blue Ridge Power Holdings, LLC and its subsidiaries (all of which are Debtors); and

(vi)    the Company's O&M (operations and maintenance) segment, which operates through ACT Power Services Holding Company Guarantor, LLC and its subsidiaries (which are <u>not</u> Debtors).



19.     A more detailed corporate organizational chart illustrating the Debtors and certain Non-Debtor Affiliates is attached hereto as Exhibit A.

**B.      History of the Company**

20.     The Company was founded in 2016 to develop, finance, own, and operate solar projects in the expanding utility scale solar market in the Southeastern U.S.  In addition, as was common at the time among Southeastern solar developers, the Company performed EPC management services directly on its own projects.  The Company grew significantly over the following years, increasing the average size of its solar projects and expanding the number of projects in its portfolio.  Today, the Company has 107 projects in operation across the United States with three gigawatts ("***GWs***")[4] of total power capacity, with over 130 additional projects in various stages of development, with over 30 GWs of capacity.



---

[4]     A "gigawatt" is a unit of electric power equal to one billion watts and is commonly used as a unit of measurement for large-scale power plants.

21.     Beginning in 2020, the Company saw an opportunity to provide EPC services to third parties in the underserved Southeastern market while continuing to construct the Company's own projects.  To capitalize on the opportunity, in 2021, the Company acquired the solar division of a mechanical and civil subcontractor (Horne Brothers Construction) and, in conjunction with spinning out its in-house team of construction professionals, formed a new entity for this EPC business, Debtor BRP and, together with its Debtor EPC affiliates, "***Blue Ridge Power***").

22.     Shortly thereafter, in 2022, the Company further expanded its capabilities by acquiring an independent O&M provider for power plants and other energy facilities, Non-Debtor Affiliate ACT Power Services, LLC (together with its O&M segment affiliates, "***ACT***").

C.     **Business Segments**

23.     With the addition of the EPC and O&M business segments, Pine Gate's business consists of a full suite of capabilities through the renewable energy life cycle, including development, EPC services (construction), offtake (power sales), and O&M services (operations and maintenance).

24.     As described further below, depending on the life cycle of the project, the Company's projects are either in the development stage, under construction, or operational.  The projects serve as collateral for certain debt obligations owed by the Company across three different "silos" of the Company's "corporate-level" lenders: Fundamental Renewables ("***Fundamental***"), Brookfield Asset Management ("***Brookfield***"), and The Carlyle Group ("***Carlyle***" and together with Fundamental and Brookfield, the "***Corporate Lenders***").  Each project in a Corporate Lender's silo is pledged, either directly or indirectly, as collateral to that Corporate Lender.  In addition to those three silos of projects (totaling 162 projects), the Company has a minority, subordinated interest in a joint venture with John Hancock of 85 projects.  Last, the Company has a recourse construction loan

with Pathward, National Association ("*Pathward*") regarding one project.  A summary of the Company's projects is as follows:

|  | Development | Construction | Operating | *Total* |
|---|---|---|---|---|
| **Fundamental** | 128 | 2 | 1 | **131** |
| **Brookfield** | 3 | 4 | 15 | **22** |
| **Carlyle** | 2 | 1 | 6 | **9** |
| **John Hancock** | 0 | 0 | 85 | **85** |
| **Pathward** | 0 | 1 | 0 | **1** |
| *Total* | **133** | **8** | **107** | **248** |

25.     Development.   The first phase of a project's life cycle is development.   In developing a project, the Company identifies suitable land, conducts in-depth analyses, and obtains land rights, permits, and contractual arrangements to construct, finance, operate, and sell power generated by the project.  As set out more fully in the Rajcevich Declaration, in connection with the development stage, the Company engages various contractors and vendors to, among other things, support the land leasing and entitlement process, conduct engineering studies, and perform environmental due diligence.  The Company will also strategically acquire projects in various stages of development to add to the Company's portfolio.

26.     During the development stage, the Company enters into PPAs with utility companies, private companies, and/or government entities.  The PPAs govern the terms of the sale of the Company's power to the PPA counterparty, including the price and duration of such sale.  Though energy is not yet sold as the project is under development, entry into a PPA is a key part of the project transitioning from development to construction and, ultimately, operations.  In

connection with project operations and the sale of power generated, the Company also enters into interconnection agreements to connect the project facility to the electrical grid.

27. <u>EPC Services (Construction).</u>  After the initial development stage, a project enters the "EPC" phase for construction.  For construction services, the Company contracts with either Blue Ridge Power or a third-party EPC contractor.  Payments for EPC Services are generally made periodically by the project owners upon achievement of certain construction milestones.  During 2024, Blue Ridge Power earned approximately $342 million in revenue on account of its EPC services.

28. <u>Sale or Offtake.</u>  Once a project is constructed, the project commences regular operations within PGR's fleet, generating revenue from the PPA associated with such project, paying project-level operating expenses such as O&M and project insurance costs, and servicing project-level permanent debt and tax equity.  From time to time, the Company may sell a project, or an interest in a project, to a third-party operator with sale proceeds being used by the Company for further development and operations.  During 2024, the Company earned (i) $155 million in revenue from the sale of power, and (ii) approximately $400,000 in revenue from project sales.

