## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| PINE GATE RENEWABLES, LLC, *et al.*, | : | Case No. 25-90669 (CML) |
|  | : |  |
| Debtors.[1] | : | (Joint Administration Requested) |
|  | : |  |

------------------------------------------------------------ x

**EMERGENCY MOTION OF DEBTORS FOR
ENTRY OF ORDERS (I) (A) APPROVING BIDDING PROCEDURES
FOR SALE OF DEBTORS' ASSETS, (B) ESTABLISHING PROCEDURES
FOR DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH,
(C) SCHEDULING DATES FOR AN AUCTION AND A HEARING TO CONSIDER
APPROVAL OF ANY RESULTING SALE, (D) APPROVING FORM AND MANNER
OF NOTICES RELATED THERETO, AND (E) GRANTING RELATED RELIEF; AND
(II) (A) APPROVING AND AUTHORIZING SALE OF DEBTORS' ASSETS FREE AND CLEAR
OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS, AND ENCUMBRANCES,
(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on November 10, 2025.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on November 10, 2025 at 1:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.

Pine Gate Renewables, LLC and its debtor affiliates in the above-captioned cases, as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully state as follows in support of this motion (this "***Motion***"):

## PRELIMINARY STATEMENT

1.    As described below and in the First Day Declaration (as defined below), the Debtors, in consultation with their advisors, have determined that the value of their estates can be maximized through the sales of their assets (the "***Assets***").  This Motion seeks approval of a process by which the Debtors can market and sell all, substantially all, or any portion of the Assets.  For the reasons set forth herein, the proposed procedures, among other things: (i) comply with applicable law, (ii) provide good and sufficient notice to all parties in interest, and (iii) facilitate the Debtors' ability to accept the highest (or otherwise best) offers for the Assets.

**RELIEF REQUESTED**

2.      By this Motion, the Debtors seek entry of:

i.      an order, substantially in the form attached hereto (the "***Bidding Procedures Order***"):

    (a)      approving the proposed bidding procedures attached to the Bidding Procedures Order as __Annex 1__ (the "***Bidding Procedures***"), by which the Debtors will solicit and select the highest or otherwise best offer for one or more sales (each a "***Transaction***") of the Assets;

    (b)      approving the designation of BII BID Solar II Aggregator, LP (collectively with any affiliates thereof, "***Brookfield***"), Summit Infrastructure LLC (collectively with any affiliates thereof, "***Carlyle***"), FP Acquisition Holdings LLC (collectively with any affiliates thereof, "***Fundamental***") (collectively, the "***Initial Stalking Horse Bidders***") as Stalking Horse Bidders with respect to the Brookfield Assets, Carlyle Assets, and Fundamental Assets (each as defined below), respectively, as well as procedures governing the Debtors' selection of one or more stalking horse bidders for other Assets (each, including the Initial Stalking Horse Bidders, a "***Stalking Horse Bidder***"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder(s) or other non-Stalking Horse Bidder(s), if necessary in the exercise of the Debtors' business judgment;

    (c)      authorizing (i) in connection with the Brookfield APA (as defined below), the reimbursement of Brookfield's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) incurred in connection with the negotiation, execution, performance, and enforcement of the Brookfield APA, pursuant to the terms of the Brookfield APA (the "***Brookfield Expense Reimbursement***"), (ii) in connection with the Carlye APA (as defined below), the reimbursement of Carlye's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) incurred in connection with the negotiation, execution, performance, and enforcement of the Carlye APA,  pursuant to the terms of the Carlye APA (the "***Carlye Expense Reimbursement***"), and (iii) in connection with the Fundamental APA (as defined below), the reimbursement of Fundamental's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) incurred in connection with the negotiation, execution, performance, and enforcement of the Fundamental APA, pursuant to the terms of the Fundamental APA (the "***Fundamental Expense Reimbursement***" and, together with the Brookfield Expense Reimbursement and the Carlyle Expense Reimbursement, the "***Expense Reimbursements***"), in each case, capped at $3 million, payable solely from proceeds of an Alternative Transaction (as defined in the Brookfield APA, the Carlyle APA, and the Fundamental

APA, respectively), with such Expense Reimbursements to be reduced pro rata in the event of an Alternative Transaction for a portion of the assets subject to the Brookfield APA, the Carlyle APA, and the Fundamental APA, as applicable, provided that each Expense Reimbursement may be waived by the applicable Initial Stalking Horse Bidder in its sole discretion;

(d)     approving procedures for the assumption and assignment of executory contracts and unexpired leases, and approving the form and manner of notice of proposed Cure Costs (as defined below) (the "***Assumption and Assignment Procedures***");

(e)     establishing dates for (x) an auction (the "***Auction***"), if any, in the event that the Debtors receive one or more timely and acceptable, in the exercise of the Debtors' business judgment, Qualified Bids (as defined below) with respect to the same Assets and (y) a final hearing (the "***Sale Hearing***") to approve one or more Transactions;

(f)     approving the form and manner of notice (x) of any Auction and Sale Hearing (such notice, the "***Sale Notice***"), (y) Assumption and Assignment Procedures (such notice, the "***Assumption Notice***"), and (z) the identification of the Successful Bidder(s) (as defined below) (such notice, the "***Post-Auction Notice***" and together with the Sale Notice and Assumption Notice, the "***Sale Process Notices***"); and

(g)     granting related relief; and

ii.     following the Sale Hearing, entry of one or more sale orders (collectively, the "***Sale Order(s)***"):[2]

(a)     approving and authorizing, with respect to any Transaction, the sale of the applicable Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and other interests thereon (collectively, the "***Encumbrances***"), subject to the terms of the applicable purchase agreement;

(b)     authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(c)     granting related relief.

3.      The Bidding Procedures revolve around certain key dates which are intended to

(i) facilitate one or more value-maximizing Transactions and (ii) comply with the milestones

---

[2]     The proposed form of Sale Order(s) will be filed with the Court prior to the Sale Hearing.

contained in the DIP Documents (as defined below).  These key dates, which are subject to modification as further provided for in the Bidding Procedures, are:

i. **Indication of Interest Deadline**:  November 14, 2025, at 11:59 p.m. (prevailing Central Time) (the "*IOI Deadline*"), as the deadline by which all non-binding Indication of Interests (as defined below) must be submitted to the Debtors by interested parties;

ii. **Assumption Notice Deadline**: November 28, 2025, at 11:59 p.m. (prevailing Central Time) (the "*Assumption Notice Deadline*") as the deadline to file with the Court (as defined below), post on the Case Website (as defined below), and serve on each of the applicable Counterparties (as defined below) an Assumption Notice;

iii. **Stalking Horse Designation Deadline for Other Assets**: November 28, 2025, at 11:59 p.m. (prevailing Central Time) as the deadline for the Debtors to file any Bid Protections Notice(s) (as defined below) with respect to the designation of a Stalking Horse Bidder for Other Assets;

iv. **Sale Objection Deadline**: December 1, 2025, at 5:00 p.m. (prevailing Central Time) as the deadline to object to this Motion and the sale(s) of the Assets (the "*Sale Objection Deadline*"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidders), which objections must be filed by the Post-Auction Objection Deadline (as defined below);

v. **Bid Deadline**: December 15, 2025, at 5:00 p.m. (prevailing Central Time), as the deadline by which all binding Bids (as defined below) must be submitted to the Debtors by interested parties (the "*Bid Deadline*");

vi. **Auction**: December 17, 2025, at 10:00 a.m. (prevailing Eastern Time), as the date and time of the Auction, if the Debtors, in their business judgment and after consultation with the Consultation Parties (as defined in the Bidding Procedures), elect to conduct an auction, which will be held at the offices of proposed co-counsel for the Debtors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020 or at such other place and time as the Debtors shall notify all parties who have submitted Qualified Bids, the Consultation Parties, and all other parties entitled to attend the Auction;

vii. **Close of Auction:**  The auction shall conclude by 5:00 p.m. (prevailing Central Time) on the date that is one day prior to the Sale Hearing (as defined below) (the "*Auction Close Deadline*").

