## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
------------------------------------------------------------ x
                                             :
In re:                                       :    Chapter 11
                                             :
PINE GATE RENEWABLES, LLC, et al.,           :    Case No. 25-90669 (CML)
                                             :
          Debtors.¹                          :    (Jointly Administered)
                                             :
------------------------------------------------------------ x
```

## EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on November 10, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on November 10, 2025 at 1:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

¹ A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR. The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

Pine Gate Renewables, LLC and its debtor affiliates in the above-captioned cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully state as follows in support of this motion (this "**Motion**"):[2]

## RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of interim and final orders (the "**Interim Order**" and the "**Final Order**" and, together, the "**DIP Orders**"), substantially in the forms attached hereto, among other things, that:

   a.    authorizes and approves the Debtors to obtain up to $551.4 million in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "**Brookfield DIP Facility**"), consisting of (a) up to $134.1 million (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "**Brookfield New Money DIP Loans**"), of which up to $17.5 million (the "**Brookfield Interim Draw**"), plus certain additional Brookfield Subsequent Draws (as defined below) may be made available during the Interim Period, with the balance of such Brookfield New Money DIP Loans subject to entry of the Final Order, and (b) upon entry of the proposed Interim Order,  $417.3 million in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement (the "**Brookfield Roll-Up DIP Loans**" and, together with the Brookfield New Money DIP Loans, the "**Brookfield DIP Loans**"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "**Brookfield Borrower**"), the other Debtors identified as guarantors of the Brookfield DIP Obligations in the Brookfield DIP Documents (each a "**Brookfield Debtor Guarantor**"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Brookfield DIP Obligations in the Brookfield DIP Documents (each a "**Brookfield Non-Debtor Guarantor**" and together with the Debtor Guarantors, collectively the "**Brookfield Guarantors**"), the lenders party thereto (collectively, the "**Brookfield DIP Lenders**"), and BID Administrator LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Brookfield DIP Agent**" and, together with the Brookfield DIP Lenders, the "**Brookfield DIP Secured Parties**"), substantially in the form attached to the proposed Interim Order as <u>**Exhibit A**</u> (as it may be amended, restated, amended and restated, modified, supplemented, extended,

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration, the proposed Interim Order, and the DIP Declarations (each as defined herein).  To the extent of a conflict, the proposed Interim Order controls.

waived or replaced from time to time, the "***Brookfield DIP Credit Agreement***" and the funding commitments thereunder, the "***Brookfield DIP Commitments***");

b.    authorizes and approves the Debtors to obtain up to $374.0 million in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession notes and other financial accommodations (the "***Carlyle DIP Facility***"), consisting of (a) up to $51.7 million (excluding fees, premiums and other amounts payable-in-kind) in principal amount issuance of new money notes (the "***Carlyle New Money DIP Notes***"), of which up to **$16.6 million** (the "***Carlyle Interim Issuance***"), plus certain additional discretionary loan amounts, shall be made available during the Interim Period, with the balance of such issuance of Carlyle New Money DIP Notes subject to entry of the Final Order, and (b) upon entry of the proposed Interim Order, **$322.2 million** in principal amount of notes shall be issued to repay and refinance, on a dollar-for-dollar, cashless basis, Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement (the "***Carlyle Roll-Up DIP Notes***" and, together with the Carlyle New Money DIP Notes, the "***Carlyle DIP Notes***"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement*], by and among Debtor Pine Gate Renewables, LLC (the "***Carlyle Issuer***"), the other Debtors identified as guarantors of the Carlyle DIP Obligations in the Carlyle DIP Documents (each a "***Carlyle Debtor Guarantor***"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Carlyle DIP Obligations in the Carlyle DIP Documents (each a "***Carlyle Non-Debtor Guarantor***" and together with the Carlyle Debtor Guarantors, collectively the "***Carlyle Guarantors***"), the note purchasers party thereto (collectively, the "***Carlyle DIP Noteholders***"), and Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent (in such capacities, the "***Carlyle DIP Agent***" and, together with the Carlyle DIP Noteholders, the "***Carlyle DIP Secured Parties***"), substantially in the form attached to the proposed Interim Order as **<u>Exhibit B</u>** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***Carlyle DIP Note Purchase Agreement***" and the funding commitments thereunder, the "***Carlyle DIP Commitments***");

c.    authorizes and approves the Debtors to obtain up to **$730.8 million** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "***Fundamental DIP Facility***" and, together with the Brookfield DIP Facility and the Carlyle DIP Facility, the "***DIP Financing***"), consisting of (a) up to $64.6 million (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "***Fundamental New Money DIP Loans***" and, collectively with the Brookfield New Money DIP Loans and the Carlyle New Money DIP Notes, the "***New Money DIP Loans***"), of which up to **$21.3 million** (the "***Fundamental Interim Draw***"), plus certain additional discretionary loan amounts, shall be made available during the Interim Period, with the balance of such Fundamental New Money DIP Loans subject to entry of the Final Order, and (b) upon entry of the proposed Interim Order, **$666.1 million** in principal amount of

3

term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Fundamental Prepetition Loans under the Fundamental Prepetition Credit Agreements (the "*Fundamental Roll-Up DIP Loans*" and, together with the Fundamental New Money DIP Loans, the "*Fundamental DIP Loans*"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*], by and among Debtor Pine Gate Renewables, LLC (the "*Fundamental Borrower*"), certain of the other Debtors identified as guarantors of the Fundamental DIP Obligations in the Fundamental DIP Documents (each a "*Fundamental Debtor Guarantor*"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Fundamental DIP Obligations in the Fundamental DIP Documents (each a "*Fundamental Non-Debtor Guarantor*" and together with the Debtor Guarantors, collectively the "*Fundamental Guarantors*"), the lenders party thereto (collectively, the "*Fundamental DIP Lenders*," together with the Brookfield DIP Lenders and the Carlyle DIP Noteholders, the "*Bridge/DIP Lenders*"), and FP Solar Development I LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "*Fundamental DIP Agent*" and, together with the Fundamental DIP Lenders, the "*Fundamental DIP Secured Parties*"), substantially in the form attached to the proposed Interim Order as **Exhibit C** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "*Fundamental DIP Credit Agreement*" and the funding commitments thereunder, the "*Fundamental DIP Commitments*" and, together with the Brookfield DIP Commitments and the Carlyle DIP Commitments, the "***DIP Commitments***");

d.  authorizes the Debtors to use the proceeds of the DIP Facilities in accordance with the terms of the proposed DIP Orders and the DIP Documents, subject to the Approved Budget;

e.  approves and authorizes the Debtors and the Non-Debtor Guarantors to (a) enter into, execute, and perform under the DIP Documents and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Documents and the proposed DIP Orders;

f.  grants to each DIP Agent, subject to the applicable Carve Out, for itself and on behalf of the applicable DIP Secured Parties, valid, enforceable, nonavoidable, automatically perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code), junior solely to the applicable Carve Out, in and upon all of the applicable DIP Collateral held by the applicable DIP Loan Parties to secure the applicable DIP Obligations as provided by and more fully defined in the DIP Documents, which liens shall be secured by the DIP Collateral and have the priorities set forth in Annex 3 attached to the proposed Interim Order;

g.  grants to each DIP Agent, subject to the applicable Carve Out, for itself and on behalf of the applicable DIP Secured Parties, allowed superpriority administrative expense claim status (junior solely to the applicable Carve Out) for the applicable DIP Obligations in each of the Chapter 11 Cases of the DIP Borrower and each applicable

Debtor Guarantor and any of their Successor Cases (as defined herein), pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the terms of the DIP Orders, which allowed superpriority administrative expense claims shall have the priorities set forth in Annex 3 attached to the proposed Interim Order;

h.      authorizes the application of the proceeds of all of the DIP Collateral in the manner and on the terms set forth in the proposed DIP Orders and the DIP Intercreditor Agreement;

i.      authorizes the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, (A) in the case of the Brookfield DIP Credit Agreement, the Commitment Fee, the Exit Fee, and the Applicable Prepayment Premium (each as defined in the Brookfield DIP Credit Agreement) (the "***Brookfield Fees***"), (B) in the case of the Carlyle DIP Note Purchase Agreement, the Upfront Payment, the Exit Payment and the Applicable Prepayment Premium (each as defined in the Carlyle DIP Note Purchase Agreement) (the "***Carlyle Payments***"), and (C) in the case of the Fundamental DIP Credit Agreement, the Commitment/Funding Fee, the Exit Fee and the Applicable Prepayment Premium (each as defined in the Fundamental DIP Credit Agreement) (the "***Fundamental Fees***"), and (D) in the case of each DIP Document, all other commitment fees, closing fees, exit fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, and the reasonable and documented fees and disbursements of the applicable DIP Agent's and the other DIP Secured Parties' attorneys, financial advisors, accountants, consultants, and other advisors, all to the extent provided in, and in accordance with, the applicable DIP Documents;

j.      authorizes the Debtors to use the Prepetition Collateral, including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Documents, and providing adequate protection to the Prepetition Secured Parties for, among other things, any diminution in value of their respective interests in the Prepetition Collateral, including on a dollar-for-dollar basis in respect of Cash Collateral used, from and after the Petition Date to the extent such diminution in value occurs for any reason arising under the Bankruptcy Code, including, among other things, on account of the Debtors' sale, lease or use of the Prepetition Collateral, including Cash Collateral, the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, or the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including by the Carve Out) ("***Diminution in Value***");

k.      authorizes the Debtors to waive (x) any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (y) the equitable doctrine of marshaling and other similar doctrines, and (z) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, subject to and effective upon (a) entry of the Final Order, with respect to the Prepetition Collateral and (b) entry of the proposed Interim Order, with respect to the DIP Collateral, in each case except to the extent of the Carve Out;

l. approves, subject to and upon consummation of a (a) Brookfield Sale Transaction, at the election of the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), a release of certain intercompany claims against or interests in the Brookfield Silo Entities, including the Brookfield Pledged Intercompany Claims, (b) Carlyle Sale Transaction, at the election of the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), a release of certain intercompany claims against or interests in the Carlyle Silo Entities, including the Carlyle Pledged Intercompany Claims, and (c) Fundamental Sale Transaction, at the election of the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), a release of certain intercompany claims against or interests in the Fundamental Silo Entities, including the Fundamental Pledged Intercompany Claims;

m. modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the proposed Interim Order and waives the 14-day stay provisions of Bankruptcy Rule 4001(a)(3);

n. waives the notice requirements of Bankruptcy Rule 6004(a), and any applicable stay (including under Bankruptcy Rule 6004), and provides for immediate effectiveness of the proposed Interim Order; and

o. schedules a final hearing on this Motion (the "***Final Hearing***") for entry of a Final Order authorizing the DIP Facilities as contemplated in the proposed Interim Order on a final basis and granting such other relief as is requested therein.

2. The Debtors' initial budget reflecting the anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the 13th calendar week following the Petition Date is attached to the proposed Interim Order as **Exhibit D** (the "***Initial Budget***" which is the first Approved Budget as defined in the proposed Interim Order) to the proposed Interim Order.

## JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution. Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532  (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules (the "***Bankruptcy Local Rules***") for the Court; and the Procedures for Complex Cases in the Southern District of Texas.

## **<u>BACKGROUND</u>**

5.      On November 6, 2025 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.      The Chapter 11 Cases are being jointly administered, for procedural purposes, pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1

7.      The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Ray Shem, President and Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First-Day Relief* (the "***First Day Declaration***"), filed prior to the filing of this Motion and incorporated herein by reference.

8.      In support of this Motion, the Debtors submit the *Declaration of Mark Rajcevich in Support of (A) Debtors' Motions to Obtain (I) Postpetition Financing and (II) Approval of Bidding Procedures for Sale of Debtors' Assets and (B) Debtors' Other First Day Motions* (the "***Rajcevich Declaration***") and the *Declaration of Tyler W. Cowan in Support of Debtors' Motions*

*to Obtain (A) Postpetition Financing and (B) Approval of Bidding Procedures for Sale of Debtors'*
*Assets* (the "***Cowan Declaration***" and, together with the Rajcevich Declaration, the "***DIP***
***Declarations***"), each as will be filed prior to the hearing on this Motion and incorporated herein
by reference.

## PRELIMINARY STATEMENT

9.      To achieve their objectives for these Chapter 11 Cases, the Debtors require new
money under the DIP Financing and the consensual use of Cash Collateral.  The DIP Financing
will ensure that the Debtors can stabilize their businesses at the outset of these Chapter 11 Cases,
which in turn will allow the Debtors to pursue a value-maximizing sale process for the benefit of
all stakeholders.  At the same time, the DIP Financing sends a critical message to the Debtors'
employees, suppliers, vendors, and offtaker customers:  the Debtors will be able to maintain
ordinary course operation of their power-producing projects and to continue to develop and bring
on line their in-development solar power projects.  Finally and crucially, as discussed in greater
detail below, the DIP Financing is one element of a much bigger picture that combines a
multifaceted business, a highly complex capital structure and significant pre-bankruptcy bridge
financing to provide the Debtors with an orderly pathway to selling solar power project portfolios
and confirming a chapter 11 plan.

10.      As discussed in the DIP Declarations, beginning in summer 2025, the Debtors and
their advisors assessed the amount of time required to undertake a comprehensive, robust
marketing process for a sale of all or substantially all of their assets and worked to size the amount
of financing required to run such a process while the Debtors continue operating at an optimal
level to preserve and maximize value.  Contemporaneously, the Debtors, with assistance from

Lazard, widely marketed various forms of financing and engaged in diligence and negotiations with numerous third-party financing sources and the Bridge/DIP Lenders.

