**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

-------------------------------------------------------- x
                                         :

In re:                                   :      Chapter 11
                                         :

PINE GATE RENEWABLES, LLC, *et al.*,    :      Case No. 25-90669 (CML)
                                         :

Debtors.[1]                           :      (Jointly Administered)
                                         :

-------------------------------------------------------- x

**DECLARATION OF TYLER W. COWAN IN SUPPORT OF
DEBTORS' MOTIONS TO OBTAIN (A) POSTPETITION FINANCING AND
(B) APPROVAL OF BIDDING PROCEDURES FOR SALE OF DEBTORS' ASSETS**

I, Tyler W. Cowan, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I submit this declaration (this "***Declaration***") in support of the (a) *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* [Docket No. 46] (together with all exhibits, annexes and attachments thereto, the "***DIP Motion***") and (b) *Emergency Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

*Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief; and (II)(A) Approving and Authorizing Sale of Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 22] (together with all exhibits, annexes and attachments thereto, the "**Bidding Procedures Motion**").[2]

2.      Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge, belief, or opinion, (b) my review of relevant documents, (c) information provided to me by the Debtors, Lazard employees working directly with me or under my supervision,  or the other proposed advisors to the Debtors, including Alvarez & Marsal North America, LLC ("**A&M**"), Latham & Watkins LLP ("**Latham**") and Hunton Andrews Kurth LLP ("**Hunton**"), and/or (d) my experience as a restructuring professional.  I am not being compensated specifically for this testimony other than through payments received by Lazard as a professional proposed to be retained by the Debtors, which payments include a fee for securing debtor-in-possession financing.  If called to testify, I could and would testify to the facts set forth herein on the foregoing bases.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

## QUALIFICATIONS AND PROFESSIONAL BACKGROUND

3.      I am Global Head of and a Managing Director in the Restructuring & Liability Management Group at Lazard Frères & Co. LLC ("**Lazard**"), a global investment bank providing

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration (as defined below), the DIP Motion or the Bidding Procedures Motion, as applicable.

financial advisory services, including with respect to mergers and acquisitions, capital raises, and restructurings, which has its principal office at 30 Rockefeller Plaza, New York, New York 10012. I have been one of the principal advisors working on Lazard's engagement as the proposed investment banker for Pine Gate Renewables, LLC and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") and, their non-debtor affiliates (the "***Non-Debtor Affiliates***," and, together with the Debtors, "***Pine Gate***" or the "***Company***") in the above-captioned chapter 11 cases.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 175 years.  Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Since 1990, Lazard professionals have been involved in over 500 restructurings, representing over $1 trillion in debtor assets.

4.      Lazard and its senior professionals have extensive experience in the reorganization, restructuring, and sale of distressed companies, in both out-of-court and in-court contexts.  In addition, Lazard's investment banking professionals have extensive experience advising debtors and other constituents in chapter 11 cases and have served as investment bankers to numerous debtors, creditors' committees, creditor ad hoc groups, and prospective buyers in chapter 11 proceedings.  Lazard's business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others:  *In re First Brands Group, LLC,* No. 25-90399 (CML) (Bankr. S.D. Tex. 2025); *In re Global Clean Energy Holdings, Inc.*, No. 25-90113 (ARP) (Bankr. S.D. Tex. 2025); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. 2024); *In re Steward Health Care System, LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re Enviva Inc.*, No 24-10453 (BFK) (Bankr. S.D. Va. 2024); *In re Air Methods Corporation*, No. 23-90886 (MI) (Bankr. S.D. Tex 2023); *In re SiO2 Medical Products, Inc.*, No.

23-10366 (JTD) (Bankr. D. Del 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D. N.J. 2023); *In re National Cinemedia, LLC*, No. 23-90291 (DRJ) (Bankr. S.D. Tex. 2023); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. 2021); *In re Basic Energy Services, Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. 2021); *In re FTS International, Inc.*, No. 20-34622 (DRJ) (Bankr. S.D. Tex. 2020); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del 2020); *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. 2020); *In re J.C. Penney Co.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. 2020); *In re Neiman Marcus Group Ltd.*, No. 20-32519 (Bankr. S.D. Tex. 2020); *In re Forever21*, No. 19-12122 (KG) (Bankr. D. Del. 2019); *In re Weatherford International PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. 2019); *In re Sears Holdings Corporation*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. 2018); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. 2017); *In re LINN Energy, LLC*, No. 16-60040 (Bankr. S.D. Tex. 2016).

5.      Since joining Lazard in 2003, I have advised companies and creditors, including in situations involving power and energy companies, with respect to in-court and out-of-court restructurings, recapitalizations, and reorganizations.  I have also advised companies regarding capital raises, mergers, acquisitions, and divestitures.  I have been involved in a variety of restructuring engagements including, among others, 24 Hour Fitness, Accuride (advisor to term loan lenders), Air Methods, Alpha Natural Resources (advisor to Rice Energy, the stalking horse bidder for certain gas assets), Altice France, Anthology (advisor to term loan lenders), Atlas Iron, Avison Young (advisor to term loan lenders), Bed Bath & Beyond, Belk, Blackboard, Boart Longyear (advisor to bondholders), Brazos Electric Power Cooperative (advisor to the Unsecured Creditors' Committee), Cengage Learning, Chassix, Claire's Stores, Dex Media (formerly R.H. Donnelley), Dish (advisor to DBS bondholders), Empire Today (advisor to term loan lenders),

