IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------ x
: 
In re: : Chapter 11
: 
PINE GATE RENEWABLES, LLC, *et al.*, : Case No. 25-90669 (CML)
: 
Debtors.[1] : (Jointly Administered)
: 
------------------------------------------------------------ x

**DECLARATION OF MARK RAJCEVICH IN SUPPORT OF
(A) DEBTORS' MOTIONS TO OBTAIN (I) POSTPETITION
FINANCING AND (II) APPROVAL OF BIDDING PROCEDURES FOR
SALE OF DEBTORS' ASSETS AND (B) DEBTORS' OTHER FIRST DAY MOTIONS**

I, Mark Rajcevich, declare under the penalty of perjury:

1. I am a Managing Director with Alvarez & Marsal North America, LLC ("***A&M***"). A&M is the proposed financial advisor to the above-captioned debtors and debtors in possession (the above-captioned debtors, the "***Debtors***," their non-debtor affiliates, the "***Non-Debtor Affiliates***," and the Debtors and Non-Debtor Affiliates together, "***Pine Gate***" or the "***Company***").

2. I am over the age of 18 and authorized to submit this declaration (the "***Declaration***") on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by A&M as a proposed professional to be retained by the Debtors. If called upon to testify, I could and would testify as to the facts set forth herein.

3. Except as otherwise stated herein, the statements set forth herein are based on (a) my personal knowledge or opinion based on my experience; (b) information that I have received from the Debtors, my colleagues at A&M working directly with me or under my

---

[1] A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR. The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

supervision, direction, or control, or other proposed advisors of the Debtors; and/or (c) my review of relevant documents.

4. I submit this Declaration on behalf of the Debtors in support of the relief requested in the following motions (collectively, the "**First Day Motions**"):[2]

- Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief [Docket No. 46] (together with all exhibits, annexes and attachments thereto, the "**DIP Motion**");

- Emergency Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief; and (II) (A) Approving and Authorizing Sale of Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief [Docket No. 22] (together with all exhibits, annexes and attachments thereto, the "**Bidding Procedures Motion**");

- Emergency Motion of Debtors for Entry of an Order (A) Extending the Time to File Schedules and Statements and 2015.3 Reports, (B) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (C) Granting Related Relief [Docket No. 4];

- Emergency Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors, (B) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (C) Approving the Form and Manner of Notice of Commencement, and (D) Granting Related Relief [Docket No. 18];

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion, Bidding Procedures Motion, or the *Declaration of Ray Shem, President and Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First-Day Relief* [Docket No. 19] (the "**First Day Declaration**"), as applicable.

2

- Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (B) Granting Related Relief [Docket No. 8];

- Emergency Motion of Debtors for Entry of an Order (A) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (B) Establishing Procedures for Resolving Objections by Utility Providers, (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, and (D) Granting Related Relief [Docket No. 9];

- Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to (I) Continue Insurance Programs, (II) Continue the Bonding Program, and (III) Pay all Obligations with Respect thereto; (B) Modifying Automatic Stay to Permit Employees to Proceed with Workers' Compensation Claims; and (C) Granting Related Relief [Docket No. 5]];

- Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (II) Maintain Employee Benefits Programs and Pay Related Obligations; and (B) Granting Related Relief [Docket No. 6];

- Emergency Motion of Debtors for Entry of an Order (A) Establishing Notification Procedures and Approving Restrictions on (I) Certain Transfers of Interests in the Debtors and (II) Claims of Certain Worthlessness Deductions, and (B) Granting Related Relief [Docket No. 10];

- Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Project Vendors; (B) Confirming Administrative Expense Priority; and (C) Granting Related Relief [Docket No. 7]; and

- Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Operating Their Existing Cash Management System, (II) Honor Certain Related Prepetition Obligations, and (III) Continue Intercompany Transactions, (B) Waiving Certain Deposit Requirements, and (C) Granting Related Relief [Docket No. 11].

**BACKGROUND AND QUALIFICATIONS**

5. A&M is an internationally recognized restructuring and turnaround firm and possesses a wealth of experience in providing financial advisory services in complex restructurings and reorganizations. A&M has significant experience assisting distressed companies with restructuring, insolvency, litigation support, interim management, capital market advisory,

3

valuation, tax advisory, financial management, and performance improvement services and solutions. A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including: developing or validating forecasts, business plans, and related assessments of strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring transactions, including sales of all or substantially all assets of debtors in large, complex chapter 11 cases. Additionally, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to, among other things, assist in sales of assets in accordance with the provisions of the Bankruptcy Code and develop feasible and executable plans of reorganization and liquidation.

