United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 11, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

---

------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
PINE GATE RENEWABLES, LLC, *et al.*,                    :   Case No. 25-90669 (CML)
                                                        :
Debtors.[1]                                             :   (Jointly Administered)
                                                        :
------------------------------------------------------- x

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**
**[Relates to Docket No. 46]**

Upon the motion (the "***DIP Motion***")[2] of each of the above-captioned debtors and debtors in possession (collectively the "***Debtors***," and each, a "***Debtor***") in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended (the "***Bankruptcy Code***") and rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules (the "***Local Rules***") for the United States Bankruptcy Court for the Southern District of Texas (this "***Court***") seeking entry of an interim order (this "***Interim Order***") granting the relief provided herein until the date that a final order approving the relief sought in

---

[1]   A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in Annex A, the DIP Motion or the DIP Documents, as applicable.

the DIP Motion (the "***Final Order***," together with the Interim Order, the "***DIP Orders***") has been

entered (such interim period being the "***Interim Period***"), including among other things:

(i)     Authorization and approval for the Debtors to obtain up to **$551,507,371.92** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "***Brookfield DIP Facility***"), consisting of (a) up to **$134,084,563.51** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "***Brookfield New Money DIP Loans***"), of which up to **$17,500,000** (the "***Brookfield Interim Draw***"), plus certain additional Brookfield Subsequent Draws, may be made available during the Interim Period, with the balance of such Brookfield New Money DIP Loans subject to entry of the Final Order, and (b) (1) upon entry of the Interim Order, **$250,266,570.24** in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement (the "***Brookfield Interim Roll-Up DIP Loans***"); and (2) subject to entry of the Final Order, **$167,156,238.18** in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement (the "***Brookfield Final Roll-Up DIP Loans***" and, together with the Brookfield Interim Roll-Up DIP Loans, the "***Brookfield Roll-Up DIP Loans***" and, together with the Brookfield New Money DIP Loans, collectively, the "***Brookfield DIP Loans***"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Superpriority Senior Secured Debtor-in-Possession Credit Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "***Brookfield Borrower***"), the other Debtors identified as guarantors of the Brookfield DIP Obligations in the Brookfield DIP Documents (each a "***Brookfield Debtor Guarantor***"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Brookfield DIP Obligations in the Brookfield DIP Documents (each a "***Brookfield Non-Debtor Guarantor***" and together with the Debtor Guarantors, collectively the "***Brookfield Guarantors***"), the lenders party thereto (collectively, the "***Brookfield DIP Lenders***"), and Bid Administrator LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "***Brookfield DIP Agent***" and, together with the Brookfield DIP Lenders, the "***Brookfield DIP Secured Parties***"), substantially in the form attached hereto as **Exhibit A** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***Brookfield DIP Credit Agreement***" and the funding commitments thereunder, the "***Brookfield DIP Commitments***");

(ii)    Authorization and approval for the Debtors to obtain up to **$373,965,652.75** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession notes and other financial accommodations (the "***Carlyle DIP Facility***"), consisting of (a) up to **$51,722,511.23** (excluding fees, premiums and other amounts payable-in-kind) in principal amount issuance of new money notes (the "***Carlyle New Money DIP Notes***"), of which up to **$16,559,056.06** (the "***Carlyle Interim Issuance***"), plus certain additional Carlyle Subsequent Draws, may be made available during the Interim Period, with the balance of such issuance of Carlyle New Money DIP Notes subject to entry of the Final Order, and (b) (1) upon entry of the Interim Order, **$142,697,722.12**

2

in principal amount of notes shall be issued to repay and refinance, on a dollar-for-dollar, cashless basis, Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement (the "*Carlyle Interim Roll-Up DIP Notes*"); and (2) subject to entry of the Final Order, **$179,545,419.39** in principal amount of notes shall be issued to repay and refinance, on a dollar-for-dollar, cashless basis, Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement (the "*Carlyle Final Roll-Up DIP Notes*" and, together with the Carlyle Interim Roll-Up DIP Notes, the "*Carlyle Roll-Up DIP* Notes," and, together with the Carlyle New Money DIP Notes, collectively, the "*Carlyle DIP Notes*"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "*Carlyle Issuer*"), the other Debtors identified as guarantors of the Carlyle DIP Obligations in the Carlyle DIP Documents (each a "*Carlyle Debtor Guarantor*"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Carlyle DIP Obligations in the Carlyle DIP Documents (each a "*Carlyle Non-Debtor Guarantor*" and together with the Carlyle Debtor Guarantors, collectively the "*Carlyle Guarantors*"), the note purchasers party thereto (collectively, the "*Carlyle DIP Noteholders*"), and Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent (in such capacities, the "*Carlyle DIP Agent*" and, together with the Carlyle DIP Noteholders, the "*Carlyle DIP Secured Parties*"), substantially in the form attached hereto as **Exhibit B** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "*Carlyle DIP Note Purchase Agreement*" and the funding commitments thereunder, the "*Carlyle DIP Commitments*");

(iii) Authorization and approval for the Debtors to obtain up to **$730,758,214.97** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "*Fundamental DIP Facility*"), consisting of (a) up to **$64,633,622.97** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "*Fundamental New Money DIP Loans*" and, collectively with the Brookfield New Money DIP Loans and the Carlyle New Money DIP Notes, the "*New Money DIP Loans*"), of which up to **$21,304,328.11** (the "*Fundamental Interim Draw*"), plus certain additional Fundamental Subsequent Draws, may be made available during the Interim Period, with the balance of such Fundamental New Money DIP Loans subject to entry of the Final Order, and (b) upon entry of the Interim Order, **$360,831,678.46** in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Fundamental Prepetition Loans under the Fundamental Prepetition Credit Agreements (the "*Fundamental Interim Roll-Up DIP Loans*"); and (2) subject to entry of the Final Order, **$305,292,913.55** in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, Fundamental Prepetition Loans under the Fundamental Prepetition Credit Agreement (the "*Fundamental Final Roll-Up DIP Loans*" and, together with the Fundamental Interim Roll-Up DIP Loans, the "*Fundamental Roll-Up DIP Loans*" and, together with the Fundamental New Money DIP Loans, collectively, the "*Fundamental DIP Loans*"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Loan Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "*Fundamental Borrower*"), certain of the other Debtors identified as guarantors of the Fundamental DIP

Obligations in the Fundamental DIP Documents (each a "***Fundamental Debtor Guarantor***"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Fundamental DIP Obligations in the Fundamental DIP Documents (each a "***Fundamental Non-Debtor Guarantor***" and together with the Debtor Guarantors, collectively the "***Fundamental Guarantors***"), the lenders party thereto (collectively, the "***Fundamental DIP Lenders***"), and FP Solar Development I, LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "***Fundamental DIP Agent***" and, together with the Fundamental DIP Lenders, the "***Fundamental DIP Secured Parties***"), substantially in the form attached hereto as **Exhibit C** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***Fundamental DIP Credit Agreement***" and the funding commitments thereunder, the "***Fundamental DIP Commitments***");

(iv)   Authorization for the Debtors to use the proceeds of the DIP Facilities in accordance with the terms of the DIP Orders and the DIP Documents, subject to the Approved Budget (as defined herein);

(v)   Approval of and authorization for the Debtors and the Non-Debtor Guarantors to (a) enter into, execute, and perform under the DIP Documents and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Documents and the DIP Orders;

(vi)   Subject to the applicable Carve Out (as defined below), granting to each DIP Agent, for itself and on behalf of the applicable DIP Secured Parties, valid, enforceable, nonavoidable, automatically perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code), junior solely to the applicable Carve Out, in and upon all of the applicable DIP Collateral held by the applicable DIP Loan Parties to secure the applicable DIP Obligations as provided by and more fully defined in the DIP Documents, which liens shall be secured by the DIP Collateral and have the priorities set forth in Annex 3;

(vii)   Subject to the applicable Carve Out, granting to each DIP Agent, for itself and on behalf of the applicable DIP Secured Parties, allowed superpriority administrative expense claim status (junior solely to the applicable Carve Out) for the applicable DIP Obligations in each of the Chapter 11 Cases of the DIP Borrower and each applicable Debtor Guarantor and any of their Successor Cases (as defined herein), pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the terms of the DIP Orders, which allowed superpriority administrative expense claims shall have the priorities set forth in Annex 3;

(viii)   Approving the application of the proceeds of all of the DIP Collateral in the manner and on the terms set forth in the DIP Orders and the DIP Intercreditor Agreement;

(ix)   Authorizing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, (A) in the case of the Brookfield DIP Credit Agreement, the Commitment Fee, the Exit Fee, and the Applicable Prepayment Premium (each as defined in the Brookfield DIP Credit Agreement) (the "***Brookfield Fees***"), (B) in the case of the Carlyle DIP Note Purchase Agreement, the Upfront Payment, the Exit Payment and the Applicable

Prepayment Premium (each as defined in the Carlyle DIP Note Purchase Agreement) (the "***Carlyle Payments***"), and (C) in the case of the Fundamental DIP Credit Agreement, the Commitment/Funding Fee, the Exit Fee and the Applicable Prepayment Premium (each as defined in the Fundamental DIP Credit Agreement) (the "***Fundamental Fees***"), and (D) in the case of each DIP Document, all other commitment fees, closing fees, exit fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, and the reasonable and documented fees and disbursements of the applicable DIP Agent's and the other DIP Secured Parties' attorneys, financial advisors, accountants, consultants, and other advisors, all to the extent provided in, and in accordance with, the applicable DIP Documents;

(x) Authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral of each of the Prepetition Secured Parties under the Prepetition Documents, and providing adequate protection to each of the Prepetition Secured Parties for, among other things, any diminution in value of their respective interests in the Prepetition Collateral, including on a dollar-for-dollar basis in respect of Cash Collateral used, from and after the Petition Date to the extent such diminution in value occurs for any reason arising under the Bankruptcy Code, including, among other things, on account of the Debtors' sale, lease or use of such Prepetition Collateral, including Cash Collateral, the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, or the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including by the applicable Carve Out) ("***Diminution in Value***");

(xi) Subject to and effective upon (a) entry of the Final Order, with respect to the Prepetition Collateral and (b) entry of the Interim Order, with respect to the DIP Collateral, in each case except to the extent of the Carve Out, authorizing the Debtors to waive (x) any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (y) the equitable doctrine of marshaling and other similar doctrines, and (z) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xii) Subject to and upon consummation of a (a) Brookfield Sale Transaction, at the election of the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), a release of certain intercompany claims against or interests in the Brookfield Silo Entities, including the Brookfield Pledged Intercompany Claims, (b) Carlyle Sale Transaction, at the election of the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), a release of certain intercompany claims against or interests in the Carlyle Silo Entities, including the Carlyle Pledged Intercompany Claims, and (c) Fundamental Sale Transaction, at the election of the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), a release of certain intercompany claims against or interests in the Fundamental Silo Entities, including the Fundamental Pledged Intercompany Claims;

(xiii) Modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order and waiving the 14-day stay provisions of Bankruptcy Rule 4001(a)(3);

(xiv) Waiving the notice requirements of Bankruptcy Rule 6004(a), and any applicable stay (including under Bankruptcy Rule 6004), and providing for immediate effectiveness of this Interim Order; and

(xv) Scheduling a final hearing on the DIP Motion (the "***Final Hearing***") for entry of a Final Order authorizing the DIP Facilities as contemplated hereby on a final basis and granting such other relief as is requested in the DIP Motion.

Notice of the DIP Motion, the relief requested therein during the Interim Period, and the Interim Hearing (as defined herein) ("***Notice***") having been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on: (a) the U.S. Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, and Norton Rose Fulbright US LLP, co-counsel to Brookfield; (d) Milbank LLP and Haynes and Boone, LLP, co-counsel to Carlyle; (e) Sidley Austin LLP, counsel to Fundamental; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Noticed Parties***"), and this Court finding that in light of the nature of the relief requested, no other or further notice is required.

This Court having considered the relief requested in the DIP Motion for the Interim Period, the First Day Declaration, the DIP Declarations, and the arguments of counsel made at the interim hearing on the DIP Motion (the "***Interim Hearing***"); the Interim Hearing having been held by this Court and concluded; all objections and reservations of rights, if any, to the relief requested in the DIP Motion for the Interim Period having been withdrawn, resolved, or overruled by this Court; it appearing that approval of the interim relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors and their Estates, and is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; it appearing that the Debtors' entry into and performance under the DIP Documents and the other transactions contemplated by this Interim Order is a sound and prudent exercise of the Debtors' business

judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      <u>Disposition</u>.  The relief requested in the DIP Motion is **GRANTED** to the extent set forth herein for the Interim Period in accordance with the terms of this Interim Order.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.      <u>Petition Date</u>.  On November 6, 2025, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

C.      <u>Debtors in Possession</u>.  The Debtors continue to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases, and no official committee of unsecured creditors, or any other statutory committee, has been appointed in the Chapter 11 Cases.

D.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, this Interim Order, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This Court's consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

US-DOCS\165239540.22

consent to this Court's entry of a final order in connection with the DIP Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and the DIP Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and procedural bases for the relief sought in the DIP Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-1, 4002-1, and 9013-1.

E.   <u>Notice</u>.  Upon the record presented to this Court at the Interim Hearing, and under the exigent circumstances set forth therein and in the DIP Motion, the First Day Declaration and the DIP Declaration, notice of the DIP Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 2002, 4001(b), and 4001(c)(1) and Local Rules 2002-1, 4001-1, 4002-1, and 9013-1, which notice was appropriate under the circumstances and sufficient for entry of this Interim Order.  No other or further notice of the DIP Motion is required for entry of this Interim Order.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

F.   <u>Final Hearing</u>.  At the Final Hearing, the Debtors will seek approval of the Final Order in accordance with the terms of the DIP Documents.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

G.   <u>Debtors' Stipulations and Releases</u>.  Without prejudice to the rights of other parties in interest, including any official committee of unsecured creditors (the "***Committee***"), as set forth in paragraph 17 herein, the Debtors admit, stipulate, acknowledge, and agree to the statements set

forth in Annex 2 hereto and the granting of the releases of the Prepetition Secured Parties set forth in paragraph 20 (collectively, the "***Debtors' Stipulations and Releases***").

H.    <u>No Control</u>.  None of the DIP Secured Parties or the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their properties or operations, have authority to determine the manner in which any of the Debtors' operations are conducted or are control persons or insiders of any of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from any of the DIP Documents or the Prepetition Documents.

I.    <u>Findings Regarding the DIP Facility</u>.

(1)    *Request for DIP Financing*.  The Debtors have requested that the DIP Lenders purchase notes and extend loans, advances, and other financial accommodations, as applicable, and the DIP Lenders are only willing to do so as more particularly described, and subject to the terms and conditions set forth, in this Interim Order and the applicable DIP Documents.

(2)    *Need for DIP Financing*.  As set forth in the DIP Declarations and the First Day Declaration, the Debtors do not have sufficient available sources of working capital to operate their business in the ordinary course without the DIP Facilities, or to fund the Chapter 11 Cases without access to the proceeds of the DIP Facilities, all on the terms set forth in the DIP Documents and this Interim Order.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations is essential to the viability of the Debtors and the Chapter 11 Cases. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facilities on the terms set forth in the DIP Documents and this Interim Order is vital to the preservation and maximization of the

9

value of the Debtors' business pending consummation of a restructuring transaction, including a Sale Transaction. Accordingly, the Debtors have an immediate need to obtain funds from each of the DIP Facilities for the purposes and on the terms and subject to the limitations set forth herein and in the applicable DIP Documents, including the Approved Budget, in order to, among other things: (a) maintain business relationships; (b) permit the continued operation of their business; (c) pay the costs of administration of the Chapter 11 Cases and satisfy their other working capital and general corporate purposes; (d) minimize disruption of their business operations; and (e) manage and preserve the assets of the Debtors' Estates in order to maximize the value of such assets and the recoveries to creditors of the Estates.

(3)     *No Credit Available on More Favorable Terms*.   As stated in the DIP Declarations and the First Day Declaration, the Debtors are unable to procure financing or other financial accommodations on more favorable terms from sources other than from the DIP Lenders under the applicable DIP Documents and are unable to obtain satisfactory unsecured credit allowable under sections 364(a) or 364(b) and 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit for the purposes set forth in the DIP Documents on more favorable terms without the grant of liens on all or substantially all of the Debtors' assets pursuant to section 364(c) of the Bankruptcy Code and the terms of this Interim Order. In the Debtors' business judgment, the Debtors cannot procure the necessary financing on terms more favorable than the financing offered by the DIP Secured Parties pursuant to the applicable DIP Documents and this Interim Order.

(4)     *Budget*.   Based upon the record presented to this Court by the Debtors, (a) the Debtors have prepared and delivered the Initial Budget, in the form attached hereto as **Exhibit D**, (b) the Initial Budget was prepared by the Debtors with the assistance of their

professional advisors and management, and (c) the Initial Budget (as the same may be amended or extended solely as provided for herein) sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.  The Initial Budget and any supplemental Approved Budget may be modified by the Debtors in accordance with this Interim Order and the DIP Documents without further order of this Court.  Each of the DIP Secured Parties are relying upon the Debtors' compliance with the Approved Budget, subject to such variances as permitted herein and in the applicable DIP Documents, in determining to enter into the applicable DIP Facility as provided for in this Interim Order and the DIP Documents.

(5)     *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the record before this Court, (a) the Debtors, the DIP Agents and the other DIP Secured Parties have negotiated at arm's length and in good faith regarding the terms of the DIP Orders, the DIP Credit Agreements, the other DIP Documents, and the DIP Facilities, (b) the terms of the DIP Credit Agreements, the other DIP Documents, the DIP Orders, and the DIP Facilities are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration, (c) the interest, fees, costs, and expenses incurred by the Debtors in connection with the DIP Facilities, including, without limitation, the Brookfield Fees, the Carlyle Payments, and the Fundamental Fees, are fair, reasonable, and necessary, and (d) each of the DIP Facilities, the DIP Liens, and the DIP Superpriority Claims (as defined herein) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.  Each of the DIP Secured Parties and the Prepetition Secured Parties has acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing,

documenting, or obtaining requisite approvals of the Debtors' incurrence of the DIP Facilities and the use of Cash Collateral, including in respect of all of the terms of this Interim Order, all documents related thereto, and all transactions contemplated by the foregoing. Any credit extended under the terms of this Interim Order shall be deemed to have been extended in "good faith" (as that term is used in section 364(e) of the Bankruptcy Code) by the applicable DIP Secured Parties and their respective counsel, advisors, and consultants.

(6)     *Issuance of Roll-Up DIP Loans*.  As a condition to entry into each of the DIP Credit Agreements, the extension of credit under each of the DIP Facilities, and authorization to use the Cash Collateral of each of the Prepetition Secured Parties, the Debtors, each of the DIP Secured Parties, and each of the Prepetition Secured Parties has agreed that, (a) as of the Interim Order Effective Date, the Debtors shall (i) repay and refinance $250,266,570.24 of the Brookfield Prepetition Secured Obligations with the proceeds of Brookfield Interim Roll-Up DIP Loans, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Brookfield Prepetition Secured Obligations, as set forth in the Brookfield DIP Credit Agreement and in accordance with the terms of this Interim Order; (ii) repay and refinance $142,697,722.12 of the Carlyle Prepetition Secured Obligations through the issuance of the Carlyle Interim Roll-Up DIP Notes, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Carlyle Prepetition Secured Obligations as set forth in the Carlyle DIP Note Purchase Agreement and in accordance with the terms of this Interim Order, and (iii) repay and refinance $360,831,678.46 of the Fundamental Prepetition Secured Obligations with the proceeds of Fundamental Interim Roll-Up DIP Loans, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Fundamental Prepetition Secured Obligations, to the extent and as set forth in the Fundamental DIP Credit Agreement and in accordance with the terms of this Interim Order; and (b)  subject to entry of the

Final Order, the Debtors shall (i) repay and refinance $167,156,238.18 of the Brookfield Prepetition Secured Obligations with the proceeds of Brookfield Final Roll-Up DIP Loans, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Brookfield Prepetition Secured Obligations, as set forth in the Brookfield DIP Credit Agreement and in accordance with the terms of the Final Order; (ii) repay and refinance $179,545,419.39 of the Carlyle Prepetition Secured Obligations through the issuance of the Carlyle Final Roll-Up DIP Notes, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Carlyle Prepetition Secured Obligations as set forth in the Carlyle DIP Note Purchase Agreement and in accordance with the terms of the Final Order, and (iii) repay and refinance $305,292,913.55 of the Fundamental Prepetition Secured Obligations with the proceeds of Fundamental Final Roll-Up DIP Loans, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Fundamental Prepetition Secured Obligations, to the extent and as set forth in the Fundamental DIP Credit Agreement and in accordance with the terms of the Final Order.  The issuance of the Roll-Up DIP Loans reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Each of the Prepetition Secured Parties would not consent to the use of the Prepetition Collateral, including Cash Collateral or the subordination of its Prepetition Liens to the DIP Liens or the applicable Carve Out, and each of the DIP Secured Parties would not be willing to provide the applicable DIP Facility or extend credit to the Debtors thereunder without the repayment and refinancing of the applicable Prepetition Secured Obligations through the issuance of the Roll-Up DIP Loans in substitution of and in exchange for such Prepetition Secured Obligations.  The issuance of the Roll-Up DIP Loans will benefit the Debtors and their Estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations, which financing would not otherwise be available.  Because the

13

repayment and refinancing of the Prepetition Secured Obligations as set forth in each of the DIP Documents and this Interim Order is aligned with the Bankruptcy Code's priority of payments mandate, such repayment and refinancing will not prejudice the rights of any party in interest.  The issuance of the Interim Roll-Up DIP Loans shall be final and irrevocable as to the Debtors upon entry of this Interim Order but otherwise shall be subject to the provisions of paragraph 17 of this Interim Order.

(7)     *Adequate Protection*. Each of the Prepetition Secured Parties is entitled, as of the Interim Order Effective Date, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution in Value thereof as set forth herein.

(8)     *Sections 506(c) and 552(b) and Marshaling*. In light of the DIP Secured Parties' and the Prepetition Secured Parties' undertakings as set forth herein, each of the DIP Secured Parties and, subject to the entry of the Final Order, each of the Prepetition Secured Parties is entitled to a waiver of (A) the provisions of section 506(c) of the Bankruptcy Code and (B) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (C) the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable, in each case, except to the extent of the applicable Carve Out.

(9)     *No Responsible Person.*  The Debtors stipulate that in making the decision to finance the Debtors' continued business operations through the DIP Facility and use of Cash Collateral, in administering any loans, in approving the Initial Budget, or in taking any actions permitted by this Interim Order, the DIP Documents, or the Prepetition Documents, neither the

DIP Agents, the DIP Lenders, nor the Prepetition Secured Parties, as applicable, shall be deemed

to be in control of the operations of the Debtors or to be acting as a "responsible person," "owner

or operator," or part of any "control group" with respect to any of the Debtors or the management

of the Debtors or owe any fiduciary duty to the Debtors, their respective creditors, shareholders,

or Estates.

(10)     *Good Cause*.   Good and sufficient cause has been shown for the entry of

this Interim Order and for authorizing the Debtors to obtain financing pursuant to each of the DIP

Facilities.   The relief requested in the DIP Motion is necessary, essential, and appropriate, and is

in the best interest of and will benefit the Debtors and their Estates, as its implementation will,

among other things, provide the Debtors with the necessary liquidity to: (a) minimize disruption

to the Debtors' efforts for the continued operations of their business; (b) preserve and maximize

the value of the Debtors' Estates; and (c) avoid immediate and irreparable harm to the Debtors,

their business, employees, and assets.

(11)     *No Obligation to Monitor*.   No DIP Secured Party shall have any obligation

or responsibility to monitor any Debtor's use of any DIP Facility and each DIP Lender and each

DIP Agent may rely upon each Debtor's representations that the extensions of credit under each

DIP Facility requested at any time and the use thereof are in accordance with the requirements of

this Interim Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

(12)     *Immediate Entry*.   Good and sufficient cause exists for immediate entry of

this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and, to the extent applicable,

6004(h).   Absent the immediate grant by this Court of the interim relief sought by the DIP Motion,

including authorization to incur the Interim Draws and Subsequent Draws (as defined in the DIP

Documents), each Debtor's Estate will be immediately and irreparably harmed pending the Final

Hearing.  Consummation of each of the DIP Facilities in accordance with the terms of this Interim Order, the Approved Budget, and the DIP Documents is in the best interests of the Debtors' Estates and is consistent with the Debtors' exercise of their fiduciary duties.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**I.     Authorization and Terms of Financing.**

1.     <u>DIP Motion Granted on Interim Basis</u>.  The interim relief sought in the DIP Motion is granted as provided herein, and the interim financing described herein is authorized and approved, subject to the terms and conditions set forth in each of the DIP Documents, the Approved Budget (subject to the Carve Out and the Permitted Variance as defined herein) and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.     <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.

(a)     The DIP Facilities are hereby approved as set forth herein.  To prevent immediate and irreparable harm to the Debtors' Estates, the Debtors are hereby expressly authorized and empowered to immediately (i) borrow, or guaranty, as applicable, and obtain, on a joint and several basis, aggregate principal amount of New Money DIP Loans during the Interim Period in an amount equal to $**55,363,384.17**, plus any Subsequent Draws (as defined in the applicable DIP Documents) borrowed for project-level expenditures as required under and in accordance with the applicable DIP Documents, which amounts, other than any such Subsequent Draws, shall consist of (A) $**17,500,000.00** in principal amount of Brookfield New Money DIP

16

Loans under the Brookfield DIP Facility, (B) **$16,559,056.06** in principal amount of Carlyle New Money DIP Notes under the Carlyle DIP Facility, and (C) **$21,304,328.11** in principal amount of Fundamental New Money DIP Loans under the Fundamental DIP Facility, (ii) incur, on a joint and several basis, all other obligations owing to the applicable DIP Agent and DIP Lenders on the terms and subject to the conditions and limitations set forth in the applicable DIP Documents and this Interim Order, and (iii) cause each of the DIP Guarantors to guarantee the applicable DIP Obligations, in each case in accordance with the terms of the applicable DIP Documents and this Interim Order; *provided* that the DIP Secured Parties shall not be required to extend DIP Loans or other extensions of credit under the applicable DIP Facility to the extent that the applicable conditions for making such DIP Loans or other extensions of credit under such DIP Credit Agreement have not been satisfied or waived in accordance with the applicable DIP Documents.

(b)      Immediately upon the entry of the Interim Order, but subject to the provisions and limitations contained in paragraph 17 hereof, the Debtors shall be deemed, automatically and without any further action, to incur $753,795,970.82 in Interim Roll-Up DIP Loans consisting of (A) $250,266,570.24 in Brookfield Interim Roll-Up DIP Loans incurred to repay and refinance $250,266,570.24 in outstanding Brookfield Prepetition Secured Obligations as set forth in the Brookfield DIP Credit Agreement and this Interim Order, (B) $142,697,722.12 in Carlyle Interim Roll-Up DIP Notes issued to repay and refinance $142,697,722.12 in outstanding Carlyle Prepetition Secured Obligations as set forth in the Carlyle DIP Note Purchase Agreement and this Interim Order, and (C) $360,831,678.46 in Fundamental Interim Roll-Up DIP Loans incurred to repay and refinance $360,831,678.46 in outstanding Fundamental Prepetition Secured Obligations as set forth in the Fundamental DIP Credit Agreement and this Interim Order, in each case on a cashless basis. The Prepetition Secured Obligations deemed repaid and

refinanced under this paragraph 2(b) shall (x) be deemed indefeasibly repaid as of the date of entry of this Interim Order and the Interim Roll-Up DIP Loans issued to refinance the Prepetition Secured Obligations shall be deemed exchanged therefor by each DIP Lender in accordance with the terms of the applicable DIP Documents and (y) be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund the DIP Facilities and not as adequate protection for, or otherwise on account of, the Prepetition Secured Obligations.  Each Debtor, DIP Secured Party and Prepetition Secured Party is hereby authorized to take any actions as may be necessary or advisable to effectuate the issuance of the Interim Roll-Up DIP Loans.

(c)     In accordance with the terms of this Interim Order and the DIP Documents, the proceeds of borrowings issued under the DIP Facilities and of Cash Collateral shall be used solely for purposes permitted under the applicable DIP Documents and this Interim Order, and in accordance with the Approved Budget, subject to the Carve Out and the Permitted Variance (as defined below) as set forth in this Interim Order and the DIP Documents.

(d)     The applicable DIP Loan Parties are hereby authorized to cause the applicable Non-Debtor Guarantors to be party to the applicable DIP Documents to (i) jointly and severally guarantee the applicable DIP Obligations as set forth in the applicable DIP Documents, and (ii) execute, deliver, enter into and, as applicable, perform all of their obligations under the applicable DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.

3.     <u>Financing Documents</u>.

(a)     *Authorization*.    The Debtors are hereby expressly authorized and empowered to immediately execute, deliver, enter into, and, as applicable, perform all of their

obligations under each of the DIP Documents.  The Debtors are hereby authorized to incur and perform the DIP Obligations and borrow money pursuant to the applicable DIP Credit Agreements, which shall be used for all purposes permitted hereunder and under such DIP Documents, subject to the Approved Budget, subject to the Carve Out and the Permitted Variance.  Upon entry of this Interim Order, in furtherance of the foregoing and without further approval of this Court, the Debtors are hereby authorized and empowered themselves, and are authorized and empowered to cause the Non-Debtor Subsidiaries, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified solely to the extent necessary, to: (a) enter into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of the DIP Documents, including, without limitation, the DIP Credit Agreements, any fee letters with any of the DIP Secured Parties, and all security, guaranty, and pledge agreements; (b) execute and deliver all certificates, reports, statements, and other agreements, instruments and documents required or contemplated by the DIP Documents (including, without limitation, documents required for the Debtors' performance of their obligations under the DIP Documents and the creation and perfection of liens granted or contemplated therein); and (c) pay all obligations incurred under the DIP Documents in accordance herewith (whether principal, interest, fees, costs, expenses, indemnities, or other amounts described in the DIP Documents as such amounts become earned, due, and payable and without need to obtain further Court approval, including, without limitation, the Brookfield Fees, the Carlyle Payments, the Fundamental Fees, any other commitment fees or exit fees, administrative agent's fees, and the fees and disbursements of or incurred by (to the extent provided in the DIP Documents) each of the DIP Agent's and DIP Lenders' attorneys, financial advisors, accountants, consultants, and other advisors, whether or not such fees arose before, on, or after the Petition Date, to the extent provided under the applicable DIP Documents),

and perform all other undertakings and acts required or contemplated by, the applicable DIP Documents.

(b)    *Approval of Financing Documents*.   The DIP Documents (and all certificates, reports, statements, and other agreements and documents) constitute valid and binding obligations of the applicable Debtors enforceable in accordance with their terms and are approved to the extent necessary to implement the terms and provisions of this Interim Order.

(c)    *Amendment of DIP Documents*.   The Debtors and (x) the Brookfield DIP Secured Parties in the case of the Brookfield DIP Documents, (y) the Carlyle DIP Secured Parties in the case of the Carlyle DIP Documents, and (z) the Fundamental DIP Secured Parties in the case of the Fundamental DIP Documents, are in each case hereby authorized to approve and implement, in accordance with the terms of the applicable DIP Documents, any amendment, restatement, amendment and restatement, supplement, modification, extension or waiver (each, an "***Amendment***") of such DIP Documents; provided, however, that in the case of any material Amendment to any of the DIP Documents that is adverse to the interests of the Debtors or their Estates, (i) the Debtors shall provide notice of such material Amendment (which may be provided through electronic email) to counsel to the Committee (if any), the U.S. Trustee, each DIP Agent and DIP Lender Advisors for the DIP Facilities not subject to such Amendment, and (ii) each of the Committee, the U.S. Trustee, and the DIP Secured Parties not party to such Amendment shall have five (5) days from the date of such notice to object in writing to such Amendment.  If each of the Committee, the U.S. Trustee, and the DIP Secured Parties not party to such Amendment indicate that it has no objection to the Amendment (or if no objections are timely received), the Debtors may proceed to execute the Amendment, which shall become effective immediately upon execution; *provided* that notwithstanding any failure to object to such Amendment, the rights of

each of the other DIP Secured Parties whose DIP Facilities are not subject to such Amendment are fully preserved under the applicable DIP Documents. If any of the Committee, the U.S. Trustee, or any DIP Secured Party timely objects to such Amendment, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the Amendment.  The foregoing requirements shall not apply to any amendment, modification, extension, update or approval of any Approved Budget, and shall not limit any covenants or provisions of any of the DIP Documents that restrict or limit Amendments to the DIP Documents of any other DIP Facility.

(d)     *Application of DIP Facility Proceeds*.  The advances under each DIP Facility shall be used solely in a manner consistent with the terms and conditions of each of the DIP Documents and this Interim Order and in accordance with and as may be limited by the Approved Budget (subject to the Carve Out and the Permitted Variance), solely as follows, (i) to effect the issuance of the Roll-Up DIP Loans, (ii) for the Debtors' working capital and other general corporate needs, (iii) for the payment of professional fees, costs and expenses in connection with the DIP Credit Agreements (as applicable) and the Chapter 11 Cases, (iv) for the payment of fees, costs, and expenses of the administration of the Chapter 11 Cases, (v) for the payment of other prepetition obligations approved by the Court, (vi) for the payment of adequate protection payments as authorized herein, (vii) for the payment of agency fees and fees, costs, and expenses of the DIP Agents and the DIP Lenders owed under the DIP Documents and in connection with the DIP Credit Agreements (as applicable) and the Chapter 11 Cases, and (viii) for the payment of obligations arising from or related to the Carve Out (in each case, other than in the case of clauses (iii) and (viii), in a manner consistent with the Approved Budget).

(e)     *Prohibited Uses of DIP Facility Proceeds*.  No proceeds of the DIP Facilities may be used for any purpose not set forth in the Approved Budget and no proceeds of

(i) the Brookfield DIP Facility may be transferred to, or used to fund Projects owned by, the Carlyle Silo Entities or the Fundamental Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to Blue Ridge (other than the amounts explicitly provided to be funded to Blue Ridge in accordance with the Approved Budget), ACT, the Carlyle Silo Entities or the Fundamental Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Brookfield Silo Entities or, as provided in the Approved Budget, corporate overhead costs) without the prior consent of the Brookfield Required DIP Lenders, (ii) the Carlyle DIP Facility may be transferred to, or used to fund Projects owned by, the Brookfield Silo Entities or the Fundamental Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to Blue Ridge (other than the amounts explicitly provided to be funded to Blue Ridge in accordance with the Approved Budget), ACT, the Brookfield Silo Entities or the Fundamental Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Carlyle Silo Entities or, as provided in the Approved Budget, corporate overhead costs) without the prior consent of the Carlyle Required DIP Noteholders, and (iii) the Fundamental DIP Facility may be transferred to or used to fund Projects owned by the Brookfield Silo Entities or the Carlyle Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to Blue Ridge (other than the amounts explicitly provided to be funded to Blue Ridge in accordance with the Approved Budget), ACT, the Brookfield Silo Entities or the Carlyle Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Fundamental Silo Entities or, as provided in the Approved Budget, corporate overhead costs) without the consent of the Fundamental Required DIP Lenders.

(f)     *Conditions Precedent; DIP Commitments*.  Notwithstanding anything to the contrary herein or in any DIP Documents, none of the DIP Agents or the DIP Lenders shall (i) have any obligation to make any loan or advance under any DIP Credit Agreement unless the conditions precedent to such loan or extension of credit under the applicable DIP Credit Agreement have been satisfied in full or waived in accordance with such DIP Credit Agreement, which conditions precedent shall include the simultaneous funding under each other DIP Facility of (A) the Interim Draws in the amounts set forth in paragraph 2(a) and (B) the Escrow Account in the amounts set forth in paragraph 11(c), or (ii) be required to lend in excess of their DIP Commitments.

(g)     *Budget Maintenance*.

(i)     The Debtors shall deliver, to each DIP Agent and the DIP Lender Advisors for distribution to each DIP Lender, not later than 5:00 p.m. on every fourth Friday occurring after the Petition Date (each, an "***Updated Budget Delivery Date***"), commencing with the Friday of the fifth full calendar week occurring after the Petition Date (i.e., December 12, 2025), a supplement to the Initial Budget or the previously Approved Budget for the rolling 13-week period commencing on the Saturday immediately preceding the applicable Updated Budget Delivery Date (each, an "***Updated Budget***"), in form and substance acceptable to the Required DIP Lenders (after approval by the Required DIP Lenders, the "***Approved Budget***"); provided that: (i) such Updated Budget shall be deemed acceptable to the Required DIP Lenders if none of the Brookfield Required DIP Lenders, the Carlyle Required DIP Noteholders or the Fundamental Required DIP Lenders have objected in writing (which response may be provided by email by any of the applicable DIP Lender Advisors to the applicable DIP Borrower or its lead counsel or financial advisors) to such Updated Budget within three Business Days after receipt by the DIP Agents and the DIP Lender Advisors of such Updated Budget; *provided* that such three-Business

Day period shall be tolled for so long as the Updated Budget is subject to a "professional eyes only" or similar designation; (ii) the failure of any Updated Budget to be accepted by the Required DIP Lenders, in and of itself and without limitation to the obligation to continue complying with the existing Approved Budget, shall not be deemed to be a violation of this Interim Order or the budget covenants in the DIP Documents or this Interim Order and no Event of Default (as defined below) shall result solely from any objection by any DIP Lender to any proposed Updated Budget; (iii) for the avoidance of doubt, upon (and subject to) the acceptance (or deemed acceptance) by the Required DIP Lenders of any Updated Budget (and at no time prior thereto), such Updated Budget shall constitute the "Approved Budget"; and (iv) during any period where an Updated Budget has not been approved by the Required DIP Lenders, the Initial Budget or, if an Updated Budget has previously been approved by the Required DIP Lenders, the existing Approved Budget, as applicable, shall constitute the "Approved Budget" until the expiration of the period covered by such Approved Budget.

(ii)     Starting in the second full week after the Petition Date and every week thereafter, no later than 11:59 p.m. (Eastern time) on the Friday of each such week, the Debtors shall deliver to the DIP Agents and the DIP Lender Advisors a variance report comparing the Debtors' actual receipts and disbursements for the prior week with the projected receipts and disbursements for such period as reflected in the applicable Approved Budget.

(iii)     The Debtors shall not permit aggregate disbursements as reported by the Debtors for such Budget Variance Test Period (excluding disbursements in respect of (x) professional fee disbursements for all advisors working on the Chapter 11 Cases, (y) interconnection costs, and (z) any Project spend that is either (1) incremental to the amounts set forth in the Approved Budget and/or (2) on a cadence that differs from the Approved Budget,

provided, in the case of this clause (z), that the applicable DIP Lenders under the DIP Facility having DIP Liens on such Project (or on the Silo that owns such Project) have (A) consented to such incremental Project spend and/or change in timing in accordance with and to the extent required under the applicable DIP Documents and (B) funded, without any reduction in DIP Commitments under such DIP Facility (other than any reduction in DIP Commitments for DIP Loans the proceeds of which are required to be used solely for such Project spend), any amounts that are in excess of the amount set forth in the Approved Budget for such Project) to have a negative variance of (*i.e.*, to exceed) more than the greater of $2,000,000 and 15% of the forecasted aggregate disbursements as reported by the applicable DIP Borrower for such Budget Variance Test Period in the applicable Approved Budget (the "***Permitted Variance***").  It is agreed and understood that following an Updated Budget Delivery Date, if any of the DIP Lenders have objected in writing to the Updated Budget within three Business Days after receipt by the DIP Agents and the DIP Lender Advisors of such Updated Budget and the existing Approved Budget remains in effect, any favorable variance from a prior Budget Variance Test Period may be carried forward and utilized in future Budget Variance Test Periods relating to such existing Approved Budget to offset negative variances in such future Budget Variance Test Period at the election of the applicable DIP Borrower.

   (iv) The "***Budget Variance Test Date***" means the Friday of every week (commencing with the Friday of the fifth full calendar week occurring after the Petition Date (i.e., December 12, 2025)) or, to the extent such Friday is not a Business Day, the next Business Day thereafter; and the "***Budget Variance Test Period***" shall mean, with respect to any Budget Variance Test Date, the four-week period ending on the last Business Day of the week immediately preceding the applicable Budget Variance Test Date; *provided* that the initial Budget Variance

Test Period shall include the period beginning on the Petition Date through end of the otherwise applicable four-week period.

4.      <u>Payments and Application of Payments</u>.  The Debtors are authorized to make all payments and transfers of the Estates' property to the DIP Secured Parties as provided, permitted, or required under the DIP Documents and this Interim Order, which payments, proceeds, and other amounts shall be applied to the applicable DIP Obligations in accordance with the DIP Documents and the DIP Intercreditor Agreement.  Upon entry of this Interim Order, the DIP Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Interim Order and the other DIP Documents, against each Debtor, their Estates and any successors thereto, including, without limitation, any Trustee or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***").  No obligation, payment, transfer, or grant of collateral or security hereunder or under any of the DIP Documents to the DIP Agents and/or the DIP Lenders (including any DIP Superpriority Claims or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law, section 724(a) of the Bankruptcy Code, or any other provision with respect to Avoidance Actions under the Bankruptcy Code or applicable federal, state or foreign law equivalents), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim,

cross-claim, or any other challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason; provided that the DIP Secured Parties shall be subject to the DIP Intercreditor Agreement. Without limiting the generality of the foregoing, the Debtors are authorized, without further order of this Court, to (i) pay all principal, interest, fees, premiums, and indemnities when due, under the DIP Documents and (ii) pay or reimburse the DIP Secured Parties, in accordance with the DIP Documents for all present and future costs and expenses, including, without limitation, all reasonable and documented pre- and post-Petition Date professional fees, financial advisor fees, legal fees, consultant fees and other advisor fees and expenses paid or incurred by the DIP Agents and DIP Lenders as provided in the applicable DIP Documents and this Interim Order regardless of whether such amounts are in the Approved Budget. None of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by this Court. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

5. <u>Interest and Fees</u>. The rates of interest to be charged for the DIP Loans shall be the rates set forth in the applicable DIP Credit Agreements and shall be calculated in the manner and payable at the times set forth therein. The fees charged under the DIP Facilities shall be those set forth in the applicable DIP Credit Agreements and shall be unconditionally earned and payable in the amounts and at the times set forth in such DIP Credit Agreement. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described above and in the DIP Documents, including, without limitation, the Brookfield Fees, the Carlyle Payments, and the Fundamental Fees, as such amounts become due and without need to obtain further Court approval, and the applicable Debtors

27

shall be jointly and severally obligated to pay all such amounts, and satisfy all such obligations, which in each case shall constitute DIP Obligations hereunder and under the applicable DIP Documents.

6. <u>DIP Obligations</u>.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against each of the Debtors to the extent provided by the applicable DIP Documents, along with their Estates, and any successors thereto, including, without limitation, against any Trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing.  Upon entry of this Interim Order, the DIP Obligations will include all loans, notes, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Agents or the other DIP Secured Parties, in each case, under the applicable DIP Documents or this Interim Order or secured by the applicable DIP Liens, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, indemnities, and other amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Documents and/or this Interim Order) owing under the DIP Documents.

7. <u>Use of Cash Collateral</u>. The Debtors are authorized, as of the Interim Order Effective Date, to use all Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, solely for the purposes and subject to the restrictions set forth in this Interim Order (subject to the Carve Out) and in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to make payments to the Prepetition Agents on account of the

applicable Adequate Protection Obligations (as defined below) provided for in this Interim Order and the DIP Documents, from the Interim Order Effective Date through and including the DIP Termination Date (as defined below). Nothing in this Interim Order shall authorize the Disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except pursuant to the Approved Budget (subject to the Carve Out and the Permitted Variance) as permitted in this Interim Order (including with respect to the Carve Out), the DIP Facilities, and the DIP Documents.

**II.    Collateralization and Superpriority Administrative Claim Status.**

8.    <u>Collateralization</u>.

(a)    *DIP Lien Grant.*   To secure the prompt payment and performance of the applicable DIP Obligations of the Debtors to the applicable DIP Secured Parties of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, and subject and subordinate to the applicable Carve Out, and for the benefit of itself and the applicable DIP Lenders, and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar instruments or document, or the possession or control by the applicable DIP Agent or any other DIP Secured Party of, or over, any DIP Collateral, (i) the Brookfield DIP Agent is granted valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Brookfield DIP Liens***") in and upon the Brookfield DIP Collateral held by the Brookfield Borrower or the Brookfield Debtor Guarantors and the Brookfield Pledged Intercompany Claims, (ii) the Carlyle DIP Agent is granted valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Carlyle DIP Liens***") in and upon the Carlyle DIP Collateral held by the Carlyle Issuer or the

29

Carlyle Debtor Guarantors and the Carlyle Pledged Intercompany Claims, and (iii) the Fundamental DIP Agent is granted valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "**_Fundamental DIP Liens_**") in and upon the Fundamental DIP Collateral held by the Fundamental Borrower or the Fundamental Debtor Guarantors and the Fundamental Pledged Intercompany Claims.  For the avoidance of doubt, the DIP Collateral shall exclude the equity in or assets of ACT Power Services Holding Company Guarantor, LLC and its subsidiaries (collectively "**_ACT_**"), but shall include the proceeds of the equity in ACT Power Services Holding Company Guarantor, LLC and its direct and indirect subsidiaries, subject to the lien priority set forth in the DIP Intercreditor Agreement.  Any provision of any lease (except for nonresidential real property leases) or other license, contract or other agreement that requires (i) the consent or approval of one or more parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any interest in any such lease, license, contract, or other agreement, or the proceeds thereof, or other collateral related thereto, is deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law. Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens (as defined below) on such interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreements or this Interim Order, subject to applicable law.

(b)     _DIP Lien Priority_.  The DIP Liens securing each DIP Facility shall be, in all cases, subject to the Carve Out and have the priority set forth in Annex 3.  Other than as set forth herein (including with respect to the Carve Out and any Replacement Additional DIP Facility (as defined below) incurred in accordance with the terms of paragraph 23 and the DIP Documents)

or permitted under the DIP Documents, the DIP Liens (i) shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and (ii) shall be valid and enforceable (A) against any Trustee, (B) upon the conversion of any of the Chapter 11 Cases to any Successor Case, (C) notwithstanding any abstention by the Court, and/or (D) upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens.

(c)     *Post-Petition Lien Perfection*.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, enforceability, and validity of the DIP Liens, Adequate Protection Liens and any other post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral held by the DIP Borrowers or the Debtor Guarantors, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtors (a "***Perfection Act***"). Notwithstanding the foregoing, if any DIP Agent or Prepetition Agent elects for any reason to file, record, or otherwise effectuate any Perfection Act, subject to the DIP Intercreditor Agreement, such DIP Agent or Prepetition Agent, as applicable, in each case in its sole discretion, is authorized to perform such Perfection Act, and the Debtors are authorized to perform such Perfection Acts to the extent necessary or required by such DIP Agent or Prepetition Agent, as applicable, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is

31

authorized and directed to accept, file, and/or record any document in regard to such act in accordance with applicable law.  Any DIP Agent or Prepetition Agent may, in each case in its sole discretion, choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record such certified copy of this Interim Order in accordance with applicable law.  Should any DIP Agent or Prepetition Agent so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the DIP Liens or the Adequate Protection Liens, as applicable, granted herein by virtue of the entry of this Interim Order.

9.      <u>Superpriority Administrative Expense</u>.

(a)      For the applicable DIP Obligations, whether now existing or hereafter arising pursuant to this Interim Order, the DIP Documents, or otherwise, subject and subordinate only to the applicable Carve Out as provided herein, each DIP Agent, for the benefit of itself and the DIP Secured Parties for which such DIP Agent serves as agent, is granted an allowed superpriority administrative expense claim against each of the Debtors' Estates to the extent that such Debtors are DIP Loan Parties under the DIP Facility under which such DIP Agent serves as agent (without the need to file any proof of claim) pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors, of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, sections 105,

326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code (the "***DIP Superpriority Claims***"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof to the extent provided in the DIP Documents or this Interim Order, including, without limitation, all applicable DIP Collateral, subject and subordinate only to the payment of the applicable Carve Out as provided for herein.

(b)       Each DIP Superpriority Claim against each Debtor shall be senior in right of payment to the Adequate Protection Claims (as defined below) against such Debtor and junior in right of payment to the applicable Carve Out.  No Debtor may incur any financing with liens or claims senior or *pari passu* to the DIP Superpriority Claims against such Debtor (other than each of the DIP Facilities, as applicable, or a Replacement Additional DIP Facility incurred in accordance with the terms of paragraph 23 and the DIP Documents) without the consent of the applicable DIP Lenders holding DIP Superpriority Claims against such Debtor.

(c)       Notwithstanding anything to the contrary in this Interim Order, (A) the Brookfield DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the DIP Liens under the Brookfield DIP Facility against any asset of any Carlyle Silo Entity or Fundamental Silo Entity, or any equity interests in any such entity, other than the Brookfield Pledged Intercompany Claims, (B) the Carlyle DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the DIP Liens under the Carlyle DIP Facility against any asset of any Brookfield Silo Entity or Fundamental Silo Entity, or any equity interests in any

33

such entity, other than the Carlyle Pledged Intercompany Claims, and (C) the Fundamental DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the DIP Liens under the Fundamental DIP Facility against any asset of any Brookfield Silo Entity or Carlyle Silo Entity, or any equity interests in any such entity, other than the Fundamental Pledged Intercompany Claims.  For the avoidance of doubt, the DIP Superpriority Claims under each DIP Facility shall be subject to the priorities set forth on Annex 3.

(d)     With respect to rights preserved under section 506(c) of the Bankruptcy Code, with the exception of the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or the DIP Obligations or with any other claims of the DIP Secured Parties arising hereunder or under the DIP Documents.

## III.   Adequate Protection

10.     <u>Adequate Protection for the Prepetition Secured Parties</u>. Until the Prepetition Secured Obligations are Paid in Full, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral, including in the amount of any unpaid portion of the Prepetition Secured Obligations following the issuance of the Roll-Up DIP Loans and any amount of the Prepetition Secured Obligations subsequently reinstated after the refinancing and repayment thereof pursuant to paragraph 2(b) because such refinancing or repayment is rescinded or required to be returned or repaid pursuant to paragraph

34

17 or otherwise. As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "***Adequate Protection Obligations***"):

(a)      <u>Adequate Protection Liens</u>. As security for the payment of the Adequate Protection Obligations, each of the Prepetition Agents, for the benefit of the applicable Prepetition Secured Parties, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the applicable DIP Collateral of the Debtors as set forth in Annex 3 (the "***Adequate Protection Liens***"), which security interests and liens shall be subject and subordinate to the applicable Carve Out and the applicable DIP Liens and have the priorities set forth in Annex 3. The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date except to the extent set forth in Annex 3. The Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Parties and not in substitution therefor.

(b)      <u>Adequate Protection Claims</u>. Each of the Prepetition Agents, for the benefit of the applicable Prepetition Secured Parties, is hereby granted an allowed administrative expense claim against each Debtor on a joint and several basis, which shall (i) have recourse to and be payable from all prepetition and postpetition property of the applicable Debtors, and (ii) have priority over all other administrative claims in the Chapter 11 Cases, including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code, subject to the applicable Carve Out and the applicable DIP Superpriority Claims with the priorities set forth in Annex 3

US-DOCS\165239540.22

(the "***Adequate Protection Claims***").  Notwithstanding anything to the contrary in this Interim Order, (i) the Brookfield Prepetition Secured Parties shall not have recourse in respect of the Adequate Protection Claims granted in connection with the Brookfield Prepetition Secured Obligations against any asset of any Carlyle Silo Entity or Fundamental Silo Entity, or the respective equity interests in any such entity, other than the Brookfield Pledged Intercompany Claims, (ii) the Carlyle Prepetition Secured Parties shall not have recourse in respect of the Adequate Protection Claims granted in connection with the Carlyle Prepetition Secured Obligations against any asset of any Brookfield Silo Entity or Fundamental Silo Entity, or the respective equity interests in any such entity, other than the Carlyle Pledged Intercompany Claims, and (iii) the Fundamental Prepetition Secured Parties shall not have recourse in respect of the Adequate Protection Claims granted in connection with the Fundamental Prepetition Secured Obligations against any asset of any Brookfield Silo Entity or Carlyle Silo Entity, or the respective equity interests in any such entity, other than the Fundamental Pledged Intercompany Claims.  For the avoidance of doubt, the Adequate Protection Claims under each DIP Facility shall be subject to the priorities set forth on Annex 3.

(c)     <u>Postpetition Interest Payments</u>. From and after the Petition Date, each of (i) the Brookfield Prepetition Agent, on behalf of the Brookfield Prepetition Secured Parties, shall receive current payment of all accrued and unpaid interest on the Brookfield Prepetition Secured Obligations under the Brookfield Prepetition Credit Agreement, if any, (ii) the Carlyle Prepetition Agent, on behalf of the Carlyle Prepetition Secured Parties, shall receive current payment of all accrued and unpaid interest on the Carlyle Prepetition Secured Obligations under the Carlyle Prepetition Note Purchase Agreement, if any, and (iii) the Fundamental Prepetition Agent, on behalf of the Fundamental Prepetition Secured Parties, shall receive current payment of all accrued

US-DOCS\165239540.22

and unpaid interest on the Fundamental Prepetition Secured Obligations under the Fundamental Prepetition Credit Agreement, if any, in each case paid in kind and compounded monthly.

(d)     <u>Adequate Protection Fees and Expenses</u>.  Each of the Prepetition Agents and Prepetition Lenders shall receive from the Debtors current cash payments of all prepetition and postpetition accrued and unpaid fees and expenses, including professional fees and expenses, for (i) one primary counsel and one local counsel in each applicable jurisdiction for each of the Prepetition Agents and (ii)(A) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Norton Rose Fulbright LLP, and Porter & Hedges LLP, as co-counsel to the Brookfield Prepetition Lenders, FTI Consulting, Inc., as financial advisor to the Brookfield Prepetition Lenders, and any other local or special counsel or other professionals retained by the Brookfield Prepetition Lenders, (B) Milbank LLP and Haynes and Boone, LLP, as co-counsel to the Carlyle Prepetition Noteholders, Solomon Partners Securities, LLC, as financial advisor to the Carlyle Prepetition Noteholders, and any other local or special counsel or other professionals retained by the Carlyle Prepetition Noteholders, and (C) Sidley Austin LLP, as counsel to the Fundamental Prepetition Lenders, Guggenheim Securities, LLC, as financial advisor to the Fundamental Prepetition Lenders, and any other local or special counsel or other professionals retained by the Fundamental Prepetition Lenders.  None of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by this Court; *provided* that such fees and expenses shall be payable in compliance with paragraphs 25(b) and 25(c), as applicable (the "***Adequate Protection Fees and Expenses***"). No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

(e)     <u>Adequate Protection Information Rights</u>. The Debtors shall provide to the Prepetition Agents at the same time as such reporting is provided to the DIP Secured Parties all

reporting required to be provided to the DIP Secured Parties under the DIP Documents. Upon any or all DIP Obligations being Paid in Full, the Prepetition Secured Parties shall continue to be entitled hereby to satisfaction of such reporting rights unless and until the applicable Prepetition Secured Obligations of the applicable Prepetition Secured Party are also Paid in Full.

(f)      Adequate Protection Reservation. Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of (i) the Prepetition Secured Parties to request additional adequate protection or similar relief from the Court; or (ii) the Debtors to object to or defend against such relief, notwithstanding any other provision of this Interim Order.

## IV.   Carve Out.

11.     Carve Out.

(a)      As used in this Interim Order, the "***Carve Out***" means a superpriority administrative expense claim, with priority over all other administrative expense claims in the Chapter 11 Cases, in the aggregate amount of the Pre-Carve Out Trigger Notice Cap and the Post-Carve Out Trigger Notice Cap, which claims shall be secured by a priming lien senior to all other liens, in each case, to the extent provided under this Interim Order (for the avoidance of doubt, with respect to the priority position of the applicable Carve Out in the DIP Collateral and with respect to the DIP Superpriority Claims for each DIP Facility and the Prepetition Secured Obligations, as set forth in Annex 3 hereto, the applicable Carve Out shall be calculated on the

basis of and limited by the Allocable Percentage with respect to such DIP Facility and the applicable Prepetition Secured Obligations).  The "***Pre-Carve Out Trigger Notice Cap***" means the Pre-Carve Out Trigger Notice Gross Amount (as defined herein) net of all amounts transferred to the Carve Out Account (as defined herein) prior to the first day following the delivery of a Carve Out Trigger Notice.  The "***Pre-Carve Out Trigger Notice Gross Amount***" means the aggregate amount of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (the "***U.S. Trustee Fees***"); (ii) all reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code incurred on any date in any Successor Cases; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, costs, and expenses (including Transaction Fees (as defined herein) to the extent reserved for in the Carve Out Account in accordance with this Interim Order prior to the delivery of a Carve Out Trigger Notice but otherwise excluding any Transaction Fees or other transaction or success fees in excess of $3 million in the aggregate) incurred or earned by any persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") or any persons or firms retained by any statutory committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***") at any time (the "***Allowed Professional Fees***"), the fees in clauses (i) and (iii) to the extent that such U.S. Trustee Fees or Allowed Professional Fees are incurred or earned before the first day following delivery by any DIP Agent (acting at the direction of the applicable DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, in each case without regard to

whether such fees, costs, or expenses are included or provided for in any Approved Budget or were invoiced on or after the Carve Out Trigger Date (as defined below).  The "***Post-Carve Out Trigger Cap***" means the aggregate amount of (x) the fees in clause (i) of the definition of Pre-Carve Out Trigger Notice Gross Amount to the extent incurred on or after the first day following delivery of a Carve Out Trigger Notice; (y) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $4,500,000 incurred on or after the first day following delivery by any DIP Agent (acting at the direction of applicable DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Debtor Professional and not previously returned or applied to its respective fees and expenses; and (z) Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $500,000 incurred after the first day following delivery by the DIP Agent (acting at the direction of the applicable DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.  For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by email by any DIP Agent or DIP Lender Advisor (in each case acting at the direction of the applicable DIP Lenders) to the Debtors' restructuring co-counsel (Latham & Watkins LLP and Hunton Andrews Kurth LLP), the U.S. Trustee, counsel to the Committee (if any), and each DIP Agent, which notice (i) may be delivered only following the occurrence, and during the continuation of, an Event of Default and (ii) shall expressly state that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     <u>Delivery of Weekly Fee Statements</u>.  No later than 11:59 p.m. on the fifth Business Day of each week (or if such week does not have five Business Days, the first Business Day of the following week), beginning with the first full calendar week following the Petition Date,

each Professional Person shall deliver to the Debtors, the DIP Agents and the DIP Lender Advisors a statement (each such statement, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (through the final day of such week, the "***Calculation Date***"), along with a good faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date (the "***Cumulative Total Unpaid Fees and Expenses***") and a statement of the amount of such fees and expenses that have been paid to date by the Debtors.  No later than five (5) Business Days after the delivery of a Carve Out Trigger Notice, each Professional Person shall deliver one additional statement to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Committee, the DIP Agents, and the DIP Lender Advisors, setting forth a good faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of delivery of the Carve Out Trigger Notice.

        (c)      <u>Escrow Account</u>.  Following the entry of the Interim Order,  $**8,209,327.54** of the proceeds of the Brookfield DIP Loans from Brookfield Interim Draw, $**9,937,908.23** of the proceeds of the Carlyle DIP Notes from the Carlyle Interim Issuance, and $**9,937,908.23** of the proceeds of the Fundamental DIP Loans from the Fundamental Interim Draw, and, following the entry of the Final Order, $**16,604,352.46** of the proceeds of Brookfield DIP Loans, $**8,672,351.77** of the proceeds of the Carlyle DIP Notes, and $**8,172,351.77** of the proceeds of the Fundamental DIP Loans, shall, in each case, be funded into the escrow account with Ankura Trust Company, LLC (the "***Escrow Account***").  The Debtors' interest in such Escrow Account shall be subject to a first priority lien in favor of the DIP Agents and the DIP Lenders, subject to the DIP Intercreditor

Agreement, and not any liens or claims of existing prepetition creditors (other than the Prepetition Secured Obligations), but such lien shall be subject to the priority position of the Carve Out.  The Debtors will be permitted to draw upon the Escrow Account solely (i) to pay (including by making transfers to the Carve Out Account (as defined below) as provided in subparagraph (d) below) (A) the fees earned and payable upon a financing, amendment, restructuring, sale, success, completion, or other transaction (collectively, a "***Transaction***") of any investment bankers or financial advisors to the Debtors or the Committee (collectively, the "***Transaction Fees***") and (B) the Allowed Professional Fees, including upon such amounts becoming earned and payable upon the closing of any Transaction (in each case, to the extent not paid to the applicable investment bankers, financial advisors to the Debtors or the Committee, or Professional Person upon the closing of a Transaction, out of the cash proceeds of such Transaction), including upon the effectiveness of an Acceptable Plan, and (ii) to fund the Carve Out, and the Debtors will not be permitted to draw on the Escrow Account other than for such purposes.  The Debtors' obligations to pay Allowed Professional Fees and Transaction Fees shall not be limited or be deemed limited to funds held in the Escrow Account.  For the avoidance of doubt, amounts held in the Escrow Account shall not in any way act as a cap on Allowed Professional Fees or Transaction Fees.  Upon the delivery of a Carve Out Trigger Notice (or, if no Carve Out Trigger Notice is delivered, upon payment of all Allowed Professional Fees), all amounts remaining in the Escrow Account (upon the funding in full of the Pre-Carve Out Trigger Notice Gross Amount and the Post-Carve Out Trigger Cap and after giving effect to any amounts in the Carve Out Account in the case of delivery of a Carve Out Trigger Notice) shall be promptly distributed to the DIP Agents in accordance with the percentages set forth in paragraph 11(j).

(d)     <u>Carve Out Reserves</u>.  The Debtors shall, on a weekly basis or at such other times as they may determine appropriate, transfer from the Escrow Account or from other available cash to a separate escrow account established with Ankura Trust Company, LLC that is subject to a first priority lien in favor of the DIP Agents for the benefit of the applicable DIP Secured Parties (subject to the DIP Intercreditor Agreement), and not any other liens or claims (other than the Prepetition Secured Obligations), but shall be subject to the Carve Out in all instances (the "***Carve Out Account***"), cash in an amount equal to (x) the Cumulative Total Unpaid Fees and Expenses (other than any Transaction Fees) included in the most recent Weekly Statement provided by all Professional Persons timely received by the Debtors, the DIP Agents, and the DIP Lender Advisors for the prior week set forth in the Approved Budget, plus a good faith estimate of any Transaction Fees that are fully earned and became due and payable in such prior week, less (y) the amount of cash already on deposit in the Carve Out Account, which shall be reported to the DIP Agents, the DIP Lender Advisors and the Prepetition Agents.  Before the Carve Out Trigger Date, funds in the Carve Out Account may be used to pay such Allowed Professional Fees.

(e)     Notwithstanding the occurrence of an Event of Default, upon delivery of a Carve Out Trigger Notice to the Debtors (the "***Carve Out Trigger Date***"), such Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall, utilize all cash in the Escrow Account, and all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve Out Account in an amount equal to (i) the Pre-Carve Out Trigger Notice Cap and (ii) the Post-Carve Out Trigger Notice Cap.  Following the Carve Out Trigger Date, all funds in the Escrow Account and the Carve Out Account shall be used first to pay Allowed Professional Fees, subject to the Carve Out, and then, to the extent the Escrow Account or the Carve Out Account have not been reduced to zero, any such excess shall be promptly paid

US-DOCS\165239540.22

to the DIP Agents in accordance with the DIP Intercreditor Agreement for distribution to the applicable DIP Lenders, but amounts in the Carve Out Account shall not be swept or otherwise applied to repay DIP Loans unless and until all Allowed Professional Fees up to the amount of the Pre-Carve Out Trigger Notice Gross Amount and the Post-Carve Out Trigger Cap are paid in full, regardless of when allowed.

(f)    Notwithstanding anything to the contrary in the DIP Documents or this Interim Order: (i) following delivery of a Carve Out Trigger Notice, the DIP Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other Disposition of any assets) of the Debtors until the Carve Out has been fully funded in cash from such cash and the Escrow Account, but the DIP Agents (on behalf of the applicable DIP Secured Parties) shall have a lien on and security interest in the Debtors' interest in any residual cash balance remaining in the Escrow Account and in the Carve Out Account in excess of the Carve Out; (ii)(A) disbursements by the Debtors from the Escrow Account or the Carve Out Account shall not increase or reduce the balance of the DIP Obligations, (B) the failure of the Escrow Account or the Carve Out Account to satisfy in full in cash the Allowed Professional Fees shall not affect, alter, or impair the amount, scope, or priority of the Carve Out, (C) in no way shall any Approved Budget, proposed Approved Budget, Carve Out, Pre-Carve Out Trigger Notice Cap, Post-Carve Out Trigger Notice Cap, Weekly Statement, weekly estimate, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors; and (iii) the Allocable Percentage of the Carve Out for each DIP Facility shall be senior to (1) the DIP Obligations and Prepetition Secured Obligations of each Debtor in favor of the applicable DIP Lenders and Prepetition Lenders, and (2) the Adequate Protection Liens, Adequate Protection Claims, and any claims arising under section 507(b) of the Bankruptcy Code against

each Debtor in favor of the applicable DIP Lenders and Prepetition Lenders, and (3) all security interests and liens (as defined in Section 101(37) of the Bankruptcy Code) on property of the Debtors securing any of the claims or administrative expenses described in clauses (1) or (2) in favor of the applicable DIP Lenders and Prepetition Lenders.

(g)     No Direct Obligation to Pay Allowed Professional Fees.  None of the DIP Agents, the DIP Lenders, or any other DIP Secured Party shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code regardless of whether such fee or expense has been allowed by this Court.  Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Agents, the DIP Lenders, or any other DIP Secured Party in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(h)     Payment of Allowed Professional Fees Prior to, on or After the Carve Out Trigger Date.  Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(i)     Allocable Percentage.  Notwithstanding anything to the contrary in this Interim Order, the amount (i) required to be funded by the DIP Lenders under each DIP Facility to the Escrow Account, including for funding the applicable Carve Out and (ii) of the applicable Carve Out that is senior to the applicable DIP Liens and applicable DIP Superiority Claims of a DIP Facility and the applicable Prepetition Liens and applicable Prepetition Secured Obligations shall be calculated on the basis of and limited by the Allocable Percentage with respect to such

US-DOCS\165239540.22

DIP Facility and Prepetition Secured Obligations. The Allocable Percentages shall otherwise in no way act as a cap or limitation on the aggregate amount of the Allowed Professional Fees against the Estates or the aggregate amount of the Carve Out.

(j)     Upon funding of the Carve Out in full, all amounts remaining in the Escrow Account shall be promptly distributed to the DIP Agents, with each DIP Agent receiving, for the benefit of the DIP Secured Parties under the applicable DIP Facility, a percentage of such residual amount equal to the ratio of (i) the aggregate amount of cash transferred to the Escrow Account from the proceeds of such DIP Facility to (ii) the aggregate amount transferred to the Escrow Account from the proceeds of all DIP Facilities, for application to the applicable DIP Obligations until Paid in Full (with any excess, including any excess in respect of any DIP Facility that has been Paid in Full (for the avoidance of doubt, including any Roll-Up DIP Loans) prior to such distribution) being distributed to the remaining DIP Agents ratably in accordance with the aggregate amount of cash transferred to the Escrow Account from the proceeds of each remaining DIP Facility).

(k)     If no Carve Out Trigger Notice is delivered, upon payment of all Allowed Professional Fees in the Chapter 11 Cases, or, if a Carve Out Trigger Notice is delivered, upon payment of all Allowed Professional Fees up to the aggregate amount of the Pre-Carve Out Trigger Notice Gross Amount and the Post-Carve Out Trigger Cap, all amounts remaining in the Carve Out Account shall be promptly distributed to the DIP Agents, with each DIP Agent receiving, for the benefit of the DIP Secured Parties under the applicable DIP Facility, a percentage of such residual amount equal to the ratio of (x) the aggregate amount of cash transferred to the Carve Out Account from the proceeds of such DIP Facility to (y) the aggregate amount transferred to the Carve Out Account from the proceeds of all DIP Facilities, for application to the applicable DIP

Obligations until Paid in Full (with any excess, including any excess in respect of any DIP Facility that has been Paid in Full (for the avoidance of doubt, including any Roll-Up DIP Loans) prior to such distribution) being distributed to the remaining DIP Agents ratably in accordance with the aggregate amount of cash transferred to the Carve Out Account from the proceeds of each remaining DIP Facility).

12.    <u>Excluded Professional Fees</u>.    Notwithstanding anything to the contrary in this Interim Order, no proceeds of any DIP Facility, the Carve Out, or any Cash Collateral may be used by any Debtor (or any subsidiary or affiliate thereof) or any other party in interest, including the Committee, any other statutory or non-statutory committee or any Trustee or any Representative of the foregoing, to: (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt or collateral position of any of the DIP Agents, the DIP Lenders, any other DIP Secured Party, or the Prepetition Secured Parties, whether by (i) challenging the validity, extent, amount, perfection, priority or enforceability of the obligations under any DIP Facility, any DIP Documents, any of the Prepetition Secured Obligations or any of the Prepetition Documents, (ii) challenging the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect to any DIP Facility, any DIP Documents, any of the Prepetition Secured Obligations or any of the Prepetition Documents, (iii) seeking to subordinate or recharacterize the obligations under any DIP Facility or any of the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (iv) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent, DIP Lender, any other DIP Secured Party, or any Prepetition Secured Party or any of

their respective Representatives; (b) prevent, hinder or otherwise delay any DIP Agent's, DIP Lender's, any other DIP Secured Party's, or Prepetition Secured Party's assertion, enforcement, or realization on any of the DIP Collateral or the Prepetition Collateral in accordance with the DIP Documents or the Prepetition Documents, as applicable; (c) seek to modify the rights granted to any DIP Agent, DIP Lender, any other DIP Secured Party, or Prepetition Secured Party under any DIP Document or Prepetition Document, as applicable, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (which order may be the Interim Order or the Final Order) and (ii) permitted by the DIP Documents; *provided* that during the Challenge Period, an investigation budget in an aggregate amount of $25,000 of the DIP Loans and/or the Prepetition Collateral, including Cash Collateral, and the proceeds thereof, may be used by the Committee to investigate, but not to prepare, initiate, litigate, or prosecute, an objection to, or otherwise challenge, (x) the claims and liens of the Prepetition Secured Parties against the Debtors, and (y) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties.

**V.      Right to Credit Bid.**

13.      <u>Right to Credit Bid</u>.

(a)      Subject to the terms of the DIP Documents and the Prepetition Documents, as applicable, each of the DIP Agents and the Prepetition Agents shall have the unqualified right to credit bid (either directly or through one or more acquisition vehicles), on a dollar-for-dollar basis up to the full amount of the applicable DIP Obligations and Prepetition Secured Obligations, if any, including any accrued interest, fees and expenses, including fees and expenses of the DIP Lender Advisors and Adequate Protection Fees and Expenses capitalized pursuant to paragraph

48

25(b) and the Brookfield Fees, the Carlyle Payments, and the Fundamental Fees, as applicable, in any sale (including any deposit in connection with such sale) of all or any portion of the applicable DIP Collateral or Prepetition Collateral, including, without limitation, any Sale Transaction or any other sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan, including chapter 11 plans subject to confirmation under section 1129(b) of the Bankruptcy Code, and any sale or Disposition by a chapter 7 trustee for any of the Debtors, including under sections 363 or 725 of the Bankruptcy Code or otherwise, and such DIP Secured Parties and Prepetition Secured Parties shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code or otherwise.  Further, the Brookfield DIP Agent and the Brookfield Prepetition Agent may credit bid for the Debtors' claims against any employees to be hired in relation to a Brookfield Sale Transaction, the Carlyle DIP Agent and the Carlyle Prepetition Agent may credit bid for the Debtors' claims against any employees to be hired in relation to a Carlyle Sale Transaction, and the Fundamental DIP Agent and the Fundamental Prepetition Agent may credit bid for the Debtors' claims against any employees to be hired in relation to a Fundamental Sale Transaction.

   (b)  No bid for all or any portions of the (i) Brookfield Silo Assets shall be submitted by the Debtors as a Successful Bid (as defined in the Bidding Procedures Order) to be approved by an order of this Court unless such bid, together with any other bids for any portions of the Brookfield Silo Assets, provides for the Brookfield DIP Obligations and the Brookfield Prepetition Secured Obligations to be Paid in Full on or before the closing date of the proposed sale transaction set forth in such bid with the proceeds of such sale (unless otherwise consented to by the Brookfield Required DIP Lenders), (ii) Carlyle Silo Assets shall be submitted by the Debtors as a Successful Bid to be approved by an order of this Court unless such bid, together with any

other bids for any portions of the Carlyle Silo Assets, provides for the Carlyle DIP Obligations and the Carlyle Prepetition Secured Obligations to be Paid in Full on or before the closing date of the proposed sale transaction set forth in such bid with the proceeds of such sale (unless otherwise consented to by the Carlyle Required DIP Noteholders), and (iii) Fundamental Silo Assets shall be submitted by the Debtors as a Successful Bid to be approved by an order of this Court unless such bid, together with any other bids for any portions of the Fundamental Silo Assets, provides for the Fundamental DIP Obligations and the Fundamental Prepetition Secured Obligations to be Paid in Full on or before the closing date of the proposed sale transaction set forth in such bid with the proceeds of such sale (unless otherwise consented to by the Fundamental Required DIP Lenders).

**VI.    Default; Rights and Remedies; Relief from Stay.**

14.    <u>Events of Default</u>.  (a) The failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; or (b)(i) with respect to the Brookfield DIP Facility, the occurrence of any Event of Default as defined in and under the Brookfield DIP Credit Agreement (unless waived by the Brookfield Required DIP Lenders); (ii) with respect to the Carlyle DIP Facility, the occurrence of any Event of Default as defined in and under the Carlyle DIP Note Purchase Agreement (unless waived by the Carlyle Required DIP Noteholders); and (iii) with respect to the Fundamental DIP Facility, the occurrence of any Event of Default as defined in and under the Fundamental DIP Credit Agreement (unless waived by the Fundamental Required DIP Lenders), shall constitute an "***Event of Default***" under this Interim Order with respect to the applicable DIP Facility, unless extended or otherwise waived by prior written consent from the applicable Required DIP Lenders.

15.    <u>Rights and Remedies Upon Event of Default/Relief from Stay</u>.

(a)    Without requiring further order from this Court and without the need for filing any motion for relief from the automatic stay or any other pleading, immediately upon the

date of delivery of a written notice (a "***Default Notice***," and the date of delivery of such Default Notice, the "***Default Termination Date***") by any DIP Agent (acting at the direction of the applicable Required DIP Lenders) to the Debtors, the U.S. Trustee, each other DIP Agent, each Prepetition Agent and the Committee (if any),[4] of the occurrence of the Maturity Date (as defined in the applicable DIP Credit Agreement) or an Event of Default, the automatic stay shall be modified, without further order of the Court, solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the applicable DIP Agent (acting at the direction of the applicable Required DIP Lenders, in their sole discretion): (i) the Debtors' authority to use the Cash Collateral of the applicable DIP Secured Parties shall immediately terminate (subject only to the applicable Carve Out and except as set forth in this paragraph 15); (ii) the applicable DIP Obligations shall (subject only to the applicable Carve Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (iii) the termination, reduction, or restriction of any further DIP Commitments under the applicable DIP Facility to the extent any such DIP Commitments remain outstanding; (iv) the applicable DIP Facility shall be terminated with respect to any future liability or obligation of the applicable DIP Agent and DIP Lenders, but, for the avoidance of doubt, without affecting any of the applicable DIP Liens, DIP Superpriority Claims or DIP Obligations; and (v) the application of the applicable Carve Out through the delivery of the Carve Out Trigger Notice (the date that is the earliest to occur of the election of any the foregoing under clauses 15(a)(i) through (v) a "***DIP Termination Date***").

---

[4]   The Debtors shall promptly file any such Default Notice with the Court.

(b)      During the continuation of an Event of Default and following the delivery of a Default Notice, but prior to exercising the remedies set forth in this paragraph 15(b), the applicable DIP Agent, on behalf of the applicable DIP Secured Parties, shall be required to file a motion with the Court seeking emergency relief (a "***Stay Relief Motion***" and the hearing on such motion, the "***Stay Relief Hearing***") on not less than five (5) business days' notice (the "***Notice Period***") for a further order of the Court modifying the automatic stay to permit the applicable DIP Agent, on behalf of the applicable DIP Secured Parties, to exercise any other right or remedy with respect to the applicable DIP Collateral or the applicable DIP Liens permitted under the DIP Documents or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition Documents.  In the event the Court determines at the Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which remedy may include the exercise of any and all rights available to the applicable DIP Secured Parties.  The Notice Period shall be automatically extended (without further notice, hearing, motion, order or other action) until three (3) business days after the date that the Court rules on the Stay Relief Motion.  During the Notice Period, the Debtors shall be permitted to cure any Event of Default and to use Cash Collateral to (i) make payroll and fund critical expenses necessary to continue the operation of their business or to maximize and maintain the value of the DIP Collateral, in each case in accordance with the terms of the Approved Budget (subject to any Permitted Variance) and this Interim Order or as otherwise agreed by the applicable DIP Agent (acting at the direction of the applicable Required DIP Lenders), without prejudice to the rights of any of the other DIP Secured Parties or Prepetition Secured Parties, (ii) fund the Carve Out, and (iii) contest whether an Event of Default has occurred or is continuing.  Notwithstanding the foregoing, the DIP Lenders shall

not be obligated to provide any DIP Loans or advances at any time an Event of Default has occurred and is continuing, including during the Notice Period, or after the Maturity Date.

(c)     For the avoidance of doubt, following a DIP Termination Date under a DIP Facility, unless otherwise ordered by the Court, the applicable DIP Agent, on behalf of the applicable DIP Secured Parties, may exercise remedies as to any applicable Non-Debtor Guarantor or its property or assets, including property or assets of Non-Debtor Guarantors that constitute DIP Collateral, without the requirement of delivering a Default Notice or complying with the Notice Period, and such exercise of remedies shall be permitted under this Interim Order and not constitute a violation of the automatic stay under section 362 of the Bankruptcy Code; *provided* that any such exercise of remedies shall be in accordance with the applicable DIP Documents.

16.     <u>Relief from Stay</u>.  Subject to paragraph 15 and, to the extent required by paragraph 15(b), the expiration of the Notice Period and entry of an order granting the relief requested in a Stay Relief Motion, for the purpose of exercising rights, options, and remedies set forth in this Article VI, unless otherwise ordered by this Court, each DIP Agent (acting at the direction of the applicable DIP Lenders), on behalf of the DIP Secured Parties, shall be automatically relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to them, or any of them, solely to the extent necessary to exercise their rights and remedies pursuant to the terms and conditions of the DIP Documents and this Interim Order.

## VII.  Challenges to the Prepetition Secured Obligations

17.     <u>Effect of Stipulations on Third Parties</u>.

(a)     The Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Interim Order (including the incurrence of the Roll-Up DIP Loans, which shall be final and irrevocable as to the Debtors upon entry of this Interim Order

but otherwise shall be subject to the provisions of this paragraph 17) shall be irrevocably binding upon the Debtors and their Estates and any and all of the Debtors' successors-in-interest and assigns in all circumstances and for all purposes upon the entry of this Interim Order, and the Debtors and their Estates are deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date.

(b) Upon the expiration of the Challenge Period, the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Interim Order shall also be binding upon all creditors and other parties in interest and all of their respective successors and assigns, including the Committee and any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any Trustee, in each case in all circumstances and for all purposes, unless and solely to the extent that (i) during the Challenge Period, the Committee or any other party in interest with proper standing granted by an order of the Court prior to the expiration of the Challenge Period and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding, has timely and properly filed an appropriate proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this Interim Order, including this paragraph 17) challenging any of the Debtors' Stipulations and Releases or other admissions, agreements, and releases contained in this Interim Order with respect to the Prepetition Secured Obligations (each such proceeding or contested matter, a "***Challenge**"*), and (ii) the Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely and properly filed Challenge (a "***Successful Challenge**"*); provided, however, that, (x) any pleadings filed in a proceeding asserting any Challenge shall set forth with

specificity the basis for such Challenge, and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred and (y) if the Chapter 11 Cases are converted to chapter 7, or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, any such estate representative or trustee shall receive the full benefit of any remaining time before the expiration of the Challenge Period.  The Court may fashion any appropriate remedy upon a Successful Challenge.

(c)     If no Challenge is timely and properly filed by a party-in-interest with the requisite standing and authority as contemplated herein prior to the expiration of the Challenge Period or to the extent that the Court does not rule in favor of the plaintiff in any such Challenge proceeding, then, without further order of the Court:  (i) the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Interim Order shall be binding and preclusive on all parties in interest, including the Debtors, the Debtors' Estates, the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Trustee, or other successors and assigns of the Debtors and the Debtors' Estates, and on any other person or entity; (ii) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, claim, subordination, recoupment, demands, offset, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases, including, without limitation, any subsequent chapter 7 case; (iii) the Prepetition Liens on the Prepetition Collateral held by the Prepetition Secured Parties shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected, security interests and liens and with the priority specified in the Debtors' Stipulations and Releases or in this Interim Order, not subject to defense, counterclaim, recharacterization, subordination, avoidance or other defense; (iv) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral held

by the Prepetition Secured Parties, the Prepetition Secured Parties (and their respective Representatives), shall not be subject to any other or further Challenge or other proceeding by any Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee, or any successors and assigns of the Debtors and the Debtors' Estates, or by any other person or entity, and all such parties shall be enjoined from seeking to exercise the rights of the Debtors or the Debtors' Estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); and (v) any and all Challenges by any party (including the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Trustee, or other successors and assigns of the Debtors and the Debtors' Estates, and any other person or entity) and any right to bring a Challenge shall be deemed forever waived, released, and barred, in each case except to the extent that such Debtors' Stipulations and Releases and any other admissions, agreements, and releases contained in this Interim Order were subject to a Successful Challenge.

(d)     If any Challenge is timely and properly filed prior to the expiration of the Challenge Period (as defined below) by any Committee, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee or any other person or entity, in each case, with requisite standing and authority, (i) any claim or action that is not brought shall forever be barred, and (ii) the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Interim Order shall nonetheless remain binding and preclusive on any Committee, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee, and any other person or entity, as applicable, except as to any such stipulations, admissions, agreements, and releases that were subject to a Successful Challenge.

(e)        Nothing in this Interim Order vests or confers on any person, including any Committee or any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, any Trustee, or any other party in interest, standing or authority to pursue any claim or cause of action belonging to the Debtors or their Estates, including, without limitation, Challenges with respect to the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Interim Order, or the Roll-Up DIP Loans, which shall be final and irrevocable as to the Debtors upon entry of this Interim Order but shall otherwise be subject to the provisions of this paragraph 17, and (i) a separate order of the Court conferring such standing on the Committee or other person shall be a prerequisite for the prosecution of a Challenge by the Committee or such other person and (ii) all rights to object or to oppose such standing or any Challenge in any manner are expressly reserved.

(f)        The "***Challenge Period***" shall mean earliest to occur of (i) the commencement of a hearing to consider confirmation of a chapter 11 plan, (ii) three (3) Business Days' prior to the hearing (A) with respect to the Debtors' Stipulations and Releases in favor of the Brookfield Prepetition Secured Parties, for approval of a Brookfield Sale Transaction, (B) with respect to the Debtors' Stipulations and Releases in favor of the Carlyle Prepetition Secured Parties, for approval of a Carlyle Sale Transaction, and (C) with respect to the Debtors' Stipulations and Releases in favor of the Fundamental Prepetition Secured Parties, for approval of a Fundamental Sale Transaction, (iii) for any party in interest other than the Committee, no later than the date that is sixty (60) days from entry of this Interim Order, and (iv) for the Committee, no later than sixty (60) days from the appointment of the Committee; provided, however, that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period ending on the later of

57

sixty (60) days after entry of this Interim Order and forty-five (45) days after the date of such conversion or appointment, as applicable, in each case solely with respect to any such trustee.  The Challenge Period may be extended in writing prior to the expiration of the Challenge Period (which writing may be in the form of email by counsel) from time to time in the sole discretion of (x) the Brookfield Prepetition Agent (at the direction of the Brookfield Prepetition Lenders) with respect to any Challenge to the Brookfield Prepetition Liens, the Brookfield Prepetition Secured Obligations, or the Brookfield Prepetition Secured Parties, (y) the Carlyle Prepetition Agent (at the direction of the Carlyle Prepetition Noteholders) with respect to any Challenge to the Carlyle Prepetition Liens, the Carlyle Prepetition Secured Obligations, or the Carlyle Prepetition Secured Parties, (z) the Fundamental Prepetition Agent (at the direction of the Fundamental Prepetition Lenders) with respect to any Challenge to the Fundamental Prepetition Liens, the Fundamental Prepetition Secured Obligations, or the Fundamental Prepetition Secured Parties.

(g)     For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, upon the entry of this Interim Order, (i) the Challenge Period shall automatically be deemed to have lapsed as to the Debtors with respect to the Debtors' Stipulations and Releases, (ii) such stipulations, admissions, agreements, and other releases shall be binding upon the Debtors, and (iii) any Challenges by the Debtors with respect to the Prepetition Secured Parties (including on account of the Roll-Up DIP Loans), shall be deemed forever waived, released, and barred.

(h)     Any successor to the Debtors (including, without limitation, any Trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be bound by the terms of this Interim Order and the Final Order to the same extent as the Debtors, including with respect to the Debtors' Stipulations and Releases.

**VIII.  Debtors' Waivers and Releases.**

18.      Section 506(c) Claims and 552(b) Equities.

(a)      Without affecting, modifying or limiting the scope or priority of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against or recovered from any of (i) the DIP Secured Parties, their respective claims, or the DIP Collateral or (ii) subject to entry of the Final Order, the Prepetition Secured Parties, their respective claims, or the Prepetition Collateral, in each case pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the applicable DIP Agent (acting at the direction of the applicable DIP Lenders) or the applicable Prepetition Agent (at the direction of the applicable Prepetition Lenders), as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Secured Party.

(b)      Each of the DIP Secured Parties and  the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, to the extent applicable, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the DIP Secured Parties or, subject to entry of the Final Order, the Prepetition Secured Parties, with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable.

19.      Marshaling.  In no event shall any DIP Agent, DIP Lender, or, subject to entry of the Final Order, any Prepetition Agent or Prepetition Lender, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable, and the proceeds of the DIP Collateral and the Prepetition Collateral shall be received and applied pursuant to this Interim Order, including Annex 3, and the

59

DIP Documents and the Prepetition Documents, including the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements, notwithstanding any other agreement or provision to the contrary; provided, however, that each DIP Agent and each DIP Lender shall use commercially reasonable efforts to first obtain recoveries from the applicable DIP Collateral other than proceeds of Avoidance Actions.

       20.    <u>Release of the DIP Secured Parties and Prepetition Secured Parties</u>.

       (a)    Subject to and effective upon entry of the Interim Order, and in consideration of and as a condition to each DIP Agent and each DIP Lender making the DIP Facilities available under the DIP Credit Agreements and providing other credit and financial accommodations to the Debtors pursuant to the provisions of this Interim Order and the DIP Documents (including the Carve Out provisions), each Prepetition Agent and each other Prepetition Secured Party consenting to the priming of the Prepetition Liens by the DIP Liens and the applicable Carve Out and permitting the use of the Prepetition Collateral and Cash Collateral pursuant to the provisions of this Interim Order, each Debtor and each Estate, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present, and future subsidiaries and assigns (collectively, the "***Releasors***"), hereby absolutely, unconditionally and irrevocably and forever releases, acquits, absolves, and discharges (i) each DIP Secured Party (solely in their capacity as such), (ii) each Prepetition Secured Party (solely in their capacity as such), and (iii) with respect to each of the foregoing (solely in their capacities as such), each of their respective Representatives (the persons and entities described in these clauses (i) through (iii), each a "***Released Party***") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, demands, liabilities, responsibilities, disputes, remedies, causes of action (including causes of action in the nature of

60

"lender liability"), Avoidance Actions, suits, judgments, costs, debts, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, bonds, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, recoupment, demands, controversies, other rights of disgorgement or recovery, and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or such entities' successors or assigns, whether individually or collectively) that exist on the date hereof, at law or in equity, by statute or common law, in contract, or in tort, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, (C) any and all offsets, defenses, claims, counterclaims, set-off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement or recovery, and (D) any defense, right of counterclaim, right of set-off, or deduction on the payment of the Prepetition Secured Obligations, the Roll-Up DIP Loans, or the DIP Obligations, in each case that any Releasor may now or hereafter own, hold, have, or claim to have against the Released Parties, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of this Interim Order, arising out of, relating to, or in connection with, any of the DIP Obligations,

the Prepetition Secured Obligations, the DIP Liens, the Prepetition Liens, any sale process, any Sale Transaction, the payment of any fees and expenses, including the DIP Lender Advisors, the DIP Documents, the Prepetition Documents, or other financial accommodations under the DIP Documents, or the Prepetition Documents, the negotiations concerning the same, or the Chapter 11 Cases (individually, a "***Released Claim***" and collectively, the "***Released Claims***"), but excluding claims or obligations arising on or after the date of the Interim Order, including claims against or obligations of the DIP Lenders under each DIP Facility.

(b)     As of the entry of this Interim Order, the releases granted solely to the DIP Secured Parties and their associated Released Parties in this paragraph 20 are final and binding and are not subject to a Challenge pursuant to paragraph 17 of this Interim Order or otherwise.  For the avoidance of doubt, the releases granted to all other parties, other than the DIP Secured Parties and their associated Released Parties, in this paragraph 20 shall be subject to Challenge pursuant to paragraph 17 of this Interim Order.

(c)     Each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Released Party that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Released Party on the basis of any Released Claim or other claim or cause of action that has been released and discharged by any Releasor pursuant to clause (a) above (and upon the granting of such release, clause (b) above).  If any Releasor violates the foregoing covenant, such Releasor agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

## IX.    **Intercompany Claims Settlement**

21.    <u>Preserved Procurement Claims</u>.

(a)     None of Debtor PGR Procurement, LLC or any secured party with respect to any Preserved Procurement Claim shall, directly or indirectly, exercise any remedial or enforcement action in respect of any Preserved Procurement Claim until 90 days after the closing of a Sale Transaction or other Disposition with respect to a material portion of the assets of or equity interests of the entity against which such Preserved Procurement Claim has been asserted. None of the provisions in this Article IX of the Interim Order shall in any way limit, alter, or affect any defenses, setoffs, recoupments, or other rights or defenses of any person or entity against whom the Preserved Procurement Claims may be asserted.

(b)     The Debtors shall cause Catalina to engage the Catalina Independent Engineer to review and adjudicate the Identified BRP Claims under customary procedures; *provided* that the scope of the Catalina Independent Engineer's review and adjudication shall be acceptable to the Brookfield Required DIP Lenders and the Fundamental Required DIP Lenders.

22.    Release of Pledged Intercompany Claims.    Upon the consummation of a (a) Brookfield Sale Transaction, all Brookfield Pledged Intercompany Claims held by any Debtor or any subsidiary or affiliate thereof shall, at the election of the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), be fully and finally released (other than Preserved Procurement Claims and Other BRP Claims), including by such Debtor agreeing to release any claims or interests it may have against or in or that may attach to such Brookfield Pledged Intercompany Claims as of the closing of such sale, (b) Carlyle Sale Transaction, all Carlyle Pledged Intercompany Claims held by any Debtor or any subsidiary or affiliate thereof shall, at the election of the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), be fully and finally released (other than the Preserved Procurement Claims), including by such Debtor agreeing to release any claims or interests it may have against or in or

63

that may attach to such Carlyle Pledged Intercompany Claims as of the closing of such sale, and (c) Fundamental Sale Transaction, all Fundamental Pledged Intercompany Claims held by any Debtor or any subsidiary or affiliate thereof shall, at the election of the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), be fully and finally released, including by such Debtor agreeing to release any claims or interests it may have against or in or that may attach to such Fundamental Pledged Intercompany Claims as of the closing of such sale.

## X.    Other Rights and Obligations.

23.    <u>Replacement Additional DIP Facilities</u>.  Following the entry of this Interim Order, the Debtors shall be permitted to enter into one or more new debtor-in-possession financing facilities (each, a "***Replacement Additional DIP Facility***") solely for the purpose of refinancing and replacing one or more of the existing DIP Facilities (each, a "***Replaced DIP Facility***"); *provided* that, each such Replacement Additional DIP Facility shall (a) repay in full in cash and refinance the applicable Replaced DIP Facility and cause such Replaced DIP Facility to be Paid in Full, and (b) be on identical terms to the Replaced DIP Facility (other than with respect to covenants, pricing and fees; *provided* that (i) any covenants contained in such Replacement Additional DIP Facility that are more favorable to the lenders thereunder shall have been incorporated into the remaining DIP Facilities at the election of the applicable DIP Lenders, (ii) the pricing and fees in respect of the remaining DIP Facilities shall be increased to the same extent that such pricing and fees under such Replacement Additional DIP Facility represent an increase relative to the Replaced DIP Facility, in each case pursuant to an Amendment pursuant to paragraph 3(c) of this Interim Order to the remaining DIP Facilities entered into on or prior to the closing date of such Replacement Additional DIP Facility, (iii) each Replacement Additional DIP Facility shall have identical provisions related to funding the applicable Carve Out as the Replaced

64

DIP Facility and shall be obligated to fund the Allocable Percentage of the Carve Out of each applicable Replaced DIP Facility.

24.      <u>Blue Ridge Surety Bonds</u>.  Upon any Debtor or any subsidiary or affiliate thereof, including Blue Ridge, obtaining any proceeds of any Blue Ridge Surety Bond, such proceeds shall be immediately applied to pay amounts outstanding to, or to cash collateralize, the applicable beneficiary thereof.  Nothing herein shall modify the terms, conditions and/or provisions of any such bonds and/or any surety defenses under such bonds.

25.      <u>Payment of Fees and Expenses</u>.

(a)      The Debtors are authorized to and shall pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of each DIP Agent and each other DIP Secured Party, including the fees and expenses of the DIP Lender Advisors, in connection with each DIP Facility, including in connection with (i) the discussion, negotiation, preparation, execution and delivery of any DIP Documents and the funding of the DIP Loans, (ii) the administration of the DIP Facilities and any amendment, modification or waiver of any provision of any DIP Document, (iii) the interpretation, enforcement or protection of any of the rights and remedies of the DIP Secured Parties under the DIP Documents, (iv) the Chapter 11 Cases, and (v) the Sale Transactions, in each case as provided in the applicable DIP Documents. No attorney or advisor to any of the Prepetition Secured Parties, the DIP Agents or the other DIP Secured Parties, including the fees and expenses of the DIP Lender Advisors, shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agents, the other DIP Secured Parties, or the DIP Lender Advisors in connection with any of the DIP Facilities are hereby approved in full.

(b)      Notwithstanding the foregoing, to the extent the fees, costs, disbursements and expenses of any of the Brookfield DIP Lender Advisors, the Carlyle DIP Noteholder Advisors or the Fundamental DIP Lender Advisors or the payment of any Adequate Protection Fees and Expenses exceed the aggregate amount budgeted for such DIP Lender Advisors or Adequate Protection Fees and Expenses in the Initial Budget (or, with the consent or deemed consent of the Required DIP Lenders, the Approved Budget), the DIP Loan Parties shall not be obligated to pay such excess to the DIP Lender Advisors or the advisors to the Prepetition Secured Parties in cash, but to the extent the applicable DIP Lenders pay such amounts to the applicable DIP Lender Advisors or the advisors to the Prepetition Secured Parties in accordance with this paragraph 25(b), the outstanding amount of the applicable DIP Obligations shall automatically be increased (for the avoidance of doubt, without any reduction of the applicable DIP Commitments) by such amount, with no further action by any party, upon notice to the DIP Loan Parties.  For the avoidance of doubt, no proceeds of any DIP Facility or Cash Collateral solely of any DIP Secured Party under a DIP Facility may be used to pay fees and expenses of DIP Lender Advisors for any other DIP Facility or the advisors to Prepetition Secured Parties for any other Prepetition Secured Obligations.

(c)      Any time that the advisors to the Prepetition Secured Parties seek payment (whether in cash or in additional applicable DIP Obligations pursuant to paragraph 25(b)) of Adequate Protection Fees and Expenses from the Debtors, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-

product doctrine or other privilege) by electronic mail to the U.S. Trustee and counsel to the Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors' primary restructuring counsel. The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "***Disputed Invoiced Fees***") by notifying the submitting party in writing, within ten (10) days of the receipt of such fee and expense statement or invoice (the "***Review Period***"), setting forth the specific objections to the Disputed Invoiced Fees.  If such objection cannot be consensually resolved, the objecting party may file with the Court a motion or other pleading to resolve such dispute prior to the expiration of the Review Period (which such deadline may be extended by the applicable submitting party in writing), with at least ten (10) days' prior written notice to the submitting party of any hearing on such motion or other pleading.  The Debtors shall promptly pay at the expiration of the applicable Review Period in full in cash (or, in the case of any payment pursuant to paragraph 25(b), the Debtors shall automatically be deemed to have paid at the expiration of the Review Period in full in the form of additional applicable DIP Obligations) all such invoiced fees and expenses other than the Disputed Invoiced Fees, and this Court shall have jurisdiction to determine the Disputed Invoiced Fees if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors shall pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of each Prepetition Agent and each other Prepetition Secured Party incurred on or prior to such date without the need for any professional engaged by any Prepetition Agent or other Prepetition Secured Party to first deliver a copy of its invoice as provided for herein (other than to the Debtors). No attorney or advisor to any of the Prepetition Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid

prior to the Petition Date by any of the Debtors to any Prepetition Agent or the other Prepetition Secured Party in connection with the Prepetition Secured Obligations, the DIP Facility, the Chapter 11 Cases or otherwise are hereby approved in full.

26.     ACT Provisions.  The Debtors are expressly authorized to enter into, and the DIP Documents shall be deemed to include, the following covenants for the benefit of the DIP Secured Parties:

(a)     "The Debtors shall not, and shall not permit ACT to, Dispose of, or enter into any agreement to Dispose of, in one transaction or a series of transactions, all or any part of ACT's business, assets or property of any kind whatsoever, either real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed (the foregoing transactions, collectively, an "*ACT Disposition*"), except on terms and conditions and with a counterparty reasonably acceptable to the Required DIP Lenders, it being understood that any refusal to consent to an ACT Disposition by (i) the Brookfield Required DIP Lenders shall be deemed reasonable if (A) such ACT Disposition is proposed to occur before the consummation of a Brookfield Sale Transaction, (B) the Brookfield Required DIP Lenders in good faith determine that such ACT Disposition could adversely affect the operation and maintenance services provided to the Brookfield Silo Entities or the Brookfield Silo Assets (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Brookfield Borrower or its subsidiaries or affiliates; (ii) the Carlyle Required DIP Noteholders shall be deemed reasonable if (A) such ACT Disposition is proposed to occur before the consummation of a Carlyle Sale Transaction, (B) the Carlyle Required DIP Noteholders in good faith determine that such ACT Disposition could adversely affect the operation and maintenance services provided to the Carlyle Silo Entities or the Carlyle Silo Assets (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Carlyle Issuer or its subsidiaries or affiliates; and (iii) the Fundamental Required DIP Lenders shall be deemed reasonable if (A) such ACT Disposition is proposed to occur before the consummation of a Fundamental Sale Transaction, (B) the Fundamental Required DIP Lenders in good faith determine that such ACT Disposition could adversely affect the operation and maintenance services provided to the Fundamental Silo Entities or the Fundamental Silo Assets (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Fundamental Borrower or its subsidiaries or affiliates.

(b)     The Debtors shall not permit ACT or its direct or indirect subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become directly or indirectly liable with respect to any funded indebtedness, including any DIP Obligations (such indebtedness, "***ACT Indebtedness***"), except on terms and conditions and funded by counterparties reasonably acceptable to the Required DIP Lenders, it being understood that any refusal to consent to such indebtedness by (i) the Brookfield Required DIP Lenders shall be deemed reasonable if (A) such financing provides for milestones, events of default, or the ability of the lender thereunder to exercise remedies, in each case prior to the consummation of a Brookfield Sale Transaction, (B) the Brookfield Required DIP Lenders in good faith determine that such indebtedness could adversely affect the operation and maintenance services provided to any Brookfield Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (as each is defined in the Brookfield DIP Credit Agreement) (including based on the cost or quality thereof and the reputation of the provider) or (C) if the financing is provided by parties with existing investments in the Brookfield Borrower or any of its subsidiaries or affiliates, (ii) the Carlyle Required DIP Noteholders shall be deemed reasonable if (A) such financing provides for milestones, events of default, or the ability of the lender thereunder to exercise remedies, in each case prior to the consummation of a Carlyle Sale Transaction, (B) the Carlyle Required DIP Noteholders in good faith determine that such indebtedness could adversely affect the operation and maintenance services provided to any Carlyle Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (as each is defined in the Carlyle DIP Note Purchase Agreement) (including based on the cost or quality thereof and the reputation of the provider) or (C) if the financing is provided by parties with existing investments in the Carlyle Issuer or any of its subsidiaries or affiliates, and (iii) the Fundamental Required DIP Lenders shall be deemed reasonable if (A) such financing provides for milestones, events of default, or the ability of the lender thereunder to exercise remedies, in each case prior to the consummation of a Fundamental Sale Transaction, (B) the Fundamental Required DIP Lenders in good faith determine that such indebtedness could adversely affect the operation and maintenance services provided to any Fundamental Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (as each is defined in the Fundamental DIP Credit Agreement) (including based on the cost or quality thereof and the reputation of the provider) or (C) if the financing is provided by parties with existing investments in the Fundamental Borrower or any of its subsidiaries or affiliates (such Indebtedness to which the Requisite Lenders consent, "***Permitted ACT Indebtedness***").

(c)     The Debtors shall not permit ACT or its direct or indirect subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any lien on or security interest in or with respect to any of ACT's assets or property, in each case in respect of funded indebtedness, except liens and security

interests incurred in the ordinary course of business and liens and security interests securing Permitted ACT Indebtedness (such prohibited liens and security interests, "***Unpermitted ACT Liens***").

(d)     Upon the incurrence of (x) Unpermitted ACT Liens or (y) the occurrence of an ACT Disposition or the incurrence of ACT Indebtedness that was not reasonably acceptable to the (i) Brookfield Required DIP Lenders, an Event of Default shall occur with respect to the Brookfield DIP Facility and, in addition to all rights and remedies available under Article VI of the Interim Order, any or all of the O&M Services Agreements (as defined in the Brookfield DIP Credit Agreement) between any Brookfield Silo Entity and ACT, whether such contractual relationship is direct or through an intermediary, including Pine Gate O&M, LLC, shall, at the election of the Brookfield Required DIP Lenders, be terminated and of no further force or effect  and each of ACT and any intermediary party, including Pine Gate O&M, LLC, shall waive any  and all claims arising from such termination and shall not be permitted to recover on account of  such claims from any Brookfield Silo Entity or Brookfield Silo Asset; (ii) Carlyle Required DIP Lenders, an Event of Default shall occur with respect to the Carlyle DIP Facility and, in addition to all rights and remedies available under Article VI of this Interim Order, any or all of the O&M  Services Agreements (as defined in the Carlyle DIP Note Purchase Agreement) between any Carlyle Silo Entity and ACT, whether such contractual relationship is direct or through an  intermediary, including Pine Gate O&M, LLC, shall, at the election of the Carlyle Required DIP Noteholders, be terminated and of no further force or effect and each of ACT and any intermediary party, including Pine Gate O&M, LLC, shall waive any and all claims arising from such termination and shall not be permitted to recover on account of such claims from any Carlyle Silo  Entity or Carlyle Silo Asset; and (iii) Fundamental Required DIP Lenders, an Event of Default shall occur with respect to the Fundamental DIP Facility and, in addition to all rights and remedies available under Article VI of the Interim Order, any or all of the O&M Services Agreements (as defined in the Fundamental DIP Credit Agreement) between any Fundamental Silo Entity and ACT, whether such contractual relationship is direct or through an intermediary, including Pine Gate O&M, LLC, shall, at the election of the Fundamental Required DIP Lenders, be terminated and of no further force or effect and each of ACT and any intermediary party, including Pine Gate O&M, LLC, shall waive any and all claims arising from such termination and shall not be permitted to recover on account of such claims from any Fundamental Silo Entity or Fundamental Silo Asset."

27.     <u>No Modification or Stay of This Order</u>.

(a)     Based upon the record presented to this Court by the Debtors, notwithstanding (i) any stay, modification, amendment, supplement, vacatur, revocation, or

reversal of this Interim Order, the DIP Documents or any term hereunder or thereunder, (ii) the failure to obtain a Final Order pursuant to Bankruptcy Rule 400l(c)(2), or (iii) the dismissal or conversion of one or more of the Chapter 11 Cases, each DIP Agent and each DIP Lender shall retain and be entitled to all of the rights, remedies, privileges, and benefits in favor of the DIP Agents and the DIP Lenders pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, and the applicable DIP Documents as of the date any event referred to in clauses (i), (ii), or (iii) shall have occurred.

(b)      Unless and until all DIP Obligations are indefeasibly Paid in Full, and all DIP Commitments are terminated, other than with respect to a Replacement Additional DIP Facility incurred in accordance with the terms of paragraph 23 and the DIP Documents, the Debtors irrevocably waive the right to seek and shall be prohibited from seeking or consenting to, directly or indirectly, (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of each DIP Agent (at the direction of the applicable DIP Lenders), as applicable (and no such consent shall be implied by any action or inaction of any DIP Agent): (A) any reversal, modification, stay, vacatur, or amendment of this Interim Order or any provision hereof, (B) a priority claim for any administrative expense, priority claim, secured claim, unsecured claim, or any other claims against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, pari passu with or senior to the DIP Liens or the DIP Superpriority Claims, or (C) any order, other than this Interim Order or the Final Order, allowing the use of Cash Collateral constituting or resulting from DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out and the DIP Intercreditor Agreement), any lien on any of the DIP

71

Collateral with priority equal or superior to the DIP Liens; or (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order. The Debtors irrevocably waive any right to seek any Amendment of this Interim Order without the prior written consent, as provided in the foregoing, of each DIP Agent (at the direction of the applicable DIP Lenders) and no such consent shall be implied by any other action, inaction, or acquiescence of any DIP Agent or DIP Lender.

28.     <u>Power to Waive Rights; Duties to Third Parties; No Waiver by Failure to Seek Relief</u>.  Each DIP Secured Party and Prepetition Secured Party shall have the right, in its respective sole discretion, to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order or the applicable DIP Documents or Prepetition Documents ("***Lender Rights***") with respect to such party, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by any such party of any Lender Rights shall apply solely to such party and to the Lender Rights so waived and shall not be or constitute a continuing waiver, except that any waiver by (a) a DIP Agent, on behalf of the applicable DIP Secured Parties, shall bind such DIP Lenders in accordance with the applicable DIP Documents and (b) a Prepetition Agent, on behalf of the applicable Prepetition Secured Parties, shall bind such Prepetition Lenders in accordance with the applicable Prepetition Documents. Any delay in or failure by any DIP Secured Party or Prepetition Secured Party to seek relief or otherwise exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, nor cause or enable any other party to rely upon or in any way assert a defense based upon such delay or failure.  No delay on the part of any party in the exercise of any Lender Right or remedy under this Interim Order shall preclude any other or further exercise of any such Lender Right or remedy or the exercise of any other Lender Right or remedy.  None

of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing, and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder, any DIP Document, or any Prepetition Document from any of the DIP Secured Parties or Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

29.     <u>Modification of the Automatic Stay</u>.  The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified solely as necessary to effectuate all of the terms and provisions of this Interim Order and the DIP Documents, including, without limitation, the incurrence of obligations, the authorization to make payments, the granting of liens and the perfection of liens.

30.     <u>Binding Effect</u>.

(a)     The provisions of this Interim Order, the DIP Documents, the DIP Superpriority Claims, the DIP Liens, the DIP Obligations, and any and all rights, remedies, privileges, protections, liens, priorities, and benefits, in favor of the DIP Agents, the DIP Lenders, any other DIP Secured Party, and/or any Prepetition Secured Party, respectively, provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rule 6004(h), shall continue in full force and effect, shall survive entry of any other order, and shall not be modified, impaired, or discharged by the entry of any order (i) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to a chapter 7 case, (iii) dismissing any of the

Chapter 11 Cases or any Successor Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases or any Successor Cases, (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases or Successor Cases in this Court, (vi) terminating the joint administration of the Chapter 11 Cases, or (vii) approving the sale of any DIP Collateral or Prepetition Collateral, including pursuant to section 363(b) of the Bankruptcy Code, or by any other act or omission.  The terms and provisions of this Interim Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following the dismissal of the Chapter 11 Cases or any Successor Cases, notwithstanding the entry of any such order, and such protections, rights, remedies, liens, priorities, privileges, and benefits, shall continue in full force and effect in these proceedings and after any dismissal thereof, and shall maintain their respective priorities as provided by this Interim Order and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations have been Paid in Full.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code (and pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations), unless the DIP Obligations have been Paid in Full on or before the effective date of such plan of reorganization or the DIP Agents (at the direction of the applicable Required  DIP Lenders) have otherwise agreed in writing.

(b)     Any order dismissing one or more of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) each DIP Agent's, DIP Lender's, and any other DIP Secured Party's respective liens on, and security interests in, the applicable DIP Collateral and the Adequate Protection Liens, the Adequate Protection Obligations and the other

administrative claims granted pursuant to this Interim Order shall continue in full force and effect (in each case, subject to the Carve Out) notwithstanding such dismissal and shall maintain their priorities as provided in this Interim Order until the DIP Obligations and Adequate Protection Obligations have been Paid in Full (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties-in-interest), and (ii) this Court shall retain jurisdiction, to the maximum extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claims, the DIP Liens and the claims, liens, and security interests referred to in the foregoing clause (i), as applicable.

(c)     The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, their Estates, any Committee, all other creditors of any of the Debtors, and all other parties in interest in the Chapter 11 Cases, and in each case their respective successors and assigns, including any Trustee in the Chapter 11 Cases or any Successor Cases or otherwise in respect of any Debtors or any property of the Estate of any of the Debtors, and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, and their respective successors and assigns.  Such binding effect is an integral part of this Interim Order.

31.     <u>Indemnification</u>.  Each of (a) the DIP Secured Parties and their Representatives and (b) the Prepetition Secured Parties and their Representatives, respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any

challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, each of the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the applicable Prepetition Documents and DIP Documents, as applicable. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this Interim Order, the DIP Documents, or the Prepetition Documents to indemnify and/or hold harmless the DIP Agents, any other DIP Secured Party, the Prepetition Agents, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

32.     <u>Limits on Lender Liability</u>.

(a)     Nothing in this Interim Order, any of the DIP Documents, any of the Prepetition Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors or their affiliates in the operation of their business or in connection with the Debtors' or their affiliates' restructuring efforts or the administration of the Chapter 11 Cases or any Successor Cases.

(b)     In determining to make any loan under the DIP Documents or the Prepetition Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, or the Prepetition Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or their affiliates, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or

management of the Debtors or their affiliates (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

(c)  Furthermore, nothing in this Interim Order, in the DIP Documents or in the Prepetition Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, any other DIP Secured Party, or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors or their affiliates or any fiduciary duties owed to the Debtors, their affiliates, or the Debtors' or their affiliates' respective creditors, shareholders, or Estates. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors or their affiliates, and the DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, (v) any payments to any vendors, contractors or service providers to any Debtor or any subsidiary or affiliate thereof, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

33.  <u>Proofs of Claim</u>.

(a)  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a bar date or deadline for the filing of proofs of claim or requests for payment of administrative expenses under

section 503(b) of the Bankruptcy Code in any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, none of the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be required to file proofs of claim or requests for payment of administrative expenses in any of the Chapter 11 Cases or any Successor Cases with respect to, as applicable, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Obligations, the Prepetition Liens, the Adequate Protection Claims, the Adequate Protection Liens or any other claims or liens granted hereunder or created by this Interim Order, the DIP Documents or the Prepetition Documents.  Upon approval of this Interim Order, each of the DIP Secured Parties and the Prepetition Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim in the full amount of the applicable DIP Obligations and Prepetition Secured Obligations.  All of the DIP Obligations and the remaining Prepetition Secured Obligations, if any, shall be and shall remain due and payable in accordance with the applicable DIP Documents and Prepetition Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents, the Prepetition Documents or any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect any DIP Agent's, DIP Lender's, any other DIP Secured Party's, or Prepetition Secured Party's rights, remedies, powers, or privileges under any of the DIP Documents, the Prepetition Documents, this Interim Order or applicable law.  Each (i) DIP Agent, for the benefit of the applicable DIP Lenders, and (ii) Prepetition Agent, for the benefit of the applicable Prepetition Lenders, is authorized (but not directed), in its sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit)

proofs of claim in each of the Chapter 11 Cases on behalf of the applicable DIP Secured Parties in respect of the applicable DIP Obligations or the applicable Prepetition Secured Parties in respect of the applicable Prepetition Secured Obligations. Any proofs of claim so filed shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender.

(b)  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' Estates, each DIP Agent and Prepetition Agent is authorized (but not directed), in its sole discretion, to file in the Debtors' lead Chapter 11 Case *In re Pine Gate Renewables, LLC*, Case No. 25-90669 (CML), a master proof of claim on behalf of the applicable DIP Secured Parties or Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable DIP Documents or Prepetition Documents and hereunder (as applicable) (each, a "***Master Proof of Claim***") against each of the applicable Debtors. Upon the filing of any such Master Proof of Claim, the DIP Agent or the Prepetition Agent filing such Master Proof of Claim  shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims of any type or nature whatsoever with respect to the applicable DIP Documents or Prepetition Documents, and the claims of each applicable DIP Secured Party or Prepetition Secured Party (and each of its successors and assigns), asserted or described in such Master Proof of Claim shall be treated as if a separate proof of claim had been filed in each of the Chapter 11 Cases of the Debtors identified as having liability in such Master Proof of Claim. The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by the applicable Debtors to the DIP Secured Parties or the Prepetition Secured Parties, as applicable. Any Master Proof of Claim so filed by any DIP Agent or Prepetition Agent shall be deemed to be in addition to and not in lieu

of any other Master Proof of Claim that may be filed by any other DIP Secured Party or Prepetition Secured Party.

34.     Waiver of Bankruptcy Rule 6004(a) and 6004(h).   The notice requirements of Bankruptcy Rule 6004(a) and the 14-day stay of Bankruptcy Rule 6004(h) are hereby waived.

35.     Insurance. Until the DIP Obligations and Prepetition Secured Obligations have been Paid in Full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and otherwise in accordance with the DIP Documents. To the fullest extent provided by applicable law, each DIP Agent and Prepetition Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors to the extent that such policy in any way relates to the DIP Collateral securing the obligations under the credit facility for which such DIP Agent or Prepetition Agent, as applicable, serves as agent.

36.     Cash Management. Until such time as all DIP Obligations and Prepetition Secured Obligations are Paid in Full, unless otherwise agreed to by each DIP Agent and Prepetition Agent, the Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any Cash Management Order. The Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of the applicable DIP Agent, for the benefit of the applicable DIP Lenders (in which case they shall be subject to the lien priorities and other provisions set forth in this Interim Order), and no bank account pledged in favor of any DIP Agent or Prepetition Agent will be closed during the Chapter 11 Cases without the prior written consent of the applicable DIP Agent, and nothing in this Interim Order will alter or impair any security interest or perfection thereof that existed as of the Petition

Date or that arises after the Petition Date. Until the DIP Obligations and Prepetition Secured Obligations are Paid in Full, the Debtors shall (a) maintain accurate records of all transfers (including intercompany transactions) within their cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, and (b) provide reasonable access to such records to each DIP Agent, the other DIP Secured Parties, and the DIP Lender Advisors.

37.    <u>Intercreditor Provisions</u>. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Documents (including, for the avoidance of doubt, the Prepetition Intercreditor Agreements) shall remain in full force and effect; *provided*, that to the extent there exists any conflict among the terms and conditions of the Prepetition Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

38.    <u>Interim Order Controls</u>.  In the event of a conflict between (a) the terms and provisions of the DIP Documents and (b) the terms and provisions of this Interim Order, then in each case the terms and provisions of this Interim Order shall govern. Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this Interim Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

39.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

40.     <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to or for the benefit of any of the DIP Secured Parties pursuant to the provisions of this Interim Order, any subsequent order of this Court, or the DIP Documents, shall, subject to the terms of this paragraph, be irrevocable, received free and clear of any claims, charges, assessments, or other liabilities, including, without limitation, any such claims or charges arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of the Carve Out Trigger Notice, subject to the applicable Carve Out in all respects.

41.     <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' Estates or any subset thereof, it being understood, however, that the applicable Debtors shall be jointly and severally liable for the obligations hereunder and the DIP Obligations in accordance with the terms hereof and of the DIP Documents (including the DIP Intercreditor Agreement).

42.     <u>Necessary Action</u>. The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.

43.     <u>Intercompany Claims</u>. For the avoidance of doubt, any claim against a Debtor or Non-Debtor Guarantor held by a Debtor, and any Lien securing any such claim held by a Debtor, shall be junior and subordinate to the DIP Superiority Claims, DIP Liens, Adequate Protection Claims, Adequate Protection Liens, and the Carve Out.

44.     <u>Treatment of DIP Obligations</u>. On the Maturity Date of each DIP Facility, the applicable DIP Borrower shall pay the then unpaid and outstanding amount of the applicable DIP

Obligations pursuant to the provisions of the applicable DIP Documents or as otherwise provided in an Acceptable Plan.

45.     <u>Preservation of Rights Granted Under this Interim Order</u>.   Notwithstanding anything herein to the contrary, and subject to the DIP Intercreditor Agreement, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) any DIP Agent's, DIP Secured Party's or Prepetition Secured Party's rights to seek any other or supplemental relief in respect of the Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the Prepetition Secured Parties to seek the payment by the Debtors of post-petition interest or fees pursuant to section 506(b) of the Bankruptcy Code; (c) any of the rights of any of the DIP Agents, the other DIP Secured Parties and/or the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of or relief from the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) oppose any request for use of Cash Collateral or any request for the use of proceeds of any DIP Facility (other than as permitted under this Interim Order and the DIP Documents), (v) object to any sale of assets, including any DIP Collateral or Prepetition Collateral, (vi) object to the granting of any interest in the DIP Collateral or Prepetition Collateral (other than as contemplated herein or permitted under the DIP Documents), (vii) object to any application for either or both allowance and payment of compensation of Professional Persons or other parties seeking compensation or reimbursement from the Estates, or (viii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (d) any other rights, claims,

or privileges (whether legal, equitable, or otherwise) of any of the DIP Agents, the other DIP Secured Parties or the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Other than as expressly set forth in this Interim Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties and the Prepetition Secured Parties are preserved.

46.     <u>Replacement Agent</u>. Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including any DIP Agent or Prepetition Agent, or the appointment of a new DIP Agent or Prepetition Agent, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral and the Adequate Protection Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral or administrative agent.

47.     <u>Zions Adequate Protection Liens</u>.

(a)     Until the Zions Secured Obligations are Paid in Full, the Zions Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Zions Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Zions Collateral. As adequate protection, and as security for the payment of the Zions Secured Obligations, the Zions Agent, for the benefit of the Zions Secured Parties, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid,

perfected replacement security interest in and lien on the Zions Collateral of each Debtor that is a Zions Obligor (the "***Zions Adequate Protection Liens***"), which security interests and liens shall be subject to the Carve Out and senior in priority to any DIP Liens that encumber the Zions Collateral. The Zions Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Zions Secured Parties and not in substitution therefor.

(b)     As used in this paragraph 47, (i) "***Zions Agent***" means Zions Bancorporation, N.A., in its capacity as "Collateral Agent" under the Zions Documents; (ii) "***Zions Credit Agreement***" means the Financing Agreement, dated as of July 12, 2024, by and among Catalina Solar Borrower, LLC as Borrower, the financial institutions party thereto as Lenders, Zions Bancorporation, N.A., as Administrative Agent and Collateral Agent, and Lloyds Bank PLC, as Joint Lead Arranger and LC Issuing Bank as amended, restated, amended and restated, supplemented or otherwise modified from time to time on or prior to the Petition Date; (iii) "***Zions Collateral***" means the "Collateral" as defined in the Zions Documents; (iv) "***Zions Documents***" means the Zions Credit Agreement and each of the "Collateral Documents" (as defined in the Zions Credit Agreement); (v) "***Zions Obligors***" means Catalina Solar Borrower, LLC, in its capacity as "Borrower" under the Zions Credit Agreement; (vi) "***Zions Secured Parties***" means the "Secured Parties" as defined in the Zions Documents; and (vii) "***Zions Secured Obligations***" means each of the "Obligations" (as defined in the Zions Documents).

48.     <u>MUFG Adequate Protection Liens</u>.

(a)     Until the MUFG Secured Obligations are Paid in Full, the MUFG Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy

Code, to adequate protection of their respective interests in the MUFG Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the MUFG Collateral. As adequate protection, and as security for the payment of the MUFG Secured Obligations, the MUFG Agent, for the benefit of the applicable MUFG Secured Parties, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the MUFG Collateral of each Debtor that is an MUFG Obligor (the "***MUFG Adequate Protection Liens***"), which security interests and liens shall be subject to the Carve Out and senior in priority to any DIP Liens that encumber the MUFG Collateral. The MUFG Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the MUFG Secured Parties and not in substitution therefor.

(b)      As used in this paragraph 48, (i) "***MUFG Agent***" means U.S. Bank National Association (as successor to MUFG Union Bank, N.A.) and Wilmington Trust, National Association, in their capacities as "Collateral Agent" under the applicable MUFG Documents; (ii) "***MUFG Credit Agreements***" means the (A) Financing Agreement, dated as of March 29, 2023, by and among Grande Holdco Borrower, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd., as the Administrative Agent, and the other agents party thereto; (B) Credit Agreement, dated as of October 12, 2022, by and among Virginia Line Solar, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd. as Administrative Agent, and the other agents party thereto; (C) Credit Agreement, dated as of October 12, 2022, by and among Landrace Holdings, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd., as Administrative Agent, and the other agents party thereto; and

US-DOCS\165239540.22

(D) Financing Agreement, dated as of May 26, 2023, by and among Grande Holdco Borrower II, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd., as Administrative Agent, and the other agents party thereto, in each case, as amended, restated, amended and restated, supplemented, extended, waived or otherwise modified from time to time on or prior to the Petition Date; (iii) "*MUFG Collateral*" means the "Collateral" as defined in the MUFG Documents; (iv) "*MUFG Documents*" means each of the MUFG Credit Agreements and each of the respective "Financing Documents as defined in the MUFG Credit Agreements; (v) "*MUFG Obligors*" means PGR 2021 Manager 18, LLC; PGR 2021 Fund 18, LLC; PGR 2022 Manager 1, LLC; PGR 2022 Fund 1, LLC; Grande Holdco Borrower II, LLC; and Grande Holdco Borrower, LLC, each in their capacity as "Borrower," "Pledgor," or "Guarantor" under the applicable MUFG Credit Agreements; (vi) "*MUFG Secured Parties*" means the "Secured Parties" as defined in each of the MUFG Documents; and (vii) "*MUFG Secured Obligations*" means each of the "Obligations" as defined in the applicable MUFG Documents.

49.    <u>Polaris B. Secured Parties Adequate Protection</u>.   Until the Polaris B Secured Obligations are Paid in Full, the Polaris B Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Polaris B Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Polaris B Collateral. As adequate protection, the Polaris B Secured Parties are hereby granted the following:

(a)    <u>Polaris B Adequate Protection Liens</u>. As security for the payment of the Polaris B Secured Obligations, the Deutsche Bank Trust Company Americas, in its capacity as Administrative Agent and Collateral Agent under the Polaris B Credit  Agreement (the "**Polaris B Agent**"), for the benefit of the Polaris B Secured Parties, is hereby granted (effective and

perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the Polaris B Collateral of each Debtor that is a Polaris B Loan Party (the "**Polaris B Adequate Protection Liens**"), which security interests and liens shall be subject to the Carve Out and senior in priority to any DIP Liens and Polaris B Liens that encumber the Polaris B Collateral. The Polaris B Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date other than with respect to the Carve Out. The Polaris B Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Polaris B Secured Parties and not in substitution therefor.

(b)     As used in this section, (i) "**Polaris B Secured Obligations**" means the "Secured Obligations" as defined in the Polaris B Credit Agreement, dated as of March 26, 2025 (as amended, restated, amended and restated, supplemented, extended, waived or otherwise modified from time to time on or prior to the Petition Date), by and among Polaris DevCo Borrower B, LLC, the Polaris B Agent, and the lenders party thereto (the "**Polaris B Credit Agreement**"); (ii) "**Polaris B Secured Parties**" means each of the Polaris B Agent, the "Lenders" defined in the Polaris B Credit Agreement, and each of the other "Secured Parties" as defined in the Polaris B Credit Agreement; (iii) "**Polaris B Collateral**" means the "Collateral" as defined in the Polaris B Credit Agreement and the "Security Documents" as defined in the Polaris B Credit Agreement; (iv) "**Polaris B Loan Party**" means each of the Polaris B Borrower and each of the "Loan Parties" as defined in the Polaris B Credit Agreement (other than the Polaris B Borrower);

US-DOCS\165239540.22

and (v) "**Polaris B Liens**" mean each of the liens and security interests granted by the Polaris B

Loan Parties in the Polaris B Collateral to secure the Polaris B Secured Obligations.

        50.     <u>Back Bay Solar, LLC</u>.

        (a)     Notwithstanding anything to the contrary in this Interim Order or any other

order, no funds generated by or deposited in the bank accounts of PGR Signature Fund 1, LLC

("***Signature Fund 1***") and any of its direct and indirect subsidiaries (collectively, the "***BBS Silo***

***Entities***") shall be transferred to, or used to fund Projects owned by the Carlyle Silo Entities, the

Fundamental Silo Entities, the Brookfield Silo Entities or other expenses related thereto, or used

to fund operations or other expenses that are related to any of the Debtors, Blue Ridge or ACT,

without the prior consent of Back Bay Solar, LLC ("***BBS***"); *provided* that the foregoing will not

restrict in any way the payment of any debts owed by the BBS Silo Entities as they come due,

regardless of to whom such debts are owed.

        (b)     The Debtors shall deliver to BBS's counsel on a "professionals' eyes only"

basis, any Updated Budget or Approved Budget containing the applicable line items showing

receipts and disbursements related to the BBS Silo Entities, at the same time that any such Updated

Budget or Approved Budget is delivered to any of the DIP Agents and DIP Lender Advisors;

*provided* that the foregoing will not be construed as requiring any alteration of the agreed-upon

form of budget as between the Debtors and the DIP Lenders.

        (c)     For the avoidance of doubt, any cash generated by or held in the bank

accounts of any of the BBS Silo Entities on and after the Petition Date shall be segregated at non-

Debtor bank accounts and shall not constitute Cash Collateral for any purpose under the Interim

Order.

(d)    The Debtors shall also (i) maintain accurate records of all transfers (including intercompany transactions) within their cash management system so that all postpetition transfers and transactions between the Debtors and their non-Debtor affiliates, on the one hand and the BBS Silo Entities, on the other hand, shall be adequately and promptly documented in, and readily ascertainable from, their books and records, and (ii) provide reasonable access to such records to BBS and its counsel.

(e)    Other than as expressly set forth in this Interim Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of BBS, the DIP Secured Parties and the Prepetition Secured Parties are preserved.

(f)    Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, to the extent that any funds received or held by the Debtors are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors (with the consent of the DIP Secured Parties and the Prepetition Secured Parties as to any agreement entered into on or after the Petition Date) and Signature 1 Fund, to be the property of or held in trust for Signature 1 Fund or any of the other BBS Silo Entities as of the Petition Date (the "Disputed Funds"), neither this Interim Order nor the DIP Documents shall be deemed to grant liens, claims, or encumbrances in favor of any current or future lienholder, including the DIP Liens or the Adequate Protection Liens on such Disputed Funds.  If the Court rules, pursuant to a final non-appealable order, that Signature 1 Fund or any of the other BBS Silo Entities owns the Disputed Funds and that the Debtors held such funds in trust for Signature 1 Fund or any of the other BBS Silo Entities as of the Petition Date, then entry of this Interim Order and the subsequent use of such funds shall not prejudice Signature 1 Fund's alleged trust claims and any remedies in connection therewith.  The Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and Signature 1 Fund reserve

all of their rights and remedies with respect to the Disputed Funds under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and federal laws, including, but not limited to, their rights to file any objections, motions, or adversary proceedings as may be appropriate.

51.     <u>Applied Sureties</u>.  Nothing in this Interim Order shall be deemed to: (a) limit the subrogation rights of any of Siriuspoint America Insurance Company, Continental Indemnity Company, Argonaut Insurance Company, and/or Pennsylvania Insurance Company (the "***Applied Sureties***"), and/or the Applied Sureties' respective rights as beneficiaries of any trusts granted or created under any of their respective indemnity agreements, if any; or (b) impair, release, discharge, preclude, or enjoin any obligations of the Debtors, or any non-Debtor indemnitors to the Applied Sureties, arising out of any trusts granted or created under any such indemnity agreements, pursuant to any statutory trusts, and/or the Applied Sureties' subrogation rights. All parties' rights to challenge any such rights or interests are expressly preserved.

52.     <u>Pathward Entities</u>.  For the avoidance of doubt, the DIP Secured Parties agree that none of (a) PW Blocker Holdco, LLC, (b) PW Revolver Borrower, LLC or (c) West River Solar, LLC (collectively, the "***Pathward Entities***") are DIP Loan Parties.  Each of the DIP Agents reserves all rights with respect to the Pathward Entities.

53.     <u>PGR Procurement, LLC Assets</u>.  Except as otherwise set forth in this Interim Order or the DIP Intercreditor Agreement (including, for the avoidance of doubt, with respect to the Brookfield Pledged Intercompany Claims, Carlyle Pledged Intercompany Claims, and Fundamental Pledged Intercompany Claims), during the Interim Period, without the prior written consent of the Fundamental Required DIP Lenders, Debtor PGR Procurement, LLC shall not sell,

transfer, assign or otherwise convey any of its assets (including all equipment, wherever located) to any Person.

54.     <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

55.     <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction to resolve any disputes arising from or related to the interpretation or enforcement of this Interim Order.

**XI.     Final Hearing and Response Dates.**

56.     The Final Hearing on the DIP Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for **December 3, 2025 at 11:00 a.m. (prevailing Central Time)** before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to a  Committee, if appointed, through its counsel.  Any party in interest objecting to the relief sought at the Final Hearing shall file written objections with the Clerk of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, by no later than **November 26, 2025 at 4:00 p.m. (prevailing Central Time)**.

Signed:  November 11, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

92

**Annex 1**

**Definitions**

"***Acceptable Plan***" means a chapter 11 plan of reorganization or liquidation for any of the Debtors or their Estates that provides for (a) the termination of all DIP Commitments, (b) all DIP Obligations and Prepetition Secured Obligations (but not, for the avoidance of doubt, any unsecured deficiency claims resulting from the value of the applicable Prepetition Collateral being less than the amount of the applicable Prepetition Secured Obligations) to be Paid in Full on or prior to the effective date thereof, and (c) treatment otherwise consented to by the applicable DIP Agent (acting at the direction of the applicable DIP Lenders) and the applicable Prepetition Agent (acting at the direction of the applicable Prepetition Lenders) in each case in their sole discretion.

"***ACT***" means ACT Power Services Holding Company Guarantor, LLC, a North Carolina limited liability company and its direct and indirect subsidiary.

"***Allocable Percentage***" means, with respect to (a) the Brookfield DIP Facility and the Brookfield Prepetition Secured Obligations, 40%, (b) the Carlyle DIP Facility and the Carlyle Prepetition Secured Obligations, 30%, (c) the Fundamental DIP Facility and the Fundamental Prepetition Secured Obligations, 30%, and (d) any Replacement Additional DIP Facility, the Allocable Percentage of the DIP Facility or DIP Facilities refinanced and replaced by such Replacement Additional DIP Facility.

"***Avoidance Actions***" means any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code).

"***Bidding Procedures Order***" means the *Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and] a Hearing to Consider Approval of any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief* entered by the Bankruptcy Court on November 10, 2025.

"***Blue Ridge***" means PGR Blue Ridge Power Holdings, LLC and its subsidiaries, excluding ACT Power Services Holding Company Guarantor, LLC and its direct and indirect subsidiaries.

"***Blue Ridge Surety Bond***" means any letter of credit, surety bond, or similar instrument for the benefit of any subcontractor of Blue Ridge in connection with work performed by Blue Ridge or any subcontractor in connection with any Project.

"***Brookfield DIP Collateral***" means (a) all DIP Collateral Assets held by any (i) Pari Guarantor Debtor, (ii) Priority Guarantor Debtor, or (iii) Debtor or Non-Debtor Guarantor that is a Brookfield Silo Entity, and (b) the Brookfield Pledged Intercompany Claims. For the avoidance of doubt, the Brookfield DIP Collateral includes all of the Brookfield Exclusive DIP Collateral and excludes the Carlyle Exclusive DIP Collateral and the Fundamental Exclusive DIP Collateral.

"***Brookfield DIP Documents***" means (a) the Brookfield DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the Brookfield DIP Agent and/or the Brookfield DIP Lenders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"***Brookfield DIP Lender Advisors***" means (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Norton Rose Fulbright LLP, and Porter & Hedges LLP, as co-counsel to the Brookfield DIP Lenders, (b) FTI Consulting, Inc., as financial advisor to the Brookfield DIP Lenders, and (c) any other local or special counsel or other professionals retained by the Brookfield DIP Lenders.

"***Brookfield DIP Obligations***" means (a) the "Secured Obligations" as defined in the Brookfield DIP Credit Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the Brookfield DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the Brookfield DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"***Brookfield Exclusive DIP Collateral***" means (a) the equity interests of Debtors (i) BF Dev Holdco, LLC, (ii) PGC Solar Holdings Holdco II, LLC, (iii) Cascade NTP Holdco, LLC, (iv) PGR Blocker Holdco, LLC, and (v) Polaris OpCo Pledgor B, LLC, (b) the Brookfield Silo Assets, (c) the Brookfield Pledged Intercompany Claims, (d) the Specified BRP Claims (but not, for the avoidance of doubt, any Other BRP Claims; and (e) any cash deposit funded by or on behalf of any potential purchaser, whether pursuant to the Bidding Procedures Order or otherwise, in connection with any purchase or acquisition (or bid to purchase or acquire) any Brookfield Silo Assets; *provided* that, in no event, shall the Brookfield Retained Liabilities be Brookfield Exclusive DIP Collateral.

"***Brookfield Pledged Intercompany Claims***" means (x) all claims, interests, intercompany receivables, obligations, liabilities and intercompany balances or rights (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Brookfield Silo Entity or Brookfield Silo Asset, and any proceeds of the foregoing, including any Tariff Claims, (other than in respect of the O&M Services Agreement (as defined in the Brookfield DIP Credit Agreement) and the Brookfield Retained Liabilities), and (y) the Specified BRP Claims; *provided* that, in no event shall the Other BRP Claims be Brookfield Pledged Intercompany Claims.

"***Brookfield Prepetition Agent***" means Bid Administrator LLC, in its capacity as Administrative Agent and Collateral Agent under the Brookfield Prepetition Credit Agreement, and any successor thereto.

"***Brookfield Prepetition Borrower***" means BF Dev Holdco, LLC, in its capacity as Borrower under the Brookfield Prepetition Credit Agreement.

"***Brookfield Prepetition Collateral***" means (a) the "Collateral" as defined in the Brookfield Prepetition Documents and (b) all other assets and property that secure the Brookfield Prepetition Secured Obligations.

"***Brookfield Prepetition Credit Agreement***" means the Credit Agreement, dated as of January 30, 2025, as amended by that certain Amendment No. 1, dated as of March 26, 2025, that certain Amendment No. 2, dated as of April 17, 2025, that certain Amendment No. 3, dated as of October 6, 2025, and as may be further amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the Brookfield Prepetition Borrower, the Brookfield Prepetition Agent, and the Brookfield Prepetition Lenders.

"***Brookfield Prepetition Documents***" means (a) the Brookfield Prepetition Credit Agreement, (b) the Brookfield Prepetition Security Documents, and (c) each of the other "Credit Documents" (as defined in the Brookfield Prepetition Credit Agreement).

"***Brookfield Prepetition Guarantors***" means Pine Gate Renewables, LLC and each subsidiary thereof party to the Brookfield Prepetition Documents as a guarantor or secondary obligor of the Brookfield Prepetition Secured Obligations.

"***Brookfield Prepetition Lenders***" means the "Lenders" (as defined in the Brookfield Prepetition Credit Agreement).

"***Brookfield Prepetition Liens***" means each of the liens and security interests granted by the Grantors (as defined in the Brookfield Prepetition Security Documents) in the Brookfield Prepetition Collateral pursuant to the Brookfield Prepetition Security Documents to secure the Brookfield Prepetition Secured Obligations.

"***Brookfield Prepetition Loan Parties***" means the Brookfield Prepetition Borrower and the Brookfield Prepetition Guarantors.

"***Brookfield Prepetition Loans***" means the "Loans" as defined in the Brookfield Prepetition Credit Agreement and all other loans and other financial accommodations provided by the Brookfield Prepetition Lenders to the Brookfield Prepetition Loan Parties pursuant to the Brookfield Prepetition Documents.

"***Brookfield Prepetition Secured Obligations***" means the "Secured Obligations" as defined in the Brookfield Prepetition Credit Agreement.

"***Brookfield Prepetition Secured Parties***" means each of the Brookfield Prepetition Agent, the Brookfield Prepetition Lenders, and each of the other "Secured Parties" as defined in the Brookfield Prepetition Credit Agreement.

"***Brookfield Prepetition Security Documents***" means (a) the Collateral Documents (as defined in the Brookfield Prepetition Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Brookfield Prepetition Agent has been granted a security interest in and continuing liens on the Brookfield Prepetition Collateral.

"***Brookfield Required DIP Lenders***" means the "Requisite Lenders" as defined in the Brookfield DIP Credit Agreement.

"***Brookfield Retained Liabilities***" means any liabilities (a) as of October 6, 2025 and (b) thereafter, any amounts permitted to be incurred in accordance with the then-applicable Approved Budget (prior to the entry of this Interim Order, as defined in the Brookfield Prepetition Credit Agreement), in each case, in respect of any equipment purchased or to be purchased by or on behalf of any Brookfield Silo Entity from PGR Procurement, LLC, to the extent (i) such equipment has been physically delivered to the Project site of a Brookfield Silo Entity and (ii) an independent engineer has verified in writing that such equipment has been so delivered; *provided* that the Brookfield Retained Liabilities shall exclude (x) the Funded Brookfield Procurement Claims and (y) Tariff Claims against any Brookfield Silo Entity or Brookfield Silo Asset.

"***Brookfield Sale Transaction***" means, at the election of the Brookfield Required DIP Lenders, a sale of all or substantially all or a material portion of the Brookfield Silo Assets pursuant to (a) a credit bid of the Brookfield DIP Obligations, (b) a cash purchase pursuant to which the Brookfield DIP Obligations are Paid in Full, or (c) such other treatment of the Brookfield DIP Obligations acceptable to the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), which transaction may be consummated pursuant to an order of the Court.

"***Brookfield Silo Assets***" means (a) the assets of, and the equity interests in, the Brookfield Silo Entities and (b) the Brookfield Pledged Intercompany Claims.

"***Brookfield Silo Entities***" means each of (a) BF Dev Holdco, LLC, (b) PGC Solar Holdings Holdco II, LLC, (c) Cascade NTP Holdco, LLC, (d) PGR Blocker Holdco, LLC, (e) Polaris OpCo Pledgor B, LLC, and (f) each direct or indirect subsidiary of the foregoing.

"***Brookfield Subsequent Draws***" has the meaning ascribed to "Subsequent Draws" in the Brookfield DIP Documents.

"***BRP***" means Debtor Blue Ridge Power, LLC.

"***BRP Claims Conditions***" means the following conditions with respect to claims held by BRP: (a) such claims are Identified BRP Claims (b) such claims are determined to be valid and payable by the Catalina Independent Engineer, and (c) such claims (together with the aggregate amount of Identified BRP Claims paid after October 5, 2025 and prior to such date of determination) do not at any time exceed in the aggregate $7,000,000.

"***Business Day***" shall mean any day that is not a Saturday, Sunday or other day on which banking institutions in New York City are authorized or required by law to be closed.

"***Carlyle DIP Collateral***" means (a) all DIP Collateral Assets held by any (i) Pari Guarantor Debtor, (ii) Priority Guarantor Debtor, or (iii) Debtor or Non-Debtor Guarantor that is a Carlyle Silo Entity, and (b) the Carlyle Pledged Intercompany Claims. For the avoidance of doubt, the Carlyle DIP Collateral includes all of the Carlyle Exclusive DIP Collateral and excludes the Brookfield Exclusive DIP Collateral and the Fundamental Exclusive DIP Collateral.

"*Carlyle DIP Documents*" means (a) the Carlyle DIP Note Purchase Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the Carlyle DIP Agent and/or the Carlyle DIP Noteholders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"*Carlyle DIP Noteholder Advisors*" means (a) Milbank LLP and Haynes and Boone, LLP, as co-counsel to the Carlyle DIP Noteholders, (b) Solomon Partners Securities LLC, as financial advisor to the Carlyle DIP Noteholders, and (c) any other local or special counsel or other professionals retained by the Carlyle DIP Noteholders.

"*Carlyle DIP Obligations*" means (a) the "Obligations" as defined in the Carlyle DIP Note Purchase Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the Carlyle DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the Carlyle DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"*Carlyle Exclusive DIP Collateral*" means (a) the equity interests of (i) NPA 2023 Holdco, LLC, (ii) NPA PGR Blocker Holdco, LLC, (iii) NPA Polaris OpCo Holdco, LLC, and (iv) NPA Polaris DevCo Holdco, LLC, (b) the Carlyle Silo Assets, (c) the Carlyle Pledged Intercompany Claims; and (d) any cash deposit funded by or on behalf of any potential purchaser, whether pursuant to the Bidding Procedures Order or otherwise, in connection with any purchase or acquisition (or bid to purchase or acquire) any Carlyle Silo Assets; *provided* that, in no event shall the Carlyle Retained Liabilities or the Identified BRP Claims (including the Specified BRP Claims and the Other BRP Claims) be Carlyle Exclusive DIP Collateral.

"*Carlyle Pledged Intercompany Claims*" means all claims, interests, intercompany receivables, obligations, liabilities and other intercompany balances or rights (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Carlyle Silo Entity or Carlyle Silo Asset, including any Tariff Claims, and any proceeds of the foregoing (other than in respect of the O&M Services Agreement (as defined in the Carlyle DIP Note Purchase Agreement) and the Carlyle Retained Liabilities).

"*Carlyle Prepetition Agent*" means Wilmington Trust, National Association, in its capacity as Collateral Agent under the Carlyle Prepetition Note Purchase Agreement, and any successor thereto.

"*Carlyle Prepetition Collateral*" means (a) the "Collateral" as defined in the Carlyle Prepetition Documents and (b) all other assets and property that secure the Carlyle Prepetition Secured Obligations.

"**Carlyle Prepetition Documents**" means (a) the Carlyle Prepetition Note Purchase Agreement, (b) the Carlyle Prepetition Security Documents, and (c) each of the other "Financing Documents" (as defined in the Carlyle Prepetition Note Purchase Agreement).

"**Carlyle Prepetition Guarantors**" means Pine Gate Renewables, LLC and each subsidiary thereof party to the Carlyle Prepetition Documents as a guarantor or secondary obligor of the Carlyle Prepetition Secured Obligations.

"**Carlyle Prepetition Issuer**" means NPA 2023 Holdco, LLC, in its capacity as Issuer of the Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement.

"**Carlyle Prepetition Liens**" means each of the liens and security interests granted by the Securing Parties (as defined in the Carlyle Prepetition Security Documents) in the Carlyle Prepetition Collateral pursuant to the Carlyle Prepetition Security Documents to secure the Carlyle Prepetition Secured Obligations.

"**Carlyle Prepetition Note Parties**" means the Carlyle Prepetition Issuer and the Carlyle Prepetition Guarantors.

"**Carlyle Prepetition Note Purchase Agreement**" means the Amended and Restated Note Purchase Agreement, dated as of October 6, 2025, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the Carlyle Prepetition Issuer, the Carlyle Prepetition Agent, and the Carlyle Prepetition Noteholders.

"**Carlyle Prepetition Noteholders**" means the holders of the "Notes" as defined in the Carlyle Prepetition Note Purchase Agreement.

"**Carlyle Prepetition Notes**" means the "Notes" as defined in the Carlyle Prepetition Note Purchase Agreement and all other loans and other financial accommodations provided by the Carlyle Prepetition Noteholders to the Carlyle Prepetition Note Parties pursuant to the Carlyle Prepetition Documents.

"**Carlyle Prepetition Secured Obligations**" means the "Secured Obligations" as defined in the Carlyle Prepetition Note Purchase Agreement.

"**Carlyle Prepetition Secured Parties**" means each of the Carlyle Prepetition Agent, the Carlyle Prepetition Noteholders, and each of the other "Secured Parties" as defined in the Carlyle Prepetition Note Purchase Agreement.

"**Carlyle Prepetition Security Documents**" means (a) the "Security Documents" (as defined in the Carlyle Prepetition Note Purchase Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Carlyle Prepetition Agent has been granted a security interest in and continuing liens on the Carlyle Prepetition Collateral.

"**Carlyle Required DIP Noteholders**" means the "Required Holders" as defined in the Carlyle DIP Note Purchase Agreement.

"**Carlyle Retained Liabilities**" means any liabilities (a) as of October 6, 2025 and (b) thereafter, any amounts permitted to be incurred in accordance with the then-applicable Approved Budget (prior to the entry of this Interim Order, as defined in the Carlyle Prepetition Note Purchase Agreement), in each case, in respect of any equipment purchased or to be purchased by or on behalf of any Carlyle Silo Entity from PGR Procurement, LLC, to the extent (i) such equipment has been physically delivered to the Project site of a Carlyle Silo Entity and (ii) an independent engineer has verified in writing that such equipment has been so delivered; *provided* that the Carlyle Retained Liabilities shall exclude (x) the Funded Carlyle Procurement Claims and (y) Tariff Claims against any Carlyle Silo Entity or Carlyle Silo Asset.

"**Carlyle Sale Transaction**" means, at the election of the Carlyle Required DIP Noteholders, a sale of all or substantially all or a material portion of the Carlyle Silo Assets pursuant to (a) a credit bid of the Carlyle DIP Obligations, (b) a cash purchase pursuant to which the Carlyle DIP Obligations are Paid in Full, or (c) such other treatment of the Carlyle DIP Obligations acceptable to the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), which transaction may be consummated pursuant to an order of the Court.

"**Carlyle Silo Assets**" means (a) the assets of, and the equity interests in, the Carlyle Silo Entities and (b) the Carlyle Pledged Intercompany Claims.

"**Carlyle Silo Entities**" means each of (a) NPA 2023 Holdco, LLC, (b) NPA PGR Blocker Holdco, LLC, (c) NPA Polaris OpCo Holdco, LLC, (d) NPA Polaris DevCo Holdco, LLC and (e) each direct or indirect subsidiary of the foregoing.

"**Carlyle Subsequent Draws**" has the meaning ascribed to "Subsequent Draws" in the Carlyle DIP Documents.

"**Cash Collateral**" means "cash collateral" (as defined in section 363(a) of the Bankruptcy Code) that is, as applicable, (a) the property of the DIP Loan Parties or is the traceable proceeds of DIP Collateral, in each case in which one or more of the DIP Secured Parties have an interest, or (b) the property of the Prepetition Loan Parties or is the traceable proceeds of Prepetition Collateral, in each case in which one or more of the Prepetition Secured Parties have an interest.

"**Cash Management Motion**" means the first day motion of the Debtors seeking interim and final approval of the Debtors' cash management system.

"**Cash Management Orders**" means the interim and final orders approving the Cash Management Motion, which orders shall be in form and substance acceptable to the Required DIP Lenders.

"**Catalina**" means Catalina Solar, LLC.

"**Catalina Independent Engineer**" means an independent engineer (which may be Catalina's existing independent engineer, that is mutually acceptable to Catalina and the Brookfield Required DIP Lenders.

"**Closing Date**" means, with respect to any DIP Facility, the date on which the conditions precedent to the closing of the DIP Facility have been satisfied or waived in accordance with the

applicable DIP Documents and the effectiveness of the applicable DIP Documents and the DIP Facility has occurred.

"**Debtor Guarantors**" means each of the Brookfield Debtor Guarantors, the Carlyle Debtor Guarantors and the Fundamental Debtor Guarantors.

"**DIP Agents**" means each of the Brookfield DIP Agent, the Carlyle DIP Agent and the Fundamental DIP Agent.

"**DIP Borrowers**" means each of the Brookfield Borrower, the Carlyle Issuer and the Fundamental Borrower.

"**DIP Collateral**" means each of the Brookfield DIP Collateral, the Carlyle DIP Collateral and the Fundamental DIP Collateral.

"**DIP Collateral Assets**" means all property and rights and interests in property of the Debtors or their Estates of any kind or nature whatsoever, whether tangible or intangible, in existence as of the Petition Date as well as thereafter created or acquired, and wherever located, including, without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), tax credits, rights to the payment of money (including tax refunds, interconnection deposit refunds, equipment refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all other claims including commercial tort claims; (c) all proceeds of leased real property; (d) if not otherwise described above, all of the property or rights in property identified as Collateral (as defined in any of the DIP Credit Agreements); (e) subject to entry of the Final Order, proceeds of Avoidance Actions, *provided* that the Avoidance Actions are not DIP Collateral; (f) subject to entry of the Final Order, the proceeds of any exercise of the Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code; (g) the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (h) all proceeds from the sale, assignment, or other Disposition of any commercial real estate leases and the Debtors' right to select, identify, and designate which commercial leases may be assumed or assumed and assigned under section 365 of the Bankruptcy Code; (i) any security deposits refunded to the Debtors after application by a landlord of non-residential real property; (j) all intercompany claims held by any Debtor against one or more of its affiliates and the entitlement of such Debtor thereunder to receive payment on such claims, including all collateral for such claims, subject to the terms set forth in this Interim Order, and (k) except as provided above, all other personal property of the Debtors and their Estates of every kind and nature.

"***DIP Commitments***" means the Brookfield DIP Commitments, the Carlyle DIP Commitments and the Fundamental DIP Commitments.

"***DIP Credit Agreements***" means the Brookfield DIP Credit Agreement, the Carlyle DIP Note Purchase Agreement and the Fundamental DIP Credit Agreement.

"***DIP Documents***" means the Brookfield DIP Documents, the Carlyle DIP Documents and the Fundamental DIP Documents.

"***DIP Facilities***" means the Brookfield DIP Facility, the Carlyle DIP Facility and the Fundamental DIP Facility.

"***DIP Guarantors***" means the Brookfield Guarantors, the Carlyle Guarantors and the Fundamental Guarantors.

"***DIP Intercreditor Agreement***" means that certain (a) Amended and Restated Debtor-in-Possession Intercreditor Agreement among the Brookfield DIP Agent, the Carlyle DIP Noteholders and the Fundamental DIP Agent and (b) Amended and Restated Junior Lien Debtor-in-Possession Intercreditor and Subordination Agreement among the Brookfield DIP Agent, the Carlyle DIP Noteholders and the Fundamental DIP Agent.

"***DIP Lender Advisors***" means each of the Brookfield DIP Lender Advisors, the Carlyle DIP Noteholder Advisors and the Fundamental DIP Lender Advisors.

"***DIP Lenders***" means each of the Brookfield DIP Lenders, the Carlyle DIP Noteholders and the Fundamental DIP Lenders.

"***DIP Liens***" means each of the Brookfield DIP Liens, the Carlyle DIP Liens and the Fundamental DIP Liens.

"***DIP Loan Parties***" means each of the DIP Borrowers and the Debtor Guarantors.

"***DIP Loans***" means each of the Brookfield DIP Loans, the Carlyle DIP Notes and the Fundamental DIP Loans.

"***DIP Obligations***" means each of the Brookfield DIP Obligations, the Carlyle DIP Obligations and the Fundamental DIP Obligations.

"***DIP Secured Parties***" means each of the Brookfield DIP Secured Parties, the Carlyle DIP Secured Parties and the Fundamental DIP Secured Parties.

"***Disposition***" means the sale, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction) of any property by any person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  "***Dispose***", "***Disposed***" and "***Disposal***" have correlative meanings.

"**Estate**" means, with respect to a Debtor, their bankruptcy estate (as defined under section 541 of the Bankruptcy Code), and "**Estates**" means the bankruptcy estates (as defined under section 541 of the Bankruptcy Code) of each Debtor.

"**Fundamental DIP Collateral**" means (a) all DIP Collateral Assets held by any (i) Pari Guarantor Debtor, (ii) Priority Guarantor Debtor, or (iii) Debtor or Non-Debtor Guarantor that is a Fundamental Silo Entity, and (b) the Fundamental Pledged Intercompany Claims. For the avoidance of doubt, the Fundamental DIP Collateral includes all of the Fundamental Exclusive DIP Collateral and excludes the Brookfield Exclusive DIP Collateral and the Carlyle Exclusive DIP Collateral.

"**Fundamental DIP Documents**" means (a) the Fundamental DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the Fundamental DIP Agent and/or the Fundamental DIP Lenders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"**Fundamental DIP Lender Advisors**" means (a) Sidley Austin LLP, as counsel to the Fundamental DIP Lenders, (b) Guggenheim Securities, LLC, as investment banker to the Fundamental DIP Lenders, and (c) any other local or special counsel or other professionals retained by the Fundamental DIP Lenders.

"**Fundamental DIP Obligations**" means (a) the "Obligations" as defined in the Fundamental DIP Credit Agreements and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the Fundamental DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the Fundamental DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"**Fundamental Exclusive DIP Collateral**" means (a) the equity interests of (i) FP 2021 Dev Holdco, LLC, (ii) Sirius OpCo Pledgor, LLC, (iii) Cascade Dev Holdco, LLC, (iv) PGR 2021 Holdco 17, LLC, (v) PG Dev Carver Holdco, LLC, (vi) PGR Carver Holdco, LLC and (viii) Blue Ridge Power, LLC, (b) the Fundamental Silo Assets, (c) the Fundamental Pledged Intercompany Claims, the Carlyle Retained Liabilities, the Brookfield Retained Liabilities, the Other BRP Claims, and the Preserved Procurement Claims; and (d) any cash deposit funded by or on behalf of any potential purchaser, whether pursuant to the Bidding Procedures Order or otherwise, in connection with any purchase or acquisition (or bid to purchase or acquire) any Fundamental Silo Assets; *provided* that, in no event shall the Specified BRP Claims be Fundamental Exclusive DIP Collateral.

"**Fundamental Pledged Intercompany Claims**" means (x) all claims, interests, intercompany receivables, obligations, liabilities and other intercompany balances or rights (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Fundamental Silo Entity or Fundamental

Silo Asset, including any Tariff Claims, and any proceeds of the foregoing (other than in respect of the O&M Services Agreement (as defined in the Fundamental DIP Credit Agreement)) and (y) the Other BRP Claims and the Preserved Procurement Claims; *provided* that, in no event shall the Specified BRP Claims be Fundamental Pledged Intercompany Claim.

"***Fundamental Prepetition Agent***" means FP Solar Development I LLC, and any successor thereto.

"***Fundamental Prepetition Borrowers***" means (a) FP 2021 Dev Holdco, LLC and/or Blue Ridge Power, LLC, as applicable, in their respective capacities as Borrower under the Fundamental Prepetition Credit Agreements.

"***Fundamental Prepetition Bridge Agreement***" means "that certain Amended and Restated Revolving Loan Agreement, dated October 6, 2025, as may have been amended or modified prior to the date hereof, by and among FP 2021 Dev Holdco, LLC, as borrower, FP Solar Development I LLC, as lender, and Solar Construction Lending, LLC, as lender.

"***Fundamental Prepetition Collateral***" means (a) the "Collateral" as defined in the Fundamental Prepetition Documents and (b) all other assets and property that secure the Fundamental Prepetition Secured Obligations.

"***Fundamental Prepetition Credit Agreements***" means (a) the Revolving Loan Agreement, dated as of December 10, 2021, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the applicable Fundamental Prepetition Borrower, the Fundamental Prepetition Agent, and the applicable Fundamental Prepetition lender, (b) the Fundamental Prepetition Bridge Agreement, and (c) the Amended and Restated Loan Agreement, dated as of June 26, 2025, as may have further been amended or modified prior to the date hereof, by and among Blue Ridge Power, LLC, as borrower and Solar Construction Lending, LLC, as lender.

"***Fundamental Prepetition Documents***" means (a) the Fundamental Prepetition Credit Agreements, (b) the Fundamental Prepetition Security Documents, and (c) each of the other "Loan Documents" (as defined in the Fundamental Prepetition Credit Agreements).

"***Fundamental Prepetition Guarantors***" means Pine Gate Renewables, LLC and each subsidiary thereof party to the Fundamental Prepetition Documents as a guarantor or secondary obligor of the Fundamental Prepetition Secured Obligations.

"***Fundamental Prepetition Lenders***" means FP Solar Development I LLC, and any successor thereto and/or Solar Construction Lending, LLC, and any successor thereto as applicable, in their respective capacities as Lender under the Fundamental Prepetition Credit Agreements

"***Fundamental Prepetition Liens***" means each of the liens and security interests granted by the Grantors (as defined in the Fundamental Prepetition Security Documents) in the Fundamental Prepetition Collateral pursuant to the Fundamental Prepetition Security Documents to secure the Fundamental Prepetition Secured Obligations.

"***Fundamental Prepetition Loan Parties***" means the Fundamental Prepetition Borrowers and the Fundamental Prepetition Guarantors.

"***Fundamental Prepetition Loans***" means the "Loans" as defined in the Fundamental Prepetition Credit Agreements and all other loans and other financial accommodations provided by the Fundamental Prepetition Lenders to the Fundamental Prepetition Loan Parties pursuant to the Fundamental Prepetition Documents.

"***Fundamental Prepetition Secured Obligations***" means the "Secured Obligations" as defined in the Fundamental Prepetition Credit Agreements.

"***Fundamental Prepetition Secured Parties***" means each of the Fundamental Prepetition Agent, the Fundamental Prepetition Lenders, and each of the other "Secured Parties" as defined in the Fundamental Prepetition Credit Agreements.

"***Fundamental Prepetition Security Documents***" means (a) the Security Documents (as defined in the Fundamental Prepetition Credit Agreements) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Fundamental Prepetition Agent has been granted a security interest in and continuing liens on the Fundamental Prepetition Collateral.

"***Fundamental Required DIP Lenders***" means the "Required Lenders" as defined in the Fundamental DIP Credit Agreement.

"***Fundamental Sale Transaction***" means, at the election of the Fundamental Required DIP Lenders, a sale of all or substantially all or a material portion of the Fundamental Silo Assets pursuant to (a) a credit bid of the Fundamental DIP Obligations, (b) a cash purchase pursuant to which the Fundamental DIP Obligations are Paid in Full, or (c) such other treatment of the Fundamental DIP Obligations acceptable to the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), which transaction may be consummated pursuant to an order of the Court.

"***Fundamental Silo Assets***" means (a) the assets of, and the equity interests in, the Fundamental Silo Entities and (b) the Fundamental Pledged Intercompany Claims.

"***Fundamental Silo Entities***" means (a) FP 2021 Dev Holdco, LLC, (b) Sirius OpCo Pledgor, LLC, (c) Cascade Dev Holdco, LLC, (d) PGR 2021 Holdco 17, LLC, (e) PG Dev Carver Holdco, LLC, (f) PGR Carver Holdco, LLC, (g) Blue Ridge Power, LLC, and (h) each direct or indirect subsidiary of the foregoing.

"***Fundamental Subsequent Draws***" has the meaning ascribed to "Subsequent Draws" in the Fundamental DIP Documents.

"***Funded Brookfield Procurement Claims***" means claims or interests held by Debtor PGR Procurement, LLC in respect of equipment to the extent of the amount of any financing extended to any Brookfield Silo Entity (whether under the Brookfield Prepetition Credit Agreement or under any Project financing of such entity) on account of an invoice relating to such equipment.

"***Funded Carlyle Procurement Claims***" means claims or interests held by Debtor PGR Procurement, LLC in respect of equipment to the extent of the amount of any financing extended to any Carlyle Silo Entity (whether under the Carlyle Prepetition Note Purchase Agreement or under any Project financing of such entity) on account of an invoice relating to such equipment.

"***Identified BRP Claims***" has the meaning given to such term in the DIP Intercreditor Agreement.

"***Initial Budget***" means the 13-week consolidated weekly operating budget of the Debtors and their subsidiaries setting forth, among other things, projected disbursements, liquidity and net cash flow for the period described therein prepared by the DIP Borrowers' management and advisors and approved by the Required DIP Lenders on or prior to the Interim Order Effective Date and attached hereto as **Exhibit D**.

"***Interim Draws***" means each of the Brookfield Interim Draw, the Carlyle Interim Issuance and the Fundamental Interim Draw.

"***Interim Order Effective Date***" means the date of entry of the Interim Order.

"***Interim Roll-Up DIP Loans***" means each of the Brookfield Interim Roll-Up DIP Loans, the Carlyle Interim Roll-Up DIP Notes and the Fundamental Interim Roll-Up DIP Loans.

"***Non-Debtor Guarantors***" means each of the Brookfield Non-Debtor Guarantors, the Carlyle Non-Debtor Guarantors and the Fundamental Non-Debtor Guarantors.

"***Other BRP Claims***" means Identified BRP Claims that meet the BRP Claims Conditions.

"***Other Collateral***" means the assets and property of the Debtors other than Prepetition Collateral, Brookfield Silo Assets, Carlyle Silo Assets and Fundamental Silo Assets.

"***Paid in Full***" means (a) the indefeasible payment in full in cash of the obligations (including principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) and all other amounts due and owing by the Debtors, any Non-Debtor Guarantors or any other obligors thereunder (with such payment being without prejudice to any terms or provisions contained in such credit facility that survive such discharge by their terms) under the applicable credit facility and this Interim Order, (b) the termination of all commitments to make loans or extend other financial accommodations under such facility, (c) the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of all letters of credit, in each case, in accordance with the terms of the applicable facility, and (d) in the case of the Prepetition Secured Obligations, no Challenge has been timely and properly asserted in accordance with this Interim Order (including any Challenge against the applicable Prepetition Secured Parties or their Representatives), or if such a Challenge is timely and properly commenced, upon the disposition of such Challenge pursuant to a final, non-appealable order of a court of competent jurisdiction in favor of such Prepetition Secured Parties and Representatives and consistent with the Debtors' Stipulations and Releases; *provided*, that Paid in Full shall also include a credit bid or other voluntary release of the full amount of (x) with respect to any reference

to Paid in Full in relation to a DIP Facility, all applicable DIP Obligations, and (y) with respect to any reference to Paid in Full in relation to any Prepetition Secured Obligations, all applicable Prepetition Secured Obligations (including, in the case of each of the preceding clauses (x) and (y), principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) owing by the Debtors and any other DIP Loan Party in connection with consummation of a sale of any or all of the Brookfield Silo Assets, Carlyle Silo Assets or Fundamental Silo Assets, as applicable.

"***Pari Guarantor Debtors***" means each of following Debtors: (a) PGR Guarantor, LLC, (b) Pine Gate Renewables, LLC, (c) Pine Gate Fund Management, LLC, (d) Pine Gate Development, LLC, (e) PGC Solar Holdings I Managing Member, LLC, (f) Cascade Pledgor, LLC, (g) PGR Blue Ridge Power Holdings, LLC, (h) PGR 2024 Sponsor Holdco, LLC, (i) PGR Signature Fund 1 Manager, LLC, (j) Pine Gate Assets, LLC, (k) Pine Gate Energy Capital, LLC, (l) Pine Gate Dev Holdco, LLC, (m) Pine Gate O&M, LLC, and (n) any Debtor that is not a Priority Guarantor Debtor or a Debtor that is a Brookfield Silo Entity, a Carlyle Silo Entity, or a Fundamental Silo Entity.

"***Permitted Prior Liens***" means any valid and non-avoidable senior lien in existence and perfected immediately prior to the Petition Date or any valid and non-avoidable lien in existence immediately prior to the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. For the avoidance of doubt, Permitted Prior Liens shall not include any Prepetition Liens or any DIP Liens.

"***Petition Date***" means the date on which the Debtors file chapter 11 petitions with the Court.

"***Prepetition Agents***" means each of the Brookfield Prepetition Agent, the Carlyle Prepetition Agent and the Fundamental Prepetition Agent.

"***Prepetition Collateral***" means the Brookfield Prepetition Collateral, the Carlyle Prepetition Collateral and the Fundamental Prepetition Collateral.

"***Prepetition Documents***" means the Brookfield Prepetition Documents, the Carlyle Prepetition Documents and the Fundamental Prepetition Documents.

"***Prepetition Intercreditor Agreements***" means (a) that certain Junior Lien Intercreditor and Subordination Agreement, dated October 6, 2025, by and among each Carlyle Prepetition Noteholder, the Brookfield Prepetition Agent and the Fundamental Prepetition Lenders and (b) that certain Intercreditor Agreement, dated as of October 6, 2025, by and among each Carlyle Prepetition Noteholder, the Brookfield Prepetition Agent and the Fundamental Prepetition Lenders.

"***Prepetition Lenders***" means the Brookfield Prepetition Lenders, the Carlyle Prepetition Noteholders and the Fundamental Prepetition Lenders.

"***Prepetition Liens***" means the Brookfield Prepetition Liens, the Carlyle Prepetition Liens and the Fundamental Prepetition Liens.

"***Prepetition Loan Parties***" means the Brookfield Prepetition Loan Parties, the Carlyle Prepetition Note Parties and the Fundamental Prepetition Loan Parties.

"***Prepetition Secured Obligations***" means the Brookfield Prepetition Secured Obligations, the Carlyle Prepetition Secured Obligations and the Fundamental Prepetition Secured Obligations.

"***Prepetition Secured Parties***" means the Brookfield Prepetition Secured Parties, the Carlyle Prepetition Secured Parties and the Fundamental Prepetition Secured Parties.

"***Preserved Procurement Claims***" means the Brookfield Retained Liabilities and the Carlyle Retained Liabilities.

"***Priority Guarantor Debtors***" means each of (a) PGR 2022 Sponsor Holdco, LLC, (b) Blue Ridge Power Holding Company, LLC, (c) BF Dev Holdco Pledgor, LLC, (d) PGC Solar Holdings I, LLC, and (e) NPA Polaris DevCo Pledgor, LLC.

"***Project***" means any solar power generating, storage or generating and storage project, and, in each case, any associated facilities owned, leased or operated by any of the Debtors or their subsidiaries or affiliates.

"***Representative***" means, as to any Person, its current and former affiliates, and its and each such entity's current and former directors, officers, managers, participants and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect parents, subsidiaries and divisions, and its and each of such entity's current and former officers, members, managers, directors, controlling persons, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys, accountants, investment bankers, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, legal advisors, consultants, and partners (including both general and limited partners).

"***Required DIP Lenders***" means each of the Brookfield Required DIP Lenders, the Carlyle Required DIP Noteholders and the Fundamental Required DIP Lenders.

"***Roll-Up DIP Loans***" means each of the Brookfield Roll-Up DIP Loans, the Carlyle Roll-Up DIP Notes and the Fundamental Roll-Up DIP Loans.

"***Sale Transaction***" means each of the Brookfield Sale Transaction, the Carlyle Sale Transaction and the Fundamental Sale Transaction.

"***Shared Prepetition Collateral***" means the assets and property of the Pari Guarantor Debtors and the Priority Guarantor Debtors that constitute Prepetition Collateral.

"***Silo***" means each of the Brookfield Silo Entities, the Carlyle Silo Entities, and the Fundamental Silo Entities.

"***Specified BRP Claims***" means Identified BRP Claims that do not meet the BRP Claims Conditions.

"***Tariff Claims***" means any claims or liabilities in respect of or directly or indirectly arising from, or relating to (a) duties, tariffs or trade remedies, including in respect of any anti-dumping or countervailing duty cash deposits, tariffs, duties, or other trade remedies imposed, assessed, or collectible by the U.S. Department of Commerce or the U.S. Customs and Border Protection as a result of, arising out of, or relating to the circumvention proceedings associated with the petition filed by Auxin Solar Inc. concerning crystalline silicon photovoltaic cells and modules, and (b) any claims by any person for indemnity or reimbursement of the foregoing.

"***Trustee***" means any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors and/or any examiner or other estate representative or other fiduciary appointed or elected in the Chapter 11 Cases or any Successor Case, and any other person acting or seeking to act on behalf of the Debtors' Estates in the Chapter 11 Cases or any Successor Case.

"***U.S. Trustee***" means Office of the United States Trustee for the Southern District of Texas.

**Annex 2**

**The Debtors' Stipulations and Releases**

Without prejudice to the rights of all parties in interest other than the Debtors, but subject to the limitations contained in paragraph 17 of the Interim Order, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate, acknowledge and agree that:

**Stipulations as to Brookfield Prepetition Secured Parties**.

1.      Brookfield Prepetition Credit Agreement.   Prior to the commencement of the Chapter 11 Cases, the Brookfield Prepetition Secured Parties made the Brookfield Prepetition Loans to the Brookfield Prepetition Loan Parties pursuant to the Brookfield Prepetition Documents.  Pursuant to the Brookfield Prepetition Documents, each of the Brookfield Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Brookfield Prepetition Secured Obligations to the Brookfield Prepetition Agent for the benefit of the Brookfield Prepetition Lenders.

2.      Brookfield Prepetition Secured Obligations. As of the Petition Date, the Brookfield Prepetition Borrower and the other Brookfield Prepetition Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Brookfield Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $**417.422 million** on account of the Brookfield Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Brookfield Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11

Cases in accordance with the terms of the Brookfield Prepetition Documents, and all commitments of the Brookfield Prepetition Secured Parties to extend Brookfield Prepetition Loans or make other financial accommodations were terminated on the Petition Date.

3.     <u>Validity and Priority of Brookfield Prepetition Secured Obligations</u>. (a) The Brookfield Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Brookfield Prepetition Loan Parties and such Brookfield Prepetition Secured Obligations are enforceable in accordance with the terms of the Brookfield Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Brookfield Prepetition Secured Obligations exist, and no portion of the Brookfield Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Brookfield Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Brookfield Prepetition Documents, or the Brookfield Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Brookfield Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

4.     <u>Validity, Priority and Perfection of Brookfield Prepetition Liens</u>: As more fully set forth in the Brookfield Prepetition Credit Agreement, prior to the Petition Date, the Brookfield Prepetition Loan Parties became parties to the Brookfield Prepetition Security Documents pursuant

to which the Brookfield Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Brookfield Prepetition Collateral in favor of the Brookfield Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Brookfield Prepetition Liens on the Brookfield Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Brookfield Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Brookfield Prepetition Liens were senior in priority over any and all other liens on the Brookfield Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Brookfield Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.

5.     <u>No Challenges/Claims as to Brookfield Prepetition Secured Parties</u>. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Brookfield Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Brookfield Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Brookfield Prepetition Documents, the Brookfield Prepetition Secured Obligations, or the Brookfield Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable

state law equivalents.

**Stipulations as to Carlyle Prepetition Secured Parties**.

6.     <u>Carlyle Prepetition Note Purchase Agreement</u>.  Prior to the commencement of the Chapter 11 Cases, the Carlyle Prepetition Secured Parties purchased the Carlyle Prepetition Notes from the Carlyle Prepetition Issuer pursuant to the Carlyle Prepetition Documents.  Pursuant to the Carlyle Prepetition Documents, each of the Carlyle Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Carlyle Prepetition Secured Obligations to the Carlyle Prepetition Agent for the benefit of the Carlyle Prepetition Noteholders.

7.     <u>Carlyle Prepetition Secured Obligations</u>. As of the Petition Date, the Carlyle Prepetition Issuer and the other Carlyle Prepetition Note Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Carlyle Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $**322.2 million** on account of the Carlyle Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Carlyle Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Carlyle Prepetition Documents, and all commitments of the Carlyle Prepetition Secured Parties to purchase Carlyle Prepetition Notes or make other financial accommodations were terminated on the Petition Date.

8.     <u>Validity and Priority of Carlyle Prepetition Secured Obligations</u>. (a) The Carlyle Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Carlyle Prepetition Note Parties and such Carlyle Prepetition Secured Obligations are enforceable in accordance with the terms of the Carlyle Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Carlyle Prepetition Secured Obligations exist, and no portion of the Carlyle Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Carlyle Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Carlyle Prepetition Documents, or the Carlyle Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Carlyle Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

9.     <u>Validity, Priority and Perfection of Carlyle Prepetition Liens</u>: As more fully set forth in the Carlyle Prepetition Note Purchase Agreement, prior to the Petition Date, the Carlyle Prepetition Note Parties became parties to the Carlyle Prepetition Security Documents pursuant to which the Carlyle Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Carlyle Prepetition Collateral in favor of the Carlyle Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition

21

Date (a) the Carlyle Prepetition Liens on the Carlyle Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Carlyle Prepetition Noteholders for fair consideration and reasonably equivalent value; (b) the Carlyle Prepetition Liens were senior in priority over any and all other liens on the Carlyle Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Carlyle Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.

10.     <u>No Challenges/Claims as to Carlyle Prepetition Secured Parties</u>. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Carlyle Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Carlyle Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Carlyle Prepetition Documents, the Carlyle Prepetition Secured Obligations, or the Carlyle Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Fundamental Prepetition Secured Parties**.

11.     _Fundamental Prepetition Credit Agreement_.  Prior to the commencement of the Chapter 11 Cases, the Fundamental Prepetition Secured Parties made the Fundamental Prepetition Loans to the Fundamental Prepetition Loan Parties pursuant to the Fundamental Prepetition Documents.  Pursuant to the Fundamental Prepetition Documents, each of the Fundamental Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Fundamental Prepetition Secured Obligations to the Fundamental Prepetition Agent for the benefit of the Fundamental Prepetition Lenders.

12.     _Fundamental Prepetition Secured Obligations_. As of the Petition Date, the Fundamental Prepetition Borrower and the other Fundamental Prepetition Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Fundamental Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $**843.3 million** on account of the Fundamental Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Fundamental Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Fundamental Prepetition Documents, and all commitments of the Fundamental Prepetition Secured Parties to extend Fundamental Prepetition Loans or make other financial accommodations were terminated on the Petition Date.

13.     <u>Validity and Priority of Fundamental Prepetition Secured Obligations</u>. (a) The Fundamental Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Fundamental Prepetition Loan Parties and such Fundamental Prepetition Secured Obligations are enforceable in accordance with the terms of the Fundamental Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Fundamental Prepetition Secured Obligations exist, and no portion of the Fundamental Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Fundamental Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Fundamental Prepetition Documents, or the Fundamental Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Fundamental Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

14.     <u>Validity, Priority and Perfection of Fundamental Prepetition Liens</u>: As more fully set forth in the Fundamental Prepetition Credit Agreement, prior to the Petition Date, the Fundamental Prepetition Loan Parties became parties to the Fundamental Prepetition Security Documents pursuant to which the Fundamental Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the

US-DOCS\165239540.22

Fundamental Prepetition Collateral in favor of the Fundamental Prepetition Agent. The Debtors acknowledge and agree that as of the Petition Date (a) the Fundamental Prepetition Liens on the Fundamental Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Fundamental Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Fundamental Prepetition Liens were senior in priority over any and all other liens on the Fundamental Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Fundamental Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.

15. <u>No Challenges/Claims as to Fundamental Prepetition Secured Parties</u>. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Fundamental Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Fundamental Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Fundamental Prepetition Documents, the Fundamental Prepetition Secured Obligations, or the Fundamental Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

# Annex 3

## Lien/Claim Priority Annex

| Priority | Brookfield Exclusive DIP Collateral | | Carlyle Exclusive DIP Collateral | | Fundamental Exclusive DIP Collateral | | Shared Prepetition Collateral | Other Collateral |
|---|---|---|---|---|---|---|---|---|
| | Brookfield Borrower and Brookfield Debtor Guarantors | Brookfield Non-Debtor Guarantors | Carlyle Issuer and Carlyle Debtor Guarantors | Carlyle Non-Debtor Guarantors | Fundamental Borrower and Fundamental Debtor Guarantors | Fundamental Non-Debtor Guarantors | | |
| 1st | Allocable Percentage of Carve Out | Permitted Prior Liens | Allocable Percentage of Carve Out | Permitted Prior Liens | Allocable Percentage of Carve Out | Permitted Prior Liens | Carve Out (solely with respect to Debtor property) | Carve Out (solely with respect to Debtor property) |
| 2nd | Permitted Prior Liens | Brookfield DIP Liens | Permitted Prior Liens | Carlyle DIP Liens | Permitted Prior Liens | Fundamental DIP Liens | Permitted Prior Liens | Permitted Prior Liens |
| 3rd | Brookfield DIP Liens | Brookfield Prepetition Liens | Carlyle DIP Liens | Carlyle Prepetition Liens | Fundamental DIP Liens | Fundamental Prepetition Liens | DIP Liens, subject to DIP Intercreditor Agreement | DIP Liens, subject to DIP Intercreditor Agreement |
| 4th | Adequate Protection Liens, subject to DIP Intercreditor Agreement | | Adequate Protection Liens, subject to DIP Intercreditor Agreement | | Adequate Protection Liens, subject to DIP Intercreditor Agreement | | Adequate Protection Liens, subject to DIP Intercreditor Agreement | Adequate Protection Liens (solely with respect to Debtor property) |
| 5th | Brookfield Prepetition Liens | | Carlyle Prepetition Liens | | Fundamental Prepetition Liens | | Prepetition Liens (subject to Prepetition Intercreditor Agreements) | |

**<u>Exhibit A</u>**

**Brookfield DIP Credit Agreement**

_____

**SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**


**dated as of November [•], 2025**


**among**


**PINE GATE RENEWABLES, LLC
as Borrower,**

**VARIOUS LENDERS PARTY HERETO,**

**and**

**BID ADMINISTRATOR LLC,
as Administrative Agent and Collateral Agent**


_____

# TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS AND INTERPRETATION ................................................................. 1
   1.1.   Definitions ................................................................................................ 1
   1.2.   Accounting Terms ................................................................................... 40
   1.3.   Interpretation, Etc. ................................................................................. 40
   1.4.   Certain Interpretive Provisions Applicable to the Credit Documents. ............................ 41

SECTION 2.   LOANS ................................................................................................ 42
   2.1.   Loans ...................................................................................................... 42
   2.2.   Pro Rata Shares; Availability of Funds ................................................. 43
   2.3.   Use of Proceeds ..................................................................................... 44
   2.4.   Evidence of Debt; Register; Lenders' Books and Records; Notes ................................ 46
   2.5.   Interest on Loans ................................................................................... 47
   2.6.   Fees ........................................................................................................ 47
   2.7.   Maturity ................................................................................................. 48
   2.8.   Voluntary Prepayments ......................................................................... 48
   2.9.   Mandatory Prepayments ........................................................................ 49
   2.10.   General Provisions Regarding Payments ............................................... 50
   2.11.   Ratable Sharing ..................................................................................... 51
   2.12.   Increased Costs; Capital Adequacy ....................................................... 52
   2.13.   Taxes; Withholding, Etc. ....................................................................... 53
   2.14.   Obligation to Mitigate ........................................................................... 57
   2.15.   Defaulting Lenders ................................................................................ 57
   2.16.   Accounts ................................................................................................ 58
   2.17.   Reserved. ............................................................................................... 59
   2.18.   Schedules ............................................................................................... 59

SECTION 3.   CONDITIONS PRECEDENT ....................................................................... 59
   3.1.   Conditions to the Closing Date and First Draw and Subsequent Draws ...................... 59
   3.2.   Conditions to the Second Draw and Subsequent Draws ......................... 63

SECTION 4.   REPRESENTATIONS AND WARRANTIES ................................................. 65
   4.1.   Organization; Requisite Power and Authority; Qualification ......................... 65
   4.2.   Equity Interests and Ownership ............................................................. 65
   4.3.   Due Authorization ................................................................................. 65
   4.4.   No Conflict ............................................................................................ 65
   4.5.   Governmental Consents ........................................................................ 66
   4.6.   Binding Obligation ................................................................................ 66
   4.7.   Financial Statements .............................................................................. 66
   4.8.   No Material Adverse Effect .................................................................... 66
   4.9.   Adverse Proceedings, Etc. ..................................................................... 66
   4.10.   Taxes ..................................................................................................... 67
   4.11.   Properties; Title ..................................................................................... 67
   4.12.   Environmental Matters .......................................................................... 67
   4.13.   No Defaults ............................................................................................ 68
   4.14.   Material Contracts ................................................................................. 68
   4.15.   Federal Reserve Regulations; Exchange Act ........................................ 68
   4.16.   Employee Matters ................................................................................. 68

| 4.17. | Employee Benefit Plans | 68 |
|---|---|---|
| 4.18. | [Reserved] | 68 |
| 4.19. | Compliance with Statutes, Etc | 68 |
| 4.20. | Disclosure | 69 |
| 4.21. | Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws | 69 |
| 4.22. | Security Documents | 69 |
| 4.23. | Accounts | 70 |
| 4.24. | Energy Regulatory Matters | 70 |
| 4.25. | Cases; Orders. | 71 |
| 4.26. | Intellectual Property | 72 |

| SECTION 5. | AFFIRMATIVE COVENANTS | 73 |
|---|---|---|
| 5.1. | Financial Statements and Other Reports | 73 |
| 5.2. | Existence | 78 |
| 5.3. | Taxes | 78 |
| 5.4. | Maintenance of Properties | 78 |
| 5.5. | Insurance | 79 |
| 5.6. | Books and Records; Inspection Rights | 79 |
| 5.7. | Compliance with Laws | 79 |
| 5.8. | Environmental | 80 |
| 5.9. | Tax Equity Buyouts | 80 |
| 5.10. | Use of Proceeds | 80 |
| 5.11. | Further Assurances | 80 |
| 5.12. | Separateness | 80 |
| 5.13. | [Reserved] | 81 |
| 5.14. | Compliance with Sanctions, Etc | 81 |
| 5.15. | Energy Regulatory Status | 81 |
| 5.16. | Post-Closing Deliverables. | 81 |
| 5.17. | Certain Milestones | 81 |
| 5.18. | Project Financing Consents; Project Senior Financing Collateral and Guarantee Requirement; Additional Guarantors. | 83 |
| 5.19. | Regulatory Approvals | 83 |
| 5.20. | Terms No Less Favorable | 84 |
| 5.21. | Draft Pleadings | 84 |
| 5.22. | [Reserved] | 84 |
| 5.23. | Amendments to any Additional DIP Facilities | 84 |
| 5.24. | Polaris B Covenants | 84 |
| 5.25. | Surety Bonds | 85 |
| 5.26. | Operation in the Ordinary Course of Business | 85 |
| 5.27. | Project Senior Financing Remedies | 85 |
| 5.28. | Certain Bankruptcy Matters | 85 |
| 5.29. | Priority of Liens; No Discharge | 86 |
| 5.30. | Replacement Additional DIP Facility | 87 |
| 5.31. | DIP Proceeds Account | 87 |
| 5.32. | Material Decisions; MIPA Proceeds | 87 |

| SECTION 6. | NEGATIVE COVENANTS | 88 |
|---|---|---|
| 6.1. | Indebtedness | 88 |
| 6.2. | Liens | 89 |
| 6.3. | Prohibited Restrictions on Financing Subsidiaries | 91 |

| | | |
|---|---|---|
| 6.4. | Investments | 91 |
| 6.5. | Fundamental Changes; Disposition of Assets | 92 |
| 6.6. | Transactions with Affiliates | 93 |
| 6.7. | Conduct of Business | 94 |
| 6.8. | Amendments or Waivers of Organizational Documents; Material Contracts | 94 |
| 6.9. | Swap Contracts | 95 |
| 6.10. | Restricted Payments | 95 |
| 6.11. | Bank Accounts | 95 |
| 6.12. | Sanctions and Anti-Corruption | 95 |
| 6.13. | Financial Covenants. | 95 |
| 6.14. | Reserved | 95 |
| 6.15. | Disqualified Person | 95 |
| 6.16. | Budgets/Capex/Opex Covenant | 95 |
| 6.17. | Portfolio Equipment Sourcing Requirements | 96 |
| 6.18. | Material Settlements | 96 |
| 6.19. | Cash Management Arrangements | 96 |
| 6.20. | Executive Compensation | 96 |
| 6.21. | Specified Transferees | 96 |
| 6.22. | Independent Director | 96 |
| 6.23. | Tax Matters | 96 |
| 6.24. | Holdco Covenant | 97 |
| 6.25. | New Subsidiaries | 97 |
| 6.26. | Additional Bankruptcy Matters | 98 |
| SECTION 7. | EVENTS OF DEFAULT | 98 |
| 7.1. | Events of Default | 98 |
| 7.2. | Consequences of an Event of Default | 105 |
| SECTION 8. | ADMINISTRATIVE AGENT AND OTHER AGENTS | 106 |
| 8.1. | Appointment of Agents | 106 |
| 8.2. | Powers and Duties | 106 |
| 8.3. | General Immunity | 107 |
| 8.4. | Agents Entitled to Act as Lender | 108 |
| 8.5. | Lenders' Representations, Warranties and Acknowledgment | 109 |
| 8.6. | Right to Indemnity | 109 |
| 8.7. | Successor Administrative Agent | 110 |
| 8.8. | Collateral Documents | 111 |
| 8.9. | Withholding Taxes | 113 |
| 8.10. | Agents May File Bankruptcy Disclosure and Proofs of Claim | 114 |
| 8.11. | Defaults | 114 |
| 8.12. | No Discretion | 114 |
| 8.13. | ERISA Matters | 115 |
| 8.14. | Erroneous Payments | 116 |
| 8.15. | DIP Intercreditor Agreements and DIP Orders | 118 |
| SECTION 9. | MISCELLANEOUS | 119 |
| 9.1. | Notices | 119 |
| 9.2. | Expenses | 120 |
| 9.3. | Indemnity | 122 |
| 9.4. | Set-Off | 123 |

9.5.    Amendments and Waivers ......................................................................... 123
9.6.    Successors and Assigns; Participations.................................................... 125
9.7.    Independence of Covenants ...................................................................... 128
9.8.    Survival of Representations, Warranties and Agreements ...................... 128
9.9.    No Waiver; Remedies Cumulative............................................................ 128
9.10.   Marshalling; Payments Set Aside ............................................................ 129
9.11.   Severability ............................................................................................... 129
9.12.   Obligations Several; Independent Nature of Lenders' Rights.................. 129
9.13.   Headings..................................................................................................... 129
9.14.   APPLICABLE LAW ................................................................................. 129
9.15.   CONSENT TO JURISDICTION ............................................................. 129
9.16.   WAIVER OF JURY TRIAL ...................................................................... 130
9.17.   Confidentiality........................................................................................... 130
9.18.   Effectiveness; Counterparts...................................................................... 131
9.19.   PATRIOT Act ........................................................................................... 132
9.20.   Electronic Execution of Credit Documents............................................. 132
9.21.   No Fiduciary Duty..................................................................................... 132
9.22.   Acknowledgment and Consent to Bail-In of Affected Financial Institutions ............. 132
9.23.   Acknowledgment Regarding Any Supported QFCs ................................ 133
9.24.   Interest Rate Limitation............................................................................ 134
9.25.   Orders Control........................................................................................... 134

| | | |
|---|---|---|
| APPENDICES: | A | Commitments |
| | B | Notice Addresses |
| | | |
| SCHEDULES: | | |
| | 4.1 | Holding Companies PSF Obligors |
| | 4.2 | Project Owners |
| | 4.2(a) | Projects |
| | 4.2(d) | Options, Warrants, Calls and Commitments |
| | 4.2(e) | Equity Interests and Ownership |
| | 4.9 | Adverse Proceedings |
| | 4.10 | Taxes |
| | 4.11 | Properties; Title |
| | 4.14 | Material Contracts |
| | 4.23 | Accounts |
| | 4.24 | Energy Regulatory Matters |
| | 4.27(a) | Goods Subject to Auxin-Related Matters |
| | 4.27(b) | Auxin-Related Obligations |
| | 4.27(c) | Auxin-Related Documents |
| | 5.17 | Transition Milestones |
| | 6.1 | Indebtedness |
| | 6.2 | Liens |
| | 6.3 | Prohibited Restrictions on Financing Subsidiaries |
| | 6.5 | Fundamental Changes; Disposition of Assets |
| | 6.6 | Transactions with Affiliates |
| | 6.10 | Permitted Affiliated Services Agreement |
| | 6.13 | Permitted EPC Contractor |
| | 6.14 | Permitted Equipment Supply Arrangers |
| | | |
| EXHIBITS: | A-1 | Funding Notice |
| | B | Loan Note |
| | C | [reserved] |
| | D | Form of Assignment and Assumption Agreement |
| | E | Form of Tax Compliance Certificates |
| | F-1 | Closing Date Certificate |
| | H | [reserved] |
| | I | Form of Pre-Operations Report |
| | J | Form of Operating Report |
| | K | [reserved] |
| | L | Form of Project Senior Financing Consent |
| | | |
| ANNEXES: | A | Initial Approved Budget |
| | B | Identified BRP Claims |
| | C | Specified Events |

**SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This **SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of November [•], 2025 (this "**Agreement**") , is entered into by and among Pine Gate Renewables, LLC, a North Carolina limited liability company (the "**Borrower**"), the Lenders party hereto from time to time, and **BID ADMINISTRATOR LLC**, as administrative agent (in such capacity, together with its permitted successors and permitted assigns in such capacity, "**Administrative Agent**") and as collateral agent (in such capacity, together with its permitted successors and permitted assigns in such capacity, "**Collateral Agent**").

## RECITALS:

**WHEREAS**, on the Petition Date (as defined below), the Borrower and certain of the Borrower's Subsidiaries and Affiliates (each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions for relief with the Bankruptcy Court, initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**").  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrower has requested that the Lenders provide a superpriority senior secured debtor-in-possession credit facility, in a principal amount of up to $134,084,563.51 (the "**DIP Facility**") consisting of:  (a) up to $17,500,000.00 which shall be made available upon entry of the Interim DIP Order, (b) up to $29,713,877.34 which shall be made available upon entry of the Final DIP Order and (c) up to $86,870,686.17  available after the entry of the Interim DIP Order and pursuant to the conditions precedent to each such drawing (the "**Subsequent Draws**"), in each case, on the terms and subject to the conditions set forth in this Agreement;

**WHEREAS**, the priority of the DIP Facility with respect to the Collateral granted as security for the payment and performance of the Obligations shall be as set forth in the Interim DIP Order and the Final DIP Order, as applicable, in each case, upon entry thereof by the Bankruptcy Court and in the Collateral Documents;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS AND INTERPRETATION

**1.1.    Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Account Bank**" means Fifth Third Bank or any other financial institution that (a) is acceptable to the Requisite Lenders and (b) replaces the Account Bank pursuant to arrangements and documentation which, in each case, are acceptable to the Requisite Lenders.

"**Acceptable Plan**" means a chapter 11 plan of reorganization or liquidation for any of the Debtors or their estates that provides for (a) the termination of all Commitments, (b) all Obligations and Prepetition Secured Obligations (but not, for the avoidance of doubt, any unsecured deficiency claims resulting from the value of the applicable Prepetition Collateral being less than the amount of the applicable Prepetition Secured Obligations) to be Paid in Full on or prior to the effective date thereof, and (c) treatment otherwise consented to by the Administrative Agent (acting at the direction of the Requisite Lenders) and

the Prepetition Agent (acting at the direction of the applicable Prepetition Lenders) in each case in their sole discretion.

"**Acquired Assets**" means the Brookfield Silo Assets acquired by Newco under the Stalking Horse APA.

"**ACT**" means ACT Power Services Holding Company Guarantor, LLC and its direct and indirect Subsidiaries.

"**Additional DIP Documents**" means the "loan documents", "credit documents" or similar defined term in any credit agreement or equivalent document memorializing an Additional DIP Facility.

"**Additional DIP Facilities**" means, collectively, the Carlyle DIP Facility, the Fundamental DIP Facility and any Replacement Additional DIP Facility in respect of the foregoing.

"**Additional O&M Services Agreements**" mean (a) any agreement between Pine Gate O&M, LLC and any Financing Subsidiary and (b) all agreements (other than Initial O&M Services Agreements) between the Borrower and its Subsidiaries, in each case relating to the provision of operations and maintenance, asset management, or other services with respect to the Projects owned by a Brookfield Silo Entity.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), or arbitration (whether or not purportedly on behalf of Borrower or any of the Borrower Parties) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of Borrower or any of the Borrower Parties, threatened in writing against or affecting Borrower or any of the Borrower Parties or any property of Borrower or any of the Borrower Parties.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to any Person, any other Person, that directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Affiliate Transaction**" as defined in <u>Section 6.6</u>.

"**Agency Fee Letter**" means the Agency Fee Letter, dated as of the Closing Date, between the Borrower and the Agent.

"**Agent**" means (i) the Administrative Agent, (ii) the Collateral Agent and (iii) any other Person appointed under the Credit Documents to serve in an agency or similar capacity on behalf of the Secured Parties.

"**Agent Affiliates**" as defined in <u>Section 9.1(b)(iii)</u>.

"**Aggregate Amounts Due**" as defined in <u>Section 2.11(b)</u>.

"**Agreement**" as defined in the preamble hereto.

"**Amendment No. 3 Term Loans**" has the meaning assigned to such term in the Prepetition Credit Agreement.

"**Allora Project**" means Allora Solar, LLC, a South Carolina limited liability company.

"**Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act of 1977, as amended and any other applicable similar laws or regulations concerning or relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means the financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended by the PATRIOT Act and any other applicable similar laws or regulations concerning or relating to terrorism financing or money laundering.

"**Applicable Interest Rate**" means:

(a)    with respect to the New Money DIP Loans and the Roll-Up DIP Loans issued in exchange for Amendment No. 3 Term Loans, 14.00%;

(b)    with respect to the Roll-Up DIP Loans issued in exchange for Prepetition PIKed Interest Loans, 12.25%; and

(c)    with respect to the Roll-Up DIP Loans issued in exchange for Prepetition Loans other than Amendment No. 3 Term Loans and PIKed Interest Loans, 11.25%;

<u>provided</u>, that, if at any time the interest rate or all-in yield (including pricing and fees) applicable to any amount outstanding under an Additional DIP Facility or any other financing entered into by the Borrower or any of its Subsidiaries on or after the Closing Date is greater than the Applicable Interest Rate for the New Money DIP Loans, the Applicable Interest Rate for the New Money DIP Loans shall automatically be increased to the greater of the interest rate applicable to (i) such Additional DIP Facility, and (ii) such other financing entered into by the Borrower or any of its Subsidiaries on or after the Closing Date; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, and without limitation, the Applicable Interest Rate is subject to <u>Section 2.5(c)(ii)</u>.

"**Applicable Prepayment Premium**" means, with respect to any repayment or prepayment of Loans paid, or otherwise becoming due and payable, upon the occurrence of a MOIC Event hereunder and in respect of which an Applicable Prepayment Premium is payable hereunder, an additional payment in an amount, payable in cash, equal to the MOIC Amount.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to Agents or Lenders by means of electronic communications pursuant to <u>Section 9.1(b)</u>.

3

"**Approved Budget**" means the Initial Approved Budget or, if an Updated Budget has been approved (including, for the avoidance of doubt, if an Updated Budget has been deemed approved) by the Requisite Lenders in accordance with Section 5.1(q)(i) of this Agreement, such Updated Budget.

"**Approved Financial Officers**" means, as applied to any Person, the chief executive officer, chief investments officer, chief operating officer, chief accounting officer or chief financial officer of or other equivalent officer of such Person (or any such officer of a manager, member or managing member of such Person or a direct or indirect parent company thereof), in each case that is duly authorized as an authorized signatory (or similar designation) of such Person in accordance with such Person's Organizational Documents in respect of the applicable matter or issue in question.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by the Requisite Lenders, such approval not to be unreasonably withheld, conditioned or delayed.

"**Assignment Effective Date**" as defined in Section 9.6(b).

"**Authorized Officer**" means, as applied to any Person, any executive or officer of such Person, or any other Person, in each case that is duly authorized as an authorized signatory (or similar designation) of such Person in accordance with such Person's Organizational Documents in respect of the applicable matter or issue in question.

"**Automatic Stay**" shall mean the automatic stay imposed under Section 362 of the Bankruptcy Code.

"**Auxin Circumvention Tariffs**" as defined in Section 4.27(a).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan".

"**Bid**" has the meaning specified in the Bidding Procedures.

"**Bidding Procedures**" has the meaning specified in Section 5.17(f).

"**Bidding Procedures / Stalking Horse APA Motion**" has the meaning specified in Section 5.17(f).

"**Bidding Procedures Order**" has the meaning specified in Section 5.17(g).

"**Blue Ridge**" means PGR Blue Ridge Power Holdings, LLC and its Subsidiaries, excluding ACT.

"**Blue Ridge Surety Bond**" means any letter of credit, surety bond, or similar instrument for the benefit of Catalina or any subcontractor of Blue Ridge in connection with work performed by Blue Ridge or any subcontractor in connection with the Catalina Project.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Borrower**" as defined in the preamble hereto.

"**Borrower Parties**" means, collectively, the Borrower, the Credit Parties (including the Intermediate Holding Companies) and the Financing Subsidiaries; and "**Borrower Party**" means any of them.

"**Borrower Revenue Account**" means the Deposit Account of BF Dev Holdco, LLC (other than the DIP Proceeds Account), as (a) identified in the Obligor Account Control Agreement with respect to the Borrower, (b) maintained with the Account Bank with account number ending in 2577, and (c) made subject to a First Priority Lien in favor of the Collateral Agent pursuant to the DIP Orders and the Collateral Documents.

"**Brookfield**" means Brookfield Asset Management Ltd.

"**Brookfield Confidentiality Agreement**" means that certain Mutual Nondisclosure Agreement, dated as of September 3, 2025, by and between the Borrower and Brookfield Asset Management Ltd.

"**Brookfield Pledged Intercompany Claims**" means (a) all claims, interests, intercompany receivables, obligations, liabilities and other intercompany balances or rights to payment (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Brookfield Silo Entity or Brookfield Silo Asset, including any Tariff Claims, (b) the Specified BRP Claims, and (c) any proceeds of the foregoing; *provided* that, in

5

no event shall claims in respect of the O&M Services Agreement, the Brookfield Retained Liabilities, or the Other BRP Claims be Brookfield Pledged Intercompany Claims.

"**Brookfield Retained Liabilities**" means any liabilities (a) outstanding as of October 6, 2025 and (b) thereafter, any amounts permitted to be incurred in accordance with the then-applicable Approved Budget, in each case, in respect of any equipment purchased or to be purchased by or on behalf of any Brookfield Silo Entity from PGR Procurement, LLC, to the extent (i) such equipment has been physically delivered to the project site of a Brookfield Silo Entity and (ii) an independent engineer has verified in writing that such equipment has been so delivered; provided that the Brookfield Retained Liabilities shall exclude (x) any claims or interests held by PGR Procurement, LLC in respect of equipment to the extent of the amount of any financing extended to any Brookfield Silo Entity (whether under the Prepetition Credit Agreement or under any Project Senior Financing of such entity) on account of an invoice relating to such equipment and (y) Tariff Claims against any Brookfield Silo Entity.

"**Brookfield Silo Assets**" means (a) the Equity Interests and assets of the Brookfield Silo Entities, and (b) the Brookfield Pledged Intercompany Claims.

"**Brookfield Silo Entities**" means each of (a) BF Dev Holdco, LLC, (b) PGC Solar Holdings Holdco II, LLC, (c) Cascade NTP Holdco, LLC, (d) PGR Blocker Holdco, LLC, (e) Polaris OpCo Pledgor B, LLC, and (f) any direct or indirect subsidiary of the foregoing.

"**BRP**" means Blue Ridge Power, LLC.

"**BRP Claims Conditions**" means the following conditions:

(a)     the claims are Identified BRP Claims;

(b)     such claims are determined to be valid and payable by the Independent Engineer; and

(c)     such claims (together with the aggregate amount of Identified BRP Claims paid after October 6, 2025 and prior to such date of determination) do not at any time exceed in the aggregate $7,000,000.

"**Budget Variance Report**" means, a weekly detailed variance report in respect of the weeks comprising the applicable Budget Variance Test Period, in form reasonably satisfactory to the Lenders, setting forth (a) the actual disbursements of the Borrower and its Subsidiaries, on an aggregate basis during the applicable Budget Variance Test Period, (b) a comparison (whether positive or negative, in Dollars and expressed as a percentage) for the applicable Budget Variance Test Period to the amount of the projected disbursements of the Borrower and its Subsidiaries for such applicable Budget Variance Test Period (the "**Budgeted Disbursements**"), respectively, set forth in the Approved Budget for such applicable Budget Variance Test Period and (c) a statement from a Responsible Officer certifying the information contained in such Budget Variance Report and providing an explanation of the variances set forth therein, including any variances in excess of the Permitted Variance and any corrective action to be taken with respect thereto.

"**Budget Variance Test Date**" shall mean the Friday of every week (commencing with the Friday of the fifth full calendar week occurring after the Petition Date (i.e., December [5], 2025) or, to the extent such Friday is not a Business Day, the next Business Day thereafter.

6

"**Budget Variance Test Period**" shall mean, with respect to any Budget Variance Test Date, the four-week period ending on the last Business Day of the week immediately preceding the applicable Budget Variance Test Date; *provided* that the initial Budget Variance Test Period shall include the period beginning on the Petition Date through end of the otherwise applicable four-week period.

"**Budgeted Disbursements**" as defined in the definition of "Budget Variance Report."

"**Business**" means, with respect to the Financing Subsidiaries, the direct or indirect ownership and operation of the assets of such Financing Subsidiary, including the ownership, development, construction and operation of the applicable Projects, the generation, sale or storage of electricity, capacity and electricity-related products, including, but not limited to, the registration, creation, reporting, monitoring, managing, transacting, transferring, monetizing, selling or contracting for the sale of, and retiring Renewable Energy Incentives, Renewable Energy Certificates, and Reporting Rights (in each case as defined in the Stalking Horse APA), at or from such Projects, and the conduct of other activities and services by the Financing Subsidiaries incidental or otherwise related to the foregoing.

"**Business Day**" means any day excluding (a) Saturday, Sunday and any other day that is a legal holiday under the laws of the State of New York, or (b) is any other day on which banking institutions located in such jurisdiction are authorized or required by law or other governmental action to close.

"**Cabin Creek Project**" means Cabin Creek Solar, LLC, a North Carolina limited liability company.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP (as in effect prior to the adoption of Accounting Standards Codification, 842, Leases, or a subsequent or similar accounting pronouncement or codification), is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Carlyle**" means Carlyle Investment Management, LLC.

["**Carlyle DIP Facility**" means the up to $[●] in principal amount of postpetition superpriority senior secured debtor-in-possession notes and other financial accommodations entered into by the Debtors and certain non-Debtors pursuant to the Carlyle DIP Note Documents.]

["**Carlyle DIP Note Documents**" means the Carlyle DIP Note Purchase Agreement and the other "Finance Documents" as defined in the Carlyle DIP Note Purchase Agreement.]

"**Carlyle DIP Noteholders**" means the holders of the "Notes" as defined in the Carlyle DIP Note Purchase Agreement.

["**Carlyle DIP Note Purchase Agreement**" means that certain [*Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement*], by and among Debtor Pine Gate Renewables, LLC, as Issuer, certain of the other Debtors and certain non-Debtor direct and indirect subsidiaries of the Debtors, as guarantors, the note purchasers party thereto, and Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent (as it may be amended, restated, amended and restated, modified, supplemented, extended, or waived from time to time).]

"**Carlyle Pledged Intercompany Claims**" has the meaning given to such term in the Interim DIP Order (and, when entered, the Final DIP Order).

7

"**Carlyle Prepetition Facility**" means that certain senior secured notes issuance pursuant to the Carlyle Prepetition Note Purchase Agreement and the other Carlyle Prepetition Finance Documents.

"**Carlyle Prepetition Finance Documents**" means "Finance Documents" as defined in the Carlyle Prepetition Note Purchase Agreement.

"**Carlyle Prepetition Note Purchase Agreement**" means that certain Note Purchase Agreement, dated as of October 10, 2023 (as amended by that certain Amendment to Note Purchase Agreement, dated as of March 1, 2024, that certain Second Amendment to Note Purchase Agreement, dated as of March 18, 2025, and that certain Third Amendment to Note Purchase Agreement, dated October 6, 2025, by and between certain affiliates of the Borrower, including NPA 2023 Holdco, LLC, a North Carolina limited liability company as the issuer, the Purchasers and the Holders (each as defined therein) from time to time party thereto, and Wilmington Trust, National Association, as collateral agent.

"**Carlyle Prepetition Noteholders**" means the holders of the "Notes" as defined in the Carlyle Prepetition Note Purchase Agreement.

"**Carlyle Silo Assets**" means the Equity Interests and assets of the Carlyle Silo Entities and the Carlyle Pledged Intercompany Claims.

"**Carlyle Silo Entities**" means each of (a) NPA 2023 Holdco, LLC, (b) NPA PGR Blocker Holdco, LLC, (c) NPA Polaris OpCo Holdco, LLC, (d) NPA Polaris DevCo Holdco, LLC and (e) any direct or indirect subsidiary of the foregoing.

"**Carve Out**" has the meaning assigned to the term "Carve Out" in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account or securities account.

"**Cash Collateral**" has the meaning specified in the Interim DIP Order and, when applicable, the Final DIP Order.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or F-1 from Fitch or P-1 from Moody's; (iii) commercial paper maturing no more than three (3) months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or F-1 from Fitch or P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously

8

in the types of investments referred to in <u>clauses (i)</u> and <u>(ii)</u> above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P, Fitch or Moody's.

"**Cash Management Motion**" means the first day motion of the Debtors seeking interim and final approval of the Debtors' cash management system.

"**Cash Management Order**" means the interim and final orders of the Bankruptcy Court entered in the Chapter 11 Cases that authorizes the Debtors to maintain their cash management system and treasury arrangements, subject to the consent rights of the Requisite Lenders, as the same may be amended, supplemented or modified from time to time after the entry thereof subject to the consent rights of the Requisite Lenders.

"**Casualty/Condemnation Proceeds**" means:

(a)    any net cash proceeds received under any insurance policies or otherwise with respect to any casualty or other insured damage to any properties or assets of the Borrower Parties; and

(b)    any net cash proceeds received by the Borrower Parties in connection with any action or proceeding for the taking of any properties or assets of the Borrower Parties, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, by reason of any similar public improvement or condemnation proceeding;

provided that, taxes paid or reasonably estimated in good faith to be payable as a result thereof, fees (including investment banking fees, attorneys' fees, accountants' fees, underwriting fees and discounts), commissions, costs and other out-of-pocket expenses and other customary expenses, actually incurred by the applicable Borrower Party in connection with such casualty or condemnation event shall be deducted from such net cash proceeds received pursuant to clause (a) and (b) above.

"**Catalina**" means Catalina Solar, LLC.

"**Catalina Direct Payment Agreement**" means that certain Direct Payment Agreement, dated as of October 6, 2025, among Catalina and BRP.

"**Catalina Payment Failure**" means the failure of Blue Ridge to make any payment to any of Blue Ridge's Catalina Project subcontractors when such payment is due and owing to such subcontractor.

"**Catalina Project**" means the construction-phase solar power generating facility that Catalina owns in Ridge Spring, South Carolina.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory

authorities, in each case pursuant to *Basel III*, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means the occurrence of the following:

(a) the Permitted Holders cease to (i) beneficially own and control, in the aggregate, directly or indirectly, at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower, (ii) beneficially own and control, in the aggregate, directly or indirectly, one hundred percent (100%) of the common units of PGR Holdco, LP held by PGR Partners, LLC, or (iii) collectively hold the right, directly or indirectly, to appoint at least a majority of the board of directors, managers or equivalent governing body of the Borrower;

(b) Borrower ceases to own and control (directly or indirectly), legally and beneficially, one hundred percent (100%) of the voting and economic Equity Interests of each Guarantor; or

(c) the Borrower ceases (i) to own and control (directly or indirectly), legally and beneficially, one hundred percent (100%) of the voting and economic Equity Interests of each Brookfield Silo Entity; provided, that, for purposes of determining such percentage (x) customary negative control rights granted in connection with a Permitted Tax Equity Investment if applicable, shall not be considered voting Equity Interests and (y) any economic Equity Interests granted under a Permitted Tax Equity Investment, if applicable, shall not be taken into account.

"**Chapter 11 Cases**" has the meaning assigned to such term in the recitals of this Agreement.

"**Closing Date**" means the date on which the conditions precedent to the closing of the DIP Facility have been satisfied or waived in accordance with the Credit Documents and the effectiveness of the Loan Documents and the DIP Facility has occurred.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit F-1.

"**Collateral**" means "Brookfield DIP Collateral" (as defined in the Interim DIP Order and when entered, the Final DIP Order).

"**Collateral Agent**" has the meaning assigned to such term in the recitals of this Agreement.

"**Collateral Documents**" means, collectively (i) the Guarantee and Security Agreement, (ii) the DIP Proceeds Account Control Agreement, and (iii) all other instruments, documents and agreements delivered by or on behalf of Borrower or any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of Secured Parties, a Lien on any personal property of that Credit Party as security for the Obligations.

"**Commercial Operation**" means, with respect to any Financing Project, that such Financing Project has achieved "commercial operation" (or any equivalent standard) under each of its interconnection agreement and Permitted Power Purchase Agreement or, with respect to any Financing

Project that has a forward starting Permitted Power Purchase Agreement, and expects to sell into the merchant market during some period of time before the start date under such Permitted Power Purchase Agreement, "substantial completion" (or any equivalent standard) under the Permitted EPC Contract.

"**Commitment**" means any DIP Interim Funding Commitment, DIP Final Funding Commitment or DIP Subsequent Draw Commitment.

"**Committee**" has the meaning specified in Section 2.3(c).

"**Commitment Fee**" as defined in Section 2.6(a).

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Agency Fee Letter, the Collateral Documents, and all other documents, certificates, instruments or agreements executed and delivered by or on behalf of any Borrower Party, and/or any Affiliate of the foregoing, in each case, for the benefit of any Secured Party in connection herewith on or after the Closing Date (including any document designated as a Credit Document by the Borrower and an Agent).

"**Credit Extension**" means, without duplication, the making of Loans to Borrower on or after the Closing Date.

"**Credit Parties**" means, collectively, the Borrower, the Guarantors and each other Subsidiary of the Borrower that guarantees the Obligations pursuant to this Agreement and/or the Project Senior Financing Collateral and Guarantee Requirement; and "**Credit Party**" means each of them.

"**Debtor(s)**" has the meaning assigned to such term in the recitals of this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, administration, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Rate**" as defined in Section 2.5(b).

"**Defaulting Lender**" means subject to Section 2.15(b), any Lender (a) that has failed to (i) fund all or any portion of its Loans within ten Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Administrative Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Administrative Agent, or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) that has notified Borrower or Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder,

11

or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) that has failed, within ten Business Days after written request by Administrative Agent or Borrower to confirm in writing to Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower), or (d) for which Administrative Agent has received notification that such Lender is, or has a direct or indirect parent company that is, (i) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (ii) the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment, (iii)become the subject of a Bail-In Action or (iv) the target of any Economic Sanctions and Trade Controls Laws and Regulations or is not in compliance with any applicable Anti-Corruption Law, or any applicable Anti-Money Laundering Law; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Facility**" has the meaning specified in the Recitals.

"**DIP Final Funding Commitment**" means, with respect to each Lender, the commitment of such Lender to make or otherwise fund DIP Final Funding Loans on the DIP Final Funding Date, pursuant to Section 2.1(a), in an aggregate amount not to exceed the amount set forth opposite such Lenders' name set forth on Appendix A or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the DIP Final Funding Commitments as of the Closing Date is $29,713,877.34.

"**DIP Final Funding Date**" means the date on which the conditions set forth in Section 3.2 are satisfied (or waived in accordance with Section 9.5).

"**DIP Final Funding Loans**" means any borrowing hereunder of Loans in respect of the DIP Final Funding Commitments.

"**DIP Intercreditor Agreement**" means (i) that certain Pari Passu Lien Intercreditor Agreement entered into on or about the [date hereof] between the Collateral Agent, the Carlyle DIP Noteholders, and the Fundamental DIP Lender, and (ii) that certain Junior Lien Intercreditor and Subordination Agreement entered into on or about the date hereof between the Collateral Agent, the Carlyle DIP Noteholders, and the Fundamental DIP Lender.

12

"**DIP Interim Funding Commitment**" means, with respect to each Lender, the commitment of such Lender to make or otherwise fund DIP Interim Funding Loans on the DIP Interim Funding Date, pursuant to Section 2.1(a), in an aggregate amount not to exceed the amount set forth opposite such Lenders' name set forth on Appendix A or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the DIP Interim Funding Commitments as of the Closing Date is $17,500,000.00.

"**DIP Interim Funding Date**" means the date on which the conditions set forth in Section 3.1 are satisfied (or waived in accordance with Section 9.5).

"**DIP Interim Funding Loans**" means any borrowing hereunder of Loans in respect of the DIP Interim Funding Commitments.

"**DIP Motion**" has the meaning specified in Section 5.17(a).

"**DIP Orders**" means the Interim DIP Order and the Final DIP Order.

"**DIP Proceeds Account**" means the Deposit Account of BF Dev Holdco, LLC as (a) identified in the DIP Proceeds Account Control Agreement, (b) maintained with the Account Bank with account number ending in 2569, and (c) made subject to a First Priority Lien in favor of the Collateral Agent pursuant to the Guarantee and Security Agreement and the DIP Proceeds Account Control Agreement.

"**DIP Proceeds Account Control Agreement**" means a deposit account control agreement, by and among BF Dev Holdco, LLC, Account Bank and Collateral Agent in form and substance satisfactory to the Collateral Agent and the Requisite Lenders that is sufficient to give the Collateral Agent "control" (for purposes of Article 8 and 9 of the Uniform Commercial Code) over the DIP Proceeds Account.

"**DIP Subsequent Draw Commitment**" means, with respect to each Lender, the commitment of such Lender to make or otherwise fund DIP Subsequent Draw Loans on any DIP Subsequent Draw Date, pursuant to Section 2.1(c), in an aggregate amount not to exceed the amount set forth opposite such Lenders' name set forth on Appendix A or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the DIP Subsequent Draw Commitment as of the Closing Date is $86,870,686.17.

"**DIP Subsequent Draw Date**" means the date on which the conditions set forth in Section 3.1 (with respect to Subsequent Draws made after entry of the Interim DIP Order and prior to entry of the Final DIP Order) and Section 3.2 (with respect to Subsequent Draws made after entry of the Final DIP Order), including Sections 3.1(y) and 3.2(o), as applicable, are satisfied (or waived in accordance with Section 9.5).

"**DIP Subsequent Draw Loans**" means any borrowing hereunder of Loans in respect of the DIP Subsequent Draw Commitments.

"**DIP Superpriority Claims**" means the superpriority expense claims of the Credit Parties granted by the Bankruptcy Court pursuant to the DIP Orders against each Debtor, subject to the terms set forth in the Interim DIP Order and, when entered, the Final DIP Order, and junior only to the Carve Out to the extent set forth in the Interim DIP Order.

13

"**Disbursement Date**" means the date of a Credit Extension.

"**Disposition**" means the sale, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith. "**Dispose**", "**Disposed**" and "**Disposal**" have correlative meanings.

"**Disqualified Person**" means (a) a "tax-exempt entity" within the meaning of Section 168(h)(2) of the Internal Revenue Code (unless the exception under Section 168(h)(1)(D) or Section 168(h)(2)(B) of the Internal Revenue Code applies) or a "tax-exempt controlled entity" as defined in Section 168(h)(6)(F) of the Internal Revenue Code (unless an election under Section 168(h)(6)(F)(ii) of the Internal Revenue Code is in effect); (b) a Person described in Section 50(d) of the Internal Revenue Code whose indirect ownership of any Project would result in a reduction in the amount of ITC that may be claimed with respect to any Project by any other Person; or (c) any partnership or other pass-through entity (including a single-member disregarded entity) any direct or indirect partner of which (or other direct or indirect holder of an equity or profits interest) is described in clauses (a) through (b) above, unless such Person holds its interest in the partnership or other pass-through entity indirectly through an entity taxable as a corporation for U.S. federal income tax purposes that is not a "tax-exempt controlled entity" as defined in Section 168(h)(6)(F) of the Internal Revenue Code (unless an election under Section 168(h)(6)(F)(ii) of the Internal Revenue Code is in effect) or a corporation that is a Person described in clause (b) above.

"**Dollars**" and "**$**" means the lawful money of the United States of America.

"**Economic Sanctions and Trade Controls Laws and Regulations**" means (i) economic sanctions or trade embargoes imposed, administered, or enforced by the United States, including by the U.S. Department of State or by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), (b) all applicable laws concerning exportation, including rules and regulations administered by the U.S. Department of Commerce, the U.S. Department of State or the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security ("**U.S. CBP**") and (c) any applicable federal or international anti-boycott laws, including any executive orders, rules and regulations.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the effective date of a chapter 11 plan in the Chapter 11 Cases.

"**Eligible Assignee**" means any Person (other than a Natural Person).

14

"**Eligible Project Costs**" is defined in Annex B to the Prepetition Brookfield Facility.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is subject to ERISA and is or was sponsored, maintained or contributed to by, or required to be contributed by, Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any Adverse Proceeding, written notice of potential liability, notice of violation, complaint, claim, demand, abatement order or other order or directive by any Governmental Authority or any other Person arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Release or threatened Release of, contamination by, or exposure to Hazardous Materials; or (iii) in connection with any actual or alleged damage, injury, threat or harm to natural resources, wildlife or the environment.

"**Environmental Laws**" means any and all foreign or domestic, federal, state, or local (or any subdivision of either of them) laws (including common law), statutes, ordinances, orders, rules, regulations, judgments, or any legally enforceable other requirements of Governmental Authorities relating to (i) pollution or protection of public health (to the extent related to exposure to Hazardous Materials) or the environment, including natural resources and plant and animal life, or (ii) the Release, threatened Release, regulation, manufacture, sale, processing, labeling, generation, use, storage, transportation or disposal of, or exposure to, Hazardous Materials.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests, and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERCOT**" means the Electric Reliability Council of Texas.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Borrower or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Borrower or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Borrower or such Subsidiary and with respect to liabilities arising after such period for which Borrower or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to

15

make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan or a determination that any Pension Plan is, or is expected to be, considered an at-risk plan within the meaning of Section 430 of the Internal Revenue Code or Section 303 of ERISA; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors that are not ERISA Affiliates, or the termination of any such Pension Plan resulting in liability to Borrower, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in insolvency pursuant to Section 4245 of ERISA, that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA or that it is in endangered, critical and declining or critical status under Section 432 of the Internal Revenue Code or Section 305 of ERISA; or (viii) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"**Erroneous Payment Deficiency Assignment**" as defined in Section 8.14(d).

"**Erroneous Payment Return Deficiency**" as defined in Section 8.14(d).

"**Erroneous Payment Subrogation Rights**" as defined in Section 8.14(d)

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" as defined in Section 7.1.

"**EWG**" as defined in Section 4.24(a).

"**EWG Status**" as defined in Section 4.24(a).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Property**" shall have the meaning assigned to such term in the Guarantee and Security Agreement.

"**Excluded Subsidiaries**" means:

(a) any Financing Subsidiary (other than any obligor under the Prepetition Credit Agreement) that, notwithstanding the Borrower's use of reasonable best efforts in accordance with

16

Section 5.18, has not obtained the Project Senior Financing Guarantee Consents (solely to the extent required),

(b) each Carlyle Silo Entity and each Fundamental Silo Entity, in each case as to which the (i) the Prepetition Intercreditor Agreements, (ii) the DIP Intercreditor Agreements, or (iii) the intercreditor arrangements between the Collateral Agent and the agent for any Replacement Additional DIP Facility provide that such Subsidiary shall not provide or shall be released from its guarantee of the DIP Facility,

(c) PGR Signature Fund 1, LLC or any wholly-owned subsidiary thereof,

(d) any direct or indirect subsidiaries of Blue Ridge Power Holding Company, LLC,

(e) ACT, and

(f) any Subsidiary of the Borrower other than an Intermediate Holding Company that is not a Debtor or a Brookfield Silo Entity and owns no assets, has no liabilities, and has no operations or employees.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Lender or Agent or required to be withheld or deducted from a payment to a Lender or Agent: (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (a) imposed as a result of such Person being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or (b) that are Other Connection Taxes, (ii) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Person with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (a) such Person acquires such interest in the Loan or Commitment or in this Agreement or (b) in the case of a Lender, such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.13, amounts with respect to such Taxes were payable either to such Person's assignor immediately before such Person became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Person's failure to comply with Section 2.13(f) and (iv) any United States withholding Taxes imposed under FATCA.

"**Exit Fee**" as defined in Section 2.6(b).

"**Extraordinary Receipts**" means any net cash received by or paid to or for the account of any Person not in the ordinary course of business, including (a) tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) indemnity payments or funds released from escrow, and (f) any purchase price adjustments in connection with any transaction agreement; provided, however, that an Extraordinary Receipt shall not include (i) cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto, (ii) any Casualty/Condemnation Proceeds or (iii) any proceeds received pursuant to any MIPA; provided, further, that, taxes paid or reasonably estimated in good faith to be payable as a result thereof, fees (including investment banking fees, attorneys' fees, accountants' fees, underwriting fees and discounts), commissions,

17

costs and other out-of-pocket expenses and other customary expenses, actually incurred by the Borrower or such Subsidiary shall be deducted from such net cash proceeds received pursuant to this definition.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any intergovernmental agreements entered into with respect thereto (together with any law implementing such agreements) and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

"**Federal Energy Regulatory Authorizations, Exemptions, and Waivers**" as defined in Section 4.24(c).

"**Federal Funds Effective Rate**" means for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**FERC**" means the Federal Energy Regulatory Commission, or its successor.

"**Final DIP Order**" means a Final Order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, authorizing and approving on a final basis, among other things, authorizing and approving the DIP Facility on a final basis, which order shall be in form and substance satisfactory to the Requisite Lenders.

"**Final Order**" means, as applicable, an order of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, stayed, reconsidered, readjudicated, modified or amended.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of an Approved Financial Officer, that such financial statements fairly present, in all material respects, the financial condition of Borrower and its Subsidiaries as at the dates indicated and the stockholders' equity, results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments, and provided that any unaudited financial statements shall not have any footnotes.

"**Financing Projects**" means each Project owned by a Brookfield Silo Entity of which the Borrower owns, directly or indirectly, any Equity Interest.  The Financing Projects are specified on Schedule 4.2(a).

"**Financing Subsidiaries**" means, collectively, each Brookfield Silo Entity or any entity in which a Brookfield Silo Entity has, or acquires, directly or indirectly, any Equity Interests.

"**First Day Motions**" as defined in Section 3.1(l).

18

"**First Draw**" means a borrowing of up to $17,500,000.00 of the DIP Facility that becomes available upon entry of the Interim DIP Order.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the highest priority Lien to which such Collateral is subject, other than any Permitted Lien that, pursuant to applicable law, are entitled to an equal or higher priority than the liens granted by the Collateral Documents.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower ending on December 31 of each calendar year.

"**FPA**" as defined in Section 4.24(b).

"**Fundamental DIP Credit Agreement**" means that certain Senior Secured Super Priority Debtor-in-Possession Credit Agreement, dated as of the date hereof, by and among Pine Gate Renewables, LLC, as Borrower, certain of the other Debtors party thereto and certain other non-Debtor direct and indirect subsidiaries of the Debtors, as guarantors, and the Fundamental DIP Lender (as it may be amended, restated, amended and restated, modified, supplemented, extended, or waived from time to time).

"**Fundamental DIP Facility**" means the up to $[●] in principal amount of postpetition superpriority senior secured debtor-in-possession term loans and other financial accommodations entered into by the Debtors and certain non-Debtors pursuant to the Fundamental DIP Loan Documents.

"**Fundamental DIP Lender**" means, individually and collectively, FP Solar Development I LLC, a Delaware limited liability company and Solar Construction Lending, LLC, a Delaware limited liability company, under the Fundamental DIP Facility.

"**Fundamental DIP Loan Documents**" means the "Loan Documents", or equivalent term, as defined in the Fundamental DIP Credit Agreement.

"**Fundamental Prepetition Credit Agreement**" means that certain Amended and Restated Revolving Loan Agreement, dated as of October 6, 2025, by and among FP 2021 Dev HoldCo, LLC, a North Carolina limited liability company, as borrower, FP Solar Development I LLC, a Delaware limited liability company, and Solar Construction Lending, LLC, a Delaware limited liability company, as lenders.

"**Fundamental Prepetition Facility**" means that certain senior secured credit facility pursuant to the Fundamental Prepetition Credit Agreement and the other Fundamental Prepetition Loan Documents.

"**Fundamental Prepetition Lender**" means the "Lender" (as defined in the Fundamental Prepetition Credit Agreement).

"**Fundamental Prepetition Loan Documents**" means "Loan Documents" as defined in the Fundamental Prepetition Credit Agreement.

19

"**Fundamental Silo Assets**" means the Equity Interests and assets of the Fundamental Silo Entities and the Fundamental Pledged Intercompany Claims.

"**Fundamental Silo Entities**" means (a) FP 2021 Dev Holdco, LLC, PGR 2022 Sponsor Holdco, LLC, PGR Carver Holdco LLC, PGR Dev Carver Holdco LLC, and/or each of their direct and indirect subsidiaries, (b) Sirius OpCo Pledgor, LLC and each of its direct and indirect subsidiaries, and (c) Cascade Dev Holdco, LLC and each of its direct and indirect subsidiaries.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the provisions of Section 1.2 and the definition of "Capital Lease", United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Goods**" as defined in Section 4.27(a).

"**Governmental Authority**" means any state, municipal, national, federal, provincial or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States or a foreign entity or government (including any supra-national bodies such as the European Union or the European Central Bank), any securities exchange, FERC, and any self-regulatory organization or entity exercising authority delegated by a governmental entity (such as NERC).

"**Governmental Authorization**" means any permit, identification number, filing, license, certificate, approval, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guarantors**" means, collectively, (a) each Debtor other than the Borrower, including, for the avoidance of doubt, PGR Blue Ridge Holdings, LLC and its direct and indirect subsidiaries that are Debtors, (b) each Financing Subsidiary, (c) each of the entities that is a "Credit Party" as defined in the Prepetition Credit Agreement (other than the Borrower) and their respective direct and indirect subsidiaries, and (d) the Intermediate Holding Companies, and "Guarantor" means any of them. Notwithstanding the foregoing, the Guarantors shall not include any Excluded Subsidiary.

"**Guarantee and Security Agreement**" means that certain Debtor-in-Possession Guarantee and Security Agreement, dated as of the date hereof, by and among the Guarantors and the Collateral Agent.

"**Gunsight Project**" means Gunsight Solar, LLC, a South Carolina limited liability company.

"**Hazardous Materials**" means: (a) any chemical, waste, material or substance, which is prohibited, listed, defined, designated, classified or regulated as "hazardous," "radioactive," "corrosive" or toxic, or as a "pollutant" or "contaminant" by any Governmental Authority or pursuant to any Environmental Law, including any petroleum or petroleum products and by-products, radioactive materials, asbestos or asbestos-containing materials, urea formaldehyde, lead, per- and polyfluoroalkyl substances, or polychlorinated biphenyls, toxic mold, and radon gas, or (b) any other chemical, waste, material or

20

substance, which is prohibited or otherwise regulated under any Environmental Law due to its deleterious effects or for which cleanup or other remedial action is required or for which liability or standards of conduct are imposed under any applicable Environmental Law.

"**Hedging Indebtedness**" of any Person means, as of any date of determination, the Swap Termination Value that such Person would be required to make under outstanding Swap Contracts.

"**Historical Financial Statements**" means the (a) unaudited consolidated balance sheets and statements of income and cash flow for the Borrower as of the Fiscal Quarter ended March 31, 2025, June 30, 2025 and September 30, 2025 and (b) the audited consolidated balance sheets and statements of income and cash flow of the Borrower as of the Fiscal Year ended December 31, 2024.

"**Holding Company**" means a Brookfield Silo Entity established solely to own, directly or indirectly, the Equity Interests in one or more Project Owners and which does not conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any material business or operations or other activity other than those directly related thereto (except, in the case of a PSF Obligor, entering into a Project Senior Financing, consummating the transactions contemplated thereunder, and owning the Equity Interests in applicable Financing Subsidiaries.  The Holding Companies are specified on Schedule 4.1.

"**Identified BRP Claims**" means the purported obligations of Catalina to Blue Ridge in respect of change orders or similar claims set forth on Annex B.

"**Indebtedness**" means, as applied to any Person, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof and not overdue by more than 30 days); (v) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person; (vi) the principal component of all obligations, contingent or otherwise, of such Person (x) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instruments in respect of which a back-to-back letter of credit has been issued under or as permitted by this Agreement) and (y) in respect of bankers' acceptances; (vii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; and (viii) all obligations of such Person in respect of Hedging Indebtedness. For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company or the foreign equivalent thereof) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any Indebtedness of any Person for purposes of clause (v) that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid principal amount of such Indebtedness, and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Agent**" as defined in Section 8.6(b).

21

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages and related expenses, including documented out-of-pocket counsel fees (subject to Section 9.2), charges and disbursements incurred by, or asserted against any such Indemnitee arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby; (ii) the Loans or the use of Proceeds, (iii) any Environmental Claim or other claim relating to Hazardous Materials in connection with or arising from any past or present act, omission, operation, land ownership, or practice of Borrower or any of its Subsidiaries, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto.

"**Indemnified Taxes**" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of a Borrower or any other Credit Party under any Credit Document and (ii) to the extent not otherwise described in clause (i), Other Taxes.

"**Indemnitee**" as defined in Section 9.3(a).

"**Independent Accountant**" means Deloitte, Ernst & Young, KPMG, PricewarehouseCoopers, Forvis Mazars, LLP, Novogradac & Company LLP or other independent certified public accountants of recognized national standing selected by Borrower, and satisfactory to the Requisite Lenders.

"**Independent Directors**" means each of the independent directors appointed to the board of directors or equivalent governing body of PGR Blocker Holdco, LLC, PGC Solar Holdings II, LLC, BF Dev Holdco, LLC, Cascade NTP Holdco, LLC, and Polaris OpCo Pledgor B, LLC, in each case in accordance with the Prepetition Credit Agreement and the Loan Documents.

"**Independent Engineer**" means an independent engineer engaged by Catalina, which may be Catalina's existing independent engineer, provided that any independent engineer that is not Catalina's existing independent engineer must be reasonably acceptable to the Requisite Lenders.

"**Initial Approved Budget**" means the Budget set forth in Annex A or otherwise in form and substance satisfactory to the Requisite Lenders.

"**Initial O&M Services Agreements**" means, collectively, any agreement between ACT Power Services, LLC and Pine Gate O&M, LLC, in each case relating to the provision of operations and maintenance, asset management, or other services with respect to the Projects owned by a Brookfield Silo Entity.

"**Intellectual Property**" has the meaning specified in the Guarantee and Security Agreement.

"**Interim Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, together with all extensions, modifications, and amendments thereto approved by the Borrower and the Administrative Agent.

"**Interim DIP Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, in the form attached hereto as Exhibit [•] and/or otherwise in form and substance satisfactory to the Credit Parties and the Administrative Agent, together with all extensions, modifications, and amendments thereto approved by the Borrower and the Administrative Agent.

22

"**Intermediate Holding Company**" means each of following Debtors:   (a) PGR Guarantor, LLC, (b) Pine Gate Renewables, LLC, (c) Pine Gate Fund Management, LLC, (d) Pine Gate Development, LLC, (e) PGC Solar Holdings I Managing Member, LLC, (f) Cascade Pledgor, LLC, (g) PGR Blue Ridge Power Holdings, LLC, (h) PGR 2024 Sponsor Holdco, LLC, (i) PGR Signature Fund 1 Manager, LLC, (j) Pine Gate Assets, LLC, (k) Pine Gate Energy Capital, LLC, (l) Pine Gate Dev Holdco, LLC, (m) Pine Gate O&M, LLC, (n) PGR 2022 Sponsor Holdco, LLC, (o) Blue Ridge Power Holding Company, LLC, (p) BF Dev Holdco Pledgor, LLC, (q) PGC Solar Holdings I, LLC, and (r) NPA Polaris DevCo Pledgor, LLC.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the Closing Date and from time to time thereafter, and any successor statute.

"**Inventory**" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by any Borrower Party, stored by any of the Borrower Parties or on behalf of any of the Borrower Parties, or in transit to, any Borrower Parties, including any such inventory, goods or materials (a) being held by customers of the Business pursuant to consignment arrangements, (b) being held by suppliers of the Business under tolling or similar arrangements , or (c) acquired on behalf of the Business by a third party, including PGR Procurement, LLC or any other affiliated third party.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by a Credit Party of, or of a beneficial interest in, any Equity Interests; or (ii) any direct or indirect loan or advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by a Credit Party to any other Person, including all Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business.  The amount of any Investment of the type described in <u>clauses (i)</u> and <u>(ii)</u> shall be the original cost of such Investment <u>plus</u> the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**ITC**" means the federal investment tax credit pursuant to Section 48 of the Internal Revenue Code.

"**Landrace Project**" means Landrace Holdings, LLC, a North Carolina limited liability company.

"**Lender Advisors**" means FTI Consulting, Inc. and Paul, Weiss Rifkind, Wharton & Garrison LLP.

"**Lenders**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Liquidity**" means, at any time, an amount equal to the amount of total Unrestricted Cash (which, for the avoidance of doubt, shall include proceeds of the funded Loans) and Cash Equivalents held by the Borrower and its Subsidiaries, including all Credit Parties.

23

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Limewood Account**" means that certain deposit account of the Limewood Project Company maintained at Fifth Third Bank, account number 7474272353.

"**Limewood Project Company**" has the meaning specified in the recitals hereto.

"**Loan**" means any Credit Extension by the Lenders to the Borrower under Section 2.1 in the form of New Money DIP Loans and Roll-Up DIP Loans.

"**Loan Exposure**" means, with respect to any Lender as of any date of determination, the sum of (i) that Lender's outstanding Commitment plus (ii) the aggregate principal balance of all Loans (including PIKed Interest Loans) of such Lender then outstanding.

"**Loan Note**" means a promissory note in the form of Exhibit B, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Margin Stock**" as defined in Regulation U.

"**Market-Based Rate Authorizations**" as defined in Section 4.24(c).

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business or financial condition of the Borrower Parties in the aggregate; (ii) the ability of any Credit Party to perform its obligations under the Credit Documents; or (iii) the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party, except, with respect to clause (iii), in accordance with the express terms of such Credit Document; provided, that, notwithstanding anything to the contrary in this defined term, none of the matters described in clauses (i) through (iii) above shall constitute a Material Adverse Effect to the extent arising from events leading up to and customarily resulting from the commencement of the Chapter 11 Cases, circumstances leading thereto, or the continuation and prosecution thereof, including any decline in business relationships, reputation, or financial performance resulting therefrom; provided further, that, any effects resulting from changes in general economic conditions, financial markets, industry conditions, or geopolitical events, except to the extent such efforts have a materially disproportionate impact on the Borrower relative to similarly situated companies, shall not constitute a Material Adverse Effect; provided, further, that, no Specified Event shall constitute a Material Adverse Effect.

"**Material Contract**" means, solely with respect to the Brookfield Silo Entities, each of the (a) Project Senior Financing Documents, (b) Material Project Documents, and (c) solely for the purpose of Section 6.8, any contract which is deemed "material" by the Administrative Agent (acting at the direction of the Requisite Lenders), provided that, in the case of clause (c), the Administrative Agent has notified the Borrower in writing of such designation.

"**Material Project Document**" means each of the following agreements entered into by a Financing Subsidiary in connection with a Financing Project, provided, however, that any Material Project

24

Document shall cease to be a Material Project Document when all material obligations thereunder have been indefeasibly performed and Paid in Full:

> (a)     any power purchase agreement, renewable energy credit agreement or similar agreement pursuant to which such electricity, capacity and/or related attributes produced by the applicable Financing Project are (or, upon the Commercial Operation of such Financing Project, are projected to be) sold;

> (b)     any engineering, procurement and construction contract pursuant to which a material portion of the applicable Financing Project is (or is to be) constructed;

> (c)     any interconnection agreement pursuant to which the applicable Financing Project connects to the applicable transmission-owning public utility;

> (d)     any lease agreement for the entire applicable Project Site or any material portion thereof;

> (e)     any shared facilities agreement pursuant to which the applicable Financing Project shares facilities with co-located projects;

> (f)     any Organizational Documents of any Borrower Party; and

> (g)     any agreement pursuant to which the primary equipment provided to an applicable Financing Project exceeds $1,000,000.

"**Maturity Date**" means the earliest of

(a) the Scheduled Maturity Date,

(b) the Effective Date,

(c) the date on which the consummation of a Sale occurs (excluding any sale of ACT or resulting from a sale of the Carlyle Silo Assets or the Fundamental Silo Assets pursuant to the Bidding Procedures Order),

(d) the date of termination of the Lenders' commitments and the acceleration of any outstanding Loans under the Loan Documents,

(e) the date on which the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code occurs,

(f) the date that is 30 days after the Petition Date or such later date as agreed by the Administrative Agent unless the Final DIP Order has been entered by the Bankruptcy Court on or prior too such date,

(g) the date on which the Debtors' right to use Cash Collateral in accordance with the Interim DIP Order or Final DIP Order is terminated, as applicable,

(h) the occurrence of the maturity date under or the acceleration of any Additional DIP Facility, and

(i) the date on which the Debtors, without the prior written consent of the Administrative Agent file or express written support for bidding procedures, sale processes, or transactions that are not acceptable to the Administrative Agent or any plan of liquidation or reorganization (or related disclosure statement) that is not an Acceptable Plan.

"**MIPA**" as defined in the definition "Tax Equity Financing Documents".

"**MOIC**" means the ratio of (a) the sum of all fees (including original issue discount, commitment fees, the Commitment Fee and the Exit Fee), interest, principal, in respect of the principal amount repaid, and other payments received in cash by the Lenders in respect of the New Money DIP Loans since the Closing Date (excluding, for the avoidance of doubt, any reimbursement of out of pocket costs or expenses, administrative agent fees, fees paid to the Lender Advisors and any indemnification payments made to the Lenders), as the numerator and (b) the sum of the total aggregate Commitments in respect of New Money DIP Loans pursuant to the Loan Documents (determined prior to giving effect to any reduction of the Commitments or extension of the New Money DIP Loans thereunder) as the denominator.

"**MOIC Amount**" means with respect to any MOIC Event, an amount that is paid to the Lenders sufficient to cause such Lenders to achieve a MOIC of 1.30 on Commitments in respect of the New Money DIP Loans, net of the aggregate amount paid in respect of clause (b) of the definition "MOIC Amount" under the Prepetition Brookfield Facility in respect of Amendment No. 3 Term Loans (as defined in the Prepetition Credit Agreement) that is paid with the proceeds of, or in exchange for, Roll-Up DIP Loans.

"**MOIC Event**" means the occurrence of any of the following: (a) the payment in full (or other retirement, including pursuant to a credit bid) of the New Money DIP Loans, (b) a reduction of the Commitments to zero Dollars ($0) other than as a result of the disbursement of such New Money DIP Loans, (c) any acceleration of the Obligations (including, for the avoidance of doubt, upon the commencement of any insolvency proceeding) or (d) the Maturity Date.

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA and that is subject to Title IV of ERISA.

"**Natural Person**" means a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person.

"**New Money DIP Loans**" means the Loans other than the Roll-Up DIP Loans.

"**Newco**" means the "Buyer" as defined in the "Stalking Horse APA".

"**NERC**" means the North American Electric Reliability Corporation and any regional entity thereunder, and any successor.

"**Non-Consenting Lender**" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of <u>Section 9.5</u> and (b) has been approved by the Requisite Lenders.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Public Information**" means all information received from or on behalf of the Borrower relating to the Borrower Parties or any of their respective businesses, other than any such information that is available to any Agent or any Lender by or on behalf of the Borrower on a nonconfidential basis.

"**Non-US Lender**" means a Lender that is not a U.S. Person.

"**O&M Services Agreements**" means the Initial O&M Services Agreements and the Additional O&M Services Agreements.

"**Obligations**" means all obligations of every nature of each Credit Party, including obligations from time to time owed to Agents (including former Agents), Lenders or any of them, under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy or other analogous formal legal proceeding (as applicable), with respect to such Credit Party would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy or other analogous formal legal proceeding (as applicable)), fees, expenses, indemnification or otherwise. Without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, Letter of Credit commissions, charges, expenses, fees, indemnities and other amounts payable by the Borrower under any Credit Document, including Erroneous Payment Subrogation Rights, and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that the Administrative Agent or any Lender , in each case in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"**Obligor Account Control Agreement**" means (a) with respect to the Borrower, that certain deposit account control agreement, dated as of the date hereof, by and among the Borrower, Account Bank and Collateral Agent with respect to the Borrower Revenue Account, and (b) with respect to any other Credit Party, a deposit account control agreement, by and among the applicable Credit Party, Account Bank and Collateral Agent with respect to the applicable Obligor Account.

"**Obligor Accounts**" means, (a) with respect to BF Dev Holdco, LLC, the Borrower Revenue Account, and (b) with respect to any other Credit Party, a Deposit Account of such Credit Party, as (i) identified in an Obligor Account Control Agreement, (ii) maintained with the Account Bank, and (iii) made subject to a First Priority Lien in favor of the Collateral Agent pursuant to the DIP Orders and the Collateral Documents.

"**OFAC**" has the meaning given to such term in the definition of "Economic Sanctions and Trade Controls Laws and Regulations."

"**Operating Project**" means each Financing Project in respect of which (i) Commercial Operation has commenced and (ii) to the extent applicable, the Term Conversion Date has occurred.

27

"**Organizational Documents**" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, (iv) with respect to any limited liability company, its certificate of formation, as amended, and its operating agreement, as amended, (v) with respect to any trust, its trust deed of trust agreement, and (vi) with respect to any other entity, the functional equivalent of the foregoing.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Other BRP Claims**" means Identified BRP Claims that meet the BRP Claims Conditions.

"**Other Connection Taxes**" means, with respect to any Lender or Agent, Taxes imposed as a result of a present or former connection between such Lender or Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment requested by the Borrower).

"**Paid in Full**" has the meaning assigned to such term in the DIP Orders.

"**Participant Register**" as defined in Section 9.6(g)(i).

"**PATRIOT Act**" means all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and Anti-Money Laundering Laws, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Payment**" as defined in Section 8.14(a).

"**Payment Date**" means (i) the 15th day of each calendar month and (ii) the Maturity Date.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted ACT Indebtedness**" as defined in Section 6.1.

28

"**Permitted Affiliated Services Agreements**" means any development services agreement, management services agreements, administrative services agreements, construction management agreements or similar agreements with respect to a Financing Project:

(a) the existence of which was disclosed to, and approved by, the Requisite Lenders, it being acknowledged and agreed that:

(i) the agreements set forth on Schedule 6.10 as of the date hereof have been disclosed to, and approved by, the Requisite Lenders;

(ii) such Schedule 6.10 may be updated from time to time to add any agreements disclosed to, and approved by, the Lenders after the date hereof;

(b) the amounts payable thereunder have not been amended without the prior written consent of the Lenders.

"**Permitted EPC Contract**" means a fixed-price, date-certain engineering, procurement and construction contract between a Permitted EPC Contractor and one or more Financing Subsidiaries pursuant to which such Permitted EPC Contractor undertakes to perform, on a fixed price basis, all or substantially all of the engineering, procurement, construction and related services required for the Project to achieve Commercial Operation (provided that, Permitted Equipment Supply Arrangements, substation and similar high voltage component construction contracts and stormwater compliance may be procured separately).

"**Permitted EPC Contractor**" means any contractor listed on Schedule 6.13 or any other contractor consented to by the Requisite Lenders.

"**Permitted Equipment Supply Arrangements**" means, with respect to any Project, arrangements satisfying the following criteria for the supply of no less than 95% of the modules and racking needed for such Project:

(a) each of the suppliers is (i) listed on Schedule 6.14, or (ii) otherwise expressly consented to in writing by the Requisite Lenders; and

(b) all customary warranties for such project equipment and components are either (i) enforceable by the applicable Project Owner or (ii) are covered through appropriate reserves for the contracted period reflected for the applicable Project.

"**Permitted Holders**" means each of Delaney Kate Holdings, LLC, Bedrock Energy Holdings, LLC, CIC Holdings, LLC and CWDunbar Holdings, LLC.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Power Purchase Agreement**" means a power purchase agreement (and not a power hedge, revenue hedge, or other Swap Contract) with an offtaker that has (or is owned, directly or indirectly, or controlled by an Affiliate that has) an investment grade rating and that (i) has a minimum tenor at least ten (10) years (provided that the weighted average tenor of the power purchase agreements of all Financing Projects, will not have a weighted average tenor of less than fifteen (15) years) and (ii) is not a fixed shape power purchase agreement; provided further that the calculation of the weighted average tenor

29

of the power purchase agreements of all Financing Projects shall not include or take into account the power purchase agreements governed by PURPA with a tenor of five (5) years in connection with the Landrace Project, Virginia Line Project, Phobos Project, Allora Project, Cabin Creek Project and Gunsight Project.

"**Permitted Tax Equity Investment**" means the Disposal prior to the Petition Date of tax equity voting and economic Equity Interests by a PSF Obligor pursuant to Tax Equity Financing and not in violation of any Project Senior Financing.

"**Person**" means and includes Natural Persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" means the date on which the Debtors file chapter 11 petitions with the Bankruptcy Court.

"**Phobos Project**" means Phobos Solar, LLC, a North Carolina limited liability company.

"**PIKed Interest Loans**" as defined in Section 2.5(c).

"**Platform**" as defined in Section 5.1(q)(v).

"**Polaris B Tax Equity Financing**" has the meaning specified in Section 5.24.

"**Portfolio Equipment Sourcing Requirements**" means, with respect to any equipment the contract value of which exceeds $100,000 or any PV solar panel (or major components used in assembling any PV solar panel or such other equipment) that is expected and required to be used in a Financing Project:

(a)      if such PV solar panel, equipment or any major components thereof are sourced or manufactured in China or any other country with targeted import restrictions under Economic Sanctions and Trade Controls Laws and Regulations, such panel, equipment or component has been delivered into the United States and released by U.S. CBP for consumption in the United States; provided, however, that the Requisite Lenders may, acting in good faith but otherwise in their sole discretion, deem a Project as complying with the this clause (a) if (x) such Project utilizes modules or other equipment made by a supplier in the People's Republic of China, Malaysia, Vietnam, Thailand or Cambodia that sources polysilicon (or other applicable materials) from outside of the People's Republic of China, Malaysia, Vietnam, Thailand or Cambodia, (y) such supplier has demonstrated their modules or other equipment are being permitted in the United States, and (z) such modules or other equipment have been approved under, or are otherwise not prohibited by, the applicable Project Senior Financing;

(b)      the applicable Material Project Document or other equipment supply agreement for the procurement of such equipment includes restrictions on the usage of forced labor and indemnification of Intellectual Property claims (including no limitation on the liability of the supplier for Intellectual Property claims), in each case in form and substance satisfactory to the Requisite Lenders; and

(c)      if such Project utilizes modules made by a supplier in the People's Republic of China, Malaysia, Vietnam, Thailand or Cambodia or that sources materials from the People's Republic of China, Malaysia, Vietnam, Thailand or Cambodia, (i) the applicable Material Project Document or other

30

equipment supply agreement for the procurement of such equipment places the risk of retroactive tariffs on the supplier and (ii) the equipment is exempt from tariffs.

"**Pre-Operations Project**" means each Financing Project that is not an Operating Project.

"**Prepetition**" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"**Prepetition Agent**" means Bid Administrator LLC, in its capacity as Administrative Agent and Collateral Agent under the Prepetition Credit Agreement.

"**Prepetition Brookfield Facility**" means that certain senior secured credit facility pursuant to the Prepetition Credit Agreement and the other Prepetition Documents.

"**Prepetition Collateral**" means (a) the "Collateral" as defined in the Prepetition Documents and (b) all other assets and property that secure the Prepetition Secured Obligations.

"**Prepetition Credit Agreement**" means the Credit Agreement, dated as of January 30, 2025, as amended by that certain Amendment No. 1, dated as of March 26, 2025, that certain Amendment No. 2, dated as of April 17, 2025, that certain Amendment No. 3, dated as of October 6, 2025, and as may be further amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among BF Dev Holdco, LLC, as the borrower, the Prepetition Agent, and the Prepetition Lenders.

"**Prepetition Documents**" means (a) the Prepetition Credit Agreement, (b) the Prepetition Security Documents, and (c) each of the other "Credit Document" (as defined in the Prepetition Credit Agreement).

"**Prepetition Intercreditor Agreements**" means (a) that certain Junior Lien Intercreditor and Subordination Agreement, dated October 6, 2025, by and among each Carlyle Prepetition Noteholder, the Brookfield Prepetition Agent and the Fundamental Prepetition Lender and (b) that certain Intercreditor Agreement, dated as of October 6, 2025, by and among each Carlyle Prepetition Noteholder, the Brookfield Prepetition Agent and the Fundamental Prepetition Lender.

"**Prepetition Liens**" means each of the liens and security interests granted by the Grantors (as defined in the Prepetition Security Documents) in the Prepetition Collateral pursuant to the Prepetition Security Documents to secure the Prepetition Secured Obligations.

"**Prepetition Loans**" means the "Loans" as defined in the Prepetition Credit Agreement.

"**Prepetition PIKed Interest Loans**" has the meaning assigned to the term "PIKed Interest Loans" in the Prepetition Credit Agreement.

"**Prepetition Secured Obligations**" means the "Secured Obligations" as defined in the Prepetition Credit Agreement.

"**Prepetition Security Documents**" means (a) the Collateral Documents (as defined in the Prepetition Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements

31

pursuant to which the Prepetition Agent has been granted a security interest in and continuing liens on the Prepetition Collateral.

"**Principal Office**" means, for Administrative Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

"**Private Lenders**" means Lenders that wish to receive Private-Side Information.

"**Private-Side Information**" means any information with respect to any party that is not Public-Side Information.

"**Proceeds**" means the funds disbursed to the Borrower pursuant to a Loan.

"**Pro Rata Share**" means, with respect to any Lender, the percentage obtained by dividing (a) the Loan Exposure of such Lender by (b) the aggregate Loan Exposure of all Lenders.

"**Project**" means any solar power generating, storage or generating and storage project, and, in each case, together with all related assets, rights, interests, and operations associated with such facilities.

"**Project Debt Financing**" means Indebtedness consisting of senior construction, interim or long-term debt financing or refinancing for the acquisition, development, construction, installation or operation of one or more Financing Project(s), including back-leverage borrowing, sale-leaseback transactions, letters of credit or bonds with respect to any Financing Project assets required under applicable material project agreements, tax credit financing bridges and member loans required to be provided pursuant to Tax Equity Financing Documents; provided that, in each case, such Indebtedness (i) is non-recourse to the Credit Parties or any of the Financing Subsidiaries (other than any PSF Obligor party thereto), (ii) does not finance any projects other than Financing Projects (provided that a single financing may apply to more than one Financing Project) and (iii) was incurred or committed under a facility that was entered into and disclosed to the Lenders prior to the Petition Date.

"**Project Debt Financing Documents**" means, with respect to any PSF Obligor, (i) any financing agreement related to its applicable Project Debt Financing, and (ii) any documents granting collateral security in connection with such Project Debt Financing.

"**Project Eligibility Criteria**" as described in Annex A of the Prepetition Credit Agreement.

"**Project Ineligibility Event**" means, with respect to any Financing Project, that such Financing Project:

(a) ceases to satisfy each of the Project Eligibility Criteria, and such circumstance has not been cured within 30 days of a Borrower having knowledge of such (provided that the Requisite Lenders may approve an extension of such period); or

(b) is owned, directly or indirectly, by a PSF Obligor and an event of default has occurred under the applicable Project Debt Financing Documents and:

32

(i) either (A) the lenders under the applicable Project Debt Financing have exercised remedies thereunder, or (B) such event of default is continuing (following expiration of any applicable cure periods) and has not been waived by the applicable lenders under the applicable Project Senior Financing Documents; or

(ii) commencing on the first distribution date (or equivalent thereof) to occur under the applicable Project Debt Financing Documents, cash distributions have been disallowed under such Project Debt Financing Documents

It is acknowledged and agreed that Project Ineligibility Event, in and of itself, shall not constitute a Default or Event of Default hereunder.

"**Project On-Boarding Criteria**" as described in <u>Annex A</u> to the Prepetition Credit Agreement.

"**Project Owners**" means a Brookfield Silo Entity which directly or, to the extent identified as such on <u>Schedule 4.2</u>, indirectly, owns a Project.  The Project Owners are specified on <u>Schedule 4.2</u>.

"**Project Sell-Down**" means any transaction, or series of related transactions, other than in connection with a Permitted Tax Equity Investment or Tax Equity Financing, for the purpose of or resulting, directly or indirectly, in a reduction to a Borrower Party's share of direct or indirect voting and economic Equity Interests in a Financing Subsidiary, whether such reduction is due to the Disposition of a portion of such Equity Interests, (ii) the issuance of new Equity Interests in such Financing Subsidiary, or (iii) otherwise.

"**Project Senior Financing**" means any (a) Project Debt Financing or (b) Tax Equity Financing.

"**Project Senior Financing Change of Control Consent**" means the necessary consents or waivers by all or any of the lenders or investors (and, to the extent requested by the Requisite Lenders, counterparties to power purchase or similar agreements) under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to allow a change of control or similar transaction to occur (whether through an exercise of remedies, an asset sale or otherwise) wherein Newco, the Administrative Agent, the Lenders, the Prepetition Secured Parties, Brookfield Asset Management Ltd. and/or any affiliate of the foregoing were to obtain control or the direct or indirect beneficial ownership of the outstanding voting and/or economic equity interests of such Financing Subsidiary, in each case without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"**Project Senior Financing Collateral and Guarantee Requirement**" means the requirement that the Credit Parties cause each of the Borrower's Subsidiaries (other than Excluded Subsidiaries) to, pursuant to the Guarantee and Security Agreement or other Collateral Documents acceptable to the Requisite Lenders, guarantee the Obligations and grant Liens on substantially all its assets (other than Excluded Property) to secure the Obligations; <u>provided</u> that, if the Requisite Lenders so request, any Excluded Subsidiary that is solely an Excluded Subsidiary under clause (f) of the definition thereof will reasonably promptly become subject to this requirement.

"**Project Senior Financing Consents**" means the Project Senior Financing Guarantee Consents, the Project Senior Financing Lien Consents, the Project Senior Financing Change of Control

Consents, the Project Senior Financing Independent Director Consent and the Project Senior Financing Cross-Default Consents.

"**Project Senior Financing Cross-Default Consent**" means the necessary consents or waivers by all or any of the lenders or investors (and, to the extent requested by the Requisite Lenders, counterparties to power purchase or similar agreements) under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to permit each of the Debtors and each of their Subsidiaries (including Blue Ridge) to commence a Chapter 11 Case without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"**Project Senior Financing Documents**" means any (a) Project Debt Financing Documents or (b) Tax Equity Financing Documents.

"**Project Senior Financing Guarantee Consent**" means the necessary consents or waivers by all or any of the lenders or investors under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to cause such Financing Subsidiary to become a Credit Party without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"**Project Senior Financing Independent Director Consent**" means the necessary consents or waivers by all or any of the lenders or investors under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to allow the Independent Director to be appointed by the Lenders at the board of directors (or equivalent governing body) of the applicable direct or indirect parent entity of such Subsidiary without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"**Project Senior Financing Junior Liens**" means any Liens incurred by a Financing Subsidiary in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Obligations on a second priority basis junior only to the liens securing any Project Debt Financing.

"**Project Senior Financing Lien Consent**" means the necessary consent or waiver by all or any of the lenders or investors under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to cause such Financing Subsidiary to cause its assets and property to be subject to the Project Senior Financing Junior Liens without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"**Project Site**" means, in respect of any Financing Project, the real property located on the site on which such Project is or will be located.

"**Project Surety Bonds**" means letters of credit, surety bonds, or similar instruments for Eligible Project Costs or otherwise for the benefit of the Borrower or any Financing Subsidiary (or any provider of Project Senior Financing in respect of a Financing Project).

"**Prudent Industry Practice**" means those practices, methods, techniques, specifications and standards of safety and performance, as they may be modified from time to time, that (a) are generally accepted in the wind or solar electric generating, storage and transmission industry in the United States as good, safe and prudent engineering practices in connection with the design, construction, operation, maintenance, repair or use of solar electric generating, storage and transmission facilities and (b) are

34

otherwise in compliance in all material respects with all applicable laws, rules, regulations and orders of any Governmental Authority (including Environmental Laws).

"**PSF Obligor**" means a Project Owner and/or Holding Company that is a party to, or is bound by, the covenants and other restrictions set forth in the Project Senior Financing Documents.  The PSF Obligors are specified on Schedule 4.1.

"**PTC**" means the renewable electricity production tax credit under Section 45 of the Internal Revenue Code or any successor to such section.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lenders**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means information that is either (x) of a type that would be made publicly available if the Borrower were issuing securities pursuant to a public offering or (y) not material non-public information (for purposes of United States federal, state or other applicable securities laws).

"**PUHCA**" as defined in Section 4.24(a).

"**PUHCA Exemption**" as defined in Section 4.24(b).

"**PUHCA Regulations**" as defined in Section 4.24(a).

"**PURPA**" as defined in Section 4.24(a).

"**PURPA Regulations**" as defined in Section 4.24(a).

"**QF**" as defined in Section 4.24(a).

"**QF Status**" as defined in Section 4.24(a).

"**Register**" as defined in Section 2.4(b).

"**Regulation T**" means Regulation T of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, disposal, discharge, dumping, migrating, or leaching of any Hazardous Material into or through the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material).

"**Relevant Lenders**" as defined in Section 8.12(a).

"**Replacement Additional DIP Facility**" means a debtor-in-possession financing facility used to replace the Carlyle DIP Facility or the Fundamental DIP Facility on identical terms to the debtor-in-possession facility being replaced (other than with respect to covenants and pricing and fees, subject to Section 5.20).

"**Requisite Lenders**" means one or more Lenders having or holding Loan Exposure and representing more than 50% of the aggregate Loan Exposure of all Lenders.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, in respect of any Credit Party, (a) the chief executive officer, chief financial officer, chief operating officer or the president, any vice president, treasurer, or any secretary of such Person, as the context may require, or any other officer, director or representative of such Person having (x) substantially the same authority and responsibility or designated by the chief executive officer, president, managing member, or such Person's board of directors to act in such capacity or (y) day-to-day supervisory responsibility for the management of the Credit Documents; or (b) with respect to any action to be taken by any Credit Party hereunder or under a Credit Document, an Authorized Officer.

"**Restricted Payment**" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock, or other Equity Interest of any Borrower Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Borrower Party's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment, or (b) any other payments made by (i) any Borrower Party to any Affiliate that is not a Borrower Party or (ii) any Financing Subsidiary to any Affiliate that is not a Financing Subsidiary (whether in respect of management fees, development, fees, or otherwise).

"**Roll-Up DIP Loans**" means the Loans of the Borrower and the subsidiaries of the Borrower that are Debtors, issued on account of all of the obligations under the Prepetition Credit Agreement which are rolled up dollar for dollar into the DIP Facility on a cashless basis.

"**S&P**" means Standard & Poor's, a Division of S&P Global Inc.

"**Sale**" means the consummation of a sale of all or substantially all of the assets of the Debtors or any material portion of the Brookfield Silo Assets pursuant to section 363 of the Bankruptcy Code or otherwise, but excluding any sale of ACT or resulting from the sale processes contemplated by the Additional DIP Facilities.

"**Sale Milestone**" has the meaning specified in Section 5.17(l).

"**Sale Order**" has the meaning specified in Section 5.17(k).

"**Sanctioned Country**" means, at any time, a country or territory which is the subject or target of comprehensive Economic Sanctions and Trade Controls Laws and Regulations (which, as of the

date of this Agreement, are Cuba, Iran, North Korea, Syria, and the so-called Donetsk People's Republic, so-called Luhansk People's Republic, and Crimea regions of Ukraine).

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Economic Sanctions and Trade Controls Laws and Regulations-related list of designated Persons maintained by OFAC or the U.S. Department of State or (b) any Person located, organized, or resident in a Sanctioned Country.

"**Scheduled Maturity Date**" means March 31, 2026.

"**Second Day Motions**" has the meaning specified in Section 3.2(c).

"**Second Day Orders**" has the meaning specified in Section 3.2(c).

"**Second Draw**" means a borrowing of up to the balance of Commitments after the First Draw, less the amount of Commitments allocated to the Subsequent Draws.

"**Secured Parties**" means each Agent and the Lenders.

"**Secured Party Accounts Agreement**" as defined in Section 8.6(c).

"**Securities**" means any stock, shares, partnership interests, units, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Silo**" means any of the Brookfield Silo Entities, Carlyle Silo Entities or Fundamental Silo Entities, as applicable.

"**Specified BRP Claims**" means Identified BRP Claims that do not meet the BRP Claims Conditions.

"**Specified Event**" means the events and circumstances that have occurred prior to the date hereof and are listed on Annex C hereto.

"**Specified Transferee**" means each of (a) the Borrower, (b) Blue Ridge, (c) ACT, (d) PGR Signature Fund 1, LLC and each of its Subsidiaries, (e) the Carlyle Silo Entities, (f) the Fundamental Silo Entities, (g) any Excluded Subsidiary, (h) any Financing Subsidiary that is not a Credit Party, and (i) the Intermediate Holding Companies.

"**Stalking Horse APA**" means a stalking horse asset purchase agreement with Newco, in form and substance mutually acceptable to the Administrative Agent and the Borrower, that provides for (a) a sale of the Acquired Assets in exchange for a credit bid by the Lenders and the Prepetition Secured Parties of all of their Obligations and the Prepetition Secured Obligations for such Acquired Assets, and

(b) provides for expense reimbursement in the form of a superpriority expense claim in the event of an overbid.

"**State Electric Utility Regulations**" as defined in <u>Section 4.24(d)</u>.

"**Subsequent Draws**" has the meaning specified in the recitals.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided that, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Successful Bid**" has the meaning specified in the Bidding Procedures.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities thereunder.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contract, (a) for any date on or after the date such Swap Contract have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contract, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contract (which may include a Lender or any Affiliate of a Lender).

"**Tariff Claims**" means any claims or liabilities in respect of or directly or indirectly arising from, or relating to (a) duties, tariffs or trade remedies, including in respect of any anti-dumping or countervailing duty cash deposits, tariffs, duties, or other trade remedies imposed, assessed, or collectible by the U.S. Department of Commerce or the U.S. Customs and Border Protection as a result of, arising out of, or relating to the circumvention proceedings associated with the petition filed by Auxin Solar Inc. concerning crystalline silicon photovoltaic cells and modules, and (b) any claims by any person for indemnity or reimbursement of the foregoing.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (together with interest, penalties and other additions thereto) of any nature imposed by any Governmental Authority.

"**Tax Equity Financing**" means with respect to a Financing Project, any transaction or series of related transactions (i) for the purpose of monetizing any federal tax attribute, including PTCs and ITCs and/or depreciation deductions, available with respect to the generation of electricity from or investment in renewable generation sources, (ii) if applicable, pursuant to which an investor obtains a non-management investment interest in the applicable PSF Obligor and is allocated a share of cash distributions associated with the applicable Financing Project, (iii) which is non-recourse to the Credit Parties or any of the Financing Subsidiaries (other than any PSF Obligor party thereto and the applicable tax equity partnership), (iv) which does not involve any projects other than Financing Projects and (v) which prohibits any Disqualified Person from acquiring any right or interest therein.

"**Tax Equity Financing Documents**" means, with respect to any Financing Subsidiary that is the subject of a Tax Equity Financing, (i) the Organizational Documents of such Financing Subsidiary, (ii) any equity contribution and/or purchase agreement ("**MIPA**") related to such Tax Equity Financing and/or any documentation for tax credit transfers pursuant to the Inflation Reduction Act, P.L. 117-169 and its implementing regulations and (iii) solely to the extent that terms that are customarily contained in Organizational Documents, equity contribution agreements, purchase agreements or tax credit transfer documents associated with Tax Equity Financings are contained therein, any other material documents or material agreements related to such Tax Equity Financing.

"**Term Conversion Date**" means, with respect to a Project, the first date on which such Project has achieved Commercial Operation and either all conditions precedent to "term conversion" under the applicable Project Debt Financing have been satisfied or such Project Debt Financing has "termed out."

"**Transition Milestones**" as defined in Section 5.17(m).

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**United Kingdom**" means the United Kingdom of Great Britain and Northern Ireland.

"**Unrestricted Cash**" means, as of any date, the sum of the amount of cash of the Credit Parties, as set forth on the balance sheet of the Borrower and its Subsidiaries, including the cash proceeds of any funded Loans, it being understood that such amount shall exclude in any event (i) any cash or investment identified on such balance sheet as "restricted" (other than cash or investments restricted in favor of the Secured Parties) and (ii) any amount to the extent any use thereof for application to the payment for Indebtedness under the Credit Documents is restricted or prohibited by Law or contract.

"**Updated Budget**" has the meaning specified in <u>Section 5.1(q)(i)</u>.

"**Updated Budget Delivery Date**" has the meaning specified in <u>Section 5.1(q)(i)</u>.

"**U.S.**" means the United States of America.

"**U.S. CBP**" has the meaning given to such term in the definition of "Economic Sanctions and Trade Controls Laws and Regulations".

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"**U.S. Tax Compliance Certificate**" means a certificate substantially in the form of one of <u>Exhibits E-1</u>, <u>E-2</u>, <u>E-3</u> or <u>E-4</u>, as applicable.

"**U.S. Trustee**" means the Office of the United States Trustee for the Southern District of Texas.

"**Virginia Line Project**" means Virginia Line Solar, LLC, a North Carolina limited liability company.

["**Warehouse Lease Agreement**" means that certain Lease Agreement, dated as of May 5, 2021, by and between Vernon Aven Investments, LLC, a North Carolina limited liability company, and Pine Gate Renewables, LLC, a North Carolina limited liability company.]

"**Write-Down and Conversion Powers**" means, with respect to (a) any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2.    **Accounting Terms**.  Except as otherwise expressly provided herein, including without limitation, as set forth in the definition of "Capital Lease", all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Borrower to Lenders pursuant to <u>Section 5.1(a)</u> shall be prepared in accordance with GAAP as in effect at the time of such preparation.

1.3.    **Interpretation, Etc**.

(a)    Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The word "or" is not exclusive.  Thus, if a party "may do (a) or (b)," then the party may do either or both.  The party is not limited to a mutually exclusive

choice between the two alternatives.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The terms lease and license shall include sub-lease and sub-license, as applicable.  A reference to a Person includes its successors and permitted assigns.

(b)   References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time to the extent permitted under the Credit Documents, including Sections 6.8 and 9.5 hereof, and in effect at any given time.

(c)   The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.  References to "days" means calendar days, unless the term "Business Days" shall be used.  References to a time of day means such time in New York, New York, unless otherwise specified.  If any Credit Party is required to perform an action, deliver a document or take such other action by a calendar day and such day is not a Business Day, then such Credit Party shall take such action by the next succeeding "Business Day".  References to "knowledge" or "actual knowledge" of any Credit Party shall mean the actual knowledge of a Responsible Officer of such Credit Party.

**1.4.   Certain Interpretive Provisions Applicable to the Credit Documents.**

(a)   [Reserved.]

(b)   Notwithstanding anything herein to the contrary, no event, occurrence, consequence, or circumstance shall constitute a Default or an Event of Default under the Credit Agreement if the same occurs as a proximate result of any determination by the Lenders not to fund a Subsequent Draw, due to the failure to satisfy the conditions precedent set forth in Section 3.1(y) or Section 3.2(o), as applicable, the proceeds of which were requested to be utilized for project expenditures under the Commitment Sizing Budget dated October 3, 2025 or any reasonable budget submitted thereafter in good faith in accordance with the Credit Agreement, regardless of whether or not such budgets submitted become the Approved Budget.

(c)   No Default or Event of Default, nor any breach of any representation or warranty, shall be deemed to exist as a proximate result of any Specified Event.

(d)   [Reserved.]

(e)   In the event of any conflict between the terms of the DIP Intercreditor Agreement and this Agreement, the terms of the DIP Intercreditor Agreement shall govern, including without limitation with respect to any representations for the priority of obligations by the Credit Parties.

**SECTION 2.   LOANS**

2.1.    **Loans**.

(a)    <u>Borrowing Mechanics for Loans</u>.

(i)    Subject to the terms and conditions hereof and the Interim DIP Order, and in reliance upon the representations and warranties of the Credit Parties contained herein and the stipulations of the Borrower in the Interim DIP Order, each Lender severally, and not jointly, agrees to make Loans denominated in Dollars to the Borrower within three (3) Business Days following entry of the Interim DIP Order in an aggregate principal amount not to exceed its DIP Interim Funding Commitment. The Commitments of the Lenders shall automatically and permanently be reduced upon the making of such Loans (or, if earlier, on the Maturity Date).

(ii)    Subject to the terms and conditions hereof and in the Final DIP Order and in reliance upon the representations and warranties of the Credit Parties contained herein and the stipulations of the Borrower in the Final DIP Order, each Lender severally, and not jointly, agrees to make Loans denominated in Dollars to the Borrower within three (3) Business Days following entry of the Final DIP Order in an aggregate principal amount not to exceed its DIP Final Funding Commitment.  The Commitments of the Lenders shall automatically and permanently be reduced upon the making of such Loans (or, if earlier, on the Maturity Date).

(iii)    Subject to the terms and conditions hereof and in the DIP Orders and in reliance upon the representations and warranties of the Credit Parties contained herein and the stipulations of the Borrower in the DIP Orders, each Lender severally, and not jointly, agrees to make DIP Subsequent Draw Loans denominated in Dollars to the Borrower on any DIP Subsequent Draw Date in an aggregate principal amount not to exceed its DIP Subsequent Draw Commitment.  The DIP Subsequent Draw Commitments of the Lenders shall be automatically and permanently reduced upon the making of the DIP Subsequent Draw Loans on any DIP Subsequent Draw Date (or, if earlier, on the Maturity Date).

(iv)    On the date of the entry of the Interim DIP Order, all of the obligations under the Prepetition Brookfield Facility shall be rolled up dollar for dollar into the DIP Facility on a cashless basis (excluding for the avoidance of doubt, any unfunded commitments) and the Roll-Up DIP Loans shall be deemed funded hereunder; <u>provided</u>, that the Roll-Up DIP Loans shall be deemed to have been issued on the Closing Date and for the avoidance of doubt, shall be deemed to have begun accruing interest as of the Closing Date.

(v)    Loans borrowed and repaid or prepaid may not be reborrowed.

(vi)    Loans shall be made in an aggregate minimum amount of $5,000,000 and integral multiples of $100,000 in excess of that amount (unless otherwise agreed by Administrative Agent or for the amount of the then-remaining Commitments.

(vii)    Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than 1:00 p.m. (New York City time) at least five (5) Business Days (or such period shorter than five (5) Business Days as may be agreed by Administrative Agent) in advance of any proposed Disbursement Date.

(viii)    Each such Funding Notice shall specify:  (A) the requested date of the borrowing (which shall be a Business Day), (B) the principal amount of Loans to be borrowed from each specific Lender, (C) whether the Loans to be borrowed constitute DIP Interim Funding Loans, DIP Final Funding Loans or DIP Subsequent Draw Loans, and (D) the wire instructions of the account of the Borrower to which the proceeds of such Loans are to be disbursed.

(ix)    Notice of receipt of a Funding Notice in respect of Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the Applicable Interest Rate, shall be provided by Administrative Agent to each applicable Lender within one (1) Business Day (or, if the Administrative Agent shall have received such notice after 1:00 p.m. (New York City time), two (2) Business Days) following the Borrower's delivery of such Funding Notice to the Administrative Agent.

(x)    Each Lender shall make the amount of its Pro Rata Share, if any, of the Loans available to Administrative Agent not later than 5:00 p.m. (New York City time) on the applicable Disbursement Date by wire transfer of same day funds in Dollars, at the Principal Office of Administrative Agent.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the Proceeds of any such Loans available to Borrower on the applicable Disbursement Date by causing an amount of same day funds in Dollars equal to the Proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the DIP Proceeds Account.

(xi)    Subject to Section 2.10, all Obligations shall be Paid in Full no later than the Maturity Date.

(b)    Reduction of the Commitments.

(i)    The Commitments shall be utilized by the amount of each Loan (excluding PIKed Interest Loans) borrowed and shall be automatically and permanently reduced upon the making of such Loans.  No Loans may be re-borrowed.

(ii)    On the Maturity Date, the unused Commitments shall terminate and be reduced to zero (0), and Lender shall have no obligation to make any further Credit Extensions in the form of Loans or Credit Extensions in respect of such Commitments.

(c)    Notwithstanding anything to the contrary herein, solely to the extent required to effectuate a credit bid submitted by Newco pursuant to the Stalking Horse APA or an amendment thereto, the undrawn Commitments (other than in respect of Subsequent Draws) shall become available upon the closing of such Sale notwithstanding the Credit Parties' inability to satisfy the conditions precedent to drawing on the DIP Facility.

**2.2.    Pro Rata Shares; Availability of Funds**.

(a)    Pro Rata Shares.  All Loans shall be made by the Lenders simultaneously and proportionately to their respective Pro Rata Share of the Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder.

(b)      <u>Availability of Funds</u>.  Unless Administrative Agent shall have been notified by any Lender prior to any Disbursement Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Disbursement Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Disbursement Date, and Administrative Agent shall make available to Borrower a corresponding amount on such Disbursement Date.  If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the applicable Disbursement Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three (3) Business Days.  In the event that (i) Administrative Agent declines to make a requested amount available to Borrower until such time as all applicable Lenders have made payment to Administrative Agent, (ii) a Lender fails to fund to Administrative Agent all or any portion of the Loans required to be funded by such Lender hereunder prior to the time specified in this Agreement and (iii) such Lender's failure results in Administrative Agent failing to make a corresponding amount available to Borrower on the any Disbursement Date, at Administrative Agent's option, such Lender shall not receive interest hereunder with respect to the requested amount of such Lender's Loans for the period commencing with the time specified in this Agreement for receipt of payment by Borrower through and including the time of Borrower's receipt of the requested amount. If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrower and Borrower shall promptly pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Disbursement Date until the date such amount is paid to Administrative Agent, at the Applicable Interest Rate.   Nothing in this <u>Section 2.2(b)</u> shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

**2.3.    Use of Proceeds**.

(a)      Borrower shall use the Proceeds of each Loan for the following permitted purposes:

(i)      subject to and upon entry of the Interim DIP Order, to effect the issuance of the Roll-Up DIP Loans,

(ii)      for the Debtors' working capital and other general corporate needs,

(iii)      for the payment of fees, costs, and expenses of the administration of the Chapter 11 Cases,

(iv)      to pay other prepetition obligations approved by the Bankruptcy Court,

(v)      to pay adequate protection payments as authorized by the Bankruptcy Court in the Interim DIP Order and the Final DIP Order,

44

(vi)     $8,209,327.54 of the proceeds of the Loans from the First Draw and $16,604,352.46 of the proceeds of the Second Draw shall be funded into the Escrow Account (as defined in the DIP Orders) to pay professional fees, costs and expenses, subject to the DIP Orders,

(vii)     to pay agency fees and fees, costs, and expenses of the Administrative Agent and the Lenders owed under the Loan Documents,

(viii)     to pay obligations arising from the Lenders' Allocable Share (as defined in the DIP Orders) of the Carve Out, and

(ix)     for other general corporate purposes (in each case, other than in the case of clause (viii), in a manner consistent with the Approved Budget).

(b)     No proceeds of the DIP Facility and/or Cash Collateral of the Prepetition Secured Parties may be used for any purpose not set forth in the Approved Budget, nor may be (i) transferred to, or used to fund Projects owned by, the Carlyle Silo Entities or the Fundamental Silo Entities or other expenses solely related thereto, or (ii) used to fund operations, or other expenses that are related to Blue Ridge, ACT, the Carlyle Silo Entities, or the Fundamental Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Brookfield Silo Entities or corporate overhead costs of Pine Gate Development, LLC in accordance with the Approved Budget) without the prior consent of the Requisite Lenders.

(c)     No proceeds of the DIP Facility, the Carve Out, or any Cash Collateral may be used by the Credit Parties or any other party in interest, or their representatives, to (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt or collateral position of the Administrative Agent, the Lenders, the secured creditors under the Fundamental Prepetition Facility or the Carlyle Prepetition Facility or the Prepetition Secured Parties, whether by (i) challenging the validity, extent, amount, perfection, priority or enforceability of the obligations under the DIP Facility, any of the Prepetition Secured Obligations, the Fundamental Prepetition Facility, the Carlyle Prepetition Facility, or the Prepetition Documents, (ii) challenging the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect thereto, (iii) seeking to subordinate or recharacterize the obligations under the DIP Facility, the Fundamental Prepetition Facility, the Carlyle Prepetition Facility or the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (iv) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Administrative Agent, the Lenders, the secured creditors under the Fundamental Prepetition Facility or the Carlyle Prepetition Facility or the Prepetition Secured Parties or any of their respective officers, directors, agents, employees or representatives, (b) prevent, hinder or otherwise delay the Administrative Agent's, the Lenders', the secured creditors under the Fundamental Prepetition Facility or the Carlyle Prepetition Facility or the Prepetition Secured Parties' assertion, enforcement, or realization on the Collateral, the Prepetition Collateral or the collateral securing the Fundamental Prepetition Facility or the Carlyle Prepetition Facility in accordance with the Credit Documents, the documentation for the Fundamental Prepetition Facility or the Carlyle Prepetition Facility or Prepetition Documents, as applicable, (c) seek to modify the rights granted to the Administrative Agent, the Lenders, the secured creditors under the Fundamental Prepetition Facility or the Carlyle Prepetition Facility or the Prepetition Secured Parties under the Credit

45

Documents, the documentation for the Fundamental Prepetition Facility or the Carlyle Prepetition Facility or the Prepetition Documents, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Bankruptcy Court (which order may be the Interim DIP Order or the Final DIP Order) and (ii) permitted by the Credit Document; provided that during the Challenge Period, an investigation budget in an aggregate amount of $25,000 of the Loans and/or the Prepetition Collateral, including Cash Collateral, and the proceeds thereof, may be used by any official committee of unsecured creditors (the "**Committee**") to investigate, but not to prepare, initiate, litigate, prosecute an objection to, or otherwise challenge, (i) the claims and liens of the Prepetition Secured Parties against the Debtors, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties.

### 2.4. Evidence of Debt; Register; Lenders' Books and Records; Notes.

(a)    Lenders' Evidence of Debt.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Borrower, absent manifest error; provided that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any applicable Loans; provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.  Each Lender shall deliver to Borrower the records and accounts set forth in this Section 2.4(a) promptly after written request therefor.

(b)    Register.  Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the "**Register**").  The Register shall be available for inspection by Borrower or any Lender (with respect to (i) any entry relating to such Lender's Loans and (ii) the identity of the other Lenders (but not any information with respect to such other Lenders' Loans)) at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record, or shall cause to be recorded, in the Register the Commitments and the Loans in accordance with the provisions of Section 9.6, and each repayment or prepayment in respect of the principal amount of the Loans.  The entries in the Register shall be conclusive, absent manifest error, and binding on Borrower, each Lender and Administrative Agent.  Borrower hereby designates Administrative Agent to serve as Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this Section 2.4, and Borrower hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees."

(c)    Notes.  If so requested by any Lender by written notice to Borrower (with a copy to Administrative Agent) at least five (5) Business Days prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 9.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loan.

**2.5.    Interest on Loans**.

(a)    <u>Interest</u>.  Subject to paragraphs (b) through (d) of this <u>Section 2.5</u>, each Loan shall bear interest at a rate *per annum* equal to the Applicable Interest Rate.

(b)    <u>Default Interest</u>.  Subject to paragraphs (c) through (d) of this <u>Section 2.5</u>, during any period in which an Event of Default has occurred and is continuing, each Loan shall bear interest at a rate per annum equal to 2.00% <u>plus</u> the Applicable Interest Rate (the "**Default Rate**").  In addition, but without duplication of interest that would otherwise accrue hereunder, any Obligations not paid by the Borrower when due hereunder shall bear interest at the Default Rate.

(c)    <u>Interest Payment Dates</u>.

(i)    Interest under this Agreement shall accrue and be payable in arrears on each Payment Date (subject to those provisions of this Agreement, including <u>Section 2.10(b)</u> and <u>Section 7.2</u>, which may require such interest to be paid on an earlier date).

(ii)    Interest on the Loans shall be paid and discharged in kind, without the taking of any further action, by adding such accrued interest to the principal balance of the Loans (on an equal and ratable basis), it being understood and agreed that such additional principal balance shall thereafter constitute Loans incurred by Borrower for all purposes hereunder (such Loans, "**PIKed Interest Loans**").

(d)    <u>Interest Computation</u>.  All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)    <u>Interest Override</u>.  Notwithstanding anything to the contrary in this Agreement or any other Credit Document, all interest (including, for the avoidance of doubt, Default Rate interest) hereunder shall be payable in kind and shall constitute PIKed Interest Loans.

**2.6.    Fees**.

(a)    Borrower agrees to pay to Administrative Agent for the account of each Lender a commitment fee (the "**Commitment Fee**") equal to each such Lender's pro rata share of (a) 4.00% of the aggregate principal amount of Commitments (excluding, for the avoidance of doubt, the funding of the Roll-Up DIP Loans and DIP Subsequent Draw Commitments), payable in kind to the Lenders on a pro rata basis in respect of their Commitments upon entry of the Interim DIP Order and (b) 4.00% of the aggregate amount of the Commitments in respect of the amount actually funded in respect of the Subsequent Draws (excluding, for the avoidance of doubt, any Roll-Up DIP Loans), payable in kind to the Lenders on a pro rata basis in respect of their Commitments upon the funding of such Subsequent Draw.

(b)    Borrower agrees to pay to the Administrative Agent for the account of each Lender an exit fee (the "**Exit Fee**"), solely on the New Money DIP Loans payable in cash upon the Maturity Date or any other repayment or prepayment (including upon acceleration of the DIP Facility, including any satisfaction of such New Money DIP Loans in respect of a credit bid by the Administrative Agent in any sale or disposition of Collateral) of the New Money DIP Loans of 8.00% of principal amount of New Money DIP Loans so repaid or prepaid; <u>provided</u>, that if the

47

New Money DIP Loans are repaid pursuant to a credit bid in accordance with the Stalking Horse APA, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid and shall be paid in kind in such an event; and

(c)       On the Petition Date, the Borrower agrees to pay to the Administrative Agent, for its own account, an agency fee equal (but in addition) to the agency fee set forth in the Agency Fee Letter.

(d)       All fees and premiums payable hereunder shall be paid on the dates due. The parties agree that the Commitment Fee and the Exit Fee shall be treated as creating a difference between the issue price of the New Money DIP Loans and their stated redemption price at maturity for U.S. federal income tax purposes and the parties shall file all tax returns consistently therewith.

**2.7.       Maturity**.  On the Maturity Date, the Borrower shall (a) repay the unpaid principal balance of all Loans and (b) pay the Applicable Prepayment Premium and the Exit Fee.

**2.8.       Voluntary Prepayments**.

(a)       The Borrower shall have the right at any time and from time to time to make any voluntary prepayment of the Loans on any Business Day in whole or in part, in an aggregate minimum amount of $5,000,000 and integral multiples of $100,000 in excess of that amount; underlined, that, concurrently with any such prepayment in connection with a MOIC Event, the Borrower shall pay the Applicable Prepayment Premium, which shall be payable in cash, and the Exit Fee.

(b)       Any such voluntary prepayment shall be made at the option and direction of the Borrower, upon not less than one (1) Business Day's prior written notice, given to Administrative Agent by 12:00 p.m. (New York City time) on the date required.  Administrative Agent will promptly notify each Lender of its receipt, and the substance, of such notice.  Upon Borrower's delivery of such notice, the principal amount of the Loans specified in such notice, together with the other amounts as described in underlined Section 2.10 (including the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee), shall become due and payable on the prepayment date specified therein.

(c)       Voluntary prepayments shall be applicable to the aggregate Loans, in each case of each Lender on a ratable basis in accordance with Section 2.11(a); provided, that, if requested by the Borrower in the applicable prepayment notice, each Lender's proportionate share of such prepayment shall be applied (i) *first,* to the PIKed Interest Loans of such Lender with respect to such Loans, until such PIKed Interest Loans are Paid in Full, and (ii) *second*, to prepay up to 100% of the outstanding New Money DIP Loans, and (iii) *third*, prepay up to 100% of the outstanding Roll-Up DIP Loans.

(d)       At the election of the Borrower, any voluntary prepayment made hereunder shall not cause a corresponding dollar-for-dollar reduction in the Commitments unless otherwise stated as a permanent dollar-for-dollar reduction in the Commitments hereunder.

**2.9.     Mandatory Prepayments**.

(a)     Within three (3) Business Day after receipt by a Borrower Party of the net cash proceeds received by such Borrower Party in respect of property insurance or condemnation proceeds paid on account of a total loss of any Financing Project, the Borrower shall apply such net cash proceeds to (x)(i) first, prepay up to 100% of the outstanding New Money DIP Loans, and (ii) second, prepay up to 100% of the outstanding Roll-Up DIP Loans, and (y) pay the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee.

(b)     Within three (3) Business Day after any Borrower Party incurs, or receives any proceeds of, Indebtedness (other than Indebtedness permitted pursuant to Section 6.1), the Borrower shall (x) first, prepay up to 100% of the outstanding New Money DIP Loans, and (ii) second, prepay up to 100% of the outstanding Roll-Up DIP Loans, in each case in an amount equal to the lesser of (A) the amount of such proceeds and (B) the amount of such Indebtedness and (y) pay the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee.

(c)     Within three (3) Business Day after any Borrower Party makes, or receives any net proceeds from, a Disposition (other than in the ordinary course of business), then the Borrower shall, by the third (3rd) Business Day after the relevant Disposition, apply such net cash proceeds to (x)(i) first, prepay up to 100% of the outstanding New Money DIP Loans, and (ii) second, prepay up to 100% of the outstanding Roll-Up DIP Loans, and (y) pay the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee.

(d)     Within three (3) Business Day after any Borrower Party receives any proceeds, or incurs any obligations under, an Affiliate Transaction (other than an Affiliate Transaction permitted pursuant to Section 6.6), the Borrower shall (x) first, prepay up to 100% of the outstanding New Money DIP Loans, and (ii) second, prepay up to 100% of the outstanding Roll-Up DIP Loans, in each case in an amount equal to the greater of (A) the amount of such proceeds and (B) the cost of such obligations (such prepayment to be applied first, to the outstanding New Money DIP Loans, and second, to the Roll-Up DIP Loans), and (y) pay the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee.

(e)     Within three (3) Business Day after any Borrower Party receives any Extraordinary Receipt, the Borrower shall apply such net cash proceeds to (x)(i) first, prepay up to 100% of the outstanding New Money DIP Loans, and (ii) second, prepay up to 100% of the outstanding Roll-Up DIP Loans, and (y) pay the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee; provided that if such Extraordinary Receipt is specifically and solely in connection with assets that, prior to the Chapter 11 Cases, were Carlyle Silo Assets or the Fundamental Silo Assets, then such Extraordinary Receipts shall be applied solely to the loans under the applicable Additional DIP Facility.

(f)     To the extent the Borrower has drawn any Subsequent Draws, all net cash proceeds received in respect of Project Surety Bonds shall, by the third (3rd) Business Day after receipt of such Project Surety Bond funds, apply such net cash proceeds to prepay the Obligations in an amount equal to the lesser of (i) the amount of such net cash proceeds and (ii)(A) the aggregate principal amount of Subsequent Draws made since the Petition Date, less (B) the aggregate amount of such mandatory prepayments in respect of Subsequent Draws made since the Petition Date, and shall be applied (x) first, to prepay up to 100% of the outstanding New Money DIP Loans, and

49

(y) second, to prepay up to 100% of the outstanding Roll-Up DIP Loans, and (z) pay the Applicable Prepayment Premium, if any, which shall be payable in cash, and the Exit Fee.

Notwithstanding anything to the contrary herein, (x) all prepayments subject to this Section 2.9 shall (1) be subject to the Carve Out to the extent set forth in the DIP Orders, (2) be accompanied by accrued and unpaid interest pursuant to Section 2.5, and (3) not be subject to any prepayment, premium, fee, or penalty, other than the Exit Fee and the Applicable Prepayment Premium, as applicable, and (y) no prepayment subject to clauses (c) and (e) of this Section 2.9 shall be required to be made for so long as the applicable cash or other proceeds that are the subject of such prepayment secure any Project Senior Financing incurred in accordance with the terms of this Agreement and such prepayment is prohibited by the terms of such Project Senior Financing.

For the avoidance of doubt, any amount subject to mandatory prepayment shall be allocated to the repayment of principal, accrued interest, fees, including the Exit Fee, and the Applicable Prepayment Premium, if applicable, such that the aggregate amount of such mandatory prepayment shall not exceed the amount of the applicable cash proceeds that are the subject of such prepayment. In the event that a transaction or receipt involving a Credit Party that is also a party under an Additional DIP Facility obligates any Credit Party to make a mandatory prepayment under both the DIP Facility and one or more Additional DIP Facilities, subject to the DIP Intercreditor Agreement, the amount subject to mandatory prepayment shall be allocated to prepay the outstanding Obligations and the obligations under the applicable Additional DIP Facilities in accordance with the DIP Intercreditor Agreement.

### 2.10. General Provisions Regarding Payments.

(a) All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 1:00 p.m. (New York City time) on the date due at the Principal Office of Administrative Agent for the account of Lenders; solely for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date may be deemed by Administrative Agent to have been paid by Borrower on the next succeeding Business Day.

(b) All payments in respect of the principal amount of any Loan shall be accompanied by payment of the accrued interest on the principal amount being repaid or prepaid, the Exit Fee, and the Applicable Prepayment Premium, if any, which shall be payable in cash, as applicable. All such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest and fees then due and payable before application to principal then due and payable.

(c) Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d) Whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(e)      If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 7, or pursuant to any sale of, any collection from, or other realization upon all or any part of the Collateral, all payments or proceeds received by Agents in respect of any of the Obligations, shall be applied to the Obligations, in the following order of priority:

(i)      *First*, on a pro rata basis, to the payment of all amounts due to the Collateral Agent and the Administrative Agent under any of the Credit Documents, including, to the extent such expenses are reimbursable in accordance with the terms of the relevant Credit Documents, any out of pocket costs and expenses and any indemnification payments owed to any such Person;

(ii)      *Second*, on a pro rata basis, to the payment of that portion of the Obligations constituting out-of-pocket expenses (including legal fees) incurred by any Secured Party (other than the Administrative Agent or the Collateral Agent in respect of amounts payable pursuant to priority *First*), to the extent such expenses are reimbursable in accordance with the terms of the relevant Credit Documents, in each case, with interest at the rates specified in the applicable Credit Documents, in respect of overdue amounts;

(iii)      *Third*, on a pro rata basis to the payment of all amounts then due and payable to the Secured Parties in respect of the Obligations under any Credit Document in respect of New Money DIP Loans;

(iv)      *Fourth*, on a pro rata basis to the payment of all amounts then due and payable to the Secured Parties in respect of the Obligations under any Credit Document in respect of Roll-Up DIP Loans;

(v)      *Fifth*, on a pro rata basis to the payment of all amounts then due and payable to the Secured Parties in respect of any Prepetition Secured Obligations to the extent not exchanged for Roll-Up DIP Loans pursuant to Section 2.1(a)(iv) and that are not yet Paid in Full;

(vi)      *Sixth* , on a pro rata basis to the payment of any Letter of Credit fees and charges and interest and/or fees then due and payable to the Secured Parties under the Credit Documents;

(vii)      *Seventh* , on a pro rata basis to the payment of all other amounts then due and payable to the Secured Parties in respect of the Obligations under any Credit Document.

(viii)      *Eighth,* the balance, if any, after all of the Obligations have been Paid in Full in cash, to the Borrower, or as otherwise required by applicable law.

**2.11.   Ratable Sharing**.

(a)      Except to the extent otherwise provided herein: (i) each Credit Extension shall be made from the relevant Lenders, each payment of a Commitment Fee under Section 2.8 in respect of Commitments shall be made for account of the relevant Lenders, and each termination of the amount of the Commitments under Section 2.1(b) shall be applied to the respective

51

Commitments of the relevant Lenders, pro rata among the Lenders according to the amounts of their respective Commitments; (ii) each borrowing shall be allocated pro rata among the relevant Lenders according to the amounts of their respective Commitments; (iii) each payment or prepayment of principal of Loans by the Borrower, and each payment of the Exit Fee or the Applicable Prepayment Premium (which shall be payable in cash), shall be made for the account of the Lenders pro rata in accordance with the respective unpaid principal amounts of the applicable Loans; and (iv) each payment of interest on Loans by the Borrower shall be made for the account of the Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the respective Lenders.

(b)     Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender entitled to receive the same proportion in respect of the Aggregate Amounts Due, then the Lender receiving such proportionately greater payment shall (i) notify Administrative Agent and each other Lender of the receipt of such payment and (ii) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.  The provisions of this Section 2.11 shall not be construed to apply to (x) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

**2.12.    Increased Costs; Capital Adequacy**.

(a)     Compensation for Increased Costs and Taxes.  In the event that any Lender determines that any Change in Law: (i) subjects such Lender (or its applicable lending office) or any company controlling such Lender to any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, liquidity, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other

credit extended by, or any other acquisition of funds by, any office of such Lender or any company controlling such Lender; or (iii) imposes any other condition, cost, or expense (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or any company controlling such Lender or such Lender's obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or in a lump sum or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder; provided, however, that the Borrower shall not be required under this Section 2.12(a) to compensate such Lender with respect to any increased costs or reductions incurred more than 270 calendar days prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions; provided that, if the Change in Law giving rise to such claim is retroactive, then such 270-day period referred to above shall be extended to include the period of retroactive effect thereof.  Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.12(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)      Capital Adequacy and Liquidity Adjustment.  In the event that any Lender determines that (i) any Change in Law regarding capital adequacy or liquidity or (ii) compliance by any Lender (or its applicable lending office) or any company controlling such Lender with any Change in Law has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitments or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such Change in Law (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy and liquidity), then from time to time, within ten (10) days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company for such reduction.  Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.12(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(c)      Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation.

**2.13.   Taxes; Withholding, Etc**.

(a)      Payments to Be Free and Clear.  All sums payable by or on behalf of any Borrower Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed by any Governmental Authority.

(b)      Withholding of Taxes.  If any Borrower Party or Administrative Agent is (in such Borrower Party's or Administrative Agent's reasonable good faith discretion) required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by any Borrower Party to Administrative Agent or any Lender under any of the Credit Documents: such Credit Party or Administrative Agent, as applicable, shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.  If such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.13) the applicable beneficiary receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)      Payment of Other Taxes by Borrower.  Without limiting the provisions of Section 2.13(b) above, Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.  Borrower shall deliver to Administrative Agent official receipts or other evidence of such payment satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(d)      Indemnification by Borrower.  Borrower shall indemnify Administrative Agent and any Lender for the full amount of Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.13) paid by Administrative Agent or such Lender or any of their respective Affiliates and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower shall be conclusive absent manifest error.  Such payment shall be due within ten (10) days of such Borrower Party's receipt of such certificate.

(e)      Indemnification by the Lenders.  Each Lender shall severally indemnify Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified Administrative Agent for such Indemnified Taxes and without limiting the obligation of Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.6(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Administrative Agent in connection with any Credit Document, and any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by Administrative Agent to the Lender from any other source against any amount due to Administrative Agent under this paragraph (e).

(f)      Status of Lenders.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to Borrower and Administrative Agent, at the time or times reasonably requested by Borrower or

54

Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower or Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or Administrative Agent as will enable Borrower or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.13(f)(ii)(A)</u>, <u>Section 2.13(f)(ii)(B)</u> and <u>Section 2.13(f)(ii)(D)</u>) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any (i) Lender that is a U.S. Person shall deliver to Borrower and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement and (ii) Administrative Agent shall deliver to Borrower on or prior to the date on which it becomes Administrative Agent under this agreement (and, in each case, from time to time thereafter upon the reasonable request of Borrower or Administrative Agent, as applicable), properly completed and duly executed copies of IRS Form W-9 certifying that such Lender or Administrative Agent, as applicable, is exempt from U.S. federal backup withholding tax;

(B)     any Non-US Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-US Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Administrative Agent), whichever of the following is applicable:

(1) in the case of a Non-US Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, properly completed and duly executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) properly completed and duly executed copies of IRS Form W-8ECI;

(3) in the case of a Non-US Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the

55

Internal Revenue Code, (x) a certificate substantially in the form of <u>Exhibit E-1</u> to the effect that such Non-US Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code and (y) properly completed and duly executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4) to the extent a Non-US Lender is not the beneficial owner, properly completed and duly executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit E-2</u> or <u>Exhibit E-3</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-US Lender is a partnership and one or more direct or indirect partners of such Non-US Lender are claiming the portfolio interest exemption, such Non-US Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit E-4</u> on behalf of each such direct and indirect partner;

(C)     any Non-US Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-US Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Administrative Agent to determine the withholding or deduction required to be made; and

(D)     each Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. For purposes of this <u>Section 2.13</u>, "law" includes FATCA and, solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender and the Administrative Agent agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall

56

update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding anything else herein, if a Lender has designated a collection agent to receive payments on its behalf, such collection agent will be required to provide any relevant documentation required by this Section 2.13(f) on behalf of such Lender.

(g)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.13 (including additional amounts pursuant to this Section 2.13), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.13 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts in respect of such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

2.14.     **Obligation to Mitigate**. Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would entitle such Lender to receive payments under Section 2.12 or 2.13, then such Lender will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extension, including any affected Loans, through another office of such Lender or (b) take such other measures as such Lender may deem reasonable if, as a result thereof, the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.12 or 2.13 would be eliminated or reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.14 unless Borrower agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above. A certificate as to the amount of any such expenses payable by Borrower pursuant to this Section 2.14 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower (with a copy to Administrative Agent) shall be conclusive absent manifest error.

2.15.     **Defaulting Lenders**.

(a)     Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)      Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7 or otherwise) or received by Administrative Agent from a Defaulting Lender pursuant to Section 9.4 shall be applied at such time or times as may be determined by Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder; *second*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *third*, as Borrower may request (so long as no Default or Event of Default shall have occurred and be continuing), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Administrative Agent; *fourth*, if so determined by Administrative Agent and Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement;  *fifth*, so long as no Default or Event of Default shall have occurred and be continuing, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.1 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the applicable Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)      Defaulting Lender Cure.  If Borrower and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the applicable Commitments whereupon such Lender will cease to be a Defaulting Lender; provided that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

2.16.    **Accounts**.  The Credit Parties (a) shall allocate all amounts on deposit in the Obligor Account as directed by the Administrative Agent within two (2) Business Days after receiving such direction, including, but not limited to, transferring such amounts to the DIP Proceeds Account or funding a voluntary prepayment of the Loans pursuant to Section 2.8, and (b)  hereby irrevocably confirm the authority of the Collateral Agent to (and directs and authorizes the Collateral Agent to) instruct the Account Bank to deposit into and remit funds from the Obligor Accounts in accordance with the instructions of the Collateral Agent.  The Secured Parties and the Borrower acknowledge and agree that the Collateral Agent shall not be required to instruct the Account Bank to transfer, withdraw or otherwise deal with any funds

on deposit or credited to an Obligor Account except upon written instructions to do so from the Administrative Agent.

**2.17.    Reserved.**

**2.18.    Schedules**.  From time to time after the Closing Date, with the prior written consent of the Administrative Agent (acting at the direction of the Requisite Lenders), the Borrower may supplement, modify or amend and deliver updates to the Schedules that have been rendered inaccurate or incomplete since the Closing Date as a result of matters, circumstances or events occurring after the Closing Date as necessary to complete or correct any information therein; provided, that, unless such consent provides otherwise, no such supplement, amendment or modification shall be deemed to have cured any prior breach of warranty or representation resulting from the inaccuracy or incompleteness of any such disclosure.

## SECTION 3.    CONDITIONS PRECEDENT

**3.1.    Conditions to the Closing Date and First Draw and Subsequent Draws**.  The obligations of the Lenders to fund the First Draw upon the entry of the Interim DIP Order and Subsequent Draws upon entry of the Interim DIP Order but prior to entry of the Final DIP Order hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived by the Requisite Lenders in their sole discretion) after giving effect to the initial borrowing:

(a)    Credit Documents.  The Administrative Agent shall have received from (i) the Borrower a counterpart, executed by each relevant Credit Party (either originally executed or a .pdf file), of this Agreement and the Collateral Documents for the Loans in form and substance mutually agreed between the Administrative Agent and the Borrower; provided that, upon entry of the Interim DIP Order (and, if entered, the Final DIP Order), the Administrative Agent shall have valid and automatically perfected security interests as set forth herein and in the DIP Orders, and no filing or other action will be necessary to perfect or protect such security interests with respect to the Debtors' obligations under the Credit Documents and such DIP Order.

(b)    Secretary's Certificate.  The Administrative Agent and the Lenders shall have received a copy of (i) each organizational document of each Credit Party certified, to the extent applicable, by the applicable governmental authority, (ii) signature and incumbency certificates of the responsible officers, directors, authorized signatories or attorneys-in- fact of each Credit Party executing the Credit Documents to which it is a party, (iii) resolutions of the applicable board and/or similar governing bodies of each Credit Party approving and authorizing the execution, delivery and performance of Credit Documents to which it is a party, certified as of the Closing Date by its secretary, an assistant secretary, director, authorized signatory, attorney-in-fact or a responsible officer or board member as being in full force and effect without modification or amendment, in a form reasonably acceptable to the Requisite Lenders.

(c)    Representations and Warranties.  The representations and warranties contained in the Credit Documents shall be true and correct in all respects (except such representations and warranties that by their terms are qualified by materiality or a material adverse effect, which representations and warranties shall be true and correct in such respects) on and as of the Closing Date (or to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date), except for certain Specified Events listed on <u>Annex C</u>.

(d)    <u>Closing Date Certificate</u>.  The Administrative Agent and the Lenders shall have received a certificate, dated the Closing Date and signed by a responsible officer of each Borrower, confirming compliance with the conditions set forth in clauses (c), (e), (f), (m), (n), and (o) of this <u>Section 3.1</u>, in a form reasonably acceptable to the Requisite Lenders.

(e)    <u>Material Adverse Effect</u>.  Since the Petition Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect (other than as a result of events leading up to and customarily resulting from the commencement of the Chapter 11 Cases and the continuation and prosecution thereof including any decline in business relationships, reputation, or financial performance resulting from the Chapter 11 filing); provided that no Specified Event shall constitute a Material Adverse Effect.

(f)    <u>No Default or Event of Default</u>.  At the time of and immediately after giving effect to the borrowing of the First Draw, (x) no Default or Event of Default shall have occurred and be continuing, and (y) no Default or Event of Default (other than pursuant to <u>Section 7.1(g)</u> of the Prepetition Credit Agreement solely as a result of the commencement of the Chapter 11 Cases and other than a Default or Event of Default arising as a proximate result of any Specified Event) shall have occurred and be continuing under the Prepetition Credit Agreement.

(g)    <u>Collateral Documents</u>.  The Credit Parties shall have used reasonable best efforts to take on or prior to the Closing Date the relevant perfection steps contemplated under the Collateral Documents delivered on the Closing Date; <u>provided</u> that, upon entry of the Interim DIP Order (and, if entered, the Final DIP Order), the Administrative Agent shall have valid and automatically perfected security interests as set forth in this Agreement, the Collateral Documents and in the DIP Orders, and no filing or other action will be necessary to perfect or protect such security interests with respect to the Debtors' obligations under the Credit Documents and such DIP Order.

(h)    <u>Fees</u>.  The Administrative Agent shall have received all fees payable thereto and the Lenders shall have received all fees payable to any Lender on or prior to the Closing Date and, to the extent invoiced, all other amounts due and payable pursuant to the Credit Documents on or prior to the Closing Date (or, in the case of a Subsequent Draw, the date thereof), including, to the extent invoiced at least one (1) Business Day prior to the Closing Date (or, in the case of a Subsequent Draw, at least three (3) Business Days prior to the date thereof), reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of the Lender Advisors) required to be reimbursed or paid by the Credit Parties hereunder or under any Credit Document.

(i)    <u>Fee Letter</u>. The Borrower shall have entered into a fee letter with the Administrative Agent.

(j)    <u>Borrowing Request</u>.  The Administrative Agent shall have received a Funding Notice from the Borrower with respect to the Loans to be made pursuant to the First Draw or Subsequent Draw.

(k)    <u>Interim DIP Order</u>.  The Interim DIP Order shall have been approved and entered by the Bankruptcy Court, which Interim DIP Order shall be in form and substance acceptable to the Requisite Lenders and the Administrative Agent (solely with respect to its own treatment), and shall not have been modified or amended in any respect without the consent of the

60

Administrative Agent (solely with respect to its own treatment) and the Requisite Lenders, and the Credit Parties and their subsidiaries shall be in compliance with the Interim DIP Order.

(l)     First Day Orders.  The Lenders and the Administrative Agent shall have received advanced drafts of the Interim Orders to be entered by the Bankruptcy Court (the "**First Day Orders**") in respect of the first day motions and applications in respect of the Chapter 11 Cases (the "**First Day Motions**") (including, without limitation, any order approving significant or outside the ordinary course of business transactions entered on (or prior to) the Closing Date and a Cash Management Order) [and a list of critical vendors (which for the avoidance of doubt may only be paid in accordance with the Approved Budget),] and the forms of the First Day Motions filed in the Chapter 11 Cases shall be, in each case, in form and substance satisfactory to the Requisite Lenders and (solely with respect to its own treatment) the Administrative Agent, and (ii) except as would not adversely affect the Lenders, the Administrative Agent, or the Prepetition Secured Parties, all First Day Orders intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" hearing shall have been entered by the Bankruptcy Court, shall be acceptable to the Requisite Lenders and (solely with respect to its own treatment) the Administrative Agent, and shall be in full force and effect.

(m)     Petition Date.  The Petition Date shall have occurred, and the Borrower and each Guarantor [(subject to exceptions as agreed among the Requisite Lenders and the Borrower)] as of the Closing Date shall be a debtor and a debtor-in-possession in the Chapter 11 Cases.

(n)     No Trustee.  No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(o)     Chapter 11 Cases.  The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(p)     Budget.  The Administrative Agent and the Lenders shall have received a copy of the Initial Approved Budget, which shall be in form and substance satisfactory to the Requisite Lenders and shall be agreed as the Approved Budget.

(q)     USA Patriot Act; KYC.  The Administrative Agent and the Lenders shall have received from the Borrower and each of the Credit Parties, all documentation and other information reasonably requested by the Administrative Agent and any Lender no less than three (3) Business Days prior to the Closing Date that the Administrative Agent and any such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(r)     Transaction Funds Flow.  The Administrative Agent shall have received a funds flow agreement relating to the DIP Facility and the transactions contemplated thereby in form and substance reasonably satisfactory to the Requisite Lenders and duly executed by the Borrower, the Administrative Agent and the other parties thereto.

(s)     Stalking Horse APA.  The Debtors shall not be in breach of the applicable milestone regarding entry into the Stalking Horse APA, and if the Stalking Horse APA shall have been executed at the time of the First Draw, it shall be in form and substance acceptable to the

61

Requisite Lenders and remain in full force and effect and no facts or circumstances shall exist that shall permit the purchaser thereunder to terminate the Stalking Horse APA, either through the giving of notice, the passage of time, or both;

(t)    Additional DIP Facilities.  The Debtors shall have entered into and received commitments for debtor-in-possession financing under the Carlyle DIP Facility and the Fundamental DIP Facility collectively in an amount of no less than $116,356,134.19 in new money commitments, which Additional DIP Facilities shall be in each case on terms and conditions reasonably acceptable to the Requisite Lenders and shall be approved by the Interim DIP Order, each of the Additional DIP Facilities shall remain in full force and effect and no default or event of default shall exist thereunder, and substantially concurrently with the First Draw the Debtors shall have borrowed the full initial amount then intended to be available under the Additional DIP Facilities such that the borrowing of the Loans represents no more than [40]% of the aggregate amount of all such concurrent borrowings of Loans and borrowings under Additional DIP Facilities.

(u)    ACT Transactions.  Any indebtedness of ACT or any liens securing indebtedness for borrowed money on ACT or the equity or assets of ACT, including in the form of debtor-in-possession financing, incurred in connection with or in anticipation of the Chapter 11 Cases shall have been incurred on terms and conditions and funded by counterparties reasonably acceptable to the Requisite Lenders (it being understood that any refusal to consent shall be deemed reasonable if such financing provides for milestones, events of default, or the ability of the lender to exercise remedies, in each case prior to the consummation of the Sale, or if the financing is provided by parties with existing investments in the Borrower or its subsidiaries or affiliates), and any asset purchase agreement or similar agreement or transaction providing for a sale of ACT (or the assets or equity thereof) shall have been entered into on terms and conditions and with a counterparty reasonably acceptable to the Requisite Lenders or that provide for all Obligations (including Roll-Up DIP Loans) and Prepetition Secured Obligations to be Paid in Full in cash upon consummation of such sale (it being understood that any refusal to consent shall be deemed reasonable (A) if the disposition is proposed to occur before consummation of the sale pursuant to the Stalking Horse APA, (B) if the Requisite Lenders in good faith determine that such disposition could adversely affect ACT's ability to provide operations and maintenance services provided to the Brookfield Silo Entities (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Borrower or its subsidiaries or affiliates).

(v)    Project Senior Financing Consents.  The Debtors shall have used reasonable best efforts to obtain the Project Senior Financing Consents on or before the Closing Date, with respect to each Financing Subsidiary.

(w)    Aggregate Amount.  The aggregate amount of the Loans after giving effect to the funding of such First Draw shall not exceed the amount of the Commitments.

(x)    Catalina Solar Direct Pay. The Catalina Direct Payment Agreement shall be in full force and effect and no default thereunder shall exist.

(y)    In the case of each Subsequent Draw, (x) the Proceeds of such Subsequent Draw shall be used to make contemporaneous payments in respect of construction and development or other expenses of the Brookfield Silo Entities that are, in each case, acceptable to the Requisite

Lenders in their sole discretion, and (y) the Requisite Lenders shall be satisfied in their sole discretion that the Debtors have first used good faith efforts to instead draw all available Project Surety Bonds to fund such expenses.

     **3.2.**    **Conditions to the Second Draw and Subsequent Draws**.  The obligations of the Lenders to fund the Second Draw, and Subsequent Draws after entry of the Final DIP Order shall not become effective until the date on which each of the following conditions shall be satisfied (or waived by the Requisite Lenders in their sole discretion) after giving effect to such borrowing:

     (a)    <u>Closing Date</u>.  The conditions precedent to the First Draw shall have been satisfied or waived in accordance with the Credit Documents and the First Draw shall have been made.

     (b)    <u>DIP Orders</u>. The Final DIP Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Requisite Lenders and the Administrative Agent (solely with respect to its own treatment) and shall not have been modified or amended in any respect without the consent of the Administrative Agent (solely with respect to its own treatment) and the Requisite Lenders, and the Credit Parties and their Subsidiaries shall be in compliance with the Final DIP Order

     (c)    <u>Second Day Orders</u>.  (i) All material "second day orders" (the "**Second Day Orders**") and all related pleadings intended to be entered on or prior to the date of entry of the Final DIP Order and any order establishing material procedures for the administration of the Chapter 11 Cases (the "**Second Day Motions**"), shall have been entered by the Bankruptcy Court, and (ii) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be in form and substance satisfactory to the Requisite Lenders.

     (d)    <u>Borrowing Request</u>.  The Administrative Agent shall have received a Funding Notice from the Borrower with respect to the Loans to be made pursuant to such Second Draw or Subsequent Draw.

     (e)    <u>Representations and Warranties</u>.  The representations and warranties contained in the Credit Documents shall be true and correct in all respects (except such representations and warranties that by their terms are qualified by materiality or a material adverse effect, which representations and warranties shall be true and correct in such respects, or, to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date), except for certain Specified Events listed on <u>Annex C</u>.

     (f)    <u>Material Adverse Effect.</u> Since the Petition Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect; provided that no Specified Event shall constitute a Material Adverse Effect.

     (g)    <u>No Default or Event of Default</u>.  Immediately before and after giving effect to the borrowing of Loans, no event shall have occurred and be continuing or would result therefrom that would constitute an Event of Default or a Default.

(h) <u>Chapter 11 Cases</u>.  The Chapter 11 Cases of any of the Debtors shall have not been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(i) <u>Trustee</u>.  No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(j) <u>Fees</u>. The Administrative Agent shall have received all fees payable thereto and the Lenders shall have received all amounts due and payable pursuant to the Credit Documents on or prior to the date of such Second Draw or Subsequent Draw, including, to the extent invoiced at least three (3) Business Days prior to such date (subject to any other limitations provided by the Bankruptcy Court), reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of the Lender Advisors) required to be reimbursed or paid by the Credit Parties hereunder or under any Credit Document.

(k) <u>Aggregate Amount</u>.  In the case of the Second Draw, the aggregate amount of the Loans after giving effect to the funding of such Second Draw shall not exceed the amount of the Commitments.

(l) <u>Stalking Horse APA</u>.  The milestone regarding entry into the Stalking Horse APA shall have been satisfied, and the Stalking Horse APA shall remain in full force and effect and no facts or circumstances shall exist that shall permit the purchaser thereunder to terminate the Stalking Horse APA, either through the giving of notice, the passage of time, or both.

(m) <u>Additional DIP Facilities</u>.  Each of the Additional DIP Facilities shall remain in full force and effect and no default or event of default shall exist thereunder, and, substantially concurrently with the Second Draw the Debtors shall have borrowed the full amount intended to be available under the Additional DIP Facilities upon entry of the Final DIP Order approving such Additional DIP Facilities such that the borrowing of the Loans represents no more than [40]% of the aggregate amount of all such concurrent borrowings of Loans and borrowings under Additional DIP Facilities.

(n) The Services Agreement Assumption Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Requisite Lenders and shall not have been modified or amended in any respect without the consent of the Requisite Lenders, and the Credit Parties and their subsidiaries shall be in compliance with the Services Agreement Assumption Order.

(o) In the case of each Subsequent Draw, (x) the Proceeds of such Subsequent Draw shall be used to make contemporaneous payments in respect of construction and development or other expenses of the Brookfield Silo Entities that are, in each case, acceptable to the Requisite Lenders in their sole discretion, and (y) the Requisite Lenders shall be satisfied in their sole discretion that the Debtors have first used good faith efforts to instead draw all available Project Surety Bonds to fund such expenses.

Notwithstanding anything to the contrary herein, solely to the extent required to effectuate a credit bid submitted by Newco pursuant to the Stalking Horse APA or an amendment thereto, the undrawn Commitments (other than in respect of Subsequent Draws) shall become available upon the closing of such

64

Sale notwithstanding the Credit Parties' inability to satisfy the conditions precedent to drawing on the DIP Facility.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES

In order to induce Agents and Lenders to enter into this Agreement and to make the Credit Extension to be made hereby, Borrower represents and warrants to each Agent and Lender that the following statements are true and correct (x) on the Closing Date as to itself and as to each of the other Borrower Parties and (y) on each Disbursement Date, as to itself and as to each other Borrower Party:

**4.1.    Organization; Requisite Power and Authority; Qualification**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, each of Borrower and the other Borrower Parties (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**4.2.    Equity Interests and Ownership**.  The Equity Interests of each of Borrower and the other Borrower Parties have been duly authorized and validly issued and are fully paid and non-assessable.  Except as set forth on Schedule 4.2(d), there is no existing option, warrant, call, right, commitment or other agreement to which Borrower or any of the other Borrower Parties is a party requiring, and there is no membership interest or other Equity Interests of Borrower or any of the other Borrower Parties outstanding which upon conversion or exchange would require, the issuance by Borrower or any of the other Borrower Parties of any additional membership interests or other Equity Interests of Borrower or any of the other Borrower Parties or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Borrower or any of the other Borrower Parties.  Schedule 4.2(e) correctly sets forth the Securities that may be issued or granted to or held by any Grantor (as defined in the Guarantee and Security Agreement) while this Agreement is in effect.

**4.3.    Due Authorization**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each of the Credit Parties.

**4.4.    No Conflict**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, the execution, delivery and performance by the Credit Parties of the Credit Documents to which they are a party and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) materially violate (i) any provision of any law or any governmental rule or regulation applicable to Borrower or any of the other Borrower Parties, (ii) any of the Organizational Documents of Borrower or any of the other Borrower Parties, or (iii) any order, judgment or decree of any court or other agency of government binding on Borrower or any of the other Borrower Parties; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Borrower or any of the other Borrower Parties; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Borrower or any of the other Borrower Parties (other than any Liens created under any of the Credit Documents in favor of a Collateral Agent, for the benefit of the Secured Parties); or (d) require any approval of stockholders, members or partners or any

65

approval or consent of any other Person under any Contractual Obligation of Borrower or any of the other Borrower Parties except for such approvals or consents which will be obtained on or before the date of such Credit Documents.

4.5.     **Governmental Consents**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, the execution, delivery and performance by each Credit Party of the Credit Documents to which it is party and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except for (a) approvals, consents, exemptions, authorizations, filings and notices which have been obtained or made and are in full force and effect, (b) filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Administrative Agent for filing and/or recordation, and (c) approvals, consents, exemptions, authorizations, filings and notices as are necessary under securities, regulatory or other applicable law in connection with the exercise of certain remedies in respect of the Collateral.

4.6.     **Binding Obligation**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, each Credit Document has been duly executed and delivered by the Credit Parties is the legally valid and binding obligation of such Credit Party, enforceable against such Person in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.7.     **Financial Statements**.  The Historical Financial Statements and the most recent annual and quarterly financial statements delivered pursuant to Section 5.1 were prepared in conformity with GAAP and fairly present in all material respects the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.  None of Borrower Parties has any contingent liability or liability for long-term lease or unusual forward or long-term commitment that is not reflected in the Historical Financial Statements, the most recent annual and quarterly financial statements delivered pursuant to Section 5.1 or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Borrower and any of the other Borrower Parties.

4.8.     **No Material Adverse Effect**.  Since the Petition Date, no Material Adverse Effect has occurred and is continuing.

4.9.     **Adverse Proceedings, Etc**.  Except for the Chapter 11 Cases (and any adversary proceedings or contested matters filed with the Bankruptcy Court and related thereto) and those proceedings set forth in Schedule 4.9 hereof, there are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.  Neither Borrower nor any of the other Borrower Parties (a) is in violation of any applicable laws that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.10.    **Taxes**.  Subject to the Bankruptcy Code, the terms of the DIP Orders and any required approval by the Bankruptcy Court, except for those set forth in Schedule 4.10 or as otherwise permitted under Section 5.3, all federal, state, provincial and other tax returns and reports of Borrower and the other Borrower Parties required to be filed by any of them with respect to their income, properties or operations, have been timely filed, and all Taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Borrower and the other Borrower Parties and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves ae being maintained in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

4.11.    **Properties; Title**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, except as set forth on Schedule 4.11, each of Borrower and the other Borrower Parties has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets necessary or used in the ordinary conduct of its business, except for such defects in title (or such invalidity of leasehold interests, licensed rights or rights to use) as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as permitted by this Agreement (including with respect to any Permitted Liens), all such properties and assets are free and clear of Liens.

4.12.    **Environmental Matters**.  Subject to the Bankruptcy Code, the terms of the DIP Orders and any required approval by the Bankruptcy Court, except for those proceedings set forth in Schedule 4.9 hereof, neither Borrower nor any of the other Borrower Parties is subject to any outstanding written order or consent decree with any Governmental Authority relating to any Environmental Law or any Environmental Claim that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Neither Borrower nor any of the other Borrower Parties is subject to any pending or, to the knowledge of Borrower, threatened Environmental Claim pursuant to Environmental Laws, except for any Environmental Claim that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Neither Borrower nor any of the other Borrower Parties, nor any Person whose liabilities have been expressly assumed or undertaken by the Borrower or any of the Borrower Parties, has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, Released, or exposed any Person to, any Hazardous Materials, or owned or operated any real property contaminated by Hazardous Materials, except in each case as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  Borrower and the other Borrower Parties are, and for the past three (3) years have been, in compliance with applicable Environmental Laws, including obtaining, possessing and complying with any Governmental Authorizations issued under any applicable Environmental Law, and, neither Borrower nor any Borrower Party has received written notice that could reasonably be expected to result in the revocation, cancellation, suspension, or modification of any such Governmental Authorizations, except for any failure to comply or written notice that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of Borrower, with respect to any Project that is currently under development or construction or otherwise not yet fully operational, the applicable Borrower Party, or another Person on behalf of any applicable Borrower Party as allowed by Environmental Law, will be able to obtain all Governmental Authorizations that are required under applicable Environmental Laws for the operation of such Project by the date such Governmental Authorization will become legally required and without effecting any material delay to the operations of such Project, except for any such failures to so timely obtain that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

67

**4.13.    No Defaults**.  Neither Borrower nor any of the other Borrower Parties is in default in the performance, observance or fulfilment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

**4.14.    Material Contracts**.  Subject to the Bankruptcy Code, the terms of the DIP Orders and any required approval by the Bankruptcy Court, the Material Contracts listed on Schedule 4.14 are in full force and effect and no defaults exist thereunder that could reasonably be expected to result in a Material Adverse Effect.  Schedule 4.14 contains a true, correct and complete list of all Material Contracts in effect on the Closing Date.

**4.15.    Federal Reserve Regulations; Exchange Act**.

(a)    None of the Borrower Parties is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No portion of the Proceeds of any Credit Extension shall be used in any manner, whether directly or indirectly, that causes or could reasonably be expected to cause, such Credit Extension or the application of such Proceeds to violate Regulation T, Regulation U or Regulation X or any other regulation thereof or to violate the Exchange Act.

**4.16.    Employee Matters**.  There are no collective bargaining agreements covering the employees of the any of the Borrower Parties as of the Closing Date and, as of the Closing Date, no Borrower Party has suffered any strike, work stoppage, or other material labor difficulty.

**4.17.    Employee Benefit Plans**.  No ERISA Event has occurred or is reasonably expected to occur that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any Subsidiary sponsors, maintains, participates in, contributes to or has any obligation to contribute to or any liability in respect of any Pension Plan or Multiemployer Plan nor has the Borrower or any Subsidiary sponsored, maintained, participated in, contributed to or had any obligation to contribute to or any liability in respect of any Pension Plan or Multiemployer Plan in the last six (6) years.  Without limiting the foregoing, no liability in respect of any Pension Plan or Multiemployer Plan of any ERISA Affiliate is reasonably expected to be imposed upon the Borrower or any Subsidiary and no Lien pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA is reasonably expected to be imposed upon the Borrower or any Subsidiary.

**4.18.    [Reserved]**.

**4.19.    Compliance with Statutes, Etc**.  Subject in the case of the Debtors to entry of the DIP Orders and the terms thereof, each of Borrower and the other Borrower Parties is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.20.   Disclosure**.

(a)      There is no fact known to Borrower (other than general industry and economic conditions and risks and legal and regulatory requirements which are readily known and applicable to companies and businesses similar to Borrower, generally) that Borrower has not disclosed in writing which would reasonably be expected to have a Material Adverse Effect. The factual information (taken as a whole) furnished in writing by or on behalf of any Credit Party for purposes of or in connection with this Agreement or any transaction contemplated herein was, when furnished, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such Person in writing will be, true and accurate in material respects on the date as of which such information is furnished, dated or certified and not materially incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided, except that all information consisting of financial projections and pro forma financial information contained in such materials, prepared by Borrower is only represented herein as being based on good faith estimates and assumptions believed by such persons to be reasonable at the time made (it being understood that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of Borrower, that no assurance can be given that any particular projection will be realized, that actual results may differ from the projected results and that such differences may be material).

(b)      Reserved.

(c)      As of the Closing Date, to the knowledge of the Borrower, the information included in the Beneficial Ownership Certification is complete and correct in all material respects.

**4.21.   Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  None of Borrower, the other Borrower Parties or any of their Subsidiaries or any of their respective directors, officers or, to the knowledge of the Borrower, employees or Affiliates of the Borrower Parties or any of their Subsidiaries is a Sanctioned Person.  The Borrower Parties and their Subsidiaries and the directors, officers and, to the knowledge of the Borrower, employees, agents and Affiliates of the Borrower Parties and their Subsidiaries are in compliance (i) in all material respects with all applicable Economic Sanctions and Trade Controls Laws and Regulations, and (ii) in all material respects with all applicable Anti-Corruption Laws and applicable Anti-Money Laundering Laws.  The Borrower Parties and their Subsidiaries have instituted and maintain (or have instituted and maintained on their behalf) policies and procedures reasonably designed to promote compliance with applicable Economic Sanctions and Trade Controls Laws and Regulations, and applicable Anti-Corruption Laws.

**4.22.   Security Documents**.

(a)      Upon entry of the Interim DIP Order (and, when entered, the Final DIP Order), the Liens granted thereunder by the Debtors to the Collateral Agent on any Collateral shall be valid and automatically perfected with the priority set forth herein and in the DIP Orders, and no filing or other action will be necessary to perfect or protect such Liens and security interests with respect to the Debtors' Obligations under the Credit Documents and such Order.

(b)      With respect to non-Debtor Credit Parties, the Collateral Documents will, upon execution and delivery thereof by the parties thereto, be effective to create in favor of a Collateral Agent, for the benefit of the Secured Parties, Liens on, and security interests in, the Collateral described therein,

69

and when financing statements in appropriate form are filed in the offices specified in the Guarantee and Security Agreement, the Liens created by the Collateral Documents shall constitute perfected Liens on, and security interests in, all right, title and interest of the applicable Credit Parties in such Collateral to the extent perfection is required under the Collateral Documents and can be obtained by filing financing statements or the taking of possession or control, in each case, subject to no Liens other than Permitted Liens. The Project Senior Financing Collateral and Guarantee Requirement is satisfied.

      **4.23.** **Accounts**. The Credit Parties have no Deposit Accounts or securities accounts other than the Obligor Accounts, the Limewood Account and [●].

      **4.24.** **Energy Regulatory Matters**

      (a)     Each of the electrical generating facilities owned by the Borrower or any the other Borrower Parties is, or will be, beginning at the time of first generating electric energy, (i) a small power production facility that is a qualifying facility ("**QF**") under the regulations of the Federal Energy Regulatory Commission's ("**FERC**") at 18 C.F.R. Part 292 ("**PURPA Regulations**") under the Public Utility Regulatory Policies Act of 1978 ("**PURPA**") (such status as a QF, "**QF Status**") or (ii) if not a QF, then owned or operated by an "Exempt Wholesale Generator" or "EWG" within the meaning of the Public Utility Holding Company Act of 2005 ("**PUHCA**") ("**EWG**" and such status as an EWG, "**EWG Status**"). The QF Status of each such electrical generating facility that is a QF has been or will be, by the time such facility begins to generate electric energy, validly obtained through certification or self-certification pursuant to the PURPA Regulations, or certification or self-certification with respect to such QF Status is not required pursuant to 18 C.F.R. § 292.203(d). The EWG Status of any owner or operator of such electrical generating facility that is an EWG has been or will be, by the time such facility begins to generate electric energy, validly obtained through determination or self-certification pursuant to the FERC's regulations at 18 C.F.R. Part 366 ("**PUHCA Regulations**").

      (b)     Borrower and the other Borrower Parties are not subject to, or are exempt from, regulation under the federal access to books and records, accounting, record-retention and reporting provisions of PUHCA (the "**PUHCA Exemption**"). Any Borrower Party that is a holding company as defined under PUHCA, are holding companies under PUHCA solely with respect to one or more QFs, "Foreign Utility Companies" (as defined in PUHCA) or EWGs and are entitled to the benefit of blanket authorization under Section 203(a)(2) of the Federal Power Act ("**FPA**") pursuant to 18 C.F.R. § 33.1(c)(6) and (c)(8).

      (c)     If and to the extent that the Borrower or any other Borrower Party is subject to regulation under Sections 204, 205 and 206 of the FPA it (i) makes all of its sales of electricity exclusively at wholesale, (ii) has authority to engage in wholesale sales of electricity at market-based rates, and to the extent permitted under its market-based rate authority, other products and services at market-based rates, and (iii) has such waivers and authorizations as are customarily granted to market-based rate sellers by FERC, including blanket authorization to issue securities and assume liabilities pursuant to Section 204 of the FPA, (such waivers and authorizations, the "**Market-Based Rate Authorizations**" and, together with QF Status, the PUHCA Exemption and the other authorizations described in this paragraph (c), the "**Federal Energy Regulatory Authorizations, Exemptions, and Waivers**"). FERC has not issued any orders imposing a rate cap, mitigation measure, or other limitation on the Market-Based Rate Authorizations, other than challenges, investigations, rate caps and mitigation measures generally applicable to wholesale sellers participating in the applicable electric market.

(d)     On the Closing Date, no Borrower Party, and on any subsequent Disbursement Date no Borrower Party that is the subject to such Credit Extension at any time after the immediately prior Disbursement Date will, as the result of entering into any Credit Documents, or any transaction contemplated hereby or thereby, be subject to state laws and regulations respecting (i) the rates of electric utilities and (ii) the financial and organizational regulation of electric utilities (such laws and regulations, the "**State Electric Utility Regulations**"), except as listed on <u>Schedule 4.24</u> (as such <u>Schedule 4.24</u> may be amended by the Borrower from time to time).

(e)     None of the Lenders or any of their "affiliates" (as defined under the PUHCA Regulations) of any of them will, solely as a result of each of the Borrower Parties' respective ownership, leasing or operation of its electrical generating facility, the sale or transmission of electricity therefrom or the Borrower Parties' entering into any Credit Documents, or any transaction contemplated hereby or thereby, be subject to regulation under the FPA, PUHCA, or state laws and regulations respecting the rates of, or the financial or organizational regulation of, public utilities, except that the exercise by the Administrative Agent or the Lenders of certain foreclosure remedies allowed under the Credit Documents may subject the Administrative Agent, the Lenders and their "affiliates" (as that term is defined in PUHCA) to regulation under the FPA, PUHCA or state laws and regulations respecting the rates of, or the financial or organizations regulation of, electric utilities.

**4.25.   Cases; Orders**.

(a)     The Chapter 11 Cases were commenced on the Petition Date, duly authorized in accordance with applicable laws, and proper notice thereof has been or will be given of the motion and hearing seeking approval of the Credit Documents, the entry of the Interim DIP Order and the Final DIP Order.

(b)     With respect to each Credit Party, subject to and upon entry of the Interim DIP Order, the Collateral Documents are legally binding on such Credit Party, and the Collateral shall be subject to a legal, valid, enforceable and perfected security interest and Liens in favor of the Collateral Agent for the benefit of the Secured Parties with the priority set forth in the DIP Orders, to the fullest extent permissible under applicable law.

(c)     The Credit Parties are in compliance in all material respects with the terms and conditions of the DIP Orders. Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) and the Final DIP Order (from and after the date on which the Final DIP Order is entered) is in full force and effect, is a Final Order and has not been modified or amended other than as acceptable to the Lenders.

(d)     From and after the entry of the Interim DIP Order, pursuant to and to the extent permitted in the Interim DIP Order and applicable law, the Obligations (i) will constitute allowed joint and several superpriority claims and (ii) will be secured by a valid, binding, continuing, enforceable, fully perfected Lien on all of the Collateral pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code, subject to the Carve Out and the priorities set forth in the DIP Orders.

(e)     Each Budget Variance Report delivered pursuant to Section 5.01(q) is true, complete and correct in all material respects for the period covered thereby as of the date such Budget Variance Report is delivered.

**4.26.    Intellectual Property**. Each of Borrower and the other Borrower Parties owns or has a valid license or right to use all Intellectual Property that is used in or otherwise necessary for the operation of its businesses as currently conducted, in each case free and clear of all Liens except as permitted by this Agreement (including Permitted Liens), and except where failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither Borrower nor any of the other Borrower Parties is infringing, misappropriating, diluting or otherwise violating any Intellectual Property of any third party, nor does the operation of their respective businesses, in each case in a manner that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim, action, suit, litigation or proceedings regarding any of the foregoing is pending or, to the knowledge of Borrower, threatened, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of Borrower, no Person is engaging in any activity that infringes, misappropriates, dilutes or otherwise violates any Intellectual Property that is owned by Borrower or any of the other Borrower Parties in a manner that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Borrower and the other Borrower Parties take commercially reasonable actions to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.27.    Auxin Circumvention Tariffs**

(a)    Other than as set forth on Schedule 4.27(a), no Financing Subsidiary has commercialized any Inventory or products or raw materials, components, subassemblies, or intermediate goods incorporated therein (together, the "**Goods**"), nor were any Goods manufactured, completed, assembled, exported, transferred or assigned, in each case, in a manner that would cause such Financing Subsidiary to be subject to, directly or indirectly, any anti-dumping or countervailing duty cash deposits, tariffs, duties, or other trade remedies imposed, assessed, or collectible by the U.S. Department of Commerce or U.S. Customs and Border Protection as a result of, arising out of, or relating to the circumvention proceedings associated with the petition filed by Auxin Solar Inc. concerning crystalline silicon photovoltaic cells and modules (the "**Auxin Circumvention Tariffs**"). For the avoidance of doubt, the foregoing includes any such measures applicable to goods completed or assembled in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-origin inputs, as well as any successor, continuation, modification, reinstatement, or replacement of such measures, and any related cash deposit requirements, certifications, or country-of-origin / circumvention findings.

(b)    Without limiting the generality of the foregoing, each of the Borrower Parties represents and warrants that directly or indirectly: (A) the Borrower Parties have not taken, and will not take, any action in the supply chain that would reasonably be expected to cause any Financing Subsidiary to become subject to liability for Auxin Circumvention Tariffs (it being agreed that the mere act of placing and fulfilling purchase orders shall not constitute an action proscribed by the foregoing) and (B) all information, documentation, and certifications provided by or on behalf of any Borrower Party to any Secured Party in connection with customs entry, origin, classification, valuation, and duty assessment for the Goods, including any Auxin-related certifications, are true, correct, and complete in all material respects.

(c)    Other than as set forth on Schedule 4.27(c), none of the Financing Subsidiaries, directly or indirectly, are potentially responsible or otherwise potentially liable for any Auxin-related obligations, including with respect to indemnification, in connection with the import or export of Goods to any other Person, including the Borrower Parties or their Affiliates.

72

(d)      Other than as set forth on Schedule 4.27(d), the Borrower Parties represent and warrant that each Borrower Party maintains any documentation required by law to be maintained by such Borrower Party to substantiate the status of the Goods as being "Applicable Entries" as that term is defined in the U.S. Department of Commerce's final affirmative determinations of circumvention, 88 Fed. Reg. 57419  (Aug. 23, 2023), including with respect to their utilization in the Projects.

(e)      The Borrower Parties further represent and warrant that, as of the date of delivery and entry of the Goods into the United States, there are no pending audits, inquiries, questionnaires, verifications, scope or circumvention reviews, administrative reviews, or other proceedings to which any of the Borrower Parties are subject that would reasonably be expected to result in the Goods being subject to Auxin Circumvention Tariffs or any related cash deposit requirements, and the Borrower Parties have not received any notice or communication alleging noncompliance with any Auxin-related measure with respect to the Goods.

## SECTION 5.    AFFIRMATIVE COVENANTS

The Borrower covenants and agrees that, so long as any Commitment is in effect and until the Obligations are Paid in Full, it shall perform, and shall, to the extent applicable, cause each of the other Borrower Parties to perform, all covenants in this Section 5.

**5.1.    Financial Statements and Other Reports**.    Borrower will deliver to Administrative Agent (for distribution to the Lenders) or, in the case of Section 5.1(i), shall participate in:

(a)      Quarterly Financial Statements.  As soon as available, and in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, commencing with the Fiscal Quarter ending on [March 31, 2026], the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related unaudited consolidated statements of income, stockholders' equity and cash flows for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, all in reasonable detail, together with a Financial Officer Certification with respect thereto.

(b)      Annual Financial Statements.  As soon as available, and in any event within 120 days after the end of each Fiscal Year, (i) the audited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year or the Borrower consolidated annual audit of the Borrower and its Subsidiaries and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year of each as applicable; provided that such financial statements may be included as separate supplemental schedules in the consolidated financial statements of a direct or indirect equity owner of the relevant entity together with a Financial Officer Certification with respect thereto; and (ii) with respect to such consolidated financial statements or Borrower consolidated annual audit a report thereon of the Independent Accountant (which report and/or the accompanying financial statements shall be unqualified as to going concern and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position as at the dates indicated and the stockholders' equity, the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards).

(c)     [Reserved].

(d)     [Reserved].

(e)     <u>Notice of Certain Events</u>.  Promptly upon any Responsible Officer of Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default, or otherwise constitutes a Project Ineligibility Event, or (ii) of the occurrence of any event or change that has had, or is reasonably expected to have, a Material Adverse Effect, a notice identifying nature and period of existence of such condition, event or change and what action the relevant Borrower Parties have taken, are taking and propose to take with respect thereto, if any.

(f)     <u>Notice of Litigation</u>.  Promptly upon any Responsible Officer of Borrower obtaining knowledge of (i) any Adverse Proceeding not previously disclosed in writing by Borrower to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or clause (ii), could be reasonably expected to have a Material Adverse Effect, written notice thereof.

(g)     <u>Financial Plan</u>.  Unless otherwise covered during the weekly Lender calls, or if requested by the Requisite Lenders, then as soon as practicable and in any event no later than thirty days prior to the beginning of each Fiscal Year, the final operating budget for the ensuing calendar year for each Financing Project that has achieved Commercial Operation prior to such date, to the extent such budgets have been provided to Project Debt Financing counterparties under the applicable Project Debt Financing Documents.

(h)     <u>Other Financing Notices</u>; Copies of any construction budgets, operating budgets, financial models, third party consultant reports, project reports, and notices of adverse events or circumstances, in each case, promptly following the date upon which such document(s) are provided to the financiers under any Project Senior Financing.

(i)     <u>Management Calls</u>. Upon reasonable written notice from the Requisite Lenders, the Borrower shall conduct up to one update call with the Lenders per week and shall make one or more members of its senior management team, including but not limited to a Responsible Officer, available for such call; <u>provided</u>, that, notwithstanding any similar requirement under the Carlyle DIP Note Purchase Agreement or the Fundamental DIP Credit Agreement, Borrower shall only be required to conduct one update call in total with respect to this Agreement, the Carlyle DIP Note Purchase Agreement, and the Fundamental DIP Credit Agreement (which update call can be attended by the Lenders, the Carlyle DIP Note Purchasers, and the Fundamental DIP Lender).

(j)     <u>Development and Construction Asset Reporting</u>.  Unless otherwise covered during the weekly Lender calls, or if requested by the Requisite Lenders, then no later than thirty (30) days after the end of each month commencing in the first full month after the Closing Date, a report detailing the status of construction and development of each Pre-Operations Project, in substantially the form attached hereto as Exhibit I.

(k)     <u>Operating Asset Reporting</u>. Unless otherwise covered during the weekly Lender calls, or if requested by the Requisite Lenders, no later than thirty (30) days after the end of each Fiscal Quarter commencing in the first full Fiscal Quarter after the Closing Date, a report

74

detailing the status of performance of each Operating Project, in substantially the form attached hereto as Exhibit J.

(l)    Information Regarding Collateral.  Prompt written notice of any change in any of the Credit Parties' (i) corporate or other organization name or (ii) jurisdiction of incorporation or other organization.

(m)    Other Information.  Such other information and data with respect to any Borrower Parties, or compliance with the terms of the Credit Documents (including information regarding the Credit Parties and their Affiliates relevant to compliance with the terms of the Credit Documents), as from time to time may be requested by Administrative Agent or any Lender.

(n)    KYC Information.  Upon the request of any Lender, all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(o)    Monthly Financial Statements.  As soon as available, and in any event within 25 days after the end of each fiscal month, commencing in the fiscal month in which the Petition Date occurs, the unaudited consolidated balance sheet of the Borrower and its Subsidiaries and the related income statements at the consolidated and subsidiary level, for the immediately preceding fiscal month, all in reasonable detail, together with a Financial Officer Certification with respect thereto.

(p)    Financial Status of Blue Ridge and Brookfield Silo Assets.  Together with each monthly financial statement required to be delivered in accordance with Section 5.1(o) hereof, the unaudited consolidated balance sheet of Blue Ridge, its Subsidiaries and any entities holding Brookfield Silo Assets as at the end of such fiscal month and the related unaudited consolidated statements of income, stockholders' equity, cash flows, business funding requirements and other business updates for the period from the beginning of the then current fiscal month to the end of such fiscal month, all in reasonable detail, together with a Financial Officer Certification with respect thereto.

(q)    Budget.

(i)    The use of Loans under this Agreement and the other Credit Documents shall be consistent with the Approved Budget (subject to Permitted Variances). No proceeds of the Loans shall be used for any purpose not set forth in the Approved Budget. The Initial Approved Budget approved by the Lenders hereunder is attached hereto as Exhibit B for the first thirteen (13) week period from the Petition Date. The Initial Approved Budget shall be the Approved Budget until the next Updated Budget is delivered on the Updated Budget Delivery Date and such Updated Budget has been accepted (or deemed accepted) in accordance with this Section 5.1(q).  The Borrower shall deliver to the Administrative Agent and the Lender Advisors for distribution to each Lender, not later than 5:00 p.m. (Eastern time) on the Friday of the fifth full calendar week occurring after the Petition Date and on every fourth Friday thereafter (each, an "**Updated Budget Delivery Date**"), a supplement to the Initial Approved Budget or the previously Approved Budget for the rolling 13-week period commencing on the Saturday immediately preceding the applicable Updated Budget Delivery Date (each, an "**Updated Budget**"), in form and substance acceptable to the Requisite Lenders; provided that (w) such Updated Budget shall be deemed acceptable to the Requisite Lenders if the Requisite Lenders have not objected in writing

75

(which response may be provided by email by the Lenders or Lender Advisors to the Borrower or its lead counsel and financial advisors) to such Updated Budget within three Business Days after receipt by the Administrative Agent of such Updated Budget; provided that such three Business Day period shall be tolled for so long as the Updated Budget is subject to a "professional eyes only" or similar designation, (x) the failure of any Updated Budget to be accepted by the Requisite Lenders, in and of itself, and without limitation to the obligation to continue complying with the existing Approved Budget, shall not be deemed to be a violation of this Section 5.1(q) and no Default or Event of Default shall result solely from any objection by the Requisite Lenders to any Updated Budget, (y) for the avoidance of doubt, upon (and subject to) the acceptance (or deemed acceptance) by the Requisite Lenders of any Updated Budget (and at no time prior thereto), such Updated Budget shall constitute the "Approved Budget"; and (z) during any period where an Updated Budget has not been approved by the Requisite Lenders, the Initial Approved Budget or, if an Updated Budget has previously been approved by the Requisite Lenders (including, for the avoidance of doubt, if an Updated Budget has been deemed approved), the existing Approved Budget, as applicable, shall constitute the "Approved Budget" until the expiration of the period covered by such Approved Budget.

(ii)    The Borrower shall deliver to the Administrative Agent and the Lender Advisors for distribution to each Lender, not later than 5:00 p.m. (Eastern time) on the Friday of the second full calendar week occurring after the Petition Date and on every week thereafter, a Budget Variance Report.

(iii)    The Debtors shall not permit aggregate disbursements as reported by the Debtors for each Budget Variance Test Period (excluding disbursements in respect of (x) professional fee disbursements for all advisors working on the Chapter 11 Cases, (y) interconnection costs, and (z) any Project spend that is either (a) incremental to the amounts set forth in the Approved Budget and/or (b) on a cadence that differs from what is set forth in the Approved Budget, provided, in the case of this clause (z), that the Requisite Lenders (or the requisite lenders or requisite noteholders under the Additional DIP Facility, as applicable, having Liens on such Project (or on the Silo that owns such Project)) have (i) consented to such incremental Project spend and/or change in timing in accordance with the Credit Documents (or the loan documents or note documents for such Additional DIP Facility, as applicable), and (ii) funded, without any reduction in Commitments (or commitments under such Additional DIP Facility) (other than any reduction in Commitments (or commitments under such Additional DIP Facility) for Loans (or loans or notes under such Additional DIP Facility) the proceeds of which are required to be used solely for Project spend) any amounts that are in excess of the amount set forth in the Approved Budget for such Project) to have a negative variance of more than the greater of $2,000,000 and 15% of the forecasted Budget Disbursements for such Budget Variance Test Period in the applicable Approved Budget (the "**Permitted Variance**"). It is agreed and understood that following an Updated Budget Delivery Date, unless and until the relevant Updated Budget becomes the Approved Budget, the existing Approved Budget remains in effect and any favorable variance from a prior Budget Variance Test Period may be carried forward and utilized in future Budget Variance Test Periods relating to such existing Approved Budget to offset negative variances in such future Budget Variance Test Period at the election of the Borrower.

(iv)    The timing of delivery of any deliverables under this Section 5.1 may be extended with the consent of the Administrative Agent (acting at the direction of the Requisite Lenders), which consent may be conveyed via email from the Lender Advisors to lead counsel to the Borrower.

(v)     Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 5.1 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak, Egnyte or another relevant website or other information platform (the "**Platform**"), any document or notice that Borrower has indicated contains Private-Side Information shall not be posted on that portion of the Platform designated for such Public Lenders.  Borrower agrees to clearly designate all information provided to Administrative Agent by or on behalf of Borrower which contains only Public-Side Information, and by doing so shall be deemed to have represented that such information contains only Public-Side Information.  If Borrower has not indicated whether a document or notice delivered pursuant to this Section 5.1 contains Private-Side Information, Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Private Lenders.

(r)     Information Technology.    The Credit Parties shall provide the Administrative Agent and Newco with access upon reasonable request to information technology and other systems (subject to limitations pursuant to applicable regulations, including NERC and FERC) and data (including from ACT) related to operation and maintenance, engineering, procurement, construction, development and asset management services provided to the Brookfield Silo Entities.

(s)     O&M Services Agreement; Transition Services Agreement; ACT.  Together with each monthly financial statement required to be delivered in accordance with Section 5.1(o) hereof, the Credit Parties shall provide the Administrative Agent a report, in form and substance reasonably acceptable to the Administrative Agent, which shall include a description of (i) the continued operations and maintenance, engineering, procurement, construction, development, and asset management services under the O&M Services Agreements, and those expected to be provided under the Transition Services Agreement, (ii) the continued asset management, back office and general support services provided by the Debtors, and (iii) ACT's business, operations and financial position and any sale or financing process of ACT (including any reporting being provided to the lenders under any financing secured by the assets or equity of ACT).

(t)     Bankruptcy Orders.  Every other Friday, commencing with the first Friday after the Petition Date (if such Friday is not a Business Day, the next Business Day thereafter), schedules of all payments made pursuant to the First Day Orders and the Second Day Orders.

(u)     Sale Process.  On a weekly basis, or upon request of the Administrative Agent, the Debtors shall promptly provide to the Administrative Agent an update on the Sale and any progress towards the Sale Milestone.

(v)     Liquidity Reporting.  Not later than 5:00 p.m. on every Monday occurring after the Closing Date, commencing with the Monday of the first full week after the Petition Date, a certificate of a Responsible Officer on behalf of the Borrower certifying the amount of Liquidity as of the Monday immediately preceding such delivery date.

(w)     Disbursement Reporting.  Not later than 5:00 p.m. on every Friday, beginning with the second full calendar week after the Closing Date, reporting on all disbursements made from the DIP Proceeds Account, which report shall indicate with respect to each disbursement (i) the line item in the Approved Budget and the general ledger account pursuant to which such

disbursement was made, (ii) the Project with respect to which such disbursement was made, as applicable, and (iii) the vendor and invoice number for which such disbursement was made, as applicable.

(x)     <u>Project Level Reporting</u>.  Not later than 5:00 p.m. on the last day of each month (or, to the extent the last day of the relevant month is not a Business Day, the next Business Day thereafter) occurring after the Closing Date, reporting pertaining to the immediately preceding month on each Project owned by a Brookfield Silo Entity, including (i) financial statements for each Project, (ii) capital expenditures expended as of such date for each Project by vendor, and (iii) capital expenditures for each Project to reach notice to proceed status and the commercial operation date, (iv) accrued accounts payable for each Project and future expected expenses, (v) monthly aging report of vendor payables broken out by Project, and (vi) the reporting of liens filed by Project.

(y)     <u>Tax Reporting</u>.  Not later than 5:00 p.m. on the last day of each month (or, to the extent the last day of the relevant month is not a Business Day, the next Business Day thereafter) occurring after the Closing Date, an updated report on each tax filing or tax payment expected to be made by or on behalf of any Financing Subsidiary in the subsequent six months, including federal and state income taxes, franchise taxes, property taxes, sales and use taxes, the deadline for such filing, and the amount of such taxes to be paid in cash during such period.

**5.2.     Existence**.  Considering the commencement of the Chapter 11 Cases and the continuance and prosecution thereof, except as otherwise permitted under <u>Section 6.5</u>, Borrower will, and will cause each of the other Borrower Parties to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits necessary for its business.

**5.3.     Taxes**.  Subject to the Bankruptcy Code, the terms of the DIP Orders and any required approval by the Bankruptcy Court, Borrower will, and will cause each of the other Borrower Parties to, pay all income and other material Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any material penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any material penalty or fine shall be incurred with respect thereto; <u>provided</u>, no such Tax or claim need be paid if (a) it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.4.     Maintenance of Properties**.  Borrower will, and will cause each of the other Borrower Parties to, (a) maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear, condemnation events and force majeure excepted, all material tangible properties used or useful in the business of Borrower and the other Borrower Parties in accordance with Prudent Industry Practice and applicable law, (b) from time to time will make or cause to be made all necessary repairs, renewals and replacements thereof, in each case, except where the failure to do so could be reasonably expected to constitute a Material Adverse Effect, and (c) otherwise operate the Brookfield Silo Assets in the ordinary course of business, unless failure to do so is a proximate result of the Requisite Lenders' determination not to fund discretionary project spending requested in a proposed Updated Budget, or otherwise as a proximate result of an action or a consequence taken at the request of the Requisite Lenders.

78

**5.5.    Insurance**.  Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and property insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Borrower and the other Borrower Parties (other than any PSF Obligor) as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Each such policy of insurance of the Borrower shall (i) in the case of each general liability insurance policy (other than any third party liability, employers' liability or workers compensation policy unrelated to the Collateral), name Collateral Agent as an additional insured thereunder as its interests may appear, and (ii) in the case of each property or business interruption insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Collateral Agent, that names Collateral Agent, for the benefit of the Secured Parties, as the loss payee thereunder and provide for at least thirty (30) days' prior written notice (10 days in the case of cancellation for nonpayment of premium) to Collateral Agent of any cancellation of such policy.

**5.6.    Books and Records; Inspection Rights**.

(a)    <u>Books and Records</u>.  Borrower will, and will cause each of the other Borrower Parties to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities.

(b)    <u>Inspection Rights</u>.

(i)    Borrower will, and will cause each of the other Borrower Parties to, permit any authorized representatives and independent contractors designated by the Administrative Agent, including any independent engineer, to visit and inspect any of the properties of any Borrower Party and any Financing Subsidiary, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their appropriate officers and independent public accountants upon notice and at such reasonable times during normal business hours; <u>provided</u> that (x) so long as no Default or Event of Default has occurred and is continuing, such inspections shall be limited to once per month and upon at least three (3) Business Days prior written notice to Borrower and (y) all such inspecting parties and their representatives shall be required to agree to the provisions of <u>Section 9.17</u> or other confidentiality provisions acceptable to the Borrower.

(ii)    Borrower will, and will cause each of the other Borrower Parties to, permit any authorized representatives and independent contractors designated by any Lender, to conduct field audits and examinations of, and appraisals of, the businesses of the Borrower and the other Borrower Parties (including, without limitation, visits to any Project Site and review of Material Project Documents by technical advisors).

**5.7.    Compliance with Laws**.  Borrower will comply, and shall cause each of the other Borrower Parties to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including the Bankruptcy Code, all applicable Environmental Laws, Economic Sanctions and Trade Controls Laws and Regulations, applicable Anti-Corruption Laws and applicable Anti-Money Laundering Laws), except to the extent that noncompliance therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

79

**5.8.    Environmental**.

(a)    <u>Environmental Disclosure</u>.    Borrower will deliver written notice to Administrative Agent and Lenders promptly after obtaining knowledge of an actual or threatened Environmental Claim, violation of any applicable Environmental Law, or Release of Hazardous Materials related to the development, construction or operation of any Project or for which Borrower or any Borrower Party is otherwise legally responsible, that, in each case could reasonably be expected to result in a material liability to the Borrower or any Borrower Party.

(b)    <u>Hazardous Materials Activities, Etc.</u>    Borrower shall promptly take, and shall cause each of the Borrower Parties promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by Borrower or any of the Borrower Parties, (ii) make an appropriate response to any Environmental Claim or threatened Environmental Claim against Borrower, or any of the other Borrower Parties, and (iii) address any Release or comply with any final order from any Governmental Authority requiring Borrower or any other Borrower Party to address any threatened Release at any real property owned or leased by Borrower or any Borrower Party, or at any other location for which Borrower or any other Borrower Party is legally responsible for such Release or threatened Release, including, but not limited to, conducting any cleanup or other remedial action to achieve compliance with applicable Environmental Laws and, if applicable, to the reasonable satisfaction of a Governmental Authority, where, in each case in respect of the foregoing clauses (i), (ii), and (iii), failure to do so could reasonably be expected to subject any of the Secured Parties to any material liability.

**5.9.    Tax Equity Buyouts**.    Subject to the Bankruptcy Code, if applicable, Borrower shall endeavor in good faith to cause any Financing Subsidiary which has, or acquires, an option to buy out tax equity investors to exercise such option at the earliest possible date, so long as such buy out has been consented to by the Requisite Lenders and is permitted by the other provisions of this Agreement and the Credit Documents.

**5.10.    Use of Proceeds**.    Borrower shall apply the Proceeds of the Credit Extension in accordance with <u>Section 2.3</u>.

**5.11.    Further Assurances**.    Borrower shall, and shall cause each of the other Borrower Parties (at Borrower's expense) to, promptly execute, acknowledge and deliver such documents, and do such other acts and things, as Administrative Agent or Collateral Agent may reasonably request from time to time in order to effect fully the purposes of the Credit Documents, including to perfect the Liens granted to Collateral Agent by the foregoing, and to maintain such Liens prior to the Liens or other interests of any Person other than Collateral Agent (except for Permitted Liens that constitute Permitted Prior Liens (as defined in the DIP Orders)).    Borrower shall fully cooperate with the Agents and perform all additional acts reasonably necessary or requested by the Agents to effect the purposes of the foregoing.    Notwithstanding anything to the contrary in any Collateral Document, neither Borrower nor any other Borrower Party shall have any obligation to take any action (other than obtaining entry of the DIP Orders) to perfect Liens created under the Collateral Documents in any Intellectual Property created, existing, registered or applied-for in any jurisdiction other than the United States.

**5.12.    Separateness**.    Borrower shall, and shall cause each of the other Borrower Parties to, (a) maintain entity records and books of account separate from those of its Affiliates, (b) not commingle its funds or assets with those of its Affiliates and (c) cause the managing member, members of its board of directors or other analogous entity or governing body to hold all appropriate meetings or to act through

80

written consent or as otherwise permitted by its Organizational Documents or applicable Governmental Authorization to authorize and approve actions.

5.13.   **[Reserved]**.

5.14.   **Compliance with Sanctions, Etc.**

(a)      The Borrower shall notify the Administrative Agent in the event that (i) it or any of its Subsidiaries are notified in writing that, or (ii) to its knowledge its or any of its Subsidiaries' directors, officers or employees, has become subject to any action, proceeding or investigation with regard to any material violation of Economic Sanctions and Trade Controls Laws and Regulations or any alleged material violation of Anti-Corruption Laws or Anti-Money Laundering Laws.

(b)      The Borrower will maintain in effect and enforce, or remain subject to, policies and procedures reasonably designed to promote compliance by the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with applicable Anti-Corruption Laws and applicable Economic Sanctions and Trade Controls Laws and Regulations.

5.15.   **Energy Regulatory Status**.  The Borrower shall take, and shall cause the other Borrower Parties promptly to take, any and all actions necessary to maintain the Federal Energy Regulatory Authorizations, Exemptions, and Waivers, and as applicable to maintain exemption from or compliance with any State Electric Utility Regulations; provided that the failure to maintain the Federal Energy Regulatory Authorizations, Exemptions, and Waivers, or as applicable to maintain the exemption from or compliance with any State Electric Utility Regulations shall not constitute a breach of this Section 5.15 if such failure could not reasonably be expected to have a Material Adverse Effect and is promptly cured.

5.16.   **Post-Closing Deliverables.**

**[__]**

5.17.   **Certain Milestones**.  The Credit Parties shall ensure that each of the milestones set forth below (the "**Milestones**") is achieved in accordance with the applicable timing referred to below (or such later dates as approved in writing by the Requisite Lenders in their sole discretion, which approval may be provided via electronic mail):

(a)      On the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Administrative Agent, seeking entry of interim and final orders approving the Debtors' entry into the DIP Facility and the use of the Cash Collateral and Prepetition Collateral of the Prepetition Secured Parties (the "**DIP Motion**").

(b)      On the Petition Date, to the extent any Debtors are party to services agreements for operations and maintenance, engineering, procurement, construction, development, and asset management services with Projects owned by a Brookfield Silo Entity, the Debtors shall have filed a motion for entry of an order (the "**Services Agreement Assumption Order**") to assume or to assume such agreements pursuant to Section 365 of the Bankruptcy Code.

(c)      No later than 5 days after the Petition Date, the Debtors shall have obtained entry of Interim DIP Order.

81

(d)      No later than 30 days after the Petition Date, the Debtors shall have obtained entry of Final DIP Order,

(e)      [Within one (1) day of the Petition Date, the applicable Debtors and their applicable subsidiaries, and Newco shall have entered into a transition services agreement (the "**Transition Services Agreement**") in form and substance reasonably acceptable to the Requisite Lenders to provide Newco and the Brookfield Silo Entities with (A) continued operations and maintenance, engineering, procurement, construction, development, and asset management services on terms substantially similar to the existing O&M Services Agreements following a Sale in which the Administrative Agent (or the Administrative Agent's designee) is the winning bidder, and (B) at cost, full access before and for a reasonable period after such Sale to information technology and other systems and data (including from ACT) related to operations and maintenance, engineering, procurement, construction, development, and asset management services provided to the Brookfield Silo Entities, and other transition services reasonably determined by Newco to be necessary or appropriate to transition such operations and management, engineering, procurement, construction, development, and/or asset management services to other providers.  For the avoidance of doubt, the Transition Services Agreement will not have the effect of waiving or reducing or altering in any way any termination or similar fees owed under the Initial O&M Services Agreements].

(f)      within one (1) day of the Petition Date, the Debtors shall have filed a motion (the "**Bidding Procedures / Stalking Horse APA Motion**"), in form and substance acceptable to the Administrative Agent, seeking entry of an order approving (i) procedures for a sale, in one or a series of related transactions, of all or substantially all of the assets of the Debtors, including the Brookfield Silo Assets (the "**Bidding Procedures**") and (ii) the Debtors' entry into and performance under the Stalking Horse APA; provided that, for the avoidance of doubt, the order approving Bidding Procedures / Stalking Horse APA Motion shall provide that the Secured Parties and the Prepetition Secured Parties may credit bid the Obligations and the Prepetition Secured Obligations, as applicable, in any sale of the Debtors' assets or any of the Brookfield Silo Assets, and the Debtors shall have entered into the Stalking Horse APA;

(g)      No later than November 5, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Administrative Agent, approving the Bidding Procedures and the Debtors' entry into and performance under the Stalking Horse APA (the "**Bidding Procedures Order**").

(h)      On or prior to November 19, 2025, the Borrower shall have provided the Administrative Agent with summaries of all indications of interest and letters of intent received for the Sale.

(i)      No later than December 15, 2025, the deadline for parties to submit bids to the Debtors pursuant to the Bidding Procedures Order shall have occurred.

(j)      No later than December 17, 2025, the Debtors shall have commenced an auction pursuant to the Bidding Procedures Order; provided that the Debtors shall retain the right to cancel such auction pursuant to the Bidding Procedures Order.

(k)      No later than December 23, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Administrative Agent, approving a sale of all or

82

substantially all (or any material portion thereof acceptable to the Administrative Agent) of their assets pursuant to the Bidding Procedures Order (the "**Sale Order**").

(l)      No later than December 31, 2025, the Debtors shall have consummated the Sale pursuant to the Sale Order (the "**Sale Milestone**"); provided that the Sale Milestone shall be deemed extended until the earlier of (x) 60 days after the initial Sale Milestone and (y) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed.

(m)      No later than the date set forth in Schedule 5.17, the Debtors shall have achieved the Milestones set forth therein (the "**Transition Milestones**").

**5.18.    Project Financing Consents; Project Senior Financing Collateral and Guarantee Requirement; Additional Guarantors**.

(a)      The Credit Parties shall use reasonable best efforts to obtain the Project Senior Financing Consents in form and substance consistent with the form attached as Exhibit L and shall include the Lenders in discussions with the applicable counterparties. The Credit Parties hereby irrevocably consent to the Lenders discussing the Project Senior Financing Consents directly and in good faith with the applicable counterparties, subject to reasonable coordination with the Credit Parties, for all purposes and notwithstanding anything to the contrary in the Brookfield Confidentiality Agreement or any other agreement.

(b)      The Credit Parties shall comply with the Project Senior Financing Collateral and Guarantee Requirement.

(c)      If (i) any additional Subsidiary of the Borrower (other than an Excluded Subsidiary) is formed or acquired after the Closing Date, (ii) any Subsidiary of the Borrower ceases to be an Excluded Subsidiary, (iii) the Borrower elects to cause a Subsidiary to become a Guarantor, or (iv) the Requisite Lenders request that an Excluded Subsidiary that is solely an Excluded Subsidiary under clause (f) of the definition thereof shall become a Guarantor, then within five (5) Business Days thereafter, the Agents shall have received from such Subsidiary counterparts of, or a supplement to, each relevant Collateral Document duly executed and delivered on behalf of such Subsidiary and to take such perfection steps as reasonably requested by the Agents to create the Liens intended to be created by the Collateral Documents and to perfect such Liens to the extent required by, and with the priority required by, the Collateral Documents.

**5.19.    Regulatory Approvals**.  The Borrower will use its reasonable best efforts to (a) obtain approval from the Federal Energy Regulatory Commission under section 203 of the Federal Power Act, including with respect to any Sale, (b) if required, make any filings and obtain any consents or approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, in each case if requested by the Requisite Lenders to consummate any Disposition or related transaction supported by the Requisite Lenders, including any Sale, and (c) obtain any other required regulatory approvals or third party consents, in each case if requested by the Requisite Lenders to consummate any Sale supported by the Requisite Lenders, and (d) coordinate with the Lenders and the Lender Advisors on such approvals, filings and consents, including promptly upon request of the Requisite Lenders or the Lender Advisors, providing copies of documents prepared in connection therewith (provided, for the avoidance of doubt, that the Credit Parties' efforts to obtain regulatory approvals or third party consents in connection with any transaction

selected as the highest and otherwise best offer pursuant to the Bidding Procedures shall not be a default or breach of the Credit Documents).

5.20. **Terms No Less Favorable**. If (i) the all-in yield (including pricing and fees) or any covenant in any Additional DIP Facility is more favorable to the provider of such financing than the corresponding terms of this Agreement, or (ii) an Additional DIP Facility is amended so that such term is more favorable to the holder of such Indebtedness than the corresponding term of this Agreement, then, in each case, at the election of the Requisite Lenders in their sole discretion, this Agreement and any applicable Credit Documents shall, subject to the DIP Orders, be automatically amended upon written notice to the Borrower so that the Loans benefit from the same term; *provided*, that in the case of the foregoing clauses (i) and (ii), to the extent such amendment also modifies any term of such Indebtedness to make such term less favorable than the corresponding term of this Agreement, such amendment of this Agreement and any applicable Credit Documents shall also be amended so that the Borrower and its applicable Subsidiaries benefit from the same term.

5.21. **Draft Pleadings**. The Borrower shall deliver to the Lender Advisors, the Administrative Agent and the Lenders draft pleadings, motions, including "first day" motions, documents and other filings with the Bankruptcy Court to be filed in the Chapter 11 Cases or any other insolvency proceeding commenced by the Borrower or any Subsidiary or Affiliate thereof, at least 48 hours in advance of the commencement of the Chapter 11 Cases or such proceeding, and shall, or shall cause the Borrower or such Subsidiary or Affiliate thereof, to consider any reasonable comments by the Administrative Agent, the Lenders and the Lender Advisors to such pleadings, motions, documents and other filings.

5.22. **[Reserved]**.

5.23. **Amendments to any Additional DIP Facilities**. The Borrower shall consult with the Administrative Agent regarding any amendments, restatements, amendments and restatements, supplements, modifications or waivers to the Carlyle DIP Note Documents, the Fundamental DIP Loan Documents or any Additional DIP Documents, and shall, or shall cause such Subsidiary or Affiliate thereof, as applicable, to consider any reasonable comments by the Administrative Agent to such amendments, restatements, amendments and restatements, supplements, modifications or waivers. The Borrower shall not and shall not permit its Subsidiaries to amend Section [11(p)] of the Carlyle DIP Note Purchase Agreement without the consent of the Requisite Lenders.

5.24. **Polaris B Covenants**. The Credit Parties and the Financing Subsidiaries:

(a) with respect the Financing Projects held by Rio Lago Solar, LLC, Old Hayneville Solar, LLC, and Limewood Bell Renewables, LLC, shall not (i) submit ERCOT New Generator Checklist 2 or otherwise request Initial Synchronization from ERCOT, (ii) remove lock out / tag in (LOTO) controls from any portion of such Financing Project, (iii) energize the photovoltaic project, (iv) commence hot commissioning of the inverters, or (iv) consummate or receive proceeds from any Tax Equity Financing (including the Polaris B Tax Equity Financing), in each case without consent of the Requisite Lenders;

(b) shall use reasonable best efforts to obtain, at least five (5) weeks prior to the placed in service date for each applicable Financing Project, (i) all consents from the applicable counterparties to the Tax Equity Financing with respect to the Polaris B Financing Projects (the "**Polaris B Tax Equity Financing**") necessary to ensure that such financing will be available on such date, or (ii) replacement Tax Equity Financing with respect to such Projects on terms at least

84

as favorable, taken as a whole, to the applicable Financing Subsidiaries as the Polaris B Tax Equity Financing;

(c)       shall provide reasonable access to information to, and consult with, the Lenders and their Affiliates with respect to the Credit Parties' efforts to obtain the consents or Tax Equity Financing described in clause (b); and

(d)       hereby irrevocably consent to the Lenders and their Affiliates discussing the Polaris B Tax Equity Financing, or a potential replacement of such Tax Equity Financing, with the applicable counterparties to such Tax Equity Financing and with potential third-party investors.

**5.25.    Surety Bonds**.

(a)       The Borrower and the Financing Subsidiaries shall (i) use reasonable best efforts to draw or cause to be drawn all Project Surety Bonds as the same become available to draw, (ii) consult with the Lenders with respect to any settlement negotiations with respect thereto and provide regular reporting as reasonably requested by the Requisite Lenders and the Lender Advisors, and (iii) accept any settlement offer with respect thereto only with the consent of the Requisite Lenders.

(b)       The Credit Parties shall (i) cause Catalina to draw or cause to be drawn all Blue Ridge Surety Bonds as the same become available to draw by Catalina for Catalina Payment Failures or otherwise, (ii) use, and cause Blue Ridge to use, reasonable best efforts to obtain all proceeds that are available to Catalina under the Blue Ridge Surety Bonds for Catalina Payment Failures or otherwise, (iii) consult, and cause Blue Ridge to consult, with the Lenders with respect to any settlement negotiations with the applicable sureties or other obligors in respect of claims related to Catalina Payment Failures or otherwise under the Blue Ridge Surety Bonds, (iv) accept any settlement offer with respect to such settlement negotiations only with the consent of the Requisite Lenders, and (v) cause Catalina, immediately upon receiving any proceeds of any Blue Ridge Surety Bond, to apply all such proceeds to pay amounts due to the applicable subcontractor.

**5.26.    Operation in the Ordinary Course of Business**.  Each Credit Party shall, and shall cause its Subsidiaries to, at all times during the terms of this Agreement, continue to operate the Brookfield Silo Entities in the ordinary course of its business, in each case subject to this Agreement, the DIP Orders and the Approved Budget.

**5.27.    Project Senior Financing Remedies**.  If any lenders or investors under any Project Senior Financing exercise remedies in respect of any Project and any assets or Equity Interests thereof, the Credit Parties will, at the request of the Requisite Lenders, promptly file one or more motions, in form and substance acceptable to the Administrative Agent, seeking an order authorizing (i) a temporary restraining order and injunction in respect of such exercise of remedies and/or (ii) the Debtors to sell such Project to Newco on an expedited basis for a credit bid in an amount based on the purchase price adjustment schedule agreed among the Debtors and the Lenders prior to the Petition Date (and otherwise on the terms and conditions set forth in the Stalking Horse APA to the extent applicable), and thereafter use reasonable best efforts to promptly consummate such sale, and in any event prior to any such exercise of remedies by any such lenders or investors.

**5.28.    Certain Bankruptcy Matters**.  The Credit Parties shall comply (i) after entry thereof, with all of the requirements and obligations set forth in the DIP Orders and the Cash Management

85

Order, as each such order is amended and in effect from time to time in accordance with this Agreement, (ii) after entry thereof, with each Final Order, as each such order is amended and in effect in accordance with this Agreement and (iii) after entry thereof, with the orders (to the extent not covered by subclause (i) or (ii) above) approving the Debtors' "first day" and "second day" relief and any pleadings seeking to establish material procedures for administration of the Chapter 11 Cases or approving significant or material non-ordinary course transactions and obtained in the Chapter 11 Cases, as each such order is amended and in effect in accordance with this Agreement; provided that such orders shall be in form and substance reasonably satisfactory to the Administrative Agent and the Requisite Lenders, shall not have been vacated, reversed or stayed and shall not have been amended or modified except in a manner reasonably satisfactory to the Administrative Agent and the Lenders.

### 5.29.   Priority of Liens; No Discharge.

(a)     Each of the Credit Parties hereby covenants, represents, warrants and agrees that, upon entry of, and subject to the terms of, the Interim DIP Order (and when applicable, the Final DIP Order) (including and without prejudice to, without limitation, in each case, any rights or liens or perfected security interests (and the priorities thereof) granted under the Interim DIP Order or Final DIP Order under any other provision of Section 364 of the Bankruptcy Code or any other applicable provisions of the Bankruptcy Code) and subject to the Carve Out as set forth in the DIP Orders in all respects, the Obligations: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Chapter 11 Cases; and (ii) pursuant to Section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, shall be secured by a valid, binding, enforceable, non-avoidable, and automatically perfected senior priority Lien upon the Collateral.

(b)     The relative priorities of the Liens on property and assets of Debtors described in this Section 5.29 with respect to the Collateral shall be as set forth in the Interim DIP Order (and, when entered, the Final DIP Order).  In accordance with the Interim DIP Order (or, once entered, the Final DIP Order), all of the Liens on property and assets of Debtors described in this Section 5.29 shall be effective and perfected upon entry of the Interim DIP Order, without the necessity of the execution, recordation of filings by the Debtors or security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent or Collateral Agent, of, or over, any Collateral, as set forth in the Interim DIP Order (and, when entered, the Final DIP Order).

(c)     Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim DIP Order (and, when applicable, the Final DIP Order), upon the occurrence of the Maturity Date (whether by acceleration or otherwise), the Administrative Agent and the Collateral Agent shall be entitled to immediate payment in full in cash of the Obligations and to enforce the remedies provided for hereunder.

(d)     Each of the Credit Parties agrees that (i) its obligations under the Credit Documents shall not be discharged by the entry of an order confirming any chapter 11 plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby irrevocably waives any such discharge) and (ii) the DIP Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the DIP Orders and the Liens granted to the Collateral Agent and the Lenders pursuant to the DIP Orders shall not be affected in any manner by the entry of an order confirming any chapter 11 plan.

5.30.  **Replacement Additional DIP Facility**.  If (a) (i) any covenants in any Replacement Additional DIP Facility are more favorable to the provider of such financing than the corresponding terms of this Agreement or (ii) a Replacement Additional DIP Facility is amended so that such covenants are more favorable to the holder of such Indebtedness than the corresponding term of this Agreement, then, in each case, at the election of the Requisite Lenders in their sole discretion, this Agreement and any applicable Credit Documents shall be automatically amended upon written notice to the Borrower so that the Loans benefit from the same covenants, and (b) any pricing and fees in any Replacement Additional DIP Facility are more favorable to the provider of such financing than the pricing and fees of this Agreement, then, at the election of the Requisite Lenders in their sole discretion, the pricing and fees in respect of the DIP Facility shall be increased to the same extent that such pricing and fees in the Replacement Additional DIP Facility represent an increase relative to the Additional DIP Facility being replaced (subject to any requirements for such amendments set forth in the DIP Orders).

5.31.  **DIP Proceeds Account**.  Notwithstanding anything to the contrary contained herein, the Borrower shall deposit or credit all net proceeds of the Loans, after giving effect to the payments of all expenses and other disbursements projected to be paid on the date of the applicable borrowing (including deposits into the Escrow Account as set forth in Section 2.3(a)(vi)), into the DIP Proceeds Account and which shall be at all times subject to a deposit account control agreement with the Collateral Agent after the execution and delivery thereof pursuant to the terms of this Agreement to provide the Collateral Agent, for the equal and ratable benefit of the Secured Parties, a First-Priority, perfected lien on and security interest in, all of the applicable Credit Party's right, title and interest in, to and under the DIP Proceeds Account.  All withdrawals from the DIP Proceeds Account shall be used solely for the permitted purposes described under Section 2.3 or to make interest payments with respect to the Loans or pay fees and expenses of Lender Advisors in accordance with the Approved Budget, including withdrawals of proceeds out of the DIP Proceeds Account in anticipation of upcoming payment obligations due within five (5) Business Days after such withdrawal to another operating account of a Credit Party, as determined by the Borrower in good faith.  The Borrower shall provide an accounting of the DIP Proceeds Account and proceeds thereof (without duplication of such disclosure that would be included in the Budget Variance Report) upon request by the Requisite Lenders or the Administrative Agent; provided, that such request shall not be made more than once every week and such information shall be delivered to the Administrative Agent to be available to all Lenders.  The Borrower shall not be permitted to redesignate or replace the DIP Proceeds Account. Nothing in this Section 5.31 shall limit the Carve Out or funding of any amounts contemplated by the Carve Out.

5.32.  **Material Decisions; Tax Equity Financing Proceeds**.

(a)  The Credit Parties shall consult with the Administrative Agent and the Requisite Lenders regarding all decisions that could reasonably be expected to have a material effect on the Collateral and the Brookfield Silo Assets.

(b)  The Borrower shall not, and shall not permit any Borrower Party to (a) permit any proceeds received on account of any Tax Equity Financing Documents or any MIPA to be transferred to an entity that is not a Financing Subsidiary without the prior written consent of the Requisite Lenders and (b) shall use or hold such proceeds as directed by the Requisite Lenders or the Lender Advisors, including by depositing such amounts in the DIP Proceeds Account or an Obligor Account within one (1) Business Day after receiving such direction.

**SECTION 6.   NEGATIVE COVENANTS**

Borrower covenants and agrees that, so long as any Commitment is in effect and until all Obligations are Paid in Full, it shall perform, and shall, to the extent applicable, cause each of the Financing Subsidiaries to perform, all covenants in this <u>Section 6</u>.

**6.1.   Indebtedness**.  Borrower shall not permit any of the Financing Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)   the Obligations;

(b)   Indebtedness of any Financing Subsidiary or, solely with respect to the Obligor Accounts, BF Dev Holdco, LLC, in each case, resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business;

(c)   Indebtedness solely between or among the Financing Subsidiaries;

(d)   Indebtedness of any Financing Subsidiary (but excluding, for the avoidance of doubt, the Borrower or any Intermediate Holding Company):

(i)   constituting Indebtedness in existence on the Petition Date under a Project Senior Financing;

(ii)   [reserved];

(iii)   in the nature of guaranties or letters of credit, surety bonds or performance bonds securing the performance of such Financing Subsidiary, in each case pursuant to a power purchase agreement, renewable energy credit agreement or other project agreement or applicable permit, in each case, entered into and maintained in furtherance of the development, construction, and/or operation of a Financing Project owned (whether directly or indirectly) by such Financing Subsidiary;

(iv)   which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations issued or incurred (as the case may be) by such Financing Subsidiary in the ordinary course of business (excluding guaranties, performance, surety, statutory, appeal or similar obligations in favor of any other Financing Subsidiary); or

(v)   consisting of limited guarantees or indemnification obligations as required under the project documents for the applicable Financing Project so long as such limited guarantees or indemnification obligations (A) are not made in respect of obligations to repay Indebtedness for borrowed money and (B) are entered into and maintained in furtherance of the development, construction, and/or operation of a Financing Project owned (whether directly or indirectly) by such Financing Subsidiary;

(e)   Tax Equity Financings funded prior to the Petition Date or, with the consent of the Requisite Lenders, committed prior to the Petition Date;

88

(f)     Indebtedness incurred prior to the Petition Date that is set forth on Schedule 6.1 hereto;

(g)     Hedging Indebtedness of Financing Subsidiaries;

(h)     Indebtedness incurred under the Prepetition Brookfield Facility.

Notwithstanding anything to the contrary herein, (a) no Financing Subsidiary shall at any time directly or indirectly, create, incur, assume or guaranty, or otherwise become directly or indirectly liable with respect to any Indebtedness under any Additional DIP Facility, including any Replacement Additional DIP Facility, the Prepetition Carlyle Secured Obligations or the Prepetition Fundamental Secured Obligations, and (b) the Credit Parties shall not permit ACT or its direct or indirect subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become directly or indirectly liable with respect to any funded Indebtedness, except on terms and conditions and funded by counterparties reasonably acceptable to the Requisite Lenders (it being understood that any refusal to consent shall be deemed reasonable (x) if such financing provides for milestones, events of default, or the ability of the lender to exercise remedies, in each case prior to the consummation of the Sale, (y) if the Requisite Lenders in good faith determine that such Indebtedness could adversely affect the operation and maintenance services provided to any Brookfield Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (including based on the cost or quality thereof and including based on the reputation of the provider) or (z) if the financing is provided by parties with existing investments in the Borrower or any of its Subsidiaries or Affiliates) (such Indebtedness to which the Requisite Lenders consent, "**Permitted ACT Indebtedness**").

**6.2.    Liens**.  Borrower shall not permit any of the Financing Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of its property, except:

(a)     Liens in favor of a Collateral Agent for the benefit of Secured Parties granted pursuant to any Collateral Document;

(b)     statutory Liens for current Taxes not yet due and payable or delinquent and Liens for Taxes that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which adequate reserves have been made in accordance with GAAP;

(c)     the Prepetition Liens;

(d)     Liens incurred by any Financing Subsidiary (excluding any Intermediate Holding Company):

(i)     incurred prior to the Petition Date that secured Indebtedness described in Sections 6.1(d)(i);

(ii)    constituting Liens of landlords, banks (and rights of set-off) (including, without limitation, the Account Bank), carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA) and incurred in the ordinary course of business and which are either (a) for amounts not overdue for a period of more than 30 days or (b) being contested in good faith by appropriate proceedings, so long as

(x) such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts or (y) which have been bonded over or otherwise secured against;

(iii)     constituting Liens, deposits and pledges incurred in the ordinary course of business to secure the performance of tenders, statutory obligations, surety and appeal bonds, bonds for decommissioning obligations, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar or related obligations other than Indebtedness for borrowed money;

(iv)     constituting     easements,     rights-of-way,     restrictions, encroachments, and other minor defects or irregularities and deficiencies in title, and other similar restrictions, charge or encumbrances, and defects and irregularities in the easements, leases, licenses and other rights of a Financing Subsidiary in which case which do not and will not interfere in any material respect with the ordinary conduct of the business or the development, construction or operation of any Financing Project;

(v)     constituting an interest or title of a lessor or sublessor under any lease or sublease of real estate, in each case, permitted hereunder (or with respect to any deposits or reserves posted thereunder);

(vi)     constituting purported Liens evidenced by the filing of precautionary UCC financing statements (or equivalent filings) in respect of operating leases or consignments of personal property entered into in the ordinary course of business;

(vii)     in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(viii)     constituting a zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property, which are not violated by the use or occupancy of any Project Site or the development, construction or operation of any Financing Project;

(ix)     constituting nonexclusive licenses or sublicenses of (or other nonexclusive grants or rights to use) patents, copyrights, trademarks and other Intellectual Property rights granted by the Borrower or any Financing Subsidiary (a) to a Credit Party or (b) in the ordinary course of business and not (A) interfering in any material respect with the ordinary conduct of, or materially detracting from the value of, the business of the Borrower and the Financing Subsidiaries, or (B) securing any Indebtedness for borrowed money;

(x)     constituting an agreement to lease, option to lease, license, sub-lease or other right to occupancy assumed or entered into by or on behalf of any Financing Subsidiary in the ordinary course of its business and permitted hereunder;

(xi)     arising out of judgments or awards that do not otherwise constitute an Event of Default hereunder;

(xii)     pursuant to or permitted under any Project Debt Financing on (a) the Equity Interests in any PSF Obligor and/or (b) the property or assets of any PSF Obligor;

90

(xiii)    arising by virtue of any statutory or common law or contractual provisions under general depositary agreements, in each case, relating to banker's liens, rights of set-off, revocation, refund, chargeback or similar rights and remedies, and burdening only instruments, deposit accounts, or other funds maintained with a depository institution;

(xiv)    on (a) security deposits or (b) commodity accounts, deposit accounts and securities accounts securing obligations to a counterparty, in each case of clauses (a) and (b), in respect of any power purchase agreements, agreements for the sale of renewable energy credits, state credits and other environmental attributes, energy management agreements or interconnection arrangements or queue position for a Financing Project;

(xv)    constituting pledges or deposits or Liens in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation or any inchoate Lien imposed by ERISA;

(xvi)    Liens incurred prior to the Petition Date that are set forth on Schedule 6.2 hereto;

(xvii)   Liens described in [items 12 and 13] of the schedule of Specified Events attached to this Agreement as Annex D.

Notwithstanding anything to the contrary herein, (a) no Financing Subsidiary shall at any time directly or indirectly create, incur, assume or permit to exist any Lien securing any Indebtedness under any Additional DIP Facility, including any Replacement Additional DIP Facility, the Prepetition Carlyle Secured Obligations or the Prepetition Fundamental Secured Obligations, and (b) the Credit Parties shall not permit ACT or its direct or indirect subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of their property, in each case in respect of funded Indebtedness, except Liens incurred in the ordinary course of business and Liens securing Permitted ACT Indebtedness.

**6.3.    Prohibited Restrictions on Financing Subsidiaries**.  Except (i) for Permitted Liens, (ii) for restrictions described on Schedule 6.3, (iii) for restrictions that arise pursuant to a Disposition permitted by Section 6.5 and customary for transactions of such type, (iv) for restrictions that arise pursuant to the terms of Affiliate Transactions permitted by Section 6.6 and customary for transactions of such type, or (v) restrictions on PSF Obligors pursuant to the Project Senior Financing Documents, the Borrower shall not permit any of the Financing Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Financing Subsidiary to (a) pay Restricted Payments, (b) repay or prepay any Indebtedness owed by such Financing Subsidiary to a Borrower Party (if any), (c) make loans or advances to any Financing Subsidiary, or (d) create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders and to secure the Obligations under the Credit Documents.

**6.4.    Investments**.  The Borrower shall not permit any of the Financing Subsidiaries to, directly or indirectly, make or own any Investment in any Person, except:

(a)    Investments in Cash and Cash Equivalents;

(b)    to the extent constituting Investments, deposits or prepayments made by any Financing Subsidiary (i) to suppliers in respect of Projects, (ii) in the ordinary course of business and (iii) consistent with the past practices of the Financing Subsidiaries;

(c)      equity Investments by (i) any Intermediate Holding Company in a lower tier Intermediate Holding Company or a Financing Subsidiary and (ii) any Financing Subsidiary in any lower tier Financing Subsidiary;

(d)      solely in the case of any Financing Subsidiary, Investments (i) in any securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with past practices;

(e)      Investments made by Financing Subsidiaries (i) expressly permitted pursuant to the terms of any Project Debt Financing Documents and (ii) in accordance with any applicable requirements under the Credit Documents;

(f)      other Investments in Financing Subsidiaries solely to the extent made with the proceeds of any cash capital contributions to the Borrower, in each case, received by Borrower following the Closing Date;

(g)      solely in the case of any Financing Subsidiary, Investments in real property in connection with the development of Financing Projects;

(h)      [reserved];

(i)      Investments relating to energy and related commodities trading or related risk mitigation activities entered into by a Borrower or Financing Subsidiary in the ordinary course of business and not otherwise prohibited by any Project Senior Financing Documents;

(j)      [reserved]; and

(k)      Investments expressly specified in the Approved Budget.

Notwithstanding the foregoing, except pursuant to transactions expressly specified in the Approved Budget, from and after the Petition Date, the Borrower shall not, and shall not permit any Financing Subsidiary to, make any Investment in any Specified Transferee.

Notwithstanding anything to the contrary set forth in this Agreement, subject to, and in accordance with, the Approved Budget, the Borrower and other upstream owners of the Financing Subsidiaries shall be permitted (but not obligated) to make unlimited equity contributions to the Financing Subsidiaries, and the Financing Subsidiaries in other downstream Financing Subsidiaries, for the purpose of making interest payments hereunder, making mandatory or optional prepayments or repayments of the Loans hereunder or, solely to the extent expressly set forth in the Approved Budget, making required interest and principal payments and prepayments under any Project Senior Financing or other Indebtedness of any Financing Subsidiary.

**6.5.      Fundamental Changes; Disposition of Assets**.  The Borrower shall not permit any Financing Subsidiaries to, directly or indirectly, Dispose of, in one transaction or a series of transactions (including any Project Sell-Down), all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, except as follows (in each case, subject to compliance with Section 2.9, as applicable):

92

(a)      any Disposition of property by a Financing Subsidiary to another Financing Subsidiary that owns, directly or indirectly, the same Project, in each case, in the ordinary course of business;

(b)      (i) disposals of obsolete, worn out or surplus property, and sales or disposals of inventory or other assets sold, leased or licensed out; (ii) abandonment, non-renewal, allowance to lapse or become cancelled or other Disposition of Intellectual Property that is not used or useful in a material respect in the business of Borrower and the Financing Subsidiaries; and (iii) ordinary-course-of-business Dispositions of leases, subleases, rights of way, easements, licenses, sublicenses, equipment and other assets being sold in the ordinary course of business that, individually and in the aggregate, do not materially interfere with the ordinary conduct of the business of Borrower or any Financing Subsidiary and do not materially detract from the value or the use of the property which they affect;

(c)      Dispositions of assets (i) resulting from the condemnation thereof or (ii) that are the subject of a material casualty;

(d)      Dispositions of (and the granting of any option or other right to purchase, lease or otherwise acquire) power, electric capacity, transmission capacity, renewable energy credits, tax credits, emissions credits or ancillary services or other inventory or products in the ordinary course of business;

(e)      to the extent constituting a Disposition and prior to enforcement thereof, Permitted Liens;

(f)      Dispositions expressly specified in the Approved Budget; and

(g)      Dispositions in the ordinary course of business in an amount, when aggregated with all other Dispositions pursuant to this Section 6.5(g), not to exceed $2,500,000.

Notwithstanding the foregoing, (x) except pursuant to transactions expressly specified in the Approved Budget, from and after the Petition Date, the Credit Parties shall not, and shall not permit any Financing Subsidiary to Dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, to any Specified Transferee, and (y) the Credit Parties shall not, and shall not permit ACT to Dispose of, or enter any agreement to Dispose of, in one transaction or a series of transactions, all or any part of ACT's business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, except on terms and conditions and with a counterparty reasonably acceptable to the Requisite Lenders (it being understood that any refusal to consent shall be deemed reasonable (A) if the Requisite Lenders in good faith determine that such disposition could adversely affect the operation and maintenance services provided to the Brookfield Silo Entities (including the cost or quality thereof and including based on the reputation of the provider), or (B) if the counterparty holds existing investments in the Borrower or its Subsidiaries or Affiliates).

**6.6.      Transactions with Affiliates**. Except for those Affiliate Transactions (as defined below) occurring prior to the Petition Date that are set forth in <u>Schedule 6.6</u>, Borrower shall not, and shall not permit any of the other Borrower Parties to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service)

93

with any Affiliate of the Borrower Parties (each, an "**Affiliate Transaction**") on terms that are less favorable to the Borrower Parties than those that might be obtained at the time from a Person that is not such an Affiliate in an arms' length transaction; provided, that, the foregoing restriction shall not apply to:

(a)        indemnities and similar amounts paid or provided to members of the board of directors (or similar governing body) of Borrower and the Financing Subsidiaries;

(b)        transactions among the Financing Subsidiaries in the ordinary course of business;

(c)        Restricted Payments expressly permitted by Section 6.10;

(d)        Permitted Affiliated Services Agreements entered into prior to the Closing Date and listed on Schedule 6.10, provided that the terms of such Permitted Affiliated Services Agreements are no less favorable in any respect to the Borrower Parties than immediately prior to the Closing Date;

(e)        Affiliate Transactions expressly specified in the Approved Budget;

(f)        the entry into or performance under any Transition Services Agreement between one or more of the Borrower Parties and one or more of the Subsidiaries of the Borrower during the Chapter 11 Cases; and

(g)        [the Warehouse Lease Agreement.]

Notwithstanding the foregoing, except pursuant to transactions expressly specified in the Approved Budget, from and after the Petition Date, the Borrower shall not, and shall not permit any Financing Subsidiary to, loan, invest, pay, or otherwise transfer any assets to any Specified Transferee, except pursuant to Section 6.10(b).

**6.7.        Conduct of Business**.  Borrower shall not, and shall not permit any of the other Borrower Parties to, engage in any business other than (a)(i) as of the Petition Date, in the case of Borrower, undertaking corporate operations of the Debtors, borrowing the Loans and the loans under the Additional DIP Facilities and directly or indirectly owning the equity of its Subsidiaries, (ii) in the case of any Intermediate Holding Company, guaranteeing the Loans and the loans under the Additional DIP Facilities and directly or indirectly owning the equity of its Subsidiaries (and, in the case of Pine Gate O&M, LLC, performing under the O&M Services Agreements), (iii) any Holding Company (other than a PSF Obligor), directly owning Equity Interests in a Holding Company or Project Owner, (iv) in the case of any PSF Obligor, entering into a Project Senior Financing, consummating the transactions contemplated thereunder, and owning Equity Interests in applicable Financing Subsidiaries and (v) in the case of any Project Owner, the development, construction, ownership, operation and maintenance of the applicable Financing Project, and (b) in each case, such other activities as may be necessary or advisable in connection therewith, incidental or non-material or reasonable extensions thereof.

**6.8.        Amendments or Waivers of Organizational Documents; Material Contracts**. The Credit Parties shall not, and shall not permit any of the Financing Subsidiaries to, enter into, or agree to any amendment, restatement, supplement or modification to, or waiver of, any of their Organizational Documents or Material Contracts.

94

**6.9.    Swap Contracts**. Borrower shall not, and it shall not permit or cause any of the Financing Subsidiaries to, enter into any Swap Contract for speculative purposes.

**6.10.    Restricted Payments**.  Borrower shall not, and shall not permit any of the Financing Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment, except:

(a)    payments pursuant to the terms of any Permitted Affiliated Services Agreement set forth on Schedule 6.10;

(b)    distributions by the Borrower Parties of the net proceeds of the Loans in accordance with the Approved Budget and solely for the purposes provided in the Approved Budget; and

(c)    Restricted Payments to the Borrower or any other Borrower Party that directly or indirectly owns the Equity Interests in the Financing Subsidiaries, solely to the extent such Restricted Payments are expressly specified in the Approved Budget.

Notwithstanding the foregoing, except pursuant to transactions expressly specified in the Approved Budget, the Borrower shall not, and shall not permit any other Financing Subsidiary to, make any Restricted Payment directly or indirectly to any Specified Transferee.

**6.11.    Bank Accounts**.  Except for the accounts listed on Schedule 4.23, no Credit Party shall open or maintain any Deposit Account, securities account or similar account with any financial institution other than the Obligor Accounts with the Account Bank.

**6.12.    Sanctions and Anti-Corruption**.  Borrower Parties will not, directly or indirectly, use any part of the Proceeds of the Loans or lend, contribute or otherwise make available such Proceeds to any subsidiary, joint venture partner or other Person (A) to fund or facilitate any activities or business of or with any Sanctioned Person or Sanctioned Country in violation of applicable Economic Sanctions and Trade Controls Laws and Regulations, (B) in any other manner that would result in a violation of Economic Sanctions and Trade Controls Laws and Regulations by any Person party to this Agreement (including any Person participating in the Loans, whether as Administrative Agent, Lender, underwriter, advisor, investor, or otherwise), or (C) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in material violation of any applicable Anti-Corruption Law.

**6.13.    Financial Covenants.**

(a)    Minimum Liquidity.  Borrower shall not permit Liquidity to be less than $5,000,000, tested on Monday of each calendar week.

**6.14.    Reserved**.

**6.15.    Disqualified Person**.  No Borrower Party, nor any applicable Financing Subsidiary thereof, shall be a Disqualified Person.

**6.16.    Budgets/Capex/Opex Covenant**.  Borrower shall provide construction budgets and annual operating budgets for Lender review. For each Project, including Projects under construction

and operating Projects, the Financing Subsidiaries shall not exceed budgeted operating expenses unless set forth in the Approved Budget.

6.17.    **Portfolio Equipment Sourcing Requirements**.  Except for any Material Project Documents or equipment supply arrangements entered into prior to the Closing Date for the Projects as of the Closing Date set forth on Schedule 4.2(a), no Borrower Party, nor any applicable Financing Subsidiary thereof, shall be a party to (a) a Material Project Document or (b) any other equipment supply arrangement for the supply of equipment the total contract value of which exceeds $100,000, unless such Material Project Document or equipment supply arrangement complies with the Portfolio Equipment Sourcing Requirements.

6.18.    **Material Settlements**.  Borrower shall not, and shall not permit any of its Subsidiaries to, enter into any material settlements of litigation claims, claims held by Governmental Authorities, trade claims, or judgments unless such settlement is in form and substance reasonably acceptable to the Requisite Lenders.

6.19.    **Cash Management Arrangements**.  The Credit Parties shall maintain their cash management arrangements in compliance with the Cash Management Orders, subject to amendments acceptable to the Requisite Lenders; provided that the Cash Management Motion and the Cash Management Orders shall be in form and substance acceptable to the Requisite Lenders.  No pledged bank account will be closed during the Chapter 11 Cases without the prior written consent of the Administrative Agent and nothing in the Interim DIP Order or Final DIP Order will alter or impair any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date.  The Borrower and its Subsidiaries shall not make any payment or disbursement for any purpose that is not contemplated by the Approved Budget.

6.20.    **Executive Compensation**.  Without the prior written consent of the Requisite Lenders, Borrower shall not, and shall not permit any of its Subsidiaries to, (a) establish key employee incentive plans, key employee retention plans or any other similar payments or awards programs, (b) change or amend in any manner any such existing programs or related programs or (c) agree to any executive compensation plan, incentive payment or plan, retention plan or executive bonuses.

6.21.    **Specified Transferees**.  Except pursuant to transactions expressly specified in the Approved Budget, none of the Borrower or any Subsidiary thereof shall transfer the assets or property of any Borrower Party or any Subsidiary thereof, including cash proceeds of the Loans, to any Specified Transferee.

6.22.    **Independent Director**.  Following the appointment of the Independent Director to the board of directors or equivalent governing body of any Borrower Party or any Subsidiary thereof, the Borrower and its Subsidiaries shall not (a) remove or replace such Independent Director, (b) limit the authority or scope of consent rights of such Independent Director under the Organizational Documents of such Borrower Party or any Subsidiary thereof on whose board of directors or equivalent governing body such Independent Director serves, or (c) amend, restate, amend and restate, supplement, modify or waive the terms of any Organizational Documents of any Borrower Party or any Subsidiary thereof on whose board of directors or equivalent governing body such Independent Director serves, in each case without the consent of the Requisite Lenders.

6.23.    **Tax Matters**.  The parties hereto mutually agree the Borrower will not, and will cause each Brookfield Silo Entity to not, cause, make, permit or consent to any action or election that would

96

result in the classification of any Credit Party or any other Brookfield Silo Entity as anything other than a disregarded entity or partnership for federal and state income Tax purposes, or that would result in any Credit Party or any other Brookfield Silo Entity becoming a member of an affiliated, consolidated, combined or unitary group that files or is required to file Tax returns on a group basis; provided, that each Secured Party covenants and agrees to consider in good faith agreeing to a waiver of the foregoing, if so requested by the Borrower to minimize anticipated cash tax liabilities from recapture of investment tax credits (whether pursuant to Code Section 50, Code Section 6418, or otherwise); provided, further, that the Secured Parties shall be permitted to decline providing such a waiver in their sole discretion. The parties hereto agree to treat the Loans as debt for U.S. federal income tax purposes and to file all tax returns consistently therewith.

6.24. **Holdco Covenant**. The Borrower shall not and shall not permit any other Intermediate Holding Company to (a) directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness for borrowed money (except any such Indebtedness incurred under (i)(A) the Carlyle DIP Facility in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), (B) the Fundamental DIP Facility in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), and/or (C) Indebtedness incurred under this Agreement); provided that, in the case of clauses (A) and (B), such Indebtedness is subject to the DIP Intercreditor Agreements, and (ii)(A) the Carlyle Prepetition Finance Documents in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), (B) the Fundamental Prepetition Loan Documents in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), and/or (C) the Prepetition Documents; provided that, (x) in the case of the Carlyle Prepetition Finance Documents and the Prepetition Documents, until such amounts are Paid in Full pursuant to the Interim DIP Order and (y) in the case of the Carlyle Prepetition Finance Documents and the Fundamental Loan Documents, such Indebtedness is subject to the Prepetition Intercreditor Agreements, (b) directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of its property securing any Indebtedness for borrowed money (except any such Liens securing Indebtedness incurred under (i)(A) the Carlyle DIP Facility in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), (B) the Fundamental DIP Facility in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest) and/or (C) Indebtedness incurred under this Agreement), provided that, in the case of clauses (A) and (B), such Liens are subject to the DIP Intercreditor Agreements, and (ii)(A) the Carlyle Prepetition Finance Documents in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), (B) the Fundamental Prepetition Loan Documents in an amount not to exceed $[●] (plus any increase in the principal amount pursuant to the payment in kind of interest), and/or (C) the Prepetition Secured Obligations; provided that, (x) in the case of the Carlyle Prepetition Finance Documents and the Prepetition Documents, until such amounts are Paid in Full pursuant to the Interim DIP Order and (y) in the case of the Carlyle Prepetition Finance Documents and the Fundamental Prepetition Loan Documents, such Liens are subject to the Prepetition Intercreditor Agreements, (c) consummate any Disposition outside the ordinary course of business, except to the extent that the Borrower immediately applies all net cash proceeds (minus amounts applied to prepay the Carlyle DIP Facility and the Fundamental DIP Facility on no more than a ratable basis with the Loans) of such Disposition to prepay the Obligations and pay the Applicable Prepayment Premium, if any, and the Exit Fee, (d) merge, amalgamate, consolidate, or transfer all or substantially all of its assets or property to or with any Person, or (e) consummate any Investment or Restricted Payment unless expressly specified in the Approved Budget.

6.25. **New Subsidiaries**. The Credit Parties shall not, nor shall they permit any of their Subsidiaries to, create or acquire any Subsidiary without the prior written consent of the Requisite Lenders,

unless such Subsidiary would constitute a Carlyle Silo Entity, a Fundamental Silo Entity or a Subsidiary of PGR Signature Fund 1, LLC.

**6.26.    Additional Bankruptcy Matters**.  Subject to the terms of the DIP Orders, no Credit Party shall, without the Requisite Lenders' prior written consent, do any of the following:

(a)    assert, join, support or prosecute any claim or cause of action against any of the Lenders, unless such claim or cause of action is in connection with the enforcement of the Credit Documents against any of the Agents or Lenders; provided that nothing contained in this Section 6.26(a) shall prohibit the Debtors from responding to or complying with discovery requests of any statutory committee appointed or appearing in the Chapter 11 Cases, in whatever form, made in connection with an investigation against any of the Administrative Agent or Lenders or the payment from proceeds of the Loans of professional fees related thereto;

(b)    subject to Section 7, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default; provided, that any Credit Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Orders; and

(c)    solely to the extent such action relates to a Brookfield Silo Entity, file, amend, modify, execute, or enter into, or file a pleading seeking authority to execute, enter into, amend, or modify, any material pleading or material transaction document that is not in form and substance acceptable to the Administrative Agent.

## SECTION 7.   EVENTS OF DEFAULT

**7.1.    Events of Default**.  The following conditions or events shall constitute an "**Event of Default**" hereunder:

(a)    <u>Failure to Make Payments When Due</u>.  Failure by Borrower or any other Credit Party to pay (i) any principal of any Loan when due under this Agreement, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) within three (3) Business Days after the date due, any interest, Applicable Prepayment Premium (which shall be payable in cash) or fee due under this Agreement or any other Credit Document; or (iii) within five (5) Business Days after the date due, any other amount due under this Agreement, any other Credit Document or the DIP Orders; or

(b)    <u>Default in Other Agreements</u>.  Other than in connection with the Chapter 11 Cases, any breach or default by any Borrower Party in respect of one or more items of Indebtedness (other than Indebtedness under this Agreement or any of the Additional DIP Facilities) in an individual principal amount of $1,000,000 or more or with an aggregate principal amount of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor, which breach or default would permit the lenders or creditors under such facilities to accelerate the obligations thereunder and has resulted in such acceleration, in each case, exclusive of any Indebtedness incurred prior to the Petition Date the payment or enforcement of which is subject to the Automatic Stay or Section 365(e) of the Bankruptcy Code or any order of the Bankruptcy Court;

(c)     Breach of Certain Covenants.  Failure of any Borrower Party to perform or comply with any term or condition contained in Sections 2.3(c), 5.1(e), 5.1(q), 5.2 (solely with respect to the existence of the Borrower), 5.10 [5.16], 5.17, 5.18, 5.25, 5.28, 5.29 or in Section 6; or

(d)     Breach of Representations, Etc.   Any representation, warranty, certification or other statement made or deemed made by any Borrower Party in any Credit Document or in any statement or certificate at any time given by any Borrower Party in writing pursuant hereto or thereto or in connection herewith or therewith shall be false or misleading in any material respect as of the date made or deemed made; provided, that if any such misstatement (other than a misstatement in respect of the representation in Section 4.27) is capable of being remedied and, either individually or in the aggregate, has not caused a Material Adverse Effect, a Borrower Party may correct such misstatement (and cure the associated default) by delivering a correction notice of such misstatement containing a correct (in all material respects) representation to Administrative Agent in form and substance reasonably satisfactory to the Requisite Lenders within fifteen (15) days after obtaining knowledge of such misstatement; or

(e)     Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other paragraph of this Section 7.1, and such default shall not have been remedied or waived within five (5) Business Day after the earlier of the date of receipt by the Borrower of written notice from Administrative Agent of such default or the date on which any Responsible Officer obtains actual knowledge thereof;; or

(f)     Involuntary Bankruptcy; Appointment of Receiver, Etc. (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of any direct or indirect Subsidiary of the Borrower that is not a Debtor in an involuntary case under any Debtor Relief Laws now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against any such direct or indirect Subsidiary of the Borrower under any Debtor Relief Laws now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any such direct or indirect Subsidiary of the Borrower, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any such direct or indirect Subsidiary of the Borrower for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any such direct or indirect Subsidiary of the Borrower, and any such event described in this clause (ii) shall continue for forty-five (45) days without having been dismissed, bonded or discharged; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, Etc. (i) Any direct or indirect Subsidiary of the Borrower that is not a Debtor shall have an order for relief entered with respect to it or shall commence a voluntary case under any Debtor Relief Laws now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or any such direct or indirect Subsidiary of the Borrower shall make any assignment for the benefit of creditors; or (ii) any such direct or indirect Subsidiary of the Borrower shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become

99

due; or the board of directors (or similar governing body) of any direct or indirect Subsidiary of the Borrower (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 7.1(f) above; or

(h)   Judgments and Attachments.   Any final and non-appealable money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $5,000,000 or (ii) in the aggregate at any time an amount in excess of $15,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage and other than any such judgment or judgments the payment or enforcement of which is subject to the Automatic Stay) shall be entered or filed against any Borrower Party or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five days prior to the date of any proposed sale thereunder); or

(i)   Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or could reasonably be expected to result in a Material Adverse Effect; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect; or

(j)   Guaranties, Collateral Documents and other Credit Documents.   At any time after the execution and delivery thereof, (i) any guarantee provided by a Guarantor for any reason, other than the Obligations being Paid in Full, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or such Guarantor shall repudiate its obligations thereunder or (ii) other than as a result of an action taken or failed to be taken by a Secured Party, this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the Obligations being Paid in Full in accordance with the terms hereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any material portion of the Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document and the DIP Orders; or

(k)   Material Project Document.

(i)   Any Borrower Party shall default in the performance or observance of any covenant or agreement contained in, or any other default shall arise under any Material Project Document to which it is a party, and in either such case such default has continued beyond any applicable cure period specified therein; or

(ii)   any Material Project Document shall cease for any reason to be in full force and effect unless terminated or expired in accordance with its terms and not as a result of a default thereunder other than in connection with the completion, Disposition or removal of any Financing Project; or

(l)   Change of Control. A Change of Control shall have occurred; or

100

(m)      (i) Any of the Borrower or its Subsidiaries or Affiliates that is a party to any O&M Services Agreement or the Transition Services Agreement shall fail to perform any of its or their material obligations thereunder, (ii) any of the Transition Services Agreement or any O&M Services Agreement is terminated or amended, modified, or waived, in each case by Borrower or any of its Subsidiaries or Affiliates without the consent of the Administrative Agent, or (iii) the Debtors (if applicable) fail to assume or assume and assign, as applicable, the Transition Services Agreement to any purchaser of the assets or equity of ACT or (iv) the Debtors fail to cause any applicable non-Debtor Subsidiary to perform under the Transition Services Agreement; or

(n)      the Brookfield Retained Liabilities exceed (i) with respect to Brookfield Retained Liabilities arising on or before October 6, 2025, an amount equal to 115% of $1,210,000 or (ii) with respect to Brookfield Retained Liabilities, if any, arising after October 6, 2025, the amount of such claims that has been approved by Brookfield pursuant to a Subsequent Draw or that has been paid with the proceeds of any Project Debt Financing that the Financing Subsidiary that is an obligor on such Brookfield Retained Liabilities is a party to; or

(o)      except for (A) any sale of ACT, (B) a sale resulting from the Sale contemplated by the Stalking Horse APA or (C) a sale of the Carlyle Silo Assets or the Fundamental Silo Assets permitted under the Additional DIP Facilities, any sale of any assets of any Debtor with a fair market value or sale price, in either case, when aggregated with all such prior sales, in excess of $2,500,000, other than sales on terms and conditions reasonably acceptable to the Administrative Agent; or

(p)      any Brookfield Silo Entity makes any payment in respect of obligations owed to Blue Ridge other than (A) payments when due (but excluding prepayments), up to a maximum of $7,000,000 (less the amount of all such payments made after October 6, 2025 and prior to the Closing Date), in respect of Identified BRP Claims that satisfy the other BRP Claims Conditions, and (B) payments in respect of bona fide goods and services on arm's length terms provided by Blue Ridge to the applicable Project owned by the Brookfield Silo Entities in the ordinary course of business after the Closing Date; or

(q)      The Independent Engineer is terminated or resigns and is not replaced by an independent engineer acceptable to the Requisite Lenders within five (5) days, such acceptance not to be unreasonably withheld, conditioned, or delayed; or

(r)      Any Borrower Party (other than a Borrower Party set forth on Schedule 4.27(d) as of the Closing Date) (a) has commercialized Goods in a manner that would cause such Borrower Party to be subject to, directly or indirectly, any Auxin Circumvention Tariffs (including, for the avoidance of doubt, any such measures applicable to goods completed or assembled in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-origin inputs, as well as any successor, continuation, modification, reinstatement, or replacement of such measures, and any related cash deposit requirements, certifications, or country-of-origin / circumvention findings), (b) has taken or takes any action that would reasonably be expected to cause such Borrower Party to become subject to liability for Auxin Circumvention Tariffs, or (c) is responsible or otherwise liable for any Auxin-related obligations, including with respect to indemnification, in connection with the import or export of Goods to any other Person, including the Borrower Parties or their Affiliates; or

(s)     Chapter 11 Cases.   The occurrence of any of the following in the Chapter 11 Cases:

(i)     the entry by the Bankruptcy Court of a final, non-appealable order (A) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) dismissing any of the Chapter 11 Cases (or any subsequent chapter 7 case), or (C) pursuant to which the Bankruptcy Court abstains from hearing any of the Chapter 11 Cases (or any subsequent chapter 7 case), or (ii) the filing by any Debtor or any Subsidiary or Affiliate thereof of a motion or other pleading seeking the entry of any such orders;

(ii)     any Debtor's exclusive right to file and/or solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code is terminated for any reason, unless such order was entered as a result of a request by, or received support from, the Administrative Agent or the Requisite Lenders;

(iii)     failure of any Debtor to comply with the DIP Orders in any material respect;

(iv)     any DIP Order is revoked, remanded, vacated, reversed, stayed, rescinded, or modified (other than modifications consented to by the Administrative Agent);

(v)     the appointment of a (A) trustee, (B) responsible officer, or (C) examiner or disinterested person with expanded powers relating to the operations or the business of any of the Debtors in the Chapter 11 Cases (having powers beyond those set forth in the sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner under section 1104(c) of the Bankruptcy Code) or (ii) the filing by any Debtor or any Subsidiary or Affiliate thereof of a motion or other pleading seeking the entry of an order implementing any such appointment;

(vi)     any administrative expense claim against any Debtor is allowed having priority over or ranking in parity with the rights of the Administrative Agent, other than in respect of the Carve Out and as expressly permitted under the Credit Documents, the DIP Orders or in any DIP Intercreditor Agreement with respect to the Additional DIP Facilities;

(vii)     any Debtor consents to the payment, settlement, grant of, or stipulation to pay, settle or grant, adequate protection with respect to any of the prepetition secured debt of the Debtors, other than to the extent permitted under the DIP Orders and the Approved Budget, or the Bankruptcy Court enters an order allowing any of the foregoing;

(viii)     the Liens on the Collateral securing the Obligations or DIP Superpriority Claims shall at any time cease to be valid, perfected, and enforceable in all respects with the priority described herein, in the DIP Orders and in the Credit Document, or any such Liens or DIP Superpriority Claims shall be (or asserted by any Debtor or any Subsidiary or Affiliate thereof to be) invalid;

(ix)     (A) the Debtors propose, file or support, or the Bankruptcy Court enters an order (1) confirming or approving any plan of reorganization or liquidation that is not an Acceptable Plan or (2) approving the adequacy of a disclosure statement in connection with any plan of reorganization or liquidation that is not an Acceptable Plan, or (B) the Debtors shall support

102

or fail to contest in good faith the filing or confirmation of any plan of reorganization or liquidation that is not an Acceptable Plan filed by any other Person, in each case without the written approval of the Administrative Agent;

(x)      any of the Debtors incurs or seeks to incur post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code (other than the DIP Facility or other Indebtedness permitted by the Credit Documents (including the Additional DIP Facilities and any Replacement Additional DIP Facilities) and such loans or financial accommodations will not provide for the Obligations and the Prepetition Secured Obligations being Paid in Full on or prior to the closing of such loans or financial accommodations;

(xi)      Any of the Debtors or any Subsidiary or Affiliate thereof shall (A) assert that the Liens on the Collateral securing the Obligations, the DIP Superpriority Claims or the guarantees of the Obligations by the Guarantors are invalid, or any such liens, claims or guarantees shall be invalidated, or (B) file or otherwise commence, join in, assist, support or otherwise participate as an adverse party in any suit, challenge or proceeding against any of the Secured Parties (in their capacity as such) in respect of the DIP Facility or the Prepetition Secured Parties (in their capacity as such) in respect of the Prepetition Credit Agreement or Prepetition Secured Obligations, including with respect to the Debtors' stipulations, admissions, agreements and releases included in the DIP Orders, or seeking the invalidation or subordination or otherwise challenging to the DIP Superpriority Claims or the Liens granted to secure the Obligations; provided that the Debtors shall not be precluded from contesting whether an Event of Default has occurred and is continuing;

(xii)      the termination of the Debtors' use of Cash Collateral or Prepetition Collateral, or the entry of an order by the Bankruptcy Court terminating or denying the Debtors' use of Cash Collateral or Prepetition Collateral;

(xiii)      the entry of a final, non-appealable order by the Bankruptcy Court granting relief from the Automatic Stay to any other creditor or party in interest in the Chapter 11 Cases that would permit such other creditor or party in interest to (A) pursue actions that would have a material adverse effect on the Debtors or their estates or (B) proceed against any portion of the Collateral exceeding $1,000,000 in value in the aggregate;

(xiv)      the entry of a final, non-appealable order by the Bankruptcy Court allowing any claim or claims under section 506(c) of the Bankruptcy Code or otherwise to surcharge any (i) Collateral or (ii) subject to entry of the Final DIP Order, any Prepetition Collateral;

(xv)      subject to entry of the Final DIP Order, the filing of a motion by the Borrower, any Subsidiary thereof or any of their respective Affiliates seeking to limit, or the entry by the Bankruptcy Court of an order limiting, the extension under Section 552(b) of the Bankruptcy Code of the Prepetition Liens on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any Credit Party after the Petition Date;

(xvi)      any of the Secured Parties with respect to the Collateral or, subject to entry of the Final DIP Order, the Prepetition Secured Parties with respect to the Prepetition Collateral, are subject to the equitable doctrine of marshaling;

103

(xvii)   any of the DIP Orders, the Bidding Procedures or the Bidding Procedures Order are amended, supplemented, vacated, stayed or otherwise modified, including pursuant to an order of the Bankruptcy Court (or the Debtors seek to amend, supplement, vacate, stay or otherwise modify any of foregoing, including making any filing seeking to make any such amendment, vacation, stay or modification or take any other act in furtherance of the foregoing) without the prior written consent of the Administrative Agent;

(xviii)   the occurrence under any of the Additional DIP Facilities of (A) a payment default or (B) an event of default that has occurred and is continuing, which payment default or event of default would permit the lenders or creditors under any such Additional DIP Facility to accelerate the obligations thereunder and has resulted in such acceleration, provided, that if the Debtors shall have obtained a Replacement Additional DIP Facility within 30 days (or such shorter time as the Approved Budget indicates that the Debtors have sufficient liquidity to operate without drawing on such defaulted Additional DIP Facility), such event of default under this Section 7.1(s)(xviii) shall be deemed to have been cured, it being understood that during such period (which period may be extended with the consent of the Requisite Lenders) (x) the Borrower shall not be permitted to draw any of the Commitments and (y) the Secured Parties shall not terminate the Commitments, accelerate the Loans, or exercise remedies in respect of the Collateral; provided that such period shall immediately terminate without further action or notice by any Secured Party if any secured party under an Additional DIP Facility subject to such payment default or event of default has exercised any remedies in respect thereof;

(xix)   any third party (A) enters into an asset purchase agreement with the Borrower or any of its Subsidiaries or Affiliates that provides for the sale or disposition of any Brookfield Silo Assets or (ii) is granted a break-up fee or other bid protections and/or the reimbursement of expenses in connection with a bid for a sale of any assets that include any Brookfield Silo Assets, in each case without the written consent of the Administrative Agent;

(xx)   the Stalking Horse APA is terminated in accordance with its terms or otherwise without the written consent of the Administrative Agent;

(xxi)   except as set forth in any motions or other pleadings which have been delivered to and are acceptable to the Administrative Agent or as set forth in the DIP Orders, the payment of, or, with respect to the Debtors, application for authority to pay, any claim that arose prior to the Petition Date, without the prior written consent of the Administrative Agent;

(xxii)   the entry of an order in any of the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Obligations or the Prepetition Secured Obligations, including the issuance of the Roll-Up DIP Loans;

(xxiii)   other than with the prior written consent of the Administrative Agent, the filing of a motion by any Credit Party or any of their respective Subsidiaries or Affiliates seeking, or the Bankruptcy Court shall enter an order granting, a change in venue with respect to the Chapter 11 Case;

(xxiv)   the Debtors enter into any Additional DIP Facility or Replacement Additional DIP Facility that does not include terms and conditions having an identical effect in respect of reimbursement of fees, costs, disbursements, or expenses in respect of advisors to the lenders thereunder as those set forth in this Agreement, including Section 9.2(b), in form and

substance reasonably acceptable to the Administrative Agent in its sole discretion, or (b) the Debtors and their subsidiaries shall pay in cash any amounts in respect advisors to the lenders under any Additional DIP Facility or Replacement Additional DIP Facility in excess of the limits specified in the Approved Budget in effect at the time of entry of the Interim DIP Order;

(xxv)     the Debtors select a bid as a Successful Bid with respect to a sale of any or all of the Brookfield Silo Assets pursuant to the Bidding Procedures that does not provide for the DIP Obligations and the Prepetition Obligations to be Paid in Full on or prior to the earlier of the Maturity Date and the closing of the sale transaction set forth in such bid; or

(xxvi)   the Borrower or any Subsidiary or Affiliate thereof shall take any action in support or in furtherance of any occurrence that would constitute an Event of Default pursuant to this Section 7.1(s), or any other Person shall do so and such application is not contested in good faith by the Borrower and the relief requested is granted in an order that is not stayed pending appeal.

**7.2.     Consequences of an Event of Default**.  (a) Upon the occurrence of any Event of Default described in paragraphs 7.1(f) or 7.1(g) of <u>Section 7.1</u>, automatically, and (b) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, subject to the DIP Order and the terms thereof, the Administrative Agent may take any of the following actions, at the same or different times:

(i)     terminate, reduce, or restrict the Commitments, and thereupon the Commitments shall terminate, be reduced or restricted, as applicable, immediately;

(ii)     declare the Obligations then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;

(iii)     terminate, reduce or restrict any right or ability of the Credit Parties to use any Cash Collateral of Secured Parties or the Prepetition Secured Parties, other than to the extent expressly permitted in the Interim DIP Order or, when entered, the Final DIP Order;

(iv)     declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the DIP Orders) in accordance with the Interim DIP Order or, when entered, the Final DIP Order;

(v)     deliver a Default Notice (as defined in the DIP Orders) in accordance with the DIP Order; and

(vi)     enforce any and all Liens and security interests created pursuant to the Collateral Documents and any other right or remedy permitted hereunder with respect to the Collateral.

Notwithstanding anything to the contrary herein or in any other Credit Document, the enforcement of Liens on or remedies with respect to the Collateral and the exercise of all other remedies provided for in

the Credit Documents against any Debtor shall be subject to the provisions of the Interim DIP Order and, when entered, the Final DIP Order.

## SECTION 8.   ADMINISTRATIVE AGENT AND OTHER AGENTS

8.1.   **Appointment of Agents**.   BID Administrator LLC, is hereby appointed Administrative Agent hereunder and under the other Credit Documents and each Lender hereby authorizes BID Administrator LLC, to act as Administrative Agent in accordance with the terms hereof and the other Credit Documents.   Each Secured Party hereby consents and agrees to the appointment by the Administrative Agent on its behalf of the Collateral Agent as the agent of the Secured Parties under the Collateral Documents.   Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable.   Except as set forth in Section 8.7, the provisions of this Section 8 are solely for the benefit of the Agents and the other Secured Parties and no Borrower Party (or Affiliate thereof) shall have any rights as a third party beneficiary of any of the provisions thereof.   In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of Lenders and the Collateral Agent shall act solely as an agent of the Secured Parties and neither assumes and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Borrower Party (or Affiliate thereof).   It is understood and agreed that the use of the term "agent" herein or in any other Credit Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.   Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.   The Administrative Agent, Secured Parties, and Lenders acknowledge and agree that at no time shall the fee of the Administrative Agent be increased beyond one hundred five percent (105%) of the amounts set forth in the Agency Fee Letter without the consent of the Requisite Lenders.

8.2.   **Powers and Duties**.   Each Lender irrevocably authorizes the Administrative Agent, and each Secured Party irrevocably authorizes the Collateral Agent, to take such action on such Person's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.   Each Agent shall have only those duties and responsibilities that are expressly specified herein, in the other Credit Documents to which such Agent is a party and its duties thereunder shall be administrative in nature only, whether or not a default has occurred and is continuing, and shall not be a trustee for, or fiduciary of, any Secured Party.   Each Agent (i) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by them in accordance with the advice of such counsel, accountants or experts, and (ii) shall not be responsible for or have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants, agreements or other terms or conditions of any Credit Document on the part of any party thereto or to inspect the property (including the books and records) of the Borrower or any other Person or the occurrence of any default.   No Agent shall have, by reason hereof, any of the other Credit Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein, in any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof, any of the other Credit Documents except as expressly set forth in any such document to which the applicable Agent is a party.

106

### 8.3.   **General Immunity**.

(a)      No Responsibility for Certain Matters.  No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof, any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or Secured Parties, or by or on behalf of any Borrower Party to any Agent or any Secured Party in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Borrower Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the Proceeds of the Loans, letters of credit or other credit extensions or as to the existence or possible existence of any Event of Default or Default (or equivalent term as used therein) or to make any disclosures with respect to the foregoing.  Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of the Loans that remain outstanding or the component amounts thereof.

(b)      Exculpatory Provisions.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith, any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions from Requisite Lenders (or such other Lenders or, in the case of the Collateral Agent, Secured Parties as may be required to give such instructions under Section 9.5) and, upon receipt of such instructions from Requisite Lenders (or such other Secured Parties, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under any Debtor Relief Law or that may result in a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for a Borrower Party), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders or, in the case of the Collateral Agent, Secured Parties as may be required to give such instructions under Section 9.5).

No Agent shall be responsible or liable for any failure or delay in the performance of its obligations under the Credit Documents arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics

and interruptions, or loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility.

No Agent shall be responsible, liable for or have any obligation with respect to (i) the environmental condition of or any contamination by, Release or threatened Release of, transportation of, or exposure to Hazardous Materials on, at, to, or from, any Project or Project Site or for any diminution in value of any Project or Project Site as a result thereof unless caused by the gross negligence or willful misconduct of said Agent, or (ii) any Environmental Claims or threatened Environmental Claims by or on behalf of the Borrower or Lenders or any other Person arising from any Project or Project Site (unless such Environmental Claims or threatened Environmental Claims result from the gross negligence or willful misconduct of such Agent), and shall have no duty, responsibility or obligation to assess the environmental condition of any Project or Project Site or with respect to compliance of any Project or Project Site under Environmental Laws or Governmental Authorizations issued thereunder.

No Agent shall be under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Borrower or any other Borrower entity, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

No Agent shall, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

In no event shall any Agent be required to expend, advance or risk any of its own funds or otherwise incur any liability, financial or otherwise, in the performance of its duties under the Credit Documents or in the exercise of any of its rights or powers thereunder.

(c)     Delegation of Duties.  Any Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by such Agent.  An Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory, indemnification and other provisions of this Section 8.3 and of Section 8.6 shall apply to any Affiliates of an Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 8.3 and of Section 8.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein.  No Agent shall be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

8.4.     **Agents Entitled to Act as Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, each Agent shall

have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Borrower Party as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection  herewith and otherwise without having to account for the same to Lenders.

<strong>8.5.     Lenders' Representations, Warranties and Acknowledgment</strong>.

(a)      Each Secured Party represents and warrants that it has made its own independent investigation of the financial condition and affairs of each Borrower Party in connection with Credit Extension hereunder and that it has made and shall continue  to make its own appraisal, without reliance on the Agents or any affiliates, agents, sub-agents, attorneys-in-fact or any of its own or their partners, trustees, administrators, managers, representatives, officers, directors, employees, agents attorneys-in-fact, advisors or affiliates thereof or any other Lender, of the creditworthiness of each Borrower Party.  None of the Agents shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of the Secured Parties or to provide any Secured Party with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and none of the Agents shall have any responsibility with respect to the accuracy of or the completeness of any information provided to  Lenders.

(b)      Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on the Closing Date.

<strong>8.6.     Right to Indemnity</strong>.

(a)      Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify the Administrative Agent, to the extent that the Administrative Agent shall not have been reimbursed by any Borrower Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,  expenses (including counsel fees and disbursements) or disbursements  of any kind or  nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as Administrative Agent in any way  relating to or arising out of this Agreement or the other Credit Documents; <u>provided</u>, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. If any indemnity furnished  to the Administrative Agent for any purpose shall, in the opinion of  the Administrative Agent, be insufficient or become impaired, the  Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against  until such additional indemnity is furnished; <u>provided</u>, in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Person's Pro Rata Share thereof; and <u>provided</u> <u>further</u> that this sentence shall not be deemed to require any Lender to indemnify

109

the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

(b)     Each Secured Party (other than any Agent), in proportion to its pro rata share of the Obligations outstanding, severally agrees to indemnify the Collateral Agent and Administrative Agent (each of the foregoing an "**Indemnified Agent**"), to the extent that such Indemnified Agent shall not have been reimbursed by any Borrower Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnified Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as a Collateral Agent or Administrative Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Secured Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnified Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  If any indemnity furnished to a Collateral Agent for any purpose shall, in the opinion of such Indemnified Agent, be insufficient or become impaired, such Indemnified Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Secured Party to indemnify an Indemnified Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Person's pro rata share thereof; and provided further that this sentence shall not be deemed to require any Secured Party to indemnify an Indemnified Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

(c)     In addition to the foregoing but without duplication, if applicable, each Secured Party (other than any Agent) hereby agrees, to the extent not paid by any Borrower Party, to pay to the Collateral Agent, in proportion to its pro rata share of the Obligations outstanding, within any period required under any applicable account control agreement or similar agreement executed by the Collateral Agent at the direction of the Administrative Agent (an "**Secured Party Accounts Agreement**") following receipt of a written notice thereof by the Collateral Agent, such funds as are necessary in order for the Collateral Agent to make the payments required to be made to any account bank pursuant to any Secured Party Accounts Agreement, including without limitation, as a result of any indemnification by the Collateral Agent and/or the return of any cheque, money order, wire transfer, note, draft, other order for payment of money, other remittance or other adjustment as required by the applicable account bank pursuant to the terms of the applicable Secured Party Accounts Agreement; provided, that no such payment shall be required to the extent that it is determined by a court of competent jurisdiction by final and non-appealable judgment that the Collateral Agent's obligation to make the applicable payment to such account bank has resulted from the gross negligence or willful misconduct of the Collateral Agent as determined by a final non-appealable judgment of a court of competent jurisdiction.

(d)     The provisions of this Section 8.6 shall survive the termination of this Agreement and other Credit Documents and the resignation or removal of any Agent.

**8.7.     Successor Administrative Agent**.  Each Agent shall have the right to resign at any time by giving prior written notice thereof to Lenders and Borrower and each Agent may be removed

at any time (a) by a Borrower or the Requisite Lenders if it or one of its affiliates is a Defaulting Lender or a Non-Consenting Lender and (b) with or without cause by an instrument or concurrent instruments in writing delivered to Borrower and such Agent and signed by Requisite Lenders.  The Requisite Lenders shall have the right to appoint a financial institution to act as the replacement Agent hereunder, subject to the reasonable satisfaction of Borrower, and such Agent's resignation shall become effective on the earliest of (i) in the case of the Administrative Agent, 30 days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor Agent by Borrower and the Requisite Lenders or (iii) such other date, if any, agreed to by the Requisite Lenders; provided that, the administrative agent fee of such replacement Agent shall not exceed the administrative fee of the removed Agent in effect as of the Closing Date hereof without the prior written consent of Borrower.  Upon any such notice of resignation or any such removal, if a successor Agent has not already been appointed by the resigning Agent, Requisite Lenders shall have the right, upon five Business Days' notice to Borrower, to appoint a successor Agent.  If neither Requisite Lenders nor Administrative Agent have appointed a successor Administrative Agent, Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent.  In the case of the Collateral Agent, the Collateral Agent shall have the right to plead to a court of competent jurisdiction to appoint a successor Collateral Agent or for such other appropriate relief.  Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, that successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Agent and the resigning or removed Agent shall promptly transfer to such successor Agent all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Agent under the Credit Documents, whereupon such resigning or removed Agent shall be discharged from its duties and obligations hereunder.  After any resigning or removed Agent's resignation or removal hereunder as Agent, the provisions of <u>Section 8</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent hereunder.

### 8.8.    **Collateral Documents**.

(a)    <u>Agents under Collateral Documents and Guarantee</u>.  Each Secured Party hereby further authorizes the Collateral Agent on behalf of and for the benefit of Secured Parties, to be the agents for and representatives of Secured Parties with respect to the Guarantors, the Collateral and the Collateral Documents.  Subject to <u>Section 9.5</u>, without further written consent or authorization from any Secured Party, Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments to which Requisite Lenders (or such other Lenders or Secured Parties as may be required to give such instructions under <u>Section 9.5</u>) have consented.

(b)    <u>Right to Realize on Collateral and Enforce Against the Guarantors</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrower, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Obligations against the Guarantors, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by the Collateral Agent, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, a Sale or other transaction pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k),

111

Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Requisite Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale or other disposition. In connection with any such bid (i) each Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agents with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Requisite Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Requisite Lenders contained in Section 9.05(b)), (iii) each Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

(c)      Release of Collateral, Termination of Credit Documents.

(i)      Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations (other than cash, contingent or indemnification obligations for which no claim has been made) have been Paid in Full and all Commitments have terminated or expired, upon request of Borrower, the Collateral Agent shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Credit Document and upon any such termination, the Collateral Agent will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any substantial part of its property, or otherwise, all as though such payment had not been made.

(ii)      The Collateral Agent shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner.  The Lenders hereby waive any claims arising solely by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might

112

have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree.  The Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale.

(iii)     General.  The powers conferred on the Collateral Agent under the Agreement and related Collateral Documents are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody and preservation of the Collateral in its possession and the accounting for monies actually received by it, the Collateral Agent shall have no other duty as to the Collateral, whether or not the Collateral Agent or any of the other Lenders has or is deemed to have knowledge of any matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to the Collateral. the Collateral Agent hereby agrees to exercise reasonable care in respect of the custody and preservation of the Collateral. the Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property.  The Collateral Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, and shall not be responsible for or have any duty to ascertain or inquire into the value or the sufficiency of any Collateral.  Notwithstanding anything to the contrary herein, the Collateral Agent shall not be liable for any action taken or omitted in connection with this Agreement or any Collateral Document, or in connection herewith or therewith, including without limitation for any error of judgment, except to the extent of its own gross negligence or willful misconduct as determined pursuant to a final, non-appealable judgment of a court of competent jurisdiction.

(d)     No Duty to Inquire.  The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of its Lien thereon, or any certificate prepared by any Borrower Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Secured Parties for any failure to monitor or maintain any portion of the  Collateral. Nothing herein or in any other Credit Document shall require the Collateral Agent to file financing statements or continuation statements, or be responsible for maintaining the security interests purported to be created as described herein or therein (except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder or under any other Credit Documents) and such responsibility shall be solely that of the Borrower Parties.

**8.9.     Withholding Taxes**.  To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without duplication of the provisions of Section 2.13(e), if the IRS or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

113

**8.10.    Agents May File Bankruptcy Disclosure and Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Borrower Party, Administrative Agent and the Collateral Agent (irrespective of whether the principal of any Loan or other credit extension shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent or the Collateral Agent shall have  made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    if relevant, to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent or, as applicable, Secured Parties and Collateral Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of such Agent and its respective agents and counsel and all other amounts due such Agent under Sections 2.8, 9.2 and 9.3 allowed in such judicial proceeding); and

(c)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the  same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the applicable Agent and, in the event that such Agent shall consent to the making of such payments directly to the applicable Secured Parties, to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due such Agent under Sections 2.8, 9.2 and 9.3. To the extent that the payment of any such compensation, expenses, disbursements and advances of such Agent, its agents and counsel, and any other amounts due such Agent under Sections 2.8, 9.2 and 9.3  out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the applicable Secured Party may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize any Agent to authorize or consent to or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Secured Party or to authorize an Agent to vote in respect of the claim of any Secured Party in any such proceeding.

**8.11.    Defaults**.  No Agent (acting in its capacity as an Agent and not in any other capacity) shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless an officer of such Agent responsible for the day to day administration of the Credit Documents has received a written notice from a Secured Party or the Borrower, referring to this Agreement, describing such Default or Event of Default and indicating that such notice is a "notice of default."

**8.12.    No Discretion**.

(a)    Administrative Agent.  Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication

114

from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent, it is understood that in all cases the Administrative Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Requisite Lenders or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents or any agreement to which the Lenders and the Administrative Agent or the Collateral Agent is a party and acting in accordance with such documents (such Lenders being referred to herein as the "**Relevant Lenders**"), as the Administrative Agent deems appropriate. Upon receipt of such written instruction, advice or concurrence from the Relevant Lenders, the Administrative Agent shall take such discretionary actions in accordance with such written instruction, advice or concurrence.  This provision is intended solely for the benefit of the Administrative Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

(b)      Collateral Agent.  Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Collateral Agent, it is understood that in all cases the Collateral Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Administrative Agent (acting in accordance with the Credit Agreement and other Credit Documents), as it deems appropriate.  This provision is intended solely for the benefit of the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

**8.13.    ERISA Matters**.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent, and not  to or for the benefit of any Borrower Party or Affiliate thereof, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans in connection with the Loans or the Commitments;

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91- 38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions

determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii)      (A) such Lender is an investment fund  managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE  84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the  Commitments and this  Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are  satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-paragraph (a)(i) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-paragraph (a)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent, and not to or for the benefit of the Borrower or the Borrower's agent, that the Administrative Agent is not a fiduciary  with  respect to the  assets of  such Lender involved in the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related to hereto or thereto).

**8.14.    Erroneous Payments**.

(a)      Each Lender hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "**Erroneous Payment**") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Lender and held in trust for the benefit of the Administrative Agent and such Lender shall promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on

116

"discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this Section 8.14(a) shall be conclusive, absent manifest error.

(b)     Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "**Payment Notice**"), (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment or (z) such Lender otherwise becomes aware the Payment was transmitted, or received, in error or by mistake (in whole or in part) in each case: (i) (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment and (ii) such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.14(b).

(c)     Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Credit Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)     In the event that a Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Payment (or portion thereof) (and/or from any Person who received such Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) the "**Erroneous Payment Deficiency Assignment**") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment Agreement (or, to the extent applicable, an agreement incorporating an Assignment Agreement by reference pursuant to the Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Loan Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell

117

any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf).   No Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.   In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable or Secured Party under the Credit Documents with respect to each Erroneous Payment Return Deficiency (the "**Erroneous Payment Subrogation Rights**").

(e)   The parties hereto agree that a Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Borrower Party, except, in each case, to the extent such Payment is, and solely with respect to the amount of such Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Borrower Party for the purpose of making such Payment.

(f)   To the extent permitted by applicable law, no Person shall assert any right or claim to a Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine

(g)   Each party's obligations, agreements and waivers under this Section 8.14 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

(h)   Notwithstanding anything to the contrary in this Section 8.14, this Section 8.14 shall not create any obligations, liabilities or responsibilities or alter or change any obligations, liabilities or responsibilities of the Borrower and the Financing Subsidiaries under any of the other provisions of this Agreement or any other Credit Document, other than with respect to acknowledging and consenting to any assignment and/or subrogation rights referenced in this Section 8.14, subject to any consent rights set forth in Section 9.6 and other than the Borrower' agreement to this Section 8.14 (it being understood that this clause (h) shall not limit any rights the Administrative Agent may have against any Borrower Party under any provision of this Agreement or any other Credit Document other than this Section 8.14).

**8.15.   DIP Intercreditor Agreements and DIP Orders** .   Each Lender and each other Secured Party hereby (a) authorizes each Agent to enter into (i) each DIP Intercreditor Agreement, (ii) amendments or supplements to each DIP Intercreditor Agreement to the extent permitted by this Agreement and made in accordance with the applicable DIP Intercreditor Agreement, (iii) the Interim DIP Order and the Final DIP Order and (iv) amendments or supplements to the Interim DIP Order or the Final DIP Order, in each case, to the extent permitted by this Agreement and made in accordance with the Interim DIP Order or the Final DIP Order, as applicable, (b) agrees that such Person will be subject to and bound by, and will

118

take no actions contrary to, the provisions of any DIP Intercreditor Agreement, and (c) agrees that each Agent may take such actions on behalf of such Person as is contemplated by the terms of any such DIP Intercreditor Agreement.

## SECTION 9.   MISCELLANEOUS

### 9.1.   **Notices**.

(a)      <u>Notices Generally</u>.  Any notice or other communication herein required or permitted to be given to a Borrower Party, a Collateral Agent or the Administrative Agent shall be sent to such Person's address as set forth on <u>Appendix B</u> or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on <u>Appendix B</u> or otherwise indicated to Administrative Agent in writing.  Except as otherwise set forth <u>paragraph (b)</u> below, each notice hereunder shall be in writing in English and may be personally served, sent by fax, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of fax or electronic mail, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed; <u>provided</u>, no notice to any Agent shall be effective until received by such Agent; <u>provided</u>, <u>further</u>, any such notice or other communication shall at the request of Administrative Agent be provided to any sub-agent appointed pursuant to <u>Section 8.3(c)</u> as designated by Administrative Agent from time to time.  Copies of all notice or other communication given to the Collateral Agent, the Administrative Agent or any Lender (which shall not constitute notice to such parties) shall also be delivered to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attention:  Brian Hermann, Robert Britton, Brian Bolin
> Email:  bhermann@paulweiss.com; rbritton@paulweiss.com; bbolin@paulweiss.com

(b)      <u>Electronic Communications</u>.

(i)      Notices and other communications to any Agent and Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by Administrative Agent.  Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  Unless Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment); <u>provided</u>, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing <u>clause (A)</u> of notification that such notice or communication is available and identifying the website address therefor.

119

(ii)     The Borrower and each Lender understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii)     The Platform and any Approved Electronic Communications are provided "as is" and "as available".  None of the Agents or any of their respective officers, directors, employees, agents, advisors or representatives (the "**Agent Affiliates**") warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with the Platform or the Approved Electronic Communications.  In no event shall the Agent Affiliates have any liability to the Borrower or the other Borrower Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of Borrower's, any Borrower Party's or Administrative Agent's transmission of communications through the Platform.

(iv)     The Borrower, each Lender and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(c)     Private-Side Information Contacts.  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public-Side Information" portion of the Platform and that may contain non-public information with respect to the Borrower, its Subsidiaries or their securities for purposes of United States federal or state securities laws.  In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither the Borrower nor Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it have obtained in connection with this Agreement and the other Credit Documents.

**9.2.     Expenses**.

(a)     Whether or not the transactions contemplated hereby shall be consummated, except as may be agreed separately in writing, the Borrower agree to pay as promptly as practicable (a) all the documented out-of-pocket costs and expenses incurred in connection with the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) the documented out-of-pocket fees, expenses and disbursements of counsel to Agents (and any sub-agents thereof) and Lenders in connection with the negotiation, preparation, execution, interpretation, enforcement and

administration of the Credit Documents, the protection of any of the rights and remedies of the Secured Parties and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrower, including the discussion, negotiation, preparation, execution and delivery of any documents in connection with the Loans; (c) all the documented out-of-pocket expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Collateral Agent, for the benefit of Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes; (d) all the documented out-of-pocket costs and expenses incurred in connection with the Chapter 11 Cases, and (e) all the documented out-of-pocket costs and expenses incurred in connection with the Sale, including the negotiation, preparation, execution, and interpretation of the Stalking Horse APA and all related agreements, investigating the Acquired Assets and the Debtors, implementing the Sale, negotiating and obtaining entry of the Bidding Procedures Order and the Sale Order, and obtaining regulatory and other approvals of governmental entities necessary to consummate the Sale if needed, and (e) after the occurrence of a Default or an Event of Default, all documented out-of-pocket costs and expenses and costs of settlement, incurred by any Agent (and any sub-agents thereof) or other Secured Party in enforcing any Obligations of or in collecting any payments due from any Borrower Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement against the Guarantors) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings; provided that, the reimbursement of such fees, expenses and disbursements of counsel shall include those of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Norton Rose Fulbright LLP as counsel to the Lenders, Porter Hedges LLP as Texas counsel to the Lenders, and any other local or specialist counsel or other professional advisors retained by the Lenders, and the documented out-of-pocket fees, expenses and disbursements of FTI Consulting, Inc., as financial advisor to the Lenders, and one primary counsel and one local counsel (in each applicable jurisdiction) for the Agents incurred in connection with (i) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the proposed financing contemplated by this Agreement and the funding of the Loans, (ii) the administration of the DIP Facility and any amendment, modification or waiver of any provision of this Agreement, (iii) the interpretation, enforcement or protection of any of the rights and remedies of the Secured Parties under this Agreement or (iv) the Chapter 11 Cases.  Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower shall not be responsible for the payment of any fees, costs, or other liabilities arising out of any dispute between or among the Secured Parties and their respective Affiliates, except to the extent that such dispute arises out of any failure of any Borrower Party to perform its respective obligations under the Credit Documents, as determined by a court of competent jurisdiction in a final, non-appealable judgment.

(b)     Notwithstanding the foregoing, to the extent the fees, costs, disbursements and expenses of the Lender Advisors exceed the aggregate amount budgeted for them in the Approved Budget in effect at the time of entry of the Interim DIP Order, the Credit Parties shall not be obligated to pay such excess to the Lender Advisors in cash, but to the extent the Lenders pay such amounts to the Lender Advisors, the outstanding amount of the Obligations shall automatically be increased (for the avoidance of doubt, without any reduction of the Commitments) by such amount, with no further action by any party, upon notice to the Credit Parties.  Each Additional DIP Facility and the DIP Orders shall provide for a similar limit in respect of reimbursement of fees, costs, disbursements, or expenses of advisors to the

lenders thereunder, and the Debtors and their subsidiaries shall not pay in cash any amounts in respect thereof in excess of such limit.

### 9.3.  **Indemnity**.

(a)      In addition to the payment of expenses pursuant to Section 9.2, the Credit Parties agree, jointly and severally, to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent, Lender, Secured Party and each of their respective affiliates and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and representatives of such person and its affiliates (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, the Credit Parties shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of such Indemnitee or from a material breach in bad faith of the obligation of such Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 9.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)      To the extent permitted by applicable law, no party hereto or its Affiliates shall assert, and each party hereto, on behalf of itself and its Affiliates hereby waives, any claim against each other party hereto and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the Proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.  No Lender or Agent or any of their respective Affiliates, directors, employees, attorneys, agents or sub-agents shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent caused by the gross negligence or willful misconduct of such Lender or Agent or of any of their respective Affiliates, directors, employees, attorneys, agents or sub-agents determined by a final, non-appealable judgment of a court of competent jurisdiction.

(c)      [Reserved].

(d)      Notwithstanding any other provision of this Section 9.3, and subject to the provisions of Section 2.13 (which shall be controlling with respect to the matters covered thereby), Indemnified Liabilities shall not include any Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(e)　None of the Borrower Parties shall be liable to any Indemnitee for any indirect, consequential, special or punitive damages in connection with this Agreement or the transactions contemplated hereby; provided that such waiver of indirect, consequential, special or punitive damages shall not limit the indemnification obligations of the Borrower Parties under this Section 9.3 in connection with any third party claim with respect to which an Indemnitee is entitled to indemnification.

(f)　The provisions of this Section 9.3 shall survive the termination of this Agreement and other Credit Documents and the resignation or removal of any Agent.

(g)　All amounts due under this Section 9.3 shall be payable as promptly as practicable after written demand therefor.

**9.4.　Set-Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, if any Event of Default has occurred and is continuing, each Lender is hereby authorized by Borrower at any time or from time to time, without notice to any Borrower Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of the Borrower against and on account of the obligations and liabilities of the Borrower to such Lender hereunder, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section 9.4 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.

**9.5.　Amendments and Waivers**.

(a)　Requisite Lenders' Consent.  Subject to clause (b) below, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Borrower Party therefrom, as applicable, shall in any event be effective without the written concurrence of each applicable Borrower Party and the Requisite Lenders; provided, that Administrative Agent may, with the consent of the Borrower only, amend, modify or supplement this Agreement or any other Credit Document to cure any ambiguity, omission, defect or inconsistency (as reasonably determined by Administrative Agent), so long as such amendment, modification or supplement does not adversely affect the rights of any Lender.

(b)　Affected Lenders' Consent.  Without the written consent of each Lender that would be directly affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)　extend the scheduled final maturity of any Loan or Loan Note;

123

(ii)     waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)     reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to <u>Section 2.8</u>) or any fee or any premium payable hereunder;

(iv)     extend the time for payment of any such interest, fees or premium;

(v)     reduce the principal amount of any Loan;

(vi)     [reserved];

(vii)     amend, modify, terminate or waive any provision of this <u>Section 9.5(b)</u>, <u>Section 9.5(d)</u> or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(viii)     amend or modify the provisions of <u>Section 2.11</u>, the definition of "Requisite Lenders", or "Pro Rata Share", or any other provision of the Credit Documents specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender or that provides for pro rata sharing of payments among the Lenders in a manner that would by its terms alter the pro rata sharing of payments required thereby;

(ix)     release all or substantially all of the Collateral  or the guarantees of Obligations except as expressly provided in the Credit Documents; <u>provided</u>, that consent of the Lenders shall not be required for any Collateral released pursuant to <u>Section 8.8(c)</u> or otherwise released in accordance with the terms of the Credit Documents;

(x)     consent to the assignment or transfer by any Borrower Party of any of its rights and obligations under any applicable Credit Document; <u>provided</u> that a merger, consolidation, amalgamation or similar transaction not prohibited hereunder shall not constitute an assignment or transfer;

(xi)     waive any condition set forth in <u>Section 3.1</u> hereof; or

(xii)     waive, amend or modify the DIP Superpriority Claim status of the Lenders under the DIP Orders or under any Credit Document without the prior written consent of each Lender adversely affected thereby;

<u>provided</u>, that all Lenders shall be deemed directly affected thereby with respect to any amendment described in <u>clauses (vi)</u>, <u>(vii)</u>, <u>(viii)</u>, <u>(ix)</u> or <u>(x)</u>.

(c)     <u>Amendments, Etc</u>.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Borrower Party therefrom, shall amend, modify, terminate or waive any provision of the Credit Documents as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case, without the consent of such Agent.

(d)     Execution of Amendments, Etc.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Borrower Party in any case shall entitle any Borrower Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 9.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Borrower Party, on such Borrower Party.

**9.6.     Successors and Assigns; Participations**.

(a)     Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  Neither the Borrower's rights or obligations hereunder nor any interest therein may be assigned, transferred or delegated by it without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, participants to the extent provided in paragraph (g) below, and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders and other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Register.  The Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 9.6(d).  Each assignment shall be recorded in the Register promptly following receipt by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to the Borrower and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date**."  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)     Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations to any "Eligible Assignee" without the written consent of the Borrower; provided, that each such assignment pursuant to this Section 9.6(c) shall be in an aggregate amount of not less than the lower of: (w) $1,000,000, (x) the aggregate amount of the Loans of the assigning Lender, (y) the amount assigned by an assigning Lender to an Affiliate of such Lender or (z) such lesser amount as agreed to by the Administrative Agent.

(d)     Mechanics.

(i)     Assignments and assumptions of Loans and Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement.  Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date.  In connection with all assignments there shall be delivered to Administrative Agent an administrative questionnaire, such forms, certificates or other evidence, if any, as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.13(f), together with payment to Administrative Agent of a registration and processing fee of $5,000 (except that no such registration and processing fee shall be payable in the case of an assignee which is already a Lender or is an Affiliate of a Lender or a Person under common management with a Lender).

(ii)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent and each Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this Section 9.6(d)(ii), then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(e)     Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 9.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control); and (iv) it will not provide any information obtained by it in its capacity as a Lender to the Borrower or any Affiliate of the Borrower.

(f)     Effect of Assignment.  Subject to the terms and conditions of this Section 9.6, as of the Assignment Effective Date (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 9.6) and be released from its obligations hereunder (and, in the

126

case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided, that anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee; and (iv) if any such assignment occurs after the issuance of any Loan Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Loan Notes to Administrative Agent for cancellation, and thereupon the Borrower shall issue and deliver new Loan Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the Loans of the assignee and/or the assigning Lender.

(g)     Participations.

(i)     Each Lender shall have the right at any time to sell one or more participations to any Person (other than any Borrower Party or any of their respective Affiliates or any Natural Person) in all or any part of its Commitments, Loans or in any other Obligation. Each Lender that sells a participation pursuant to this Section 9.6(g) shall, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, maintain a register on which it records the name and address of each participant and the principal amounts of (and stated interest on) of each participant's participation interest with respect to the Loan (each, a "**Participant Register**"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations. Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to the Loan for all purposes under this Agreement, notwithstanding any notice to the contrary. Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement

127

or (C) release all or substantially all of the Collateral under the Collateral Documents to the extent supporting the Loans hereunder in which such participant is participating.

(iii)     The Borrower agree that each participant shall be entitled to the benefits of Section 2.12 and 2.13 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section 9.6; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.12 or Section 2.13 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participant acquired the applicable participation (and any such claim by a participant shall entitle the Borrower to replace the Lender that sold such participation) and (y) a participant that would be a Non US Lender if it were a Lender shall not be entitled to the benefits of Section 2.13 unless the Borrower are notified of the participation sold to such participant (but not the identity of such participant) and such participant agrees, for the benefit of the Borrower, to comply with Section 2.13 as though it were a Lender (it being understood that the documentation required under Section 2.13 shall be delivered to the participating Lender); provided further that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to the Borrower or any other Person in connection with the sale of any participation.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 9.4 as though it were a Lender; provided such participant agrees to be subject to Section 2.11 as though it were a Lender.

(iv)     Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 9.6 any Lender may assign, pledge and/or grant a security interest in all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Loan Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided that no Lender, as between the Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge; provided, further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**9.7.     Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**9.8.     Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of the Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of the Borrower set forth in Sections 2.12, 2.13, 9.2, 9.3, and 9.4 and the agreements of Lenders set forth in Sections 2.11, 8.3(b) and 8.6 shall survive the payment of the Loans, and the termination hereof.

**9.9.     No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Secured Party in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each

Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

9.10.    **Marshalling; Payments Set Aside**.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Borrower Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Borrower Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

9.11.    **Severability**.  In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

9.12.    **Obligations Several; Independent Nature of Lenders' Rights**.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

9.13.    **Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

9.14.    **APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK**.

9.15.    **CONSENT TO JURISDICTION.  SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR,**

IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK.   BY EXECUTING AND DELIVERING THIS AGREEMENT, OR UPON ACCEDING TO THIS CREDIT AGREEMENT, EACH PARTY HERETO, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE (SUBJECT TO <u>CLAUSE (E)</u> BELOW) JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO IT AT ITS ADDRESS PROVIDED IN <u>SECTION 9.1</u>; (D) AGREES THAT SERVICE AS PROVIDED IN <u>CLAUSE (C)</u> ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER IT IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST THE BORROWER IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY CREDIT DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, SUCH COURTS.

**9.16.    WAIVER OF JURY TRIAL.**   EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS.   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.16</u>.

**9.17.    Confidentiality**.

(a)    Each Secured Party shall hold all Non-Public Information regarding each Borrower Party, its Affiliates and their businesses obtained by such Secured Party pursuant to the requirements hereof confidential in accordance with such Secured Party's customary procedures for handling confidential information of such nature and shall treat all such information as confidential, it being understood and agreed by the Borrower that, in any event, Administrative Agent may disclose such information to the Lenders and each Secured Party may make (i) disclosures of such information to Affiliates of such Secured Party and to their respective officers, directors, partners, members, employees, legal counsel, independent auditors and other advisors, experts or agents who need to know such information and on a confidential basis (and to other Persons authorized by a Secured Party to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this <u>Section 9.17</u>), (ii) disclosures of such information reasonably required by any potential or prospective assignee,

transferee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein (provided, that such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 9.17 or other provisions at least as restrictive as this Section 9.17), (iii) disclosure to any rating agency when required by it; provided, that prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to Borrower Parties and/or their Subsidiaries received by it from any Secured Party, (iv) disclosure on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (v) disclosures in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (vi) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform the Borrower promptly thereof to the extent not prohibited by law), (vii) disclosures made upon the request or demand of any regulatory, self-regulatory, supervisory authority or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates, (viii) disclosures to its insurers, (ix) disclosures with the prior written consent of the Borrower, and (x) to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the DIP Facility, including to the Bankruptcy Court in connection with the approval of the DIP Facility and the entry of the DIP Orders or any other transactions related hereto and thereto.  In addition, the Secured Parties may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Secured Parties in connection with the administration of this Agreement, the other Credit Documents, and the Commitments.

(b)     No party hereto shall make any press release or public statement with respect to the matters set forth herein without the prior written consent of the Borrower (and to the extent any Lender or Agent is to be referenced or identified therein, the prior consent of such Lender or Agent).

(c)     Any Person required to maintain the confidentiality of Non-Public Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Non-Public Information as such Person would accord to its own confidential information.

**9.18.     Effectiveness; Counterparts**.  Except as provided in Section 3.1, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. The parties agree that this Agreement, or any part thereof, shall not be denied legal effect, validity or enforceability solely on the ground that it is in the form of an electronic record.  This Agreement and the other Credit Documents, and any separate letter agreements with respect to fees payable to the Agents, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

131

**9.19.   PATRIOT Act**.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it may be required to obtain, verify and record information that identifies each Borrower Party, which information includes the name and address of each Borrower Party and other information that will allow such Lender to identify such Borrower Party in accordance with the PATRIOT Act.

In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, Anti-Money Laundering Laws, each Agent is required to obtain, verify, record and update certain information relating to individuals and entities that maintain a business relationship with such Agent.  Accordingly, each of the parties hereto agrees to provide to any Agent, upon its request from time to time such identifying information and documentation as may be available to and required to be provided by such party in order to enable such Agent to comply with Anti-Money Laundering Laws.

**9.20.   Electronic Execution of Credit Documents**.  The words "execution," "signed," "signature," and words of like import in this Agreement and the other Credit Documents, including any Assignment Agreement, shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.21.   No Fiduciary Duty**.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Borrower Parties, their stockholders and/or their Affiliates.  The Borrower agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and it, its stockholders or its affiliates, on the other.  The Borrower acknowledges and agrees that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrower Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Borrower Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Borrower Party, its stockholders or its Affiliates on other matters) or any other obligation to any Borrower Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Borrower Party, its management, stockholders, creditors or any other Person.  The Borrower acknowledge and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Borrower agree that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to it, in connection with such transaction or the process leading thereto.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Borrower Party or any of their respective Affiliates as if it were not performing the duties specified herein.

**9.22.   Acknowledgment and Consent to Bail-In of Affected Financial Institutions**.  Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement

or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable, (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document, or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

**9.23.    Acknowledgment Regarding Any Supported QFCs**.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)  In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regimes if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regimes if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that the rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)  As used in this Section 9.23, the following terms have the following meanings:

133

(i)      "**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(ii)     "**Covered Entity**" means any of the following:

(A)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(B)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(C)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)    "**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(iv)     "**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**9.24.    Interest Rate Limitation**.  If any provision of this Agreement or any other Credit Document would obligate the Borrower or any other Borrower Party to make any payment of interest or other amount payable to a Secured Party in an amount or calculated at a rate which would be prohibited by applicable law, then, notwithstanding that provision, that amount or rate shall be deemed to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law, the adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid to such Secured Party under this <u>Section 9.24</u>.

**9.25.    Orders Control**.  To the extent that any specific provision hereof or in any other Credit Document is inconsistent with any of the DIP Orders, the Interim DIP Order and the Final DIP Order (as applicable) shall control.

[*Signature page(s) to follow*]

134

**<u>Exhibit B</u>**

**Carlyle DIP Note Purchase Agreement**

Pine Gate Renewables, LLC
as the Company,
and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

$[281,713,905.62] 10.75% Senior Secured Roll Up Notes due March 31, 2026

$[40,529,235.89] 14.00% Senior Secured Roll Up Notes due March 31, 2026

$[51,722,511.23] [14.0%] Senior Secured New Money Notes due March 31, 2026

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE
AGREEMENT

_____

Dated as of November [_____], 2025

TABLE OF CONTENTS

SECTION 1.      AUTHORIZATION OF NOTES...................................................................... 2

      Section 1.1.      Authorization of Notes..................................................... 2
      Section 1.2.      Priority of Security........................................................ 2

SECTION 2.      SALE AND PURCHASE OF NOTES. .............................................................. 3

      Section 2.1.      Issuance of Notes. ......................................................... 3
      Section 2.2.      Fees and Premiums. ...................................................... 3

SECTION 3.      CLOSING. .......................................................................................... 4

      Section 3.1.      Effectiveness. ............................................................... 4
      Section 3.2.      Closings....................................................................... 4

SECTION 4.      CONDITIONS TO INITIAL CLOSING. ........................................................... 6

      Section 4.1.      Conditions to the Initial Closing. .................................... 6
      Section 4.2.      Conditions to the Second Draw Closing and each Delayed Draw
                     Closing. .................................................................... 11

SECTION 5.      REPRESENTATIONS AND WARRANTIES. ..................................................... 15

      Section 5.1.      Organization; Power and Authority ................................. 15
      Section 5.2.      Authorization, Etc. ...................................................... 15
      Section 5.3.      Disclosure .................................................................. 15
      Section 5.4.      Organization and Ownership of Shares of Subsidiaries; Affiliates .......... 15
      Section 5.5.      Material Liabilities...................................................... 16
      Section 5.6.      Compliance with Laws, Other Instruments, Etc. ................. 16
      Section 5.7.      Governmental Authorizations, Etc. ................................. 17
      Section 5.8.      Litigation; Observance of Agreements, Statutes and Orders.......... 17
      Section 5.9.      Taxes ........................................................................ 18
      Section 5.10.      Title to Property; Leases .............................................. 18
      Section 5.11.      Licenses, Permits, Etc. ................................................ 18
      Section 5.12.      Compliance with Employee Benefit Plans ......................... 19
      Section 5.13.      Private Offering by the Company .................................... 19
      Section 5.14.      Use of Proceeds; Margin Regulations.............................. 19
      Section 5.15.      Existing Indebtedness; Future Liens ................................ 19
      Section 5.16.      Foreign Assets Control Regulations, Etc. .......................... 20
      Section 5.17.      Status Under Certain Statutes ....................................... 21
      Section 5.18.      Environmental Matters................................................. 21
      Section 5.19.      Bank Accounts ............................................................ 22
      Section 5.20.      Employees.................................................................. 22
      Section 5.21.      Security Documents...................................................... 22
      Section 5.22.      Material Project Contracts ........................................... 23
      Section 5.23.      Beneficial Ownership Certification ................................. 23

Section 5.24.  Cases; Orders. .............................................................................. 23
Section 5.25.  Budget. ........................................................................................... 24

Section 6.      Representations of the Purchasers. .......................................... 25

Section 6.1.   Purchase for Investment ............................................................... 25
Section 6.2.   Source of Funds ............................................................................ 25
Section 6.3.   Accredited Investor; Independent Investigation ....................... 26

Section 7.      Information as to Company ........................................................ 26

Section 7.1.   Financial and Business Information............................................ 26
Section 7.2.   Officer's Certificate ..................................................................... 32
Section 7.3.   Visitation ...................................................................................... 33
Section 7.4.   Electronic Delivery ...................................................................... 33

Section 8.      Payment and Prepayment of the Notes. .................................... 34

Section 8.1.   Payment; Maturity ........................................................................ 34
Section 8.2.   Optional Prepayments with Prepayment Premium ................... 34
Section 8.3.   Mandatory Redemption and Prepayment................................... 35
Section 8.4.   Allocation of Partial Prepayments .............................................. 37
Section 8.5.   Maturity; Surrender, Etc. ............................................................. 37
Section 8.6.   Purchase of Notes ......................................................................... 38
Section 8.7.   Reserved. ....................................................................................... 38
Section 8.8.   Payments Due on Non-Business Days........................................ 38

Section 9.      Affirmative Covenants. .............................................................. 38

Section 9.1.   Compliance with Laws; Authorizations...................................... 38
Section 9.2.   Insurance ....................................................................................... 38
Section 9.3.   [Intentionally Omitted]. ............................................................... 39
Section 9.4.   Payment of Taxes and Claims ..................................................... 39
Section 9.5.   Maintenance of Existence, Etc..................................................... 39
Section 9.6.   Books and Records ....................................................................... 39
Section 9.7.   Distributions.................................................................................. 39
Section 9.8.   Maintenance of Title .................................................................... 40
Section 9.9.   Separate Conduct of Business...................................................... 40
Section 9.10.  Construction and Operation of Projects...................................... 40
Section 9.11.  Use of Proceeds............................................................................ 40
Section 9.12.  Priority of Liens and Claims ....................................................... 40
Section 9.13.  ........................................................................................................ 40
Section 9.14.  Further Assurances ....................................................................... 41
Section 9.15.  Material Contracts......................................................................... 41
Section 9.16.  Accounts ........................................................................................ 42
Section 9.17.  Certain Project Covenants............................................................ 44
Section 9.18.  Additional Subsidiaries; Designation of Subsidiaries............... 45
Section 9.19.  Additional Beneficial Ownership Certification ......................... 47

-2-

Section 9.20.   Amendments to any Additional DIP Facilities ........................................ 47
Section 9.21.   Most Favored Lender. ................................................................................. 47
Section 9.22.   Credit Support; FERC; Motions. ............................................................... 47
Section 9.23.   Conference Calls; Meetings; Etc.. ............................................................. 48
Section 9.24.   Foley ........................................................................................................... 48
Section 9.25.   ACT. ............................................................................................................ 48
Section 9.26.   Bankruptcy Filings. .................................................................................... 48
Section 9.27.   Project Surety Bonds .................................................................................. 49
Section 9.28.   Material Decisions. ..................................................................................... 49
Section 9.29.   Ordinary Course of Business. .................................................................... 49
Section 9.30.   Milestones. .................................................................................................. 49
Section 9.31.   Budget. ........................................................................................................ 49
Section 9.32.   Certain Bankruptcy Matters ....................................................................... 49
Section 9.33.   Replacement Additional DIP Facility ........................................................ 49

SECTION 10.   NEGATIVE COVENANTS. .................................................................................. 50

Section 10.1.   Transactions with Affiliates ....................................................................... 50
Section 10.2.   Merger, Amalgamation, Consolidation, Etc. ............................................ 50
Section 10.3.   Line of Business .......................................................................................... 50
Section 10.4.   Economic Sanctions, Etc ............................................................................ 51
Section 10.5.   Liens. ........................................................................................................... 51
Section 10.6.   Indebtedness ................................................................................................ 51
Section 10.7.   Sale of Assets .............................................................................................. 51
Section 10.8.   Restricted Payments .................................................................................... 52
Section 10.9.   Reporting Practices ..................................................................................... 52
Section 10.10. Bank Accounts ............................................................................................ 52
Section 10.11. ERISA ......................................................................................................... 52
Section 10.12. Material Changes to Organizational Documents, Material Project
               Documents, Governmental Approvals ....................................................... 52
Section 10.13. Investments .................................................................................................. 53
Section 10.14. No Other Subsidiaries ................................................................................. 53
Section 10.15. Prohibited Restrictions on Subsidiaries ..................................................... 53
Section 10.16. Foley. .......................................................................................................... 54
Section 10.17. Restricted Parties. ....................................................................................... 54
Section 10.18. Use of Proceeds. ......................................................................................... 54
Section 10.19. Executive Compensation. ........................................................................... 55
Section 10.20. Material Settlements. .................................................................................. 56
Section 10.21. Use of Collateral. ........................................................................................ 56
Section 10.22. Use of Property; Rejection and Assumption of Contracts; Post-
               Filing Pleadings. ....................................................................................... 56
Section 10.23. Liquidity ...................................................................................................... 57
Section 10.24. Additional Bankruptcy Matters .................................................................. 57

SECTION 11.   EVENTS OF DEFAULT. ..................................................................................... 58

SECTION 12.   REMEDIES ON DEFAULT, ETC. ........................................................................ 67

Section 12.1.   Acceleration ................................................................... 67
Section 12.2.   Other Remedies .............................................................. 68
Section 12.3.   Rescission ...................................................................... 68
Section 12.4.   No Waivers or Election of Remedies, Expenses, Etc. .............. 68

SECTION 13.    REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES. ....................................... 69

Section 13.1.   Registration of Notes ...................................................... 69
Section 13.2.   Transfer and Exchange of Notes ...................................... 69
Section 13.3.   Replacement of Notes ..................................................... 69

SECTION 14.    PAYMENTS ON NOTES. ..................................................................... 70

Section 14.1.   Place of Payment ............................................................ 70
Section 14.2.   Payment by Wire Transfer ............................................... 70
Section 14.3.   Tax Withholding; FATCA Information ................................... 71

SECTION 15.    EXPENSES, ETC. .......................................................................... 72

Section 15.1.   Transaction Expenses; Indemnity; Waiver ............................ 72
Section 15.2.   Certain Taxes ................................................................. 73
Section 15.3.   Survival ......................................................................... 73

SECTION 16.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT. .......... 74

SECTION 17.    AMENDMENT AND WAIVER. ............................................................. 74

Section 17.1.   Requirements ................................................................. 74
Section 17.2.   Solicitation of Holders of Notes ...................................... 75
Section 17.3.   Binding Effect, Etc. ........................................................ 75
Section 17.4.   Notes Held by Company, Etc. ................... **Error! Bookmark not defined.**

SECTION 18.    NOTICES. ................................................................................. 76

SECTION 19.    REPRODUCTION OF DOCUMENTS. ...................................................... 76

SECTION 20.    CONFIDENTIAL INFORMATION. ........................................................... 77

SECTION 21.    SUBSTITUTION OF PURCHASER. ......................................................... 78

SECTION 22.    MISCELLANEOUS. ......................................................................... 78

Section 22.1.   Successors and Assigns .................................................. 78
Section 22.2.   Accounting Terms ........................................................... 78
Section 22.3.   Severability ................................................................... 79
Section 22.4.   Construction, Etc. ........................................................... 79
Section 22.5.   Counterparts .................................................................. 80
Section 22.6.   Governing Law ............................................................... 80

US-DOCS\165312452.14

Section 22.7.  Jurisdiction and Process; Waiver of Jury Trial ........................................ 80

Section 22.8.  Release of Collateral ............................................................................ 81

SECTION 23.   COLLATERAL AGENT ............................................................................. 82

SECTION 24.   SECURITY AGREEMENT ......................................................................... 83

SECTION 25.   CERTAIN AGREEMENTS ......................................................................... 83

SECTION 26.   INTERCREDITOR AGREEMENT AND DIP ORDERS. .................................. 83

US-DOCS\165312452.14

| | | |
|---|---|---|
| SCHEDULE A | — | Defined Terms |
| SCHEDULE B | — | Information Relating to Purchasers |
| SCHEDULE C | — | Initial Approved Budget |
| SCHEDULE 1.1 | — | Form of [14.00]% Senior Secured New Money Note due March 31, 2026 |
| SCHEDULE 1.2 | — | Form of 10.75% Senior Secured Roll-Up Note due March 31, 2026 |
| SCHEDULE 1.3 | — | Form of 14.00% Senior Secured Note Roll-Up Notes due March 31, 2026 |
| SCHEDULE 2.1 | | Commitment Schedule |
| SCHEDULE 3.2 | — | Borrowing Schedule |
| SCHEDULE 4.1(e) | — | Guarantors |
| SCHEDULE 4.1(f) | — | Carlyle Silo Entities |
| SCHEDULE 4.1(h) | — | Independent Directors |
| SCHEDULE 4.2(h) | — | Form of Notice of Drawing |
| SCHEDULE 5.3 | — | Disclosure Materials |
| SCHEDULE 5.4 | — | Subsidiaries of the Company and Ownership of Subsidiary Stock |
| SCHEDULE 5.8 | — | Specified Litigation |
| SCHEDULE 5.15 | — | Specified Permitted Liens |
| SCHEDULE 7.1(p) | — | Budget |
| SCHEDULE 9.2 | — | Insurance Schedule |
| SCHEDULE 9.25 | — | Milestones |
| SCHEDULE 10.5 | — | Liens |
| SCHEDULE 10.6 | — | Indebtedness |
| SCHEDULE 14.3 | — | Tax Compliance Certificates |
| EXHIBIT A | — | Material Contracts |
| EXHIBIT B | — | DIP Commitment Letter |
| EXHIBIT C | | Interim DIP Order |

US-DOCS\165312452.14

**Pine Gate Renewables, LLC**
130 Roberts Street
Asheville, NC 28801

$[281,713,905.62] 10.75% Senior Secured Roll Up Notes due March 31, 2026

$[40,529,235.89] 14.00% Senior Secured Roll Up Notes due March 31, 2026

$[51,772,511.23] [14.0%] Senior Secured New Money Notes due March 31, 2026

Dated as of [_____], 2025

To

EACH OF THE PURCHASERS LISTED IN SCHEDULE B HERETO, AND
WILMINGTON TRUST, NATIONAL ASSOCIATION, AS COLLATERAL AGENT:

Ladies and Gentlemen:

On [_____], 2025 (the "**Petition Date**"), Pine Gate Renewables, LLC, a [  ] limited liability company (the "**Company**") and each of the Guarantors (each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each such case, a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**") and have continued in the possession of their assets and management of their business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On [_____], 2025, the Debtors filed the Joint Plan Of Reorganization Pursuant to Chapter 11 Of The United States Bankruptcy Code (Docket No. [__] in the Chapter 11 Cases) (the "**Plan of Reorganization**") and accompanying disclosure statement.

The Company has requested that the Purchasers (i) purchase from the Company $[51,722,511.23] of [14.0]% Senior Secured New Money Notes due March 31, 2026 (the "**New Money DIP Notes**") and (ii) exchange the Prepetition Notes held by such Purchasers for Roll-Up DIP Notes, with all of the Company's Obligations under the Notes to be guaranteed by each Guarantor.

The priority of the Notes with respect to the Collateral granted to secure the Obligations shall be as set forth in the Financing Documents, the Interim DIP Order and the Final DIP Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

The Company and each Guarantor are engaged in related businesses, and the Company and each Guarantor will derive substantial direct and indirect benefit from the issuance of the Notes under this Agreement.

Each of the Purchasers is willing to (x) exchange its Prepetition Notes for Roll-Up DIP Notes and (y) purchase the New Money DIP Notes from the Company on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto covenant and agree as follows:

**Section 1.**     **AUTHORIZATION OF NOTES.**

**Section 1.1.     Authorization of Notes**.

(a)     The Company will, subject to the terms and conditions of this Agreement and the DIP Orders, authorize:

(i)     on and from the Interim DIP Order Entry Date, (1) an exchange on the Initial Closing Date of (A) all outstanding Prepetition A&R Notes (including all of the obligations thereunder) for 10.75% Senior Secured Roll-Up Notes due March 31, 2026 (the "**Roll-Up A&R Notes**") and (B) all outstanding Prepetition Bridge Notes (including all of the obligations thereunder) for 14.00% Senior Secured Roll-Up Notes due March 31, 2026 (the "**Roll-Up Bridge Notes**, and together with the Roll-Up A&R Notes, the "**Roll-Up DIP Notes**" and such exchange, the "**Roll-Up**"), (2) the issue and sale of $[16,559,056.06] of New Money DIP Notes on the Initial Closing Date (the "**DIP First Draw Notes**") and (3) additional issuances and sales of New Money DIP Notes on any Delayed Draw Closing Date in an aggregate amount not to exceed $[24,410,196.64] (the "**DIP Delayed Draw Notes**"); and

(ii)     on and from the Final DIP Order Entry Date, the issue and sale of $[10,753,258.53] of New Money DIP Notes on the Second Draw Closing Date (the "**DIP Second Draw Notes**").

(b)     The New Money DIP Notes shall be substantially in the form set out in <u>Schedule 1.1</u>.

(c)     Each Series of Roll-Up DIP Notes shall constitute a separate series of Roll-Up DIP Notes for purposes of this Agreement.  The Roll-Up A&R Notes shall be substantially in the form set out in <u>Schedule 1.2</u> and the Roll-Up Bridge Notes shall be substantially in the form set out in <u>Schedule 1.3</u>, in each case, with effect from the Initial Closing Date as set out in <u>Section 3.1</u>.  Certain capitalized and other terms used in this Agreement are defined in <u>Schedule A</u> and, for purposes of this Agreement, the rules of construction set forth in <u>Section 22.4</u> shall govern.

**Section 1.2.     Priority of Security.**

The relative priorities of the Liens described in Section 9.12 with respect to the Collateral shall be as set forth in the Interim DIP Order (and, when entered, the Final DIP Order). All of the Liens described in Section 9.12 shall be effective and perfected upon entry of the Interim DIP Order (and, when entered, the Final DIP Order) without the necessity of the execution or recordation of filings by any Note Party of security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent of, or over, any Collateral, as set forth in the Interim DIP Order and, when entered, the Final DIP Order; provided that for the avoidance of doubt, each such Lien shall be subject to the Carve-Out in all respects.

**Section 2.**    SALE AND PURCHASE OF NOTES.

**Section 2.1.    Issuance of Notes.**

Subject to the terms and conditions of this Agreement and the DIP Orders, (a) the Company will issue and sell to each Purchaser and each Purchaser will purchase from the Company, at each Closing, provided for in Section 3, the corresponding New Money DIP Notes to be issued in accordance with its applicable New Money DIP Commitment and (b) the Company and each Purchaser (who is a Prepetition Noteholder) will agree to exchange on a cashless basis, at the Initial Closing, 100% of the Prepetition A&R Notes and/or Prepetition Bridges Notes, as applicable, held by such Purchaser for an equivalent amount of Roll-Up A&R Notes and/or Roll-Up Bridge Notes, as applicable (i.e., each $1.00 of Prepetition Notes (which, for the avoidance of doubt, shall include all outstanding principal, accrued and unpaid fees, premiums and interest (including any interest to be paid in kind to the extent not yet capitalized as additional principal) thereunder) shall be exchanged for $1.00 of the applicable Roll-Up DIP Notes); *provided* that the aggregate principal amount of the Notes of each Series to be purchased or exchanged, as applicable, by each Purchaser hereunder at the respective Closing shall not exceed the principal amount specified opposite the applicable Commitment for such Purchaser's name in Schedule 2.01 for such Series. The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**Section 2.2.    Fees and Payments.**

(a)    The Company hereby agrees (i) on the Initial Closing Date, to pay each Purchaser an upfront payment (the "**Upfront Payment**") in an amount equal to 4.00% of the aggregate amount of such Purchaser's DIP First Draw Commitments and DIP Second Draw Commitments on the Initial Closing Date, which shall be fully earned and payable in kind (by automatically capitalizing and increasing the outstanding principal amount of the DIP First Draw Notes issued on the Initial Closing Date), subject to entry of the Interim DIP Order and (ii) on each Delayed Draw Closing Date, to pay each Purchaser a funding payment (the "**Funding Payment**") in an amount equal to 4.00% of the aggregate amount of DIP Delayed Draw Notes purchased by such Purchaser, which shall be fully earned and payable in kind (by automatically capitalizing and increasing the outstanding principal amount of the DIP Delayed Draw Notes issued on such Delayed Draw Closing Date) on such Delayed Draw Closing Date.

(b)    The Company hereby agrees on the earlier of (i) the Maturity Date and (ii) any other date of repayment or prepayment of the New Money DIP Notes (including following an acceleration or Mandatory Prepayment thereof, or any satisfaction of such New Money DIP Notes in respect of a credit bid in any sale or disposition of Collateral), to pay each Purchaser or holder, on a pro rata basis, an exit premium (the "**Exit Premium**" and together with the Upfront Payment and the Funding Payment, the "**DIP Payments**")) in an amount equal to 8.00% of the principal amount of New Money DIP Notes so prepaid, repaid, accelerated, satisfied or otherwise maturing on such date and shall be fully earned and payable in cash; *provided* that if any such New Money DIP Notes are repaid pursuant to a credit bid in accordance with the Stalking Horse APA, the Exit Premium shall be reduced to 5.00% of the principal amount of the New Money DIP Notes so repaid on such date and shall be fully earned and payable in kind (by automatically

-3-

capitalizing and increasing the outstanding principal amount of such New Money DIP Notes being repaid). For the avoidance of doubt and notwithstanding anything to the contrary herein, any Exit Premium or any Prepayment Premium shall not apply to any repayment or prepayment of the Roll-Up DIP Notes.

(c)     The Company agrees to pay the Collateral Agent, for its own account, the fees set forth in the Agency Fee Schedule (all such fees, the "**Agency Fee**").

(d)     The DIP Payments and the Agency Fee, once earned and paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances. The DIP Payments and the Agency Fee shall be (a) paid free and clear of any set-off or counterclaims, and shall not otherwise be affected by any claim or dispute relating to any other matter, (b) made without deduction or withholding for any taxes, levies, imposts, duties or charges imposed by any federal, national, state or local taxing authority, (c) unless payable in kind in accordance to the terms hereunder, be paid in United States Dollars in immediately available funds and (d) separate and apart from, and in addition to, any other fees, expenses or other amounts payable to the Purchasers or holders and their Affiliates and funds or managed accounts advised by it and its Affiliates, and their or their representatives, pursuant to the Financing Documents. The Purchasers and holders reserve the right to allocate, in whole or in part, to their Affiliates the DIP Payments payable to them hereunder in such manner as they and such Affiliates shall agree in their sole discretion.

**Section 3.     CLOSING.**

**Section 3.1.     Effectiveness.**  The effectiveness of this Agreement shall occur on such day as is designated by the Company within three (3) Business Days after the Interim DIP Order Entry Date, subject to the conditions precedent in <u>Section 4.1</u> being satisfied or waived (such date, the "**Initial Closing Date**").

**Section 3.2.     Closings.**  The sale and purchase of each Series of New Money DIP Notes to be purchased by each Purchaser and the exchange by each Purchaser (who is a Prepetition Noteholder) of the Prepetition Notes for the Roll-Up DIP Notes shall occur at the offices of Milbank LLP, 55 Hudson Yards, New York, NY 10001-2163, at 9:00 a.m., New York time, at a closing (i) on the Initial Closing Date, with respect to the purchase of DIP First Draw Notes and the exchange for Roll-Up DIP Notes, subject to the conditions precedent in <u>Section 4.1</u> being satisfied or waived (such closing, the "**Initial Closing**"), (ii) on the Second Draw Closing Date, with respect to the purchase of the DIP Second Draw Notes, subject to the conditions precedent in <u>Section 4.2</u> being satisfied or waived (such closing, the "**Second Draw Closing**") or (iii) on any Delayed Draw Closing Date, with respect to the purchase of DIP Delayed Draw Notes, subject to the conditions precedent in <u>Section 4.1</u> or <u>Section 4.2</u>, as applicable, being satisfied or waived (any such closing, a "**Delayed Draw Closing**");

(a)     **Initial Closing Date; Roll-Up**. On the Initial Closing Date, (i) the Company will deliver to each Purchaser (who is a Prepetition Noteholder) the applicable Roll-Up DIP Notes to be exchanged with such Purchaser in the form of a single Roll-Up A&R Note and/or a single Roll-Up Bridge Note, as applicable, (or such greater number of the applicable Roll-Up DIP Notes, in denominations of at least $100,000 as such Purchaser may request) dated the date of

-4-

the Initial Closing Date and registered in such Purchaser's name, and (1) upon receipt by such Purchaser of the Roll-Up DIP Notes, such Purchaser shall be deemed to have exchanged its Prepetition Notes for Roll-Up DIP Notes in the aggregate principal amount thereof and (2) upon the exchange by each Purchaser (who is a Prepetition Noteholder) for the Roll-Up DIP Notes as described in this Section 3.2, the Prepetition Notes shall be deemed surrendered and canceled in accordance with Section 8.5 and (ii) the Company will deliver to each Purchaser the DIP First Draw Notes to be purchased by such Purchaser in the form of a single New Money DIP Note (or such greater number of New Money DIP Notes in denominations of at least $100,000 as such Purchaser may request) dated the date of the Initial Closing Date and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Collateral Agent of an instruction to transfer funds in the amount of the purchase price therefor in accordance with such instruction. If at the Initial Closing, the Company shall fail to tender such DIP First Draw Notes to any Purchaser as provided in this Section 3.2, or any of the conditions specified in Section 4.1 shall not have been fulfilled (or waived) to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement with respect to such DIP First Draw Notes, without thereby waiving any rights such Purchaser may have by reason of such failure by the Company to tender such DIP First Draw Notes or any of the conditions specified in Section 4.1 not having been fulfilled to such Purchaser's satisfaction. No Purchaser shall be required to purchase DIP First Draw Notes and/or exchange for Roll-Up DIP Notes in excess of such Purchaser's DIP First Draw Commitment and/or Roll-Up DIP Commitment, as applicable. All DIP First Draw Commitments and Roll-Up DIP Commitments shall automatically and permanently terminate upon the issuance of the DIP First Draw Notes and Roll-Up DIP Notes on the Initial Closing Date.

(b) **Second Draw Closing**. On the Second Draw Closing Date, the Company will deliver to each Purchaser the DIP Second Draw Notes to be purchased by such Purchaser in the form of a single New Money DIP Note (or such greater number of New Money DIP Notes in denominations of at least $100,000 as such Purchaser may request) dated the date of the Second Draw Closing Date and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Collateral Agent of an instruction to transfer funds in the amount of the purchase price therefor in accordance with such instruction. If at the Second Draw Closing, the Company shall fail to tender such DIP Second Draw Notes to any Purchaser as provided in this Section 3.2, or any of the conditions specified in Section 4.2 shall not have been fulfilled (or waived) to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement with respect to such DIP Second Draw Notes, without thereby waiving any rights such Purchaser may have by reason of such failure by the Company to tender such DIP Second Draw Notes or any of the conditions specified in Section 4.2 not having been fulfilled to such Purchaser's satisfaction. No Purchaser shall be required to purchase DIP Second Draw Notes in excess of such Purchaser's DIP Second Draw Commitment. All DIP Second Draw Commitments shall automatically and permanently terminate upon the issuance of the DIP Second Draw Notes on the Second Draw Closing Date. Notwithstanding anything to the contrary herein, solely to the extent required to effectuate a credit bid submitted by Newco pursuant to the Stalking Horse APA or an amendment thereto, the undrawn DIP First Draw Commitment and DIP Second Draw Commitments shall become available upon the closing of such Sale notwithstanding the Note Parties' inability to satisfy the conditions precedent specified in Section 4.1 and/or Section 4.2.

-5-

(c)        **Delayed Draw Closing**.  On each Delayed Draw Closing Date, the Company will deliver to each Purchaser the DIP Delayed Draw Notes to be purchased by such Purchaser in the form of a single New Money DIP Note (or such greater number of New Money DIP Notes in denominations of at least $100,000 as such Purchaser may request) dated the date of such Delayed Draw Closing Date and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Collateral Agent of an instruction to transfer funds in the amount of the purchase price therefor in accordance with such instruction.  If at such Delayed Draw Closing, the Company shall fail to tender such DIP Delayed Draw Notes to any Purchaser as provided in this <u>Section 3.2</u>, or any of the conditions specified in <u>Section 4.1</u> or <u>Section 4.2</u>, as applicable, shall not have been fulfilled (or waived) to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement with respect to such DIP Delayed Draw Notes, without thereby waiving any rights such Purchaser may have by reason of such failure by the Company to tender such DIP Delayed Draw Notes or any of the conditions specified in <u>Section 4.1</u> or <u>Section 4.2</u>, as applicable, not having been fulfilled to such Purchaser's satisfaction.  No Purchaser shall be required to purchase DIP Delayed Draw Notes in excess of such Purchaser's available DIP Delayed Draw Commitment.  On the Maturity Date, all remaining DIP Delayed Draw Commitments shall automatically terminate.

**Section 4.        CONDITIONS TO INITIAL CLOSING.**

**Section 4.1.    Conditions to the Initial Closing.**  The occurrence of the Initial Closing and each Delayed Draw Closing before entry of the Final DIP Order are subject to the fulfillment to such Purchaser's satisfaction or waiver, prior to or at the Initial Closing Date, of the following conditions in this <u>Section 4.1</u>.

(a)        <u>Representations and Warranties</u>.  The representations and warranties of each Note Party in this Agreement and each of the other Financing Documents to which any Note Party is a party shall be true and correct in all respects (except such representations and warranties that by their terms are qualified by materiality or a material adverse effect, which representations and warranties shall be true and correct in such respects) on and as of the date of the Initial Closing Date (or to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date).

(b)        <u>Reserved</u>.

(c)        <u>Opinions</u>. The Collateral Agent and the Purchasers shall have received opinions in form and substance satisfactory to the Collateral Agent and the Purchasers and addressed to the Collateral Agent, the Purchasers and the holders of the Notes, dated the Initial Closing Date, (i) from Latham & Watkins LLP, New York counsel for the Note Parties and [(ii) from Blanco Tackabery, North Carolina counsel for the Note Parties]; *provided* that such opinions shall include, without limitation, the enforceability, validity, and perfection of the Liens on the Collateral of the non-Debtor Guarantors.

(d)        <u>Financing Documents</u>.  The Collateral Agent and the Purchasers shall have received from (i) the Company a counterpart (either originally executed or a .pdf file) of this Agreement and each other Financing Document, and (ii) each Guarantor a counterpart (either originally

-6-

executed or a .pdf file) of each Financing Document; *provided* that upon entry of the Interim DIP Order (and, if entered, the Final DIP Order), the Collateral Agent shall have valid and automatically perfected security interests as set forth in the DIP Orders, and no filing or other action will be necessary to perfect or protect such security interests with respect to the Debtors' obligations under the Financing Documents and such DIP Order; *provided* that, to the extent the Company shall have made reasonable best efforts to negotiate, agree and deliver this Agreement and the Security Agreement, in each case in form and substance mutually agreed between the Required Holders and the Company, but such definitive documentation cannot be finalized prior to the entry of the Interim DIP Order, this condition precedent shall be satisfied provided that the Interim DIP Order has been entered by the Bankruptcy Court and the DIP Commitment Letter remains in full force and effect

(e)    Secretary's Certificate.  The Collateral Agent and the Required Holders shall have received a copy of (i) each organizational document of each Note Party certified, to the extent applicable, by the applicable governmental authority, (ii) signature and incumbency certificates of the responsible officers, directors, authorized signatories or attorneys-in-fact of each Note Party executing the Financing Documents to which it is a party, (iii) resolutions of the applicable board and/or similar governing bodies of each Note Party approving and authorizing the execution, delivery and performance of the Financing Documents to which it is a party, certified as of the Initial Closing Date by its secretary, an assistant secretary, director, authorized signatory, attorney-in-fact or a responsible officer or board member as being in full force and effect without modification or amendment, in a form reasonably acceptable to the Required Holders;

(f)    Collateral Documents.  The Note Parties shall have used commercially reasonable efforts to complete on or prior to the Initial Closing Date the relevant perfection steps contemplated under the Security Documents delivered on the Initial Closing Date; *provided*, that, upon entry of the Interim DIP Order (and, if entered, the Final DIP Order), the Collateral Agent shall have valid and automatically perfected security interests as set forth in the DIP Orders, and no filing or other action will be necessary to perfect or protect such security interests with respect to the Debtors' obligations under the Financing Documents and such DIP Order.

(h)    Closing Date Certificate.  The Purchasers and the Collateral Agent shall have received a certificate, dated the Initial Closing Date and signed by a Responsible Officer of the Company, confirming compliance with the conditions set forth in clauses (a), (i), (j), (r), (s), and (t) of this Section 4.1, in a form acceptable to the Required Holders.

(i)    Material Adverse Effect.  Since October 6, 2025, no event, circumstance or change shall have occurred or be continuing that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect (other than as a result of the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, including any decline in business relationships, reputation, or financial performance resulting from the Chapter 11 filing).

(j)    No Default or Event of Default.  At the time of and immediately after giving effect to the Initial Closing, (x) no Default or Event of Default shall have occurred and be continuing, and (y) no default or event of default (other than pursuant to 11(g) of the Prepetition Note Purchase Agreement solely as a result of the commencement of the Chapter 11 Cases) shall have occurred and be continuing under the Prepetition Note Purchase Agreement.

-7-

(k)    Know-Your-Customer Deliverables.  The Purchasers and the Collateral Agent shall have received such information and documents as shall have been reasonably requested by such Purchaser or the Collateral Agent (as applicable), in writing at least three (3) Business Days prior to the Closing Date to allow such Purchaser and the Collateral Agent (as applicable) to comply with Applicable Law and related internal procedures relating to "know your client," as well as "anti-money laundering" and "anti-terrorist financing" requirements, including the USA Patriot Act, that such Purchaser is obligated to undertake as a condition precedent prior to executing this Agreement.

(l)    Budget.  The Purchasers and the Collateral Agent shall have received the initial budget, in form and substance satisfactory to the Required Holders and such initial budget shall be agreed as the Initial Approved Budget and attached hereto as Schedule C.  It is agreed and understood that the budget approved in accordance with the terms of the Prepetition Note Purchase Agreement as in effect immediately prior to the Petition Date may be the Initial Approved Budget in satisfaction of this condition precedent and shall constitute the Initial Approved Budget until the earlier of the expiration of the period covered by such Initial Approved Budget and the date such Initial Approved Budget is replaced pursuant to the terms of the Financing Documents.

(n)    Fees and Payments. The Purchasers and the Collateral Agent shall have received (x) all fees and DIP Payments payable to the Collateral Agent or any Purchaser, respectively, on or prior to the Initial Closing Date and (y) to the extent invoiced, all other amounts due and payable pursuant to the Financing Documents on or prior to the Initial Closing Date, including, to the extent invoiced at least one (1) Business Day prior to the Initial Closing Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of the DIP Secured Parties Advisors) required to be reimbursed or paid by the Note Parties hereunder or under any Financing Document.

(o)    Fee Letter. The Company shall have entered into a fee letter with the Collateral Agent.

(p)    Interim DIP Order.  The Interim DIP Order shall have been approved and entered by the Bankruptcy Court, which Interim DIP Order shall be in form and substance acceptable to the Required Holders and the Collateral Agent (solely with respect to its own treatment) and shall not have been modified or amended in any respect without the consent of the Collateral Agent (solely with respect to its own treatment) and the Required Holders. The Note Parties and their Subsidiaries shall be in compliance with the Interim DIP Order.

(q)    First Day Orders.  (i) The Purchasers and the Collateral Agent shall have received advanced drafts of the First Day Orders to be entered by the Bankruptcy Court in respect of the first day motions and applications in respect of the Chapter 11 Cases (the "**First Day Motions**") (including, without limitation, any order approving significant or outside the ordinary course of business transactions entered on (or prior to) the Closing Date and a Cash Management Order) and a list of critical vendors (which for the avoidance of doubt may only be paid in accordance with the Approved Budget), and the forms of the First Day Motions filed in the Chapter 11 Cases shall be, in each case, in form and substance satisfactory to the Required Holders and the Collateral Agent (solely with respect to its own treatment), and (ii) except as would not adversely affect the Required Holders, the Collateral Agent, or the Prepetition Secured Parties, all First Day Orders

-8-

intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" hearing shall have been entered by the Bankruptcy Court, shall be reasonably acceptable to the Required Holders and the Collateral Agent (solely with respect to its own treatment), and shall be in full force and effect.

(r)     Petition Date.  The Petition Date shall have occurred, and the Company and each Guarantor (subject to exceptions as agreed among the Required Holders and the Company) shall be a "debtor" and a "debtor-in-possession" in the Chapter 11 Cases.

(s)     No Trustee.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(t)     Chapter 11 Cases.  None of the Chapter 11 Cases of any of the Debtors shall have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(u)     Transaction Funds Flow.  The Collateral Agent shall have received a funds flow agreement relating to the Notes and the transactions contemplated thereby in form and substance reasonably satisfactory to the Required Holders and duly executed by the Company, the Collateral Agent and the other parties thereto.

(v)     Stalking Horse APA.  The Debtors shall not be in breach of the applicable Milestone regarding entry into the Stalking Horse APA, and if the Stalking Horse APA shall have been executed at the Initial Closing Date, it shall be in form and substance acceptable to the Required Holders and remain in full force and effect, and no facts or circumstances shall exist that shall permit the purchaser thereunder to terminate the Stalking Horse APA, either through the giving of notice, the passage of time, or both.

(w)     Additional DIP Facilities.  The Debtors shall have entered into and received commitments for debtor-in-possession financing under one or more Additional DIP Facilities in an amount of no less than $198,718,186.48 which Additional DIP Facilities shall be in each case on terms and conditions reasonably acceptable to the Required Holders (it being agreed and understood that such Additional DIP Facilities on terms substantially similar to the term sheets attached to the commitment letters executed by the Debtors with Brookfield and Fundamental on October 6, 2025 and delivered to the Required Holders before execution of the DIP Commitment Letter, without giving effect to any subsequent modifications to such other commitment letters, are reasonably acceptable) and shall be approved by an interim order of the Bankruptcy Court (which may be the Interim DIP Order) in form and substance reasonably acceptable to the Required Holders, each of the Additional DIP Facilities shall remain in full force and effect, and no default or event of default shall exist thereunder, and substantially concurrently with the Initial Closing Date the Debtors shall have borrowed the full initial amount then intended to be available under the Additional DIP Facilities.

(x)     ACT Transactions.  Any indebtedness of ACT or any liens securing indebtedness for borrowed money on ACT or the equity or assets of ACT, including in the form of debtor-in-possession financing, incurred in connection with or in anticipation of the Chapter 11 Cases shall have been incurred on terms and conditions and funded by counterparties reasonably acceptable

to the Required Holders (it being understood that any refusal to consent shall be deemed reasonable if such financing provides for milestones, events of default, or the ability of the lender to exercise remedies, in each case prior to the consummation of the Sale, or if the financing is provided by parties with existing investments in the Company or its subsidiaries or affiliates), and any asset purchase agreement or similar agreement or transaction providing for a sale of ACT (or the assets or equity thereof) shall have been entered into on terms and conditions and with a counterparty or counterparties reasonably acceptable to the Required Holders or provide for all Obligations (including Roll-Up DIP Notes) and Prepetition Secured Obligations to be Paid in Full upon consummation of such sale (it being understood that any refusal to consent shall be deemed reasonable (A) if the disposition is proposed to occur before consummation of the sale pursuant to the Stalking Horse APA, (B) if the Required Holders in good faith determines that such disposition could adversely affect the ACT's ability to provide operation and maintenance services provided to the Carlyle Silo Entities (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Company or its subsidiaries or affiliates).

(y)     Project Senior Financing Consents.  The Debtors shall have used reasonable best efforts to obtain the Project Senior Financing Consents on or before the Initial Closing Date.

(z)     Aggregate Amount.  The aggregate amount of the Notes after giving effect to the funding and issuance of the DIP First Draw Notes and the exchange for and issuance of Roll-Up DIP Notes shall not exceed the amount of the DIP First Draw Commitments and Roll-Up DIP Commitments immediately prior to the Initial Closing Date.

(aa)     Funding Instructions.  Each Purchaser and the Collateral Agent shall have received at least one (1) business day prior to the Initial Closing Date a Notice of Drawing in substantially the form of Schedule 4.2(h) (the "**Notice of Drawing**") signed by a Responsible Officer of the Company, setting forth the following information setting forth the following information for such Series:

(i)     the requested Closing Date for such Series, which shall be on a date set forth in Schedule 3.2;

(ii)     the Series number (differentiated from all previous Series by sequential alphabetical designation inscribed thereon); and

(iii)     an estimate of the requested principal amount of Notes for such Series.

(bb)     Organizational Documents.  The organizational documents of the Note Parties shall not have been amended to (i)(a) impair the rights of the Independent Manager or (b) provide that such Independent Manager may be removed or replaced without the prior written consent of the Required Holders, unless and until all Prepetition Secured Obligations and Obligations have been fully repaid in cash or (ii) no longer prohibit any election or other action which is inconsistent with treating any subsidiary of PGR Development, LLC (other than any entity that is a partnership for tax purposes between an Affiliate of Company and an unrelated third-party tax equity investor) (collectively, the "**Disregarded Subsidiaries**") as disregarded entities.

-10-

**Section 4.2. Conditions to the Second Draw Closing and Delayed Draw Closings After Entry of Final DIP Order.**  In respect of the Second Draw Closing and each Delayed Draw Closing occurring from and after entry of the Final DIP Order, each Purchaser's obligation to purchase and pay for the applicable Notes to be sold to such Purchaser at each such Closing is subject to the fulfillment to the Required Holders' satisfaction or waiver, prior to or at the relevant Closing, of the following conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of each Note Party in this Agreement and each of the other Financing Documents to which any Note Party is a party shall be true and correct in all respects (except such representations and warranties that by their terms are qualified by materiality or a material adverse effect, which representations and warranties shall be true and correct in such respects, or, to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date), taking into account the commencement of the Chapter 11 Cases and continuation and prosecution thereof, and except to the extent such representations or warranties are false or incorrect as a result of a breach, default, event or condition of which the Required Holders have been informed and have otherwise waived.

(b)    <u>No Default</u>.  Immediately before and after giving effect to the issue and sale of the Notes to be made on such date (and the application of the proceeds thereof as contemplated by <u>Section 5.14</u>), no Default or Event of Default shall have occurred and be continuing or would result therefrom.

(c)    <u>Initial Closing Date</u>.  The conditions precedent in <u>Section 4.1</u> shall have been satisfied or waived in accordance with the Financing Documents and the DIP First Draw Notes and the Roll-Up DIP Notes shall have been issued.

(d)    <u>Purchase Permitted by Applicable Law, Etc</u>. On the date of the applicable Closing such Purchaser's purchase of Notes shall (a) be permitted by the laws and regulations of each jurisdiction to which such Purchaser is subject, without recourse to provisions (such as section 1405(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment, (b) not violate any Applicable Law or regulation (including Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (c) not subject such Purchaser to any tax, penalty or liability under or pursuant to any Applicable Law or regulation, which law or regulation was not in effect on the date hereof. If requested by such Purchaser, such Purchaser shall have received an Officer's Certificate certifying as to such matters of fact as such Purchaser may reasonably specify to enable such Purchaser to determine whether such purchase is so permitted.

(e)    [Reserved].

(f)    <u>Payment of Fees</u>.  Without limiting <u>Section 15.1</u>, the Company shall have paid all reasonable and documented fees, costs, disbursements and expenses that are due and payable or otherwise required to be reimbursed to the Collateral Agent or the Purchasers, in each case, to the extent invoiced on or prior to the date that is three (3) Business Days prior to the Second Draw Closing Date or the relevant Delayed Draw Closing Date (subject to any limitations provided by the Bankruptcy Court) .

-11-

(g)     Funding Instructions.     Each Purchaser and the Collateral Agent shall have received at least one (1) Business Day prior to the Second Draw Closing Date or applicable Delayed Draw Closing Date, a Notice of Drawing in substantially the form of Schedule 4.2(h) (the "**Notice of Drawing**") signed by a Responsible Officer of the Company, setting forth the following information setting forth the following information for such Series:

(i)     the requested Closing Date for such Series, which shall be on a date set forth in Schedule 3.2;

(ii)     the Series number (differentiated from all previous Series by sequential alphabetical designation inscribed thereon); and

(iii)     an estimate of the requested principal amount of Notes for such Series.

(h)     No Material Adverse Effect. Since October 6, 2025, no event, circumstance or change shall have occurred or be continuing that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect (other than as a result of the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, including any decline in business relationships, reputation, or financial performance resulting from the Chapter 11 filing).

(i)     Officer's Certificate. The Company shall have delivered to each holder of Notes a certificate signed by a Responsible Officer certifying that (i) the proceeds of such Closing be used in accordance with the Approved Budget, (ii) unless specifically identified to the holders of the Notes in the Notice of Drawing or accompanying documentation and in the Approved Budget in a separate line item and consented to by the Required Holders, no proceeds of such Closing will be transferred to a Restricted Party, and (iii) no Default or Event of Default shall have occurred and be continuing or would result from such Closing and (iv) the Carlyle Silo Entities and Shared Collateral Entities have used commercially reasonable efforts to comply with the Collateral and Guarantee Requirement.

(j)     Reserved.

(k)     Final DIP Order.  With respect to the Second Draw Closing, the Final DIP Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Required Holders and the Collateral Agent (solely with respect to its own treatment) and shall not have been modified or amended in any respect without the consent of the Collateral Agent (solely with respect to its own treatment) and the Required Holders, and the Note Parties and their Subsidiaries shall be in compliance with the Final DIP Order.

(l)     Interim DIP Order.  With respect to each Delayed Draw Closing, the Interim DIP Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Required Holders and the Collateral Agent (solely with respect to its own treatment) and shall not have been modified or amended in any respect without the consent of the Collateral Agent (solely with respect to its own treatment) and the Required Holders, and the Note Parties and their Subsidiaries shall be in compliance with the Interim DIP Order (or the Final DIP Order, if it has been entered and approved by the Bankruptcy Court).

-12-

(m)    Second Day Orders.  (i) All material "second day orders" (the "**Second Day Orders**") and all related proposed orders intended to be entered on or prior to the date of entry of the Final DIP Order and any order establishing material procedures for the administration of the Chapter 11 Cases (the "**Second Day Motions**"), shall have been entered by the Bankruptcy Court, and (ii) all proposed orders and other pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be satisfactory in form and substance to the Required Holders.

(n)    Chapter 11 Cases.  None of the Chapter 11 Cases of any of the Debtors shall have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(o)    Trustee.  No Trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(p)    Aggregate Amount.  (i) With respect to the Second Draw Closing Date, the aggregate amount of the DIP Second Draw Notes funded and issued shall not exceed the amount of DIP Second Draw Commitments immediately prior to the Second Draw Closing Date or (ii) with respect to any Delayed Draw Closing Date, the aggregate amount of DIP Delayed Draw Notes funded and issued shall not exceed the available DIP Delayed Draw Commitments immediately prior to any such Delayed Draw Closing Date.

(q)    Stalking Horse APA.  The Milestone regarding entry into the Stalking Horse APA shall have been satisfied, and the Stalking Horse APA shall remain in full force and effect and no facts or circumstances shall exist that shall permit the purchaser thereunder to terminate the Stalking Horse APA, either through the giving of notice, the passage of time, or both.

(r)    Additional DIP Facilities.  Each of the Additional DIP Facilities shall remain in full force and effect and no default or event of default shall exist thereunder, and substantially concurrently with the Second Draw Closing or any Delayed Draw Closing, the Debtors shall have borrowed the full amount intended to be available under the Additional DIP Facilities on or after entry of the final order approving such Additional DIP Facilities.

(s)    ACT Transactions.    Any Indebtedness of ACT or any Liens securing Indebtedness for borrowed money on ACT or the equity or assets of ACT, including in the form of debtor-in-possession financing, incurred in connection with or in anticipation of the Chapter 11 Cases shall have been incurred on terms and conditions and funded by counterparties reasonably acceptable to the Required Holders (it being understood that any refusal to consent shall be deemed reasonable if such financing provides for milestones, events of default, or the ability of the lender to exercise remedies, in each case prior to the consummation of the Sale, or if the financing is provided by parties with existing investments in the Company or its subsidiaries or affiliates), and any asset purchase agreement or similar agreement or transaction providing for a sale of ACT (or the assets or equity thereof) shall have been entered into on terms and conditions and with a counterparty or counterparties reasonably acceptable to the Required Holders or provide for all Obligations (including Roll-Up DIP Notes) and Prepetition Secured Obligations to be Paid in Full upon consummation of such sale (it being understood that any refusal to consent shall be deemed reasonable (A) if the disposition is proposed to occur before

-13-

consummation of the sale pursuant to the Stalking Horse APA, (B) if the Required Holders in good faith determines that such disposition could adversely affect the ACT's ability to provide operation and maintenance services provided to the Carlyle Silo Entities (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Company or its Subsidiaries or Affiliates).

(t)      <u>Project Senior Financing Consents</u>.  The Debtors shall have continued to use reasonable best efforts to obtain the Project Senior Financing Consents on or before such Second Draw Closing or Delayed Draw Closing.

(u)      <u>Existing Services Agreement</u>.  The Existing Services Agreement Assumption Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Required Holders and shall not have been modified or amended in any respect without the consent of the Required Holders, the Note Parties and their Subsidiaries (as applicable) shall be in compliance with the Existing Services Agreement Assumption Order and the Existing Services Agreements, and the Existing Services Agreements shall not have been terminated and shall be in full force and effect.

(v)      <u>Transition Services Agreement</u>.  The Note Parties and their Subsidiaries (as applicable) shall be in compliance with the Transition Services Agreement and the Transition Services Agreement shall not have been terminated and shall be in full force and effect.

(w)      <u>Delayed Draw Closings</u>.  In the case of each Delayed Draw Closing, which shall be funded at the Required Holders' sole discretion, (x) the proceeds of such DIP Delayed Draw Notes shall be used to make contemporaneous payments in respect of construction and development or other expenses of the Carlyle Silo Entities that are, in each case, acceptable to the Required Holders in its sole discretion, and (y) the Required Holders shall be satisfied in its sole discretion that the Debtors have first used reasonable best efforts to instead draw all available letters of credit, surety bonds, or similar instruments for Project Costs or otherwise for the benefit of the Carlyle Silo Entities to fund such expenses.

(x)      <u>Organizational Documents</u>.  The organizational documents of the Note Parties shall not have been amended to (i)(a) impair the rights of the Independent Manager or (b) provide that such Independent Manager may be removed or replaced without the prior written consent of the Required Holders, unless and until all Prepetition Secured Obligations and Obligations have been fully repaid in cash or (ii) no longer prohibit any election or other action which is inconsistent with treating any Subsidiary of Company (other than any entity that is a partnership for tax purposes between an Affiliate of Company and an unrelated third-party tax equity investor) as disregarded entities.

Notwithstanding anything to the contrary herein, solely to the extent required to effectuate a credit bid submitted by Newco pursuant to the Stalking Horse APA or an amendment thereto, the undrawn DIP First Draw Commitment and DIP Second Draw Commitments shall become available upon the closing of such Sale notwithstanding the Note Parties' inability to satisfy the conditions precedent specified in <u>Section 4.1</u> and/or <u>Section 4.2</u>.

-14-

**Section 5.      REPRESENTATIONS AND WARRANTIES.**

The Company represents and warrants to each Purchaser and the Collateral Agent that, as of the date hereof and as of each Closing (or, for those representations and warranties that are made only as of a particular date, as of such date):

**Section 5.1.    Organization; Power and Authority**.  Each Note Party and, each Subsidiary of the Company (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified as a foreign limited liability company authorized to do business and in good standing in each jurisdiction in which its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified or in good standing in such other jurisdiction could not reasonably be expected to have a Material Adverse Effect and (c) subject in the case of the Debtors to the entry of the DIP Orders and the terms thereof, has the limited liability company power and authority to (A) own or hold under lease the properties it purports to own or hold under lease, (B) transact the business it transacts and proposes to transact, (C) execute, deliver and perform its obligations under any Financing Document to which it is a party or by which it is bound and (D) grant the liens and security interests provided for in any Security Documents to which it is a party.

**Section 5.2.    Authorization, Etc.** Subject to the entry of the DIP Orders and terms thereof, the Financing Documents to which each Note Party is a party have been duly authorized by all necessary limited liability company action on the part of such Note Party and each Financing Document to which it is a party constitutes a legal, valid and binding obligation of such Note Party enforceable against such Note Party in accordance with its terms, except as such enforceability may be limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (b) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 5.3.    Disclosure**.  This Agreement and the documents, certificates or other writings delivered to the Purchasers by or on behalf of the Company prior to the Initial Closing Date in connection with the transactions contemplated hereby and identified in Schedule 5.3 (this Agreement and such documents and certificates or other writings delivered to each Purchaser being referred to, collectively, as the "**Disclosure Documents**"), taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made.  Except as disclosed in the Disclosure Documents, since the Petition Date, there has been no change in the financial condition, operations, business, properties or prospects of the Company and its Subsidiaries except changes that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  There is no fact known to the Company that could reasonably be expected to have a Material Adverse Effect that has not been set forth herein or in the Disclosure Documents.

**Section 5.4.    Organization and Ownership of Shares of Subsidiaries; Affiliates**.

-15-

(a)       Schedule 5.4 contains (except as noted therein) complete and correct lists of (i) the Company's Subsidiaries, showing, as to each Subsidiary, the name thereof, the jurisdiction of its organization, the percentage of shares of each class of its Capital Stock or similar equity interests outstanding owned by the Company, an Operating Project HoldCo and each other Subsidiary, and whether it is a Pledged Subsidiary, an Encumbered Subsidiary or a Project Company, and (ii) the Company's officers.

(b)       All of the outstanding shares of Capital Stock or similar equity interests of each Subsidiary shown in Schedule 5.4 as being owned by the Company, an Operating Project HoldCo and their respective Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by the Company or another Subsidiary free and clear of any Lien other than Permitted Liens.

(c)       No Subsidiary is subject to any legal, regulatory, contractual or other restriction (other than the agreements listed on Schedule 5.3, restrictions imposed under any applicable Solar Development Project Financing Facility and customary limitations imposed by limited liability company law, corporation law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions of profits to the Company, an Operating Project HoldCo or any of their respective Subsidiaries that owns outstanding shares of Capital Stock or similar equity interests of such Subsidiary.

(d)       Each direct and indirect Subsidiary of the Persons set forth on Schedule 4.1(h) is managed by a member, either as the manager of a manger-managed limited liability company or as the sole member of a member-managed limited liability company.

(e)       No Person that directly or indirectly owns any Project Company and that is also a Subsidiary of the Company has not granted a Lien in favor of the Collateral Agent pursuant to a Security Document, except any such Person that is subject to an Encumbrance Restriction or that is prohibited from granting such Lien as set forth in any Security Document.

Section 5.5.    Material Liabilities.  As of the Initial Closing Date, the Company and its Subsidiaries do not have any Material liabilities that are not disclosed in the Disclosure Documents and there are no pending or threatened litigation or proceeding asserting a Material liability with respect to any Carlyle Silo Entity to the extent that such liability is not dischargeable under section 1141 of the Bankruptcy Code or a material asset cannot be sold free and clear of such liability under section 363(f) of the Bankruptcy Code.

Section 5.6.    Compliance with Laws, Other Instruments, Etc.  Subject to the entry of the DIP Orders and terms thereof, the execution, delivery and performance by the Company of the Financing Documents to which it is a party will not (a) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien (other than the Liens created pursuant to the Security Documents) in respect of any property of the Company or any applicable Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, its Organizational Documents or any other material agreement or instrument to which the Company or any Subsidiary is a party or by which Company or any Subsidiary or any of their respective properties may be bound or affected, (b) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court,

-16-

arbitrator or Governmental Authority applicable to the Company or any Subsidiary, or (c) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Company or any Subsidiary (other than violations arising as a result of the commencement of the Chapter 11 Cases and except as otherwise excused by the Bankruptcy Court).

**Section 5.7.    Governmental Authorizations, Etc.**

(a)      Subject to the entry of the DIP Orders and terms thereof, the Company and each Subsidiary is in compliance in all material respects with all Governmental Approvals applicable to it.

(b)      Subject to the entry of the DIP Orders and terms thereof, all Governmental Approvals which are required to be obtained by the Company in connection with the issuance and sale of the Notes and the execution and delivery by the Company of, and performance by the Company of its obligations under, the Financing Documents have been duly obtained, were validly issued, are in full force and effect, are not subject to appeal or all applicable appeal periods have expired or will have expired as of the applicable Closing (other than Governmental Approvals which do not have statutory limits on appeal periods), are held in the name of the Company and are free from unsatisfied conditions or requirements, in each case, other than those Governmental Approvals which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)      Subject to the entry of the DIP Orders and terms thereof, all Governmental Approvals which are required to be obtained and maintained in connection with the ownership, construction, and operation by each Project Company of its applicable Project in accordance with Applicable Law and the Material Contracts, other than any such Governmental Approvals not required to be obtained until a later date, have been duly obtained, were validly issued, are in full force and effect, are not subject to appeal or all applicable appeal periods have expired (other than Governmental Approvals which do not have statutory limits on appeal periods), are held in the name of such Project Company, as applicable, and are free from unsatisfied conditions or requirements, in each case, other than those Governmental Approvals which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders**. Except as set forth on Schedule 5.8 and taking into account the commencement of the Chapter 11 Cases and the continuance and prosecution thereof, including any adversary proceedings or contested matters related thereto:

(a)  Other than as a result of the Foley Forbearance Event or the Chapter 11 Cases, there are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting the Prepetition Issuer or any Subsidiary or any property of the Prepetition Issuer or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Other than as a result of the Foley Forbearance Event or the Chapter 11 Cases, neither the Prepetition Issuer nor any Subsidiary is (i) in default under any agreement or instrument to

-17-

which it is a party or by which it is bound other than as a result of a BRP Matter, a Surety Matter, the Foley Forbearance Event or East Atmore Forbearance Event, (ii) in violation of any order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or (iii) in violation of any Applicable Law, ordinance, rule or regulation of any Governmental Authority (including Environmental Laws, the USA PATRIOT Act or any of the other laws and regulations that are referred to in <u>Section 5.16</u>), which default or violation in the case of clauses (i), (ii) and (iii) could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c) Other than the Chapter 11 Cases, there are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting any Carlyle Silo Entity in any court or before any arbitrator of any kind or before or by any Governmental Authority to the extent that (x) such liability is not dischargeable under section 1141 of the Bankruptcy Code or (y) a material asset cannot be sold free and clear of such liability under 363(f) of the Bankruptcy Code.

**Section 5.9.    Taxes**.  Subject to Bankruptcy Law, the terms of the applicable DIP Order and any required approval by the Bankruptcy Court, the Company and its Subsidiaries have filed all tax returns that are required to have been filed in any jurisdiction, and have paid all taxes shown to be due and payable on such returns and all other taxes and assessments levied upon them or their properties, assets, income or franchises, to the extent such taxes and assessments have become due and payable and before they have become delinquent, except for any taxes and assessments (a) the amount of which, individually or in the aggregate, is not Material or (b) the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which the Company or a Subsidiary, as the case may be, has established adequate reserves in accordance with GAAP.  The Company knows of no basis for any other tax or assessment that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of U.S. federal, state or other taxes for all fiscal periods are adequate. Each Subsidiary of PGR Development, LLC, is, and has always been, treated as a disregarded entity for U.S. federal income tax purposes.

**Section 5.10.  Title to Property; Leases**.  Subject to the entry of the DIP Orders and terms thereof, the Company and its Subsidiaries have good and sufficient title to their respective properties that individually or in the aggregate are Material, in each case free and clear of Liens or other encumbrances (other than the Permitted Liens).  Subject to the entry of the DIP Orders and terms thereof, all leases of the Company and its Subsidiaries that individually or in the aggregate are Material are valid and subsisting and are in full force and effect in all material respects.

**Section 5.11.  Licenses, Permits, Etc.**

(a)    The Company and its Subsidiaries own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, that individually or in the aggregate are Material, without known conflict with the rights of others; *provided* that no representation or warranty is made in this <u>Section 5.11</u> with respect to Governmental Approvals.

-18-

(b)      To the knowledge of the Company, no product or service of the Company or any of its Subsidiaries infringes in any material respect any license, permit, franchise, authorization, patent, copyright, proprietary software, service mark, trademark, trade name or other right owned by any other Person. To the knowledge of the Company, there is no Material violation by any Person of any right of the Company or any of its Subsidiaries with respect to any license, permit, franchise, authorization, patent, copyright, proprietary software, service mark, trademark, trade name or other right owned or used by the Company or any of its Subsidiaries.

**Section 5.12.   Compliance with Employee Benefit Plans**.

(a)      The Company does not maintain, sponsor or contribute to any Plan and does not have any ERISA Affiliates.

(b)      The execution and delivery of this Agreement and the issuance and sale of the Notes hereunder will not involve any transaction that is subject to the prohibitions of section 406 of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code.  The representation by the Company to each Purchaser in the first sentence of this Section 5.12(b) is made in reliance upon and subject to the accuracy of such Purchaser's representation in Section 6.2 as to the sources of the funds to be used to pay the purchase price of the Notes to be purchased by such Purchaser.

**Section 5.13.   Private Offering by the Company**.   Neither the Company nor anyone acting on its behalf has offered the Notes or any similar Securities for sale to, or solicited any offer to buy the Notes or any similar Securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchasers and not more than ten (10) other Institutional Investors, each of which has been offered the Notes at a private sale for investment. Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the registration requirements of section 5 of the Securities Act or to the registration requirements of any Securities or blue sky laws of any applicable jurisdiction.

**Section 5.14.   Use of Proceeds; Margin Regulations**.   Subject to any additional restrictions provided for in the DIP Orders, the Company will apply the proceeds of the sale of the Notes to the Permitted Uses.  No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221), or for the purpose of buying or carrying or trading in any Securities under such circumstances as to involve the Company in a violation of Regulation X of said Board (12 CFR 224) or to involve any broker or dealer in a violation of Regulation T of said Board (12 CFR 220).  The Company does not own or carry any margin stock. As used in this Section, the terms "**margin stock**" and "**purpose of buying or carrying**" shall have the meanings assigned to them in said Regulation U.

**Section 5.15.   Existing Indebtedness; Future Liens**.

(a)      (i) The Prepetition Issuer does not have any Indebtedness outstanding other than the Indebtedness evidenced by the Notes and Permitted Debt described in clause (e) of the

-19-

definition thereof, and (ii) the Subsidiaries do not have any Indebtedness outstanding other than Permitted Debt.

(b)      (i) Other than Permitted Liens, the Prepetition Issuer has not agreed or consented to cause or permit any of its property, whether now owned or hereafter acquired, to be subject to a Lien that secures Indebtedness or to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien that secures Indebtedness, and (ii) other than Permitted Liens, none of the Subsidiaries has agreed or consented to cause or permit any of its property, whether now owned or hereafter acquired, to be subject to a Lien that secures Indebtedness or to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien that secures Indebtedness.

(c)      (i) The Prepetition Issuer is not a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of the Company, any agreement relating thereto or any other agreement (including its Organizational Documents) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness of the Company, and (ii) other than Permitted Debt and any Tax Equity Financing Documents, no Subsidiary is a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of such Subsidiary, any agreement relating thereto or any other agreement (including its Organizational Documents) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness of such Subsidiary.

### Section 5.16.   Foreign Assets Control Regulations, Etc.

(a)      Neither the Company nor any Controlled Entity nor any of their respective officers, directors, or employees or, to the knowledge of the Company, any agents, or other third parties acting on behalf of the Company or any Controlled Entity (i) is a Blocked Person, (ii) has been notified that its name appears or may in the future appear on a Sanctions List, (iii) is a target of sanctions that have been imposed by the United States, the United Nations or the European Union, or (iv) has or is engaged in any direct or indirect dealings or transactions in or with a Blocked Person or Restricted Country.

(b)      Neither the Company nor any Controlled Entity nor any of their respective officers, directors, or employees or, to the knowledge of the Company, any agents, or other third parties acting on behalf of the Company or any Controlled Entity (i) has violated, been found in violation of, or been charged or convicted under, any applicable Sanctions Laws, Anti-Money Laundering Laws or Anti-Corruption Laws, (ii) has offered, paid, promised to pay, authorized the payment of, received, or solicited anything of value under circumstances such that all or a portion of such thing of value would be offered, given, or promised, directly or indirectly, to any Person to obtain any improper advantage, or (iii) to the Company's knowledge, is under investigation by any Governmental Authority for possible violation of any Sanctions Laws, Anti-Money Laundering Laws or Anti-Corruption Laws.

(c)      No part of the proceeds from the sale of the Notes hereunder:

(i)      will be used by the Company or any Controlled Entity, directly or indirectly, (A) in connection with any investment in, or any transactions or dealings with, any Blocked Person, (B) for any purpose that would cause any Purchaser to be in violation of any Sanctions Laws or (C) otherwise in violation of any Sanctions Laws;

(ii)      will be used, directly or indirectly, in violation of, or cause any Purchaser to be in violation of, any applicable Anti-Money Laundering Laws; or

(iii)      will be used, directly or indirectly, for the purpose of making any improper payments, including bribes, to any Governmental Official or commercial counterparty in order to obtain, retain or direct business or obtain any improper advantage, in each case which would be in violation of, or cause any Purchaser to be in violation of, any applicable Anti-Corruption Laws.

The Company has established procedures and controls to which the Company is subject and which the Company reasonably believes are adequate (and otherwise comply with Applicable Law) to ensure that the Company and each Controlled Entity is and will continue to be in compliance with all applicable Sanctions Laws, Anti-Money Laundering Laws and Anti-Corruption Laws.

**Section 5.17.  Status Under Certain Statutes**.  Neither the Company nor any Subsidiary is subject to regulation under the Investment Company Act of 1940.  Neither the Company nor any Subsidiary is subject to, or not exempt from, regulation as a "holding company" under PUHCA, other than as a holding company solely with respect to one or more Exempt Wholesale Generators or Qualifying Facilities that qualifies for the exemption from FERC regulation under PUHCA set forth in 18 C.F.R. § 366.3(a).  The Company is not subject to regulation as a "public utility" under section 201(e) of the FPA. Each Subsidiary is not subject to, or is exempt from, (i) regulation as a "public utility" as such term is defined under section 201(e) of the FPA, other than regulation applicable to (A) a Qualifying Facility that is exempt from sections 205 and 206 of the FPA pursuant to 18 C.F.R. § 292.601(c)(l) or (B) an entity that has obtained MBR Authority from FERC, where such authority is in full force and effect, and (ii) regulation by FERC under PUHCA as (A) a Qualifying Facility pursuant to 18 C.F.R. § 292.602(b) or (B) an Exempt Wholesale Generator pursuant to 18 C.F.R. § 366.7(e).

**Section 5.18.  Environmental Matters**.

(a)      The Company has no knowledge of any claim nor has it received any written notice of any claim and no proceeding has been instituted asserting any claim against the Company or any of its Subsidiaries or any of their respective real properties now or formerly owned, leased or operated by any of them, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(b)      The Company has no knowledge of any facts which would give rise to any claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to real properties now or formerly owned, leased or

-21-

operated by the Company or any of its Subsidiaries or their use, except, in each case, such as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)     Neither the Company nor any Subsidiary has stored any Hazardous Materials on real properties now or formerly owned, leased or operated by any of them in a manner which is contrary to any Environmental Law that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(d)     Neither the Company nor any Subsidiary have disposed of any Hazardous Materials in a manner which is contrary to any Environmental Law that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)     All buildings on all real properties now owned, leased or operated by the Company or any Subsidiary are in compliance with applicable Environmental Laws, except where failure to comply could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 5.19.  Bank Accounts**.  The Company will not have any bank accounts, except for the Accounts, any Permitted Local Account and otherwise as permitted by the Financing Documents.

**Section 5.20.   [Reserved]**

**Section 5.21.  Security Documents**.  Subject to any exceptions and other terms set forth in the applicable DIP Order and the Intercreditor Agreement: The Security Documents, taken together with and subject to the entry and to the extent of the terms of the Interim DIP Order and/or the Final DIP Order, create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid, enforceable and automatically perfected First Priority security interests in the Collateral described therein securing the Secured Obligations as provided in and subject to the limitations set forth in therein.  Pursuant to the terms of the Interim DIP Order and/or Final DIP Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.  Pursuant to and to the extent provided in the Interim DIP Order and/or the Final DIP Order, the Obligations of the Note Parties under this Agreement will constitute Superpriority Claims, having priority over all administrative expense claims and unsecured claims against such Note Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all Superpriority Claims granted to any other Person, subject only to the Carve-Out. Notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all Liens and claims (including administrative and Superpriority Claims) securing the Obligations, the Note Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and Superpriority Claims) granted to the Collateral Agent and the other Secured Parties. The provisions of this Agreement and the other Financing Documents create legal and valid Liens on all the Collateral in favor of Collateral

-22-

Agent, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Note Party and all third parties, and having priority over all other Liens on the Collateral except in the case of the Carve-Out.

### Section 5.22.   Material Project Contracts.

(a)    As of the Initial Closing Date, each Material Contract is in effect on the Initial Closing Date (including all amendments and modifications thereto) and a true, correct and complete copy of each Material Contract to which a Carlyle Silo entity is a party  has been delivered to the Purchasers.

(b)    For each Material Contract set forth on Exhibit A, subject to the entry of the DIP Orders and terms thereof and other than as a result of the commencement of the Chapter 11 Cases and the continuance and prosecution thereof, (x) such Material Contract is in full force and effect and is binding upon and enforceable against such Project Company or other Subsidiary of the Company party thereto, as applicable, and, to the knowledge of the Company, all other parties thereto in accordance with its terms (other than those that have been cancelled or terminated as permitted under this Agreement), except, in each case, as the enforceability thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and (y) all consents (if any) required under such Material Contract in connection with the issuance of the Notes, the execution, delivery and performance of the Financing Documents and the granting of the security interests pursuant to the Security Documents in respect thereof have been obtained. Other than as a result of the commencement of the Chapter 11 Cases and the continuance and prosecution thereof, a BRP Matter, a Surety Matter, the Foley Forbearance Event or East Atmore Forbearance Event, none of the Project Companies or other Subsidiary of the Company party thereto is in material default under any Material Contract. To the knowledge of the Company, no counterparty is in material default under any Material Contract to which it is party.

### Section 5.23.   Beneficial Ownership Certification.   The information included in each Beneficial Ownership Certification delivered pursuant to Section 9.18 is true and correct in all respects.

### Section 5.24.   Cases; Orders.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof was given for (i) the motion seeking approval of the Financing Documents, the Interim DIP Order and Final DIP Order, (ii) the hearing for the entry of the Interim DIP Order and (iii) the hearing for the entry of the Final DIP Order. The Debtors shall give, on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given to all parties specified in the Interim DIP Order or Final DIP Order, as applicable.

(b)    After the entry of the Interim DIP Order, and pursuant to and to the extent permitted in the DIP Orders, as applicable, the Obligations will constitute allowed Superpriority Claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim DIP Order or Final DIP Order, as applicable.

(c)    The Interim DIP Order (with respect to the period on and after entry of the Interim DIP Order and prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Holders' consent, modified or amended. The Debtors are in compliance in all material respects with the DIP Orders.

(d)    Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim DIP Order or the Final DIP Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the Collateral Agent and the holders of the Notes shall be entitled to immediate payment in full and to enforce the remedies provided for hereunder or under applicable laws.

Section 5.25.  **Budget.**  The Initial Approved Budget, each Approved Budget, each Updated Budget and variance report delivered pursuant to Schedule 7.1(p) was prepared in good faith by the management of the Note Parties, based on assumptions believed by the management of the Note Parties to be reasonable at the time made and upon information believed by the management of the Note Parties to have been accurate based upon the information available to the management of Note Parties at the time such budget and variance report was furnished.

Section 5.26.  **Intellectual Property**.  Each of the Company and the other Note Parties owns or has a valid license or right to use all Intellectual Property that is used in or otherwise necessary for the operation of its businesses as currently conducted, in each case free and clear of all Liens except for Permitted Liens, and except where failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither the Company nor any of the other Note Parties is infringing, misappropriating, diluting or otherwise violating any Intellectual Property of any third party, nor does the operation of their respective businesses, in each case in a manner that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim, action, suit, litigation or proceedings regarding any of the foregoing is pending or, to the knowledge of the Company, threatened, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of the Company, no Person is engaging in any activity that infringes, misappropriates, dilutes or otherwise violates any Intellectual Property that is owned by or exclusively licensed to the Company or any of the other Note Parties. The Company and the other Note Parties take all reasonable actions that should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.**        **REPRESENTATIONS OF THE PURCHASERS.**

**Section 6.1.**        **Purchase for Investment**. Each Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof; *provided* that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control. Each Purchaser understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

**Section 6.2.**        **Source of Funds**. Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "**Source**") to be used by such Purchaser to pay the purchase price of the Notes to be purchased by such Purchaser hereunder:

(a)        the Source is an "insurance company general account" (as the term is defined in the United States Department of Labor's Prohibited Transaction Exemption ("**PTE**") 95-60) in respect of which the reserves and liabilities (as defined by the annual statement for life insurance companies approved by the NAIC (the "**NAIC Annual Statement**")) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed ten percent (10%) of the total reserves and liabilities of the general account (exclusive of separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(b)        the Source is a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(c)        the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 or (ii) a bank collective investment fund, within the meaning of PTE 91-38 and, except as disclosed by such Purchaser to the Company in writing pursuant to this clause (c), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than ten percent (10%) of all assets allocated to such pooled separate account or collective investment fund; or

(d)        the Source constitutes assets of an "investment fund" (within the meaning of Part VI of PTE 84-14 (the "**QPAM Exemption**")) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part VI of the QPAM Exemption), no employee benefit plan's assets that are managed by the QPAM in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same

-25-

employer or by an affiliate (within the meaning of Part VI(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, represent more than twenty percent (20%) of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a person controlling or controlled by the QPAM maintains an ownership interest in the Company that would cause the QPAM and the Company to be "related" within the meaning of Part VI(h) of the QPAM Exemption and (i) the identity of such QPAM and (ii) the names of any employee benefit plans whose assets in the investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Part VI(c)(1) of the QPAM Exemption) of such employer or by the same employee organization, represent ten percent (10%) or more of the assets of such investment fund, have been disclosed to the Company in writing pursuant to this <u>clause (d)</u>; or

(e)      the Source constitutes assets of a "plan(s)" (within the meaning of Part IV(h) of PTE 96-23 (the "**INHAM Exemption**")) managed by an "in-house asset manager" or "INHAM" (within the meaning of Part IV(a) of the INHAM Exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption are satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Part IV(d)(3) of the INHAM Exemption) owns a ten percent (10%) or more interest in the Company and (i) the identity of such INHAM and (ii) the name(s) of the employee benefit plan(s) whose assets constitute the Source have been disclosed to the Company in writing pursuant to this <u>clause (e)</u>; or

(f)      the Source is a governmental plan; or

(g)      the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Company in writing pursuant to this <u>clause (g)</u>; or

(h)      the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this <u>Section 6.2</u>, the terms "**employee benefit plan**," "**governmental plan**," and "**separate account**" shall have the respective meanings assigned to such terms in section 3 of ERISA.

Section 6.3.        **Accredited Investor; Independent Investigation**.  Each Purchaser represents that it is an "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others are also "accredited investors").  Each Purchaser has made its own independent investigation of the condition (financial or otherwise), prospects and affairs of the Company and the Subsidiaries in connection with its purchase of the Notes hereunder and has made its own appraisal of the creditworthiness of the Company.

**Section 7.**      I<small>NFORMATION AS TO</small> C<small>OMPANY</small>

Section 7.1.        **Financial and Business Information**.  Commencing on the Initial Closing Date, the Company shall (but solely with respect to <u>clause (h)</u> below, shall use

-26-

commercially reasonably efforts to) deliver to each holder of a Note that is an Institutional Investor:

(a)     *Monthly Statements* — As soon as available, and in any event within twenty (20) days after the end of each month, commencing with the month in which the Petition Date occurs, duplicate copies of,

(i)     a consolidated balance sheet of the Company and its Subsidiaries (including Blue Ridge and any entities included in the Acquired Assets), and

(ii)     consolidated statements of income, changes in shareholders' equity and cash flows of the Company and its Subsidiaries (including Blue Ridge and any entities included in the Acquired Assets), in each case, for such month,

setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to interim financial reporting generally, and certified by a Senior Financial Officer as fairly presenting, in all material respects, the financial position of the companies being reported on and their results of operations and cash flows, subject to changes resulting from year-end adjustments;

(b)     *Quarterly Statements* — As soon as available, and in any event within sixty (60) days after the end of each quarterly fiscal period in each fiscal year of the Company (other than the last quarterly fiscal period of each such fiscal year), commencing with the fiscal quarter ending on December 31, 2025, duplicate copies of,

(i)     a consolidated balance sheet of the Company and its Subsidiaries (including Blue Ridge and any entities included in the Acquired Assets), in each case, as at the end of such quarter, and

(ii)     consolidated statements of income, changes in shareholders' equity and cash flows of the Company and its Subsidiaries, in each case, for such quarter and (in the case of the second and third quarters) for the portion of the fiscal year ending with such quarter,

setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to quarterly financial statements generally, and certified by a Senior Financial Officer as fairly presenting, in all material respects, the financial position of the companies being reported on and their results of operations and cash flows, subject to changes resulting from year-end adjustments;

(c)     *Annual Statements* — As soon as available, and in any event, within one hundred eighty (180) days after the end of each fiscal year of Company, respectively, duplicate copies of

(i)     a consolidated balance sheet of the Company and its Subsidiaries (including Blue Ridge and any entities included in the Acquired Assets), in each case, as at the end of such year, and

(ii)     consolidated statements of income, changes in shareholders' equity and cash flows of the Company and its Subsidiaries, in each case, for such year,

setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP, and accompanied by an opinion thereon (without a "going concern" or similar qualification or exception and without any qualification or exception as to the scope of the audit on which such opinion is based) of independent public accountants of recognized national standing, which opinion shall state that such financial statements present fairly, in all material respects, the financial position of the companies being reported upon and their results of operations and cash flows and have been prepared in conformity with GAAP, and that the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards, and that such audit provides a reasonable basis for such opinion in the circumstances;

(d)     *Notice of Default or Event of Default* — promptly, and in any event within one (1) Business Day after a Responsible Officer of the Company obtains knowledge of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder or that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 11(f), a written notice specifying the nature and period of existence thereof and what action the Company is taking or proposes to take with respect thereto;

(e)     *Employee Benefits Matters* — promptly, and in any event within five (5) days after a Responsible Officer of the Company or an ERISA Affiliate becomes aware of any of the following, a written notice setting forth the nature thereof and the action, if any, that the Company or an ERISA Affiliate proposes to take with respect thereto:

(i)     with respect to any Plan, any reportable event, as defined in section 4043(c) of ERISA and the regulations thereunder, for which notice thereof has not been waived pursuant to such regulations as in effect on the date hereof;

(ii)     the taking by the PBGC of steps to institute, or the threatening by the PBGC of the institution of, proceedings under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by the Company or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan;

(iii)     any event, transaction or condition that could result in the incurrence of any liability by any the Company or any ERISA Affiliate pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, or in the imposition of any Lien on any of the rights, properties or assets of the Company or any ERISA Affiliate pursuant to Title I or IV of ERISA or such penalty or excise tax provisions, if such liability or Lien, taken together with any other such liabilities or Liens then existing, could reasonably be expected to have a Material Adverse Effect; or

-28-

(iv)    receipt of notice of the imposition of a Material financial penalty (which for this purpose shall mean any tax, penalty or other liability, whether by way of indemnity or otherwise) with respect to one or more Non-U.S. Plans;

(f)    *Notices from Governmental Authority* — promptly, and in any event within one (1) Business Day of receipt thereof, copies of any notice to the Company or any Subsidiary from any Governmental Authority relating to any order, ruling, statute or other law or regulation that could reasonably be expected to have a Material Adverse Effect;

(g)    *Resignation or Replacement of Auditors* — within one (1) Business Day following the date on which any of the Company's auditors resign or the Company elects to change auditors, as the case may be, notification thereof, together with such further information as the Required Holders may reasonably request;

(h)    *Requested Information* — within one (1) Business Day following the date of request, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Company or any of its Subsidiaries (including the Projects) or relating to the ability of the Company to perform its obligations hereunder and under the Financing Documents as from time to time may be reasonably requested by any such holder of a Note;

(i)    *Know Your Customer Information* — promptly following a written request by such holder of a Note, such documentation or other information that such holder requires pursuant to Applicable Law or reasonably requests, in any such case, in order to comply with its ongoing obligations under applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(j)    *[Reserved]*;

(k)    *Amendments to Material Contracts* — promptly, and in any event within thirty (30) days of any amendments, modifications, waivers, consents, updates, or changes to any Material Contracts, copies of such amendments, modifications, waivers, consents, updates, or changes to any Material Contracts;

(l)    *Construction Progress Reports* —within sixty (60) days after the end of each quarterly fiscal period in each fiscal year of the Company until the Project Completion Date for each Construction Project has occurred, copies of a report prepared by the Company on each Project that has not reached its respective Project Completion Date, providing details on the level of progress of the construction of such Construction Projects (i) comparing such progress against the previously delivered report and (ii) the latest budget and schedule for such Construction Project; *provided* that to the extent a Solar Development Project Financing Facility requires the delivery of a substantially similar report, the Company may deliver such report to the holders in satisfaction of its obligation under this <u>Section 7.1(l)</u>; *provided*, *further*, that to the extent the Company wishes to extend the Projected NTP Date for any Construction Project, (A) the Company shall include such request in its construction report with a certification from the Independent Engineer explaining the reason for the delay and confirming that such Construction Project is reasonably expected to achieve its commercial operation date (however defined) by the applicable date scheduled therefor in the Material Contracts and (B) any extended date

-29-

approved by the Required Holders in writing to the Company shall be the new Projected NTP Date for such Construction Project.

(m)    *Operating Reports* — on each Monthly Date, copies of a report prepared in respect of each Operating Project including: (i) details in respect of such Project's revenue, performance, operating costs and Capital Expenditures; (ii) information on technical performance and any developments during such period which could reasonably be expected to have a Material Adverse Effect; (iii) details of any actual material maintenance during such fiscal quarter and details of planned material maintenance for the succeeding quarterly fiscal period; (iv) details of generation capacity for such Project during such quarterly fiscal period and (v) other material operating and performance data for such Project; *provided* that to the extent a Solar Development Project Financing Facility requires the delivery of a substantially similar report, the Company may deliver such report to the holders in satisfaction of its obligation under this Section 7.1(m);

(n)    *Reserved.*

(o)    *Other Financing Notices* –

(i)    copies of any construction budgets, third party consultant reports, project reports and material notices required to be provided to lenders providing financing under a Solar Development Project Financing Facility; *provided* that if the obligation to deliver any such construction budgets, third party consultant reports, project reports and material notices is waived on an ad-hoc basis under the applicable Solar Development Project Financing Facility (while maintaining the obligation to deliver according to the original reporting requirements in future), a copy of such waiver shall be delivered (irrespective of whether a copy of such waiver would otherwise be required to be delivered pursuant to Section 7.1(k));

(ii)    without limiting Section 7.1(o)(i), promptly, and in any event within one (1) Business Day after a Responsible Officer of the Company obtains knowledge of the existence of any default or event of default under a Solar Development Project Financing Facility, a written notice specifying the nature and period of existence thereof and what action the Company and the applicable Project Company are taking or propose to take with respect thereto;

(p)    *Liquidity* – On each Liquidity Testing Date, an Officer's Certificate certifying the amount of Liquidity as of such Liquidity Testing Date.

(q)    *Budget* – Beginning with the Friday of the fifth full calendar week occurring after the Petition Date, an Updated Budget in accordance with Schedule 7.1(p). The parties agree that the terms and conditions set out in Schedule 7.1(p) shall govern the Updated Budget.

(r)    *Additional Reporting in the Chapter 11 Cases* –

(i)    promptly, upon request of the Required Holders, financial statements, business funding requirements and other business updates on Blue Ridge, the Company, and the entities included in the Acquired Assets;

US-DOCS\165312452.14

(ii)     promptly, upon request of the Required Holders, reports detailing professional fee expenditures, allocated according to whether such professional fees were expended in connection with the Brookfield Silo Entities, Fundamental Silo Entities, Carlyle Silo Entities, or otherwise;

(iii)     every other Friday, commencing with the first Friday after the Petition Date (if such Friday is not a business day, the next business day thereafter), schedules of all payments made pursuant to the First Day Orders and the Second Day Orders;

(iv)     together with each monthly financial statement required to be delivered in accordance with Section 7.1(a) hereof, the Note Parties shall provide the Collateral Agent a report, in form and substance reasonably acceptable to the Required Holders, which shall include a description of (i) the continued operations and maintenance, engineering, procurement, construction, development, and asset management services under the Existing Service Agreements, and those expected to be provided under the Transition Services Agreement and (ii) ACT's business, operations and financial position and any sale or financing process of ACT (including any reporting being provided to the lenders under any financing secured by the assets or equity of ACT);

(v)     upon request by the Required Holders, summary information regarding indications of interest and bids (subject to any confidentiality restrictions) received in the Debtors' marketing and sale process, including related to the Sale, in each case, including regular update calls and other information as reasonably requested by the Required Holders (or its advisors), subject to the Bidding Procedures;

(vi)     as soon as available, and in any event within five (5) days after the end of each month, an update report satisfactory to the Required Holders demonstrating substantial progress towards and ability to execute Power Purchase Agreements with respect to the Allora, Cabin Creek, Gunsight, East Atmore, Foley, Lavender, Jungmann, Texas One, and Phobos Projects with material terms satisfactory to the Required Holders, including delivery of draft term sheets and long-form documents, as applicable;

(vii)     on each Friday, to the extent available at such time, the then-current drafts or other applicable evidence of the documentary conditions precedent and other key documents for (1) the "Class A Substantial Completion Capital Contribution" (as defined in the Polaris A LLCA) under the tax equity documents in respect of the East Atmore Project and (2) receipt of payment of the "Purchase Price" as defined in and under the ITC Tax Credit Purchase Agreement in respect of the East Atmore Project;

(viii)     on each Friday, update reports with respect to closing of the financing and tax equity for Foley Solar, LLC, including providing the Required Holders with copies of then-current drafts of any financing documents (including any credit agreements, security documents, tax equity LLCAs, tax equity ECCAs, guarantees or other credit support documents and any other materials requested by the Required Holders);

(ix)     all reporting required to be provided under the Prepetition Note Purchase Agreement; and

-31-

(x)     all reporting required to be delivered pursuant to any Additional DIP Facility, Replacement Additional DIP Facility, the Brookfield Prepetition Credit Agreement, the Fundamental Prepetition Credit Agreement or any other credit facility to the extent such required reporting includes material information regarding the Carlyle Silo Entities.

Section 7.2.          **Officer's Certificate**.  Each set of financial statements delivered to a holder of a Note pursuant to Section 7.1(b) or Section 7.1(c) shall be accompanied by a certificate of a Senior Financial Officer:

(a)     *Solar Development Project Cost Report*— attaching an updated Solar Development Project Cost Report.

(b)     *Covenant Compliance* — solely to the extent the Company desires to make a Restricted Payment in accordance with Section 10.8, certifying as to the Company's calculation of the HoldCo Debt Service Coverage Ratio for the Rolling Period ending on the most recent fiscal quarter end and setting forth the information from such financial statements that is required in order to perform such calculation.

(c)     *Event of Default* — certifying that such Senior Financial Officer has reviewed the relevant terms hereof and has made, or caused to be made, under his or her supervision, a review of the transactions and conditions of the Company and its Subsidiaries from the beginning of the quarterly or annual period covered by the statements then being furnished to the date of the certificate and that such review shall not have disclosed the existence during such period of any condition or event that constitutes a Default or an Event of Default or, if any such condition or event existed or exists (including any such event or condition resulting from the failure of the Company or any Subsidiary to comply with any Environmental Law), specifying the nature and period of existence thereof and what action the Company shall have taken or proposes to take with respect thereto; and

(d)     *Subsidiary and Material Project Contract Updates* — with respect to Schedule 5.4 and Exhibit A, and any applicable Schedules to the Security Agreement, notify the Required Holders of, in each case, any updates relating to the formation, Acquisition or Disposition of any Subsidiaries and the status of all Material Contracts with respect to the Subsidiaries and the A&R Projects during the period since the most recent update (and including copies of any new Material Contracts or any amendments, modifications, waivers, consents, updates, or changes thereto, to the extent not already delivered pursuant to Section 7.1(k)); *provided* that any of the updates requiring notification pursuant to this Section 7.2(c) shall have been conducted in accordance with, and not be prohibited by, the Financing Documents.

provided that, during the Forbearance Period the Company shall not be required to deliver the certificates described in clauses (a) through (d) above.

**Section 7.3.**          **Visitation**.  The Company shall permit the Collateral Agent and the representatives of each holder of a Note that is an Institutional Investor:

(a)     *No Default* — if no Default or Event of Default then exists, at the expense of such holder and upon reasonable prior notice to the Company, to visit the principal executive office of the Company, to discuss the affairs, finances and accounts of the Company and its Subsidiaries with the Company's officers, and (with the consent of the Company, which consent will not be unreasonably withheld) its independent public accountants, and (with the consent of the Company, which consent will not be unreasonably withheld) to visit the other offices and properties of the Company and its Subsidiaries, all at such reasonable times (which visits shall be limited to once per fiscal year in the aggregate absent a Default or Event of Default occurring and continuing); and

(b)     *Default* — if a Default or Event of Default then exists, at the expense of the Company (to the extent provided for in the Approved Budget) to visit and inspect any of the offices or properties of the Company and its Subsidiaries, to examine all their respective books of account, records, reports and other papers, to make copies and extracts therefrom, and to discuss their respective affairs, finances and accounts with their respective officers and independent public accountants (and by this provision the Company authorizes said accountants to discuss the affairs, finances and accounts of the Company and its Subsidiaries), all at such times and as often as may be requested.

**Section 7.4.**          **Electronic Delivery**.  Financial statements, opinions of independent certified public accountants, other information and Officer's Certificates that are required to be delivered by the Company pursuant to Sections 7.1 and Section 7.2 shall be deemed to have been delivered if the Company satisfies any of the following requirements with respect thereto:

(a)     such financial statements satisfying the requirements of Section 7.1(a) or (b) and related Officer's Certificate satisfying the requirements of Section 7.2 and any other information required under Section 7.1 are delivered to each holder of a Note by e-mail at the e-mail address set forth in Schedule B for such holder or as communicated from time to time in a separate writing delivered to the Company; or

(b)     such financial statements satisfying the requirements of Section 7.1(a) or Section 7.1(b) and related Officer's Certificate satisfying the requirements of Section 7.2 and any other information required under Section 7.1 are timely posted by or on behalf of the Company on IntraLinks or on any other similar website to which each holder of Notes has free access; *provided* that Company shall deliver a separate written notice, which may be by e-mail or in accordance with Section 18, to the Collateral Agent and each holder advising that such materials have been posted on such website;

*provided however,* that in no case shall access to such financial statements, other information and Officer's Certificates be conditioned upon any waiver or other agreement or consent (other than confidentiality provisions consistent with Section 20 of this Agreement); *provided further*, that upon request of any holder to receive paper copies of such forms, financial statements, other information and Officer's Certificates or to receive them by e-mail, the Company will promptly e-mail them or deliver such paper copies, as the case may be, to such holder.

-33-

**Section 8.**      **PAYMENT AND PREPAYMENT OF THE NOTES.**

**Section 8.1.**          **Payment; Maturity**.

(a)      As provided therein, the entire unpaid principal balance of the Roll-Up DIP Notes and the New Money DIP Notes *plus* the Exit Premium and the Prepayment Premium shall be due and payable on the Maturity Date.

(b)      Interest payable on each New Money DIP Note shall accrue in accordance with the terms of such New Money DIP Note and on each Monthly Date shall be automatically capitalized by increasing the outstanding principal amount of such New Money DIP Note by the amount of PIK Interest for such New Money DIP Note; *provided* that if an Event of Default has occurred and is continuing, interest on each New Money DIP Note shall be paid in kind at the Default Rate in accordance with the terms of such New Money DIP Note.

(c)      Interest payable on each Roll-Up DIP Note shall accrue and on each Monthly Date shall be automatically capitalized by increasing the outstanding principal amount of such Roll-Up DIP Note by the amount of PIK Interest for such Roll-Up DIP Note; *provided* that if an Event of Default has occurred and is continuing, interest on each Roll-Up DIP Note shall be paid in kind at the Default Rate in accordance with the terms of such Roll-Up DIP Note.

**Section 8.2.**          **Optional Prepayments with Prepayment Premium**.      The Company may, at its option, with the prior written consent of the Required Holders, prepay at any time all but not less than all of the Notes, at one hundred percent (100%) of the principal amount so prepaid *plus* unpaid accrued interest on the principal amount so prepaid *plus* the Exit Premium *plus* the Prepayment Premium.  Any optional prepayment or purported optional prepayment of less than all of the outstanding principal amount of the Notes (including accrued and unpaid premiums and interest (including PIK Interest)) made by the Company shall be automatically void ab initio.  The Company will give each holder of Notes and the Paying Agent written notice of each optional prepayment under this Section 8.2 not less than one (1) Business Days prior to the anticipated date for such prepayment unless the Company and the Required Holders agree to another time period pursuant to Section 17.  Each such notice shall specify such anticipated date of prepayment (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date of prepayment, the principal amount of each Note held by such holder to be prepaid (determined in accordance with Section 8.4), and the interest to be paid on the prepayment date with respect to such principal amount being prepaid, and shall be accompanied by an Officer's Certificate of a Senior Financial Officer as to the estimated Exit Premium and Prepayment Premium (if applicable) due in connection with such prepayment (calculated as if the date of such notice were the date of the prepayment), setting forth the details of such computation.  One (1) Business Days prior to such prepayment, the Company shall deliver to each holder of Notes an Officer's Certificate of a Senior Financial Officer specifying the calculation of such Exit Premium and Prepayment Premium (if applicable) as of the specified prepayment date.

**Section 8.3.            Mandatory Redemption and Prepayment.**

(a)    *Mandatory Redemption and Prepayment Events.*

(i)    Indebtedness.  Subject to the Intercreditor Agreements, the DIP Orders and the Carve-Out, no later than three (3) Business Days following the receipt by the Company or any Note Party of any Net Cash Proceeds in respect of an incurrence or issuance of any Indebtedness by the Company or any Note Party (other than with respect to any Indebtedness permitted to be incurred or issued pursuant to Section 10.6), the Company shall apply an amount equal to 100% of such Net Cash Proceeds to prepay the outstanding Notes *plus* unpaid accrued interest (if any) on the principal amount so prepaid, *plus* the Exit Premium, *plus* the Prepayment Premium (on a *pro rata* basis for each holder based on their respective principal amounts outstanding of the Notes).

(ii)    Permitted Dispositions; Project Sales; Event of Loss. Subject to the Intercreditor Agreements, the DIP Orders and the Carve-Out, no later than three (3) Business Days following the receipt by the Company or any Note Party of any Net Cash Proceeds in respect of any Permitted Disposition (but excluding sales in the ordinary course of business up to $500,000), Project Sale or Event of Loss, the Company shall apply an amount equal to 100% of such Net Cash Proceeds to prepay the outstanding Notes *plus* unpaid accrued interest (if any) on the principal amount so prepaid, *plus* the Exit Premium, *plus* the Prepayment Premium (on a *pro rata* basis for each holder based on their respective principal amounts outstanding of the Notes).

(iii)    Extraordinary Receipts. Subject to the Intercreditor Agreements, the DIP Orders and the Carve-Out, no later than three (3) Business Days following the receipt by the Company or any Note Party of any Net Cash Proceeds in respect of Extraordinary Receipts, the Company shall apply an amount equal to 100% of such Net Cash Proceeds to prepay the outstanding Notes *plus* unpaid accrued interest (if any) on the principal amount so prepaid, *plus* the Exit Premium, *plus* the Prepayment Premium (on a *pro rata* basis for each holder based on their respective principal amounts outstanding of the Notes); *provided*, if any Extraordinary Receipts are received in respect of any assets that, prior to the Petition Date, constituted Brookfield Exclusive Collateral or Fundamental Exclusive Collateral (each, as defined in the Junior Intercreditor Agreement), the Net Cash Proceeds of such Extraordinary Receipts shall be applied solely to the obligations under the applicable Additional DIP Facility; *provided*, *further*, that if any Extraordinary Receipts are received in respect of any assets that, prior to the Petition Date, constituted Shared Collateral (as defined in the Pari Intercreditor Agreement and/or Junior Intercreditor Agreement, as applicable), the Net Cash Proceeds of such Extraordinary Receipts shall be applied in accordance with the Pari Intercreditor Agreement and/or Junior Intercreditor Agreement, as applicable.

(iv)    Affiliate Transactions.  Subject to the Intercreditor Agreements, the DIP Orders and the Carve-Out, no later than three (3) Business Days following the receipt by the Company or any Note Party of any Net Cash Proceeds in respect of an Affiliate Transaction (other than with respect to any Affiliate Transaction permitted pursuant to Section 10.1), the Company shall apply an amount equal to the greater of (1) 100% of such

-35-

Net Cash Proceeds and (2) the amount of any obligations incurred by a Note Party or any Subsidiary thereof in such Affiliate Transaction to prepay the outstanding Notes *plus* unpaid accrued interest (if any) on the principal amount so prepaid, *plus* the Exit Premium, *plus* the Prepayment Premium (on a *pro rata* basis for each holder based on their respective principal amounts outstanding of the Notes);

(v)    Project Surety Bonds. Subject to the Intercreditor Agreements, the DIP Orders and the Carve-Out,  if the Company has issued any DIP Delayed Draw Notes, no later than three (3) Business Days following the receipt by the Company or any Note Party of any Cash proceeds, to the extent unrestricted under the applicable Solar Development Project Financing Facility, in respect of letters of credit, surety bonds, or similar instruments for Project Costs or otherwise for the benefit of any Carlyle Silo Entity (or any project financing or tax equity provider in respect of a Project) (collectively, the "**Project Surety Bonds**"), the Company shall apply an amount equal to the lesser of (1) 100% of such Cash proceeds and (2)(x) the aggregate principal amount of DIP Delayed Draw Notes issued since the Second Draw Closing Date less (y) the aggregate amount of such Mandatory Prepayment in respect of such DIP Delayed Draw Notes made since the Second Draw Closing Date to prepay the outstanding Notes *plus* unpaid accrued interest (if any) on the principal amount so prepaid, *plus* the Exit Premium, *plus* the Prepayment Premium (on a *pro rata* basis for each holder based on their respective principal amounts outstanding of the Notes).

Notwithstanding anything herein to the contrary, any Mandatory Prepayment required pursuant to this Section 8.3(a)(i), (ii), (iii), (iv) or (v), which does not repay all of the outstanding Notes, shall be allocated to the repayment of the principal amount of the outstanding Notes, unpaid accrued interest (if any) on the principal amount so prepaid, the Exit Premium and the Prepayment Premium (if applicable), in a manner such that the aggregate amount of such Mandatory Prepayment shall not exceed the amount of Net Cash Proceeds received that triggered such Mandatory Prepayment.

Following the receipt by any Note Party that is a Pari Guarantor of any Net Cash Proceeds in connection with an event or transaction that would trigger a Mandatory Prepayment under this Section 8.3 and a mandatory prepayment under one or more Additional DIP Facilities, the amounts allocated and applied to any Mandatory Prepayment of the outstanding Obligations hereunder and corresponding mandatory prepayment of the obligations under the applicable Additional DIP Facilities shall be made in accordance with the Pari Intercreditor Agreement and in a manner so that the aggregate amount actually paid in respect of such Mandatory Prepayment and corresponding mandatory prepayments under the applicable Additional DIP Facilities shall not exceed the amount of Net Cash Proceeds received that triggered such Mandatory Prepayment and mandatory prepayments.

(b)    *Procedures for Mandatory Prepayments*.

(i)    With respect to any Mandatory Prepayment, (A) the Company shall notify the Collateral Agent in writing of any such Mandatory Prepayment no later than two (2) Business Days before the date of any such Mandatory Prepayment (the "**Prepayment Notice**") and (B) on any date as required in accordance with Section 8.3(a), the Company

-36-

shall (1) to the extent lawful, accept for payment the Notes or portions thereof tendered for repayment pursuant to the related Mandatory Prepayment and (2) pay to each applicable holder an amount equal to the payment required in respect of such holder's Notes or portions thereof so tendered pursuant to Section 8.3.  Promptly following receipt of any Prepayment Notice, the Collateral Agent shall forward such Prepayment Notice to the holders of the Notes.  On such date of any Mandatory Prepayment, all Notes purchased or repaid by the Company in full shall be delivered to the Company for cancellation.

(ii)     If the Company complies with the provisions of the preceding clause, on and after such date of repurchase or repayment, interest shall cease to accrue on the Notes or the portions thereof repurchased or repaid.  If the Company is required to make a Mandatory Prepayment, but the Company does not repurchase or repay such Note because of the failure of the Company to comply with the preceding clause, interest shall be paid on the unpaid principal, from the proposed date of repurchase or repayment until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes.

(iii)     Notwithstanding any of the other provisions of this Section 8.3, each holder of the applicable Series of Notes may elect not to accept all (but not less than all) of its pro rata percentage of any Mandatory Prepayment (any such holder, a "**Declining Holder**", and any such declined amounts, the "**Declined Amounts**") of Notes required to be prepaid pursuant to Sections 8.3(a) and 8.4 by providing written notice (each, a "**Rejection Notice**") to the Collateral Agent.  If a holder of the Notes fails to deliver a Rejection Notice to the Collateral Agent, such failure will be deemed an acceptance of the total amount of such Mandatory Prepayment of Notes. Any Declined Amounts shall be offered to redeem Notes of holders that are not Declining Holders on a pro rata basis, and any Declined Amounts remaining thereafter may be retained by the Company.

**Section 8.4.          Allocation of Partial Prepayments**.  In the case of each partial prepayment of the Notes pursuant to Section 8.3, the principal amount of the Notes to be prepaid or redeemed shall be allocated, *first*, up to 100% of the outstanding amount of New Money DIP Notes (and if less than 100%, to the New Money DIP Notes on a *pro rata* basis for each holder based on their respective principal amounts outstanding of the New Money DIP Notes), including, for the avoidance of doubt, any unpaid accrued interest (if any) on the principal amount so prepaid, the Exit Premium and the Prepayment Premium and *second*, up to 100% of the outstanding amount of each Series of Roll-Up DIP Notes (and if less than 100%, to each Series of Roll-Up DIP Notes on a *pro rata* basis for each holder based on their respective principal amounts outstanding of each Series of Roll-Up DIP Notes), including, for the avoidance of doubt, an unpaid accrued interest (if any) on the principal amount so prepaid.

**Section 8.5.          Maturity; Surrender, Etc.**  In the case of each optional or Mandatory Prepayment of Notes or mandatory redemption of Notes pursuant to this Section 8, the principal amount of each Note to be prepaid or redeemed shall mature and become due and payable on the date fixed for such prepayment or redemption, together with interest on such principal amount accrued to such date and the applicable Prepayment Premium, if any.  From and after such date, unless the Company shall fail to pay such principal amount when so due and payable, together with the interest and Prepayment Premium, if any, as aforesaid, interest on such principal amount

-37-

shall cease to accrue.  Any Note paid or prepaid in full shall be surrendered to the Company and cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid or redeemed principal amount of any Note.

Section 8.6.          **Purchase of Notes**.  The Company will not and will not permit any Affiliate to purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes except upon the payment or prepayment or redemption of the Notes in accordance with this Agreement and the Notes.  The Company will promptly cancel all Notes acquired by it or any Affiliate pursuant to any payment, prepayment or redemption of the Notes pursuant to this Agreement and no Notes may be issued in substitution or exchange for any such Notes.

Section 8.7.          **Reserved.**

Section 8.8.          **Payments Due on Non-Business Days**.  Anything in this Agreement or the Notes to the contrary notwithstanding, (x) except as set forth in clause (y), any payment of interest on any Note that is due on a date that is not a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day; and (y) any payment of principal or Prepayment Premium (as applicable) on any Note (including principal due on the Maturity Date of such Note) that is due on a date that is not a Business Day shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

Section 9.     **AFFIRMATIVE COVENANTS.**

The Company covenants that so long as any of the Notes are outstanding:

Section 9.1.          **Compliance with Laws; Authorizations**. Without limiting Section 10.4, the Company will, and will Procure that each of its Subsidiaries, comply with all Applicable Laws, ordinances or governmental rules or regulations to which each of them is subject (including ERISA, Environmental Laws, the USA PATRIOT Act and the other laws and regulations that are referred to in Section 5.16) and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations then necessary for the ownership of their respective properties or for the conduct of their respective businesses, in each case to the extent that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 9.2.          **Insurance**.

(a)     The Company will Procure that each Note Party maintain insurance as set forth in Schedule 9.2.

(b)     The Company shall, and shall Procure that each Note Party (including through Permitted Payments, to the extent applicable), deposit any Special Proceeds actually received by the Company or any Note Party in respect of an Event of Loss (only after the applicable

-38-

Subsidiaries have applied such monies in accordance with any applicable Solar Development Project Financing Facility and subject to any restrictions on the distribution of such Special Proceeds in any applicable Solar Development Project Financing Facility), into the Collections Account, and the Company shall apply such Special Proceeds in accordance with Section 8.3(a).

**Section 9.3.**          **[Intentionally Omitted]**.

**Section 9.4.**          **Payment of Taxes and Claims**. Subject to Bankruptcy Law, the terms of the applicable DIP Order and any required approval by the Bankruptcy Court, the Company will, and will Procure that each of its Subsidiaries, file all tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, or levies imposed on them or any of their properties, assets, income or franchises, to the extent the same have become due and payable and before they have become delinquent and all claims for which sums have become due and payable that have or might become a Lien on properties or assets of the Company or any Subsidiary; *provided* that neither the Company nor any Subsidiary need pay any such tax, assessment, charge, levy or claim if (a) the amount, applicability or validity thereof is contested by the Company or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or a Subsidiary has established adequate reserves therefor in accordance with GAAP on the books of the Company or such Subsidiary or (b) the nonpayment of all such taxes, assessments, charges, levies and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 9.5.**          **Maintenance of Existence, Etc.** Considering the commencement of the Chapter 11 Cases and the continuance and prosecution thereof, subject to Section 10.2 and Section 10.7, the Company will and will Procure that each of its Subsidiaries, at all times preserve and keep in full force and effect its legal existence (excluding, in the case of any Subsidiary, any merger of such Subsidiary into the Company or a Wholly-Owned Subsidiary of the Company) and all of its rights and franchises unless, in the good faith judgment of the Company, the termination of or failure to preserve and keep in full force and effect such legal existence, right or franchise could not, individually or in the aggregate, have a Material Adverse Effect.

**Section 9.6.**          **Books and Records**. The Company will, and will Procure that each of its Subsidiaries, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Company or such Subsidiary, as the case may be.

**Section 9.7.**          **Distributions**.   The Company will Procure that each of its Subsidiaries (including for the avoidance of doubt, any Operating Project HoldCo) make distributions of all available cash to the Company, except to the extent of any minimum reserves or distributions to another member expressly required in accordance with its respective Organizational Documents and subject to the terms of any applicable Solar Development Project Financing Facility; provided that to the extent the Organizational Documents or other contractual restrictions applicable to an Operating Project HoldCo prohibit the distribution of cash to the Company but permit an intercompany loan, such Operating Project HoldCo shall make such distribution in the form of an unsecured intercompany loan subject to terms of subordination

-39-

reasonably acceptable to the Secured Parties and pledged to the Collateral Agent pursuant to terms and conditions reasonably acceptable to the Secured Parties.

**Section 9.8.**          **Maintenance of Title**.  Subject to <u>Section 10.7</u>, the Company will, and will Procure that each of its Subsidiaries, (a) maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear) and in accordance with the terms of the Material Project Documents, as applicable, so that the business carried on in connection therewith may be properly conducted at all times and (b) preserve and maintain good and valid title or leasehold or easement rights to their respective properties (subject to no Liens other than Permitted Liens) except, in the case of each of <u>clauses (a)</u> and <u>(b)</u>, where the failure to do so could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

**Section 9.9.**          **Separate Conduct of Business**.  The Company will (a) act solely in its name and through its duly authorized officers, managers or agents in the conduct of its businesses, (b) conduct its business solely in its own name and in a manner not misleading to other Persons as to its identity, (c) maintain its books, records and accounts separately from any other entity and (d) comply in all material respects with the terms of its Organizational Documents.

**Section 9.10.**          **Construction and Operation of Projects**.  To the extent provided for in the Approved Budget, the Company will Procure that each Project Company construct, operate and maintain its respective Project, or cause the same to be constructed, operated and maintained, in each case, as applicable, consistent with Prudent Industry Practice.

**Section 9.11.**          **Use of Proceeds**.  The Company will use the proceeds of the sale of the Notes solely for the Permitted Uses.

**Section 9.12.**          **Priority of Liens and Claims.**

(a)      Each of the Note Parties hereby covenants, represents, warrants and agrees that, upon entry of, and subject to the terms of, the Interim DIP Order (and when applicable, the Final DIP Order) (including and without prejudice to, without limitation, in each case, any rights or liens or perfected security interests (and the priorities thereof) granted under the Interim DIP Order or Final DIP Order under any other provision of Section 364 of the Bankruptcy Code or any other applicable provisions of the Bankruptcy Code) and subject to the Carve-Out in all respects, the Obligations: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims in the Chapter 11 Cases; and (ii) pursuant to Section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, shall be secured by a valid, binding, enforceable, non-avoidable, and automatically perfected senior priority Lien upon the Collateral.

(b)      The relative priorities of the Liens on property and assets of Debtors described in this <u>Section 9.12</u> with respect to the Collateral shall be as set forth in the Interim DIP Order (and, when entered, the Final DIP Order).  In accordance with the Interim DIP Order (or, once entered, the Final DIP Order), all of the Liens on property and assets of Debtors described in this <u>Section 9.12</u> shall be effective and perfected upon entry of the Interim DIP Order, without the necessity of the execution, recordation of filings by the Debtors or security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the

-40-

possession or control by the Collateral Agent, of, or over, any Collateral, as set forth in the Interim DIP Order (and, when entered, the Final DIP Order).

(c)     Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim DIP Order (and, when applicable, the Final DIP Order), upon the occurrence of the Maturity Date (whether by acceleration or otherwise), the Collateral Agent shall be entitled to immediate payment in full in cash of the Obligations and to enforce the remedies provided for hereunder.

(d)     Each of the Note Parties agrees that (i) its Obligations under the Financing Documents shall not be discharged by the entry of an order confirming any chapter 11 plan (and each of the Note Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby irrevocably waives any such discharge) and (ii) the Superpriority Claim granted to the Secured Parties pursuant to the DIP Orders and the Liens granted to the Collateral Agent for the benefit of the Secured Parties pursuant to the DIP Orders shall not be affected in any manner by the entry of an order confirming any chapter 11 plan.

Section 9.14.     **Further Assurances**.  Subject to the DIP Order, the Company will promptly (a) correct any material defect or error that may be discovered in any Financing Document or in the execution, acknowledgment, filing or recordation thereof promptly after a Responsible Officer of the Company obtains knowledge of such material defect or error and (b) do, execute, acknowledge, deliver, record, rerecord, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Collateral Agent or any holder of Notes may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Financing Documents, (ii) subject any applicable Pine Gate Party's properties, assets, rights or interests to the Liens now or hereafter intended to be created by any of the Security Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Security Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Financing Document or under any other instrument executed in connection with any Financing Document to which the Company is or is to be a party.

Section 9.15.     **Material Contracts**.  To the extent funds allocated in the Approved Budget are necessary for compliance with the following covenants in this Section 9.15, then subject to such funds actually being so allocated and the Company and its Subsidiaries having sufficient funds to do the same:

(a)     the Company will, and will Procure that each of its Subsidiaries, perform and observe all of its covenants and obligations contained in the Material Contracts to which it is a party and take commercially reasonable action to enforce its rights under the Material Contracts to which it is a party in accordance with their respective terms to the extent that such failure to perform, observe or enforce could reasonably be expected to have a Material Adverse Effect.

(b)     With respect to any Material Contracts that are proposed to be entered into by a Subsidiary on terms that prohibit changes of control (but excluding any interconnection agreements and any Power Purchase Agreements entered into based on a form agreement), the

-41-

Company shall, notwithstanding Section 9.15(d), use commercially reasonable efforts to include in such Material Contracts provisions which permit the Collateral Agent to exercise remedies without the need for prior consent or approval of the counterparties to such Material Contracts.

(c)     With respect to any Material Project Documents and operating agreements that are proposed to be entered into by a Subsidiary (but excluding any interconnection agreements and any Power Purchase Agreements entered into based on a form agreement), the Company shall use commercially reasonable efforts to obtain from the relevant counterparty a representation in favor of the applicable Project Company to the effect that neither the proposed counterparty nor its affiliates has been charged under Anti-Corruption Laws or Anti-Money Laundering Laws.

(d)     (A)With respect to any Material Contracts (x) in effect as of the Initial Closing Date, and (y) entered into in connection with the Foley Project at any time, the Company shall, and shall Procure that each of its Subsidiaries, (i) use commercially reasonable efforts to obtain the Project Senior Financing Consents for each of the Projects, and (ii) in the case of the Foley Project, use commercially reasonable efforts to obtain the Project Senior Financing Consents for such Project by no later than  October 15, 2025; and (B) at the request of the Required Holders, (i) Company shall, use commercially reasonable efforts to make the Pine Gate Parties' senior management and employees available for meetings and negotiations related to the obtaining of Project Senior Financing Consents and (ii) share contact information for contact persons at the applicable counterparties.

(e)     On each Weekly Date after the Initial Closing Date, (x) the Company shall deliver to the holders a written report setting out in reasonable detail the status of, and all material information relating to, the steps taken and progress made by the Company toward obtaining, satisfying and/or causing to be satisfied the Project Senior Financing Consents, which such report shall include updates with respect to: (i) the closing of the financing and tax equity for the Foley Project, including providing the holders with copies of then-current drafts of any financing documents (including any credit agreements, security documents, tax equity LLCAs, tax equity ECCAs, guarantees or other credit support documents and any other materials requested by the Required Holders) and (ii) the efforts by the Pine Gate Parties to obtain Project Senior Financing Consents, including delivery of a tracker document ("**Consent Status Report**") with a line item for each relevant Solar Development Project Financing Facility and Material Project Document containing (A) a reasonably detailed status update of interactions with the applicable counterparty for the prior week, (B) the cumulative status from all prior weeks, (C) proposed next steps, and (D) the Company's reasonable estimate of when such Project Senior Financing Consent will be obtained and (y) at the request of the Required Holders, the Company shall schedule a conference call to discuss the Consent Status Report with senior management of the Company or other Pine Gate Parties' personnel (which call shall be scheduled prior to the next Weekly Date).

**Section 9.16.          Accounts**.

(a)     The Company will at all times maintain the Accounts.

(b)      The Company shall deposit or credit all net proceeds of the Notes, after giving effect to the payments of all expenses and other disbursements projected to be paid on the applicable Closing Date, into the DIP Proceeds Account and which shall be at all times subject to a deposit account control agreement with the Collateral Agent after the execution and delivery thereof pursuant to the terms of this Agreement to provide the Collateral Agent, for the equal and ratable benefit of the Secured Parties, a First Priority Lien on and security interest in, all of the applicable Company's right, title and interest in, to and under the DIP Proceeds Account. All withdrawals from the DIP Proceeds Account shall be used solely for the Permitted Uses and in accordance with the covenant in Section 10.18 or to make interest payments with respect to the Notes or pay fees and expenses of DIP Secured Parties Advisors in accordance with the Approved Budget.  For the avoidance of doubt, no less than $9,937,908.23 of the proceeds of the DIP First Draw Notes and $8,672,351.77 of the proceeds of the DIP Second Draw Notes shall be funded into the DIP Proceeds Account.  The Company shall provide an accounting of the DIP Proceeds Account and proceeds thereof (without duplication of such disclosure that would be included in the variance report required to be delivered pursuant to the Budget Covenant) upon request by the Required Holders or the Collateral Agent; *provided*, that such request shall not be made more than once every week and such information shall be delivered to the Collateral Agent and all holders of the Notes.  The Company shall not be permitted to redesignate or replace the DIP Proceeds Account.  Nothing in this Section 9.16(b) shall limit the Carve-Out or funding of any amounts contemplated by the Carve-Out.

(c)      Except as otherwise expressly permitted in the Approved Budget (subject to Permitted Variances) and excluding the PPA Reimbursements, which shall be deposited in the Escrow Accounts in accordance with Section 9.16(d), the Company will, and in the case of clause (i), will Procure that its Subsidiaries, take or cause to be taken all necessary action to ensure that the Collections Account is funded with (i) all Portfolio Revenues (in each case, (A) only after the Subsidiaries have applied such Portfolio Revenues in accordance with any applicable Solar Development Project Financing Facility and (B) subject to any restrictions on the distribution of such Portfolio Revenues in any applicable Solar Development Project Financing Facility or Organizational Document of such Subsidiary), (ii) upon and concurrently with any Project Sale, the Net Cash Proceeds of such Project Sale, (iii) upon the financial closing of a Solar Development Project's CTL Financing or TEBL Financing, the Net Cash Proceeds of such CTL Financing or TEBL Financing (only after the applicable Subsidiaries have applied such monies in accordance with any applicable Solar Development Project Financing Facility and subject to any restrictions on the distribution of such proceeds in any applicable Solar Development Project Financing Facility or Organizational Document of such Subsidiary) (if any), and (iv) any Net Cash Proceeds received in respect of a sale or Disposition of assets (only after the applicable Subsidiaries have applied such monies in accordance with any applicable Solar Development Project Financing Facility and subject to any restrictions on the distribution of such Net Cash Proceeds in any applicable Solar Development Project Financing Facility or Organizational Document of such Subsidiary).

(d)      The Company will, and will Procure that its Subsidiaries take or cause to be taken, all necessary action to ensure that the PPA Reimbursements are deposited *first* in the Project Costs Escrow Account and *second* in the Overhead Costs Escrow Account.

(e)      [Reserved]

-43-

**Section 9.17.   Certain Project Covenants**.

(a)     The Company shall use commercially reasonable efforts to deliver to each holder of Notes (i) the then-current drafts of the Foley Financing Documents (including any credit agreements, security documents, tax equity LLCAs, tax equity capital contribution agreements, guarantees or other credit support documents and any other materials requested by the Required Holders) and (ii) the then-current drafts of any issues lists and closing checklists, in each case of the foregoing on a weekly basis after the Initial Closing Date as and when such items are available.

(b)     The Company shall use commercially reasonable efforts to negotiate and continue to progress Power Purchase Agreements with respect to the Cabin Creek Project and the Phobos Project (the "**New PPAs**"), which shall in each case include price, delivery obligations, a tenor (which shall be at least 15 years), and other material terms each reasonably acceptable to the Required Holders. Upon the reasonable request of the Required Holders, the Company shall provide updates on the New PPAs, including information on active discussions. Any New PPAs and the terms thereof may be reviewed in consultation with the Required Holders at their request.

(c)     The Company shall use commercially reasonable efforts to deliver to each holder of Notes, to the extent available at such time, the then current drafts or other applicable evidence of the documentary conditions precedent and other key documents for (1) the Class A Substantial Completion Capital Contribution under the tax equity documents in respect of the East Atmore Project and (2) receipt of payment of the Purchase Price under the ITC Tax Credit Purchase Agreement in respect of the East Atmore.

(d)     On each Monthly Date after the Initial Closing Date, the Company shall deliver to the holders a written report setting out in reasonable detail progress towards and ability to execute Power Purchase Agreements with respect to the Allora, Cabin Creek, Gunsight, East Atmore, Foley, Lavender, Jungmann, Texas One, and Phobos Projects with material terms satisfactory to the Required Holders, including delivery of draft term sheets and long-form documents as applicable.

(e)     [Reserved].

(f)     The Company shall use reasonable best efforts to deliver to the Required Holders evidence of the following: either (a) AutoZone shall have waived in writing the conditions precedent requiring (i) the Guarantor (as defined in the AutoZone TCPA) not be in default under the AutoZone TCPA and (ii) the delivery of a certification by Seller (as defined in the AutoZone TCPA) that there has been no material adverse change in the financial condition of Guarantor (as defined in the AutoZone TCPA) that has a material adverse effect on its ability to fulfill its obligations under the AutoZone TCPA. or (b) the Seller (as defined in the AutoZone TCPA) shall have delivered a certificate to Buyer (as defined in the AutoZone TCPA) certifying as to the matters in clauses (i) and (ii).

(g)     The Company shall use reasonable best efforts to effectuate the following:  To the extent that consent is required from a third-party (a) in order for any Person listed on Schedule

-44-

<u>4.1(f)</u> to grant a Lien or claim in favor of the Collateral Agent on the Initial Closing Date, (b) to waive a default or event of default or a condition to funding or consummating a purchase under any Material Project Document or Solar Development Project Financing Facility, or (c) to effectuate a "Change of Control" (however defined) under any Solar Development Project Financing Facility, Power Purchase Agreement or interconnection agreement, then such Person shall have obtained the necessary consent or waiver from such third-party and, in the case of <u>clause (a)</u> incurred such Lien or claim, and the Company shall have delivered such consent or waiver agreements to each holder of the Notes, which shall be in form and substance reasonably satisfactory to the Required Holders. For the avoidance of doubt, the Company shall use commercially reasonable efforts to deliver the consents or waivers required under the Required Consent Documents.

(h)     If any lenders or investors under any Solar Development Project Financing Facility exercise remedies in respect of any Project, a requirement to, at the request of the Required Holders, the Company shall promptly file one or more motions, in form and substance acceptable to the Required Holders, seeking an order authorizing (i) a temporary restraining order and injunction in respect of such exercise of remedies and/or (ii) the Debtors to sell such Project to Newco on an expedited basis for a credit bid in an amount based on the purchase price adjustment schedule agreed among the Debtors and the Required Holders prior to the Petition Date (and otherwise on the terms and conditions set forth in the Stalking Horse APA to the extent applicable), and thereafter use their reasonable best efforts to consummate such sale.

### Section 9.18.   Additional Subsidiaries; Designation of Subsidiaries.

(a)     The Company shall furnish to the holders and the Collateral Agent prompt written notice of the following:

(i)     the formation or Acquisition of any new direct or indirect Subsidiary by the Company or any Operating Project HoldCo;

(ii)     a Carlyle Silo Entity becoming, or (if a Project Company) ceasing to be, a Project Company; *provided* that each A&R Project shall have a Project Company at all times and the Project Company for a A&R Project shall be the direct legal and beneficial owner of the A&R Project (subject to any later changes to such Subsidiary's status as may be designated from time to time in accordance with this <u>Section 9.18(a)</u>);

(iii)     an applicable Pine Gate Party becoming, or ceasing to be, an Encumbered Subsidiary, subject to <u>Section 9.18(d)</u>;

(iv)     an applicable Pine Gate Party becoming, or ceasing to be, a Pledged Subsidiary (including as a result of (A) such Subsidiary becoming, or ceasing to be, an Operating Project HoldCo or a directly Wholly-Owned Subsidiary of the Company, as applicable, or (B) such Subsidiary becoming a Released Subsidiary);

(v)     [Reserved]; and

(vi)     the dissolution of a Subsidiary,

-45-

and such notice shall set forth with respect to such Subsidiary (A) the applicable date, and (B) whether the change results in any Subsidiaries becoming or ceasing to be Pledged Subsidiaries, Encumbered Subsidiaries, Sold Subsidiaries or Released Subsidiaries.

(b)     Concurrently with giving written notice pursuant to Section 9.18(a), the Company shall:

(i)     deliver an updated version of Schedule 4.1(f), Schedule 5.4 and the Exhibit A most recently provided, with updates limited to those matters impacted by the designations included in the written notice delivered pursuant to Section 9.18(a) since the last copy of Schedule 5.4 and Exhibit A to have been provided, respectively; and

(ii)     (A) with respect to any Subsidiary becoming a Pledged Subsidiary or (B) subject to the Intercreditor Agreements, with respect to any other applicable Pine Gate Party acquired or formed, as notified by the Company pursuant to Section 9.18(a)(i), if such Subsidiary would be a Carlyle Silo Entity or a Shared Collateral Entity, subject to Section 9.18(e), cause such Subsidiary to become a Grantor under and as defined in the Security Agreement and take all such actions and execute and deliver, or cause to be executed and delivered, a duly executed Subsidiary Guarantor Joinder Agreement, together with all such documents, instruments, agreements, and certificates described in Sections 4.1(f) and 9.18.

(c)     The Company shall furnish to the Collateral Agent prior written notice of any change in (i) the legal name of any Note Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Note Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Note Party or (iv) the organizational identification number, if any, or, with respect to any Note Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a Uniform Commercial Code financing statement, the Federal Taxpayer Identification Number of such Note Party.

(d)     Notwithstanding anything to the contrary herein, an Encumbrance Restriction shall cause any applicable Pine Gate Party to be an "Encumbered Subsidiary" only to the extent and for so long as the Encumbrance Restriction applicable to it and its property shall apply to such Subsidiary, and, in the event such Encumbrance Restriction shall no longer be applicable, such Subsidiary may become subject to the Collateral and Guarantee Requirement.

(e)     Notwithstanding anything to the contrary herein:

(i)     the Company shall not be required to grant a security interest in the Capital Stock or any assets of any Subsidiary that has been designated as an Encumbered Subsidiary;

(ii)     the Capital Stock or any assets in any Sold Subsidiary or Released Subsidiary shall not be required to satisfy clause (a) or clause (b) of the Collateral and Guarantee Requirement, as applicable; and

-46-

(iii)     a Sold Subsidiary will no longer be a Subsidiary of the Company and shall cease to be subject to the Collateral and Guarantee Requirement.

(f)     The Company will, in each case as promptly as practicable, notify the Collateral Agent of the existence of any deposit account or securities account maintained by the Company or any Affiliate thereof in respect of which a Control Agreement is required to be in effect pursuant to clause (c) of the definition of the term "Collateral and Guarantee Requirement" but is not yet in effect.

**Section 9.19.  Additional Beneficial Ownership Certification**.  At least five (5) days prior to any Person becoming a Note Party, if requested by any holder, the Company shall cause any such Person that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and has not previously delivered a Beneficial Ownership Certification to deliver a Beneficial Ownership Certification to the Purchasers.

**Section 9.20.     Amendments to any Additional DIP Facilities**. The Company shall consult with the Required Holders regarding any amendments, restatements, amendments and restatements, supplements, modifications or waivers to any Additional DIP Documents and shall, or shall cause the Company or such Subsidiary or Affiliate thereof, as applicable, to consider any reasonable comments by the Required Holders to such amendments, restatements, amendments and restatements, supplements, modifications or waivers.

**Section 9.21.     Most Favored Lender.**  Subject to the DIP Orders, if, from and after the Initial Closing Date, the terms of any Indebtedness incurred by the Company, including a Replacement Additional DIP Facility, or any amendment to any existing Indebtedness, including under the Brookfield DIP Facility or the Fundamental DIP Facility and the applicable "Security Documents" (however defined) in connection therewith, would be more favorable to a lender or creditor party thereto when compared to the terms of this Agreement, then the Company will, within five (5) Business Days after such Indebtedness or amendment is consummated, deliver written notice thereof to each holder of a Note.  Such notice shall be signed by a Responsible Officer and shall refer to the provisions of this Section 9.20 and set forth a reasonably detailed description of the proposed Indebtedness and/or amendment (including any defined terms used therein) and reasonably detailed explanatory calculations relating thereto, as applicable. At the election of the Required Holders in their sole discretion, this Agreement and any applicable Financing Documents shall be amended such that the terms of this Agreement are no less favorable in any respect to the holders of the Notes than the terms of such other Indebtedness.

**Section 9.22.  Credit Support; FERC; Motions.**

(a)     As directed by the Required Holders, the Company will obtain or replace any existing credit support in favor of lenders or investors to the Carlyle Silo Entities with guarantees, indemnities, or other acceptable credit support, which shall be provided by NPA PGR Blocker Holdco, LLC, NPA Polaris Opco, Holdco, LLC, NPA Polaris Devco Holdco, LLC, or the Prepetition Issuer, as applicable, and otherwise be acceptable to the Required Holders, in each case without triggering an event of default or other material adverse consequences under any relevant Solar Development Project Financing Facility.

(b)      The Company will use its reasonable best efforts to (i) (A) obtain approval from the FERC under section 203 of the Federal Power Act, including with respect to any Sale, (B) if required, make any filings and obtain any consents or approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and (C) obtain any other required regulatory approvals or third party consents, in each case if requested by the Required Holders to consummate any Sale supported by the Required Holders; *provided*, for the avoidance of doubt, that such obligation shall not preclude the Note Parties seeking to obtain regulatory approvals or third party consents in connection with any Sale selected as the highest and best offer pursuant to the Bidding Procedures), and (ii) coordinate with the Required Holders and the DIP Noteholder Advisors on such approvals, filings and consents, including providing copies of such documents.

### Section 9.23.   Conference Calls; Meetings; Etc..

(a)      Upon reasonable written notice from the Required Holders, the Company shall conduct up to one update call with the holders of the Notes per week and shall make one or more members of its senior management team, including but not limited to a Responsible Officer, available for such call; *provided*, that, notwithstanding any similar requirement under the Brookfield DIP Credit Agreement or the Fundamental DIP Credit Agreement, the Company shall only be required to conduct one update call in total with respect to this Agreement, the Brookfield DIP Credit Agreement, and the Fundamental DIP Credit Agreement (which update call can be attended by the holders of the Notes, the Brookfield DIP Lenders, and the Fundamental DIP Lenders).

(b)      Upon reasonable written notice from the Required Holders, the Debtors shall make one or more members of the Debtors' senior management team available for discussions with the holders of the Notes and the DIP Noteholder Advisors.

**Section 9.24.   Foley**.  The Company will use commercially reasonable efforts to ensure that the enforcement of remedies by the Collateral Agent hereunder or under the Security Documents (including any subsequent transfer of any foreclosed-upon assets) is permitted by the Foley Financing Documents.

**Section 9.25.   ACT**. The Company shall, upon reasonable request, provide Newco, or cause to be provided to Newco, access to information technology and data (including from ACT) related to operations and maintenance, engineering, procurement, construction, development and asset management services provided to the Carlyle Silo Entities.

**Section 9.26. Bankruptcy Filings.**   The Company shall deliver to the DIP Noteholder Advisors all material draft pleadings, motions, including First Day Motions, documents and other filings to be filed in the Chapter 11 Cases or in any other insolvency proceeding commenced by the Company or any Subsidiary or Affiliate thereof, at least 48 hours in advance of the filing of such  pleadings, motions, documents and other filings with the Bankruptcy Court or court overseeing such other insolvency proceeding, and shall, or shall cause the Company or such Subsidiary or Affiliate thereof, to incorporate any reasonable comments by the Required Holders or the DIP Noteholder Advisors to such pleadings, motions, documents and other filings.

-48-

**Section 9.27.   Project Surety Bonds**. Subject to the terms and conditions thereof, the Company shall, and shall Procure that each Subsidiary shall, (i) use reasonable best efforts to draw or cause to be drawn all available Project Surety Bonds as the same become available to draw, (ii) consult with the Required Holders with respect to any settlement negotiations with respect thereto, and (iii) to accept any settlement offer with respect thereto only with the consent of the Required Holders.

**Section 9.28.   Material Decisions**.  The Note Parties shall consult the Required Holders regarding all material decisions relevant to the Collateral and the Carlyle Silo Assets.

**Section 9.29.   Ordinary Course of Business**.  Each Note Party shall and shall Procure that each of its Subsidiaries shall, at all times during the term of this Agreement, continue to operate the Carlyle Silo Assets in the ordinary course of business, in each case, subject to this Agreement, the DIP Orders and the Approved Budget.

**Section 9.30.   Milestones.** The Company shall, and shall Procure that each of its Subsidiaries shall, achieve each of the Milestones set for on Schedule 9.25.

**Section 9.31.   Budget.** The Company shall, and shall Procure that each of its Subsidiaries, shall comply with the Budget Covenant and the Variance Covenant.

**Section 9.32.   Certain Bankruptcy Matters**.  The Note Parties shall comply (i) after entry thereof, with all of the requirements and obligations set forth in the DIP Orders and the Cash Management Orders, as each such order is amended and in effect from time to time in accordance with this Agreement, (ii) after entry thereof, with each Approved Bankruptcy Court Order, as each such order is amended and in effect in accordance with this Agreement and (iii) after entry thereof, with the orders (to the extent not covered by subclause (i) or (ii) above) approving the Debtors' "first day" and "second day" relief and any pleadings seeking to establish material procedures for administration of the Chapter 11 Cases or approving significant or material non-ordinary course transactions and obtained in the Chapter 11 Cases, as each such order is amended and in effect in accordance with this Agreement; *provided* that such orders shall be in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, shall not have been vacated, reversed or stayed and shall not have been amended or modified except in a manner reasonably satisfactory to the Collateral Agent and the Required Holders.

**Section 9.33.   Replacement Additional DIP Facility.** If (a) (i) any covenants in any Replacement Additional DIP Facility are more favorable to the provider of such financing than the corresponding terms of this Agreement or (ii) a Replacement Additional DIP Facility is amended so that such covenants are more favorable to the holder of such Indebtedness than the corresponding term of this Agreement, then, in each case, at the election of the Required Holders in their sole discretion, this Agreement and any applicable Financing Documents shall be automatically amended upon written notice to the Company so that the Notes benefit from the same covenants, and (b) any pricing and fees in any Replacement Additional DIP Facility are more favorable to the provider of such financing than the pricing and fees of this Agreement, then, at the election of the Required Holders in their sole discretion, the pricing and fees in respect of the Notes shall be increased to the same extent that such pricing and fees in the Replacement

-49-

Additional DIP Facility represent an increase relative to the Additional DIP Facility being replaced (subject to any requirements for such amendments set forth in the DIP Orders).

Section 9.34. **Cash Management**. The Company shall, and shall Procure that each of its Subsidiaries will maintain their cash management arrangements consistent with past practice and in compliance with the Cash Management Motion and Cash Management Orders, subject to amendments acceptable to the Required Holders; *provided* that the Cash Management Motion and the Cash Management Orders shall be in form and substance acceptable to the Required Holders.  No Account pledged as Collateral will be closed during the Chapter 11 Cases without the prior consent of the Required Holders.

## Section 10.    NEGATIVE COVENANTS.

The Company covenants that so long as any of the Notes are outstanding:

Section 10.1. **Transactions with Affiliates**.  The Company will not, and will Procure that each of its Subsidiaries will not, enter into directly or indirectly any transaction or group of related transactions (including the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Affiliate (other than the Company or another Subsidiary) (each such transaction, an "**Affiliate Transaction**"), except (a) as contemplated in the Material Contracts identified in Schedule 5.3 as of the Initial Closing Date, (b) to the extent permitted in accordance with Section 10.3(iv), (c) intercompany loans to the extent not prohibited by Section 10.6 or Section 10.13, (d) the payment of Restricted Payments expressly permitted under Section 10.8, (e) the Financing Documents, (f) the transactions expressly specified in the Approved Budget or (g) any transaction with Blue Ridge or any direct or indirect Subsidiary of the Company that is not a Note Party (including ACT) with the prior written consent of the Required Holders in their sole discretion.

Section 10.2. **Merger, Amalgamation, Consolidation, Etc.**  Except to the extent authorized pursuant to the Sale Order, the Company will not, and will Procure that each of its Subsidiaries will not, enter into any transaction of merger, amalgamation, consolidation or limited liability company or corporate division or plan of division, change its form of organization or its business, liquidate or dissolve itself (or suffer any liquidation or dissolution) or discontinue its business, except as permitted in accordance with Section 10.7 and, in the case of any Subsidiary. The Company will not, and will Procure that each of its Subsidiaries will not, purchase or otherwise acquire all or substantially all of the assets or any class of stock or ownership interest of any other Person, except as permitted by Section 10.13. The Company will Procure that each of its Subsidiaries, and each of its Project Companies, will remain Wholly-Owned Subsidiaries (*provided* that, for the avoidance of doubt, Project Companies in respect of which the Company or a Subsidiary of the Company owns an indirect ownership interest through a Class B Member in a Tax Equity Vehicle shall be permitted under this Section 10.2 to the extent 100% of such Class B Member's interest in such Tax Equity Vehicle is wholly-owned by a Wholly-Owned Subsidiary).

Section 10.3. **Line of Business**. The Company will not, and will Procure that each of its Subsidiaries will not, engage in any business other than (a) (i) in the case of a SPV Holding Company, holding the interests in the Project Companies or Class B Members (and entering into Solar Development Project Financing Facilities in connection therewith) or other SPV Holding

-50-

Companies, (ii) in the case of any Class B Member, holding the "Class B" or "managing" membership interests in a Tax Equity Vehicle (and entering into Solar Development Project Financing Facilities in connection therewith), (iii) in the case of any Project Company, the development, construction, ownership, financing, operation and maintenance of the applicable Project, (iv) in the case of a Shared Collateral Entity, those businesses which such Shared Collateral Entity is engaged in as of the Initial Closing Date and (v) in the case of the Company, issuing the Notes and owning its Subsidiaries (other than any Operating Project HoldCo and the Operating Project HoldCo Subsidiaries) and (b) in the ordinary course of business or such other lines of business as may be consented to by Required Holders.

**Section 10.4.   Economic Sanctions, Etc**.  The Company will not, and will Procure that each of its Controlled Entities will not (a) become (including by virtue of being owned or controlled by a Blocked Person), own or control a Blocked Person or (b) directly or indirectly have any investment in or engage in any dealing or transaction (including any investment, dealing or transaction involving the proceeds of the Notes) with any Person if such investment, dealing or transaction (i) would cause any holder or any Affiliate of such holder to be in violation of, or subject to sanctions under, any law or regulation applicable to such holder, or (ii) is prohibited by or subject to sanctions under any Sanctions Laws.

**Section 10.5.   Liens**.  The Company will not and will Procure that each of its Subsidiaries will not directly or indirectly create, incur, assume or permit to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to the Collateral or any property or asset (including any document or instrument in respect of goods or accounts receivable) of the Company or any such Subsidiary, now owned or held or hereafter acquired, or any income or profits therefrom (other than Liens granted under any Tax Equity Financing Document), except for Permitted Liens, the Carve-Out and the Liens created in connection with the Additional DIP Facilities.

**Section 10.6.   Indebtedness**.  The Prepetition Issuer will not, and will Procure that each of its Subsidiaries will not, create, incur, assume or suffer to exist any Indebtedness other than Permitted Debt; *provided* that no SPV Holding Company shall incur, assume or suffer to exist any Indebtedness (other than (a) Indebtedness arising under any Solar Development Project Financing Facilities that a SPV Holding Company may be party to in its capacity as a Class B Member of a Tax Equity Vehicle for a Project or (b) Indebtedness described in <u>clause (e)</u> of the definition thereof with respect to such SPV Holding Company).

**Section 10.7.   Sale of Assets**.

(a)      The Company will not and will Procure that each of its Subsidiaries will not sell, lease (as lessor) or transfer (as transferor) or otherwise dispose of any property or assets, whether now owned or hereafter acquired, other than Permitted Dispositions.

(b)      The Company will not and will Procure that each of its Subsidiaries will not Dispose of (i) any Capital Stock or similar equity interest in any Pledged Subsidiary or (ii) any Project other than with the approval of the Required Holders (not to be unreasonably withheld).

-51-

(c)     In the case of a Disposal of a Project, the Company shall deposit such Project's Par Amount in the Collections Account for prepayment in accordance with <u>Section 8.3(a)</u>.

(d)     Notwithstanding the foregoing, the Company will not and will Procure that each of its Subsidiaries will not Dispose of any assets of any Debtor or any Carlyle Silo Assets, if the fair market value or sale price or such assets, in either case, when aggregated with all such prior sales, exceeds $2,500,000, other than sales on terms and conditions reasonably acceptable to the Required Holders.

**Section 10.8.  Restricted Payments**.  Except as expressly specified in the Approved Budget and subject to <u>Section 9.7</u>, the Company will not and will Procure that each of its Subsidiaries will not make any Restricted Payment (except to the Company or another Subsidiary of the Company that has granted to the Collateral Agent a First Priority Lien over substantially all its assets) without the prior written consent of the Required Holders.

**Section 10.9.  Reporting Practices**.  The Company will not make any change in reporting practices or accounting procedures, except as may be required or permitted by GAAP or Applicable Law.

**Section 10.10.  Bank Accounts**.  The Company will not establish, or instruct the Collateral Agent or any other Person to establish, any bank account other than the Accounts and any Permitted Local Account.  The Company shall not permit the monthly average daily balance of the amount on deposit in any Permitted Local Account to exceed one million dollars ($1,000,000).

**Section 10.11.  ERISA**.  The Company will not, and will Procure that any ERISA Affiliate will not, maintain, Company or contribute to any employee benefit plan subject to Title IV of ERISA or Section 4975 of the Code.

**Section 10.12.  Material Changes to Organizational Documents, Material Project Documents, Governmental Approvals, Independent Manager.**

(a)     The Company will not, and will Procure that each of its Subsidiaries will not, without the prior written consent of the Required Holders, amend, amend and restate, or otherwise modify their respective Organizational Documents.

(b)     The Company will not, and will Procure that each of its Subsidiaries will not, without the prior written consent of the Required Holders, (i) remove or replace the Independent Manager, (ii) limit the authority or scope of consent rights of the Independent Manager, or (iii) amend, amend and restate, or otherwise modify their respective Organizational Documents or the Organizational Documents of any entity on whose governing body the Independent Manager serves or any direct or indirect subsidiary of any such entities, in each case without the consent of the Required Holders.

(c)     The Company will not, and will Procure that each of its Subsidiaries will not, enter into any Additional Project Document in replacement of a Material Project Document without the prior written consent of the Required Holders.

-52-

(d)     The Company will not, and will Procure that each of its Subsidiaries will not, without the prior written consent of the Required Holders, cause, consent to, or permit, any termination or surrender of, amendment, modification, variance or supplement to, or waiver of timely compliance with, any terms or conditions of any Governmental Approval (other than amendments, modifications, variances, supplements or waivers to cure any defective provisions contained therein or to permit immaterial deviations from the terms thereof, if, in each case, such amendment, modification, variance, supplement or waiver is not inconsistent with the Financing Documents) to the extent that action could reasonably be expected to have an adverse effect on the Company and its Subsidiaries.

(e)     The Company will not, and will Procure that each of its Subsidiaries will not, without the prior written consent of the Required Holders, enter into, amend, modify or grant any waiver or consent under, or permit the full or partial termination of (except upon fulfillment of the obligations of the parties thereto thereunder or the scheduled expiration of the term thereof), or assign its or their obligations under any Material Contract without the prior written consent of the Required Holders (not to be unreasonably withheld).

Section 10.13.  **Investments**.  The Company will not, and will Procure that each of its Subsidiaries will not, make any advance, loan or extension of credit to, or make any Acquisitions or investments (whether by way of transfers of property, contributions to Capital Stock, Acquisitions of stock, securities, evidences of indebtedness or otherwise) in, or purchase any stock, bonds, notes, debentures or other securities of, any other Person, except (a) Permitted Investments, (b) in the case of the Company, the Capital Stock of (i) its Subsidiaries as set forth in Schedule 5.4 or (ii) Tax Equity Vehicles with respect to A&R Projects other than those in effect on the date hereof, (c) investments expressly specified in the Approved Budget and (d) in the case of any Class B Member, any advance, loan or extension of credit required to be made pursuant to the applicable Tax Equity Financing.

Section 10.14.  **No Other Subsidiaries**.  Subject to Section 9.18 and compliance by the Company and its Subsidiaries with the Collateral and Guarantee Requirement, the Company will not, and will Procure that each of its Subsidiaries will not, (i) acquire, create, form, own, maintain or invest in any Subsidiaries except to the extent not prohibited by Section 10.13; (ii) own any Capital Stock in, or otherwise control any voting stock of or have any ownership interest in, any joint venture or other Person except to the extent not prohibited by Section 10.13; or (iii) in the case of the Company and its direct Subsidiaries, issue any Capital Stock of any Person that does not constitute part of the Collateral, in each instance other than the Company's or any of its Subsidiaries' ownership, maintenance and investment in the respective SPV Holding Companies and Project Companies as set forth in Schedule 5.4.

Section 10.15.  **Prohibited Restrictions on Subsidiaries**.  Except with respect to Permitted Liens and any property subject to Permitted Liens or customary restrictions that arise in connection with a Disposition permitted by Section 10.7 which are applicable only to the assets subject to such Disposition, the Company shall not, and the Company shall Procure that each of its Subsidiaries shall not, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind (including any Cash reserves) on the ability of any Subsidiary (other than any Encumbered Subsidiary or any other Subsidiary party to a Solar Development Project Financing Facility) to (a) pay Restricted Payments, (b) repay or prepay any

-53-

Indebtedness owed by such Subsidiary to a Note Party (if any), (c) make loans or advances to the Company or any SPV Holding Company between it and the Company, or (d) create, incur, assume or suffer to exist Liens on property of such Person.

Section 10.16. **Foley.** The Company will not, and will Procure that each Pine Gate Party will not, enter into any Solar Development Project Financing Facility in respect of the Foley Project (the "**Foley Financing Documents**") without the prior written consent of the Required Holders, not to be unreasonably withheld, conditioned or delayed.

Section 10.17. **Restricted Parties**. Notwithstanding anything to the contrary in any Financing Document, the Company shall not, and shall not permit any Subsidiary to: (i) make any investment in any Restricted Party; (ii) dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, to any Restricted Party, or to, loan, invest, pay, or otherwise transfer any assets to any Restricted Party; or (iii) transfer the assets or property of Company or any Subsidiary thereof, including cash proceeds of the Notes, to any Restricted Party unless such transfer is (I) (a) specifically identified in the Approved Budget in a separate line item, (b) consented to by the Required Holders or (c) in the case of cash proceeds of the Notes, specifically identified in the documentation pursuant to which such Notes were funded and (II) in the form of a secured intercompany loan pledged to the Collateral Agent pursuant to terms and conditions reasonably acceptable to the Secured Parties.

Section 10.18. **Use of Proceeds**.

(a)    The Company shall not, and shall not permit any Subsidiary to use any proceeds of the Notes and/or cash collateral of the Prepetition Secured Parties (i) for any purpose not set forth in the Approved Budget, (ii) to transfer to, or to fund projects owned by, the Brookfield Silo Entities or Fundamental Silo Entities, (iii) to fund operations or other expenses that are related to Blue Ridge, ACT, the Brookfield Silo Entities, or the Fundamental Silo Entities (and, for the avoidance of doubt, not principally for the operations of the Carlyle Silo Entities or corporate overhead costs of Pine Gate Development, LLC in accordance with the Approved Budget), in each case, unless consented to by the Required Holders.

(b)    Notwithstanding anything to the contrary herein, the Company shall not, and shall not permit any Subsidiary to use any proceeds of the Notes to pay any fees, expenses, or other amounts incurred by any advisors, consultants, or other professionals retained by or on behalf of any lender, agent, or secured party under any Other Credit Facility; *provided* that, for the avoidance of doubt, this Section 10.18 shall not prohibit the Company and its Subsidiaries from using any proceeds of the Notes to pay the fees and expenses of the DIP Secured Parties Advisors.

(c)    The Company shall not, and shall not permit any Subsidiary (in each case, including any of their representatives) to use any proceeds of the Notes, the Carve-Out or any cash collateral to (i) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt or collateral position of the Collateral Agent, the holders of the Notes, the secured creditors under the Brookfield

-54-

Prepetition Credit Agreement or the Fundamental Prepetition Credit Agreement, or the Prepetition Secured Parties, whether by (1) challenging the validity, extent, amount, perfection, priority or enforceability of the Obligations under the Notes, any of the Prepetition Secured Obligations, the Brookfield Prepetition Credit Facility, the Fundamental Prepetition Credit Facility, or the Prepetition Documents, (2) challenging the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect thereto, (3) seeking to subordinate or recharacterize the obligations under the Notes, the Brookfield Prepetition Credit Facilities, the Fundamental Prepetition Credit Facilities or the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (4) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Collateral Agent, the holders of the Notes, the secured creditors under the Brookfield Prepetition Credit Agreement or the Fundamental Prepetition Credit Agreement, the Prepetition Secured Parties, or any of their respective officers, directors, agents, employees or representatives, (ii) prevent, hinder or otherwise delay the Collateral Agent's, the holders', Brookfield's (with respect to the Brookfield Prepetition Credit Facility), Fundamental's (with respect to the Fundamental Prepetition Credit Facility), or the Prepetition Secured Parties' assertion, enforcement, or realization on the Collateral, the Prepetition Collateral, or the collateral securing the Fundamental Prepetition Credit Facility or the Brookfield Prepetition Credit Facility in accordance with the Financing Documents, the documentation for the Fundamental Prepetition Credit Facility or the Brookfield Prepetition Credit Facility or Prepetition Documents, as applicable, (iii) seek to modify the rights granted to the Collateral Agent, the holders of the Notes, the secured creditors under the Fundamental Prepetition Credit Facility or the Brookfield Prepetition Credit Facility, or the Prepetition Secured Parties under the Financing Documents, the documentation for the Fundamental Prepetition Credit Facility or the Brookfield Prepetition Credit Facility or the Prepetition Documents, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion, or (iv) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (1) approved by an order of the Bankruptcy Court (which order may be the Interim DIP Order or the Final DIP Order) and (ii) permitted by the Financing Documents; *provided* that during the Challenge Period (as defined in the DIP Orders), an investigation budget in an aggregate amount of $25,000 of the Collateral and/or the Prepetition Collateral, including cash collateral, and the proceeds thereof, may be used by any official committee of unsecured creditors (the "**Committee**") to investigate, but not to prepare, initiate, litigate, or prosecute an objection to, or otherwise challenge, (i) the claims and liens of the Prepetition Secured Parties against the Debtors, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties.

      **Section 10.19. Executive Compensation**. Without the prior written consent of the Required Holders, the Company shall not, and shall not permit any of its Subsidiaries to, (a) establish key employee incentive plans, key employee retention plans or any other similar payments or awards programs, (b) change or amend in any manner any such existing programs or related programs or (c) agree to any executive compensation plan, incentive payment or plan, retention plan or executive bonuses.

**Section 10.20. Material Settlements**. Company shall not, and shall not permit any of its Subsidiaries to, enter into any material settlements of litigation claims, claims held by Governmental Authorities, trade claims, general unsecured claims, or judgments unless such settlement is in form and substance reasonably acceptable to the Required Holders.

**Section 10.21. Use of Collateral**. Use Collateral, proceeds of Notes, any portion of the Carve-Out or any other amounts directly or indirectly:

(a)     to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Financing Documents or the Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Obligations in "full" in cash;

(b)     to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, against the Collateral Agent, the holders of the Notes, the other Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any avoidance actions or causes of action under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority Claims, the Liens granted under the Financing Documents, the Prepetition Documents, the Prepetition Secured Obligations or the Liens securing, or guarantees in respect of, the Prepetition Secured Obligations; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Secured Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Collateral Agent or the holders of the Notes hereunder or under any of the other Financing Documents or (B) the Prepetition Noteholders (in each case, as applicable, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Financing Documents and the DIP Orders); or (vi) objecting to, contesting, or interfering with, in any way, the Collateral Agent's and the holders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; or

(c)     in any manner that causes or might cause any issuance of Notes or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

**Section 10.22. Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleading**s. On or after the Petition Date, without the Required Holders' prior written consent, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Note Party to (i) use any of the material properties or assets of the Note Parties outside the ordinary course of business, (ii) satisfy prepetition claims of the Note Parties or (iii) incur material

-56-

administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Approved Budget, subject to Permitted Variances), (b) seeking to reject or assume any contract, agreement, lease or other agreement to which any Note Party is a party, or (c) seeking relief that is otherwise inconsistent with this Agreement or the DIP Orders.

**Section 10.23. Liquidity.** The Company shall not permit (commencing with the first calendar week commencing after the Initial Closing Date) Liquidity to be less than $5,000,000, tested as of Monday of each calendar week (each such a date, a "**Liquidity Testing Date**") until the consummation of a sale or all or substantially all of the Carlyle Silo Assets.

**Section 10.24. Additional Bankruptcy Matters.** Subject to the terms of the DIP Orders, no Note Party shall, without the prior written consent of the Required Holders, do any of the following:

(a)     assert, join, support or prosecute any claim or cause of action against any of the holders of the Notes, unless such claim or cause of action is in connection with the enforcement of the Financing Documents against any of the Collateral Agent or the holders of the Notes; *provided* that nothing contained in this Section 10.24 shall prohibit the Debtors from responding to or complying with discovery requests of any statutory committee appointed or appearing in the Chapter 11 Cases, in whatever form, made in connection with an investigation against any of the Collateral Agent or the holders of the Notes or the payment from proceeds of the Notes of professional fees related thereto;

(b)     subject to Section 11, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Collateral Agent or the holders of the Notes with respect to the Collateral following the occurrence of an Event of Default; *provided*, that any Note Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Orders;

(c)     make any payment or distribution to any Affiliate or insider (as such term is defined in the Bankruptcy Code) unless expressly set forth in the Approved Budget; or

(d)     file, amend, modify, execute, or enter into, or file a pleading seeking authority to execute, enter into, amend, or modify, any material pleading or transaction document that is not in form and substance acceptable to the Required Holders.

**Section 10.25. Holdings.** Notwithstanding anything to the contrary set forth in this Agreement or any other Financing Document, at no time shall the Company nor any of its Affiliates be permitted to hold any Notes or purchase (by assignment, participation or otherwise) any Notes or any right title or interest therein, and any such purported assignment, participation or purchase by the Company or any of its Affiliates shall be void ab initio and of no force or effect whatsoever; *provided* this Section 10.25 shall not prohibit any Mandatory Prepayment pursuant to Section 8.3 or any optional prepayment of all outstanding Notes in full pursuant to Section 8.2 so long as in each case the Notes so prepaid or redeemed are immediately cancelled.

-57-

**Section 11.**     EVENTS OF DEFAULT.

An "**Event of Default**" shall exist if any of the following conditions or events shall occur and be continuing:

(a)     the Company defaults in the payment of (i) any principal or Prepayment Premium (as applicable), if any, on any Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or redemption or by declaration or otherwise or (ii) interest on any Note or any fee or any other amount due hereunder or due and payable pursuant to the DIP Orders when the same becomes due and payable; or

(b)     the Company defaults in the payment of any interest (other than PIK Interest) on any Note or any other amount payable hereunder or under any Financing Document for more than five (5) Business Days after the same becomes due and payable; or

(c)     the Company defaults in the performance of or compliance with any term contained in Sections 7.1(a)-(e), (p), (q) or (r), Section 9.3, Section 9.11, Section 9.12, Section 9.15, Section 9.16, Section 9.17, Section 9.18, Section 9.19, Section 9.24, Section 9.25, Section 9.26, Section 9.27, Section 9.30, Section 9.31, Section 9.32 and Section 10 (solely in respect of Section 10, taking into account the commencement of the Chapter 11 Cases and the continuation and prosecution thereof); or

(d)     any Note Party or any Subsidiary defaults in the performance of or compliance with any term contained herein or in any other Financing Document to which it is a party (other than those referred to in Sections 11(a), (b) and (c)) and such default is not remedied within five (5) Business Days after the earlier of (i) a Responsible Officer of a Note Party or Subsidiary, as applicable, obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from the Collateral Agent or any holder of a Note (any such written notice to be identified as a "notice of default" and to refer specifically to this Section 11(d)); or

(e)     any representation or warranty made in writing by or on behalf of any Note Party or any Subsidiary in any Financing Document or DIP Order or in any certificate or writing furnished in connection with the transactions contemplated hereby proves to have been untrue or misleading in any material respect on the date as of which made, unless the matter giving rise to such misrepresentation is capable of remedy and is remedied within fifteen days after the earlier of (i) a Responsible Officer of a Note Party or Subsidiary, as applicable, obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from any holder of a Note (any such written notice to be identified as a "notice of default" and to refer specifically to this Section 11(e)); or

(f)     Other than in connection with the Chapter 11 Cases and solely to the extent that the taking of any remedial action as a result of the following occurrences is not stayed pursuant to section 362 of the Bankruptcy Code or any other order of the Bankruptcy Court, (i) the Company is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest on any Indebtedness (other than the Indebtedness under the Financing Documents) beyond any period of grace provided with respect thereto, or (ii) the Company is in default in the performance of or compliance with any term of any evidence

-58-

of any Indebtedness (other than the Indebtedness under the Financing Documents) or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Indebtedness has become, or has been declared (or one or more Persons are entitled to declare such Indebtedness to be), due and payable before its stated maturity or before its regularly scheduled dates of payment, or (iii) as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Indebtedness to convert such Indebtedness into equity interests), (x) the Company has become obligated to purchase or repay Indebtedness (other than the Indebtedness under the Financing Documents) before its regular maturity or before its regularly scheduled dates of payment, or (y) one or more Persons have the right to require the Company to purchase or repay such Indebtedness; <u>provided</u> that, notwithstanding the foregoing, this clause (f) shall not apply to any Prepetition Indebtedness enforcement of which is stayed as a result of the Chapter 11 Cases; or

(g)     Any subsidiary of the Company that is not a Debtor (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction (including by becoming a Debtor in the Chapter 11 Cases), (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (v) is adjudicated as insolvent or to be liquidated, or (vi) takes limited liability company or corporate action for the purpose of any of the foregoing; in each case without the reasonable consent of the Required Holders; or

(h)     a court or other Governmental Authority of competent jurisdiction enters an order appointing, without consent by any Note Party, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of any Subsidiary of the Company that is not a Debtor, or any such petition shall be filed against any such Subsidiary and such petition shall not be dismissed within thirty (30) days; or

(i)     except for any order fixing the amount of any claim in the Chapter 11 Cases, one or more final and non-appealable judgments or orders for the payment of money aggregating in excess of $2,000,000 (or its equivalent in the relevant currency of payment), including any such final order enforcing a binding arbitration decision, are rendered against the Company and which judgments are not, within sixty (60) days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within thirty (30) days after the expiration of such stay; or

(j)     if (i) any Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under section 412 of the Code, (ii) a notice of intent to terminate any Plan shall have been or is reasonably expected to be filed with the PBGC or the PBGC shall have instituted proceedings under ERISA section 4042 to terminate or appoint a

-59-

trustee to administer any Plan or the PBGC shall have notified the Company or any ERISA Affiliate that a Plan may become a subject of any such proceedings, (iii) there is any "amount of unfunded benefit liabilities" (within the meaning of section 4001(a)(18) of ERISA) under one or more Plans, determined in accordance with Title IV of ERISA, (iv) the aggregate present value of accrued benefit liabilities under all funded Non-U.S. Plans exceeds the aggregate current value of the assets of such Non-U.S. Plans allocable to such liabilities, (v) the Company or any ERISA Affiliate shall have incurred or is reasonably expected to incur any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, (vi) the Company or any ERISA Affiliate withdraws from any Multiemployer Plan, (vii) the Company or any ERISA Affiliate establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Company or any ERISA Affiliate thereunder, (viii) the Company or any ERISA Affiliate fails to administer or maintain a Non-U.S. Plan in compliance with the requirements of any and all Applicable Laws, statutes, rules, regulations or court orders or any Non-U.S. Plan is involuntarily terminated or wound up, or (ix) the Company or any ERISA Affiliate becomes subject to the imposition of a financial penalty (which for this purpose shall mean any tax, penalty or other liability, whether by way of indemnity or otherwise) with respect to one or more Non-U.S. Plans; and any such event or events described in clauses (i) through (ix) above, either individually or together with any other such event or events, could reasonably be expected to have a Material Adverse Effect.  As used in this Section 11(j), the terms "**employee benefit plan**" and "**employee welfare benefit plan**" shall have the respective meanings assigned to such terms in section 3 of ERISA; or

(k)      (i) any material provision of any Financing Document is declared in a final judgment by a court of competent jurisdiction to be illegal or unenforceable as against the Company, (ii) any Financing Document ceases to be valid and binding as against the Company or in full force and effect as against the Company (in each case, except in accordance with its terms and not related to any default thereunder) or (iii) any Financing Document is repudiated in writing by a Note Party party thereto; or

(l)      Following entry of the Interim DIP Order or Final DIP Order, as applicable, any Security Document fails or ceases to create a valid and perfected Lien with the priority set forth in the Interim DIP Order or the Final DIP Order (as applicable) on any material portion of the Collateral purported to be covered thereby, other than as a result of actions or failure to act by the Collateral Agent or any holder of a Note; or

(m)      there shall have occurred a Change of Control without the consent of the Required Holders;

(n)      any A&R Project with respect to which the applicable Project Company or another Subsidiary having an ownership interest therein and:

(i)      is in default under any Material Contract to which it is a party beyond any grace period provided therein with respect thereto, other than breaches, defaults, violations and terminations of, or claims or demands in connection with, any engineering, procurement and construction contract or subcontract to which Blue Ridge Power, LLC or

-60-

any of its direct or indirect subsidiaries is party, or credit support provided in connection with any of the foregoing;

(ii)      is a party to a Material Contract under which any counterparty, as a result of an event or omission in connection therewith that has occurred and is continuing, is entitled to terminate such Material Contract pursuant to the terms thereof;

(iii)      is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest on any Indebtedness (other than the Indebtedness under a Solar Development Project Financing Facility) that is outstanding in an aggregate principal amount of at least $1,000,000 (or its equivalent in the relevant currency of payment) beyond any period of grace provided with respect thereto, other than with respect to a Surety Matter;

(iv)      is in default in the performance of or compliance with any term of any evidence of any Indebtedness (other than the Indebtedness under a Solar Development Project Financing Facility) in an aggregate outstanding principal amount of at least $1,000,000 (or its equivalent in the relevant currency of payment) or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Indebtedness has become, or has been declared (or one or more Persons are entitled to declare such Indebtedness to be), due and payable before its stated maturity or before its regularly scheduled dates of payment;

(v)      as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Indebtedness to convert such Indebtedness into equity interests), (x) has become obligated to purchase or repay Indebtedness (other than the Indebtedness under a Solar Development Project Financing Facility) before its regular maturity or before its regularly scheduled dates of payment in an aggregate outstanding principal amount of at least $1,000,000 (or its equivalent in the relevant currency of payment), or (y) is subject to the right of one or more Persons to purchase or repay such Indebtedness;

(vi)      has had (A) any of its Material Project Documents terminate or expire other than in the case of expiration of a Material Project Document in accordance with its terms, (B) any material provision of any Material Project Document declared in a final judgment by a court of competent jurisdiction to be illegal or unenforceable as against the Company, a Subsidiary or any counterparty to such Material Project Document, (C) any Material Project Document cease to be valid and binding as against the Company, a Subsidiary or any counterparty to such Material Project Document or in full force and effect as against the Company, a Subsidiary or any counterparty to such Material Project Document (in each case, except in accordance with its terms and not related to any default thereunder) or (D) any Material Project Document repudiated in writing by the Company or any of its Subsidiaries, and any such event or events described in clauses (A) through (D), either individually or together with any other such event or events, could reasonably be expected to be Material; and

-61-

(vii)    with respect to any A&R Project that is an Early Stage Project or Construction Project, such Early Stage Project or Construction Project, as applicable, has not achieved full notice to proceed within six (6) months following the Projected NTP Date;

*provided* that, it shall only be an Event of Default under this Section 11(n) if the occurrence of the events described in clauses (i) through (vii) above, could, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the holders of the Notes and did not occur in connection with the Chapter 11 Cases; or

(o)    there shall have occurred a breach or default by the Company or any Subsidiary thereof under either of the Fundamental DIP Credit Agreement or the Brookfield DIP Credit Agreement, which breach or default would permit the lenders or creditors under such facilities to accelerate the obligations thereunder and has resulted in such acceleration;

(p)    the Carlyle Retained Liabilities exceed an amount equal to (i) 115% of $8,900,000 with respect to Carlyle Retained Liabilities as of the Initial Closing Date or (ii) amounts (other than amounts described in clause (i) above) permitted to be incurred in accordance with any then-applicable Approved Budget; or

(q)    the Company or any Carlyle Silo Entity makes any payment in respect of obligations owed to Blue Ridge; or

(r)    (i) entry of any unstayed order (A) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) dismissing any of the Chapter 11 Cases (or any subsequent chapter 7 case), or (C) pursuant to which the Bankruptcy Court abstains from hearing any of the Chapter 11 Cases (or any subsequent chapter 7 case), or (ii) the filing by any Debtor of a motion or other pleading seeking the entry of such an order;

(s)    any Debtor's exclusive right to file and/or solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code is terminated for any reason, unless such order was entered as a result of a request by, or received support from, the Collateral Agent and the Required Holders;

(t)    the failure of any Debtor to comply with the DIP Orders;

(u)    any DIP Order is revoked, remanded, vacated, reversed, stayed, rescinded, or modified (other than modifications consented to by the Required Holders);

(v)    the failure of the Debtors to comply with the Budget Covenant or the Variance Covenant;

(w)    (i) the appointment of a trustee, responsible officer, examiner, or disinterested person with expanded powers relating to the operations or the business of any of the Debtors in any of the Chapter 11 Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) (other than a fee examiner under section 1104(c) of the Bankruptcy Code) or (ii) the filing by any Debtor of a motion or other pleading seeking the entry of such appointment;

-62-

(x)      any administrative expense claim (other than in respect of the Carve-Out and as otherwise expressly permitted under the Financing Documents or the DIP Orders in respect of the Additional DIP Facilities) is allowed having priority over or, ranking in parity with, the rights of the Secured Parties;

(y)      except for any sale of ACT, a sale under the Stalking Horse APA, a sale pursuant to a cash overbid in accordance with the bid procedures and solely on all or substantially all of the Carlyle Silo Assets, or a sale of the assets subject to the stalking horse APAs contemplated by the Additional DIP Facilities, one or more sales of any assets of any Debtor or any Carlyle Silo Assets with a fair market value or sale price, in either case, when aggregated with all such prior sales, in excess of $2,500,000, other than sales on terms and conditions reasonably acceptable to the Required Holders;

(z)      payment of or granting adequate protection with respect to any of the existing secured debt of the Debtors, other than to the extent permitted under the DIP Orders and the Approved Budget;

(aa)      the Liens on the Collateral securing the Notes or Superpriority Claims shall at any time cease to be valid, perfected, and enforceable in all respects with the priority described herein, in the DIP Orders or any Financing Documents shall be (or asserted by any Debtor to be) invalid;

(bb)      the failure to meet any DIP Milestone set forth on <u>Schedule 9.25</u>;

(cc)      (A) the Debtors propose, file, or support, or the Bankruptcy Court enters an order in the Chapter 11 Cases confirming, a chapter 11 plan that does not propose to (i) terminate all the Commitments, (ii) have all the Obligations (including claims under the Roll-Up DIP Notes) and the Prepetition Secured Obligations be Paid in Full, and (iii) otherwise provide for treatment consented to by the Required Holders in their sole discretion (an "**Acceptable Plan**"), or the entry of an order approving a disclosure statement in support of a plan that is not an Acceptable Plan or (B) the Debtors support or fail to contest the solicitation or confirmation of any plan of reorganization or liquidation that is not an Acceptable Plan filed by any other Person, in each case, without the prior written consent of the Required Holders;

(dd)      any of the Debtors incurs or seeks to incur postpetition loans or other financial accommodations pursuant to section 364(c)(1) or (d) of the Bankruptcy Code (other than the Notes or other loans permitted by the Financing Documents (including the Additional DIP Facilities and any Replacement Additional DIP Facilities in the event of a failure by the lenders under any Additional DIP Facility to fund such facility)) and such loans or financial accommodations do not pay the Notes and the Prepetition Secured Obligations in full in cash (together with all accrued interest, fees, premiums, and other payments, including the Exit Premium and the Prepayment Premium (if applicable));

(ee)      any of the Debtors shall (i) assert that the Liens on the Collateral securing the Notes, the Superpriority Claims or the guarantees by the Guarantors of the Obligations are invalid, or any such Liens, claims or guarantees shall be invalidated, or (ii) file or otherwise commence, join in, assist, support or otherwise participate as an adverse party in any suit, challenge or proceeding against any of the Secured Parties (in their capacity as such) in respect of the Notes or the

-63-

Prepetition Secured Parties (in their capacity as such) in respect of the Prepetition Note Purchase Agreement, including with respect to the Debtors' stipulations, admissions, agreements and releases included in the DIP Orders, or seeking the invalidation or subordination or otherwise challenging to the Superpriority Claims or the Liens granted to secure the Obligations; *provided* that the Debtors shall not be precluded from contesting whether an Event of Default has occurred and is continuing;

(ff)     the termination of the Debtors' use of the cash collateral or Prepetition Collateral of any Prepetition Secured Party;

(gg)     the entry of an unstayed order granting relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases that would permit such other creditor or party in interest to (a) pursue actions that would have a material adverse effect on the Debtors or their estates or (b) proceed against any portion of the Collateral exceeding $1,000,000 in value in the aggregate;

(hh)     the entry of an unstayed order allowing any claim or claims under section 506(c) of the Bankruptcy Code or otherwise to surcharge any (i) Collateral or (ii) the Prepetition Collateral;

(ii)     the application of the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to any Prepetition Collateral;

(jj)     any of the Secured Parties with respect to the Collateral or the Prepetition Secured Parties with respect to the Prepetition Collateral, are subject to the equitable doctrine of marshaling;

(kk)     any Subsidiary of the Debtors commences an insolvency proceeding, including by becoming a Debtor in the Chapter 11 Cases, other than with the reasonable consent of the Required Holders;

(ll)     any of the DIP Orders, the Bidding Procedures, or the Bidding Procedures Order are amended, supplemented, vacated, stayed or otherwise modified, including pursuant to an order of the Bankruptcy Court (or the Debtors seek to amend, supplement, vacate, stay or otherwise modify any of the foregoing, including making any filing seeking to make any such amendment or modification or taking any other act in furtherance of the foregoing) without the prior written consent of the Required Holders;

(mm)    the occurrence under any of the Additional DIP Facilities of (i) a payment default or (ii) an event of default that has occurred and is continuing that would permit the lenders under such facilities to accelerate the obligations thereunder and has resulted in such acceleration provided, that if the Debtors shall have refinanced such Additional DIP Facility with the proceeds of debtor-in-possession financing on identical terms to such Additional DIP Facility (other than with respect to covenants and pricing and fees, provided that any such covenants that are more favorable to the lenders under the Replacement Additional DIP Facility shall have been incorporated into the Notes and the pricing and fees in respect of the Notes shall be increased to the same extent that such pricing and fees in the Replacement Additional DIP Facility represent an increase relative to the applicable Additional DIP Facility (subject to any requirements for such amendments set forth in the DIP Orders)) within 21 days or such shorter time as the Approved

-64-

Budget indicates that the Debtors have sufficient liquidity to operate without drawing on such defaulted Additional DIP Facility (a "**Replacement Additional DIP Facility**"), such event of default shall be deemed to have been cured, it being understood that during such period (x) so long as no secured parties thereunder have exercised any remedies in respect of such payment default or event of default thereunder, the holders of the Notes shall not terminate the Commitments, accelerate the Notes, or exercise remedies in respect of the Collateral, and (y) the Company shall not be permitted to draw any of the Commitments;

(nn)   any third party (i) enters into an asset purchase agreement with the Company or any of its subsidiaries or its Affiliates that provides for the sale or disposition of any Carlyle Silo Assets or (ii) is granted a break-up fee or other bid protections and/or the reimbursement of expenses in connection with a bid for a sale of any assets that include the Carlyle Silo Assets, in each case without the written consent of the Required Holders;

(oo)   any lenders or investors under any Solar Development Project Financing Facility exercise remedies in respect of any Project, unless the Debtors are using reasonable best efforts to contest such exercise of remedies, including by promptly filing a motion seeking to have the automatic stay or an equivalent restraining order extended to prevent such exercise of remedies;

(pp)   any of the parties to the Existing Services Agreements or the Transition Services Agreement shall fail to perform any of its or their material obligations thereunder, any of the Transition Services Agreement or the Existing Services Agreements is terminated or amended, modified, or waived, or the Debtors fail to (i) assume and assign the Existing Services Agreements and the Transition Services Agreement to ACT or the purchaser of the assets or equity of ACT in accordance with the DIP Orders or (ii) cause the applicable non-Debtor subsidiary to perform under each of the Existing Services Agreements and the Transition Services Agreement;

(qq)   the Stalking Horse APA is terminated in accordance with its terms;

(rr)   any change of control of Company, including any change in composition of the board of directors of Company resulting from any exercise of remedies with respect to any pledged equity interests in Company;

(ss)   ACT is or becomes an obligor under any Additional DIP Facility or any Replacement Additional DIP Facility, or any such Additional DIP Facility or Replacement Additional DIP Facility is secured by any assets or equity of ACT (excluding, for the avoidance of doubt, liens on the proceeds of any sale of the equity of ACT subject to intercreditor arrangements agreed between Carlyle, Fundamental, and Brookfield);

(tt)   any Project or the applicable owner thereof is unable to, or not reasonably expected to, satisfy the conditions precedent to a further advance or contribution or installment payment under any Solar Development Project Financing Facility for such Project;

(uu)   the Preserved Carlyle Procurement Claims exceed (i) with respect to Preserved Carlyle Procurement Claims arising on or before October 6, 2025, an amount equal to 115% of $8,900,000 or (ii) with respect to Preserved Carlyle Procurement Claims, if any, arising after October 6, 2025, the amount of such claims that has been approved by the Required Holders

-65-

pursuant to a DIP Delayed Draw Note or that has been paid with proceeds of applicable project financing;

(vv)     any Debtor consents to the payment, settlement, grant of, or stipulation to pay, settle or grant, adequate protection with respect to any of the prepetition secured debt of the Debtors, other than to the extent permitted under the DIP Orders and the Approved Budget, or the Bankruptcy Court enters an order allowing any of the foregoing;

(ww)    except as set forth in any motions or other pleadings which have been delivered to and are acceptable to the Required Holders or as set forth in the DIP Orders, the payment of, or application for authority to pay, any claim that arose prior to the Petition Date, without the prior written consent of the Required Holders;

(xx)     the entry of an order in any of the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations or the Prepetition Secured Obligations, including the issuance of the Roll-Up DIP Notes;

(yy)     other than with the prior written consent of the Required Holders, the filing of a motion by any Note Party or any of their respective Subsidiaries or Affiliates seeking, or the Bankruptcy Court shall enter an order granting, a change in venue with respect to the Chapter 11 Cases; or

(zz)     the Debtors enter into any Additional DIP Facility or Replacement Additional DIP Facility that does not include terms and conditions having an identical effect in respect of reimbursement of fees, costs, disbursements, or expenses in respect of advisors to the lenders thereunder as those set forth in this Agreement, including Section 15.1, in form and substance reasonably acceptable to the Required Holders, or (b) the Debtors and their Subsidiaries shall pay in cash any amounts in respect of advisors to the lenders under any Additional DIP Facility or Replacement Additional DIP Facility in excess of the limits specified in the Approved Budget in effect at the time of entry of the Interim DIP Order.

(aaa)   the Debtors deem a Bid to be a Qualified Bid or permit a potential buyer to participate in any Auction, in each case with respect to a sale of any or all of the Carlyle Silo Assets pursuant to the Bidding Procedures Order, unless the applicable potential buyer has otherwise complied with the Bidding Procedures Order;

(bbb)   the Debtors select a bid as a Successful Bid with respect to a sale of any or all of the Carlyle Silo Assets pursuant to the Bidding Procedures that does not provide, together with any other bids for any portions of the Carlyle Silo Assets, for the Obligations and the Prepetition Secured Obligations to be Paid in Full, or provide for any other treatment consented to by the Required Holders in their sole discretion, on or prior to the earlier of the Maturity Date and the closing of the sale transaction set forth in such bid; or

(ccc)   the Company or any Subsidiary thereof shall take any action in support or in furtherance of any occurrence that would constitute an Event of Default pursuant to this Section 11, or any other Person shall do so and such application is not contested in good faith by the Company and the relief requested is granted in an order that is not stayed pending appeal.

-66-

**Section 12.**     **REMEDIES ON DEFAULT, ETC.**

**Section 12.1.  Acceleration**.  Subject to the DIP Orders and the terms thereof:

(a)     If an Event of Default with respect to any Note Party described in <u>Sections 11(g)</u> or <u>(h)</u> has occurred, all the Notes then outstanding shall automatically become immediately due and payable and all Commitments shall automatically terminate;

(b)     If any other Event of Default has occurred and is continuing, the Required Holders may at any time at its or their option, by notice or notices to the Company, take any of the following actions:

(i)     terminate, reduce, or restrict the Commitments, and thereupon the Commitments shall terminate, be reduced or restricted, as applicable, immediately;

(ii)     declare the Obligations then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Obligations so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Company accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Company;

(iii)     terminate, reduce or restrict any right or ability of the Note Parties to use any Cash Collateral of Secured Parties or the Prepetition Secured Parties, other than to the extent expressly permitted in the Interim DIP Order or, when entered, the Final DIP Order;

(iv)     declare that the application of the Carve-Out has occurred through the delivery of a Carve-Out Trigger Notice (as defined in the DIP Orders) in accordance with the Interim DIP Order or, when entered, the Final DIP Order;

(v)     deliver a Default Notice (as defined in the DIP Orders) and take any permitted actions in accordance with the DIP Order; and

(vi)     enforce any and all Liens and security interests created pursuant to the Security Documents and any other right or remedy permitted hereunder with respect to the Collateral; and

(c)     If any Event of Default described in <u>Section 11(a)</u> or <u>(b)</u> has occurred and is continuing, any holder or holders of Notes at the time outstanding affected by such Event of Default may at any time, at its or their option, by notice or notices to the Company, declare all the Notes held by it or them to be immediately due and payable.

Subject to the DIP Orders, upon any Notes becoming due and payable under this <u>Section 12.1</u>, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus (x) all accrued and unpaid interest thereon (including interest accrued thereon at the Default Rate) and (y) the Exit Premium and the Prepayment Premium determined in respect of such principal amount, shall all be immediately due

-67-

and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.  The Company acknowledges, and the parties hereto agree, that each holder of a Note has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for) and that the provision for payment of an Exit Premium and Prepayment Premium by the Company in the event that the Notes are prepaid, redeemed or are accelerated as a result of an Event of Default, is intended to provide compensation for the deprivation of such right under such circumstances.

Section 12.2.  **Other Remedies**.  Subject to the Intercreditor Agreements and the DIP Orders, if any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under <u>Section 12.1</u>, the Collateral Agent (as directed by the Secured Parties under the Security Agreement) or the holder of any Note at the time outstanding may proceed to protect and enforce the rights of such holder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Financing Document, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

Section 12.3.  **Rescission**.  At any time after any Notes have been declared due and payable pursuant to <u>Section 12.1(b)</u> or <u>(c)</u>, the Required Holders, by written notice to the Company, may rescind and annul any such declaration and its consequences if (a) the Company has paid all overdue interest on the Notes, all principal of and Prepayment Premium (as applicable), if any, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal and Prepayment Premium (as applicable), if any, and (to the extent permitted by Applicable Law) any overdue interest in respect of the Notes, at the Default Rate, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default and Defaults, other than non-payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to <u>Section 17</u>, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes.  No rescission and annulment under this <u>Section 12.3</u> will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

Section 12.4.  **No Waivers or Election of Remedies, Expenses, Etc.**  No course of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holder's rights, powers or remedies.  No right, power or remedy conferred by this Agreement or any other Financing Document upon any holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise.  Without limiting the obligations of the Company under <u>Section 15</u>, the Company will pay to the holder of each Note on demand such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection under this <u>Section 12</u>, including reasonable attorneys' fees, expenses and disbursements.

US-DOCS\165312452.14

**Section 13.**     **REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.**

**Section 13.1.   Registration of Notes**.  The Company shall keep at its principal executive office a register for the registration and recordation of transfers of Notes.  The name and address of each holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register.  If any holder of one or more Notes is a nominee, then (a) the name and address of the beneficial owner of such Note or Notes shall also be registered in such register as an owner and holder thereof and (b) at any such beneficial owner's option, either such beneficial owner or its nominee may execute any amendment, waiver or consent pursuant to this Agreement.  Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary.  The Company shall give to the Paying Agent and any holder of a Note that is an Institutional Investor promptly upon request therefor, a complete and correct copy of the names and addresses of all registered holders of Notes.

**Section 13.2.   Transfer and Exchange of Notes**.  Upon surrender of any Note to the Company at the address and to the attention of the designated officer (all as specified in Section 18(iii)), for registration of transfer or exchange (and in the case of a surrender for registration of transfer accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof), within ten (10) Business Days thereafter, the Company shall execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note.  Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Schedule 1.  Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon.  The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.  Notes shall not be transferred in denominations of less than $100,000, *provided* that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $100,000.  Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have made the representation set forth in Section 6.2. Notwithstanding the foregoing, a Purchaser may transfer Notes to any of its Affiliates without first complying with the foregoing requirements in this Section 13.2; *provided* that such Purchaser shall comply with such requirements within 30 days after such transfer.

**Section 13.3.   Replacement of Notes**.  Upon receipt by the Company at the address and to the attention of the designated officer (all as specified in Section 18(iii)) of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note (which evidence shall be, in the case of an Institutional Investor, notice from such Institutional Investor of such ownership and such loss, theft, destruction or mutilation), and

(a)     in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it (provided that if the holder of such Note is, or is a nominee for, an original Purchaser or another

-69-

holder of a Note with a minimum net worth of at least $100,000,000 or a Qualified Institutional Buyer, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), or

(b)      in the case of mutilation, upon surrender and cancellation thereof,

within ten (10) Business Days thereafter, the Company at its own expense shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed, mutilated or updated Note or dated the date of such lost, stolen, destroyed, mutilated or updated Note if no interest shall have been paid thereon.

## Section 14.    PAYMENTS ON NOTES.

**Section 14.1.  Place of Payment**.  Subject to Section 14.2, payments of principal, Exit Premium, if any, Prepayment Premium, if any, and interest becoming due and payable on the Notes shall be made by the Company to the Paying Agent at the account set forth below:

Bank: M&T Bank/Wilmington Trust, N.A.
ABA 031100092
Account 165743-001
Account Name: NPA 2023 Holdco Collections Acct
Attn: Kevin Pennant
Reference: NPA 2023 Holdco Collections Acct

or any other account of the Paying Agent specified in writing by the Paying Agent to the Company upon at least 10 Business Days' prior written notice. Subject to Section 14.2, the Paying Agent shall make any payments of principal, Prepayment Premium, if any, and interest becoming due and payable on the Notes that it receives from the Company to each holder of Notes pursuant to (a) the information for each Purchaser as set forth on Schedule B or (b) the information separately provided in writing by such holder of Notes to the Company and the Paying Agent, in each case, to the holder of Notes of record of each such Note on the Business Day immediately preceding the applicable date of payment. For certainty, payments hereunder shall be made net of any applicable withholding tax (including any amounts required to withheld pursuant to FATCA) and no party shall have any obligation to pay additional amount, or indemnify any other party, with respect to any such withholding tax.

**Section 14.2.  Payment by Wire Transfer**.  So long as any Purchaser or its nominee shall be the holder of any Note, and notwithstanding anything contained in Section 14.1 or in such Note to the contrary, the Company will pay all sums becoming due on such Note for principal, Prepayment Premium, if any, interest and all other amounts becoming due hereunder by the method and at the address specified for such purpose below such Purchaser's name in Schedule B, or by such other method or at such other address as such Purchaser shall have from time to time specified to the Company and the Paying Agent in writing for such purpose, without the presentation or surrender of such Note or the making of any notation thereon, except that upon written request of the Company or the Paying Agent made concurrently with or reasonably promptly after payment or prepayment in full of any Note, such Purchaser shall surrender such

-70-

Note for cancellation, reasonably promptly after any such request, to the Company at its principal executive office or at the place of payment most recently designated by the Company pursuant to Section 14.1. Prior to any sale or other disposition of any Note held by a Purchaser or its nominee, such Purchaser will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such Note to the Company in exchange for a new Note or Notes pursuant to Section 13.2. The Company will afford the benefits of this Section 14.2 to any Institutional Investor that is the direct or indirect transferee of any Note purchased by a Purchaser under this Agreement and that has made the same agreement relating to such Note as the Purchasers have made in this Section 14.2.

### Section 14.3.  Tax Withholding; FATCA Information.

(a)     By acceptance of any Note, the holder of such Note agrees that such holder will with reasonable promptness duly complete and deliver to the Company, the Paying Agent, or to such other Person as may be reasonably requested by the Company, from time to time (a) in the case of any such holder that is a United States Person, such holder's United States tax identification number or other forms reasonably requested by the Company or Paying Agent necessary to establish such holder's status as a United States Person under FATCA and as may otherwise be necessary for the Company and the Paying Agent to comply with its obligations under FATCA, to the extent not otherwise provided pursuant to this Section 14.3, and (b) in the case of any such holder that is not a United States Person, such documentation prescribed by Applicable Law (including as prescribed by section 1471(b)(3)(C)(i) of the Code) and such additional documentation as may be necessary for the Company and the Paying Agent to comply with its obligations under FATCA and to determine that such holder has complied with such holder's obligations under FATCA or to determine the amount (if any) to deduct and withhold from any such payment made to such holder, to the extent not otherwise provided pursuant to this Section 14.3. Nothing in this Section 14.3 shall require any holder to provide information that is confidential or proprietary to such holder unless the Company or the Paying Agent is required to obtain such information under FATCA and, in such event, the Company shall treat any such information it receives as confidential.

(b)     Without limiting the foregoing, each holder of a Note shall deliver to the Company and the Paying Agent (in such number of copies as shall be requested), on or about the date on which such holder becomes a holder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or Paying Agent) executed copies of IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable, certifying that such holder is exempt from U.S. federal backup withholding or, in the event that such holder is not a United States Person, whichever of the following is applicable: (i) in the case of any such holder claiming the benefits of an income tax treaty to which the United States is a party, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from withholding under such tax treaty with respect to such payment, (ii) executed copies of IRS Form W-8ECI, (iii) in the case of any such holder claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, as well as a U.S. Tax Compliance Certificate substantially in the form attached as Schedule 14.3-1, or (iv) in the case of any such holder that is not the beneficial owner, executed copies of IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, as well as the applicable U.S. Tax Compliance Certificate substantially in the form

-71-

attached as Schedule 14.3-2 or Schedule 14.3-3, IRS Form W-9, and/or other certification documents from each beneficial owner; *provided* that if such holder is a partnership and one or more direct or indirect partners of such holder is claiming the benefits of the portfolio interest exemption, such holder may provide a U.S. Tax Compliance Certificate substantially in the form of Schedule 14.3-4 on behalf of such direct or indirect partner. Each holder agrees that if any form or certification that it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly update and deliver such form or certification to the Company and the Paying Agent.

**Section 15.    EXPENSES, ETC.**

**Section 15.1.  Transaction Expenses; Indemnity; Waiver**

(a)      Whether or not the transactions contemplated hereby are consummated, the Company will pay on a current basis all reasonable and documented costs and expenses (including the reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements expenses, and indemnity obligations of the DIP Secured Parties Advisors) incurred by the Purchasers and each other holder of a Note in connection with such transactions and in connection with any amendments, waivers or consents under or in respect of this Agreement or any other Financing Documents (whether or not such amendment, waiver or consent becomes effective), including: (a) the costs and expenses incurred in enforcing or defending (or determining whether or how to enforce or defend) any rights under this Agreement or any other Financing Documents, or in responding to any subpoena or other legal process or informal investigative demand issued in connection with this Agreement or any other Financing Documents, or by reason of being a holder of any Note, (b) the costs and expenses, including any DIP Secured Parties Advisors, incurred in connection with (i) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the proposed financing contemplated by the Financing Documents and the funding or deemed funding of the Notes, (ii) the administration of the Notes and any amendment, modification or waiver of any provision of the Financing Documents, (iii) the interpretation, enforcement or protection of any of the rights and remedies of the Secured Parties under the Financing Documents, (iv) the Chapter 11 Cases, (v) the Sale, including the negotiation, preparation, execution, and interpretation of the Stalking Horse APA and all related agreements, investigating the Acquired Assets and the Debtors, implementing the Sale, negotiating and obtaining entry of the Bidding Procedures Order and the Sale Order, and obtaining regulatory and other approvals of governmental entities necessary to consummate the Sale if needed, or (vi) any other insolvency or bankruptcy of any Note Party or any of its Subsidiaries or in connection with any work-out or restructuring of the transactions contemplated hereby and by any other Financing Documents and (c) the costs and expenses incurred in connection with the initial filing of this Agreement and all related documents and financial information with the SVO.  If required by the NAIC, the Company shall obtain and maintain at its own cost and expense a Legal Entity Identifier (LEI).

(b)      The Company and each Note Party will pay, and will jointly and severally indemnify and hold the Collateral Agent, the Paying Agent, each Purchaser and each other holder of a Note and each of their respective affiliates and their respective directors, officers, employees, attorneys, advisors, consultants, agents and other representatives (each an "**Indemnified Person**") harmless and defend from and against, (i) all claims in respect of any fees, costs or expenses, if

-72-

any, of brokers and finders (other than those, if any, retained by a Purchaser or other holder in connection with its purchase of the Notes), (ii) any and all wire transfer fees that any bank or other financial institution deducts from any payment under such Note to such holder or otherwise charges to a holder of a Note with respect to a payment under such Note and (iii) any loss, judgment, liability, claim, damage, order, decree, fine, penalty, cost, fee, expense (including reasonable attorneys' fees and expenses) or obligation joint or several, to which any such Indemnified Person may become subject, arising out of, in connection with, or resulting from (i) this Agreement, the other Financing Documents, the consummation of the transactions contemplated hereby and thereby, including the use of the proceeds of the Notes by the Company, (ii) any actual or prospective claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by the Company, its equity holders, affiliates, creditors or any other person or (iii) the Chapter 11 Cases, or any related cases in any other jurisdiction, and to reimburse each Indemnified Person reasonably promptly following receipt of a reasonably detailed invoice for any reasonable, documented and invoiced out-of-pocket legal or other reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, but subject to the limitations in the next sentence, except to the extent that such loss, judgment, liability, claim, damage, order, decree, fine, penalty, cost, fee, expense or obligation is finally determined by a court of competent jurisdiction to be the direct result of the gross negligence or willful misconduct of the party seeking indemnification.

(c)     Notwithstanding the foregoing, to the extent the fees, costs, disbursements and expenses of the DIP Secured Parties Advisors exceed the aggregate amount budgeted for them in the Approved Budget in effect at the time of entry of the Interim DIP Order, the Note Parties shall not be obligated to pay such excess to the DIP Secured Parties Advisors in cash, but to the extent the Secured Parties pay such amounts to the DIP Secured Parties Advisors, the outstanding amount of the Obligations shall automatically be increased by such amount (for the avoidance of doubt, without any reduction of the Commitments), with no further action by any party, upon notice to the Note Parties. Each Additional DIP Facility and the DIP Orders shall provide for a similar limit in respect of reimbursement of fees, costs, disbursements, or expenses of advisors to the lenders or other secured parties thereunder, and the Debtors and their subsidiaries shall not pay in cash any amounts in respect thereof in excess of such limit.

Section 15.2.   **Certain Taxes**.  The Company agrees to pay all stamp, documentary or similar taxes or fees which may be payable in respect of the execution and delivery or the enforcement of this Agreement or any other Financing Documents or the execution and delivery (but not the transfer) or the enforcement of any of the Notes in the United States or any other jurisdiction where the Company has assets or of any amendment of, or waiver or consent under or with respect to, this Agreement or any other Financing Documents, and to pay any value added tax due and payable in respect of reimbursement of costs and expenses by the Company pursuant to this Section 15.2, and will save each holder of a Note to the extent permitted by Applicable Law harmless against any loss or liability resulting from nonpayment or delay in payment of any such tax or fee required to be paid by the Company hereunder.

Section 15.3.   **Survival**.  The obligations of the Company under this Section 15 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any

provision of this Agreement or any other Financing Documents, and the termination of this Agreement.

**Section 16.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.**

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Notes, the purchase or transfer by any Purchaser of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent holder of a Note, regardless of any investigation made at any time by or on behalf of such Purchaser or any other holder of a Note. All statements contained in any certificate or other instrument delivered by or on behalf of the Company pursuant to this Agreement and all other Financing Documents shall be deemed representations and warranties of the Company under this Agreement. Subject to the preceding sentence, this Agreement and all other Financing Documents embody the entire agreement and understanding between each Purchaser and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

**Section 17.    AMENDMENT AND WAIVER.**

**Section 17.1. Requirements**. Subject to the Intercreditor Agreements, this Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), only with the written consent of the Company and the Required Holders or the Collateral Agent (acting on behalf of the Required Holders), except that:

(a)    no amendment or waiver of any of Section 1, Section 2, Section 3, Section 4, Section 5, Section 6, Section 17.1 or Section 21 hereof, or any defined term (as it is used therein), will be effective as to any Purchaser unless consented to by such Purchaser in writing; and

(b)    no amendment or waiver may, without the written consent of each Purchaser and the holder of each Note at the time outstanding, (i) subject to Section 12 relating to acceleration or rescission, change the amount or time of any prepayment or payment of principal of, or reduce the rate or change the time of payment or method of computation of (x) interest on the Notes or (y) any DIP Payment (as applicable); *provided*, that, for the avoidance of doubt, DIP Payments applicable solely to a Series of Notes shall only be deemed to affect the holder of Notes of such Series, (ii) change the percentage of the principal amount of the Notes the holders of which are required to consent to any amendment or waiver or amend the definition of "Required Holders", (iii) subordinate the Company's payment obligations under the Financing Documents or the priority of any Lien granted pursuant to the Security Documents, (iv) amend any of Section 8 (except as set forth in the second sentence of Section 8.2), Section 11(a), Section 11(b), Section 12, Section 17, Section 20, or any defined term used therein, (v) release all or a material portion of the Collateral or all or a material amount of the Guarantees or (vi) waive, amend or modify the Superpriority Claim status of the holders of the Notes under the DIP Orders or under any Financing Document.

(c)    Section 8.6 may be amended or waived to permit offers to purchase made by the Company or an Affiliate pro rata to the holders of all Notes at the time outstanding upon the same

US-DOCS\165312452.14

terms and conditions only with the written consent of the Company and the Super Majority Holders.

### Section 17.2.   Solicitation of Holders of Notes.

(a)      *Solicitation*.   The Company will provide each holder of a Note with sufficient information, sufficiently far in advance of the date a decision is required, to enable such holder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of any other Financing Documents.   The Company will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to this Section 17 to each holder of a Note promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the requisite holders of Notes.

(b)      *Payment*.   The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security or provide other credit support, to any holder of a Note as consideration for or as an inducement to the entering into by such holder of any waiver or amendment of any of the terms and provisions hereof or any other Financing Documents unless such remuneration is concurrently paid, or security is concurrently granted or other credit support concurrently provided, on the same terms, ratably to each holder of a Note even if such holder did not consent to such waiver or amendment.

(c)      *Consent in Contemplation of Transfer*.   Any consent given pursuant to this Section 17 by a holder of a Note that has transferred or has agreed to transfer its Note to (i) the Company, (ii) any Subsidiary or any other Affiliate or (iii) any other Person in connection with, or in anticipation of, such other Person acquiring, making a tender offer for or merging with the Company and/or any of its Affiliates (either pursuant to a waiver under Section 17.1(c) or subsequent to Section 8.6 having been amended pursuant to Section 17.1(c)), in each case in connection with such consent, shall be void and of no force or effect except solely as to such holder, and any amendments effected or waivers granted or to be effected or granted that would not have been or would not be so effected or granted but for such consent (and the consents of all other holders of Notes that were acquired under the same or similar conditions) shall be void and of no force or effect except solely as to such holder.

### Section 17.3.   Binding Effect, Etc.   Any amendment or waiver consented to as provided in this Section 17 applies equally to all holders of Notes and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver.   No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.   No course of dealing between any Note Party and any holder of a Note and no delay in exercising any rights hereunder or under any Note or under any other Financing Documents shall operate as a waiver of any rights of any holder of such Note.

**Section 18.     NOTICES.**

Except to the extent otherwise provided in <u>Section 7.4</u>, all notices and communications provided for hereunder shall be in writing and sent (a) by e-mail if the sender on the same day sends a confirming copy of such notice by an internationally recognized overnight delivery service (charges prepaid); *provided* that such confirming copy shall not be required if the recipient of such e-mail provides a confirmation of receipt, (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by an internationally recognized overnight delivery service (charges prepaid).  Any such notice must be sent:

(i)     if to any Purchaser or its nominee, to such Purchaser or nominee at the address specified for such communications in the <u>Schedule B</u>, or at such other address as such Purchaser or nominee shall have specified to the Company and the Collateral Agent in writing;

(ii)     if to any other holder of any Note, to such holder at such address as such other holder shall have specified to the Company and the Collateral Agent in writing;

(iii)     if to the Company, to the Company at its address set forth at the beginning hereof to the attention of Legal Department, email: legal@pgrenewables.com, phone: 855-969-3380, or at such other address as the Company shall have specified to the holder of each Note and the Collateral Agent in writing; or

(iv)     if to the Collateral Agent, to the Collateral Agent at its address 1100 North Market Street, Wilmington, DE 19890-1605 to the attention of Project Finance – Kevin Pennant, email: kpennant@wilmingtontrust.com, phone: (908) 798-2963, or at such other address as the Collateral Agent shall have specified to the holder of each Note and the Company in writing.

Notices under this <u>Section 18</u> will be deemed given only when actually received.

**Section 19.     REPRODUCTION OF DOCUMENTS.**

This Agreement and all documents relating thereto, including (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any Purchaser at each Closing (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to any Purchaser, may be reproduced by such Purchaser by any photographic, photostatic, electronic, digital, or other similar process and such Purchaser may destroy any original document so reproduced.  The Company agrees and stipulates that, to the extent permitted by Applicable Law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Purchaser in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.  This <u>Section 19</u> shall not prohibit the Company or any other holder of Notes from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

US-DOCS\165312452.14

**Section 20.**    CONFIDENTIAL INFORMATION.

For the purposes of this Section 20, "**Confidential Information**" means information delivered to any Purchaser by or on behalf of the Company or any Affiliate in connection with the Projects or in connection with the transactions contemplated by or otherwise pursuant to this Agreement that is proprietary in nature or that is subject to a non-disclosure or confidentiality agreement between any Purchaser and the Company or any Affiliate or delivered via IntraLinks or any other similar website used by the Company pursuant to Section 7.4 hereof; *provided* that such term does not include information that (a) was publicly known or otherwise known (without obligation of confidentiality) to such Purchaser prior to the time of such disclosure, (b) subsequently becomes publicly known through no act or omission by such Purchaser or any Person acting on such Purchaser's behalf, (c) otherwise becomes known to such Purchaser (without obligation of confidentiality) other than through disclosure by the Company or any Affiliate or (d) constitutes financial statements delivered to such Purchaser under Section 7 that are otherwise publicly available.   Each Purchaser will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such Purchaser in good faith to protect confidential information of third parties delivered to such Purchaser; *provided* that such Purchaser may deliver or disclose Confidential Information to (i) its directors, officers, employees, agents, attorneys, trustees and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by its Notes), (ii) its auditors, financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with this Section 20, (iii) any other holder of any Note or the Collateral Agent, (iv) any Institutional Investor to which it sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by this Section 20), (v) any Person from which it receives offers to purchase any security of the Company (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by this Section 20), (vi) any federal or state regulatory authority having jurisdiction over such Purchaser, (vii) the NAIC or the SVO or, in each case, any similar organization, or any nationally recognized rating agency that requires access to information about such Purchaser's investment portfolio, (viii) to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Notes, including to the Bankruptcy Court in connection with the approval of the Notes and the entry of the DIP Orders or any other transactions related hereto and thereto or (ix) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such Purchaser, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such Purchaser is a party or (z) if an Event of Default has occurred and is continuing, to the extent such Purchaser may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under such Purchaser's Notes, this Agreement or any other Financing Document.  Each holder of a Note, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 20 as though it were a party to this Agreement.  On reasonable request by the Company in connection with the delivery to any holder of a Note of information required to be delivered to such holder under this Agreement or requested by such holder (other than a holder that is a party to this Agreement or its nominee), such holder will enter into an agreement with the Company embodying this Section 20.

In the event that as a condition to receiving access to information relating to the Company or its Affiliates in connection with the transactions contemplated by or otherwise pursuant to this Agreement, any Purchaser or holder of a Note is required to agree to a confidentiality undertaking (whether through IntraLinks, another secure website, a secure virtual workspace or otherwise) which is different from this Section 20, this Section 20 shall not be amended thereby and, as between such Purchaser or such holder and the Company, this Section 20 shall supersede any such other confidentiality undertaking. For the avoidance of doubt, an agent of a Purchaser may deliver or disclose Confidential Information to (i) another agent of a Purchaser, (ii) any Purchaser or (iii) any holder of a Note.

**Section 21.    SUBSTITUTION OF PURCHASER.**

Each Purchaser shall have the right to substitute any one of its Affiliates or another Purchaser or any one of such other Purchaser's Affiliates (a "**Substitute Purchaser**") as the purchaser of the Notes that it has agreed to purchase hereunder, by written notice to the Company, which notice shall be signed by both such Purchaser and such Substitute Purchaser, shall contain such Substitute Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by such Substitute Purchaser of the accuracy with respect to it of the representations set forth in Section 6. Upon receipt of such notice, any reference to such Purchaser in this Agreement (other than in this Section 21), shall be deemed to refer to such Substitute Purchaser in lieu of such original Purchaser. In the event that such Substitute Purchaser is so substituted as a Purchaser hereunder and such Substitute Purchaser thereafter transfers to such original Purchaser all of the Notes then held by such Substitute Purchaser, upon receipt by the Company of notice of such transfer, any reference to such Substitute Purchaser as a "Purchaser" in this Agreement (other than in this Section 21), shall no longer be deemed to refer to such Substitute Purchaser, but shall refer to such original Purchaser, and such original Purchaser shall again have all the rights of an original holder of the Notes under this Agreement.

**Section 22.    MISCELLANEOUS.**

**Section 22.1. Successors and Assigns**. All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including any subsequent holder of a Note) whether so expressed or not, except that, the Company may not assign or otherwise transfer any of its rights or obligations hereunder or under the Notes without the prior written consent of each holder. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**Section 22.2. Accounting Terms**. All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP. Except as otherwise specifically provided herein, (a) all computations made pursuant to this Agreement shall be made in accordance with GAAP, and (b) all financial statements shall be prepared in accordance with GAAP. For purposes of determining compliance with this Agreement (including Section 9, Section 10 and the definition of "**Indebtedness**"), any election by the Company to measure any financial liability using fair value (as permitted by Financial Accounting Standards Board Accounting Standards Codification Topic No. 825-10-25

-78-

– *Fair Value Option,* International Accounting Standard 39 – *Financial Instruments: Recognition and Measurement* or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made.

        **Section 22.3.   Severability**.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

        **Section 22.4.   Construction, Etc**.   Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.   Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

        Defined terms herein shall apply equally to the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."   The word "will" shall be construed to have the same meaning and effect as the word "shall."   Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein) and, for purposes of the Notes, shall also include any such notes issued in substitution therefor pursuant to Section 13, (b) subject to Section 22.1, any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections and Schedules shall be construed to refer to Sections of, and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (f) any reference to a "Subsidiary," a "Subsidiary" of the Company, or the Company's "Subsidiaries" shall, in each case, include any Operating Project HoldCo and any Subsidiary of any Operating Project HoldCo (an "Operating Project HoldCo Subsidiary") and (g) any reference to a "Wholly-Owned Subsidiary" of the Company, shall include any Operating Project HoldCo and any Wholly-Owned Subsidiary of any Operating Project HoldCo.   For the avoidance of doubt, all Schedules attached to this Agreement shall be deemed to be a part hereof.   In the event there is a conflict or inconsistency between this Agreement and any of the DIP Orders, the terms of the Interim DIP Order or, once effective, the Final DIP Order shall control; provided that any provision of this Agreement or another Financing Document which imposes additional burdens on any Note Party or any of its Subsidiaries or further restricts the rights of any Note Party or any of its Subsidiaries or gives any of the Secured Parties additional rights shall not be deemed to be in conflict or inconsistent with this Agreement or the DIP Orders and shall be given full force and effect.

US-DOCS\165312452.14

**Section 22.5.   Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. The parties agree to electronic contracting and signatures with respect to this Agreement and the other Financing Documents (other than the Notes). Delivery of an electronic signature to, or a signed copy of, this Agreement and such other Financing Documents (other than the Notes) by email or other electronic transmission shall be fully binding on the parties to the same extent as the delivery of the signed originals and shall be admissible into evidence for all purposes. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the other Financing Documents (other than the Notes) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Company, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Notwithstanding the foregoing, if any Purchaser shall request manually signed counterpart signatures to any Financing Document, the Company hereby agrees to use its reasonable endeavors to provide such manually signed signature pages as soon as reasonably practicable (but in any event within thirty (30) days of such request or such longer period as the requesting Purchaser and the Company may mutually agree). Solely with respect to the Notes, in the event of any conflict between any other provision of the Financing Documents and this <u>Section 22.5</u>, this <u>Section 22.5</u> shall govern.

**Section 22.6.   Governing Law**.  This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York and, to the extent applicable, the Bankruptcy Code, excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

**Section 22.7.   Jurisdiction and Process; Waiver of Jury Trial**.

(a)     The Company irrevocably submits to the non-exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or the Notes.  To the fullest extent permitted by Applicable Law, the Company irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)     The Company agrees, to the fullest extent permitted by Applicable Law, that a final judgment in any suit, action or proceeding of the nature referred to in <u>Section 22.7(a)</u> brought in any such court shall be conclusive and binding upon it subject to rights of appeal, as the case may

be, and may be enforced in the courts of the United States of America or the State of New York (or any other courts to the jurisdiction of which it or any of its assets is or may be subject) by a suit upon such judgment.

(c)     The Company consents to process being served by or on behalf of any holder of Notes in any suit, action or proceeding of the nature referred to in <u>Section 22.7(a)</u> by mailing a copy thereof by registered, certified, priority or express mail (or any substantially similar form of mail), postage prepaid, return receipt or delivery confirmation requested, to it at its address specified in <u>Section 18</u> or at such other address of which such holder shall then have been notified pursuant to said Section.  The Company agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by Applicable Law, be taken and held to be valid personal service upon and personal delivery to it.  Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(d)     Nothing in this <u>Section 22.7</u> shall affect the right of any holder of a Note to serve process in any manner permitted by law, or limit any right that the holders of any of the Notes may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(e)     EACH OF THE COMPANY AND THE PURCHASERS (BY THEIR ACCEPTANCE OF THE NOTES) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH AND FOR ANY COUNTERCLAIM THEREIN.

### Section 22.8.   Release of Collateral.

(a)     From and after the date that a Subsidiary is designated as a "Released Subsidiary", an "Encumbered Subsidiary" or a "Sold Subsidiary" in accordance with and subject to <u>Section 9.18</u> (the circumstances of which have been demonstrated to the Required Holders' satisfaction):

(i)     to the extent such Subsidiary was a Pledged Subsidiary, such Subsidiary shall cease to be a Pledged Subsidiary without any further action by any Secured Party or any other Person;

(ii)     the Capital Stock of such Subsidiary shall be deemed to not be part of the Collateral; *provided* that in the case of an Encumbered Subsidiary, this clause (a)(ii) shall apply solely to the extent the specific Encumbrance Restriction applicable to such Encumbered Subsidiary would prohibit the pledge of such Encumbered Subsidiary's Capital Stock; and

(iii)     in the case of a Sold Subsidiary: (1) such Subsidiary shall cease to be a Subsidiary and the relevant Project owned by such Subsidiary shall cease to be a Project under the Financing Documents, (2) any covenants applicable to such Subsidiary, in its

capacity as a Project Company or a SPV Holding Company, immediately prior to such designation shall be deemed to not apply thereafter, (3) any Material Contracts of such Project shall cease to be Material Contracts hereunder, and (4) any schedules, exhibits, appendices, annexes or other similar documents attached hereto or to any other Financing Document with respect to such Subsidiaries and such Project shall cease to be schedules, exhibits, appendices, annexes or other similar documents hereunder or thereunder (or, to the extent any such schedule, exhibit, appendix, annex or other similar document relates to any other Subsidiary that has not been so designated, the information relating solely to the Subsidiary that has been so designated shall be removed therefrom and shall not longer be considered to be a part thereof).

(b)     Without limiting the foregoing, in connection with any such designation of a Subsidiary as a Sold Subsidiary, a Released Subsidiary or an Encumbered Subsidiary, the holders, at the reasonable request and expense of the Company, agree to execute and deliver (or instruct any Collateral Agent to execute and deliver) any lien releases, guarantee releases, pay-off letters or other similar instruments or documents, or to authorize the filing of (or cause any Collateral Agent to authorize the filing of) any financing statements or similar instruments, reasonably requested by any Note Party to effect the foregoing.

**Section 22.9.  Credit Bid.**.  The Note Parties and the Secured Parties hereby irrevocably authorize the Collateral Agent, based upon the instruction of the Required Holders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363, 1123 or 1129 of the Bankruptcy Code or any similar laws in any other jurisdictions to which a Note Party is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure or acceptance of Collateral in lieu of debt conducted by (or with the consent or at the direction of) the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of the Collateral Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of the Collateral Agent to credit bid, then such claims shall be disregarded, shall not be credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the equity interests of the acquisition vehicle or vehicles that are used to consummate such purchase).

**Section 23.    COLLATERAL AGENT**

By entering into this Agreement, and its acceptance of the Notes, each Purchaser hereby (i) agrees to appoint Wilmington Trust, National Association as the Collateral Agent hereunder and (b) is deemed to instruct the Collateral Agent to enter into the Security Documents to which the Collateral Agent is a party on the Initial Closing Date.

-82-

**Section 24.    SECURITY AGREEMENT**

The provisions of Section 6 of the Security Agreement are incorporated herein *mutatis mutandis*.  Each of the parties hereto agrees that each holder of a Note may exercise those rights and shall perform those obligations applicable to a Secured Party set forth in the Security Agreement.

**Section 25.    CERTAIN AGREEMENTS**

In the event of any conflict between the terms of the Intercreditor Agreements and this Agreement, the terms of the Intercreditor Agreement shall govern, including without limitation with respect to any representations for the priority of obligations by the Company and its Subsidiaries.

The parties hereto (i) agree that for U.S. federal income tax purposes the Notes are intended to constitute debt; and (ii) shall file all U.S. federal and applicable state and local income tax returns consistently with the foregoing intended treatment.

The parties hereto mutually agree the Company will not, and will Procure that each Note Party will not, cause, make, permit or consent to any action or election that would result in classification of any Note Party or any Carlyle Silo Entity as anything other than a disregarded entity or partnership for federal and state income Tax purposes, or that would result in any Note Party or any Carlyle Silo Entity becoming a member of an affiliated, consolidated, combined or unitary group that files or is required to file Tax returns on a group basis; *provided*, that each Secured Party covenant and agree to consider in good faith agreeing to a waiver of the foregoing, if so requested by the Company to minimize anticipated cash tax liabilities from recapture of investment tax credits (whether pursuant to Code Section 50); *provided* that the Secured Parties shall be permitted to decline providing such a waiver in their sole discretion.

**Section 26.    INTERCREDITOR AGREEMENT AND DIP ORDERS.**

Each Secured Party hereby (a) authorizes the Collateral Agent and holder of the Notes to enter into (i) each Intercreditor Agreement, (ii) amendments or supplements to each Intercreditor Agreement to the extent permitted by this Agreement and made in accordance with the applicable Intercreditor Agreement, (iii) the Interim DIP Order and the Final DIP Order and (iv) amendments or supplements to the Interim DIP Order or the Final DIP Order, in each case, to the extent permitted by this Agreement and made in accordance with the Interim DIP Order or the Final DIP Order, as applicable and (b) agrees that such Person will be subject to and bound by, and will take no actions contrary to, the provisions of any Intercreditor Agreement.

To the extent that any specific provision hereof or in any other Financing Document is inconsistent with any of the DIP Orders, the Interim DIP Order and the Final DIP Order (as applicable) shall control.

*   *   *   *   *

-83-

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

PINE GATE RENEWABLES, LLC

By  _____

[Title]

This Agreement is hereby accepted and agreed to as of the date hereof.

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____

Name:

Title:

[ADD PURCHASER SIGNATURE BLOCKS]

-84-

**SCHEDULE A**

**DEFINED TERMS**

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**A&R Projects**" means the Gunsight Project, the East Atmore Project, the Foley Project, the Lavender Project, the Jungmann Project, the Texas One Project, the Allora Project, the Phobos Project, and the Cabin Creek Project.

"**Acceptable Plan**" is defined in clause (cc) of <u>Section 11</u>.

"**Accounts**" means the Collections Account and the Escrow Accounts.

"**Acquired Assets**" means all of the Carlyle Silo Assets acquired by Newco pursuant to the Stalking Horse APA.

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of one hundred percent (100%) of the capital stock, partnership interests, or equity of any Person (or one hundred percent (100%) of the "Class B" or managing member interests in the case of partnership interests in a Tax Equity Vehicle), or otherwise causing any Person to become a Subsidiary, or (c) a merger, amalgamation, or consolidation or any other combination with another Person, in each case, where such other Person owns a project that, upon such acquisition being consummated, shall constitute a "Project" owned through a Wholly-Owned Subsidiary hereunder.

"**ACT**" means ACT Power Services Holding Company Guarantor, LLC and its direct and indirect Subsidiaries.

"**Additional DIP Documents**" means the "loan documents", "credit documents" or similar defined term in any credit agreement or equivalent document memorializing an Additional DIP Facility.

"**Additional DIP Facilities**" shall mean the Brookfield DIP Facility and Fundamental DIP Facility and any Replacement Additional DIP Facility in respect of the foregoing.

"**Additional Project Document**" means each contractual obligation related to the construction, operation, maintenance, management, administration, ownership or use of a Project, the provision of inputs therefor, the sale of electricity, renewable energy credits, subscriptions or the disposal of other outputs therefrom or the provision of services therefor, entered into by, or assigned to, the Company or any of its Subsidiaries subsequent to the original date of this Agreement and which (a) replaces a Material Project Document, (b) obliges the Company or any of its Subsidiaries to make or receive payments in excess of three hundred fifty thousand dollars ($350,000) per annum or (c) if terminated, could reasonably be expected to have a Material Adverse Effect.

"**Affiliate**" means, at any time, and with respect to any Person, any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person, and, with respect to the Company, shall include any Person beneficially owning or holding, directly or indirectly, fifty percent (50%) or more of any class of voting or equity interests of the Company or any Subsidiary or any Person of which the Company and its Subsidiaries beneficially own or hold, in the aggregate, directly or indirectly, fifty percent (50%) or more of any class of voting or equity interests. Unless the context otherwise clearly requires, any reference to an "Affiliate" is a reference to an Affiliate of the Company.

"**Affiliate Transaction**" is defined in <u>Section 10.1</u>.

"**Agency Fee**" is defined in <u>Section 2.2</u>.

"**Agency Fee Schedule**" means that certain fee scheduled, dated as of the date hereof, executed by the Collateral Agent and the Company.

"**Agreement**" means this Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement, including all Schedules attached to this Agreement.

"**Allora Project**" means the Allora solar project located in South Carolina.

"**Anti-Corruption Laws**" means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding bribery or any other corrupt activity, including the U.S. Foreign Corrupt Practices Act.

"**Anti-Money Laundering Laws**" means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes, including the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act) and the USA PATRIOT Act.

"**Applicable Law**" means with respect to any Person, property or matter, any of the following applicable thereto: any statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, authorization, approval, concession, grant, franchise, license, or other requirement of any Governmental Authority, whether in effect as of the original date of this Agreement or thereafter and in each case as amended, including any of the foregoing pertaining to land use or zoning restrictions and the UCC.

"**Approved Bankruptcy Court Order**" means (a) each of the DIP Orders, as such orders are amended and in effect from time to time in accordance with this Agreement, (b) any other order entered by the Bankruptcy Court regarding, relating to or in any way impacting (i) any rights or remedies of any Secured Party, (ii) the Financing Documents (including the Note Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any superpriority claims (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or superpriority claims), (iv) use of Cash Collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to any Prepetition Secured Obligations (vii) any chapter 11 plan, or (viii) any disclosure statement, in the case of each of the foregoing clauses (i) through (viii), that (x) is in form and substance satisfactory to the Collateral Agent and the Required

-86-

Holders, (y) has not been vacated, reversed or stayed and (z) has not been amended or modified in a manner adverse to the rights of the Collateral Agent or the holders except as agreed in writing by the Collateral Agent and the Required Holders in their sole discretion, and (c) any other order entered by the Bankruptcy Court that (i) is in form and substance satisfactory to the Collateral Agent and the Required Holders, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner satisfactory to the Collateral Agent and the Required Holders.

"**Approved Budget**" is defined in Schedule 7.1(p).

"**Auction**" has the meaning specified in the Bidding Procedures.

"**AutoZone**" means AutoZone Parts, Inc., a Nevada corporation.

"**AutoZone TCPA**" means the Tax Credit Purchase Agreement, dated as of September 20, 2024, by and between AutoZone and Polaris OpCo HoldCo A, LLC.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or any other court having competent jurisdiction over the Chapter 11 Cases from time to time.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Bid**" has the meaning specified in the Bidding Procedures.

"**Bidding Procedures**" is defined in Schedule 9.25.

"**Bidding Procedures / Stalking Horse APA Motion**" is defined in Schedule 9.25.

"**Bidding Procedures Order**" is defined in Schedule 9.25.

"**Blocked Person**" means (a) a Person whose name appears on one or more Sanctions Lists, (b) a Person, entity, organization, country or regime that is blocked or a target of sanctions that have been imposed under Sanctions Laws, (c) a Person that is ordinarily resident in, located in, or organized under the laws of a country or regime that is blocked or a target of sanctions that have been imposed under Sanctions Laws (a "**Restricted Country**"), or (d) a Person that is an agent, department or instrumentality of, or is otherwise beneficially owned by, controlled by or acting on behalf of, directly or indirectly, any Person, entity, organization, country or regime described in clause (a), clause (b) or clause (c).

"**Blocker Holdco**" means NPA PGR Blocker Holdco, LLC, a North Carolina limited liability company.

"**Blue Ridge**" means PGR Blue Ridge Power Holdings, LLC and its Subsidiaries, excluding ACT Power Services Holding Company Guarantor, LLC and its direct and indirect Subsidiaries.

"**Brookfield**" means BII BID AGGREGATOR A LP and its Affiliates.

"**Brookfield DIP Credit Agreement**" means that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement, dated as of the date hereof, by and among Company, as borrower, the lenders party thereto from time to time and BID ADMINISTRATOR LLC, as administrative agent and collateral agent.

"**Brookfield DIP Facility**" means the credit facilities under the Brookfield DIP Credit Agreement.

"**Brookfield DIP Lenders**" means "Lenders" as defined in the Brookfield DIP Credit Agreement.

"**Brookfield Prepetition Credit Agreement**" means that certain Amended and Restated Credit Agreement, dated as of January 30, 2025 (as amended prior to the date hereof), by and among BF DEV HOLDCO LLC, a North Carolina limited liability company, BID ADMINISTRATOR LLC, a Delaware limited liability company, as Administrative Agent for the Secured Parties (as defined therein) and Collateral Agent for the Secured Parties, BII BID AGGREGATOR A LP, as Lender and Issuing Bank (each as defined therein), and the financial institutions from time to time party thereto.

"**Brookfield Prepetition Credit Facility**" means the credit facilities under the Brookfield Prepetition Credit Agreement.

"**Brookfield Silo Entities**" means each of (a) BF Dev Holdco, LLC, (b) PGC Solar Holdings Holdco II, LLC, (c) Cascade NTP Holdco, LLC, (d) PGR Blocker Holdco, LLC, (e) Polaris OpCo Pledgor B, LLC, and (f) any direct or indirect subsidiary of the foregoing.

"**Brookfield/Fundamental Subsidiaries**" means any subsidiary of the Company that is an obligor under the Fundamental DIP Credit Agreement, the Fundamental Prepetition Credit Agreement, the Brookfield DIP Credit Agreement or the Brookfield Prepetition Credit Agreement, in each case, as amended, supplemented, amended and restated or otherwise modified from time to time, or any wholly-owned subsidiary of any of the foregoing entities.

"**BRP Matters**" means any disputes, claims, and indemnification expenses and obligations, Defaults, Events of Default, the exercise of put options or call options, the failure to make any operating deficit loans or to pay any amounts due under any Solar Development Project Financing Facility on the Gunsight Project, the Jungmann Project, the Texas One Project, the Allora Project,  the Phobos Project, and the Cabin Creek Project, in each case, solely resulting directly or indirectly from the following and which could not reasonably be expected to result in aggregate liability to the Company and its Subsidiaries of more than $50,000:

       (a)     breaches of that certain Amended & Restated Loan Agreement between Blue Ridge Power, LLC and Solar Construction Lending, LLC dated as of June 26, 2025;

-88-

(b)      breaches, violations and terminations of any engineering, procurement and construction contract or subcontract to which Blue Ridge Power, LLC or any of its direct or indirect subsidiaries is party;

(c)      claims and demands of issuers of surety bonds in support of the business of Blue Ridge Power, LLC and its direct and indirect subsidiaries;

(d)      any guaranty by the Company or any of its subsidiaries of the obligations of Blue Ridge Power, LLC or any of its subsidiaries of the foregoing; and

(e)      matters relating to pending or rejected change order requests with Blue Ridge Power, LLC under any engineering, procurement and construction contract or subcontract to which Blue Ridge Power, LLC or any of its direct or indirect subsidiaries is party.

"**Budget Covenant**" is defined in Schedule 7.1(p).

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York are required or authorized to be closed.

"**Cabin Creek Project**" means the Cabin Creek solar project located in North Carolina.

"**Capital Expenditures**" means expenditures to acquire or construct fixed assets, plant and equipment (including renewals, improvements and replacements) or other Solar Development Project Costs classified as capital expenditures in accordance with GAAP.

"**Capital Lease**" means, at any time, a lease with respect to which the lessee is required concurrently to recognize the acquisition of an asset and the incurrence of a liability in accordance with GAAP.

"**Capital Stock**" is defined in the Security Agreement.

"**Carlyle**" means Carlyle Global Credit Investment Management L.L.C. or one or more of its affiliates.

"**Carlyle Retained Liabilities**" is defined in the intercreditor agreement referred to in clause (b) of the definition of "Intercreditor Agreement".

"**Carlyle Silo Assets**" means all or substantially all of the assets of the Carlyle Silo Entities.

"**Carlyle Silo Entity**" means each of the Persons set forth on Part I of Schedule 4.1(f) and each Person added to Part I of Schedule 4.1(f) after the Initial Closing Date in accordance with the terms of this Agreement and (f) each direct and indirect subsidiary of the foregoing.

"**Carve-Out**" has the meaning assigned to such term in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account or securities account.

"**Cash Collateral**" shall have the meaning assigned to such term in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any holder or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Cash Management Motion**" means the first day motion of the Debtors seeking interim and final approval of the relief to be provided in the Cash Management Orders.

"**Cash Management Orders**" means the interim and final orders of the Bankruptcy Court entered in the Chapter 11 Cases that authorizes the Debtors to maintain their existing treasury, depositary, purchase card and other cash management system and treasury arrangements, subject to the reasonable consent rights of the Required Holders, as the same may be amended, supplemented or modified from time to time after the entry thereof subject to the reasonable consent rights of the Required Holders.

"**Change of Control**" means an event, condition or circumstance that results in any of the following:

    (a)    the Company ceases to own and Control, directly or indirectly, one hundred percent (100%) of the legal and beneficial equity interests in any Note Party or an Operating Project HoldCo;

    (b)    at any time, any Note Party that directly owns legal and beneficial interests in an Operating Project Holdco does not directly own and Control one hundred percent (100%) of the legal and beneficial equity interests in such Operating Project HoldCo;

-90-

(c)     at any time, the Company does not own and Control, directly or indirectly, one hundred percent (100%) of the legal and beneficial equity interests in a Pledged Subsidiary (other than an Operating Project Holdco) or an Operating Project HoldCo does not own and Control, directly or indirectly, one hundred percent (100%) of the legal and beneficial equity interests in an Operating Project HoldCo Subsidiary (excluding any Tax Equity Vehicle or any Subsidiary of a Tax Equity Vehicle);

(d)     the issuance, sale, disposition or transfer of more than 50% of the direct or indirect Capital Stock of the Company;

(e)     any change of control of Company, including any change in composition of the board of directors of Company resulting from any exercise of remedies with respect to any pledged equity interests in Company;

(f)     any Subsidiary of the Company that is a Class B Member of a Tax Equity Vehicle ceases to own 100% of its "Class B" (however defined in the applicable Solar Development Project Financing Facility) membership interests; or

(g)     any Tax Equity Vehicle ceases to own 100% of any project company owned or acquired by such Tax Equity Vehicle.

"**Chapter 11 Cases**" has the meaning assigned to the term in the recitals hereto.

"**Claim**" has the meaning assigned to such term in Section 101(5) of the Bankruptcy Code.

"**Class B Member**" means, with respect to a Project which has a Solar Development Project Financing Facility for tax equity commitments, the "Class B Member" or "Managing Member" (however defined in the applicable Solar Development Project Financing Facility) owning Class B or managing member interests in the Tax Equity Vehicle which owns such Project, to which the Project is leased, or to which such Project will be transferred after it has achieved "mechanical completion" (however defined in the applicable Solar Development Project Financing Facility) or leased after it has been Placed In Service.

"**Closing**" means (i) the Initial Closing, (ii) the Second Draw Closing and (iii) each Delayed Draw Closing, as context requires.

"**Closing Date**" means (i) the Initial Closing Date, (ii) the Second Draw Closing Date and (iii) each Delayed Draw Closing Date, as context requires.

"**Code**" means the Internal Revenue Code of 1986 and the rules and regulations promulgated thereunder from time to time.

"**Collateral**" means (i) all assets, property, rights and interests of the Note Parties that are or are intended to be subject to the Liens granted or purported to be granted pursuant to the Security Documents and (ii) the "DIP Collateral" (as defined in the Interim DIP Order); *provided* that, for the avoidance of doubt, all equity in, and assets of ACT (other than the proceeds of the equity interests in ACT) shall not constitute Collateral.

"**Collateral Agent**" means (i) Wilmington Trust, National Association or (ii) any other agent satisfactory to the Required Holders, in each case, not in its individual capacity but solely as collateral agent (together with successors and assigns in such capacity).

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)      all Capital Stock issued by a Subsidiary which (i) is directly owned by any Pine Gate Party, (ii) directly or indirectly owns a Project Company which owns an A&R Project (other than a Project Company or SPV Holding Company directly or indirectly owned by an Operating Project HoldCo) or (iii) is a Project Company that owns an A&R Project (other than a Project Company directly or indirectly owned by an Operating Project HoldCo) shall, in each case, subject to the Intercreditor Agreements, have been pledged pursuant to the Security Agreement and the Collateral Agent shall, except in the case of any Subsidiaries of PGR Blocker but otherwise to the extent required by the Security Agreement or applicable law, have received certificates or other instruments representing all such Capital Stock, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(b)      substantially all of the assets of (i) each Pine Gate Party, (ii) a Project Company which owns an A&R Project (other than a Project Company directly or indirectly owned by an Operating Project HoldCo) and (iii) any Operating Project Holdco shall, in each case, have been pledged pursuant to the Security Agreement;

(c)      to the extent required to create a First Priority Lien in accordance with applicable law, the Collateral Agent shall have received a counterpart, duly executed and delivered by the Company the applicable depositary bank or securities intermediary, as the case may be, of a Control Agreement with respect to (i) each Deposit Account maintained by the Company (including the Accounts) or any Pine Gate Party with any depositary bank (to the extent such Subsidiary grants a First Priority Lien in its Deposit Accounts to the Collateral Agent pursuant to a Security Agreement); and (ii) each securities account maintained by the Company with any securities intermediary;

(d)      all documents and instruments, including Uniform Commercial Code financing statements (or similar documents), required by the Security Documents or applicable law or reasonably requested by the Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been filed, registered or recorded or delivered to the Collateral Agent for filing, registration or recording;

(e)      each Note Party shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder; and

(f)      the Company shall have caused and Procured that each of the Company and its Subsidiaries (other than Excluded Subsidiaries), pursuant to the Security

-92-

Agreement or other Security Documents acceptable to the Required Holders, guarantee the Obligations and grant Liens on substantially all of its assets (other than Excluded Assets) to secure the Secured Obligations;

*provided* that in no event will any mortgage, deed of trust or similar instrument providing for the granting of a security interest in real property be required.

"**Collections Account**" means a Deposit Account or securities account of the Prepetition Issuer with account number 165743-001 maintained with Wilmington Trust, National Association that is subject to a Lien pursuant to the Security Agreement and a blocked account Control Agreement in favor of the Collateral Agent.

"**Commitment**" means a New Money DIP Commitment and/or a Roll-Up DIP Commitment, as the context requires.

"**Committee**" is defined in Section 10.18.

"**Community Solar Program**" means any program that provides for a Project, or the electric utility that purchases power from the Project, to deliver bill credits or discounts to electric utility customers.

"**Company**" is defined in the first paragraph of this Agreement.

"**Confidential Information**" is defined in Section 20.

"**Consent Status Report**" is defined in Section 9.14(d).

"**Construction Project**" means a Solar Development Project which has incurred costs in excess of fifteen percent (15%) of its construction budget and has not yet been Placed in Service.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Agreement**" means, with respect to any Deposit Account, other account or securities account maintained by the Company, a control agreement in form and substance reasonably satisfactory to the Collateral Agent, duly executed and delivered by the Collateral Agent, the Company and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"**Controlled Entity**" means (a) any of the Subsidiaries of the Company and any of their or the Company's respective Controlled Affiliates and (b) if the Company has a parent company, such parent company and its Controlled Affiliates.

"**CTL Financing**" means, with respect to an A&R Project, any debt or equity financing facility provided or to be provided by one or more commercial banks, investment funds, insurance companies or other financial or other companies or institutions (including non-bank institutions)

-93-

to a Project Company or a direct or indirect owner thereof and that is non-recourse or limited recourse to any Pine Gate Party that do not directly or indirectly own such Project Company in order to finance (i) the development, construction and commissioning of such A&R Project (not including a TEBL Financing), or (ii) any back leverage therefrom (whether or not such financing pursuant to <u>clauses (i)</u> or <u>(ii)</u> is made through a direct or indirect parent entity).

"**Debtor**" or "**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, judicial management, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief statute, law, ordinance, rule or regulation from time to time in effect in the United States of America, any State thereof, the District of Columbia, Canada, any province or territory thereof or any other applicable jurisdiction in which the Company or any Subsidiary thereof may be organized, hold assets or conduct business.

"**Declined Amounts**" is defined in <u>Section 8.3(b)(iii)</u>.

"**Declining Holder**" is defined in <u>Section 8.3(b)(iii)</u>.

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"**Default Rate**" means that rate of interest per annum that is the greater of (a) 2% above the rate of interest stated in <u>clause (a)</u> of the first paragraph of the Notes or (b) 2% over the rate of interest last quoted by *The Wall Street Journal* as the "U.S. prime rate" or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Board of Governors of the Federal Reserve System in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Purchasers) or any similar release by said Board (as determined by the Purchasers). Each change in the U.S. prime rate shall be effective on the date such change is publicly announced as effective.

"**Delayed Draw Closing Date**" means any date on which the conditions precedent in <u>Section 4.2</u> have been satisfied or waived and a Delayed Draw Closing has occurred.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Collateral Agent Advisors**" means one primary counsel and one local counsel (in each applicable jurisdiction) retained by the Collateral Agent.

"**DIP Commitment Letter**" means the commitment letter attached hereto as <u>Exhibit B</u>, pursuant to which the Purchasers have agreed to provide commitments for a superpriority secured debtor-in-possession senior secured note facility for the Company and certain of its affiliates under Sections 364(c) and 364(d) of the Bankruptcy Code.

-94-

"**DIP Delayed Draw Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to purchase DIP Delayed Draw Notes on any Delayed Draw Closing Date, in an aggregate principal amount not to exceed the amount set forth opposite such Purchaser's name on Schedule 2.01 hereto under the heading "DIP Delayed Draw Commitment".

"**DIP Delayed Draw Notes**" is defined in <u>Section 1.1</u>.

"**DIP First Draw Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to purchase DIP First Draw Notes on the Initial Closing Date, in an aggregate principal amount not to exceed the amount set forth opposite such Purchaser's name on Schedule 2.01 hereto under the heading "DIP First Draw Commitment".

"**DIP First Draw Notes**" is defined in <u>Section 1.1</u>.

"**DIP Noteholder Advisors**" means Milbank LLP, as counsel to the Purchasers, Solomon Partners Securities, LLC, as financial advisor to the Purchasers, and any other local or special counsel or other professionals retained by the Purchasers.

"**DIP Order**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Payments**" is defined in <u>Section 2.2</u>.

"**DIP Proceeds Account**" means a Deposit Account or securities account of the Company with account number [_____] maintained with Ankura Trust Company, LLC, that is subject to a First Priority Lien in favor of the Collateral Agent, for the benefit of the Secured Parties, and each other agent under the Additional DIP Facilities for the benefit of the applicable secured parties thereunder (subject to the DIP Orders and the Intercreditor Agreements).

"**DIP Second Draw Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to purchase DIP Second Draw Notes on the Second Draw Closing Date, in an aggregate principal amount not to exceed the amount set forth opposite such Purchaser's name on Schedule 2.01 hereto under the heading "DIP Second Draw Commitment".

"**DIP Second Draw Notes**" is defined in <u>Section 1.1</u>.

"**DIP Secured Parties Advisors**" means the DIP Noteholder Advisors and the DIP Collateral Agent Advisors.

"**Disclosure Documents**" is defined in <u>Section 5.3</u>.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Early Stage Project**" means a Solar Development Project which has not yet incurred costs in excess of fifteen percent (15%) of its construction budget or been Placed in Service.

"**East Atmore Financing Documents**" means (a) the Credit Agreement, dated as of September 30, 2024, by and among Polaris DevCo Borrower A, LLC, as DevCo Borrower; Polaris OpCo Borrower A, LLC, as OpCo Borrower; Deutsche Bank Trust Company Americas, as Administrative Agent and as Collateral Agent, and the lenders and issuing banks from time to time party thereto and (b) the Amended and Restated Limited Liability Company Agreement of Polaris OpCo HoldCo A, LLC, dated as of September 17, 2024.

"**East Atmore Forbearance Event**" means the failure of the Borrower (as defined in the East Atmore Financing Documents) to use commercially efforts to (a) satisfy the conditions precedent to Credit Events (as defined in the East Atmore Financing Documents), (b) achieve the East Atmore Term Conversion Date (as defined in the East Atmore Financing Documents) or (c) achieve the SC Funding Date (as defined in the East Atmore Financing Documents) with respect to the East Atmore Project, in each case, during the Forbearance Period.

"**East Atmore Project**" means the East Atmore project located in Alabama.

"**Encumbered Subsidiary**" means a Subsidiary of the Company subject to an Encumbrance Restriction pursuant to a Solar Development Project Financing Facility (or documentation for the granting of a security interest in support thereof), that (a) has been listed as an Encumbered Subsidiary on Schedule 5.4 as of the Initial Closing Date or (b) has been designated by a Responsible Officer as an "Encumbered Subsidiary" pursuant to Section 9.18(a)(iii).

"**Encumbrance Restriction**" means any applicable law, rule, regulation or any lease, license, permit, contract, property right or agreement to which an Encumbered Subsidiary or its property is a party or bound (including any of its right or interests thereunder) to the extent that a security interest in the equity interests of, or substantially all assets of, such Encumbered Subsidiary is prohibited by or in violation of (a) such law, rule or regulation applicable to such Encumbered Subsidiary or (b) a term, provision or condition of any such lease, license, permit, contract, property right or agreement (other than to the extent that any such term would be rendered ineffective with respect to the creation of the security interest created under the Financing Documents pursuant to any applicable law or principles of equity).

"**Environmental Laws**" means any and all federal, state, provincial, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974 and the rules and regulations promulgated thereunder from time to time in effect.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is treated as a single employer together with the Company under section 414 of the Code.

"**Escrow Accounts**" means the DIP Proceeds Account, the Overhead Costs Escrow Account and the Project Costs Escrow Account.

"**Event of Default**" is defined in Section 11.

-96-

"**Event of Loss**" means a single insured event or a related series of events causing any loss of, destruction of or damage to, or any condemnation or other taking of (including by eminent domain), all or any portion of any Project or all or any portion of the property or assets of the Company or its Subsidiaries.

"**Excluded Assets**" is defined in the Security Agreement.

"**Excluded Subsidiaries**" means:

(a)   any Subsidiary (other than any obligor under the Prepetition Note Purchase Agreement) that, (i) cannot be a Debtor absent a Project Senior Financing Lien Consent from the tax equity investor with respect to a Tax Equity Financing and (ii) notwithstanding the Company's use of commercially reasonable efforts in accordance with Section 9.14, has not obtained the Project Senior Financing Guarantee Consents (solely to the extent required by it),

(b)   each Brookfield Silo Entity and each Fundamental Silo Entity, in each case as to which (i) the Prepetition Intercreditor Agreements, (ii) the Intercreditor Agreements or (iii) the intercreditor arrangements between the Collateral Agent and the agent for any Replacement Additional DIP Facility provide that such Subsidiary shall not provide or shall be released from its guarantee of the Notes,

(c)   PGR Signature Fund 1, LLC or any wholly-owned subsidiary thereof,

(d)   any direct or indirect Subsidiaries of Blue Ridge Power Holding Company, LLC and

(e)   ACT.

"**Exempt Wholesale Generator**" means an "exempt wholesale generator" as such term is defined under Section 1262(6) of PUHCA and in the implementing regulations of FERC, at 18 C.F.R. §§ 366.1 and 366.7.

"**Existing Services Agreement**" is defined in Schedule 9.25.

"**Existing Services Agreement Assumption Order**" is defined in Schedule 9.25.

"**Exit Premium**" is defined in Section 2.2.

"**Extraordinary Receipts**" means an amount equal to (a) any Cash payments or proceeds (including Cash Equivalents) received by or on behalf of any Note Party not in the ordinary course of business and not consisting of Net Cash Proceeds described in Section 8.3(i), (ii) or (iv) in respect of (i) foreign, United States, state or local tax refunds (other than (x) tax refunds applied by the applicable Governmental Authority to future tax payments and (y) tax refunds in respect of overpayments of estimated taxes for the current or immediately preceding tax year received in the ordinary course of business), (ii) pension plan reversions, (iii) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (but not including, for the avoidance of doubt, ordinary course disputes with customers or suppliers, and not including

-97-

proceeds received by any Note Party as reimbursement for any costs previously incurred or any payment previously made, or used by any Note Party to remedy the actual loss or damages (if any) giving rise to such proceeds) and (iv) indemnity payments (other than to the extent such indemnity payments are (A) immediately payable to a Person that is not an Affiliate of the Company or any Subsidiary or (B) received by the Note Parties that are Debtors as reimbursement for any payment previously made to such Person).

"**FATCA**" means (a) sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), together with any current or future regulations or official interpretations thereof, (b) any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the United States of America and any other jurisdiction, which (in either case) facilitates the implementation of the foregoing <u>clause (a)</u>, and (c) any agreements entered into pursuant to section 1471(b)(1) of the Code.

"**Federal Power Act**" or "**FPA**" means the Federal Power Act and the implementing regulations of FERC thereunder.

"**Fee Letter**" means any fee letter between the Company and a Purchaser (or an Affiliate thereof) as of any Closing Date.

"**FERC**" means the Federal Energy Regulatory Commission or any successor agency thereto.

"**Fifth Third Account**" means a Deposit Account or securities account of the Prepetition Issuer with account number 07474267908 maintained with Fifth Third Bank.

"**Final DIP Order**" means a final order of the Bankruptcy Court in substantially the form of the Interim DIP Order, with only such modifications thereto as are reasonably necessary to convert the Interim DIP Order to a final order and such other modifications as are satisfactory in form and substance to the Required Holders and (solely with respect to its own rights, obligations, liabilities, duties and treatment) the Collateral Agent in their sole discretion.

"**Final DIP Order Entry Date**" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"**Financing Documents**" means this Agreement, each Note, each Fee Letter, the Intercreditor Agreements, the Security Documents and any other document agreed as such by the Required Holders and the Company.

"**First Day Motions**" is defined in <u>Section 4.1(q)</u>.

"**First Day Orders**" means the orders entered by the Bankruptcy Court in respect of first day motions and applications in respect of the Chapter 11 Cases.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is the highest priority Lien to which such Collateral is subject, other than any Permitted Lien.

-98-

"**Foley Financing Documents**" is defined in <u>Section 10.16</u>.

"**Foley Forbearance Event**" means the failure of the Company or its Affiliates to use commercially reasonable efforts to achieve the initial funding under the Foley Financing Documents during the Forbearance Period.

"**Foley Project**" means the Foley project located in Alabama.

"**Forbearance Period**" means the period beginning on October 6, 2025 and ending on January 31, 2026.

"**FPA**" means the Federal Power Act, as amended, and FERC's regulations issued thereunder.

"**Fundamental**" means FP Solar Development I LLC and its Affiliates.

"**Fundamental DIP Credit Agreement**" means that certain Senior Secured Super Priority Debtor-In-Possession Loan Agreement, dated as of the date hereof, by and among the Company, FP Solar Development I LLC, and Solar Construction Lending, LLC.

"**Fundamental DIP Facility**" means the credit facilities pursuant to the Fundamental DIP Credit Agreement.

"**Fundamental DIP Lenders**" means "Lenders" as defined in the Fundamental DIP Credit Agreement.

"**Fundamental Prepetition Credit Agreements**" means that (a) certain Amended and Restated Revolving Loan Agreement, dated October 6, 2025, by and among FP 2021 Dev Holdco, LLC, as borrower, FP Solar Development I LLC, as lender, and Solar Construction Lending, LLC, as lender (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the date hereof, including by that certain First Amendment to Loan Agreement and Guarantee and Security Agreement and Limited Waiver, dated as of October 20, 2025, and that certain Second Amendment to Loan Agreement and Limited Waiver, dated as of October 24, 2025), (b) certain Revolving Loan Agreement, dated as of December 10, 2021, by and among FP 2021 Dev Holdco, LLC, a North Carolina limited liability company, as borrower, and FP Solar Development I LLC, a Delaware limited liability company, as lender, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (c) certain Amended and Restated Loan Agreement, dated as of June 26, 2025, by and among Blue Ridge Power, LLC, as borrower, and Solar Construction Lending, LLC, as lender, as amended by that certain First Amendment to Amended and Restated Loan Agreement, dated as of October 6, 2025.

"**Fundamental Prepetition Credit Facility**" means the credit facilities under the Fundamental Prepetition Credit Agreements.

"**Fundamental Silo Entity**" means (a) FP 2021 Dev Holdco, LLC, PGR 2022 Sponsor Holdco, LLC, PGR Carver Holdco LLC, PGR Dev Carver Holdco LLC and/or each of their direct and indirect subsidiaries, (b) PGR 2024 Sponsor Holdco, LLC solely with respect to Sirius OpCo

Pledgor, LLC and each of its direct or indirect subsidiaries, (c) Cascade Pledgor, LLC solely with respect to Cascade Dev Holdco, LLC and each of its direct and indirect subsidiaries.

"**Funding Instruction**" means that certain waiver and direction letter, by and among the Company, the holders of the Note Party thereto and the Collateral Agent.

"**Funding Payment**" is defined in <u>Section 2.2</u>.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States of America.

"**Governmental Approval**" means (a) any approval, authorization, consent, decree, order, judgment, ruling, permit, concession, license, waiver, privilege, exemption, tariff, rate, certification, variance or claim of, by or with, (b) any registration or filing (or the like) by or with, (c) any declaration of or with, or (d) any required report or notice (or the like) to, any Governmental Authority.

"**Governmental Authority**" means

    (a)    the government of

        (i)    the United States of America or any state or other political subdivision thereof, or

        (ii)    any other jurisdiction in which the Company or any Subsidiary conducts all or any part of its business, or which asserts jurisdiction over any properties of the Company or any Subsidiary, or

    (b)    any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government.

"**Governmental Official**" means any governmental official or employee, employee of any government-owned or government-controlled entity, political party, any official of a political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity.

"**Guarantee**" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other Person in any manner, whether directly or indirectly, including obligations incurred through an agreement, contingent or otherwise, by such Person:

    (a)    to purchase such indebtedness or obligation or any property constituting security therefor;

    (b)    to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet

-100-

condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

(c)     to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation; or

(d)     otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guarantee, the indebtedness or other obligations that are the subject of such Guarantee shall be assumed to be direct obligations of such obligor.

"**Guarantor**" means (a) each Debtor other than the Company, including, for the avoidance of doubt, PGR Blue Ridge Holdings, LLC and Blue Ridge Power Holding Company, LLC, (b) each Carlyle Silo Entity, (c) each of the entities that is a "Note Party" as defined in the Prepetition Note Purchase Agreement and their respective direct and indirect subsidiaries, (d) the Pari Guarantors, (e) the Priority Guarantors and (f) each Person listed on Schedule 4.1(e) hereto. Notwithstanding the foregoing, the Guarantors shall not include any Excluded Subsidiary.

"**Gunsight Project**" means the Gunsight solar project located in South Carolina.

"**Hazardous Materials**" means any and all pollutants, toxic or hazardous wastes or other substances that might pose a hazard to health and safety, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration of which is or shall be restricted, prohibited or penalized by any Applicable Law, including asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum, petroleum products, lead based paint, radon gas or similar restricted, prohibited or penalized substances.

"**Hedge Contract**" means (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, currency options, spot contracts or any other similar transactions or any of the foregoing (including any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any International Foreign Exchange Master Agreement.

"**HoldCo Available Cash**" means, with respect to any Rolling Period, cash received by the Company from its Subsidiaries during such period (excluding any (a) Note proceeds, (b) Net Cash Proceeds, (c) Permitted Investments and (d) proceeds from the issuance of Indebtedness).

"**HoldCo Debt Service**" means, with respect to any Rolling Period, the sum of the following (without duplication): (a) all scheduled interest payments due and payable in respect of Indebtedness of the Company during such period, *plus* (b) scheduled fees, if any (excluding any

-101-

up-front or one time fees and bank fees), due and payable by the Company in respect of Indebtedness of the Company during such period, *plus* (c) all scheduled payments of principal in respect of Indebtedness of the Company (excluding (A) any balloon or similar payment due at the final maturity date of any Indebtedness and (B) in the case of (a), (b) and (c), Indebtedness that is subordinated in right of payment to the Notes).

"**HoldCo Debt Service Coverage Ratio**" means, for any Rolling Period, the ratio of (a) HoldCo Available Cash for such period to (b) HoldCo Debt Service during such period, as determined by the Company and certified to the Collateral Agent pursuant to Section 7.2(b) and Section 10.8.

"**holder**" means, with respect to any Note, the Person in whose name such Note is registered in the register maintained by the Company pursuant to Section 13.1; *provided, however,* that if such Person is a nominee, then for the purposes of Section 7, Section 12, Section 17.2 and Section 18 and any related definitions in this Schedule A, "holder" shall mean the beneficial owner of such Note whose name and address appears in such register.

"**INHAM Exemption**" is defined in Section 6.2(e).

"**Indebtedness**" with respect to any Person means, at any time, without duplication,

(a) its liabilities for borrowed money and its redemption obligations in respect of mandatorily redeemable Preferred Stock;

(b) its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

(c) (i) all liabilities appearing on its balance sheet in accordance with GAAP in respect of Capital Leases and (ii) all liabilities which would appear on its balance sheet in accordance with GAAP in respect of Synthetic Leases assuming such Synthetic Leases were accounted for as Capital Leases;

(d) all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities);

(e) all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

(f) the aggregate Swap Termination Value of all Hedge Contracts of such Person; and

(g) any Guarantee of such Person with respect to liabilities of a type described in any of clauses (a) through (f) hereof.

-102-

Indebtedness of any Person shall include all obligations of such Person of the character described in clauses (a) through (g) to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP.

"**Independent Engineer**" means, for any Solar Development Project, any "independent engineer" or equivalent technical consultant appointed for in respect of such Solar Development Project, whether (a) for the benefit of financiers to any Solar Development Project Financing Facility or (b) for the benefit of, and reasonably acceptable to, the Required Holders (including any successors or replacements reasonably acceptable to the Required Holders).

"**Independent Manager**" means the independent manager appointed to the board of managers or equivalent governing body of certain of the Note Parties in accordance with the Prepetition Note Purchase Agreement.

"**Initial Approved Budget**" means the budget set forth in Schedule C or otherwise in form and substance satisfactory to the Required Holders.

"**Initial Closing Date**" is defined in Section 3.1.

"**Institutional Investor**" means (a) any Purchaser of a Note, (b) any holder of a Note holding (together with one or more of its affiliates) more than 5% of the aggregate principal amount of the Notes then outstanding, (c) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (d) any Related Fund of any holder of any Note.

"**Intellectual Property**" has the meaning ascribed to such term in the Security Agreement.

"**Intercreditor Agreement**" means one or more of (a) that certain Amended and Restated Debtor-in-Possession Intercreditor Agreement, dated as of [_____], 2025, by and among the holders of the Note Party thereto, the Prepetition Noteholders, Brookfield, Fundamental and the other parties party thereto (the "**Pari Intercreditor Agreement**") and (b) that certain Amended and Restated Junior Lien Debtor-in-Possession Intercreditor and Subordination Agreement, dated as of [_____], 2025, by and among the holders of the Note Party thereto, the Prepetition Noteholders, Brookfield,  Fundamental and the other parties party thereto (the "**Junior Intercreditor Agreement**").

"**Interest Amount**" means, with respect to a Project at any time, an amount equal to the accrued interest on such Project's Par Amount that is unpaid or has been paid with Note proceeds at such time (including, without duplication, amounts withdrawn from the Accounts for application to such Project).

"**Interim DIP Order**" means an interim order of the Bankruptcy Court (and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of (solely with respect to its own rights, obligations, liabilities, duties and treatment) the Collateral Agent and the Required Holders in their sole discretion) in the form set forth as Exhibit C, with changes to such form as are satisfactory to the Collateral Agent (solely with respect to its own

rights, obligations, liabilities, duties and treatment) and the Required Holders, in their sole discretion, approving the Financing Documents and related matters.

"**Interim DIP Order Entry Date**" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"**Jungmann Project**" means the Jungmann project located in Texas.

"**Lavender Project**" means the Lavender project located in Texas.

"**Lien**" means, with respect to any Person, any mortgage, lien, pledge, charge, security interest or other encumbrance, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or Capital Lease, upon or with respect to any property or asset of such Person (including in the case of stock, stockholder agreements, voting trust agreements and all similar arrangements).

"**Liquidity**" shall mean, at any time, an amount equal to the amount of total unrestricted cash (which, for the avoidance of doubt, shall include proceeds of the funded New Money DIP Notes but shall exclude unfunded New Money DIP Commitments) held by the Company and its Subsidiaries, including all Note Parties.

"**Liquidity Testing Date**" is defined in Section 10.23.

"**Loss Proceeds**" means, collectively, net available insurance proceeds, condemnation awards or other compensation, awards, damages and other payments or relief (exclusive, in each case, of the proceeds of liability insurance and business interruption insurance and other payments for interruption of operations) with respect to any Event of Loss.

"**Mandatory Prepayment**" means any mandatory prepayment of the Notes pursuant to Section 8.3(a).

"**Material**" means material in relation to the business, operations, affairs, financial condition, assets, properties, or prospects of the Company and its Subsidiaries, taken as a whole.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, affairs, financial condition, assets or properties of the Company and its Subsidiaries, taken as a whole, (b) the ability of the Company and its Subsidiaries to perform their respective obligations under this Agreement, the Notes and the other Financing Documents, (c) the validity or enforceability of this Agreement or any other Financing Documents, or (d) the validity, perfection or priority of the Liens in favor of the Collateral Agent for the benefit of the Secured Parties on the Collateral; provided further that, notwithstanding anything to the contrary in this defined term, none of the matters described above shall be Material Adverse Effects to the extent arising from events leading up to and customarily resulting from the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, including any decline in business relationships, reputation, or financial performance resulting from the Chapter 11 filing and circumstances leading thereto); provided further that any effects resulting from changes in general economic conditions, financial markets, industry conditions, or geopolitical events, except to the extent such efforts have

-104-

a materially disproportionate impact on the Company relative to similarly situated companies shall not constitute a Material Adverse Effect.

"**Material Contract**" means (a) the "Material Contracts" set forth on Exhibit A as of the Initial Closing Date, (b) any Third Party Guarantee for which breach thereof would reasonably be expected to have a Material Adverse Effect, (c) (i) any credit agreement or equivalent debt or equity funding agreement providing for the extension of debt or equity funding entered into in connection with a Solar Development Project Financing Facility and (ii) any Tax Equity Financing Document entered into in connection with a Solar Development Project and its Solar Development Project Financing Facility and (d) each Material Project Document.

"**Material Project Documents**" means (a) the "Material Project Documents" set forth on Exhibit A as of the Closing Date and (b) each of the following agreements entered into in connection with a Project on or prior to the Initial Closing Date for a Project:

(a)     any power purchase agreement or similar agreement pursuant to which such electricity, capacity and/or related attributes produced by the applicable Project are sold (a "**Power Purchase Agreement**");

(b)     solely in respect of a Project which participates in a Community Solar Program, any subscription management agreement or "anchor subscription agreement" (however defined in the applicable Solar Development Project Financing Facility for such Project);

(c)     solely in respect of a Solar Development Project (or, with respect to an Operating Project, to the extent applicable warranty periods continue to run), any engineering, procurement and construction contract pursuant to which the applicable Project is constructed;

(d)     solely in respect of a Solar Development Project (or, with respect to an Operating Project, to the extent applicable warranty periods continue to run), any equipment supply agreement or supply and installation agreement for the applicable Project to which the applicable Project Company is a party;

(e)     [reserved];

(f)     any interconnection agreement pursuant to which the applicable Project connects to the applicable transmission-owning public utility;

(g)     any lease agreement for the site of the applicable Project; and

(h)     any Additional Project Document.

"**Maturity Date**" means the earlier of (a) March 31, 2026 (the "**Scheduled Maturity Date**"); (b) the Plan Effective Date; (c) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code or otherwise, except for any sale of ACT or resulting from the sale processes contemplated by the Stalking Horse APA or the Additional DIP Facilities; (d) the date of termination of the Commitments and the acceleration of

-105-

any outstanding Notes hereunder; (e) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into cases under Chapter 7 of the Bankruptcy Code; (f) the date that is 30 days after the Petition Date or such later date as agreed by the Required Holders unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date; (g) the date on which the Debtors' right to use cash collateral in accordance with the Interim DIP Order or Final DIP Order is terminated, as applicable; (h) the occurrence of the maturity date under or the acceleration of any Additional DIP Facility or Replacement Additional DIP Facility; and (i) the date on which the Debtors, without the prior written consent of the Required Holders, file or express written support for bidding procedures, sale processes, or transactions that are not acceptable to the Required Holders or any plan of liquidation or reorganization (or related disclosure statement) that is not an Acceptable Plan.

"**MBR Authority**" means an order issued by FERC (a) authorizing the sale of electric energy, capacity and specified ancillary services at market-based rates pursuant to Section 205 of the FPA, (b) accepting a tariff pertaining to such sales, and (c) granting waivers and blanket authorizations customarily granted by FERC to an entity that sells electric energy, capacity and specified ancillary services at market-based rates, including blanket FERC approval for the issuance of securities and assumption of liabilities under Section 204 of the FPA and FERC's regulations at 18 C.F.R. Part 34.

"**Milestones**" means each of the milestones set forth on <u>Schedule 9.25</u>.

"**MOIC**" means the ratio of (a) the sum of all fees (including original issue discount, commitment fees, the Upfront Payment, and the Exit Premium), interest, principal, in respect of the principal amount repaid, and other payments received in cash by the Purchasers in respect of the New Money DIP Notes since the Initial Closing Date (excluding, for the avoidance of doubt, any reimbursement of out of pocket costs or expenses, administrative agent fees, fees paid to the DIP Secured Parties Advisors and any indemnification payments made to the Secured Parties or any of their respective related parties), as the numerator to (b) $51,722,511.23 as the denominator.

"**MOIC Amount**" shall mean an amount that is paid to the holders of the Notes sufficient to cause such holders to achieve a MOIC of 1.30 on the aggregate principal amount of the New Money DIP Commitments immediately prior to the issuance of the DIP First Draw Notes (which shall be $[51,722,511.23]), *net of* the aggregate amount of the Prepetition Prepayment Premium actually paid in respect of the Prepetition Secured Obligations under the Prepetition Notes that are exchanged for Roll-Up DIP Notes.

"**MOIC Event**" means the occurrence of any of the following: (a) the payment in full (or other retirement, including pursuant to a credit bid) of the New Money DIP Notes, (b) a reduction of the New Money DIP Commitments to zero Dollars ($0) other than as a result of the disbursement of such New Money DIP Notes, (c) any acceleration of the Obligations (including, for the avoidance of doubt, upon the commencement of any insolvency proceeding) or (d) the Maturity Date.

"**Monthly Date**" means the last Business Day of each calendar month.

-106-

"**Multiemployer Plan**" means any Plan that is a "multiemployer plan" (as such term is defined in section 4001(a)(3) of ERISA).

"**NAIC**" means the National Association of Insurance Commissioners.

"**Net Cash Proceeds**" means, as applicable, (a) with respect to any Event of Loss, the aggregate amount of Loss Proceeds actually received by or on behalf of the Company or any of its Subsidiaries in connection with such Event of Loss, (b) with respect to any Permitted Dispositions or Project Sales, an amount equal to (i) the net proceeds actually received by the Company or any of its Subsidiaries in respect of such sale or disposition of assets, in Cash or Cash Equivalents, *minus* (ii) transaction expenses actually incurred in connection with such sale or disposition of assets, and (c) with respect to any issuances or incurrence of Indebtedness, the Cash proceeds thereof, net of all taxes and customary fees, commissions, costs, underwriting discounts and other expenses incurred by the Company or any of its Subsidiaries in connection therewith.

"**New Money DIP Commitment**" means a DIP First Draw Commitment, a DIP Second Draw Commitment and/or a DIP Delayed Draw Commitment, as the context requires.

"**New Money DIP Notes**" has the meaning assigned to the term in the recitals hereto.

"**Newco**" means any entity formed by the Secured Parties and the Prepetition Secured Parties for the purpose of acquiring an interest in one or more Carlyle Silo Entities.

"**Non-U.S. Plan**" means any plan, fund or other similar program that (a) is established or maintained outside the United States of America by Company or any of its Subsidiaries primarily for the benefit of employees of the Company or one or more Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and (b) is not subject to ERISA or the Code.

"**Note Party**" means each of the Company and the Guarantors, and collectively, the "**Note Parties**".

"**Notes**" means New Money DIP Notes and/or Roll-Up DIP Notes, as the context requires.

"**Notice of Drawing**" is defined in Section 4.2(g).

"**Obligations**" means all debts, liabilities and obligations (whether now existing or hereafter arising, absolute or contingent, joint, several or independent) of every nature of the Company, each other Note Party and/or its Subsidiaries from time to time owed to the Collateral Agent, the Paying Agent, the holders, any Indemnitee or any of them, under any Financing Document or the DIP Orders, including in respect of the principal of any Note, the Exit Premium, the Funding Payment, the Upfront Payment, Prepayment Premium, any other premium, interest (including interest and premium which, but for the filing of a petition in bankruptcy with respect to such Note Party, would have accrued on any Obligation, whether or not a claim is allowed against such Note Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise, and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance) and any such obligations that arise after the

filing of a petition by or against any Note Party under the Bankruptcy Code or under Debtor Relief Laws, regardless of whether allowed as a claim in the resulting proceeding, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 (or under any other Debtor Relief Laws) or otherwise.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**OFAC Sanctions Program**" means any economic or trade sanction that OFAC is responsible for administering and enforcing.  A list of OFAC Sanctions Programs may be found at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx.

"**Officer's Certificate**" means a certificate of a Senior Financial Officer or of any other officer or authorized representative of the Company whose responsibilities extend to the subject matter of such certificate.

"**Operating Project**" means a Project which has been Placed in Service.

"**Operating Project HoldCo**" means any one or more of Blocker Holdco, and any other Person that becomes a party to the Security Agreement as an "Operating Project Holdco" by delivery of a Subsidiary Guarantor Joinder Agreement in accordance with the terms thereof, as the context requires.

"**Operating Project HoldCo Subsidiary**" is defined in Section 22.4.

"**Organizational Documents**" means, as to any Person, the charter, the articles or certificate of incorporation, the by-laws, the certificate of partnership, the partnership agreement, the certificate of formation, the limited liability company agreement, the operating agreement or other organizational or governing documents of such Person.

"**Original Note Purchase Agreement**" has the meaning ascribed to such term in the Prepetition Note Purchase Agreement.

"**Other Credit Facility**" means any credit facility other than the Notes issued hereunder or the Prepetition Notes.

"**Overhead Costs Escrow Account**" means a Deposit Account or securities account of the Company with account number 165743-002 maintained with Wilmington Trust, National Association that is subject to a Lien pursuant to the Security Agreement and a blocked account Control Agreement in favor of the Collateral Agent. It is understood that any references to the "Note Proceeds Account" by Wilmington Trust, National Association, in the Financing Documents or in the applicable Control Agreement shall be deemed to be references to the Overhead Costs Escrow Account.

"**Paid in Full**" means (a) the indefeasible payment in full in cash of the obligations (including principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) and all other amounts due and owing by the Debtors, any non-Debtor Guarantors or

any other obligors thereunder (with such payment being without prejudice to any terms or provisions contained in such credit facility that survive such discharge by their terms) under the applicable credit facility and the Interim DIP Order, (b) the termination of all commitments to make loans or extend other financial accommodations under such facility, and (c) in the case of the Prepetition Secured Obligations, no Challenge (as defined in the DIP Orders) has been timely and properly asserted in accordance with the Interim DIP Order (including any Challenge (as defined in the DIP Orders) against the applicable Prepetition Secured Parties or their Representatives (as defined in the DIP Orders)), or if such a Challenge (as defined in the DIP Orders) is timely and properly commenced, upon the disposition of such Challenge (as defined in the DIP Orders) pursuant to a final, non-appealable order of a court of competent jurisdiction in favor of such Prepetition Secured Parties and their Representatives (as defined in the DIP Orders) consistent with the Debtors' Stipulations (as defined in the DIP Orders) and Releases (as defined in the DIP Orders).

"**Par Amount**" means, with respect to a Project at any time, an amount equal to the aggregate principal amount of Note proceeds invested in such Solar Development Project as of such time (including, without duplication, amounts withdrawn from the Accounts for application to such Project, but not including accrued and unpaid interest in respect thereof).

"**Pari Guarantors**" means, collectively, (a) PGR Guarantor, LLC, (b) Pine Gate Renewables, LLC, (c) Pine Gate Fund Management, LLC, (d) Pine Gate Development, LLC, (e) PGC Solar Holdings I Managing Member, LLC, (f) Cascade Pledgor, LLC, (g) PGR Blue Ridge Power Holdings, LLC, (h) PGR 2024 Sponsor Holdco, LLC, (i) PGR Signature Fund 1 Manager, LLC, (j) Pine Gate Assets, LLC, (k) Pine Gate Energy Capital, LLC, (l) Pine Gate Dev Holdco, LLC, (m) Pine Gate O&M, LLC, and (n) any Debtor that is not a Priority Guarantor or a Debtor that is a Brookfield Silo Entity, a Carlyle Silo Entity, or a Fundamental Silo Entity.

"**Paying Agent**" means Wilmington Trust, National Association, not in its individual capacity but as paying agent, together with its successors and assigns in such capacity.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Permitted Debt**" means any of the following Indebtedness of the Company or its Subsidiaries (including ACT):

(a)     the Notes;

(b)     Indebtedness of any Subsidiary of the Company to the Company or to another Wholly-Owned Subsidiary of the Company; provided that any Indebtedness from a Carlyle Silo Entity to another Subsidiary of the Company that is not a Carlyle Silo Entity shall be (i) unsecured, (ii) subject to terms of subordination reasonably acceptable to the Secured Parties and (iii) pledged to the Collateral Agent pursuant to terms and conditions reasonably acceptable to the Secured Parties;

(c)     Hedge Contracts entered into by a Subsidiary which are entered into in order to manage existing or anticipated interest rate or commodity price risks and not for

-109-

speculative purposes, solely to the extent not prohibited by a Solar Development Project Financing Facility (without giving effect to any waiver or consent thereunder);

(d)      Indebtedness which may be deemed to exist pursuant to any letters of credit, guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(e)      Indebtedness (i) resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business or (ii) arising under or in connection with cash management services in the ordinary course of business;

(f)      guaranties by a Subsidiary of Indebtedness of another Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to Section 10.6; *provided*, that if the Indebtedness that is being guaranteed is unsecured and/or subordinated to the Notes, the guaranty shall also be unsecured and/or subordinated to the Notes;

(g)      Indebtedness incurred by a Subsidiary pursuant to a Solar Development Project Financing Facility (without giving effect to any waiver or consent thereunder) in the ordinary course of business;

(h)      Indebtedness of any Subsidiary consisting of limited guarantees or indemnification obligations as required under the Material Project Documents so long as such limited guarantees or indemnification obligations are not made in respect of obligations to repay Indebtedness for borrowed money (such guarantees or obligations, the "**Third Party Guarantees**") in the ordinary course of business;

(i)      solely with respect to Brookfield/Fundamental Subsidiaries, Indebtedness incurred pursuant to the Brookfield DIP Credit Agreement, the Brookfield Prepetition Credit Agreement, the Fundamental DIP Credit Agreement and the Fundamental Prepetition Credit Agreement, together with any Replacement Additional DIP Facility, subject in all respects to Section 9.20 and the Intercreditor Agreements;

(j)      Indebtedness outstanding on the date hereof and listed on Schedule 10.6; and

(k)      Indebtedness of ACT or any of its direct or indirect Subsidiaries on terms and conditions and funded by counterparties reasonably acceptable to the Required Holders (it being understood that any refusal to consent shall be deemed reasonable (1) if such financing provides for milestones, events of default, or the ability of the lender to exercise remedies, in each case prior to the consummation of the Sale, (2) if the Required Holders in good faith determine that such Indebtedness could adversely affect the operation and maintenance services provided to any Carlyle Silo Entity, including pursuant to the Existing Services Agreements or the Transition Services Agreement (including based on the cost or quality thereof and including based on the reputation of the provider) or (3) if the financing is provided by parties with existing investments in the

-110-

Company or any of its Subsidiaries or Affiliates) (any such Indebtedness, "**Permitted ACT Debt**").

"**Permitted Disposition**" means to sell, lease, transfer or otherwise dispose of, including by way of merger or amalgamation:

(a)     property that is worn out, obsolete or no longer useful or necessary in connection with the operation of the Projects; *provided* that such dispositions in excess of $500,000 in the aggregate in any fiscal year shall require the prior written consent of the Required Holders;

(b)     dispositions expressly specified in the Approved Budget;

(c)     Dispositions of leases, subleases, rights of way, easements, licenses, sublicenses, equipment and other assets in the ordinary course of business that, individually and in the aggregate, do not interfere with the ordinary conduct of the business of the Company and the Subsidiaries and do not detract from the value or the use of the property which they affect;

(d)     any disposition of ACT (including the assets and equity thereof), pursuant to an asset purchase agreement or similar agreement on terms and conditions and with a counterparty reasonably acceptable to the Required Holders or that provides for all Obligations (including Roll-Up DIP Notes) and Prepetition Secured Obligations to be Paid in Full upon consummation of such disposition (it being understood that any refusal to consent shall be deemed reasonable (A) if the disposition is proposed to occur before consummation of the sale pursuant to the Stalking Horse APA, (B) if the Required Holders in good faith determine that such disposition could adversely affect the operation and maintenance services provided to the Carlyle Silo Entities (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Company or its Subsidiaries or Affiliates);

(e)     the voluntary unwinding or termination of Hedge Contracts permitted pursuant to clause (c) of the definition of "Permitted Debt", solely to the extent not prohibited by a Solar Development Project Financing Facility (without giving effect to any waiver or consent thereunder) and in the ordinary course of business;

(f)     Dispositions pursuant to the Stalking Horse APA or pursuant to a cash overbid in accordance with the bid procedures and solely on all or substantially all of the Carlyle Silo Asset;

(g)     Dispositions of (and the granting of any option or other right to purchase, lease or otherwise acquire) power, electric capacity, transmission capacity, tax credits, emissions credits or ancillary services or other inventory or products in the ordinary course of business;

(h)     any Disposition with the prior written consent of the Required Holders in their sole discretion;

(i)      Dispositions pursuant to the stalking horse APAs contemplated by the Additional DIP Facilities; and

(j)      any Disposition of property by a Carlyle Silo Entity to another Carlyle Silo Entity that owns, directly or indirectly, the same Project, in each case, in the ordinary course of business.

"**Permitted Investments**" means an investment denominated in Dollars in Cash or any Cash Equivalents.

"**Permitted Liens**" means any of the following:

(a)      Liens in favor of the Collateral Agent securing the Indebtedness and obligations evidenced by the Financing Documents;

(b)      statutory Liens for current taxes not yet due and payable or delinquent and Liens for taxes that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which adequate reserves have been made in accordance with GAAP;

(c)      Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and for the payment of which bonds or other security have been provided (for which neither the Company nor any of its Subsidiaries is the account party) or are fully covered by insurance;

(d)      Liens arising by virtue of any statutory or common law or contractual provisions under general depositary agreements, in each case, relating to banker's liens, rights of set-off, revocation, refund, chargeback or similar rights and remedies, and burdening only instruments, deposit accounts, or other funds maintained with a depository institution;

(e)      solely in the case of the Subsidiaries (other than any Operating Project HoldCo or any SPV Holding Company), Subsidiary Permitted Liens;

(f)      Liens securing Indebtedness permitted to be incurred pursuant to clause (d) of the definition of "Permitted Debt";

(g)      Liens listed on Schedule 5.15;

(h)      subject in all respects to the Intercreditor Agreements, Liens granted in favor of Brookfield or Fundamental (or any agents on their behalf);

(i)      the Prepetition Liens;  and

(j)      Liens on property or assets of ACT incurred in the ordinary course of business securing Permitted ACT Debt.

-112-

"**Permitted Local Account**" means a Deposit Account or securities account of the Prepetition Issuer with account number 165743-005 maintained with Wilmington Trust, National Association that is subject to a Lien pursuant to the Security Agreement and a blocked account Control Agreement in favor of the Collateral Agent. It is understood that any references to the "Interest Reserve Account" by Wilmington Trust, National Association, in the Financing Documents or in the applicable Control Agreement shall be deemed to be references to the Permitted Local Account.

"**Permitted Payment**" means, in respect of (i) Net Cash Proceeds, (ii) proceeds of Indebtedness that is not Permitted Debt or (iii) Portfolio Revenues, in each case, of an Operating Project HoldCo or an Operating Project HoldCo Subsidiary, the distribution of such Cash by such Person to its direct or indirect parent (and the distribution by such direct or indirect parent to its direct or indirect parent entities, as applicable); *provided* that substantially concurrently with the distribution of such Cash by the applicable Operating Project HoldCo Subsidiary or Operating Project HoldCo, such Cash is contributed by a recipient thereof to the Company for further application in accordance with the terms of Section 8.3(a) or to be deposited into the Collection Account at the direction of the Required Holders; *provided*, *further*, from and after the making of a distribution by (x) an Operating Project HoldCo or (y) any Operating Project HoldCo Subsidiary (in the case of (y), to a Subsidiary that is not subject to an Encumbrance Restriction or to any entity which is not a Subsidiary of an Operating Project HoldCo), at no time shall any such Cash be deposited into a Deposit Account or securities account that is not subject to a Control Agreement.

"**Permitted Uses**" means (i) subject to and upon entry of the Interim DIP Order, to effect the Roll-Up, (ii) for the Debtors' working capital and other general corporate needs, (iii) for the payment of fees, costs, and expenses of the administration of the Chapter 11 Cases, (iv) to pay other prepetition obligations approved by the Bankruptcy Court, (v) to pay adequate protection payments as authorized by the Bankruptcy Court in the Interim DIP Order and the Final DIP Order, (vi) to pay professional fees, costs, and expenses, (vii) to pay agency fees and fees, costs, and expenses of the Secured Parties owed under the Financing Documents, (viii) to pay obligations arising from or related to the Carve-Out, and (ix) for other general corporate purposes (in each case, other than in the case of clauses (vi) and (viii), in a manner consistent with the Approved Budget).

"**Permitted Variances**" means the variances described in Schedule 7.1(p).

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority.

"**Petition Date**" has the meaning assigned to the term in the recitals hereto.

"**Phobos Project**" means the Phobos solar project located in North Carolina.

"**PIK Interest**" means interest on the Notes that is automatically capitalized and added to the principal balance of such Notes or issued as the principal amount of new Notes in accordance with the terms of this Agreement.

"**Pine Gate Parties**" means the Company, the Debtors, the Shared Collateral Entities, the Note Parties, and the Carlyle Silo Entities.

-113-

"**Placed in Service**" means, with respect to a Project, the earliest date on which such Project (a) has obtained all applicable permits required for its operation and (b) is interconnected and synchronized to the grid and capable of producing electricity in commercial quantities.

"**Plan**" means an "employee benefit plan" (as defined in section 3(3) of ERISA) subject to Title I of ERISA that is or, within the preceding five years, has been established or maintained, or to which contributions are or, within the preceding five years, have been made or required to be made, by the Company or any ERISA Affiliate or with respect to which the Company or any ERISA Affiliate may have any liability.

"**Plan Effective Date**" shall have the meaning assigned to the term "Effective Date" in the Plan of Reorganization.

"**Plan of Reorganization**" has the meaning assigned to the term in the recitals hereto.

"**Pledged Subsidiary**" means, at any time with respect to any A&R Project, (a) any applicable Subsidiary (excluding any Operating Project HoldCo Subsidiary) (i) which owns, directly or indirectly, Capital Stock in the Project Company that owns such A&R Project at such time or (ii) which is a Project Company and (b) any applicable Subsidiary whose Capital Stock is one hundred percent (100%) directly or indirectly owned by the Company at such time, and shall mean (A) each Subsidiary of the Company listed as a Pledged Subsidiary on <u>Schedule 5.4</u> as of the Initial Closing Date or (B) any Subsidiary of the Company which is subsequently designated a "Pledged Subsidiary" after the Initial Closing Date in accordance with <u>Section 9.18(a)(iv)</u>; *provided* that any Encumbered Subsidiary, Released Subsidiary or Sold Subsidiary shall not constitute a Pledged Subsidiary.

"**Portfolio Revenues**" means, without duplication, all revenues, interest, payments, cash and other proceeds from whatever source received by or on behalf of the Company or any Subsidiary arising from the ownership or operation of the Projects, including payments made to the Company or any Subsidiary under any Material Contract, liquidated damages payable as compensation for delay paid by the relevant counterparty under any Material Contract, delay in start up proceeds, business interruption insurance proceeds and proceeds of liability insurance (to the extent such liability insurance proceeds represent reimbursement of third party claims previously paid by the Company or any Subsidiary), and investment income on amounts in the Accounts, it being acknowledged that the following shall not constitute Portfolio Revenues: (i) Special Proceeds and any asset sale proceeds, proceeds of Indebtedness for borrowed money, any performance based liquidated damages payments to the Company or any Subsidiary under any Material Project Document, (ii) any amounts distributed by a Tax Equity Vehicle to a Tax Equity Investor, (iii) any Net Cash Proceeds required to be applied as a Mandatory Prepayment of the Notes pursuant to <u>Sections 8.3(a)</u>, (iv) any amounts transferred from one Account to another Account, from any Account to the Permitted Local Account or reserved in a secured account for the benefit of parties providing Indebtedness to any Subsidiary and (v) equity contributions to the Company or any Subsidiary.

"**Power Purchase Agreement**" is defined in <u>clause (a)</u> of the definition of "Material Project Documents".

-114-

"**PPA Reimbursements**" means reimbursements of deposits that are received by the Company or its Subsidiaries with respect to the Cabin Creek Project and the Phobos Project made in respect of Power Purchase Agreement credit support obligations of the Company or its Subsidiaries on or before the Initial Closing Date, in an aggregate amount not exceeding $4,108,087.

"**Preferred Stock**" means any class of Capital Stock of a Person that is preferred over any other class of Capital Stock (or similar equity interests) of such Person as to the payment of dividends or the payment of any amount upon liquidation or dissolution of such Person.

"**Prepetition A&R Notes**" means the "A&R Notes" as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Agent**" means Wilmington Trust, National Association, in its capacity as Collateral Agent under the Prepetition Note Purchase Agreement.

"**Prepetition Bridge Notes**" means the "Bridge Notes" as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Collateral**" means (a) the "Collateral" as defined in the Prepetition Note Purchase Agreement and (b) all other assets and property that secure the Prepetition Secured Obligations.

"**Prepetition Documents**" means (a) the Prepetition Note Purchase Agreement, (b) the "Security Documents" (as defined in the Prepetition Note Purchase Agreement), and (c) each other "Financing Document" (as defined in the Prepetition Note Purchase Agreement).

"**Prepetition Indebtedness**" means the Prepetition Notes, the Brookfield Prepetition Credit Facility and/or the Fundamental Prepetition Credit Facility, as the context requires.

"**Prepetition Issuer**" means NPA 2023 Holdco, LLC, a North Carolina limited liability company.

"**Prepetition Intercreditor Agreements**" means the "Intercreditor Agreements" as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Liens**" means each of the liens and security interests granted by the Securing Parties (as defined in the Prepetition Note Purchase Agreement) in the Prepetition Collateral pursuant to the Prepetition Documents to secure the Prepetition Secured Obligations.

"**Prepetition Note Purchase Agreement**" means the Amended and Restated Note Purchase Agreement, dated as of October 6, 2025, as amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the date hereof, by and among the Prepetition Issuer, as the company, each of the purchasers party thereto and the Prepetition Agent.

"**Prepetition Noteholder**" means each "holder" of "Notes", in each case, as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Notes**" means the Prepetition A&R Notes and/or Prepetition Bridge Notes, as the context requires.

"**Prepetition Prepayment Premium**" means the "Prepayment Premium" as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Secured Obligations**" means the "Secured Obligations" as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Secured Parties**" means each of the Prepetition Agent, the Prepetition Noteholders, and each of the other "Secured Parties" as defined in the Prepetition Note Purchase Agreement.

"**Prepayment Premium**" means, with respect to any repayment or prepayment of New Money DIP Notes paid, or otherwise becoming due and payable, upon the occurrence of a MOIC Event hereunder, an additional payment in an amount, payable in cash, equal to the MOIC Amount.

"**Preserved Carlyle Procurement Claims**" means any claims or interests in respect of equipment verified as delivered to the applicable Carlyle Silo Entity by an independent engineer, except to the extent of the amount of any financing extended within the Carlyle Silo Entities (whether under the Prepetition Note Purchase Agreement or under the relevant project financing) on account of an invoice relating to such equipment.

"**Priority Guarantor**" means each of (a) PGR 2022 Sponsor Holdco, LLC, (b) Blue Ridge Power Holding Company, LLC, (c) BF Dev Holdco Pledgor, LLC, (d) PGC Solar Holdings I, LLC, and (e) NPA Polaris DevCo Pledgor, LLC.

"**Proceeding**" is defined in Section 15.1.

"**Procure**" means (a) in respect of a Subsidiary (other than an Operating Project HoldCo or an Operating Project HoldCo Subsidiary), to cause such Subsidiary to, as the context requires, (x) in the case of a covenant in Section 9 (or any similar affirmative covenant), take or permit certain actions and (y) in the case of a covenant in Section 10 (or any similar negative covenant), not permit, suffer to exist or refrain from taking certain actions, in each case, in compliance with the Financing Documents and (b) in respect of an Operating Project HoldCo or an Operating Project HoldCo Subsidiary, as the context requires, (x) in the case of a covenant in Section 8 or Section 9 (or any similar affirmative covenant), to take or permit certain actions, including Permitted Payments and (y) in the case of a covenant in Section 10 (or any similar negative covenant), to not permit, suffer to exist or otherwise not restrict such Operating Project HoldCo or Operating Project HoldCo Subsidiary from taking certain actions, in each case, in compliance with the Financing Documents.

"**Project**" means (a) as of the Initial Closing Date, each of the A&R Projects and (b) any other solar power generating, or generating and storage project and any associated facilities, to the extent one hundred percent (100%) owned by a Project Company and indirectly owned by the Company, an Operating Project HoldCo or a Pledged Subsidiary (but excluding any Project that has been sold as part of a Project Sale and released in accordance with Section 9.18).

-116-

"**Project Company**" means (a) each Subsidiary of the Company listed as a Project Company on Schedule 5.4 as of the Initial Closing Date and (b) each Subsidiary of the Company which is subsequently designated a "Project Company" after the Initial Closing Date in accordance with Section 9.18(a)(ii).

"**Project Completion Date**" means for each Project, the date on which the corresponding Project Company delivers evidence to each holder of Notes that such Project has achieved "Substantial Completion" under and as defined in its respective Material Contracts.

"**Project Costs**" means, in respect of any Project, third party costs and other costs incurred directly or by reimbursement to the Company or any of its direct or indirect Subsidiaries in connection with the acquisition, development, and/or construction of such Project.

"**Project Costs Escrow Account**" means a Deposit Account or securities account of the Prepetition Issuer with account number 165743-003 maintained with Wilmington Trust, National Association. that is subject to a Lien pursuant to the Security Agreement and a blocked account Control Agreement in favor of the Collateral Agent. It is understood that any references to the "Debt Service Reserve Account" by Wilmington Trust, National Association, in the Financing Documents or in the applicable Control Agreement shall be deemed to be references to the Project Costs Escrow Account.

"**Project Purchaser**" means any Person that is not an Affiliate of the Company that purchases a Project from the Company or a Subsidiary.

"**Project Sale**" means a Disposition of (i) all of the direct or indirect Capital Stock or similar interests in any Project Company or (ii) substantially all of the property or assets (including an undivided interest therein) of any Project Company, in each case, to a Project Purchaser, not including, for the avoidance of doubt, through the sale of such interests or assets (as applicable) to a Tax Equity Vehicle.

"**Project Sale Document**" means each purchase and sale agreement and material ancillary agreement referred to therein between the Company or any Subsidiary and any Project Purchaser in connection with the sale of a Project.

"**Project Senior Financing Consents**" means the Project Senior Financing Change of Control Consents, Project Senior Financing Cross-Default Consents, Project Senior Financing Guarantee Consents and Project Senior Financing Lien Consents.

"**Project Senior Financing Change of Control Consents**" means the necessary consents or waivers by (x) each lender and investor under each Solar Development Project Financing Facility and (y) each counterparty under each Material Project Document, in each case, to allow (a) a change of control or similar transaction to occur (whether through an exercise of remedies, an asset sale or otherwise) any Secured Party and any wherein Newco, Collateral Agent, the Purchasers, the Prepetition Secured Parties, the Secured Parties or any affiliate of the foregoing were to obtain control or the direct or indirect beneficial ownership of the outstanding voting and/or economic equity interests of one or more Carlyle Silo Entities and (b) the right to replace, at the direction of the Required Holders (which may be given in their sole discretion), any existing credit support in favor of lenders, investors or the applicable counterparty with guarantees or

-117-

indemnities or other acceptable credit support to be agreed from NPA PGR Blocker Holdco, LLC, NPA Polaris Opco Holdco, LLC, NPA Polaris Devco Holdco, LLC, or the Prepetition Issuer, as applicable (each such replacement credit support to be on terms providing for termination upon NewCo, the Collateral Agent, the Purchasers, the Prepetition Secured Parties, and/or any affiliate of the foregoing ceasing to have control of the applicable entities within the Carlyle Silo Entities), in each case without triggering an event of default or other material adverse consequences under such Solar Development Project Financing Facility or Material Project Document, as applicable.

"**Project Senior Financing Cross-Default Consents**" means the necessary consents or waivers by (x) each lender and investor under each Solar Development Project Financing Facility and (y) each counterparty under each Material Project Document, in each case, to permit each of the Pine Gate Parties to commence a Chapter 11 Case or Sale without triggering an event of default or other material adverse consequences under such Solar Development Project Financing Facility or Material Project Document, as applicable.

"**Project Senior Financing Guarantee Consents**" means the consents or waivers by (x) each lender and investor under each Solar Development Project Financing Facility and (y) each counterparty under each Material Project Document, in each case, that are necessary for each Carlyle Silo Entity to have become an obligor under the Notes or to be subject to a Sale without triggering an event of default or other material adverse consequences under such Solar Development Project Financing Facility or Material Project Document, as applicable.

"**Project Senior Financing Lien Consents**" means the consents or waivers by (x) each lender and investor under each Solar Development Project Financing Facility and (y) each counterparty under each Material Project Document, in each case, that are necessary for each Carlyle Silo Entity to cause its assets and property to be subject to Liens securing the Secured Obligations hereunder (which, to the extent that such assets or property are subject to senior liens in favor of any Solar Development Project Financing Facility, may be granted in favor of the Notes on a junior basis) without triggering an event of default or other material adverse consequences under such Solar Development Project Financing Facility or Material Project Document, as applicable.

"**Project Surety Bonds**" is defined in Section 8.3(a)(v).

"**Projected NTP Date**" means, with respect to a Project, the date on which a full notice to proceed (however defined in the applicable engineering, procurement and construction contract) is reasonably expected to be issued to the construction contractor for such Project, as set forth in the Solar Development Project Cost Report, which date may be extended with the approval of the Required Holders in accordance with Section 7.1(l).

"**property**" or "**properties**" means, unless otherwise specifically limited, real or personal property of any kind, tangible or intangible, choate or inchoate.

"**Prudent Industry Practice**" means those practices, methods, techniques, specifications and standards of safety and performance, as they may be modified from time to time, that are generally accepted in the solar industry as good, safe and prudent engineering and operating practices in connection with the design, construction, operation, maintenance, repair or use of solar

-118-

projects and/or solar and storage projects of the same type and size as the applicable Project located in North America.  Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be acceptable practices, methods or acts generally accepted in the region or as required by any Governmental Authority or standards setting agency.

"**PTE**" is defined in Section 6.2(a).

"**PUHCA**" means the Public Utility Holding Company Act of 2005 and FERC's implementing regulations thereunder at 18 C.F.R. Part 366.

"**Purchaser**" or "**Purchasers**" means each of the purchasers that has executed and delivered this Agreement to the Company and such Purchaser's successors and assigns (so long as any such assignment complies with Section 13.2), *provided, however,* that any Purchaser of a Note that ceases to be the registered holder or a beneficial owner (through a nominee) of such Note as the result of a transfer thereof pursuant to Section 13.2 shall cease to be included within the meaning of "Purchaser" of such Note for the purposes of this Agreement upon such transfer.

"**QPAM Exemption**" is defined in Section 6.2(d).

"**Qualified Bid**" has the meaning specified in the Bidding Procedures.

"**Qualified Institutional Buyer**" means any Person who is a "qualified institutional buyer" within the meaning of such term as set forth in Rule 144A(a)(1) under the Securities Act.

"**Qualifying Facility**" means a "qualifying small power production facility" as such term is defined in Section 3(17)(C) of the FPA and FERC's regulations at 18 C.F.R. §§ 292.203(a) and 292.204, that is also a "qualifying facility" as such term is defined in FERC's regulations at 18 C.F.R. § 292.101(b)(1).

"**Rejection Notice**" is defined in Section 8.3(b)(iii).

"**Related Fund**" means, with respect to any holder of any Note, any fund or entity that (a) invests in Securities or bank loans, and (b) is advised or managed by such holder, the same investment advisor as such holder or by an affiliate of such holder or such investment advisor.

"**Released Subsidiary**" means, at any time with respect to a Subsidiary of the Company, (a) the Project owned by such Subsidiary, whether directly or indirectly, has been Disposed to a Tax Equity Vehicle, and such Disposal results in such Subsidiary ceasing to own any Project or (b) such Subsidiary shall have entered into a CTL Financing or TEBL Financing (or documentation for the granting of a security interest thereof) and becomes an Encumbered Subsidiary and, in each case, such event results in such Subsidiary ceasing to be a Pledged Subsidiary (solely to the extent that, immediately prior to such Disposal, it was a Pledged Subsidiary).

"**Replacement Additional DIP Facility**" is defined in clause (mm) of Section 11.

"**Required Consent Documents**" means (a) the Virtual Power Purchase Agreement, dated as of December 7, 2023, between Apple Energy LLC and East Atmore Solar, LLC, (b) the Virtual

-119-

Power Purchase Agreement, dated as of December 7, 2023, between Apple Energy LLC and Foley Solar, LLC, (c) the Contract for the Purchase of Energy from a Qualifying Facility, dated as of September 12, 2023, by and between Foley Solar, LLC and Alabama Power Company, (d) the Contract for the Purchase of Energy from a Qualifying Facility, dated as of November 16, 2022, by and between Hecate Energy East Atmore, LLC and Alabama Power Company, (e) the Amended and Restated Limited Liability Company Agreement of Polaris OpCo HoldCo A, LLC, dated as of September 17, 2024, (e) the AutoZone TCPA and (f) the Credit Agreement, dated as of September 30, 2024, by and among Polaris DevCo Borrower A, LLC, as DevCo Borrower; Polaris OpCo Borrower A, LLC, as OpCo Borrower; Deutsche Bank Trust Company Americas, as Administrative Agent and as Collateral Agent, and the lenders and issuing banks from time to time party thereto, in each case, as may be amended from time to time.

"**Required Holders**" means at any time on or after the Initial Closing Date, the holders of more than fifty percent (50%) in principal amount of the Notes at the time outstanding.

"**Responsible Officer**" means any Senior Financial Officer and any other officer or authorized representative of the Company with responsibility for the administration of the relevant portion of this Agreement.

"**Restricted Country**" is defined in the definition of "Blocked Person".

"**Restricted Party**" means (a) Blue Ridge Power, LLC, a North Carolina limited liability company, (c) ACT, (d) the Brookfield/Fundamental Subsidiaries, and (e) each direct or indirect subsidiary of the Company that is not a Note Party, a Carlyle Silo Entity or a Shared Collateral Entity.

"**Restricted Payment**" means all payments, distributions or dividends of the Company or any of its Subsidiaries on account of, or the setting apart of money for a sinking or analogous fund for, or the purchase, redemption, retirement or other Acquisition by the Company or any of its Subsidiaries, of, any portion of any outstanding shares of Capital Stock or similar equity interests in the Company or any of its Subsidiaries, whether in cash, property, obligations or other notes (other than distributions or dividends payable solely in outstanding shares of Capital Stock or similar equity interests of such Person).

"**Rolling Period**" means a period of four (4) consecutive fiscal quarters; *provided*, *however*, if fewer than four (4) complete consecutive fiscal quarters have elapsed subsequent to the Initial Closing Date, then such period shall be deemed to be the period that has elapsed subsequent to the Initial Closing Date.

"**Roll-Up**" means the exchange of all Prepetition Notes

"**Roll-Up A&R Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to exchange Prepetition A&R Notes on the Initial Closing Date, in an aggregate principal amount not to exceed the amount set forth opposite such Purchaser's name on Schedule 2.01 hereto under the heading "Roll-Up A&R Commitment".

"**Roll-Up A&R Notes**" is defined in Section 1.1.

-120-

"**Roll-Up Bridge Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to exchange Prepetition Bridge Notes on the Initial Closing Date, in an aggregate principal amount not to exceed the amount set forth opposite such Purchaser's name on  Schedule 2.01 hereto under the heading "Roll-Up Bridge Commitment".

"**Roll-Up Bridge Notes**" is defined in Section 1.1.

"**Roll-Up DIP Commitment**" means a Roll-Up A&R Commitment and/or a Roll-Up Bridge Commitment, as the context may require.

"**Roll-Up DIP Notes**" is defined in Section 1.1.

"**Sale**" the consummation of a sale of all or substantially all of the assets of the Debtors or any material portion of the Carlyle Silo Assets, pursuant to section 363 of the Bankruptcy Code or otherwise, but excluding any sale of ACT or resulting from the sale processes contemplated by the Additional DIP Facilities.

"**Sale Milestone**" is defined in Schedule 9.25.

"**Sale Order**" is defined in Schedule 9.25.

"**Sanctions Authority**" means (a) the United States (including by OFAC and the U.S. Department of State), or (b) any other relevant national or supra-national Governmental Authority with jurisdiction over the Company and its Affiliates.

"**Sanctions Laws**" means economic or financial sanctions or trade embargoes imposed, administered, or enforced by a Sanctions Authority.

"**Sanctions List**" means any list of designated individuals or entities maintained by any Sanctions Authority, including the Specially Designated Nationals and Blocked Persons List maintained by OFAC.

"**Second Day Motions**" is defined in Section 4.2.

"**Second Day Orders**" is defined in Section 4.2.

"**Second Draw Closing Date**" means a date within three (3) Business Days after entry of the Final DIP Order.

"**Secured Obligations**" has the meaning specified in the Security Agreement.

"**Secured Parties**" means collectively, the Purchasers, the Collateral Agent and any holder of the Notes.

"**Securities**" or "**Security**" has the meaning specified in section 2(1) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933 and the rules and regulations promulgated thereunder from time to time in effect.

-121-

"**Security Agreement**" means that certain Superpriority Senior Secured Debtor-In-Possession Guarantee and Security Agreement, dated as of the Initial Closing Date, by and among the Company, each Guarantor and the Collateral Agent.

"**Security Documents**" means the Security Agreement, Control Agreements, Subsidiary Guarantor Joinder Agreements and each other security agreement or instrument hereafter executed and delivered to the Collateral Agent granting or perfecting a Lien on any property of any Person to secure the obligations and liabilities of the Note Parties under this Agreement, any other Financing Document and the other Secured Obligations.

"**Senior Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or comptroller of the Company.

"**Series**" means any series of Notes issued pursuant to this Agreement.

"**Shared Collateral Entity**" means each of the Persons listed on Part II of Schedule 4.1(f) and each Person added to Part II of Schedule 4.1(f) after the Initial Closing Date in accordance with the terms of this Agreement.

"**Solar Development Project**" means a Project that satisfies all applicable Defined Eligibility Criteria (as defined in the Original Note Purchase Agreement).

"**Solar Development Project Cost Report**" means a report delivered from time to time demonstrating, with respect to each Project individually, and the portfolio as a whole, the Company's compliance at such time with (a) the then-applicable Par Amount and Interest Amount for each Project (if any) and (b) with respect to any Early Stage Project or Construction Project, the Projected NTP Date for such Early Stage Project or Construction Project, as applicable.

"**Solar Development Project Costs**" means, in respect of any Solar Development Project and without duplication, third party costs and other reasonable and documented costs (and, with respect to construction costs with individual amounts in excess of $350,000, verified by the Independent Engineer) incurred directly or by reimbursement to the Company or any Subsidiary in connection with the Acquisition, development and/or construction of such Solar Development Project relating to: (a) the Acquisition of such Solar Development Project, including but not limited to reasonable and documented costs incurred or reasonably expected to be incurred, directly or by reimbursement to an Affiliate for planning, feasibility analysis, revenue forecasting, environmental review, preliminary engineering and design work and other preconstruction work, (b) tangible site Acquisition (including, without limitation, any ITC eligible costs, plus fencing), (c) interconnection (including interconnection deposits), (d) engineering, procurement and construction, (e) plant equipment procurement, (f) development fees to third parties, (g) transaction fees (including the cost of financial instruments such as letters of credit) and repayment of development loans, (h) client Acquisition (including off-taker procurement), (i) reasonable fees, charges and disbursements of counsel and (j) third party environmental and engineering studies and surveys, and (k) all other reasonable costs to development, finance and construct such Solar Development Project reasonably acceptable to the Required Holders.

"**Solar Development Project Financing Facility**" means any debt or equity financing facility provided by one or more commercial banks or other financial or other institutions

-122-

(including non-bank institutions and, in the case of any equity financing, any other Person) to a Project Company or a direct or indirect owner thereof and that is non-recourse or limited recourse to any Note Party, Company and any Controlled Affiliates thereof that do not directly or indirectly own such Project Company in order to finance (i) the development, construction and commissioning of a Solar Development Project (including a Construction Project), (ii) the funding of tax equity or the monetization of tax credits relating to any Solar Development Project (a "**Tax Equity Financing**") or (iii) in the case of clause (i), any back leverage refinancing thereof (whether or not such financing pursuant to clauses (i), (ii) or (iii) is made through a direct or indirect parent entity), it being understood that (x) a Subsidiary may enter into a Solar Development Project Financing Facility solely with the consent of the Required Holders and (y) an Encumbered Subsidiary may enter into a Solar Development Project Financing Facility concurrently with the discharge and release of Collateral in accordance with Section 9.17 and Section 22.8 with respect to such Encumbered Subsidiary.

"**Sold Subsidiary**" means, at any time with respect to a Subsidiary of the Company, Project Sale Documents have been entered into for a Project Sale in respect of the Project being developed by the applicable Subsidiary, whether owned directly or indirectly, and the conditions precedent to the making of the Project Sale under such Project Sale Documents shall have been satisfied or waived and the Project Sale consummated, with the effect that such Subsidiary will no longer be a Subsidiary of the Company.

"**Source**" is defined in Section 6.2.

"**Special Proceeds**" means Net Cash Proceeds arising from an Event of Loss.

"**SPV Holding Company**" means a direct or indirect Subsidiary of the Company established solely to directly own the Capital Stock in one or more Project Companies or one or more other SPV Holding Companies and which does not conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any material business or operations or other activity other than those directly related thereto.

"**Stalking Horse APA**" means a stalking horse asset purchase agreement by and between the Company and certain of its Subsidiaries and Newco, which shall be in form and substance mutually acceptable to the Required Holders and the Company, that provides for (a) a sale of the Carlyle Silo Assets in exchange for a credit bid by the holders of the Notes and/or the Prepetition Secured Parties, as applicable, and (b) expense reimbursement in the form of a superpriority administrative expense claim in the event of an overbid.

"**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other entity of which more than fifty percent (50%) of the outstanding Capital Stock or similar equity interests having ordinary voting power to elect a majority of the board of directors (or equivalent governing body) or other managers of such corporation, partnership, limited liability company or other entity is at the time owned by (directly or indirectly) or the management is otherwise controlled by (directly or indirectly) such Person (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation, partnership, limited liability company or other entity shall have or might have voting power by reason of the happening of any contingency); *provided* that, in the Financing Documents, subject to Section 22.4, "Subsidiary"

-123-

shall mean a Subsidiary of the Company unless the context clearly otherwise indicates; *provided, further*, that for the avoidance of doubt, Project Companies in respect of which the Company or a Subsidiary of the Company owns an indirect ownership interest through a Class B Member in a Tax Equity Vehicle shall constitute "Subsidiaries".

"**Subsidiary Guarantor**" is defined in the Security Agreement.

"**Subsidiary Guarantor Joinder Agreement**" has the meaning given to the term "Pledgor/Subsidiary Guarantor Joinder Agreement" in the Security Agreement.

"**Subsidiary Permitted Liens**" means any of the following:

(a)     Liens of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA) and incurred in the ordinary course of business and which are either (i) for amounts not overdue for a period of more than thirty (30) days or (ii) being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts or which have been bonded over or otherwise secured against;

(b)     Liens, deposits and pledges incurred in the ordinary course of business to secure the performance of tenders, statutory obligations, surety and appeal bonds, bonds for decommissioning obligations, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar or related obligations other than Indebtedness for borrowed money easements, rights of way, restrictions, encroachments, and other minor defects or irregularities and deficiencies in title, and other similar restrictions, charge or encumbrances, and defects and irregularities in the easements, leases, licenses and other rights of a Subsidiary in which case which do not and will not interfere in any material respect with the ordinary conduct of the business or the development, construction or operation of any Project, or any other Lien, title exception, or encumbrance acceptable to Purchasers;

(c)     Liens arising under the Material Project Documents (excluding Liens incurred to secure Indebtedness for borrowed money), including any interest or title of a lessor or sublessor under any lease or sublease of real estate permitted hereunder (or with respect to any deposits or reserves posted thereunder);

(d)     purported Liens evidenced by the filing of precautionary UCC financing statements (or equivalent filings) in respect of operating leases or consignments of personal property entered into in the ordinary course of business;

(e)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(f)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property, which

-124-

are not violated by the use or occupancy of any Project's site or the development, construction or operation of any Project;

(g)     licenses or sublicenses of patents, copyrights, trademarks and other intellectual property rights granted by any Subsidiary in the ordinary course of business and not interfering in any respect with the ordinary conduct of or materially detracting from the value of the business of each such Subsidiary or securing any Indebtedness;

(h)     any agreement to lease, option to lease, license, sub-lease or other right to occupancy assumed or entered into by or on behalf of any Subsidiary in the ordinary course of its business;

(i)     Liens on the Capital Stock of any Encumbered Subsidiary to the extent granted pursuant to a Solar Development Project Financing Facility;

(j)     Liens securing Indebtedness permitted under clause (i) of the definition of "Permitted Debt"; *provided* that (i) such Liens do not at any time encumber any property, equipment or inventory other than the property, equipment or inventory financed or improved by such Indebtedness, and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the equipment or inventory financed with such Indebtedness as of the date such equipment or inventory is acquired by the Company or the applicable Subsidiary (as applicable);

(k)     Liens arising by virtue of any statutory or common law or contractual provisions under general depositary agreements, in each case, relating to banker's liens, rights of set-off, revocation, refund, chargeback or similar rights and remedies, and burdening only instruments, deposit accounts, or other funds maintained with a depository institution;

(l)     Liens under netting and other offset rights granted by any Subsidiary to counterparties under any Hedge Contracts permitted under Section 10.6;

(m)     Liens on (i) security deposits or (ii) commodity accounts, deposit accounts and securities accounts securing obligations to a counterparty, in each case of clauses (i) and (ii), in respect of any Power Purchase Agreements or interconnection arrangements or queue position for a Project Company;

(n)     pledges or deposits or Liens in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation or any inchoate Lien imposed by ERISA;

(o)     terms and conditions of contracts not constituting a security interest under the UCC or a proprietary interest which are entered into in the ordinary course of business, including indemnification obligations;

(p)     Liens existing as of the Initial Closing Date with respect to any Project and listed on Schedule 10.5 and Schedule 10.15 and, in each case, any renewals or extensions thereof; *provided* that (i) the amount secured or benefited thereby is not increased except

-125-

as contemplated by clause (k) in the definition of "Permitted Debt" and (ii) any renewal or extension of the obligations secured or benefitted thereby is permitted by clause (k) in the definition of "Permitted Debt";

(q)     Liens consisting of an agreement to dispose of any property in a Disposition permitted hereunder solely to the extent that such Disposition would have been permitted on the date of the creation of such Lien; and

(r)     in the case of any Encumbered Subsidiary that (i) is not party to a Solar Development Project Financing Facility and (ii) is not a Project Company or the direct or indirect owner thereof, Liens granted by such Encumbered Subsidiary pursuant to the documentation containing the Encumbrance Restriction applicable to such Encumbered Subsidiary.

"**Substitute Purchaser**" is defined in Section 21.

"**Successful Bid**" has the meaning specified in the Bidding Procedures.

"**Super Majority Holders**" means at any time on or after the Initial Closing Date, the holders of at least 66-2/3% in principal amount of the Notes at the time outstanding.

"**Superpriority Claims**" means superpriority administrative expense claim status in the Chapter 11 Cases having a priority over all administrative expenses and any claims of any kind or nature whatsoever, specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code.

"**Surety Matters**" means the following surety bonds, together with the related indemnification and related Liens:

| Principal (Non-Debtor) | Beneficiary Name | Bond Amount | Start Date | End Date | Surety | Premium | Indemnity lien |
|---|---|---|---|---|---|---|---|
| GUNSIGHT SOLAR, LLC | SOUTH CAROLINA PUBLIC SERVICE AUTHORITY | 5,000,000 | 01/30/25 | 01/30/26 | UNITED STATES FIRE INSURANCE COMPANY | 100,000 | Yes |
| GRANSOLAR TEXAS ONE, LLC | AMAZON ENERGY LLC | 3,750,000 | 01/26/25 | 01/26/26 | SWISS RE CORPORATE SOLUTIONS AMERICA INSURANCE CORPORATION | 75,000 | Yes |
| BT JUNGMANN, LLC | AMAZON ENERGY LLC | 3,000,000 | 01/26/25 | 01/26/26 | SWISS RE CORPORATE SOLUTIONS | 60,000 | Yes |

AMERICA
INSURANCE
CORPORATION

"**SVO**" means the Securities Valuation Office of the NAIC.

"**Swap Termination Value**" means, in respect of any one or more Hedge Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Contracts, (a) for any date on or after the date such Hedge Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amounts(s) determined as the mark-to-market values(s) for such Hedge Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Contracts.

"**Synthetic Lease**" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Tax Equity Financing**" is defined in the definition of "Solar Development Project Financing Facility".

"**Tax Equity Financing Document**" means, without duplication, any document, agreement or instrument evidencing, securing or entered into and delivered by a Tax Equity Investor or the Company or any Subsidiary in connection with any Tax Equity Financing, in form and substance satisfactory to the Required Holders, as any such document, agreement or instrument may be amended, modified or restated from time to time pursuant to the terms thereof.

"**Tax Equity Investor**" is defined in the definition of "Tax Equity Vehicle".

"**Tax Equity Vehicle**" means with respect to a Project, any tax equity partnership or similar vehicle (a) which has been formed or acquired for the purpose of directly owning or leasing such Project, (b) through which one or more Persons (each, a "<u>Tax Equity Investor</u>") benefits directly or indirectly, from any production tax credits, investment tax credits, bonus depreciation, accelerated depreciation, other depreciation or any other federal or state tax benefits and (c) in which the Company owns, directly or indirectly, Capital Stock in a Class B Member in order to have an indirect ownership interest in such Project.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, mortgage recording taxes, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or other similar items applicable thereto.

-127-

"**TEBL Financing**" means, with respect to an A&R Project, any debt or equity financing facility provided by one or more commercial banks, investment funds, insurance companies or other financial or other companies or institutions (including non-bank institutions) to a Project Company or a direct or indirect owner thereof and that is non-recourse or limited recourse to any Pine Gate Party that does not directly or indirectly own such Project Company to the extent such facility is (i) provided to finance the development, construction and commissioning of such A&R Project and (ii) to be repaid from a Tax Equity Financing (whether or not such financing is made through a direct or indirect parent entity).

"**Texas One Project**" means the Texas One project located in Texas.

"**Third Party Guarantees**" is defined in clause (h) of the definition of "Permitted Debt".

"**Transition Services Agreement**" is defined in Schedule 9.25.

"**Uniform Commercial Code**" or "**UCC**" means Uniform Commercial Code of the jurisdiction the law of which governs the document in which such term is used or which governs the creation or perfection of the Liens granted thereunder.

"**United States Person**" has the meaning set forth in Section 7701(a)(30) of the Code.

"**Updated Budget**" is defined in Schedule 7.1(p).

"**Upfront Payment**" is defined in Section 2.2.

"**USA PATRIOT Act**" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the rules and regulations promulgated thereunder from time to time in effect.

"**Variance Covenant**" is defined in Schedule 7.1(p).

"**Weekly Date**" means the last Business Day of each calendar week.

"**Wholly-Owned Subsidiary**" means, at any time, any Subsidiary of a Person as to which all of the equity interests (except directors' qualifying shares or other shares required by Applicable Law to be owned by a Person other than such Person and/or one or more of such Person's Wholly-Owned Subsidiaries) and voting interests in such Subsidiary are owned by such Person and such Person's other Wholly-Owned Subsidiaries at such time.

-128-

SCHEDULE B

INFORMATION RELATION TO PURCHASERS

**SCHEDULE C**

**INITIAL APPROVED BUDGET**

SCHEDULE 7.1(p)

BUDGET

The initial Approved Budget approved by the Required Holders hereunder is attached as Schedule C (the "**Initial Approved Budget**"). The Initial Approved Budget shall be the Approved Budget until the next Updated Budget is delivered on the Updated Budget Delivery Date and such Updated Budget has been accepted (or deemed accepted) in accordance with this Schedule.

**Other Business and Financial Information**.

(a)     The Company shall deliver to the Collateral Agent for distribution to each holder of Notes, not later than 5:00 p.m. on every fourth Friday occurring after the Petition Date (each, an "**Updated Budget Delivery Date**"), commencing with the Friday of the fifth full calendar week occurring after the Petition Date, a budget for the rolling 13-week period commencing on the Saturday immediately preceding the applicable Updated Budget Delivery Date (each, an "**Updated Budget**"), in form and substance acceptable to the Required Holders (after approval by the Required Holders, the "**Approved Budget**"); *provided* that: (i) such Updated Budget shall be deemed acceptable to the Required Holders if it has not objected in writing (which response may be provided by email by the DIP Noteholders Advisors to the Company or its lead counsel and financial advisors) to such Updated Budget within three Business Days after receipt by the DIP Noteholder Advisors of such Updated Budget (provided that such three Business Day period shall be tolled for so long as the Updated Budget is subject to a professional eyes' only or similar designation); (ii) the failure of any Updated Budget to be accepted by the Required Holders, in and of itself and without limitation to the obligation to continue complying with the existing Approved Budget, shall not be deemed to be a violation of the Budget Covenant and no Default or Event of Default shall result solely from any objection by the Required Holders to any proposed Updated Budget; (iii) for the avoidance of doubt, upon (and subject to) the acceptance (or deemed acceptance) by the Required Holders of any Updated Budget (and at no time prior thereto), such Updated Budget shall constitute the "Approved Budget"; and (iv) during any period where an Updated Budget has not been approved by the Required Holders, the Initial Approved Budget or, if an Updated Budget has previously been approved by the Required Holders, the existing Approved Budget, as applicable, shall constitute the "Approved Budget".

(b)     Starting in the second full week after the Petition Date and every week thereafter, the Company shall deliver to the Collateral Agent and the DIP Noteholder Advisors (for delivery to the Required Holders) a variance report comparing the Note Parties' actual receipts and disbursements for the prior week with the projected receipts and disbursements for such period as reflected in the applicable Approved Budget (the covenants in the foregoing paragraphs (a) and (b), the "**Budget Covenant**").

**Budget Variance Covenant**.  The Company shall not permit aggregate disbursements as reported by the Company for such Budget Variance Test Period (excluding disbursements in respect of (x) professional fees for all advisors working on the Chapter 11 Cases, (y) interconnection costs, and (z) any project spend that is incremental to budgeted amounts and/or on a cadence that differs from

the Approved Budget, provided that for this clause (z), the corresponding lender to the silo with an equity interest in such project has (i) consented to such incremental project spend and/or change in timing and (ii) funded any amounts that are in excess of the budgeted amount for such project using solely the dedicated commitment sublimit (or an increase thereto) under the applicable Additional DIP Facility for project spend) to have a negative variance of more than the greater of $2,000,000 and 15% of the forecasted aggregate disbursements as reported by the Company for such Budget Variance Test Period in the applicable Approved Budget. It is agreed and understood that following an Updated Budget Delivery Date, if the Required Holders have not approved the Updated Budget and the existing Approved Budget remains in effect, any favorable variance from a prior Budget Variance Test Period may be carried forward and utilized in future Budget Variance Test Periods relating to such existing Approved Budget to offset negative variances in such future Budget Variance Test Period at the election of the Company (the covenants in the foregoing paragraph, the "**Variance Covenant**").

The timing of delivery of any deliverables under this Schedule may be extended with the consent of the Required Holders (which may be in the form of an email from the DIP Secured Parties Advisors).

"**Budget Variance Test Date**" shall mean the Friday of every week (commencing with the Friday of the fifth full calendar week occurring after the Petition Date) or, to the extent such Friday is not a Business Day, the next Business Day thereafter.

"**Budget Variance Test Period**" shall mean, with respect to any Budget Variance Test Date, the four-week period ending on the last Business Day of the week immediately preceding the applicable Budget Variance Test Date; *provided* that the initial Budget Variance Test Period shall include the period beginning on the Petition Date through end of the otherwise applicable four-week period.

SCHEDULE 9.25

MILESTONES

The Debtors shall achieve each of the following Milestones, in each case on terms and conditions, and subject to documentation, including, in each case, forms of all applicable orders, in form and substance acceptable to the Required Holders:

**DIP Milestones**

(a)    No later than the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Required Holders, seeking entry of interim and final orders approving the Debtors' entry into the Notes and the use of the cash collateral and Prepetition Collateral of the Prepetition Secured Parties.

(b)    No later than 5 days after the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order, in form and substance acceptable to the Required Holders.

(c)    No later than 30 days after the Petition Date, the Debtors shall have obtained entry of the Final DIP Order, in form and substance acceptable to the Required Holders.

**Asset Sale Milestones**

(a)    Within one (1) day of the Petition Date, ACT, the other applicable Debtors and their applicable subsidiaries, and Newco shall have entered into a transition services agreement (the "**Transition Services Agreement**") in form and substance reasonably acceptable to the Required Holders to provide Newco and the Carlyle Silo Entities with (A) continued operations and maintenance, engineering, procurement, construction, development, and asset management services on terms substantially similar to the Existing Services Agreements following a Sale in which the Required Holders (or their designee) is the winning bidder, and (B) at cost, full access before and for a reasonable period after such Sale to information technology and other systems and data (including from ACT) related to operations, and maintenance, engineering, procurement, construction, development, and asset management services provided to the Carlyle Silo Entities, and other transition services reasonably determined by Newco to be necessary or appropriate to transition such operations and maintenance, engineering, procurement, construction, development, and/or asset management services to other providers. For the avoidance of doubt, the Transition Services Agreement will not have the effect of waiving or reducing or altering in any way any termination or similar fees owed under the Existing Services Agreements.

(b)    Within one (1) day of the Petition Date, the Debtors shall have entered into the Stalking Horse APA and shall have filed a motion (the "**Bidding Procedures / Stalking Horse APA Motion**"), in form and substance acceptable to the Required Holders, seeking entry of an order approving (i) procedures for a sale, in one or a series of related transactions, of all or substantially all of the assets of the Debtors, including the Carlyle Silo Assets (the "**Bidding Procedures**") and (ii) the Debtors' entry into and performance under the Stalking Horse APA; provided that, for the avoidance of doubt, the order approving Bidding Procedures / Stalking Horse APA Motion shall provide

that the Secured Parties and the Prepetition Secured Parties may credit bid the Obligations and the Prepetition Secured Obligations, as applicable, in any sale of the Debtors' assets or any of the Carlyle Silo Assets.

(c)     No later than November 5, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Required Holders, approving the Bidding Procedures / Stalking Horse APA Motion, including the Debtors' entry into and performance under the Stalking Horse APA (the "**Bidding Procedures Order**").

(d)     On the Petition Date, to the extent any Debtors are party to services agreements for operations and maintenance, engineering, procurement, construction, development, and asset management services with Projects in the Carlyle Silo Entities (collectively, the "**Existing Services Agreements**"), the Debtors shall have filed a motion for entry of an order, in form and substance acceptable to the Required Holders (the "**Existing Services Agreement Assumption Order**") to assume or to assume and assign to ACT Power Services (upon closing of a sale of ACT Power Services) such agreements pursuant to Section 365 of the Bankruptcy Code.

(e)     On or prior to November 19, 2025, the Company shall have provided the Required Holders with summaries of all indications of interest and letters of intent received for the Sale, any sale of equity interests in or assets of ACT, or any sale of all or substantially all of the Debtors' assets or businesses.

(f)     No later than December 15, 2025, the deadline for parties to submit binding bids to the Debtors pursuant to the Bidding Procedures Order shall have occurred.

(g)     No later than December 17, 2025, the Debtors shall have commenced an auction pursuant to the Bidding Procedures Order; *provided* that the Debtors shall retain the right to cancel such auction pursuant to the Bidding Procedures Order.

(h)     No later than December 23, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Required Holders, approving a sale of all or substantially all (or any material portion thereof acceptable to the Required Holders) of their assets pursuant to the Bidding Procedures Order (the "**Sale Order**").

(i)     No later than December 31, 2025, the Debtors shall have consummated the sale of all or substantially all of the Carlyle Silo Assets pursuant to the Sale Order (the "**Sale Milestone**"); *provided* that the Sale Milestone shall be deemed extended until the earlier of (x) 60 days after the initial Sale Milestone and (y) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed.

**Other**

For the East Atmore Project, the Note Parties shall use their reasonable best efforts to timely achieve the following milestones (for the avoidance of doubt, the failure to achieve the Milestones

set forth in the following clauses (i) – (vi) shall not give rise to a Default or Event of Default so long as the Note Parties use their best efforts to timely achieve such milestones):

i.   No later than [November 12, 2025], the Note Parties shall have delivered evidence satisfactory to the Required Holders that Substantial Completion (or equivalent milestone as defined in EPC contract) has been achieved (as confirmed by the EPC contractor and the independent engineer under the East Atmore project financing (the "**East Atmore IE**")).

ii.  No later than [December 1, 2025], the Note Parties shall have delivered evidence satisfactory to the Required Holders that "Term Conversion" has been achieved, including by a copy of the "Notice of Term Conversion" and the "Borrowers' Term Conversion Certificate" (each as referenced in the Credit Agreement with respect to the East Atmore Project dated as of September 30, 2024).

iii. No later than [December 1, 2025], the "SC Funding Date" shall have occurred and the "Class A Substantial Completion Capital Contribution" shall have been paid (each as referenced in the Amended & Restated Limited Liability Company Agreement of Polaris OpCo Holdco A, LLC dated as of September 17, 2024 (the "**Polaris A LLCA**")).

iv.  No later than [December 19, 2025], the Purchase Price for 100% of the East Atmore ITCs shall have been paid under AutoZone ITC Tax Credit Purchase Agreement.

v.   Promptly upon receipt and in any event no later than fifteen (15) Business Days prior to [December 19, 2025], the Note Parties shall have delivered to the Required Holders (a) the certificate of the then-applicable Guarantor referenced in Section 2.1(c)(xix)(B) of the Tax Credit Purchase Agreement with respect to the East Atmore Project dated as of September 20, 2024 or (b) evidence satisfactory to the Required Holders that the Buyer (as defined therein) has waived the delivery of such certificate or accepted an alternative deliverable in satisfaction of the applicable condition precedent (including a copy of such waiver or alternative deliverable, as applicable).

vi.  No later than [December 1, 2025], the Note Parties shall have delivered to the Required Holders the updated appraisal, cost segregation, and independent engineer reports reflecting final tax credit amounts as referenced in Section 2.1(c)(viii) of the East Atmore TCPA.

vii. No later than [December 1, 2025], the Note Parties shall have delivered to the Required Holders the bringdown of prevailing wage & apprenticeship, energy community and beginning of construction compliance certificates as referenced in Section 3.8(u) of the Polaris A LLCA.

The timing to complete each Milestone under this Schedule may be extended with the consent of the Required Holders (which may be in the form of an email from the DIP Secured Parties Advisors).

**<u>Exhibit C</u>**

**Fundamental DIP Credit Agreement**

**SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION LOAN
AGREEMENT**

by and among

**PINE GATE RENEWABLES, LLC,**
a North Carolina limited liability company
("***Borrower***")

and

**FP SOLAR DEVELOPMENT I LLC,**
a Delaware limited liability company,
as a Lender

and

**SOLAR CONSTRUCTION LENDING, LLC,**
a Delaware limited liability company,
as a Lender

Dated as of November [•], 2025

_____

## Table of Contents

Page

**SECTION 1.**     Definitions; Rules of Construction ................................................................2

1.1.     Definitions ................................................................................................2
1.2.     Accounting Terms and Determinations..................................................35
1.3.     Rules of Interpretation...........................................................................35

**SECTION 2.**     The Facilities ...........................................................................................37

2.1.     The Commitments ..................................................................................37
2.2.     Loan Disbursement Procedures.............................................................40
2.3.     Conditions Precedent to First Draw and each Subsequent Draw before entry of the Final DIP Order ...................................................................41
2.4.     Project Qualification...............................................................................44
2.5.     Conditions Precedent to Second Draw and each Subsequent Draw after entry of the Final DIP Order...................................................................45
2.6.     [Reserved] ..............................................................................................46
2.7.     [Reserved] ..............................................................................................46
2.8.     [Reserved] ..............................................................................................47
2.9.     Waivers of Conditions Precedent ...........................................................47
2.10.    Loan Ledger............................................................................................47
2.11.    Interest Calculation; Late Charges .........................................................47
2.12.    [Reserved] ..............................................................................................47
2.13.    Prepayments...........................................................................................47
2.14.    Treatment of Applicable Prepayment Premium ....................................49
2.15.    Reserved .................................................................................................50
2.16.    Fees........................................................................................................50
2.17.    [Reserved] ..............................................................................................51
2.18.    Loan Payments .......................................................................................51
2.19.    [Reserved] ..............................................................................................52
2.20.    [Reserved] ..............................................................................................52
2.21.    Taxes ......................................................................................................52
2.22.    Recovery of Additional Costs .................................................................54
2.23.    Addition of Projects................................................................................55
2.24.    Valuation of Projects..............................................................................56
2.25.    [Reserved] ..............................................................................................58

**SECTION 3.**     Representations and Warranties ..............................................................58

3.1.     Existence; Compliance with Laws ..........................................................58
3.2.     Power; Authorization; Enforceability .....................................................58
3.3.     No Contravention ...................................................................................58
3.4.     Financial Information ..............................................................................59
3.5.     [PGR Procurement Equipment ...............................................................59
3.6.     No Event of Default ................................................................................59
3.7.     [Reserved] ..............................................................................................59

i

| | | |
|---|---|---|
| 3.8. | Litigation | 59 |
| 3.9. | Sole Business and Subsidiaries | 59 |
| 3.10. | Equity Interests/Subsidiaries | 59 |
| 3.11. | Project Budget; Project Schedule; Financial Projections | 60 |
| 3.12. | [Reserved] | 60 |
| 3.13. | Title to Properties; Real Property; Site Locations | 60 |
| 3.14. | Compliance with Laws | 61 |
| 3.15. | Accounts | 61 |
| 3.16. | Project Documents | 61 |
| 3.17. | Sufficiency of Project Documents | 62 |
| 3.18. | Permits | 62 |
| 3.19. | Federal Reserve Board Regulations | 62 |
| 3.20. | ERISA Plans | 62 |
| 3.21. | Environmental Conditions; Hazardous Substances | 62 |
| 3.22. | Governmental Regulation | 63 |
| 3.23. | Prohibited Equipment | 63 |
| 3.24. | Intellectual Property | 64 |
| 3.25. | Investment Company Act | 64 |
| 3.26. | PATRIOT Act; OFAC and Other Regulations | 64 |
| 3.27. | Disclosure | 65 |
| 3.28. | Filings | 66 |
| 3.29. | Land Not in Flood Zone | 66 |
| 3.30. | Labor Disputes and Acts of God | 66 |
| 3.31. | Security Documents | 66 |
| 3.32. | Importation Tariffs | 67 |
| 3.33. | Approved Budget | 67 |
| 3.34. | DIP Order | 67 |
| 3.35. | Bankruptcy Cases | 68 |
| **SECTION 4.** | **Affirmative Covenants** | 69 |
| 4.1. | Financial Statements | 69 |
| 4.2. | Development/Construction Reports | 70 |
| 4.3. | Notice | 71 |
| 4.4. | Conduct of Business and Maintenance of Existence | 72 |
| 4.5. | Compliance with Laws | 72 |
| 4.6. | Permits | 72 |
| 4.7. | Payment of Liabilities and Taxes | 72 |
| 4.8. | Contractual Obligations | 73 |
| 4.9. | Use of Loan Proceeds | 73 |
| 4.10. | Development and Construction Work | 73 |
| 4.11. | Insurance | 73 |
| 4.12. | Event of Eminent Domain | 74 |
| 4.13. | Deposits to the Lenders | 75 |
| 4.14. | Project Incentives | 75 |
| 4.15. | Inspection | 75 |
| 4.16. | Further Assurances | 75 |

4.17.    Additional Collateral Assignments and Consents ............................................76

4.18.    Exemption from Regulation ............................................................................76

4.19.    Warranty of Title ............................................................................................76

4.20.    Separateness ...................................................................................................77

4.21.    Additional Reporting .....................................................................................78

4.22.    Prohibited Equipment ....................................................................................78

4.23.    Minimum Qualified Projects ..........................................................................78

4.24.    Weighted Average PPA ..................................................................................78

4.25.    Material Pleadings .........................................................................................78

4.26.    Evidence of Compliance with WRO ................................................................79

4.27.    Weekly Call ...................................................................................................79

4.28.    Approved Budget ...........................................................................................79

4.29.    DIP Milestones ..............................................................................................80

4.30.    Control Agreements .......................................................................................80

4.31.    Terms No Less Favorable ...............................................................................80

4.32.    Amendments to Additional DIP Facilities ......................................................81

4.33.    Project Senior Financing Consents; Exercise of Remedies Under any Project Senior Financing ............................................................................................81

4.34.    Credit Support; Regulatory Approvals ...........................................................81

4.35.    Surety Bonds. .................................................................................................82

4.36.    Other Bankruptcy Matters. .............................................................................82

4.37.    Additional DIP Facilities ...............................................................................84

4.38.    Material Decisions .........................................................................................84

4.39.    Certain Project Covenants .............................................................................84

4.40.    ACT ...............................................................................................................84

**SECTION 5.**    Negative Covenants ...............................................................................84

5.1.    Indebtedness ..................................................................................................84

5.2.    Liens .............................................................................................................85

5.3.    Distributions ..................................................................................................85

5.4.    Limitations on Restrictive Agreements; Negative Pledge ................................85

5.5.    Sale of Assets ................................................................................................85

5.6.    Transfer of Interests ......................................................................................86

5.7.    Loans; Investments; Etc. ................................................................................86

5.8.    Contractual Obligations; Material Project Documents; Material Contracts .....86

5.9.    Fundamental Changes ...................................................................................86

5.10.    Change of Business; Use of Site .....................................................................86

5.11.    Modification of Organizational Documents ....................................................86

5.12.    Affiliates .......................................................................................................87

5.13.    ERISA ...........................................................................................................87

5.14.    Accounts .......................................................................................................87

5.15.    [Reserved] .....................................................................................................87

5.16.    Loan Proceeds ...............................................................................................87

5.17.    Anti-Terrorism Laws; OFAC; Other Regulations............................................87

5.18.    Federal Reserve Board Regulations ...............................................................88

5.19.    Name and Location; Fiscal Year ....................................................................88

5.20. Hedging Agreements ........................................................................88
5.21. Contingent Liabilities .....................................................................88
5.22. Partnerships ....................................................................................88
5.23. Compliance With Operative Documents .........................................88
5.24. Environmental Laws and Hazardous Substances ............................88
5.25. Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings ........................................................................................89
5.26. Land Not in Flood Zone ..................................................................89
5.27. Exercise of Rights Under Option ....................................................89
5.28. Repurchase Option ..........................................................................89
5.29. No Restrictions on Granting Security Interest .................................89
5.30. Limitation on Changes to System Design ........................................89
5.31. Limitation on Changes to Plans and Specifications .........................89
5.32. Liquidity .........................................................................................90
5.33. Material Settlements ........................................................................90
5.34. Cash Management Arrangements .....................................................90
5.35. Executive Compensation ..................................................................90
5.36. Independent Director .......................................................................90
5.37. Tax Matters .....................................................................................90
5.38. ACT Covenants ...............................................................................91
5.39. Material Pleading ............................................................................91
5.40. New Subsidiaries ............................................................................91
5.41. Promissory Note ..............................................................................91

SECTION 6.   Events of Default...........................................................................91

6.1. Payment of Obligations ...................................................................91
6.2. Failure to Perform Provisions of Loan Documents ..........................91
6.3. Representations and Warranties .......................................................92
6.4. Unenforceability of Loan Documents; Impairment of Security Interests ........92
6.5. Default under Other Indebtedness ...................................................92
6.6. Liquidation, Termination, Dissolution, Etc......................................93
6.7. Bankruptcy ......................................................................................93
6.8. Judgments ........................................................................................97
6.9. Change of Control ...........................................................................97
6.10. Project Document Default ................................................................97
6.11. Financing Consents .........................................................................98
6.12. Loss of Approvals, Licenses ...........................................................98
6.13. Suspension of Work ........................................................................98
6.14. Defect in Title .................................................................................98
6.15. Regulatory Status ............................................................................99
6.16. ERISA .............................................................................................99
6.17. [Reserved] .....................................................................................100
6.18. Material Adverse Effect .................................................................100

SECTION 7.   Rights and Remedies ...................................................................100

7.1. Rights and Remedies .....................................................................100

| 7.2. | Cure by Lenders | 101 |
|------|-----------------|-----|
| 7.3. | Possession of Project | 101 |
| 7.4. | Right to Terminate Affiliate Contracts | 101 |
| 7.5. | Remedies under Loan Documents | 101 |
| 7.6. | Default Rate | 102 |
| 7.7. | Liens, Set-Off | 102 |
| 7.8. | Enforcement Costs | 102 |
| 7.9. | Application of Proceeds | 102 |
| 7.10. | Remedies, Etc.; Cumulative | 103 |
| 7.11. | No Waiver, Etc. | 104 |
| 7.12. | Attorney-In-Fact | 104 |
| 7.13. | Reserved | 105 |

| **SECTION 8.** | Miscellaneous | 105 |
|------|-----------------|-----|
| 8.1. | Course of Dealing; Amendment | 105 |
| 8.2. | Waiver of Event of Default | 105 |
| 8.3. | Notices | 105 |
| 8.4. | Costs and Expenses | 106 |
| 8.5. | Applicable Law; Consent to Jurisdiction | 107 |
| 8.6. | Waiver of Jury Trial | 108 |
| 8.7. | Assignment and Participations | 108 |
| 8.8. | Limitation on Liability | 108 |
| 8.9. | Indemnification | 109 |
| 8.10. | Entire Agreement | 109 |
| 8.11. | No Advisory or Fiduciary Responsibility; No Partnership, Etc. | 110 |
| 8.12. | Severability | 110 |
| 8.13. | Survival | 110 |
| 8.14. | Binding Effect; Assignment | 111 |
| 8.15. | Time of Essence | 111 |
| 8.16. | Duplicate Originals and Counterparts | 111 |
| 8.17. | No Third Party Beneficiary | 111 |
| 8.18. | Non-Usurious Interest | 111 |
| 8.19. | Publicity | 111 |
| 8.20. | Confidentiality | 111 |
| 8.21. | USA PATRIOT Act | 113 |
| 8.22. | Termination of Security Interests; Release of Collateral | 113 |
| 8.23. | Headings | 113 |
| 8.24. | [Reserved] | 113 |
| 8.25. | Designation of Agent | 113 |

Exhibit A – Form of Draw Request
Exhibit B – Form of Approved Budget
Exhibit C – Form of Interim DIP Order

Annex A – DIP Milestones
Annex B – Specified Events and Specified EODs

v

Schedule 1.1A – Projects; Project Companies
Schedule 1.1B – Lender's Account
Schedule 1.1C – Material Projects
Schedule 1.1D – Liens
Schedule 2.1 – Lender Commitments
Schedule 3.8   – Litigation
Schedule 3.10 – Equity Interests/Subsidiaries
Schedule 3.16 – Project Documents
Schedule 3.18 – Permits
Schedule 3.21 – Hazardous Substances
Schedule 4.1(k) – PGR Procurement Equipment
Schedule 4.11 – Lenders' Insurance Requirements

## SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

This **SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "***Agreement***"), is made as of [•], 2025 by and among **PINE GATE RENEWABLES, LLC**, a North Carolina limited liability company] (the "***Borrower***"), **FP SOLAR DEVELOPMENT I LLC**, a Delaware limited liability company ("***FP Solar***") and **SOLAR CONSTRUCTION LENDING, LLC**, a Delaware limited liability company ("***Solar Construction Lender***" and together with FP Solar, individually each, a "***Lender***" and collectively, the "***Lenders***").

## RECITALS

Certain of the terms and words used in these Recitals are defined in Section 1.1 of this Agreement.

WHEREAS, FP 2021 DEV HOLDCO, LLC, a North Carolina limited liability company as borrower, and FP Solar, as lender, entered into that certain Revolving Loan Agreement, dated as of December 10, 2021, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

WHEREAS, FP 2021 DEV HOLDCO, LLC, FP Solar and Solar Construction Lender entered into an Amended and Restated Revolving Loan Agreement, dated as of October 6, 2025 (including the exhibits, annexes, and schedules thereto, the "***Prepetition FP 2021 Credit Agreement***") whereby the Lenders agreed to make the New Money Commitments (as defined in Prepetition FP 2021 Credit Agreement) in the amount of $109,819,470.49 available to the Borrower.

WHEREAS, Solar Construction Lender and BRP Borrower entered into that certain Amended BRP Agreement (as defined below).

WHEREAS, on November 6, 2025 (the "***Petition Date***"), the Borrower and certain of its Subsidiaries (the "***Debtors***" and each, a "***Debtor***") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "***Chapter 11 Case***") with the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") and are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested and the Lenders have agreed to make available to the Borrower, from and after the date of entry of the Interim DIP Order, the DIP Facility on the terms and conditions set forth in this Agreement.

WHEREAS, the DIP Facility shall be available for borrowing as of the Interim DIP Facility Effective Date, subject in all respects to the terms, conditions and limitations set forth herein, and in the other Loan Documents and shall be afforded the Liens and priorities set forth in the DIP Order and to be used during the Chapter 11 Cases for the purposes set forth in Section 2.1(b).

1

Subject to and upon the terms, conditions and provisions of this Agreement, the Lenders have agreed to make the Loans to the Borrower subject to the terms and conditions set forth below and for the purposes permitted herein.

## AGREEMENTS

**NOW**, **THEREFORE**, in consideration of the premises, the representations and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**SECTION 1.**  Definitions; Rules of Construction.

1.1.  Definitions. The following terms, when used in this Agreement, shall have the following meanings unless otherwise indicated:

"*Acceptable Plan*" means an "Acceptable Plan" as defined in the DIP Order.

"*Accrual Period*" means, with respect to a Loan Payment Date, the actual number of days in the calendar quarter immediately preceding such Loan Payment Date; provided that, the first Accrual Period shall begin on the Interim DIP Facility Effective Date and the last Accrual Period shall end on the Maturity Date.

["*Acquired Assets*" means, collectively, the assets and equity of the Fundamental Silo Entities, all Fundamental Pledged Intercompany Claims and any other assets as determined by the Lenders.][1]

"*ACT*" means ACT Power Services Holding Company Guarantor, LLC, a North Carolina limited liability company and its direct and indirect Subsidiaries.

"*Additional DIP Documents*" means the "loan documents", "credit documents" or similar defined term in any credit agreement or equivalent document memorializing an Additional DIP Facility.

"*Additional DIP Facilities*" means, collectively, the Carlyle DIP Facility, the Brookfield DIP Facility and any Replacement Additional DIP Facility.

"*Additional Project Documents*" means, with respect to any Project, any Material Project Document entered into by the Borrower or the applicable Project Company and the applicable Project Counterparties, or assigned to the Borrower or the applicable Project Company, subsequent to the Interim DIP Facility Effective Date.

"*Additional Required Permits*" means, with respect to any Project, Permits that are required to be obtained by the applicable Project Company or a Project Counterparty in order to

---

[1] [NTD: To conform with the final Fundamental APA]

complete construction of, delivery, interconnection and operation of a Project, but which have not been obtained as of the Interim DIP Facility Effective Date.

"*Advance*" means any borrowing of Loans hereunder.

"*Affiliate*" of a specified Person means any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the Person specified, or who holds or beneficially owns fifty percent (50%) or more of the equity interests in the Person specified or fifty percent (50%) or more of any class of voting securities of the Person specified.

"*Aggregate Collateral Value*" is defined in Section 2.24(c).

"*Agreement*" has the meaning provided in the introductory paragraph hereto.

"*Allocated Shared Costs*" means the Lenders' share of costs and expenses related to the Restructuring and Chapter 11 Cases as provided in the latest Approved Budget.

"*Amended BRP Agreement*" means that certain Amended and Restated Loan Agreement, dated as of June 26, 2025, by and between Blue Ridge Power, LLC, a North Carolina limited liability company, as borrower, and Solar Construction Lender, as lender, as amended by that certain First Amendment to Amended and Restated Loan Agreement, dated as of October 6, 2025, by Blue Ridge Power, LLC, a North Carolina limited liability company, as borrower, and Solar Construction Lender, as lender.

"*Anti-Money Laundering Laws*" is defined in Section 3.25.

"*Anti-Terrorism Law*" means any Applicable Law related to money laundering or financing terrorism including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) (also known as the "*Bank Secrecy Act*"), the Trading With the Enemy Act (50 U.S.C. § 1 et seq.) and Executive Order 13224 (effective September 24, 2001).

"*Applicable Laws*" means, with respect to any Person, all laws, statutes, rules, regulations, ordinances, judgments, settlements, orders, decrees, injunctions, permits and writs of any Governmental Authority having jurisdiction over such Person or the applicable Project, as applicable.

"*Applicable Prepayment Premium*" means with respect to any New Money DIP Loan being prepaid or repaid (or required to be prepaid or repaid) upon the occurrence of a MOIC Event, an amount sufficient to achieve a MOIC of 1.30 with respect to the New Money DIP Loans so prepaid or repaid (or required to be prepaid or repaid).

"*Approved Budget*" means the initial Approved Budget attached hereto as Exhibit B or, if an Updated Budget has been approved (including, for the avoidance of doubt, if an Updated Budget has been deemed approved) by the Lenders in accordance with Section 4.28 of this Agreement, such Updated Budget.

3

"***Approved Costs***" means, collectively and individually as the context requires, Approved Development and Construction Costs and Allocated Shared Costs, in each case, as provided in the latest Approved Budget.

"***Approved Development and Construction Costs***" means, with respect to any Project, no matter when incurred, (i) any development costs, including, without limitation, interconnection payments and security deposits, PPA security deposits, permitting expenses, project acquisition costs and expenses, equipment costs and deposits, and procurement of third-party site diligence reports, surveys and studies, (ii) payments to the contractor of the contract price pursuant to a LNTP, Notice to Proceed, or engineering, procurement and construction contract, (iii) any fees or expenses associated with the Loans, and (iv) other development and construction costs and expenses, third-party development fees, and any other amounts attributable to costs or expenses allocated to a Project (excluding Allocated Shared Costs), subject to the discretion of the Lenders, that, in each case, are contained in the applicable Project Budget, as applicable, or are otherwise approved by the Lenders in writing.

"***Auction***" has the meaning specified in the Bidding Procedures Order.

"***Avoidance Actions***" means any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code).

"***Bank Secrecy Act***" is defined in the definition of "Anti-Terrorism Law".

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended.

"***Bankruptcy Court***" is defined in the Recitals.

"***Bankruptcy Event***" shall mean with respect to any Person,

(i)     such Person or any of its Subsidiaries shall commence any case, proceeding or other action (x) under any existing or future Applicable Laws relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (y) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or (z) such Person or any of its Subsidiaries shall make a general assignment for the benefit of its creditors (or files a notice of its intention to do so);

(ii)     Any petition is filed, application made, or other proceeding instituted against or in respect of any Person or any of its Subsidiaries (A) seeking to adjudicate it as insolvent; (B) seeking a receiving order against it; (C) seeking liquidation, dissolution, winding-up, reorganization, restructuring, compromise, arrangement, adjustment, protection, moratorium, relief, stay of proceedings of creditors generally (or any class of creditors), deed of company arrangement or composition of it or its debts or any other relief under any law, now or hereafter in

4

effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors at common law or in equity; or (D) seeking the entry of an order for relief or the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property, and, in each case under this clause (ii), such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of sixty (60) days after the institution thereof; provided that if an order, decree or judgment is granted or entered (whether or not subject to appeal) against any such Person or any of its Subsidiaries thereunder in the interim, such grace period will cease to apply; provided, further, that if any such Person or any of its Subsidiaries files an answer admitting the material allegations of a petition filed against it in any such proceeding prior to such date, the grace period will cease to apply;

(iii)    there shall be commenced against such Person or any of its Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against any material assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(iv)    Any Person or any of its Subsidiaries applies for the appointment of, or the taking of possession by, a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator, voluntary administrator, receiver and manager or other similar official for it or any substantial part of its property;

(v)    Any Person or any of its Subsidiaries becomes insolvent within the meaning of 11 U.S.C. §101(32) (or any equivalent or similar provision of other debtor relief law applicable to such Person or Subsidiary);

(vi)    such Person or any of its Subsidiaries generally does not or becomes unable to pay its debts or meet its liabilities as the same become due, or admits in writing its inability to pay its debts generally, or declares any general moratorium on its Indebtedness, or proposes a compromise or arrangement or deed of company between it and any class of its creditors;

(vii)    Any Person or any of its Subsidiaries takes any action, corporate or otherwise, including, an affirmative vote by its board of directors (or equivalent management or oversight body), to commence any insolvency proceeding or to approve, effect, consent to or authorize any of the actions described in the clauses (i)-(vi) above, or otherwise acts in furtherance thereof; or

(viii)    Any other event or circumstance occurs which, under any debtor relief law, has an effect equivalent to any of the events or circumstance referred to in the other clauses of this definition.

"***Bid***" has the meaning specified in the Bidding Procedures Order.

"***Bidding Procedures***" is defined in Annex A.

"***Bidding Procedures / Stalking Horse APA Motion***" is defined in Annex A.

5

"***Bidding Procedures Order***" is defined in Annex A.

"***Blocked Person***" means any Person that (a) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, or (b) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Applicable Law.

"***Board***" is defined in Section 3.19.

"*Borrower*" has the meaning set forth in the introductory paragraph hereto.

"***Brookfield***" means Brookfield Asset Management Ltd.

"***Brookfield Agent***" means BID ADMINISTRATOR LLC, as administrative agent and collateral agent for the lenders under the Brookfield Credit Agreement.

"***Brookfield Credit Agreement***" means that certain Credit Agreement, dated as of January 30, 2025 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2025, as amended by that certain Amendment No. 2 to Credit Agreement, dated as of April 17, 2025 and as further amended by that certain Amendment No. 3 to Credit Agreement, dated October 6, 2025) by and among BF Dev Holdco, LLC, as borrower, the Brookfield Agent, and the lenders party thereto.

"***Brookfield DIP Agent***" means BID ADMINISTRATOR LLC, as administrative agent and collateral agent for the lenders under the Brookfield DIP Facility.

"***Brookfield DIP Credit Agreement***" means that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement, by and among Pine Gate Renewables, LLC, as borrower, certain of the other Debtors and certain non-Debtor direct and indirect subsidiaries of the Debtors, as guarantors, the lenders party thereto, and the Brookfield DIP Agent (as it may be amended, restated, amended and restated, modified, supplemented, extended, or waived from time to time).

"***Brookfield DIP Credit Documents***" means the Brookfield DIP Credit Agreement and the other "Credit Documents" as defined in the Brookfield DIP Credit Agreement.

"***Brookfield DIP Facility***" means the up to $[551,410,691.55] in principal amount of postpetition superpriority senior secured debtor-in-possession term loans and other financial accommodations entered into by the Debtors and certain non-Debtors pursuant to the Brookfield DIP Credit Documents.

"***Brookfield Forbearance Agreement***" means that certain Forbearance Agreement dated October 6, 2025 among the Brookfield Agent and BF DEV HOLDCO LLC, a North Carolina limited liability company, as a borrower.

["**_Brookfield Silo Entities_**" means each of (a) BF Dev Holdco, LLC, (b) PGC Solar Holdings Holdco II, LLC, (c) Cascade NTP Holdco, LLC, (d) PGR Blocker Holdco, LLC, (e) Polaris OpCo Pledgor B, LLC, and (f) each direct or indirect subsidiary of the foregoing.]

"**_BRP Borrower_**" means Blue Ridge Power, LLC, a North Carolina limited liability company, as borrower under the Amended BRP Agreement.

"**_Budget Variance Report_**" means, a weekly detailed variance report in respect of the weeks comprising the applicable Budget Variance Test Period, in form reasonably satisfactory to the Lenders, setting forth (a) the actual disbursements of the Sponsor and substantially all of its Subsidiaries (including the Loan Parties, but excluding ACT), on an aggregate basis during the applicable Budget Variance Test Period (excluding disbursements in respect of Permitted Exclusions), (b) a comparison (whether positive or negative, in Dollars and expressed as a percentage) for the applicable Budget Variance Test Period to the amount of the projected disbursements of such entities (excluding disbursements in respect of Permitted Exclusions) for such applicable Budget Variance Test Period (the "**_Budgeted Disbursements_**"), respectively, set forth in the Budget for such applicable Budget Variance Test Period and (c) a statement from a Responsible Officer certifying the information contained in such Budget Variance Report.

"**_Budget Variance Test Date_**" shall mean the Friday of every week (commencing with the Friday of the fifth full calendar week occurring after the Petition Date) or, to the extent such Friday is not a Business Day, the next Business Day thereafter.

"**_Budget Variance Test Period_**" shall mean, with respect to any Budget Variance Test Date, the four-week period ending on the last Business Day of the week immediately preceding the applicable Budget Variance Test Date; provided that the initial Budget Variance Test Period shall include the period beginning on the Petition Date through the end of the otherwise applicable four-week period.

"**_Budgeted Disbursements_**" as defined in the definition of "Budget Variance Report."

"**_Business Day_**" means any day that is not a Saturday, Sunday or other day on which banking institutions in New York City are authorized or required by law to be closed.

"**_Calculated Value_**" is defined in Section 2.24(b).

"**_Carlyle_**" means Carlyle Global Credit Investment Management, LLC or one or more of its affiliates.

"**_Carlyle DIP Agent_**" means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the Carlyle DIP Facility.

"**_Carlyle DIP Facility_**" means the superpriority senior secured debtor-in-possession notes facility providing up to $[373,965,652.74] in principal amount of postpetition notes and other financial accommodations to the Debtors and certain non-Debtors pursuant to the Carlyle DIP Note Documents.

"*Carlyle DIP Note Documents*" means the Carlyle DIP Note Purchase Agreement and the other "Finance Documents" as defined in the Carlyle DIP Note Purchase Agreement.

"*Carlyle DIP Note Purchase Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement, by and among Pine Gate Renewables, LLC, as Issuer, certain of the other Debtors and certain non-Debtor direct and indirect subsidiaries of the Debtors, as guarantors, the note purchasers party thereto, and Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent (as it may be amended, restated, amended and restated, modified, supplemented, extended, or waived from time to time).

"*Carlyle Exclusive DIP Collateral*" has the meaning assigned to such term in the DIP Order.

"*Carlyle Prepetition Note Purchase Agreement*" means that certain Amended and Restated Note Purchase Agreement, dated October 6, 2025 by and among certain affiliates of the Borrower, including NPA 2023 Holdco, LLC, a North Carolina limited liability company as the issuer, the Purchasers and the Holders (each as defined therein) from time to time party thereto, and Wilmington Trust, National Association, as collateral agent.

"*Carlyle Prepetition Noteholders*" means each of the holders of the notes issued pursuant to the Carlyle Prepetition Note Purchase Agreement.

"*Carlyle Retained Liabilities*" has the meaning assigned to such term in the DIP Order.

"*Carlyle Silo Entities*" means any of the obligors under the Note Purchase Agreement, dated October 6, 2025 by and among certain affiliates of the Borrower, including NPA 2023 Holdco, LLC, a North Carolina limited liability company as the issuer, the Purchasers and the Holders (each as defined therein) from time to time party thereto, and Wilmington Trust, National Association, as collateral agent (immediately prior to giving effect to the amendment and restatement thereof on October 6, 2025) or any of their subsidiaries.

"*Carve Out*" has the meaning assigned to such term in the DIP Order.

"*Cash Collateral*" has the meaning assigned to such term in the DIP Order.

"*Cash Management Motion*" means the first day motion of the Debtors seeking interim and final approval of the Debtors' cash management system.

"*Cash Management Order*" means any order of the Bankruptcy Court entered in the Chapter 11 Cases, together with all extensions, modifications and amendments thereto, consistent with the DIP Order and in form and substance acceptable to the Lenders, which approves the relief requested in the Cash Management Motion.

"*Casualty Insurance Proceeds*" means any and all proceeds of any insurance, indemnity, warranty or guaranty payment from time to time with respect with any damage to, or destruction in whole or in part of, any Project or any other Collateral.

"*Challenge Period*" is defined in Section 4.36(e).

8

"**Change in Law**" means the occurrence, after the Interim DIP Facility Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority that based on precedent would reasonably be expected to result in a material change in the application of Tax law; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means if any of the following shall occur:

(a)     Ben Catt, James Luster, Ray Shem and Chris Dunbar, individually or in the aggregate (and any estate planning vehicles established for their benefit, or the benefit of their immediate families, to which any such individuals have contributed equity, provided that at all times such vehicles are under the complete Control of such individuals during their lifetimes, or the immediate families of such individuals, after their death), shall either (a) cease, to be the beneficial owners, directly or indirectly, of fifty-one percent (51%) of the outstanding Equity Interests of Sponsor or (b) cease to otherwise possess Control of Sponsor; or

(b)     the Sponsor (i) shall cease to be the direct or indirect beneficial owner of all of the outstanding Equity Interests of the Holding Company or any class of voting securities of the Holding Company, or (ii) shall cease to otherwise possess Control of the Holding Company, in each case free and clear of all Liens other than Permitted Liens.

"**Chapter 11 Case**" is defined in the Recitals.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means the "Fundamental DIP Collateral" (as defined in the DIP Order).

"**Collateral Assignments**" means, to the extent required by the Lenders with respect to any Material Project Document or Additional Project Document, each Collateral Assignment of such Material Project Document or Additional Project Document in a form reasonably acceptable to the Required Lenders, (i) in respect of each Material Project Document entered into prior to or on the Interim DIP Facility Effective Date, dated as of the Interim DIP Facility Effective Date, and (ii) in respect of each Additional Project Document, dated as of the date of such Additional Project Document, in each case executed by the Borrower or the applicable Project Company or Affiliate of the Borrower for such Material Project Document or Additional Project Document in favor of the Lenders, together with all Supplements thereto.

"**Commercial Operation Date**" means, with respect to each Project, the date on which such Project is electrically interconnected to the distribution system and authorized to operate by the applicable Utility and, to the extent applicable, is capable of generating electricity for sale.

9

"**Commitment/Funding Fee**" is defined in Section 2.16(a).

"**Committee**" is defined in Section 2.1(b)(ii).

"**Complex Case Procedures**" means the Procedures for Complex Cases in the Southern District of Texas, as may be amended.

"**Condemnation Proceeds**" means any and all payments (in any form whatsoever) made or due and payable from time to time in connection with any Event of Eminent Domain.

"**Consent to Collateral Assignment**" means each Consent to Collateral Assignment of a Material Contract, executed by the Borrower, any Project Company or any other Loan Party, as applicable, and the Project Counterparty, party to such agreement, in favor of the Lenders, together with all Supplements thereto.

"**Construction Budget**" means, with respect to any Project, a budget describing all material expenditures to be incurred by Borrower from the inception of design of the Project through completion of construction of the Project, noting which amounts have already been incurred, as approved by the Lenders from time to time.

"**Construction Schedule**" means, with respect to any Project, a timeline setting forth all estimates for completion of all material construction events, stages of construction of the Project and events necessary to achieve commercial operation and all material deadlines for the construction of the Project through and including commercial operation, as approved by the Lenders from time to time.

"**Contractual Obligation**" of any Person, means any provision of any security interests or credit support issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound, other than the Obligations.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Controlled Account**" means each Deposit Account and each Securities Account of the Borrower or any other Loan Party (other than Excluded Accounts) that is subject to a Deposit Account Control Agreement or a Securities Account Control Agreement.

"**Creditworthy**" means a Person has a long-term issuer rating of at least Baa3 from Moody's and at least BBB- from S&P.

"**Customer**" means a party that has entered into a Customer Contract with the Borrower for the construction of a Project, including any such parties that are Affiliates of the Borrower.

"**Customer Contract**" means any agreement between the Borrower and a Customer for the construction of all or a portion of any Project, together with all permitted Supplements thereto, pursuant to which Borrower has rights to receive payment from a Customer.

10

"*Customer Payments*" means any payments from a Customer to the Borrower paid under a Customer Contract or otherwise in connection with the Projects.

"*Debtor*" is defined in the Recitals.

"*Debtor Professional*" means any attorney, financial advisor or investment bank proposed to be retained in the Chapter 11 Cases, including Latham & Watkins LLP, Lazard Frères & Co. LLC, Hunton Andrews Kurth LLP and Alvarez & Marsal.

"*Default*" is defined in Section 6.

"*Default Rate*" is defined in Section 7.6.

"*Deposit Account*" means any checking or other demand deposit account maintained by the Borrower and the other Loan Parties, including any "deposit accounts" under Article 9 of the UCC. All funds in such Deposit Accounts (other than Excluded Accounts) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to this Agreement.

"*Deposit Account Control Agreement*" means an effective deposit account control agreement with an account bank in form and substance reasonably satisfactory to the Lenders.

"*Desktop Site Report*" means a report prepared by the Borrower addressing the suitability of the Site for the development, construction and operation of a Project, including flood zone, wetlands, current zoning and zoning requirements, previous land usage, offtake plan, interconnection plan, site control, required permits and status and any other matters reasonably requested by the Lenders.

"*Development Budget*" means, with respect to any Project, a budget describing all material expenditures to be incurred by Borrower or the applicable Project Company from the inception of development of such Project sufficient to achieve all milestones to reach Notice to Proceed, noting which amounts have already been paid, as approved by the Lenders from time to time. Such Development Budget shall also contain a Preliminary Construction Budget.

"*Development Schedule*" means, with respect to any Project, a timeline setting forth all estimates for completion of all material development milestones of such Project necessary to achieve Notice to Proceed, including any material contingencies, such as potential delays to delivery of material equipment, as approved by the Lenders from time to time. Such Development Schedule shall also contain a Preliminary Construction Schedule.

"*DIP Agent*" means "DIP Agent" (as defined in the DIP Order).

"*DIP Commitments*" means Brookfield DIP Commitments, the Carlyle DIP Commitments and the Fundamental DIP Commitments (each as defined in the DIP Order).

"*DIP Facility*" means the DIP Loans made hereunder, and any Roll-Up Loans made hereunder and pursuant to the DIP Order.

"*DIP Intercreditor Agreement*" means (a) that certain Amended and Restated Debtor-in-Possession Intercreditor Agreement entered into on or about the date hereof between FP Solar, the Carlyle DIP Agent, and the Brookfield DIP Agent, and (b) that certain Amended and Restated Junior Lien Debtor-in-Possession Intercreditor and Subordination Agreement entered into on or about the date hereof between FP Solar, the Carlyle DIP Agent, and the Brookfield DIP Agent.

"*DIP Loans*" has the meaning set forth in Section 2.1(a)(ii).

"*DIP Milestones*" means all of the milestones set forth in Annex A attached hereto.

"*DIP Motion*" has the meaning set forth in Section 3.35(a).

"*DIP Obligations*" means "DIP Obligations" (as defined in the DIP Order).

"*DIP Order*" means, as the context may require, the Interim DIP Order or the Final DIP Order, whichever is then applicable.

"*DIP Super-Priority Claim*" has the meaning set forth in Section 3.31(a)(i).

"*Discretionary Permit*" each Permit that is subject to any discretionary approval or authorization by a Governmental Authority, including, without limitation, conditional use permits, special use permits and similar permits requiring such an approval or authorization.

"*Disposition*" means the sale, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  "*Dispose*", "*Disposed*" and "*Disposal*" have correlative meanings.

"*Disqualified Project*" means any Project designated as a "Disqualified Project" by the Lenders to the Borrower in writing from time to time in the Lenders' sole discretion.

"*Draw Forecast*" is defined in Section 2.2(f).

"*Draw Request*" is defined in Section 2.2(a).

"*Early Stage Development Budget*" means, with respect to any Project, a budget showing the total amount of the expected material expenditures to be incurred by Borrower or the applicable Project Company from the inception of development up to Notice to Proceed for such Project, which shall include a breakdown of such total amount into such categories as may be requested by the Lenders, as approved by the Lenders from time to time.  Such Early Stage Development Budget shall also contain a Preliminary Construction Budget.

"*Early Stage Development Schedule*" means, with respect to any Project, a timeline setting forth the expected timing for completion of all material development milestones necessary to achieve Notice to Proceed for a project in the same market as the applicable Project, as approved by the Lenders from time to time.  Such Early Stage Development Schedule shall also contain Preliminary Construction Schedule.

12

"***Enforcement Costs***" is defined in Section 7.8.

"***Environmental Claim***" means any and all liabilities, losses, expenses or other costs incurred in connection with, otherwise arising out of, or the existence of any administrative, regulatory or judicial actions, suits, demands, decrees, claims, liens, judgments, warning notices, notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages, penalties, fees, out-of-pocket costs, expenses, disbursements or reasonable attorneys' or consultants' fees, arising from alleged injury or threat of injury to health, safety or the environment relating in any way to (a) a violation or alleged violation of any Environmental Laws or Permit issued under any Environmental Laws, (b) a Release or threatened Release of Hazardous Substances, or (c) Hazardous Substances, whether or not arising out of legal or administrative proceedings relating to any of the above.

"***Environmental Laws***" means all Applicable Laws relating to the protection of human health or the environment, including without limitation Applicable Laws that govern the use or Release of Hazardous Substances, the regulations adopted and publications promulgated pursuant to all such foregoing laws, any applicable common law legal and equitable principles respecting personal injury, property damage, indemnification (including equitable indemnification) and contribution, and Permits issued pursuant to the foregoing Environmental Laws, but specifically excluding any laws arising under the Occupational Safety and Health Act of 1970.

"***Equity Interest***" means with respect to a Person, any (a) stock, partnership interest, membership interest or other equity interest (whether common, preferred or otherwise) in such Person or (b) any option, warrant or other direct or indirect right to acquire, convert into or exchange for an equity interest in such Person.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***ERISA Affiliate***" means an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of § 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under §414 of the Code.

"***ERISA Plan***" means any employee benefit plan (a) maintained by Borrower or any ERISA Affiliate, or to which any of them contributes or is obligated to contribute, for its employees and (b) covered by Title IV of ERISA or to which Section 412 of the Code applies.

"***Event of Default***" is defined in Section 6.

"***Event of Eminent Domain***" means any compulsory transfer or taking by requisition, confiscation, condemnation, seizure or forfeiture, eminent domain or exercise of a similar power, or transfer under threat of such compulsory transfer or taking of any part of any Project, any Site or any of the other Collateral by any agency, department, authority, commission, board, instrumentality or political subdivision of any State, the United States or another Governmental Authority having jurisdiction or any Person acting under color of any such Government Authority.

"***Event of Loss***" means that any Site or any Project or any part thereof (a) is so damaged that, in the reasonable opinion of the Lenders, such Site and/or such Project or such part thereof cannot reasonably be expected to be promptly (and in any event prior to the Maturity Date) restored

or rebuilt with available funds to a condition upon which construction of the applicable Project can be conducted in material conformity with the System Design for such Project or (b) experiences an Event of Eminent Domain and could not reasonably be expected to promptly (and in any event prior to the Maturity Date) be restored or rebuilt with available funds to a condition upon which construction of the applicable Project could be conducted in material conformity with the System Design for such Project.

"*Event of Loss Prepayment Date*" means the earliest of (a) the date which is seventy-five (75) days after the date on which the Lenders has deemed an Event of Loss to have occurred and (b) the date on which the Proceeds are received with respect to such Event of Loss, and (c) the Maturity Date.

"*Excluded Account*" means any Deposit Account or Securities Account of any Loan Party (and all cash, cash equivalents and other securities or investments credited thereto or deposited therein):  (1) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement, so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement) without the consent of the Required Lenders; (2) that is a trust account; (3) any Deposit Account that constitutes a disbursement account of the Borrower or any Subsidiary (other than the Borrower's primary operating and disbursement account) the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the Loans; or (4) to the extent that it is cash collateral for letters of credit to the extent permitted hereunder.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to any Lender or required to be withheld or deducted from a payment to any Lender (a) Taxes imposed on or measured by net income or net worth (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loans or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.22, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to the Lender's failure to comply with Section 2.22, (d) any U.S. federal withholding Taxes imposed under FATCA and (d) any Taxes imposed as a result of such Lender's gross negligence, fraud or willful misconduct.

"*Executive Order 13920*" means Executive Order 13920 of May 1, 2020: Executive Order on Securing the United States Bulk-Power System, 85 FR 26595 and any rules or regulations promulgated in connection with such order.

"*Existing Services Arrangements*" is defined in Annex A.

"*Exit Fee*" is defined in Section 2.16(b).

"**_Extraordinary Receipts_**" means any cash received not in the ordinary course of business (other than clause (i) which is in the ordinary course), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (d) indemnity payments, (e) refunds, including interconnection deposit refunds and equipment deposit refunds, (f) proceeds from any tax equity financing or similar financing or arrangement, (g) any purchase price adjustment received in connection with any purchase agreement, and (h) any insurance proceeds or other compensation, awards, damages and other payments or relief, including proceeds of liability insurance and business interruption insurance and other payments for interruption of operations; provided that the following payments will not be considered to be Extraordinary Receipts: (i) amounts received from Foley Solar, LLC to PGR Procurement, LLC for the transfer of title of certain equipment which are not reflected in the Approved Budget expected to total approximately $8.9 million and (ii) amounts received from West River Solar, LLC to PGR Procurement, LLC for the transfer of title of certain equipment which are not reflected in the Approved Budget expected to total approximately $15 million.

"**_EWG_**" means an "exempt wholesale generator," as such term is defined in Section 1262(6) of PUHCA and the FERC's regulations thereunder.

"**_FATCA_**" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement entered into in connection with any of the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"**_FERC_**" means the Federal Energy Regulatory Commission and its successors.

"**_Final DIP Order_**" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, approving the relief provided in the Interim DIP Order on a final basis, which shall be form and substance acceptable to the Lender.

"**_Final DIP Order Date_**" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"**_Financial Projections_**" means financial projections prepared by the Borrower with respect to each applicable Project and approved by the Lenders in their sole discretion, showing (a) in the case of a Solar Project, (1) $P_{50}$ case energy production assumptions prepared with PV Syst, (2) operating expense assumptions (including without limitation, operation and maintenance expenses and costs of insurance premiums and Taxes), (3) resulting operating cash flow, (4) revenue assumptions, including under any PPA, any SREC Sale Agreement, any prices for power sold on a merchant basis, and any prices for any SREC sold in the market, and (5) a preliminary Valuation Model which includes the expected Value for each Solar Project and (b) in the case of a Storage Project, (1) operating expense assumptions (including without limitation, operation and

maintenance expenses and costs of insurance premiums and Taxes), (2) resulting operating cash flow, (3) revenue assumptions, including under any Storage Project Revenue Contract and the Storage Project's ability to sell power and other products and provide related services in any wholesale market on a merchant basis, and (4) a preliminary Valuation Model which includes the expected Value for each Storage Project.

"***Financing Project***" means each of the Apex, Two Hearted and Eastover Projects.

"***Financing Subsidiaries***" means, collectively, the Loan Parties that own no substantial assets other than those associated with a Financing Project;

"***Financing Consent***" means each Consent to Collateral Assignment and any other consents or estoppel certificates required under the Loan Documents or reasonably requested by Lenders, executed by any Host and any other Person with an interest in any Site necessary for Borrower or any Project Company to develop, construct, operate, and maintain any Project.

"***First Day Motions***" is defined in Section 2.3(q).

"***First Draw***" is defined in Section 2.2(a)(i).

"***Forbearance Agreements***" means, collectively, the Fundamental Forbearance Agreements and the Brookfield Forbearance Agreement.

"***Forward Looking Information***" is defined in Section 3.26.

"***FPA***" means the Federal Power Act, as amended, and all rules and regulations adopted thereunder.

"***FP Solar***" has the meaning provided in the introductory paragraph hereto.

"***Fundamental Forbearance Agreements***" means that certain (a) Forbearance Agreement dated October 6, 2025 between FP Solar Development I LLC and FP 2021 DEV Holdco, LLC; and (b) Forbearance Agreement dated October 6, 2025 between Solar Construction Lending, LLC and Blue Ridge Power, LLC.

"***Fundamental Silo Entities***" means collectively, (w) FP 2021 Dev Holdco, LLC, PGR 2022 Sponsor Holdco, LLC, PGR Carver Holdco LLC, PGR Dev Carver Holdco LLC, and/or each of their direct and indirect subsidiaries, (x) PGR 2024 Sponsor Holdco, LLC solely with respect to Sirius OpCo Pledgor, LLC and each of its direct and indirect subsidiaries, (y) Cascade Pledgor, LLC solely with respect to Cascade Dev Holdco, LLC and each of its direct and indirect subsidiaries.

"***Fundamental Pledged Intercompany Claims***" means the "Fundamental Pledged Intercompany Claims" as defined in the DIP Order.

"***GAAP***" means generally accepted accounting principles in the United States of America consistently applied.

16

"*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including any State Utility Commission.

"*Guarantee and Security Agreement*" means the Superpriority Senior Secured Debtor-in-Possession Guarantee and Security Agreement dated the date hereof by and among Borrower and each other Loan Party party thereto and FP Solar, as agent for the Lenders.

"*Hazardous Substances*" means any hazardous substances, pollutants, contaminants, wastes, or materials (including petroleum (including crude oil or any fraction thereof), petroleum wastes, radioactive material, hazardous wastes, toxic substances, or asbestos or any materials containing asbestos) designated, regulated, or defined under or with respect to which any requirement or liability may be imposed pursuant to any Environmental Law.

"*Hedging Agreement*" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Holding Company*" means Pine Gate Development, LLC, a North Carolina limited liability company.

"*Host*" means any landowner who (a) leases a Site to a Project Company or (b) who has granted an option to lease or entered into a contract to sell a Site to a Project Company.

"*Importation Tariff*" means any tariff or duty or similar Tax, fee or charge upon the equipment included or intended to be included in a Project, by virtue of the importation of such equipment.

"*Indebtedness*" of any Person at any date means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable and accrued expenses arising in the ordinary course of business, (d) all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as capital leases in respect of which such Person is liable, (e) all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property), (f) all deferred obligations of such Person to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit or other similar instrument, (g) all Indebtedness of others secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person or is non-recourse to such Person, (h) all Indebtedness of others guaranteed directly or indirectly by such Person or as to which such Person has an obligation substantially the economic equivalent of a guarantee, (i) all net ordinary course settlement or other obligations of such Person under any Hedging Agreement or (j) all indebtedness created or arising

17

under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement are limited to repossession or sale of such property).

"*Indemnified Party*" has the meaning set forth in Section 8.9(a).

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under this Agreement and (b) to the extent not otherwise described in (a), Other Taxes.

"*Insurance Consultant*" means BRP D&M Insurance, LLC.

"*Interconnection Agreement*" means any applicable interconnection agreement between the applicable Utility and the applicable Project Company in connection with any Project, together with all Supplements thereto.

"*Interconnection Deposit*" is defined for each Project in the Development Budget for such Project.

"*Intercreditor Agreement*" means, individually or collectively, each of (a) that certain Intercreditor Agreement, dated October 6, 2025 among FP Solar, Brookfield Agent and the Carlyle Prepetition Noteholders, and (b) that certain Junior Lien Intercreditor and Subordination Agreement, dated October 6, 2025 among FP Solar, Brookfield Agent and the Carlyle Prepetition Noteholders.

"*Interest Rate*" means, as of any date of determination, (a) with respect to any New Money DIP Loan, the highest of (i) 14.00% per annum (compounded monthly) and (ii) the highest of the non-default interest rates agreed to at any time with respect to the Brookfield Credit Agreement, Carlyle Prepetition Note Purchase Agreement, any Additional DIP Facility and any other financing entered into by the Borrower or any of its Subsidiaries on or after the Interim DIP Facility Effective Date or (b) with respect to any Roll-Up Loan, the rate of interest as set forth in the Prepetition Credit Agreements.

"*Interim DIP Facility Effective Date*" means the date on which each of the conditions set forth in Section 2.3 hereof have been satisfied (or waived by the Required Lenders in their sole discretion).

"*Interim DIP Order*" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing in the form attached as **Exhibit C** hereto, together with all extensions, modifications and amendments thereto, in each case in form and substance acceptable to the Lenders.

"*Interim DIP Order Date*" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"*Investments*" has the meaning set forth in Section 5.7.

"*Late Charge*" has the meaning set forth in Section 2.11.

18

"**Lender**" has the meaning provided in the introductory paragraph hereto.

"**Lender Advisors**" means Guggenheim Securities, LLC, Sidley Austin LLP and any other local or special counsel or other professionals retained by the Lenders.

"**Lender's Account**" means Lender's Account No. 80010327353 at First Republic Bank. The payment instructions for such account are set forth on Schedule 1.1B.

"**Lien**" means, with respect to an asset, any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge, warrant, deed of trust, claim, restriction (whether on voting, sale, transfer, disposition or otherwise), assessment, variance, purchase right, right of first refusal, reservation, encroachment, irregularity, deficiency, default, defect, adverse claim, interest, restrictive covenant, easement or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease), and the authorized filing of, or any agreement to give, any financing statement relating to any such asset or property under the Uniform Commercial Code of any jurisdiction or any interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement.

"**Loan**" means a DIP Loan.

"**Loan Documents**" means this Agreement, the Security Documents, the DIP Order, each other "Fundamental DIP Document" (as defined in the DIP Order) and any financing statements or other similar documents filed, recorded or delivered in connection with the foregoing, and any other instrument, document or agreement both now and hereafter executed, delivered or furnished by any Loan Party evidencing, guaranteeing, securing, or in connection with this Agreement or all or any part of the Obligations, together with all Supplements thereto.

"**Loan Expenses**" is defined in Section 2.3(l).

"**Loan Ledger**" is defined in Section 2.10.

"**Loan Party**" means each of the Borrower, the Fundamental Silo Entities, and the Shared Obligors.

"**Loan Payment Date**" means (x) the 15th day of each calendar month, and (y) the Maturity Date.

"**Loan Proceeds**" means all amounts advanced by any Lender as a Loan, whether advanced directly to Borrower or otherwise.

"**Major Storage Equipment**" means battery modules, battery enclosures with related HVAC and fire suppression systems, battery control systems, inverters and transformers.

"**Material Adverse Effect**" means (i) any change, circumstance, occurrence, or effect that is, or could reasonably be expected to be, materially adverse to (A) the operations, business, properties, condition (financial or otherwise), of the Borrower and the Project Companies taken as

a whole, other than any material and adverse effect on the value of the Projects that is the result of market or other circumstances or occurrences not under the control of the Borrower, including, without limitation, impacts related to COVID-19, (B) the Borrower's ability to perform the Obligations, (C) the legality, validity, binding effect or enforceability of this Agreement or any other Loan Document, (D) [reserved], or (E) [reserved]; or (ii) any change, circumstance, occurrence, or effect that is, or could reasonably be expected to be, materially adverse to (x) the rights of the Lenders under this Agreement, (y) title to or value of the Projects and the other Collateral taken as a whole, other than any material and adverse effect on the value of the Projects that is the result of market or other circumstances or occurrences not under the control of the Borrower, including, without limitation, impacts related to COVID-19, or (z) the validity or priority of the security interest in the Projects and the other Collateral taken as a whole created and granted by the Loan Documents; <u>provided</u> that, for the avoidance of doubt, the occurrence of a Project Specific Adverse Effect with respect to a Project shall not automatically constitute a Material Adverse Effect; <u>provided</u> further that, notwithstanding anything to the contrary in this defined term, none of the matters described in limbs (i) or (ii) shall be a Material Adverse Effect to the extent arising from events leading up to and customarily resulting from the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, including any decline in business relationships, reputation, or financial performance resulting from the Chapter 11 Case filing and circumstances leading thereto); <u>provided</u> further that any effects resulting from changes in general economic conditions, financial markets, industry conditions, or geopolitical events, except to the extent such efforts have a materially disproportionate impact on the Borrower relative to similarly situated companies shall not constitute a Material Adverse Effect.

"***Material Contracts***" with respect to any Person, means each contract to which such Person is a party involving aggregate consideration payable by or to such Person equal to at least $250,000, and each Material Project Document; <u>provided</u> that no contract to which Blue Ridge Power, LLC is a party shall be a Material Contract.

"***Material Project***" means those Projects set forth on <u>Schedule 1.1C</u>.

"***Material Project Counterparty***" means a party to a Material Project Document other than a Loan Party.

"***Material Project Document***" means each PPA, each Site Control Agreement, each Interconnection Agreement, any engineering, procurement and/or construction contract, any SREC Sale Agreement, each Storage Project Revenue Contract, any material module, inverter, racking, tracker, Major Storage Equipment, or other original equipment manufacturer or supply agreement and any corresponding warranties, but only if financed hereunder, and all other documents listed on <u>Schedule 3.16</u>, and any other documents material to the development, design, construction, installation, maintenance, ownership or operation of any Project, whether executed before or after the Interim DIP Facility Effective Date, together with all permitted Supplements thereto, provided that service contracts with third party consultants and other contractors to perform ordinary course development work on commercially reasonable terms shall not be considered Material Project Documents; <u>provided</u> that no contract to which Blue Ridge Power, LLC is a party is a Material Project Document.

"**Maturity Date**" means the earliest to occur of (a) March 31, 2026 (the "**Scheduled Maturity Date**"); (b) the effective date of a chapter 11 plan in the Chapter 11 Cases; (c) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise, except ACT or any sale resulting from the sale processes contemplated by the Stalking Horse APA or the Additional DIP Facilities (such transaction being the "**Sale Transaction**"); (d) the date of termination of the Lenders' commitments and the acceleration of any outstanding DIP Loans under the Loan Documents; (e) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; (f) the date that is 30 days after the Petition Date or such later date as agreed by the Lenders, unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date; (g) the date on which the Debtors' right to use Cash Collateral in accordance with the Interim DIP Order or Final DIP Order is terminated, as applicable; (h) the occurrence of the maturity date under or the acceleration of any Additional DIP Facility; and (i) the date on which the Debtors, without the prior written consent of the Required Lenders file or express written support for bidding procedures, sale processes, or transactions that are not acceptable to the Required Lenders or any plan of liquidation or reorganization (or related disclosure statement) that is not an Acceptable Plan, in each case, concerning the Loan Parties or the Collateral.

"**MBR Authority**" means a final and non-appealable order from FERC pursuant to Section 205 of the FPA authorizing the sale at wholesale of electric energy, capacity and ancillary services at market-based rates, accepting a tariff providing for such sales, and granting such waivers and blanket authorizations as are customarily granted by FERC to a similarly-situated company that sells wholesale electric energy, capacity and ancillary services at market-based rates, including blanket authorization to issue securities and assume liabilities pursuant to Section 204 of the FPA; provided that such order from FERC shall be deemed to be final and non-appealable upon issuance in the event that no third party intervenes in the proceeding.

"**Milestone Tracker**" means a spreadsheet prepared by the Borrower listing all Projects, the nameplate capacity of each Project, and the status of development milestones for each Project.

"**MOIC**" means, as of any date of calculation, with respect to any Advance, a ratio equal to (i) the sum of all fees (including original issue discount, commitment fees, the Commitment/Funding Fee and the Exit Fee), interest, principal, in respect of the principal amount repaid, and other payments received in cash by the Lenders in respect of the New Money DIP Loans since the Interim DIP Facility Effective Date (excluding, for the avoidance of doubt, any reimbursement of out of pocket costs or expenses, administrative agent fees, fees paid to the Lender Advisors and any indemnification payments made to the Lenders), as the numerator, divided by (ii) the New Money DIP Commitments (determined prior to giving effect to any reduction of the New Money DIP Commitments or extension of the New Money DIP Loans hereunder) as the denominator.

"**MOIC Event**" means the occurrence of any of the following: (a) the payment in full (or other retirement including pursuant to a credit bid) of the New Money DIP Loans, (b) a reduction of the New Money DIP Commitments to zero Dollars ($0) other than as a result of the disbursement of such New Money DIP Loans, (c) any acceleration of the Obligations (including, for the avoidance of doubt, upon the commencement of any insolvency proceeding) or (d) the Maturity Date.

"*Mortgage*" means, with respect to each Project, each mortgage, deed of trust or similar security instrument, executed by the Project Company owning such Project in favor of the Lenders, together with all Supplements thereto.  For each condition precedent and covenant requiring the execution of a Mortgage, such Mortgage shall be in form and substance reasonably acceptable to the Required Lenders.

"*Moody's*" means Moody's Investor Service, or any successor entity.

"*Multiemployer Plan*" means any ERISA Plan that is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which Borrower or any ERISA Affiliate is making, or has an obligation to make, contributions, or has made, or has been obligated to make, contributions since the date which is six years immediately preceding the Interim DIP Facility Effective Date.

"*Net Cash Proceeds*" means:

(a)        with respect to the Disposition of any asset by the Borrower or any of its Subsidiaries or any Event of Loss, the excess, if any, of (i) cash and cash equivalents received in connection with such Disposition or Event of Loss over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Event of Loss and required to be repaid in connection with such Disposition or Event of Loss (other than Indebtedness under the Loan Documents and any other Indebtedness secured by a Lien that is *pari passu* with or expressly subordinated to the Lien on the Collateral securing the Obligations), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Subsidiary in connection with such Disposition or Event of Loss and restoration costs following an Event of Loss and (C) Taxes paid or reasonably estimated to be payable in connection therewith (including Taxes imposed on, or that would be payable upon, the distribution or repatriation of any such Net Cash Proceeds);

(b)        with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Subsidiary, or the issuance of any Equity Interests by the Borrower or any direct or indirect parent of the Borrower, the excess, if any, of (A) the sum of the cash and cash equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred in connection with such incurrence.

"*NewCo*" is defined in the definition of "Stalking Horse APA".

"*New Independent Director*" has the meaning assigned to such term in the Prepetition FP 2021 Credit Agreement.

"*New Money DIP Commitment*" means the obligation of each Lender, severally and not jointly, to make New Money DIP Loans to the Borrower hereunder in the amount set forth opposite such Lender's name on <u>Schedule 2.1</u>. The aggregate amount of New Money DIP Commitments on the Interim DIP Facility Effective Date is $[64,633,622.97].

"*New Money DIP Loans*" has the meaning set forth in Section 2.1(a)(i).

"*Notice to Proceed*" means a full notice to proceed or other similar document issued by the Borrower or a Project Company to one or more contractors to commence the full engineering, procurement and construction services for a Project.

"*Obligations*" means all present and future Indebtedness, loans, advances, debts, liabilities (including any indemnification or other obligations that survive the termination of this Agreement and other Loan Documents) and obligations of any kind and nature whatsoever (including guarantee obligations) of the Borrower and the other Loan Parties to the Lenders of any kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, both now existing and hereafter arising under, as a result of, on account of, or in connection with, the Loans, this Agreement, and any and all Supplements hereto or thereto, or any of the other Loan Documents, including, without limitation, future disbursements, principal, interest, PIK Interest, indemnities, fees, late charges, Loan Expenses, Enforcement Costs, other payments or amounts paid in kind, and costs and expenses, whether direct, contingent, joint, several, matured or unmatured, whether from time to time reduced and thereafter increased, or entirely extinguished and thereafter re-incurred, together with all extensions, renewals and replacements thereof.

"*OFAC*" is defined in Section 3.25(d)(i).

"*Offtaker*" means any purchaser of power under a PPA or of power, capacity, resource adequacy, or distribution services under a Storage Project Revenue Contract.

"*Operative Documents*" means, collectively, the Loan Documents and the Material Contracts.

"*Organizational Documents*" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Other Connection Taxes*" means, with respect to the Lenders, Taxes imposed as a result of a present or former connection between any Lender and the jurisdiction (or any political subdivision thereof) imposing such Tax (other than connections arising solely from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" means any and all present or future stamp, court, recording, filing, intangible, documentary or similar Taxes arising from any payment made under, from the execution, delivery, enforcement or registration of, or performance under, or from the receipt or perfection of a security interest under or otherwise with respect to this Agreement or any other

23

Loan Document, other than (i) Excluded Taxes and (ii) any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"***O&M Services Agreement***" means the "O&M Services Agreement" (as defined in the DIP Order).

"***O&M Services Agreement Assumption Order***" means an order by the Bankruptcy Court approving assumption of the O&M Services Agreement.

"***Paid in Full***" has the meaning specified in the DIP Order.

"***PATRIOT Act***" has the meaning set forth in Section 8.21.

"***Payment Direction Letters***" means those letters and/or consents (a) [reserved], and (b) executed for the benefit of the Lenders by the applicable Project Company, irrevocably directing the applicable Utility to pay any payment or reimbursement due under the applicable Interconnection Agreement to or as directed by the Lenders.  To the extent that any Financing Consent includes payment direction acceptable to the Required Lenders, such Financing Consent shall also constitute a "Payment Direction Letter".

"***PBGC***" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under Title IV of ERISA.

"***Permit***" means any action, approval, consent, waiver, exemption, variance, franchise, order, permit, authorization, determination, filing, notice, registration right or license of, with, from, or required or approved by a Governmental Authority or any Utility.

"***Permitted Exclusions***" is defined in Section 4.28(c).

"***Permitted Indebtedness***" shall mean Indebtedness consisting of any of the following: (a) the Obligations and any Indebtedness to any Lender, (b) trade or other similar Indebtedness incurred in the ordinary course of developing a Project in accordance with the Project Budget and not more than ninety (90) days past due, (c) any Interconnection Deposits or any other cash, bond or letter of credit posted or provided by a Project Company with respect to an Interconnection Agreement or other interconnection study for the relevant Project, (d) Indebtedness incurred by the endorsement of negotiable instruments for deposit or collection in the ordinary course of business, (e) any Indebtedness which is immediately used to repay the Obligations in full, (f) solely with respect to the Shared Obligors, the Indebtedness incurred under the Prepetition FP 2021 Credit Agreement, the Amended BRP Agreement, the Carlyle Prepetition Note Purchase Agreement, the Brookfield Credit Agreement, and the Additional DIP Facilities, in each case as in effect on the date hereof or as amended in accordance with the Intercreditor Agreement and/or DIP Intercreditor Agreement and (g) Indebtedness existing prior to October 6, 2025 arising or resulting from surety bonds issued to support the obligations of Blue Ridge Power, LLC (including indemnity and reimbursement obligations owed to the surety).

"***Permitted Liens***" means (a) the rights and interests of the Lenders created by this Agreement and the other Loan Documents; (b) Liens for any Tax, assessment or other governmental charge not yet due or that are being contested in good faith by appropriate

proceedings, so long as (i) enforcement of the contested Tax, assessment or other charge is effectively stayed for the entire duration of such contest, and such proceedings shall not interfere in any material respect with the normal operation or disposition of any Project or any Site, and (ii) a bond other security reasonably satisfactory to the Lenders has been posted or provided in such manner and amount reasonably satisfactory to the Lenders so as to ensure that any Taxes, assessments, accrued interest thereon or other charges or fees determined to be due may be promptly paid in full when such contest is determined, or other adequate provision for payment thereof shall have been made, and such amounts are promptly paid when due after resolution of such contest if required by such resolution; (c) materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, arising in the ordinary course of business for amounts not yet due or for amounts being contested in good faith and by appropriate proceedings so long as (i) such proceedings shall not interfere in any material respect with the normal operation or disposition of any Project or any Site and (ii) (A) a bond to discharge the Lien in the form and amount as required by Applicable Law or (B) a bond or other security reasonably satisfactory to the Lenders has been posted or provided in such manner and amount reasonably satisfactory to the Lenders so as to ensure that any amount determined to be due will be promptly paid in full when such contest is determined, and such amounts are promptly paid when due after resolution of such contest if required by such resolution; (d) exceptions to title with respect to any real property interest of Borrower that do not interfere in any material respect, in the Lenders' reasonable judgment (for the avoidance of doubt, any such exception included in a title commitment approved by the Lenders shall be considered approved), with Borrower's or the applicable Project Company's ability to own and operate each Project in the ordinary course of business; (e) Liens, deposits or pledges to secure statutory obligations or performance of bids, tenders, contracts (other than for the repayment of Indebtedness or as covered under clause (c) of this definition) or leases, incurred in the ordinary course of business, not to exceed Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate at any time; (f) Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and for the payment of which cash reserves, bonds or other security (in the case of any such other security, in form and substance reasonably acceptable to the Required Lenders) have been provided or are fully covered by insurance; (g) involuntary liens created by the Project Documents which are junior to the Lien of the Loan Documents, in an aggregate sum of less than Two Hundred Fifty Thousand Dollars ($250,000), and which the Borrower or applicable Project Company is contesting in good faith by appropriate proceedings; (h) any other Lien not described in (a) through (g) above so long as any such Liens (1) shall not have been voluntarily granted by the Borrower or applicable Project Company, (2) shall be for an amount not to exceed Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate at any time, and (3) either are not yet due and payable or are being contested in good faith and are vacated, discharged, stayed or bonded pending appeal within 30 days after the creation thereof; (i) a Lien which is superior to the interest of the applicable Project Company in a Site pursuant to the terms and conditions of a Site Control Agreement, provided that the Borrower has received a subordination, attornment and non-disturbance agreement in a form reasonably acceptable to the Required Lenders, (j) minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of property or minor imperfections in title which do not impair the property affected thereby for the purpose for which title was acquired or interfere with the operation of any Project as contemplated by the Operative Documents, (k) any other Lien or encumbrance acceptable to the Lenders, including as

25

set forth on Schedule 5.2, (l) solely with respect to the Shared Obligors, pari passu liens on the assets of the Shared Obligors subject to the Intercreditor Agreement or DIP Intercreditor Agreement and (m) any Lien arising from the non-performance of Blue Ridge Power, LLC under any contract with a Project Company.  With respect to assets of the Loan Parties and Collateral, in each case consisting of Equity Interests, only the items included in clauses (a) and (l) shall be Permitted Liens.

"**Person**" means any individual, trustee, corporation, general partnership, limited partnership, limited liability company, limited liability limited partnership, joint stock company, trust, unincorporated organization, bank, business association, firm, joint venture or Governmental Authority.

"**Petition Date**" is defined in the Recitals.

"**PIK Interest**" is defined in Section 2.18.

"**PPA**" means (i) each "Power Purchase Agreement" identified on Schedule 3.16, and (ii) each power purchase agreement or similar agreement (including, without limitation, power hedging agreements in wholesale markets) now existing or hereafter executed by any Project Company, in each case together with all permitted Supplements thereto.

"**Preliminary Construction Budget**" means, with respect to any Project, a budget showing the total amount of the expected material construction expenditures to be incurred by Borrower or the applicable Project Company from Notice to Proceed through final completion of such Project, which shall include a breakdown of such total amount into such categories as may be requested by the Lenders, as approved by the Lenders from time to time.

"**Preliminary Construction Schedule**" means, with respect to any Project, a timeline setting forth the expected timing for completion of all material construction milestones necessary to achieve final completion for a project in the same market as the applicable Project, as approved by the Lenders from time to time.

"**Prepetition Collateral**" means the "Fundamental Prepetition Collateral" (as defined in the DIP Order).

"**Prepetition Credit Agreement**" means the "Fundamental Prepetition Credit Agreements" (as defined in the DIP Orders).

"**Prepetition FP 2021 Credit Agreement**" has the meaning set forth in the Recitals.

"**Prepetition Lenders**" means, collectively, the "Lenders" as defined in the applicable Prepetition Credit Agreement.

"**Prepetition Liens**" means the "Fundamental Prepetition Liens" (as defined in the DIP Order).

"**Prepetition Loans**" means the "Fundamental Prepetition Loans" (as defined in the DIP Order).

"**Prepetition Loan Documents**" means (a) the Prepetition Credit Agreements and (b) each of the other "Loan Documents" (as defined in the applicable Prepetition Credit Agreement).

"**Prepetition Secured Obligations**" means the "Fundamental Prepetition Secured Obligations" (as defined in the DIP Order).

"**Prepetition Secured Parties**" means each of the "Lenders" and each other "Secured Party" as defined in the applicable Prepetition Credit Agreement.

"**Proceeds**" means collectively, Net Cash Proceeds, Casualty Insurance Proceeds, Condemnation Proceeds, any refunded Interconnection Deposits or other refunds of deposits or return of security under any Project Document, and any termination payments received under any PPA or any other Project Document.

"**Prohibited Equipment**" means any equipment that is or will be subject to any prohibition or restriction on the acquisition, importation, transfer, or installation of any equipment in the United States, related to the country or location of origin, including the Uyghur Forced Labor Prevention Act, any regulations promulgated thereunder and any applicable withhold release order, but not including import or export duties, tariffs, and other similar charges or fees levied or assessed by any jurisdiction (including current and future antidumping or countervailing duties).

"**Project**" means each of the Solar Projects and each of the Storage Projects.

"**Project Budget**" means with respect to any Project, the Development Budget, Early Stage Development Budget, Construction Budget and/or Preliminary Construction Budget, as applicable, of such Project.

"**Project Company**" means each owner of a Project listed on <u>Schedule 1.1A</u> and any additional Project Companies approved by the Lenders.

"**Project Counterparty**" means a party to a Project Document other than a Loan Party.

"**Project Debt Financing**" means Indebtedness consisting of senior construction, interim or long-term debt financing or refinancing for the acquisition, development, construction, installation or operation of one or more Financing Project(s), including back-leverage borrowing, sale-leaseback transactions, letters of credit or bonds with respect to any Financing Project assets required under applicable material project agreements, tax credit financing bridges and member loans required to be provided pursuant to Tax Equity Financing Documents.

"**Project Debt Financing Documents**" means, with respect to any Financing Subsidiary, (i) any financing agreement related to its applicable Project Debt Financing, and (ii) any documents granting collateral security in connection with such Project Debt Financing.

"**Project Document Default**" is defined in Section 6.10.

"**Project Documents**" means, collectively, (a) each Material Project Document and any Additional Project Document executed after the Interim DIP Facility Effective Date, and (b) any and all other contracts to which the Borrower or any Project Company is a party or of which the

27

Borrower or any Project Company is a beneficiary which relates to the development, design, construction, installation, maintenance, ownership, operation, sale or delivery of any Project, together with all Supplements thereto.

"***Project Incentives***" means all incentives, subsidies, programs, credits, or other benefits available under Applicable Law or available from a Governmental Authority or Utility that are necessary for a Project to receive the projected revenues set forth in the Financial Projections, including, by way of example, SRECs/renewable portfolio standards, net metering, net metering aggregation, virtual net metering, community solar programs, feed in tariffs, and state and federal Tax credits.

"Project Purchaser" means any Person that is not an Affiliate of the Borrower that purchases a Project from the Company or a Subsidiary.

"***Project Sale***" means a Disposition of (i) all of the direct or indirect capital stock or similar interests in any Project Company or (ii) substantially all of the property or assets (including an undivided interest therein) of any Project Company, in each case, to a Project Purchaser, not including, for the avoidance of doubt, through the sale of such interests or assets (as applicable) to a tax equity vehicle.

"***Project Schedule***" means with respect to any Project, the Development Schedule, Early Stage Development Schedule, Construction Schedule and/or Preliminary Construction Schedule, as applicable, of such Project.

"***Project Senior Financing Consent***" means the Project Senior Financing Guarantee Consents, the Project Senior Financing Lien Consents, the Project Senior Financing Change of Control Consents, the Project Senior Financing Independent Director Consent and the Project Senior Financing Cross-Default Consents.

"***Project Senior Financing***" means any (a) Project Debt Financing or (b) Tax Equity Financing.

"***Project Senior Financing Change of Control Consent***" means the necessary consents or waivers by all or any of the lenders or investors (or, to the extent requested by the Lenders, counterparties to power purchase or similar agreements) under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to allow a change of control or similar transaction to occur (whether through an exercise of remedies, an asset sale or otherwise) wherein the Lenders and/or any affiliate thereof were to obtain control or the direct or indirect beneficial ownership of the outstanding voting and/or economic equity interests of such Financing Subsidiary, in each case without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"***Project Senior Financing Collateral and Guarantee Requirement***" means the requirement that the Loan Parties cause each of the Financing Subsidiaries to guarantee the Obligations and grant Liens on substantially all its assets to secure the Obligations.

"***Project Senior Financing Cross-Default Consent***" means the necessary consents or waivers by all or any of the lenders or investors (or, to the extent requested by the Lenders,

counterparties to power purchase or similar agreements) under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to permit the Sponsor, and each of its Subsidiaries (including Blue Ridge Power, LLC) to commence insolvency proceedings under the Bankruptcy Code without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"***Project Senior Financing Documents***" means any (a) Project Debt Financing Documents or (b) Tax Equity Financing Documents.

"***Project Senior Financing Guarantee Consent***" means the necessary consents or waivers by all or any of the lenders or investors under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to cause such Financing Subsidiary to become a Loan Party without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"***Project Senior Financing Independent Director Consent***" means the necessary consents or waivers by all or any of the lenders or investors under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to allow a New Independent Director to be appointed by the Lenders at the board of directors (or equivalent governing body) of the applicable direct or indirect parent entity of such Financing Subsidiary without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"***Project Senior Financing Junior Liens***" means any Liens incurred by a Financing Subsidiary in favor of the Lenders to secure the Obligations on a second priority basis junior only to the liens securing any Project Debt Financing.

"***Project Senior Financing Lien Consent***" means the necessary consent or waiver by all or any of the lenders or investors under the terms of the applicable Project Senior Financing to which a Financing Subsidiary is a party to cause such Financing Subsidiary to cause its assets and property to be subject to Project Senior Financing Junior Liens without triggering an event of default or other material adverse consequences under such Project Senior Financing.

"***Project Specific Adverse Event***" means with respect to a Project: (a) any change, circumstance, occurrence, or effect that could reasonably be expected to materially and adversely affect (i) the title to the applicable Site or the Value of such Project as set forth in the applicable Valuation Model or (ii) the validity or priority of any Lender's security interest in such Project or the related Project Company, and (b) other than a Disqualified Project, any Event of Default shall have occurred and is continuing as a result of events, conditions or circumstances relating to such Project.

"***Project Surety Bonds***" has the meaning set forth in Section 2.14(c).

"***PUHCA***" means the Public Utility Holding Company Act of 2005, as amended, and all rules and regulations adopted thereunder.

"***PURPA***" means Public Utility Regulatory Policies Act of 1978, as amended, and all rules and regulations adopted thereunder.

29

"***Qualified Bid***" has the meaning specified in the Bidding Procedures Order.

"***Qualified Construction Stage Project***" is defined in the Prepetition FP 2021 Credit Agreement.

"***Qualified Early Stage Project***" is defined in the Prepetition FP 2021 Credit Agreement.

"***Qualified Late Stage Project***" is defined in the Prepetition FP 2021 Credit Agreement.

"***Qualified Mid Stage Project***" is defined in the Prepetition FP 2021 Credit Agreement.

"***Qualified Project***" means each Solar Project and Storage Project which is a Qualified Early Stage Project, Qualified Mid Stage Project, Qualified Late Stage Project or Qualified Construction Stage Project.

"***Qualified Spend***" means with respect to the Approved Costs of any Project, the portion thereof consisting of: (i) refundable deposits made or to be made, including any performance security and assurance posted or to be posted as cash, pursuant to any applicable Material Project Documents, (ii) costs related to the procurement of major items of equipment that are related solely to such Project, (iii) costs defined in a scope of pre-construction on-site work which are intended to manage construction schedules and weather constraints (iv) costs of purchasing fee ownership of land that will constitute a Site; provided, however, that the determination of whether any Approved Costs constitute Qualified Spend shall be made by the Lenders in its sole and reasonable discretion.

"***Qualifying Facility***" means a cogeneration facility or a small power production facility that is a qualifying facility under 18 CFR 292, Subpart B.

"***Release***" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, emitting, escaping, emptying, seeping, placing or the like, into or upon any land or water or air, or otherwise entering into the environment.

"***Renewable Portfolio Standard***" means any Applicable Laws that establish rules for the creation, buying, selling and retirement of SRECs.

"***Replacement Additional DIP Facility***" is defined in 6.7(v).

"***Required Lenders***" means, as of any date of determination, Lenders holding more than 50% of the sum of the (i) unused New Money DIP Commitments and (ii) the outstanding principal amount of Loans.

"***Reportable Event***" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty (30) day notice period is waived by the PBGC.

"***Restricted Payment***" is defined in Section 5.3.

"***Responsible Officer***" means, in respect of any Loan Party, the chief executive officer, chief financial officer, chief operating officer or the president, any vice president, treasurer, or any

secretary of such Person, as the context may require, or any other officer, director or representative of such Person having (x) substantially the same authority and responsibility or designated by the chief executive officer, president, managing member, or such Person's board of directors to act in such capacity or (y) day-to-day supervisory responsibility for the management of the Loan Documents.

"***Roll-Up Loans***" is defined in Section 2.1(a)(ii).

"***S&P***" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., or any successor entity.

"***Sale Assets***" means the assets of FP 2021 Dev Holdco, LLC, PGR 2021 Holdco 17, LLC, Cascade Dev Holdco, LLC, PGR Carver Holdco, LLC, PG Dev Carver Holdco, LLC, ACT Power Services Holding Company Guarantor, LLC, Sirius OpCo Pledgor, LLC and/or each of their direct and indirect subsidiaries.

"***Sale Milestone***" is defined in Annex A.

"***Sale Order***" is defined in Annex A.

"***Sale Transaction***" is defined in the definition of "Maturity Date".

"***Sanctions***" is defined in Section 3.26(d)(i).

"***Scheduled Maturity Date***" is defined in the definition of "Maturity Date".

"***Second Day Orders***" is defined in Section 2.5(c).

"***Second Draw***" is defined in Section 2.2(a)(ii).

"***Securities Account***" means any securities account maintained by the Borrower and the other Loan Parties, including any "security accounts" under Article 9 of the UCC. All funds in such Securities Accounts (other than Excluded Accounts) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Securities Accounts, subject to this Agreement.

"***Securities Account Control Agreement***" means an effective securities account control agreement with an account bank in form and substance reasonably satisfactory to the Lenders.

"***Security Documents***" means the DIP Order, the Guarantee and Security Agreement and any other instrument, document or agreement granting or otherwise relating to a security interest in the Collateral.

"***Shared DIP Collateral***" consists of the assets of Loan Parties that are (with the consent of the Required Lenders) obligors under one or more Additional DIP Facilities.

"*Shared Obligors*" means the Sponsor and each Subsidiary of the Sponsor that is also an obligor on the Brookfield Credit Agreement, the Carlyle Prepetition Note Purchase Agreement or any Additional DIP Facility.

"*Silo*" means any of the Brookfield Silo Entities, Carlyle Silo Entities or Fundamental Silo Entities, as applicable.

"*Site*" means the real estate on which a Project is or will be located, and which either owned in fee or which is described in and subject to the applicable Site Control Agreement.

"*Site Control Agreement*" means (i) each Site Control Agreement identified on Schedule 3.16, (ii) each other option to obtain a lease, or obtain an easement to use or purchase all or any portion of a Site, and (iii) each other ground lease, site lease, site license, easement or similar agreement now existing or hereafter executed by any Project Company, in each case together with all permitted Supplements thereto.

"*Solar Construction Lender*" has the meaning provided in the introductory paragraph hereto.

"*Solar Project*" means each of the solar photovoltaic electric generating facilities and solar photovoltaic electric generating plus storage facilities identified on Schedule 1.1A to be developed by the Borrower and/or Project Companies and any additional Solar Projects that are approved by the Lenders in writing in its sole discretion.  At the Lenders' reasonable discretion, Schedule 1.1A may be updated from time to time to reflect the addition of any Solar Projects as approved by the Lenders as well as the removal or release of any Solar Projects as provided herein.

"*Solvent*" with respect to any Person as of any date of determination, means that on such date (a) the present fair salable value of the property and assets of such Person exceeds the debts and liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the property and assets of such Person is greater than the amount that will be required to pay the probable liability of such Person on its debts and other liabilities, including contingent liabilities, as such debts and other liabilities become absolute and matured, (c) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts and liabilities, including contingent liabilities, beyond its ability to pay such debts and liabilities as they become absolute and matured, and (d) such Person does not have unreasonably small capital (or access to capital via an enforceable contractual obligation) with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*Specified Event*" means the events and circumstances that have occurred prior to the date hereof that are listed on **Annex B** hereto under the heading "Specified Event".

"*Specified EOD*" means the events and circumstances that have occurred prior to the date hereof that are listed on **Annex B** hereto under the heading "Specified EOD".

"*Sponsor*" means Pine Gate Renewables, LLC, a North Carolina limited liability company.

"**SREC**" means a solar renewable energy certificate, or similar certificate or asset, as defined in any SREC Sale Agreement and/or in accordance with the applicable Renewable Portfolio Standard and issued in accordance with Applicable Laws.

"**SREC Purchaser**" means any purchaser of SRECs under an SREC Sale Agreement.

"**SREC Sale Agreement**" means (i) each "SREC Sale Agreement" identified on Schedule 3.16, (ii) each agreement for the sale of SRECs now existing or hereafter executed by the Borrower or any Project Company, in each case together with all permitted Supplements thereto.

"**Stalking Horse APA**" means a stalking horse asset purchase agreement with an entity formed by the Lenders and the Prepetition Lenders ("**NewCo**") that provides for (a) the sale of the Acquired Assets and is otherwise in form and substance mutually acceptable to the Lenders and (b) provides for expense reimbursement in the form of a superpriority expense claim in the event that the Debtors consummate a transaction in connection with the Acquired Assets other than the sale of such Acquired Assets to NewCo.

"**State**" means each State in which a Project is located.

"**State Utility Commission**" means, as applicable, any State's public service commission or public utility commission, however titled.

"**Storage Project**" means each of the standalone battery energy storage system facilities identified on Schedule 1.1A to be developed by the Borrower and/or Project Companies and any additional Storage Projects that are approved by the Lenders in writing in its sole discretion. At Lenders' reasonable discretion, Schedule 1.1A may be updated from time to time to reflect the addition of any Storage Projects as approved by the Lenders as well as the removal or release of any Storage as provided herein.

"**Storage Project Revenue Contract**" means any contract for the sale or provision of power, capacity, resource adequacy, or distribution services, or any similar agreement, listed on Schedule 3.16, or any other contract or agreement that produces or is expected to produce revenue for a Storage Project.

"**Successful Bid**" has the meaning specified in the Bidding Procedures Order.

"**Subsequent Draws**" is defined in Section 2.2(a)(iii).

"**Subsidiary**" as to any Person, means any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or (c) the beneficial interest in such trust or estate, in each case, is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "**Subsidiary**" or to "**Subsidiaries**" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower, including each Project Company.

33

"***Supplement***" or "***Supplements***" means any and all extensions, renewals, modifications, amendments, restatements, consents, supplements and substitutions.

"***System Design***" means the system design, including site layout, list of major equipment, and, to the extent applicable, the PV Syst report for any Project, provided to the Lenders.

"***Tax Equity Financing***" means with respect to a Financing Project, any transaction or series of related transactions for the purpose of monetizing any federal tax attribute, including PTCs and ITCs and/or depreciation deductions, available with respect to the generation of electricity from or investment in renewable generation sources.

"***Tax Equity Financing Documents***" means, with respect to any Financing Subsidiary that is the subject of a Tax Equity Financing, (i) the Organizational Documents of such Financing Subsidiary, (ii) any equity contribution and/or purchase agreement related to such Tax Equity Financing and/or any documentation for tax credit transfers pursuant to the Inflation Reduction Act, P.L. 117-169 and its implementing regulations and (iii) solely to the extent that terms that are customarily contained in Organizational Documents, equity contribution agreements, purchase agreements or tax credit transfer documents associated with Tax Equity Financings are contained therein, any other material documents or material agreements related to such Tax Equity Financing.

"***Taxes***" means any and all present or future income, stamp or other taxes, levies, imposts, duties, charges, fees or withholdings (including backup withholding), in each case in the nature of a tax, imposed by any Governmental Authority, together with any interest, additions to tax or penalties imposed thereon and with respect thereto.

"***Termination Letters***" means those undated letters executed for the benefit of the Lenders by the applicable Project Company, irrevocably directing the applicable Utility (i) to accept notice of an early termination of the applicable Interconnection Agreement as directed by the Lenders on behalf of the applicable Project Company and (ii) to pay any payment or reimbursement due under the applicable Interconnection Agreement to or as directed by the Lenders.

"***Transition Services Agreement***" is defined in Annex A.

"***Updated Budget***" is defined in Section 4.28(a).

"***Updated Budget Delivery Date***" is defined in Section 4.28(a).

"***Uniform Commercial Code***" or "***UCC***" means, as applicable, the Uniform Commercial Code of the jurisdiction the law of which governs the document in which such term is used or which governs the creation or perfection of the Liens granted thereunder."***Utility***" means, with respect to each Project, the electric distribution company responsible for electric energy transmission and distribution service at the applicable Site.

"***Value***" is defined in Section 2.24(a).

"***Value Adjustment***" is defined in Section 2.24(d).

34

"***Valuation Model***" is defined in Section 2.24(e).

"***WRO***" means, the Withhold Release Order issued by the U.S. Customs and Border Protection on June 23, 2021 on silica-based products and materials or goods derived from or produced using those silica-based products.

1.2.     Accounting Terms and Determinations.

(a)     Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lenders hereunder shall (unless otherwise disclosed to the Lenders in writing at the time of delivery thereof in the manner described in Section 1.2(b) below) be prepared in accordance with GAAP applied on a basis consistent with that used in the preparation of the latest financial statements furnished to the Lenders hereunder.  All calculations made for the purposes of determining compliance with the terms of this Agreement shall (except as otherwise expressly provided herein) be made by application of GAAP applied on a basis consistent with that used in the preparation of the annual or quarterly financial statements of Borrower furnished to the Lenders pursuant to Section 3.4 unless (i) Borrower shall have objected to determining such compliance on such basis at the time of delivery of such financial statements or (ii) the Lenders shall so object in writing within thirty (30) days after delivery of such financial statements, in either of which events such calculations shall be made on a basis consistent with those used in the preparation of the latest financial statements as to which such objection shall not have been made.  Notwithstanding the foregoing, for the purpose of determining compliance with any covenant contained in this Agreement, any obligation of any Person that is or would have been treated as a capital lease for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update shall continue to be accounted for as a capital lease for purposes of the Loan Documents (whether or not such capital lease obligation was in effect on such date).

(b)     Borrower shall deliver to the Lenders at the same time as the delivery of any annual or quarterly financial statements under Section 3.4 a description in reasonable detail of any material variation between the application of accounting principles employed in the preparation of such statements and the application of accounting principles employed in the preparation of the next preceding annual or quarterly financial statements as to which no objection has been made in accordance with the last sentence of Section 1.2(a) above, and reasonable estimates of the differences between such statements arising as a consequence thereof.

(c)     To enable the ready and consistent determination of compliance with the covenants set forth herein, Borrower will not change the last day of its fiscal year from December 31 of each year, or the last days of the first three (3) quarters in each of its fiscal years from March 31, June 30 and September 30 of each year.

1.3.     Rules of Interpretation.

(a)     The singular includes the plural and the plural includes the singular.

(b)     The word "or" is not exclusive.

35

(c)     A reference to any Applicable Law includes any amendment or modification to such Applicable Law, and all regulations, rulings and other Applicable Laws promulgated under such Applicable Law.

(d)     A reference to a Person includes its successors and permitted assigns.

(e)     Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.

(f)     The words "include," "includes" and "including" are not limiting.

(g)     A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

(h)     References to or definitions of any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, as amended and restated, modified and supplemented from time to time (to the extent permitted under the Loan Documents) and in effect at any given time.

(i)     The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(j)     References to "days" shall mean calendar days, unless the term "Business Days" shall be used. References to a time of day shall mean such time in New York, New York, unless otherwise specified.

(k)     The Loan Documents are the result of negotiations between, and have been reviewed by Borrower, the Lenders and their respective counsel. Accordingly, the Loan Documents shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against Borrower or the Lenders.

(l)     The words "will" and "shall" shall be construed to have the same meaning and effect.

(m)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(n)     All calculations required to be made hereunder on a "pro forma basis" or in order to demonstrate "pro forma compliance" after giving effect to any acquisition, sale or other transfer of a Project or Project Company, or incurrence, assumption or repayment or prepayment of Indebtedness, or other transaction, shall, as at the applicable date of calculation, be based on the most recently delivered Valuation Model adjusted to give pro forma effect to the transaction (i) as

36

if it had been consummated on such calculation date and (ii) giving pro forma effect to the assets acquired, sold or transferred and any Indebtedness incurred or repaid in connection therewith.

(o)     All references to "the Lender" and/or "the Lenders" shall mean FP Solar and Solar Construction Lender individually or collectively as the context may require.

(p)     In the event there is a conflict or inconsistency between this Agreement and any of the DIP Order, the terms of the Interim DIP Order or as applicable, once effective, the Final DIP Order shall control; provided that any provision of this Agreement or another Loan Document which imposes additional burdens on any Loan Party or any of its Subsidiaries or further restricts the rights of any Loan Party or any of its Subsidiaries or gives any of the Secured Parties additional rights shall not be deemed to be in conflict or inconsistent with this Agreement or the DIP Order and shall be given full force and effect.

(q)     The Loan Parties' performance under the Loan Documents including, without limitation, covenants, conditions precedent, events of default, representations and warranties are qualified with respect to each Specified Event and Specified EOD, and considering the commencement of the Chapter 11 Cases and the continuance and prosecution thereof, and whether a Project Specific Adverse Event, Default or an Event of Default has occurred shall be qualified with respect to each Specified Event and Specified EOD and no Default, Event of Default, Project Specific Adverse Event, nor any breach of any representation or warranty, or failure to satisfy any condition precedent, shall be deemed to exist as a proximate result of any Specified Event or Specified EOD or of any other event incidental to the commencement of the Chapter 11 Cases and the continuance and prosecution thereof. [2]

(r)     Notwithstanding anything herein to the contrary, no event, occurrence, consequence, or circumstance shall constitute a Default or an Event of Default under this Agreement if the same occurs as a proximate result of any determination by the Lenders not to fund a Subsequent Draw, the proceeds of which were requested to be utilized for project expenditures under the Commitment Sizing Budget dated October 3, 2025 or any reasonable budget submitted thereafter in good faith in accordance with this Agreement, regardless of whether or not such budgets submitted become the Approved Budget.

**SECTION 2.**  The Facilities.

2.1.  The Commitments.

(a)          The DIP Facility.

(i)     Each Lender agrees, on the terms and conditions set forth herein, to make new money Loans in an aggregate amount not to exceed its New Money DIP Commitment (the "***New Money DIP Loans***") to the Borrower. The New Money DIP Loans shall be made available in an aggregate amount up to $[64,633,622.97] in new cash funding of DIP Loans.

---

[2] Sidley:  We cannot accept removal of CP protection – Specified Events cannot result in CP misses.

(ii)     Subject to the terms and conditions set forth herein and as set forth in the DIP Order, on the Interim DIP Facility Effective Date, $[666,124,592.00] of Prepetition Loans owing to the respective Prepetition Lenders, in their capacities as Prepetition Lenders, shall be rolled-up and converted into, on a cashless dollar-for-dollar basis, and shall thereafter constitute and automatically be deemed to be Loans and Obligations under the DIP Facility (such deemed borrowings, the "***Roll-Up Loans***" and, together with the New Money DIP Loans, collectively, the "***DIP Loans***").

(iii)    Notwithstanding anything to the contrary contained herein, no DIP Loans that are prepaid or repaid may be reborrowed.

(b)      Use of Proceeds.

(i)      The proceeds of the DIP Facility and/or Cash Collateral shall be available, subject to and upon entry of the applicable DIP Order:

(A)      to effect the roll up of Prepetition Loans,

(B)      for the Debtors' working capital and other general corporate needs,

(C)      for the payment of fees, costs, and expenses of the administration of the Chapter 11 Cases,

(D)      to pay other prepetition obligations approved by the Bankruptcy Court,

(E)      to pay adequate protection payments as authorized by the Bankruptcy Court in the Interim DIP Order and the Final DIP Order,

(F)      to pay professional fees, costs, and expenses and in connection with this Agreement and the Chapter 11 Cases,

(G)      to pay fees, costs, and expenses of the Lenders owed under the Loan Documents and in connection with this Agreement and the Chapter 11 Cases,

(H)      to pay obligations arising from or related to the Carve Out, and

(I)      for other general corporate purposes,

in each case, other than in the case of clauses (F) and (H), in a manner consistent with the Approved Budget).  Notwithstanding the foregoing, in no event shall the proceeds of the DIP Facility be used for the benefit of any Additional DIP Facilities or any assets that do not constitute Prepetition Collateral and/or Collateral, except in connection with the payment of Allocated Shared Costs in accordance with the Approved Budget, including, for the avoidance of doubt, professionals fees, payroll, G&A, insurance, and other overhead, and costs of the Debtors' Chapter 11 Cases.  No proceeds of the DIP Facility and/or Cash Collateral of the Prepetition Secured Parties may be used

38

for any purpose not set forth in the Approved Budget or used to fund projects or any other expenses that are solely related to the Carlyle Silo Entities or the Brookfield Silo Entities (and, for the avoidance of doubt, not related to any Fundamental Silo Entity or any of its parent entities) without the prior consent of the Required Lenders.

(ii)     No proceeds of the DIP Facility, the Carve Out, or any Cash Collateral may be used by the Loan Parties or any other party in interest, or their representatives, to (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt or collateral position of the Lenders, Prepetition Lenders, or the secured creditors under the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement, whether by (i) challenging the validity, extent, amount, perfection, priority or enforceability of the obligations under the DIP Facility, any of the Prepetition Secured Obligations, the Brookfield Credit Agreement, the Carlyle Prepetition Note Purchase Agreement, or the Prepetition Loan Documents, (ii) challenging the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect thereto, (iii) seeking to subordinate or recharacterize the obligations under the DIP Facility, the Brookfield Credit Agreement, the Carlyle Prepetition Note Purchase Agreement or the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (iv) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the Lenders, the Prepetition Lenders, or the secured creditors under the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement or any of their respective officers, directors, agents, employees or representatives, (b) prevent, hinder or otherwise delay the Lenders', the Prepetition Lenders', or the secured creditors' under the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement assertion, enforcement, or realization on the Collateral, the Prepetition Collateral or the collateral securing the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement in accordance with the Loan Documents, the documentation for the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement or Prepetition Loan Documents, as applicable, (c) seek to modify the rights granted to the Lenders, the Prepetition Lenders, or the secured creditors under the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement under the Loan Documents, the documentation for the Brookfield Credit Agreement or the Carlyle Prepetition Note Purchase Agreement or the Prepetition Loan Documents (as applicable), in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Bankruptcy Court (which order may be the Interim DIP Order or the Final DIP Order) and (ii) permitted by the Loan Documents; provided that during the Challenge Period, an investigation budget in an aggregate amount of $25,000 of the DIP Loans and/or the Prepetition Collateral, including Cash Collateral, and the proceeds thereof, may be used by any official committee of unsecured creditors (the "*Committee*") to investigate, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge, (i) the claims and liens of the Prepetition Lenders, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Lenders.

39

(iii)     $9,937,908.23 of the proceeds of the First Draw and $8,172,351.77 of the proceeds of the Second Draw shall be funded into an escrow account in accordance with and pursuant to the terms of the DIP Order.

2.2.     <u>Loan Disbursement Procedures</u>.

(a)     <u>Draw Requests</u>.  Subject to compliance by the Borrower with all of the terms, provisions and conditions set forth in this Agreement, the Lenders will make disbursements of Loan Proceeds to be used in accordance with Section 4.9; <u>provided</u> that the making of New Money DIP Loans shall be subject to the following limitations:

(i)     up to $21,304,328.11 of the DIP Facility shall be available and funded within three (3) Business Days after entry of the Interim DIP Order (the "***First Draw***"); and

(ii)     up to an additional amount equal to (x) the balance of the New Money DIP Commitments, less (y) the amount of New Money DIP Commitments allocated to the Subsequent Draws (as set forth below) shall be available and funded within three (3) Business Days after entry of the order approving the DIP Facility on a final basis (the "***Final DIP Order***") and the satisfaction of the conditions precedent thereto (the "***Second Draw***");

(iii)     up to $28,713,902.04 will be available in multiple draws and funded within three (3) Business Days after the satisfaction of the conditions precedent thereto (the "***Subsequent Draws***"); and

(iv)     solely to the extent required to effectuate a credit bid submitted by NewCo pursuant to the Stalking Horse APA or an amendment thereto, the undrawn New Money DIP Commitments (other than in respect of Subsequent Draws) shall become available upon the closing of such Sale Transaction notwithstanding the Loan Parties' inability to satisfy the conditions precedent to drawing on the DIP Facility.

(b)     <u>Disbursements to Lenders</u>.  At any time when an Event of Default or a Default has occurred and is continuing, the Lenders shall have the right, but not be obligated, to disburse Loan Proceeds to pay accrued interest on the Loans and any commitment fees when due and payable, notwithstanding any advice or the absence of any advice from the Borrower pursuant to this Section 2.2(b).  Each Lender is authorized to disburse to itself funds sufficient to pay all Enforcement Costs for which the Lenders are entitled to be reimbursed pursuant to Section 7.8, if any.  The Lenders shall give the Borrower written notice of any disbursements that any Lender makes directly to itself on its monthly account statements to the Borrower.  The Borrower hereby authorizes the Lenders to make any and all disbursements described in this Section 2.2(b).

(c)     <u>Disbursements to Third Parties</u>.  In lieu of making any disbursement of Loan Proceeds to the Borrower, the Lenders may, in their discretion and consistent with any applicable Draw Request, disburse any Loan Proceeds directly to one or more third parties to pay any Approved Costs identified in the Approved Budget and the applicable Draw Request.

(d)     <u>[Reserved]</u>.

40

(e)      No Liability to Third Parties.  The making or availability of the Loans shall not in any way be construed as obligating the Lenders to any Person for the payment of any expense incurred with respect to any Project, and, no Person contracting with the Borrower, any Project Company or any of their Affiliates in connection with a Project shall be reimbursed by the Lenders under any circumstance whatsoever.  The Lenders shall in no event be responsible or liable to any Person other than the Borrower for the disbursement of or failure to disburse any Loan Proceeds or other available amounts on deposit with the Lenders, and no contractor, subcontractor or material or equipment supplier shall have any right or claim against the Lenders under this Agreement or in connection with the administration hereof.

2.3.      Conditions Precedent to First Draw and each Subsequent Draw before entry of the Final DIP Order. The Lenders shall not be required to disburse any Loan Proceeds (including the initial New Money DIP Loan) in connection with the First Draw and each Subsequent Draw before entry of the Final DIP Order, unless the following conditions have been satisfied (or waived by the Required Lenders in their sole discretion) as of the date of the applicable Loan under the applicable Draw Request in a manner acceptable to the Required Lenders:

(a)      Representations and Warranties.  All representations and warranties made in this Agreement and the other Loan Documents are true, correct and complete in all material respects on and as of the Interim DIP Facility Effective Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct on and as of such earlier date; provided that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b)      Default or Event of Default.  At the time of and immediately after giving effect to the First Draw, (x) no Default or Event of Default shall have occurred and be continuing and (y) no default or event of default (other than solely as a result of the commencement of the Chapter 11 Cases) shall have occurred and be continuing under the Prepetition Credit Agreements, unless such default or event of default was addressed by the amendments, consents, waivers, and forbearance arrangements entered into in connection with the Forbearance Agreements or Prepetition Credit Agreements.

(c)      Material Adverse Effect.  Since the Petition Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(d)      Transaction Funds Flow. The Lenders shall have received a funds flow agreement relating to the DIP Facility and the transactions contemplated thereby in form and substance reasonably satisfactory to the Lenders and duly executed by the Borrower, the Lenders and the other parties thereto.

(e)      Stalking Horse APA. The Debtors shall not be in breach of the applicable milestone regarding entry into the Stalking Horse APA, and if the Stalking Horse APA shall have been executed at the time of the First Draw, it shall be in form and substance acceptable to the Required Lenders and remain in full force and effect and no facts or circumstances shall exist that

41

shall permit the purchaser thereunder to terminate the Stalking Horse APA, either through the giving of notice, the passage of time, or both.

(f)     Collateral Documents.  The Loan Parties shall have used reasonable best efforts to take on or prior to the Interim DIP Facility Effective Date the relevant perfection steps contemplated under the collateral documents delivered on the Interim DIP Facility Effective Date; provided that, upon entry of the Interim DIP Order (and, if entered, the Final DIP Order), the Lenders shall have valid and automatically perfected security interests as set forth in this Agreement and in the DIP Order, and no filing or other action will be necessary to perfect or protect such security interests with respect to the Debtors' obligations under the Loan Documents and such DIP Order.

(g)     Loan Documents.  The Lenders shall have received from each relevant Loan Party, a counterpart (either originally executed or a .pdf file) of this Agreement, the Security Documents and any applicable security, pledge or other collateral agreements and guarantees for the DIP Loans in form and substance mutually agreed between the Lenders and the Borrower, or such other written evidence satisfactory to the Lenders (which may include delivery of a signed signature page by facsimile or other means of electronic transmission (e.g., "pdf")) that such party has signed a counterpart of such Loan Document; provided that, upon entry of the Interim DIP Order (and, if entered, the Final DIP Order), the Lenders shall have valid and automatically perfected security interests as set forth in this Agreement and in the DIP Order, and no filing or other action will be necessary to perfect or protect such security interests with respect to the Debtors' obligations under the Loan Documents and such DIP Order.

(h)     Secretary's Certificate.  The Lenders shall have received a copy of (i) each organizational document of each Loan Party certified, to the extent applicable, by the applicable governmental authority, (ii) signature and incumbency certificates of the responsible officers, directors, authorized signatories or attorneys-in-fact of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the applicable board and/or similar governing bodies of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the date hereof by its secretary, an assistant secretary, director, authorized signatory, attorney-in-fact or a responsible officer or board member as being in full force and effect without modification or amendment, in a form reasonably acceptable to the Required Lenders.

(i)     Interim DIP Order.  The Interim DIP Order shall have been approved and entered by the Bankruptcy Court, which Interim DIP Order shall be in form and substance acceptable to the Required Lenders and shall not have been modified, amended, reversed, modified, stayed, vacated, appealed or subject to a stay pending appeal, in any respect without the consent of the Required Lenders, and the Loan Parties and their subsidiaries shall be in compliance with the Interim DIP Order.

(j)     Closing Certificate.  The Lenders shall have received a certificate, dated the date hereof and signed by a responsible officer of each Borrower, confirming compliance with the conditions set forth in clauses (a), (b), (r), (s) and (t), in a form reasonably acceptable to the Required Lenders.

42

(k)  [Reserved].

(l)  Fees.  The Lenders shall have received all fees payable to any Lender on or prior to the Interim DIP Facility Effective Date and, to the extent invoiced, all other amounts due and payable pursuant to the Loan Documents on or prior to the Interim DIP Facility Effective Date, including, to the extent invoiced at least one (1) Business Day prior to the Interim DIP Facility Effective Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of the Lender Advisors) required to be reimbursed or paid by the Loan Parties hereunder or under any Loan Document (the "***Loan Expenses***").

(m)  Third Party Funding.  The Debtors shall have entered into and received commitments for debtor-in-possession financing under one or more new money Additional DIP Facilities in an amount of no less than $185,807,074.74, which Additional DIP Facilities shall be in each case on terms and conditions reasonably acceptable to the Required Lenders (it is agreed and understood that such Additional DIP Facilities on terms substantially similar to the term sheets attached to the commitment letters executed by the Debtors with Carlyle and Brookfield on October 6, 2025 are reasonably acceptable) and shall be approved by an interim order of the Bankruptcy Court (which may be the Interim DIP Order) in form and substance reasonably acceptable to the Required Lenders, each of the Additional DIP Facilities shall remain in full force and effect and no default or event of default shall exist thereunder, and substantially concurrently with the First Draw the Debtors shall have borrowed the full initial amount then intended to be available under the Additional DIP Facilities.

(n)  ACT Transactions. Any indebtedness of ACT or any liens securing Indebtedness for borrowed money on ACT or the equity or assets of ACT, including in the form of debtor-in- possession financing, incurred in connection with or in anticipation of the Chapter 11 Cases shall have been incurred on terms and conditions and funded by counterparties acceptable to the Required Lenders, and any asset purchase agreement or similar agreement or transaction providing for a sale of ACT (or the assets or equity thereof) shall have been entered into on terms and conditions and with a counterparty or counterparties reasonably acceptable to the Required Lenders or that provide for all Obligations (including Roll-Up Loans) and Prepetition Secured Obligations to be Paid in Full in cash upon consummation of such sale (it being understood that any refusal to consent shall be deemed reasonable (A) if the disposition is proposed to occur before consummation of the sale pursuant to the Stalking Horse APA, (B) if the Lenders in good faith determine that such disposition could adversely affect the ACT's ability to provide O&M services provided to the Fundamental Silo Entities or the Brookfield Silo Entities (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Sponsor or its subsidiaries or affiliates).

(o)  Approved Budget.  The Lenders shall have received the initial Approved Budget, and the Loan Parties shall be in compliance with the Approved Budget.

(p)  USA Patriot Act; KYC. The Lenders shall have received from the Borrower and each of the Loan Parties, all documentation and other information reasonably requested by any Lender no less than three (3) Business Days prior to the Interim DIP Facility Effective Date that any such Lender reasonably determines is required by regulatory authorities under applicable

"know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(q)  First Day Orders. (i) The Lenders shall have received advanced drafts of the "first day" orders to be entered by the Bankruptcy Court in respect of the first day motions and applications in respect of the Chapter 11 Cases (the "**First Day Motions**") (including, without limitation, any order approving significant or outside the ordinary course of business transactions entered on (or prior to) the Interim DIP Facility Effective Date and a Cash Management Order) and a list of critical vendors (which for the avoidance of doubt may only be paid in accordance with the Approved Budget), and the forms of the First Day Motions filed in the Chapter 11 Cases shall be, in each case, in form and substance satisfactory to the Lenders, and (ii) except as would not adversely affect the Lenders, or the Prepetition Secured Parties, all first day orders intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" hearing shall have been entered by the Bankruptcy Court, shall be reasonably acceptable to the Required Lenders, and shall be in full force and effect.

(r)  Petition Date. The Petition Date shall have occurred, and the Borrower and each Guarantor (subject to exceptions as agreed among the Lenders and the Borrower) as of the date hereof shall be a debtor and a debtor-in-possession in the Chapter 11 Cases.

(s)  No Trustee. No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(t)  Chapter 11 Cases. The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(u)  Project Senior Financing Consents. The Debtors shall have used reasonable best efforts to obtain the Project Senior Financing Consents on or before the date hereof.

(v)  Aggregate Amount. The aggregate amount of the New Money DIP Loans after giving effect to the funding of the First Draw shall not exceed the amount of the New Money DIP Commitments.

(w)  Borrowing Request. The Lenders shall have received a Draw Request from the Borrower.

(x)  In the case of each Subsequent Draw, (x) the proceeds of such Subsequent Draw shall be used solely to make contemporaneous payments in respect of construction and development or other expenses of the Fundamental Silo Entities that are, in each case, acceptable to the Required Lenders in their sole discretion, and (y) the Lenders shall be satisfied in their sole discretion that the Debtors have first used reasonable good faith efforts to instead draw all available letters of credit, surety bonds, or similar instruments for Approved Costs or otherwise for the benefit of the Fundamental Silo Entities to fund such expenses.

2.4.  Project Qualification. No additional Project will be qualified as a Qualified Construction Stage Project, a Qualified Early Stage Project, a Qualified Mid Stage Project, a Qualified Late Stage Project or a Disqualified Project, nor will the qualification status of an

existing Project change, absent the prior written consent of the Required Lenders, given or withheld in the Lenders' sole discretion.

2.5.     Conditions Precedent to Second Draw and each Subsequent Draw after entry of the Final DIP Order. The Lenders shall not be required to disburse any Loan Proceeds in connection with the Second Draw or any Subsequent Draw occurring from and after entry of the Final DIP Order, unless the following conditions have been satisfied (or waived by the Lenders) as of the date of the applicable Loan under the applicable Draw Request:

(a)     Effective Date.  The conditions precedent set forth in Section 2.3 shall have been satisfied or waived in accordance with the Loan Documents and the First Draw shall have been made.

(b)     Court Orders.  The Final DIP Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Required Lenders and shall not have been modified or amended in any respect without the consent of the Required Lenders, and the Loan Parties and their subsidiaries shall be in compliance with the Final DIP Order.

(c)     Second Day Orders.  (i) All material "second day orders" (the "**Second Day Orders**") and all related pleadings intended to be entered on or prior to the date of entry of the Final DIP Order and any order establishing material procedures for the administration of the Chapter 11 Cases, shall have been entered by the Bankruptcy Court, and (ii) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be satisfactory in form and substance to the Lenders.

(d)     Borrowing Request.  The Lenders shall have received a Draw Request from the Borrower.

(e)     Representations and Warranties.  All representations and warranties made in this Agreement and the other Loan Documents are true, correct and complete in all material respects, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct on and as of such earlier date; provided that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(f)     Material Adverse Effect.  Since the Petition Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(g)     Default or Event of Default.  At the time of and immediately after giving effect to the Second Draw or any Subsequent Draw (as applicable), (x) no Default or Event of Default shall have occurred and be continuing and (y) no default or event of default (other than solely as a result of the commencement of the Chapter 11 Cases) shall have occurred and be continuing under the Prepetition Credit Agreements, unless such default or event of default was

45

addressed by the amendments, consents, waivers, and forbearance arrangements entered into in connection with the Forbearance Agreements or the Prepetition Credit Agreements.

(h)     <u>Chapter 11 Cases</u>.  The Chapter 11 Cases of any of the Debtors shall have not been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(i)     <u>Trustee</u>.  No Trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(j)     <u>Fees</u>. The Borrower shall have paid all reasonable and documented fees, costs, disbursements and expenses that are due and payable by the Lenders, and invoiced on or prior to the date that is three (3) Business Days prior to the date of such additional Advance (subject to any other limitations provided by the Bankruptcy Court).

(k)     <u>Aggregate Amount</u>.  The aggregate amount of the New Money DIP Loans after giving effect to the funding of the Second Draw shall not exceed the amount of the New Money DIP Commitments.

(l)     <u>Stalking Horse APA</u>.  The milestone regarding entry into the Stalking Horse APA shall have been satisfied and the Stalking Horse APA shall remain in full force and effect and no facts or circumstances shall exist that shall permit the purchaser thereunder to terminate the Stalking Horse APA, either through the giving of notice, the passage of time, or both;

(m)     <u>Additional DIP Facilities</u>.  Each of the Additional DIP Facilities shall remain in full force and effect and no default or event of default shall exist thereunder, and substantially concurrently with the Second Draw the Debtors shall have borrowed the full amount intended to be available under the Additional DIP Facilities upon entry of the final order approving such Additional DIP Facilities.

(n)     If applicable, the O&M Services Agreement Assumption Order shall have been approved and entered by the Bankruptcy Court, which order shall be in form and substance acceptable to the Required Lenders and shall not have been modified or amended in any respect without the consent of the Required Lenders, and the Loan Parties and their subsidiaries shall be in compliance with the O&M Services Agreement Assumption Order.

(o)     In the case of each Subsequent Draw, (x) the proceeds of such Subsequent Draw shall be used solely to make contemporaneous payments in respect of construction and development or other expenses of the Fundamental Silo Entities that are, in each case, acceptable to the Required Lenders in their sole discretion, and (y) the Lenders shall be satisfied in their sole discretion that the Debtors have first used reasonable good faith efforts to instead draw all available letters of credit, surety bonds, or similar instruments for Approved Costs or otherwise for the benefit of the Fundamental Silo Entities to fund such expenses.

2.6.     [Reserved].

2.7.     [Reserved].

46

2.8.    [Reserved].

2.9.    <u>Waivers of Conditions Precedent</u>. The failure of any Lender to insist upon strict performance of the requirements for any disbursement of Loan Proceeds shall not be deemed a waiver of any Lender's right to later insist upon strict compliance with such requirements for any subsequent disbursement of Loan Proceeds.

2.10.    <u>Loan Ledger</u>. The Lenders will maintain on their books a loan ledger (the "***Loan Ledger***") with respect to payments of the Loans, the accrual and payment of interest on the Loans and all other amounts and charges owing to the Lenders in connection with the Loans.  Except for manifest error, the Loan Ledger shall be conclusive as to all amounts owing by the Borrower to the Lenders in connection with and on account of the Loans; <u>provided</u> that neither the failure to make any such notation nor any error in such notation shall affect the validity of Borrower's obligations to repay the full unpaid principal amount of the Loans or the other obligations of Borrower hereunder.

2.11.    <u>Interest Calculation; Late Charges</u>. All interest and applicable fees payable under the provisions of this Agreement shall be computed on the basis of actual number of days elapsed over a year of three hundred sixty-five (365) days.  If the Borrower fails to make any payment of principal, interest, fees or any other amount becoming due pursuant to the provisions of this Agreement, within ten (10) days of the date due and payable, the Borrower shall pay to the Lenders a late charge with respect to such late payment (each a "***Late Charge***") equal to five percent (5%) of the amount of such payment. Such ten (10) day period shall not be construed in any way to extend the due date of any such payment.  Late Charges are imposed for the purpose of defraying the Lenders' expenses incident to the handling of delinquent payments, and are in addition to, and not in lieu of, the exercise by any Lender of any rights and remedies hereunder (including its rights under Section 6 and Section 7.8) or under Applicable Laws and any reasonable fees and expenses of any agents or attorneys which any Lender may employ upon an Event of Default.

2.12.    [Reserved].

2.13.    <u>Prepayments</u>.

    (a)    <u>Optional Prepayments</u>.

        (i)    The Borrower shall have the right, upon one (1) Business Days' notice, to prepay the Loans from time to time, in whole or in part, subject to payment of the Exit Fee and the Applicable Prepayment Premium in accordance with Section 2.14(a).

        (ii)    Each prepayment shall be subject to the requirements that (A) each partial prepayment shall be in an amount not less than $100,000, other than prepayments that pay in full the outstanding balance of the Loans, and (B) the Borrower shall pay to the Lenders, simultaneously with each such prepayment, interest accrued on the amount prepaid to the date of prepayment, and (C) the Applicable Prepayment Premium, as applicable.

    (b)    <u>Mandatory Prepayments</u>. The Loans are subject to mandatory prepayment, and the Borrower shall prepay the outstanding Obligations, in each case, subject to the Carve Out, as follows:

47

(i)       Upon the receipt by the Borrower or any other Loan Party of Net Cash Proceeds in connection with any Disposition (but excluding sales in the ordinary course of business up to $500,000) or Project Sale, the Borrower shall prepay on or prior to the date which is three (3) Business Days after the date of such receipt, the Obligations (subject to the Applicable Prepayment Premium, if applicable) in an amount equal to 100% of all Net Cash Proceeds so received;

(ii)       Upon the occurrence of an Event of Loss, the Borrower shall prepay the Obligations, if applicable) in an amount equal to 100% of all Net Cash Proceeds so received plus the Applicable Prepayment Premium to the extent payable in accordance with the terms of this Agreement;

(iii)      Upon the receipt by the Borrower[3] of any Extraordinary Receipt, such funds shall be applied to prepay the Obligations (subject to the Applicable Prepayment Premium, if applicable) in an amount equal to 100% of all Proceeds so received; provided that if such Extraordinary Receipt is specifically in connection with assets that, prior to the Petition Date, were solely part of the Carlyle Silo Entities or the Brookfield Silo Entities, such Extraordinary Receipt will be applied solely to the loans under the corresponding Additional DIP Facility;

(iv)     If the Borrower or any other Loan Party incurs or issues any Indebtedness or any Equity Interests not permitted to be incurred or issued hereunder, the Borrower shall prepay the Obligations in an amount equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds;

(v)      If the Borrower or any other Loan Party enters into, or agrees to enter into, any transactions not permitted by Section 5.12, the Borrower shall prepay the Obligations in an amount equal to the greater of (i) such proceeds received by a Loan Party or any Subsidiary thereof and (ii) the amount of any obligations incurred by a Loan Party or any Subsidiary thereof in such transaction;

(vi)     Upon receipt by the Borrower or any of its Subsidiaries of any payment in respect of amounts owing by (x) Foley Solar, LLC to PGR Procurement, LLC in respect of certain equipment sold, transferred, assigned, or otherwise conveyed (or to be sold, transferred or otherwise conveyed on behalf of PGR Procurement, LLC) which are not reflected in the Approved Budget expected to total approximately $8.9 million or (y) West River Solar, LLC to PGR Procurement, LLC in respect of certain equipment sold, transferred, assigned, or otherwise conveyed (or to be sold, transferred or otherwise conveyed on behalf of PGR Procurement, LLC) which are not reflected in the Approved Budget expected to total approximately $15 million; and

(vii)    On the Maturity Date, the Borrower shall repay the Obligations in full.

---

[3] Sidley: That is correct – net proceeds get distributed upstream and whatever remains is used to make prepayments on the loans, in each case subject to the terms of the loan documents (including any ICA) and senior financing documents.

For the avoidance of doubt, any amount subject to mandatory prepayment shall be allocated to the repayment of principal, accrued interest, fees, including the Exit Fee, and the Applicable Prepayment Premium, if applicable, such that the aggregate amount of such mandatory prepayment shall not exceed the amount of the applicable Net Cash Proceeds subject to prepayment. In the event that a transaction or receipt involving a Loan Party that is a Shared Obligor obligates any Loan Party to make a mandatory prepayment under both the DIP Facility and one or more Additional DIP Facilities, subject to the DIP Intercreditor Agreement, the amount subject to mandatory prepayment shall be allocated to prepay the outstanding Obligations and the obligations under the applicable Additional DIP Facilities in accordance with the DIP Intercreditor Agreement.[4]

(c)        To the extent the Borrower has drawn any Subsequent Draws, all net cash proceeds received by the Loan Parties or any of their Subsidiaries in the Fundamental Silo Entities in respect of letters of credit, surety bonds, or similar instruments for Approved Costs or otherwise for the benefit of the Fundamental Silo Entities (collectively, "**_Project Surety Bonds_**"), shall be used to make prepayments of Obligations in an amount equal to the lesser of (x) the amount of such net proceeds, and (y)(i) the aggregate principal amount of Subsequent Draws made since the Interim DIP Facility Effective Date, less (ii) the aggregate amount of such mandatory prepayments in respect of Subsequent Draws made since the Interim DIP Facility Effective Date.

2.14.   Treatment of Applicable Prepayment Premium. The Borrower agrees that:

(a)        The Applicable Prepayment Premium shall be payable upon the occurrence of any MOIC Event.  If a MOIC Event occurs pursuant to clause (c) of the definition thereof and the Lenders provide debtor-in-possession financing on terms reasonably acceptable to the Required Lender, the Lenders will waive the Applicable Prepayment Premium that is otherwise due and payable upon the occurrence of such MOIC Event.

(b)        In the event that any Applicable Prepayment Premium is payable in connection with the occurrence of a MOIC Event (including automatic acceleration of any Advance in the case of an Event of Default described in Section 6), such Applicable Prepayment Premium shall be presumed to be liquidated damages sustained by the Lenders as the result of the occurrence of such MOIC Event without having received a MOIC of 1.30, and the Borrower agrees that it is reasonable under the circumstances currently existing and existing as of the Interim DIP Facility Effective Date.

(c)        The Applicable Prepayment Premium shall also be immediately payable in the event that any Advance (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure, or by any other means.  The Borrower expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Applicable Prepayment Premium in connection with any such acceleration.

---

[4] Sidley: If ICA is inconsistent with Fundamental's desired disposition of the proceeds, then that issue needs to be resolved with the other lenders, but the company cannot be whipsawed by the ICA.

(d)      EACH LOAN PARTY HEREBY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE APPLICABLE PREPAYMENT PREMIUM AND ANY DEFENSE TO PAYMENT, WHETHER SUCH DEFENSE MAY BE BASED IN PUBLIC POLICY, AMBIGUITY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION IN CONNECTION WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION OF THE OBLIGATIONS PURSUANT TO ANY INSOLVENCY PROCEEDING OR OTHER PROCEEDING PURSUANT TO ANY BANKRUPTCY, INSOLVENCY, OR OTHER DEBTOR RELIEF LAW OR PURSUANT TO A PLAN OF REORGANIZATION.  Each Loan Party acknowledges and agrees that any Applicable Prepayment Premium and any fee payable in accordance with this agreement does not and shall not be deemed to constitute unmatured interest, whether under Section 502(b)(2) of the U.S. Bankruptcy Code or otherwise. Each Loan Party further acknowledges and agrees, and waives any argument to the contrary, that payment of such amount does not constitute a penalty or an otherwise unenforceable or invalid obligation. The parties have agreed that the Applicable Prepayment Premium captures the attractiveness of the investment and the opportunity cost for its capital investment because the Lenders have limited ability to recycle capital and the Applicable Prepayment Premium reflects the parties' view on risk return. All parties to this Agreement agree that the Applicable Prepayment Premium is not to be construed as part of a headline interest rate, but instead compensation specifically reflecting agreement to forego receiving additional compensation, fees and pricing on the Interim DIP Facility Effective Date in return for the Borrower agreeing to pay the Applicable Prepayment Premium and that the payment of such amount reflects the Lenders' capital anticipated to be returned for the specific investment of the Lenders' capital after taking into account all of the circumstances, including the costs of funds, course of dealing, the opportunity cost of capital, the relative risk of the investment, and the operational benefits for the Lenders from continued use of funds as a result of the Lenders' agreement to receive cash payment of that portion of their compensation at a date later than the Interim DIP Facility Effective Date in lieu of additional upfront fees. Each Loan Party expressly acknowledges and agrees that, prior to executing this Agreement, it has had the opportunity to review, evaluate, and negotiate the Applicable Prepayment Premium and the calculations thereof with its advisors, and that (i) the Applicable Prepayment Premium is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel, (ii) the Applicable Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the Applicable Prepayment Premium, (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 2.14, (v) the Borrower's agreement to pay the Applicable Prepayment Premium is a material inducement to the Lenders' agreement to make any Advance, and (vi) the Applicable Prepayment Premium is a good faith, reasonable estimate and calculation of the lost profits, losses or other damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of any applicable triggering event.

2.15.   Reserved.

2.16.   Fees.

50

(a)        A nonrefundable fee in an amount equal to 4.00% of the aggregate New Money DIP Commitments in effect as of the Interim DIP Facility Effective Date (calculated as $[2,585,344.92]) (the "***Commitment/Funding Fee***") was earned by the Lenders, and shall be due and payable, upon the Interim DIP Facility Effective Date; provided, that the Commitment/Funding Fee can be paid from Loan Proceeds.   The amount of the Commitment/Funding Fee shall, on the Interim DIP Facility Effective Date, be capitalized and added to the outstanding principal balance of the Loans and, thereafter shall constitute part of the Obligations for all purposes under the Loan Documents, including, but not limited to, for purposes of calculating interest after the Interim DIP Facility Effective Date.

(b)        The Borrower agrees to pay to the Lenders a cash fee in Dollars (the "***Exit Fee***") upon the occurrence of any MOIC Event or any prepayment pursuant to Section 2.13, in each case, equal to 8.00% of the aggregate principal amount of the New Money DIP Loans so repaid or prepaid; provided, that if the New Money DIP Loans are repaid pursuant to a credit bid in accordance with the Stalking Horse APA, the Exit Fee shall be reduced to 5.00% of the principal amount of the New Money DIP Loans so repaid and shall be paid in kind in such an event.

2.17.   [Reserved].

2.18.   Loan Payments.

(a)        Subject to Section 2.2(b), on each Loan Payment Date, the Borrower shall pay to the Lenders monthly interest on the outstanding principal balance of the Loans for the applicable Accrual Period at a per annum rate of interest equal at all times to the applicable Interest Rate based on an average daily balance method and not on outstanding principal as of the end of the Accrual Period. Whenever any payment to be made by the Borrower under the provisions of this Agreement is due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, in the case of any payment which bears interest, such extension of time shall be included in computing interest on such payment.  In the case of interest on Loans not paid in cash by the Borrower on any Loan Payment Date, at the Lender's election in its sole discretion, such interest shall be paid in cash (subject to such interest payment being included in the latest Approved Budget) as an additional Loan or in kind (interest paid in kind, "***PIK Interest***") at the Interest Rate applicable to such payments and the amount of applicable Loans and New Money DIP Commitments shall be automatically increased on the applicable Loan Payment Date by the amount of such PIK Interest (and such increased principal shall bear interest at a rate per annum equal to the Interest Rate).  All payments of principal, interest, fees or other amounts to be made by the Borrower in cash under the provisions of this Agreement shall be paid without deduction, set-off or counterclaim to the Lenders at the Lenders' offices specified in Section 8.3 hereof or at such other place as the Lenders may designate in writing to the Borrower, in lawful money of the United States of America in immediately available funds.

(b)        Except as otherwise expressly provided herein or in the other Loan Documents, payments made by Borrower under this Agreement (including prepayments made

pursuant to Section 2.13) or the other Loan Documents and proceeds realized from the sale or other disposition of the Collateral (including any Proceeds) shall be applied as provided in Section 7.9.

2.19.    [Reserved].

2.20.    [Reserved].

2.21.    Taxes.

(a)    Any and all payments by the Borrower under or in respect of this Agreement shall be made, in accordance with this Section 2.21, free and clear of and without deduction or withholding for any Taxes, except as required by Applicable Laws. If the Borrower is required by Applicable Laws (as determined in the good faith discretion of the Borrower) to deduct or withhold any Taxes from such payments by the Borrower, then:  (i) if such Tax is an Indemnified Tax, the amount payable by the Borrower shall be increased as necessary so that after all such required deductions or withholdings have been made for such Indemnified Taxes (including deductions or withholdings applicable to additional amounts payable under this Section 2.21), each Lender receives an amount equal to the amount it would have received had no such deduction or withholding for such Indemnified Taxes been made, and  (ii) the Borrower shall be entitled to make such deductions or withholdings and timely pay, to the extent required by Applicable Laws, the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Laws.

(b)    The Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Laws, or at the option of the Lenders timely reimburse the Lenders for the Lenders' payment of any Other Taxes.

(c)    The Borrower shall indemnify the Lenders, within thirty (30) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed on or attributable to amounts payable under this Section) paid or payable by any Lender or required to be withheld or deducted from a payment to any Lender, together with any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability, including any supporting documentation reasonably necessary to explain the basis of such payment or liability, delivered to the Borrower by any Lender shall be conclusive absent manifest error.

(d)    Promptly after any payment of Indemnified Taxes by the Borrower to a Governmental Authority pursuant to this Section (but in any event within thirty (30) days after the date of such payment), the Borrower shall deliver to the Lenders the original or certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the relevant return reporting such payment or other evidence of such payment reasonably satisfactory to the Lenders.

(e)    Each Lender, to the extent it is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement, shall deliver to the Borrower at the time or times prescribed by Applicable Laws or reasonably requested by the

52

Borrower, such properly completed and executed documentation prescribed by Applicable Laws as will permit such payments to be made without withholding Tax or at a reduced rate of withholding Tax; provided, that such Lender is legally entitled to complete, execute and deliver such documentation.  In addition, each Lender, if requested by the Borrower, shall deliver such other documentation prescribed by Applicable Laws or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements and to enable the Borrower to comply with such requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Without limiting the generality of the foregoing, each Lender shall deliver to Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of the U.S. Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax.  For avoidance of doubt, if the Lender is a disregarded entity for U.S. federal Tax purposes, its direct or indirect owners, as applicable, shall provide such a properly completed U.S. Internal Revenue Service Form W-9 establishing that payments made by the Borrower to the Lender under any Loan Documents are exempt from U.S. federal backup withholding Tax.

(f)     If a payment made by the Borrower to any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by Applicable Laws and at such time or times reasonably requested by the Borrower such documentation prescribed by Applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.21(f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)     If the Borrower is required to pay additional amounts or to pay Indemnified Taxes pursuant to Sections 2.19(a) through 2.19(c), then the applicable Lender shall use its reasonable efforts (consistent with legal and regulatory restrictions) to change the jurisdiction of its applicable lending office so as to eliminate or minimize any such additional payment by the Borrower that may thereafter accrue, if such change is deemed by such Lender in its reasonable discretion, to be not otherwise disadvantageous to such Lender.

(h)     If any Lender shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of any amounts as to which it has been indemnified by the Borrower, it promptly shall notify the Borrower of the availability of such refund claim and shall make a timely claim to such Governmental Authority for such refund at the Borrower's expense. If any Lender receives a refund (including pursuant to a claim for refund made pursuant to the preceding sentence) in respect of any amounts as to which it has been indemnified by the Borrower,

it shall within thirty (30) days from the date of such receipt pay over the amount of such refund to the Borrower, net of all reasonable out-of-pocket expenses of such Lender and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of such Lender, agrees to repay the amount paid over to the Borrower (plus penalties, interest or other reasonable charges) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority and provides reasonable written evidence thereof to the Borrower.  Notwithstanding anything to the contrary in this Section 2.21(h), in no event will any Lender be required to pay any amount to the Borrower pursuant to this Section 2.21(h) the payment of which would place such Lender in a less favorable net after-Tax position than such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.21(h) shall not be construed to require any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(i)     Each party's obligations under this Section shall survive the replacement of or any assignment of rights by any Lender and the repayment, discharge or satisfaction of all obligations under any Loan Document.

2.22.   Recovery of Additional Costs.

(a)     Change in Law.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Lender to any Taxes (other than Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or the Loans made by such Lender;

and the result of any of the foregoing shall be to demonstrably increase the cost to any Lender of making, converting to, continuing or maintaining the Loans or of maintaining its obligation to make the Loans, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender as soon as practicable such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered that is directly related to the Loans as reasonably demonstrated by such Lender.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting any Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate

of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then, from time to time Borrower will pay to such Lender as soon as practicable such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered that is directly related to the Loans as reasonably demonstrated by such Lender.

(c)     Certificates for Reimbursement.  A certificate of any Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.22 and delivered to Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.22 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate any Lender pursuant to this Section 2.22 for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.23.     Addition of Projects.

(a)     Borrower may request that the Lenders accept additional projects as Solar Projects or Storage Projects under this Agreement.  Borrower shall make any such request in writing and such request shall be accompanied by a description of such Project (including the information set forth on Schedule 1.1A) and the Financial Projections, a Project Budget and a Project Schedule for such proposed Project.

(b)     In connection with such request, Borrower shall provide to the Lenders all evidence and documentation requested by the Lenders in their sole discretion.  Acceptance of any additional Project after the Interim DIP Facility Effective Date shall be subject to the Lenders' discretion.

(c)     In connection with such request, Borrower shall provide to the Lenders updates to Schedules to the Loan Documents to reflect the applicable items on such Schedules for the new Project and Project Company.

(d)     Promptly, but in no event more than ten (10) Business Days after the receipt of all information set forth in Section 2.23(a) and (b), the Lenders shall respond to Borrower's request with either an acceptance or non-acceptance of such proposed Project or a request for additional time to review the materials along with an explanation for the need for such additional time and an estimate as to when the Lenders will be able to make a decision on such proposed

55

Project.  Any decision to accept an additional Project shall be made in the Lenders' sole discretion and the Lenders shall not be obligated to accept any additional Projects.

(e)     Upon the Lenders' written acceptance of such proposed Project, and the execution and delivery of all Loan Documents necessary to add the applicable new Project Companies as Loan Parties and satisfaction of any applicable conditions precedent listed in Sections 2.23(a) and (b), such proposed Project shall become a Project hereunder and the Lenders shall establish the initial Value of such Project and whether such Project constitutes a Qualified Project and what type of Qualified Project.  Then Schedule 1.1A shall be updated to reflect the inclusion of such Project subject to the terms of this Agreement.

2.24.   Valuation of Projects.  The Value for each Project and each Project shall be calculated as set forth in this Section 2.24.

(a)     "*Value*" means:

(i)     with respect to a Qualified Early Stage Project, the Calculated Value of such Project (excluding the portion thereof constituting Qualified Spend) *multiplied by* 25%;

(ii)     with respect to a Qualified Mid Stage Project, the Calculated Value of such Project (excluding the portion thereof constituting Qualified Spend) *multiplied by* 50%;

(iii)     with respect to a Qualified Late Stage Project or Qualified Construction Stage Project, the Calculated Value of such Project (excluding the portion thereof constituting Qualified Spend) *multiplied by* 100%;

(iv)     with respect to Qualified Spend, the aggregate amount thereof *multiplied by* 100%;

(v)     [reserved]; and

(vi)     with respect to an unqualified Project, $0 unless the Lenders, in their sole discretion elects to assign a higher value to it.

(b)     "*Calculated Value*" shall be determined by Lenders in their reasonable discretion as follows:

(i)     [reserved].

(ii)     [reserved].

(iii)     For any Qualified Project, the Calculated Value shall be the development fee and reimbursable expenses expected to be received by the Borrower according to the Valuation Model.

(iv)     [reserved].

(v)     [reserved].

(vi)     In all cases, the Calculated Value of a Project shall be subject to Value Adjustments as set forth in Section 2.24(d).

(vii)     The Calculated Value of a Qualified Early Stage Project (other than the portion constituting Qualified Spend) shall be capped at and shall not exceed $10,000,000.

(viii)     The Calculated Value of a Qualified Mid Stage Project (other than the portion constituting Qualified Spend) shall be capped at and shall not exceed $10,000,000.

(c)     "***Aggregate Collateral Value***" means the Value of all Projects and Qualified Spend subject to the following limitations:

(i)     The Value of all Qualified Early Stage Projects shall not constitute more than 30% of the Aggregate Collateral Value.

(ii)     The Value of all Qualified Early Stage Projects plus the Value of all Qualified Mid Stage Projects shall not constitute more than 75% of the Aggregate Collateral Value.

(iii)     Notwithstanding anything else contained herein, at no time shall the Value of a single Project constitute more than 15% of the Aggregate Collateral Value (excluding Qualified Spend), unless such Project is a Qualified Construction Stage Project or otherwise approved by the Lenders in writing. For the avoidance of doubt, Aggregate Collateral Value for purposes of this Section 2.24(c)(iii) only, is to be calculated without regard to any reduction thereto that would result after giving effect to the reduction in the Value assigned to any particular Project which is necessary in order to meet the requirements of this Section 2.24(c)(iii).

(iv)     Notwithstanding anything else contained herein, at no time shall more than 50% of the Aggregate Collateral Value consist of the Value of Projects that are located in the same state or which have the same Offtaker; <u>provided</u>, however, that the limitation on the calculation of Aggregate Collateral Value set forth in this Section 2.24(c)(iv) shall not take effect until February 1, 2022.

"***Value Adjustment***" means a reduction or an increase, as applicable, of the Calculated Value attributed to a Project, in each case as determined by the Lenders in their reasonable discretion working in good faith with Borrower and utilizing the Valuation Model containing substantially similar assumptions and calculations upon which the original Calculated Value was determined, based on any changes to the Project Budget and/or Project Schedule for such Project, the status of the offtake structure, valuation assumptions related to PPA revenues, merchant revenues, SREC revenues, revenues under any Storage Project Revenue Contract, availability or amount of Project Incentives or any other matters relating to the Calculated Value or such Project deemed material by the Lenders in their reasonable discretion.

(d)     "***Valuation Model***" means the calculations set forth in the following excel models: 500M Blue Team (External)v6.xlsx, 500M Gray Team (External)v6.xlsx, and 500M Orange Team (External)v3.xlsx, as applicable.  The initial Value of a Qualified Project will be equal to the "Potential Developer Fee" (as defined in the Valuation Model) and the Value will be increased upon payment of any PPA deposits, interconnection costs, or equipment purchases.

(e)     [reserved].

2.25.   [Reserved].

**SECTION 3.**  Representations and Warranties. The Borrower represents and warrants to the Lenders that, the following statements are true, correct and complete as of the Interim DIP Facility Effective Date, the date on which any Project becomes a Qualified Project, and the date of each advance of Loan Proceeds hereunder, as applicable:

3.1.   Existence; Compliance with Laws. Each Loan Party (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (b) is duly qualified as a foreign corporation, limited liability company or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, and (c) is in compliance with all Applicable Laws excepting non-compliance that could not reasonably be expected to result in a Material Adverse Effect.

3.2.   Power; Authorization; Enforceability.

(a)     Each Loan Party has the power and authority, and the legal right, to own or lease and operate its property, to carry on its business as now conducted and as proposed to be conducted, and to execute, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain the Loans hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the borrowing of Loan on the terms and conditions contained herein.  No consent or authorization of, filing with, notice to or other act by, or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) corporate and other organizational approvals, which approvals have been obtained and are in full force and effect and true and correct copies of which have provided to the Lenders, and (ii) consents, authorizations, filings or notices that are in full force and effect and true and correct copies of which have been provided to the Lenders, and (iii) consents or authorizations that are not required to be obtained until a later date.  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.

(b)     Each Loan Document to which a Loan Party is a party when delivered hereunder will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.3.   No Contravention. The execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties, the borrowing of the Loans hereunder and the use of the Loan Proceeds thereof will not violate any Applicable Law or any Organizational Document or Contractual Obligation of any Loan Party and will not result in, or require, the creation or

58

imposition of any Lien on any of their respective properties or assets pursuant to any Applicable Law or any such Organizational Document or Contractual Obligation (other than the Liens created by the Loan Documents). No Applicable Law, Organizational Document or Contractual Obligation applicable to any Loan Party could reasonably be expected to have a Material Adverse Effect.

3.4.    Financial Information.

(a)    All financial statements of each Loan Party delivered to the Lenders were prepared in accordance with GAAP and fairly present in all material respects the financial condition of such Loan Party as of the respective dates thereof.

(b)    No Loan Party (other than Sponsor) has any Indebtedness other than as reflected on or disclosed in such financial statements, or incurred pursuant to any of the Project Documents listed in Schedule 3.16 or otherwise not prohibited by the provisions of this Agreement.

3.5.    [PGR Procurement Equipment.  Schedule 4.1(k), as updated in accordance with Section 4.1(k), sets forth a true and correct list of all equipment owned by, or in the possession of, PGR Procurement, LLC or in which PGR Procurement, LLC retains title.]

3.6.    No Event of Default. No (a) Event of Default or Default has occurred and is continuing under any of the Loan Documents or (b) default or event of default has occurred and is continuing under or with respect to any Contractual Obligation of the Borrower or any other Loan Party, in each case, that is not subject to the Fundamental Forbearance Agreement.

3.7.    [Reserved]

3.8.    Litigation. Except as set forth in Schedule 3.8, there are no actions, suits, proceedings, claims or disputes pending or, to the Borrower's knowledge after reasonable investigation, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of its properties or revenues or, to Borrower's knowledge, against any Project Counterparty that (a) as of the Interim DIP Facility Effective Date, purport to affect or pertain to any Project or any Project Document, or (b) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or thereby, or (c) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

3.9.    Sole Business and Subsidiaries. The ownership and development of the applicable Project is and has always been each Project Company's sole business and neither the Borrower nor any Project Company has any outstanding Indebtedness or other material liabilities other than pursuant to the Operative Documents and Permitted Indebtedness, or is a party to or bound by any material contract other than the Operative Documents to which it is a party.  The ownership of the Equity Interests in each Project Company and the development of the Projects is and has always been the Borrower's sole business.  Neither the Borrower nor any Project Company has any employees.

3.10.    Equity Interests/Subsidiaries.

59

(a)     Schedule 3.10 sets forth the name, jurisdiction of formation, and each owner of Equity Interests of the Borrower, the Holding Company, each Project Company and each Subsidiary of the Sponsor that owns a direct or indirect interest in any Loan Party (other than Sponsor).  All of the outstanding Equity Interests in each Loan Party have been validly issued, are fully paid and non-assessable.

(b)     There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments relating to or Liens encumbering any Equity Interest in any Loan Party (other than Sponsor), except (i) as created by the Loan Documents, (ii) Permitted Liens of the type described in section (l) of the definition thereof and (ii) as otherwise disclosed in Schedule 3.10.

(c)     No Loan Party (other than the Sponsor) owns any Equity Interest in any Person not listed on Schedule 3.10.

3.11.   Project Budget; Project Schedule; Financial Projections. The Borrower has prepared each Project Budget and each Project Schedule and is responsible for developing the assumptions on which each such Project Budget, Project Schedule and the Financial Projections are based.  Each such Project Budget, Project Schedule and Financial Projections (a) as of the date delivered, updated or supplemented are based on reasonable assumptions (including as to all legal and factual matters material to the estimates set forth therein), which assumptions are clearly set forth therein, and (b) as of the date delivered, updated or supplemented are consistent in all material respects with the provisions of the Project Documents executed on or prior to such date.

3.12.   [Reserved].

3.13.   Title to Properties; Real Property; Site Locations.

(a)     Each Project Company that owns a Qualified Project has a valid fee or leasehold interest or an enforceable option to obtain a fee or leasehold interest in the applicable Site, and good title to, or a valid leasehold interest in, all its other property required for the development, ownership or construction of its Qualified Project; and such properties are subject to no Liens except for Permitted Liens.

(b)     Each Project Company that owns a Qualified Late Stage Project has a valid fee or leasehold interest in the applicable Site; and such properties are subject to no Liens except for Permitted Liens.

(c)     Neither the Borrower nor any Project Company has any interest in any real property other than the Sites pursuant to the Site Control Agreements.

(d)     There are no land use restrictions applicable to a Qualified Project that could reasonably be expected to have a Material Adverse Effect.

(e)     As designed, each Project is intended to be and is capable of being located entirely on the applicable Site at the address set forth on Schedule 1.1A outside of any wetlands and outside of any area that has been identified by the Director of the Federal Emergency Management Agency (FEMA) as an area having special flood hazards.

(f)     The Borrower and each Project Company has valid title to all of its personal property, and such properties are subject to no Liens except for Permitted Liens.

3.14.   <u>Compliance with Laws</u>.  Except as set forth in <u>Schedule 3.8</u>, each Loan Party is in compliance in all material respects with all Applicable Laws and has not received any written notice and, to the knowledge of any Loan Party, is not the subject of any investigation to the effect that the Loan Party is not in material compliance with any such Applicable Law, including applicable zoning, environmental, health and safety laws and regulations.

3.15.   <u>Accounts</u>. Neither the Borrower nor any Project Company has any "deposit account" with a "bank" or a "securities account" with a "securities intermediary" (in each case within the meaning of Section 9-102 of the UCC) or any similar accounts other than established in accordance with this Agreement and the other Loan Documents.

3.16.   <u>Project Documents</u>.

(a)     <u>Part 1</u> of <u>Schedule 3.16</u> lists all Material Project Documents (other than the Loan Documents) to which the Borrower or any Project Company is a party or of which the Borrower or any Project Company is a beneficiary, in each case relating to the development or design of each Project, and all Supplements thereto, in each case that are in effect as of the Interim DIP Facility Effective Date.  <u>Part 2</u> of <u>Schedule 3.16</u> lists all deposits, collateral and security posting obligations that the Borrower or any Project Company has under the Material Project Documents to which it is a party that are in effect as of the Interim DIP Facility Effective Date and each Project Company has fully funded all such obligations (if any) in cash, to the extent due and payable.  The Borrower has delivered a true and correct copy of each such Material Project Document to the Lenders.  Each such Material Project Document is in full force and effect and, to the Borrower's knowledge, no event, condition or circumstance has occurred and is continuing which currently or with the giving of notice, the lapse of time or both would provide any party to any such Material Project Document with a right to terminate such Material Project Document. Borrower, each of its Subsidiaries, and each Project Company and, to the Borrower's knowledge, each other party to each such Material Project Document is in compliance with such Material Project Document in all material respects and, to Borrower's knowledge, no default or event, condition or circumstance has occurred and is continuing which currently or with the giving of notice, the lapse of time or both would constitute a default or any event of default has occurred and is continuing under any such Material Project Document and each of the representations and warranties made by the Borrower or any Project Company contained in the Material Project Documents to which the Borrower or such Project Company is a party were true and correct in all material respects as of the date each was made (unless any such representation or warranty relates to a specific earlier date, in which case it shall have been true and correct in all material respects as of such earlier date).  As of the Interim DIP Facility Effective Date, no Affiliate of the Borrower is counterparty to any Material Project Document except as specifically identified on <u>Part 1</u> of <u>Schedule 3.16</u>.

(b)     The Borrower has delivered a true and correct copy of each Material Contract to which a Fundamental Silo Entity is a party to the Lenders.  Each such Material Contract is in full force and effect and to the Borrower's knowledge, no event, condition or circumstance has occurred or exists, which currently or with the giving of notice, the lapse of time or both, would

61

provide any party to any such Material Contract with a right to terminate such Material Contract. The Borrower and each Project Company party to each such Material Contract and, to the Borrower's knowledge, each other party to each such Material Contract is in compliance with such Material Contract in all material respects and no default or event of default has occurred and is continuing under any such Material Contract.

3.17. <u>Sufficiency of Project Documents</u>. Other than those services, materials, interests and other rights that can be reasonably expected to be commercially available when and as required, the services to be performed, the materials to be supplied and the real property interests and other rights granted pursuant to the Project Documents in effect as of the Interim DIP Facility Effective Date (a) comprise all of the property interests necessary to secure any right material to the development of each Qualified Project and the conduct of Borrower's and the other Project Companies' business in accordance with all Applicable Laws, Permits and Project Documents all without reference to any proprietary information not owned by the Borrower or the other Loan Parties and (b) [reserved]. There are no Project Documents, Permits or other assets or material rights that are necessary for the development and sale of any Project that are held in the name of any Person other than the Borrower or the applicable Project Company.

3.18. <u>Permits</u>.

(a) Except as disclosed in <u>Schedule 3.8</u> or <u>Schedule 3.18</u>, the Loan Parties have or will have all material Permits that are or will be required in order to construct, complete, deliver, interconnect and operate each Project under existing Applicable Laws as each Project is currently designed (such Permits to be provided to the Lenders by Borrower upon their issuance or modification). Except as disclosed in <u>Part 2</u> of <u>Schedule 3.18</u> (as so supplemented), no Permit is subject to any current legal proceeding or to any unsatisfied condition, and all applicable appeal periods with respect thereto have expired.

(b) Except as disclosed in <u>Schedule 3.18</u> (as so supplemented), no Additional Required Permit is subject to any current legal proceeding or to any unsatisfied condition that could reasonably be expected to have a Material Adverse Effect. Borrower has no reason to believe that any Permit set forth on <u>Schedule 3.18</u> that is not in full force and effect cannot be obtained in material accordance with the applicable Project Budget and Project Schedule. Except as disclosed in <u>Schedule 3.8</u> or <u>Schedule 3.18</u>, neither Borrower nor any other Loan Party is in material violation of any Permit.

3.19. <u>Federal Reserve Board Regulations</u>. Neither Borrower nor any Project Company is engaged in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States (the "***Board***") and no part of the Loan Proceeds will be used for any purpose which entails a violation of Regulations U, T or X of the Board.

3.20. <u>ERISA Plans</u> Neither the Borrower nor any Project Company (a) has any employees, or (b) maintains or contributes to or is obligated to contribute to any ERISA Plan.

3.21. <u>Environmental Conditions; Hazardous Substances</u>.

62

(a)      (i) Neither the Borrower nor any Project Company is not and in the past has been in material violation of any Environmental Laws; (ii) to the Borrower's knowledge, except as disclosed on Schedule 3.21, there are no Hazardous Substances used, stored or present at or on any Site or the improvements thereon, except in compliance with Environmental Laws; and (iii) to the Borrower's knowledge, there is no existing, nor in the past has there been any, condition, circumstance, action, activity or event that could reasonably be expected to be, or result in, any obligation of, material liability to, or Environmental Claim against, any Lender, or obligation of, material liability to, or material Environmental Claim against, the Borrower or any Project Company under any Environmental Laws.

(b)      There is no pending or, to the Borrower's knowledge, threatened in writing, action or proceeding by any Governmental Authority or any other Person with respect to (i) any alleged violation of any Environmental Laws or Permit issued thereunder relating to any Site or any Project, or (ii) the presence, Release or threatened Release of Hazardous Substances in, on, under, from or to any Site or any Project.

3.22.   Governmental Regulation.

(a)      With respect to each Solar Project either: (i) it is a Qualifying Facility or (ii) the Project Company owning it is capable of being qualified as an EWG no later than sixty (60) days prior to the Commercial Operation Date of the applicable Project.  Each Solar Project that is required to be a Qualifying Facility in order to obtain its expected Project Incentives is a Qualifying Facility.

(b)      No Loan Party is or will be subject to any financial, organizational or rate regulation under Applicable Laws as a result of the development, construction, ownership, leasing or operation of any Project or the generation, sales or transmission of electric energy, capacity, ancillary services or SRECs generated thereby.  Making the Loans will not subject any Lender to regulation as an "electric utility," "electric service company," "public utility," or as an "affiliate" of any of the foregoing under the laws of any State in which a Project is located or the FPA or any other Applicable Laws; provided that the Borrower makes no representation as to applicability of any such laws solely on the basis of the Lenders' business or activities unrelated to the Loans.

(c)      Each Qualified Project, as currently contemplated, is eligible or, upon completion of construction, will be eligible to obtain all Project Incentives included in the Valuation Model.

(d)      No notice is required to be filed with the FAA relating to any Project or, if notice is required to be filed with the FAA, then the FAA shall have delivered a "Determination of No Hazard" with respect to such Project.

3.23.   Prohibited Equipment.  No equipment identified in any Project Budget for a Qualified Project or otherwise expected to be utilized in such Project could reasonably be expected to be Prohibited Equipment, other than such equipment that becomes Prohibited Equipment subsequent to Borrower's inclusion of such equipment in the Project Budget; provided that the Borrower (a) has promptly notified the Lenders of such fact in writing along with a plan for

4925-1692-5288v.26

replacing such equipment, (b) the Borrower is diligently working to replace the same with comparable equipment that is not Prohibited Equipment, and (c) [reserved].

3.24.   <u>Intellectual Property</u>. Borrower and each Project Company owns or has the right to use all material patents, trademarks, service marks, trade names, copyrights, licenses and other rights which are material to its business.  None of Borrower or any Project Company has received written notice that (a) any material product, process, method, substance, part or other material presently contemplated to be sold by or employed by such Loan Party in connection with its business will infringe in any material manner on any patent, trademark, service mark, trade name, copyright, license or other right owned by any other Person that is not a Loan Party which infringement could reasonably be expected to have a Material Adverse Effect or (b) there is pending or threatened any claim or litigation against or affecting such Loan Party contesting its right to sell or use any such product, process, method, substance, part or other material which claim or litigation would reasonably be expected to have a Material Adverse Effect.

3.25.   <u>Investment Company Act</u>. No Loan Party is an investment company or a company controlled by an investment company, within the meaning of the Investment Company Act of 1940, as amended.

3.26.   <u>PATRIOT Act; OFAC and Other Regulations</u>.

(a)   No Loan Party, nor any of its Subsidiaries or Affiliates, nor any director, officer or employee of the foregoing, nor, to the Borrower's knowledge, any broker, agent or representative of such Loan Party, Subsidiary or Affiliate, has violated any Anti-Terrorism Laws.

(b)   No Loan Party, nor any of its Subsidiaries or Affiliates, nor any director, officer, or employee of the foregoing, nor, to the Borrower's knowledge, any broker, agent or representative of such Loan Party, Subsidiary or Affiliate, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage; and each Loan Party and its Subsidiaries and Affiliates have conducted their businesses in compliance with applicable anti-corruption laws and have instituted and maintain and will continue to maintain policies and procedures designed to promote and achieve compliance with such laws and with the representation and warranty contained herein.

(c)   The operations of each Loan Party and its Subsidiaries and Affiliates are and have been conducted at all times in material compliance with all applicable financial recordkeeping and reporting requirements, including those of the Bank Secrecy Act, as amended by Title III of the PATRIOT Act, and the applicable anti-money laundering statutes of jurisdictions where such party conducts its business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "***Anti-Money Laundering Laws***"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving any

64

Loan Party or any of its Subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Borrower, threatened.

(d)     No Loan Party, nor any of its Subsidiaries or Affiliates, nor any director, officer, or employee of the foregoing, nor, to the Borrower's knowledge, any broker, agent or representative of such Loan Party, Subsidiary, or Affiliate, is a Person that is, or is owned or controlled by a Person that is:

(i)     the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control ("*OFAC*"), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "*Sanctions*"), nor

(ii)     located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

(e)     The Borrower will not, directly or indirectly, use the Loan Proceeds, or lend, contribute or otherwise make available the Loan Proceeds to any Subsidiary or Affiliate, joint venture partner or other Person:

(i)     to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions; or

(ii)     in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the offering, whether as underwriter, advisor, investor or otherwise).

(f)     The Loan Parties and their Subsidiaries and Affiliates have never knowingly engaged in, are not knowingly engaged in, or will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.

3.27.   Disclosure. The Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which the Borrower is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. No statement or information contained in this Agreement, any other Loan Document, or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lenders, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statement contained herein or therein not misleading.  The preceding sentence applies to the factual matters contained in any third party reports and Forward Looking Information furnished by the Borrower or any of its Affiliates, to the extent that such factual matters were provided by the Borrower or any of its Affiliates.  The Construction Budget, the Construction Schedule and any estimates or other expressions of view as to future circumstances (hereinafter collectively "*Forward Looking Information*") included in such materials are based upon good faith estimates and assumptions believed by the Borrower to

65

be reasonable at the time made; it being recognized by the Lenders that to the extent that the Project Budgets, the Project Schedules and Financial Projections pertain to future events such items are not to be viewed as fact and that actual results during the period or periods covered by the Forward Looking Information may differ from such projected results and such differences may be material.

3.28.   Filings. No filing, recording, re-filing or rerecording is necessary to perfect and maintain the perfection and priority of the interest, title or Liens created by the Loan Documents with respect to Collateral that can be perfected by filing.

3.29.   Land Not in Flood Zone. None of the Collateral includes improved real property that is or will be located in an area that has been identified by the Director of the Federal Emergency Management Agency (FEMA) as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended, or if any Collateral is so located, Borrower or the applicable Project Company has obtained the required flood insurance and provided evidence of such coverage to the Lenders.

3.30.   Labor Disputes and Acts of God. Neither the business nor the properties of Borrower or any other Loan Party (or, to the knowledge of the Loan Parties, any Material Project Counterparty) is affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, volcano, earthquake, embargo, act of God, or of the public enemy, or other casualty or force majeure event (whether or not covered by insurance), which could reasonably be expected to have a Material Adverse Effect.

3.31.   Security Documents.

(a)    Subject to the entry and to the extent of the terms of the Interim DIP Order (and the Final DIP Order, when applicable), all of the Obligations of each Loan Party will be authorized by each DIP Order and shall, subject only to the Carve Out (and other exceptions set forth in each DIP Order and the DIP Intercreditor Agreement):

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, constitute joint and several allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all other administrative expenses, adequate protection claims, diminution in value claims and all other claims asserted against Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506(b), 506(c) (subject to the entry of the Final DIP Order), 507(a), 507(b), 507(d), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "***DIP Super-Priority Claims***") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Super-Priority Claims shall be payable from and have recourse to all pre- and post-petition assets and property, whether existing on the Petition Date or thereafter acquired, of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, subject to entry of the Final DIP Order, the proceeds of any Avoidance Actions).  The DIP Super Priority Claims shall be entitled to the full protection of

66

section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order (or, after entry thereof, the Final DIP Order) or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise;

(ii)     pursuant to sections 364(c) and 364(d) of the Bankruptcy Code and the Security Documents, be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable security interest in and Lien on the Collateral of each Loan Party, including, subject to the entry of and to the extent of the terms of the Final DIP Order, the proceeds of Avoidance Actions, in each case, subject to the priorities and other terms set forth in each DIP Order;

(b)     upon the entry, and subject to the terms, of each of the Interim DIP Order and the Final DIP Order, each such DIP Order is effective to create in favor of each Lender, a legal, valid, enforceable and perfected security interest in the Collateral of the Loan Parties and proceeds thereof, without any further action being required by the Lender; and

(c)     upon the entry, and subject to the terms, of each of the Interim DIP Order and the Final DIP Order, each such DIP Order and the Loan Documents is sufficient to provide the DIP Super-Priority Claims and security interests in and Liens on the Collateral of the Loan Parties described in, and with the priority provided in, Annex 3 to the DIP Order, without any further action being required by the Lender.

3.32.   <u>Importation Tariffs</u>. To the Borrower's knowledge after reasonable investigation, no equipment identified in the Project Budget for any Project or otherwise expected to be utilized in any Project could reasonably expected to be subject to any Importation Tariffs, except for Importation Tariffs set forth in the Project Budget.

3.33.   <u>Approved Budget</u>. The initial Approved Budget attached hereto as Exhibit B and each subsequent Approved Budget delivered in accordance with Section 4.28 has been prepared in good faith, with due care and based upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) could reasonably be expected to result in any material change in the Approved Budget, other than those disclosed to the Lenders and their advisors.

3.34.   <u>DIP Order</u>.

(a)     From and after the Petition Date, the Loan Parties are in compliance in all material respects with the terms and conditions of the Interim DIP Order or the Final DIP Order, as applicable.

(b)     From and after the Interim DIP Order Date, the Interim DIP Order, or after the Final DIP Order Date, the Final DIP Order, is in full force and effect and has not been vacated, stayed, reversed, terminated, rescinded, modified or amended without the prior written consent of the Required Lenders.

(c)     The Borrower, Loan Parties and the Lenders shall be entitled to rely in good faith upon the DIP Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrower, Loan Parties and the Lenders shall be permitted and required to perform their

respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant DIP Order has been stayed by a court of competent jurisdiction.

3.35.   Bankruptcy Cases.

(a)   Solely to the extent the Petition Date occurs, the Chapter 11 Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim DIP Order and Final DIP Order (the "**DIP Motion**"), (ii) the hearing for the entry of the Interim DIP Order and (iii) following the entry of the Interim DIP Order, the hearing for entry of the Final DIP Order. The Borrower and the other Loan Parties shall give, on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules for the Bankruptcy Court, the Complex Case Procedures and as specified in the Interim DIP Order or Final DIP Order, as applicable.

(b)   Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the provisions of Article VI and the applicable provisions of the Interim DIP Order or the Final DIP Order, as the case may be (and subject to any notice required hereunder or thereunder), upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall be entitled to immediate payment of the Obligations and to enforce the remedies provided for hereunder, under the DIP Order or under applicable laws without further motion or application to, or order from, the Bankruptcy Court.

(c)   From and after the Petition Date, no order has been entered in any of the Chapter 11 Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner (other than a fee examiner) or receiver having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code or (iii) to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases, in each case, without the consent of the Required Lenders.

(d)   Subject to an upon entry of the Interim DIP Order, the Collateral is subject to a legal, valid, enforceable and perfected security interest and Liens with the priority set forth in the DIP Order, to the fullest extent permissible under applicable law.

(e)   The Borrower is in compliance in all material respects with the terms and conditions of the DIP Order. Each of the Interim DIP Order (with respect to the period prior to the Final DIP Order Date) and the Final DIP Order (from and after the Final DIP Order Date) is in full force and effect, is a Final Order and has not been modified or amended other than as reasonably acceptable to the Lenders.

(f)   From and after the entry of the Interim DIP Order, pursuant to and to the extent permitted in the Interim DIP Order and applicable law, the Obligations (i) will constitute allowed joint and several superpriority claims and (ii) will be secured by a valid, binding, continuing, enforceable, fully perfected Lien on all of the Collateral pursuant to Sections 364(c)(2)

68

and (c)(3) of the Bankruptcy Code, subject to the Carve Out and the priorities set forth in the DIP Order.

(g)    Each Budget Variance Report is true, complete and correct in all material respects for the period covered thereby as of the date such Budget Variance Report is delivered.

**SECTION 4.**  <u>Affirmative Covenants</u>. The Borrower covenants and agrees that so long as any of the Obligations (other than indemnity obligations that survive the termination of the Agreement) remain outstanding, the Borrower shall and, as applicable, shall cause each of its Subsidiaries and, in the case of Section 4.28, the other Loan Parties and Shared Obligors to:

4.1.    <u>Financial Statements</u>. Maintain at all times a system of accounting established and administered in accordance with sound business practices and GAAP, to Borrower's and Sponsor's knowledge, and will deliver to the Lenders, in form and detail reasonably satisfactory to the Lenders:

(a)    quarterly, within forty-five (45) days after the end of each fiscal quarter of Sponsor, Borrower and each Project Company, commencing with the quarter ending on December 31, 2025, quarterly management-prepared unaudited financial statements of Sponsor (which statements of each Project Company and of the Borrower may be consolidated into the Sponsor's statement) prepared in accordance with GAAP, to Borrower's and Sponsor's knowledge, which shall include a balance sheet as of such fiscal quarter end and year-to-date income statement;

(b)    annually, within one hundred twenty-five (125) days after the end of each fiscal year of Sponsor, Borrower and each Project Company, commencing with the fiscal year ending on December 31, 2025, annual management-prepared audited financial statements for Sponsor (which statements of Borrower and each Project Company may be consolidated into the Sponsor's) prepared in accordance with GAAP by independent certified public accountants satisfactory to the Lenders and which shall include a balance sheet, an income statement, and a statement of cash flows and the auditor's opinion with respect to such financial statements, which shall not contain any qualifications or exceptions;

(c)    quarterly, within five (5) Business Days after the end of each fiscal quarter of Borrower, commencing with the quarter ending on December 31, 2025, an updated Valuation Model certified by the Borrower in writing as true and correct and based on reasonable assumptions;

(d)    promptly upon request of the Lenders, such other information, reports or documents respecting the business, properties, operations, or financial condition of Sponsor, Borrower, each Project Company, each "Loan Party" (or other similar defined term) under each of the Carlyle Prepetition Note Purchase Agreement and the Brookfield Credit Agreement, and each of their respective Subsidiaries, as the Lenders may at any time and from time to time reasonably request;

(e)    every other Friday, commencing with the first Friday after the Petition Date, schedules of all payments made pursuant to the "first day orders" or the "second day orders";

(f)      within 20 days after the end of each fiscal month, commencing in the fiscal month in which the Petition Date occurs, reporting on (i) the continued operations and maintenance, engineering, procurement, construction, development, and asset management services under the O&M Services Agreements, and those expected to be provided under the Transition Services Agreement, and (ii) ACT's business, operations and financial position and any sale or financing process of ACT (including any reporting being provided to the lenders under any financing secured by the assets or equity of ACT).

(g)      every other Friday, commencing with the first Friday after the Petition Date, summary information regarding indications of interest and bids received in the marketing and sale process related to the Sale Transaction subject to the Bidding Procedures and such other material information regarding the marketing and sale process as the Lenders may reasonably request (in each case, subject to any confidentiality restrictions);

(h)      on each Friday, update reports with respect to the status of construction milestones required to be achieved under the debt financing for the Apex and Two Hearted projects and the satisfaction of conditions to the remaining funding dates under the tax equity financing for the Apex and Two Hearted projects, including providing the Lenders with copies of then-current drafts of any amendments or additional financing documents and any material communications;

(i)      on each date Liquidity is test pursuant to Section 5.32, an officer's certificate certifying the amount of Liquidity as of such date;

(j)      promptly, upon request of the Lenders, reports detailing professional fee expenditures, allocated according to whether such professional fees were expended in connection with the Brookfield Silo Entities, Fundamental Silo Entities, Carlyle Silo Entities, or otherwise;

(k)      [within five (5) Business Days after the end of every one week period, (i) a statement of cash flows for PGR Procurement, LLC, which shall include all actual receipts and disbursements and a summary of all equipment deliveries and status of pending deliveries, in each case, for the week then ending, (ii) an updated Schedule 4.1(k) as of the applicable one week period then ending and (iii) all such other information the Lenders request in respect of clauses (i) and (ii); and][5]

(l)      all reporting required to be delivered pursuant to any Additional DIP Facility, the Brookfield Credit Agreement, the Carlyle Prepetition Note Purchase Agreement or any other Additional DIP Facility to the extent such required reporting includes information regarding the Fundamental Silo Entities.

4.2.    Development/Construction Reports. Deliver to the Lenders within five (5) Business Days after the end of every two week period following the Interim DIP Facility Effective Date, a report, with respect to each Project, in form and substance reasonably satisfactory to the Lenders containing the following:

(a)      An updated Milestone Tracker;

_____

[5] Sidley: Company to confirm whether they can accommodate this request.

(b) Status of all security deposits, letters of credit, and other credit support with respect to such Project, including amounts, beneficiaries, and updates regarding any anticipated draw on such credit support and/or any additional credit support requirements that will be required for such Project;

(c) Status of interconnection process, including construction of any interconnection and transmission facilities and any Utility approvals and any other material milestones with the Utility;

(d) Status of any filings that must be made, actions that must be taken, approvals that must be obtained and any material deadlines applicable to any Project Incentives;

(e) Status of acquisition of all Permits, including a list of each Permit and each Supplement to a Permit received by Borrower or any Project Company during the prior calendar month in connection with the Projects (together with a copy of each such Permit or Supplement);

(f) Status of other development and construction work;

(g) Copies of any new or changes/additions to third party reports (environmental, engineering, etc.);

(h) A list and copies of any new Material Project Documents, Supplements to Material Project Documents and terminations of Material Project Documents;

(i) [reserved];

(j) [reserved];

(k) Receipt of any surveys along with a copy of such survey;

(l) Any updates or proposed changes to the Project Budgets;

(m) Any updates or proposed changes to the Project Schedules;

(n) A narrative of development status and any material events that have occurred since the prior development report and status of progress towards any important deadlines for the development work to be performed by or on behalf of Borrower and the applicable Project Company for each Project; and

(o) The amount of safe harbor radiators (transformers) and any other safe harbor equipment owned by the Sponsor or its Affiliates which are unassigned to a project and available for use by the Projects.

4.3.  Notice. Promptly, and in any event no later than one (1) Business Day after acquiring notice, giving notice or obtaining knowledge thereof, as the case may be, give written notice to the Lenders of (a) the occurrence of any Default, Event of Default, Project Specific Adverse Event, or any event, development or circumstance which could reasonably be expected to have a Material Adverse Effect or otherwise materially and adversely affect any Project Budget,

71

any Project Schedule or the commercial viability of any Project; (b) any litigation instituted or threatened against any Loan Party, or any judgment against any Loan Party, where claims against such Loan Party exceed Two Hundred Fifty Thousand Dollars ($250,000); (c) any notice of a claim which exceeds Two Hundred Fifty Thousand Dollars ($250,000) against or investigation of any Loan Party or any of such Loan Party's properties with respect to any Applicable Laws; (d) any material breach, default or event of default under a Project Document or any termination or intended termination of a Project Document or any other Material Contract; (e) any casualty event to or any initiation of any condemnation proceedings involving any Project or any Site or any material portion thereof; (f) execution and delivery of any Additional Project Document (together with a copy thereof); (g) (1) receipt of any Permit (together with a copy thereof), (2) any loss of any Permit; (3) any Supplement to any Permit and (4) receipt of any material notice relating to the development of any Project received by any Loan Party from, or delivered by any Loan Party to, any Governmental Authority, any Utility or any Material Project Counterparty; (h) [reserved]; (i) material suspension of the work on the development of any Project; and (j) any seizure by any Governmental Authority of any Prohibited Equipment and any action by a Governmental Authority causing equipment owned by a Project Company or intended to be owned by a Project Company to be Prohibited Equipment.

4.4.    <u>Conduct of Business and Maintenance of Existence</u>. Continue to engage in business of the same general type as being conducted by it and proposed to be conducted by it as of the Interim DIP Facility Effective Date and do and cause to be done all things necessary to maintain and keep in full force and effect its existence in good standing in its jurisdiction of formation and qualified to do business in each jurisdiction in which it conducts business and at all times hold itself out to the public as a legal entity separate and distinct from any other entity (including any Affiliate of Borrower), except where the failure to be so qualified would not result in a Material Adverse Effect.  Borrower and its Subsidiaries shall engage only in the business contemplated by the Operative Documents and shall continue to operate the Fundamental Silo Entities (and assets thereof) in the ordinary course of business.

4.5.    <u>Compliance with Laws</u>. Comply in all material respects with all Applicable Laws and Permits to which Borrower, any Project Company or any Project are subject, and comply, or cause compliance, in all respects, with all Sanctions, Anti-Money Laundering Laws and applicable anti-corruption laws applicable to any Loan Party or any Project.

4.6.    <u>Permits</u>. (a) Maintain all necessary Permits with respect to its business and each Project, (b) timely obtain all necessary Additional Required Permits, as and when needed and (c) comply with all material requirements of all Permits.

4.7.    <u>Payment of Liabilities and Taxes</u>. Subject to the terms of the Bankruptcy Code, the terms of the DIP Order and any required approval by the Bankruptcy Court, pay, when due, all of its material Indebtedness, all utility and other charges incurred in the development of any Project, and all assessments and charges lawfully made by any Governmental Authority for public improvements that may be secured by a Lien on the properties of any Loan Party or any Project, and liabilities, and timely file all income and other material Tax returns and timely pay all material Taxes imposed upon the Borrower or any Project Company or upon Borrower's or any Project Company's income, profits or property, except to the extent the amount or validity thereof is

contested in good faith by appropriate proceedings so long as adequate cash reserves have been set aside therefor.

4.8.  Contractual Obligations. Comply (except to the extent excused by force majeure events or the non-performance of the other party) in all material respects with each Operative Document and any other Contractual Obligations to which any Loan Party is a party, including any obligation to maintain, replace or replenish any credit support obligations as and when required under any Material Project Document, and maintain in full force and effect all Project Documents and comply with all incentive programs in which the Borrower or any Project Company participates and take all actions necessary for the Borrower or any Project Company to obtain the full benefits to which it is entitled under such incentive programs.

4.9.  Use of Loan Proceeds. The Loan Proceeds shall be used by the Loan Parties and their subsidiaries in accordance with the terms of the Loan Documents and the DIP Order, including the uses specified in Section 2.1(b) of this Agreement.

4.10.  Development and Construction Work. Proceed with the design, development and construction of each Project: (i) in material compliance with the applicable Project Budget, the applicable Project Schedule, the Loan Documents, all Applicable Laws, all Permits and the Project Documents, (ii) in compliance with all requirements of any applicable Utility tariffs and the rules and requirements of all Project Incentives, and (iii) in accordance with the generally accepted practices, standards and procedures customary in the U.S. photovoltaic power generation industry with respect to solar powered generation facilities.

4.11.  Insurance.

(a)  Maintain insurance in such amounts and covering such risks as is consistent with sound business practice, and in any event as is ordinarily and customarily carried by companies similarly situated and in the same or similar businesses as the Borrower and each Project Company.  Such insurance shall include (a) the coverages set forth on Schedule 4.11 attached hereto, unless the Lenders consent to any changes in writing and (b) any coverages required under the Project Documents.  The Borrower will pay (or cause the applicable Project Company to pay) when due all premiums on such insurance and will furnish to the Lenders evidence of payment of such premiums and, upon request, such other information as to the insurance carried by the Borrower or each Project Company as the Lenders may request.  Each policy of such insurance covering the Collateral and each policy of insurance required to be maintained hereunder or under any Project Document shall contain a provision or endorsement satisfactory to the Lenders naming each Lender as a lender loss payee or additional insured, as applicable, and providing that (i) such policy may not be canceled or altered and no Lender may be removed as a lender loss payee or additional insured, as applicable, without at least thirty (30) days' prior written notice to the Lenders, and (ii) no act or default of the Borrower, any Project Company or any other Person shall affect the right of any Lender to recover under such policy.

(b)  The Borrower (on its own behalf and on behalf of each Project Company) hereby irrevocably, until all Obligations have been satisfied in full, (i) assigns and grants to the Lenders a security interest in any and all Casualty Insurance Proceeds, (ii) directs each insurance company to pay all such Casualty Insurance Proceeds directly to the Lenders as loss payee, and

73

(iii) constitutes and appoints the Lenders (and all officers, employees or agents designated by the Lenders) as the Borrower's and each Project Company's true and lawful attorney-in-fact (coupled with an interest) with authority and power on behalf of the Borrower or any Project Company to make, adjust, settle or compromise all claims under each such insurance policy, to collect and receive all Casualty Insurance Proceeds payable under each such insurance policy and to endorse any check, draft or instrument for such Casualty Insurance Proceeds.  Notwithstanding the foregoing, so long as no Event of Default has occurred and is continuing, the Borrower or the applicable Project Company may (and the Lenders may not) adjust, settle or compromise any such claim, provided that if such claim exceeds Two Hundred Fifty Thousand Dollars ($250,000) the Borrower and such Project Company, as applicable, shall obtain the Lenders' prior written approval.

(c)     Any Casualty Insurance Proceeds received by the Lenders (less the amount of any reasonable costs for the settlement thereof) shall be applied by Lenders as follows:

(i)     If Lenders reasonably believe that an Event of Loss has occurred or Borrower otherwise elects not to repair or restore such Project, then at the option of the Lenders, such Casualty Insurance Proceeds shall be first applied to repay the Obligations and then disbursed to the Borrower;

(ii)     If Lenders reasonably believe that an Event of Loss has not occurred and Borrower elects to repair or restore such Project, then, provided that no Event of Default has occurred and is continuing, then the Lenders shall hold all insurance proceeds for the purpose of re-advancing the same to the Borrower, in a manner similar to that described in this Agreement for advances of Loan Proceeds, for the purpose of repairing such damage or destruction, subject to such other conditions and requirements as the Lenders may reasonably require; and

(iii)     Any excess Casualty Insurance Proceeds not required for the repair or restoration of such Project shall be applied to prepay the Obligations.

4.12.   Event of Eminent Domain.

(a)     If an Event of Eminent Domain shall occur with respect to any Collateral, (a) diligently pursue all its rights to compensation against the relevant Governmental Authority in respect of such Event of Eminent Domain, (b) not, without the written consent of the Required Lenders, compromise or settle any claim against such Governmental Authority, and (c) pay all Condemnation Proceeds in respect of such Event of Eminent Domain to the Lenders.  The Borrower (on its own behalf and on behalf of each Project Company) hereby irrevocably assigns and grants to the Lenders a security interest in any and all Condemnation Proceeds, and constitutes and appoints the Lenders (and all officers, employees or agents designated by the Lenders) as the Borrower's and each Project Company's true and lawful attorney in fact (coupled with an interest) with authority and power on behalf of the Borrower and each Project Company to make, adjust, settle or compromise all claims under each such Event of Eminent Domain, to collect and receive all Condemnation Proceeds payable under each such Event of Eminent Domain and to endorse any check, draft or instrument for such proceeds.  Any Condemnation Proceeds received by the Lenders as a result of any Event of Eminent Domain (less the amount of any reasonable costs for the settlement thereof) shall be applied to the Obligations.  The Borrower (on its own behalf and

74

on behalf of each Project Company) consents to, and agrees not to object to or otherwise impede or impair, the participation of the Lenders in any eminent domain proceedings, and the Borrower shall (or shall cause the applicable Project Company to) from time to time deliver to the Lenders all documents and instruments requested by the Lenders to permit such participation.

(b)    Borrower shall (or shall cause the applicable Project Company to), and Lenders may, apply any Condemnation Proceeds received or held by it to prepay the Obligations.

4.13.   <u>Deposits to the Lenders</u>.

(a)    Direct all Material Project Counterparties and other obligors to pay all amounts due under any and all Project Documents to the Lenders, as directed by the Lenders.

(b)    [reserved].

4.14.   <u>Project Incentives</u>. Comply in all material respects with all the rules and requirements of all applicable Project Incentives and take all necessary or appropriate actions, in light of its present stage of development, so that each such Project shall be able to obtain the full benefits to which it is entitled in connection with such Project Incentives.

4.15.   <u>Inspection</u>. Permit the Lenders, by their representatives and agents, to inspect each Project and any of the properties, books and financial records of the Borrower and any Loan Party, to examine and make <u>copies</u> of the books of accounts and other financial records of the Borrower and any Loan Party, and to discuss the affairs, finances and accounts of the Borrower and any Loan Party, and to be advised as to the same by, the Borrower or any Loan Party (or its representatives) at such reasonable times and intervals as the Lenders may designate; <u>provided</u> that so long as no Default or Event of Default shall have occurred and be continuing, such inspection shall occur during reasonable business hours and after providing advance notice to Borrower or such other Loan Party. In connection with the foregoing, the Lenders and their representatives and agents, at the expense of the Borrower or such Loan Party, shall have the right to (a) enter any premises where the Collateral and the records relating thereto may be located and to audit, appraise, examine and inspect the Collateral and all records related thereto and to make extracts therefrom and copies thereof, and (b) verify under reasonable procedures the validity, amount, quality, quantity, value and condition of, and any other matter relating to, the Collateral, including contacting account debtors or any Person possessing any of the Collateral.

4.16.   <u>Further Assurances</u>. From time to time, at the Lenders' request and at Borrower's or such Loan Party's expense, execute, deliver, acknowledge and cause to be duly filed, recorded or registered any statement, assignment, instrument, agreement or other document and take any other action that may, in the Lenders' judgment, be reasonably necessary or desirable, in order to create, preserve, continue, perfect, or confirm the security interests and liens created in favor of the Lenders under, or to enable the Lenders to obtain the full benefits of, this Agreement and the other Loan Documents or to exercise and enforce any of the Lenders' rights, powers and remedies hereunder, thereunder, or under Applicable Laws.  The Borrower authorizes, and shall cause each other Loan Party to authorize, the Lenders at any time and from time to time to file in any appropriate filing office any financing statements and amendments thereto and continuations thereof covering any Collateral provided by the Borrower or any other Loan Party, including, but not limited to, any

75

amendment to terminate the Lenders' security interest in any other debtor listed on the same financing statement as the Borrower or any other Loan Party. The Borrower shall not, and shall not instruct or permit any Loan Party to, file any amendments, corrections statements or termination statements concerning any Collateral without the prior written consent of the Required Lenders. If any receivable arises out of a contract with the United States of America or any state, county, territory, municipality or any department, agency or instrumentality thereof, the Borrower shall immediately notify the Lenders thereof and, if required by the Lenders, execute and deliver any agreements, notices and/or assignments and do such other things as may be satisfactory to the Lenders in order that all sums due or to become due to the Borrower or such Loan Party under such contract shall be duly assigned to the Lenders in accordance with the Federal Assignment of Claims Act and/or any other applicable federal, state and local laws or regulations relating to the assignment of governmental obligations.

4.17.   <u>Additional Collateral Assignments and Consents</u>. With respect to any Additional Project Document, concurrently with the execution and delivery of such Additional Project Document, (a) cause the applicable Project Company to execute and deliver to the Lenders any Collateral Assignment reasonably requested by the Lenders, (b) cause the applicable counterparty to execute and deliver to the Lenders a Financing Consent, which is, in the Lenders' judgment, in form and substance reasonably satisfactory to the Lenders, and (c) if the applicable counterparty is an Affiliate of the Borrower, the Borrower shall cause the counterparty to execute and deliver to the Lenders a subordination agreement which is, in the Lenders' judgment, in form and substance reasonably satisfactory to the Lenders.

4.18.   <u>Exemption from Regulation</u>.

(a)   Take all necessary or appropriate actions with respect to each Solar Project to obtain and maintain its status as a Qualifying Facility or to cause the Project Company owning such Solar Project to obtain or maintain its status as an EWG in each case consistent with the representations set forth in Section 3.22(a).

(b)   Take all necessary or appropriate actions so that each Project and each Loan Party qualifies for all Project Incentives.

(c)   Take all necessary or appropriate actions so that each Project and each Loan Party shall be exempt from any financial, organizational or rate regulation under Applicable Laws as a result of the development, construction, ownership, leasing or operation of each Project or the generation, sales or transmission of electric energy, capacity, ancillary services or SRECs generated thereby.

(d)   If not exempt from Section 205 of the FPA, prior to the generation, sale or transmission of any electric energy (including test energy), capacity or ancillary services from each Project, the Borrower shall obtain MBR Authority. Thereafter, the Borrower shall take all necessary or appropriate actions so that it maintains such MBR Authority.

4.19.   <u>Warranty of Title</u>. Maintain with respect to each Site (a) either (i) an enforceable interest in and to the fee or leasehold estate (as the case may be) to such Site pursuant to any applicable Site Control Agreement or, (ii) an enforceable option to such fee or leasehold estate (as the case may be) to such Site, in each case (1) pursuant to the terms of any applicable Site Control

Agreement and (2) subject only to Permitted Liens, and (b) good and valid title to all of its other respective properties and assets, other than property or assets disposed of in the ordinary course of its business.

4.20.   <u>Separateness</u>. Borrower shall, and shall cause each Project Company to:

(a)     Maintain its accounts separate from those of each other Loan Party or any other Person with commercial banking institutions and not commingle their funds with those of any other Person;

(b)     Act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses, and at all times using its own stationery, invoices and checks separate from those of any other Person;

(c)     Conduct its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts) and maintain accurate and separate books, records and accounts and financial statements (it being understood that the Borrower will be consolidated for financial reporting purposes with Sponsor);

(d)     Maintain in full effect its existence, rights and franchises as a limited liability company under the laws of the formation state and obtaining and preserving its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement and each other instrument or agreement necessary or appropriate to properly administer this Agreement and permit and effectuate the transactions contemplated hereby and thereby;

(e)     Obtain proper authorization from member(s), director(s) and manager(s) as required by its limited liability company agreement for all of its limited liability company actions;

(f)     Comply with the terms of its organizational documents;

(g)     Conduct all material transactions between itself and any of its Affiliates on an arm's length basis and on a commercially reasonable basis;

(h)     Allocate fairly and reasonably the cost of any shared office space with any other Person or any of its Affiliates;

(i)     [Reserved];

(j)     Pay its operating expenses, debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its own assets;

(k)     Maintain all of its assets in its own name and not commingle its assets with those of any other Person;

(l)     Maintain adequate capital for the normal obligations reasonably foreseeable in light of its contemplated business operations;

77

(m)     Not pledge its assets for the benefit of any Person, except as provided for in the Loan Documents and the grant of Permitted Liens of the type described in section (l) of the definition thereof; and

(n)     Not acquire the securities of its Affiliates.

4.21.    <u>Additional Reporting</u>.

(a)     <u>Monthly Financial Statements</u>. As soon as available, and in any event within 20 days after the end of each fiscal month, commencing with the month ending October 31, 2025, the unaudited consolidated balance sheet of the Borrower and its Subsidiaries and the related unaudited consolidated operating statements for the immediately preceding fiscal month, all in reasonable detail, certified by the Chief Financial Officer;

(b)     <u>Financial Status of Blue Ridge and Sale Assets</u>. Together with each monthly financial statement required to be delivered in accordance with Section 4.21(a) hereof, the unaudited consolidated balance sheet of Blue Ridge, its Subsidiaries and any entities holding Sale Assets as at the end of such fiscal month and the related unaudited consolidated statements of income, stockholders' equity, cash flows, business funding requirements and other business updates for the period from the beginning of the then current fiscal month to the end of such fiscal month, all in reasonable detail, certified by the Chief Financial Officer.

(c)     <u>Applicable Rate</u>. Prompt written notice if at any time the interest rate applicable to any obligations under the Carlyle Prepetition Note Purchase Agreement or the Brookfield Credit Agreement is greater than the rate that would be the Interest Rate pursuant to clause (x) of the definition thereof.

4.22.    <u>Prohibited Equipment</u>. Exclude any Prohibited Equipment from any Project and the Project Budget for any Project.  If any equipment installed in or expected to be installed in such Project could reasonably expected to be Prohibited Equipment, Borrower shall promptly notify the Lenders of such fact in writing along with a plan for replacing such equipment and shall promptly replace the same with comparable equipment that is not Prohibited Equipment in such Project or budget.

4.23.    <u>Minimum Qualified Projects</u>. The Borrower shall at all times cause the total number of Projects constituting Qualified Projects hereunder at any given time to be no fewer than 20 Projects.

4.24.    <u>Weighted Average PPA</u>. The Borrower shall at all times cause the weighted average PPA term, based on MWdc size, to be no less than 5 years.

4.25.    <u>Material Pleadings</u>. At least three (3) Business Days prior to filing (or, if not practicable, as soon as reasonably practicable), the Loan Parties shall cause their advisors to deliver to the Lender Advisors copies of all material pleadings, motions (other than "first day" motions and proposed orders) and other material documents to be filed by or on behalf of any Loan Party with the Bankruptcy Court in the Chapter 11 Cases, which such pleadings shall include each Lender as a notice party; provided that such pleadings, motions and other material documents shall

4925-1692-5288v.26

incorporate any reasonable comments by the Lenders or the Lender Advisors to such pleadings, motions and other material documents.

4.26.   Evidence of Compliance with WRO. In the event that any Governmental Authority, including the U.S. Customs and Border Protection or U.S. Department of Homeland Security, seizes any polysilicon or other materials related to the construction or development of any Project in connection with an actual or perceived violation of the WRO, then the Lenders may request, and upon any such request by the Lenders the Borrower shall promptly (and in any event within five (5) Business Days of such request, or such longer time as the Lenders may agree in their sole discretion) provide, evidence reasonably satisfactory to the Lenders of the Borrower's compliance with the WRO.

4.27.   Weekly Call. The Borrower shall conduct, and shall ensure that its senior management and advisors participate in, weekly status calls or meetings with the Lenders (and their respective advisors) no earlier than 12:00 p.m. New York City time on Thursday of any calendar week to discuss (i) the Approved Budget or the Approved Budget Variance Reports and/or any other reports or information delivered pursuant to this Article 4 or otherwise, (ii) the financial operations and performance of the Loan Parties' business, and (iii) such other matters relating to the Loan Parties as the Lenders (or their agents or advisors) shall reasonably request (subject to limitations on confidentiality arrangements and/or to protect attorney-client privilege).

4.28.   Approved Budget.

(a)      The use of Loans under this Agreement and the other Loan Documents shall be consistent with the Approved Budget (subject to variances permitted under Section 4.28(c)). No proceeds of the Loans shall be used for any purpose not set forth in the Approved Budget. The initial Approved Budget approved by the Lenders hereunder is attached hereto as Exhibit B for the [first thirteen (13) week period from week ending November [7], 2025]. The initial Approved Budget shall be the Approved Budget until the next Updated Budget is delivered on the Updated Budget Delivery Date and such Updated Budget has been accepted (or deemed accepted) in accordance with this Section 4.28.  The Borrower shall deliver to the Lenders not later than 5:00 p.m. on every fourth Friday occurring after the Petition Date (each, an "***Updated Budget Delivery Date***"), commencing with the Friday of the fifth full calendar week occurring after the Petition Date, a Budget for the rolling 13-week period commencing on the Saturday immediately preceding the applicable Updated Budget Delivery Date (each, an "***Updated Budget***"), in form and substance acceptable to the Required Lenders; provided that: (i) such Updated Budget shall be deemed acceptable to the Required Lenders if the Lenders have not responded (which response may be provided by email by the Lender Advisors to the Borrower) to such Updated Budget within three Business Days after receipt by the Lender Advisors of such Updated Budget; provided that if the Lenders have not objected in writing (which objection may be provided by email by the Lender Advisors to the Borrower) to such Updated Budget within three Business Days after receipt by the Lender Advisors of such Updated Budget such Updated Budget shall be deemed acceptable to the Required Lenders; (ii) the failure of any Updated Budget to be accepted by the Lenders shall not be deemed to be a violation of this Section 4.28 and no Default or Event of Default shall result solely from any objection by the Lenders to any Updated Budget; (iii) for the avoidance of doubt, upon (and subject to) the acceptance (or deemed acceptance) by the Lenders of any Updated Budget (and at no time prior thereto), such Updated Budget shall constitute the "Approved

79

Budget"; and (iv) during any period where an Updated Budget has not been approved by the Lenders, the initial Approved Budget or, if an Updated Budget has previously been approved by the Lenders, the existing Approved Budget, as applicable, shall constitute the "Approved Budget."

(b)    The Borrower shall deliver to the Lenders and the Lender Advisors for distribution to each Lenders on each Budget Variance Test Date, a Budget Variance Report.

(c)    The Borrower shall not permit aggregate disbursements as reported by the Borrower for such Budget Variance Test Period (excluding the effects of (x) professional fee disbursements for all advisors working on the Chapter 11 Cases (y) interconnection costs, and (z) any project spend that is either (a) incremental to amounts set forth in the Approved Budget and/or (b) on a cadence that differs from the Approved Budget, provided that for this clause (z), the corresponding lenders under the Additional DIP Facilities with Liens on such Project (or on the Silo that owns such Project) has (i) consented to such incremental project spend and/or change in timing and (ii) agreed to fund any amounts that are in excess of the budgeted amount for such project) (the amounts in clauses (x), (y) and (z), the "***Permitted Exclusions***") to have a negative variance of more than the greater of $2,000,000 and 15% of the forecasted aggregate disbursements as reported by the Borrower for such Budget Variance Test Period in the applicable Approved Budget. It is agreed and understood that following an Updated Budget Delivery Date, if the Lenders have objected in writing to the Updated Budget within three Business Days after receipt by the Lender Advisors of such Updated Budget and the existing Approved Budget remains in effect, any favorable variance from a prior Budget Variance Test Period may be carried forward and utilized in future Budget Variance Test Periods relating to such existing Approved Budget to offset negative variances in such future Budget Variance Test Period at the election of the Borrower.

(d)    The timing of delivery of any deliverables under this Section 4.28 may be extended with the consent of the Required Lenders.

4.29.    <u>DIP Milestones</u>. The Loan Parties shall achieve each of the DIP Milestones in accordance with the applicable timing referred to in Annex A (or by such later time as approved in writing by the Lenders).

4.30.    <u>Control Agreements</u>. The Borrower shall cause all Proceeds and all Customer Payments to be deposited into a Controlled Account.

4.31.    <u>Terms No Less Favorable</u>. If (i) the all-in yield (including pricing and fees) or any covenant in any Indebtedness incurred by the Sponsor or any Subsidiary thereof (including, but not limited to, the Borrower and the Loan Parties) after the Interim DIP Facility Effective Date is more favorable to the provider of such financing than the corresponding terms of this Agreement applicable to the Loans, or (ii) any term of any outstanding Indebtedness of the Sponsor or any such Subsidiary (including under the Carlyle Prepetition Note Purchase Agreement and the Brookfield Credit Agreement) is amended after the Interim DIP Facility Effective Date so that such term is more favorable to the holder of such Indebtedness than the corresponding term of this Agreement applicable to the Loans, then, in each case, at the election of the Lenders in their sole discretion, this Agreement and any applicable Loan Documents shall be automatically amended upon written notice to the Borrower so that the Loans benefit from the same term.

80

4.32.  Amendments to Additional DIP Facilities. The Borrower shall consult with the Lenders regarding any amendments, restatements, amendments and restatements, supplements, modifications or waivers to any Additional DIP Facility and shall, or shall cause the Borrower or the applicable Subsidiary or Affiliate thereof, as applicable, to consider any reasonable comments by the Lenders to such amendments, restatements, amendments and restatements, supplements, modifications or waivers.

4.33.  Project Senior Financing Consents; Exercise of Remedies Under any Project Senior Financing.

(a)  The applicable Loan Parties shall use reasonable best efforts to obtain Project Senior Financing Consents, in form and substance reasonably satisfactory to the Lenders, for the Eastover, Apex, and Two Hearted Projects, and shall include the Lenders in discussions with the applicable counterparties. The Loan Parties hereby irrevocably consent for all purposes to the Lenders discussing the Project Senior Financing Consents directly with the applicable counterparties, notwithstanding anything to the contrary in any confidentiality or other agreement.  To the extent requested by the Lenders at their sole discretion, the Loan Parties shall comply with the Project Senior Financing Collateral and Guarantee Requirement on the later of the Interim DIP Facility Effective Date and three (3) Business Days after such Person obtains any required Project Senior Financing Consents.

(b)  Upon any lenders or investors under any Project Senior Financing exercising remedies in respect of any Project and at the request of the Lenders, the Loan Parties shall promptly file one or more motions, in form and substance acceptable to the Required Lenders, seeking an order authorizing (i) a temporary restraining order and injunction in respect of such exercise of remedies and/or (ii) the Debtors to sell such Project on an expedited basis for a credit bid in an amount based on the purchase price adjustment schedule agreed among the Debtors and the Lenders prior to the Petition Date (and otherwise on the terms and conditions set forth in the Stalking Horse APA to the extent applicable), and thereafter use reasonable best efforts to consummate such sale.

4.34.  Credit Support; Regulatory Approvals.

(a)  The Loan Parties shall (i) use their reasonable best efforts (except with respect to third party consents, in which case the Loan Parties shall use commercially reasonable efforts) to (A) obtain approval from FERC under section 203 of the Federal Power Act, (B) if required, make any filings and obtain any consents or approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and (C) any other required regulatory approvals or third party consents, in each case if requested by the Lenders to consummate any transaction supported by the Lenders (provided, for the avoidance of doubt, that the Loan Parties' efforts to obtain regulatory approvals or third party consents in connection with any transaction selected as the highest and best offer pursuant to the Bidding Procedures shall not be a default or breach of the Loan Documents), and (ii) coordinate with the Lenders and the Lender Advisors on such approvals, filings and consents, including providing copies of such documents.

81

4.35.   <u>Surety Bonds</u>. The Borrower shall (a) use good faith efforts to draw or cause to be drawn all Project Surety Bonds as the same become available to draw, (b) consult with the Lenders with respect to any settlement negotiations with respect thereto, and (c) accept any settlement offer with respect thereto only with the consent of the Required Lenders.

4.36.   <u>Other Bankruptcy Matters</u>. The DIP Order shall be in form and substance satisfactory to the Lenders and the Debtors and shall include the following provisions:

(a)   modifying the automatic stay to permit the creation and perfection of the Liens set forth in this Agreement and in the DIP Order, subject to the Carve Out;

(b)   authorizing and approving the DIP Facility and the transactions contemplated thereby, including the Roll-Up Loans, and granting of the superpriority status, security interests, and liens and the payment of all premiums, payments, and fees referred to herein;

(c)   prohibiting the incurrence of any debt with a payment priority senior to or, unless expressly contemplated herein in connection with the liens on the Shared DIP Collateral securing the Additional DIP Facilities, equal to, the DIP Facility;

(d)   prohibiting the granting or imposition of liens senior or, unless expressly contemplated herein in connection with the liens on Shared DIP Collateral securing the Additional DIP Facilities, pari passu with the Liens set forth in this Agreement and in the DIP Order;

(e)   subject to a customary challenge period (the "***Challenge Period***"), acknowledging the validity and enforceability of the Prepetition Secured Obligations and the Prepetition Liens, waiving any and all claims and causes of action against the Prepetition Lenders, whether arising prior to, on or after the Petition Date, including, without limitation, any lender liability claims, any subordination claims, or any claims under any non-disclosure or confidentiality agreement, and providing a release to the Prepetition Lenders and their respective affiliates and representatives for any and all claims and causes of action arising from or related to the Prepetition Secured Obligations, the Prepetition Loan Documents, the DIP Facility, the Loan Documents or the negotiations in respect of the foregoing or the transactions reflected thereby;

(f)   providing that the Lenders and their counsel, advisors, and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(g)   subject to and upon entry of the Interim DIP Order, providing that in connection with any sale or other disposition of the Collateral or the Prepetition Collateral, including sales pursuant to section 363(k) of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or any sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code and/or applicable law, the Lenders (and the Prepetition Lenders) shall be authorized to credit bid on a dollar-for-dollar-basis the full amount of the Obligations and Prepetition Secured Obligations, as applicable, including any accrued interest and expenses, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code or otherwise;

(h)       providing that (i) the Obligations and the terms and provisions of the DIP Order shall survive entry of any order that may be entered (A) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) pursuant to which the Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code, and (ii) the Obligations shall not be discharged by the entry of any order confirming any plan of reorganization or liquidation in the Chapter 11 Cases;

(i)       providing for (i) a release by the Debtors, on their own behalf and on behalf of their estates, upon entry of the Interim DIP Order, of the Secured Parties and the Prepetition Lenders and each of their current and former directors, officers, employees, agents, advisors, and other representatives of and from any and all claims and causes of action solely with respect to the negotiations and entry into the Loan Documents and the use of Cash Collateral, and (ii) a waiver and release of any and all defenses as to the validity, perfection, priority, enforceability and avoidability of the Liens set forth in this Agreement and in the DIP Order and the DIP Obligations;

(j)       prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the Secured Parties with respect to the Collateral and, subject to entry of the Final DIP Order, the Prepetition Lenders with respect to the Prepetition Collateral;

(k)       subject to entry of the Final DIP Order, providing that the Prepetition Lenders are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the foregoing with respect to the proceeds, product, offspring, or profits of any of the Prepetition Collateral;

(l)       providing that in no event shall any of the Secured Parties with respect to the Collateral or, subject to entry of the Final DIP Order, the Prepetition Lenders with respect to the Prepetition Collateral, be subject to the equitable doctrine of marshaling; and

(m)       upon the occurrence and during the continuance of an Event of Default, providing that, upon five (5) business days' written notice from the Lenders to each of the Debtors, the U.S. Trustee, counsel to the Committee (if any), the Prepetition Lenders, and counsel to the agent or trustee for each Additional DIP Facility, the automatic stay under section 362 of the Bankruptcy Code shall be terminated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the purposes of permitting the Secured Parties to exercise rights and remedies as permitted under the DIP Order, the Loan Documents, and applicable law.

(n)       Notwithstanding anything to the contrary herein or in any Loan Document, the provisions of the Loan Documents shall be subject to the terms of the DIP Order.  In the event of any conflict between the terms of the DIP Order and the Loan Documents, the terms of the DIP Order shall govern and control (it being understood and agreed that the DIP Order shall be in form and substance reasonably acceptable to the Required Lenders).

(o)    The Secured Parties will not object to the retention of or allowance or payment of fees to any proposed Debtor Professional that are in compliance with the Approved Budget.

4.37.    Additional DIP Facilities. If (a) (i) any covenants in any Additional DIP Facility are more favorable to the provider of such financing than the corresponding terms of this Agreement or (ii) a Additional DIP Facility is amended so that such covenants are more favorable to the holder of such Indebtedness than the corresponding term of this Agreement, then, in each case, at the election of the Required Lenders in their sole discretion, this Agreement and any applicable Loan Documents shall be automatically amended upon written notice to the Borrower so that the Loans benefit from the same covenants, and (b) any pricing and fees in any Additional DIP Facility are more favorable to the provider of such financing than the pricing and fees of this Agreement, then, at the election of the Required Lenders in their sole discretion, the pricing and fees in respect of the DIP Facility shall be increased to the same extent that such pricing and fees in the Additional DIP Facility represent an increase relative to the Additional DIP Facility being replaced (subject to any requirements for such amendments set forth in the DIP Order).

4.38.    Material Decisions. The Loan Parties shall consult with the Required Lenders regarding all decisions that could reasonably be expected to have a material effect on the Collateral and the Fundamental Silo Entities (including its assets).

4.39.    Certain Project Covenants. The Borrower shall use reasonable best efforts to effectuate the following: To the extent that consent is required from a third-party (a) in order for the Loan Parties to grant a Lien or claim in favor of the Lenders on the Interim DIP Facility Effective Date, (b) to waive a default or event of default or a condition to funding or consummating a purchase under any Material Project Document, or (c) to effectuate a "Change of Control" (however defined) under any PPA or interconnection agreement, then such Person shall have obtained the necessary consent or waiver from such third-party and, in the case of clause (a) incurred such Lien or claim, and the Borrower shall have delivered such consent or waiver agreements to each holder of the Notes, which shall be in form and substance reasonably satisfactory to the Required Lenders.

4.40.    ACT. The Company shall, upon reasonable request, provide Newco, or cause to be provided to Newco, access to information technology and data (including from ACT) related to operations and maintenance, engineering, procurement construction, development and asset management services provided to the Fundamental Silo Entities.

**SECTION 5.**    Negative Covenants. The Borrower covenants and agrees that so long as any of the Obligations (other than indemnity obligations that survive termination of this Agreement) remain outstanding, the Borrower shall not, and shall cause each Project Company and ACT, and in the case of Sections 5.1, 5.2, 5.3, 5.7, 5.33, 5.35, 5.36, 5.37, 5.38, 5.39 and 5.40, the Loan Parties, and in the case of Sections 5.35, the Shared Obligors, not to, directly or indirectly, without the prior written consent of the Lenders:

5.1.    Indebtedness. Create, incur, assume or permit to exist any Indebtedness to exist except for Permitted Indebtedness and under the Additional DIP Facilities.

84

5.2.    <u>Liens</u>. Create, incur, assume or permit to exist any Lien on any of its property or assets, both now owned and hereafter acquired and including, without limitation, the Collateral, except for the Carve Out, Permitted Liens and the Liens created in connection with the Additional DIP Facilities.

5.3.    <u>Distributions</u>. Declare or pay any dividend or distribution (whether in cash, securities or other property) with respect to any Equity Interests in, or subordinated Indebtedness of, the Borrower or any Project Company, or make any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any such Equity Interest in, or subordinated Indebtedness of, the Borrower or any Project Company or of any option, warrant or other right to acquire any such Equity Interest in, or subordinated Indebtedness of, the Borrower or any Project Company, or make any tax distributions, or other payments to an Affiliate of the Borrower or any Project Company (each a "***Restricted Payment***"); <u>provided</u> that the limitations of this Section 5.3 shall not restrict or prohibit (a) distributions and dividends made to the Borrower or (b) the Borrower or any Project Company from repaying or reimbursing the Sponsor or any other Affiliate of the Sponsor for any Approved Costs paid by the Sponsor (or such Sponsor Affiliate) consistent with the Approved Budget; <u>provided</u> that the limitations of this Section 5.3 shall not be applicable to or otherwise restrict or prohibit any Project Company and/or Borrower from undertaking any transaction solely to the extent expressly identified and for the purposes disclosed in the Approved Budget.

5.4.    <u>Limitations on Restrictive Agreements; Negative Pledge</u>.

(a)    Except with respect to this Agreement and the other Loan Documents, enter into or permit to exist or become effective any consensual encumbrance or restriction on the ability of the Borrower or any Project Company to declare or pay any dividend or distribution (whether in cash, securities or other property) with respect to any Equity Interests in such Person, or make any payment (whether in cash, securities or other property) for the redemption, acquisition, or cancellation of any such Equity Interest.

(b)    Except with respect to this Agreement and the other Loan Documents, enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its Obligations under the Loan Documents to which it is a party (other than Permitted Liens of the type described in section (l) of the definition thereof).

5.5.    <u>Sale of Assets</u>. Sell, convey, license, transfer, assign, lease, abandon or otherwise dispose of (including in a sale and leaseback transaction) any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible including, without limitation, the Collateral, except for sales or dispositions in the ordinary course of business of materials and equipment that are worn out, obsolete or no longer useful, in each case, at fair market value or otherwise as approved pursuant to the Sale Order or other order of the Bankruptcy Court.

5.6.     <u>Transfer of Interests</u>. Cause, make, suffer, permit or consent to any creation, sale, assignment or transfer of any Equity Interest in the Borrower or any Project Company, except as expressly permitted under this Agreement, the Sale Order, or otherwise permitted by the Lenders.

5.7.     <u>Loans; Investments; Etc</u>. Make or permit to remain outstanding any loan, advance, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase or own any Equity Interests, bonds, notes, debentures or other debt securities of or make any other investment in, any Person or enter into any partnership, limited liability company or joint venture in any other Person (all of the foregoing, "***Investments***"), except that the Borrower may acquire Project Companies in accordance with the Approved Budget and as permitted under Section 2.21 and the Borrower may make further equity investments in its wholly-owned Subsidiaries that are Project Companies hereunder.

5.8.     <u>Contractual Obligations; Material Project Documents; Material Contracts</u>. Without the prior written consent of the Required Lenders (which consent shall not be unreasonably withheld, delayed or conditioned):

(a)     Other than the Sponsor, enter into any Contractual Obligation other than a Project Document or in connection with the Additional DIP Facilities; or

(b)     (i) enter into or become obligated under any Material Project Document, (ii) enter into any Supplement to any Material Project Document or terminate any Material Project Document, (iii) assign or consent to the assignment of any Material Project Document, or (iv) waive, or accept any waiver of any material provisions of any Material Project Document or grant any material consents thereunder.

Notwithstanding the foregoing, the limitations of this Section 5.8 shall not be applicable to or otherwise restrict or prohibit any Project Company and/or Borrower from undertaking any transaction that is consistent with and expressly identified in the Approved Budget.

5.9.     <u>Fundamental Changes</u>. Merge, consolidate, or combine with any other Person or wind-up, dissolve, liquidate or change its legal form, divide or split into two or more Persons, sell, or lease or otherwise transfer or dispose of all or any substantial part of the property, assets or business of or purchase or otherwise acquire substantially all of the assets of any Person except to the extent authorized pursuant to the Sale Order.

5.10.     <u>Change of Business; Use of Site</u>. (i) Change the nature of its business or expand its business beyond the business contemplated in the Operative Documents, (ii) acquire, own, lease or license any assets other than the Projects and assets necessary or incidental to the development, construction or operation of the Projects as contemplated by the Operative Documents, or (iii) use any Site for any purpose other than as necessary for or incidental to the development, construction, use, ownership, maintenance, operation or leasing of the applicable Project as contemplated by the Operative Documents.

5.11.     <u>Modification of Organizational Documents</u>. Enter into any Supplement to or terminate any of its Organizational Documents, or waive any material provisions thereof or grant any material consents thereunder.

5.12.    Affiliates. Make any payment to or enter into or participate in any transaction with an Affiliate (including any other Loan Party), unless (a) such transaction is (i) otherwise permitted by the terms of this Agreement or (ii) in the ordinary course of business of the Borrower, (b) the terms of such transaction are no more favorable to such Affiliate than those which would have prevailed in an arm's length transaction between unrelated third parties and (c) all obligations of the Borrower or its applicable Subsidiary to the Affiliate under such transaction are unsecured and subordinated to the Obligations pursuant to an affiliate subordination agreement approved by the Lenders and can be terminated by the Lenders upon an Event of Default; provided that the limitations of this Section 5.12 shall not be applicable to or otherwise restrict or prohibit any Project Company and/or Borrower from undertaking any transaction that is consistent with and expressly identified in the Approved Budget.

5.13.    ERISA. Maintain, contribute to, or become obligated to contribute to any employee benefit plans subject to ERISA.

5.14.    Accounts.

(a)    Maintain any deposit accounts, securities accounts or similar accounts other than Controlled Accounts (other than Excluded Accounts).

(b)    Without the prior written consent of the Required Lenders, withdraw or cause any funds to be withdrawn from the Controlled Accounts other than to make payments of the Obligations, pay for Approved Costs in accordance with the Approved Budget or to reimburse Borrower for Approved Costs; provided that in each such case the Borrower has made all mandatory prepayments required to be made pursuant to Section 2.13(b) prior to such withdrawal.

5.15.    [Reserved].

5.16.    Loan Proceeds. Directly or indirectly use, pay, transfer, distribute or dispose of any Loan Proceeds in any manner or for any purposes except as provided in Section 4.9 hereof.

5.17.    Anti-Terrorism Laws; OFAC; Other Regulations.

(a)    Violate any Anti-Terrorism Laws, Anti-Money Laundering Laws or otherwise take any action that would result in the representation set forth in Section 3.25 no longer being true;

(b)    Conduct any business or engage in making or receiving any contribution of goods, services or money to or for the benefit of any Blocked Person or Person which is subject to Sanctions;

(c)    Deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law; or

(d)    Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

5.18.   Federal Reserve Board Regulations. Directly or indirectly apply, or cause or permit any Loan Party to apply, any part of the proceeds of the Loans to the purchasing or carrying of any margin stock within the meaning of Regulations T, U or X of the Board, or any regulations, interpretations or rulings thereunder.

5.19.   Name and Location; Fiscal Year. (a) Unless thirty (30) days' advance notice in writing is delivered to the Lenders, change, or cause or permit any other Loan Party to change, its name, its jurisdiction of organization, its organization identification number, federal identification number, the location of its chief executive office, or its principal place of business, or (b) change its fiscal year without the written consent of the Required Lenders.

5.20.   Hedging Agreements. Enter into any Hedging Agreement.

5.21.   Contingent Liabilities. Except as provided in this Agreement or obligations under the Loan Documents, agree to become liable as a surety, guarantor, accommodation endorser or otherwise, for or upon the obligation of any other Person or otherwise create, incur, assume or suffer to exist any contingent obligation; provided, however, that this Section 5.21 shall not be deemed to prohibit (a) the acquisition of goods, supplies or merchandise in the normal course of developing, constructing and operating the Projects on normal trade credit; (b) the endorsement of negotiable instruments received in the normal course of developing, constructing and operating the Projects, (c) contingent liabilities required under any Permit or Operative Document, (d) Permitted Indebtedness or (e) any transaction that is consistent with and expressly identified in the Approved Budget.

5.22.   Partnerships. Execute a binding agreement to become a general or limited partner in any partnership, or a member in any limited liability company, or a joint venturer in any joint venture or acquire property, create and hold stock or other equity interests in any Person or form or acquire any Subsidiaries (other than new Project Companies and Projects that become subject to the terms of this Agreement), in each case other than expressly contemplated by the applicable Operative Documents.

5.23.   Compliance With Operative Documents. Do or permit (to the extent within its control and permitted by the Operative Documents) to be done any act under the Operative Documents, or omit or refrain (to the extent within its control and permitted by such Operative Documents) from any act under such Operative Documents, where such act done or permitted to be done, or such omission of or refraining from action, would reasonably be expected to have a Material Adverse Effect.

5.24.   Environmental Laws and Hazardous Substances.

(a)      Release, or cause or permit any Loan Party or Sponsor to Release, into the environment any Hazardous Substances in violation of or non-compliance with any Environmental Laws, Applicable Laws or applicable Permits or in a manner that would reasonably be expected to result in a Material Adverse Effect, or store, treat or dispose or allow the storage, treatment or disposal of any Hazardous Substances at, on or under any Site, except for the storage of Hazardous Substances in accordance with Environmental Laws, Applicable Laws and applicable Permits.

4925-1692-5288v.26

(b)    Conduct actions, or fail to take required actions, which result in adverse impacts to threatened or endangered species or habitat, cultural resources, or jurisdictional streams or wetlands, except for (i) actions or inactions in accordance with Environmental Laws and Permits, or (ii) actions or inactions that would not reasonably be expected to result in a Material Adverse Effect.

5.25.    Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings. On or after the Petition Date, without the Required Lenders' prior written consent, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Loan Party to (i) use any of the material properties or assets of the Loan Parties outside the ordinary course of business, (ii) satisfy prepetition claims of the Loan Parties or (iii) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Approved Budget, subject to Permitted Variances), (b) seeking to reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party, or (c) seeking relief that is otherwise inconsistent with this Agreement or the DIP Order.

5.26.    Land Not in Flood Zone. Permit any Collateral that includes improved real property to be located in an area that has been identified by the Director of the Federal Emergency Management Agency (FEMA) as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended, without the required flood insurance, if any, evidence of which flood insurance coverage shall be provided to the Lenders.

5.27.    Exercise of Rights Under Option. Exercise Borrower's rights under any option agreement to obtain fee simple or leasehold title to a Site unless and until the Borrower has executed a Mortgage in favor of the Lenders, and arrangements have been made for recording such Mortgage immediately following the execution of the lease or delivery of the warranty deed to the Borrower.

5.28.    Repurchase Option. Exercise any option to repurchase any Project or Project Company.

5.29.    No Restrictions on Granting Security Interest. Without the prior written consent of the Required Lenders, neither Borrower nor any Project Company shall permit to become effective in any lease, license (including, without limitation, any intellectual property license), Contractual Obligation or other agreement containing a provision that would prohibit or require the consent of any Person to the grant of a Lien on such lease, license, Contractual Obligation or other agreement in favor of the Lenders.

5.30.    Limitation on Changes to System Design. Neither the Borrower nor any Project Company shall change the System Design for a Qualified Project in a manner that is reasonably expected to either (a) [reserved], or (b) reduce the Aggregate Collateral Value.

5.31.    Limitation on Changes to Plans and Specifications. Without the prior written consent of the Required Lenders, neither Borrower nor any Project Company shall make or permit to be made any changes to the plans and specifications for a Project, unless such change could not reasonably be expected to reduce the Aggregate Collateral Value.

5.32.   _Liquidity_. The Borrower shall not permit unrestricted cash and cash equivalents (which, for the avoidance of doubt, shall include the proceeds of the funded Loans) held by the Sponsor and its Subsidiaries to be less than $5,000,000, tested on Monday of each calendar week after the Interim DIP Facility Effective Date and immediately prior to the consummation of any transaction pursuant to the Stalking Horse APA.

5.33.   _Material Settlements_. Borrower shall not, and shall not permit any of its Subsidiaries to, enter into any material settlements of litigation claims, claims held by Governmental Authorities, trade claims, or judgments unless such settlement is in form and substance reasonably acceptable to the Required Lenders.

5.34.   _Cash Management Arrangements_. The Loan Parties shall maintain their cash management arrangements consistent with past practice, and in compliance with the Cash Management Orders, subject to amendments acceptable to the Required Lenders; provided that the Cash Management Motion and the Cash Management Orders shall be in form and substance acceptable to the Required Lenders and nothing in the Interim DIP Order or Final DIP Order will alter or impair any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date. The Borrower and its Subsidiaries shall not make any payment or disbursement for any purpose that is not contemplated by the Approved Budget. No Controlled Account will be closed for so long as the Obligations remain outstanding without the prior consent of the Required Lenders.

5.35.   _Executive Compensation_. From and after the Interim DIP Facility Effective Date, without the prior written consent of the Required Lenders, Borrower shall not, and shall not permit any of its Subsidiaries to, (a) establish key employee incentive plans, key employee retention plans or any other similar payments or awards programs, (b) change or amend in any manner any such existing programs or related programs or (c) pay or agree to any compensation payment or plan, incentive payment or plan, employment agreement, retention plan or executive bonuses for any new employees or executives hired or retained on or after the Interim DIP Facility Effective Date.

5.36.   _Independent Director_. The Sponsor and its Subsidiaries shall not (a) remove or replace any New Independent Director, (b) limit the authority or scope of consent rights of any New Independent Director under the Organizational Documents of such Loan Party on whose board of directors or equivalent governing body any New Independent Director serves, or (c) amend, restate, amend and restate, supplement, modify or waive the terms of any Organizational Documents of any Loan Party on whose board of directors or equivalent governing body any New Independent Director serves, in each case without the consent of the Required Lenders.

5.37.   _Tax Matters_  The parties hereto mutually agree that the Borrower will not, and will cause that each Loan Party will not, cause, make, permit or consent to any action or election that would result in classification of any Loan Party as anything other than a disregarded entity or partnership for federal and state income Tax purposes, or that would result in any Loan Party becoming a member of an affiliated, consolidated, combined or unitary group that files or is required to file Tax returns on a group basis; provided, that the Lenders covenant and agree to consider in good faith agreeing to a waiver of the foregoing, if so requested by the Borrower to minimize anticipated cash tax liabilities from recapture of investment tax credits (whether pursuant

90

to Code Section 50, Code Section 6418, or otherwise); <u>provided</u> that the Lenders shall be permitted to decline providing such a waiver in their sole discretion.

5.38.   <u>ACT Covenants</u>. Without the prior written consent of the Required Lenders, directly or indirectly, cause or permit ACT, or any of its direct or indirect subsidiaries, to:

(a)   create, incur, assume or permit to exist any Indebtedness except for Indebtedness existing as of the Interim DIP Facility Effective Date;

(b)   create, incur, assume or permit to exist any Lien on any of its property or assets, both now owned and hereafter acquired, except for Liens existing as of the Interim DIP Facility Effective Date; or

(c)   enter into any asset purchase agreement or similar agreement providing for any disposition of ACT (including the assets and/or equity thereof), except on terms and conditions and with a counterparty reasonably acceptable to the Required Lenders.

5.39.   <u>Material Pleading</u>. Without the prior written consent of the Required Lenders, no Debtor or Loan Party shall file, amend, modify, execute, or enter into, or file a pleading seeking authority to execute, enter into, amend, or modify, any material pleading or transaction document that is not in form and substance acceptable to the Required Lenders.

5.40.   <u>New Subsidiaries</u>. The Loan Parties shall not, nor shall they permit any of their Subsidiaries to, create or acquire any Subsidiary without the prior written consent of the Required Lenders, unless such Subsidiary would constitute a Carlyle Silo Entity or Brookfield Silo Entity.

5.41.   <u>Promissory Note</u>. Without the prior written consent of the Required Lenders, such consent not to be unreasonably withheld, conditioned or delayed, the Loan Parties shall not, nor shall they permit any of their Subsidiaries to, Dispose of that certain Secured Promissory Note made by PGR Partners, LLC in favor of Pine Gate Renewables, LLC dated as of March 15, 2024.

**SECTION 6.**   <u>Events of Default</u>.   The term "***Event of Default***" shall mean, whenever it is used in this Agreement, any one or more of the following events (and the term "***Default***" whenever it is used herein, means any one or more of the following events, whether or not any requirement for the giving of notice, the lapse of time, or both has been satisfied):

6.1.   <u>Payment of Obligations</u>. The failure of the Borrower to pay, in accordance with the terms of this Agreement, (i) any principal on the Loans on the date that such sum is due (including any principal due in respect of a mandatory prepayment); (ii) any interest or fee due and owing to the Lenders on the date that such sum is due; or (iii) any other amount, cost, charge or other sum due under this Agreement or any other Loan Document within ten (10) days after the date that such sum is due.

6.2.   <u>Failure to Perform Provisions of Loan Documents</u>.

(a)   The failure of the Borrower to perform, observe or comply with Sections 4.1 (Financial Statements), 4.2 (Development/Construction Reports), 4.3 (Notice), 4.4 (Conduct of Business and Maintenance of Existence) (with respect to the Borrower), 4.9 (Use of Loan

Proceeds), 4.11 (Insurance), 4.12 (Event of Eminent Domain), 4.13 (Deposits to Lenders), 4.16 (Further Assurances), 4.27 (Weekly Call), 4.28 (Approved Budget), 4.29 (DIP Milestones), 4.30 (Control Agreements), 4.34 (Regulatory Approvals), 4.36 (Other Bankruptcy Matters) or Section 5 (Negative Covenants) of this Agreement.

(b)        [Reserved].

(c)        The failure of the Borrower to perform, observe or comply with any of the provisions of this Agreement, other than those covered by Sections 6.1, 6.2(a) above, and such failure is not cured to the satisfaction of the Lenders within a period of five (5) Business Days after the earlier of the date of written notice thereof by the Lenders to the Borrower or the date the Borrower becomes aware thereof.

(d)        Except as provided under Sections 6.1, 6.2(a) or 6.2(c), the Borrower or any other Loan Party fails to perform or observe any other covenant, term, condition or agreement contained in any of the other Loan Documents to which it is a party, and such failure continues beyond either of (i) any applicable cure period in such Loan Document, or (ii) if there is no applicable cure period in such Loan Document, a period of five (5) Business Days following written notice to the Borrower from the Lenders of such failure or the date the Borrower otherwise becomes aware of such failure.

(e)        Borrower shall have failed, or shall have permitted any other Loan Party or any of their Affiliates to fail, to pursue its rights and remedies under a Material Project Document with an Affiliate of Borrower upon a breach by the applicable Affiliate of the terms thereof, and such failure shall continue un-remedied for a period of ten (10) Business Days; provided, however, that if such failure is not possible to be remedied within such ten (10) Business Day period, but a remedy has been commenced and is diligently pursued thereafter, such ten (10) Business Day period shall be extended by up to thirty (30) days.

6.3.        Representations and Warranties. If any representation or warranty of any Loan Party contained herein or in any other Loan Document or any statement or representation made in any certificate by any Loan Party pursuant to this Agreement or any of the other Loan Documents shall prove to be false, incorrect or misleading in any material respect on the date as of which it was made and the material effects of such circumstance have not been remedied or cured.

6.4.        Unenforceability of Loan Documents; Impairment of Security Interests. At any time after the execution and delivery thereof, (a) any material provision of any Loan Document shall cease to be in full force and effect or any Loan Party shall make any assertion or claim to such effect or any Loan Document or material provisions thereof shall be declared null and void by a Governmental Authority of competent jurisdiction, or (b) if there shall occur any loss of perfection, of the priority status set forth in the applicable DIP Order or enforceability of the security interest of the Lenders in any of the Collateral, except to the extent solely as a result of acts or omissions of the Lenders or the incurrence of Permitted Liens, Liens contemplated under the Additional DIP Facilities, or the Carve Out.

6.5.        Default under Other Indebtedness. (a) (i) If any Loan Party shall default in any payment of any Indebtedness owing to any Lender (other than the Obligations under the Loan

Documents), or (ii) if any Loan Party shall default in any payment of any Indebtedness owing to any other Person(s) in an aggregate principal amount in excess of Two Hundred Fifty Thousand Dollars ($250,000) with respect to the Holding Company or any Project Company, or Five Hundred Thousand Dollars ($500,000) with respect to the Sponsor, in each case of (i) and (ii) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created, or (b) if any Loan Party shall default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, beyond the period of grace, if any, provided in such instrument or agreement, or any other event shall occur the effect of which default or other event is to cause or to permit the holder of such Indebtedness to cause, with the giving of notice, if required, such Indebtedness to become due prior to its stated maturity, except to the extent the amount or validity of any such Indebtedness owing to any Person other than the Lenders is contested in good faith by appropriate proceedings, so long as adequate reserves have been set aside therefor.

6.6.    <u>Liquidation, Termination, Dissolution, Etc.</u> Any Loan Party shall liquidate, dissolve or terminate its existence without the consent of the Required Lenders.

6.7.    <u>Bankruptcy</u>.

(a)    (i) entry of any order (A) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (B) dismissing any of the Chapter 11 Cases (or any subsequent chapter 7 case), or (C) pursuant to which the Bankruptcy Court abstains from hearing any of the Chapter 11 Cases (or any subsequent chapter 7 case), or (ii) the filing by any Debtor of a motion or other pleading seeking the entry of such an order;

(b)    any Debtor's exclusive right to file and/or solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code is terminated, unless such order was entered as a result of a request by, or received support from, the Lenders;

(c)    the failure of any Debtor to comply with the DIP Order in any material respect;

(d)    any DIP Order is revoked, remanded, vacated, reversed, stayed, rescinded, or modified, in each case, in a manner adverse to the Lenders (other than modifications consented to by the Lenders);

(e)    the failure of the Debtors to comply with Section 4.28;

(f)    (i) the appointment of a trustee, responsible officer, examiner, or disinterested person with expanded powers relating to the operations or the business of any of the Debtors in the Chapter 11 Cases (having powers beyond those set forth in the Bankruptcy Code sections 1106(a)(3) and (4)) (other than a fee examiner under section 1104(c) of the Bankruptcy Code) or (ii) the filing of any Debtor of a motion or other pleading seeking the entry of such appointment;

(g)    any administrative expense claim (other than in respect of the Carve Out, the DIP Facility and as otherwise expressly permitted under the DIP Facility Documents

or the DIP Order) is allowed having priority over or ranking in parity with the rights of the Lenders, other than in respect of the Additional DIP Facilities;

(h)      except for sales resulting from the sale processes contemplated by the Stalking Horse APA or the Additional DIP Facilities or a sale of ACT, any sale (or any amendment, modification or supplement to any such sale) of any assets of any Debtor (x) with a fair market value or sale price, in either case, when aggregated with all such prior sales, in excess of $2,500,000 or (y) constituting a material portion of the assets constituting the Prepetition Collateral and/or the Collateral, other than, sales on terms and conditions acceptable to the Required Lenders;

(i)      payment of or granting adequate protection with respect to any of the existing secured debt of the Debtors, other than to the extent permitted under the DIP Order and the Approved Budget;

(j)      the DIP Liens or DIP Super-Priority Claims shall at any time cease to be valid, perfected, enforceable, in all respects with the priority described herein or in the DIP Order or any DIP Documents shall be (or asserted by any Debtor to be) invalid;

(k)      the failure to meet any DIP Milestone;

(l)      the Debtors propose, file, or support, or the Bankruptcy Court enters an order in the Chapter 11 Cases confirming, a chapter 11 plan that is not an Acceptable Plan, or the entry of an order approving a disclosure statement in support of a plan that is not an Acceptable Plan;

(m)      any of the Debtors incurs or seeks to incur postpetition loans or other financial accommodations pursuant to Section 364(c)(1) or (d) of the Bankruptcy Code (other than the DIP Facility, the Additional DIP Facilities, and other loans permitted by the Loan Documents (including the Additional DIP Facilities and any Replacement Additional DIP Facilities in the event of a failure by the lenders under any Additional DIP Facility to fund such facility)) and such loans or financial accommodations do not pay the DIP Loans in full in cash (together with all accrued interest, fees, premiums, and other payments, including the Exit Fee and the Applicable Prepayment Premium);

(n)      any of the Debtors shall (i) assert that the Liens, the DIP Super-Priority Claims or the guarantees by the Guarantors of the Obligations are invalid, or any such liens, claims or guarantees shall be invalidated, or (ii) file or otherwise support any challenge or proceeding against any of the Secured Parties (in their capacity as such) in respect of the DIP Facility or the Prepetition Lenders (in their capacity as such) in respect of the Prepetition Credit Agreements, including with respect to the Debtors' stipulations included in the DIP Order;

(o)      the termination of the Debtors' use of the Cash Collateral or Prepetition Collateral of any Prepetition Secured Party;

(p)      the entry of a final, non-appealable order granting relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the

Chapter 11 Cases that would permit such other creditor or party in interest to (a) pursue actions that would have a material adverse effect on the Debtors or their estates or (b) proceed against any portion of the Collateral exceeding $1,000,000 in value in the aggregate;

(q)     the entry of a final, non-appealable order allowing any claim or claims under section 506(c) of the Bankruptcy Code or otherwise to surcharge any (i) Collateral or (ii) subject to entry of the Final DIP Order, any Prepetition Collateral;

(r)     subject to entry of the Final DIP Order, the application of the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to any Prepetition Collateral;

(s)     any of the Secured Parties with respect to the Collateral or, subject to entry of the Final DIP Order, the Prepetition Lenders with respect to the Prepetition Collateral, are subject to the equitable doctrine of marshaling;

(t)     any subsidiary of the Debtors commences an insolvency proceeding including by becoming a Debtor in the Chapter 11 Cases, other than with the consent of the Required Lenders;

(u)     any of the DIP Order, the Bidding Procedures or the Bidding Procedures Order are amended or modified (or the Debtors seek to amend or modify the Bidding Procedures, including making any filing seeking to make any such amendment or modification or taking any other act in furtherance of the foregoing) without the prior written consent of the Required Lenders;

(v)     the occurrence under any of the Additional DIP Facilities of (i) a payment default or (ii) an event of default that has occurred and is continuing that would permit the lenders under such facilities to accelerate the obligations thereunder and has resulted in such acceleration; provided, that if the Debtors shall have refinanced such Additional DIP Facility with the proceeds of debtor-in-possession financing on identical terms to such Additional DIP Facility (other than with respect to covenants and pricing and fees, subject to Section 4.31, provided that any such covenants that are more favorable to the lenders under the Replacement Additional DIP Facility shall have been incorporated into the DIP Facility and the pricing and fees in respect of the DIP Facility shall be increased to the same extent that such pricing and fees in the Replacement Additional DIP Facility represent an increase relative to the applicable Additional DIP Facility (subject to any requirements for such amendments set forth in the DIP Order)) within 30 days or such shorter time as the Approved Budget indicates that the Debtors have sufficient liquidity to operate without drawing on such defaulted Additional DIP Facility (a "**Replacement Additional DIP Facility**"), such event of default shall be deemed to have been cured, it being understood that during such period (which period may be extended with the consent of Required Lenders) (x) so long as no secured parties thereunder have exercised any remedies in respect of such payment default or event of default thereunder, the Lenders shall not terminate the Commitments, accelerate the DIP Loans, or exercise remedies in respect of the Collateral, and (y) the Debtors shall not be permitted to draw any of the New Money DIP Commitments;

95

(w)    any third party (i) enters into a stalking horse asset purchase agreement with the Sponsor or any of its subsidiaries that includes the Acquired Assets or (ii) is granted a break-up fee or other bid protections and/or the reimbursement of expenses in connection with a bid for a sale of any assets that include the Acquired Assets;

(x)    any lenders or investors under any Project Senior Financing exercise remedies in respect of any Project, unless the debtors are using reasonable efforts to contest such exercise of remedies, including by promptly filing a motion seeking to have the automatic stay or an equivalent restraining order extended to prevent such exercise of remedies;

(y)    any of the parties to the O&M Services Agreement or the Transition Services Agreement shall fail to perform any of its or their obligations thereunder, any of the Transition Services Agreement or the O&M Services Agreement is terminated or amended, modified, or waived, or the Debtors fail to assume and assign (or cause the applicable non-Debtor subsidiary to perform under) the Transition Services Agreement to any purchaser of the assets or equity of ACT;

(z)    the Stalking Horse APA is terminated in accordance with its terms;

(aa)    object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Lenders with respect to the Collateral following the occurrence of an Event of Default; provided, that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Order;

(bb)    make any payment or distribution to any Affiliate or insider (as such term is defined in the Bankruptcy Code) unless contemplated by the Approved Budget;

(cc)    any change of control of Sponsor, including any change in composition of the board of directors of Sponsor resulting from any exercise of remedies with respect to any pledged equity interests in Sponsor;

(dd)    the Debtors deem a Bid to be a Qualified Bid or permit a potential buyer to participate in any Auction, in each case with respect to a sale of any or all of the Fundamental Silo Assets pursuant to the Bidding Procedures Order, unless the applicable potential buyer has otherwise complied with the Bidding Procedures Oder;

(ee)    the Debtors select a bid as a Successful Bid with respect to a sale of any or all of the Fundamental Silo Assets pursuant to the Bidding Procedures that does not provide, together with any other bids for any portions of the Fundamental Silo Assets, for the Obligations and the Prepetition Secured Obligations to be Paid in Full, or provide for any other treatment consented to by the Required Lenders in their sole discretion, on or prior to the earlier of the Maturity Date and the closing of the sale transaction set forth in such bid; or

(ff)    the Borrower or any Subsidiary thereof shall take any action in support of any occurrence that would constitute an Event of Default pursuant to this Section 6, or

96

any other Person shall do so to the knowledge of the management of the Borrower and such application is not contested by the Borrower and the relief requested is granted in an order that is not stayed pending appeal.

6.8.    <u>Judgments</u>. One or more final and non-appealable judgments or decrees (i) shall be entered against the Holding Company or any Project Company involving in the aggregate a liability in excess of Two Hundred Fifty Thousand Dollars ($250,000) and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days after the entry thereof, (ii) shall be entered against the Sponsor involving in the aggregate a liability in excess of Five Hundred Thousand Dollars ($500,000) and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days after the entry thereof, or (iii) shall be reasonably expected to materially impair or inhibit the development and construction of any Project or the applicable Loan Party's use of any Project for the purpose for which any Project was intended (other than (x) a judgment or decree which is fully covered by insurance, bond or other security or satisfied in full or (y) a judgment or decree the execution of which is effectively stayed).

6.9.    <u>Change of Control</u>. A Change of Control shall occur, unless the Lenders provided their prior written consent approving such Change of Control.

6.10.    <u>Project Document Default</u>.

(a)    With respect to any Material Project Document for a Material Project (other than a Disqualified Project), any of the following (each, a "***Project Document Default***") shall have occurred: (a) any such Material Project Document shall at any time cease to be valid and binding and in full force and effect for any reason; (b) any such Material Project Document shall be terminated prior to the scheduled expiration date thereof for any reason whatsoever; (c) any material provision of any such Material Project Document shall be declared null and void by a Government Authority of competent jurisdiction; (d) any party to any such Material Project Document shall deny that it has any further liability or obligation under any of its material liabilities or obligations under any such Material Project Document; (e) a Bankruptcy Event shall occur with respect to any Material Project Counterparty which is a party to any such Material Project Document; or (f) any party to any such Material Project Document shall fail to perform or observe in any material respect any covenant or obligation contained in any such Material Project Document, and such failure shall continue beyond the applicable grace period, if any, provided for in such Material Project Document; <u>provided</u>, that in any case Borrower or the applicable Project Company shall have a period of forty-five (45) days to either enter into a replacement agreement (1) on substantially similar terms with an acceptable counterparty or (2) otherwise reasonably acceptable to the Required Lenders, in which case a Project Document Default shall not be deemed to have occurred.

(b)    Any Loan Party shall be in breach of any material obligation or a material default by such Loan Party shall have occurred and be continuing, under a Material Project Document for a Material Project (other than a Disqualified Project), and such breach or default shall not be remediable or, if remediable, shall continue unremedied for a period equal to the lesser of the cure period provided under such Material Project Document or forty-five (45) days; <u>provided</u> that if (i) such breach cannot be cured within such period, (ii) such breach is susceptible

97

of cure within sixty (60) days, (iii) such Loan Party is proceeding with diligence and in good faith to cure such breach, (iv) the existence of such breach has not resulted in, and could not after considering the nature of the cure be reasonably expected to give rise to, a termination by the counterparty to the Material Project Document which is subject to breach or to otherwise have a Material Adverse Effect as determined by the Lenders in their reasonable discretion, and (v) the Lender shall have received an officer's certificate from Borrower to the effect of clauses (i), (ii), (iii) and (iv) above and stating what action such Loan Party is taking to cure such breach, then, so long as no such Material Adverse Effect occurs, such forty-five (45) day cure period shall be extended to such date not to exceed sixty (60) days as shall be reasonably necessary for such Loan Party diligently to cure such breach; provided further, that no Event of Default shall be deemed to occur for so long as any remedial action of any Material Project Counterparty for such breach or default remains stayed by the provisions of the Bankruptcy Code or other order of the Bankruptcy Court.

6.11.   Financing Consents. (a) Any Material Project Counterparty shall disaffirm or repudiate in writing its material obligations under any Financing Consent, (b) any representation or warranty made by any Material Project Counterparty in a Financing Consent shall be untrue or misleading in any material respect as of the time made and such untrue or misleading representation or warranty could reasonably be expected to adversely affect the rights of any Lender thereunder, or (c) a Material Project Counterparty shall breach any material covenant of a Financing Consent and such breach or default shall not be remediable or, if remediable, shall continue unremedied for a period of 30 days from the time Borrower obtains knowledge of such breach; provided, that in the case (a) or (b) above Borrower shall have a period of thirty (30) days to cure any such occurrence, either by causing the Material Project Counterparty to reaffirm the Financing Consent or cure the relevant breach, as applicable, or enter into a replacement agreement with an alternative Material Project Counterparty reasonably acceptable to the Required Lenders on substantially similar terms.

6.12.   Loss of Approvals, Licenses. The transfer, assignment, loss of, revocation, or failure to obtain or renew, any Permit or other legal right necessary or required for the Borrower or any Project Company to develop, construct and deliver any Material Project as a solar power generating facility at the applicable Site, provided, however, that the Borrower or such Project Company shall be permitted a grace period of thirty (30) days to replace any such Permit or right if (a) such loss, revocation or failure was not caused by an intentional act of any Loan Party (or any Affiliate of any Loan Party), (b) the Borrower or such Project Company replaces such Permit or right within the foregoing thirty (30) day grace period and (c) no Material Adverse Effect could reasonably be expected to occur as a result of such loss, revocation or failure.

6.13.   Suspension of Work. Any Project Company shall, or shall be compelled to, suspend work on any Material Project and such suspension shall (a) materially adversely affect the value of the Collateral or the rights of any Lender under the Loan Documents or the DIP Order and (b) remain in effect in excess of thirty (30) days, unless due to force majeure, including, without limitation, impacts related to COVID-19.

6.14.   Defect in Title. Any Lien or other defect in the title to any Project Company's fee or leasehold (as applicable) estate or the estate to be obtained via an option agreement in any Site which such defect could reasonably be expected to have a Project Specific Adverse Event shall be

created, arise or otherwise come into existence at any time during which any Loans are outstanding, except for Permitted Liens, and such Project Company fails to have such Lien or other default in title removed within thirty (30) days of notice thereof.

6.15.   <u>Regulatory Status</u>.

(a)     The failure of (i) any Material Project that is a Solar Project to maintain its status as a Qualifying Facility or (ii) the Project Company owning such Material Project to obtain or maintain its status as an EWG, in each case consistent with the representations set forth in Section 3.22(a), and such failure could reasonably be expected to cause a Project Specific Adverse Event.

(b)     Holding Company, Borrower or any Project Company shall become subject to any financial, organizational or rate regulation under Applicable Laws as a result of the development, construction, ownership, leasing or operation of any Material Project or the generation, sales or transmission of electric energy, capacity, ancillary services or SRECs generated thereby.

(c)     Any Material Project for any reason fails to be eligible for any Project Incentives that are contemplated in the Project Budget.

(d)     If not exempt from Section 205 of the FPA, any Project Company that owns a Material Project fails to obtain or maintain its MBR Authority as and when required.

6.16.   <u>ERISA</u>. If any Loan Party or any ERISA Affiliate should establish, maintain, contribute to or become obligated to contribute to any ERISA Plan and (a) a Reportable Event shall have occurred with respect to any ERISA Plan and, within forty-five (45) days after the reporting of such reportable event to the Lenders by Borrower (or any Lender otherwise obtaining knowledge of such event) and the furnishing of such information as the Lenders may reasonably request with respect thereto, the Lenders shall have notified Borrower in writing that (i) the Lenders have made a determination that, on the basis of such Reportable Event, there are reasonable grounds for the termination of such ERISA Plan by the PBGC or for the appointment by the appropriate United States District Court of a trustee to administer such ERISA Plan and (ii) as a result thereof, an Event of Default exists hereunder; or (b) a trustee shall be appointed by a United States District Court to administer any ERISA Plan; or (c) the PBGC shall institute proceedings to terminate any ERISA Plan; or (d) a complete or partial withdrawal by Borrower, any other Loan Party or any ERISA Affiliate from any Multiemployer Plan shall have occurred, or any Multiemployer Plan shall enter reorganization status, become insolvent, or terminate (or notify Borrower, any other Loan Party or any ERISA Affiliate of its intent to terminate) under Section 4041A of ERISA and, within forty-five (45) days after the reporting of any such occurrence to the Lenders by Borrower (or any Lender otherwise obtaining knowledge of such event) and the furnishing of such information as the Lenders may reasonably request with respect thereto, the Lenders shall have notified Borrower in writing that the Lenders have made a determination that, on the basis of such occurrence, an Event of Default exists hereunder; <u>provided</u> that any of the events described in this Section 6.16 shall involve (x) one or more ERISA Plans that are single-employer plans (as defined in Section 4001(a)(15) of ERISA) and under which the aggregate gross amount of unfunded benefit liabilities (as defined in Section 4001(a)(16) of

ERISA), including vested unfunded liabilities which arise or might arise as the result of the termination of such ERISA Plan or Plans, and/or (y) one or more Multiemployer Plans to which the aggregate liabilities of Borrower, each other Loan Party and all ERISA Affiliates shall, in each case, be in an amount that would reasonably be expected to have a Material Adverse Effect on the economic condition of Borrower or on all ERISA Affiliates as a whole.

6.17.   [Reserved].

6.18.   <u>Material Adverse Effect</u>. The occurrence of any Material Adverse Effect which is not cured or remedied to the satisfaction of the Lenders within thirty (30) days after the date of written notice thereof by the Lenders to the Borrower, or if such cure or remedy cannot be accomplished within such period, Borrower commences such cure or remedy within such period and diligently prosecutes same to completion within an additional (30) day period.

Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, (a) Borrower makes no representations or warranties regarding any Disqualified Project and shall have no obligations hereunder to cause any Disqualified Project (or the direct or indirect owners thereof) to take or refrain from taking any action, and no Default, Event of Default, misrepresentation or breach of covenant shall apply in connection with the foregoing.

**SECTION 7.**   <u>Rights and Remedies</u>.

7.1.   <u>Rights and Remedies</u>. If any Event of Default shall occur and be continuing, the Lenders may take any of the following actions at the same or different times:

(a)   terminate, reduce, or restrict the New Money DIP Commitments, and thereupon the New Money DIP Commitments shall terminate, be reduced or restricted, as applicable, immediately;

(b)   declare the Obligations then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; provided, that, in the case of any Event of Default pursuant to Section 6.7, the unpaid principal amount of the Loans, together with accrued and unpaid interest thereon and all other Obligations then outstanding shall be automatically and immediately due and payable by the Borrower to the Lenders without notice, presentment, demand, protest or other action of any kind, all of which are expressly waived by the Borrower;

(c)   terminate, reduce or restrict any right or ability of the Loan Parties to use any Cash Collateral of Lenders or the Prepetition Secured Parties, other than to the extent expressly permitted in the Interim DIP Order or, when entered, the Final DIP Order;

(d)      declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the DIP Order) in accordance with the Interim DIP Order or, when entered, the Final DIP Order;

(e)      deliver a Default Notice (as defined in the DIP Order) in accordance with the DIP Order;

(f)      refuse to make any additional Loans in whole or in part; and

(g)      enforce any and all Liens and security interests created pursuant to the Collateral Documents and any other right or remedy permitted hereunder with respect to the Collateral.

Upon the occurrence and during the continuation of any Event of Default, then in each and every case, the Lenders shall be entitled to exercise in any jurisdiction in which enforcement thereof is sought, all rights and remedies available to the Lenders under the other provisions of this Agreement and the other Loan Documents, the rights and remedies of a secured party under the Uniform Commercial Code with respect to the Collateral and all other rights and remedies available to the Lender under Applicable Law, all such rights and remedies being cumulative and enforceable alternatively, successively or concurrently.

7.2.    Cure by Lenders. If any Event of Default shall occur and be continuing, without any obligation to do so, the Lenders may make disbursements of Loan Proceeds to or on behalf of Borrower to cure any Event of Default hereunder and to cure any default and render any performance under the Material Project Documents as the Lenders in their sole, good faith discretion may consider necessary or appropriate, whether to preserve and protect the Collateral or the Lenders' interests therein or for any other reason, and all sums so expended, together with interest on such total amount at the Default Rate (but in no event shall the rate exceed the maximum lawful rate), shall be repaid by Borrower to the Lenders on demand and shall be secured by the Loan Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the amount of the total Obligations.

7.3.    Possession of Project. If any Event of Default shall occur and be continuing, the Lenders may enter into possession of any Project and perform or cause to be performed any and all work and labor necessary to develop such Project substantially according to the applicable Project Budget and Project Documents, and all sums expended by Lenders in so doing, together with interest on such total amount at the Default Rate, shall be repaid by the Borrower to the Lenders upon demand and shall be secured by the Loan Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the amount of the total Obligations.

7.4.    Right to Terminate Affiliate Contracts. If any Event of Default shall occur and be continuing, without being limited by any of the foregoing, the Lenders may terminate any Contractual Obligations between the Borrower or any of its Subsidiaries and any of their Affiliates.

7.5.    Remedies under Loan Documents. If any Event of Default shall occur and be continuing, without being limited by any of the foregoing, the Lenders may exercise any and all rights and remedies available to them under any of the Loan Documents, including judicial or non-

judicial foreclosure or public or private sale of any of the Collateral, including the right to deliver one or more Termination Letters to the applicable Utilities, and including the right to enforce the rights and remedies of Loan Parties pursuant to any Material Project Document.

7.6.    Default Rate. Upon the occurrence of an Event of Default hereunder occurring after the Interim DIP Facility Effective Date, the outstanding principal amount of the Loans and all other monetary Obligations outstanding or becoming outstanding while such Event of Default exists shall bear interest from the date of such Event of Default until such Event of Default has been cured to the satisfaction of the Lenders, at a rate that is two percent (2%) per annum in excess of the interest rate then otherwise payable under this Agreement with respect to the Loans (the "**Default Rate**"), irrespective of whether or not as a result thereof, the Loan or any of the Obligations have been declared due and payable or the maturity thereof accelerated.  Interest accruing at the Default Rate shall be paid in kind and the amount of the applicable Obligations shall be automatically increased on the applicable Loan Payment Date by the amount of such PIK Interest (and such increased principal shall bear interest at a rate per annum equal to the Default Rate until such time as the underlying Event of Default is no longer continuing).

7.7.    Liens, Set-Off.  As security for the payment and performance of the Obligations, the Borrower hereby grants to the Lenders a continuing security interest and lien on, in and upon all indebtedness owing to, and all deposits (general or special), credits, balances, monies, securities and other property of, the Borrower and all proceeds thereof, both now and hereafter held or received by, in transit to, or due by, the Lenders.  In addition to, and without limitation of, any rights of the Lenders under Applicable Laws, if any Event of Default occurs and is continuing, the Lenders may, to the fullest extent permitted by Applicable Law, at any time and from time to time thereafter, without notice to the Borrower, set-off, hold, segregate, appropriate and apply at any time and from time to time thereafter all such indebtedness, deposits, credits, balances (whether provisional or final and whether or not collected or available), monies, securities and other property toward the payment of all or any part of the Obligations in such order and manner as the Lenders in their sole discretion may determine and whether or not the Obligations or any part thereof shall then be due or demand for payment thereof made by the Lenders.

7.8.    Enforcement Costs. The Borrower agrees to pay to the Lenders on demand (a) all Enforcement Costs paid, incurred or advanced by or on behalf of the Lenders and (b) interest on such Enforcement Costs from the date paid, incurred or advanced until Paid in Full at a per annum rate of interest equal at all times to the Default Rate.  As used herein, the term "**Enforcement Costs**" shall mean and include collectively all out of pocket expenses, charges, or Other Taxes, costs and fees (including all fees, charges and expenses of internal or external counsel) of any nature whatsoever advanced, paid or incurred by or on behalf of any Lender in connection with the enforcement of this Agreement or the other Loan Documents, including without limitation, (i) the collection of the Obligations, (ii) the enforcement of this Agreement or any of the other Loan Documents, (iii) the creation, perfection, maintenance, preservation, defense, protection, realization upon, disposition, collection, sale or enforcement of all or any part of the Collateral, and (iv) the exercise by any Lender of any rights or remedies available to it under the provisions of this Agreement, or any of the other Loan Documents.  All Enforcement Costs, with interest as above provided, shall be a part of the Obligations hereunder.

7.9.    Application of Proceeds.

102

(a)        Non-Collateral Proceeds.   Any proceeds of the collection of the Obligations not realized from the sale or other disposition of the Collateral (including any Proceeds) will be applied by the Lenders to the payment of Enforcement Costs, and any balance of such proceeds (if any) will be applied by the Lenders, *first*, to the payment of the Roll-Up Loans until Paid in Full, and *second*, to the payment of the remaining Obligations (whether then due or not), at such time or times and in such order and manner of application as the Lenders may from time to time in their sole discretion determine.   If the sale or other disposition of any Collateral fails to satisfy all of the Obligations, the Borrower shall remain liable to the Lenders for any deficiency.

(b)        Collateral Proceeds.   Any Proceeds realized from the sale or other disposition of the Collateral will be applied by the Lenders as follows:

(i)        *first*, to the payment or reimbursement of Enforcement Costs payable to the Lenders;

(ii)        *second*, to the payment of accrued interest on the Roll-Up Loans;

(iii)        *third*, to the payment of the outstanding principal (including any interest paid in kind and added to the principal balance) of, plus any Applicable Prepayment Premium on, the Roll-Up Loans;

(iv)        *fourth*, to the payment of accrued interest on the New Money DIP Loans;

(v)        *fifth*, to the payment of the outstanding principal (including any interest paid in kind and added to the principal balance) of, plus any Applicable Prepayment Premium on, the New Money DIP Loans;

(vi)        *sixth*, to the payment of any other Obligations hereunder;

(vii)        *seventh*, after final payment in full of the amounts described in clauses *first* through *sixth* above, to the Prepetition Lenders for the payment of the Prepetition Secured Obligations in accordance with the terms of the Prepetition Loan Documents; and

(viii)        *eighth*, after final payment in full of the amounts described in clauses *first* through *seventh* above and the Obligations and Prepetition Secured Obligations are Paid in Full, to the Borrower or as otherwise required by the DIP Order or other Applicable Law.

7.10.   Remedies, Etc.; Cumulative. Each right, power and remedy of the Lenders as provided for in this Agreement or in the other Loan Documents or now or hereafter existing under Applicable Laws or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or in the other Loan Documents or now or hereafter existing under Applicable Laws or otherwise, and the exercise or beginning of the exercise by any Lender of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by any Lender of any or all such other rights, powers or remedies.

7.11.  No Waiver, Etc. No failure or delay by any Lender to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement or of the other Loan Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant or agreement or of any such breach, or preclude any Lender from exercising any such right, power or remedy at any later time or times. By accepting payment after the due date of any amount payable under this Agreement or under any of the other Loan Documents, no Lender shall be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement or under any of the other Loan Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount.  The payment by the Borrower or any other Person and the acceptance by any Lender of any amount due and payable under the provisions of this Agreement or the other Loan Documents at any time during which an Event of Default exists shall not in any way or manner be construed as a waiver of such Event of Default by any Lender or preclude any Lender from exercising any right, power or remedy consequent upon such Event of Default.

7.12.  Attorney-In-Fact.

(a)  For the purpose of allowing the Lenders to exercise their rights and remedies provided in this Section 7 following the occurrence and during the continuation of an Event of Default, Borrower hereby constitutes and appoints each Lender its true and lawful attorney-in-fact, with full power of substitution, to develop any or all of any Project in the name of Borrower, and hereby empowers such attorney or attorneys as follows:

(i)  to use any unadvanced proceeds under the DIP Facility or the New Money DIP Commitments for the purpose of developing each Project as provided in the Material Project Documents;

(ii)  to make such changes and corrections in the Project Budget or Project Schedule for any Project as reasonably shall be necessary or desirable to complete the development of such Project;

(iii)  to employ such contractors, subcontractors, agents, architects and inspectors as reasonably shall be required for such purposes;

(iv)  to pay, settle or compromise all bills and claims which may be or become Liens or security interests against any Project or the Collateral, or any part thereof, unless a bond or other security satisfactory to the Lenders has been provided;

(v)  to execute applications and certificates in the name of Borrower or any Project Company which reasonably may be required by the Loan Documents or any other agreement or instrument executed by or on behalf of Borrower or any Project Company in connection with any Project;

(vi)  to prosecute and defend all actions or proceedings in connection with any Project or the Collateral or any part thereof and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the Loan Documents; and

(vii)    to do any and every act which Borrower or any Project Company might do on its behalf with respect to the Collateral or any part thereof or any Project and to exercise any or all of Borrower's rights and remedies under any or all of the Material Project Documents.

(b)    This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable, but shall automatically terminate upon the Obligations are Paid in Full.

7.13.    Reserved.

**SECTION 8.**  Miscellaneous.

8.1.    Course of Dealing; Amendment. No course of dealing between any Lender and the Borrower shall be effective to amend, modify or change any provision of this Agreement or the other Loan Documents.  The Lenders shall have the right at all times to enforce the provisions of this Agreement and the other Loan Documents in strict accordance with the provisions hereof and thereof, notwithstanding any conduct or custom on the part of any Lender in refraining from so doing at any time or times.  The failure of any Lender at any time or times to enforce its respective rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom in any way or manner contrary to specific provisions of this Agreement or the other Loan Documents or as having in any way or manner modified or waived the same.  This Agreement and the other Loan Documents may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Lenders and the Borrower.

8.2.    Waiver of Event of Default. The Lenders may, at any time and from time to time, execute and deliver to the Borrower a written instrument waiving, on such terms and conditions as the Lenders may specify in such written instrument, any of the requirements of this Agreement or of the other Loan Documents or any Event of Default or Default and its consequences, provided, that any such waiver shall be for such period and subject to such conditions as shall be specified in any such instrument.  In the case of any such waiver, the Borrower and the Lenders shall be restored to their former positions prior to such Event of Default or Default and shall have the same rights as they had hereunder.  No such waiver shall extend to any subsequent or other Event of Default or Default, or impair any right consequent thereto and shall be effective only in the specific instance and for the specific purpose for which given.

8.3.    Notices. All notices to or upon the parties to this Agreement, required or permitted hereunder, shall be given by delivery to a nationally recognized overnight express courier service which provides a receipt for delivery, or by certified mail, postage prepaid, return receipt requested, or by electronic mail transmission, addressed to the Person to whom such communication is to be given, at the following addresses:

If to the Lenders:   FP Solar Development I LLC
745 5th Avenue, 25th Floor
New York, NY 10151
Attention:  Mark Domine

Email:  mdomine@fundamentalrenewables.com

With a copy to:   Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Attention:  Leslie Plaskon; Dan Philion
Email: lplaskon@sidley.com; dphilion@sidley.com

If to the Borrower:   Pine Gate Renewables, LLC
130 Roberts Street
Asheville, NC 28801
Attention: Legal Department
Email: legal@pinegaterenewables.com

With a copy to:   Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention: Andrew Parlen
Email:  Andrew.Parlen@lw.com

Notices shall be deemed given on the next Business Day, if by recognized overnight express courier or electronic mail, or on the third (3rd) Business Day after deposit with the United States postal service, if by certified mail, postage prepaid, return receipt requested.  Any of the persons listed above may, by notice given hereunder, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent, such further or different address to be effective at the later of three (3) days after notice of such further or different address is sent or the date designated in such notice.

8.4.   Costs and Expenses. Whether or not the transactions contemplated hereby shall be consummated, except as may be agreed separately in writing, the Borrower agree to pay as promptly as practicable (a) all the documented out-of-pocket costs and expenses incurred in connection with the negotiation, preparation and execution of the Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) the documented out-of-pocket fees, expenses and disbursements of counsel to the Lenders (including, without limitation, the Lender Advisors) and other fees, expenses and disbursements of the Lender Advisors as set forth in the Approved Budget, in each case in connection with the negotiation, preparation, execution, interpretation, enforcement and administration of the Loan Documents, the protection of any of the rights and remedies of any Lender and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrower, including the discussion, negotiation, preparation, execution and delivery of any documents in connection with the Loans, the interpretation, enforcement or protection of any of the rights and remedies of the Lenders under the Loan Documents and the Chapter 11 Cases; (c) all the documented out-of-pocket expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Lenders, including filing and recording fees, expenses and taxes, stamp or documentary taxes; and (d) after the occurrence of a Default or an Event of Default, all documented out-of-pocket costs and expenses and costs of settlement, incurred by any Lender (and any agents thereof) in enforcing any Obligations of or in collecting any payments due from any Loan Party hereunder or

106

under the other Loan Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Loan Documents) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings; provided that, the reimbursement of such fees, expenses and disbursements of counsel shall include those of Sidley Austin LLP, Gallagher LLP, and Purrington Moody Weil LLP, as counsel to the Lenders and any other local or specialist counsel or other professional advisors retained by the Lenders, and the documented out-of-pocket fees, expenses and disbursements of Guggenheim Securities, LLC, as financial advisor to the Lenders.  All such fees, costs, Other Taxes shall be a part of the Obligations hereunder.  All such amounts due hereunder shall be paid by the Debtors on a current basis and no later than ten (10) Business Days after receipt of an invoice therefor.

Notwithstanding the foregoing, to the extent the fees, costs, disbursements and expenses of the Lender Advisors exceed the aggregate amount budgeted for them in the Approved Budget in effect at the time of entry of the Interim DIP Order, the Loan Parties shall not be obligated to pay such excess to the Lender Advisors in cash, but to the extent the Lenders pay such amounts to the Lender Advisors, the outstanding amount of the Obligations shall automatically be increased (for the avoidance of doubt, without any reduction of the New Money DIP Commitments) by such amount, with no further action by any party, upon notice to the Loan Parties.  Each Additional DIP Facility and the DIP Order shall provide for a similar limit in respect of reimbursement of fees, costs, disbursements, or expenses of advisors to the lenders thereunder, and the Debtors and their subsidiaries shall not pay in cash any amounts in respect thereof in excess of such limit.

8.5.    Applicable Law; Consent to Jurisdiction.  This Agreement and the other Loan Documents have been delivered to and accepted by the Lenders and will be deemed to be made in the State of New York.  This Agreement and any other Loan Document (unless otherwise expressly provided for therein), and the rights and obligations of the parties hereunder shall be governed by and determined in accordance with the laws of the State of New York, without reference to conflicts of laws principles (other than Section 5-1401 of the New York General Obligations Law), both in interpretation and performance, provided that the law governing perfection, the effect of perfection or non-perfection, and the priority of security interests, shall be determined in accordance with Part 3 of Title 9 of the Uniform Commercial Code.  Each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court; provided that during the Chapter 11 Cases, each of the Parties hereto irrevocably and unconditionally submits to the jurisdiction of the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or its properties in the courts of any jurisdiction.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.6.    <u>Waiver of Jury Trial</u>. TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE LENDERS AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THE LOANS, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF THE LENDERS OR THE BORROWER.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BORROWER AND THE LENDERS TO ENTER INTO THIS AGREEMENT.

8.7.    <u>Assignment and Participations</u>. The Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Required Lender. Subject to the last sentence of this Section 8.7, each Lender may, without notice to or consent of the Borrower, but subject to the consent of any other Lender, sell, assign or transfer to any Person (other than any solar developer who is a direct competitor of the Borrower and the Sponsor) or Persons, all or any part of the Obligations of such Lender, and each such Person or Persons shall have the right to enforce the provisions of the Loan Documents and any of the Obligations as fully as a Lender, <u>provided</u> that such Lender shall continue to have the unimpaired right to enforce the provisions of the Loan Documents and any of the Obligations as to so much of the Loan Documents and/or the Obligations that it has not sold, assigned or transferred.  Additionally, any Lender may sell or grant to any other Person or Persons (other than any solar developer who is a direct competitor of the Borrower and the Sponsor) participations in all or any part of the Obligations or all or any part of the Loan Documents.  In connection with and prior to and after any such sale, transfer, assignment or participation, any Lender may disclose and furnish to any prospective or actual purchaser, transferee, assignee or participant, any and all reports, financial statements and other information obtained by such Lender at any time and from time to time in connection with the Obligations, any of the Loan Documents or otherwise, provided that all recipients of such information have agreed to maintain the confidentiality of such information in accordance with Section 8.20.  The Borrower will fully cooperate with any Lender in connection with any such assignment or participation and will execute and deliver such consents and acceptances to any such assignment or participation or administrative amendments to the Loan Documents as may be reasonably requested by such Lender in order to effect any such assignment or participation (including, without limitation, the appointment of such Lender as agent for itself and all assignees or participants); <u>provided</u>, that the Borrower's Obligations will not be increased by reason of any such assignment or participation.

8.8.    <u>Limitation on Liability</u>. No claim shall be made by the Borrower against any Lender or any of their Affiliates, directors, employees, attorneys or agents, on the one hand, or by any Lender against the Borrower or any of its Affiliates, directors, employees, attorneys or agents, on the other hand, for any loss of profits, business or anticipated savings, special or punitive damages or any indirect or consequential loss whatsoever in respect of any breach or wrongful conduct (whether or not the claim therefor is based on contract, tort or duty imposed by law), in connection with, arising out of or in any way related to the transactions contemplated by this Agreement or

108

the other Operative Documents or any act or omission or event occurring in connection therewith, and the Borrower and the Lenders each hereby waives, releases and agrees not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

8.9.   Indemnification.

(a)   The Borrower hereby releases each Lender, each legal entity, if any, who Controls, is Controlled by or is under common Control with, each Lender, and each of their respective directors, officers, employees, attorneys and agents (each an "***Indemnified Party***"), from, agrees that the Indemnified Parties shall not be liable for, and agrees to indemnify and defend the Indemnified Parties against, all liabilities, losses, damages (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor), causes of action, suits, claims, costs and expenses, demands and judgments of any nature incurred by, imposed upon or asserted against any Indemnified Party, arising out of, in connection with, or by reason of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated by any Loan Document, the performance (or failure to perform) by the parties thereto of their respective obligations under any Loan Document or the consummation of the transactions contemplated by the Loan Documents, (ii) the Loans or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Substances on or from any Site or on or from any other property currently or formerly owned or operated by the Borrower or any of its Affiliates, or any Environmental Claim related to the Borrower or any of its Affiliates relating to any Site in any way, or (iv) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any of its Affiliates, and regardless of whether any Indemnified Party is a party thereto, *provided* that such indemnity shall not be available to any Indemnified Party to the extent that such claims, damages, losses, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Party or its material breach of this Agreement.  This Section 8.9(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)   Borrower shall pay all amounts due under this Section 8.9 promptly after demand therefor.

(c)   The provisions of this Section shall survive the termination of this Agreement, the Obligations are Paid in Full and the assignment of any rights hereunder by any Lender.

8.10.   Entire Agreement. This Agreement, the other Loan Documents and any agreement, document or instrument referred to herein to which the Lenders, the Borrower or other Loan Parties are parties integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings with respect to the subject matter hereof.  In the event of any conflict between the terms, conditions and provisions of this Agreement and any such agreement, document or instrument, the terms, conditions and provisions of this Agreement shall control.  Notwithstanding the foregoing, the Borrower and other Loan Parties have received,

reviewed and ratified the DIP Intercreditor Agreement as in effect on the date hereof and confirm they have been informed of Sections 8(c) and (d) thereof and agree to the terms thereof as if they were parties thereto.

8.11. <u>No Advisory or Fiduciary Responsibility; No Partnership, Etc.</u>

(a)     The Lenders and Borrower intend that the relationship between them shall be solely that of creditor and debtor. Nothing contained in this Agreement or in any of the other Loan Documents shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between any Lender and Borrower or any other Person. No Lender shall be in any way responsible or liable for the debts, losses, obligations or duties of Borrower or any Affiliate of Borrower, or any other Person with respect to the Material Project Documents, any Project or otherwise. All obligations to pay real property or other Taxes, assessments, insurance premiums, and all other fees and charges arising from the Material Project Documents or the ownership, operation or occupancy of any Project and to perform all obligations under the Material Project Documents and any other agreements and contracts relating to each Project shall be the sole responsibility of the Borrower.

(b)     In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Lenders are arm's-length commercial transactions between Borrower and its Affiliates, on the one hand, and the Lenders, on the other hand, (ii) Borrower has consulted its own legal, accounting, regulatory and Tax advisors to the extent it has deemed appropriate, and (iii) Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each Lender is and has been acting solely as a principal and, except as expressly agreed in writing, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower or any of its Affiliates, or any other Person and (ii) each Lender has no obligation to Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) each Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrower and its Affiliates, and each Lender has no obligation to disclose any of such interests to Borrower or its Affiliates. To the fullest extent permitted by law, Borrower hereby waives and releases any claims that it may have against any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

8.12. <u>Severability</u>. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and the parties hereto shall enter into good faith negotiations to replace the invalid, illegal or unenforceable provision.

8.13. <u>Survival</u>. All representations, warranties and covenants contained among the provisions of this Agreement and all the other Loan Documents shall survive the execution and delivery of this Agreement and all other Loan Documents until the termination of this Agreement

(other than indemnity and other obligations that expressly survive the termination of this Agreement as stated herein or in any other Loan Document).

8.14.   <u>Binding Effect; Assignment</u>. The provisions of this Agreement and all other Loan Documents shall be binding upon and inure to the benefit of the Borrower and the Lenders and their respective permitted successors and assigns.

8.15.   <u>Time of Essence</u>. Time is of the essence in connection with all obligations of the Borrower hereunder and under any of the other Loan Documents.

8.16.   <u>Duplicate Originals and Counterparts</u>. This Agreement and any Supplements hereto or in connection herewith may be executed in any number of duplicate counterparts, each of which shall be deemed to be an original, and all taken together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart. The words "execution", "signed", "signature" and words of like import in this Agreement shall be deemed to include electronic signature or electronic records, each of which shall be of the same effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law including the Federal Electronic Signatures in Global and National Commerce Act, the New York Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

8.17.   <u>No Third Party Beneficiary</u>. This Agreement is made solely and specifically by and for the benefit of the parties hereto, and their respective permitted successors and assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise; <u>provided</u>, that for the avoidance of doubt, this Section 8.17 shall not apply to or limit in any way the rights, benefits or remedies of any Indemnified Party.

8.18.   <u>Non-Usurious Interest</u>. Notwithstanding any provision of this Agreement to the contrary, in no event shall the interest contracted for, charged or received in connection with the Loans (including any other costs or considerations that constitute interest under Applicable Law which are contracted for, charged or received pursuant to this Agreement) exceed the maximum rate of interest allowed under Applicable Law.

8.19.   <u>Publicity</u>. Any publicity and press releases that Borrower may wish to publish mentioning any Lender shall be subject to such Lender's prior written approval, such approval not to be unreasonably withheld.

8.20.   <u>Confidentiality</u>.

(a)      The Lenders agree to maintain the confidentiality of the Information (as defined below), and use the Information only in connection with the transactions contemplated hereby, except that any Lender may disclose Information (a) to its Affiliates and to its and its Affiliates' respective partners, members, directors, officers, employees, agents, trustees, advisors and representatives (<u>provided</u> that the Person to whom such disclosure is made needs to know such Information in connection with the transactions

111

contemplated hereby and it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and shall either (i) be bound by professional duties to keep such information confidential, or (ii) have agreed to be bound by the confidentiality and use provisions of this Section to the same extent as if they were parties hereto and that the disclosing Person shall be responsible for any breach of this provision), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it, (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto on a confidential basis, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) to any assignee of or participant in, or any prospective assignee of or participant in, any of such Lender's rights or obligations under this Agreement, provided that such party is subject to a confidentiality agreement with such Lender containing substantially similar provisions as those of this Section 8.20, (g) to any current or potential source of debt, equity or other financing to such Lender, provided that such party is subject to a confidentiality agreement with such Lender containing substantially similar provisions as those of this Section 8.20, (h) with the prior written consent of the Borrower, (i) to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Loans, including to the Bankruptcy Court in connection with the approval of the Loans and the entry of the DIP Order or any other transactions related hereto and thereto, subject to any applicable protective order entered in the Chapter 11 Cases, or (j) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or other known confidentiality agreement or obligation or (y) becomes available to the Lenders on a nonconfidential basis from a source other than the Borrower that was not known to be bound by a confidentiality agreement or obligation; provided that with respect to clauses (b), (c), (e) and (f), the Lenders provide notification to the Borrower within a reasonable time prior to any disclosure or, if such prior notification is not reasonably practicable, then as soon as reasonably practicable, in either case to the extent such notification is not prohibited by the regulatory authority to which such disclosure is made, the legal process in which such disclosure is made and Applicable Law, as applicable.  For purposes of this Section, "*Information*" means all information received from or on behalf of the Borrower or any Affiliate thereof relating to any of their respective businesses or Affiliates, other than any such information that is available to the Lenders on a nonconfidential basis prior to disclosure by the Borrower or such Affiliate.  The Lenders shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)     The Lenders acknowledge that (a) the Information may include material non-public information concerning the Borrower or an Affiliate or Subsidiary thereof, as the case may be, (b) it has developed reasonable and customary compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Applicable Law, including United States Federal and state securities laws.  The obligations contained in this Section 8.20 shall survive the expiration or termination of this Agreement.

8.21.   USA PATRIOT Act. The Lenders hereby notify each Loan Party that pursuant to the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "*PATRIOT Act*"), it is required to obtain, verify, and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow the Lenders to identify such Loan Party in accordance with the PATRIOT Act, and the Borrower agrees to provide, or cause the other Loan Parties to provide, such information from time to time to the Lenders.

8.22.   Termination of Security Interests; Release of Collateral. Upon Payment in Full of the Obligations, the Liens on the Collateral in favor of the Lenders made pursuant to the Security Documents shall terminate.  Upon any such termination or release of Collateral, the Lenders will, at the expense of the Borrower, execute and deliver such documents as the Borrower may reasonably request, including but not limited to written authorization to file termination statements, to evidence the termination of the Lenders' security interest in and the release of such Collateral.

8.23.   Headings. Paragraph headings and a table of contents have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

8.24.   [Reserved].

8.25.   Designation of Agent. Each Lender hereby appoints FP Solar as the administrative agent and collateral agent to act on its behalf and in its name with respect to this Agreement and the Collateral, and authorizes FP Solar to take such actions, exercise such powers, and perform such duties as are delegated to FP Solar or as may be reasonably incidental thereto. FP Solar shall have the sole and exclusive right to take any and all actions to enforce this Agreement, to exercise remedies upon the occurrence of an Event of Default, and to take possession of and dispose of the Collateral. Each Lender agrees that they shall not act independently with respect to the enforcement of any rights under this Agreement, except as expressly provided herein. FP Solar shall not be liable to any Lender for any action taken or omitted to be taken by it hereunder, except for gross negligence or willful misconduct. FP Solar shall be entitled to rely upon the written instructions of the Lender holding a majority of the aggregate outstanding Obligations. All proceeds of Collateral collected or received by FP Solar shall be applied and distributed among the Lenders in accordance with their pro rata share of the Obligations. Each Lender hereby (a) authorizes FP Solar to enter into (i) each DIP Intercreditor Agreement, and (ii) amendments or supplements to each DIP Intercreditor Agreement to the extent permitted by this Agreement and made in accordance with the applicable DIP Intercreditor Agreement, in each case, to the extent permitted by this Agreement and made in accordance with the Interim DIP Order or the Final DIP Order, as applicable, (b) agrees that such Person will be subject to and bound by, and will take no actions contrary to, the provisions of any DIP Intercreditor Agreement, and (c) agrees that each Agent may take such actions on behalf of such Person as is contemplated by the terms of any such DIP Intercreditor Agreement.

(Signatures appear on the following page)

113

**IN WITNESS WHEREOF**, intending to be legally bound hereby, the Borrower and the Lenders have each caused this Agreement to be executed and delivered as of the day and year first written above.

**BORROWER:**

**PINE GATE RENEWABLES, LLC**,
a North Carolina limited liability company

By: _____
Name: Raymond Shem
Title:   Chief Financial Officer

**LENDERS:**

**FP SOLAR DEVELOPMENT I LLC**,
a Delaware limited liability company

By:      Fundamental Renewables LLC,
         its Administrative Member
By: _____
Name:
Title:

**SOLAR CONSTRUCTION LENDING, LLC**,
a Delaware limited liability company

By:      Fundamental Renewables LLC,
         its Administrator

By: _____
Name:
Title:

**Exhibit A**
**Form of Draw Request**

**DRAW REQUEST SUBMITTED TO:**

| **FP SOLAR DEVELOPMENT I LLC**<br>745 5th Avenue, 25th Floor<br>New York, New York 10151<br>Attention:  Mark Domine | Draw Request No. _____<br><br>Date: _____, 2025 |
|---|---|

This Draw Request is being submitted pursuant to the Senior Secured Super Priority Debtor-In-Possession Loan Agreement, dated as of [•], 2025, by and among Pine Gate Renewables, LLC, FP Solar Development I LLC, and Solar Construction Lending, LLC (the "***Loan Agreement***"). All capitalized terms used herein, but not otherwise defined shall have the meanings given such in the Loan Agreement.

Total amount of Loan Proceeds requested:     **$**_____

The proceeds of this Draw Request will be applied to pay for:   _____

We hereby certify that:

(a)     The conditions set forth in Section [2.3][2.5] of the Loan Agreement have been satisfied and performed in all material respects in accordance with their terms.

(b)     With respect to each Qualified Project that is the subject of this Draw Request, no Project Specific Adverse Event has occurred and is continuing with respect to such Project and such Project has not been designated by the Lenders as a Disqualified Project.

(c)     No Default or Event of Default has occurred and is continuing as of the date hereof.

(d)     All representations and warranties made in or in connection with the Loan Agreement and the other Loan Documents are true, correct and complete in all material respects on the date hereof (unless any such representation or warranty relates to a specific earlier date, in which case it was true, correct and complete in all material respects as of such earlier date).

(e)     The Additional DIP Facilities, Brookfield Forbearance Agreement and any Additional DIP Facilities remain in full force and effect.

Upon receipt of the funds requested by this Draw Request, the Borrower shall immediately apply such funds for the purpose set forth above for which such funds are being requested.

**PINE GATE RENEWABLES, LLC**,
a North Carolina limited liability company


By:   _____
   Name:
   Title:

**Exhibit B**
**Form of Approved Budget**

[Attached]

**Exhibit C**
**Form of Interim DIP Order**

[Attached]

**DRAFT**

**Annex A**

**DIP Milestones**

The Debtors shall achieve each of the following DIP Milestones, in each case on terms and conditions, and subject to documentation, including, in each case, forms of all applicable orders, in form and substance acceptable to the Required Lenders in all respects:

(a) No later than the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Required Lenders, seeking entry of interim and final orders approving the Debtors' entry into the DIP Facility and the use of the Cash Collateral and Prepetition Collateral of the Prepetition Secured Parties,

(b) No later than 5 days after the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order,

(c) No later than 30 days after the Petition Date, the Debtors shall have obtained entry of the Final DIP Order,

(d) Within one (1) day of the Petition Date, on the prior written request of the Lenders, ACT and Newco shall have entered into a transition services agreement (the "***Transition Services Agreement***") in form and substance reasonably acceptable to the Required Lenders to provide Newco and the Fundamental Silo Entities with (A) operations and management and construction development services on terms substantially similar to the Existing Services Arrangements following a Sale Transaction in which the Lenders (or the Lenders' designee) is the winning bidder, and (B) at cost, full access before and after such Sale Transaction to information technology and other systems and data (including from ACT) related to operations and management and construction and development services provided to the Fundamental Silo Entities, and other transition services reasonably determined by Newco to be necessary or appropriate to transition such operations and management and/or construction and development services to other providers.  For the avoidance of doubt, the Transition Services Agreement will not have the effect of waiving or reducing or altering in any way any termination or similar fees owed under the existing O&M services agreements.

(e) Within one (1) day of the Petition Date, the Debtors shall have filed a motion (the "***Bidding Procedures / Stalking Horse APA Motion***"), in form and substance acceptable to the Required Lenders, seeking entry of an order approving (i) procedures for a sale, in one or a series of related transactions, of all or substantially all of the assets of the Debtors, including the Fundamental Silo Entities (the "***Bidding Procedures***") and (ii) the Debtors' entry into and performance under the Stalking Horse APA; *provided* that, for the avoidance of doubt, the order approving Bidding Procedures / Stalking Horse APA Motion shall provide that the Lenders may credit bid the Obligations and the Prepetition Secured Obligations, as applicable, in any sale of the Debtors' assets or any of the assets subject to the Stalking Horse APA, and the Debtors shall have entered into the Stalking Horse APA;

(f) No later than the earlier of (x) 7 days after the later of the Petition Date and (y) November 5, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable

to the Required Lenders, approving the Bidding Procedures Motion and the Debtors' entry into and performance under the Stalking Horse APA (the "***Bidding Procedures Order***").

(g) On Petition Date, to the extent any Debtors are party to services agreements for operations and management and/or construction and development services with Projects in the Fundamental Silo Entities (collectively, the "***Existing Services Arrangements***"), the Debtors shall have filed a motion for entry of an order to assume such agreements pursuant to Section 365 of the Bankruptcy Code.

(h) On or prior to November 19, 2025, the Sponsor shall have provided the Lenders with summaries of all indications of interest and letters of intent received for the Sale Transaction;

(i) No later than the earlier of (x) 75 days after the Petition Date and (y) December 15, 2025, the deadline for parties to submit binding bids to the Debtors pursuant to the Bidding Procedures Order shall have occurred.

(j) No later than the earlier of (x) 85 days after the Petition Date and (y) December 17, 2025, the Debtors shall have commenced an auction pursuant to the Bidding Procedures Order; *provided* that the Debtors shall retain the right to cancel such auction pursuant to the Bidding Procedures Order.

(k) No later than December 23, 2025, the Debtors shall have obtained entry of an order, in form and substance acceptable to the Required Lenders, approving a sale of all or substantially all (or any material portion thereof acceptable to the Required Lenders) of their assets pursuant to the Bidding Procedures Order (the "***Sale Order***").

(l) No later than December 31, 2025, the Debtors shall have consummated the sale of all or substantially all of the assets subject to the Stalking Horse APA pursuant to the Sale Order (the "***Sale Milestone***"); *provided* that the Sale Milestone shall be deemed extended until the earlier of (x) 60 days after the initial Sale Milestone and (y) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed.

**<u>Exhibit D</u>**

**Initial Budget**

**Pine Gate Renewables**
**Initial DIP Budget**

*($ in millions)*

| | FCST 1 | FCST 2 | FCST 3 | FCST 4 | FCST 5 | FCST 6 | FCST 7 | FCST 8 | FCST 9 | FCST 10 | FCST 11 | FCST 12 | FCST 13 | Total Forecast |
| Forecast Week # > | | | | | | | | | | | | | | |
| Period Ending Date > | 11/7/25 | 11/14/25 | 11/21/25 | 11/28/25 | 12/5/25 | 12/12/25 | 12/19/25 | 12/26/25 | 1/2/26 | 1/9/26 | 1/16/26 | 1/23/26 | 1/30/26 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | $ - | $ 76 | $ 16 | $ 7 | $ 7 | $ 5 | $ 79 | $ - | $ 10 | $ - | $ - | $ - | $ - | $ 199 |
| Operating Disbursements | (22) | (162) | (22) | (16) | (29) | (7) | (82) | (3) | (36) | (8) | (1) | (1) | (1) | (390) |
| Restructuring Activites | (8) | (6) | (4) | (5) | (6) | (6) | (7) | (7) | (27) | (5) | (5) | (5) | (5) | (92) |
| **Total Net Cash Flow** | **$ (30)** | **$ (92)** | **$ (10)** | **$ (14)** | **$ (28)** | **$ (8)** | **$ (10)** | **$ (9)** | **$ (53)** | **$ (13)** | **$ (5)** | **$ (6)** | **$ (5)** | **$ (283)** |
| **Liquidity Rollforward** | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | $ 33 | $ 60 | $ 48 | $ 43 | $ 90 | $ 83 | $ 75 | $ 68 | $ 59 | $ 29 | $ 17 | $ 11 | $ 5 | $ 33 |
| Net Cash Flow | (30) | (92) | (10) | (14) | (28) | (8) | (10) | (9) | (53) | (13) | (5) | (6) | (5) | (283) |
| DIP Draws - Interim & Final | 55 | - | - | 55 | - | - | - | - | - | - | - | - | - | 110 |
| DIP Draws - Discretionary | 1 | 80 | 5 | 6 | 21 | 0 | 2 | 0 | 23 | - | - | - | - | 140 |
| **Ending Cash Balance** | **$ 60** | **$ 48** | **$ 43** | **$ 90** | **$ 83** | **$ 75** | **$ 68** | **$ 59** | **$ 29** | **$ 17** | **$ 11** | **$ 5** | **$ -** | **$ -** |
| DIP Facility Available | 194 | 113 | 108 | 47 | 26 | 26 | 23 | 23 | - | - | - | - | - | - |
| **Total Liquidity** | **$ 253** | **$ 161** | **$ 151** | **$ 137** | **$ 109** | **$ 101** | **$ 91** | **$ 82** | **$ 29** | **$ 17** | **$ 11** | **$ 5** | **$ -** | **$ -** |