# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In Re: | Case No.: 25-90669 (CML) |
| PINE GATE RENEWABLES, LLC, *et al.*[1], | Chapter 11 |
| Debtors. | (Jointly Administered) |

## GALLATIN POWER PARTNERS, LLC'S EMERGENCY MOTION FOR RELIEF FROM AUTOMATIC STAY WITH RESPECT TO SUNSTONE PROJECT

**Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on December 1, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on December 1, 2025 at 1:30 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of the Debtors in this Chapter 11 case may be obtained at https://omniagentsolutions.com/PGR (collectively, "**Debtors**").

**This is a motion for relief from the automatic stay. If it is granted, the movant may act outside of the bankruptcy process. If you do not want the stay lifted, immediately contact the moving party to settle. If you cannot settle, you must file a response and send a copy to the moving party at least 7 days before the hearing. If you cannot settle, you must attend the hearing. Evidence may be offered at the hearing and the court may rule.**

**Represented parties should act through their attorney.**

**There will be a hearing on this matter on December 1, 2025 at 1:30 p.m. in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

Creditor Gallatin Power Partners, LLC ("**Gallatin**" or "**Creditor**"), by and through its undersigned counsel, hereby submits its Motion for Relief from Stay (this "**Motion**") pursuant to sections 362(d) and 541(d) of Title 11 of the United States Code (the "**Bankruptcy Code**") and rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). This Motion is supported by the Declaration of Adam Schumaker (the "**Schumaker Decl.**"), the arguments made at the hearing, and the documents on the docket, and arguments made and evidence to be adduced at any hearing on the Motion.

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 1157(b)(2).

2.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The basis for the relief requested herein are sections 362(d) and 541(d) of the Bankruptcy Code.

## FACTUAL BACKGROUND

4.     Gallatin is a renewable energy development firm headquartered in Bozeman, Montana, and has developed solar and battery energy storage projects across the country.

5.     Adam Schumaker ("**Schumaker**") is the President of Gallatin Power.

6.      Debtor Pine Gate Renewables ("**Pine Gate**") is a solar and energy development company headquartered in Asheville, North Carolina.

7.      Ben Catt ("**Catt**") is the Chief Executive Officer of Pine Gate Renewables and, upon information and belief, manages and directed the other Debtors.

8.      This action stems from the Sunstone Solar (formerly referred to as the Echo Solar, Bombing Range Solar I, and Bombing Range Solar II) energy development in Morrow County, Oregon (the "**Sunstone Project**")—one of the largest solar and battery energy storage projects in the country.  The Project encompasses roughly 10,000 acres and, if completed, will be capable of generating and storing 1.2 GW of electricity, enough to meet the annual needs of roughly 250,000 homes.

9.      Gallatin completed initial development of the Sunstone Project, securing the necessary land agreements, grid interconnection and transmission rights through an entity formed to hold title to the development rights and relevant assets, Bombing Range Solar I, LLC ("**Bombing Range**").

A.      **Membership Interest Purchase and Sale Agreement (MIPA)**

10.     On August 18, 2021, Gallatin sold its membership interest in Bombing Range to Pine Gate Renewables pursuant to the MIPA.  A true-and-correct copy of the MIPA is attached as Exhibit 1 hereto.

11.     The MIPA defined the "Project" as including (1) the "[s]olar system under development sited in Morrow County, Oregon on approximately 3,500 +/- acres and interconnected through Umatilla Electric Cooperative," (2) the development's "Phase I Capacity" of approximately 440MW of alternating current and 880 MW of direct current capacity (3) the

"Excess Capacity" comprised of an additional Umatilla Electric Cooperative ("**UEC**") Interconnection Application for 810MW of alternating current, and (4) 1,620MW of direct current capacity, as well as additional land rights. (Ex. 1 at 17, 20.)

12.     Generally, the MIPA provided that Gallatin would sell its 100% interest in Bombing Range to Pine Gate Renewables in exchange for certain cash payments premised upon Pine Gate Renewables' successful construction of the Sunstone Project. (Ex. 1 at 1.)

13.     In exchange for the membership interests and development rights to the Sunstone Project, the MIPA provided that Gallatin would receive a cash payment of $143,314.34 on the Closing Date to reimburse Gallatin for its development costs and receive the following future payments:

- A "Second Payment" payable upon the completion of several conditions precedent (the "**Second Payment Conditions**") including, most critically, the execution of an agreement with an electrical utility provider to purchase power produced by the Sunstone Project; and

- Additional "NTP Payments" payable upon the issuance of Notices to Proceed ("**NTPs**") by Pine Gate Renewables to an engineering, procurement and construction company to begin construction of the Sunstone Project. The NTP Payment entitled Gallatin to additional funds based on the total amount of the Project Capacity that began construction.

(Ex. 1, § 1.1.)

14.     One of the other critical milestones contemplated by the MIPA was Gallatin's execution of a Transmission Service Agreement with Bonneville Power Administration ("**BPA**")

which, in turn, was to be assigned back to Pine Gate Renewables.  (Ex. 1, § 4.7.)  Transmission Service Agreements are critical to the Sunstone Project's success because they allow the Sunstone Project to connect to the electrical grid and transmit power to a buyer.

15.     In September and October of 2022, in accordance with Section 4.6 of the MIPA, Pine Gate Renewables completed its acquisition of the Excess Capacity assets by submitting Transmission Service Requests for the Excess Capacity into the 2023 BPA TSR Study and Expansion Process. Gallatin assigned the 810MW Excess Capacity Interconnection Application with UEC and four associated purchase and lease option agreements from Bombing Range Solar II, LLC to Echo Solar, LLC (the "**Excess Capacity Assets**").  On October 24, 2022, Pine Gate Renewables paid Gallatin $141,048.18 to reimburse it for its documented third-party costs associated with the Excess Capacity.

**B.     Creation of Sunstone Solar**

16.     Shortly after closing of the MIPA, Pine Gate Renewables changed the name of Bombing Range Solar I, LLC to Echo Solar, LLC.

17.     On March 16, 2023, Pine Gate Renewables changed the entity name from Echo Solar, LLC, to Sunstone Solar, LLC.

18.     While different in name, Sunstone Solar currently exists as the Project Company described in and underlying the MIPA.

**C.     Gallatin's Repurchase Option and Pine Gate Renewables' Restrictions**

19.     Critically, the MIPA also included a "Seller Repurchase" option, which granted Gallatin the right to repurchase the Sunstone Project "[i]n the event [Pine Gate Renewables] discontinues development of the Project or any portion thereof," by, *inter alia*:

- discontinuing any development of the Sunstone Project;

- failing to achieve the Second Payment Conditions or make the Second Payment to Gallatin; or

- failing to make "a payment in respect of the Interconnection Application or the interconnection of the Project" or any payment required under a Sunstone Project contract that could have a materially adverse effect on the Sunstone Project's success.

(Ex. 1, § 1.4.)

20.  The MIPA also restricted Pine Gate Renewables' rights with respect to the assets comprising the Sunstone Project. Among other things, the MIPA provided that "the material assets constituting the Project" with respect to its 440MW of Phase I Capacity "shall be held by the Project Company," namely, Sunstone Solar. (Ex. 1, § 1.5(c).)

21.  The MIPA also provided that Pine Gate Renewables was prohibited from "tak[ing] any action" that would either "reduce the amount owed to [Gallatin] for the Second Payments or NTP Payments" or "prevent achievement of the Second Payment Conditions Precedent or the Notices to Proceed" affecting the NTP Payments. (Ex. 1, § 1.5(b).)

22.  The MIPA further prevented Pine Gate Renewables from selling, assigning, or transferring any portion of the Sunstone Project or Project Assets, or any Membership Interests until all NTP Payments had been made and the final project capacity was determined absent certain permitted exceptions. (Ex. 1, § 4.3.)

23.     Applicable here, the MIPA's prohibition on any sale, transfer or assignment prevented Pine Gate Renewables from such a transaction with an affiliated entity unless such entity was "at least as creditworthy" as Pine Gate Renewables. (*Id.*)

24.     Even if a permitted sale, transfer, or assignment occurred, however, the MIPA made clear that all payments owed to Gallatin under the MIPA would remain payable. (*Id.*)

> **D.**     **First Amendment to the MIPA**

25.     On September 13, 2022, Gallatin and Pine Gate Renewables executed the First Amendment to the MIPA (the "**First Amendment**"). A true-and-correct copy of which is attached as Exhibit 2 hereto.

26.     The First Amendment expanded Pine Gate Renewables' obligation with respect to the Sunstone Project's transmission rights through BPA by requiring Gallatin to execute either a Conditional Firm Service Agreement or Transmission Service Agreement with BPA associated with certain preexisting transmission service requests (the "**AREFs**") and assign the same to Pine Gate Renewables within 60 days of execution of such an agreement along with the transmission service requests underlying the AREFs and any associated agreements. Although the agreements were in Gallatin's name (because they could not yet be assigned to Pine Gate Renewables due to the BPA's processes), Pine Gate Renewables was responsible for all costs associated with the agreement. (Ex. 2, § 2.)

27.     The First Amendment also provided that Gallatin was prohibited from executing any further agreements related to the AREFs without Pine Gate Renewables' express written consent. (*Id.*)

**E.**     <u>First Side Letter to the MIPA</u>

28.     On October 18, 2022, Gallatin and Pine Gate Renewables executed the First Side Letter to the MIPA. A true-and-correct copy of which is attached as <u>Exhibit 3</u> hereto.

29.     Through the First Side Letter, the parties acknowledged that Pine Gate Renewables would amend the two pending interconnection and transmission service requests with Umatilla Electric Cooperative ("**UEC**") from two requests for an aggregate of 1,250 MW into six separate requests of 200 MW each. (<u>Ex. 3</u>, § 2.) The First Side Letter made clear that its terms did not negate any terms of the MIPA. (*Id.*)

**F.**     <u>Second Side Letter to the MIPA</u>

30.     On August 23, 2023, Gallatin and Pine Gate Renewables executed the Second Side Letter to the MIPA prepared by Pine Gate Renewables. A true-and-correct copy of which is attached as <u>Exhibit 4</u> hereto.

31.     Through the Second Side Letter, Pine Gate Renewables agreed that it and Gallatin "continue[d] to perform under the [MIPA]." (<u>Ex. 4</u> at 1.)

32.     The Second Side Letter modified the definition of Phase I Capacity from 440MW to 400MW and stated that Pine Gate Renewables had modified the UEC Phase I Capacity interconnection and transmission service request from 440MW to 200MW and modified the UEC Excess Capacity interconnection and transmission service request from 810MW to 200MW, and that those modified interconnection and transmission service requests, along with other assets, constituted the Phase I Capacity under the MIPA. (<u>Ex. 4</u>, § 1.)

33.     The Second Side Letter also represented that Pine Gate Renewables had submitted four separate 200MW interconnection and transmission service requests with UEC, as agreed in

the First Side Letter, for an aggregate total of 800MW which constituted the Excess Capacity described in the MIPA. (Ex. 4, § 1(c).)

34.     The Second Side Letter additionally acknowledged that Bombing Range Solar II, LLC, a Gallatin-affiliated entity, had assigned certain real estate lease and purchase rights to Echo Solar, LLC, a Pine Gate Renewables-affiliated entity. Through the Second Side Letter, these rights became Excess Capacity Assets under the MIPA. (Ex. 4, § 2.)

35.     Finally, the Second Side Letter acknowledged that Gallatin had performed reasonably in performing all Services it agreed to provide under the MIPA. (Ex. 4, § 3.)

**G.     Defendants' Breaches of the MIPA**

36.     Only months after closing of the MIPA, however, Pine Gate Renewables orchestrated the formation of FP 2021, a wholly owned subsidiary of Pine Gate Development which is, in turn, a wholly owned subsidiary of Pine Gate Renewables. *See* Declaration of Adam Schumaker at ¶ 8, attached as Exhibit 5 hereto (the "**Shumaker Decl.**").

37.     Although the exact timing of the transaction is unknown, Gallatin understands that Pine Gate Renewables subsequently transferred 100% of the membership interests in Sunstone Solar (the Project Company under the MIPA) to FP 2021. (*Id.*)

38.     Such transfer violated the MIPA absent proof that FP 2021, a wholly owned subsidiary of Pine Gate Renewables, is "at least as creditworthy" as Pine Gate Renewables as of the August 2021 MIPA closing. (*Id.*, ¶ 6)

39.     Upon information and belief, FP 2021 was not and is not as creditworthy as Pine Gate Renewables was in August of 2021. (*Id.*, ¶ 8)

40.     Accordingly, the transfer of Pine Gate Renewables' interest in Sunstone Solar to FP 2021 constitutes a breach of the MIPA. (*Id.*)

41.     Even if the transfer to FP 2021 was permissible under the MIPA, the payment obligations imposed by the MIPA and owed to Gallatin remain. (Ex. 1, § 4.3).

42.     Upon information and belief, Pine Gate Renewables began experiencing financial difficulties in late 2024 or early 2025. (*Declaration of Ray Shem*, Docket 19, at ¶ 10).

43.     On February 19, 2025, Pine Gate Renewables, acting through FP 2021, formed Sunstone Solar 1, LLC, Sunstone Solar 2, LLC, Sunstone Solar 3, LLC, Sunstone Solar 4, LLC, Sunstone Solar 5, LLC, and Sunstone Solar 6, LLC (collectively, the "**Sunstone Subsidiaries**") by filing Articles of Organization with the Oregon Secretary of State.  True-and-correct copies of the Articles of Organization are attached as <u>Exhibit 6</u> hereto.

44.     Upon information and belief, the Sunstone Subsidiaries are controlled directly or indirectly by Catt, the CEO of Pine Gate Renewables. (Schumaker Decl., ¶ 9.)

45.     Upon information and belief, the Sunstone Subsidiaries were formed to accomplish the transfer of Sunstone Project assets away from the Project Company, in violation of the MIPA. (Schumaker Decl., ¶¶ 9-10.)

46.     Indeed, public filings with the Oregon Energy Facility Siting Council ("**EFSC**") the entity responsible for issuing the Site Certificate making the Sunstone Project possible, establish that Sunstone Solar requested to divide the Sunstone Project into six 200MW facilities, each of which would hold their Site Certificate issued to one of the Sunstone Subsidiaries.[2]

---

[2]  https://www.oregon.gov/energy/facilities-safety/facilities/Facilities%20library/2025-07-24-SSPAMD1-pRFA.pdf, last visited October 23, 2025.

47.     The ESFC Site Certificate constitutes a material asset of the Sunstone Project and the transfer of the same constitutes a breach of the MIPA. (Ex. 1, § 4.7.)

48.     Upon information and belief, Pine Gate Renewables plans to transfer or has transferred additional interconnection applications with BPA and/or UEC to Sunstone 1- Sunstone 6. (Schumaker Decl., ¶ 10.)

49.     Such transfer similarly constitutes a breach of the MIPA because the Sunstone Subsidiaries, at the time of the transfer(s), were not as creditworthy as Pine Gate Renewables was as of the closing of the MIPA. (Ex. 1, § 4.3.)

50.     Gallatin had no knowledge of the Sunstone Subsidiaries or FP 2021 until September of 2025. (Schumaker Decl., ¶ 11.)

51.     Concerned Pine Gate Renewables was attempting to avoid its obligations under the MIPA by transferring assets, Gallatin requested an amendment to the MIPA making the Sunstone Subsidiaries "Additional Purchasers" under the MIPA and clarifying that they were jointly and severally liable with Pine Gate Renewables for the payment obligations owed to Gallatin under the MIPA. (*Id.*)

52.     Gallatin provided Pine Gate Renewables with a draft Second Amendment to the MIPA intended to accomplish this goal. (*Id.*, ¶ 11) A true-and-correct copy of the draft Second Amendment is attached as Exhibit 7 hereto.

53.     Pine Gate Renewables represented that the draft Second Amendment was acceptable. (*Id.*, ¶ 12.)

54.     Schumaker, on behalf of Gallatin, also spoke with Catt, acting on behalf of Pine Gate Renewables and the Sunstone Subsidiaries regarding the proposed amendment. (*Id.*)

55.     Catt agreed with Schumaker that the Sunstone Subsidiaries should be added as Additional Purchasers under the MIPA and were equally responsible for all payment obligations owed to Gallatin. (*Id.*)

56.     Pine Gate Renewables' refusal to sign the Second Amendment to the MIPA and explicitly bind the Sunstone Subsidiaries to its terms was designed to reduce or escape liability for the Second Payment and/or NTP Payment owed to Gallatin and constituted a breach of the MIPA. (*Id.*)

### H.     Pine Gate Renewables' Insolvency

57.     In September of 2025, national media began reporting that Pine Gate Renewables was experiencing liquidity issues and considering bankruptcy.[3]

58.      Concerned about Pine Gate Renewables' financial stability and the future of the Sunstone Project, Gallatin sent Pine Gate Renewables formal notice that it was exercising its Repurchase option under the MIPA on October 17, 2025 (the "**Repurchase Notice**"). (Schumaker Decl., ¶ 14.)  A true-and-correct copy of the Repurchase Notice is attached as Exhibit 8 hereto.

59.     The Repurchase Notice explained that Pine Gate Renewables had failed to comply with the MIPA and achieve requisite Sunstone Project milestones including, *inter alia*:

- Financial inability to enter into a Power Purchase Agreement for the Phase I Capacity; and

- Failure to make certain Project Contract payments that had or would have a materially adverse impact on the Sunstone Project.

---

[3]      https://news.bloomberglaw.com/environment-and-energy/solar-firm-pine-gate-turns-to-advisers-amid-anti-greenpush;https://www.bloomberg.com/news/articles/2025-09-26/solar-firm-pine-gate-preparing-for-potentialbankruptcy-filing.

(Ex. 8 at 1-3.)

60.     Pursuant to the MIPA and Repurchase Notice, Pine Gate Renewables had until November 1, 2025, to provide its calculation of the Repurchase Price and had until November 16, 2025, to deliver a Membership Interest Purchase Agreement to Gallatin to accomplish the repurchase. (Ex. 8 at 2.)

61.     Pine Gate Renewables did not comply with these requirements. (Schumaker Decl., ¶ 15.)

62.     Pine Gate Renewables is insolvent and unable to comply with the MIPA or develop and construct the Sunstone Project. (*Id*.)

**I.      The Sunstone Project is on the Brink of Total Disaster**

63.     Ongoing development of the Sunstone Project requires significant financial responsibilities in the coming months including:

- Millions of dollars owed to UEC under multiple Generator Interconnection Agreements (GIAs);

- Future costs associated with connecting to BPA's power grid in excess of $8 million; and

- Annual payments to landowners under purchase and lease option agreements ranging from $25,000 to $60,000.

(*Id.*, ¶ 17.)

64.     If even a single payment to BPA or UEC is missed, the Sunstone Project will lose its interconnection rights and be forced to start the application process anew—a process that takes five to ten years, if it can be resurrected at all. (*Id.*, ¶ 19.)

65.     In addition, as indicated on Pine Gate's Surety Motion, Pine Gate did not make a $1,200,000 bond payment to Philadelphia Indemnity Insurance Company ("**Philadelphia**") relating to the $80,000,000 Surety Bond posted by Philadelphia on July 1, 2025 which secures the cost of the electric grid upgrades under the UEC Interconnection Agreement associated with the Excess Capacity Assets. (Docket 33-1 at 33).  Upon information and belief, this bond payment was due on August 30, 2025.   This is "a payment in respect of the Interconnection Application or the interconnection of the Project" and Pine Gate both failed to make this payment and also failed to provide notice to Gallatin of "its inability to make any such payment, or its intention to not make any such payment," which it was required to do under the MIPA.  Pine Gate's failure to make the payment and notify Gallatin of its inability to make the payment are a per se trigger of the repurchase right for the Excess Capacity Assets under the MIPA.

66.     Further, Pine Gate may have missed a bond payment on the $26.5 million bond posted by United States Fire Insurance Company ("USFIC") to secure the costs of the electric grid upgrades under the UEC Interconnection Agreement associated with the Phase I Capacity.  As indicated in Pine Gate's Surety Motion, there is a bond payment owed to USFIC of $397,500 that was likely due no later than October 31, 2025, and was not paid by Pine Gate. Pine Gate's failure to make the payment and notify Gallatin of its inability to make the payment are another per se trigger of the repurchase right for the Phase I Capacity under the MIPA.

67.     In addition to the financial obligations associated with continued development of the Sunstone Project, the Site Certificate requires that construction begin on the first phase of the Sunstone Project by November 18, 2027, that construction of the final phase begins on or before

November 18, 2028, and that construction of the entire Sunstone Project is complete on or before November 18, 2030. (Schumaker Decl., ¶ 20.)

68.     A typical construction timeline for a single 200MW project requires 12 months of pre-construction for engineering and procurement and at least 18 months from the start of construction to commercial operation. (*Id.*)

69.     The Sunstone Project is comprised of six 200MW phases, meaning the construction process would take nine years if the phases were built sequentially. (*Id.*)

70.     While Pine Gate Renewables planned for the pre-construction and construction of the six phases to overlap to meet this timeline, its insolvency has prevented it from beginning even the procurement process in any meaningful way. (*Id.*)

71.     If the Sunstone Project timeline is delayed any further, it will become increasingly difficult or impossible to complete construction by 2030. (*Id.*)

72.     Currently, the Sunstone Project's location makes it eligible for a 40% federal Investment Tax Credit ("**ITC**"). (*Id.*, ¶ 21.)

73.     In order to qualify for the ITC, the Sunstone Project must begin construction no later than July 4, 2026 and be placed into service no later than December 31, 2030. (*Id.*)

74.     Without the ITC, the Sunstone Project and/or any individual phase will no longer be economically viable. (*Id.*)

**J.      Pine Gate's Bankruptcy Proceeding**

75.     On November 6, 2025 (the "**Petition Date**"), Debtors commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy**

Code"), by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. (ECF 1.)

76.     Notably, the petitions were filed some 20 days *after* Galatin had given notice and exercised the repurchase option. (*See* Ex. 8.)

77.     That same day, Debtors made an emergency motion to approve and authorize the sale of Debtors' assets under Section 363 of the Bankruptcy Code and to do so free and clear of all claims and interests. (ECF 22.)  The hearing for the sale has been scheduled for December 22, 2025 at 10:00 AM at Courtroom 402.  (ECF 149.)