29. <u>O&M Services.</u>  The Company engages an O&M provider to operate and maintain its operational projects.  O&M services include real-time system monitoring (tracking metrics such as panel efficiency, grid load, and system irregularities), infrastructure maintenance, technical inspections, routine cleaning, and rapid response to potential issues.  ACT and the other O&M segment affiliates (which are not among the Debtors) form the Company's subsidiary created to provide O&M services to clients.  Similar to the Company's Blue Ridge Power EPC business, the Company's ACT business provides O&M services to both Pine Gate projects and third-party projects.  During 2024, ACT earned approximately $15 million in revenue from O&M services.

D.      **Intercompany Transactions**

30.     In the ordinary course of business, the Debtors engage in various intercompany financial transactions with Debtors and Non-Debtor Affiliates (collectively, the "***Intercompany Transactions***") that result in intercompany receivables and payables (collectively, the "***Intercompany Claims***"). The Intercompany Transactions include, but are not limited to, the following:

- Payments or transfers among Debtors and/or Non-Debtor Affiliates as part of their business operations ("***Intercompany Business***");

- Equity investments made by Debtors with respect to other Debtors and Non-Debtor Affiliates ("***Intercompany Investments***");

- Short-term cash advances among Debtors and between Debtors and Non-Debtor Affiliates ("***Intercompany Deficit Advances***"); and

- Payments made by PGR to other Debtors and Non-Debtor Affiliates for services provided to the whole Company that are later back billed (the "***Enterprise Back Billing***").

31.     The Debtors track all Intercompany Transactions processed through the Cash Management System by use of their accounting resource planning (ERP) system, and are therefore able to ascertain, trace, and account for Intercompany Transactions and Intercompany Claims.

32.     Intercompany Business.    The Debtors and Non-Debtor Affiliates collectively maintain ordinary business relationships with each other, which may result in Intercompany Transactions that give rise to Intercompany Claims. For each Intercompany Transaction, the PGR accounting team records the appropriate intercompany accounts payable/receivable and recognizes revenue/expenses on the applicable affiliate entities' financial statements. Certain prominent examples are as follows:

- ***EPC Business.***  BRP constructs projects as awarded by PGR acting in its capacity as the owner of the project or the managing member of the affiliate project entity When BRP is engaged for a project, BRP and the project company enter into a service agreement (the "***EPC Contracts***") governing the payment terms as

consideration for BRP's services. BRP will design, engineer, procure all equipment, erect, install, start-up, commission and test the project facilities. The project company will compensate BRP a fixed-price fee for providing the services. The BRP accounting team tracks costs incurred by projects and updates the estimated costs to complete each project monthly. The BRP accounting team uses this information to prepare payment application invoices and/or any necessary change orders associated with the contracts for the relevant projects. BRP then obtains internal approval for the payment application or change order and, upon approval, sends the payment applications to the PGR accounts payable and accounting teams. The accounts payable team enters the payment application into their system to document and capture the approval workflow. Thereafter, PGR executes a development or construction draw (depending on the Project) with the appropriate lender or funds via PGR corporate cash. Once the funds are received from the lender (if applicable), PGR forwards the funds to BRP to satisfy the payment applications.[5]

- ***O&M Business.*** When Non-Debtor Affiliate ACT and the O&M segment affiliates are engaged for a project, the lessee or project company and Debtor Pine Gate O&M, LLC ("***PGOM***") enter into a maintenance services agreement and PGOM and ACT enter into a maintenance service subcontract (collectively, the "***O&M Contracts***") whereby ACT will provide O&M services for the project. Under the O&M Contracts, ACT invoices PGOM a specified price for the service covered as defined in the agreement on a quarterly basis and, for additional services deemed "non-covered" by the base fees, invoice on a monthly basis. Thereafter, PGOM will invoice the lessee or project company in the same fashion.

- ***Development MIPA Transactions.*** When a project is ready to enter the portfolio structure at the closing transaction with tax equity investors, PGR, Pine Gate Development, LLC or another development subsidiary, as the seller, and the fund project entity, as the buyer, will typically execute a Membership Interest Purchase Agreement (each, a "***MIPA***"). The MIPA outlines the fees payable to the selling entity by the buyer. At the financial closing equity transaction, the agreed upon fee is submitted on the draft flow of funds for payment to PGR. This draft flow of funds is approved and signed off on by the seller and buyer for each transaction.

- ***Asset Management.*** Within the project structure, the manager project entity often provides management, accounting, or administrative support services for the respective lessor and lessee. This agreement is addressed in the operating agreement for the lessor, lessee, and project company. Payments are made only in accordance with the priority in the waterfall for the respective entity. The Company's asset management team provides a schedule of the contractual billing for all projects by quarter that is used by the accounting team for recording purposes.

---

[5]   Occasionally, a payment application invoice may be satisfied at an equity closing and addressed on a flow of funds through the same process used by the Company for Intercompany Investments.

- ***Master Leases.***  The lessees in the inverted lease structures, as described below, typically engage in a Master Lease Agreement (each, a "***Master Lease***") with the project companies and/or the lessors.  The Master Lease schedule for a project is finalized at the substantial completion closing for that project.  Once the schedule is finalized, the accounting team ensures that payments are made from the lessee to lessor or project company according to its respective schedule and the terms in its Master Lease.

33. <u>Intercompany Investments.</u>  As is typical for similar organizations within the Debtors' industry of similar size and sophistication, the Debtors periodically make investments in other Debtors and in Non-Debtor Affiliates in the form of direct capital contributions to provide required equity commitments for project costs in conjunction with project financing, as well as otherwise ensuring that such entities have sufficient cash to continue operations in the ordinary course.  The commencement of any project requires that the Company make a capital contribution to the newly formed special purpose vehicle that will own and construct the completed project (i.e., the project company).  Such capital contributions are often funded by the Debtors, either directly or indirectly, and may pass through several intermediary levels of holding company Debtors and Non-Debtor Affiliates before ultimately vesting in the applicable project company.