viii. **Post-Auction Notice Deadline**: 24 hours from the conclusion of any Auction (the "*Post-Auction Notice Deadline*"), as the deadline to file with the Court, post

on the Case Website, and serve on each of the applicable Counterparties (as defined below) a Post-Auction Notice;

ix.   **Post-Auction Objection Deadline**: 48 hours from the filing of any Post-Auction Notice, as the deadline for parties in interest to object to the identity of the Successful Bidder (other than any Stalking Horse Bidder) and to the proposed assumption and assignment of any Selected Designated Contracts (as defined below) on grounds of inadequate assurance of future performance (the "***Post-Auction Objection Deadline***");

x.    **Supplemental Assumption Notice Deadline**: December 19, 2025, or the day that is one business day prior to the Sale Hearing by 11:59 p.m. (prevailing Central Time) (the "***Supplemental Assumption Notice Deadline***") as the deadline to file with the Court, post on the Case Website, and serve on the applicable Counterparties (as defined below) a Supplemental Assumption Notice (as defined below);

xi.   **Sale Hearing**: Subject to the Court's availability, December 22, 2025, at a time to be announced, before the Honorable Christopher M. Lopez, United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"), 515 Rusk Street, Courtroom 402, Houston, TX 77002;[3] and

xii.  **Final Assumption Notice Deadline**: 14 days prior to the date of the hearing to be held before the Court to consider confirmation of the Debtors' chapter 11 plan (the "***Confirmation Hearing***") by 11:59 p.m. (prevailing Central Time) (the "***Final Assumption Notice Deadline***") as the deadline to file with the Court, post on the Case Website, and serve on the applicable Counterparties a Final Assumption Notice (as defined below).

## JURISDICTION AND VENUE

4.     The Court has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.   Venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[3]   The proposed date of December 22, 2025 is subject to this Court's availability.  To the extent that the designation of an alternative date becomes necessary, the Debtors will reflect such alternative date in a revised version of each of the Bidding Procedures Order and the Sale Process Notices (as applicable).  The Debtors will file such revised documents in the Chapter 11 Cases and serve them in accordance with the Bidding Procedures Order.

5.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## **BACKGROUND**

6.     On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the above-captioned cases (the "***Chapter 11 Cases***").

7.     Contemporaneously with the filing of this Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases, for procedural purposes, pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

8.     The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Ray Shem, President and Interim Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First-Day Relief* [Docket No. 19] (the "***First Day Declaration***"), incorporated herein by reference.

*9.*     Additional evidentiary support for the relief requested herein is set forth in the (a) *Declaration of Tyler Cowan in Support of Debtors' Motions to Obtain (A) Postpetition Financing and (B) Approval of Bidding Procedures for Sale of Debtors' Assets* (the "***Lazard***

***Declaration***") and (b) *Declaration of Mark Rajcevich in Support of Debtors' Motion to Obtain (A) Postpetition Financing and (B) Approval of Bidding Procedures for Sale of Debtors' Assets and (II) Debtors' Other First Day Motions* (the "***A&M Declaration***"), each of which will be filed prior to any hearing on the Motion and incorporated herein by reference.

## INTRODUCTION

10.     The Debtors filed the Chapter 11 Cases with the support of their "corporate-level" secured lenders (Brookfield, Carlyle, and Fundamental), including with commitments for approximately $250 million, in the aggregate, in new-money debtor-in-possession financing from such lenders and permission to use cash collateral to continue running a sale process for any or all of the Debtors' Assets, which primarily include:

- solar power projects (primarily projects either under construction or operating) that indirectly serve as collateral for Brookfield's prepetition and DIP facilities (collectively with the other Purchased Assets defined in the Brookfield APA**,** the "***Brookfield Assets***");

- solar power projects (primarily projects either under construction or operating) that indirectly serve as collateral for Carlyle's prepetition and DIP facilities (collectively, with the other Purchased Assets defined in the Carlyle APA, the "***Carlyle Assets***");

- solar power projects (primarily projects in development) that indirectly serve as collateral for Fundamental's prepetition and DIP facilities (collectively, with the other Purchased Assets defined in the Fundamental APA the "***Fundamental Assets***"); and

- the Debtors' operations & maintenance (O&M) business, operated through wholly-owned non-Debtor subsidiary ACT Power Services Holding Company Guarantor, LLC and its subsidiaries (collectively, "***ACT***").

11.     Brookfield, Carlyle, and Fundamental have each agreed to serve as a stalking horse bidder for the Brookfield Assets, Carlyle Assets, and Fundamental Assets, respectively. Specifically, each of Brookfield, Carlyle, and Fundamental have agreed to submit credit bids of

their respective debt obligations for the Brookfield Assets, Carlyle Assets, and Fundamental Assets, respectively (collectively, the "***Initial Stalking Horse Bids***").

12.     The Debtors' proposed Bidding Procedures contemplate, among other things, a bid deadline of December 15, 2025, and closing of any sales by December 31, 2025.  The Debtors believe such timeline and the proposed Bidding Procedures are fair and reasonable under the circumstances for purposes of maximizing estate value due to, among other things, the Debtors' limited liquidity and extensive prepetition marketing efforts, which included outreach to hundreds of parties.  The Debtors respectfully request that the Court grant the relief requested herein.

## THE PROPOSED BIDDING,
## ASSUMPTION AND ASSIGNMENT, AND SALE PROCEDURES

### I.     CURRENT AND POTENTIAL STALKING HORSE BIDDERS

#### A.     Initial Stalking Horse Bidders

13.     The pertinent terms of the proposed Stalking Horse Bids submitted by Brookfield, Carlyle, and Fundamental are summarized in the following tables:[4]

| Provision | Summary Description |
|---|---|
| **Brookfield Stalking Horse Bid**<br>**(see Exhibit A hereto for the APA, the "*Brookfield APA*")** | |
| Parties | <u>Sellers</u>: PGR 2022 Holdco 8, LLC; PGR Blocker Holdco, LLC; PGR 2021 Holdco 9, LLC; PGR 2021 Holdco 13, LLC; PGR 2022 Holdco 2, LLC; PGC Solar Holdings Holdco II, LLC; BF Dev Holdco, LLC; Cascade NTP Holdco, LLC; PGR 2024 Sponsor Holdco, LLC (the "Sellers")<br><br><u>Buyer</u>: BII BID Solar II Aggregator, LP |
| **Purchase Price** | A credit bid of all DIP Obligations and all Prepetition Obligations (estimated to total approximately $500-$587 million[5] in the aggregate based on a |

---

[4]     These summaries are provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between these summaries and the Initial Stalking Horse APAs, the applicable Initial Stalking Horse APA shall govern in all respects.  Capitalized terms used but not otherwise defined in these summaries shall have the meanings set forth in the applicable Initial Stalking Horse APAs or the First Day Declaration, as applicable.

[5]     Estimated amount of $587 million assumes that $87 million of forecasted project spend is funded from Brookfield's DIP Commitments prior to the consummation of the sale transaction.  This range, based on a number

| Provision | Summary Description |
|---|---|
| | December 31, 2025 closing, subject to change), plus the assumption of certain liabilities. |
| **Acquired Assets** | Generally, and subject to the terms of the Brookfield APA including customary exclusions, the direct and indirect subsidiaries of the Sellers (the "Purchased Entities"). |
| **Assumption of Contracts; Cure Costs** | In the event the sale(s) proceed as equity sales, then Sellers to pay cure costs. In the event the sale(s) proceed as asset sales, then Buyer to pay cure costs, except for any contracts of Pine Gate Renewables, LLC needed to run the business of the Purchased Entities.  No contracts have currently been designated for assignment. |
| **Bid Protections** | In recognition of Brookfield's expenditure of time, energy, resources, and value to the sale process, the Debtors seek authority to offer Brookfield the Expense Reimbursement capped at $3 million, payable solely from proceeds of an Alternative Transaction (as defined in the Brookfield APA), with such Expense Reimbursement to be reduced pro rata in the event of an Alternative Transaction for a portion of the assets subject to the Brookfield APA, unless otherwise waived by Brookfield in its sole discretion. |
| **Carlyle Stalking Horse Bid**<br>**(see Exhibit B hereto for the APA, the "*Carlyle APA*")** | |
| **Parties** | <u>Sellers</u>: Pine Gate Development, LLC or NPA 2023 Holdco, LLC; NPA Polaris DevCo Pledgor, LLC or NPA Polaris DevCo Holdco, LLC; NPA PGR Blocker Holdco, LLC or PGR 2021 Holdco 11, LLC; NPA PGR Blocker Holdco, LLC or PGR 2021 Holdco 12, LLC; NPA PGR Blocker Holdco, LLC or PGR 2021 Holdco 15, LLC; NPA PGR Blocker Holdco, LLC or PGR 2021 Holdco 19, LLC; Polaris OpCo Pledgor A, LLC<br><br><u>Buyer</u>: Summit Infrastructure LLC |
| **Purchase Price** | A credit bid of $320 million of DIP Obligations and Prepetition Obligations, plus the assumption of certain liabilities. |
| **Acquired Assets** | Generally, and subject to the terms of the Carlyle APA and customary exclusions, the direct and indirect subsidiaries of the Sellers (the "Purchased Entities"). |
| **Assumption of Contracts; Cure Costs** | Sellers to pay cure costs.  No contracts have currently been designated for assignment. |
| **Bid Protections** | In recognition of Carlyle's expenditure of time, energy, resources, and value to the sale process, the Debtors seek authority to offer Carlyle the Expense Reimbursement capped at $3 million, payable solely from proceeds of an Alternative Transaction (as defined in the Carlyle APA), with such Expense Reimbursement to be reduced pro rata in the event of an Alternative |

of assumptions, represents the current best estimate of projected project spend for the period through sale transaction consummation.  The actual project spend, and the total credit bid amount, may differ.