11.     In furtherance of the marketing process, Lazard reached out to over 30 parties to discuss providing third-party financing, approximately 20 of which signed non-disclosure agreements ("***NDAs***") for the purpose of engaging in further diligence.  Lazard presented parties under NDA with a request for proposal that provided information about the Debtors' businesses and operations, the Debtors' financial condition, and the third-party financing opportunity.  The parties also received access to a virtual data room with financial, business, and legal information, including, but not limited to, the Debtors' corporate and capital structures, liquidity information from management, and information about the solar power projects near completion and development assets.

12.     Many prospective third-party lenders initially declined to make financing proposals given the complex challenges of the Debtors' collateral base and inherent risks in connection with the Bridge/DIP Lenders' solar project portfolios.  This was despite the potential for a third-party DIP lender to achieve structural seniority to certain Bridge/DIP Lenders' prepetition loans with respect to certain projects, as discussed further in the Cowan Declaration.  The Debtors eventually received two third-party debtor-in-possession financing proposals, neither of which was actionable because each: (a) failed to provide sufficient funding for a robust sale process and consummation of a chapter 11 plan, and (b) would have required liens that were senior to the Bridge/DIP Lenders on substantially *all* assets (including priming liens on development assets) and contained conditions precedent to delayed draws that created material risks to the Company's ability to access the majority of the proposed financing commitment.  Despite the best efforts of the Debtors and their advisors to encourage these third parties to (a) increase the quantum of their proposed

financing and (b) extend the proposed timeline for the Debtors to consummate a chapter 11 plan, the third parties were unwilling to do so, citing the inherent risks and complex challenges of the Debtors' capital and corporate structures.

13.     The Debtors' efforts were not in vain, though, and their simultaneous engagement with the Bridge/DIP Lenders led to an agreement in early October 2025 to provide up to $208 million of bridge financing (the "***Bridge Financing***") and $204 million of DIP Commitments.  The negotiations with the Bridge/DIP Lenders were strenuous and complicated, as the parties had to consider three different sets of interrelated, out-of-court bridge financing facilities and associated postpetition financing commitments.  The size of each facility, amount of the Bridge/DIP Lenders' existing loans to be rolled up into DIP loans, fees and prepayment premiums, additional collateral, conditions precedent to funding, milestones, covenants and definitive documentation for the bridge financing and DIP commitments were all negotiated extensively.   Negotiations were further complicated by each of the Bridge/DIP Lenders expressly conditioning their commitment to fund on, among other items, (a) each of the other Bridge/DIP Lenders committing to fund its portion of the Debtors' funding need, and (b) agreements from each of the Bridge/DIP Lenders on the terms and conditions in the other two Bridge/DIP Lenders' documentation.  Leading up to the Petition Date after closing the Bridge Financing on October 6, 2025, the Company revised its 13-week cash flow forecast.  Consequently, the Debtors engaged with the Bridge/DIP Lenders to increase the DIP Financing commitments by approximately $46 million to approximately $250.4 million in the aggregate.   This includes (a) a rollover of approximately $40.2 million of undrawn Bridge Financing commitments and (b) approximately $5.8 million of incremental DIP Financing commitments.

14.     Importantly for this Motion, the Bridge Financing extended the runway for the Debtors and their advisors to accomplish two very important things.  *First*, the Debtors used the additional time to negotiate stalking horse terms with the Bridge/DIP Lenders to acquire the assets of their respective silos and, in the case of Fundamental, to acquire certain assets and operations underlying the Debtors' development platform.  *Second*, the Debtors and their advisors exhaustively engaged with the lenders, tax equity investors, offtakers, and other counterparties for the Debtors' solar power project-level entities, which the Debtors believe will benefit all stakeholders' through a smoother transition into and path through chapter 11.

15.     It must be reiterated that the Bridge Financing and the proposed DIP Financing were paired from the get-go.  The two sets of loans are a package—one would not have been provided without the other.  Thus, it is only because of the Bridge Financing that the Debtors are now able to seek approval for DIP Financing that: (a) is sized to meet the Debtors' urgent and significant liquidity needs; (b) offers resources for the Debtors to honor their various service agreement obligations, which are critical to preserving the value of the Debtors' estates and facilitating value-maximizing sale transactions for the benefit of all stakeholders; (c) allows the Debtors to continue value-maximizing marketing efforts to sell all or substantially all of their assets; and (d) following the contemplated sale transactions, facilitates the confirmation and consummation of a chapter 11 plan.

16.     As borne out in the DIP Declarations, the terms of the proposed DIP Financing, including the Approved Budget (subject to the Permitted Variance), interest rates and fees, were heavily negotiated through an intensive, good faith and arm's-length process.  Taken as a whole, the proposed DIP Financing is reasonable and fair under the circumstances of these Chapter 11 Cases.  The Debtors do not believe that more favorable or comparable financing was or is available

in light of (a) their evaluation of potential alternatives, (b) their liquidity position, (c) the lack of unencumbered assets to serve as a third-party lender's collateral, and (d) the Bridge/DIP Lenders' refusal to permit third-party priming of their debt.

17.     As described herein and the DIP Declarations, the proposed DIP Financing is the best financing package available to the Debtors and a key component to the Debtors' ability during the Chapter 11 Cases to maximize value for the benefit of all stakeholders.  For these reasons and others stated herein, the Debtors respectfully submit that the relief requested in the Motion should be granted.

[*Remainder of Page Left Intentionally Blank*]

## CONCISE STATEMENT PURSUANT TO COMPLEX CASE PROCEDURES AND BANKRUPTCY RULE 4001[3]

18.     Pursuant to paragraph 8 of the Complex Case Procedures, the proposed DIP Financing and/or Interim Order contains the

following provisions:

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| **Parties to the DIP Facility** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* <br><br> **Brookfield Borrower:** <br> Pine Gate Renewables, LLC <br> **Brookfield DIP Agent:** <br> BID Administrator LLC, as Administrative Agent and Collateral Agent <br> **Brookfield DIP Lenders**: <br> The Lenders party to the Brookfield DIP Documents from time to time <br> **Brookfield DIP Guarantors**: <br> The Debtors and certain non-Debtors identified as Guarantors in the Brookfield DIP Documents | **Carlyle Issuer:** <br> Pine Gate Renewables, LLC <br> **Carlyle DIP Agent:** <br> Wilmington Trust, N.A., as Indenture Trustee <br> **Carlyle DIP Noteholders**: <br> The note purchasers party to the Carlyle DIP Documents <br> **Carlyle DIP Guarantors**: <br> The Debtors and certain non-Debtors identified as Guarantors in the Carlyle DIP Documents | **Fundamental Borrower:** <br> Pine Gate Renewables, LLC <br> **DIP Lenders**: <br> The Lenders party to the Fundamental DIP Documents <br> **DIP Guarantors**: <br> The Debtors and certain non-Debtors identified as Guarantors in the Fundamental DIP Documents |
| **Purpose** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing the DIP Financing is vital to a chapter 11 process and/or to otherwise preserve the enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate access to the DIP Financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of the proposed Interim Order and the DIP Documents. <br><br> *See* Proposed Interim Order, ¶¶ I(2)-(3). | | |
| **Borrowing Limits** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **(a)  Initial Draw**—Up to $17,500,000.00 within three (3) Business Days after entry of the Interim Order; | **(a)  Initial Draw**—Up to $16,559,056.06 within three (3) Business Days after entry of the Interim Order; | **(a)  Initial Draw**—Up to $21,304,328.11 within three (3) Business Days after entry of the Interim Order; |

---

3    This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, will control.  Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the proposed Interim Order or the DIP Loan Documents.

| Summary of Material Terms of Proposed DIP Financing | | | |
|---|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| | **(b) Second Draw**—Up to the balance of the Brookfield New Money DIP Loans (*less* amounts allocated to the Brookfield Subsequent Draws) within three (3) Business Days after entry of the Final Order <br><br> **(c) Subsequent or Discretionary Draw**—Up to $86,870,686.17 in multiple draws within three (3) Business Days after satisfaction of conditions precedent (the "***Brookfield Subsequent Draws***"); and <br><br> **(d) Post-Sale Draw**—Any undrawn Brookfield New Money DIP Loans (other than amounts earmarked for the Brookfield Subsequent Draws) become available upon closing of a Sale Transaction solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse Agreement or any amendment thereto, notwithstanding unsatisfied conditions precedent. | **(b) Second Draw**—Up to the balance of the Carlyle New Money DIP Notes (*less* amounts allocated to the Carlyle Discretionary Draws) within three (3) Business Days after entry of the Final Order; <br><br> **(c) Subsequent or Discretionary Draw**—Up to $24,410,196.64 in multiple draws within three (3) Business Days after satisfaction of conditions precedent (the "***Carlyle Discretionary Draws***"); and <br><br> **(d) Post-Sale Draw**—Any undrawn Carlyle DIP Commitments (other than amounts earmarked for the Carlyle Discretionary Draws) become available upon closing of a Sale Transaction solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse Agreement or any amendment thereto, notwithstanding unsatisfied conditions precedent. | **(b) Second Draw**—Up to the balance of the Fundamental New Money DIP Loans (*less* amounts allocated to the Fundamental Subsequent Draws) within 3 Business Days after entry of the Final Order; <br><br> **(c) Subsequent or Discretionary Draw**—Up to $28,713,902.04 in multiple draws within three (3) Business Days after satisfaction of conditions precedent (the "***Fundamental Subsequent Draws***"); and <br><br> **(d) Post-Sale Draw**—Any undrawn Fundamental New Money DIP Loans (other than amounts earmarked for the Fundamental Subsequent Draws) become available upon closing of a Sale Transaction solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse Agreement or any amendment thereto, notwithstanding unsatisfied conditions precedent. |
| **Approved Budget** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | A copy of the Initial Budget is attached as **<u>Exhibit D</u>** to the proposed Interim Order. | | |
| **Maturity Date** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | Each DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"): <br><br> (a) March 31, 2026 (the "***Scheduled Maturity Date***"); <br><br> (b) the effective date of a chapter 11 plan in the Chapter 11 Cases (the "***Effective Date***"); <br><br> (c) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise (a "***Sale***"), except ACT or any sale resulting from the sale processes contemplated by the Stalking Horse Agreements or the Additional DIP Facilities; <br><br> (d) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding DIP Loans under the DIP Documents; <br><br> (e) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; <br><br> (f) the date that is 30 days after the Petition Date, or such later date as agreed by the DIP Lenders, unless the Final DIP Order has been entered by the Court on or prior to such date; | | |

| Summary of Material Terms of Proposed DIP Financing | | | |
|---|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| | (g) the date on which the Debtors' right to use cash collateral in accordance with the Interim DIP Order or Final DIP Order is terminated, as applicable;<br><br>(h) the occurrence of the maturity date under or the acceleration of any Additional DIP Facility; and<br><br>(i) the date on which the Debtors, without the prior written consent of the DIP Lenders file or express written support for bidding procedures, sale processes, or transactions that are not acceptable to the DIP Lenders or any plan of liquidation or reorganization (or related disclosure statement) that is not an Acceptable Plan, in each case, concerning the DIP Loan Parties or the DIP Collateral.<br><br>*See* Brookfield DIP Credit Agreement, definition of "Maturity Date"; *see* Carlyle DIP Note Purchase Agreement, definition of "Maturity Date"; *see* Fundamental DIP Credit Agreement, definition of "Maturity Date". | | |
| **Interest Rates**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • Brookfield New Money DIP Loans: 14.00% compounded monthly and payable in kind.<br>• Brookfield Roll-Up DIP Loans: Brookfield Roll-Up DIP Loans accrue interest at the rate of interest of the Brookfield Prepetition Loans refinanced by such Brookfield Roll-Up DIP Loans:<br> ▪ With respect to Brookfield Roll-Up DIP Loans that refinance Brookfield Prepetition Loans incurred under the Bridge Facility, 14.00% compounded monthly and payable in kind;<br> ▪ With respect to Brookfield Roll-up DIP Loans that refinance Brookfield Prepetition Loans incurred as a result of interest paid-in-kind, 12.25% (inclusive of 2.00% default interest) compounded quarterly and payable in kind; and<br> ▪ With respect all other Brookfield Roll-Up Loans, 11.25% (inclusive of 2.00% default interest) compounded quarterly and payable in kind.<br>• Default Rate: 2.00% plus the Applicable Interest Rate. | • Carlyle New Money DIP Notes: 14.00% compounded monthly and payable in kind.<br>• Carlyle Roll-Up DIP Notes: Carlyle Roll-Up DIP Notes accrue interest at the rate of interest of the Carlyle Prepetition Notes refinanced by such Carlyle Roll-Up DIP Notes:<br> ▪ With respect to Carlyle Roll-Up DIP Notes that refinance Carlyle Prepetition Notes issued under the Bridge Facility, 14.00% compounded monthly and payable in kind, and<br> ▪ With respect to all other Carlyle Roll-Up DIP Notes, 10.75% compounded monthly and payable in kind.<br>• Default Rate: The rate of interest per annum that is the greater of (a) 2% above [applicable interest rate] or (b) 2% over the rate of interest last quoted by *The Wall Street Journal* as the "U.S. prime rate"<br><br>*See* Carlyle DIP Note Purchase Agreement § 1.1, "Authorization of Notes"; *id.*, Schedule A, "Default Rate". | • Fundamental New Money DIP Loans: 14.00% compounded monthly and payable in kind.<br>• Fundamental Roll-Up DIP Loans: Fundamental Roll-Up DIP Loans accrue interest at the rate of interest of the Fundamental Prepetition Loans refinanced by such Fundamental Roll-Up DIP Loans:<br> ▪ With respect to Fundamental Roll-Up DIP Loans that refinance Fundamental Prepetition DIP Loans incurred or refinanced under the Bridge Facility, 14.00% compounded monthly and payable in kind, and<br> ▪ With respect to all other Fundamental Roll-Up DIP Loans, 13.85% or 9.85% depending on the rate of interest of the Fundamental Prepetition Loans refinanced by such Fundamental Roll-Up DIP Loans.<br>• Default Rate: Two percent (2%) per annum in excess of the interest rate then otherwise payable under the Fundamental DIP Credit Agreement.<br><br>*See* Fundamental DIP Credit Agreement § 1.1, "Interest Rate"; *id.* § 7.6, "Default Rate". |

| Summary of Material Terms of Proposed DIP Financing | | | |
|---|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| | *See* Brookfield DIP Facility, § 1.1, "Applicable Interest Rate"; *id.* § 2.5, "Interest on Loans". | | |
| **Conditions Precedent to Closing and Lending** *Fed. R. Bankr. P. 4001(c)(1)(B)* | Customary conditions precedent for a DIP financing facility and additional conditions precedent found in Section 3 of the Brookfield DIP Credit Agreement. | Customary conditions precedent for a DIP financing facility and additional conditions precedent found in Section 3 of the Carlyle DIP Note Purchase Agreement. | Customary conditions precedent for a DIP financing facility and additional conditions precedent found in Sections 2.3 and 2.5 of the Fundamental DIP Credit Agreement. |