EmployBridge (advisor to term loan lenders), Energy Future Holdings (advisor to the TCEH Creditors' Committee), First Brands Group, First Energy Solutions, Foresight Energy (advisor to secured lenders), Forever 21, Franchise Group (advisor to term loan lenders), The Great Atlantic & Pacific Tea Company, Heubach (advisor to term loan lenders), Hostess (advisor to secured lenders), iFIT Health & Fitness, Illinois Power Holdings (advisor to Dynegy), Intelsat (advisor to convertible noteholders), JCPenney, J.Crew, JOANN (advisor to term loan lenders), Rite Aid (advisor to Unsecured Creditors' Committee), Local Insight Media, Longview Power/Mepco, Macy's, Neiman Marcus, Party City (advisor to secured noteholders), Patriot Coal (advisor to Peabody Energy), Peabody Energy, Petmate (advisor to second lien lenders), Remington Outdoor, Revlon (advisor to Citi), Saks (advisor to secured bondholders), Salt Creek Midstream (advisor to shareholders), SI Group (advisor to term loan lenders), SiO2, Sirva (advisor to crossholder group), Solo Brands, Steward Health Care System, Superior Industries, Tops Markets (advisor to secured noteholders), United States Enrichment Corp., Venator (advisor to secured lenders), Walter Energy (advisor to first lien lenders), Wellness Pet (advisor to term loan lenders), Westgate Resorts, and Westmoreland Resource Partners.

6.      Pursuant to these engagements, among others, I have worked on a variety of financings for troubled companies, including a number of postpetition financings, section 363 sales, and marketing processes.  Additionally, I have provided testimony in the following bankruptcy cases:  *In re First Brands Group, LLC,* No. 25-90399 (CML) (Bankr. S.D. Tex. 2025); *In re Steward Health Care System LLC*, Case No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re SiO2 Medical Products, Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. 2023), *In re Intelsat S.A.*, Case No. 20-32299 (KLP) (Bankr. E.D. Va. 2021), *In re Chinos Holdings, Inc.*, Case No. 20-32181 (KLP) (Bankr. E.D. Va. 2020), *In re Neiman Marcus Group Ltd.*, Case No. 20-32519 (MI)

(Bankr. S.D. Tex. 2020); *In re Forever21,* No. 19-12122 (KG) (Bankr. D. Del. 2019), *In re Westmoreland Coal Company, et al*., No. 18-35672 (DRJ) (Bankr. S.D. Tex. 2019) (advisor to Westmoreland Resource Partners, LP); *In re FirstEnergy Sols. Corp., et al*., No. 18-50757 (AMK) (Bankr. N.D. Ohio 2018); *In re Claire's Stores, Inc.,* No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Peabody Energy Corporation*, No. 16-42529-399 (BSS) (Bankr. E.D. Mo. 2016); *In re Walter Energy, Inc.*, No. 15-02741 (TOM) (Bankr N.D. Ala. 2015), *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 12, 2015); *In re Longview Power, LLC,* No. 13-12211 (BLS) (Bankr. D. Del. 2013); and *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. 2011).  Prior to joining Lazard in 2003, I attended Northwestern University where I graduated with a Bachelor of Science in Engineering.

## **LAZARD'S RETENTION**

7.      Lazard was engaged by Pine Gate on June 23, 2025 to explore a potential sale of all or a majority of the equity interests in the Company.  The Company later expanded the scope of that engagement to include broader financing and restructuring services pursuant to an amended engagement letter dated August 1, 2025.  Since being retained by the Company, Lazard has worked closely with the Company and other professional advisors while providing a variety of investment banking services, including: (a) evaluating strategic and financial alternatives to improve the Company's overall financial position, (b) preparing the Company for a sale process and marketing the Company and its assets in furtherance of one or more potential sale transactions, (c) advising and assisting the Company in evaluating, identifying, negotiating, and pursuing potential capital structure and liquidity-enhancing solutions, (d) advising and assisting the Company with respect to strategies for negotiating with existing stakeholders, and (e) reviewing and negotiating the terms and conditions of both bridge and postpetition financing facilities.

8.      Since Lazard's retention, members of my team and I have worked closely with the Debtors' management, the Board, the Special Committee, A&M, Latham and Hunton analyzing the Debtors' businesses, assets, financial position, contractual arrangements, and various proposed strategic and financing transactions.  Based on this work, I, and other members of the Lazard team, have become familiar with the Company's capital structure, liquidity needs, and business operations.  Members of my team and I have also assisted the Debtors in reviewing and negotiating the terms, conditions, and potential impact of the proposed DIP Financing (as defined herein) and various strategic alternatives.

## THE COMPANY'S EXPLORATION OF STRATEGIC ALTERNATIVES

9.      As described in the *Declaration of Ray Shem, President and Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First-Day Relief* [Docket No. 19] (the "***First Day Declaration***"), the Company was founded in 2016 in response to an opportunity in the renewable energy market to finance, develop, construct, operate, and sell solar power projects, capitalizing on the Pine Gate team's expertise in project development, tax equity structuring, and power purchase agreement ("PPA") negotiation.  In recent years, increased interest rates, changes in the regulatory environment, and inflationary pressures, among other things, have caused challenges in the solar sector, including the Company's ability to monetize assets in order to recycle capital.  Accelerating losses at the Company's EPC business, Blue Ridge Power, LLC ("***BRP***"), further contributed to the challenges the Company was facing.