6. Personally, I have more than 20 years of experience, focusing on assessing and modeling financial and operational restructuring strategies, cash flow forecasting, business plans and related financial projections, cost cutting, liquidity management, preparing and operating companies through the chapter 11 process, asset dispositions, and wind-downs. I have worked with clients across various industries, including those in the renewable energy sector. I have considerable experience advising clients on maximizing value, recovery, and financial returns in complex restructuring situations. This experience includes working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. I have provided restructuring leadership guidance for several companies, including, but not limited to, Enviva, Inc., Gulfport Energy Corporation, California Resources Corporation, Chisholm Oil &

Gas LLC, Legacy Reserves Inc., Stone Energy Corporation, Penn Virginia Corporation, Vantage Drilling Company, and A123 Systems, LLC.

7. Prior to joining A&M in 2006, I spent four years in FTI Consulting, Inc.'s Restructuring practice and two years in PricewaterhouseCoopers' Business Recovery Services practice. I received a Bachelor of Science with high honors in Finance from the University of Illinois.

## A&M RETENTION

8. On March 10, 2025, the Company engaged A&M to provide consulting services to the Company to improve the financial and operating performance of Blue Ridge Power LLC ("**BRP**," and, together with its Debtor EPC affiliates, "**Blue Ridge**"). Following a meeting at the Company's offices in Asheville, North Carolina during the week ending on August 8, 2025, A&M began to help the Company analyze strategic alternatives at the request of its management. On September 3, 2025, the Company further expanded the scope of A&M's engagement to include broader liquidity and restructuring services for the whole Company, including my appointment as the Company's Chief Restructuring Officer ("**CRO**"). As CRO, I am responsible for, among other things, conducting financial and liquidity forecasting, developing restructuring plans and other strategic alternatives for maximizing value, and analyzing and negotiating the Company's use of cash collateral and debtor-in-possession financing.

9. Since A&M's engagement, the A&M team has worked closely with the Debtors' management and other professionals retained by the Debtors, including the Debtors' proposed investment banker, Lazard Frères & Co. LLC ("**Lazard**"), and proposed counsel, Latham & Watkins LLP and Hunton Andrews Kurth LLP, to assist the Debtors in considering and planning for various restructuring scenarios. Through that work and my role as CRO, I am familiar with

the Debtors' capital structure, business operations, books and records, and restructuring efforts to date. Additionally, I have developed a comprehensive understanding of the Debtors' liquidity position and needs.

## THE DEBTORS' NEED FOR THE DIP FINANCING AND ACCESS TO CASH COLLATERAL

10. The DIP Motion seeks, among other items, authorization for the Debtors to enter into three superpriority, debtor-in-possession financing facilities, in an aggregate principal amount of new money up to $250.4 million (the "**DIP Financing**"), comprised of the:

> (a) *Brookfield DIP Facility*: a postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan facility (the "**Brookfield DIP Facility**") consisting of (i) up to $134.1 million (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "**Brookfield New Money DIP Loans**"), and (ii) upon entry of the Interim Order, $417.3 million in principal amount of term loans which shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement (the "**Brookfield Roll-Up DIP Loans**" and, together with the Brookfield New Money DIP Loans, the "**Brookfield DIP Loans**"), in each case pursuant to and in accordance with the terms and conditions set forth in the Brookfield DIP Credit Agreement;
>
> (b) *Carlyle DIP Facility*: a postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession notes facility (the "**Carlyle DIP Facility**") consisting of (i) up to $51.7 million (excluding fees, premiums and other amounts payable-in-kind) in principal amount issuance of new money notes (the "**Carlyle New Money DIP Notes**"), and (ii) upon entry of the Interim Order, $322.2 million in principal amount of notes which shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement (the "**Carlyle Roll-Up DIP Notes**" and, together with the Carlyle New Money DIP Notes, the "**Carlyle DIP Notes**"), in each case pursuant to and in accordance with the terms and conditions set forth in the Carlyle DIP Note Purchase Agreement; and
>
> (c) *Fundamental DIP Facility*: a postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan facility (the "**Fundamental DIP Facility**") consisting of (i) up to $64.6 million (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "**Fundamental New Money DIP Loans**"), and (ii) upon entry of the Interim Order, $666.1 million in principal amount of term loans which shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Fundamental Prepetition Loans under the Fundamental Prepetition Credit Agreement (the "**Fundamental Roll-Up**

6

*DIP Loans*" and, together with the Fundamental New Money DIP Loans, the "***Fundamental DIP Loans***"), in each case pursuant to and in accordance with the terms and conditions set forth in the Fundamental DIP Credit Agreement.