## RELIEF REQUESTED

The Debtors have no equity in the Sunstone Project, instead, the Debtors possess mere legal title because the pre-petition repurchase right exercised by Gallatin effectively transferred equitable title to Gallatin under applicable law.  Under applicable law and, specifically, the doctrine of equitable conversion, the Sunstone Project does not belong to Debtors' chapter 11 estate because Gallatin is the sole owner of the equitable interest in the Sunstone Project.

Under section 362(d), Gallatin is entitled to relief from stay if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."  The Debtors already acknowledge that they do not need the Sunstone Project for a reorganization: they intend to sell it.  Since Gallatin has exercised its repurchase option, the Debtors have nothing more than bare legal title, and thus as a matter of law have no equity in the Sunstone Project.  Gallatin is, therefore, entitled to relief from stay.

Gallatin seeks entry of an order substantially in the form of the Proposed Order attached hereto as Exhibit 8, granting relief from the automatic stay to permit Gallatin to exercise all of its

state law remedies including without limitation pursuing equitable relief to compel specific performance for the Debtor(s) to reconvey title to the Sunstone Project or seeking other remedies available under applicable non-bankruptcy law .

<strong><u>BASIS FOR RELIEF REQUESTED</u></strong>

**I.    THE SUNSTONE PROJECT IS NOT PROPERTY OF THE BANKRUPTCY <u>ESTATE</u>**

    **A.    <u>Bare Legal Title Alone Is Not Property of the Estate, or Only Property of the Estate to the Extent of a Bare Legal Interest.</u>**

Section 541(a) of the Bankruptcy Code provides that a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).  However, this broad scope is subject to a critical exception under Section 541(d), which provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d).  "Section 541(d) reiterates the general principal that where the debtor holds bare legal title without any equitable interest, that the estate acquires bare legal title without any equitable interest in the property."  *In re Spencer*, 115 B.R. 471, 476 (D. Del. 1990) (quotations omitted).  In other words, "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"  *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 415 (Bankr. S.D.N.Y. 2011).

"In determining when a debtor has a 'legal' or 'equitable' interest in property, the court must turn to state law as the determination of property rights in the assets of a bankruptcy estate is

governed by state law." *In re Spencer*, 115 B.R. at 476; *see also Peet v. Checkett* (*In re Peet*), 529 B.R. 718, 719 (B.A.P. 8th Cir. 2015) ("State law determines the nature and extent of a debtor's interest in property."); *Scripps GSB I, LLC v. A Partners, LLC* (*In re A Partners, LLC*), 344 B.R. 114, 122 (Bankr. E.D. Cal. 2006) ("The estate is comprised of all legal and equitable interests of the debtor in property, wherever located and by whomever held, at the commencement of the case. The nature and extent of the debtor's interest in property are determined by State law. Once that determination is made, federal bankruptcy law determines if the debtor's interest in property is property of the estate.") (citations omitted); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 349 (2d Cir. 1992) ("[A]lthough federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the nature of a debtor's interest in a given item."). And as discussed below, under the governing New York law, Debtors do not have an equitable interest in the Sunstone Project.

### B.   Debtors Only Have Bare Legal Title Under State Law

Gallatin's pre-petition exercise of its Repurchase Option under the MIPA divested Pine Gate of its equitable interest in the Sunstone Project pursuant to the well-established doctrine of equitable conversion.

"It is well settled that the owner of the real estate from the time of the execution of a valid contract for its sale is to be treated as the owner of the purchase money and the purchaser of the land is to be treated as the equitable owner thereof. . .. the law of property declares that, upon the execution of a contract for sale of land, the vendee acquires equitable title. The vendor holds the legal title in trust for the vendee and has an equitable lien for the payment of the purchase price."

*Bean v. Walker*, 95 A.D.2d 70, 72, 464 N.Y.S.2d 895, 896 (App. Div. 1983) (citations omitted).[4]

"[T]he doctrine of equitable conversion as we know it today is . . . one of the oldest and best established doctrines in [property] law. . . . [It is] beyond question that the doctrine of equitable conversion goes at least back to the sixteenth century and perhaps even further." Clark, Andrew (1937) "The Origin and Bases of the Doctrine of Equitable Conversion," *Kentucky Law Journal*: Vol. 25: Iss. 2, Article 5 at 171.[5]

---

[4] The MIPA calls for the application of New York law. (Ex. 1, § 8.1(a)) The MIPA First Amendment states that "THIS AMENDMENT SHALL BE GOVERNED BY . . . THE LAWS OF THE STATE OF NORTH CAROLINA . . ." (Ex. 2, § 4) (emphases original). Regardless of which law is applied, both states have adopted the Doctrine of Equitable Conversion—*see Matthews v. Fields*, 284 N.C. App. 408, 416, 877 S.E.2d 14, 21 (2022) ("The contract of sale of the land . . . had the effect to put the equitable title to the land in the [purchaser]."). Thus, in any event, the execution of the repurchase obligation placed equitable title in the hands of Gallatin. The doctrine of equitable conversion is common law in every potentially applicable jurisdiction.

[5] *See also Seton v. Slade*, 7 Ves. 265, 274, 32 Eng. Rep. 108 (1802) (Eldon, L.) ("The effect of a contract for purchase is very different at Law and Equity. At law the estate remains the estate of the vendor and the money that of the vendee. It is not so here [in equity]. The estate from the sealing of the contract is the real property of the vendee."); *Dubbs v. Stribling & Assocs.*, 274 A.D.2d 32, 38, 712 N.Y.S.2d 19, 23-24 (App. Div. 2000) ("The general rule in regard to contracts for the sale of land is that the owner of the real estate from the time of the execution of a valid contract for such sale is to be treated as the owner of the purchase money, and the purchaser of the land is treated as the equitable owner thereof. The vendor is deemed in equity to stand seised in the land for the benefit of the purchaser, and the latter, even before the conveyance to him, can devise the same." Thus, immediately upon the formation of a contract, the purchaser is vested with equitable title, while the seller holds legal title only as security for the payment of the purchase price.") (analogizing the doctrine of equitable conversion to sale of stock interests); *Pelletier v. Morgan*, 2023 NY Slip Op 02044, ¶ 1, 215 A.D.3d 1153, 1155, 188 N.Y.S.3d 727 (App. Div.) ("[T]he execution of the November 2017 land contract would 'ordinarily vest[ ] equitable title to the property in [plaintiff], who. . . cannot be divested of that title except by proper foreclosure proceedings' . . . To put it differently, the November 2017 land contract placed plaintiff in 'the same position as [a] mortgagor at common law,' and she acquired equitable title to the property, an equitable lien in the amount of her payments, and legal title held in trust by the property vendor and subject to that lien."); *Occidental Realty Co. v. Palmer*, 117 A.D. 505, 506, 102 N.Y.S. 648, 649 (App. Div. 1907) ("[U]pon the execution of the contract, the vendor becomes a trustee of the land for the purchaser, retaining a lien for the purchase price, and the vendee becomes the equitable owner of the land."); *In re Bergman*, 585 F.2d 1171, 1177 (2d Cir. 1978) (holding same); *RTT Holdings, LLC v. Nacht*, 2022 NY Slip Op 03916, ¶ 2, 206 A.D.3d 836, 840-41, 171 N.Y.S.3d 510 (App. Div.) (same); *Cloke v. Findlan*, 2018 NY Slip Op 07220, ¶ 3, 165 A.D.3d 1545, 1549, 86 N.Y.S.3d 774 (App. Div.) (same); *Russell v. Pisana*, 2018 NY Slip Op 05789, ¶ 2, 164 A.D.3d 704, 705, 83 N.Y.S.3d 124 (App. Div.) (same); *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1298 (Del. 1989) ("Equitable conversion is . . . a well-established principle of equity . . . The execution of a contract for the sale of real property effectively transfers the seller's legal interest in the land to the purchaser, and thereafter the seller merely retains an equitable interest in the proceeds of the sales transaction."); *Butler v. Wilkinson*, 740 P.2d 1244, 1255 n.5 (Utah 1987) (Under the equitable conversion doctrine, "the [buyer] is said to convert the monetary interest that he has in the property to an interest in real estate so that he may invoke the powers of an equity court to compel specific performance of the real estate contract.").

Here, on October 17, 2025, nearly three weeks before the Petition Date, Gallatin exercised its Repurchase Option, creating a binding obligation on Pine Gate to reconvey the Sunstone Project. This act vested equitable title in the Sunstone Project with Gallatin, leaving Pine Gate with nothing more than bare legal title held in trust for Gallatin's benefit. Accordingly, pursuant to Section 541(d), the Sunstone Project and its associated assets are not property of the Debtors' estate, and the Debtors may not administer or sell them.

## II.    CAUSE EXISTS TO GRANT RELIEF FROM THE AUTOMATIC STAY

Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . ." Critically, "'cause' for relief from the automatic stay in Section 362(d)(1) is not limited to situations when the moving party's interest is not adequately protected. . . . 'cause' could be found in many situations, including the situation where naked legal title to property has passed into the estate but the equitable title is held by another party." *In re Moore*, 267 B.R. 111, 118 (Bankr. E.D. Pa. 2001) (citation omitted). "[T]hough the bankruptcy code does not comprehensively define what grounds constitute 'cause' to lift the automatic stay, the legislative history accompanying the 1978 amendments to the bankruptcy code indicates that Congress thought stay relief would be warranted when the debtor retains no equitable stake in the property." *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd.* (*In re Fin. Oversight & Mgmt. Bd. of P.R.*), 939 F.3d 340, 348 (1st Cir. 2019) (citing S. Rep. No. 95-989, at 52 (1978), H.R. Rep. No. 95-595, at 343-44 (1977)). Thus, "[w]here a debtor has been divested of an equitable interest in property and no longer retains a right of redemption on the bankruptcy filing date, courts have held that 'cause' exists to grant relief

from the automatic stay." *In re Chaomei Hu*, 639 B.R. 8, 13 (Bankr. D. Mass. 2022) (listing cases).

Indeed, "[o]f all the reasons [for granting relief from the automatic stay], the most persuasive is to

unite legal title with equitable title when title is split and the debtor holds only legal title. In these

instances, the debtor has no beneficial interest in the property, and legal title alone is of little or no

value to the estate." *Davisson v. Engles* (*In re Engles*), 193 B.R. 23, 26 (Bankr. S.D. Cal. 1996).

Because Pine Gate was divested of its equitable interest pre-petition, cause exists to lift the

stay to allow Gallatin to pursue its state-law remedies to gain legal title.  Furthermore, independent

cause for lifting the stay exists due to the imminent and irreparable harm the Sunstone Project

faces under the Debtors' control.  The Sunstone Project is on the brink of collapse, facing millions

of dollars in impending payments to UEC and BPA, the Debtors have missed bond payments,

rendering the Sunstone Project in default under critical agreements, and the failure of the foregoing

will result in the loss of critical interconnection rights that take five to ten years to re-acquire.

(Schumaker Decl., ¶¶ 17-21.)  Any delay jeopardizes the Sunstone Project's ability to meet the

construction deadlines required by its Site Certificate and to qualify for the 40% Investment Tax

Credit (ITC), without which the Sunstone Project is not economically viable. (*Id.*, ¶ 21).

The Debtors' proposed sale of the Sunstone Project will only exacerbate these delays and

likely destroy the Sunstone Project entirely. Under Oregon law, any transfer of the EFSC Site

Certificate—the main Sunstone Project permit—requires discretionary approval from the Oregon

Energy Facility Siting Council (EFSC). Oregon Administrative Rules (OAR) § 345-027-0400.

EFSC must find that the new owner has the requisite "Organizational Expertise" to construct and

operate the facility. OAR § 345-022-0010  The proposed stalking horse bidder, Fundamental, is

not a developer, builder, or operator of power projects and does not meet these standards.  It is

therefore unlikely that the EFSC would approve a transfer to Fundamental, rendering the Sunstone Project unbuildable.  The subsequent process of Fundamental reselling the Sunstone Project to a qualified developer and that new entity seeking EFSC approval would take many months (and potentially not be allowed by EFSC), causing the Sunstone Project to miss its critical deadlines. The only viable path is to grant Gallatin relief from the automatic stay and allow it to exercise its repurchase right or compel the Debtors to comply with such right if they refuse to do so.  The Debtors' inability to protect the Sunstone Project from this imminent destruction constitutes a lack of adequate protection and provides further cause to lift the stay.

## EMERGENCY CONSIDERATION

Gallatin respectfully requests emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1. As set forth above, the Debtors have filed their Sale Motion (Docket 22) seeking to conduct a sale of substantially all assets of the Debtors, including the Sunstone Project. Absent emergency relief, the Debtors will likely proceed with their plans to sell the Sunstone Project and cause irreparable harm to Gallatin. Accordingly, Gallatin respectfully submits that emergency consideration of the Motion is appropriate and should be granted.

## PRAYER FOR RELIEF

**WHEREFORE**, for all the reasons set forth herein, Gallatin respectfully requests that this Court enter an Order (i) granting relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code to permit Gallatin to exercise its rights under the MIPA, including its Repurchase Option, and to pursue any and all remedies available under applicable non-bankruptcy law; and ; and (ii) granting such other and further relief as the Court deems just and proper.

Dated this 18th day of November, 2025.

**PARSONS BEHLE & LATIMER**

/s/ Brian M. Rothschild

Brian M. Rothschild (*pro hac vice*)
Elliott D. McGill (*pro hac vice*)
*Attorneys for Gallatin Power Partners, LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 4001-1(A)(1)

Pursuant to BLR 4001-1(a)(1), counsel for Creditor certifies that it has met and conferred with opposing counsel and has been unable to reach an agreement on the requested relief herein.

Dated this 18th day of November, 2025.

**PARSONS BEHLE & LATIMER**

/s/ Brian M. Rothschild

Brian M. Rothschild (*pro hac vice*)
Elliott D. McGill (*pro hac vice*)
*Attorneys for Gallatin Power Partners, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 18, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

/s/ Brian M. Rothschild
Brian M. Rothschild

## EXHIBIT 1

**Membership Interest Purchase Agreement**

Execution Version

## MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into and effective as of August 18, 2021 (the "**Effective Date**"), by and between Gallatin Power Partners, LLC, a Montana limited liability company (the "**Seller**"), Pine Gate Renewables, LLC, a North Carolina limited liability company ("**Purchaser**" and, collectively with Seller, the "**Parties**" and each a "**Party**").

### RECITALS:

**WHEREAS**, the Seller owns one hundred percent (100%) of the issued and outstanding membership interests in the limited liability company listed on Exhibit A (the "**Project Company**" and the entire membership interest in the Project Company, the "**Membership Interests**");

**WHEREAS**, the Project Company is developing photovoltaic solar power generation facilities with an estimated nameplate capacity as set forth in Exhibit A; and

**WHEREAS**, Seller desires to sell, or cause to be sold, all right, title and interest in and to the Membership Interests to Purchaser, and Purchaser desires to purchase all right, title and interest in and to the Membership Interests from Seller on the terms and conditions set forth in this Agreement (the "**Transaction**").

**NOW, THEREFORE**, in consideration of the premises, agreements, and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

### AGREEMENT

1.    **Sale of Membership Interest; Purchase Price; Payment**.

1.1.    Sale of Membership Interest; Purchase Price. Subject to the terms and conditions set forth herein, at Closing (as defined herein), Seller will sell, transfer and assign, or cause to be sold, transferred and assigned, all of the Membership Interests to Purchaser and Purchaser will purchase, acquire and accept such Membership Interests. At Closing and at such times as are set forth herein, Purchaser will pay to Seller, as the purchase price for the Membership Interests, the amounts set forth in this Section 1.1 (collectively, including the Closing Payment, all Second Payments and all NTP Payments, the "**Purchase Price**") as the milestones set forth in Section 1.1(b) and Section 1.1(c) are satisfied with respect to any Project Capacity. For the avoidance of doubt, all Project Capacity shall be eligible to trigger the milestone payments set forth in Section 1.1(b) and Section 1.1(c) (whether such payments are triggered or made together or separate from each other), in accordance with this Agreement, such that there may be multiple Second Payments and NTP Payments. With respect to any Project Capacity, the Purchase Price shall be paid as follows:

(a)    At Closing, Purchaser shall pay to Seller an amount equal to One Hundred Forty-Three Thousand Three Hundred Fourteen and 34/100 Dollars ($143,314.34) for Seller's documented third-party costs to date incurred for the Project Company in respect of the Phase I Capacity on or before the Closing Date (the "**Closing Payment**");

(b)    Additional payments of the Purchase Price (each, a "**Second Payment**") shall be equal to $0.005 *multiplied by* the applicable Project Capacity, and shall be owed to Seller upon the earlier to occur of the satisfaction of the conditions listed on Exhibit C (such conditions being the "**Second Payment Conditions Precedent**") with respect to the applicable Project Capacity, or the occurrence of Notice to Proceed with respect to the applicable Project Capacity. Upon each occurrence of the satisfaction of the conditions to Second Payment set forth in this Section 1.1(b) with respect to any Project Capacity, the applicable Second Payment shall be paid within thirty (30) days of the earliest to occur of (i) if the Sale Election with respect to such Project Capacity is not made by Seller within the Sale Election Period, then the end of such Sale Election Period, and (ii) Seller's written notice to Purchaser within the Sale Election Period that it will not make the Sale Election with respect to such Project Capacity.

(c)    Additional payments of the Purchase Price (each, a "**NTP Payment**") shall be equal to: (i) $0.03 *multiplied by* the applicable Project Capacity; *less* (ii) the Second Payment actually paid with respect to the applicable Project Capacity; *less* (iii) any payments actually made to the Seller pursuant to the Development Services Terms and Conditions, attached hereto as Exhibit F (the "**Development Services Terms and Conditions**") with respect to the applicable Project Capacity to the extent not already deducted from a NTP Payment. Each NTP Payment shall be paid upon issuance of full notice to proceed ("**Notice to Proceed**") under the engineering, procurement and construction agreement (or such agreement serving the equivalent function) with respect to the applicable Project Capacity.

(d)      In the event any Project Capacity is constructed or reasonably expected by Purchaser to be constructed with battery storage and is not sold to a third party pursuant to Section 1.3, then the NTP Payment applicable to such Project Capacity shall be increased by an amount calculated as follows: the greater of (i) zero dollars ($0.00); and (ii) the total of: (1.8 *minus* (the applicable Project Capacity *divided by* the applicable Project Capacity AC)) *multiplied by* $0.015 *multiplied by* the applicable Project Capacity AC.

1.2.      Time and Place of Closing.  Subject to the terms and conditions herein, the Parties will consummate the transactions described in Section 1.1 on the Effective Date (the "**Closing**" and the actual date of the Closing is referred to herein as the "**Closing Date**"). The Closing will take place at such place as the Parties mutually agree and may take place remotely via the electronic exchange of signature pages and wires.

1.3.      Sale Election.  Within thirty (30) days after each occurrence of the satisfaction of the Second Payment Conditions Precedent with respect to any Project Capacity (each, a "**Sale Election Period**"), the Seller may elect to forego the Second Payment applicable to such Project Capacity and NTP Payment applicable to such Project Capacity and require the Purchaser to commence a sale process solely with respect to such Project Capacity by which Purchaser would sell all the Membership Interests in the Project Company and/or substantially all the assets of the Project Company, Purchaser, or an Affiliate of either, constituting the assets associated with such Project Capacity, or all membership interests in the entity holding such assets associated with such Project Capacity (the "**Sale Election**"). In the event that Seller makes the Sale Election with respect to any Project Capacity, Purchaser and Seller shall mutually agree on a list of ten (10) potential third parties (the "**Sale Buyers**") for Purchaser to market the Project (solely with respect to such Project Capacity) to in accordance with this Section 1.3. Following each Sale Election by Seller, the Purchaser shall use commercially reasonable efforts to execute a Sale Agreement for the purchase and sale of the membership interests or assets, as applicable with respect to the applicable Project Capacity, as set forth in this Section 1.3 (the "**Sale Agreement**"), with one of the Sale Buyers within one hundred fifty (150) days of the applicable Sale Election. Notwithstanding the foregoing, Purchaser shall have no obligation to enter into a Sale Agreement if the price in such Sale Agreement would result in total proceeds of less than an amount equal to: $0.03 *multiplied by* the applicable Project Capacity to Purchaser. Payment of the aggregate transaction consideration from Sale Buyer (including any post-closing milestone payments) pursuant to the Sale Agreement shall be distributed as follows:

(a)      To Purchaser, up to an amount equal to all reasonable and documented third-party development expenses (including, but not limited to, payments made pursuant to the Development Services Terms and Conditions to Seller), payments made to develop the Project, interconnection costs, and the Closing Payment, in each case incurred in connection with the applicable Project Capacity; provided, that upon the satisfaction of the Second Payment Conditions Precedent with respect to any Project Capacity, Purchaser shall provide Seller with its calculation, with reasonable supporting detail, of all such expenses applicable to such Project Capacity, for the Seller to consider with respect to the Sale Election, within ten (10) days of written request by Seller; and

(b)      The remainder of the aggregate transaction consideration from Sale Buyer (including any post-closing milestone payments) pursuant to the applicable Sale Agreement shall be split equally between Purchaser and Seller until Seller has been paid: (i) $0.05 per watt DC for the applicable sale, if the sale is for Project Capacity that is part of the Phase I Capacity, (ii) $0.06 per watt DC for the applicable sale if the Project Capacity is part of the first 440 MWac of the Excess Capacity, and (iii) $0.07 per watt DC for the applicable sale, if the Project Capacity is part of the balance of the Excess Capacity; provided, that following payments of such amounts in clause (i), (ii) and (iii) to Seller, any remaining amounts included in the aggregate transaction consideration from Sale Buyer (including any post-closing milestone payments) pursuant to the applicable Sale Agreement shall be paid one hundred percent (100%) to Purchaser;

provided, however, that (i) the Sale Agreement shall not provide for payment of transaction consideration in a form other than cash; (ii) the Sale Agreement shall not provide for rights in favor of Sale Buyer pursuant to which such Sale Buyer may elect to sell the Project or Membership Interests back to Purchaser or its Affiliates; (iii) the Sale Agreement shall contain customary representations, warranties, and indemnification obligations from Purchaser, but shall contain no representations, warranties, and indemnification obligations from Seller, and any losses or indemnification payments owed to Sale Buyer pursuant to the Sale Agreement shall be paid solely by Purchaser; (iv) the Sale Agreement shall not be conditioned on the use of Purchaser and/or Blue Ridge Power, LLC and/or its or their Affiliates

2

for engineering, procurement and construction services, and (v) the Sale Agreement shall not be executed without Seller's prior written consent.