34. <u>Intercompany Deficit Advances.</u>  Finally, the Company also utilizes a system of Intercompany Deficit Advances to facilitate the flow of cash by and among the Debtors and Non-Debtor Affiliates.  This system is utilized from time to time when an entity is unable to cover its financial obligations.  The Company holds weekly meetings to review and discuss open invoices for payment processing.  If a Debtor or Non-Debtor Affiliate is unable to meet a required obligation, an Intercompany Deficit Advance may be created.  If approved, the accounting team submits a wire transfer for processing and records the Intercompany Deficit Advance on the financial statements of the relevant entities.  Repayments of the Intercompany Deficit Advances can be subject to waterfall restrictions as outlined in the various entities' operating agreements or debt covenants.  On a quarterly basis, the asset management team prepares priority return

calculations to determine the ability of an entity to repay the Intercompany Deficit Advance. Should the approved priority return calculation allow for a repayment of all or a portion of the advance, the information is provided to the accounting team to execute.

35.     Enterprise Back Billing.  The Company incurs certain invoices that cover services for the benefit of all business units, spanning across the Debtors and the Non-Debtor Affiliates. Examples include, without limitation, property & casualty, workers compensation, fleet & auto, and employee benefit insurance; other employee benefit services; and software licensing fees. When these enterprise-wide invoices are received, they are recorded in the Company's accounts payable system following the same approval workflows and payment decisioning process as any other invoice.  Once approved for payment, such invoices are paid by PGR on behalf of the enterprise.  Thereafter, PGR prepares invoices to the appropriate Debtors and/or Non-Debtor Affiliates for their portion of services provided, back-billing for the month that the invoice was received.  Additionally, in prior years, PGR purchased a fleet of vehicles that were subsequently transferred to BRP.  As the relevant purchase contract for this fleet originated between the vendor and PGR, PGR pays the vendor and back bills BRP on a monthly basis.

### E.     Employee Workforce

36.     As of the Petition Date, the Debtors employ approximately 284 employees, all in the United States.  To supplement the services performed and duties executed by the employees, the Debtors currently have approximately 24 engagements with contract workers and temporary staff that fulfill duties similar to the job functions of employees and are a critical supplement to the employees.

### F.     Overview of Funded Capital

37.     An overview of the Company's funded capital as of the Petition Date is set forth below, with more detailed descriptions thereafter.

| Facility | Approx. Invested Capital / Outstanding Principal (US $Millions) | Interest Rate | Maturity |
|---|---|---|---|
| Tax Equity | $2,500 | N/A | N/A |
| Permanent Debt | $1,262 | Various | Various |
| Construction Debt | $760 | Various | Various |
| **Total Project Capital** | **$4,522** | | |
| *Fundamental Facility* ($600 million facility) | $599 | Various | December 2026 |
| *Fundamental Interim Financing* ($110 million facility) | $110 | 14.00% | January 2026 |
| *Carlyle Facility* ($280 million facility) | $244 | 10.75% | February 2026 |
| *Carlyle Interim Financing* ($30 million facility) | $30 | 14.00% | February 2026 |
| *Brookfield Facility* ($300 million facility) | $300 | 11.25% | January 2032 |
| *Brookfield Interim Financing* ($68 million facility) | $28 | 14.00% | February 2026 |
| *Pathward Facility* ($80 million facility) | $49 | 8.50% | February 2026 |
| **Total Corporate Debt** | **$1,360** | | |
| Preferred Equity A | $494 | 8.00% | N/A |
| Preferred Equity B | $605 | 12.00% | N/A |
| **Total Preferred Equity** | **$1,099** | | |
| **Total PGR Capital** | **$6,981** | | |
| Fundamental Revolving Loan | $135 | S + 550 | March 2027 |
| WTB Term Loan | $19 | 5.0% | May 2035 |
| **Total Blue Ridge Power Capital** | **$155** | | |
| **Total Funded Capital** | **$7,136** | | |

### G.     Corporate Financing

38.     The Company (through its in-house finance team) sources financing for each stage of a project, including through "corporate-level" debt facilities from the Corporate Lenders.  Each of the corporate-level debt facilities has separate collateral and obligors, as further explained below.

39.     Fundamental Facility.  Debtors FP 2021 Dev Holdco LLC, as borrower (the "***FP Dev Borrower***") is party to that certain Revolving Loan Agreement, dated as of December 10, 2021 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Development Fundamental Loan Agreement***"), with FP Solar Development I LLC, as lender (the "***FP Dev Lender***").  This facility generally funds the Debtors' development activities and projects.  Obligations under the Development Fundamental Loan Agreement are guaranteed by approximately 130 Debtor entities that are direct subsidiaries of FP Dev Borrower, each of which owns a specific project in development.  FP Dev Borrower has also pledged substantially all of its assets as collateral to FP Dev Lender.  As of the Petition Date, the Company has approximately $710 million of loans outstanding under the Development Fundamental Loan Agreement (the "***FP Dev Facility***").