| Provision | Summary Description |
|---|---|
| | Transaction for a portion of the assets subject to the Carlyle APA, unless otherwise waived by Carlyle in its sole discretion. |
| **Transaction Structuring** | To mitigate potential negative tax consequences at PGR when Buyer acquires the entities in between Pine Gate Renewables, LLC ("PGR") and Polaris OpCo Holdco A, LLC (the "Partnership"), causing a disposition of PGR's interest, Buyer's indirect acquisition of the interest in the Partnership will be structured such that Buyer receives a share of the Partnership interest held by PGR entitling it to 33% of the general profits flowing from that partnership interest and 95% of the cash. PGR will continue to hold the remaining share of the partnership interest. |
| **Fundamental Stalking Horse Bid**<br>**(see Exhibit C hereto for the APA, the "*Fundamental APA*" and, together with the Brookfield APA and the Carlyle APA, the "*Initial Stalking Horse APAs*")** | |
| **Parties** | <u>Sellers</u>: (i) FP 2021 Dev Holdco, LLC, PGR 2024 Sponsor Holdco, LLC (f/k/a PGR Blocker, LLC), Cascade Dev Holdco, LLC, PGR 2021 Holdco 17, LLC, and PGR 2020 Lessor 7, LLC (the "Equity Sellers") and (ii) Pine Gate Renewables, LLC and Pine Gate Development, LLC (the "Asset Sellers")<br><br><u>Buyer</u>: FR Acquisition Holdings LLC |
| **Purchase Price** | A credit bid of $624 million of DIP Obligations and costs, fees expenses, premiums and other amounts under the Fundamental DIP Credit Agreement, subject to a reduction of up to $5 million based on the removal of any purchased assets, plus the assumption of certain liabilities, less the purchase price by a third-party purchaser that is not the Buyer for any Purchased Assets or Purchased Equity Interests in accordance with the Bidding Procedures Order. |
| **Acquired Assets** | Generally, and subject to the terms of the Fundamental APA including customary exclusions, (i) the direct and indirect subsidiaries of the Equity Sellers (the "Purchased Entities") and (ii) substantially all assets of the Asset Sellers to the extent relating to the Purchased Entities and their business. |
| **Assumption of Contracts; Cure Costs** | Buyer agrees to pay the Cure Costs of any Purchased Contracts. Buyer has not yet designated any Purchased Contracts. |
| **Bid Protections** | In recognition of Fundamental's expenditure of time, energy, resources, and value to the sale process, the Debtors seek authority to offer Fundamental the Expense Reimbursement capped at $3 million, payable solely from proceeds of an Alternative Transaction (as defined in the Fundamental APA), with such Expense Reimbursement to be reduced pro rata in the event of an Alternative Transaction for a portion of the assets subject to the Fundamental APA, unless otherwise waived by Fundamental in its sole discretion. |
| **Employee / Consulting Services** | Fundamental has advised the Debtors, as well as their CEO and CFO, that Fundamental will require significant management assistance both pre- and post-closing from the CEO, CFO, and potentially other employees of the Debtors (including other members of the Debtors' management). |

| Provision | Summary Description |
|---|---|
| | As a result of Fundamental's need for assistance post-closing from the Debtor's CEO and CFO, the Debtors' CEO and CFO (through their joint counsel separate from the Debtors' counsel) are negotiating a term sheet for transitional consulting services to be provided by them to Fundamental, at Fundamental's option, for a period of six months after closing, subject to any agreed extensions and at compensation to be mutually agreed upon by Fundamental and the Debtors' CEO and CFO.  The option to obtain these transitional services will be made available to any winning bidder.  The Debtors believe that having these transitional services available to any winning bidder will help maximize value. |
| | In connection with and consideration for such services and in order to help avoid distractions from a strike suit, as set forth in more detail in Section 2.01(b)(xiv) of the Fundamental APA, Fundamental would purchase and release any claims of the Debtors against the Debtors' CEO, CFO, and the Debtors' other employees (including other members of management); provided, however, that such sale is subject to the outcome of the ongoing investigation by the Special Committee of the Board of Directors of Debtor PGR Holdco GP, LLC and the Special Committee's evaluation and determination thereof, and the Debtors may, subject to the Special Committee's findings, withdraw the sale of any or all of such claims. |

**B.      Procedures for Designating Other Stalking Horse Bidders and/or Providing Bid Protections to Such Bidders and Non-Stalking Horse Bidders**

14.      In accordance with the Bidding Procedures and the following procedures, the Debtors request the ability to, after consultation with the Consultation Parties  (a) enter into one or more other Stalking Horse Agreements for other Assets that are not currently part of any Stalking Horse Bids (collectively, the "***Other Assets***"), subject to higher or otherwise better offers at the Auction, with one or more Bidders that submit a Qualified Bid acceptable to the Debtors to establish a minimum Qualified Bid at the Auction and/or (b) reimburse the expenses of non-Stalking Horse Bidders(s) incurred in connection with a bid, to the extent the Debtors determine, in their reasonable business judgment and after consultation with the Consultation Parties, that doing so is likely to encourage bidding.

15.      In the event that the Debtors select one or more other parties to serve as a Stalking Horse Bidder for Other Assets and/or elect to provide Bid Protections to a Stalking Horse Bidder for Other Assets or a non-Stalking Horse Bidder, the Debtors shall file a notice of such designation

(each, a "***Bid Protections Notice***") with the Court which will: (i) identify any such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s) (as applicable), (ii) identify the Bid Protections, if any, the Debtors propose to offer such Stalking Horse Bidder or non-Stalking Horse Bidder(s), and (iii) include, as an exhibit thereto, the proposed Stalking Horse Agreement(s) or Purchase Agreement(s) with such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s).  Any Bid Protections Notice with respect to the selection of a Stalking Horse Bidder for Other Assets will be filed no later than November 28, 2025, by 11:59 p.m. (prevailing Central Time) (the "***Stalking Horse Designation Deadline***").

16.     The Debtors will provide each Bid Protections Notice to (i) all parties who are required, or have requested, to receive notice pursuant to Bankruptcy Rule 2002 (the listing of such parties as maintained by the Debtors and Omni Agent Solutions, Inc., the "***Rule 2002 List***"), (ii) counsel for any statutory committee appointed in the Chapter 11 Cases (any such committee, a "***Committee***"), (iii) counsel to the DIP Lenders, (iv) all parties then known to have expressed an interest in the Assets as part of the Debtors' prepetition and postpetition marketing process, and (v) all parties holding liens on the Assets; such notice will provide the aforementioned parties with not less than three business days' notice of and an opportunity to object to the designation of such Stalking Horse Bidder (as applicable) and the Bid Protections being provided to such Stalking Horse Bidder or non-Stalking Horse Bidder (as applicable).

17.     Parties in interest shall have until 5:00 p.m. (prevailing Central Time) on the day that is three business days after the filing of the applicable Bid Protections Notice (the "***Bid Protections Objection Deadline***") to object to the Debtors' designation of such Stalking Horse Bidder(s) for Other Assets and the Bid Protections, if any, offered to such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s), as applicable.  To the extent any objection to a Bid Protections

Notice is timely filed, the Debtors request that the Court hold a hearing (subject to its availability) within five days after the Bid Protections Objection Deadline at which hearing the Court will determine whether the Debtors are permitted to designate the Stalking Horse Bidder(s) identified in the Bid Protections Notice for which a timely objection was filed and/or whether the Debtors are permitted to offer the Bid Protections, if any, proposed for such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s) in the applicable Bid Protections Notice.