| **Events of Default** *Fed. R. Bankr. P. 4001(c)(1)(B); Complex Case Procedures,* ¶ 8(e); *Proposed Interim Order,* ¶ 14 | Customary events of default for a DIP financing facility and additional events of default set forth in Section 7 of the Brookfield DIP Credit Agreement. | Customary events of default for a DIP financing facility and additional events of default set forth in Section 11 of the Carlyle DIP Note Purchase Agreement. | Customary events of default for a DIP financing facility and additional events of default set forth in Section 6 of the Fundamental DIP Credit Agreement. |
| **Carve Out** *Fed. R. Bankr. P. 4001(c)(1)(B)* | As used in the proposed Interim Order, the "***Carve Out***" means a superpriority administrative expense claim, with priority over all other administrative expense claims in the Chapter 11 Cases, in the aggregate amount of the Pre-Carve Out Trigger Notice Cap and the Post-Carve Out Trigger Notice Cap, which claims shall be secured by a priming lien senior to all other liens, in each case, to the extent provided under the proposed Interim Order (for the avoidance of doubt, with respect to the priority position of the applicable Carve Out in the DIP Collateral and with respect to the DIP Superpriority Claims for each DIP Facility and the Prepetition Secured Obligations, as set forth in Annex 3 hereto, the applicable Carve Out shall be calculated on the basis of and limited by the Allocable Percentage with respect to such DIP Facility and the applicable Prepetition Secured Obligations). The "***Pre-Carve Out Trigger Notice Cap***" means the Pre-Carve Out Trigger Notice Gross Amount (as defined herein) net of all amounts transferred to the Carve Out Account (as defined herein) prior to the first day following the delivery of a Carve Out Trigger Notice. The "***Pre-Carve Out Trigger Notice Gross Amount***" means the aggregate amount of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (the "***U.S. Trustee Fees***"); (ii) all reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code incurred on any date in any Successor Cases; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, costs, and expenses (including Transaction Fees (as defined herein) to the extent reserved for in the Carve Out Account in accordance with the proposed Interim Order prior to the delivery of a Carve Out Trigger Notice but otherwise excluding any Transaction Fees or other transaction or success fees in excess of $3 million in the aggregate) incurred or earned by any persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") or any persons or firms retained by any statutory committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***") at any time (the "***Allowed Professional Fees***"), the fees in clauses (i) and (iii) to the extent that such U.S. Trustee Fees or Allowed Professional Fees are incurred or earned before the first day following delivery by any DIP Agent (acting at the direction of the applicable DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, in each case without regard to whether such fees, costs, or expenses are included or provided for in any Approved Budget or were invoiced on or after the Carve Out Trigger Date (as defined below). The "***Post-Carve Out Trigger Cap***" means the aggregate amount of (x) the fees in clause (i) of the definition of Pre-Carve Out Trigger Notice Gross Amount to the extent incurred on or after the first day following delivery of a Carve Out Trigger Notice; (y) Allowed Professional Fees of Debtor Professionals in an aggregate |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| **Brookfield DIP Facility** | **Carlyle DIP Facility** | **Fundamental DIP Facility** |

<table>
<tr><td></td><td colspan="3">amount not to exceed $4,500,000 incurred on or after the first day following delivery by any DIP Agent (acting at the direction of applicable DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Debtor Professional and not previously returned or applied to its respective fees and expenses; and (z) Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $500,000 incurred after the first day following delivery by the DIP Agent (acting at the direction of the applicable DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.  For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by email by any DIP Agent or DIP Lender Advisor (in each case acting at the direction of the applicable DIP Lenders) to the Debtors' restructuring co-counsel (Latham & Watkins LLP and Hunton Andrews Kurth LLP), the U.S. Trustee, counsel to the Committee (if any), and each DIP Agent, which notice (i) may be delivered only following the occurrence, and during the continuation of, an Event of Default and (ii) shall expressly state that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>*See* Proposed Interim Order, ¶ 11, "Carve Out".</td></tr>
<tr><td>**Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)*</td><td colspan="3">DIP Lien Grant.  To secure the prompt payment and performance of the applicable DIP Obligations of the Debtors to the applicable DIP Secured Parties of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, and subject and subordinate to the applicable Carve Out, and for the benefit of itself and the applicable DIP Lenders, and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar instruments or document, or the possession or control by the applicable DIP Agent or any other DIP Secured Party of, or over, any DIP Collateral, (i) the Brookfield DIP Agent is granted valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Brookfield DIP Liens***") in and upon the Brookfield DIP Collateral held by the Brookfield Borrower or the Brookfield Debtor Guarantors or Brookfield Non-Debtor Guarantors and the Brookfield Pledged Intercompany Claims, (ii) the Carlyle DIP Agent is granted valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Carlyle DIP Liens***") in and upon the Carlyle DIP Collateral held by the Carlyle Issuer or the Carlyle Debtor Guarantors or Carlyle Non-Debtor Guarantors and the Carlyle Pledged Intercompany Claims, and (iii) the Fundamental DIP Agent is granted valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Fundamental DIP Liens***") in and upon the Fundamental DIP Collateral held by the Fundamental Borrower or the Fundamental Debtor Guarantors or Fundamental Non-Debtor Guarantors and the Fundamental Pledged Intercompany Claims. For the avoidance of doubt, the DIP Collateral shall exclude the equity in or assets of ACT Power Services Holding Company Guarantor, LLC and its subsidiaries (collectively "***ACT***"), but shall include the proceeds of the equity in ACT Power Services Holding Company Guarantor, LLC and its direct and indirect subsidiaries, subject to the lien priority set forth in the DIP Intercreditor Agreement.  Any provision of any lease (except for nonresidential real property leases) or other license, contract or other agreement that requires (i) the consent or approval of one or more parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any interest in any such lease, license, contract, or other agreement, or the proceeds thereof, or other collateral related thereto, is deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law. Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens (as defined below) on such interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreements or the proposed Interim Order, subject to applicable law.<br><br>DIP Lien Priority.  The DIP Liens securing each DIP Facility shall be, in all cases, subject to the Carve Out and have the priority set forth in Annex 3.  Other than as set forth herein (including with respect to the Carve Out and any Replacement Additional DIP Facility (as defined below) incurred in accordance with the terms of paragraph 23 and the DIP Documents) or permitted under the DIP Documents, the DIP Liens (i) shall not be made subject to or pari passu with</td></tr>
</table>

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| **Brookfield DIP Facility** | **Carlyle DIP Facility** | **Fundamental DIP Facility** |

| | any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and (ii) shall be valid and enforceable (A) against any Trustee, (B) upon the conversion of any of the Chapter 11 Cases to any Successor Case, (C) notwithstanding any abstention by the Court, and/or (D) upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens. |
|---|---|
| | <u>Post-Petition Lien Perfection.</u> The proposed Interim Order shall be sufficient and conclusive evidence of the priority, perfection, enforceability, and validity of the DIP Liens, Adequate Protection Liens and any other post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral held by the DIP Borrowers or the Debtor Guarantors, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtors (a "**_Perfection Act_**"). Notwithstanding the foregoing, if any DIP Agent or Prepetition Agent elects for any reason to file, record, or otherwise effectuate any Perfection Act, subject to the DIP Intercreditor Agreement, such DIP Agent or Prepetition Agent, as applicable, in each case in its sole discretion, is authorized to perform such Perfection Act, and the Debtors are authorized to perform such Perfection Acts to the extent necessary or required by such DIP Agent or Prepetition Agent, as applicable, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record any document in regard to such act in accordance with applicable law. Any DIP Agent or Prepetition Agent may, in each case in its sole discretion, choose to file, record, or present a certified copy of the proposed Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record such certified copy of the proposed Interim Order in accordance with applicable law. Should any DIP Agent or Prepetition Agent so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the DIP Liens or the Adequate Protection Liens, as applicable, granted herein by virtue of the entry of the proposed Interim Order. |
| | _See_ Proposed Interim Order, ¶ 8, "Collateralization". |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral** _Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv)_ | As adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Secured Parties shall receive (a) Adequate Protection Liens on the appliable DIP Collateral; (b) allowed administrative expense claim against each Debtor on a joint and several basis, which shall (i) have recourse to and be payable from all prepetition and postpetition property of the applicable Debtors, and (ii) have priority over all other administrative claims in the Chapter 11 Cases, including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code, subject to the applicable Carve Out and the applicable DIP Superpriority Claims; postpetition interest payments as described in the proposed Interim Order; payment of prepetition and postpetition accrued and unpaid fees and expenses, as described in the proposed Interim Order; ad (e) information rights. |
| | _See_ Proposed Interim Order, ¶ 10. |

| Summary of Material Terms of Proposed DIP Financing | | | |
|---|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | Without prejudice to the rights of all parties in interest other than the Debtors, but subject to the limitations contained in paragraph 17 of the proposed Interim Order, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate, acknowledge and agree that:<br><br>1. Brookfield Prepetition Credit Agreement. Prior to the commencement of the Chapter 11 Cases, the Brookfield Prepetition Secured Parties made the Brookfield Prepetition Loans to the Brookfield Prepetition Loan Parties pursuant to the Brookfield Prepetition Documents. Pursuant to the Brookfield Prepetition Documents, each of the Brookfield Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Brookfield Prepetition Secured Obligations to the Brookfield Prepetition Agent for the benefit of the Brookfield Prepetition Lenders.<br><br>2. Brookfield Prepetition Secured Obligations. As of the Petition Date, the Brookfield Prepetition Borrower and the other Brookfield Prepetition Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Brookfield Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $417.3 million on account of the Brookfield Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law. | Without prejudice to the rights of all parties in interest other than the Debtors, but subject to the limitations contained in paragraph 17 of the proposed Interim Order, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate, acknowledge and agree that:<br><br>1. Carlyle Prepetition Note Purchase Agreement. Prior to the commencement of the Chapter 11 Cases, the Carlyle Prepetition Secured Parties purchased the Carlyle Prepetition Notes from the Carlyle Prepetition Issuer pursuant to the Carlyle Prepetition Documents. Pursuant to the Carlyle Prepetition Documents, each of the Carlyle Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Carlyle Prepetition Secured Obligations to the Carlyle Prepetition Agent for the benefit of the Carlyle Prepetition Noteholders.<br><br>2. Carlyle Prepetition Secured Obligations. As of the Petition Date, the Carlyle Prepetition Issuer and the other Carlyle Prepetition Note Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Carlyle Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $322.2 million on account of the Carlyle Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in | Without prejudice to the rights of all parties in interest other than the Debtors, but subject to the limitations contained in paragraph 17 of the proposed Interim Order, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate, acknowledge and agree that:<br><br>1. Fundamental Prepetition Credit Agreement. Prior to the commencement of the Chapter 11 Cases, the Fundamental Prepetition Secured Parties made the Fundamental Prepetition Loans to the Fundamental Prepetition Loan Parties pursuant to the Fundamental Prepetition Documents. Pursuant to the Fundamental Prepetition Documents, each of the Fundamental Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Fundamental Prepetition Secured Obligations to the Fundamental Prepetition Agent for the benefit of the Fundamental Prepetition Lenders.<br><br>2. Fundamental Prepetition Secured Obligations. As of the Petition Date, the Fundamental Prepetition Borrower and the other Fundamental Prepetition Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Fundamental Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $666.1 million on account of the Fundamental Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| The Brookfield Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Brookfield Prepetition Documents, and all commitments of the Brookfield Prepetition Secured Parties to extend Brookfield Prepetition Loans or make other financial accommodations were terminated on the Petition Date.<br><br>3. _Validity and Priority of Brookfield Prepetition Secured Obligations_. (a) The Brookfield Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Brookfield Prepetition Loan Parties and such Brookfield Prepetition Secured Obligations are enforceable in accordance with the terms of the Brookfield Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Brookfield Prepetition Secured Obligations exist, and no portion of the Brookfield Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Brookfield Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or | connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law. The Carlyle Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Carlyle Prepetition Documents, and all commitments of the Carlyle Prepetition Secured Parties to purchase Carlyle Prepetition Notes or make other financial accommodations were terminated on the Petition Date.<br><br>3. _Validity and Priority of Carlyle Prepetition Secured Obligations_. (a) The Carlyle Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Carlyle Prepetition Note Parties and such Carlyle Prepetition Secured Obligations are enforceable in accordance with the terms of the Carlyle Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Carlyle Prepetition Secured Obligations exist, and no portion of the Carlyle Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Carlyle Prepetition Secured Parties or any of their | charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law. The Fundamental Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Fundamental Prepetition Documents, and all commitments of the Fundamental Prepetition Secured Parties to extend Fundamental Prepetition Loans or make other financial accommodations were terminated on the Petition Date.<br><br>3. _Validity and Priority of Fundamental Prepetition Secured Obligations_. (a) The Fundamental Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Fundamental Prepetition Loan Parties and such Fundamental Prepetition Secured Obligations are enforceable in accordance with the terms of the Fundamental Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Fundamental Prepetition Secured Obligations exist, and no portion of the Fundamental Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| related to the Brookfield Prepetition Documents, or the Brookfield Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Brookfield Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.