10.      In an attempt to address these headwinds, the Company pursued a range of strategic alternatives to enhance liquidity during 2024 and early 2025.  Throughout 2024, the Company ran various processes to sell many of the Company's assets, and also engaged a third-party investment bank to run additional sale processes including: (a) in the second quarter of 2024, to sell a 49% interest in each of the Company's operating assets (excluding those in the John Hancock joint

venture), and (b) in the fourth quarter of 2024, to sell 100% of five of the Company's operating assets. As part of these extensive sale processes, the Company and the third-party investment bank contacted hundreds of potential investors but did not receive any actionable proposals. Beginning in the first quarter of 2025, the Company ran a preferred equity capital raise process that included reaching out to over 20 parties over a six-month period. The preferred equity capital raise process, however, did not result in any actionable proposals.

11.    At the time of Lazard's engagement on June 23, 2025, there was significant market and political-related uncertainty given the then-expected, but not yet passed, "One Big Beautiful Bill", which was signed on July 4, 2025. Three days after the One Big Beautiful Bill was signed, an Executive Order was issued directing the Secretary of Treasury to revise, within 45 days, certain guidance regarding what actions determined the "Beginning of Construction" for a solar project, which has historically been used by the solar industry to determine tax credit eligibility.

12.    Against this backdrop of uncertainty, the Company engaged Lazard to run a process to sell all or a majority of the equity in the Company (excluding the John Hancock joint venture and BRP). As Lazard prepared for a broader process, Lazard prescreened the investment opportunity with ten potential buyers in early July 2025. Eight parties engaged in robust and exhaustive diligence to assess an acquisition of the Company and, although several parties declined the opportunity, citing the Company's capital structure complexity and total quantum of preferred equity, equity bridge loans, and overall leverage as reasons to not participate in a transaction, a portion have continued to do so through the commencement of a broader marketing launch (described below) and these Chapter 11 Cases.

13.     In mid-September 2025, the Company and its advisors launched an expanded sale process for any and all assets of the Company (excluding the John Hancock joint venture and BRP) and have interacted with over 235 potential buyers.  The sale process is further discussed below.

14.     In parallel with the sale processes, the Company, with the assistance of its advisors, evaluated and negotiated many term sheets with one of its preferred equity investors, including for various financing, asset sale, and recapitalization transactions.  The proceeds of any transaction with this investor, along with efforts to upsize certain corporate debt facilities, would help bridge the Company's liquidity until the completion of the full Company sale process.  However, the Debtors (along with the independent and disinterested Special Committee) ultimately determined that such transaction proposals were not actionable.  Based on the fact that the sale and financing processes did not yield any actionable transactions by the end of August 2025, coupled with the prospects of the Company running out of liquidity within the next 4 to 6 weeks, the Debtors and the Special Committee directed Lazard to expand its ongoing marketing efforts to solicit interest in proposals for in-court and out-of-court financing.

## THE COMPANY'S EFFORTS TO OBTAIN FINANCING

15.     In late August 2025, the Company and its advisors began engaging with its current corporate-level lenders—affiliates of Fundamental Renewables ("**Fundamental**"), Brookfield Asset Management ("**Brookfield**"), and The Carlyle Group ("**Carlyle**") (together with Fundamental and Brookfield, the "**Prepetition Lenders**")—as well as third parties with respect to a potential financing.

16.     As part of the third-party financing process, Lazard reached out to over 30 parties, approximately 20 of which signed NDAs for the purpose of engaging in further diligence.  Upon signing NDAs, parties were presented with a request for proposal that provided information on the Company's businesses and operations, its financial condition, and the financing opportunity.

Parties were also provided with access to a virtual data room that was populated with a variety of financial, business and legal information, including details on the Company's corporate and capital structure and liquidity information provided by management, as well as information on the Company's assets, including its operating projects, projects near completion and development assets. Over the subsequent weeks, Lazard engaged with parties regarding potential financing structures and facilitated exhaustive business and legal due diligence.

17.    It was evident from the outset of this process that securing financing from lenders outside of the Debtors' existing capital structure could present challenges, in part due to the complex nature of the Company's capital structure. Substantially all of the Company's material assets fall into three general silos—each silo being subject to the funded debt provided by one of the three Prepetition Lenders (the "***Prepetition Corporate Debt***"). I understand that the three tranches of Prepetition Corporate Debt were secured by different operating (and near completion) solar power projects and development assets of the Company. More specifically, the Prepetition Corporate Debt was secured by (a) first-priority equity pledges of entities that were indirect owners of operating (and near completion) solar power projects and (b) first-priority liens on the development solar power projects and associated assets. The Prepetition Corporate Debt also generally restricted the Company from incurring separate indebtedness within these corporate silos or granting other liens on any of the relevant assets or equity. Certain holding companies in the Company's organizational structure were structurally senior to certain of the Prepetition Lenders' guarantors and had not pledged any collateral to any Prepetition Lenders. Negative covenants in the relevant loan agreements would have given rise to events of default had the Company caused those holding companies to grant structurally senior liens to a third party *prepetition* therefore preventing the Company from doing so out of court. However, I understand that it would have

10

been possible for the Company to grant such liens for a *postpetition* financing.  This possibility was made known to potential financing sources in Lazard's marketing efforts.

18.     The Company eventually received two third-party postpetition financing proposals, neither of which was actionable.  Among other issues, the financing amount in each of the proposals was significantly less than the Company's funding need.  Despite the Company's and their advisors' best efforts to encourage the third parties to increase the quantum of their proposed financing amounts, they were not willing to do so.  Ultimately, one of the potential lenders withdrew its proposal due to its inability to meet the Company's requested funding needs.  In addition to the remaining proposal being materially less than the Company's funding need, it also required liens that were senior to the Prepetition Lenders on substantially *all* assets (including priming liens on substantially all of the development assets) and contained conditions precedent to delayed draws that created material risks to the Company's ability to access the majority of the proposed financing commitment.