11. The DIP Financing draws are structured as follows:

   (a) *Initial Draws*:

   i. **Brookfield DIP Facility**: Up to $17,500,000.00 within three (3) Business Days after entry of the Interim Order;

   ii. **Carlyle DIP Facility**: Up to $16,559,056.06 within three (3) Business Days after entry of the Interim Order; and

   iii. **Fundamental DIP Facility**: Up to $21,304,328.11 within three (3) Business Days after entry of the Interim Order.

   (b) *Second Draws*:

   i. **Brookfield DIP Facility**: Up to the balance of the Brookfield New Money DIP Loans (*less* amounts allocated to the Brookfield Subsequent Draws) within three (3) Business Days after entry of the Final Order;

   ii. **Carlyle DIP Facility**: Up to the balance of the Carlyle New Money DIP Notes (*less* amounts allocated to the Carlyle Discretionary Draws) within three (3) Business Days after entry of the Final Order; and

   iii. **Fundamental DIP Facility**: Up to the balance of the Fundamental New Money DIP Loans (*less* amounts allocated to the Fundamental Subsequent Draws) within 3 Business Days after entry of the Final Order.

   (c) *Subsequent or Discretionary Draws*:

   i. **Brookfield DIP Facility**: Up to $86,870,686.17 in multiple draws within three (3) Business Days after satisfaction of conditions precedent (the "***Brookfield Subsequent Draws***");

   ii. **Carlyle DIP Facility**: Up to $24,410,196.64 in multiple draws within three (3) Business Days after satisfaction of conditions precedent (the "***Carlyle Discretionary Draws***"); and

   iii. **Fundamental DIP Facility**: Up to $28,713,902.04 in multiple draws within three (3) Business Days after satisfaction of conditions precedent (the "***Fundamental Subsequent Draws***").

    *(d) Post-Sale Draw*:

        i. **Brookfield DIP Facility**: Any undrawn Brookfield New Money DIP Loans (other than amounts earmarked for the Brookfield Subsequent Draws) become available upon closing of a Sale Transaction solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse Agreement or any amendment thereto, notwithstanding unsatisfied conditions precedent;

        ii. **Carlyle DIP Facility**: Any undrawn Caryle DIP Commitments (other than amounts earmarked for the Carlyle Discretionary Draws) become available upon closing of a Sale Transaction solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse Agreement or any amendment thereto, notwithstanding unsatisfied conditions precedent; and

        iii. **Fundamental DIP Facility**: Any undrawn Fundamental New Money DIP Loans (other than amounts earmarked for the Fundamental Subsequent Draws) become available upon closing of a Sale Transaction solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse Agreement or any amendment thereto, notwithstanding unsatisfied conditions precedent.

12. I understand that the DIP Motion also seeks authorization for, among other things, the consensual use of Cash Collateral of the Prepetition Secured Parties and to provide adequate protection to the Prepetition Secured Parties in the form of (a) payment of reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors to the Prepetition Secured Parties; (b) payment of postpetition interest, paid-in-kind; (c) replacement liens on the DIP Collateral; (d) superpriority administrative expense claims, to the extent of any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) resulting from the imposition of the Automatic Stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral); and (e) information rights.

13. Prior to the Petition Date, the Debtors worked with A&M to analyze and quantify the Debtors' potential liquidity needs leading up to and during the Chapter 11 Cases. As part of

the Debtors' evaluation of their liquidity position, A&M worked closely with the Debtors' management to review, analyze, and assist in preparing the Debtors' 13-week cash flow forecast. The cash flow forecast takes into consideration a number of factors, including the effect of the Chapter 11 Cases on the operations of the businesses, fees and interest expenses associated with the DIP Financing, adequate protection payments, professional fees and expenses, continued operation of the Debtors' operating solar power projects, and continued construction of solar power projects in development.