If Purchaser does not execute a Sale Agreement with respect to the applicable Project Capacity within one hundred fifty (150) days after the Sale Election for such Project Capacity, the Purchase Price shall be paid by Purchaser pursuant to Section 1.1(b) and Section 1.1(c) (and as further adjusted pursuant to this Section) herein with respect to such Project Capacity. Upon and after the close of the transactions contemplated by the Sale Agreement with respect to any Project Capacity, Seller shall not have the right to acquire such Project or applicable portion thereof pursuant to Section 1.4.

Notwithstanding the foregoing, in the event that Seller makes the Sale Election with respect to any Project Capacity but Purchaser does not execute a Sale Agreement with respect to such Project Capacity within one hundred fifty (150) days after the Sale Election, the Second Payment with respect to such Project Capacity shall change to Zero Dollars ($0.00). Further, the Purchaser may elect by written notice to Seller to forego the Sale Election process with respect to any Project Capacity by changing the NTP Payment for such Project Capacity to an amount equal to: (i) $0.04 *multiplied by* the applicable Project Capacity; *less* (ii) the Second Payment actually paid with respect to the applicable Project Capacity; *less* (iii) any payments actually made to the Seller pursuant to the Development Services Terms and Conditions, with respect to the applicable Project Capacity to the extent not already deducted from a NTP Payment. For the avoidance of doubt, in the event that Purchaser makes such election to forego the Sale Election process with respect to any Project Capacity, no change shall be made to the Second Payment for such Project Capacity and Seller shall no longer have the right to such Sale Election with respect to such Project Capacity.

1.4. Seller Repurchase.   In the event that Purchaser discontinues development of the Project or any portion thereof, Seller shall have the option to acquire the Project or any applicable portion thereof from Purchaser in exchange for an amount (the "**Repurchase Price**") equal to all reasonable and documented third-party development expenses of Purchase in respect of the Project or any applicable portion thereof, including, but not limited to (i) payments made pursuant to the Development Services Terms and Conditions; (ii) payments to develop the Project or any portion thereof; (iii) interconnection costs; and (iv) the Closing Payment. For purposes of this Section 1.4, Purchaser shall be deemed to have discontinued the development of the Project or any applicable portion thereof if (A) Purchaser provides written notice to Seller that it has ceased development of the Project or any portion thereof, (B) the Second Payment Conditions Precedent have not been achieved and the Second Payment has not been made (x) with respect to the Project or any portion thereof from the Phase I Capacity, by the four year anniversary of the Closing, or (y) with respect to the Project or any portion thereof from the Excess Capacity, by the four year anniversary of the date on which Purchaser has perfected its ownership of such Excess Capacity pursuant to Section 4.6 (provided, that with respect to clause (x) or clause (y) Seller's repurchase right pursuant to this Section 1.4 shall apply only to such portion of the Phase I Capacity or Excess Capacity, as applicable, for which the Second Payment Conditions Precedent have not been achieved, and in such event, the Repurchase Price for such Phase I Capacity or Excess Capacity, as applicable, shall be equal to all reasonable and documented third-party development expenses of Purchase in respect of only such Phase I Capacity or Excess Capacity, as applicable), or (C) Purchaser fails to make, or fails to cause the Project Company or an Affiliate to make, a payment required under a Project contract, or a payment in respect of the Interconnection Application or the interconnection of the Project, such that such failure results in, or would reasonably be expected to result in, a Material Adverse Effect (provided, that Purchaser shall, upon becoming aware of its inability to make any such payment, or its intention to not make any such payment, immediately provide written notice to Seller of the same) (the occurrence of any of clause (A), (B), or (C) being the "**Repurchase Trigger**"). Notwithstanding the foregoing, such Repurchase Trigger shall only be available to Seller if Seller has used commercially reasonably efforts to complete the Conditions Precedent pursuant to the Development Services Terms and Conditions. Provided that, pursuant to subsection (B) above, if Purchaser and Seller are using commercially reasonable efforts and reasonably expect to satisfy the Second Payment Conditions Precedent within the twelve (12) months following the applicable deadline, the four years shall be extended by one (1) year.

(a)     Upon the Repurchase Trigger, Seller shall have a period of 90 days to elect to acquire the Project (or applicable portion thereof) from Purchaser, during which period Purchaser shall provide Seller its calculation of the Repurchase Price (within 15 days of written request by Seller), and Purchaser will cooperate with Seller and will provide to Seller all information regarding the Project, Membership Interests, and its development expenses contributing to the Repurchase Price, in each case as may be reasonably requested by Seller.

3

(b)   If Seller elects to acquire the Membership Interests (or assets comprising the applicable Excess Capacity, or membership interests of such entity holding such assets with respect to the applicable Excess Capacity) pursuant to this <u>Section 1.4</u>, Purchaser shall within 30 days of such election, deliver a purchase and sale agreement for the acquisition of the membership interests or assets, as applicable, by Seller in which (i) Purchaser sells, transfers and delivers all of the membership interests or assets, as applicable, free and clear of any and all liens other than Permitted Liens and liens that existed immediately prior to the Closing, (ii) Purchaser shall make representations and warranties equivalent in substance to the representations and warranties made by Seller under this Agreement, (iii) Purchaser shall provide indemnification rights in favor of Seller equivalent in substance to the indemnification rights provided by Seller in favor of Purchaser provided under this Agreement, and (iv) Purchaser shall execute a release equivalent in substance to the release provided by Seller pursuant to this Agreement.

1.5. <u>Achievement of Milestones</u>. From and after the Closing until payment of the NTP Payment applicable to the final Project Capacity:

(a)   Purchaser shall use commercially reasonable efforts to achieve all Second Payment Conditions Precedent and the Notices to Proceed;

(b)   Purchaser shall not take any action the purpose of which is to (i) reduce the amounts owed to Seller for the Second Payments or NTP Payments, or (ii) prevent the achievement of the Second Payment Conditions Precedent or the Notices to Proceed;

(c)   The material assets constituting the Project, solely with respect to the Phase I Capacity, shall be held by the Project Company (except those assets that are held by Seller in accordance with this Agreement); and

(d)   Purchaser shall provide reasonably detailed updates regarding the status of completion of the Second Payment Conditions Precedent and achievement of Notices to Proceed, upon reasonable request by Seller, which shall occur no more than once per quarter.

2. **Representations and Warranties of Seller.** Seller represents and warrants to Purchaser that the following representations are true, correct and complete with respect to Seller, the Project Company, and Project, as applicable, solely as of the Effective Date (and, for clarity, the representations and warranties shall not be deemed to be brought down as of any other date except in a writing executed by Seller, including the date upon which Purchaser perfects its ownership of the Excess Capacity pursuant to <u>Section 4.6</u>):

2.1. <u>Organization; Authority of Seller</u>. Seller represents that it is a limited liability company, duly formed, validly existing and in good standing under the laws of the state of Montana. The execution, delivery and performance by Seller of this Agreement are within Seller's company powers and have been duly authorized by all necessary corporate or other action.

2.2. <u>Binding Effect</u>.  This Agreement when executed and delivered by Seller (assuming the due execution and delivery of all other parties hereto), will constitute valid and legally binding obligations of Seller, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.3. <u>Organization of Project Company</u>.  The Project Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation.  Seller has made available to Purchaser through an online data room hosted by Google Drive, on or prior to the Effective Date ("**Made Available**"), true and complete copies of Project Company's Certificate of Formation or Articles of Organization and Limited Liability Project Company Operating Agreement and any amendments thereto, each of which is listed on <u>Schedule 2.3</u>.

2.4. <u>Sole Owner; Capitalization</u>.  <u>Exhibit A</u> identifies the owner of 100% of the Membership Interests of the Project Company.  The Membership Interests were not issued in violation of the organizational documents of Seller or the Project Company or any other agreement, arrangement or commitment to which Seller or the Project Company are a party and are not subject to or in violation of any preemptive or similar rights of any individual,

4

partnership, corporation (including a business trust), nonprofit corporation, limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof ("**Person**").  Except for the obligations to Purchaser hereunder, there are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to any membership interests in the Project Company or obligating Seller or the Project Company to issue or sell any membership interests (including the Membership Interests), or any other interest, in Project Company. The Membership Interests are not certificated.

2.5.    <u>No Subsidiaries</u>. Project Company (a) does not own of record or beneficially, or control, directly or indirectly, any equity or other ownership interest in any Person (or any option, warrant, security or other right convertible, exchangeable or exercisable thereof), and (b) is not directly or indirectly, a participant in any joint venture, partnership, trust, association or other limited liability entity.

2.6.    <u>No Conflict</u>.  Assuming the notices, consents, approvals and authorizations set forth on <u>Schedule 2.7</u> have been obtained or given, the execution and performance of this Agreement and the sale of the Membership Interests pursuant hereto does not and will not result in any violation of, or conflict with, any agreement, order, injunction, decree or similar instrument to which Seller or the Project Company are bound or any law or regulation applicable to it.

2.7.    <u>Consents</u>. Except as set forth on <u>Schedule 2.7</u> hereof, no consents, approvals, or authorizations are required for the execution, delivery and performance of this Agreement and the transfer of the Membership Interests by Seller.

2.8.    <u>Litigation</u>.  There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to Seller's Knowledge, threatened against (a) the Project Company or (b) Seller that affects or relates to Project Company, Project, or Seller's ability to execute and perform this Agreement. For purposes of this Agreement, "**Seller's Knowledge**" means the actual knowledge of Adam Schumaker after reasonable inquiry, and, for the avoidance of doubt, shall include such inquiry of that of a reasonably prudent business person.

2.9.    <u>Brokers</u>.  Seller has no obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transaction contemplated by this Agreement for which the Purchaser could become liable or obligated.

2.10.    <u>Project Assets</u>.  The Project Company owns and is in possession of all material assets related to, associated with or concerning the Project (the "**Project Assets**"), except as set forth on <u>Schedule 2.10</u>, and has good and marketable title thereto (except for Permitted Liens), all of which are listed on <u>Schedule 2.10</u>. Copies of the Project Assets (or documentary evidence thereof) have been Made Available to Purchaser.  At the Closing for the Project Company, all Project Assets held by the Project Company will be free and clear of any and all liens other than Permitted Liens.  Except as set forth on <u>Schedule 2.10</u>, no Person other than the Project Company will own or have any interest in, or option or other right (contingent or otherwise) to, including a right of first refusal or a right of first offer in, the Project Assets.  For purposes herein, "**Permitted Liens**" means (a) liens for taxes not yet due and payable, (b) inchoate mechanics' and materialmen's liens for construction in progress and workmen's, repairmen's, warehousemen's and carriers' liens, arising in the ordinary course of business that in each case are for amounts not due and payable or are being contested in good faith through appropriate proceedings, (c) liens and other encumbrances (i) of record or (ii) identified in any title commitment or title documents that Seller Made Available, (d) zoning and other land use restrictions, (e) mineral rights, sub-surface easements, rights-of-way, restrictions, reservations, leases, including oil and gas leases, and other similar sub-surface encumbrances and exceptions to title existing as of the Closing Date, (f) liens created by acts or omissions of Purchaser or its affiliates, (g) restrictions on use set forth in any Permit or Contract (as defined herein), or (h) other imperfections of title, or liens that, individually or in the aggregate, do not have a Material Adverse Effect on the Project and/or Project Company.

2.11.    <u>Contracts</u>.  True, correct and complete copies of all material contracts and agreements to which the Project Company is a party (the "**Contracts**") have been Made Available to Purchaser and are listed on <u>Schedule 2.11</u>.

(a)        Each Contract is in full force and effect, and constitutes a legal, valid, binding and enforceable Contract as to Project Company and, to Seller's Knowledge, the respective counterparties thereto.

(b)        Neither the Project Company nor, to Seller's Knowledge, any other Person, (i) has indicated its intention to amend or terminate any Contract, (ii) is in material breach of or in default under any Contract, or (iii) has made any claims against, or sought indemnification as to any matter arising under or with respect to any

5

Contract, and no event has occurred which with the passage of time or giving of notice or both would constitute such a default, result in a loss of rights or permit termination, modification or acceleration under, or result in the creation of any lien under any Contract.

(c)     The Project Company is not a party to any material contract, agreement or understanding other than the Contracts.

(d)     Schedule 2.11 sets forth all contracts or agreements to which the Project Company is a party or by which its interests or the Project Assets are bound.

2.12.    Permits.  True and correct copies of each material permit, license, approval and similar consent by a governmental authority pursuant to applicable law that has been obtained by or for the benefit of Project Company (the "**Permits**") have been Made Available to Purchaser and are listed on Schedule 2.12. To Seller's Knowledge, Seller has not received any written notice that a governmental authority is considering the amendment, termination, revocation or cancellation of any such Permit and no event has occurred and is continuing that constitutes, or after notice or lapse of time or both would constitute, any material violation of any such Permit, or could reasonably be expected to result in a material adverse modification, revocation, or termination of, or any other material adverse change in, any such Permit. The Project Company has not verbally or in writing entered into any amendment, supplement, extension or restatement of any such Permit relating to the Project unless Made Available to Purchaser.

2.13.    Taxes.

(a)     All tax returns required to be filed by or with respect to Project Company or its assets have been timely filed including in accordance with duly obtained and authorized extensions.  Each such tax return was prepared in material compliance with all applicable laws and is true and correct in all material respects.

(b)     Each tax required to have been paid, or to Seller's Knowledge claimed by any governmental authority to be payable, by Project Company or in respect to any of its Project Assets or activities (whether pursuant to, or shown to be due on, any tax return or otherwise) has been duly paid in full on a timely basis.

(c)     Project Company is in material compliance with all applicable laws relating to withholding of taxes and the payment thereof in connection with amounts owing to any employee, independent contractor, creditor, partner or similar third party, has duly and timely withheld and paid over to the appropriate governmental authority all amounts required to be so withheld, and has materially complied with all reporting obligations with respect to such amounts.

(d)     No audit or other proceeding by any governmental authority is pending and no governmental authority has given written notice of any intention to commence an audit or other proceeding, or assert any deficiency or claim for additional taxes against Project Company. To Seller's Knowledge, there is no threatened audit or proposed deficiency for unpaid taxes with respect to Project Company.

(e)     Project Company has not elected under Code Section 7701 (or any comparable provision of law) to be classified as a corporation for U.S. federal income tax purposes (or under any comparable or similar provision of state or local law). At all times since its formation, Project Company has been disregarded as an entity separate from its owner or a partnership, for U.S. federal income tax purposes (including under any comparable or similar provision of state or local law).

(f)     Except as provided for in any Contract, neither Seller nor the Project Company has received any notice of any special assessments, levies or taxes imposed or to be imposed affecting any Project Assets. To Seller's Knowledge, no such special assessments, levies or taxes have been threatened by any governmental authority.

(g)     No federal investment tax credit or grant in lieu of any such credit pursuant to Section 48 of the Code has been or will be claimed by Seller or any of its affiliates with respect to any Project Assets.

(h)     There are no liens for taxes upon any assets of the Project Company, other than liens for taxes not yet due and payable.

(i)     The Project Company is not a party to nor is bound by, nor does Project Company have any obligation under, any allocation or sharing agreement (including indemnity arrangements) related to any tax (other than an agreement the principal purpose of which is not tax).

6

(j)      The Project Company does not have any liability for the taxes of any other Person as a transferee, successor, by agreement (other than an agreement the principal purpose of which is not tax), or otherwise under applicable law.

2.14.   <u>No Undisclosed Liabilities</u>. Except for Project Company's obligations in accordance with any Permits or Contracts that are listed on <u>Schedule 2.14</u>, the Project Company does not have any other material liabilities, and to Seller's Knowledge, there is no basis for any claim against Project Company for any liability.

2.15.   <u>Environmental Laws</u>.

(a)      Project Company has not assumed or undertaken any obligation, lien or other material liability of any other Person under any Environmental Law.  For purposes of this Agreement, "**Environmental Law**" means all laws (including applicable rules, regulations, codes, injunctions, judgments, orders, ordinances, decrees, rulings and charges thereunder) of governmental authorities, as well as any common law, concerning pollution or protection of public health, natural resources, or the environment, including without limitation laws relating to emissions, discharges, releases, or threatened releases of Hazardous Materials into the air, surface water, ground water, lands or subsurface, or otherwise relating to the presence, production, generation, labeling, testing, control, clean-up, manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of Hazardous Materials, and including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 – 9675; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 – 6992k; the Clean Air Act, 42 U.S.C. §§ 7401 – 7671q; the Clean Water Act, 33 U.S.C. §§ 1251 – 1387; and the National Environmental Policy Act, 42 U.S.C. §§ 4321 – 4347; each as amended, and any analogous state or local laws and regulations. "**Hazardous Materials**" means (i) any petroleum, petroleum constituents or petroleum products, by-products or wastes; flammable, ignitable, corrosive or explosive substances or materials; radioactive materials; bio hazardous materials; asbestos in any form that is or could become friable; urea formaldehyde foam insulation; and polychlorinated biphenyls ("PCBs"), excluding in each case any naturally occurring instances thereof, (ii) any chemicals or other materials or substances which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants" or words of similar import under any Environmental Law, and (iii) any other pollutant, contaminant, chemical or any other industrial, toxic, or otherwise hazardous material substance, or waste with respect to which liability or standards of conduct are imposed, or the exposure to which is prohibited, limited or regulated, by any governmental authority under any Environmental Law; provided, that "Hazardous Materials" does not include commercially reasonable amounts of such materials used in the ordinary course of operation, maintenance or construction of the Project or Project Site which are used and stored in accordance with all applicable laws.

(b)      All environmental investigations, reports, studies, audits, tests, reviews, sampling, or other analyses conducted in relation to the Project site as further described on <u>Exhibit D</u> (the "**Project Site**") have been Made Available to Purchaser.  Seller has Made Available to Purchaser copies of all other material documents and records in the possession or control of Seller or Project Company concerning any condition of the environment with respect to the Project Site.

(c)      To Seller's Knowledge, there are no Hazardous Materials present on the Project Site in violation of any Environmental Law.

(d)      To Seller's Knowledge, any jurisdictional determinations and wetland delineations Made Available to Purchaser accurately reflect the location of any wetlands on the Project Site.

(e)      To Seller's Knowledge, any reports and surveys related to the potential for or presence of threatened or endangered species in or near the Project Site Made Available to Purchaser accurately reflect whether there are any threatened or endangered species in or near the Project Site.

2.16.   <u>Public Utility</u>.  Neither Seller nor the Project Company are subject to financial, organizational or rate regulation as electric utilities or electric utility holding companies, whether under federal or state law, except as a qualifying small power production facility and as regulated in accordance with the statutes and rules administered by the applicable state utility commission, if applicable.

2.17.   <u>Insurance</u>.  There are no claims related to the Project pending under any insurance policies carried by or for the benefit of Project Company and, to Seller's Knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any claim under any such insurance policies.

2.18.    <u>Intellectual Property</u>. Project Company does not own, use or license any patents, trademarks, copyrights or other intellectual property rights necessary for the operation of Project Company as of Closing. Project Company has not infringed, nor to Seller's Knowledge has Project Company been claimed to have infringed, the patent, trademark, copyright or other intellectual property rights of any Person.

2.19.    <u>Employee Matters</u>. Project Company does not employ nor has Project Company ever employed any employees. Project Company does not have any liabilities with respect to any employees of Seller or any of its Affiliates or any other individuals (including independent contractors, contract workers, leased employees or temporary employees) that have performed work at or in connection with the Project or in connection with the business of Project Company.

2.20.    <u>Bank Accounts, Powers of Attorney</u>. There are no bank accounts, safe deposit boxes, or related powers of attorney for the Project Company. Seller does not have any outstanding powers of attorney for banking or other purposes exclusively related to, or that after the Closing Date would apply to, the Project or the Project Company.

2.21.    <u>Foreign Person</u>. Seller is not a foreign person as defined in Section 1445(f)(3) of the Code.

2.22.    <u>Bankruptcy</u>. Neither the Seller nor Project Company has committed an act of bankruptcy, proposed a compromise or arrangement to its creditors generally, taken any proceeding with respect to a compromise or arrangement to its creditors generally or in respect of bankruptcy, taken any proceeding to have itself declared bankrupt or wound-up, or taken any proceeding to have a receiver appointed in connection with the Project and the Project Company has not had any petition for a receiving order in bankruptcy filed against it, had any holder of a lien take possession of its interest in the Project or any Project Assets, or had any execution or distress become enforceable or become levied upon the Project or any Project Assets.

2.23.    <u>No Further Representations</u>. Except for the representations and warranties expressly set forth in this <u>Article 2</u>, Seller expressly disclaims any representations or warranties of any kind, express or implied, relating to Seller, the Membership Interests, the Project Company and the Project.

3.    **<u>Purchaser's Representations and Warranties</u>**. Purchaser represents and warrants to Seller that the following representations are true, correct and complete as of the Effective Date.

3.1.    <u>Organization; Authority</u>. Purchaser represents that it is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of North Carolina. The execution, delivery and performance by Purchaser of this Agreement are within Purchaser's company powers and have been duly authorized by all necessary corporate or other action.

3.2.    <u>Binding Effect</u>. This Agreement when executed and delivered by Purchaser (assuming the due execution and delivery of all other parties hereto), will constitute valid and legally binding obligations of Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.3.    <u>No Conflicts</u>. The purchase of the Membership Interests and consummation of the transactions contemplated by this Agreement does not result in any violation of, or conflict with, any agreement or instrument to which Purchaser is bound or any law or regulation applicable to it.

3.4.    <u>Membership Interests</u>. Purchaser understands and is fully aware that the Membership Interests have not been registered with the Securities and Exchange Commission under the Securities Act of 1933 or with any state securities regulatory authority, and are being transferred in reliance upon an exemption from said Act, and the Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Purchaser is acquiring the Membership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.

3.5.    <u>Brokers</u>. Purchaser has no obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Seller could become liable or obligated.

3.6.    <u>Consents</u>. No consents, approvals, or authorizations are required for the execution, delivery and performance of this Agreement and the purchase of the Membership Interests by Purchaser.

8

3.7. <u>Litigation</u>. There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to Purchaser's knowledge, threatened against Purchaser that affects or relates to Purchaser's ability to execute and perform this Agreement.

3.8. <u>Bankruptcy</u>. Purchaser has not committed an act of bankruptcy, proposed a compromise or arrangement to its creditors generally, taken any proceeding with respect to a compromise or arrangement, taken any proceeding to have itself declared bankrupt or wound-up, or taken any proceeding to have a receiver appointed.