40.     Brookfield Facility.  Debtor BF DEV Holdco, LLC is party to that certain Credit Agreement, dated as of January 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Brookfield Loan Agreement***") with various lenders party thereto (collectively, the "***Brookfield Lenders***").  Obligations under the Brookfield Loan Agreement are secured by (a) first priority equity pledges in and substantially all the assets of certain subsidiaries that are indirect owners of nineteen operating (or near completion) solar projects (the "***Brookfield Operating Projects***"), (b) all assets of three Debtor project companies (Magnolia Solar Development, LLC, Lotus Solar, LLC, and GA Solar 5, LLC) that are in development, (c) to the extent certain conditions are satisfied under the Collateral Documents

(as defined in the Brookfield Loan Agreement), substantially all assets of the Brookfield Operating Projects on a second priority basis, and (d) equity pledges in and substantially all the assets of certain subsidiaries that are indirect owners of certain project companies referenced in paragraph 39 above and paragraph 41 below, in each case on a second priority basis.  As of the Petition Date, the Company has approximately $328 million of loans outstanding under the Brookfield Loan Agreement (the "***Brookfield Facility***").

41.     Carlyle Facility.  Debtor NPA 2023 Holdco, LLC (the "***Carlyle Borrower***") is party to that Note Purchasing Agreement, dated as of October 10, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Carlyle NPA***"), with Carlyle Aurora Infrastructure Credit Partners LP as lender (the "***Carlyle Lender***"). Obligations under the Carlyle NPA are secured by (a) equity pledges in certain subsidiaries that are indirect owners of seven operating (or near completion) solar projects and (b) all assets of two Debtor project companies (Lavender Solar, LLC and Foley Solar, LLC) that are in development. As of the Petition Date, the Company has approximately $274 million of notes outstanding under the Carlyle NPA (the "***Carlyle Facility***").

**H.     Project Financing**

42.     As projects reach the final stages of development and approach the construction phase, the Debtors generally "take out" the project from the FP Dev Facility, which requires a paydown and results in the project company being released from its guarantee and pledge obligations to the FP Dev Lender.  The financing in respect of the project from the FP Dev Facility is then replaced by (i) tax equity investments, (ii) sponsor equity contributions, and (iii) new, limited recourse senior debt (construction period debt and permanent debt).

43.     Limited Recourse Construction Period Debt.  Limited recourse construction period debt is used to finance the construction of a project; it does not include any claims of contractors

or vendors that may be asserted at the project level either informally or pursuant to a mechanic's lien or similar security.  The Company collectively has approximately $760 million of construction period debt outstanding across its current project portfolio, governed under a variety of project-level credit agreements with a variety of project-level lenders.  The construction period debt is generally secured by the assets of the applicable project and the commitments from the tax equity investors to invest in the applicable project.

44.     <u>Recourse Construction Debt (Pathward).</u>     In addition, Debtor PW Revolver Borrower, LLC (the "***Pathward Borrower***") is party to that Loan Agreement, dated as of February 6, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Pathward Loan Agreement***"), with Pathward, National Association (the "***Pathward Lender***") for recourse construction debt with respect to (and secured by) Debtor project company West River Solar, LLC.  Debtor PGR guarantees the obligations on an unsecured basis.  As of the Petition Date, the Company has approximately $49 million outstanding under the Pathward Loan Agreement (the "***Pathward Facility***").

45.     <u>Permanent Debt.</u>  Once a project is built and ready to operate and the tax equity investor funds its commitment to the project, the construction period debt is paid down in part with the proceeds of the tax equity investment and the balance is replaced by permanent debt.  The Company collectively has approximately $1.3 billion of permanent debt outstanding across its current project portfolio, governed under a variety of project-level credit agreements with a variety of project-level lenders.  The permanent debt is generally secured by the assets of the applicable project, but in some cases is only secured by the Company's equity in the project.

46.     <u>Tax Equity.</u>  Tax equity financing involves investors providing capital to a solar project in exchange for the right to be allocated clean energy tax credits associated with the

applicable project. The Company generally only raises tax equity once a project enters the construction stage, after development. The Company has collectively raised approximately $2.5 billion of tax equity across its current project portfolio.

47. <u>Sponsor Equity</u>. In addition to the foregoing debt and equity financing, the Company is also often required to make an equity investment in the project, which the Company funds through either corporate cash or proceeds under the Brookfield Facility or Carlyle Facility.

48. <u>Project Financing Legal Structure</u>. To facilitate such tax equity, construction period debt, and permanent debt, additional legal entities are formed in relation to the applicable project in either (i) an inverted lease structure whereby the project is leased to an entity owned in part by a tax investor and the tax credits are passed through to the lessee under applicable Federal tax rules (the "***Inverted Lease Structure***") or (ii) a partnership flip structure whereby the project is acquired by a partnership between the tax equity investor and a Debtor and the tax credits are allocated to the tax investor under applicable Federal tax rules (the "***Partnership Flip Structure***"). 106 of the Debtors' tax equity investments are Inverted Lease Structures, and 9 of the Debtors' tax equity investments are Partnership Flip Structures.

49. Below is an illustrative example of an Inverted Lease Structure:



50.     Below is an illustrative example of a Partnership Flip Structure:



51.     At a basic level, the purpose of these structures is to allocate the economic benefits between the tax equity investor, senior project lender, and the Debtors in the desired way while giving the tax equity investor protection against a transfer of its project in a manner that would create a risk of tax credit "recapture"—i.e., mandatory repayment of previously-claimed tax credits.  To this end, as equity owners of the projects, tax equity investors generally do not permit senior debt to encumber projects they have invested in unless the debt is subject to a forbearance agreement that prevents tax credit recapture, does not permit transfer of the projects, and reserves the right of the investor to consent to a bankruptcy filing by the entities in which they have invested.