18.     Absent any timely objection to a Bid Protections Notice, the Debtors request authority to submit a proposed order to the Court under a certificate of no objection approving the selection of such Stalking Horse Bidder(s) for Other Assets and any Bid Protection(s) offered to such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s), as applicable.  If a timely objection is filed to any Bid Protections Notice(s), then the Debtors' selection of the Stalking Horse Bidder(s) subject to such objection and any Bid Protection(s) offered to such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s) shall not be approved unless and until the Court enters an order approving the Debtors' designation of the Stalking Horse Bidder(s) and/or any Bid Protection(s), if any, offered to such Stalking Horse Bidder(s) or non-Stalking Horse Bidder(s), all as set forth in the applicable Bid Protections Notice(s) (any such order, a "***Bid Protections Order***").

## II.     THE DEBTORS' PROPOSED SALE TIMELINE

19.     The Debtors are requesting a deadline of November 14, 2025 for Indications of Interest (as defined in the Bidding Procedures) and a deadline of December 15, 2025 for Qualified Bids. The Debtors' proposed timeline is fair, reasonable, and appropriate given the Debtors' extensive prepetition marketing and limited financial runway.

20.     As set forth in the Lazard Declaration, the Debtors' prepetition marketing efforts included a targeted pre-launch outreach beginning in July 2025 and an expanded broad outreach in mid-September 2025 to potential strategic and financial buyers that the Debtors and their

advisors believed might be interested in potentially purchasing the Debtors' assets. During this process, Lazard has interacted with over 235 parties. In connection with this solicitation, Lazard, with assistance from the Debtors and the Debtors' other advisors, prepared, among other things, a confidential information memorandum, a detailed financial model and an electronic data room for prospective bidders that executed confidentiality agreements. In total, approximately 150 parties have executed NDAs and received access to confidential information. As of the Petition Date, the Debtors have received preliminary indications of interest from over 20 parties, and the Debtors have continued to advance the marketing process through the commencement of the Chapter 11 Cases.

21.     As set forth in the A&M Declaration, the Debtors filed the Chapter 11 Cases with limited liquidity. Even with the benefit of DIP financing and cash collateral, it would not be prudent or in the best interests of the Debtors and their estates to run a lengthy sale process that would not be completed until the Debtors' liquidity is exhausted or nearly fully exhausted, which would be the case in the event of any material delay or extension to the proposed timeline. Pursuing such a path does not protect against contingency scenarios and exposes the Debtors to the potential adverse consequence of being unable to satisfy their postpetition obligations or running out of liquidity before the sales can be consummated and a chapter 11 plan confirmed and closed. Extending the sales process further, without additional committed capital contributions, would jeopardize the Debtors' ability to preserve and maximize the value of their estates, and could result in insufficient capital to fund operations, including payroll for the Debtors' workforce.

## III.     THE BIDDING PROCEDURES

22.     The Debtors desire to receive the greatest value for the Assets. Although the Debtors believe the Initial Stalking Horse APAs are fair and reasonable, the Debtors nevertheless intend to offer the Assets for sale, consistent with the Bidding Procedures, pursuant to a value-

maximizing section 363 sale process in the hope that higher or otherwise better bids are generated for the Assets. The Bidding Procedures are intended (a) to promote a fair, robust, and competitive sale process consistent with the timeline of the Chapter 11 Cases and (b) to either confirm that the Initial Stalking Horse Bids are, indeed, the highest or otherwise best offers or otherwise identify one or more alternative bids that are higher or otherwise better.

23.     The Debtors believe the Bidding Procedures summarized below are fair and appropriate and will enable the Debtors to maximize value while providing parties in interest with a level playing field with respect to negotiations for the purchase of the Assets. Because the Bidding Procedures are attached as **__Annex 1__** to the Bidding Procedures Order, they are not restated in their entirety herein. The Bidding Procedures provide, among other things:[6]

i.      No later than the IOI Deadline, in order to be eligible to submit a Bid, potential buyers must first submit a non-binding indication of interest (an "***Indication of Interest***"). The Indication of Interest must include, among other things: (i) a letter outlining the potential buyer's offer and form(s) of considerations, (ii) the identification of the ultimate beneficial owners of the potential buyer, (iii) written evidence acceptable to Debtors to demonstrate financial wherewithal, (iv) remaining due diligence requirements and any material conditions to be satisfied prior to submission of a Bid, (v) transaction perimeter and detailed purchase price, (vi) any obligations or liabilities that the potential buyer may assume, and (vii) confirmation that the potential buyer consents to the jurisdiction of the court and agrees to be bound by the Bidding Procedures.

ii.     No later than the Bid Deadline, potential buyers shall be required to submit written, binding irrevocable bids (each, a "***Bid***", the party who submits a Bid, a "***Bidder***", and Bids satisfying the qualification requirements in the Bidding Procedures, each a "***Qualified Bid***").

iii.    Bids may be for all or any portion of the Assets (including subgroups thereof).

iv.     To be considered a Qualified Bid, a Bid, other than an existing Stalking Horse Bid (which shall be deemed to be Qualified Bids), must, among other things:

---

[6]   The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary, the terms of the Bidding Procedures shall govern. Capitalized terms used in this summary and not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures.

(a)     be accompanied by a Deposit (as defined in the Bidding Procedures) in cash equal to 10% of the purchase price contemplated by such Bid;

(b)     be accompanied by an executed and binding asset purchase agreement (together with the exhibits and schedules thereto, the "***Purchase Agreement***"), which Purchase Agreement must be marked to show any modifications (including, but not limited to, those related to the consideration offered) to (1) the form purchase agreement (the "***Form APA***") that the Debtors will make available to interested parties as provided in the Bidding Procedures and (2) a stalking horse agreement, if applicable (including the Initial Stalking Horse APAs, a "***Stalking Horse Agreement***"); *provided*, that such executed and binding Purchase Agreement or Stalking Horse Agreement must include duly authorized and executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate a Transaction;

(c)     be accompanied by committed financing or evidence of other financial ability to (x) consummate the relevant Transaction in a timely manner and (y) pay for the costs of continuing the Chapter 11 Cases while any required approvals by regulatory agencies (including, but not limited to, FERC approval) regarding the proposed Transaction are pending;

(d)     not contain any (x) financing contingencies, (y) contingencies dependent on the outcome or review of unperformed due diligence (but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction of customary closing conditions), or (z) internal approval/corporate authority related contingencies to closing on the proposed Transaction; and

(e)     (w) clearly set forth the Purchase Price (as defined in the Bidding Procedures) to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities, (x) identify separately the cash and any non-cash components of the Purchase Price, (y) indicate the allocation of the Purchase Price among the applicable Assets, and (z) if the Bid includes any Assets subject to any Stalking Horse Agreement, indicate the allocation of value among the applicable Assets.  The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis.  Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as separate Bid for one or more sets of Assets.

v.     Each subsequent overbid at the Auction must (a) exceed the prior highest Bid by the Minimum Overbid plus (b) in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates,

the aggregate amount of Bid Protections (if any) under such Stalking Horse Agreement.

vi.  At the conclusion of any Auction, the Debtors after consultation with the Consultation Parties shall select the overall highest or otherwise best Bid or Bids for their Assets (each such Bid, a "***Successful Bid***" and, the Bidder submitting each such Successful Bid, a "***Successful Bidder***") in accordance with the Bidding Procedures. The Debtors after consultation with the Consultation Parties shall also select the next highest or otherwise best Bid or Bids at the Auction as a backup Bid (each such Bid, a "***Backup Bid***" and, the Bidder submitting such Backup Bid, a "***Backup Bidder***") in accordance with the Bidding Procedures; *provided*, that such Backup Bid shall be subject to Court approval in connection with the Court's approval of the Successful Bid; *provided further*, that no Initial Stalking Horse Bidder shall, under any circumstance, be designated a Backup Bidder in respect of any Asset absent its prior written consent to such designation, which consent is exercisable in its sole discretion. The Backup Bidder(s) shall be required to keep the Backup Bid(s) open and irrevocable until 11:59 p.m. (prevailing Central Time) on the earliest of (a) 60 days after entry of the relevant Sale Order and (b) the date on which the relevant Transaction(s) with the relevant Successful Bidder(s) closes.

vii.  The DIP Lenders and the Prepetition Lenders (as defined in the DIP Order) shall have the right to credit bid all or any portion of their outstanding allowed secured claims at any time prior to or at the Auction without making a Deposit for any portion of the bid that is a credit bid; *provided*, that such Bid otherwise complies with the Bidding Procedures and the Bankruptcy Code and, with respect to the Prepetition Lenders, is subject to any exercised "challenge" rights set forth in the DIP Order.

viii.  The Debtors shall not consider any Bids submitted after the conclusion of the Auction, and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

ix.  The Bidding Procedures may be modified by the Debtors in their reasonable business judgment following consultation with the Consultation Parties.