<br><br>4.  Validity, Priority and Perfection of Brookfield Prepetition Liens:  As more fully set forth in the Brookfield Prepetition Credit Agreement, prior to the Petition Date, the Brookfield Prepetition Loan Parties became parties to the Brookfield Prepetition Security Documents pursuant to which the Brookfield Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Brookfield Prepetition Collateral in favor of the Brookfield Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Brookfield Prepetition Liens on the Brookfield Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Brookfield Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Brookfield Prepetition Liens were senior in priority over any and all other liens on the Brookfield Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Brookfield Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens. | respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Carlyle Prepetition Documents, or the Carlyle Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Carlyle Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.<br><br>4.  Validity, Priority and Perfection of Carlyle Prepetition Liens:  As more fully set forth in the Carlyle Prepetition Note Purchase Agreement, prior to the Petition Date, the Carlyle Prepetition Note Parties became parties to the Carlyle Prepetition Security Documents pursuant to which the Carlyle Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Carlyle Prepetition Collateral in favor of the Carlyle Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Carlyle Prepetition Liens on the Carlyle Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Carlyle Prepetition Noteholders for fair consideration and reasonably equivalent value; (b) the Carlyle Prepetition Liens were senior in priority over any and all other liens on the Carlyle Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Carlyle Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected | under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Fundamental Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Fundamental Prepetition Documents, or the Fundamental Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Fundamental Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.<br><br>4.  Validity, Priority and Perfection of Fundamental Prepetition Liens: As more fully set forth in the Fundamental Prepetition Credit Agreement, prior to the Petition Date, the Fundamental Prepetition Loan Parties became parties to which the Fundamental Prepetition Security Documents pursuant to which the Fundamental Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Fundamental Prepetition Collateral in favor of the Fundamental Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Fundamental Prepetition Liens on the Fundamental Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Fundamental Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Fundamental Prepetition Liens were senior in priority over any and all other liens on the Fundamental Prepetition Collateral, subject only to certain |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| 5. No Challenges/Claims as to Brookfield Prepetition Secured Parties. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Brookfield Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Brookfield Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Brookfield Prepetition Documents, the Brookfield Prepetition Secured Obligations, or the Brookfield Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.<br><br>*See* Proposed Interim Order, Annex 2, "The Debtors' Stipulations and Releases". | subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.<br><br>5. No Challenges/Claims as to Carlyle Prepetition Secured Parties. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Carlyle Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Carlyle Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Carlyle Prepetition Documents, the Carlyle Prepetition Secured Obligations, or the Carlyle Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.<br><br>*See* Proposed Interim Order, Annex 2, "The Debtors' Stipulations and Releases". | liens senior by operation of law or otherwise permitted by the Fundamental Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.<br><br>5. No Challenges/Claims as to Fundamental Prepetition Secured Parties. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Fundamental Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Fundamental Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Fundamental Prepetition Documents, the Fundamental Prepetition Secured Obligations, or the Fundamental Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.<br><br>*See* Proposed Interim Order, Annex 2, "The Debtors' Stipulations and Releases". |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| **Waiver or Modification of Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified solely as necessary to effectuate all of the terms and provisions of this Interim Order and the DIP Documents, including, without limitation, the incurrence of obligations, the authorization to make payments, the granting of liens and the perfection of liens. *See* Proposed Interim Order, ¶ 29 | | |
| **Challenge Period** *Fed. R. Bankr. P. 4001(c)(1)(B)(iii), (viii)* | The earliest to occur of (i) the commencement of a hearing to consider confirmation of a chapter 11 plan, (ii) three (3) Business Days' prior to the hearing (A) with respect to the Debtors' Stipulations and Releases in favor of the Brookfield Prepetition Secured Parties, for approval of a Brookfield Sale Transaction, (B) with respect to the Debtors' Stipulations and Releases in favor of the Carlyle Prepetition Secured Parties, for approval of a Carlyle Sale Transaction, and (C) with respect to the Debtors' Stipulations and Releases in favor of the Fundamental Prepetition Secured Parties, for approval of a Fundamental Sale Transaction, (iii) for any party in interest other than the Committee, no later than the date that is sixty (60) days from entry of the proposed Interim Order, and (iv) for the Committee, no later than sixty (60) days from the appointment of the Committee; provided, however, that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period ending on the later of sixty (60) days after entry of the proposed Interim Order and forty-five (45) days after the date of such conversion or appointment, as applicable, in each case solely with respect to any such trustee.  The Challenge Period may be extended in writing prior to the expiration of the Challenge Period (which writing may be in the form of email by counsel) from time to time in the sole discretion of (x) the Brookfield Prepetition Agent (at the direction of the Brookfield Prepetition Lenders) with respect to any Challenge to the Brookfield Prepetition Liens, the Brookfield Prepetition Secured Obligations, or the Brookfield Prepetition Secured Parties, (y) the Carlyle Prepetition Agent (at the direction of the Carlyle Prepetition Noteholders) with respect to any Challenge to the Carlyle Prepetition Liens, the Carlyle Prepetition Secured Obligations, or the Carlyle Prepetition Secured Parties, (z) the Fundamental Prepetition Agent (at the direction of the Fundamental Prepetition Lenders) with respect to any Challenge to the Fundamental Prepetition Liens, the Fundamental Prepetition Secured Obligations, or the Fundamental Prepetition Secured Parties. <br><br> For the avoidance of doubt, notwithstanding anything to the contrary in the proposed Interim Order, upon the entry of the proposed Interim Order, (i) the Challenge Period shall automatically be deemed to have lapsed as to the Debtors with respect to the Debtors' Stipulations and Releases, (ii) such stipulations, admissions, agreements, and other releases shall be binding upon the Debtors, and (iii) any Challenges by the Debtors with respect to the Prepetition Secured Parties (including on account of the Roll-Up DIP Loans), shall be deemed forever waived, released, and barred. <br><br> *See* Proposed Interim Order, ¶¶ 17(g)-(h). | | |
| **Milestones** *Fed. R. Bankr. P. 4001(c)(1)(B)(vi); Complex Case Procedures, ¶ 8(a)* | The Credit Parties shall ensure that each of the milestones set forth below (the "**Milestones**") is achieved in accordance with the applicable timing referred to below (or such later dates as approved in writing by the Requisite Lenders in their sole discretion, which approval may be provided via electronic mail): <br><br> (a) On the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Administrative Agent, | The Debtors shall achieve each of the following Milestones, in each case on terms and conditions, and subject to documentation, including, in each case, forms of all applicable orders, in form and substance acceptable to the Required Holders: | The Debtors shall achieve each of the following DIP Milestones, in each case on terms and conditions, and subject to documentation, including, in each case, forms of all applicable orders, in form and substance acceptable to the Required Lenders in all respects: <br><br> (a) No later than the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Required |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| seeking entry of interim and final orders approving the Debtors' entry into the DIP Facility and the use of the Cash Collateral and Prepetition Collateral of the Prepetition Secured Parties (the "**DIP Motion**"). <br><br>(b) On the Petition Date, to the extent any Debtors are party to services agreements for operations and maintenance, engineering, procurement, construction, development, and asset management services with Projects owned by a Brookfield Silo Entity, the Debtors shall have filed a motion for entry of an order (the "**Services Agreement Assumption Order**") to assume or to assume such agreements pursuant to Section 365 of the Bankruptcy Code. <br><br>(c) No later than 5 days after the Petition Date, the Debtors shall have obtained entry of Interim DIP Order. <br><br>(d) No later than 30 days after the Petition Date, the Debtors shall have obtained entry of Final DIP Order. <br><br>(e) Within one (1) day of the Petition Date, the applicable Debtors and their applicable subsidiaries, and Newco shall have entered into a transition services agreement (the "**Transition Services Agreement**") in form and substance reasonably acceptable to the Requisite Lenders to provide Newco and the Brookfield Silo Entities with (A) continued operations and maintenance, engineering, procurement, construction, development, and asset management services on terms substantially similar to the existing O&M Services Agreements following a Sale in which the Administrative Agent (or the | **DIP Milestones** <br><br>(a) No later than the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Required Holders, seeking entry of interim and final orders approving the Debtors' entry into the Notes and the use of the cash collateral and Prepetition Collateral of the Prepetition Secured Parties. <br><br>(b) No later than 5 days after the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order, in form and substance acceptable to the Required Holders. <br><br>(c) No later than 30 days after the Petition Date, the Debtors shall have obtained entry of the Final DIP Order, in form and substance acceptable to the Required Holders. | Lenders, seeking entry of interim and final orders approving the Debtors' entry into the DIP Facility and the use of the Cash Collateral and Prepetition Collateral of the Prepetition Secured Parties. <br><br>(b) No later than 5 days after the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order. <br><br>(c) No later than 30 days after the Petition Date, the Debtors shall have obtained entry of the Final DIP Order. <br><br>(d) Within one (1) day of the Petition Date, on the prior written request of the Lenders, ACT and Newco shall have entered into a transition services agreement (the "**Transition Services Agreement**") in form and substance reasonably acceptable to the Required Lenders to provide Newco and the Fundamental Silo Entities with (A) operations and management and construction development services on terms substantially similar to the Existing Services Arrangements following a Sale Transaction in which the Lenders (or the Lenders' designee) is the winning bidder, and (B) at cost, full access before and after such Sale Transaction to information technology and other systems and data (including from ACT) related to operations and management and construction and development services provided to the Fundamental Silo Entities, and other transition services reasonably determined by Newco to be necessary or appropriate to transition such operations and |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| Administrative Agent's designee) is the winning bidder, and (B) at cost, full access before and for a reasonable period after such Sale to information technology and other systems and data (including from ACT) related to operations and maintenance, engineering, procurement, construction, development, and asset management services provided to the Brookfield Silo Entities, and other transition services reasonably determined by Newco to be necessary or appropriate to transition such operations and management, engineering, procurement, construction, development, and/or asset management services to other providers. For the avoidance of doubt, the Transition Services Agreement will not have the effect of waiving or reducing or altering in any way any termination or similar fees owed under the Initial O&M Services Agreements.<br><br>(f) Within one (1) day of the Petition Date, the Debtors shall have filed a motion (the "**Bidding Procedures / Stalking Horse APA Motion**"), in form and substance acceptable to the Administrative Agent, seeking entry of an order approving (i) procedures for a sale, in one or a series of related transactions, of all or substantially all of the assets of the Debtors, including the Brookfield Silo Assets (the "**Bidding Procedures**") and (ii) the Debtors' entry into and performance under the Stalking Horse APA; provided that, for the avoidance of doubt, the order approving Bidding Procedures / Stalking Horse APA Motion shall provide that the Secured Parties and the Prepetition Secured Parties may credit bid the Obligations and the Prepetition Secured Obligations, as applicable, in any sale of the Debtors' assets or any of the | **Asset Sale Milestones**<br><br>(a) Within one (1) day of the Petition Date, ACT, the other applicable Debtors and their applicable subsidiaries, and Newco shall have entered into a transition services agreement (the "**Transition Services Agreement**") in form and substance reasonably acceptable to the Required Holders to provide Newco and the Carlyle Silo Entities with (A) continued operations and maintenance, engineering, procurement, construction, development, and asset management services on terms substantially similar to the Existing Services Arrangements following a Sale in which the Required Holders (or their designee) is the winning bidder, and (B) at cost, full access before and for a reasonable period after such Sale to information technology and other systems and data (including from ACT) related to operations, and maintenance, engineering, procurement, construction, development, and asset management services provided to the Carlyle Silo Entities, and other transition services reasonably determined by Newco to be necessary or appropriate to transition such operations and maintenance, engineering, procurement, construction, development, and/or asset management services to other providers. For the avoidance of doubt, the Transition Services Agreement will not have the effect of waiving or reducing or altering in any way any termination or similar fees owed under the Existing Services Agreements.<br><br>(b) Within one (1) day of the Petition Date, the Debtors shall have entered into the Stalking Horse APA and shall have filed a motion (the | management and/or construction and development services to other providers. For the avoidance of doubt, the Transition Services Agreement will not have the effect of waiving or reducing or altering in any way any termination or similar fees owed under the existing O&M services agreements.<br><br>(e) Within one (1) day of the Petition Date, the Debtors shall have filed a motion (the "**Bidding Procedures / Stalking Horse APA Motion**"), in form and substance acceptable to the Required Lenders, seeking entry of an order approving (i) procedures for a sale, in one or a series of related transactions, of all or substantially all of the assets of the Debtors, including the Fundamental Silo Entities (the "**Bidding Procedures**") and (ii) the Debtors' entry into and performance under the Stalking Horse APA; provided that, for the avoidance of doubt, the order approving Bidding Procedures / Stalking Horse APA Motion shall provide that the Lenders may credit bid the Obligations and the Prepetition Secured Obligations, as applicable, in any sale of the Debtors' assets or any of the assets subject to the Stalking Horse APA, and the Debtors shall have entered into the Stalking Horse APA.<br><br>(f) No later than the earlier of (x) 7 days after the later of the Petition Date and (y) November 5, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Required Lenders, approving the Bidding Procedures Motion and the Debtors' entry into and performance |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| Brookfield Silo Assets, and the Debtors shall have entered into the Stalking Horse APA. | "**Bidding Procedures / Stalking Horse APA Motion**"), in form and substance acceptable to the Required Holders, seeking entry of an order approving (i) procedures for a sale, in one or a series of related transactions, of all or substantially all of the assets of the Debtors, including the Carlyle Silo Assets (the "**Bidding Procedures**") and (ii) the Debtors' entry into and performance under the Stalking Horse APA; *provided that*, for the avoidance of doubt, the order approving Bidding Procedures / Stalking Horse APA Motion shall provide that the Secured Parties and the Prepetition Secured Parties may credit bid the Obligations and the Prepetition Secured Obligations, as applicable, in any sale of the Debtors' assets or any of the Carlyle Silo Assets. | under the Stalking Horse APA (the "***Bidding Procedures Order***"). |