19.     In tandem with soliciting and negotiating third-party financing proposals, the Company and its advisors began discussions with the Prepetition Lenders in late August to pursue an out-of-court bridge financing that would extend the Company's liquidity until the end of October and provide time for the Company to pursue a larger, more comprehensive financing that would allow the Company to fund its business, execute a restructuring (including the orderly winddown of BRP) and complete the sale process.  After extensive discussions and negotiations, it became apparent that the Company would not be able to obtain out-of-court bridge financing and also preserve the flexibility required to subsequently pursue a larger second-step capital raise.

20.     Instead, the Company and its advisors continued hard-fought, arm's-length negotiations with the Prepetition Lenders and their advisors throughout September 2025 in an

effort to obtain financings that would provide runway to prepare for and ultimately fund the Chapter 11 Cases.  The negotiations with the Prepetition Lenders were complicated, as the parties had to consider three different sets of interrelated, out-of-court bridge financing facilities and associated postpetition financing commitments.  The size of each facility, amount of the roll-up of the Prepetition Lenders' existing loans into DIP loans, fees and prepayment premiums, additional collateral, conditions precedent to funding, milestones, covenants and definitive documentation for the bridge financing and DIP commitments were all negotiated extensively.  Negotiations were further complicated by each of the Prepetition Lenders expressly conditioning their commitment to fund on, among other items, (a) each of the other Prepetition Lenders committing to fund its portion of the Company's funding need based on their respective silos and (b) agreements from each of the Prepetition Lenders on the terms and conditions in the other two Prepetition Lenders documentation.  Throughout the negotiation process, the Company's advisors consistently updated the Company's management team, Special Committee, and the Board, each of which provided feedback with respect to the proposed terms of bridge financing and the postpetition financing commitments.

21.     The negotiations with the Prepetition Lenders culminated in three separate, but interrelated, financings, which closed on October 6, 2025, and collectively provided a total financing commitment to the Company in the amount of $412 million (the "***Total New Money Commitments***"), consisting of approximately $208 million of out-of-court financing (the "***Bridge Financing***") and $204 million of commitments for debtor-in-possession financing (the "***DIP Commitments***" and such financing, the "***DIP Financing***").  The DIP Commitments were structured to ensure that the Company would have access to the entire Total New Money Commitment, if it commenced chapter 11 proceedings prior to exhausting the Bridge Financing

amount. As of the Petition Date, the Total New Money Commitments have been increased to $418 million, consisting of $168 million of new-money Bridge Financing and $250 million of DIP Commitments.

22.     The Bridge Financing provided capital urgently needed to continue operations and permitted the Company to (a) complete orderly chapter 11 preparations (including the negotiation and documentation of the associated DIP Financing documents and stalking horse asset purchase agreements) and (b) engage with and solicit certain related consents from its project lenders, tax equity providers, and PPA and interconnection agreements counterparties in order to minimize any potential disruptions (due to cross defaults) that may result at project-level entities as a result of the Chapter 11 Cases.

## THE DEBTORS' NEED FOR POSTPETITION FINANCING

23.     The Debtors require immediate access to the DIP Financing, as well as continued use of Cash Collateral, to continue to operate their businesses postpetition, pay their employees and vendors, administer these Chapter 11 Cases, and continue pursuing the robust and value-maximizing sale process.

24.     As part of their evaluation of the Debtors' liquidity position, the Debtors' management, with the assistance of A&M, developed the DIP budget which I understand sought to: (a) address the Debtors' urgent and significant liquidity constraints, (b) allow the Company to honor ongoing obligations for project-level expenditures and providing critical services for its project portfolios, including operations and maintenance, engineering, procurement, construction, development, and asset management services, (c) provide the Debtors with sufficient liquidity to pay projected professional fees and other costs necessary to administer these Chapter 11 Cases,

and (d) provide the Company with sufficient runway to complete a sale of all or substantially all of their assets and to confirm a chapter 11 plan.

## THE DIP FINANCING WAS NEGOTIATED
## IN GOOD FAITH AND AT ARM'S LENGTH

25.    Overall, the negotiations that led to the Total New Money Commitments between the Debtors and their advisors, on the one hand, and the Prepetition Lenders and their advisors, on the other hand, were vigorous, hard-fought, and conducted at arm's length and in good faith.  Prior to the Petition Date, with the oversight of the Special Committee, the Debtors negotiated the underlying economics and other material terms of the DIP Financing, including, among other things, the sizing of each facility, the DIP Roll-Up (as defined herein), the applicable interest rate, and the associated fees.  Through these efforts, the Debtors, with the guidance and assistance of their advisors, including Lazard, negotiated the best financing proposal available to the Debtors under the circumstances.  The DIP Financing, as negotiated, provides a stable platform to execute their chapter 11 strategy.

## THE TERMS OF THE DIP FINANCING

26.    The following summarizes certain key terms of the DIP Financing:

- *New Money Draw:*
  - up to $134 million (excluding fees, premiums and other amounts payable in kind) in principal amount of new money term loans (the "***Brookfield New Money DIP Loans***"),  up to $18 million, plus certain additional Brookfield Subsequent Draws, may be made available during the Interim Period, with the balance of such Brookfield New Money DIP Loans subject to entry of the Final Order;

  - up to $52 million (excluding fees, premiums and other amounts payable in kind) in principal amount issuance of new money notes (the "***Carlyle New Money DIP Notes***"), up to $17 million, plus certain additional Carlyle Subsequent Draws, may be made available during the Interim Period, with the balance of such Carlyle New Money DIP Notes subject to entry of the Final Order; and

- o up to $65 million (excluding fees, premiums and other amounts payable in kind) in principal amount of new money term loans (the "***Fundamental New Money DIP Loans***"),  up to $21 million, plus certain additional Fundamental Subsequent Draws, may be made available during the Interim Period, with the balance of such Fundamental New Money DIP Loans subject to entry of the Final Order.