14. I understand that the Debtors, with the assistance of Lazard, solicited potential out-of-court and in-court debtor-in-possession financing from third parties and from the Company's Prepetition Secured Lenders. That process yielded two (2) third-party in-court postpetition financing proposals; however, neither provided sufficient funds to support the Debtors' strategic objectives for a full chapter 11 case in the assessment of the Debtors' management, Lazard, and my team. At the same time, Brookfield, Carlyle, and Fundamental (together, the "**Bridge/DIP Lenders**") each submitted proposals for a cross-conditioned package of out-of-court interim financing to provide the Debtors with sufficient liquidity to prepare for a potential chapter 11 filing and commitments for in-court debtor-in-possession financing. The Company commenced arm's-length negotiations with the Bridge/DIP Lenders in early September 2025, after each lender engaged legal and financial advisors. On October 6, 2025, those negotiations culminated in the Company closing three separate financings–one with each Bridge/DIP Lender.

15. In the aggregate, the Bridge/DIP Lenders provided approximately $412 million of committed new money financing, comprising roughly $208 million of out-of-court interim financing (collectively, the "**Bridge Financing**") and approximately $204 million of commitments for debtor-in-possession financing (the "**DIP Commitments**," and such financing, the "**DIP**

*Financing*"). Each Bridge/DIP Lender also agreed to serve as a stalking horse bidder for the solar power projects that comprise its collateral portfolio. In consideration of this integrated financing and sale solution, the Bridge/DIP Lenders required, and the Company granted, guarantees and liens from (a) previously unencumbered entities that sat above (i.e., structurally junior to) the Bridge/DIP Lenders' borrowers in the Company's corporate structure and (b) previously unencumbered entities that sat between the Bridge/DIP Lenders' borrowers and the solar power projects (*i.e.*, were structurally senior to the Bridge/DIP Lenders and junior to project financing). Leading up to the Petition Date after closing the Bridge Financing on October 6, 2025, the Company revised its 13-week cash-flow forecast. Consequently, the company engaged with the Bridge/DIP Lenders to increase the DIP Financing commitments by approximately $46.0 million to approximately $250.4 million in the aggregate. This includes (a) a rollover of approximately $40.2 million of undrawn Bridge Financing commitments and (b) approximately $5.8 million of incremental DIP Financing commitments.

16. Taking into account the Debtors' cash-on-hand, as of the Petition Date, the Debtors' 13-week cash flow forecast indicates that the Debtors have insufficient funds and, further, are unable to generate enough operating cash flow to both finance the Debtors' working capital needs and the costs of administering the Chapter 11 Cases. Given the expenses associated with the Debtors' businesses and cash burn, the Debtors' access to the DIP Financing and use of Cash Collateral is required to avoid an immediate, irreparable, and value-destructive impact on the Debtors' estates. This impact is likely to include, among other things, the Debtors' inability to pay their employees, satisfy their obligations to vendors and suppliers, and fund their business operations (including the needs of their solar power projects), all of which will be detrimental to the Debtors' estates, their creditors, and other parties in interest. The Debtors' access to the DIP

Financing and Cash Collateral is therefore critical to stabilize their business operations, administer the Chapter 11 Cases effectively, and conduct a value-maximizing sale process. Accordingly, the Debtors require immediate approval of the proposed DIP Financing and authority to continue their use of Cash Collateral as agreed to under the terms of the Bridge Financing and the proposed DIP Financing.

## THE DIP FINANCING IS SUFFICIENT

17. In connection with preparing for a potential chapter 11 filing and determining the Debtors' postpetition financing requirements, A&M worked with the Debtors and their advisors to prepare projected cash forecasts for the Debtors' business during the Chapter 11 Cases. These projections reflect a number of factors, including, among other things, operational performance of the underlying business, impact of the Chapter 11 Cases on daily operations, fees and interest expenses associated with the DIP Financing, and the projected costs (including professional fees) associated with effectuating a successful chapter 11 process and sale as contemplated under the Bidding Procedures Motion. The initial Approved Budget, attached hereto as Exhibit 1, reflects the weekly cash flow forecast for the 13-week period following the Petition Date. I believe that the initial Approved Budget provides a reasonable estimate of the Debtors' capital needs during the postpetition period.

18. Furthermore, based on A&M's involvement in the negotiations that led to the Bridge Financing and the DIP Financing, I believe the Debtors engaged in good faith, arm's-length negotiations with the Bridge/DIP Lenders to obtain financing that: (a) is sized to meet the Debtors' urgent and significant liquidity needs; (b) offers critical resources for the Debtors to manage their solar power project portfolios, which is critical to preserving the value of the Debtors' estates and successfully implementing value-maximizing sale transactions; (c) allows the Debtors to continue

their efforts to sell all or substantially all of their assets; and (d) following the contemplated sale transactions, provides essential financing for the Debtors to confirm and consummate a chapter 11 plan.