3.9. <u>Sufficiency of Funds</u>. Purchaser has sufficient cash on hand or other sources of available funds to enable it to make payment of the Purchase Price that is due upon the execution of this Agreement, and, with respect to future payments of the Purchase Price, Purchaser reasonably expects to have at the time such payment is expected to be due sufficient cash on hand or other sources of available funds to make such payment.

4. **Covenants**.

4.1. <u>Further Assurances</u>. At any time and from time to time after the Closing Date, upon the reasonable request of a party hereto, the other party hereto will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances and assurances as may be reasonably required to more effectively and completely assign and transfer to Purchaser the Membership Interests and assure and confirm to the other party hereto the effectiveness of the transactions contemplated herein. The Parties acknowledge that certain lien searches conducted by Purchaser that were expected to be completed prior to the date hereof have not been completed and received by Purchaser as of the date hereof. With respect to any liens or encumbrances shown on such lien searches that constitute a breach or inaccuracy of any representation or warranty of Seller hereunder, in furtherance of and not in limitation of any right Purchaser may have pursuant to <u>Section 6</u>, Seller agrees to take such further actions as may be reasonably required to extinguish such liens or encumbrances.

4.2. <u>Tax Matters</u>.

(a)     Purchaser shall prepare and file, or cause to be prepared and filed, all tax returns of the Company required to be filed after the Closing Date that relate to a tax period beginning on or before the Closing Date. Purchaser shall deliver any such tax return to Seller a reasonable period prior to filing such tax return for Seller's review, comment and approval. Within five (5) days of receiving a written request from Purchaser, Seller shall pay to the Project Company any taxes for which Seller is responsible under this Agreement shown to be due and payable on any such tax return. Notwithstanding the foregoing, such tax returns and filings shall not include: (i) returns for which the Project Company is considered a disregarded entity and whose activity is included in the filing of its parent; and (ii) filings for tax periods that end prior to the Closing Date, regardless of when due.

(b)     In the case of taxes that are payable with respect to a tax period that includes but does not end on the Closing Date (each such period, a "**Straddle Period**"), the portion of any such taxes that are allocable to the pre-Closing portion of the Straddle Period for purposes of this Agreement shall be: (i) in the case of property taxes and other similar taxes imposed on a periodic basis, the amount of such taxes for the entire period multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period; and (ii) in the case of all other taxes, the amount of taxes that would be payable on the basis of an interim closing of the books as of the end of the day on the Closing Date.

(c)     Unless the Parties mutually agree otherwise, Purchaser shall control the conduct of any audit or administrative or judicial proceeding with respect to taxes of Project Company (a "**Tax Contest**") for any tax period beginning on or before the Closing Date; provided, however, that (i) Seller shall be entitled, at its own expense, to participate in such Tax Contest, and (ii) Purchaser shall not settle or compromise any material issue with respect to such Tax Contest without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed. In case of any dispute in connection with the Tax Contest referenced above, the Parties shall seek to resolve the dispute in good faith negotiations. The Parties shall meet to attempt, in good faith, to resolve the dispute by negotiation, either directly or through the assistance of such advisors as they may engage. If, within seven (7) days, the Parties do not reach an agreement on the resolution of the dispute, the Parties agree to proceed in accordance with Section 8.1 outlined below.

(d)     The Parties intend for the purchase and sale of the Membership Interests to be treated as a sale by Seller to Purchaser of 100 percent of the assets of the Project Company for federal income Tax purposes and, to the extent permitted under Applicable Law, for state and local income Tax purposes. For U.S. federal income tax

9

purposes, the taxable years of Project Company shall end on the Closing Date, and Project Company shall be treated as an entity disregarded as separate from Purchaser.  Each Party will report the transaction consistently with the intent of this Section 4.2(d), as applicable, in each case, for all tax reporting purposes, except as otherwise required by Applicable Law.  After the Closing Date, Purchaser shall allocate the Purchase Price among the assets of Project Company for purposes of completing IRS Form 8594. The allocations contemplated by this Section 4.2(d) shall, in all cases, be consistent with the principles of Section 1060 of the Code and the applicable Treasury Regulations thereunder.  Purchaser shall prepare such IRS Form 8594 for Seller's review and comment, and shall use commercially reasonable best efforts to incorporate all such comments in the Form 8594.  After such review and comment, Purchaser shall deliver to Seller a completed IRS Form 8594 for Seller's execution. Such agreed allocation as set forth on IRS Form 8594 shall be final and binding on the Parties, and no Party shall take any position on any tax return that is inconsistent with the agreed allocation pursuant to this Section 4.2(d).

(e)        Seller and Purchaser will provide each other with such cooperation and information as either of them may reasonably request of the other in filing any tax returns pursuant to this Section 4.2 or in connection with any Tax Contest. Furthermore, if any tax is due within thirty (30) days after the Closing Date, Seller shall within three (3) business days of the Closing Date, provide to Purchaser all information regarding such payment(s) due to permit Purchaser to promptly make such payment.

4.3.  <u>Transfer</u>.  From and after the Closing until payment of the NTP Payment for the final Project Capacity, Purchaser shall not be permitted to cause or permit a sale, assignment or other transfer of any material portion of the Project or Project Assets, or any Membership Interests, except as set forth in this <u>Section 4.3</u>, <u>Section 1.3</u>, or <u>Section 8.6</u>, and except, subject to <u>Section 1.5</u>, (i) in connection with debt financing or tax equity financing in respect of the Project with a third party financing partner, (ii) to a third-party equity partner as part of financing for any part of the Project, (iii) to an Affiliate of Purchaser that is at least as creditworthy as Purchaser is as of Closing; (iv) to Birch Creek Development, LLC or an Affiliate thereof; or (v) in a collateral assignment to a third party financing partner in connection with financing in respect of any portion of the Project. For the avoidance of doubt, Purchaser shall not need consent from Seller to cause or permit a sale, assignment or other transfer of any material portion of the Project or Project Assets, or any Membership Interests pursuant to subsections (i), (ii), (iii), (iv), and (v) in this <u>Section 4.3</u>. Notwithstanding anything to the contrary herein, no such sale, assignment or other transfer shall release Purchaser from its obligations to Seller hereunder without the written consent of Seller. Further, in the event a sale occurs under subsections (i), (ii), (iii), (iv), and (v) above, the sale shall not be treated as a sale pursuant to <u>Section 1.3</u> and the payment structure outlined in <u>Section 1.1</u> shall govern at and after the transaction.

4.4.  <u>Interconnection Application</u>. Following Closing and the assignment contemplated in <u>Section 4.5</u>, Purchaser shall use commercially reasonable efforts to promptly request and have completed an interconnection system impact study from BPA (the "**System Impact Study**") for the full project capacity of 1,250 MWac contemplated in the Interconnection Application. Subject to <u>Section 4.6</u>, promptly following the completion of the System Impact Study, for no additional consideration Purchaser shall assign and transfer to Seller such portion of the Interconnection Application that reflects the maximum project capacity pursuant to the System Impact Study for the project contemplated in the Interconnection Application, *less* the Phase I Capacity (such resulting capacity amount being the "**Excess Capacity**" and the assignment of such portion of the Interconnection Application the reflects the Excess Capacity being the "**Excess Capacity Assignment**").

(a)        Purchaser shall not, without Seller's prior written consent, (i) consent to any reduction, or take any action reasonably likely to result in any reduction, in the capacity reflected in the Interconnection Application with respect to the Excess Capacity, (ii) revise, or take any actions reasonably likely to result in a revision of, any project inputs or assumptions reflected in the Interconnection Application, to the extent such revisions do or would reasonably be expected to adversely impact the Excess Capacity, or (iii) consent to any material limitation of the rights applicable to the applicant pursuant to the Interconnection Application in respect of the Excess Capacity.

(b)        Subject to <u>Section 4.6</u>, Purchaser and Seller shall for no additional consideration each use commercial best efforts to consummate the Excess Capacity Assignment, including obtaining consent from BPA for such assignment; <u>provided</u>, that Purchaser shall grant to Seller (and/or shall consent to the grant to Seller by the fee owner of the leased Project site, if applicable) such access easements and utility easements or rights of way (or, with respect to such utility easements or rights of way, Purchaser shall grant to the utility or

10

other applicable Person) as are reasonably necessary for the site control and development of the projects associated with the Excess Capacity.

4.5. <u>Seller Assignment of Interconnection Application</u>. Within 45 days after Closing, Seller shall assign to Purchaser the Interconnection Application.

4.6. <u>Excess Capacity</u>. Notwithstanding <u>Section 4.4</u>, the Excess Capacity Assignment shall not occur, and Purchaser shall own the Excess Capacity, only if Purchaser submits to BPA, within the period of time as required by BPA, a transmission service request (in form and substance acceptable to BPA and Seller) for all (but not less than all) of such Excess Capacity to participate in the 2023 Cluster Study in the BPA TSR Study and Expansion Process (such submission, the "**Cluster Study Submission**"). Following the Cluster Study Submission in accordance with this <u>Section 4.6</u>, (i) Purchaser shall, or shall cause its Affiliates to, use commercially reasonable efforts to execute an associated cluster study agreement with BPA and pay estimated study costs to BPA, in each case as required by BPA, and (ii) Seller shall, when allowed by Umatilla Electric Coop to transfer the Umatilla Excess Capacity Interconnection Application, transfer and assign to Purchaser or its designated subsidiary the Excess Capacity Assets. Within 30 days following the Cluster Study Submission and transfer to Purchaser or its designated subsidiary of the Excess Capacity Assets, in accordance with this <u>Section 4.6</u>, Purchaser shall pay to Seller all of Seller's documented third-party costs incurred in respect of the Excess Capacity on or before the transfer to Purchaser or its designated subsidiary the Excess Capacity Assets (including, for the avoidance of doubt, such costs incurred prior to Closing in respect of the Excess Capacity).

4.7. <u>Transmission Services</u>. At such time as is permitted by BPA, Seller shall, solely with respect to the Phase I Capacity, (i) execute a transmission service agreement between Seller and BPA (the "**Transmission Service Agreement**"), in form and substance reasonably satisfactory to Seller and Purchaser, and (ii) assign the Transmission Service Agreement, with the associated transmission service request submitted by Seller to BPA, to Purchaser.

4.8. <u>Transfer Taxes</u>. Purchaser shall be responsible for any sales, use, value added, gross receipts, excise, registration, stamp duty, transfer or other similar taxes or governmental fees (including any interest or penalties related thereto) that may be payable in connection with the sale or purchase of the Membership Interests (the "**Transfer Taxes**"). Purchaser and Seller shall jointly prepare and file all Tax Returns for any Transfer Taxes and Purchaser shall remit the Transfer Taxes shown as due on such Tax Returns.

4.9. <u>Development Services</u>. From and after the Closing, Seller shall perform the services, and Purchaser shall pay the consideration and comply with its obligations, set forth in, and in accordance with, the Development Services Terms and Conditions.

5. **Closing Conditions.**

5.1. <u>Conditions to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Transaction with respect to the Project Company is subject to the satisfaction at or prior to the Closing of each of the conditions described in this <u>Section 5.1</u> with respect to the Project Company or the Seller, as applicable, any or all of which, if not fulfilled, may be waived in writing by Purchaser.

(a) Seller shall have delivered or cause to be delivered to Purchaser a transfer and assignment instrument evidencing the transfer to Purchaser of all of the Membership Interests, in the form attached to this Agreement as <u>Exhibit B</u> (the "**Assignment Agreement**"), duly executed by Seller;

(b) Seller shall have delivered to Purchaser a certificate of the Secretary of Seller, dated as of the Closing Date, setting forth and attesting to: (i) the unanimous resolutions of the members of Seller authorizing the execution, delivery and performance of this Agreement and each of the ancillary documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby; (ii) the incumbency and signature of the officers of Seller executing this Agreement and each of the ancillary documents to which Seller is a party; (iii) a true and complete copy of the Certificate of Organization of Seller, certified by the Secretary of State of the State of Montana; (iv) a true and complete copy of the Articles of Organization of Project Company, certified by the Secretary of State of the State of Oregon; and (v) a true and complete copy of the operating agreement of Project Company;

(c) Seller shall have delivered to Purchaser the Certificate of Existence from the Secretary of State of the State of Montana and Oregon, dated within fourteen (14) days of the Closing Date, as to the good standing and legal existence of each of the Seller and the Project Company in their respective jurisdictions of incorporation, as applicable, and in each jurisdiction in which such Seller or Project Company are qualified to do business;

11

(d)     Seller shall have delivered to Purchaser fully executed copies of any consents listed on Schedule 2.7 hereto or otherwise required to consummate the transactions contemplated hereby;

(e)     Seller shall have delivered to Purchaser a certification of non-foreign status in the form prescribed by Treasury Regulation Section 1.1445-2(b) with respect to Seller (or, if Seller is a disregarded entity for U.S. federal income tax purposes, the owner of the Project Assets of the Project Company for such purposes);

(f)     Seller shall have delivered to Purchaser a release substantially in the form attached hereto as Exhibit E; and

(g)     Seller shall have delivered to Purchaser written resignations of each manager and officer of Project Company, effective as of the Closing.

5.2.     Conditions to Obligations of Seller.  The obligation of Seller to consummate the Transaction is subject to the satisfaction at or prior to the Closing of each of the conditions described in this Section 5.2 with respect to Project Company or the Purchaser, as applicable, any or all of which, if not fulfilled, may be waived in writing by Seller.

(a)     Purchaser shall have delivered to Seller the Closing Payment;

(b)     Purchaser shall have made payment(s) of $689,520 to BPA to fund a Transmission Service Request(s) for 440 MW AC on or before August 18, 2021, on behalf of Seller for the benefit of the Project Company.

(c)     Purchaser shall have delivered to Seller the Assignment Agreement, duly executed by Purchaser;

(d)     Purchaser shall have delivered to Seller a certificate of an authorized officer of Purchaser, dated as of the Closing Date, setting forth and attesting to (i) a true and complete copy of the Certificate of Formation of Purchaser and all amendments thereto; (ii) a true and complete copy of the operating agreement of Purchaser and all amendments thereto; and (iii) the authority of the officers of Purchaser executing this Agreement and each of the ancillary documents to which Purchaser is a party;

(e)     Purchaser shall have delivered to Seller certificates from the appropriate governmental authorities, dated within fourteen (14) days of the Closing Date, as to the good standing and legal existence of Purchaser in its jurisdiction of incorporation or organization; and

(f)     Seller shall have received fully executed copies of any consents listed on Schedule 2.7 hereto or otherwise required to consummate the transactions contemplated hereby.

6.     **Indemnification.**

6.1.     Seller will indemnify, defend and hold Purchaser, Project Company, and their respective managers, members, officers, agents and other representatives, and their respective successors and assigns (collectively, the "**Purchaser Indemnitees**") harmless from and against and will promptly reimburse Purchaser for, all losses, liabilities, indebtedness, damages, actions, judgments, penalties, fines, costs, costs of defense and settlement, obligations, taxes, expenses, and fees, including all reasonable attorneys' fees and court costs ("**Losses**"), incurred by or asserted against Purchaser or any of the other Purchaser Indemnitees resulting from, arising out of, relating to, or caused by (a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date),  (b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; or (c) third party claims arising out of the operation of the Project Company prior to the Closing.

6.2.     Purchaser will indemnify, defend and hold Seller and its managers, members, officers, agents and other representatives, and their respective successors and assigns (collectively, the "**Seller Indemnitees**") harmless from and against and will promptly reimburse Seller for, all Losses incurred by or asserted against Seller or any of the other Seller Indemnitees resulting from, arising out of, relating to, or caused by (a) any inaccuracy in or breach of any of the representations or warranties of Purchaser contained in this Agreement or in any certificate or instrument delivered by or on behalf of Purchaser pursuant to this Agreement, as of the date such representation or warranty was made (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date), (b) any breach or non-fulfillment of any covenant,

12

agreement or obligation to be performed by Purchaser pursuant to this Agreement, or (c) claims arising out of the operation of the Project Company following Closing.

6.3. Purchaser and Seller acknowledge and agree that the indemnification provisions in this Section 6 are the exclusive remedy of Purchaser and Seller, as applicable, with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation arising from or relating to this Agreement, the Membership Interests, the Project Company and transaction contemplated by this Agreement. Notwithstanding the foregoing, this section will not affect any equitable remedy available to any party, including any remedy for specific performance, or any claim by Seller for payment of the Purchase Price.

6.4. No party providing indemnification pursuant to this Agreement (an "**Indemnifying Party**") will be obligated to provide such indemnification to the party seeking indemnification unless the Indemnifying Party has received written notice thereof on or before the date that is twenty-four (24) months after the Closing Date (except for such claims for breaches of Fundamental Representations, which shall have a survival period of the applicable statute of limitation instead of twenty-four (24) months, and except for such claims for breaches of Section 2.15, which shall have a survival period of three years from Closing instead of twenty-four (24) months).

6.5. Notwithstanding anything herein, Seller shall not be required to indemnify, defend or hold harmless Purchaser Indemnities pursuant to Section 6.1 unless and until Purchaser Indemnitees have suffered, incurred or become subject to such Losses in excess of $60,000 in the aggregate (the "**Deductible**"), and then Seller shall indemnify the Purchaser Indemnities for the Deductible and any such Losses in excess of the Deductible.

6.6. The aggregate liability of Seller and Purchaser under this Agreement with respect to any indemnification obligations in this Section 6 will not exceed an amount equal to one hundred percent (100%) of the Purchase Price actually paid to Seller as of the date of the Indemnification Claim for such indemnification (the "**Cap**"); provided, that, to the extent Seller's indemnification liability exceeds the Cap, then the amount of such excess shall be credited toward payments of the Purchase Price thereafter due and payable by Purchaser pursuant to this Agreement (and, for the avoidance of doubt, such credit toward payments of the Purchase Price thereafter due and payable by Purchaser shall be Purchaser's sole source of recovery for any such excess amounts); provided, further, that for the avoidance of doubt, this Section 6.6 shall not limit any claim by Seller against Purchaser for payment of the Purchase Price (subject to any credits pursuant to this Section 6.6). Notwithstanding the foregoing, the Seller and Purchaser agree that the Cap shall not apply to a Party's liability with respect to claims for fraud and further, such Cap shall not apply to a Party's liability with respect to claims regarding Fundamental Representations (except for claims pursuant to Section 2.15) for a period of twelve (12) months from Closing. For the avoidance of doubt, upon the expiration of such twelve (12) month period referenced in the preceding sentence, the Cap shall then apply to claims regarding Fundamental Representations.

6.7. Any indemnity payment made pursuant to this Agreement will be treated as an adjustment to the Purchase Price for tax purposes, unless an audit or other administrative or judicial action with respect to the Indemnified Party causes any such payment not to constitute an adjustment to the Purchase Price for U.S. federal income tax purposes.

6.8. In calculating any Loss, there will be deducted the amount of any insurance proceeds actually received by the indemnified party in respect thereof, and such indemnified party shall use commercially reasonable efforts to obtain any such insurance proceeds (but shall not be obligated to initiate any litigation).

6.9. Any indemnified party shall use commercially reasonable efforts to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto.

6.10. In no event shall any Indemnifying Party be liable to any indemnified party for any punitive, incidental, consequential, or special damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, except to the extent that any such damages are awarded to a third party and actually paid in respect of such award by an indemnified party.

6.11. Procedures; Defense of Claims.

(a)     If any Buyer Indemnitee or Seller Indemnitee (an "**Indemnitee**") becomes aware of a loss for which this Section 6 provides indemnification (an "**Indemnifiable Loss**") or receives notice of the assertion or commencement of any claim with respect to which indemnification is to be sought from an Indemnifying Party (an "**Indemnification**

13

Claim"), the Indemnitee shall give such Indemnifying Party reasonably prompt written notice thereof. Such notice shall describe the nature of the Indemnification Claim in reasonable detail.  The Indemnifying Party shall have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Indemnification Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel.  The Indemnitee shall cooperate in good faith in such defense, and may, at its expense, retain separate counsel.

(b)     If the Indemnifying Party has elected to assume the defense of an Indemnification Claim as provided in the foregoing Section, the Indemnifying Party shall not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Indemnification Claim, such that the Indemnitee reasonably believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party shall be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party shall not enter into any settlement of any Indemnification Claim unless such settlement includes a full and final release of all claims against Indemnitee and does not impose any obligations on Indemnitee.

(c)     A failure to give timely notice as provided in this <u>Section 6</u> shall not affect the rights or obligations of any party hereunder except if, and only to the extent that, as a result of such failure, the party that was entitled to receive such notice was actually prejudiced as a result of such failure.

7.     **Notices.**  Any notice, consent, approval, waiver, and election which either Party will be required or permitted to make or give under this Agreement will be in writing and will be deemed to have been sufficiently made or given if delivered by hand, courier, U.S. Mail or overnight delivery service (such as Federal Express or United Parcel Service), or received by e-mail (excluding automatic replies) with a copy mailed within one (1) business day, addressed to the respective Party at its address below, or as otherwise directed by written notice to the other Party:

*If to Purchaser:*     Pine Gate Renewables, LLC
130 Roberts Street
Asheville, NC 28801
Attention: Legal
Email: legal@pgrenewables.com

*If to Seller:*     Gallatin Power Partners, LLC
303 Donegal Drive
Bozeman, MT. 59715
Attention: Adam Schumaker
Email: adam@gallatinpower.com

Such notices will be deemed received upon delivery when delivered by hand, by courier or by overnight delivery service or e-mail, and upon receipt when mailed as provided above.  Refusal to accept, or inability to deliver because of changed address of which no written notice was given, will be deemed receipt on the date of such refusal of delivery or inability to deliver.

8.     **Miscellaneous.**

8.1.     <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Agreement, including any claim or dispute arising herefrom, will be construed, governed, interpreted and applied in accordance with the laws of the State of New York without giving effect to the conflicts of law principles thereof. Any legal suit, action or

14

proceeding arising out of or based upon this Agreement shall be instituted in the United States District Court in Manhattan, New York, or the courts of the State of New York in Manhattan, New York and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY WAIVES TRIAL BY JURY IN ANY ACTION ARISING OUT OF MATTERS RELATED TO THIS AGREEMENT, WHICH WAIVER IS INFORMED AND VOLUNTARY.