**I.     <u>BRP Financing</u>**

52.     <u>BRP Fundamental Facility.</u>  Debtor BRP is party to that Amended and Restated Loan Agreement, dated as of June 26, 2025 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***BRP Fundamental Loan Agreement***"),

with Solar Construction Lending, LLC (the "***BRP Fundamental Lender***").  The BRP Fundamental Loan Agreement provides BRP with funding in connection with its EPC services.  Obligations under the BRP Fundamental Loan Agreement are generally secured by all assets of the Company's BRP business and are guaranteed by PGR.  As of the Petition Date, the Company has approximately $135 million outstanding under the BRP Fundamental Loan Agreement, which includes a $35 million note issued in June 2025 (after the BRP Fundamental Lender agreed to increase the amount of the previously lent $100 million note).

53.     <u>BRP WTB Facility.</u>  Debtor BRP Construction, Inc. (the "***BRP WTB Borrower***") is party to that Loan Agreement, dated as of May 12, 2021 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***BRP WTB Loan Agreement***"), with West Town Bank & Trust.  The proceeds from the BRP WTB Loan Agreement provided the BRP WTB Borrower with funding in connection with the acquisition of Horne Brothers Construction in 2021.  Obligations under the BRP WTB Loan Agreement are generally secured by substantially all assets of the BRP WTB Borrower.  As of the Petition Date, the Company has approximately $19 million outstanding under the BRP WTB Loan Agreement.

**J.     <u>ACT Financing</u>**

54.     Non-Debtor ACT Power Services, LLC (the "***ACT Borrower***") is party to that Loan Agreement, dated as of November 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***ACT Loan Agreement***"), with West Town Bank & Trust.  The ACT Loan Agreement provided the ACT Borrower with financing used to acquire the O&M business in 2022.  Obligations under the ACT Loan Agreement are generally secured by all assets of the ACT Borrower and its related non-Debtor affiliates.  As of the Petition Date, the Company has approximately $7.1 million outstanding under the ACT Loan Agreement.

### K.     Surety Bonds and General Indemnification Agreements

55.      In the ordinary course of business, the Company maintains surety bonds in favor of certain third parties to ensure the Company's payment or performance of certain obligations in connection with its projects, including, most notably, bonds related to the payment and performance of Blue Ridge's EPC obligations and services.  In addition, to support the issuance of those bonds, certain Blue Ridge Power sureties have indemnification agreements with certain other Debtors that provide, in some cases, security interests and other rights in favor of such surety.

### L.     Equity Ownership

56.      Debtor PGR is directly owned and managed by PGR Holdco, LP (the "***Partnership***"), which in turn is managed by PGR Holdco GP, LLC (the "***General Partner***").  All common equity of the Partnership is owned indirectly by Ben Catt, Chris Dunbar, James Luster, and myself, through PGR Partners, LLC (the "***PGR Member***").  The preferred equity of the Partnership (Class A and Class B) by (i) GC PGR HoldCo Member, LLC and GC PGR HoldCo, LLC (the "***Generate Members***"), each an affiliate of Generate Capital (which purchased its equity through one or both of the Generate Members in 2022, 2023, and 2024) and (ii) Healthcare of Ontario Pension Plan Trust Fund (the "***HOOPP Member***") (which purchased its equity in 2024). The Class A preferred equity is convertible and accrues interest at 8%; the Class B preferred equity is non-convertible and accrues interest at 12%.   Incentive units are held by Pine Gate Management Holdings, LLC, a special purpose vehicle organized to manage incentive units for key management of the Company.

### M.     Governance

57.      The Company's governance ultimately sits with the General Partner, which is managed by a board of managers (the "***Board***").  Prior to August 11, 2025, the Board consisted of five managers: two affiliated with and appointed by the PGR Member, two affiliated with and

appointed by the Generate Members, and one affiliated with and appointed by the HOOPP Member.  However, in connection with the terms of the August Forbearance (as defined and described below), the PGR Member appointed two independent managers to the Board and the Generate Members appointed one independent manager to the Board (collectively, the "***Independent Managers***").  The current Board composition is as follows:

| Manager Name | Position | Designating Member |
|---|---|---|
| Benjamin Catt | Chairman, Manager | PGR Member |
| Ray Shem | Manager | PGR Member |
| Stephen Smith | Manager | HOOPP Member |
| Aaron Bielenberg | Manager | Generate Members |
| Laxman Ramu | Manager | Generate Members |
| Neal Goldman | Independent Manager | PGR Member |
| William Transier | Independent Manager | PGR Member |
| Todd Arden | Independent Manager | Generate Members |

58.     Also in accordance with the August Forbearance, on August 20, 2025, the Board established a committee consisting of the three Independent Managers (the "***Special Committee***"). The Special Committee was delegated the right and authority to explore potential debt or equity or other financing, sale, restructuring, recapitalization, strategic transaction and other similar opportunities and transactions for the Company (each, a "***Strategic Transaction***").  In connection with such delegation, the Board authorized the Special Committee to review, evaluate, analyze, negotiate, and make recommendations to the Board to approve or reject any Strategic Transactions; however, the Board retained the ultimate authority to approve or reject any Strategic Transaction.