## II.      SALE NOTICE

24.  The Debtors request that the Court approve the form of Sale Notice attached as **Annex 2** to the Bidding Procedures Order. The Debtors submit that service of the Sale Notice as set forth below is proper and sufficient to provide notice of the Auction, the Sale Objection Deadline, the Post-Auction Objection Deadline, and the Sale Hearing to all known and unknown parties in interest.

25. The Debtors propose that, within five business days after the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures by email, if available, or otherwise by first-class mail, postage prepaid, upon, to the best knowledge of the Debtors' management: (i) all parties that have (within the six-month period prior to the Petition Date) expressed written interest in purchasing, outside of the ordinary course of the Debtors' business, any of the Assets, (ii) all entities known to have asserted any Encumbrance on the Assets, (iii) counsel for any Committee, (iv) counsel to the DIP Lenders, and (v) the Office of the United States Trustee for Region 7 (the "*U.S. Trustee*").

26. In addition, the Debtors propose that, within five business days after the entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice (without the Bidding Procedures Order or the Bidding Procedures) by email, if available, or otherwise by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF upon (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein, (ii) the Office of the United States Attorney for the Southern District of Texas, (iii) the Internal Revenue Service, (iv) all parties entitled to notice pursuant to Bankruptcy Local Rule 2002-1(b), and (v) all known creditors of the Debtors, including their contract and lease counterparties.

27. Finally, the Debtors propose to publish, substantially contemporaneous with the service described in the preceding two paragraphs or as soon as practicable thereafter, the Sale Notice, as modified for publication, in a national publication on one occasion and in any additional publications as the Debtors deem appropriate. In addition, the Debtors will cause the Sale Notice

to be posted on the case information website at https://omniagentsolutions.com/PGR (the "**_Case_**

**_Website_**").

28.     The Debtors submit that the Sale Notice and proposed publication of such notice

are reasonably calculated to provide all interested parties with timely and proper notice of the

proposed sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the

Bidding Procedures and the dates and deadlines related thereto, including, without limitation, the

Sale Objection Deadline and the Post-Auction Objection Deadline; (c) the Sale Hearing; and

(d) instructions for promptly obtaining a copy of the Stalking Horse Agreements.  Accordingly,

the Debtors request that the form and manner of the Sale Notice be approved and that the Court

determine that no other or further notice of the Auction or Sale Hearing is required.

## III.     ASSUMPTION AND ASSIGNMENT PROCEDURES

29.     The Debtors also request that the Court approve the form of Assumption Notice

attached as **Annex 3** to the Bidding Procedures Order.  The Debtors submit that service of the

Assumption Notice on the Counterparties (as defined below) is proper and sufficient to provide

notice to the Counterparties of the Assumption and Assignment Procedures.

30.     To facilitate one or more Transactions, the Debtors seek authority to assume and

assign designated executory contracts and unexpired leases (the "**_Designated Contracts_**") to the

Successful Bidder(s) in accordance with the Assumption and Assignment Procedures.   The

Assumption and Assignment Procedures are as follows:

    i.     On or prior to the Assumption Notice Deadline, the Debtors shall file with the
Court, post on the Case Website, and serve on each counterparty (each, a
"**_Counterparty_**", and collectively, the "**_Counterparties_**") to a Designated Contract,
the Assumption Notice.

    ii.     The Assumption Notice shall include, without limitation, a list of potential
Designated Contracts to be assumed and assigned (the "**_Designated Contracts_**
**_List_**") and the proposed cure amount, if any, that the Debtors believe is required to
be paid to the applicable Counterparty under sections 365(b)(1)(A) and (B) of the

Bankruptcy Code for each Designated Contract (each proposed amount, if any, a "***Cure Cost***").  If a Counterparty objects to its Cure Cost or the assumption and assignment of its Designated Contract except as to the identity of the Successful Bidder or adequate assurance of future performance (in each case, other than the Stalking Horse Bidder(s)) which objections will be due by no later than the Post-Auction Objection Deadline,  such Counterparty must file with the Court and serve on the Objection Recipients (as defined below) a written objection (each, a "***Contract Objection***") on or before the Contract Objection Deadline (as defined below).

iii.     Any Contract Objection shall: (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) be filed with the Court by no later than 10 days after the Assumption Notice is filed with the Court, at 5:00 p.m. (prevailing Central Time) (the "***Contract Objection Deadline***"); (d) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Recipients (as defined below); and (e) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Designated Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

iv.     The "***Objection Recipients***" are as follows: (a) proposed co-counsel to the Debtors, (1) Latham & Watkins LLP, (I) 1271 Avenue of the Americas, New York. NY 10020, Attn: Andrew M. Parlen, Esq. (andrew.parlen@lw.com) and Alexander W. Welch, Esq. (alex.welch@lw.com), and (II) 330 North Wabash Avenue, Chicago, IL 60611, Attn: Jason B. Gott, Esq. (jason.gott@lw.com) and Jonathan C. Gordon, Esq. (jonathan.gordon@lw.com), and (2) Hunton Andrews Kurth, LLP, 600 Travis Street, Houston, TX 77002, Attn: Timothy A. ("Tad") Davidson II (taddavidson@hunton.com), Philip M. Guffy (pguffy@hunton.com), and Brandon Bell (bbell@hunton.com); (b) counsel to Brookfield:  (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, Suite 2400, New York, NY 10019, Attn:  Brian S. Hermann (bhermann@paulweiss.com) and Robert A. Britton (rbritton@paulweiss.com) and (ii) Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, Texas 77002, Attn: John F. Higgins (jhiggins@porterhedges.com) and Megan Young-John (myoung-john@porterhedges.com); (c) counsel to Carlyle: (i) Milbank LLP, 55 Hudson Yards, New York, NY 10001, Attn: Tyson Lomazow (tlomazow@milbank.com) and Andrew Harmeyer (aharmeyer@milbank.com) and (ii) Haynes and Boone LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010, Attn: Ian Peck (ian.peck@haynesboone.com) and Charles Beckham (charles.beckham@haynesboone.com); (d) counsel to Fundamental: Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, TX 77002, Attn: Duston K. McFaul (dmcfaul@sidley.com), Maegan Quejada (mquejada@sidley.com), and Ishani Patel (ishani.patel@sidley.com); (e) proposed counsel to any Committee; (f) the Office of the United States Trustee for Region 7, 515 Rusk Street, Suite

3516, Houston, TX 77002, Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov)

3516, Houston, TX 77002, Attn: Andrew Jimenez (Andrew.Jimenez@usdoj.gov) and C. Ross Travis (C.Ross.Travis@usdoj.gov).

v.  Any time after the Assumption Notice Deadline and before the Supplemental Assumption Notice Deadline, the Debtors reserve the right, and are authorized, but not directed, to (a) add previously omitted Designated Contracts as contracts to be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for the applicable Transaction, (b) remove a Designated Contract from the Designated Contracts List that a Successful Bidder does not propose to assume and assign to it in connection with the applicable Transaction, or (c) modify the previously stated Cure Cost associated with any Designated Contract; *provided*, that as soon as practicable thereafter and in any event no later than the Supplemental Assumption Notice Deadline, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties a supplemental assumption notice which notice shall contain the same information as an Assumption Notice (each, a "***Supplemental Assumption Notice***"), and such Counterparties shall have until the date that is 10 days after the filing of the applicable Supplemental Assumption Notice (the "***Supplemental Contract Objection Deadline***") to file an objection, which objection shall comply with the same requirements as Contract Objections including, without limitation, being served on the Objection Recipients (a "***Supplemental Contract Objection***").

vi.  As soon as practicable after the Auction (if any) and in no event later than 24 hours following the conclusion of the Auction (if any), the Debtors shall file with the Court and serve on the Counterparties by email, if available, or otherwise by overnight delivery, the Post-Auction Notice substantially in the form attached as **Annex 4** to the Bidding Procedures Order that shall identify the Successful Bidder(s).