| (g) No later than November 5, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Administrative Agent, approving the Bidding Procedures and the Debtors' entry into and performance under the Stalking Horse APA (the "**Bidding Procedures Order**"). | | (g) On Petition Date, to the extent any Debtors are party to services agreements for operations and management and/or construction and development services with Projects in the Fundamental Silo Entities (collectively, the "***Existing Services Arrangements***"), the Debtors shall have filed a motion for entry of an order to assume such agreements pursuant to Section 365 of the Bankruptcy Code. |
| (h) On or prior to November 19, 2025, the Borrower shall have provided the Administrative Agent with summaries of all indications of interest and letters of intent received for the Sale. | (c) No later than November 5, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Required Holders, approving the Bidding Procedures / Stalking Horse APA Motion, including the Debtors' entry into and performance under the Stalking Horse APA (the "**Bidding Procedures Order**"). | (h) On or prior to November 19, 2025, the Sponsor shall have provided the Lenders with summaries of all indications of interest and letters of intent received for the Sale Transaction. |
| (i) No later than December 15, 2025, the deadline for parties to submit bids to the Debtors pursuant to the Bidding Procedures Order shall have occurred. | | (i) No later than the earlier of (x) 75 days after the Petition Date and (y) December 15, 2025, the deadline for parties to submit binding bids to the Debtors pursuant to the Bidding Procedures Order shall have occurred. |
| (j) No later than December 17, 2025, the Debtors shall have commenced an auction pursuant to the Bidding Procedures Order; *provided that* the Debtors shall retain the right to cancel such auction pursuant to the Bidding Procedures Order. | (d) On the Petition Date, to the extent any Debtors are party to services agreements for operations and maintenance, engineering, procurement, construction, development, and asset management services with Projects in the Carlyle Silo Entities (collectively, the "**Existing Services Agreements**"), the Debtors shall have filed a motion for entry of an order, in form and substance acceptable to the Required Holders (the "**Existing Services Agreement Assumption Order**") to assume or | (j) No later than the earlier of (x) 85 days after the Petition Date and (y) December 17, 2025, the Debtors shall have commenced an auction pursuant to the Bidding Procedures Order; *provided that* the Debtors shall retain the right to cancel such auction pursuant to the Bidding Procedures Order. |
| (k) No later than December 23, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Administrative Agent, approving a sale of all or substantially all (or any material portion thereof acceptable to the Administrative Agent) of their assets pursuant to the Bidding Procedures Order (the "**Sale Order**"). | | (k) No later than December 23, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the |
| (l) No later than December 31, 2025, the Debtors shall have consummated the Sale pursuant to | | |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| the Sale Order (the "**Sale Milestone**"); provided that the Sale Milestone shall be deemed extended until the earlier of (x) 60 days after the initial Sale Milestone and (y) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed.<br><br>(m) No later than the date set forth in Schedule 5.17, the Debtors shall have achieved the Milestones set forth therein (the "**Transition Milestones**").<br><br>*See* Brookfield DIP Credit Agreement, § 5.17, "Certain Milestones". | to assume and assign to ACT Power Services (upon closing of a sale of ACT Power Services) such agreements pursuant to Section 365 of the Bankruptcy Code.<br><br>(e) On or prior to November 19, 2025, the Company shall have provided the Required Holders with summaries of all indications of interest and letters of intent received for the Sale, any sale of equity interests in or assets of ACT, or any sale of all or substantially all of the Debtors' assets or businesses.<br><br>(f) No later than December 15, 2025, the deadline for parties to submit binding bids to the Debtors pursuant to the Bidding Procedures Order shall have occurred.<br><br>(g) No later than December 17, 2025, the Debtors shall have commenced an auction pursuant to the Bidding Procedures Order; *provided* that the Debtors shall retain the right to cancel such auction pursuant to the Bidding Procedures Order.<br><br>(h) No later than December 23, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Required Holders, approving a sale of all or substantially all (or any material portion thereof acceptable to the Required Holders) of their assets pursuant to the Bidding Procedures Order (the "**Sale Order**").<br><br>(i) No later than December 31, 2025, the Debtors shall have consummated the sale of all or substantially all of the Carlyle Silo Assets pursuant to the Sale Order (the "**Sale Milestone**"); *provided* that the Sale Milestone | Required Lenders, approving a sale of all or substantially all (or any material portion thereof acceptable to the Required Lenders) of their assets pursuant to the Bidding Procedures Order (the "*Sale Order*").<br><br>(l) No later than December 31, 2025, the Debtors shall have consummated the sale of all or substantially all of the assets subject to the Stalking Horse APA pursuant to the Sale Order (the "*Sale Milestone*"); *provided* that the Sale Milestone shall be deemed extended until the earlier of (x) 60 days after the initial Sale Milestone and (y) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed. |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| | shall be deemed extended until the earlier of (x) 60 days after the initial Sale Milestone and (y) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed.<br><br>**Other Milestones**<br><br>For the East Atmore Project, the Note Parties shall use their reasonable best efforts to timely achieve the following milestones (for the avoidance of doubt, the failure to achieve the Milestones set forth in the following clauses (i) – (vi) shall not give rise to a Default or Event of Default so long as the Note Parties use their best efforts to timely achieve such milestones):<br><br>(a) No later than [November 12, 2025], the Note Parties shall have delivered evidence satisfactory to the Required Holders that Substantial Completion (or equivalent milestone as defined in EPC contract) has been achieved (as confirmed by the EPC contractor and the independent engineer under the East Atmore project financing (the "**East Atmore IE**")).<br><br>(b) No later than [December 1, 2025], the Note Parties shall have delivered evidence satisfactory to the Required Holders that "Term Conversion" has been achieved, including by a copy of the "Notice of Term Conversion" and the "Borrowers' Term Conversion Certificate" (each as referenced in the Credit Agreement with respect to the East Atmore Project dated as of September 30, 2024). | |

| Summary of Material Terms of Proposed DIP Financing | | | |
|---|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| | | (c) No later than [December 1, 2025], the "SC Funding Date" shall have occurred and the "Class A Substantial Completion Capital Contribution" shall have been paid (each as referenced in the Amended & Restated Limited Liability Company Agreement of Polaris OpCo Holdco A, LLC dated as of September 17, 2024 (the "**Polaris A LLCA**")). | |
| | | (d) No later than [December 19, 2025], the Purchase Price for 100% of the East Atmore ITCs shall have been paid under AutoZone ITC Tax Credit Purchase Agreement. | |
| | | (e) Promptly upon receipt and in any event no later than fifteen (15) Business Days prior to [December 19, 2025], the Note Parties shall have delivered to the Required Holders (a) the certificate of the then-applicable Guarantor referenced in Section 2.1(c)(xix)(B) of the Tax Credit Purchase Agreement with respect to the East Atmore Project dated as of September 20, 2024 or (b) evidence satisfactory to the Required Holders that the Buyer (as defined therein) has waived the delivery of such certificate or accepted an alternative deliverable in satisfaction of the applicable condition precedent (including a copy of such waiver or alternative deliverable, as applicable). | |
| | | (f) No later than [December 1, 2025], the Note Parties shall have delivered to the Required Holders the updated appraisal, cost segregation, and independent engineer reports reflecting final tax credit amounts as referenced in Section 2.1(c)(viii) of the East Atmore TCPA. | |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| | (g) No later than [December 1, 2025], the Note Parties shall have delivered to the Required Holders the bringdown of prevailing wage & apprenticeship, energy community and beginning of construction compliance certificates as referenced in Section 3.8(u) of the Polaris A LLCA.<br><br>The timing to complete each Milestone under this Schedule may be extended with the consent of the Required Holders (which may be in the form of an email from the DIP Secured Parties Advisors).<br><br>*See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Milestones". | |

| | | | |
|---|---|
| **Indemnification**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | Each of (a) the DIP Secured Parties and their Representatives and (b) the Prepetition Secured Parties and their Representatives, respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, each of the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the applicable Prepetition Documents and DIP Documents, as applicable.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of the proposed Interim Order to any obligation set forth, as the case may be, in the proposed Interim Order, the DIP Documents, or the Prepetition Documents to indemnify and/or hold harmless the DIP Agents, any other DIP Secured Party, the Prepetition Agents, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.<br><br>*See* Proposed Interim Order, ¶ 31, "Indemnification" |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | Section 506(c) Claims and 552(b) Equities.<br><br>Without affecting, modifying or limiting the scope or priority of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against or recovered from any of (i) the DIP Secured Parties, their respective claims, or the DIP Collateral or (ii) subject to entry of the Final Order, the Prepetition Secured Parties, their respective claims, or the Prepetition Collateral, in each case pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the applicable DIP Agent (acting at the direction of the applicable DIP Lenders) or the applicable Prepetition Agent (at the direction of the applicable Prepetition Lenders), as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Secured Party. |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| | *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |

| | | |
|---|---|---|
| | Each of the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, to the extent applicable, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the DIP Secured Parties or, subject to entry of the Final Order, the Prepetition Secured Parties, with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable.<br><br>*See* Proposed Interim Order, ¶ 18 | | |
| **Liens on Avoidance Actions**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi);*<br>*Complex Case Procedures, ¶ 8(d)* | The proposed Brookfield, Carlyle, and Fundamental DIP Facilities contemplate, subject to entry of the Final Order, liens on the proceeds of Avoidance Actions (but not the Avoidance Actions themselves). | | |
| **Fees**<br>*Fed. R. Bankr. P. 4001(c)(1)* | • Commitment/Funding/Upfront Fee:  4:00% of the aggregate amount of the New Money DIP Commitments (excluding, for the avoidance of doubt, the Roll-Up DIP Notes), in each case, payable in kind (pursuant to the terms described in each DIP Facility) to the Bridge/DIP Lenders in respect of their New Money DIP Commitments upon entry of the proposed Interim Order.<br><br>• Exit Fee:  8.00% of principal amount of the New Money DIP Loans so repaid or prepaid; *provided*, that if the New Money DIP Loans are repaid pursuant to a credit bid in an applicable Sale Transaction, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid and shall be paid in kind in such an event.<br><br>• Prepayment Premium:  Each repayment or prepayment of the New Money DIP Loans or such New Money DIP Loans otherwise becoming due and payable, upon the occurrence of a MOIC Event (as defined in the applicable DIP Documents), shall be subject to an additional payment in an amount sufficient to cause the applicable Bridge/DIP Lenders to receive a MOIC of 1.30x on the commitments in respect of the New Money DIP Loans, inclusive of all interest and fees (other than administrative agent fees). | | |
| **Cross-Collateralization**<br>*Complex Case Procedures, ¶ 8(b)* | The Brookfield DIP Facility, Carlyle DIP Facility, and Fundamental DIP Facility shall each be secured by the DIP Collateral Assets held by any Pari Guarantor Debtor, Priority Guarantor Debtor, and any other Debtor or Non-Debtor Guarantor to the extent that, with respect to, (a) Brookfield, such DIP Collateral does not constitute Carlyle Exclusive DIP Collateral or Fundamental Exclusive DIP Collateral; (b) Carlyle, such DIP Collateral does not constitute Brookfield Exclusive DIP Collateral or Fundamental Exclusive DIP Collateral; and (c) Fundamentals, such DIP Collateral does not constitute Carlyle Exclusive DIP Collateral or Brookfield Exclusive DIP Collateral. | | |
| **Releases of Claims**<br>*Complex Case Procedures, ¶ 8(f)* | *See above* "Debtors' Stipulations". | | |
| **Limitations on Use of Cash Collateral or DIP Proceeds**<br>*Complex Case Procedures, ¶ 8(g)* | The Debtors are authorized, as of the Interim Order Effective Date, to use all Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, solely for the purposes and subject to the restrictions set forth in the proposed Interim Order (subject to the Carve Out) and in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to make payments to the Prepetition Agents on account of the applicable Adequate Protection Obligations (as defined below) provided for in the proposed Interim Order and the DIP Documents, from the Interim Order Effective Date through and including the DIP Termination Date (as defined below). Nothing in the proposed Interim Order shall authorize the Disposition of any assets of the Debtors | | |

| Summary of Material Terms of Proposed DIP Financing | | |
|---|---|---|
| *Brookfield DIP Facility* | *Carlyle DIP Facility* | *Fundamental DIP Facility* |
| or their Estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except pursuant to the Approved Budget (subject to the Carve Out and the Permitted Variance) as permitted in the proposed Interim Order (including with respect to the Carve Out), the DIP Facilities, and the DIP Documents. *See* Proposed Interim Order, ¶ 7, "Use of Cash Collateral". | | |

| | Brookfield DIP Facility | Carlyle DIP Facility | Fundamental DIP Facility |
|---|---|---|---|
| **Non-Consensual Priming Liens** *Complex Case Procedures, ¶ 8(h)* | None. | | |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties** *Complex Case Procedures, ¶ 8(i)* | N/A. | | |

## **PREPETITION CAPITAL STRUCTURE**

19.     An overview of the capital structure of the Debtors and their affiliates as of the

Petition Date is set forth below, with more detailed descriptions thereafter.