- **Roll-Up upon Entry of the Interim Order:**

  - o Brookfield Roll-Up DIP Loans: $417 million in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Brookfield Prepetition Loans (inclusive of $48 million of the Bridge Financing and related fees[3]) under the Brookfield Prepetition Credit Agreement;

  - o Carlyle Roll-Up DIP Loans:  $322 million in principal amount of notes shall be issued to repay and refinance, on a dollar-for-dollar, cashless basis, Carlyle Prepetition Notes (inclusive of $41 million of the Bridge Financing and related fees[3]) under the Carlyle Prepetition Note Purchase Agreement; and

  - o Fundamental Roll-Up DIP Loans:  $666 million in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Fundamental Prepetition Loans (inclusive of $143 million of the Bridge Financing and related fees[3]) under the Fundamental Prepetition Credit Agreements.

- **Interest Rates:**

  - o <u>New Money DIP Loans</u>:  14.00% compounded monthly and payable in kind.

  - o <u>Roll-Up DIP Loans</u>:  Roll-Up DIP Loans accrue interest at the rate of interest of the Prepetition Loans refinanced by such Roll-Up DIP Loans.

    - ▪ Brookfield Roll-Up DIP Loans:  (i) with respect to Brookfield Roll-Up DIP Loans that refinance Brookfield Prepetition Loans incurred under the Bridge Facility, 14.00% compounded monthly and payable in kind; (ii) with respect to Brookfield Roll-up DIP Loans that refinance Brookfield Prepetition Loans incurred as a result of interest paid-in-kind, 12.25% (inclusive of 2.00% default interest) compounded quarterly and payable in kind; and (iii) with respect to all other Brookfield Roll-Up Loans, 11.25% (inclusive of 2.00% default interest) compounded quarterly and payable in kind.

    - ▪ Carlyle Roll-Up DIP Notes: (i) with respect to Carlyle Roll-Up DIP Notes that refinance Carlyle Prepetition Notes issued under the Bridge Facility, 14.00% compounded monthly and payable in kind, and (ii) with respect to

---

[3] As of the Petition Date, approximately $231 million of the Bridge Financing is outstanding consisting of the new-money Bridge Financing of $168 million and applicable fees.

all other Carlyle Roll-Up DIP Notes, 10.75% compounded monthly and payable in kind.

- ▪ Fundamental Roll-Up DIP Loans: (i) with respect to Fundamental Roll-Up DIP Loans that refinance Fundamental Roll-Up DIP Loans incurred or refinanced under the Bridge Facility, 14.00% compounded monthly and payable in kind, and (ii) with respect to all other Fundamental Roll-Up DIP Loans, 13.85% or 9.85% depending on the rate of interest of the Fundamental Prepetition Loans refinanced by such Fundamental Roll-Up DIP Loans.

- • *Fees and Prepayment Premiums*:

  - o <u>Commitment/Funding/Upfront Fee</u>:  4.00% of the aggregate committed amount of New Money DIP Loans (excluding, for the avoidance of doubt, the Roll-Up DIP Notes) (the "***New Money DIP Commitments***"), in each case, payable in kind (pursuant to the terms described in each DIP Facility) to the Bridge/DIP Lenders in respect of their New Money DIP Commitments upon entry of the Interim Order.

  - o <u>Exit Fee</u>:  8.00% of the principal amount of New Money DIP Loans so repaid or prepaid; *provided*, that if the New Money DIP Loans are repaid pursuant to a credit bid in an applicable Sale Transaction, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid and shall be paid in kind in such an event.

  - o <u>Prepayment Premium</u>:  Each repayment or prepayment of the New Money DIP Loans or such New Money DIP Loans otherwise becoming due and payable, upon the occurrence of a MOIC Event (as defined in the applicable DIP Documents), shall be subject to an additional payment in an amount sufficient to cause the applicable Bridge/DIP Lenders to receive a MOIC of 1.30x on the commitments in respect of the New Money DIP Loans, inclusive of all interest and fees (other than administrative agent fees).

## <u>THE ROLL-UP OF THE PREPETITION OBLIGATIONS IS REASONABLE</u>

27.     As a condition for providing the $418 million of Total New Money Commitments, the Bridge/DIP Lenders required a roll-up of approximately $1,406 million of the Debtors' prepetition obligations owed to the Prepetition Lenders, effective upon entry of the Interim Order, on a dollar-for-dollar, cashless basis, consisting of: (a) $417 million of Brookfield Prepetition Loans (inclusive of $48 million of Bridge Financing and related fees); (b) $322 million of Carlyle Prepetition Notes (inclusive of $41 million of Bridge Financing and related fees); and (c) $666

million of Fundamental Prepetition Loans (inclusive of $143 million of Bridge Financing and related fees) (collectively, the "***DIP Roll-Up***").

28.     Because the Bridge Financing and DIP Financing were negotiated as parts of an integrated whole, and the availability of Bridge Financing was conditioned on the DIP Roll-Up, in my professional judgement, it is reasonable and appropriate to evaluate the DIP Roll-Up (excluding the Bridge Financing and related fees) as a multiple of the Total New Money Commitments.  The Debtors only alternative to the Bridge Financing and DIP Financing was a DIP proposal from a third-party that was materially lower than the Company's funding need and would have required the Company to commence Chapter 11 proceedings in early October.  The Bridge Financing allowed the Debtors to engage with many of its key stakeholders in order to minimize any potential disruptions as a result of the Chapter 11 Cases.  Against that background, the Debtors concluded that it was appropriate to agree to rolling up both (a) the Bridge Financing to be received from each Bridge/DIP Lender and (b) an additional amount of each Bridge/DIP Lender's prepetition loans up to a maximum ratio of 3.4:1.0, relative to the Total New Money Commitments provided under both the Bridge Financing and DIP Financing.