19. The quantum of the DIP Financing and the budget for these Chapter 11 Cases were the product of hard-fought, good-faith, arm's-length negotiations between the Debtors and the Bridge/DIP Lenders, along with each of their advisors. The Debtors and their advisors developed a timeline necessary to run a value-maximizing post-petition sale process and take account of market conditions, regulatory approvals and bidder diligence timelines, in addition to the time and expense necessary for the Debtors to confirm a post-sale chapter 11 plan. A&M then prepared a budget (the "***Bridge/DIP Budget***") calculated to fund continued operations, pay the costs of the administration of the Chapter 11 Cases, and protect asset value during the budget period, which was subsequently refined through negotiations with the Bridge/DIP Lenders. Ultimately, based on the Bridge/DIP Budget and discussions with the Bridge/DIP Lenders, the Debtors, in consultation with A&M, concluded that they would require access to DIP Financing in an aggregate amount of up to $250.4 million to provide sufficient liquidity to fund their corporate needs and to administer the Chapter 11 Cases for the time period required to pursue their restructuring objectives.

20. Through negotiations with the Bridge/DIP Lenders, the DIP Financing was structured to continue the use of Cash Collateral and fund the duration of the Chapter 11 Cases through the following three facilities: (a) a maximum funded principal amount up to $134.1 million under the Brookfield New Money DIP Loans; (b) a maximum funded principal amount up to $51.7 million under the Carlyle New Money DIP Notes; and (c) a maximum funded principal amount up to $64.6 million under the Fundamental New Money DIP Loans.

21. In my opinion, based on my experience with the Debtors and their businesses, as well as my experience as a financial advisor in multiple large, complex chapter 11 cases, the proceeds from the DIP Financing and access to Cash Collateral will allow the Debtors to: (a) stabilize their businesses at the outset of the Chapter 11 Cases, (b) preserve the value of their assets during the Chapter 11 Cases which, in turn, will allow the Debtors to complete a value-maximizing sale process and, ultimately, (c) proceed with filing and consummating a chapter 11 plan.

22. Without access to the funds provided by the DIP Financing and the use of Cash Collateral, the Debtors would likely experience an immediate and value-destructive disruption to their business operations, which would likely result in losing the support of essential stakeholders, including vendors and employees. These disruptions would impede the Debtors' ability to pursue a successful sale process, as they would likely be forced to significantly scale back operations and cease development on incomplete solar power projects that are in the pipeline, to the detriment of stakeholders. Without the critical source of postpetition liquidity provided under the DIP Financing, the Debtors' businesses are at risk of suffering irreparable harm. Therefore, I believe that the proposed DIP Financing and access to Cash Collateral are essential for enabling the Debtors to maximize value in the Chapter 11 Cases.

## PROPOSED BIDDING PROCEDURES

23. Through my position as CRO as well as my involvement in negotiating the Debtors' financing and sale solutions, I am familiar with the Bidding Procedures Motion and the proposed Bidding Procedures outlined therein, including the liquidity analysis underpinning the Bridge Financing and the DIP Financing, for which the proposed sale timeline is a key assumption.

24. I understand that the Bidding Procedures Motion is intended to facilitate a value-maximizing sale process through flexibility for the Debtors to obtain the highest or otherwise best-

offer for the Assets, by allowing the Debtors (in consultation with the Consultation Parties), among other things, to: (a) consider Bids for all or any portion of the Assets (including subgroups thereof), (b) reschedule the Auction, schedule additional Auctions, or cancel the Auction altogether, in certain circumstances, and (c) ensure that Bidders have the financial wherewithal to close a Transaction and fulfill their obligations under any Purchase Agreement.

25.   I believe that the timeline proposed by the Bidding Procedures is necessary and appropriate given the Debtors' limited liquidity to fund the costs of administering the Chapter 11 Cases and to address ongoing operational expenditures. I also believe, based on information provided to me by Lazard, that the proposed timeline is appropriate, taking into account the diligence that has already been completed in connection with the extensive prepetition marketing process. The Debtors' proposed sale process timeline provides approximately six (6) weeks between the filing of the Sale Motion and the proposed deadline for the submission of Qualified Bids on December 15, 2025, at 5:00 p.m. (prevailing Central Time). The proposed deadline for submission of Qualified Bids is also more than a month after the deadline for interested parties to submit Indications of Interest, meaning that Diligence Parties will have over one (1) month to organize materials to submit a Qualified Bid. This process capitalizes on existing interest and information already disseminated into the market for the Debtors' assets while mitigating the risks of extending the timeline beyond what the Debtors' liquidity forecast will permit.