(b)         Each Party irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so:

8.1.b.1. any objection which it may now or hereafter have to the laying of venue of any action arising out of or relating to this Agreement or any related matter in any New York state or federal court; and

8.1.b.2. the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.2.     Limitation of Liability.  NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY CHARACTER, RESULTING FROM, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY INCIDENT TO ANY ACT OR OMISSION OF A PARTY RELATED TO THE PROVISIONS OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER CLAIMS OR ACTIONS FOR SUCH LOSSES ARE BASED UPON CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY AT LAW OR EQUITY; PROVIDED, HOWEVER, THAT SUCH LIMITATION OF LIABILITY SHALL NOT APPLY TO THE FRAUD, INTENTIONAL MISREPRESENTATION OR WILLFUL MISCONDUCT OF A PARTY.

8.3.     Expenses.  Regardless of whether the transactions contemplated by this Agreement are consummated, each Party will bear responsibility for its own costs and expenses in connection with the Transaction, including the fees and expenses of its legal counsel and other consultants and advisors in connection with any transaction document, except as may be otherwise provided therein.

8.4.     Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

8.5.     Amendment; Waiver.  This Agreement may be amended, modified, superseded or canceled and any of its terms, provisions and conditions may be waived only by a written instrument executed by all of the Parties. Notice or knowledge of any matter will not constitute a waiver of any representation or warranty with respect to such matter.  The waiver by either Party of any breach of any provision will not be construed as a waiver of any other provision by such Party.

8.6.     Benefit and Burden; Assignment.  This Agreement inures to the benefit of and will be binding on each Party and their respective representatives, successors and assigns.  Additionally, neither Party may assign this Agreement or all or any part of their respective rights and obligations under this Agreement, without the other Party's written consent, unless as otherwise stated herein; *provided, however*, that Purchaser may assign any or all of its rights or obligations under this Agreement without Seller's consent for collateral security purposes to any lender or other financing party providing financing in respect of the Project to Purchaser or any of its affiliates (including the Project Company).

8.7.     Entire Agreement.  All understandings and agreements of the Parties with respect to the subject matter herein are merged into this Agreement and the instruments and agreements referred to herein, such that this Agreement (including the attached Schedules and Exhibits, which are incorporated by this reference) and the other transaction documents contemplated hereby contain the complete agreement between the Parties with respect to the matters contained in this Agreement and supersede all other agreements respect to the matters contained in this Agreement.

8.8.     Confidentiality.  The parties agree that this Agreement and the transactions contemplated hereby shall be subject to that certain Mutual Non-Disclosure Agreement, dated as of June 15, 2021; provided, that the foregoing will not apply to prohibit disclosures to a Party's employees, accountants, attorneys, lenders, due diligence agents, contractors, potential or actual investors or financers, or any other third parties assisting such Party with the transactions contemplated hereunder or the development or operation of the Project, or as otherwise required by law.

8.9.     Construction; Counsel.  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Each of the Parties acknowledges that it had the right and opportunity to seek independent legal counsel of its own choosing in connection with the execution of this Agreement, and each of the Parties represents that it has either done so or that it has voluntarily declined to do so.

8.10.     Disclosure Schedules.  The schedules identified herein (the "**Disclosure Schedules**") are being delivered pursuant to and form part of this Agreement. Capitalized terms used in the Disclosure Schedules but not otherwise defined shall have the meanings ascribed to such terms in this Agreement. The Disclosure Schedules are being delivered by the Seller.  The Parties acknowledge and agree that (a) the disclosure by the Seller of any matter in the Disclosure Schedules shall not be deemed to constitute an acknowledgement by the Seller that the matter is required to be disclosed by the terms of the Agreement, is material, has resulted in a Material Adverse Effect or is outside the ordinary course of business; (b) if any section of the Disclosure Schedules lists an item or information in such a way as to make its relevance to the disclosure required by or provided in another section of the Disclosure Schedules readily apparent on the face of such item or information, the matter shall be deemed to have been disclosed in or with respect to such other section of the Disclosure Schedules; and (c) headings have been inserted in the Disclosure Schedules for convenience and reference only.

9.     **Certain Definitions**. The following capitalized terms shall have the meanings herein as set forth below.

"**Affiliate**" means, with respect to a specified Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.  The term "control" means (a) the possession, directly or indirectly, of the power to vote 50% or more of the securities or other equity interests of a Person having ordinary voting power, (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, by contract or otherwise, or (c) being a director, officer, manager, executor, trustee or fiduciary (or their equivalents) of a Person or a Person that controls such Person.

"**BPA**" means the Bonneville Power Administration.

"**Excess Capacity Assets**" means the Umatilla Excess Capacity Interconnection Application and the Grieb Option.

"**Fundamental Representations**" means (a) with respect to Seller, those representations and warranties made in Section 2.1 (Organization; Authority of Seller), Section 2.2 (Binding Effect), Section 2.3 (Organization of Project Company), Section 2.4 (Sole Owner, Capitalization), Section 2.5 (No Subsidiaries), Section 2.13 (Taxes), and Section 2.15 (Environmental Laws); and (b) with respect to Purchaser, those representations and warranties made in Section 3.1 (Organization; Authority) and Section 3.2 (Binding Effect).

"**Grieb Option**" means the Option Agreement for Solar Energy System Ground Lease between Project Company and Grieb Farms, Inc., dated June 14, 2021.

"**Interconnection Application**" means that certain Interconnection Application with BPA for 1,250MW AC, dated June 17, 2021 assigned Queue Position Number G0678.

"**Material Adverse Effect**" as used in this Agreement means any event, change, condition, occurrence, circumstance or effect that is or could reasonably be expected to be materially adverse to (a) the business, condition (financial or otherwise), properties or prospects of Project Company or ability of Project Company to develop, construct, own or operate the Project, or (b) the ability of a Person to perform its obligations or exercise its rights under this Agreement; provided, that Material Adverse Effect shall not include: (i) any economic change generally affecting the international, national or regional (A) electric generating industry, (B) solar PV electric generating industry, or (C) wholesale markets for electric power or PV electric power; (ii) any economic change in markets for commodities or supplies, including electric power or PV electric power, as applicable; (iii) any change in general regulatory, political, or market conditions, including any engagements of hostilities, acts of war or terrorist activities, natural disasters or weather-related events, changes imposed by a governmental authority associated with additional

16

security, or any pandemic or epidemic; (iv) any change in any applicable law, industry standards or the generally accepted accounting principles in the United States of America, consistently applied; (v) any change in the financial condition of the Company caused by the pending sale thereof to Purchaser; (vi) any change in the financial, banking, or securities markets (including any suspension of trading in, or limitation on prices for, securities on the New York Stock Exchange, American Stock Exchange or NASDAQ Stock Market) or any change in the general national or regional economic or financial conditions; (vii) any actions to be taken pursuant to or in accordance with this Agreement; or (viii) the announcement or pendency of the Transactions.

"**Project**" means the project described on Exhibit A, including the Phase I Capacity; provided, that if Purchaser has perfected its ownership of any Excess Capacity pursuant to Section 4.6, the "Project" shall include the Phase I Capacity and such Excess Capacity.

"**Project Capacity**" means the maximum capacity expressed in watts DC based on the most recent site layout tied to the applicable AC capacity sold through the applicable power purchase agreement or build transfer agreement for all or any portion of the Phase I Capacity or Excess Capacity, as applicable.

"**Project Capacity AC**" means the maximum capacity expressed in watts AC based on the most recent site layout tied to the applicable AC capacity sold through the applicable power purchase agreement or build transfer agreement for all or any portion of the Phase I Capacity or Excess Capacity, as applicable.

"**Umatilla Excess Capacity Interconnection Application**" means the Interconnection Application with Umatilla Electric Coop for 810MW AC, dated June 23rd, 2021 assigned Queue Position Number 18/20210624-1.

*[Signature Page(s) Follow]*

17

DocuSign Envelope ID: 7F09F24C-9A3E-47C0-8E52-DB9BB32B8D52

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement effective as of the Effective Date.

**SELLER:**                                      **PURCHASER:**

**GALLATIN POWER PARTNERS, LLC**          **PINE GATE RENEWABLES, LLC**

By: _Adam Schumaker_                          By: _____
DC5DD2ABCC0A444...
Name:  Adam Schumaker                         Name:
Title:   President                            Title:

SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT (BOMBING RANGE SOLAR I)

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement effective as of the Effective Date.

SELLER:                                        PURCHASER:

**GALLATIN POWER PARTNERS, LLC**              **PINE GATE RENEWABLES, LLC**

By:_____          By:_____
Name:                                          Name: Ben Catt
Title:                                         Title:  CEO

**EXHIBIT A**

**COMPANY**

| Seller Ownership Percent of Project Company | Project Company | Estimated Nameplate Capacity | Description |
|---|---|---|---|
| 100% | Bombing Range Solar I, LLC, an Oregon limited liability company | 440MWac / 880 MWdc (the "**Phase I Capacity**") | Solar system under development sited in Morrow County, Oregon on approximately 3,500 +/- acres and interconnected through Umatilla Electric Cooperative |

**EXHIBIT B**

**FORM OF ASSIGNMENT OF MEMBERSHIP INTEREST**

      **THIS ASSIGNMENT OF MEMBERSHIP INTEREST** (this "Assignment"), dated effective as of [_____], 2021, (the "Effective Date"), is made by Gallatin Power Partners, LLC, a Montana limited liability company and (the "Assignor"), to and for the benefit of Pine Gate Renewables, LLC, a North Carolina limited liability company (the "Assignee").

**RECITALS:**

A.     The Assignor is the sole member of Bombing Range Solar I, LLC, an Oregon limited liability company (the "Project Company"), collectively owning a one hundred percent (100%) membership interest in the Project Company.

B.     The Assignors and the Assignee entered into that certain Membership Interest Purchase and Sale Agreement, dated as of the Effective Date (the "MIPA"), pursuant to which Assignor agreed to sell, assign, transfer and convey, and Assignee agreed to purchase, accept and assume, one hundred percent (100%) membership interest in the Project Company (the "Assigned Interest") pursuant to the terms and conditions of the MIPA. Capitalized terms used but not defined herein have their respective meaning specified in the MIPA.

C.     The Assignor desires to transfer its entire interest in the Assigned Interests to the Assignee.

**ASSIGNMENT:**

1.     Assignment.  The Assignor hereby sells, assigns, transfers, and conveys to the Assignee the Assigned Interest, including but not limited to the Assignor's capital accounts, rights to distributions of cash and property, and allocations of profits and losses of the Project Company related to the Assigned Interest.  As of the Effective Date, the Assignor will relinquish the right to receive from the Project Company any distributions, allocations of profits and losses and capital accounts relating to the Assigned Interest, except as specifically identified in the MIPA. Assignee accepts the foregoing assignment and assumes and agrees to observe and perform, from and after the Closing Date, all of Assignor's duties and obligations with respect to the Assigned Interests and to become a substitute member in the Project Company with respect to the Assigned Interests.

2.     Representations.  Each Party hereto represents that this Assignment has been duly executed and delivered by, and constitutes valid and binding obligations of, such party enforceable against it in accordance with its terms.

3.     Admission of Assignee as Member. Contemporaneously with the execution of this Assignment, the Assignee will become a member of the Project Company.

4.     Terms of the MIPA. This Assignment is executed and delivered pursuant to the MIPA and is subject to all of the terms, conditions and obligations set forth therein.  Each of the Parties hereto acknowledges and agrees that the representations, warranties, covenants, agreements, indemnities and survival periods contained in the MIPA are not superseded or modified hereby but remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the MIPA and the terms hereof, the terms of the MIPA shall govern and control.

5.     Miscellaneous.  This Assignment will be governed by New York law, excluding its conflict of laws principles.  This Assignment, together with the MIPA, embodies the entire agreement of the Parties hereto with respect to the subject matter hereof.  This Assignment may be modified only by a written agreement duly executed by each of the Parties hereto.  This Assignment shall be binding upon and inure to the benefit of the Parties hereto and their successors and assigns.  This Assignment may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same Assignment.  Facsimile, .pdf and other electronic signatures will be considered to be original signatures for purposes of this Assignment.

20

*[Signatures appear on following page]*

21

111905981.13 0065593-00032

**IN WITNESS WHEREOF**, the Assignor and the Assignee have signed this Assignment as of the Effective Date.

**ASSIGNOR:**                                    **ASSIGNEE:**

**GALLATIN POWER PARTNERS, LLC**         **PINE GATE RENEWABLES, LLC**


By:_____    By:_____
Name:                                    Name:
Title:                                   Title:

## EXHIBIT C

## CONDITIONS PRECEDENT

**Conditions Precedent to Second Payment**

1. Executed Power Purchase Agreement for the Project with a utility/offtaker or Executed Build-Transfer Agreement with a utility/offtaker, reasonably satisfactory to Purchaser.
2. Receipt of the System Impact Study, reasonably satisfactory to Purchaser.
3. Site lease agreements and amendments to site lease agreements, if required, to provide for reasonably adequate site control for the Project sites, and recorded memorandums of such leases, if required.
4. All necessary easements for the Project (including, without limitation, access and utility) in place and insurable (with respect to insurability, to the extent required in connection with a title commitment).
5. A title commitment regarding the Project sites, not more than six (6) months old, reasonably satisfactory to Purchaser, and an ALTA survey of the Project site, including access areas and other easements, sufficient for the issuer of the title commitment to issue the title commitment.
6. Site plans approved by any governmental authorities from which approval of such site plan is required, and any other zoning use permits for the solar PV system and the Project site that is required to be obtained from governmental authorities prior to the NTP stage of construction.
7. Wetlands delineation for the Project sites, including all access areas and other easements, showing no wetlands impacts or wetland impacts allowed by applicable law, reasonably satisfactory to Purchaser.
8. As required by applicable law, correspondence from the U.S. Army Corps of Engineers for the Project site, including all access areas and other easements, confirming there are no wetlands impacts that would necessitate obtaining impact permits from USACE or other applicable authority or a wetlands delineation and report from a reasonably qualified environmental consultant showing no wetlands impacts which would necessitate obtaining impact permits from USACE or other applicable authority. Notwithstanding the foregoing, impacts to wetlands may be allowed if the necessary impact permits and any associated mitigation is obtained, reasonably satisfactory to Purchaser.
9. Phase I environmental analyses for the Project, including all access areas and other easements, dated within six (6) months, reflecting either (a) no "recognized environmental conditions" or (b) "recognized environmental conditions" addressed in a manner reasonably satisfactory to Purchaser (which, subject to due diligence, would typically involve excluding any RECs from the leased area).
10. A site certificate, as required under applicable law, for the Project from the Oregon Energy Facility Siting Council.
11. Customary confirmation that the applicable utility, in conformance with standard utility practices, has all required easements (including easements across adjacent properties) to interconnect the Project.

**EXHIBIT D**

**PROJECT SITE**

**Matheny Property:**

The land is situated in the County of Morrow, in the State of Oregon. The Property is comprised of one parcel totaling approximately 1,706 acres, of which 1,280 acres is available for lease:

All that portion of Section 26 lying West of existing County Road running North and South through Section; all of Section 27; all of Section 34; Northwest Quarter, Northwest Quarter of the Southwest Quarter of Section 35; all in Township 2 North, Range 26, East of the Willamette Meridian, in the County of Morrow, State of Oregon;

EXCEPTING THEREFROM all that portion of the Northwest Quarter lying east of the County Roads in Section 35, Township 2 North, Range 26, East of the Willamette Meridian.

(Morrow County Code/Map Information: Account #1938; Map # 2N26000001101)
(Morrow County Code/Map Information: Account #6691; Map # 2N26000001105)


**Doherty Property:**

The land is situated in the County of Morrow, in the State of Oregon. The Property is comprised of seven parcels totaling approximately 3,221 acres of which approximately 2,522 acres is available for lease.

The entirety of Section 3, T.1N., R.26E., the west half of the east half of Section 9, T.1N., R.26E., the north quarter of the northeast quarter of Section 9, T.1N., R.26E., the north quarter of the southeast quarter of the northeast quarter of Section 9, T.1N., R.26E., the land north and west of Highway 207 of Section 2, T.1N., R.26E. and the land North and West of Highway 207 of Section 10, T.1N., R.26E. (including the land north and west of Highway 207 in the eastern half of Section 10, the northeast quarter of the northwest quarter of Section 10, the northwest quarter of the northwest quarter of Section 10, the north quarter of the southwest quarter of northwest quarter of section 10, and the north quarter of southeast quarter of the northwest of Section 10), consisting of approximately 1,266 acres identified as Parcel Identification Number 01N26E000000400, The entire parcel is approximately 1,965 acres, approximately 699 acres of which is found south and east of Highway 207 and not part of this agreement. The approximately 2.4 acre parcel identified as Parcel Identification Number 01N26E000000405 surrounded by the previously identified property is not part of this agreement.

The southwest quarter of Section 9, T.1N., R.26E. and the east half of Section 8, T.1N., R.26E. consisting of approximately 480 acres and identified as Parcel Identification Number 01N26E000001300.

The northwest quarter of Section 9, T.1N., R.26E. consisting of approximately 160 acres and identified as Parcel Identification Number 01N26E000001700.

The southwest quarter of Section 4, T.1N., R.26E. consisting of approximately 157 acres and identified as Parcel Identification Number 01N26E000000700.

The land north and west of Highway 207 of the northeast quarter of Section 2 T.1N., R26E., consisting of approximately 104 acres and identified as Parcel Identification Number 01N26E000000300.

The west half of the northwest quarter of Section 2, T.1N., R.26E. consisting of approximately 77 acres and identified as Parcel Identification Number 01N26E000000403.

The southeast quarter of Section 35, T.2N., R.26E., the northeast quarter of the southwest quarter of Section 35, T.2N., R.26E., the southwest quarter of southwest quarter of Section 35, T.2N., R.26E., and the southeast quarter of southwest quarter of Section 35, T.2N., R.26E., consisting of approximately 278 acres and identified as Parcel Identification Number 02N26E000002400.



**EXHIBIT E**

**FORM OF RELEASE**

**GENERAL RELEASE**

THIS **GENERAL RELEASE** (this "**Release**"), dated as of [____], 2021 is made by Gallatin Power Partners, LLC, a Montana limited liability company (the "**Releasing Party**"), in favor of Bombing Range Solar I, LLC, an Oregon limited liability company (the "**Project Company**"). Capitalized terms used but not defined herein shall have the meaning given to such terms in the Purchase Agreement (*as defined below*).

WHEREAS, Releasing Party owns one hundred percent (100%) of the Membership Interests in Project Company.

WHEREAS, Releasing Party entered into that certain Membership Interest Purchase and Sale Agreement (as may be amended from time to time, the "**Purchase Agreement**"), dated as of [____], 2021 with **Pine Gate Renewables, LLC**, a North Carolina limited liability company ("**Purchaser**"), pursuant to which Releasing Party agreed to sell, and Purchaser agreed to purchase, one hundred percent (100%) of the issued and outstanding Membership Interests of the Project Company.

WHEREAS, pursuant to the Purchase Agreement, Releasing Party desires to release the Project Company from all known and unknown claims, as more particularly described below.

WHEREAS, the parties hereto desire to enter into this Release.

In reliance on the foregoing facts, and in consideration of the mutual release set forth herein, the parties hereto hereby agree as follows:

1.      Release.

(a)      Releasing Party, on behalf of itself, and its Affiliates, and their respective current and former officers, managers, members, employees and agents (collectively, the "**Related Parties**") hereby fully, irrevocably, and unconditionally releases, acquits, satisfies and forever discharges the Project Company as well as the Project Company's successors and assigns (but expressly excluding, for the avoidance of doubt, Purchaser) (collectively, the "**Released Parties**"), from and against any and all claims, demands, accounts, rights, sums of money, charges, contracts, agreements, promises, covenants, causes of action, including, but not limited to, negligence and all other tort actions, suits, controversies, judgments, damages, debts, obligations, equities, statutory claims or liabilities, trespasses, losses, expenses and liabilities, of whatever kind or nature whether in law or in equity, including, without limitation, all matters related to the Project Company's obligations under any contract of any nature and kind whatsoever (other than the Purchase Agreement or a contract which is expressly stated pursuant to the Purchase Agreement to survive the Closing) between the Releasing Party or the Related Parties and Project Company (collectively, the "**Claims**") that Releasing Party or the Related Parties may have against the Released Parties prior to the date hereof and the Releasing Party forever waives any right to make any claim or seek any recourse against the Related Parties related thereto.

(b)      This is a full and final release, applying to all known or unknown, foreseen or unforeseen, anticipated or unanticipated, suspected or unsuspected, asserted or unasserted, liquidated or unliquidated, existing or contingent, direct or derivative Claims that existed, may have existed or may hereafter arise in any manner or degree from facts and circumstances whether known, or in addition to or different from those now believed to be true, occurring prior to the date of this Release.  Releasing Party understands that it or the Related Parties may have Claims arising from facts, circumstances, or occurrences occurring prior to the date of this Release which have not been manifested or presently known or have not been identified as of the date of this Release, but Releasing Party nevertheless intends to and does deliberately release all such Claims.

(c)        Releasing Party agrees, on behalf of itself and the Related Parties that (i) it has not assigned, transferred, pledged or otherwise alienated any of its rights under or with respect to any Claim, and (ii) it will forever refrain and forebear from instituting, commencing or prosecuting any litigation, action or other proceeding of any kind whatsoever, by way of action, claim, defense, set-off, cross-complaint, counterclaim or third-party action, against the Released Parties based on, or arising out of or in connection with any Claim released pursuant to this Release.

2.        Governing Law. THIS RELEASE, AND ANY INSTRUMENT OR AGREEMENT REQUIRED HEREUNDER (TO THE EXTENT NOT OTHERWISE EXPRESSLY PROVIDED FOR THEREIN), SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICTS OF LAWS PROVISIONS THEREOF.

3.        Entire Agreement; Amendments.  This Release constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, of the parties hereto with respect to the subject matter hereof.  This Release may be amended, modified or waived only by a written instrument executed by the parties hereto.

4.        Severability. If any provision of this Release is held invalid, illegal or unenforceable in any jurisdiction, the remainder of this Release, or application of that provision to any Persons or circumstances, or in any jurisdiction, other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

5.        Titles and Captions. All section or paragraph titles or captions in this Release are for convenience only, shall not be deemed part of this Release, and in no way define, limit, extend or describe the scope or intent of any provision hereof.

6.        Counterparts. This Release may be executed in one or more counterparts, each of which shall constitute an original but all of which, taken together, shall constitute but one agreement. Facsimile or PDF signatures shall be deemed original.