59.     On October 14, 2025, the Board separately delegated to the Special Committee sole and exclusive authority to initiate, conduct, and oversee any investigation and review of any potential claims or causes of action or historical transactions entered into by the Company or its subsidiaries that may be addressed, released, or implicated in any Strategic Transaction, and

determine what steps, if any, should be taken in relation thereto, including commencing, prosecuting, negotiating, settling, and/or releasing any such claims in connection with respect thereto (the "**Investigation**").  The Special Committee's Investigation remains ongoing, with the assistance of Latham, Hunton, and A&M.

60.    In connection with the Bridge Financing (as defined and further described below), on October 6, 2025, the Company implemented boards of managers at the following entities (the "**Subsidiary Board Entities**"), each comprised of the three Independent Managers and an additional independent manager appointed by the Company following nominations from each applicable Bridge/DIP Lender (each, a "**Lender Nominee**")—Michael Wartell for the Brookfield silo, Jonathan Zinman for the Carlyle silo, and Patrick Bartels for the Fundamental silo:

| Brookfield (Mr. Wartell) | Carlyle (Mr. Zinman) | Fundamental (Mr. Bartels) |
|---|---|---|
| BF Dev Holdco, LLC | NPA 2023 Holdco, LLC | Cascade Dev Holdco, LLC |
| Cascade NTP Holdco, LLC | NPA PGR Blocker Holdco, LLC | FP 2021 Dev Holdco, LLC |
| PGC Solar Holdings Holdco II, LLC | NPA Polaris DevCo Holdco, LLC | PG Dev Carver Holdco, LLC |
| PGR Blocker Holdco, LLC | NPA Polaris OpCo Holdco, LLC | PGR 2021 Holdco 17, LLC |
| Polaris OpCo Pledgor B, LLC | | PGR Carver Holdco, LLC |
| | | Sirius OpCo Pledgor, LLC |

61.    Board decisions at the Subsidiary Board Entities must be made by majority board approval, provided that any decisions that fall within the following categories (among others) specifically require approval from the applicable Lender Nominee: (a) amending the corporate organizational docs of the Subsidiary Board Entities or their subsidiaries, (b) incurring debt or granting liens at the Subsidiary Board Entities or their subsidiaries, (c) selling, transferring, or disposing of assets from the Subsidiary Board Entities or their subsidiaries outside the ordinary course of business, (d) materially changing the terms of any agreement with Pine Gate O&M, or (e) commencing any bankruptcy, insolvency, or liquidation proceeding.

II.     **KEY EVENTS PRECEDING COMMENCEMENT OF THE CHAPTER 11 CASES**

A.     **Pre-Filing Challenges**

62.     As described above, the need to commence these Chapter 11 Cases was a result of a number of factors, including financial challenges with the Company's EPC business (Blue Ridge Power), unfavorable trends in the renewable energy industry and the broader economy, and inadequate liquidity.

63.     EPC Challenges.  Blue Ridge Power, while created to generate additional revenues by bringing construction services in-house, has faced significant financial challenges and has not performed as expected, leading to substantial financial losses.  Blue Ridge Power's struggles have been a further drain on the Company's overall liquidity, as the Company has had to allocate more funds than projected to support continued delays and cost overruns on the Company's projects constructed by Blue Ridge Power.  As of the Petition Date, Blue Ridge Power has approximately $224 million in accounts payable and liabilities.

64.     Unfavorable Industry and Economic Trends.  Pine Gate's financial difficulties have been further compounded by unfavorable industry trends and broader economic factors.  With respect to the renewable energy industry, legislative and regulatory challenges have significantly slowed solar power development.  In particular, the recently passed "One Big Beautiful Bill" expedited the elimination of the federal investment tax credit for solar projects while also placing extensive new sourcing requirements on projects that utilize the credit during its remaining years.  Additionally, steep tariffs have been imposed on virtually all imported materials necessary to construct utility-scale solar projects.  This includes solar modules, the most significant capital cost associated with constructing a solar project, but extends to other materials as well, including inverters, racking, and structural steel.  In addition, continued inflation has led to increased costs in project development and construction.

65.    These market factors and associated uncertainty for the industry over the medium-term have also substantially cooled interest in investing in or acquiring solar projects, which both (a) reduces the ability for the Company to access liquidity by selling projects and (b) reduces the value of those assets.  As a result, while the Company's costs have been rising, it has been unable to charge more for projects or even successfully access their value by selling them once completed.  In combination, these forces have put extreme pressure on Pine Gate's liquidity and overall financial position.

66.    Insufficient Liquidity.  The financial strain based on the losses at Blue Ridge Power, along with the unfavorable trends in the renewable energy industry and broader economy, put Pine Gate in a precarious liquidity position with no runway outside of these Chapter 11 Cases and the Debtors' proposed DIP financing.  Immediately prior to the Bridge Financing, the Debtors had only approximately $8.5 million of cash on hand.

### B.    Pre-Filing Restructuring Efforts

67.    Despite its many challenges, the Company's Board and management remained committed to finding a value-maximizing solution for the benefit of all stakeholders.  Leading up these Chapter 11 Cases, the Company's management, advisors, Board, and Special Committee met frequently to discuss and explore all available options for the Company to address its financial challenges and maximize value, including out-of-court alternatives and in-court processes.