vii.  Counterparties shall file any objection to the assumption and assignment of the applicable Designated Contract solely as to the identity of the Successful Bidder (if such bidder is not a Stalking Horse Bidder) or on the basis of adequate assurance of future performance by the Successful Bidder (a "***Post-Auction Contract Objection***") not later than the Post-Auction Objection Deadline.

viii.  At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder(s) of only those Designated Contracts that the Debtors and the Successful Bidder(s) have agreed at such time shall be assumed and assigned to the Successful Bidder(s), as set forth in any Assumption Notice or Supplemental Assumption Notice (collectively, the "***Selected Designated Contracts***"). The Debtors and their estates reserve any and all rights with respect to any Designated Contracts that are not ultimately designated as Selected Designated Contracts.

ix.  If no Contract Objection, Supplemental Contract Objection, or Post-Auction Contract Objection is timely received with respect to a Selected Designated Contract by the Contract Objection Deadline, Supplemental Contract Objection

Deadline, or Post-Auction Objection Deadline, as applicable: (a) the Counterparty to such Selected Designated Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Designated Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (b) any and all defaults under the Selected Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Cost set forth in the Assumption Notice or the Supplemental Assumption Notice, as applicable, for such Selected Designated Contract; and (c) the Cure Cost set forth in the Assumption Notice or Supplemental Assumption Notice, as applicable for such Selected Designated Contract shall be controlling, notwithstanding anything to the contrary in such Selected Designated Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Selected Designated Contract against the Debtors and their estates or the Successful Bidder, or the property of the Debtors or the Successful Bidder, that existed prior to the entry of the order resolving the Contract Objections and the relevant Sale Order.

x.    To the extent that the parties are unable to consensually resolve any Contract Objection, Supplemental Contract Objection, or Post-Auction Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the Cure Cost required to be paid to the applicable Counterparty under sections 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "*Cure Dispute*"), such Contract Objection, Supplemental Contract Objection, or Post-Auction Contract Objection, as applicable, will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court.

xi.    Any time after the Sale Hearing and before the Confirmation Hearing, the Debtors reserve the right, and are authorized, but not directed, to (a) add previously omitted Designated Contracts as contracts to be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for the applicable Transaction, (b) remove a Designated Contract from the Designated Contracts List that a Successful Bidder does not propose to assume in connection with the applicable Transaction, or (c) modify the previously stated Cure Cost associated with any Designated Contract; *provided* that as soon as practicable thereafter and in any event no later than the Final Assumption Notice Deadline, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties a final assumption notice which notice shall contain the same information as an Assumption Notice (each, a "*Final Assumption Notice*"), and such Counterparties shall have until the date that is 10 days after the filing of the applicable Final Assumption Notice (the "*Final Contract Objection Deadline*") to file an objection, which objection shall comply with the same requirements as Contract Objections including, without limitation, being served on the Objection Recipients (a "*Final Contract Objection*").

xii.      At the Confirmation Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder(s) of only those additional Designated Contracts that the Debtors and the Successful Bidder(s) have agreed at such time shall be assumed and assigned to the Successful Bidder(s), as set forth in any Final Assumption Notice (if any) (collectively, the "***Final Designated Contracts***").

xiii.     If no Final Contract Objection is timely received with respect to a Final Designated Contract by the Final Contract Objection Deadline: (a) the Counterparty to such Final Designated Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Final Designated Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (b) any and all defaults under the Final Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Cost set forth in the Final Assumption Notice for such Final Designated Contract; and (c) the Cure Cost set forth in the Final Assumption Notice for such Final Designated Contract shall be controlling, notwithstanding anything to the contrary in such Final Designated Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Final Designated Contract against the Debtors and their estates or the Successful Bidder, or the property of the Debtors or the Successful Bidder, that existed prior to the entry of the order approving the Debtors' chapter 11 plan of reorganization.

xiv.      Any party failing to timely file a Contract Objection, Supplemental Contract Objection, Post-Auction Contract Objection, or Final Contract Objection with respect to the assumption and assignment of any Designated Contract or related Cure Cost specified on an Assumption Notice, Supplemental Assumption Notice, or Final Assumption Notice, as applicable, will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, or the Successful Bidder with respect to such Designated Contract, and shall be deemed to consent to any Transaction and the assumption and assignment of such Designated Contract assumed and assigned in connection therewith.

## BASIS FOR RELIEF

## I.   THE BIDDING PROCEDURES AND THE TRANSACTIONS CONTEMPLATED THEREIN SATISFY SECTION 363(b) OF THE BANKRUPTCY CODE

31.      The Debtors have evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum

recoveries, and result in a successful restructuring of their estates.  This process includes both the Stalking Horse Agreement(s), and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for the Debtors' assets.  The Bidding Procedures will allow the Debtors to solicit additional offers and conduct their sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best value for the assets and who can demonstrate the ability take on the assets, obligations, and liabilities being transferred.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire that information necessary to submit a timely and well-informed bid.

32.    Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit.  *See Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc., et al. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also Black v. Shor (In re BNP Petrol. Corp.)*, 642 F. App'x 429, 434-35 (5th Cir. 2016); *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO,*

*L.L.C)*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38

(Bankr. S.D. Tex. Mar. 21, 2014); *In re St. Marie Clinic PA*, No. 10-70802, 2013 WL 5221055, at

*9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL

2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934,

944 (Bankr. S.D. Tex. 1988). "The business judgment standard is flexible and encourages

discretion." *In re ASARCO, L.L.C.*, 650 F.3d at 593; *see also In re Cruther Res. Corp.*, 72 B.R.

628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving

a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant

must articulate some business justification for the sale.").

33.     Once the Debtors articulate a valid business justification, "[t]he business judgment

rule 'is a presumption that in making the business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action was in the best interests of

the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated

Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612,

615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's

management decisions"). The proper inquiry, for purposes of the Debtors' business judgment, is

whether the decision "appears to enhance a debtor's estate." *Matter of J.C. Penney Direct Mktg.

Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) (quoting *Richmond Leasing Co. v. Cap. Bank,

N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)). So long as the decision appears to enhance the

Debtors' estate, it should be approved unless such decision is clearly erroneous, too speculative,

or contrary to the provisions of the Bankruptcy Code. *See Matter of J.C. Penney*, 50 F.4th at 534

("Neither does Klairmont assert that [the debtor's] action on behalf of its estate was clearly

erroneous, too speculative, or contrary to the Bankruptcy Code. Under this court's guidance, our

inquiry can stop there."); *see also Richmond Leasing Co.*, 762 F.2d at 1309 ("[C]ourt approval of a debtor-in-possession's decision … should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code ….") (internal citation and quotation marks omitted).

34.     The Debtors have a sound business justification for selling the Assets pursuant to a competitive bidding process consistent with the Bidding Procedures.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management, in consultation with their advisors, concluded that one or more sales of the Assets pursuant to a competitive bidding process would be the best way to maximize recoveries for creditors in connection with the Debtors' efforts in the Chapter 11 Cases.

35.     Further, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this and other districts, and are in the best interests of the Debtors' estates.  Among other things, the Bidding Procedures will provide the Debtors with an adequate opportunity to consider competing Bids and select the highest or otherwise best offers for the Assets.  Indeed, fairness and reasonableness of the consideration to be received by the Debtors will be demonstrated by the "market check" that will be accomplished by, among other things, the Auction.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. LaSalle St. P'Ship*, 526 U.S. 434, 457 (1999) (recognizing "the best way to determine value is exposure to a market").  The utilization of the Bidding Procedures, therefore, demonstrates a sound exercise of the Debtors' business judgment, as such procedures are designed to maximize the value of the Assets.  Accordingly, and for the reasons set forth below, the Debtors respectfully request approval of the Bidding Procedures.