| Facility | Approx. Invested Capital / Outstanding Principal (US $Millions) | Interest Rate | Maturity |
|---|---|---|---|
| Tax Equity | $2,500 | N/A | N/A |
| Permanent Debt | $1,262 | Various | Various |
| Construction Debt | $760 | Various | Various |
| **Total Project Capital** | **$4,522** | | |
| *Fundamental Facility* ($600 million facility) | $599 | Various | December 2026 |
| *Fundamental Interim Financing* ($110 million facility) | $110 | 14.00% | January 2026 |
| *Carlyle Facility* ($280 million facility) | $244 | 10.75% | February 2026 |
| *Carlyle Interim Financing* ($30 million facility) | $30 | 14.00% | February 2026 |
| *Brookfield Facility* ($300 million facility) | $300 | 11.25% | January 2032 |
| *Brookfield Interim Financing* ($68 million facility) | $28 | 14.00% | February 2026 |
| *Pathward Facility* ($80 million facility) | $49 | 8.50% | February 2026 |
| **Total Corporate Debt** | **$1,360** | | |
| Preferred Equity A | $494 | 8.00% | N/A |
| Preferred Equity B | $605 | 12.00% | N/A |
| **Total Preferred Equity** | **$1,099** | | |
| **Total PGR Capital** | **$6,981** | | |
| Fundamental Revolving Loan | $135 | S + 550 | March 2027 |

| | | | |
|---|---|---|---|
| WTB Term Loan | $19 | 5.0% | May 2035 |
| **Total Blue Ridge Power Capital** | **$155** | | |
| Total Funded Capital | $7,136 | | |

I.     **Corporate Financing**

20.     The Debtors (through their in-house finance team) source financing for each stage of a project, including through debt facilities from lenders associated with Fundamental Renewables ("*Fundamental*"), Brookfield Asset Management ("*Brookfield*"), and The Carlyle Group ("*Carlyle*").  Each of the corporate-level debt facilities has separate collateral and obligors, as further explained below.

21.     <u>Fundamental Facility</u>.  Debtors FP 2021 Dev Holdco LLC, as borrower (the "*FP Dev Borrower*") is party to that certain Revolving Loan Agreement, dated as of December 10, 2021 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "*Development Fundamental Loan Agreement*"), with FP Solar Development I LLC, as lender (the "*FP Dev Lender*").  This facility generally funds the Debtors' development activities and solar power projects.  Obligations under the Development Fundamental Loan Agreement are guaranteed by approximately 130 Debtor entities that are direct subsidiaries of FP Dev Borrower, each of which owns a specific project in development.  FP Dev Borrower has also pledged substantially all of its assets as collateral to FP Dev Lender.  As of the Petition Date, the Debtors have approximately $741.2 million of loans outstanding under the Development Fundamental Loan Agreement (the "*FP Dev Facility*").

22.     <u>Brookfield Facility</u>.  Debtor BF DEV Holdco, LLC is party to that certain Credit Agreement, dated as of January 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "*Brookfield Loan Agreement*") with various lenders party thereto (collectively, the "*Brookfield Lenders*").  Obligations under the

34

Brookfield Loan Agreement are secured by (a) first priority equity pledges in and substantially all the assets of certain subsidiaries that are indirect owners of nineteen operating (or near completion) solar power projects, (b) all assets of three Debtor project companies (Magnolia Solar Development, LLC, Lotus Solar, LLC, and GA Solar 5, LLC) that are in development, and (c) to the extent certain conditions are satisfied under the Collateral Documents (as defined in the Brookfield Loan Agreement), substantially all assets of the Brookfield Operating Projects on a second priority basis, and (d) equity pledges in and substantially all the assets of certain subsidiaries that are indirect owners of certain project companies referenced in paragraphs 39 and 41 of the First Day Declaration, in each case on a second priority basis.  As of the Petition Date, the Debtors have approximately $417.3 million of loans outstanding under the Brookfield Loan Agreement (the "***Brookfield Facility***").

23.    <u>Carlyle Facility</u>.  Debtor NPA 2023 Holdco, LLC (the "***Carlyle Borrower***") is party to that Note Purchasing Agreement, dated as of October 10, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Carlyle NPA***"), with Carlyle Aurora Infrastructure Credit Partners LP as lender (the "***Carlyle Lender***"). Obligations under the Carlyle NPA are secured by (a) equity pledges in certain subsidiaries that are indirect owners of seven operating (or near completion) solar power projects and (b) all assets of two Debtor project companies (Lavender Solar, LLC and Foley Solar, LLC) that are in development.  As of the Petition Date, the Debtors have approximately $322.2 million of notes outstanding under the Carlyle NPA (the "***Carlyle Facility***," together with the FP Dev Facility and the Brookfield Facility, collectively, the "***Prepetition Corporate Debt***").

**II.     Project Financing**

24.    As projects reach the final stages of development and approach the construction phase, the Debtors generally "take out" the project from the FP Dev Facility, which requires a

paydown and results in the project company being released from its guarantee and pledge obligations to the FP Dev Lender.  The financing in respect of the project from the FP Dev Facility is then replaced by (a) tax equity investments, (b) sponsor equity contributions, and (c) new, limited recourse senior debt (construction period debt and permanent debt).

25.    <u>Limited Recourse Construction Period Debt</u>.  Limited recourse construction period debt is used to finance the construction of a project (the "***Construction Period Debt***"); it does not include any claims of contractors or vendors that may be asserted at the project level either informally or pursuant to a mechanic's lien or similar security.  The Debtors collectively have approximately $760 million of Construction Period Debt outstanding across its current project portfolio, governed under a variety of project-level credit agreements with a variety of project-level lenders.  The Construction Period Debt is generally secured by the assets of the applicable project and the commitments from the tax equity investors to invest in the applicable project.

26.    <u>Recourse Construction Debt (Pathward)</u>.    In addition, Debtor PW Revolver Borrower, LLC (the "***Pathward Borrower***") is party to that Loan Agreement, dated as of February 6, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Pathward Loan Agreement***"), with Pathward, National Association (the "***Pathward Lender***") for recourse construction debt with respect to (and secured by) Debtor project company West River Solar, LLC.  Debtor PGR guarantees the obligations on an unsecured basis.  As of the Petition Date, the Company has approximately $49 million outstanding under the Pathward Loan Agreement (the "***Pathward Facility***").

27.    <u>Permanent Debt.</u>  Once a project is built and ready to operate and the tax equity investor funds its commitment to the project, the construction period debt is paid down in part with the proceeds of the tax equity investment, and the balance is replaced by permanent debt (the

"***Permanent Debt***").  The Debtors collectively have approximately $1,262 million of permanent debt outstanding across its current project portfolio, governed under a variety of project-level credit agreements with a variety of project-level lenders.  The permanent debt is generally secured by the assets of the applicable project, but in some cases secured by only the Debtors' equity in the project.

28.    <u>Tax Equity</u>.  Tax equity financing involves investors providing capital to a solar project in exchange for the right to be allocated clean energy tax credits associated with the applicable project.  The Debtors generally only raise tax equity once a project enters the construction stage, after development.  The Debtors have collectively raised approximately $2.5 billion of tax equity across their current project portfolio.

29.    <u>Sponsor Equity</u>.  In addition to the foregoing debt and equity financing, the Debtors are also often required to make an equity investment in the project, which the Debtors fund through either corporate cash or proceeds under the Brookfield Facility or Carlyle Facility.

30.    <u>Project Financing Legal Structure</u>.  To facilitate such tax equity, Construction Period Debt, and Permanent Debt, additional legal entities are formed in relation to the applicable project in either: (a) an inverted lease structure whereby the project is leased to an entity owned in part by a tax investor and tax credits are passed through to the lessee under applicable Federal tax rules (the "***Inverted Lease Structure***") or (b) a partnership flip structure whereby the project is acquired by a partnership between the tax equity investor and a Debtor, and the tax credits are allocated to a tax investor under applicable Federal tax rules (the "***Partnership Flip Structure***"). 106 of the Debtors' tax equity investments are Inverted Lease Structures, and 9 of the Debtors' tax equity investments are Partnership Flip Structures.

31.     At a basic level, the purpose of these structures is to allocate the economic benefits between the tax equity investor, senior project lender, and the Debtors in the desired way while giving the tax equity investor protection against a transfer of its project in a manner that would create a risk of tax credit "recapture"—*i.e.*, mandatory repayment of previously-claimed tax credits.  To this end, as equity owners of the projects, tax equity investors generally do not permit senior debt to encumber projects they have invested in unless the debt is subject to a forbearance agreement that prevents tax credit recapture, does not permit transfer of the projects, and reserves the right of the investor to consent to a bankruptcy filing by the entities in which they have invested.

## III.     Blue Ridge Power Financing

32.     <u>BRP Fundamental Facility</u>.  Debtor BRP is party to that Amended and Restated Loan Agreement, dated as of June 26, 2025 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***BRP Fundamental Loan Agreement***"), with Solar Construction Lending, LLC (the "***BRP Fundamental Lender***").  The BRP Fundamental Loan Agreement provides BRP with funding in connection with its EPC services.  Obligations under the BRP Fundamental Loan Agreement are generally secured by all assets of the Debtors' Blue Ridge Power business and are guaranteed by PGR and, following the Bridge Financing, all the entities that were obligors under the Development Fundamental Loan Agreement as of immediately before the Bridge Financing.  As of the Petition Date, approximately $135 million was outstanding under the BRP Fundamental Loan Agreement.

33.     <u>BRP WTB Facility</u>.  Debtor BRP Construction, Inc. (the "***BRP WTB Borrower***") is party to that Loan Agreement, dated as of May 12, 2021 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***BRP WTB Loan Agreement***"), with West Town Bank & Trust.  The proceeds from the BRP WTB Loan Agreement

provided the BRP WTB Borrower with funding in connection with the acquisition of Horne Brothers Construction in 2021.  Obligations under the BRP WTB Loan Agreement are generally secured by substantially all assets of the BRP WTB Borrower.  As of the Petition Date, approximately $19 million was outstanding under the BRP WTB Loan Agreement.

**IV.    ACT Financing**

34.     Non-Debtor ACT Power Services, LLC (the "ACT Borrower") is party to that Loan Agreement, dated as of November 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***ACT Loan Agreement***"), with West Town Bank & Trust.  The ACT Loan Agreement provided the ACT Borrower with financing used to acquire the O&M business in 2022.  Obligations under the ACT Loan Agreement are generally secured by all assets of the ACT Borrower and its related non-Debtor affiliates.  As of the Petition Date, the Debtors have approximately $7.1 million outstanding under the ACT Loan Agreement.

**V.    Surety Bonds and General Indemnification Agreements**

35.     In the ordinary course of business, the Debtors maintain surety bonds in favor of certain third parties to ensure the Debtors' payment or performance of certain obligations in connection with their solar power projects, including, most notably, bonds related to the payment and performance of Blue Ridge's EPC obligations and services.  In addition, to support the issuance of those bonds, certain Blue Ridge sureties have indemnification agreements with certain other Debtors that provide, in some cases, security interests and other rights in favor of such surety.

## LIQUIDITY NEEDS AND FINANCING EFFORTS

**I.    THE DEBTORS HAVE AN IMMEDIATE NEED TO ACCESS THE PROPOSED DIP FINANCING AND USE CASH COLLATERAL**

36.     As set forth in the First Day Declaration and the DIP Declarations, the Debtors require immediate access to the proposed DIP Financing to fund ongoing business operations,

near-term working capital needs, and the costs of administering the Chapter 11 Cases. The Debtors have limited liquidity. Given the expenses associated with the Debtors' businesses, immediate access to the proposed DIP Financing and use of Cash Collateral are required to avoid immediate and irreparable harm to the Debtors' estates as a result of, among other things, the Debtors' inability to pay employees, satisfy their obligations to vendors and suppliers, or otherwise fund their ongoing businesses and operations. In addition, the Debtors do not believe it would be prudent, or even possible, to administer the Chapter 11 Cases solely with available cash on hand.

37.     To evaluate the Debtors' liquidity needs, the Debtors' management, along with the assistance of A&M, developed the Initial Budget to analyze the cash required to: (a) address the Debtors' urgent and significant liquidity constraints, (b) honor ongoing business obligations in connection with the provision of operations and maintenance, engineering, procurement, construction, development, and asset management services, (c) provide the Debtors with sufficient liquidity to pay professional fees and other costs necessary to administer these Chapter 11 Cases, and, importantly, (d) provide the Debtors with sufficient runway to complete a sale of all or substantially all of their assets, and (e) following the contemplated sale, extend the runway for the Debtors to transition their business and confirm a chapter 11 plan. Importantly, the proposed DIP Financing will provide the necessary liquidity to address each of these goals.

38.     Further, the disbursements shown in the Initial Budget include payments contemplated by the Debtors' proposed "first day" orders such as, among others, critical vendor payments (including interconnection fees), utilities, payroll and benefits, rent, and taxes. The Debtors believe that these disbursements are necessary to prevent immediate and irreparable harm to the Debtors and their estates, as well as to preserve the value of the Debtors' assets through closing of the proposed sales. Indeed, and as one example, any disruption in the Debtors' ability

40

to pay employees and vendors would ultimately result in further attrition from the Debtors' workforce, which will further put at risk important functions and experience in the Debtors' platform and jeopardize customer and other stakeholder relationships to the detriment of all stakeholders.

39.     Access to the proposed DIP Financing will enable the Debtors to consummate a swift and successful chapter 11 plan while avoiding the negative impact to the businesses, vendors, and other relationships that would otherwise be affected in connection with the filing of the Chapter 11 Cases.