29.     In other words, had the Debtors filed the Chapter 11 Cases in early October, both the Bridge Financing and the DIP Financing would have been postpetition DIP obligations which would have implied a roll-up of the Prepetition Corporate Debt (prior to the Bridge Financing) relative to the amount of aggregate new money provided of approximately 2.8x on a blended basis. Based on this assessment, the amounts outlined above imply a roll-up of: (a) the Brookfield Prepetition Loans (excluding their portion of the Bridge Financing and related fees) of approximately 2.3:1.0 relative to their portion of the Total New Money Commitments, (b) the Carlyle Prepetition Notes (excluding their portion of the Bridge Financing and related fees) of

approximately 3.4:1.0 relative to their portion of the Total New Money Commitments, and (c) the Fundamental Prepetition Loans (excluding their portion of the Bridge Financing and related fees) of 3.0:1.0 relative to their portion of the Total New Money Commitments.

30.     The DIP Roll-Up is a material and necessary component of the structure of each facility under the DIP Financing that was required by the Bridge/DIP Lenders as a condition to providing the Bridge Financing and DIP Commitments, consent to the Debtors' use of Cash Collateral, and offers to serve as stalking horse bidders for various components of the Debtors' business.  Indeed, none of the Bridge/DIP Lenders offered the Debtors Bridge Financing or DIP Financing without a roll-up component.  The Debtors and the Bridge/DIP Lenders engaged in extensive, hard fought, arm's length negotiations and ultimately agreed to the terms of the DIP Roll-Up as consideration for, among other things, the Debtors' continued use of Cash Collateral, the extension of critical bridge financing, foregoing conditions precedent to withdraw their DIP Commitments if certain consents were not received from project-level counterparties, and the extension of sufficient funding through the DIP Financing to support the Debtors' objectives during these Chapter 11 Cases, including sales of substantially all of the Debtors' assets.

31.     I believe the DIP Roll-Up is fair and reasonable under the circumstances of the Chapter 11 Cases, including the uncertainties and risks related to certain assets that serve as collateral arising from the filing of the Chapter 11 Cases.  Without the protections associated with each DIP Roll-Up, I do not believe the Bridge/DIP Lenders would have provided the DIP Financing.  It is my opinion that roll-ups of prepetition debt are a common feature in postpetition financing where, as here, they are necessary to induce lenders to advance postpetition financing.

## THE TERMS OF THE DIP FINANCING
## ARE REASONABLE UNDER THE CIRCUMSTANCES

32.     Based on my experience as a restructuring professional and my understanding of the Debtors' capital structure, as well as their immediate need for bridge and postpetition financing, I believe that the DIP Financing provided by the Bridge/DIP Lenders, taken as a whole, is reasonable based on the uniquely complex circumstances presented here.  Indeed, the DIP Financing is the Debtors' only actionable proposal that would provide the Debtors with the financing needed to fund these Chapter 11 Cases and carry out a robust and value-maximizing sale process.  I believe that the obligations, interest rates, fees, milestones, and other material terms of the DIP Financing are fair and reasonable under the circumstances, considering, among other factors: (a) the lack of other actionable alternatives, (b) the complexity and inherent uncertainty in the Debtors' capital structure (including the potential for certain project-level lenders to call a default and exercise remedies which could potentially reduce the DIP Lenders collateral), (c) the rates and fees of the Debtors' Prepetition Corporate Debt, (d) the headwinds facing the industry, and (e) the market terms for companies facing similar circumstances.

33.     The Bridge/DIP Lenders have collectively committed $418 million in new-money Bridge Financing and DIP Commitments to fund, among other things, operations, project spend, and a value-maximizing sale process for the benefit of the Debtors and their stakeholders through these Chapter 11 Cases.  Under the circumstances, I believe that the consideration being provided to the Bridge/DIP Lenders for their commitments under the DIP Financing, as a whole, (a) is reasonable in amount, (b) appropriately compensates those parties for their costs and the assurances they are providing to the Chapter 11 Cases, and (c) is necessary for the Debtors to obtain the financing needed to maximize the value of their estates for the benefit of all stakeholders.

34.     In exchange for the DIP Financing, the Bridge/DIP Lenders are entitled to receive (a) a commitment/funding fee equal to 4.00% of the aggregate amount of the committed amount of New Money DIP Loans, payable in kind (pursuant to the terms described in each DIP Facility) upon entry of the Interim Order, (b) an exit fee solely on the New Money DIP Loans equal to 8.00% of the principal amount of the New Money DIP Loans so repaid or prepaid; *provided*, that if the New Money DIP Loans are repaid pursuant to a credit bid in accordance with an applicable Sale Transaction, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid, and, as applicable to each DIP Facility, and (c) a prepayment premium in an amount sufficient to cause each DIP Lender to receive a MOIC of 1.30x on the New Money DIP Loans, inclusive of all interest and fees (other than agency fees for the DIP Agent for the administration of applicable DIP Facility).

35.     Overall, the proposed DIP Facilities are the culmination of a competitive marketing process that was conducted in good faith to identify the best source of financing available to the Debtors under the circumstances.  I believe the competitive marketing process and extensive, arm's-length negotiations over several weeks resulted in material improvements in the terms of the proposed DIP Facilities as compared to the initial proposals received.