26.   Despite the benefit of the DIP Financing and access to Cash Collateral (if approved by the Court), I do not believe it is prudent or in the best interests of the Debtors and their estates to run a sale process that would not be completed until the Debtors' liquidity is exhausted or nearly fully exhausted, which would be the case in the event of any material delay or extension to the proposed timeline. Pursuing such a path does not protect against contingency scenarios and

exposes the Debtors to the potential adverse consequence of being unable to satisfy their postpetition obligations or running out of liquidity before the sales can be consummated and a chapter 11 plan confirmed. Extending the sales process further, without additional committed capital contributions, would jeopardize the Debtors' ability to preserve and maximize the value of their estates, and could result in insufficient capital to fund operations, including payroll for the Debtors' workforce.

27. Given the Debtors' limited liquidity and the forecast set forth in the initial Approved Budget, I believe that the proposed Bidding Procedures, including a bid deadline of December 15, 2025, and targeted sale closings by December 31, 2025, are appropriate and necessary to ensure that the Debtors can maximize the value of their estates.

## FIRST DAY MOTIONS

28. I have reviewed each of the First Day Motions, proposed orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions: (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal employee attrition and disruption to their enterprise, and without loss of productivity or value; (b) is necessary to preserve valuable relationships with their customers, vendors, and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates and a prudent exercise of the Debtors' business judgement.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: November 7, 2025
New York, New York

/s/    *Mark Rajcevich*
Mark Rajcevich
Managing Director
Alvarez & Marsal North America, LLC

**Exhibit 1**

**Approved Budget**

**Exhibit 1**

**Approved Budget**

**Pine Gate Renewables**
**Initial DIP Budget**

*($ in millions)*

| Forecast Week # > | FCST 1 | FCST 2 | FCST 3 | FCST 4 | FCST 5 | FCST 6 | FCST 7 | FCST 8 | FCST 9 | FCST 10 | FCST 11 | FCST 12 | FCST 13 | Total Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Date > | 11/7/25 | 11/14/25 | 11/21/25 | 11/28/25 | 12/5/25 | 12/12/25 | 12/19/25 | 12/26/25 | 1/2/26 | 1/9/26 | 1/16/26 | 1/23/26 | 1/30/26 | |
| Receipts | $ - | $ 76 | $ 16 | $ 7 | $ 7 | $ 5 | $ 79 | $ - | $ 10 | $ - | $ - | $ - | $ - | $ 199 |
| Operating Disbursements | (22) | (162) | (22) | (16) | (29) | (7) | (82) | (3) | (36) | (8) | (1) | (1) | (1) | (390) |
| Restructuring Activites | (8) | (6) | (4) | (5) | (6) | (6) | (7) | (7) | (27) | (5) | (5) | (5) | (5) | (92) |
| **Total Net Cash Flow** | **$ (30)** | **$ (92)** | **$ (10)** | **$ (14)** | **$ (28)** | **$ (8)** | **$ (10)** | **$ (9)** | **$ (53)** | **$ (13)** | **$ (5)** | **$ (6)** | **$ (5)** | **$ (283)** |
| **Liquidity Rollforward** | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | $ 33 | $ 60 | $ 48 | $ 43 | $ 90 | $ 83 | $ 75 | $ 68 | $ 59 | $ 29 | $ 17 | $ 11 | $ 5 | $ 33 |
| Net Cash Flow | (30) | (92) | (10) | (14) | (28) | (8) | (10) | (9) | (53) | (13) | (5) | (6) | (5) | (283) |
| DIP Draws - Interim & Final | 55 | - | - | 55 | - | - | - | - | - | - | - | - | - | 110 |
| DIP Draws - Discretionary | 1 | 80 | 5 | 6 | 21 | 0 | 2 | 0 | 23 | - | - | - | - | 140 |
| **Ending Cash Balance** | **$ 60** | **$ 48** | **$ 43** | **$ 90** | **$ 83** | **$ 75** | **$ 68** | **$ 59** | **$ 29** | **$ 17** | **$ 11** | **$ 5** | **$ -** | **$ -** |
| DIP Facility Available | 194 | 113 | 108 | 47 | 26 | 26 | 23 | 23 | - | - | - | - | - | - |
| **Total Liquidity** | **$ 253** | **$ 161** | **$ 151** | **$ 137** | **$ 109** | **$ 101** | **$ 91** | **$ 82** | **$ 29** | **$ 17** | **$ 11** | **$ 5** | **$ -** | **$ -** |