[*Remainder of page intentionally left blank. Signature page follows*]

*This General Release has been duly executed as of the date first written above.*

Gallatin Power Partners, LLC,
a Montana limited liability company


By: _____

Name:

Title:


**ACCEPTED AND AGREED TO**:

Bombing Range Solar I, LLC,
an Oregon limited liability company

By: _____

Name:

Title:

**EXHIBIT F**

**DEVELOPMENT SERVICES TERMS AND CONDITIONS**

As of the Closing Date, Purchaser hereby engages Seller to perform the Services (as defined below) with respect to the Project. All capitalized terms used but not otherwise defined herein shall have the meaning assigned to them in the Agreement.

**Section 1          Services**

(1)     Development.

    (A)     Work collaboratively with the Purchaser to manage budgets and schedules for the Project, including survey, environmental, zoning, title, real estate obligations with respect to lease or purchase options, interconnection request application, interconnection studies, and interconnection upgrade cost estimate;

    (B)     Work collaboratively with the Purchaser to obtain executed site control agreements and required easements (e.g., lease, purchase or options for either) material for Project viability;

    (C)     Work collaboratively with the Purchaser to manage the process to obtain zoning and permits necessary for construction and operation of Project;

    (D)     Work collaboratively with the Purchaser to ensure the Project can viably interconnect and deliver to the appropriate utility, including overseeing the submission and review of applicable interconnection requests, studies, and agreements;

    (E)     Work collaboratively with Purchaser to manage neighbors, local interests, government officials (including negotiation of local incentives, property tax abatements and fee-in-lieu-of-tax agreements), and the public at large with respect to Project;

    (F)     Work collaboratively with the Purchaser to assemble and retain all contracts, agreements and other records and data that the Project will need as a record of what was done during development and construction;

    (G)     Work collaboratively with the Purchaser to obtain all necessary notices in connection with interconnection, power purchase agreement or real estate obligations within timeframes required by applicable agreements;

    (H)     Work collaboratively with the Purchaser to participate in RFPs and sourcing potential offtaker(s)/PPAs and/or Build Transfer Agreements; and

    (I)     Take such other actions as the Parties may mutually determine are necessary and desirable in furtherance of the development of Project.

(2)     Seller acknowledges that, in performance of the Services, it shall have no ability to bind the Purchaser, by contract of otherwise, to any third party without the express prior written consent of the Purchaser.

(3)     Payment of Expenses.

    (A)     During the Term (as defined herein) of Seller's performance of the Services, Purchaser shall reimburse Seller for any approved travel expenses (the "**Reimbursable Expenses**") incurred at Purchaser's direction in conjunction with Seller's work pursuant to these Development Services Terms and Conditions. Any Reimbursable Expenses shall be approved in writing by Purchaser prior to Seller incurring such expenses, Purchaser's approval not to be unreasonably withheld or delayed, and shall be paid to Seller within fifteen (15) calendar days of Seller's submittal of an invoice evidencing the approved Reimbursable Expenses. If Seller performs work on behalf of

third-parties other than Purchaser during approved travel, then Purchaser shall only be obligated to reimburse Seller for the portion of such expenses that are 100% allocable to work performed solely for Purchaser, or as otherwise agreed upon by both Parties.

(B)     Purchaser shall be solely responsible for all third-party costs associated with the legal, due diligence, professional services, design, entitlements, interconnection, insurance, permitting and other development expenses related to the Project including the performance of the Services (except for any accountants, legal counsel, developers or other advisors engaged by Seller for its own account). Upon agreement of the Parties as to a given expense, Purchaser shall either (a) provide Seller with sufficient funds to cover any such expenses, (b) directly pay such expenses, or (c) reimburse Seller for any such expenses incurred by Seller. Seller will not initiate or incur any of such expenses with respect to the Project without Purchaser's prior written approval, to be granted or withheld in Purchaser's sole discretion. Notwithstanding the foregoing, Seller may initiate or incur expenses with respect to the Project without Purchaser's prior written approval for such expenses equaling under fifty thousand and No/100 Dollars ($50,000.00) in the aggregate.

(4)     Term and Termination.

(A)     The term of these Development Services Terms and Conditions shall commence upon the Closing Date and, unless earlier terminated in accordance with these Development Services Terms and Conditions, shall continue in full force and effect for two (2) years following the Closing Date (such period, the "**Term**"). Notices delivered hereunder shall be delivered to the addresses set forth above or as may otherwise be agreed by the Parties. Notwithstanding the foregoing, Purchaser may terminate these Development Services Terms and Conditions, with or without cause, upon sixty (60) days' written notice to Seller and shall have no further obligation to pay any further fees or Reimbursable Expenses following such termination. For the avoidance of doubt, the Term shall not automatically renew and upon the expiration of the Term, should the Parties mutually desire to continue the Development Services Terms and Conditions, an amendment or new agreement shall be executed.

(B)     Notwithstanding anything herein to the contrary, upon termination of these Development Services Terms and Conditions, no Party shall have any rights or obligations under these Development Services Terms and Conditions except for obligations to pay any Reimbursable Expenses then due and owing to Seller.

(C)     If these Development Services Terms and Conditions are terminated, Seller shall have the option to acquire the Project from Purchaser in exchange for an amount equal to all reasonable and documented third-party development expenses, including, but not limited to (i) payments made pursuant to the Development Services Terms and Conditions; (ii) payments made to develop the Project; (iii) interconnection costs; and (iv) the Closing Payment. If Seller elects to acquire the Project from Purchase pursuant to this Section 4(C), then Seller and Purchaser shall comply with the provisions of Section 1.4(a) and Section 1.4(b) of the Agreement as though the termination of these Development Services Terms and Conditions was the Repurchase Trigger.

(5)     Representations and Warranties.

(A)     Each Party represents and warrants to the other Party that:

(i)     It is duly organized, validly existing and in good standing under the laws and regulations of its jurisdiction of incorporation, organization or chartering;

(ii)     It has the full right, power and authority to enter into these Development Services Terms and Conditions, to grant the rights and licenses granted hereunder and to perform its obligations hereunder and in compliance with all applicable laws;

(iii)     The execution of these Development Services Terms and Conditions by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary

corporate or limited liability company action of such Party; and

(iv) When executed and delivered by such Party, these Development Services Terms and Conditions shall constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

(6)     Miscellaneous.

(A)     All revisions or amendments to these Development Services Terms and Conditions shall be made in writing and signed by the Seller and Purchaser, which writing shall then be incorporated in and become a part of the Development Services Terms and Conditions.

(B)     In the event of any conflict between the provisions of these Development Services Terms and Conditions and the Agreement, the provisions of the Agreement shall govern.

(C)     Seller may not assign its rights or obligations under these Development Services Terms and Conditions without the prior written consent of Purchaser. Purchaser may assign its rights or obligations under these Development Services Terms and Conditions only to the extent it is permitted to assign the Agreement.

(D)     In case any one or more provisions contained in these Development Services Terms and Conditions, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof and these Development Services Terms and Conditions shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

(E)     The Agreement and these Development Services Terms and Conditions are the entire agreement of the Parties relating to the subject matter hereof, and supersede all prior and contemporaneous negotiations, correspondence, understandings and agreements of the Parties relating to the subject matter hereof.

(F)     Seller is an independent contractor and is not an employee or agent of the Purchaser and shall have no right to bind the Purchaser. Seller shall be entitled to no benefits or compensation from Purchaser except as set forth in the Agreement or in the Development Services Terms and Conditions and shall in no event be entitled to any fringe benefits payable to employees of the Purchaser. Seller shall be solely responsible for the payment of all taxes due on the income received for performing the Services.

(G)     Seller shall at all times comply with all laws, rules and regulations of any jurisdiction applicable to Seller or any of its affiliates from time to time concerning or relating to bribery or corruption in connection with the performance of the Services. Seller represents that prior to the Closing Date neither it nor any person acting on its behalf has paid, offered to pay or given anything of value to any person, or to any other person, with the knowledge that the payment, promise or gift, in whole or in part, will be passed on to any governmental official, in order to influence an official act, omission or decision that will assist the Seller or Purchaser in obtaining or retaining business or in directing business to any other person. Seller shall indemnity and hold Purchaser harmless from any claims, losses or damages that arise as a result of the Seller's failure to comply with this section. The remedies set forth herein are not exclusive and Purchaser shall have the right to pursue any other remedy, right or recovery which may be available to it.

(H)     If any action shall be brought by any Party to recover any sums hereunder, or for or on account of any breach of these Development Services Terms and Conditions, or to enforce or interpret any of the covenants, terms or conditions of the Development Services Terms and Conditions, the prevailing Party in such action shall be entitled to recover costs and expenses of such action, including reasonable attorneys' fees.

(I)     These Development Services Terms and Conditions shall be interpreted and enforced in

accordance with the laws of the State of New York and each Party submits to jurisdiction in the venue of the state and federal courts located in Manhattan, New York, State of New York.

**SCHEDULE 2.3**

**ORGANIZATION OF THE PROJECT COMPANY**

1.  Articles of Organization of Bombing Range Solar I, LLC, filed May 10, 2021 with the Oregon Secretary of State.

2.  Operating Agreement of Bombing Range Solar I, LLC dated August 16, 2021.

**SCHEDULE 2.7**

**CONSENTS**

None.

**SCHEDULE 2.10**

**PROJECT ASSETS**

1.  Lease Option Agreement with William J. Doherty Ranch, LLC, dated April 23, 2021 for 2,522 leasable acres.

2.  Recorded Memorandum of Lease Option Agreement with William J. Doherty Ranch, LLC.

3.  Lease Option Agreement with Matheny Property, LLC dated August 16, 2021, for 1,280 leasable acres.

4.  Critical Issues Analysis done by TetraTech, Inc. dated August 2021.

5.  Interconnection Application with Umatilla Electric Coop for 440MW AC, dated April 16, 2021 assigned Queue Position Number 17/20210416-1 and revised on June 23rd, 2021 [to be assigned from Gallatin Power Partners, LLC to Bombing Range Solar I, LLC upon closing]

6.  System Impact Study Agreement with Umatilla Electric Coop for 440MWAC, dated June 15, 2021 [to be assigned from Gallatin Power Partners, LLC to Bombing Range Solar I, LLC upon closing]

7.  Interconnection Application with Bonneville Power Administration for 1,250MW AC, dated June 17, 2021 assigned Queue Position Number G0678 [to be assigned from Gallatin Power Partners, LLC to Bombing Range Solar I, LLC within 45 days after Closing pursuant to Section 4.5]

8.  Feasibility Study Agreement with Bonneville Power Administration for 1,250MW AC, dated July 26, 2021 [to be assigned from Gallatin Power Partners, LLC to Bombing Range Solar I, LLC within 45 days after Closing pursuant to Section 4.5]

9.  Production Analysis performed by Solphi Engineering, PLLC, dated July 22, 2021

10. Single Line Electrical Drawings for Bonneville Power Administration Interconnection Application done by Solphi Engineering, PLLC, dated July 22, 2021

11. Single Line Electrical Drawings for Umatilla Electric Coop Interconnection Application done by Brucke Engineering, PLLC, dated June 17, 2021

**SCHEDULE 2.11**

**CONTRACTS**

1.  Lease Option Agreement with William J. Doherty Ranch, LLC, dated April 23, 2021 for 2,522 leasable acres.

2.  Lease Option Agreement with Matheny Property, LLC dated August 16, 2021, for 1,280 leasable acres.

3.  System Impact Study Agreement with Umatilla Electric Coop for 440MWAC, dated June 15, 2021

4.  Feasibility Study Agreement with Bonneville Power Administration for 1,250MW AC, dated July 26, 2021

**SCHEDULE 2.12**

**PERMITS**

None.

**SCHEDULE 2.14**

**LIABILITIES**

1. Lease Option Agreement with William J. Doherty Ranch, LLC, dated April 23, 2021 for 2,522 leasable acres.

2. Lease Option Agreement with Matheny Property, LLC dated August 16, 2021, for 1,280 leasable acres.

3. System Impact Study Agreement with Umatilla Electric Coop for 440MWAC, dated June 15, 2021

4. Feasibility Study Agreement with Bonneville Power Administration for 1,250MW AC, dated July 26, 2021

**<u>EXHIBIT 2</u>**

**First Amendment to MIPA**

# FIRST AMENDMENT TO
# MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

This FIRST AMENDMENT TO MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT (this "Amendment") is made and entered into as of September 13, 2022 (the "Execution Date") by and between **GALLATIN POWER PARTNERS, LLC**, a Montana limited liability company (the "Seller") and **PINE GATE RENEWABLES, LLC**, a North Carolina limited liability company (the "Buyer"). Buyer and Seller are sometimes hereinafter referred to individually as a "Party" and collective as the "Parties."

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Membership Interest Purchase and Sale Agreement dated as of August 18, 2021 (the "Agreement"), pursuant to which Seller agreed to sell and Buyer agreed to purchase, the Membership Interests on the terms and subject to the conditions set forth therein; and

WHEREAS, the Parties desire to amend certain provisions of the Agreement further outlined below;

NOW THEREFORE, in consideration of the mutual covenants and agreements in this Amendment, the receipt and sufficiency of which are hereby acknowledged by the Parties hereto, intending to be bound, hereby agree as follows:

1. Definitions. Capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.

2. Amendments.

    a. Section 4.7 of the Agreement shall be amended and restated to reflect as follows:

        "Transmission Services. At such time as is permitted by BPA, Seller shall, solely with respect to the Phase I Capacity, (i) execute the earlier of a conditional firm service agreement between Seller and BPA (the "**Conditional Firm Service Agreement**") and a transmission service agreement between Seller and BPA (the "**Transmission Service Agreement**"), in form and substance reasonably satisfactory to Seller and Purchaser, and (ii) within 60 days of the execution of the Conditional Firm Service Agreement or the Transmission Service Agreement, as applicable, assign (each an "**Assigned BPA Agreement**") (a) the Conditional Firm Service Agreement or the Transmission Service Agreement, as applicable, associated with AREF Nos. 94761421, 94761930, 94761945, 94761951, 94761959, and 94761975 (the "**AREF Nos.**"), (b) the Preliminary Engineering Agreement associated with the AREF Nos., (c) the associated transmission service requests with the AREF Nos. submitted by Seller to BPA, to Purchaser, and (d) any agreement executed between Seller and BPA associated with the AREF Nos. Until such time as Seller is able to assign the Assigned BPA Agreements, Purchaser shall

assume all costs associated with the Assigned BPA Agreements. Seller shall not execute any further agreements regarding the AREF Nos. without Purchaser's prior written consent."

3.  <u>Effect of Amendment</u>.   Upon execution of this Amendment by the Parties, the Agreement shall be, and be deemed to be, modified and amended only to the extent set forth in this Amendment and the respective rights, obligations, duties and liabilities of the Parties shall hereafter be determined, exercised and enforced subject in all respects to such modifications and amendments, and all the terms and conditions of this Amendment shall be deemed to be a part of the terms and conditions of the Agreement, as applicable, for any and all purposes. Except as specifically provided herein, the Agreement shall remain unchanged and in full force and effect.

4.  <u>Governing Law</u>.     THIS AMENDMENT SHALL BE GOVERNED BY, AND INTERPRETED AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF.

5.  <u>No Strict Construction</u>.   The Parties hereto have participated jointly in the negotiation and drafting of this Amendment. In the event any ambiguity or question of intent or interpretation arises, this Amendment shall be construed as if drafted jointly by all Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Amendment.

6.  <u>Counterparts; Electronic Signatures</u>.   This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument, binding on each signatory thereto. This Amendment may be executed by signatures delivered by facsimile or email, and a copy hereof that is executed and delivered by a Party by facsimile or email (including in *.pdf* format) will be binding upon that Party to the same extent as a copy hereof containing that Party's original signature.

*[Signature Pages to Follow]*

**IN WITNESS WHEREOF,** this Amendment has been duly executed by the Parties as of and on the date first above written.

**BUYER:**

**PINE GATE RENEWABLES, LLC**

By: _Ben Catt_
Name:  Ben Catt
Title:   Authorized Person

**SELLER:**

**GALLATIN POWER PARTNERS, LLC**

By: _Adam Schumaker_
Name: Adam Schumaker
Title: President

## EXHIBIT 3

**First Side Letter to MIPA**

# PINE GATE RENEWABLES, LLC

Adam Schumaker
Gallatin Power Partners, LLC
3794 Pipestone Street
Bozeman, MT 59718

Mr. Schumaker:

The Parties, Pine Gate Renewables, LLC ("PGR") and Gallatin Power Partners, LLC ("Gallatin") desire to enter into this side letter (this "**Side Letter**") to memorialize their agreement regarding the amendment and filing of additional interconnection and transmission service requests with Umatilla Electric Cooperative ("UEC") for the Echo Solar project, with the understanding and agreement of the parties being that PGR will amend its two pending interconnection and transmission service requests previously filed with UEC to 200 MW each and will also file four (4) additional interconnection and transmission service requests with UEC for the Echo Solar project each consisting of 200 MW. The parties to this Side Letter further agree that nothing in this Side Letter will serve to negate the terms and conditions of the Membership Interest Purchase Agreement ("MIPA") previously executed by PGR and Gallatin.

Now, therefore, the Parties hereto agree as follows:

1.     This Side Letter shall be effective upon full execution by all Parties, as set forth in their signature blocks, below (the "**Effective Date**") and shall remain in effect through the duration of the MIPA previously executed by the parties.

2.     The parties agree, and this side letter sets forth their agreement, that PGR will modify its two previously filed interconnection and transmission service requests for the Echo Solar project, specifically Interconnection Application Queue # 17/20210416-1 (Project Name: Echo Solar) which will be amended from 440 MW to 200 MW and Queue # 18/20210624-1 (Project Name: Bombing Range Solar II) which will be amended from 810 MW to 200 MW. In addition, PGR will file four (4) additional interconnection and transmission service requests with UEC for the Echo Solar project consisting of 200 MW each.

3.     This Side Letter shall inure to the benefit of and be binding upon each of the Parties and each of their respective successors and assigns. This Side Letter may be signed in multiple counterparts, and in electronic counterparts which electronic counterparts shall be binding as originals.

**Pine Gate Renewables, LLC**
a North Carolina limited liability company

By: _Ben Catt_
Name: Ben Catt
Title: CEO
Date: 10/18/2022


**Gallatin Power Partners, LLC**
a Montana limited liability company

By: _Adam Schumaker_
Name: Adam Schumaker
Title: President
Date: 10/18/2022

# <u>EXHIBIT 4</u>

**Second Side Letter to MIPA**



**Headquarters**: 130 Roberts Street, Asheville, NC 28801

**Charlotte Office**: 301 Camp Road, Suite 104, Charlotte, NC 28206

pinegaterenewables.com

August 23, 2023

Adam Schumaker
Gallatin Power Partners, LLC
270 W Kagy Blvd, Suite E
Bozeman, MT 59715

RE: Membership Interest Purchase and Sale Agreement (as amended from time to time, the "Agreement"), dated August 18, 2021, by and between Gallatin Power Partners, LLC ("Seller") and Pine Gate Renewables, LLC ("Buyer")

Dear Adam,

Seller and Buyer continue to perform under the Agreement. Pursuant to our discussions, the Parties desire to enter into this side letter (this "Side Letter") to memorialize their agreements with respect to certain matters under the Agreement in light of the Parties cooperation and performance thereunder to date. Capitalized terms used but not defined herein shall have the meanings ascribed under the Agreement.

Now, therefore, the Parties hereto agree as follows:

1. **Phase I Capacity and Excess Capacity**.  The Phase 1 Capacity has been established as 400 MWAC and the Excess Capacity has been established as 800 MWAC based on the following:

   a. The Interconnection Application and related System Impact Study, which was downsized from 1250 MW to 1200 MW.

   b. The Umatilla Excess Capacity Interconnection Application and the interconnection and transmission service request with Umatilla Electric Coop with Interconnection Application Queue #17/20210416-1, which Buyer downsized from 810 MWAC and 440 MWAC, respectively, to 200 MWAC each, for a total of 400 MWAC.  Such capacity together with 400 MWAC of the capacity described in Section 1a above, constitute the Phase 1 Capacity.

   c. Pursuant to the Side Letter between the Parties dated October 18, 2022, in order to replace the downsized capacity described in Section 1b above, Buyer submitted four additional interconnection applications to Umatilla Electric, each with a capacity of 200 MWAC, for

a total of 800 MW AC.  Such capacity together with 800 MW AC of the capacity described in Section 1a above, constitute the Excess Capacity.

2.  **Excess Capacity Assets**.

    a.  In lieu of the Grieb Option, pursuant to that certain Assignment and Assumption of Sale Agreement, dated September 21, 2022, Bombing Range Solar II, LLC, an affiliate of Seller, assigned to Echo Solar, LLC, an affiliate of Buyer, that certain Real Estate Purchase and Sale Agreement between Ken and Carri Grieb and Grieb Farms, Inc as Seller and Bombing Range Solar II, LLC as Buyer, dated February 16, 2022, as amended by the First Amendment to Real Estate Purchase and Sale Agreement dated March 23, 2022.

    b.  Further, pursuant to those certain Assignment and Assumption of Option Agreements, dated September 21, 2022, Bombing Range Solar II, LLC, an affiliate of Seller, assigned to Echo Solar, LLC, an affiliate of Buyer the following:

        i.  Option Agreement for Solar Energy System Ground Lease between Tony Robert Ashbeck and Gerald Thomas Ashbeck and Bombing Range Solar II, dated October 26, 2021.

        ii.  Option Agreement for Solar Energy System Ground Lease between William J. Doherty Ranch, LLC and Bombing Range Solar II, LLC, dated February 2, 2022.

        iii.  Option Agreement for Solar Energy System Ground Lease between John and Patricia Ann Monagle, William J. Doherty and Terese Ann Sanderson and Bombing Range Solar II, dated February 11, 2022.

    c.  The Parties acknowledge and agree that for all purposes under the Agreement, the Excess Capacity Assets means the Umatilla interconnection applications described in Section 1c above and the real estate agreements described in Section 2 above.

3.  **Services**.  The Parties acknowledge that the Term as defined under Exhibit F to the Agreement with respect to Seller's obligation to perform Services will expire as of August 18, 2023, and that Seller has used commercially reasonable efforts to complete the Conditions Precedent pursuant to the Development Services Terms and Conditions for all purposes under the Agreement.