68.    Prior Alternative Transaction Efforts.  Throughout 2024 and early 2025, the Company (through its Board, management, and then-existing advisors) pursued a range of strategic alternatives in an effort to address the Company's financial circumstances.  For example:

- In the first quarter of 2024, the Company launched a process to sell seven of the Company's assets known as Magenta, Long Bridge, Salt, Richardson, Coxton Lake, Promise, and Pearl.  As part of that process, the Company reached out to approximately 130 potential investors.  That process lasted approximately six months and did not result in any actionable proposal.

- In the second quarter of 2024, the Company engaged a third-party investment banking firm (the "***Prior Banker***") to run an auction process to sell 49% of materially all of the Company's operating assets, excluding those included in the John Hancock joint ventures.  As part of that process, the Prior Banker reached out to approximately 50 potential investors.  That process lasted approximately nine months and did not result in any actionable proposal.

- In the third quarter of 2024, the Company launched a sale process to sell 100% of the Company's asset known as Sunstone.  As part of that process, the Company reached out to approximately 10 potential investors.  That process lasted approximately six months and did not result in any actionable proposal.

- In the fourth quarter of 2024, the Company and the Prior Banker launched an auction process to sell 100% of five of the Company's assets known as Porter, Cane Creek, Moonshot, Sonny, and Bulldog, with additional projects evaluated by potential bidders along the way.  As part of that process, the Company and the Prior Banker reached out to approximately 77 potential investors.  That process lasted approximately 12 months and did not result in any actionable proposal.

- Also in the fourth quarter of 2024, the Company signed a letter of intent with NextEnergy Capital to sell two of the Company's projects known as Landrace and Phobos.  That process lasted approximately six months and did not result in any actionable proposal.

- In the first quarter of 2025, the Company launched a project-level preferred equity capital raise process.  As part of that process, the Company reached out to approximately 22 potential investors.  That process lasted approximately six months and did not result in any actionable proposal.

- In June 2025, the Company, together with its preferred equity shareholder Generate Capital, launched several project specific transaction processes with three potential counterparties for a variety of the Company's assets.  To date, those processes have not resulted in actionable proposals.

69.    <u>Engagement of Restructuring Professionals.</u>  Given the unsuccessful outcome of those processes, the Company retained the following professionals to advise the Company in potential alternative value-maximizing solutions to its financial challenges:

- On March 10, 2025, the Company engaged A&M to provide consulting services to the Company to improve the financial and operating performance of Blue Ridge Power LLC.  The Company expanded the scope of that engagement as of September 3, 2025 to include broader liquidity and restructuring services for the whole Company, including the appointment of Mark Rajcevich as the Company's Chief Restructuring Officer.

- On June 23, 2025, the Company engaged Lazard to explore potential sale transactions. The Company expanded the scope of that engagement as of August 1, 2025 to include broader financing and restructuring services.

- On July 18, 2025 and September 9, 2025, the Company engaged Latham and Hunton (respectively) to provide legal services in connection with the Company's financing and restructuring efforts.

70.     <u>Preferred Investors' Forbearance.</u>  On April 7, 2025, the Company did not make an approximately $9 million preferred coupon payment owed to the Generate Members and the HOOPP Member under the partnership agreement for the Partnership. The partnership agreement provided a four-month cure period that expired on August 7, 2025. Failure to make the coupon payment by such date arguably would have resulted in a mandatory redemption event under the partnership agreement, with other consequences to the Company flowing from that event.

71.     With the assistance of their advisors, the Company negotiated and entered into a forbearance agreement with the Generate Members and the HOOPP Member on August 7, 2025 (the "***August Forbearance***"), providing a two-week forbearance period until August 21, 2025, to allow the Company time to continue progress towards a longer-term financial solution. The Generate Members and the HOOPP Member granted various extensions of the August Forbearance, ultimately extending the August Forbearance to October 17, 2025. On October 17, 2025, the Debtors entered into a second forbearance agreement with the Generate Members and the HOOPP Member, which (among other things) extended the forbearance period through the earlier of (among other things) November 30, 2025 and the bar date for filing proofs of claim in the Chapter 11 Cases.

72.     <u>Blue Ridge Power Winddown.</u>  In September 2025, the Company began an orderly winddown of Blue Ridge Power in light of its struggles. At its projects for third-party owners, Blue Ridge Power began to focus primarily on "health, safety, security, and environment" (HSSE)

services while transitioning those projects back to the owners or other third parties to complete the outstanding construction. Blue Ridge Power also implemented a reduction in force on October 17, 2025, reducing its workforce from over 500 employees to 51 employees. Blue Ridge Power is continuing to progress the operational and administrative aspects of the winddown, including office closures and data retention plans.

73. <u>Continued Sale and Financing Efforts.</u> At the time of Lazard's engagement in late June 2025, there was significant market and political-related uncertainty around the renewables industry, particularly given the then-expected, but not yet passed, "One Big Beautiful Bill" (which was ultimately signed on July 4, 2025). Three days after passage of the "One Big Beautiful Bill," that uncertainly was exacerbated by the issuance of the Executive Order directing the Secretary of Treasury to revise, within 45 days, certain guidance regarding the "Beginning of Construction" that has historically been used by the solar industry to determine tax credit eligibility.

74. Against this backdrop of uncertainty, the Company engaged Lazard to run a process to sell all or a majority of the equity in the Company (excluding the John Hancock joint venture and BRP). As Lazard prepared for a broader process, Lazard prescreened the investment opportunity with ten potential buyers in early July 2025. Though several parties cited the Company's capital structure complexity and total quantum of preferred equity, equity bridge loans, and overall leverage as reasons to not participate in a transaction, eight parties engaged in robust and exhaustive diligence to assess an acquisition of the Company and a portion have continued to do so through the commencement of a broader marketing launch (described below) and these Chapter 11 Cases.