II.   **THE PROPOSED EXPENSE REIMBURSEMENTS AND BID PROTECTIONS FOR POTENTIAL STALKING HORSE BIDDER(S) AND OTHER NON-STALKING HORSE BIDDER(S) ARE APPROPRIATE AND SHOULD BE APPROVED**

36.     In connection with, and pursuant to the terms of, the Brookfield APA, the Carlyle APA, and the Fundamental APA, the Debtors are providing an Expense Reimbursement to each of Brookfield, Carlyle, and Fundamental capped at $3 million each, payable solely from proceeds of an Alternative Transaction (as defined in the Brookfield APA, the Carlyle APA, and the Fundamental APA, respectively), with such Expense Reimbursements to be reduced pro rata in the event of an Alternative Transaction for a portion of the assets subject to the Brookfield APA, the Carlyle APA, and the Fundamental APA, as applicable, provided that each Expense Reimbursement may be waived by the applicable Initial Stalking Horse Bidder in its sole discretion.  The Expense Reimbursements provided to Brookfield, Carlyle, and Fundamental are a material inducement for Brookfield's, Carlyle's, and Fundamental's willingness to commit to the Transactions contemplated by the Brookfield APA, the Carlyle APA, and the Fundamental APA, respectively, and to invest substantial time, effort, and resources necessary to negotiate and finalize a binding bid, and to pursue the consummation of such Transactions.  The allowance of the Expense Reimbursements is in the best interests of the Debtors' estates and their creditors as the Brookfield APA, the Carlyle APA, and the Fundamental APA each promote further bidding by third parties by showing that the Initial Stalking Horse Bidders are interested in owning the Debtors' assets, which in turn may encourage other bidders to evaluate owning the assets.

37.     To induce other potential Stalking Horse Bidders to enter into other Stalking Horse Agreements for Assets other than the Brookfield Assets, Carlyle Assets, and Fundamental Assets (the "***Potential Stalking Horse Bidders for Other Assets***"), the Debtors may be required, to the extent necessary as determined in the exercise of their business judgment and after consultation

with the Consultation Parties, to provide one or more Potential Stalking Horse Bidder(s), with customary Bid Protections.  As requested herein and set forth in the Bidding Procedures, the terms of any Bid Protections will be subject to Court approval pursuant to a separate Bid Protections Order entered on not less than three business days' notice of the same to all relevant parties and after an opportunity for a hearing (which hearing may only be scheduled if a party in interest timely objects to the provision of such Bid Protections).

38.     Further, to induce non-credit bidders to participate in the sale process, it may be necessary for the Debtors to agree to some form of fee reimbursement for non-Stalking Horse Bidders.  As requested herein and set forth in the Bidding Procedures, the terms of any such expense reimbursement will be subject to Court approval pursuant to a separate order entered after not less than three business days' notice of the same to all relevant parties and after an opportunity for a hearing (which hearing may only be scheduled if a party in interest timely objects to the provision of such expense reimbursement).

39.     The Debtors believe that the grant of the Bid Protections (if any) to Stalking Horse Bidders and fee reimbursement (if any) to non-Stalking Horse Bidders is fair, reasonable, and necessary under the circumstances.  Any break-up fee and expense reimbursement will be negotiated at arms' length and in good faith and will only be offered to the extent that, in the Debtors' view (formed following consultation with the Consultation Parties), and in the exercise of the Debtors' business judgment, the Debtors believe any break-up fee and/or expense reimbursement is necessary to secure the Stalking Horse Bidder and other non-Stalking Horse Bidders' participation in the proposed Transaction.

40.     Courts have acknowledged that the approval of break-up fees and expense reimbursements in connection with substantial sales in bankruptcy is warranted to compensate an

unsuccessful acquirer whose initial offer served as the basis and catalyst for the estate's potential receipt of higher or better offers.  *See In re ASARCO,* 650 F.3d, 597–98, 601–03 & n.9; *In re JW Res., Inc.*, 536 B.R. 193, 195–96 (Bankr. E.D. Ky. 2015); *In re Hupp Indus., Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).  Courts consider various factors in determining whether to authorize break-up fees and expense reimbursements, such as:

    i.      whether the fee requested correlates with a maximization of value to the debtor's estate;

    ii.     whether the transaction in the negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

    iii.    whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

    iv.    the existence of available safeguards beneficial to the debtor's estate; and

    v.    whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*In re Hupp Indus.*, 140 B.R. at 194-96; *see also In re JW Res.*, 536 B.R. at 195 (citing with approval *Hupp Industries*' multi-factor test).

41.    To warrant court approval of such break-up fees and expenses, the Fifth Circuit in *ASARCO* required a showing that the requested fees and expenses must be supported by a sound business justification.  *In re ASARCO*, 650 F.3d at 602–03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders which were approved by the bankruptcy court prior to the incurrence of such fees and expenses by bidders).

42.    The Debtors believe that the Expense Reimbursements are appropriate and justified under the circumstances and are a sound exercise of the Debtors' business judgment.  Specifically, the Expense Reimbursements: (i) constitute allowed superpriority administrative expense claims

under section 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code; (ii) are commensurate with the actual and material benefits provided to the Debtors' estates by Brookfield, Carlyle, and Fundamental; and (iii) are fair and reasonable in light of the binding commitments made and the value of the Brookfield Stalking Horse Bid, the Carlyle Stalking Horse Bid, and the Fundamental Stalking Horse Bid .  Accordingly, approval of the Expense Reimbursements is warranted under the circumstances.

43.     Additionally, any Bid Protections to be offered under the facts and circumstances of the Chapter 11 Cases will satisfy the foregoing tests because they will only be offered if the Debtors, in consultation with their advisors and the Consultation Parties, conclude that they are: (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder(s); (iii) reasonable and appropriate, in light of the size and nature of the proposed Transaction and comparable transactions, to the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Bidder(s); (iv) necessary to induce the Stalking Horse Bidder to consummate a Transaction in accordance with a Stalking Horse Agreement; and (v) subject to all parties in interests' rights to object and be heard with respect to approval of such Bid Protections.

44.     Indeed, the Bid Protections (if any) and fee reimbursement (if any) will not be offered unless the Debtors, in consultation with their advisors, reasonably conclude, in the exercise of the Debtors' business judgment, that they will enable the Debtors to secure an adequate floor price for the Assets, thereby ensuring that competing Bids would be materially higher or otherwise better than the Bids reflected in any Stalking Horse Agreement(s) — a clear benefit to the Debtors'

estates.  Moreover, it is unlikely any Stalking Horse Bidder would be willing to agree to act in such capacity without being granted the Bid Protections.  Without the ability to offer the Bid Protections, the Debtors may lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  The Debtors may also need to provide fee reimbursement to non-Stalking Horse Bidders in an effort to encourage bidding, as the Debtors work toward obtaining the highest or otherwise best offer for their Assets.

45.     Additionally, any Stalking Horse Bidder will have expended, and will continue to expend, considerable time, money and energy in connection with the relevant Transaction and will engage in extended and lengthy good faith negotiations.  In particular, any Stalking Horse Agreement will be the culmination of a marketing effort and part of a process undertaken by the Debtors and the Debtors' professionals to identify and negotiate a Transaction that they believe to be the highest or otherwise best proposal for an acquisition of the relevant Assets.  For all of the foregoing reasons, the Debtors believe that granting any Bid Protections requested by the Debtors pursuant to any Bid Protections Order will maximize the value realized for the benefit of the Debtors' estates, their creditors, and other parties in interest.

46.     Finally, payment of the Bid Protections in the context of a sale to another purchaser that outbids a Stalking Horse Bidder will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing Bid must exceed a Stalking Horse Bid by an amount in excess of the break-up fee and expense reimbursement.  For the foregoing reasons, the Debtors submit that the Bid Protections offered to any Stalking Horse Bidder(s), if any, will reflect a sound business purpose, be fair and appropriate under the circumstances, and should be approved.

III.   **THE ASSUMPTION AND ASSIGNMENT PROCEDURES ARE APPROPRIATE AND SHOULD BE APPROVED**

47.   In connection with the potential assumption and assignment of the Designated Contracts, the Debtors believe it is in the best interest of their estates to establish an efficient process by which (i) the Debtors and the Counterparties can reconcile Cure Costs, if any, in accordance with section 365 of the Bankruptcy Code, and (ii) such Counterparties can object to the assumption and assignment of executory contracts and unexpired leases and any applicable Cure Costs.