## II.     THE DEBTORS' EFFORTS TO SECURE BRIDGE AND DEBTOR-IN-POSSESSION FINANCING INVOLVED EXTENSIVE GOOD FAITH, ARM'S-LENGTH NEGOTIATIONS

40.     The negotiations regarding the Bridge Financing and DIP Financing between the Debtors and their advisors, on the one hand, and the Bridge/DIP Lenders and their advisors, on the other hand, were vigorous, hard-fought, and conducted at arm's length and in good faith.  Prior to the Petition Date, with the assistance of the independent and disinterested Special Committee, the Debtors negotiated the underlying economics and other material and interrelated terms of both the Bridge Financing and the DIP Financing.  Through these efforts, the Debtors negotiated the best debtor-in-possession financing proposal available under the circumstances to meet the Debtors' liquidity needs and provide a stable platform to execute their chapter 11 strategy.

41.     As described in the Cowan Declaration, throughout the month of September 2025, the Debtors and their advisors engaged in hard-fought, arm's-length negotiations with the Bridge/DIP Lenders and their advisors in an effort to obtain financing that was sized appropriately to provide the Debtors with sufficient runway to prepare for and ultimately fund these Chapter 11 Cases, including, crucially, a value-maximizing sale process and consummation of a chapter 11 plan.

42.     The negotiations with the Bridge/DIP Lenders were complicated, as the parties had to consider three different sets of interrelated, out-of-court bridge financing facilities and associated postpetition financing commitments.  Negotiations were further complicated by each of the Bridge/DIP Lenders expressly conditioning their commitment to fund on, among other items, (a) each of the other Bridge/DIP Lenders committing to fund its portion of the Debtors' funding need based on their respective silos and (b) agreements from each of the Bridge/DIP Lenders on the terms and conditions in the other two Bridge/DIP Lenders documentation.

43.     The Debtors and their advisors, however, continued to advance negotiations with each of the three Bridge/DIP Lenders regarding the underlying economics and other material terms of three separate, but interrelated, out-of-court bridge financing facilities and associated postpetition financing commitments.  These extensive, good faith, and arm's length negotiations with the Bridge/DIP Lenders focused a great deal on the size of the DIP Financing, the amount of the DIP Roll-Up, fees and prepayment premiums, additional collateral (including the granting of junior liens across each of the three Bridge/DIP Lenders' silos to the other Bridge/DIP Lenders), conditions precedent to funding, milestones, covenants and definitive documentation.

44.     These negotiations culminated in three separate, but interrelated financings, which closed on October 6, 2025, and collectively provided the Debtors with approximately $208 million in Bridge Financing and approximately $204 million in DIP Commitments.  Importantly, the Debtors fought to ensure that the DIP Commitments were structured to ensure that the Company would have access to the full amount of the DIP Financing if they commenced chapter 11 proceedings prior to exhausting the Bridge Financing amount and no non-customary conditionality.  Leading up to the Petition Date after closing the Bridge Financing on October 6, 2025, the Company revised its 13-week cash flow forecast.  Consequently, the Debtors engaged

with the Bridge/DIP Lenders to increase the DIP Financing commitments by approximately $46 million to approximately $250.4 million in the aggregate.  This includes (a) a rollover of approximately $40.2 million of undrawn Bridge Financing commitments and (b) approximately $5.8 million of incremental DIP Financing commitments.

**III.    THE PROPOSED DIP FINANCING IS THE BEST DEBTOR-IN-POSSESSION FINANCING OPTION CURRENTLY AVAILABLE TO THE DEBTORS**

45.    Based on the Debtors' exploration of alternative financing options, as described in the Cowan Declaration, the complexities of the Debtors' prepetition capital structure and the facts and circumstances of the Chapter 11 Cases, the DIP Financing is the best available debtor-in-possession financing option for the Debtors.

46.    The Debtors sought alternative financing options with competitive terms to the DIP Financing in connection with a third-party financing process that was run in tandem with the Debtors' negotiations with the Bridge/DIP Lenders.  As part of that third-party financing process, Lazard reached out to over 30 parties, approximately 20 of which signed NDAs for the purpose of engaging in further diligence.  Once under NDA, parties were provided with extensive business and legal due diligence, including details on the Debtors' corporate and capital structures and liquidity information provided by management, as well as information on the Debtors' assets, including its operating projects, projects near completion and development assets.

47.    It was evident from the outset of this process that securing financing from lenders outside of the Debtors' existing capital structure could present challenges, in part due to the complex nature of the Debtors' capital structure.  Substantially all of the Debtors' material assets fall into three general silos—each silo being subject to the funded debt provided by one of the three Bridge/DIP Lenders.  The three tranches of Prepetition Corporate Debt were secured by the Debtors' different operating and in-construction solar power projects and solar power development

assets.  More specifically, the Prepetition Corporate Debt was secured by (a) equity pledges of entities that were indirect owners of operating (and near completion) solar power projects, and (b) liens on certain solar power projects in development and in construction.

48.     The Prepetition Corporate Debt also generally restricted the Debtors from incurring separate indebtedness within these corporate silos or granting other liens on any of the relevant assets or equity.  Notably, certain holding companies in the Debtors' organizational structure were structurally senior to certain of the Prepetition Lenders' guarantors and had not pledged any collateral to any Prepetition Lenders.  These negative covenants in the relevant loan agreements would have nevertheless given rise to events of default had the Debtors caused those holding companies to grant structurally senior liens to a third party prepetition; however, it would have been possible to grant such liens despite those restrictions for a postpetition financing.  This possibility was made known to potential financing sources in Lazard's marketing efforts.

49.     The Debtors eventually received two third-party postpetition financing proposals, neither of which was actionable.  Among other issues, the financing amount in each of the proposals was significantly less than the Debtors' funding need.  Despite the Debtors' and their advisors' best efforts to encourage the third parties to increase the quantum of their proposed financing amounts, they were not willing to do so.  Ultimately, one of the potential lenders withdrew its proposal due to its inability to meet the Debtors' requested funding needs.  In addition to the remaining proposal being materially less than the Debtors' funding need, it also required liens that were senior to the Bridge/DIP Lenders on substantially all assets (including priming liens on substantially all of the development assets) and contained conditions precedent to delayed draws that created material risks to the Debtors' ability to access the majority of the proposed financing commitment.

50.     Given the Bridge/DIP Lenders were not willing to allow for priming, third-party debtor-in-possession financing and there was no market interest in providing junior financing, the Debtors continued their work in negotiating with the Bridge/DIP Lenders and their advisors on the terms of a consensual path forward.  These discussions were highly iterative, hard fought, and proceeded in good faith, with the Debtors and the Bridge/DIP Lenders agreeing to certain concessions in order to fund the Chapter 11 Cases, facilitate a sale process that maximizes value for all stakeholders, and pursue the consummation of a chapter 11 plan.

## IV.    THE TERMS OF THE DIP FINANCING ARE REASONABLE UNDER THE CIRCUMSTANCES

51.     As described in the DIP Declarations, the Bridge/DIP Lenders expressly conditioned their proposal on, among other things, customary forms of adequate protection and standard stipulations regarding their liens and claims (which will be subject to a Challenge Period as set forth in the proposed Interim Order).  The Bridge/DIP Lenders also insisted on standard debtor-in-possession priming liens on substantially all of the Debtors' assets as part of the collateral package securing the proposed DIP Financing.

52.     As a condition for providing the $418 million of new money Bridge Financing and DIP Financing commitments, the Bridge/DIP Lenders required a roll-up of a substantial majority of the Debtors' prepetition obligations owed to the Bridge/DIP Lenders, effective entirely upon entry of the proposed Interim Order.  Ultimately, the DIP Financing contemplates rolling on a dollar-for-dollar, cashless basis: (a) $417.3 million of Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement, including $48.0 million of Bridge Financing; (b) $322.2 million of Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement, including $40.5 million of Bridge Financing; and (c) $666.1 million of Fundamental Prepetition

Loans under the Fundamental Prepetition Credit Agreements, including $142.8 million of Bridge Financing (collectively, the "***DIP Roll-Up***").

53.     The Debtors alternative to the Bridge Financing and DIP Financing was to commence chapter 11 proceedings in early October with a DIP commitment from a third-party that was materially below the Company's funding need and that contained conditions precedent to delayed draws that created material risks to accessing the majority of the proposed financing commitment.  Additionally, the Bridge Financing allowed the Debtors to engage with many of its key stakeholders in order to minimize any potential disruptions as a result of the Chapter 11 Cases.  Against that backdrop, the Debtors concluded that it was appropriate to agree to rolling up ***both*** (a) the Bridge Financing to be received from each Bridge/DIP Lender and (b) an additional amount of each Bridge/DIP Lender's prepetition loans up to a maximum ratio of 3.4:1.0, relative to the total new money commitments provided under both the Bridge Financing and DIP Financing.  In other words, had the Debtors filed chapter 11 in early October, both the Bridge Financing and the DIP Financing would have been postpetition DIP obligations, which would have implied a roll-up relative to the amount of aggregate new money amount of approximately 2.8x on a blended basis.   Based on this assessment, the DIP Roll-Up appropriately reflects rolling of (a) Brookfield Prepetition Loans, excluding the Bridge Financing, on an approximate 2.3:1.0 basis, (b) Carlyle Prepetition Notes, excluding the Bridge Financing,  on an approximate 3.4:1.0 basis, and (c) Fundamental Prepetition Loans, excluding the Bridge Financing,  on a 3.0:1.0 basis.

54.     The DIP Roll-Up is a material and necessary component of the structure of each facility under the DIP Financing that was required by the Bridge/DIP Lenders as a condition to providing the Bridge Financing and DIP Commitments, consent to the Debtors' use of Cash Collateral, and offers to serve as stalking horse bidders for various components of the Debtors'

businesses.  As explained in the Cowan Declaration, none of the Bridge/DIP Lenders offered the Debtors Bridge Financing or DIP Financing without a roll-up component.  Therefore, the Debtors and the Bridge/DIP Lenders engaged in extensive, hard fought, arm's-length negotiations and ultimately agreed to the terms of the DIP Roll-Up as consideration for, among other things, the Debtors' continued use of Cash Collateral, the extension of critical Bridge Financing, foregoing conditions precedent to withdraw their DIP Commitments if certain consents were not received from the project-level counterparties, and the extension of sufficient funding through the DIP Financing to support the Debtors' objectives during these Chapter 11 Cases, including sales of substantially all of the Debtors' assets and, thereafter, confirmation and consummation of a chapter 11 plan.

55.    Likewise, the transaction fees and interest to be paid under the proposed DIP Financing were the subject of arm's-length and good-faith negotiation between the Debtors and the Bridge/DIP Lenders, are integral components of the overall terms of the proposed DIP Financing, and were necessary to induce the Bridge/DIP Lenders to provide financing of this magnitude under the expedited timeline necessitated by the challenges facing the Debtors' businesses.  Given the cash position and operating condition of the Debtors, the timing, cost, and risk of administering these Chapter 11 Cases, and the lack of viable alternatives, the fees and interest under the DIP Financing are reasonable under the circumstances.  Further, the pricing and fees are reasonable under the circumstances and generally consistent with comparable debtor-in-possession financings in complex cases where there is substantial uncertainty such as the Chapter 11 Cases.

56.    Additionally, the terms of the proposed DIP Financing also contain certain milestones that the Debtors must meet throughout the Chapter 11 Cases.  The milestones were

negotiated by the Bridge/DIP Lenders as a condition to providing the DIP Financing, and the Debtors, in consultation with their legal and financial advisors, believe that the milestones provide them with adequate time to implement a series of value-maximizing transactions and pursue a chapter 11 plan.  The milestones are consistent with those in other chapter 11 cases.

57.     The proposed DIP Financing and the Bridge Financing were committed to fund, among other things, the Debtors' operations, project spend, the winddown of BRP, a value-maximizing sale process, and an orderly plan confirmation for the benefit of the Debtors and their stakeholders through these Chapter 11 Cases.  Given the headwinds in the solar power industry, as well as the complexity of the Debtors' corporate structure and the challenges presented by their capital structure, the proposed DIP Financing, as a whole, is reasonable in amount, appropriately compensates those parties for their costs and assurances provided to the Chapter 11 Cases, and necessary for the Debtors to obtain the financing needed to maximize the value of their estates for the benefit of all stakeholders.

58.     In exchange for the substantial consideration provided by the Bridge/DIP Lenders under the proposed DIP Financing, the Bridge/DIP Lenders are entitled to receive (a) a commitment/funding fee equal to 4.00% of the aggregate amount of the committed amount of New Money DIP Loans, payable (pursuant to the terms described in each DIP Facility) upon entry of the proposed Interim Order; (b) an exit fee solely on the New Money DIP Loans equal to 8.00% of the principal amount of the New Money DIP Loans so repaid or prepaid, *provided*, that if the New Money DIP Loans are repaid pursuant to a credit bid in accordance with an applicable Sale Transaction, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid; and, as applicable to each DIP Facility, (c) a prepayment premium in an amount sufficient to cause each DIP Lender to receive a MOIC of 1.30x on the New Money DIP

Loans, inclusive of all interests and fees (other than agency fees for the DIP Agent for the administration of the applicable DIP Facility).

59.     Further, in exchange for the use of Cash Collateral and any diminution in the value of the Bridge/DIP Lenders' interests in the Prepetition Collateral, the Bridge/DIP Lenders will receive pursuant to the terms of the DIP Financing, subject in all cases to the Carve Out for the benefit of the Debtors and the Committee, as adequate protection: (a) the payment of the reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors retained by the Bridge/DIP Lenders or their counsel; (b) validly perfected liens on and security interests in the DIP Collateral, junior only to the Carve Out and the liens granted to the DIP Secured Parties under each DIP Facility, Permitted Prior Liens, and liens securing any Additional DIP Facility, and pari passu with any adequate protection liens granted in favor of each other Bridge/DIP Lender; and (c) superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code.