36.     Based on my familiarity with the Debtors' capital structure and financial situation, along with my experience as a restructuring professional, I believe the pricing and fees associated with the DIP Financing are reasonable under the circumstances and generally consistent with comparable postpetition financings in complex cases.  Based on the extensive efforts described above, I do not believe that a financing commitment with more favorable terms than the DIP Financing is available to the Debtors.  Accordingly, I believe that the terms and fees reflected in

each DIP Facility and the DIP Roll-Up are reasonable under the circumstances of these Chapter 11 Cases.

## BIDDING PROCEDURES MOTION

37.     With respect to the Bidding Procedures Motion, the Debtors seek entry of an order (a) authorizing and approving the Debtors' proposed Bidding Procedures; (b) scheduling an auction (the "***Auction***") and sale hearing (the "***Sale Hearing***") with respect to the sale of the Assets (as defined below); (c) approving the form and manner of notice of the Auction and the Sale Hearing; (d) authorizing the Debtors to enter into, and perform under, (i) that certain Asset Purchase Agreement with Brookfield (the "***Brookfield APA***"), (ii) that certain Asset Purchase Agreement with Carlyle (the "***Carlyle APA***"), and (iii) that certain Asset Purchase Agreement with Fundamental (the "***Fundamental APA***"); and (e) approving procedures for the assumption and assignment (the "***Assumption Procedures***") of certain of the Debtors' executory contracts and approving the form and manner of notice thereof (the "***Assumption Notice***").

38.     As more fully described in the First Day Declaration, the Debtors anticipate going-concern sales of some or all of the Debtors' assets (the "***Assets***"), which consist primarily of:

   i.      Solar power projects (primarily projects in construction or operating) that directly or indirectly serve as collateral for the Brookfield Prepetition Facility and Brookfield DIP Facility (the "***Brookfield Assets***");

   ii.     Solar power projects (primarily projects in construction or operating) that directly or indirectly serve as collateral for the Carlyle Prepetition Facility and Carlyle DIP Facility (the "***Carlyle Assets***");

   iii.    Solar power projects and assets (primarily development assets) that directly or indirectly serve as collateral for the Fundamental Prepetition Facility and Fundamental DIP Facility (the "***Fundamental Assets***"); and

   iv.     The Debtors' operations & maintenance (O&M) business, operated through non-Debtor ACT Power Services Holding Company Guarantor, LLC and its subsidiaries (collectively, "***ACT***").

**PREPETITION SALE AND MARKETING PROCESS**

39.     As described above, prior to the Petition Date, the Company's assets have been marketed extensively.   Throughout 2024, the Company and a third-party investment bank conducted various sale processes that included outreach to hundreds of parties and did not result in any actionable proposals.   Since Lazard's engagement in June 2025, the Debtors' marketing efforts have continued with a targeted pre-launch outreach beginning in July 2025 and an expanded broad outreach in mid-September 2025 to potential strategic and financial buyers that the Debtors and their advisors believe may be interested in potentially purchasing the Company, ACT, and the Debtors' Assets.   As part of this extensive process, Lazard has had contact with over 235 parties. In connection with this solicitation, Lazard, with assistance from the Company and the Company's other advisors, prepared, among other things, a confidential information memorandum, a detailed financial model and an electronic data room for prospective bidders that executed NDAs.   In total, approximately 150 parties have executed NDAs and received access to confidential information.

40.     As of the Petition Date, the Debtors had received preliminary indications of interest from approximately 20 parties, and the Debtors have continued to advance the marketing process through the commencement of the Chapter 11 Cases.

41.     The approval of the Bidding Procedures will allow the Debtors to continue marketing the Assets to potential buyers, facilitate access to diligence materials and encourage potential bidders to participate and submit Bids.   The key dates for the sale process are as follows:

| Date | Event or Deadline |
|---|---|
| November 14, 2025 | Indication of Interest Deadline |
| November 28, 2025 | Stalking Horse Designation Deadline |
| December 15, 2025 | Bid Deadline |
| December 17, 2025 | Auction (if applicable) |
| December 22, 2025 (subject to Court availability) | Sale Hearing |
| December 31, 2025 | Deadline for closing of any Transaction approved by Court at Sale Hearing |

## STALKING HORSE AGREEMENTS

42.     As noted in the Motion, the Debtors seek authority to enter into the Brookfield APA, the Carlyle APA, and the Fundamental APA, (collectively, the "***Stalking Horse Agreements***" and Brookfield, Carlyle and Fundamental, the "***Stalking Horse Bidders***") each of which were approved by the Debtors' Board of Directors upon recommendation from the Special Committee.  As more fully described in the Stalking Horse Agreements, subject to higher or better bids, Brookfield will purchase the Brookfield Assets for a purchase price between $500 million and $587 million,[4] Carlyle will purchase the Carlyle Assets for a purchase price of $320 million, and Fundamental will purchase the Fundamental Assets for a purchase price of $624 million, each through a credit bid of their secured debt[5].  Each of the Stalking Horse Agreements include various customary representations, warranties and covenants by and to the parties thereto.

43.     The Debtors are also seeking approval of the Expense Reimbursement. Specifically, as noted in the Bidding Procedures, the Debtors have agreed to reimburse each of the Stalking Horse Bidders for its reasonable and documented out-of-pocket expenses up to a maximum amount of $3 million, payable *only* from proceeds of an Alternative Transaction, with such Expense Reimbursements to be reduced pro rata in the event of an Alternative Transaction for only a portion of the Brookfield Assets, Carlyle Assets or Fundamental Assets, as applicable. The Stalking Horse Bidders may elect to waive the Expense Reimbursement.