4.  **Miscellaneous**

    a.  This Side Letter shall inure to the benefit of and be binding upon each of the Parties and each of their respective successors and assigns. This Side Letter may be signed in multiple

counterparts, and in electronic counterparts which electronic counterparts shall be binding as originals.

b. Except as herein expressly changed and amended, the Agreement shall remain and continue in full force and effect in accordance with all of the terms and provisions thereof.

Notwithstanding the expiration of the Term of the Development Services Terms and Conditions, Seller shall deliver to Buyer copies of all material notices and written communications that Seller receives from counterparties to any Contract.

Please indicate your agreement to the foregoing by returning an executed copy of this Side Letter.

Sincerely,

Pine Gate Renewables, LLC
a North Carolina limited liability company

By: _Ben Catt_

Name: Ben Catt

Title: CEO

Date: 8/29/2023

ACKNOWLEDGED AND AGREED BY:

Gallatin Power Partners, LLC
a Montana limited liability company

By: _Adam Schumaker_

Name: Adam Schumaker

Title: President

Date: 8/31/2023

## **EXHIBIT 5**

**Declaration of Adam Schumaker**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In Re: | Case No.: 25-90669 (CML) |
| PINE GATE RENEWABLES, LLC, *et al.*[1], | Chapter 11 |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ADAM SCHUMAKER IN SUPPORT OF GALLATIN POWER PARTNERS, LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY WITH RESPECT TO SUNSTONE PROJECT**

I, Adam Schumaker, declare as follows:

1.      I am the President of Gallatin Power Partners, LLC ("**Gallatin**"), the Creditor in this matter. I have held this position since the company's inception and have been personally and continuously involved in all aspects of the development of the Sunstone Solar project (the "**Sunstone Project**"), which is the subject of the pending Motion for Relief from Stay. The facts set forth in this declaration are based on my personal knowledge, my review of business records maintained by Gallatin in the ordinary course of business, and information I have gathered in my capacity as President. If called as a witness, I could and would competently testify to the matters stated herein.

**I.      BACKGROUND AND THE GOVERNING AGREEMENTS**

2.      Gallatin is a renewable energy development firm that specializes in developing large-scale solar and battery energy storage projects. My role as President involves overseeing all

---

[1] A complete list of the Debtors in this Chapter 11 case may be obtained at https://omniagentsolutions.com/PGR (collectively, "**Debtors**").

stages of project development, from initial land acquisition and permitting to negotiating financing and sales agreements. I was the lead negotiator for Gallatin on all agreements with Pine Gate Renewables ("**Pine Gate**") concerning the Sunstone Project.

3.     Gallatin conceived of and performed the initial, critical development work for the Sunstone Project, which is located in Morrow County, Oregon. This work included securing the necessary land agreements, obtaining grid interconnection agreements and transmission rights. We held these assets in a special purpose entity named Bombing Range Solar I, LLC.

4.     On August 18, 2021, Gallatin, through its subsidiary, entered into a Membership Interest Purchase and Sale Agreement (the "**MIPA**") with Pine Gate, whereby Gallatin sold its 100% membership interest in Bombing Range Solar I, LLC to Pine Gate. A true and correct copy of the MIPA is attached as Exhibit 1 to Gallatin's Motion. The MIPA was structured to provide Gallatin with an initial payment to reimburse our development costs, followed by substantial future payments (the "**Second Payment**" and "**NTP Payments**") that were contingent on Pine Gate achieving specific development milestones, such as executing a power purchase agreement and issuing notices to proceed with construction.

5.     Because Gallatin's most significant compensation was tied to the future success of the Sunstone Project, the MIPA contained several critical provisions to protect our interests. Specifically, Section 1.4 of the MIPA granted Gallatin a "Seller Repurchase" option, giving us the right to repurchase the Sunstone Project if Pine Gate discontinued development. Triggers for this option included, among other things, failing to achieve the conditions required for the Second Payment or failing to make any payment under a Sunstone Project contract that could have a

2

materially adverse effect on the Sunstone Project's success, including, most critically, interconnection related payments.

6.    The MIPA also placed strict limitations on Pine Gate's ability to transfer the Sunstone Project assets. Section 1.5(c) required that all material assets for the Sunstone Project's 440MW Phase I Capacity be held by the Project Company (which is now named Sunstone Solar, LLC). Furthermore, Section 4.3 prohibited Pine Gate from selling, assigning, or transferring any portion of the Sunstone Project or its assets to another entity unless that entity was "at least as creditworthy as [Pine Gate Renewables]."

7.    Over the next two years, the parties executed several amendments and side letters to facilitate the Sunstone Project's development. These included the First Amendment to the MIPA (Motion, Ex. 2), the First Side Letter (Motion, Ex. 3), and the Second Side Letter (Motion, Ex. 4). The Second Side Letter, dated August 23, 2023, is particularly relevant as it explicitly acknowledged that both parties "continue[d] to perform under the [MIPA]" and that Gallatin had "performed reasonably in performing all Services it agreed to provide under the MIPA."

## II.    <u>PINE GATE'S BREACHES OF THE MIPA</u>

8.    Despite the clear terms of the MIPA, Pine Gate undertook a series of actions designed to improperly transfer Sunstone Project assets and, I believe, to shield those assets from the payment obligations owed to Gallatin. Upon information and belief, Pine Gate transferred 100% of the membership interests in Sunstone Solar, LLC (the Project Company) to a newly formed, wholly owned subsidiary named FP 2021. This transfer occurred without Gallatin's knowledge or consent. Based on my understanding of Pine Gate's corporate structure, FP 2021 is a shell entity with no independent operations or assets beyond its interest in the Sunstone Project.

I do not believe that FP 2021 was, or is, as creditworthy as Pine Gate Renewables was at the time the MIPA was executed in August 2021. This transfer therefore constitutes a direct breach of Section 4.3 of the MIPA.

9.      On February 19, 2025, Pine Gate, acting through FP 2021, formed six new entities: Sunstone Solar 1, LLC, Sunstone Solar 2, LLC, Sunstone Solar 3, LLC, Sunstone Solar 4, LLC, Sunstone Solar 5, LLC and Sunstone Solar 6, LLC (the "**Sunstone Subsidiaries**"). Upon information and belief, these entities are controlled by Pine Gate's CEO, Ben Catt, and were created for the sole purpose of carving up the Sunstone Project and transferring its assets away from the original Project Company, in violation of Section 1.5(c) of the MIPA.

10.     This belief was confirmed by public filings. Pine Gate, through Sunstone Solar, filed a request with the Oregon Energy Facility Siting Council ("**EFSC**") to divide the Sunstone Project's single Site Certificate—a material Sunstone Project asset—into six separate certificates, one for each of the Sunstone Subsidiaries. Upon information and belief, Pine Gate also has transferred or plans to transfer other key assets, such as the interconnection applications with Bonneville Power Administration ("**BPA**") and Umatilla Electric Cooperative ("**UEC**"), to these new subsidiaries. These transfers are clear breaches of the MIPA.

11.     Gallatin had no knowledge of FP 2021 or the Sunstone Subsidiaries until September of 2025. Once we discovered these unauthorized transfers, we sought to protect our rights by proposing a Second Amendment to the MIPA. A true and correct copy of the draft Second Amendment is attached as Exhibit 7 to the Motion. The purpose of this amendment was to formally add the Sunstone Subsidiaries as "Additional Purchasers" under the MIPA, making them jointly and severally liable for all payments owed to Gallatin.

12.     I personally spoke with Ben Catt about the proposed amendment. During our conversation, Mr. Catt agreed that the Sunstone Subsidiaries should be added as Additional Purchasers and acknowledged that they were equally responsible for the payment obligations to Gallatin. Pine Gate's counsel initially represented that the draft amendment was acceptable. However, despite these assurances, Pine Gate ultimately refused to execute the Second Amendment on October 14, 2025. I believe this refusal was a deliberate tactic to avoid and reduce their liability for the substantial payments owed to Gallatin under the MIPA, constituting a breach of Section 1.5(b), which prohibits Pine Gate from taking any action that would reduce the amount owed to Gallatin.

## III.     EXERCISE OF THE REPURCHASE OPTION

13.     In September 2025, national media outlets began reporting that Pine Gate was experiencing severe liquidity issues and was considering bankruptcy. These reports, combined with Pine Gate's breaches of the MIPA and its refusal to execute the Second Amendment, confirmed my fears that Pine Gate was no longer capable of advancing the Sunstone Project or honoring its financial commitments.

14.     Consequently, on October 17, 2025, Gallatin sent a formal notice to Pine Gate exercising its Repurchase Option under Section 1.4 of the MIPA (the "**Repurchase Notice**"). A true and correct copy of the Repurchase Notice is attached as Exhibit 8 to the Motion. The notice was based on, among other things, Pine Gate's clear financial inability to enter into a Power Purchase Agreement for the Sunstone Project's capacity and its failure to make critical payments to third parties necessary for the Sunstone Project's continuation.

15.     Pursuant to the MIPA, the Repurchase Notice required Pine Gate to provide its calculation of the Repurchase Price by November 1, 2025, and to deliver a Membership Interest Purchase Agreement to effectuate the repurchase by November 16, 2025. To date, Pine Gate has failed to do either. It has given no indication that it intends to comply with its contractual obligation to reconvey the Sunstone Project to Gallatin.

## IV.    THE SUNSTONE PROJECT IS ON THE BRINK OF TOTAL DISASTER

16.     The automatic stay is causing immediate and irreparable harm to the Sunstone Project. Pine Gate's insolvency has left the Sunstone Project in a state of paralysis at a time when significant financial commitments and swift action are required to preserve its value. Any further delay will result in the Sunstone Project's total collapse.

17.     The Sunstone Project faces several imminent and critical payment deadlines. Millions of dollars are owed to UEC under multiple Generator Interconnection Agreements ("GIA"s) in the coming months, and future costs to connect to BPA's grid will exceed $8 million. In addition, annual payments ranging from $25,000 to $60,000 are due to landowners under various lease and purchase option agreements.

18.     I am aware that Pine Gate failed to make one or more payments to service the surety bonds that secure the UEC GIAs. As indicated on Pine Gate's Surety Motion, Pine Gate did not make a $1,200,000 bond payment to Philadelphia Indemnity Insurance Company ("Philadelphia") relating to the $80,000,000 Surety Bond posted by Philadelphia on July 1, 2025 which secures the cost of the electric grid upgrades under the UEC Interconnection Agreement associated with the Project Excess Capacity Assets. Upon information and belief, this bond payment was due on August 30, 2025.   This is "a payment in respect of the Interconnection Application or the

interconnection of the Project" and Pine Gate both failed to make this payment and also failed to provide notice to Gallatin of "its inability to make any such payment, or its intention to not make any such payment," which it was required to do under the MIPA. Pine Gate's failure to make the payment and notify Gallatin of its inability to make the payment are a per se trigger of the repurchase right for the Excess Capacity Assets under the MIPA. Further, Pine Gate may have missed a bond payment on the $26.5 million bond posted by United States Fire Insurance Company ("USFIC") to secure the costs of the electric grid upgrades under the UEC Interconnection Agreement associated with the Phase I Capacity. As indicated in Pine Gate's Surety Motion, there is a bond payment owed to USFIC of $397,500 that was likely due no later than October 31, 2025, and was not paid by Pine Gate. Pine Gate's failure to make the payment and notify Gallatin of its inability to make the payment are another per se trigger of the repurchase right for the Phase I Capacity under the MIPA.

19.     Based on my extensive experience in energy development, missing even a single one of these payments to UEC or BPA would be catastrophic. It would cause the Sunstone Project to lose its place in the interconnection queue, forcing it to restart a five-to-ten-year application process. The Sunstone Project would effectively be terminated.

20.     The Sunstone Project also faces strict construction deadlines imposed by its EFSC Site Certificate. Construction on the first phase must begin by November 18, 2027, and the entire 1.2 GW Sunstone Project must be completed by November 18, 2030. A project of this magnitude requires a highly coordinated and lengthy construction schedule. A typical 200MW solar project requires at least 12 months of pre-construction work for engineering and procurement, followed by at least 18 months of construction. To meet the 2030 deadline for all six phases, the pre-

construction and construction timelines must overlap significantly. Pine Gate's insolvency has halted all meaningful progress, and every day of delay makes meeting the 2030 completion deadline more difficult, if not impossible.

21.     Finally, the Sunstone Project's economic viability is entirely dependent on qualifying for the federal Investment Tax Credit ("**ITC**"), which provides a 40% credit for projects in its specific location. To qualify, the Sunstone Project must begin construction no later than July 4, 2026, and be placed into service by December 31, 2030. Without the ITC, the Sunstone Project is not financially feasible. The delays caused by Pine Gate's financial distress and this bankruptcy proceeding place the ITC in grave jeopardy. If the stay is not lifted immediately to allow Gallatin to resume development, this multi-billion dollar project and its immense value will be destroyed.

*I, Adam Schumaker, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.*

DATED November 18, 2025.

*/s/ Adam Schumaker*
**Adam Schumaker**
President, Gallatin Power Partners, LLC

## **EXHIBIT 6**

**Articles of Organization of Sunstone Subsidiaries**



**Articles of Organization - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business - Phone: (503) 986-2200

**FILED: FEB 19, 2025**
**OREGON SECRETARY OF STATE**

REGISTRY NUMBER: _236814794_

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is We must release this information to all parties upon request and it will be posted on our website.

236814794-27380993

**SUNSTONE SOLAR 1, LLC**          **NEWORG**

Please Type or Print Legibly in Black ink. Attach Additional Sheet if Necessary.

**1. NAME OF LIMITED LIABILITY COMPANY:** (Must contain the words "Limited Liability Company" or the abbreviations "LLC" or "L.L.C.")

Sunstone Solar 1, LLC

**2. DURATION:** (Please check one.)

[X] Duration shall be perpetual.

[ ] Latest date upon which the Limited Liability Company

is to dissolve is _____

**3. PRINCIPAL OFFICE:** (Must be a physical street address)

130 Roberts Street

Asheville, NC 28801

**4. REGISTERED AGENT:** (Individual or entity that will accept legal service for this business)

Cogency Global Inc.

**5. REGISTERED AGENT'S PUBLICLY AVAILABLE ADDRESS:** (Must be an Oregon Street Address, which is identical to the registered agent's office.)

698 12th Street SE, Suite 200

Salem, OR 97301

**6. ADDRESS WHERE THE DIVISION MAY MAIL NOTICES:**

130 Roberts Street

Asheville, NC 28801

**7. HOW WILL THIS LIMITED LIABILITY COMPANY BE MANAGED?**

[ ] This LLC will be member-managed by one or more members.

[X] This LLC will be manager-managed by one or more managers.

**8. IF RENDERING A LICENSED PROFESSIONAL SERVICE OR SERVICES, DESCRIBE THE SERVICE(S) BEING RENDERED:**
ORS 58.015(5)(m)

**9. OPTIONAL PROVISIONS:** (Attach a separate sheet if necessary.)

[ ] **BENEFIT COMPANY:** The Limited Liability Company is a benefit company subject to sections 1 to 11 of chapter 269, Oregon Laws 2013. (additional requirements apply)

[ ] **INDEMNIFICATION:** The company elects to indemnify its members, managers, employees, agents for liability and related expenses under ORS 63.160 - 63.170.

[ ] SEE ATTACHED

**10. NAME AND ADDRESS OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (ORGANIZER)

Chaye Besherse

130 Roberts Street

Asheville, NC 28801

**LIST MEMBERS AND/OR MANAGERS NAMES AND ADDRESSES** (MAY BE REQUIRED BY YOUR BANK)

**11. OWNERS: (MEMBERS)** (Names and Addresses)

FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

**12. MANAGERS: (MANAGERS)** (Names and Addresses)

FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

**13. INDIVIDUAL WITH DIRECT KNOWLEDGE** (Name and Address)
List the name and address of at least one _individual_ who is a member or manager of the LLC or an authorized representative with direct knowledge of the operations and business activities of the LLC.

Benjamin Catt

130 Roberts Street

Asheville, NC 28801

**14. EXECUTION/SIGNATURE OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (Organizer)

I declare as an authorized signer, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise misrepresent the identity of the person or any members, managers, employees or agents of the limited liability company. This filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment or both.

SIGNATURE: _~C. Besherse~_

PRINTED NAME: Chaye Besherse, Authorized Signatory

TITLE: Organizer

**CONTACT NAME:** (To resolve questions with this filing)

**PHONE NUMBER:** (Include area code)

**FEES**

Required Processing Fee   $100

Processing Fees are nonrefundable. Please make check payable to "Corporation Division".

Free copies are available at sos.oregon.gov/business using the Business Name Search program.

Articles of Organization - Limited Liability Company 11/17



**Articles of Organization - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business - Phone: (503) 986-2200

**FILED: FEB 19, 2025**
**OREGON SECRETARY OF STATE**



236814992-27381014

SUNSTONE SOLAR 2, LLC          NEWORG

**REGISTRY NUMBER:** 236814992

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is pu
We must release this information to all parties upon request and it will be posted on our website.

Please Type or Print Legibly in Black ink. Attach Additional Sheet if Necessary.

1. **NAME OF LIMITED LIABILITY COMPANY:** (Must contain the words "Limited Liability Company" or the abbreviations "LLC" or "L.L.C.")

   Sunstone Solar 2, LLC

2. **DURATION:** (Please check one.)
   [X] Duration shall be perpetual.

   [ ] Latest date upon which the Limited Liability Company

   is to dissolve is _____

3. **PRINCIPAL OFFICE:** (Must be a physical street address)

   130 Roberts Street

   Asheville, NC 28801

4. **REGISTERED AGENT:** (Individual or entity that will accept legal service
   for this business)

   Cogency Global Inc.

5. **REGISTERED AGENT'S PUBLICLY AVAILABLE ADDRESS:**
   (Must be an Oregon Street Address, which is identical to the
   registered agent's office.)

   698 12th Street SE, Suite 200

   Salem, OR 97301

6. **ADDRESS WHERE THE DIVISION MAY MAIL NOTICES:**

   130 Roberts Street

   Asheville, NC 28801

7. **HOW WILL THIS LIMITED LIABILITY COMPANY BE MANAGED?**
   [ ] This LLC will be member-managed by one or more members.
   [X] This LLC will be manager-managed by one or more managers.

8. **IF RENDERING A LICENSED PROFESSIONAL SERVICE OR
   SERVICES, DESCRIBE THE SERVICE(S) BEING RENDERED:**
   ORS 58.015(5)(m)

9. **OPTIONAL PROVISIONS:** (Attach a separate sheet if necessary.)
   [ ] **BENEFIT COMPANY:** The Limited Liability Company is a benefit
   company subject to sections 1 to 11 of chapter 269, Oregon Laws 2013.
   (additional requirements apply)
   [ ] **INDEMNIFICATION:** The company elects to indemnify its
   members, managers, employees, agents for liability and related
   expenses under ORS 63.160 - 63.170.
   [ ] **SEE ATTACHED**

10. **NAME AND ADDRESS OF EACH PERSON WHO IS FORMING
    THIS BUSINESS:** (ORGANIZER)

    Chaye Besherse

    130 Roberts Street

    Asheville, NC 28801

    **LIST MEMBERS AND/OR MANAGERS NAMES AND
    ADDRESSES** (MAY BE REQUIRED BY YOUR BANK)

11. **OWNERS: (MEMBERS)** (Names and Addresses)
    FP 2021 Dev Holdco, LLC

    130 Roberts Street

    Asheville, NC 28801

12. **MANAGERS: (MANAGERS)** (Names and Addresses)
    FP 2021 Dev Holdco, LLC

    130 Roberts Street

    Asheville, NC 28801

13. **INDIVIDUAL WITH DIRECT KNOWLEDGE** (Name and Address)
    List the name and address of at least one __individual__ who is a member or
    manager of the LLC or an authorized representative with direct knowledge
    of the operations and business activities of the LLC.

    Benjamin Catt

    130 Roberts Street

    Asheville, NC 28801

14. **EXECUTION/SIGNATURE OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (Organizer)
I declare as an authorized signer, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise
misrepresent the identity of the person or any members, managers, employees or agents of the limited liability company. This filing has been examined by me and is, to
the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines,
imprisonment or both.

**SIGNATURE:** _Chaye Besherse_

**PRINTED NAME:** Chaye Besherse, Authorized Signatory

**TITLE:** Organizer

**CONTACT NAME:** (To resolve questions with this filing)

_____

**PHONE NUMBER:** (Include area code)

_____

**FEES**

Required Processing Fee   $100

Processing Fees are nonrefundable. Please make check payable to "Corporation Division".

Free copies are available at sos.oregon.gov/business using the Business Name Search program.

Articles of Organization - Limited Liability Company 11/17



**Articles of Organization - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business - Phone: (503) 986-2200

**FILED: FEB 19, 2025**
**OREGON SECRETARY OF STATE**

**REGISTRY NUMBER:** 236815999

236815999-27381053

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is
We must release this information to all parties upon request and it will be posted on our website.

SUNSTONE SOLAR 3, LLC                    NEWORG

Please Type or Print Legibly in **Black** ink. **Attach Additional Sheet If Necessary.**

1. **NAME OF LIMITED LIABILITY COMPANY:** (Must contain the words "Limited Liability Company" or the abbreviations "LLC" or "L.L.C.")

Sunstone Solar 3, LLC

2. **DURATION:** (Please check one.)
   - [X] Duration shall be perpetual.
   - [ ] Latest date upon which the Limited Liability Company
   is to dissolve is _____

3. **PRINCIPAL OFFICE:** (Must be a physical street address)

130 Roberts Street

Asheville, NC 28801

4. **REGISTERED AGENT:** (Individual or entity that will accept legal service for this business)

Cogency Global Inc.

5. **REGISTERED AGENT'S PUBLICLY AVAILABLE ADDRESS:**
(Must be an Oregon Street Address, which is identical to the registered agent's office.)

698 12th Street SE, Suite 200

Salem, OR 97301

6. **ADDRESS WHERE THE DIVISION MAY MAIL NOTICES:**

130 Roberts Street

Asheville, NC 28801

7. **HOW WILL THIS LIMITED LIABILITY COMPANY BE MANAGED?**
   - [ ] This LLC will be member-managed by one or more members.
   - [X] This LLC will be manager-managed by one or more managers.