75. In late August 2025, the Company and its advisors began engaging with the Corporate Lenders as well as third parties with respect to potential financing. As part of the third-

party financing process, Lazard reached out to over 30 parties, approximately 20 of which signed NDAs for the purpose of engaging in further diligence.

76.     In mid-September 2025, the Company and its advisors launched an expanded sale process for any and all assets of the Company (excluding the John Hancock joint venture and Blue Ridge Power).  As part of this process, Lazard has interacted with over 235 potential buyers, of which approximately 150 have executed NDAs and received access to confidential information.  As of October 31, 2025, the Company had received preliminary indications of interest from approximately 20 parties and has continued to advance the marketing process through the commencement of the Chapter 11 cases.

77.     The Company eventually received two third-party postpetition financing proposals, neither of which were actionable.  The financing amount in both proposals was significantly less than the Company's funding need.  Despite the Company's and their advisors' best efforts to encourage the third parties to increase the quantum of their proposed financing amounts, they were not willing to do so.  Ultimately, one of the potential lenders withdrew its proposal due to its inability to meet the Company's requested funding needs.  In addition to the remaining proposal being materially less than the Company's funding need, it also required liens that were senior to the Corporate Lenders on substantially *all* assets (including priming liens on substantially all of the development assets) and contained conditions precedent to delayed draws that created material risks to the Company's ability to access the majority of the proposed financing commitment.

78.     Among the Debtors' efforts to raise additional capital, they evaluated and negotiated several term sheets with the Generate Members, structured around potential financing, sale, and recapitalization transactions, however the parties determined that such transactions were not ultimately actionable.

32

79.     Bridge Financing.  Simultaneously with their outreach to third parties, the Debtors engaged in discussions with Fundamental, Brookfield, and Carlyle (the Debtors' three Corporate Lenders) in an effort to obtain bridge financing that would provide the Debtors with additional liquidity and more runway to prepare for these Chapter 11 Cases in a more orderly, value-maximizing manner.  These discussions began in earnest in early September 2025 and—after a month of hard-fought, arm's-length negotiations—ultimately resulted in the three lenders providing $412 million of total financing commitments to the Company, consisting of approximately $208 million in out-of-court financing (the "***Bridge Financing***") and approximately $204 million in additional DIP financing commitments (plus amounts not lent in the Bridge Financing) (the "***DIP Commitments***").  The lenders also each agreed to serve as stalking horse bidder for the purchase (through credit bids) of their respective projects' collateral.

80.     The Bridge Financing closed on October 6, 2025.  In connection with the Bridge Financing and DIP Commitments, the three lenders received guarantees and liens from (a) previously unencumbered entities that sat above the Bridge/DIP Lenders' borrowers in the Company's corporate structure and (b) previously unencumbered entities that sat between the Bridge/DIP Lenders' borrowers and the solar power projects.

81.     The Company's Board, its independent Special Committee, its management, and its advisors unanimously believed that the Bridge/DIP Lenders' proposal presented the best and most value-maximizing path available to the Company under the circumstances and justified the granting of new liens and guarantees.  Without the financing under Bridge/DIP Lenders' proposal, the Company would have had to either file chapter 7 or file an insufficiently funded chapter 11 process with the attendant risk of conversion to chapter 7.

82.     Among other things, the proposal provided the Company with sufficient and committed liquidity to preserve asset value as it pursues a sale process through an orderly chapter 11 case.  The Bridge Financing permitted the Company (i) to continue chapter 11 preparations (including the negotiation and documentation of DIP financing documents and stalking horse purchase agreements) and (ii) to solicit certain related consents from its tax equity providers, project lenders, and PPA and interconnection agreement counterparties, to minimize any potential disruptions that may result at Non-Debtor Affiliates from the Chapter 11 Cases.

## III.     PATH FORWARD IN CHAPTER 11 CASES

83.     The Debtors' ultimate goal in these Chapter 11 Cases is to facilitate a strategic and robust Court-supervised sales process for substantially all of the Debtors' assets and business operations, to maximize value for the benefit of all stakeholders while preserving jobs and transitioning business operations.

84.     In connection with that goal, the Debtors have filed a motion asking the Court to approve (i) bid procedures that contemplate a bid deadline of December 15, 2025 and closings by December 31, 2025, (ii) the designation of the Bridge/DIP Lenders as the stalking horse buyers for their respective solar projects and (in the case of Fundamental) the Debtors' independent power producer platform, and (iii) procedures by which the Company can designate a stalking horse buyer for the sale of ACT, should one materialize.  Following such sales, the Debtors intend to seek confirmation of a chapter 11 plan.

85.     In the near term, however, the Debtors' immediate objective is to preserve the value of the Company during the early stage of these Chapter 11 Cases so that they can continue their sales process and pursuit of value-maximizing transactions.  The Debtors believe that the breathing spell provided by the Chapter 11 Cases and the liquidity runway provided by the DIP financing best position the Debtors to maximize the value of their estates, preserve as many jobs as possible,

transition business operations in a value-maximizing manner, and ultimately lead to a successful resolution of these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   November 6, 2025
       Asheville, North Carolina

                                    */s/ Ray Shem*
                                      Name: Ray Shem
                                      Title:   President and Chief Financial Officer

## Exhibit A

### Simplified Organizational Chart