48.   As set forth in the Assumption and Assignment Procedures, the Debtors are also requesting that any Counterparty that fails to timely object to the proposed assumption and assignment of any Designated Contract be deemed to consent to the assumption and assignment of the applicable Designated Contract pursuant to section 365 of the Bankruptcy Code and on the terms set forth in the Sale Order(s), notwithstanding any anti-alienation provision or other restriction on assignment contained in the applicable contract or lease.  *See, e.g.*, *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to sale motion, creditor was deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

49.   Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524–25 & n.5 (5th Cir. 2004); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re*

*Gucci*, 193 B.R. 411 (S.D.N.Y. 1996); *In re Pisces Energy, LLC*, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009).  Under the business judgment test, a court should approve a debtor's proposed assumption of executory contracts if such assumption will benefit the estate.  *Matter of J.C. Penney*, 50 F.4th at 534 ("We have held that as long as assumption of a lease appears to enhance a debtor's estate, a bankruptcy court should only withhold approval when the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (internal citation and quotation marks omitted); *In re Pisces Energy*, 2009 WL 7227880, at *6; *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698 (Bankr. W.D. Tex. 1988); *In re Food City, Inc.*, 94 B.R. 91, 93–94 (Bankr. W.D. Tex. 1988).  Any more exacting scrutiny would slow the administration of a debtor's estates, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control cases impartially.  *See Richmond Leasing*, 762 F.2d 1303 at 1311.  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

50.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  Section 365(f) of the Bankruptcy Code specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable.  *See* 11 U.S.C. § 365(f)(1); *see also In re Amidee Cap. Grp., Inc.*, No. 10-20041, 2010 WL 5141276, at *5 (Bankr. S.D. Tex. Oct. 7, 2010) (treating such prohibitions or limitations as null and void under section 365(f)); *In re Off. Prods. of Am., Inc.*, 140 B.R. 407 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Ctrs., Inc.*, 209

F.3d 291, 299 (3d Cir. 2000) ("[t]he code generally favors free assignability as a means to maximize the value of the debtor's estate").

51.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999) (internal quotations omitted); *see also Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re PRK Enters.*, 235 B.R. at 603 ("The financial evidence presented by [assignee] demonstrates the likelihood that it has the financial capacity to perform its future obligations under the lease agreements and that its principal officers are serious in their commitment to rehabilitate this corporation."); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

52.     The terms of the Bidding Procedures ensure that any Successful Bidder will have financial resources that are more than sufficient to perform under any Designated Contracts it seeks to have assumed and assigned by the Debtors.  Moreover, if necessary, the Debtors will adduce testimony, or other supporting evidence, at the Sale Hearing if an objection is lodged challenging

adequate assurance of future performance which will demonstrate the financial wherewithal of the Successful Bidder(s) and their willingness and ability to perform under the Designated Contracts proposed to be assigned to them.  The Bidding Procedures and the Assumption and Assignment Procedures therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge, the ability of the Successful Bidder(s) to provide adequate assurance of future performance with respect to the Designated Contracts to be assumed and assigned, which, if challenged, will be taken up by the Court at the Sale Hearing.

53.     The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide adequate notice in the form of the Assumption Notice, the Supplemental Assumption Notice, and the Final Assumption Notice, if any, including the proposed Cure Costs communicated pursuant thereto.  The Counterparties will then be given an opportunity to object to such Cure Costs.  If a Contract Objection, Supplemental Contract Objection, or Post-Auction Contract Objection is timely filed, such objection will be heard at the Sale Hearing or at a later hearing in accordance with the Court's schedule if the parties cannot resolve the dispute consensually in advance of the Sale Hearing.

54.     Furthermore, to the extent that any monetary defaults exist under any Designated Contracts, the Debtors (or, in certain cases, the buyer, as applicable under the relevant Final Purchase Agreement (as defined in the Bidding Procedures)) will cure any such defaults prior to assuming and assigning the Designated Contracts.  Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in the Chapter 11 Cases.  The Debtors therefore request that the Court approve the Assumption and Assignment Procedures and authorize the Debtors to assume and assign the Designated Contracts to the Successful Bidder(s).

## IV.     THE FORM AND MANNER OF THE SALE NOTICE SHOULD BE APPROVED

55.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c)(1), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.  While the Bankruptcy Rules generally require notices to be served on creditors at their addresses, the Bankruptcy Rules provide bankruptcy courts with significant latitude to modify such general rules.  *See* Fed. R. Bankr. P. 2002(m) and 9007.  Indeed, Bankruptcy Rule 2002(m) provides the Court explicit authority to modify "the matters about which, the entity to whom, and the form and manner in which a notice must be sent." Fed. R. Bankr. P. 2002(m).

56.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, together with service, including service by email where available and first-class mail where it is not, and publication of the Sale Notice as provided for herein, constitutes good and adequate notice of the Auction, the Sale Hearing, and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rules 2002, 6004, and 6006.  Moreover, the Sale Notice (a) informs interested parties of the deadlines for objecting to a Transaction and (b) otherwise includes all information relevant to parties interested in or affected by any Transaction.  Accordingly, the Debtors are confident that the Sale Notice will be properly vetted by the time of service thereof.

## V.     EACH TRANSACTION HAS BEEN PROPOSED IN GOOD FAITH AND WITHOUT COLLUSION AND THE SUCCESSFUL BIDDER(S) ARE EACH ENTITLED TO BE DESIGNATED AS A "GOOD FAITH BUYER"

57.     Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *Mark Bell Furniture*

37

*Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

58.    In other words, a party would need to show fraud or collusion between the successful bidder(s) and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *Bleaufontaine, Inc. v Roland Int'l (Matter of Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

59.    The Debtors submit that the Successful Bidder(s) arising from the Auction (if any), will be "good faith" purchasers within the meaning of section 363(m) of the Bankruptcy Code and will comply with the Bidding Procedures, and the terms of any Final Purchase Agreement with any Successful Bidder(s) will be negotiated at arms-length and in good faith without any collusion or fraud.[7]  Accordingly, the Debtors will be prepared to show at the hearing to approve any such

---

[7]    Section 363(m) of the Bankruptcy Code provides that:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

sale that the Successful Bidder(s) are entitled to the full protections of section 363(m) of the Bankruptcy Code.

**VI.    THE DEBTORS WILL DEMONSTRATE AT THE SALE HEARING THAT BANKRUPTCY CODE SECTION 363(f) CAN BE SATISFIED AND THAT THE ASSETS SHOULD BE SOLD "FREE AND CLEAR" OF ANY ENCUMBRANCES**

60.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of Encumbrances (with any such Encumbrances attaching to the net proceeds generated by the sale, with the same rights and priorities against the sale proceeds that existed against the assets prior to their sale).  As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").  The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

## EMERGENCY CONSIDERATION

61.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm.  As set forth in this Motion, the Debtors believe that promptly conducting a sale process pursuant to the Bidding Procedures will maximize the value of the Assets for the benefit of all stakeholders.  The Debtors believe that immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(a)
## AND WAIVER OF BANKRUPTCY RULES 6004(h), and 6004(d)

62.     To implement the sale process described herein successfully the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  The Debtors further request that, to the extent applicable, the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6006(d).

63.     As described herein, the Debtors wish to file and serve the Sale Notice and the Assumption Notice shortly after this Court's entry of the Bidding Procedures Order.  Accordingly, to the extent that the filing or service of these notices implicates the Bankruptcy Rules described in the previous paragraphs, the Debtors request that the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

## RESERVATION OF RIGHTS

64.     Nothing in this Motion is intended to be nor shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the

40

obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **NOTICE**

65.     Notice of this Motion will be given to (a) the Office of the United States Trustee for the Southern District of Texas; (b) Kirkland & Ellis LLP, as counsel to GC PGR HoldCo Member, LLC and GC PGR HoldCo, LLC; (c) Weil, Gotshal & Manges LLP, as counsel to Healthcare of Ontario Pension Plan Trust Fund; (d) Sidley Austin LLP, as counsel to FP Solar Development I LLC; (e) Milbank LLP, as counsel to Carlyle Global Credit Investment Management L.L.C.; (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to BID Administrator LLC; (g) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (h)  the Internal Revenue Service; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

66.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov and (b) the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, Inc., at https://omniagentsolutions.com/PGR.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bidding Procedures Order and the Sale Order (as applicable) granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated:   November 6, 2025

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Philip M. Guffy (Texas Bar No. 24113705)
Brandon Bell (Texas Bar No. 24127019)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@Hunton.com
          pguffy@Hunton.com
          bbell@Hunton.com

-and-

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew M. Parlen (NY Bar No. 5370085)
Alexander W. Welch (NY Bar No. 5624861)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
          andrew.parlen@lw.com
          alex.welch@lw.com

Jason B. Gott (IL Bar No. 6309114)
Jonathan C. Gordon (IL Bar No. 6329732)
330 N. Wabash Avenue
Suite No. 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: jason.gott@lw.com
          jonathan.gordon@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 6, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II