60.     Under the circumstances of these Chapter 11 Cases and the competitive marketing process that was conducted in good faith to identify the best source of financing, the terms of the DIP Financing are reasonable.  This is especially true considering, among other factors: (a) the lack of other actionable alternatives, (b) the complexity and inherent uncertainty in the Debtors' capital structure (including the potential for certain project-level lenders to call a default and exercise remedies, thus reducing the DIP Lenders' collateral), (c) the rates and fees of the Debtors' Prepetition Corporate Debt, (d) the headwinds facing the industry, and (e) the market terms for companies facing similar challenges.  For the reasons described herein, the terms of the DIP Financing, taken as a whole, are reasonable under the circumstances and were the product of good

faith, arm's length negotiations, and will allow the Debtors to seek to maximize the value of their estates.

<strong><u>BASIS FOR RELIEF REQUESTED</u></strong>

## I.   THE DEBTORS SHOULD BE AUTHORIZED TO ACCESS THE DIP FINANCING

61.   Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking debtor-in-possession financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

62.   In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

63.   For the reasons discussed herein, including the terms of the proposed DIP Financing, as well as the inactionable alternative sources of financing, the Debtors satisfy the

standards required to access debtor-in-possession financing on a superpriority claim and priming

lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

## II.     ENTRY INTO THE DIP FINANCING REFLECTS THE DEBTORS' REASONABLE BUSINESS JUDGMENT

64.     Courts grant considerable deference to a debtor's business judgment in obtaining

postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Estrada*, 2016 WL

745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to

obtain credit, courts generally permit debtors in possession to exercise their basic business

judgment consistent with their fiduciary duties."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313

(Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in

the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit a party-in-interest.").

65.     Further, in considering whether the terms of debtor-in-possession financing are fair

and reasonable, courts consider the terms in light of the relative circumstances of both the debtor

and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo.

2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In

re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor

may have to enter into "hard bargains" to acquire funds for its reorganization).

66.     For the reasons set forth above, entry into the DIP Documents is a reasonable

exercise of the Debtors' business judgment.  The Debtors' determination (in consultation with their

advisors) was made following a careful and thorough evaluation of all restructuring and financing alternatives.  The terms and conditions of the DIP Financing are favorable to the Debtors and in the best interests of their estates.  Specifically:

      a.  the DIP Financing is being funded by a group of the Debtors' Bridge/DIP Lenders who have a vested interest in the success of the Chapter 11 Cases; and

      b.  the DIP Financing avoids additional costs that would be incurred on account of an exit financing marketing process that would otherwise be due if the Debtors separately sought exit financing at a later date.

67.    The DIP Financing will provide the Debtors with sufficient liquidity necessary to maintain their business operations, and the terms of the DIP Documents, which are the result of good faith, arm's length negotiations, are the best available to the Debtors.

## III.   THE DEBTORS SHOULD BE AUTHORIZED TO GRANT LIENS AND SUPERPRIORITY CLAIMS TO THE BRIDGE/DIP LENDERS

68.    The Debtors propose to obtain DIP Financing, in part, by granting superpriority claims and liens pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including liens on previously unencumbered property and "priming" liens on other property (subject to the terms of the proposed DIP Orders).

69.    Section 364(c) provides that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court:

> May authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section  503(b) or 507(b) of  [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing,

upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c)).

70.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).   Accordingly, the Debtors may "prime" the liens of the Prepetition Secured Parties if the Debtors are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

71.     As set forth above and in the DIP Declarations, the Debtors are unable to obtain unsecured or junior secured debtor-in-possession financing.  The Debtors submit that the proposed DIP Financing is the best available financing option available under the circumstances. Additionally, the Bridge/DIP Lenders were not willing to provide debtor-in-possession financing on an unsecured or junior basis, nor has any third party presented such a proposal.  Following extended negotiations with the Bridge/DIP Lenders, the Debtors were able to negotiate the proposed DIP Financing and obtain concessions that materially improved the terms and economics.   Thus, as a result of these negotiations and the debtor-in-possession financing solicitation process, the Debtors determined that the DIP Financing is the best actionable and available financing to fund the Chapter 11 Cases under the circumstances.

72.     Furthermore, the Bridge/DIP Lenders have consented to their prepetition liens and claims being primed on the terms set forth in the proposed DIP Orders as part of the comprehensive

chapter 11 plan process.  The negotiated adequate protection package includes: (a) replacement liens on the DIP Collateral in accordance with the priorities set forth in the proposed Interim Order, (b) allowed, superpriority administrative expense claims in accordance with the priorities set out in the proposed Interim Order, and (c) the reasonable and documented fees and expenses of counsel and other professionals, as set forth in the proposed Interim Order and the DIP Documents. Additionally, the DIP Financing is necessary for the Debtors to continue operating in the ordinary course and to administer the Chapter 11 Cases.  The Debtors understand that the Prepetition Secured Parties are unwilling to consent to priming liens on their collateral outside of the DIP Financing.  Absent such consent, the Debtors risk a potentially costly and difficult nonconsensual priming dispute at a time when the Debtors' liquidity is severely limited.  Any such dispute would erode the value of the Debtors' estates to the detriment of all stakeholders.

## IV.   THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES AND PREPAYMENT PREMIUMS REQUIRED BY THE BRIDGE/DIP LENDERS UNDER THE DIP FINANCING

73.     In addition to the various adequate protection and other reimbursement obligations, in each case, specified under the DIP Documents and the DIP Orders, the Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Agents and the Bridge/DIP Lenders.  In particular, under the DIP Financing, the Debtors have agreed to pay:

  a. Commitment/Funding/Upfront Fee:  4.00% of the aggregate amount of the DIP Commitments (excluding, for the avoidance of doubt, the Roll-Up DIP Notes and Discretionary Draws), in each case, payable in kind to the DIP Lenders on a pro rata basis in respect of the DIP Commitments upon entry of the Interim DIP Order;

  b. Exit Fee:  8.00% of principal amount of the New Money DIP Loans so repaid or prepaid; *provided*, that if the New Money DIP Loans are repaid pursuant to a credit bid in accordance with the Stalking Horse Agreements, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid and shall be paid in kind in such an event; and

c. <u>Prepayment Premium</u>:  Each repayment or prepayment of the New Money DIP Loans or such New Money DIP Loans otherwise becoming due and payable, upon the occurrence of a MOIC Event, shall be subject to an additional payment in an amount equal to the 1.30x MOIC Amount on the New Money DIP Loans (collectively, the "***DIP Fees***").

74.     It is understood and agreed by all parties, including the Debtors, that the DIP Fees are an integral component of the overall terms of the DIP Financing and were required by the Bridge/DIP Lenders as consideration for the extension of debtor-in-possession financing after arm's-length, good faith negotiations, and substantial negotiations through which the Debtors successfully obtained meaningful concessions.  Moreover, the interest rates and fees when, taken as a whole with the economics of the DIP Financing, are reasonable, appropriate, and necessary under the circumstances.  The benefits to the Debtors and their estates provided by the DIP Financing significantly outweigh the DIP Fees incurred by the Debtors thereunder.  Additionally, the DIP Fees preserve liquidity and provide additional runway for the Debtors to consummate a chapter 11 plan.

75.     In light of the solicitation and negotiation processes described herein, the proposed DIP Financing package is the Debtors' best currently available debtor-in-possession financing option.  As a result, the Debtors determined that, in their business judgment, incurring the DIP Fees to secure the DIP Financing, which will guarantee a smooth transition into the Chapter 11 Cases and in the best interests of the Debtors, their estates, and all of their stakeholders.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

## V.     APPROVAL OF USE OF CASH COLLATERAL IS APPROPRIATE AND NECESSARY

76.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents;

or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

77.     In general, what constitutes adequate protection is decided on a case-by-case basis. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection in each case.  *See In re Timbers of Inwood Forest* Assocs., Ltd., 793 F.2d 1380, 1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696-97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection").  Adequate protection is designed to shield a secured creditor from diminution in value of its interest in collateral during the period of a debtor's use of the collateral.  *See Timbers*, 793 F.2d at 1412 (citing to Adequate Protection Under the Bankruptcy Reform Act, in W. Norton, 1978 Annual Survey of Bankruptcy Law 171, 173 ("Section 361 is designed to prevent loss or diminution of assets.")).

78.     Substantially all of the Debtors' cash constitutes the Cash Collateral under section 363(a) of the Bankruptcy Code.  The Debtors have an urgent need for the immediate use of the Cash Collateral and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Financing.  The Debtors need the Cash Collateral to fund their businesses and operations, as well as to fund the Chapter 11 Cases so they can pursue value-maximizing transactions and a chapter 11 plan.  Indeed, absent such relief, the Debtors' businesses will likely be brought to an immediate halt, with irreparable consequences for the Debtors, their estates, and all parties in interest.

79.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable, and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Furthermore, the Bridge/DIP Lenders have consented to the Debtors' use of the Cash Collateral, subject to the terms and conditions of the DIP Financing and the proposed DIP Orders.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Financing.

## VI.     THE BRIDGE/DIP LENDERS SHOULD BE DEEMED GOOD-FAITH LENDERS

80.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

81.     The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

82.     As explained herein and in the DIP Declarations, the DIP Financing is the result of the: (a) Debtors' reasonable business judgment that the Bridge/DIP Lenders provided the best debtor-in-possession financing available under the circumstances; and (b) extended arm's-length, good-faith negotiations between the Debtors and the Bridge/DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Financing are reasonable under the circumstances, and

the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the Bridge/DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded therein.

## VII.    MODIFICATION OF THE AUTOMATIC STAY IS NECESSARY

83.    The proposed Interim Order provides that the automatic stay under section 362 of the Bankruptcy Code is modified to permit the DIP Agents (at the direction of the Bridge/DIP Lenders) to exercise, upon the occurrence and during the continuation of any Event of Default under the applicable DIP Financing, all rights and remedies provided in the DIP Financing without further order of or application to the Court.  However, the DIP Agents must provide the Debtors and various parties with five business days' notice before exercising such enforcement rights or remedies in respect of their collateral.  During such period, the Debtors and other parties in interest may seek an emergency hearing to contest whether an Event of Default has occurred and is continuing.  Provisions of this sort that modify the automatic stay are common features of debtor-in-possession financing and, in the Debtors' business judgment, are reasonable under the circumstances of the Chapter 11 Cases.  Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Financing and the DIP Orders.

## VIII.   APPROVAL OF INTERIM DIP FINANCING RELIEF IS CRITICAL

84.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).  Section 363(c)(3) of the Bankruptcy

Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing." Complex Case Procedures, ¶ 5.

85.    As described above, the Debtors have an urgent and immediate need for cash in order (a) to maintain business relationships with their vendors, suppliers, customers, and other parties, (b) to make capital expenditures, (c) to satisfy other working capital and operational needs, and (d) otherwise finance their operations and the Chapter 11 Cases. Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their stakeholders, absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within one day of the Petition Date or as soon as practicable thereafter to consider the interim DIP Financing relief requested in this Motion.

## IX.    REQUEST FOR A FINAL HEARING

86.    The terms of the DIP Financing require that a Final Order approving this Motion be entered within thirty days after the Petition Date. As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 45 days following the Petition Date, and fix the time and date before the Final Hearing for parties to file objections to this Motion.

## <u>EMERGENCY CONSIDERATION</u>

87.    The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief

is necessary to avoid immediate and irreparable harm.  As described in detail above, in the DIP Declarations and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE
6004(A) AND WAIVER OF BANKRUPTCY RULE 6004(A) AND (H)**

88.     With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, their estates, and their stakeholders.   Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

**RESERVATION OF RIGHTS**

89.     Nothing in this Motion is intended to be nor shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law;  (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is

60

valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**<u>NOTICE</u>**

90.     Notice of this Motion will be served on: (a) the Office of the United States Trustee for the Southern District of Texas; (b) Kirkland & Ellis LLP, as counsel to GC PGR HoldCo Member, LLC and GC PGR HoldCo, LLC; (c) Weil, Gotshal & Manges LLP, as counsel to Healthcare of Ontario Pension Plan Trust Fund; (d) Sidley Austin LLP, as counsel to FP Solar Development I LLC; (e) Milbank LLP, as counsel to Carlyle Global Credit Investment Management L.L.C.; (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to BID Administrator LLC; (g) Greenberg Traurig, as counsel to John Hancock; (h) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (i) the Internal Revenue Service; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

91.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov and (b) the website maintained by the Debtors' claims and noticing agent, Omni Agent Solutions, Inc., at https://omniagentsolutions.com/PGR.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  November 7, 2025

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Philip M. Guffy (Texas Bar No. 24113705)
Brandon Bell (Texas Bar No. 24127019)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email: taddavidson@Hunton.com
          pguffy@Hunton.com
          bbell@Hunton.com

*-and-*

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew M. Parlen (NY Bar No. 5370085)
Alexander W. Welch (NY Bar No. 5624861)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
          andrew.parlen@lw.com
          alex.welch@lw.com

Jason B. Gott (IL Bar No. 6309114)
Jonathan C. Gordon (IL Bar No. 6329732)
330 N. Wabash Avenue
Suite No. 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: jason.gott@lw.com
          jonathan.gordon@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on November 7, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II