44.     Further, pursuant to the Bidding Procedures, the Debtors may determine (in their sole discretion) that providing expense reimbursements to non-Stalking Horse Bidders may be in the best interest of their estates, if the provision of such expense reimbursement requested will

---

[4] Purchase price of $587 million assumes that $87 million of forecasted project spend is funded from Brookfield's DIP Commitments prior to the consummation of a sale transaction.

[5] Amounts exclude any assumption of any liabilities.

entice other bidders to increase the value to be obtained in the sale. Such expense reimbursements are often integral to inducing the participation of non-Stalking Horse Bidders to ensure the highest or otherwise best offer for the Assets.

45.     I believe that the terms for the Stalking Horse Bidders' Expense Reimbursements are customary and usual under the circumstances and the flexibility for the Debtors to provide expense reimbursements to non-Stalking Horse Bidders is fair and reasonably and appropriately designed to maximize the value for the benefit of the Debtors' estates.

46.     To date, the Debtors have determined, with the assistance of their advisors, that the Stalking Horse Agreements (the "***Stalking Horse Bids***") constitute the highest or otherwise best binding bids for the respective Assets currently available to the Debtors under the facts and circumstances, recognizing that such bids will be subjected to a competitive and transparent auction process. Based on my involvement in the process and related negotiations, I believe the terms of the Stalking Horse Agreements were negotiated on an arms' length, good faith basis between the Debtors, the Stalking Horse Bidders, and their respective advisors.

47.     Accordingly, I believe that the approval of the Debtors entry into the Stalking Horse Agreements and the Stalking Horse Bids as a whole are in the best interest of the Debtors and their estates, and the Debtors' decision to seek approval of the Stalking Horse Agreements constitutes a sound exercise of the Debtors' business judgment.

## PROPOSED BIDDING PROCEDURES

48.     Based on my experience, I believe that the proposed Bidding Procedures are designed to promote a fair, competitive, and efficient sale process to maximize the value of the Debtors' Assets. If approved, the Bidding Procedures would allow the Debtors to solicit and identify bids from potential buyers or investors and elicit the highest or otherwise best offer for

the Debtors' Assets.  The Bidding Procedures would allow the Debtors to continue marketing the Assets to potential buyers, facilitate access to diligence materials, encourage potential bidders to participate and submit Bids, receive and evaluate Bids and, if necessary, permit the Debtors to run one or more separate Auctions.  Such diligence materials, for those executing an NDA with the Debtors, would include confidential presentation materials, additional legal, financial, operational and other information on the Debtors and, as appropriate, meetings with management.

49.     Prior to the Petition Date, the Company marketed itself and its assets extensively, including conducting various asset sale processes throughout 2024 that did not result in any actionable proposals.  During the third quarter of 2025, the Company, with the assistance of Lazard, launched a robust sale and marketing process for any and all of the Company's assets that has included contact with over 235 parties, has been underway for almost two months, and will continue through the Chapter 11 Cases.  Lazard's broad outreach has encompassed the parties that they believe are the most likely to be interested in bidding for the Assets, and all parties that executed NDAs as part of the prepetition marketing process have been provided access to diligence.

50.     Additionally, to the extent new parties are interested in participating in the postpetition sale process, the dataroom has been populated to ensure that such parties will be able to begin conducting diligence immediately following execution of an NDA.  Furthermore, the Bidding Procedures and proposed timeline were heavily negotiated with the Prepetition Lenders in connection with the Bridge Financing and DIP Commitments, and the Approved Budget was developed and negotiated to limit the use of proceeds of the DIP Facility and Cash Collateral to the Debtors' needs for executing a sale process on the proposed timeline.  Nevertheless, I believe that the timeframe will allow for a sufficient and thorough marketing process.

51.     Given the scope and duration of the prepetition marketing processes, the number of parties that have already executed NDAs and engaged in due diligence, the postpetition marketing process contemplated, and the associated budget and financing constraints, I believe the process and timeframe set forth in the Bidding Procedures are reasonably structured and provide parties with sufficient time and information to evaluate the opportunity.  The Bidding Procedures also provide the Debtors with an adequate opportunity to consider any competing bids and to select the highest or otherwise best offer for the Company or its Assets.

52.     For those reasons, I believe the Bidding Procedures, including the timeline for the postpetition sale process set forth therein, are appropriately designed to promote a competitive and robust sale process for the Assets to achieve the highest or otherwise best value achievable under the circumstances.

## CONCLUSION

53.     Based on my experience and Lazard's involvement in assisting the Debtors with the postpetition financing solicitation process and ongoing sale process, I believe that (a) the terms of the DIP Financing are fair and reasonable under the circumstances, the DIP Financing is the best and only actionable postpetition financing option currently available to the Debtors and, accordingly, it would be appropriate for the Court to approve the DIP Facility, (b) the approval of the Debtors entry into the Stalking Horse Agreements and the Stalking Horse Bids as a whole are in the best interest of the Debtors' estates, and the Debtors' decision to seek such approval constitutes a sound exercise of the Debtors' business judgment, and (c) the terms and timeline for the postpetition sale process set forth in the Bidding Procedures are appropriately designed to promote a competitive and robust sale process for the Assets to achieve the highest or otherwise best value currently available and, therefore, the proposed Bidding Procedures should be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

November 7, 2025
New York, New York

/s/ *Tyler W. Cowan*
Tyler W. Cowan
Global Head of Restructuring & Liability Management
Lazard Frères & Co. LLC