8. **IF RENDERING A LICENSED PROFESSIONAL SERVICE OR SERVICES, DESCRIBE THE SERVICE(S) BEING RENDERED:**
ORS 58.015(5)(m)

9. **OPTIONAL PROVISIONS:** (Attach a separate sheet if necessary.)
   - [ ] **BENEFIT COMPANY:** The Limited Liability Company is a benefit company subject to sections 1 to 11 of chapter 269, Oregon Laws 2013. (additional requirements apply)
   - [ ] **INDEMNIFICATION:** The company elects to indemnify its members, managers, employees, agents for liability and related expenses under ORS 63.160 - 63.170.
   - [ ] **SEE ATTACHED**

10. **NAME AND ADDRESS OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (ORGANIZER)

Chaye Besherse

130 Roberts Street

Asheville, NC 28801

**LIST MEMBERS AND/OR MANAGERS NAMES AND ADDRESSES** (MAY BE REQUIRED BY YOUR BANK)

11. **OWNERS: (MEMBERS)** (Names and Addresses)

FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

12. **MANAGERS: (MANAGERS)** (Names and Addresses)

FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

13. **INDIVIDUAL WITH DIRECT KNOWLEDGE** (Name and Address)
List the name and address of at least one **individual** who is a member or manager of the LLC or an authorized representative with direct knowledge of the operations and business activities of the LLC.

Benjamin Catt

130 Roberts Street

Asheville, NC 28801

14. **EXECUTION/SIGNATURE OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (Organizer)

I declare as an authorized signer, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise misrepresent the identity of the person or any members, managers, employees or agents of the limited liability company. This filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment or both.

**SIGNATURE:**

**PRINTED NAME:**
Chaye Besherse, Authorized Signatory

**TITLE:**
Organizer

**CONTACT NAME:** (To resolve questions with this filing)

**PHONE NUMBER:** (Include area code)

**FEES**

Required Processing Fee   $100

Processing Fees are nonrefundable. Please make check payable to "Corporation Division".

Free copies are available at sos.oregon.gov/business using the Business Name Search program.

Articles of Organization - Limited Liability Company 11/17



**Articles of Organization - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business - Phone: (503) 986-2200

**FILED: FEB 19, 2025**
**OREGON SECRETARY OF STATE**

**REGISTRY NUMBER:** 236816195

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is publ
We must release this information to all parties upon request and it will be posted on our website.

236816195-27381071
**SUNSTONE SOLAR 4, LLC**          **NEWORG**

Please Type or Print Legibly in Black ink. Attach Additional Sheet if Necessary.

1. **NAME OF LIMITED LIABILITY COMPANY:** (Must contain the words "Limited Liability Company" or the abbreviations "LLC" or "L.L.C.")

   Sunstone Solar 4, LLC

2. **DURATION:** (Please check one.)
   - [X] Duration shall be perpetual.
   - [ ] Latest date upon which the Limited Liability Company

   is to dissolve is _____

3. **PRINCIPAL OFFICE:** (Must be a physical street address)

   130 Roberts Street

   Asheville, NC 28801

4. **REGISTERED AGENT:** (Individual or entity that will accept legal service for this business)

   Cogency Global Inc.

5. **REGISTERED AGENT'S PUBLICLY AVAILABLE ADDRESS:**
   (Must be an Oregon Street Address, which is identical to the registered agent's office.)

   698 12th Street SE, Suite 200

   Salem, OR 97301

6. **ADDRESS WHERE THE DIVISION MAY MAIL NOTICES:**

   130 Roberts Street

   Asheville, NC 28801

7. **HOW WILL THIS LIMITED LIABILITY COMPANY BE MANAGED?**
   - [ ] This LLC will be member-managed by one or more members.
   - [X] This LLC will be manager-managed by one or more managers.

8. **IF RENDERING A LICENSED PROFESSIONAL SERVICE OR SERVICES, DESCRIBE THE SERVICE(S) BEING RENDERED:**
   ORS 58.015(5)(m)

9. **OPTIONAL PROVISIONS:** (Attach a separate sheet if necessary.)
   - [ ] BENEFIT COMPANY: The Limited Liability Company is a benefit company subject to sections 1 to 11 of chapter 269, Oregon Laws 2013. (additional requirements apply)
   - [ ] INDEMNIFICATION: The company elects to indemnify its members, managers, employees, agents for liability and related expenses under ORS 63.160 - 63.170.
   - [ ] SEE ATTACHED

10. **NAME AND ADDRESS OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (ORGANIZER)

    Chaye Besherse

    130 Roberts Street

    Asheville, NC 28801

    **LIST MEMBERS AND/OR MANAGERS NAMES AND ADDRESSES** (MAY BE REQUIRED BY YOUR BANK)

11. **OWNERS: (MEMBERS)** (Names and Addresses)
    FP 2021 Dev Holdco, LLC

    130 Roberts Street

    Asheville, NC 28801

12. **MANAGERS: (MANAGERS)** (Names and Addresses)
    FP 2021 Dev Holdco, LLC

    130 Roberts Street

    Asheville, NC 28801

13. **INDIVIDUAL WITH DIRECT KNOWLEDGE** (Name and Address)
    List the name and address of at least one individual who is a member or manager of the LLC or an authorized representative with direct knowledge of the operations and business activities of the LLC.

    Benjamin Catt

    130 Roberts Street

    Asheville, NC 28801

14. **EXECUTION/SIGNATURE OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (Organizer)

I declare as an authorized signer, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise misrepresent the identity of the person or any members, managers, employees or agents of the limited liability company. This filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment or both.

SIGNATURE: _C Besherse_

PRINTED NAME: Chaye Besherse, Authorized Signatory

TITLE: Organizer

**CONTACT NAME:** (To resolve questions with this filing)

_____

**PHONE NUMBER:** (Include area code)

_____

**FEES**

Required Processing Fee   $100

Processing Fees are nonrefundable. Please make check payable to "Corporation Division".

Free copies are available at sos.oregon.gov/business using the Business Name Search program.

Articles of Organization - Limited Liability Company 11/17



**Articles of Organization - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business - Phone: (503) 986-2200

**FILED: FEB 19, 2025**
**OREGON SECRETARY OF STATE**



236816591-27381087
SUNSTONE SOLAR 5, LLC            NEWORG

**REGISTRY NUMBER:** *236816591*

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is pub
We must release this information to all parties upon request and it will be posted on our website.
Please Type or Print Legibly in Black ink. Attach Additional Sheet if Necessary.

**1. NAME OF LIMITED LIABILITY COMPANY:** (Must contain the words "Limited Liability Company" or the abbreviations "LLC" or "L.L.C.")

Sunstone Solar 5, LLC

**2. DURATION:** (Please check one.)

[X] Duration shall be perpetual.

[ ] Latest date upon which the Limited Liability Company

is to dissolve is _____

**3. PRINCIPAL OFFICE:** (Must be a physical street address)

130 Roberts Street

Asheville, NC 28801

**4. REGISTERED AGENT:** (Individual or entity that will accept legal service
for this business)

Cogency Global Inc.

**5. REGISTERED AGENT'S PUBLICLY AVAILABLE ADDRESS:**
(Must be an Oregon Street Address, which is identical to the
registered agent's office.)

698 12th Street SE, Suite 200

Salem, OR 97301

**6. ADDRESS WHERE THE DIVISION MAY MAIL NOTICES:**

130 Roberts Street

Asheville, NC 28801

**7. HOW WILL THIS LIMITED LIABILITY COMPANY BE MANAGED?**

[ ] This LLC will be member-managed by one or more members.

[X] This LLC will be manager-managed by one or more managers.

**8. IF RENDERING A LICENSED PROFESSIONAL SERVICE OR
SERVICES, DESCRIBE THE SERVICE(S) BEING RENDERED:**
ORS 58.015(5)(m)

**9. OPTIONAL PROVISIONS:** (Attach a separate sheet if necessary.)
[ ] BENEFIT COMPANY:  The Limited Liability Company is a benefit
company subject to sections 1 to 11 of chapter 269, Oregon Laws 2013.
(additional requirements apply)
[ ] INDEMNIFICATION:   The company elects to indemnify its
members, managers, employees, agents for liability and related
expenses under ORS 63.160 - 63.170.
[ ] SEE ATTACHED

**10. NAME AND ADDRESS OF EACH PERSON WHO IS FORMING
THIS BUSINESS:** (ORGANIZER)

Chaye Besherse

130 Roberts Street

Asheville, NC 28801

**LIST MEMBERS AND/OR MANAGERS NAMES AND
ADDRESSES** (MAY BE REQUIRED BY YOUR BANK)
**11. OWNERS: (MEMBERS)** (Names and Addresses)
FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

**12. MANAGERS: (MANAGERS)** (Names and Addresses)
FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

**13. INDIVIDUAL WITH DIRECT KNOWLEDGE** (Name and Address)
List the name and address of at least one individual who is a member or
manager of the LLC or an authorized representative with direct knowledge
of the operations and business activities of the LLC.

Benjamin Catt

130 Roberts Street

Asheville, NC 28801

**14. EXECUTION/SIGNATURE OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (Organizer)
I declare as an authorized signer, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise
misrepresent the identity of the person or any members, managers, employees or agents of the limited liability company. This filing has been examined by me and is, to
the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines,
imprisonment or both.

**SIGNATURE:** *CBesherse*

**PRINTED NAME:**
Chaye Besherse, Authorized Signatory

**TITLE:**
Organizer

**CONTACT NAME:** (To resolve questions with this filing)

_____

**PHONE NUMBER:** (Include area code)

_____

**FEES**

Required Processing Fee   $100

Processing Fees are nonrefundable.  Please make check payable to "Corporation Division".

Free copies are available at sos.oregon.gov/business using the Business Name Search program.

Articles of Organization - Limited Liability Company 11/17



**Articles of Organization - Limited Liability Company**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business - Phone: (503) 986-2200

**FILED: FEB 19, 2025**
**OREGON SECRETARY OF STATE**

236816997-27381103

**REGISTRY NUMBER:** _236816997_

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is pul
We must release this information to all parties upon request and it will be posted on our website.

**SUNSTONE SOLAR 6, LLC**                    **NEWORG**

Please Type or Print Legibly in Black Ink. Attach Additional Sheet if Necessary.

1. **NAME OF LIMITED LIABILITY COMPANY:** (Must contain the words "Limited Liability Company" or the abbreviations "LLC" or "L.L.C.")

Sunstone Solar 6, LLC

2. **DURATION:** (Please check one.)

[X] Duration shall be perpetual.

[ ] Latest date upon which the Limited Liability Company

is to dissolve is _____

3. **PRINCIPAL OFFICE:** (Must be a physical street address)

130 Roberts Street

Asheville, NC 28801

4. **REGISTERED AGENT:** (Individual or entity that will accept legal service for this business)

Cogency Global Inc.

5. **REGISTERED AGENT'S PUBLICLY AVAILABLE ADDRESS:**
(Must be an Oregon Street Address, which is identical to the registered agent's office.)

698 12th Street SE, Suite 200

Salem, OR 97301

6. **ADDRESS WHERE THE DIVISION MAY MAIL NOTICES:**

130 Roberts Street

Asheville, NC 28801

7. **HOW WILL THIS LIMITED LIABILITY COMPANY BE MANAGED?**

[ ] This LLC will be member-managed by one or more members.

[X] This LLC will be manager-managed by one or more managers.

8. **IF RENDERING A LICENSED PROFESSIONAL SERVICE OR SERVICES, DESCRIBE THE SERVICE(S) BEING RENDERED:**
ORS 58.015(5)(m)

9. **OPTIONAL PROVISIONS:** (Attach a separate sheet if necessary.)

[ ] BENEFIT COMPANY: The Limited Liability Company is a benefit company subject to sections 1 to 11 of chapter 269, Oregon Laws 2013. (additional requirements apply)

[ ] INDEMNIFICATION: The company elects to indemnify its members, managers, employees, agents for liability and related expenses under ORS 63.160 - 63.170.

[ ] SEE ATTACHED

10. **NAME AND ADDRESS OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (ORGANIZER)

Chaye Besherse

130 Roberts Street

Asheville, NC 28801

**LIST MEMBERS AND/OR MANAGERS NAMES AND ADDRESSES** (MAY BE REQUIRED BY YOUR BANK)

11. **OWNERS: (MEMBERS)** (Names and Addresses)

FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

12. **MANAGERS: (MANAGERS)** (Names and Addresses)

FP 2021 Dev Holdco, LLC

130 Roberts Street

Asheville, NC 28801

13. **INDIVIDUAL WITH DIRECT KNOWLEDGE** (Name and Address)
List the name and address of at least one individual who is a member or manager of the LLC or an authorized representative with direct knowledge of the operations and business activities of the LLC.

Benjamin Catt

130 Roberts Street

Asheville, NC 28801

14. **EXECUTION/SIGNATURE OF EACH PERSON WHO IS FORMING THIS BUSINESS:** (Organizer)

I declare as an authorized signer, under penalty of perjury, that this document does not fraudulently conceal, fraudulently obscure, fraudulently alter or otherwise misrepresent the identity of the person or any members, managers, employees or agents of the limited liability company. This filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment or both.

**SIGNATURE:** _C Besherse_

**PRINTED NAME:** Chaye Besherse, Authorized Signatory

**TITLE:** Organizer

**CONTACT NAME:** (To resolve questions with this filing)

**PHONE NUMBER:** (Include area code)

**FEES**

Required Processing Fee    $100

Processing Fees are nonrefundable. Please make check payable to "Corporation Division".

Free copies are available at sos.oregon.gov/business using the Business Name Search program.

# **EXHIBIT 7**

**Draft Second Amendment to MIPA**

## SECOND AMENDMENT TO
## MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

This SECOND AMENDMENT TO MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT (this "<u>Amendment</u>") is made and entered into as of September 19, 2025 (the "<u>Execution Date</u>") by and between **GALLATIN POWER PARTNERS, LLC**, a Montana limited liability company (the "<u>Seller</u>"), **PINE GATE RENEWABLES, LLC**, a North Carolina limited liability company (the "<u>Original Purchaser</u>") and each entity listed on **Exhibit A** hereto (each, an "<u>Additional Purchaser</u>" and, collectively, the "<u>Additional Purchasers</u>"). Original Purchaser, Seller and the Additional Purchasers are sometimes hereinafter referred to individually as a "<u>Party</u>" and collective as the "<u>Parties</u>."

### RECITALS

WHEREAS, Seller and Original Purchaser entered into that certain Membership Interest Purchase and Sale Agreement dated as of August 18, 2021, that certain First Amendment to Membership Interest Purchase and Sale Agreement dated as of September 13, 2022, that certain Side Letter dated October 18, 2022, and that certain Side Letter dated August 23, 2023 (as amended, the "<u>Agreement</u>"), pursuant to which Seller agreed to sell and Original Purchaser agreed to purchase, the Membership Interests on the terms and subject to the conditions set forth therein;

WHEREAS, at the Closing, the Project Company owned the Project Assets;

WHEREAS, subsequent to the Closing, Original Purchaser and the Project Company assigned or otherwise sold the Project Assets to the Additional Purchasers;

WHEREAS, the Parties desire to add the Additional Purchasers as co-obligors to the Purchaser under the Agreement such that the Additional Purchasers are jointly and severally liable for the obligations of the Purchaser under the Agreement;

WHEREAS, Section 1.4 of the Agreement gives Seller the right to repurchase the Project and Seller desires to forbear such right in exchange for adding the Additional Purchasers as co-obligors under the Agreement; and

WHEREAS, the Parties desire to amend certain provisions of the Agreement further outlined below;

NOW THEREFORE, in consideration of the Seller agreeing to forbear its repurchase right as set forth in Section 1.4 of the Agreement, for so long as Seller determines in its sole discretion, and the other mutual covenants and agreements in this Amendment, the receipt and sufficiency of which are hereby acknowledged by the Parties hereto, intending to be bound, hereby agree as follows:

1.     <u>Definitions</u>. Capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.

2.     <u>Amendment</u>. Upon execution of this Amendment, each Additional Purchaser hereby joins and becomes party to the Agreement as Purchaser, shall have all the rights and

obligations of Purchaser, shall be co-obligors of Purchaser, and shall be jointly and severally liable for all obligations of Purchaser under the Agreement.

3. <u>Agreements of Additional Purchasers</u>. Each Additional Purchaser hereby:

    a. confirms that it has received copies of the Agreement and the other transaction documents contemplated by the Agreement, and such other documents and information as it has deemed appropriate to make its own analysis and decision to enter into this Amendment;

    b. agrees that it will perform, in accordance with the respective terms thereof, all of the obligations of (i) Purchaser under the Agreement and (ii) a Party under the Agreement or any other transaction document contemplated by the Agreement as required to be performed by it as a Purchaser in such capacity;

    c. represents and warrants to Seller that each representation and warranty with respect to the Agreement is, on and as of the date hereof, true and correct in all material respects (except that such materiality qualifier shall not be applicable to representations and warranties that are already qualified or modified by materiality) assuming, for this purpose, that each Additional Purchaser is a Purchaser thereunder; provided that (i) notwithstanding anything to the contrary in the Agreement, each Additional Purchaser is duly formed and validly existing and in good standing under the laws of the State of Oregon, and (ii) for purposes of this Section 3(c) each reference in the representations and warranties of the Agreement to "the date hereof", "the date of this Agreement", "the Effective Date" or words of like import shall mean and be a reference to the date of this Amendment and not the date of the Agreement; and

    d. agrees that it will provide such information as reasonably required by Seller under the Agreement.

4. <u>Effect of Amendment</u>. Upon execution of this Amendment by the Parties, the Agreement shall be, and be deemed to be, modified and amended only to the extent set forth in this Amendment and the respective rights, obligations, duties and liabilities of the Parties shall hereafter be determined, exercised and enforced subject in all respects to such modifications and amendments, and all the terms and conditions of this Amendment shall be deemed to be a part of the terms and conditions of the Agreement, as applicable, for any and all purposes. Except as specifically provided herein, the Agreement shall remain unchanged and in full force and effect.

5. <u>Governing Law</u>. THIS AMENDMENT SHALL BE GOVERNED BY, AND INTERPRETED AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF.

6. <u>No Strict Construction</u>. The Parties hereto have participated jointly in the negotiation and drafting of this Amendment. In the event any ambiguity or question of intent or

interpretation arises, this Amendment shall be construed as if drafted jointly by all Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Amendment.

7.      <u>Counterparts; Electronic Signatures</u>. This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument, binding on each signatory thereto. This Amendment may be executed by signatures delivered by facsimile or email, and a copy hereof that is executed and delivered by a Party by facsimile or email (including in .pdf format) will be binding upon that Party to the same extent as a copy hereof containing that Party's original signature.

*[Signature Pages to Follow]*

3

**IN WITNESS WHEREOF**, this Amendment has been duly executed by the Parties as of and on the date first above written.

**ORIGINAL PURCHASER:**

**PINE GATE RENEWABLES, LLC**

By: _____
Name: Ben Catt
Title:   Authorized Person

**SELLER:**

**GALLATIN POWER PARTNERS, LLC**

By: _____
Name: Adam Schumaker
Title:   President

**ADDITIONAL PURCHASERS**:

**SUNSTONE SOLAR, LLC**

By: _____
Name:
Title:

**SUNSTONE SOLAR 1, LLC**

By: _____
Name:
Title:

[Signature Page to Second Amendment]

**SUNSTONE SOLAR 2, LLC**

By: _____
Name:
Title:

**SUNSTONE SOLAR 3, LLC**

By: _____
Name:
Title:

**SUNSTONE SOLAR 4, LLC**

By: _____
Name:
Title:

**SUNSTONE SOLAR 5, LLC**

By: _____
Name:
Title:

**SUNSTONE SOLAR 6, LLC**

By: _____
Name:
Title:

[Signature Page to Second Amendment]

## EXHIBIT A

## ADDITIONAL PURCHASERS

1. Sunstone Solar, LLC, an Oregon limited liability company (f/k/a Echo Solar, LLC and Bombing Range Solar I, LLC)

2. Sunstone Solar 1, LLC, an Oregon limited liability company

3. Sunstone Solar 2, LLC, an Oregon limited liability company

4. Sunstone Solar 3, LLC, an Oregon limited liability company

5. Sunstone Solar 4, LLC, an Oregon limited liability company

6. Sunstone Solar 5, LLC, an Oregon limited liability company

7. Sunstone Solar 6, LLC, an Oregon limited liability company

**<u>EXHIBIT 8</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In Re: | Case No.: 25-90669 (CML) |
| PINE GATE RENEWABLES, LLC, *et al.*[6], | Chapter 11 |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING GALLATIN POWER PARTNERS, LLC'S MOTION FOR RELIEF**
**FROM THE AUTOMATIC STAY FOR SUNSTONE PROJECT**

Upon the Motion (the "**Motion**") of Gallatin Power Partners, LLC ("**Gallatin**") for entry of an order (this "**Order**") granting relief from the automatic stay to permit Gallatin to exercise all of its state law remedies including, without limitation, pursuing equitable relief to compel specific performance for the Debtor(s) to reconvey title to the Project and/or seek other remedies available under applicable non-bankruptcy law, and the Court having found that this is a core proceeding under 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Motion and heard the statements in support of the relief requested therein at the hearing on the Motion (the "**Stay Relief Hearing**"); and the Court having determined that cause exists to grant the relief requested in the Motion under 11 U.S.C. § 362(d); and the Court having determined that Gallatin provided appropriate notice of the Motion under the circumstances and

---

[6] A complete list of the Debtors in this Chapter 11 case may be obtained at https://omniagentsolutions.com/PGR (collectively, "**Debtors**").

that no other or further notice is necessary; and the Court having determined that the legal and factual bases set forth in the Motion and at the Stay Relief Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED** that Gallatin's Motion is **GRANTED** and the automatic stay under 11 U.S.C. § 362 is modified and lifted as follows:

1.      Gallatin may make all appropriate demands and file suit, if necessary against the Debtors and any other necessary parties in any court of competent jurisdiction and prosecute to final judgment, including appeals, any and all claims against the Debtors arising from the Sunstone Project described in the Motion including, without limitation, any claims for equitable relief to enforce Gallatin's right to repurchase the Sunstone Project;

2.      The Debtors shall be prohibited from selling, transferring, disposing of, or otherwise seeking relief under 11 U.S.C. § 363 with respect to the Sunstone Project until a final judgment has been entered by this Court or another court of competent jurisdiction determining the parties' respective ownership interests in the Sunstone Project;

3.      The stay of this Order under Fed. R. Bankr. P. 4001(a)(3) is hereby waived and the terms of this Order shall be effective immediately upon entry;

4.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____, 2025          _____
         Houston, Texas                                    UNITED STATES BANKRUPTCY JUDGE