### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

------------------------------------------------------------ x
                                                             :
In re:                                                       :     Chapter 11
                                                             :
PINE GATE RENEWABLES, LLC, *et al.*,                         :     Case No. 25-90669 (CML)
                                                             :
Debtors[1]                                                   :     (Jointly Administered)
                                                             :
------------------------------------------------------------ x

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN
## OF PINE GATE RENEWABLES, LLC AND ITS DEBTOR AFFILIATES

**LATHAM & WATKINS LLP**
Ray C. Schrock
Andrew M. Parlen
Alexander W. Welch
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
      andrew.parlen@lw.com
      alex.welch@lw.com

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II
Philip M. Guffy
Brandon Bell
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@Hunton.com
      pguffy@Hunton.com
      bbell@Hunton.com

Jason B. Gott
Jonathan C. Gordon
330 N. Wabash Avenue
Suite No. 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: jason.gott@lw.com
      jonathan.gordon@lw.com

*Proposed Counsel for Debtors and Debtors in Possession*

Dated: November 20, 2025
Houston, Texas

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' Balloting Agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

**IMPORTANT NOTICES**

THIS DISCLOSURE STATEMENT (THIS "*DISCLOSURE STATEMENT*") IS NOT A SOLICITATION OF VOTES ON THE PLAN.  ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  THE DEBTORS HAVE SOUGHT ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," AND APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**Plan Voting**

The voting deadline to accept or reject the Plan is 4:00 p.m. Central time (the "*Voting Deadline*"), on [January 26, 2026], unless extended by the Debtors.  The record date for determining which Holders of Claims may vote on the Plan is [December 18, 2025] (the "*Voting Record Date*").

For your vote to be counted, you must return your properly completed Ballot in accordance with the voting instructions on the Ballot so that it is actually received by the Debtors' balloting agent, Omni Agent Solutions, Inc. (the "*Balloting Agent*"), before the Voting Deadline.

Ballots may be returned to the Balloting Agent in the return envelope provided or otherwise via only one of the following methods:

Regular Mail, Overnight Courier, or Personal Delivery:

<div align="center">

**PGR Ballot Processing**
**c/o Omni Agent Solutions, Inc.**
**5955 De Soto Avenue, Suite 100**
**Woodland Hills, CA 91367**

**OR**

</div>

Online submission through the Debtors' restructuring website at: https://omniagentsolutions.com/PGR-Ballots.

> **Additional details on voting are discussed herein and set forth on the Ballots delivered to Holders of Claims entitled to vote on the Plan.**

---

**Third-Party Releases**

**If you are a Holder of a Claim or Interest, you may be deemed to grant the Third-Party Release under the Plan.  Specifically, pursuant to <u>Article 10.3</u> of the Plan, each Holder of a Claim or Interest is deemed to grant the Third-Party Release, to the maximum extent otherwise permitted by law, if: (a) such Holder is entitled to vote to accept or reject the Plan and (i) votes to accept the Plan and does not elect to opt out of the Third-Party Release, (ii) abstains from voting on the Plan and does not elect to opt out of the Third-Party Release, or (iii) votes to reject the Plan but does not elect to opt out of the Third-Party Release; or (b) such Holder is a Holder of a Claim or Interest in a Class that is presumed to accept or reject the Plan and does not timely opt out of providing the Third-Party Release.  This release is discussed further in <u>Article V.I</u> of this Disclosure Statement.**

This is the disclosure statement (as may be amended, supplemented or modified from time to time, including all exhibits and schedules hereto and references herein that relate to the Plan (as defined herein), the "**Disclosure Statement**") of Pine Gate Renewables, LLC ("**PGR**") and its debtor affiliates[2] (each, a "**Debtor**," and, collectively, the "**Debtors**"; and their non-debtor affiliates, the "**Non-Debtor Affiliates**"; and the Debtors and Non-Debtor Affiliates together, "**Pine Gate**" or the "**Company**") as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

Pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), the Debtors are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Chapter 11 Plan of Pine Gate Renewables, LLC and Its Debtor Affiliates* (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "**Plan**"). The Plan is attached hereto as **Exhibit A**. All exhibits to this Disclosure Statement are incorporated into, and are a part of, this Disclosure Statement as if set forth in full herein. Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan or the *Declaration of Ray Shem, President and Chief Financial Officer of the Debtors, In Support of the Chapter 11 Petitions and First-Day Relief* [Docket No. 19] (the "**Shem Declaration**").

Pursuant to section 363 of the Bankruptcy Code, the Debtors intend to consummate one or more sales of substantially all of their assets to the Successful Bidder(s) pursuant to the applicable 363 Sale Transaction Documentation. The Plan provides for (a) the distribution of Distributable Proceeds, including the proceeds of any Retained Causes of Action and the proceeds of all non-Cash assets of the Debtors' Estates, after giving effect to the funding of the Professional Fee Escrow Account and the funding of the Wind-Down Reserve and (b) the appointment of a Plan Administrator to implement the Plan, make required distributions, and wind down the Debtors' estates (including the wind-down and dissolution of their Non-Debtor Affiliates).

The Debtors believe that the Plan is in the best interests of their creditors and other stakeholders. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. Detailed voting instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan and a summary of these instructions is set forth in Article I.B of this Disclosure Statement and in the Disclosure Statement Order (as defined below). For your vote to be counted, your Ballot must be properly completed and returned to the Balloting Agent, in accordance with the voting instructions on your Ballot and *actually received* by the Balloting Agent, via regular mail, overnight courier, or personal delivery at the appropriate address, or via the Balloting Agent's electronic ballot site, by the Voting Deadline.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan, and they may not be relied on for any purpose other than to determine how to vote on the Plan. Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or make any representation in connection with the Plan or the solicitation of

---

[2]   An alphabetical listing of all the Debtors is attached hereto as **Exhibit D**.

acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, or annexes attached hereto. Any such information or representation given or made may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE FACTORS DESCRIBED IN <u>ARTICLE IX</u> HEREOF, THE PLAN ATTACHED AS <u>EXHIBIT A</u> HERETO AND THE PLAN SUPPLEMENT, AS WELL AS TO CONSULT THEIR OWN ADVISORS, BEFORE VOTING ON THE PLAN.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed before the approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, the Debtors will propose to file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' case website located at https://omniagentsolutions.com/PGR no later than seven (7) days before the Objection Deadline (as defined in the Disclosure Statement Order). The Objection Deadline is [January 26, 2026], at 4:00 p.m. (prevailing Central Time).

This Disclosure Statement contains, among other things, descriptions, and summaries of provisions of the Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan. The statements contained in this Disclosure Statement are made as of the date of this Disclosure Statement, and there can be no assurance that they will be correct at any time after this date. The information contained in this Disclosure Statement, including information about the Debtors' history, businesses, operations, financial information, and liquidation analysis, is included for soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any other proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on Holders of Claims against, or Interests in, the Debtors. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors believe that the solicitation of votes on the Plan made in connection with this Disclosure Statement does not require registration under the Securities Act of 1933, as amended (the "***Securities Act***"), and related state statutes.

The effectiveness of the Plan is subject to material conditions precedent. See Article V.H below and Article 9.2 of the Plan. There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtors will be bound by the terms of the Plan and the transactions contemplated thereby, including the Third-Party Release contained therein (including Holders who do not opt out of the Third-Party Release and who: (i) vote to accept the Plan; (ii) abstain from voting on the Plan; (iii) vote to reject the Plan; or (iv) are in a Class presumed to accept or reject the Plan, provided that any such Holder has not timely opted out of the Third-Party Release).

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. Forward-looking statements can often be identified by the use of terminology such as "subject to," "believe," "anticipate," "plan," "expect," "intend," "estimate," "project," "may," "will," "should," "would," "could," "can," the negatives thereof, variations thereon and similar expressions, or by discussions of strategy. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Article IX of this Disclosure Statement. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or thereto or referenced herein or therein, or have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact the Balloting Agent as follows:

**Telephone**:  (747) 263-0193 (international) or +1(888) 812-2572 (U.S./Canada, toll free);

**Email**:  PGRInquiries@OmniAgnt.com with "PGR Solicitation Inquiry" in the subject line;

**Website**:  https://omniagentsolutions.com/PGR.

**Please note that the Balloting Agent <u>cannot</u> provide you with legal or financial advice.**

**You are strongly encouraged to review the terms of the Disclosure Statement and the Plan and to consult your legal and financial advisors regarding your rights.**

**TABLE OF CONTENTS**

<div align="right"><strong>Page</strong></div>

I. INTRODUCTION ...................................................................................................1

    A.      Material Terms of the Plan ...............................................................2
    B.      Filing of the Plan Supplement ........................................................2
    C.      Voting on the Plan ..........................................................................3
    D.      Confirmation Hearing .....................................................................7
    E.      Advisors ..........................................................................................7

II. OVERVIEW OF THE DEBTORS' EXISTING OPERATIONS ..........................8

    A.      Corporate Structure ........................................................................8
    B.      The Company's Business Operations ..............................................9
    C.      The Company's Prepetition Capital Structure ..............................11

III. KEY EVENTS PRECEDING COMMENCEMENT OF THE CHAPTER 11 CASES .........16

    A.      Pre-Filing Challenges ...................................................................16
    B.      Pre-Filing Restructuring Efforts ...................................................17
    C.      Sale Process ..................................................................................20

IV. OVERVIEW OF THE CHAPTER 11 CASES .................................................21

    A.      Commencement of Chapter 11 Cases ...........................................21
    B.      First Day Motions .........................................................................21
    C.      Procedural Motions .......................................................................22
    D.      Retention Applications ..................................................................22
    E.      DIP Financing ...............................................................................23
    F.      Bidding and Sale Procedures ........................................................26
    G.      Investigation .................................................................................28
    H.      Appointment of Creditors' Committee .........................................28
    I.      Schedules and Bar Dates ..............................................................28
    J.      Contract Rejection and Assumption Motions ...............................29
    K.      The BRP WARN Adversary Proceeding .......................................29
    L.      Gallatin Power Partners, LLC Motion for Relief from the Automatic Stay ..........29
    M.     Exclusivity ....................................................................................30

V. SUMMARY OF THE PLAN ..............................................................................30

    A.      Unclassified Claims ......................................................................30
    B.      Post-Confirmation Fees and Expenses .........................................32
    C.      Classified Claims and Interests ....................................................33
    D.      Acceptance or Rejection of the Plan .............................................39
    E.      Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies ....................................39
    F.      Distributions ..................................................................................41

G.     Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests.................................................................................43
H.     Conditions Precedent to Confirmation................................................45
I.     Conditions Precedent to the Effective Date .......................................45
J.     Releases..............................................................................................47

VI. MEANS FOR IMPLEMENTATION .......................................................52

A.     Transaction Effective as of the Effective Date ..................................52
B.     363 Sale Transaction..........................................................................52
C.     General Settlement of Claims and Interests........................................53
D.     Intercreditor Agreements ...................................................................53
E.     No Substantive Consolidation............................................................54
F.     Plan Administrator .............................................................................54
G.     The Plan Administration Assets.........................................................55
H.     Merger of Debtors; Closing Cases of Debtor Affiliates .....................55
I.     Cancellation of Existing Securities and Agreements..........................55
J.     Corporate Action................................................................................56
K.     Exemption from Transfer Taxes and Fees .........................................56
L.     Effectuating Documents; Further Transactions ..................................57
M.     Insurance Policies ..............................................................................57
N.     Preservation of Retained Causes of Action .......................................58
O.     Closing of the Chapter 11 Cases ........................................................58

VII. CONFIRMATION OF THE PLAN .........................................................58

A.     Confirmation Hearing ........................................................................59
B.     Objections to Confirmation of the Plan ..............................................59
C.     Confirmation ......................................................................................60
D.     Classification of Claims and Interests................................................63
E.     Consummation ...................................................................................63
F.     Dissolution of Committee ..................................................................63
G.     Modification of Plan ..........................................................................63
H.     Revocation or Withdrawal of the Plan ...............................................64
I.     Retention of Jurisdiction of the Bankruptcy Court ............................64

VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....................................................................................................66

A.     Continuation of Chapter 11 Cases .....................................................66
B.     Liquidation under Chapter 7 ..............................................................67
C.     Dismissal of Chapter 11 Cases ..........................................................67

IX. FACTORS TO CONSIDER BEFORE VOTING ....................................67

A.     Certain Bankruptcy Law Considerations ...........................................68
B.     Additional Factors..............................................................................71

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN .........................74

    A.      Consequences to Debtors ........................................................................75
    B.      Consequences to Holders of Claims ......................................................78
    C.      Information Reporting and Backup Withholding ..................................82
    D.      Foreign Account Tax Compliance Act ..................................................83

XI. CONCLUSION AND RECOMMENDATION ......................................................84

## EXHIBITS

**EXHIBIT A**          Plan

**EXHIBIT B**          Simplified Organizational Chart

**EXHIBIT C**          Liquidation Analysis

**EXHIBIT D**          Listing of Debtors

# I.
# INTRODUCTION

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' pre-sale businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of Holders of Claims and Interests under the Plan, and (v) other matters necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. Only Holders of Claims in Classes 3(a), 3(b), 3(c), and 4 are entitled to vote on the Plan; Holders of Claims in other Classes and Holders of Interests are not entitled to vote on the Plan (*see* discussion at Article V of this Disclosure Statement).

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all Holders of Claims against the Debtors entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan. This Disclosure Statement is also available to all Holders of Claims against and Interests in the Debtors not eligible to vote on the Plan for informational purposes, including to detail the impact the Plan will have on such Holders' Claims and Interests.

The Debtors commenced these Chapter 11 Cases to complete, under section 363 of the Bankruptcy Code, an already-pending, competitive marketing and sale process for their assets, and then to confirm and implement a chapter 11 plan. That process culminated in [three] agreements for the separate sale of [three key portfolios] of the Debtors' assets (the "***363 Sale Transaction***") pursuant to asset purchase agreements (collectively, the "***Asset Purchase Agreements***") by and among the Debtors, as sellers, and [ ● ], as purchasers (each, a "***Purchaser***"). The Bankruptcy Court entered an order on [ ● ] pursuant to section 363 of the Bankruptcy Code (the "***363 Sale Order***"), approving the 363 Sale Transaction.

The Plan includes certain release, injunctive, and exculpatory provisions detailed in Section V.I below.

This Disclosure Statement sets forth certain information about the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, and material events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation and effectiveness of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

On [ ● ], the Bankruptcy Court entered an order approving, among other things, this Disclosure Statement as containing "adequate information" (the "***Disclosure Statement Order***")— *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment about the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

A.    Material Terms of the Plan

The Debtors intend to close the 363 Sale Transaction promptly after entry of the 363 Sale Order and, in all events, by December 31, 2025 (subject to any extension of the applicable end date under the applicable purchase agreement(s), including for the purpose of obtaining necessary regulatory approvals). Under the 363 Sale Transaction Documentation, the Successful Bidder(s) will acquire the applicable assets free and clear of all Liens and Claims (except for those Liens and Claims expressly assumed), and, if applicable, will deliver the sale proceeds to the Debtors in accordance with the terms of the 363 Sale Transaction Documentation. All assets of the Debtors' Estates that are not sold pursuant to the 363 Sale Transaction Documentation will be administered by the Plan Administrator in accordance with the Plan.

Distributions under the Plan will be made pursuant to the Waterfall Recovery and will be funded from Cash of the Debtors on or after the Effective Date, including the proceeds of any Retained Causes of Action and the proceeds of all non-Cash assets of the Debtors' Estates, after giving effect to the funding of the Professional Fee Escrow Account and the funding of the Wind-Down Reserve. In addition, on the Effective Date, the Plan Administrator will sign the Plan Administration Agreement and will accept the Wind-Down Reserve, the Professional Fee Escrow Account, and the Cash therein, as well as the responsibility for liquidating all non-Cash assets of the Estates, reconciling Claims, and making distributions to creditors in accordance with the Plan.

On the Effective Date, the Debtors will establish and fund the Wind-Down Reserve, which is a condition to the Effective Date under Article 9.2 of the Plan.

Following the Effective Date (or as soon as reasonably practicable thereafter), the Plan Administrator will make initial and subsequent Distributions to Holders of Allowed Claims in accordance with the timing and procedures in Article 7.1 of the Plan, including the establishment and administration of Disputed Claims Reserves under Article 8.4 and the delivery mechanics in Article 8.5. To the extent any Disputed Claims Reserves are over-funded after all related Claims are resolved, the remaining Cash will revert to the Wind-Down Reserve for further administration.

Article V of this Disclosure Statement provides a more detailed description of the Plan.

B.    Filing of the Plan Supplement

The Debtors propose to file the Plan Supplement at least seven (7) days before the deadline to object to confirmation of the Plan. The Debtors will transmit a copy of the Plan Supplement to: (a) the Office of the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*"); (b) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (c) the United States Attorney for the Southern District of Texas; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the state attorneys general for states in which the Debtors conduct business; (g) Holders of Claims entitled to vote on the Plan; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Plan Supplement will include all exhibits and Plan schedules that were not already filed or sent to parties entitled to vote on the Plan in connection with solicitation, as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

C.     Voting on the Plan

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from Holders of Claims against the Debtors, including setting the Voting Deadline, determining which Holders of Claims are eligible to vote on the Plan, and setting other voting procedures.

THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS ARTICLE I.C, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under the Plan and confirmation of the Plan. Although the Plan applies to all of the Debtors, the Plan constitutes distinct chapter 11 plans, one for each Debtor. The grouping of the Debtors in this manner will not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under the Plan, all Debtors will continue to exist as separate legal Entities.

1.     **Parties Entitled to Vote on the Plan**

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes may vote on the Plan (unless, for reasons discussed below, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes which Classes are Impaired and which are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| **3(a).** | **Brookfield Secured Claims** | **Impaired** | **Entitled to Vote** |
| **3(b).** | **Carlyle Secured Claims** | **Impaired** | **Entitled to Vote** |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| **3(c).** | **Fundamental Secured Claims** | **Impaired** | **Entitled to Vote** |
| **4.** | **General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| 5. | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 6. | Subordinated Claims | Impaired | Deemed to Reject |
| 7. | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 8. | Existing Equity Interests | Impaired | Deemed to Reject |

Accordingly, only Holders of record of Claims in Classes 3(a) (Brookfield Secured Claims), 3(b) (Carlyle Secured Claims), 3(c) (Fundamental Secured Claims), and 4 (General Unsecured Claims) (collectively, the "***Voting Classes***") as of [December 18, 2025], the Voting Record Date established by the Debtors for the solicitation of votes on the Plan, are entitled to vote on the Plan. If your Claim is not in one of these Classes, you cannot vote on the Plan, and you will not receive a Ballot with this Disclosure Statement—however, you will still be bound by the Third-Party Release if you do not validly and timely opt out, as explained further herein.  If your Claim is in one of these Classes, you should read your Ballot and follow the voting instructions carefully.  In addition, the Disclosure Statement Order sets forth certain assumptions and procedures for determining the dollar amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.  Please review the Disclosure Statement Order in its entirety before submitting your Ballot and submit only the Ballot that accompanies this Disclosure Statement.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not cast, solicited, or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a chapter 11 plan, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code

or both.  In addition, with respect to Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class that cast ballots for acceptance or rejection of a plan.  Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the holders of claims voting cast their ballots to accept the plan.

<p style="text-align:center">2.      **Parties Not Entitled to Vote on the Plan**</p>

The Debtors are not soliciting votes on the Plan from (a) Holders of Claims in Classes 1 and 2 because, in each case, such parties are conclusively presumed to have accepted the Plan; (b) Holders of Claims and Interests, as applicable, in Classes 6 and 8, because such parties are conclusively deemed to have rejected the Plan; and (c) Holders of Claims and Interests in Classes 5 and 7 because such parties are conclusively presumed to have accepted the Plan or conclusively deemed to have rejected the Plan (Classes 1, 2, 5, 6, 7 and 8, collectively, the "***Non-Voting Classes***").  In lieu of a Solicitation Package, certain of the Non-Voting Classes (Classes 1, 2, 6, and 8) will receive the Notice of Non-Voting Status.  Notwithstanding their non-voting status, Holders of Claims or Interests, as applicable, in such Non-Voting Classes will also receive a Release Opt-Out Form solely for the purpose of opting out of the Third-Party Release.  Because the Intercompany Claims in Class 5 and Intercompany Interests in Class 7 are all held by the Debtors or affiliates of the Debtors, the Debtors, through the Disclosure Statement Order, have obtained a waiver of any requirement to serve the Holders of Claims and Interests in Classes 5 and 7 with Solicitation Packages or any other type of notice, including a Notice of Non-Voting Status, in connection with solicitation.

<p style="text-align:center">3.      **Solicitation Package**</p>

The solicitation materials sent to Holders of Claims entitled to vote on the Plan contains (collectively, the "***Solicitation Package***"):

- a copy of the Confirmation Hearing Notice (the "***Confirmation Hearing Notice***");

- a copy of this Disclosure Statement together with the exhibits hereto, including the Plan;

- a copy of the Disclosure Statement Order in its entered form (without exhibits attached); and

- an appropriate form of Ballot, instructions on how to complete the Ballot, and a prepaid, pre-addressed Ballot return envelope.

In addition, the Plan, this Disclosure Statement, and, when filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Debtors' Balloting Agent at https://omniagentsolutions.com/PGR.  The Debtors will also provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Balloting Agent by email at

<p style="text-align:center">5</p>

PGRInquiries@OmniAgnt.com (with "PGR Solicitation Inquiry" in the subject line) or by phone at (747) 263-0193 (international) or +1(888) 812-2572 (U.S./Canada, toll free).

### 4.    Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot or Ballot(s) has been enclosed in your Solicitation Package for voting on the Plan.  Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

Prior to voting on the Plan, you should carefully review (1) the Plan and the Plan Supplement, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Confirmation Hearing Notice and (5) the detailed instructions accompanying your Ballot(s).

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.  If you (1) hold Claims in more than one voting Class, or (2) hold multiple Claims within one Class, you may receive more than one Ballot.

All Ballots, to be counted, must be properly completed in accordance with the voting instructions on the Ballot, and **actually received** by the Balloting Agent no later than the Voting Deadline (*i.e.*, [January 26, 2026], at 4:00 p.m. (prevailing Central Time)) by the Balloting Agent by one of the following means:

> By Regular Mail, Overnight Courier, or Personal Delivery:
>
> PGR Ballot Processing
> c/o Omni Agent Solutions, Inc.
> 5955 De Soto Avenue, Suite 100
> Woodland Hills, CA 91367
>
> - or -
>
> By Online Submission: https://omniagentsolutions.com/PGR-Ballots.

Detailed instructions for completing and transmitting Ballots are included with the Ballots, provided in the Solicitation Package.

If the Balloting Agent receives more than one timely, properly completed Ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for determining whether sufficient acceptances to confirm the Plan have been received will be the vote recorded on the last timely, properly completed Ballot, as determined by the Balloting Agent, received with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan, the Ballot, or the procedures for voting on the Plan, please contact the Balloting Agent (at the phone numbers or email address listed above).

Before voting on the Plan, each Holder of a Claim in Classes 3(a), 3(b), 3(c), or 4 should read, in their entirety, this Disclosure Statement, the Plan and the Plan Supplement, the Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions accompanying the Ballot. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.  Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own legal, tax and/or financial advisors.

> D.   <u>Confirmation Hearing</u>

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for [**February 2, 2026], at [ ● ] (Central Time)**, before the Honorable Christopher M. Lopez, United States Bankruptcy Judge for the Southern District of Texas, in Courtroom 402 of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002, (or via telephonic or other electronic means, as the Bankruptcy Court may direct).[3]  The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court without further notice except as may be stated in open Court or filed on the docket.  Any objection to Confirmation must (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any claim or interest asserted by the objector against or in the Debtors, and (d) state with particularity the legal and factual bases for the objection.  Any such objections must be filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

> E.   <u>Advisors</u>

The Debtors' bankruptcy counsel are Latham & Watkins LLP ("<u>Latham</u>") and Hunton Andrews Kurth LLP ("<u>HAK</u>").  Their financial advisor is Alvarez & Marsal North America, LLC ("<u>A&M</u>") and their investment banker is Lazard Frères & Co. LLC ("<u>Lazard</u>").  The Debtors' advisors can be contacted at:

| Latham & Watkins LLP | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock, Andrew M. Parlen and, Alexander W. Welch<br><br>Latham & Watkins LLP<br>330 N. Wabash Avenue<br>Suite No. 2800<br>Chicago, IL 60611<br>Attn: Jason B. Gott and Jonathan C. Gordon |
|---|---|

---

[3]   To the extent the Confirmation Hearing occurs virtually, participation instructions will be provided on the agenda filed on the docket prior to the Confirmation Hearing.

| Hunton Andrews Kurth LLP | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, TX 77002<br>Attn: Timothy A. ("Tad") Davidson II, Philip M. Guffy, and Brandon Bell |
|---|---|
| Alvarez & Marsal North America, LLC | Alvarez & Marsal North America, LLC<br>540 West Madison Street, Suite 1800<br>Chicago, IL 60661<br>Attn: Mark Rajcevich and Sean Farrell |
| Lazard Frères & Co. LLC | Lazard Frères & Co. LLC<br>30 Rockefeller Plaza<br>New York, NY 10112<br>Attn: Tyler Cowan and Jennifer Wild |
| Omni Agent Solutions, Inc. | Omni Agent Solutions, Inc.<br>5955 De Soto Avenue, Suite 100<br>Woodland Hills, CA 91367<br>Attn: PGR |

## II.
## OVERVIEW OF THE DEBTORS' EXISTING OPERATIONS

The following is an overview of the Debtors' historic operations, capital structure, and certain other matters. As noted above, upon closing of the 363 Sale Transaction, the Debtors' primary solar project assets and operations will be transferred to the Purchasers, and the remainder of the Debtors' Estates will be wound down and administered in accordance with the Plan.

### A. Corporate Structure

Headquartered in Asheville, North Carolina, Pine Gate is a solar energy company focused on the development, construction, operation, and financing of utility-scale solar farms across the United States. The Company has a complex corporate structure, consisting of a total of 880 entities, but only 119 have filed for chapter 11 protection. To simplify, and as further described herein, the Company's corporate structure generally consists of six main segments: (a) top-level holding companies, including Pine Gate Renewables, LLC, PGR Holdco, LP, and PGR Holdco GP (all of which are Debtors); (b) secondary-level entities that are the borrowers under the Company's prepetition "corporate-level" debt facilities with the Bridge/DIP Lenders (all of which are Debtors); (c) a joint venture with John Hancock that consists of a portfolio of operating projects managed by PGR Signature Fund 1 Manager, LLC (which is a Debtor, but the other entities within the John Hancock portfolio are <u>not</u> Debtors); (d) project-level entities, including their intermediate holding companies and related affiliates (the project-level entities are generally <u>not</u> Debtors subject to certain exceptions); (e) the Company's EPC (engineering, procurement, and construction) subsidiary, Blue Ridge Power, LLC ("***BRP***," and together with its Debtor EPC affiliates, "***Blue Ridge Power***") and its subsidiaries (all of which are Debtors); and

8

(f) the Company's O&M (operations and maintenance) subsidiary, ACT Power Services, LLC ("**ACT**") and its related holding companies and subsidiaries (which are <u>not</u> Debtors).  A more detailed corporate organizational chart illustrating the Debtors and certain Non-Debtor Affiliates is attached hereto as **Exhibit B**.  A simplified version of the chart can be found below:



B.      The Company's Business Operations

1.      **The Company's Business Segments**

Pine Gate's business consists of a full suite of capabilities through the renewable energy life cycle, including development, EPC services (construction), offtake (power sales), and O&M services (operations and maintenance).  As described further below, depending on the life cycle of the project, the Company's projects are either in the development stage, under construction, or operational.  The majority of the projects serve as collateral for certain debt obligations owed by the Company across three different "silos" of the Company's "corporate-level" lenders: Fundamental Renewables ("**Fundamental**"), Brookfield Asset Management ("**Brookfield**"), and The Carlyle Group ("**Carlyle**" and together with Fundamental and Brookfield, the "**Corporate Lenders**").  Each project in a Corporate Lender's silo is pledged, either directly or indirectly, as collateral to that Corporate Lender.  In addition to those three silos of projects (totaling 162 projects), the Company has a minority, subordinated interest in a joint venture with John Hancock consisting of 85 projects.  Last, the Company has a recourse construction loan with Pathward, National Association ("**Pathward**") regarding one project.  A summary of the Company's projects is as follows:

| | Development | Construction | Operating | Total |
|---|---|---|---|---|
| **Fundamental** | 128 | 2 | 1 | 131 |

| | Development | Construction | Operating | Total |
|---|---|---|---|---|
| **Brookfield** | 3 | 4 | 15 | 22 |
| **Carlyle** | 2 | 1 | 6 | 9 |
| **John Hancock** | 0 | 0 | 85 | 85 |
| **Pathward** | 0 | 1 | 0 | 1 |
| **Total** | **133** | **8** | **107** | **248** |

Development.  The first phase of a project's life cycle is development.  In developing a project, the Company identifies suitable land, conducts in-depth analyses, and obtains land rights, permits, and contractual arrangements to construct, finance, operate, and sell power generated by the project.  As set out more fully in the Shem Declaration, in connection with the development stage, the Company engages various contractors and vendors to, among other things, support the land leasing and entitlement process, conduct engineering studies, and perform environmental due diligence.  The Company will also strategically acquire projects in various stages of development to add to the Company's portfolio.

During the development stage, the Company enters into PPAs with utility companies, private companies, and/or government entities.  The PPAs govern the terms of the sale of the Company's power to the PPA counterparty, including the price and duration of such sale.  Though energy is not yet sold as the project is under development, entry into a PPA is a key part of the project transitioning from development to construction and, ultimately, operations.  In connection with project operations and the sale of power generated, the Company also enters into interconnection agreements to connect the project facility to the electrical grid.

EPC Services (Construction).  After the initial development stage, a project enters the "EPC" phase for construction.  For construction services, the Company historically would contract with either Blue Ridge Power or a third-party EPC contractor.  Payments for EPC Services are generally made periodically by the project owners upon achievement of certain construction milestones.  Importantly, and as further described herein, Blue Ridge Power encountered severe financial difficulties and ceased operations before the Petition Date.

Sale or Offtake.  Once a project is constructed, the project commences regular operations within PGR's fleet, generating revenue from the PPA associated with such project, paying project-level operating expenses such as O&M and project insurance costs, and servicing project-level permanent debt and tax equity.  From time to time, the Company may sell a project, or an interest in a project, to a third-party operator with sale proceeds being used by the Company for further development and operations.  During 2024, the Company earned (i) $155 million in revenue from the sale of power, and (ii) approximately $400,000 in revenue from project sales.

O&M Services.  The Company engages an O&M provider—in most instances, ACT—to operate and maintain its operational projects.  O&M services include real-time system monitoring

(tracking metrics such as panel efficiency, grid load, and system irregularities), infrastructure maintenance, technical inspections, routine cleaning, and rapid response to potential issues.

2.     **The Debtors' Employees**

As of the Petition Date, the Debtors employ approximately 284 employees, all in the United States. To supplement the services performed and duties executed by the employees, the Debtors currently have approximately twenty-four (24) engagements with contract workers and temporary staff that fulfill duties similar to the job functions of employees and are a critical supplement to the employees.

C.     <u>The Company's Prepetition Capital Structure</u>

1.     **Overview of the Funded Capital**

An overview of the Company's funded capital as of the Petition Date is set forth below, with more detailed descriptions thereafter.

| Facility | Approx. Invested Capital / Outstanding Principal (US$ Millions) | Interest Rate | Maturity |
|---|---|---|---|
| Tax Equity | $2,500 | N/A | N/A |
| Permanent Debt | $1,262 | Various | Various |
| Construction Debt | $760 | Various | Various |
| **Total Project Capital** | **$4,522** | | |
| *Fundamental Facility* ($600 million facility) | $599 | Various | December 2026 |
| *Fundamental Interim Financing* ($110 million facility) | $110 | 14.00% | January 2026 |
| *Carlyle Facility* ($280 million facility) | $244 | 10.75% | February 2026 |
| *Carlyle Interim Financing* ($30 million facility) | $30 | 14.00% | February 2026 |
| *Brookfield Facility* ($300 million facility) | $300 | 11.25% | January 2032 |
| *Brookfield Interim Financing* ($68 million facility) | $28 | 14.00% | February 2026 |
| *Pathward Facility* ($80 million facility) | $49 | 8.50% | February 2026 |
| **Total Corporate Debt** | **$1,360** | | |
| Preferred Equity A | $494 | 8.00% | N/A |
| Preferred Equity B | $605 | 12.00% | N/A |
| **Total Preferred Equity** | **$1,099** | | |

| Total PGR Capital | $6,981 | | |
|---|---|---|---|
| Fundamental Revolving Loan | $135 | S + 550 | March 2027 |
| WTB Term Loan | $19 | 5.0% | May 2035 |
| **Total Blue Ridge Power Capital** | **$155** | | |
| **Total Funded Capital** | **$7,136** | | |

2. **Corporate Financing**

The Company (through its in-house finance team) sources financing for each stage of a project, including through "corporate-level" debt facilities from the Corporate Lenders. Each of the corporate-level debt facilities had separate collateral and obligors, as further explained below, and, following the Debtors' Bridge Financing (as defined below), each was also guaranteed on a first lien *pari passu* basis by certain Debtor holding companies.

Fundamental Prepetition Facility. Debtors FP 2021 Dev Holdco LLC, as borrower (the "***FP Dev Borrower***") is party to that certain Revolving Loan Agreement, dated as of December 10, 2021 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Development Fundamental Loan Agreement***"), with FP Solar Development I LLC, as lender (the "***FP Dev Lender***"). This facility generally funds the Debtors' development activities and projects. Obligations under the Development Fundamental Loan Agreement are guaranteed by approximately 130 Debtor entities that are direct subsidiaries of FP Dev Borrower, each of which owns a specific project in development. FP Dev Borrower has also pledged substantially all of its assets as collateral to FP Dev Lender. As of the Petition Date, the Company had approximately $741.2 million of loans outstanding under the Development Fundamental Loan Agreement (the "***FP Dev Facility***").

Brookfield Prepetition Facility. Debtor BF DEV Holdco, LLC is party to that certain Credit Agreement, dated as of January 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Brookfield Loan Agreement***") with various lenders party thereto (collectively, the "***Brookfield Lenders***"). Obligations under the Brookfield Loan Agreement are secured by (a) first priority equity pledges in and substantially all the assets of certain subsidiaries that are indirect owners of nineteen operating (or near completion) solar projects (the "***Brookfield Operating Projects***"), (b) all assets of three Debtor project companies (Magnolia Solar Development, LLC, Lotus Solar, LLC, and GA Solar 5, LLC) that are in development, (c) to the extent certain conditions are satisfied under the Collateral Documents (as defined in the Brookfield Loan Agreement), substantially all assets of the Brookfield Operating Projects on a second priority basis, and (d) equity pledges in and substantially all the assets of certain subsidiaries that are indirect owners of certain project companies referenced above and below, in each case on a second priority basis. As of the Petition Date, the Company had approximately $417.3 million of loans outstanding under the Brookfield Loan Agreement (the "***Brookfield Facility***").

Carlyle Prepetition Facility. Debtor NPA 2023 Holdco, LLC (the "***Carlyle Borrower***") is party to that Note Purchasing Agreement, dated as of October 10, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Carlyle NPA***"), with Carlyle Aurora Infrastructure Credit Partners LP as lender (the "***Carlyle Lender***").

Obligations under the Carlyle NPA are secured by (a) equity pledges in certain subsidiaries that are indirect owners of seven operating (or near completion) solar projects and (b) all assets of two Debtor project companies (Lavender Solar, LLC and Foley Solar, LLC) that are in development. As of the Petition Date, the Company had approximately $322.2 million of notes outstanding under the Carlyle NPA (the "***Carlyle Facility***").

### 3. Project Financing

As projects reach the final stages of development and approach the construction phase, the Debtors generally "take out" the project from the FP Dev Facility, which requires a paydown and results in the project company being released from its guarantee and pledge obligations to the FP Dev Lender. The financing in respect of the project from the FP Dev Facility is then replaced by (i) tax equity investments, (ii) sponsor equity contributions, and (iii) new, limited recourse senior debt (construction period debt and permanent debt).

Limited Recourse Construction Period Debt. Limited recourse construction period debt is used to finance the construction of a project; it does not include any claims of contractors or vendors that may be asserted at the project level either informally or pursuant to a mechanic's lien or similar security. The Company collectively has approximately $760 million of construction period debt outstanding across its current project portfolio, governed under a variety of project-level credit agreements with a variety of project-level lenders. The construction period debt is generally secured by the assets of the applicable project and the commitments from the tax equity investors to invest in the applicable project.

Recourse Construction Debt (Pathward). In addition, Debtor PW Revolver Borrower, LLC (the "***Pathward Borrower***") is party to that Loan Agreement, dated as of February 6, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Pathward Loan Agreement***"), with Pathward, National Association (the "***Pathward Lender***") for recourse construction debt with respect to (and secured by) Debtor project company West River Solar, LLC. Debtor PGR guarantees the obligations on an unsecured basis. As of the Petition Date, the Company had approximately $49 million outstanding under the Pathward Loan Agreement (the "***Pathward Facility***").

Permanent Debt. Once a project is built and ready to operate and the tax equity investor funds its commitment to the project, the construction period debt is paid down in part with the proceeds of the tax equity investment, and the balance is replaced by permanent debt. The Company collectively has approximately $1.3 billion of permanent debt outstanding across its current project portfolio, governed under a variety of project-level credit agreements with a variety of project-level lenders. The permanent debt is generally secured by the assets of the applicable project, but in some cases is only secured by the Company's equity in the project.

Tax Equity. Tax equity financing involves investors providing capital to a solar project in exchange for the right to be allocated clean energy tax credits associated with the applicable project. The Company generally only raises tax equity once a project enters the construction stage, after development. The Company has collectively raised approximately $2.5 billion of tax equity across its current project portfolio.

<u>Sponsor Equity</u>.  In addition to the foregoing debt and equity financing, the Company is also often required to make an equity investment in the project, which the Company funds through either corporate cash or proceeds under the Brookfield Facility or Carlyle Facility.

<u>Project Financing Legal Structure</u>.  To facilitate such tax equity, construction period debt, and permanent debt, additional legal entities are formed in relation to the applicable project in either (i) an inverted lease structure whereby the project is leased to an entity owned in part by a tax investor and the tax credits are passed through to the lessee under applicable Federal tax rules (the "***Inverted Lease Structure***") or (ii) a partnership flip structure whereby the project is acquired by a partnership between the tax investor and a Debtor and the tax credits are allocated to the tax investor under applicable Federal tax rules (the "***Partnership Flip Structure***").  Nine (9) of the Debtors' tax equity investments are Partnership Flip Structures, and 106 of the Debtors' tax equity investments are Inverted Lease Structures.

Below is an illustrative example of an Inverted Lease Structure within the Brookfield and Carlyle portfolios, although the "Debtor" designations shown below are not universally true of all the Company's Inverted Lease Structures:



Below is an illustrative example of a Partnership Flip Structure:



At a basic level, the purpose of these structures is to allocate the economic benefits between the tax equity investor, senior project lender, and the Debtors in the desired way while giving the tax equity investor protection against a transfer of its project in a manner that would create a risk of tax credit "recapture"—i.e., mandatory repayment of previously-claimed tax credits. To this end, as equity owners of the projects, tax equity investors generally do not permit senior debt to encumber projects they have invested in unless the debt is subject to a forbearance agreement that prevents tax credit recapture, does not permit transfer of the projects, and reserves the right of the investor to consent to a bankruptcy filing by the entities in which they have invested.

### 4. BRP Financing

BRP Fundamental Facility. Debtor BRP is party to that Amended and Restated Loan Agreement, dated as of June 26, 2025 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***BRP Fundamental Loan Agreement***"), with Solar Construction Lending, LLC (the "***BRP Fundamental Lender***"). The BRP Fundamental Loan Agreement provides BRP with funding in connection with its EPC services. Obligations under the BRP Fundamental Loan Agreement are generally secured by all assets of the Company's BRP business and are guaranteed by PGR. As of the Petition Date, the Company had approximately $135 million outstanding under the BRP Fundamental Loan Agreement, which includes a $35 million note issued in June 2025 (after the BRP Fundamental Lender agreed to increase the amount of the previously lent $100 million note).

BRP WTB Facility.  Debtor BRP Construction, Inc. (the "***BRP WTB Borrower***") is party to that Loan Agreement, dated as of May 12, 2021 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***BRP WTB Loan Agreement***"), with West Town Bank & Trust.  The proceeds from the BRP WTB Loan Agreement provided the BRP WTB Borrower with funding in connection with the acquisition of Horne Brothers Construction in 2021.  Obligations under the BRP WTB Loan Agreement are generally secured by substantially all assets of the BRP WTB Borrower.  As of the Petition Date, the Company has approximately $19 million outstanding under the BRP WTB Loan Agreement.

### 5.  Surety Bonds and General Indemnification Agreements

In the ordinary course of business, the Company maintains surety bonds in favor of certain third parties to ensure the Company's payment or performance of certain obligations in connection with its projects, including, most notably, bonds related to the payment and performance of Blue Ridge's EPC obligations and services and certain equity contribution bonds relating to the Company's "Polaris B" portfolio.  In addition, to support the issuance of those bonds, certain Blue Ridge Power sureties have indemnification agreements with certain other Debtors and Non-Debtor Affiliates that purport to provide, in some cases, security interests and other rights in favor of such surety.

### 6.  Equity Interests

Debtor PGR is directly owned and managed by PGR Holdco, LP (the "***Partnership***"), which in turn is managed by PGR Holdco GP, LLC (the "***General Partner***").  All common equity of the Partnership is owned indirectly by Ben Catt, Chris Dunbar, James Luster, and Raymond Shem, through PGR Partners, LLC (the "***PGR Member***").  The preferred equity of the Partnership (Class A and Class B) is held by (i) GC PGR HoldCo Member, LLC and GC PGR HoldCo, LLC (the "***Generate Members***"), each an affiliate of Generate Capital (which purchased its equity through one or both of the Generate Members in 2022, 2023, and 2024) and (ii) Healthcare of Ontario Pension Plan Trust Fund (the "***HOOPP Member***") (which purchased its equity in 2024).  The Class A preferred equity is convertible and accrues interest at 8%; the Class B preferred equity is non-convertible and accrues interest at 12%.  Incentive units are held by Pine Gate Management Holdings, LLC, a special purpose vehicle organized to manage incentive units for key management of the Company.

### III.
### KEY EVENTS PRECEDING COMMENCEMENT OF THE CHAPTER 11 CASES

The need to commence these Chapter 11 Cases resulted from a number of factors, including financial challenges with the Company's EPC business (*i.e.*, Blue Ridge Power), unfavorable trends in the renewable energy industry and the broader economy, and inadequate liquidity.

### A.  Pre-Filing Challenges

EPC Challenges.  Blue Ridge Power, while created to generate additional revenues by bringing construction services in-house, has faced significant financial challenges and has not performed as expected, leading to substantial financial losses.  Blue Ridge Power's struggles have been a further drain on the Company's overall liquidity, as the Company has had to allocate more funds than

projected to support continued delays and cost overruns on the Company's projects constructed by Blue Ridge Power. As of the Petition Date, Blue Ridge Power has approximately $224 million in accounts payable and liabilities.

Unfavorable Industry and Economic Trends. Pine Gate's financial difficulties have been further compounded by unfavorable industry trends and broader economic factors. With respect to the renewable energy industry, legislative and regulatory challenges have significantly slowed solar power development. In particular, the recently passed "One Big Beautiful Bill" expedited the elimination of the federal investment tax credit for solar projects while also placing extensive new sourcing requirements on projects that utilize the credit during its remaining years. Additionally, steep tariffs have been imposed on virtually all imported materials necessary to construct utility-scale solar projects. This includes solar modules, the most significant capital cost associated with constructing a solar project, but extends to other materials as well, including inverters, racking, and structural steel. In addition, continued inflation has led to increased costs in project development and construction.

These market factors and associated uncertainty for the industry over the medium-term have also substantially cooled interest in investing in or acquiring solar projects, which both (a) reduces the ability for the Company to access liquidity by selling projects and (b) reduces the value of those assets. As a result, while the Company's costs have been rising, it has been unable to charge more for projects or even successfully access their value by selling them once completed. The confluence of these forces has put extreme pressure on Pine Gate's liquidity and overall financial position.

Insufficient Liquidity. The financial strain based on the losses at Blue Ridge Power, along with the unfavorable trends in the renewable energy industry and broader economy, put Pine Gate in a precarious liquidity position with no runway outside of these Chapter 11 Cases and the Debtors' proposed DIP financing. Immediately prior to the Bridge Financing, the Debtors had only approximately $8.5 million of cash on hand, of which only approximately $2 million was unrestricted.

## B. Pre-Filing Restructuring Efforts

Despite its many challenges, the Company's board of managers (the "***Board***") and management remained committed to finding a value-maximizing solution for the benefit of all stakeholders. Leading up these Chapter 11 Cases, the Company's management, advisors, Board, and Special Committee (as defined below) met frequently to discuss and explore all available options for the Company to address its financial challenges and maximize value, including out-of-court alternatives and in-court processes.

Prior Alternative Transaction Efforts. Throughout 2024 and early 2025, the Company (through its Board, management, and then-existing advisors) pursued a range of strategic alternatives in an effort to address the Company's financial circumstances. For example:

- In the first quarter of 2024, the Company launched a process to sell seven of the Company's assets known as Magenta, Long Bridge, Salt, Richardson, Coxton Lake, Promise, and Pearl. As part of that process, the Company reached out to

approximately 130 potential investors.  That process lasted approximately six months and did not result in any actionable proposal.

- In the second quarter of 2024, the Company engaged a third-party investment banking firm (the "***Prior Banker***") to run an auction process to sell 49% of materially all of the Company's operating assets, excluding those included in the John Hancock joint venture.  As part of that process, the Prior Banker reached out to approximately fifty (50) potential investors.  That process lasted approximately nine months and did not result in any actionable proposal.

- In the third quarter of 2024, the Company launched a sale process to sell 100% of the Company's asset known as Sunstone.  As part of that process, the Company reached out to approximately 10 potential investors.  That process lasted approximately six months and did not result in any actionable proposal.

- In the fourth quarter of 2024, the Company and the Prior Banker launched an auction process to sell 100% of five of the Company's assets known as Porter, Cane Creek, Moonshot, Sonny, and Bulldog, with additional projects evaluated by potential bidders along the way.  As part of that process, the Company and the Prior Banker reached out to approximately 77 potential investors.  That process lasted approximately 12 months and did not result in any actionable proposal.

- Also in the fourth quarter of 2024, the Company signed a letter of intent with NextEnergy Capital to sell two of the Company's projects known as Landrace and Phobos.  That process lasted approximately six months and did not result in any actionable proposal.

- In the first quarter of 2025, the Company launched a project-level preferred equity capital raise process.  As part of that process, the Company reached out to approximately twenty-two (22) potential investors.  That process lasted approximately six months and did not result in any actionable proposal.

- In June 2025, the Company, together with its preferred equity shareholder Generate Capital, launched several project specific transaction processes with three potential counterparties for a variety of the Company's assets.  To date, those processes have not resulted in actionable proposals.

Preferred Investors' Forbearance.  On April 7, 2025, the Company did not make an approximately $9 million preferred coupon payment owed to the Generate Members and the HOOPP Member under the partnership agreement for the Partnership.  The partnership agreement provided a four-month cure period that expired on August 7, 2025.  Failure to make the coupon payment by such date arguably would have resulted in a mandatory redemption event under the partnership agreement, with other consequences to the Company flowing from that event.

With the assistance of their advisors, the Company negotiated and entered into a forbearance agreement with the Generate Members and the HOOPP Member on August 7, 2025 (the "***August Forbearance***"), providing a two-week forbearance period until August 21, 2025, to allow the

Company time to continue progress towards a longer-term financial solution. The Generate Members and the HOOPP Member granted various extensions of the August Forbearance, ultimately extending the August Forbearance to October 17, 2025. On October 17, 2025, the Debtors entered into a second forbearance agreement with the Generate Members and the HOOPP Member, which (among other things) extended the forbearance period through the earlier of (among other things) November 30, 2025, and the bar date for filing proofs of claim in the Chapter 11 Cases.

Blue Ridge Power Winddown. In September 2025, the Company began an orderly winddown of Blue Ridge Power in light of its struggles. At its projects for third-party owners, Blue Ridge Power began to focus primarily on "health, safety, security, and environment" (HSSE) services while transitioning those projects back to the owners or other third parties to complete the outstanding construction. Blue Ridge Power also implemented a reduction in force on October 17, 2025, reducing its workforce from over 500 employees to fifty-one (51) employees. Blue Ridge Power is continuing to progress the operational and administrative aspects of the winddown, including office closures and data retention plans, and before the Petition Date had demobilized from all of its project sites.

Continued Sale and Financing Efforts. At the time of Lazard's engagement in late June 2025, there was significant market and political-related uncertainty around the renewables industry, particularly given the then-expected, but not yet passed, "One Big Beautiful Bill" (which was ultimately signed on July 4, 2025). After it was passed, the uncertainty was exacerbated by the issuance of the Executive Order directing the Secretary of Treasury to revise, within 45 days, certain guidance regarding the "Beginning of Construction" that has historically been used by the solar industry to determine tax credit eligibility.

Against this backdrop of uncertainty, the Company engaged Lazard to run a process to sell all or a majority of the equity in the Company (excluding the John Hancock joint venture and BRP). As Lazard prepared for a broader process, Lazard prescreened the investment opportunity with ten potential buyers in early July 2025. Though several parties cited the Company's capital structure complexity and total quantum of preferred equity, equity bridge loans, and overall leverage as reasons to not participate in a transaction, eight parties engaged in robust and exhaustive diligence to assess an acquisition of the Company and a portion have continued to do so through the commencement of a broader marketing launch (described below) and these Chapter 11 Cases.

In late August 2025, the Company and its advisors began engaging with the Corporate Lenders as well as third parties with respect to potential financing. As part of the third-party financing process, Lazard reached out to over thirty (30) parties, approximately twenty (20) of which signed NDAs for the purpose of engaging in further diligence.

The Company eventually received two third-party postpetition financing proposals, neither of which was actionable. The financing amount in both proposals was significantly less than the Company's funding need. Despite the Company's and its advisors' best efforts to encourage the third parties to increase the quantum of their proposed financing amounts, they were not willing to do so. Ultimately, one of the potential lenders withdrew its proposal due to its inability to meet the Company's requested funding needs. In addition to the remaining proposal being materially less than the Company's funding need, it also required liens that were senior to the Corporate

19

Lenders on substantially *all* assets (including priming liens on substantially all of the development assets) and contained conditions precedent to delayed draws that created material risks to the Company's ability to access the majority of the proposed financing commitment.

Among the Debtors' efforts to raise additional capital, they evaluated and negotiated several term sheets with the Generate Members, structured around potential financing, sale, and recapitalization transactions, however the parties determined that such transactions were not ultimately actionable.

Bridge Financing.  Simultaneously with their outreach to third parties, the Debtors engaged in discussions with Fundamental, Brookfield, and Carlyle (the Debtors' three Corporate Lenders) in an effort to obtain bridge financing that would provide the Debtors with additional liquidity and more runway to prepare for these Chapter 11 Cases in a more orderly, value-maximizing manner. These discussions began in earnest in early September 2025 and—after a month of hard-fought, arm's-length negotiations—ultimately resulted in the three lenders providing $412 million of total financing commitments to the Company, consisting of approximately $208 million in out-of-court financing (the "***Bridge Financing***") and approximately $204 million in additional DIP financing commitments (plus amounts not lent in the Bridge Financing) (the "***DIP Commitments***").  The lenders also each agreed to serve as stalking horse bidder (each, a "***Stalking Horse Bidder***") for the purchase (through credit bids) of their respective projects' collateral.

The Bridge Financing closed on October 6, 2025.  In connection with the Bridge Financing and DIP Commitments, the three lenders received guarantees and liens from (a) previously unencumbered entities that sat above the Bridge/DIP Lenders' borrowers in the Company's corporate structure and (b) previously unencumbered entities that sat between the Bridge/DIP Lenders' borrowers and the solar power projects.

The Company's Board, its independent Special Committee (as defined below), its management, and its advisors unanimously believed that the Bridge/DIP Lenders' proposal presented the best and most value-maximizing path available to the Company under the circumstances and justified the granting of new liens and guarantees.  Without the financing under Bridge/DIP Lenders' proposal, the Company would have had to either file chapter 7 or file an insufficiently funded chapter 11 process with the attendant risk of conversion to chapter 7.

Among other things, the proposal provided the Company with sufficient and committed liquidity to preserve asset value as it pursues a sale process through an orderly chapter 11 case.  The Bridge Financing permitted the Company (i) to continue chapter 11 preparations (including the negotiation and documentation of DIP financing documents and stalking horse purchase agreements) and (ii) to solicit certain related consents from its tax equity providers, project lenders, and PPA and interconnection agreement counterparties, to minimize any potential disruptions that may result at Non-Debtor Affiliates from the Chapter 11 Cases.

C.    Sale Process

Alongside its efforts to raise supporting financing, the Company launched a broad-based marketing process to sell its primary valuable project portfolios, as such or individually at a project level, as well as to seek interest from prospective purchasers of the Company's entire business platform.  Specifically, in mid-September 2025, the Company and Lazard conducted outreach to

potential strategic and financial buyers they believed might be interested in potentially purchasing the Debtors' assets. During this process, Lazard has interacted with approximately 270 parties. In connection with this solicitation, Lazard, with assistance from the Debtors and the Debtors' other advisors, prepared, among other things, a confidential information memorandum, a detailed financial model and an electronic data room for prospective bidders that executed confidentiality agreements. In total, approximately 170 parties have executed NDAs and received access to confidential information, and as of November 10, 2025, twenty-three (23) preliminary indications of interest had been submitted.

# IV.
# OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

On November 6, 2025 (the "***Petition Date***"), the Debtors commenced filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

### B.    First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course (the "***First Day Motions***"). The relief sought in the First Day Motions was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth going-concern sale through the chapter 11 process, and minimizing disruptions to the Debtors' businesses. The Bankruptcy Court entered various orders authorizing the relief requested in the First Day Motions, including, among other things, authorizing the Debtors to:

- Jointly administer the Chapter 11 Cases [Docket No. 33];

- Retain Omni Agent Solutions, Inc as claims and noticing agent [Docket No. 37];

- File a consolidated list of creditors and modify certain notice and identification requirements [Docket No. 117];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 119];

- Pay certain prepetition claims of Critical Project Vendors [Docket No. 120];

- Establish notification procedures and place restrictions on certain transfers of interests in the Debtors, and claims of certain worthlessness deductions [Docket No. 121];

- Continue paying prepetition workforce obligations and certain related claims [Docket No. 122];

- Continue insurance policies and insurance programs [Docket No. 123];

- Pay certain prepetition taxes and fees [Docket No. 124]; and

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 125].

C.    Procedural Motions

Since the commencement of these Chapter 11 Cases, the Debtors have also filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity including, without limitation, a motion extending the period time of time to file the Schedules and Statements [Docket No. 116], a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals [Docket No. 232], a motion for entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business [Docket No. [ ● ]], and a motion for entry of an order establishing bar dates for the filing of Proofs of Claim related to certain prepetition Claims [Docket No. [ ● ]].

D.    Retention Applications

The Debtors have filed various applications (and one motion) regarding the retention of professionals during these Chapter 11 Cases, as is common in chapter 11 cases of similar size and complexity, including, without limitation:

- An emergency motion for entry of an order retaining Omni Agent Solutions, Inc. as claims, noticing, and solicitation agent [Docket No. 3], which the Bankruptcy Court approved on November 7, 2025 [Docket No. 37];

- An application for entry of an order authorizing the retention of Latham & Watkins LLP as bankruptcy counsel [Docket No. 228], which the Bankruptcy Court approved on [ ● ] [Docket No. [ ● ]];

- An application for entry of an order authorizing the retention of Hunton Andrews Kurth LLP as bankruptcy co-counsel [Docket No. 229], which the Bankruptcy Court approved on [ ● ] [Docket No. [ ● ]];

- An application for entry of an order authorizing the retention of Alvarez & Marsal North America, LLC as financial and restructuring advisor [Docket No. 230], which the Bankruptcy Court approved on [ ● ] [Docket No. [ ● ]]; and

- An application for entry of an order authorizing the retention of Lazard Frères & Co. LLC as investment banker [Docket No. 231], which the Bankruptcy Court approved on [ ● ] [Docket No. [ ● ]].

E.    DIP Financing[4]

Pursuant to the Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief (the "**DIP Motion**") [Docket No. 46], filed on November 7, 2025, the Debtors sought authority to obtain debtor-in-possession financing through three superpriority senior secured, multi-draw, delayed-draw facilities (collectively, the "**DIP Financing**").

On November 11, 2025, the Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "***Interim DIP Order***") [Docket No. 132], which authorized the Debtors, on an interim basis and subject to the terms of the Interim DIP Order and the DIP Documents (each as defined therein), to obtain DIP Financing through: (a) a term-loan facility under that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement (the "**Brookfield DIP Credit Agreement**"), in an aggregate principal amount of up to $551,507,371.92, consisting of up to $134,084,563.51 in new-money term loans (including up to $17,500,000 available on an interim basis, plus certain additional Subsequent Draws during the Interim Period as provided in the Interim DIP Order) and roll-up loans comprised of $250,266,570.24 authorized and deemed incurred on an interim basis and $167,156,238.18 subject to entry of a final order; substantially in the form attached to the Interim DIP Order as **Exhibit A**; (b) a notes facility under that certain Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement (the "**Carlyle DIP Note Purchase Agreement**"), in an aggregate principal amount of up to $373,965,652.75, consisting of up to $51,722,511.23 in new-money notes (including up to $16,559,056.06 available on an interim basis, plus certain additional Subsequent Draws during the Interim Period as provided in the Interim DIP Order) and roll-up notes comprised of $142,697,722.12 authorized and deemed incurred on an interim basis and $179,545,419.39 subject to entry of a final order; substantially in the form attached to the Interim DIP Order as **Exhibit B**; and (c) a term-loan facility under that certain Senior Secured Superpriority Debtor-in-Possession Loan Agreement (the "**Fundamental DIP Credit Agreement**"), consisting of up to $64,633,622.97 in new-money term loans (including up to $21,304,328.11 available on an interim basis, plus certain additional Subsequent Draws during the Interim Period as provided in the Interim DIP Order) and roll-up loans comprised of $360,831,678.46 authorized and deemed incurred on an interim basis and $305,292,913.55 subject to entry of a final order; substantially in the form attached to the Interim DIP Order as **Exhibit C** (the Brookfield DIP Credit Agreement, Carlyle DIP Note Purchase Agreement, and Fundamental DIP Credit Agreement, collectively, the "**DIP Documents**").  During the Interim Period, the Interim DIP Order authorizes the Debtors to borrow up to an aggregate $55,363,384.17 in new-money across the three facilities (plus Subsequent Draws for project-level expenditures as provided in the Interim DIP Order) and deems incurred on a cashless, dollar-for-dollar basis $753,795,970.82 of interim roll-up obligations, all in accordance

---

[4]    Capitalized terms used but not defined herein will have the meaning ascribed to them in the DIP Motion, Interim DIP Order, Final DIP Order, or the DIP Documents, as applicable.

with the priorities, budgets, and other terms set forth in the Interim DIP Order and the DIP Documents.

On [ ● ], the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**Final DIP Order**") [Docket No. [ ● ]].

Pursuant to the DIP Documents, the Debtors are obligated to comply with certain milestones, as follows:

| DIP Lender(s) | Requirement | Due Date |
|---|---|---|
| **Carlyle Fundamental** | Provide summaries of IOIs and LOIs received:<br>(a) to Carlyle, for the Carlyle Sale Transaction, any sale of ACT, or any sale of all or substantially all of the Debtors' assets or businesses;[5] and<br>(b) to Fundamental, for the Fundamental Sale Transaction[6] | November 19, 2025 |
| **Brookfield** | Provide Brookfield Administrative Agent with summaries of IOIs and LOIs for Brookfield Sale[7] | November 20, 2025 |
| **Brookfield** | • Establish a Transition Team responsible for facilitating the transition under the Brookfield APA;<br>• Hold Knowledge Transfer Sessions[8] with representatives of Brookfield; and<br>• Delivery of Major Project Documents Package and current contact matrices[9] | November 21, 2025 |
| **Brookfield** | • Development of Transition Work Plan encompassing functions and relevant information;<br>• Provide Buyer with Transition Work Plan encompassing functions and relevant information;<br>• Delivery of lists of all systems, licenses, permits, necessary operational and financial reports; and<br>• Delivery of Reconciled REC Ledger to Lenders[10] | December 2, 2025 |

---

[5]   *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Asset Sale Milestones" ¶ (e).

[6]   *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Asset Sale Milestones" ¶ (h).

[7]   *See* Brookfield Credit Agreement, "Certain Milestones," § 5.17(h).

[8]   "Knowledge Transfer Sessions" to relate to each of the core functional areas, including (i) portfolio overview; (ii) per-Project technical deep-dives; (iii) O&M processes; (iv) asset management and commercial processes; (v) REC Operations; (vi) incident response; (vii) change control; and (viii) any other material program (including HSSE at Site) and NERC-CIP related processes as applicable.

[9]   *See* Brookfield Credit Agreement, Schedule 5.17, "Transition Milestones" ¶ 1.

[10]  *See* Brookfield Credit Agreement, Schedule 5.17, "Transition Milestones" ¶ 2.

| Brookfield Carlyle Fundamental | Entry of the Final DIP Order[11] | December 8, 2025 |
|---|---|---|
| Brookfield | Entry into a TSA by the applicable Debtors for the benefit of NewCo (an entity formed by NewCo) and Brookfield Silo Entities[12] | December 12, 2025 |
| Brookfield | Execution of Functional Cutover Test for each Project or, where a test window is not reasonably available, execution of an approved simulation/test-mode procedures evidencing command and data path control.[13] | December 12, 2025 |
| Brookfield Carlyle Fundamental | Deadline for Parties to Submit Binding Bids[14] | December 15, 2025 |
| Brookfield Carlyle Fundamental | Commencement of Auction[15] | December 17, 2025 |
| Brookfield Carlyle Fundamental | Entry of 363 Sale Order[16] | December 23, 2025 |
| Brookfield Carlyle Fundamental | Consummation of 363 Sale Transaction[17] | December 31, 2025[18] |

---

[11] *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "DIP Milestones" ¶ (c); *see also* Fundamental Credit Agreement, Annex A, "DIP Milestones" ¶ (c); *see also* Brookfield Credit Agreement, "Certain Milestones," § 5.17(d).

[12] *See* Brookfield Credit Agreement, "Certain Milestones," § 5.17(e).

[13] *See* Brookfield Credit Agreement, Schedule 5.17, "Transition Milestones" ¶ 3.

[14] *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Asset Sale Milestones" ¶ (f); *see also* Fundamental Credit Agreement, Annex A, "DIP Milestones" ¶ (i); *see also* Brookfield Credit Agreement, "Certain Milestones," § 5.17(i).

[15] *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Asset Sale Milestones" ¶ (g); *see also* Fundamental Credit Agreement, Annex A, "DIP Milestones" ¶ (j); *see also* Brookfield Credit Agreement, "Certain Milestones," § 5.17(j).

[16] *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Asset Sale Milestones" ¶ (h); *see also* Fundamental Credit Agreement, Annex A, "DIP Milestones" ¶ (k); *see also* Brookfield Credit Agreement, "Certain Milestones," § 5.17(k).

[17] *See* Carlyle DIP Note Purchase Agreement, Schedule 9.25, "Asset Sale Milestones" ¶ (i); *see also* Fundamental Credit Agreement, Annex A, "DIP Milestones" ¶ (l); *see also* Brookfield Credit Agreement, "Certain Milestones," § 5.17(l).

[18] The Sale Milestone will be deemed extended until the earlier of (a) 60 days after the initial Sale Milestone and (b) the Scheduled Maturity Date to obtain regulatory and other approvals of governmental entities necessary to consummate such transaction if needed.

F.     Bidding and Sale Procedures[19]

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry Of Orders (I) (A) Approving Bidding Procedures For Sale Of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief; and (II) (A) Approving and Authorizing Sale of Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts And Unexpired Leases, and (C) Granting Related Relief* [Docket No. 22] (the "**Bidding Procedures Motion**"), pursuant to which the Debtors sought to establish certain procedures (the "**Proposed Bidding Procedures**") with respect to a competitive sale and marketing process for their assets.

Following the first day hearing on November 10, 2025, the Bankruptcy Court entered the order approving the bidding procedures (the "**Bidding Procedures Order**") [Docket No. 128], and approved the bidding procedures annexed thereto (the "**Bidding Procedures**"), including the Sale timeline and the designation of the Stalking Horse Bidders; *provided, however*, that the Stalking Horse Expense Reimbursement was set for hearing (the "**Supplemental Hearing**") on November 17, 2025.   Following the Supplemental Hearing, the Bankruptcy Court entered the *Supplemental Order Approving Initial Stalking Horse Expense Reimbursements* [Docket No. 205]. Pursuant to the Bidding Procedures Order, the proposed key dates and timeline relating to the Sale and the Auction process are as follows:

| Deadline/Event | Timing |
|---|---|
| Indication of Interest Deadline | November 17, 2025, at 11:59 p.m. (prevailing Central Time) |
| Assumption Notice Deadline | November 28, 2025, at 11:59 p.m. (prevailing Central Time) |
| Stalking Horse Designation Deadline | November 28, 2025, at 11:59 p.m. (prevailing Central Time) |
| Sale Objection Deadline[20] | December 1, 2025, at 5:00 p.m. (prevailing Central Time) |
| Bid Protections Objection Deadline | 3 days after the applicable Bid Protections Notice is filed with the Court |
| Contract Objection Deadline (including with respect to any supplemental or revised Assumption Notices) | 10 days after the applicable Assumption Notice is filed with the Court at 5:00 p.m. (prevailing Central Time) |

---

[19]   Capitalized terms used but not defined herein will have the meaning ascribed to them in the Bidding Procedures Motion or the Bidding Procedures Order, as applicable.

[20]   The Sale Objection Deadline applies to all objections to the sale of the Assets (including with respect to the identity of the Initial Stalking Horse Bidders and Stalking Horse Bidder(s) and adequate assurance of future performance by the Initial Stalking Horse Bidders and Stalking Horse Bidder(s)), with the exception of (i) Contract Objections, (ii) Supplemental Contract Objections, and (iii) objections solely related to the identity of the Successful Bidder(s) and adequate assurance of future performance by the Successful Bidder(s) (in each case of (iii), other than the Initial Stalking Horse Bidders and Stalking Horse Bidders).

| | |
|---|---|
| Supplemental Assumption Notice Deadline | 1 business day prior to the Sale Hearing |
| Bid Deadline | December 15, 2025, at 5:00 p.m. (prevailing Central Time) |
| Auction (if applicable) | December 17, 2025, at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time) |
| Auction Close Deadline | 5:00 p.m. (prevailing Central Time) on the date that is one day prior to the Sale Hearing |
| Deadline for (i) Filing of Post-Auction Notice and (ii) Service of Post-Auction Notice on Relevant Counterparties | 24 hours from the conclusion of any Auction |
| Post-Auction Objection Deadline[21] | 48 hours after the Post-Auction Notice is filed with the Court |
| Sale Hearing | December 22, 2025, at 10:00 a.m. (prevailing Central Time) |
| Deadline for closing of any Transaction approved by Court at Sale Hearing | December 31, 2025, at 5:00 p.m. (prevailing Central Time) (subject to extension of the End Date pursuant to the terms of the applicable Initial Stalking Horse APA) |
| Final Assumption Notice Deadline | 14 days prior to the Confirmation Hearing at 11:59 p.m. (prevailing Central Time) |
| Final Contract Objection Deadline | 10 days after the applicable Final Assumption Notice is filed with the Court |

Pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order, interested parties were invited to submit bids for the Debtors' assets no later than 5:00 p.m. (prevailing Central Time) on December 15, 2025 (the "***Bid Deadline***").  In order for a bid to be considered a "Qualified Bid" under the Bidding Procedures, the bid must have met the various requirements described therein.  Pursuant to the Bidding Procedures, if the Debtors received two or more Qualified Bids for the same Assets before the Bid Deadline, an auction would be held (the "***Auction***"), at which the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures) to determine the highest or otherwise best Qualified Bid.

In connection with the sale procedures, upon commencement of the Chapter 11 Cases, the Debtors, with the assistance of Lazard and their other advisors, commenced a comprehensive sale process to market all of the Debtors' assets.  The Debtors, with the assistance of their advisors, prepared marketing materials, including teasers, confidential information memoranda and a virtual data room.  The Debtors and their advisors continue to advance the sale process as contemplated under the sale procedures and timeline.

The Debtors anticipate that the 363 Sale Transaction will close by December 31, 2025.  The Debtors and the Successful Bidder(s) will be authorized to take all actions as may be deemed

---

[21] The Post-Auction Objection Deadline only applies to objections related to the identity of the Successful Bidder(s) or adequate assurance of future performance provided by the Successful Bidder(s) (in each case, other than the Initial Stalking Horse Bidders and Stalking Horse Bidders).

necessary or appropriate in furtherance of the 363 Sale Transaction pursuant to the terms of the applicable purchase agreement, the 363 Sale Order, and the Plan.

G.    Investigation

On August 20, 2025, the Board established a committee composed of three Independent Managers (the "***Special Committee***").  On October 14, 2025, the Board delegated to the Special Committee sole and exclusive authority to initiate, conduct, and oversee any investigation and review of potential claims or causes of action, and historical transactions entered into by the Company or its subsidiaries, that may be addressed, released, or implicated in any Strategic Transaction, and to determine what actions, if any, should be taken in connection therewith, including commencing, prosecuting, negotiating, settling, and/or releasing any such claims.  The Special Committee's investigation remains ongoing with the assistance of Latham, HAK, and A&M.

H.    Appointment of Creditors' Committee

On November 19, 2025, the U.S. Trustee appointed a seven member official committee of unsecured creditors (the "***Committee***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 225].  The Committee subsequently retained [ ● ] as its counsel [Docket No. [ ● ]] and [ ● ] as its financial advisor [Docket No. [ ● ]].

I.    Schedules and Bar Dates

On [ ● ], the Debtors filed their schedules of assets and liabilities and statements of financial affairs.  On [ ● ], the Debtors filed the *[ ● ]* [Docket No. [ ● ]] (the "***Bar Date Motion***") seeking to set a bar date for the filing of Proofs of Claim related to certain prepetition Claims.  Parties are advised to File Proofs of Claim in accordance with the Bar Date Order.

[On [ ● ], the Bankruptcy Court entered the Bar Date Order [Docket No. [ ● ]] establishing (i) [ ● ] (prevailing Central Time) as the Deadline for each Person or entity, but not including Governmental Units, to file a proof of claim (each, a "***Proof of Claim***") in respect of a prepetition Claim including, for the avoidance of doubt, Secured Claims, priority Claims, and Claims arising under section 503(b)(9) of the Bankruptcy Code, against any of the Debtors (the "***Claims Bar Date***"), (ii) [ ● ] (prevailing Central Time) as the deadline for Governmental Units to file Proofs of Claim in respect of any prepetition Claims against any of the Debtors (the "***Governmental Bar Date***"), (iii) the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules (as defined in the Bar Date Order), as the deadline by which claimants holding Claims affected by such filing, amendment or supplement must file Proofs of Claim with respect to such Claim (the "***Amended Schedules Bar Date***"), and (iv) the later of (a) the Claims Bar Date, and (b) 5:00 p.m. (prevailing Central Time) on the date that is thirty (30) days after the effective following the service of an order approving rejection (the "***Rejection Date***") of an executory contract or unexpired lease as the deadline by which claimants asserting Claims resulting from the Debtors' rejection of such executory contract or unexpired lease must file Proofs of Claim for damages arising from such rejection (the "***Rejection Damages Bar Date***" and, together with the General Bar Date, Governmental Bar Date, and Amended Schedules Bar Date, the "***Bar Dates***").]

J.      Contract Rejection and Assumption Motions

On the Petition Date, the Debtors filed two omnibus motions regarding the rejection of certain executory contracts [Docket Nos. 20, 21].  These motions sought approval of the rejection of contracts of Blue Ridge Power, LLC, effective as of the Petition Date, to mitigate the risk to its Estate of unintended and unanticipated accrual of administrative claims liability.  [On [____], 2025, the Bankruptcy Court granted the motions [Docket Nos. __, __].]

On November 14, 2025, the Debtors filed a motion seeking authorization to assume and, subject to certain conditions, assign certain executory contracts governing the provision of O&M services and asset management services to certain of their projects [Docket No. 204].  [The Bankruptcy Court granted the motion on [____], 2025 [Docket No. __].]

K.      The BRP WARN Adversary Proceeding

On November 17, 2025, James Mathes (the "***Plaintiff***"), on behalf of himself and similarly situated former employees of BRP, commenced an adversary proceeding against BRP (in such capacity, the "***Defendant***") under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "***WARN Act***"), styled as a putative class action (the "***Class Action Adversary Proceeding***") [Docket No. 208].  The Plaintiff seeks, among other relief: (a) class certification under Federal Rule of Civil Procedure 23(b), designation of the Plaintiff as class representative (or each named plaintiff as a subclass representative), and appointment of his counsel as class counsel; (b) a declaration that the Defendant violated the WARN Act; and (c) allowance under 11 U.S.C. § 503(b)(1)(A) of an administrative expense for up to 60 days of wages and benefits that would have been payable during that period, as determined under the WARN Act; or, alternatively, priority under 11 U.S.C. § 507(a)(4)–(5) up to $15,150, with any remainder treated as a general unsecured claim.  For the avoidance of doubt, nothing in this Disclosure Statement constitutes an admission by the Defendant of liability or any violation of the WARN Act.  The Defendant disputes the allegations and will defend the Class Action Adversary Proceeding in the Bankruptcy Court under applicable law.

L.      Gallatin Power Partners, LLC Motion for Relief from the Automatic Stay

On December 2024, the Company acquired the Sunstone Solar project from Gallatin Power Partners, LLC ("***Gallatin***").  On October 17, 2025, Gallatin delivered a letter (the "***October 17 Letter***") to the Company seeking to exercise a repurchase right under the original sale agreement.  On October 28, 2025, Gallatin commenced litigation against the Company in the United States District Court for the Southern District of New York, seeking declaratory relief consistent with the positions previously asserted in its October 17 letter.  In connection with the Chapter 11 Cases, Gallatin served discovery requests on November 14, 2025.  On November 18, 2025, Gallatin filed an emergency motion for relief from the automatic stay (the "***Gallatin Motion***"), seeking authority to exercise state-law remedies to compel the reconveyance of title to the Sunstone Solar project to Gallatin.  Gallatin has requested that the Bankruptcy Court conduct a hearing on the Gallatin Motion on December 1, 2025.

The Debtors are reviewing the Gallatin Motion, preparing an objection, and evaluating strategy with respect to the Sunstone project and Gallatin's claims.  The Debtors intends to vigorously

defend against Gallatin's assertions and preserve the Estates' interests in the Sunstone Solar project.

        M.      <u>Exclusivity</u>

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "***Exclusive Plan Period***").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "***Exclusive Solicitation Period***," and together with the Exclusive Plan Period, the "***Exclusive Periods***").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Exclusive Plan Period currently expires on March 6, 2026, and the Exclusive Solicitation Period runs through May 5, 2026, both are subject to extension upon order of the Bankruptcy Court.

<div align="center">

**V.**
**SUMMARY OF THE PLAN**

</div>

THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  HOLDERS OF CLAIMS AGAINST THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

The following summarizes the material terms of the Plan and certain related agreements:

        A.      <u>Unclassified Claims</u>

          1.      **General Administrative Claims**

Except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) on the Effective Date or as

soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that Allowed General Administrative Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases will be paid in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

<div align="center">

2. **Professional Fee Claims**

</div>

All Retained Professional Persons seeking an award by the Bankruptcy Court of Professional Fee Claims (a) will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) will be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims, the Plan Administrator will pay such amounts from Distributable Proceeds within five (5) Business Days after entry of the order approving such Professional Fee Claims. The Plan Administrator is authorized to pay Professional Fee Claims incurred after the Effective Date in the ordinary course from the Professional Fee Escrow Account, without the need for Bankruptcy Court approval. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

<div align="center">

3. **Statutory Fees**

</div>

All Statutory Fees due and payable prior to the Effective Date will be paid by the Debtors on the Effective Date. After the Effective Date, the Disbursing Agent, which may be the Plan Administrator, will pay any and all such fees when due and payable from the Wind-Down Reserve. After the Effective Date, the Disbursing Agent, which may be the Plan Administrator, will file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports will include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors will remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee will not be required to File a Proof of Claim or any other request for payment of quarterly fees. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote.**

<div align="center">

31

</div>

4.      **Priority Tax Claims**

On the Effective Date, except to the extent that such holder agrees to a less favorable treatment, each Governmental Unit holding a claim of the kind specified in section 507(a)(8) of the Bankruptcy Code will receive, in full and final satisfaction of such Priority Tax Claim, treatment consistent with Section 1129(a)(9)(C) of the Bankruptcy Code. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

5.      **DIP Facility Claims**

All DIP Facility Claims will be deemed Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Documents, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facilities on such date, (ii) all interest accrued and unpaid thereon through and including the date of payment, (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the DIP Order, and (iv) any and all other DIP Obligations. On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a DIP Facility Claim will receive its payment in full in Cash from the Distributable Proceeds, except to the extent such DIP Facility Claim was included in a successful credit bid pursuant to the terms of the 363 Sale Transaction Documentation. All Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility will be of no further force or effect; *provided*, that until all Allowed DIP Claims have been indefeasibly paid in full pursuant to the DIP Credit Agreements and the DIP Order, the DIP Secured Parties' Liens and security interests in the DIP Collateral will remain valid, perfected, and enforceable. For the avoidance of doubt, the DIP Facility Claims will not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation. For the avoidance of doubt, nothing herein will modify the timing of any payments required by the DIP Documents.

B.      <u>Post-Confirmation Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      <u>Classified Claims and Interests</u>

1.      **Recovery Analysis**

In developing the Plan, the Debtors gave due consideration to various restructuring alternatives. The Debtors conducted a review of their current operations, prospects as an ongoing business,

financial projections, and estimated recoveries in a chapter 7 liquidation scenario. The Debtors believe that any alternative to Confirmation, such as a chapter 7 liquidation, would result in significantly less value available for distribution to its creditors, as demonstrated by the Liquidation Analysis, attached as **Exhibit C** to this Disclosure Statement.

### i.    *Summary of Classified Claims and Interests*

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3(a). | **Brookfield Secured Claims** | **Impaired** | **Entitled to Vote** |
| 3(b). | **Carlyle Secured Claims** | **Impaired** | **Entitled to Vote** |
| 3(c). | **Fundamental Secured Claims** | **Impaired** | **Entitled to Vote** |
| 4. | **General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| 5. | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 6. | Subordinated Claims | Impaired | Deemed to Reject |
| 7. | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 8. | Existing Equity Interests | Impaired | Deemed to Reject |

### ii.    *Classified Claims and Interests Details*

Article 3.2 of the Plan provides that each Holder of an Allowed Claim or Allowed Interest, as applicable, will receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and such Holder. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, will receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

The Debtors will be grouped solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests.

33

2.      **Class 1 – Other Priority Claims**

i.    *Classification*

Class 1 consists of all Other Priority Claims.

ii.    *Treatment*

On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof will receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

iii.    *Voting*

Class 1 is Unimpaired under the Plan.  Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      **Class 2 – Other Secured Claims**

i.    *Classification*

Class 2 consists of all Other Secured Claims.

ii.    *Treatment*

On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtor against which such Allowed Other Secured Claim is asserted agree to less favorable treatment for such Holder, each Allowed Other Secured Claim will, at the option of the applicable Debtor (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such Claim Unimpaired.

iii.    *Voting*

Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

4.      **Class 3(a) – Brookfield Secured Claims**

i.    *Classification*

Class 3(a) consists of Brookfield Secured Claims.

ii.    *Treatment*

On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a

Brookfield Secured Claim will receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery. **Upon entry of the Final DIP Order and rollup of all Brookfield Secured Claims pursuant to the Brookfield DIP Facility, Class 3(a) will be deemed eliminated from the Plan for purposes of receiving distributions under the Plan, voting to accept or reject the Plan, and determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.**

### iii.  *Voting*

Class 3(a) is Impaired under the Plan. Holders of Brookfield Secured Claims are entitled to vote on the Plan and will receive Ballots.

### 5.  **Class 3(b) – Carlyle Secured Claims**

### i.  *Classification*

Class 3(b) consists of Carlyle Secured Claims.

### ii.  *Treatment*

On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a Carlyle Secured Claim will receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery. **Upon entry of the Final DIP Order and rollup of all Carlyle Secured Claims pursuant to the Carlyle DIP Facility, Class 3(b) will be deemed eliminated from the Plan for purposes of receiving distributions under the Plan, voting to accept or reject the Plan, and determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.**

### iii.  *Voting*

Class 3(b) is Impaired under the Plan. Holders of Carlyle Secured Claims are entitled to vote on the Plan and will receive Ballots.

### 6.  **Class 3(c) – Fundamental Secured Claims**

### i.  *Classification*

Class 3(c) consists of Fundamental Secured Claims.

### ii.  *Treatment*

On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a Fundamental Secured Claim will receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery; *provided*, for the avoidance of doubt, that until all Allowed Fundamental Secured Claims have been indefeasibly paid in full, the applicable Holder's Liens

and security interests on account of the Fundamental Prepetition Documents will remain valid, perfected, and enforceable.

### iii.    *Voting*

Class 3(c) is Impaired under the Plan. Holders of Fundamental Secured Claims are entitled to vote on the Plan and will receive Ballots.

### 7.    **Class 4 – General Unsecured Claims**

### i.    *Classification*

Class 4 consists of all General Unsecured Claims.

### ii.    *Treatment*

In full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery.

### iii.    *Voting*

Class 4 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote on the Plan and will receive Ballots.

### 8.    **Class 5 – Intercompany Claims**

### i.    *Classification*

Class 5 consists of all Intercompany Claims.

### ii.    *Treatment*

Each Holder of an Allowed Intercompany Claim will receive, in full and final satisfaction of its Allowed Intercompany Claim, no distribution under the Plan, and all Intercompany Claims will be adjusted, Reinstated, or discharged in the applicable Debtor's discretion.

### iii.    *Voting*

Class 5 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under the Plan, in which case Holders of Allowed Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

9.   **Class 6 – Subordinated Claims**

i.   *Classification*

Class 6 consists of all Subordinated Claims.

ii.   *Treatment*

Allowed Subordinated Claims, if any, will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

iii.   *Voting*

Class 6 is Impaired and not receiving any distribution under the Plan, and Holders of Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan. Holders of Subordinated Claims will be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

10.   **Class 7 – Intercompany Interests**

i.   *Classification*

Class 7 consists of all Intercompany Interests.

ii.   *Treatment*

Each Holder of an Allowed Intercompany Interest will receive, in full and final satisfaction of its Allowed Intercompany Interest, no distribution under the Plan, and all Intercompany Interests will be adjusted, Reinstated, or discharged in the applicable Debtor's discretion.

iii.   *Voting*

Class 7 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under the Plan, in which case Holders of Allowed Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, in each case, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.   **Class 8 – Existing Equity Interests**

i.   *Classification*

Class 8 consists of all Existing Equity Interests.

ii.      *Treatment*

Holders of Existing Equity Interests will receive no distribution on account of their Existing Equity Interests.  On the Effective Date, all Existing Equity Interests will be canceled and extinguished and will be of no further force or effect.

1.      On the Effective Date, all Existing Equity Interests will be cancelled and one share of the Parent (the "***Single Unit***") will be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Existing Equity Interests, consistent with their former relative priority and economic entitlements.  The Single Unit will be recorded on the books and records maintained by the Plan Administrator;

2.      Each former holder of Existing Equity Interests (through their interest in the Single Unit, as applicable) will neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Existing Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of Existing Equity Interests may receive its share of any remaining assets of the Parent consistent with such holder's rights of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, on the date that the final Chapter 11 Case is closed in accordance with the Plan, the Single Unit issued on the Effective Date will be deemed cancelled and of no further force and effect; *provided*, that such cancellation does not adversely impact the Estates; and

3.      The continuing rights of former holders of Existing Equity Interests (including through their interest in the Single Unit or otherwise) will be nontransferable except by operation of law, or, subject to the Plan Administrator's consent, for administrative transfers where the ultimate beneficiary has not changed.

iii.      *Voting*

Class 8 is Impaired and not receiving any distribution under the Plan, and Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.  Holders of Existing Equity Interests will be provided an Opt-Out Release Form solely for purposes of providing an opportunity to such Holders to affirmatively opt out of the Third-Party Release.

Article 3.3 of the Plan provides that, unless otherwise provided therein, nothing under the Plan will affect, diminish, or impair the rights of the Debtors, as applicable, with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

Article 3.4 provides that any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy

Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

     D.    <u>Acceptance or Rejection of the Plan</u>

<u>Article 4</u> of the Plan sets forth certain additional rules governing the tabulation of votes under the Plan, and related matters.  Among other things, it provides that (a) Claims in Classes 1 and 2 are Unimpaired under the Plan and therefore the Holders of such Claims are presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code; (b) Claims in Classes 3(a), 3(b), 3(c) and 4 are Impaired under the Plan and therefore the Holders of such Allowed Claims are entitled to vote to accept or reject the Plan; *provided*, that, as detailed in <u>Article 3</u>, upon entry of the Final DIP Order and rollup of all applicable Funded Debt Secured Claims pursuant to the applicable DIP Facility, if any, the applicable Class will be deemed eliminated from the Plan for purposes of receiving distributions under the Plan, voting to accept or reject the Plan, and determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code; (c) Claims and Interests in Classes 6 and 8 are Impaired under the Plan and Holders of such Claims or Interests will receive no Distribution under the Plan on account of such Claims or Interests and are therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code; (d) Claims and Interests in Classes 5 and 7 are either (i) Unimpaired and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and will receive no distributions under the Plan and, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code; (e) in the event a Class of Claims that is entitled to vote on the Plan rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to 1129(b) of the Bankruptcy Code, which permits confirmation of a plan *provided* that at least one Class entitled to vote has voted to accept the plan and certain other requirements are met, including that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, non-consenting class of claims or interests under the Plan; (f) the allowance, classification, and treatment of all Allowed Claims and Interests, and the respective Distributions (if any) and treatments under the Plan will take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; and (g) the Debtors have, and on the Effective Date, will be deemed to have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any other applicable law and therefore the Debtors will be granted the protections of section 1125(e) of the Bankruptcy Code.

     E.    <u>Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies</u>

        1.    **Assumption and Assignment of Executory Contracts and Unexpired Leases**

Pursuant to <u>Article 6.1</u> of the Plan, except as otherwise provided in the Plan or in the 363 Sale Order, on the Effective Date, the Debtors will be deemed to have rejected all Executory Contracts and Unexpired Leases that (a) have not been previously rejected, assumed, or assumed and assigned, and are not the subject of a pending motion or notice to reject, assume, or assume and

assign as of the Effective Date, (b) are not identified on the Assumed Contracts List, and (c) have not expired under their own terms prior to the Effective Date. Notwithstanding anything to the contrary contained in the Plan, the Debtors reserve the right to alter, amend, modify, or supplement (a) the Assumed Contracts List and (b) any schedule of Executory Contracts and Unexpired Leases that is attached to any 363 Sale Transaction Documentation, with the consent of the Successful Bidder(s), at any time up to the earlier of (x) 90 days following the closing date of a 363 Sale Transaction, and (y) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the written consent (email being sufficient) of the applicable landlord counterparty, consistent with any 363 Sale Transaction Documentation, as applicable.

Article 6.1 of the Plan further provides that the Confirmation Order will constitute an order of the Bankruptcy Court approving the foregoing assumptions, assumptions and assignments, and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date; *provided*, that neither the Plan nor the Confirmation Order is intended to limit or will be construed as limiting the Debtors' authority under the 363 Sale Order to assume and assign Executory Contracts and Unexpired Leases to the Successful Bidder(s) pursuant to the 363 Sale Transaction Documentation. The Debtors will have the right to amend the Schedules of Assumed Executory Contracts and Unexpired Leases.

Pursuant to Article 6.4 of the Plan, monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan, as reflected on the Assumed Contracts List, as applicable, will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date in accordance with the 363 Sale Transaction Documentation or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims will be paid following the entry of a Final Order resolving any such dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided, however*, that the Debtors or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

Pursuant to Article 6.6 of the Plan, neither the exclusion nor inclusion of any contract or lease on the Assumed Contracts List, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, will have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

2.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

3.      **Assumption of the D&O Policies**

The Debtors, and upon the Effective Date, the Post-Effective Date Debtors, will assume all of the D&O Policies pursuant to section 365(a) of the Bankruptcy Code that have not been assumed pursuant to a 363 Sale Order.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Policies and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Policies.

In addition and for the avoidance of doubt, after the Effective Date, none of the Post-Effective Date Debtors will terminate or otherwise reduce the coverage under the D&O Policies covering the Debtors' current boards of directors in effect on or after the Petition Date and, subject to the terms of the applicable D&O Policies, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such policies for the full term of such policies, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

4.      **Rejection Damages Claims**

Article 6.5 of the Plan provides that all Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan must be filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order; *provided*, that the foregoing deadline will apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Article 6.1 of the Plan, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court will be the applicable deadline under such order or the Claims Bar Date Order, as applicable.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim will be classified and treated as a General Unsecured Claim against the applicable Debtor.

5.      **Nonoccurrence of Effective Date**

Article 6.7 of the Plan provides that, in the event that the Effective Date does not occur, the Bankruptcy Court will retain jurisdiction with respect to any request to extend the deadline for

assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

F.  Distributions

Article 7 of the Plan sets forth the mechanics by which Plan Distributions will be made.  As set forth more fully therein, Article 7 of the Plan provides, among other things, that, unless otherwise provided in the Plan,

(a)  except as otherwise provided in the Plan, all Distributions under the Plan will be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date, which may be the Plan Administrator (Article 7.2);

(b)  on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ninety (90) days after the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors will receive the amount of the Distribution that the Plan provides for Allowed Claims in the applicable Class (Article 7.1(a));

(c)  subsequent Distributions will be made, if determined by the Plan Administrator to be practicable and appropriate, on a quarterly basis thereafter; *provided* that the Plan Administrator may refrain from making an interim Distribution to the extent the Plan Administrator reasonably determines that the costs of making such Distribution are not reasonable in comparison to the amount of such Distribution and instead may reserve making any subsequent Distributions until a future Distribution date (Article 7.1(a));

(d)  on and after the Effective Date, the Disbursing Agent will be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date and will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes under the Plan to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date (Article 7.1(b));

(e)  the Disbursing Agent will make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (i) such Holders' address on its Proof of Claim, if applicable, (ii) such Holders' address listed on a notice filed with the Bankruptcy Court, if applicable, or (iii) if neither (i) or (ii) are available, the address of record for the Holder listed on the Debtors' Schedules (Article 7.4(a));

(f)  in the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder will be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution will be made to such Holder without interest; *provided*, *however*, such Distributions will be deemed unclaimed property

under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date the Distribution was returned (<u>Article 7.4(b)(i)</u>);

(g)     for making Distributions on the Initial Distribution Date only, the Disbursing Agent will be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business on the Distribution Record Date; *provided* that the Disbursing Agent will be authorized to make Distributions to certain transferees in accordance with the terms of the Plan (<u>Article 7.4(c)</u>);

A more detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims or Interests is set forth above.

G.     <u>Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests</u>

<u>Article 8</u> of the Plan governs the resolution of Disputed Claims and Interests.

Pursuant to <u>Article 8.1</u> of the Plan, except as expressly provided in the Plan or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim will be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code or the Plan or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Plan Administrator after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

<u>Article 8.2</u> of the Plan addresses the prosecution of objections to Claims. It provides that the Plan Administrator will have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim and may administer and adjust the Claims Register to reflect such settlements or compromises, without notice to, action, order, or approval of the Bankruptcy Court. The Plan Administrator may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided*, *however*, that for the avoidance of doubt, the underlying Claim will remain under the jurisdiction of the Bankruptcy Court and will not be Disallowed other than by order of the Bankruptcy Court. With respect to the foregoing duties of the Plan Administrator to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator, as the case may be, will stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the Plan Administrator will succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

<u>Article 8.3</u> of the Plan addresses estimation of claims. It provides that the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate

any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.

Article 8.3 of the Plan further provides that in the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the applicable Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

Article 8.4 of the Plan addresses disputes related to the Administrative Claims Reserve and the Disputed General Unsecured Claims Reserve.  It provides that on or after the Effective Date, the Plan Administrator will have the right, but is not required, to establish a Disputed Administrative Claims Reserve and a Disputed General Unsecured Claims Reserve, and to determine the amount of any Disputed Claims Reserves (based on good faith estimates, as applicable) or an order of the Bankruptcy Court estimating such Disputed Claims, net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserves.

Article 8.4 of the Plan further provides that subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator will treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes.  All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator and Holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

Additionally, Article 8.4 of the Plan notes that the Plan Administrator will hold in any Disputed Claims Reserve all payments to be made on account of Disputed Claims for the benefit of Holders of Disputed Claims whose Claims are subsequently Allowed.  All taxes imposed on the assets or income of any Disputed Claims Reserve will be payable by the Plan Administrator from the assets of such Disputed Claims Reserve.

Article 8.4 of the Plan also provides that the Disputed Claims Reserves will be funded from the Wind-Down Reserve.  In the event Cash in any Disputed Claims Reserve is insufficient to satisfy all of the applicable Disputed Claims that have become Allowed, such Allowed Claims will be satisfied from the Wind-Down Reserve.  After all Cash has been distributed from a Disputed Claims Reserve, no further distributions will be made in respect of the applicable Disputed Claims. At such time as all Disputed Claims have been resolved, any remaining Cash in the applicable Disputed Claims Reserve will be remitted to the Wind-Down Reserve.

Lastly, Article 8.4 of the Plan states that the Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims Reserves for all taxable periods through the date on which final distributions are made.

Article 7.3(b) provides that (a) no partial payments and no partial Distributions will be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim will not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

H.   Conditions Precedent to Confirmation

Article 9.1 of the Plan sets forth the conditions precedent to Confirmation and related matters, unless satisfied or waived in accordance with Article 9.4 of the Plan.  The conditions precedent set forth at Article 9.1 include that:

(a)   The Disclosure Statement Order will have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the DIP Lenders.

(b)   The Confirmation Order will have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the DIP Lenders, and will not have been vacated, amended or otherwise modified.

(c)   The Reverse TSAs will have been executed and delivered by all of the parties thereto, all conditions precedent to the consummation thereof will have been waived or satisfied in accordance with the terms thereof, and the Reverse TSAs will otherwise be in form and substance reasonably acceptable to the Debtors.

(d)   The Third-Party TSA, if any, will have been executed and delivered by all of the parties thereto, all conditions precedent to the consummation thereof will have been waived or satisfied in accordance with the terms thereof, and the Third-Party TSA, if any, will otherwise be in form and substance reasonably acceptable to the Debtors.

I.   Conditions Precedent to the Effective Date

Article 9.2 of the Plan sets forth the conditions precedent to the Effective Date and related matters, unless satisfied or waived in accordance with Article 9.4 of the Plan.  The conditions precedent set forth in Article 9.2 include that:

(a)   The Confirmation Order will have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the DIP Lenders, and will not have (i) been vacated, amended or otherwise modified and (ii) not be subject to a stay pending appeal.

(b)   The Debtors will have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and no order, injunction or judgment will have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by the Plan, and no law will have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by the Plan.

(c)     The Plan Administrator will have been appointed and vested with the authority under the Plan.

(d)     The Plan Administration Agreement will have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof will have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement will otherwise be in form and substance reasonably acceptable to the Debtors and the DIP Lenders.

(e)     The Reverse TSAs will be in full force and effect.

(f)     The Third-Party TSA, if any, will be in full force and effect.

(g)     All actions, documents, certificates, and agreements necessary to implement the Plan will (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

(h)     The Wind-Down Reserve will have been established and funded.

(i)     The Professional Fee Escrow Account will have been established and funded with the Professional Fee Escrow Amount.

(j)     All Statutory Fees due and payable prior to the Effective Date will have been paid by the Debtors.

Article 9.3 of the Plan provides that notwithstanding when a condition precedent to Confirmation or Consummation of the Plan occurs, for the purposes of the Plan, such condition precedent will be deemed to have occurred simultaneously upon the completion of the other conditions precedent; *provided*, that to the extent a condition precedent (the "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition will be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition will have occurred.

Article 9.4 of the Plan provides that, subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in Article 9 of the Plan may be waived by the Debtors, with the consent of the DIP Lenders, with or without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided*, that the waiver of the condition precedent in Article 9.2(i) of the Plan will require the consent of the affected Retained Professionals.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Article 5.5 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

Article 9.5 of the Plan addresses the effect of non-occurrence of the Effective Date.  It provides that if the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

J.     Releases

Article 10 of the Plan addresses releases, injunctions, exculpatory provisions and related provisions as follows: *Releases by the Debtors* (10.2); *Releases by Holders of Claims and Interests* (10.3); *Exculpation* (10.4); and *Permanent Injunction* (10.5):[22]

Article 10.3 of the Plan contains a Third-Party Release by all Releasing Parties.  Pursuant to Article 10.3 of the Plan, the following are the Releasing Parties: (a) the Released Parties; (b) all Holders of Claims who vote to accept the Plan; (c) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims and Interests who, in each case do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Disclosure Statement Order, (i) vote to reject the Plan, (ii) are deemed to reject the Plan, or (iii) are presumed to accept the Plan; and (e) each Related Party of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Entities in clauses (a) through (d), solely to the extent such Related Party (I) would be obligated to grant a release under the principles of agency if it were so directed by the Debtors, the Post-Effective Date Debtors, or the Entity in the foregoing clauses (a) through (d) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through the Debtors, the Post-Effective Date Debtors or an Entity in the foregoing clauses (a) through (d).  A Person will not be a Releasing Party if such Person timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

1.     **Definitions Relating to the Releases**

"***Exculpated Parties***" means collectively: (a) the Debtors; and (b) the Independent Managers.

"***Released Parties***" means, each of, and in each case solely in its capacity as such: (a) each Debtor and each Post-Effective Date Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the DIP Secured Parties and the Prepetition Secured Parties (including, but not

---

[22]   The Debtors and their Estates are continuing their ongoing internal investigation.  Nothing herein will constitute or be deemed a waiver of any rights related to such internal investigation.

limited to, for each, in their capacities as prepetition lenders); (d) the administrative and collateral agents under the Prepetition Credit Agreements; (e) the Successful Bidder(s); (f) the Plan Administrator; and (g) with respect to each of the foregoing Entities in clauses (a) through (g), such Entity and its Related Parties; *provided*, that, in each case, a Person will not be a Released Party if such Person: (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

"***Releasing Parties***" means collectively: (a) the Released Parties; (b) all Holders of Claims who vote to accept the Plan; (c) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims and Interests who, in each case do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Disclosure Statement Order, (i) vote to reject the Plan, (ii) are deemed to reject the Plan, or (iii) are presumed to accept the Plan; and (e) each Related Party of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Entities in clauses (a) through (d), solely to the extent such Related Party (I) would be obligated to grant a release under the principles of agency if it were so directed by the Debtors, the Post-Effective Date Debtors, or the Entity in the foregoing clauses (a) through (d) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through the Debtors, the Post-Effective Date Debtors or an Entity in the foregoing clauses (a) through (d).  A Person will not be a Releasing Party if such Person timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

<div align="center">2.    <b>Releases, Exculpation and Injunction</b></div>

<div align="center">i.    <i>Debtor Release (<u>Article 10.2</u> of the Plan)</i>[23]</div>

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, including the Plan Administrator, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or**

---

[23]    Any and all releases by the Debtors and their Estates remain subject to the ongoing internal investigation.  Nothing herein will constitute or be deemed a waiver of any Causes of Action that the Debtors may hold against any Entity.

assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "**Debtor Released Claims**"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan (including related to the Prepetition Funded Debt Facilities and the DIP Facilities), the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring, sale, and recapitalization efforts (including related to the Forbearance Documents), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, any 363 Sale Order, the 363 Sale Transaction Documentation, the Disclosure Statement, the DIP Order and the DIP Documents, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission; **provided**, **however**, that the foregoing "**Debtor Release**" will not operate to waive or release, and the "Debtor Released Claims" will not include, any Cause of Action of any Debtor or Post-Effective Date Debtor or its Estate: (1) against a Released Party arising from any obligations owed to the Debtors or Post-Effective Date Debtors pursuant to an Executory Contract or Unexpired Lease that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2) expressly set forth in and preserved by the Plan or related documents or the 363 Sale Transaction Documentation; (3) that is of a commercial nature and arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (4) against a Holder of a Disputed Claim to the extent necessary to administer and resolve such Disputed Claim solely in accordance with the Plan; or (5) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed in connection with the Plan or the implementation thereof with respect to the Debtors, the Post-Effective Date Debtors, or the Estates.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the

related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Debtors' Estates, or the Plan Administrator asserting any Claim or Cause of Action released pursuant to the Debtor Release.

ii.    *Release by Holders of Claims and Interests (<u>Article 10.3</u> of the Plan)*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "<u>Third Party Released Claims</u>"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the Post-Effective Date Debtors, or the Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan (including related to the Prepetition Funded Debt Facilities and the DIP Facilities), the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring, sale, and recapitalization efforts (including related to the Forbearance Documents), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, any 363 Sale Order, the 363 Sale Transaction Documentation, Disclosure Statement, the DIP Order and the DIP Documents, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or**

implementation thereof, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission; provided, however, that the foregoing Third-Party Release will not operate to waive or release, and the "Third-Party Released Claims" will not include, any Cause of Action of any Releasing Party: (1) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Post-Effective Date Debtors; (2) expressly set forth in and preserved by the Plan or related documents; or (3) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the "Third-Party Release" set forth above does not release any post-Effective Date obligations of any Entity under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed in connection with the Plan or the implementation thereof.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, will constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release; (4) in exchange for good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the 363 Sale Transaction and implementing the Plan; (5) fair, equitable, and reasonable; and (6) essential to the Confirmation of the Plan.

### iii.    *Exculpation (Article 10.4 of the Plan)*

To the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article 10.2 or Article 10.3 of the Plan, effective as of the Effective Date, the Exculpated Parties will neither have nor incur any liability to any Person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and Consummation of the Plan, making Distributions, implementing the Wind-Down, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the 363 Sale Transaction, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection therewith, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions in furtherance of any of the foregoing; provided, however, that none of the foregoing provisions will operate to waive or release (i) any Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations arising on or after the Effective Date under the Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with

**respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on the Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### iv. *Permanent Injunction (Article 10.5 of the Plan)*

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to <u>Article 10.2</u>, <u>Article 10.3</u>, <u>Article 10.4</u>, and <u>Article 10.5</u> of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party, as applicable. At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or will if any Debtor, Post-Effective Date Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court will assess before making a determination. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.**

# VI.
# MEANS FOR IMPLEMENTATION

A.  <u>Transaction Effective as of the Effective Date</u>

The transactions contemplated by the Plan will be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, managers, members, their stockholders, or any other Person or Entity.

B.  <u>363 Sale Transaction</u>

Article 5.2 of the Plan provides that pursuant to the 363 Sale Order(s), to the extent not consummated before the Effective Date, the acquired assets will be transferred to and vest in the Successful Bidder(s) free and clear of all Liens, Claims, charges, Interests, or other encumbrances (except for those Liens, Claims, charges, Interests, or other encumbrances expressly assumed by the Successful Bidder(s) pursuant to the terms of the 363 Sale Transaction Documentation) pursuant to section 363 of the Bankruptcy Code and in accordance with the terms of the 363 Sale Transaction Documentation.  In exchange, the Successful Bidder(s) will pay to the Debtors the sale proceeds in accordance with the terms of the 363 Sale Transaction Documentation; *provided*, that with respect to the sale of any collateral of the DIP Secured Parties or the Prepetition Secured Parties, such proceeds will be first applied against the DIP Facility Claims or the Funded Debt Secured Claims, as applicable.

Article 5.2 of the Plan further provides that the Debtors and the Successful Bidder(s) will be authorized to take all actions as may be deemed necessary or appropriate in furtherance of the 363 Sale Transaction pursuant to the terms of the 363 Sale Transaction Documentation, the 363 Sale Order, and the Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court; act or action under applicable law, regulation, order, rule; or the vote, consent, authorization, or approval of any Entity.

C.  <u>General Settlement of Claims and Interests</u>

Article 5.3 of the Plan provides that, unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  For the avoidance of doubt, such settlement and compromise will not include or affect any Causes of Action listed in the Schedule of Retained Causes of Action.

Article 5.3 of the Plan further provides that the Plan will be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that

such settlement and compromise is fair, equitable, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article 7 of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and will be final.

> ### D.   Intercreditor Agreements

Article 5.4 of the Plan provides that, except as expressly provided in the Plan, all rights, entitlements, and distributions will be subject to the Prepetition Intercreditor Agreement and the DIP Intercreditor Agreement, the priorities and payment waterfalls of which will be incorporated, preserved, and enforced by the Plan, the Debtors, the Plan Administrator and, as applicable, the Post-Effective Date Debtors, pursuant to section 510 of the Bankruptcy Code.

> ### E.   No Substantive Consolidation

Article 5.5 of the Plan provides that the Plan's treatment will not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Post-Effective Date Debtors or Plan Administrator to seek to have any Claim subordinated in accordance with section 510 of the Bankruptcy Code or other applicable law.

Article 5.5 of the Plan further provides that the Plan is being proposed as a joint plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

> ### F.   Plan Administrator

Article 5.6 of the Plan provides, among other things, that, on and after the Effective Date the Plan Administrator will act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors will be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors will be deemed to have resigned, and the Plan Administrator will be appointed as the sole manager and sole officer of the Debtors, and will succeed to the powers of the Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Debtors and post-Effective Date Debtors, as applicable.  The Plan Administrator will use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Transactions Memorandum.  The Plan Administrator will carry out any necessary functions required by the 363 Sale Transaction Documentation.

Article 5.6 of the Plan further provides that the powers of the Plan Administrator will include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors, including: (a) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the 363 Sale Transaction; (b) taking all steps to execute all instruments and documents necessary

to effectuate the distributions to be made under the Plan; (c) making distributions as contemplated under the Plan; (d) establishing and maintaining bank accounts in the name of the Debtors; (e) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors; (g) administering and paying taxes of the Debtors, including filing tax returns; (h) representing the interests of the Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit and completing and filing, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; (i) except to the extent Claims have been Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Claims against the Debtors; (j) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors' Estates; and (k) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

Article 5.6(a) of the Plan provides that the Plan Administrator will be appointed by the Debtors with the reasonable consent of the DIP Lenders. The Plan Administrator will retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

Article 5.6(b) of the Plan provides that the Plan Administrator will have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals will be paid by the Debtors solely from the Wind-Down Reserve, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court.

Article 5.6(c) of the Plan provides that the Plan Administrator's compensation, on a post-Effective Date basis, will be as described in the Plan Administration Agreement, which will be included in the Plan Supplement.

Article 5.6(d) of the Plan provides that the Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, will be deemed exculpated and indemnified, except for actual fraud, willful misconduct, or gross negligence, in all respects by the Debtors. The Plan Administrator may obtain, at the expense of the Debtors and solely from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, will have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

55

G.    The Plan Administration Assets

Article 5.7 of the Plan provides that, on the Effective Date, the Plan Administrator will sign the Plan Administration Agreement and accept the Wind-Down Reserve, the Professional Fee Escrow Account, and the Cash therein (the "***Plan Administration Assets***").  As of the Effective Date, all Plan Administration Assets and all assets dealt with in the Plan will be free and clear of all Liens, Claims, and Interests except as otherwise further provided in the Plan or in the Confirmation Order. The Plan Administrator will be authorized to use any proceeds of the Wind-Down Reserve in connection with the Wind-Down and use the Professional Fee Escrow Account solely for the purposes as explicitly set forth in the Plan.

H.    Merger of Debtors; Closing Cases of Debtor Affiliates

Article 5.8 of the Plan provides that, on or after the Effective Date, the Plan Administrator (a) may merge or dissolve any Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; *provided* that upon any merger with another Debtor, all Claims filed or scheduled in the non-surviving Debtor's Chapter 11 Case will be deemed to have been filed in the surviving Debtor's Chapter 11 Case; (b) may merge or dissolve Affiliates of the Debtors and complete the winding up of Affiliates of a Debtor without the necessity for any other or further actions to be taken by or on behalf of such Affiliates or their shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; and (c) may seek authority from the Bankruptcy Court to close any Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

I.    Cancellation of Existing Securities and Agreements

Article 5.9 of the Plan provides that, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest will be cancelled and of no further force and effect, except that each of the foregoing, including without limitation the Prepetition Credit Agreements, will continue in effect solely to the extent necessary to (a) allow Holders of such Claims or Interests to receive Distributions under the Plan; (b) allow the Debtors, the Plan Administrator, and the Administrative and Collateral Agents, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to the Plan on account of such Claims; (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or Interests pursuant to any such applicable document or instrument; (d) allow the Administrative and Collateral Agents to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnification rights or any rights with respect to priority or payment or to exercise charging liens; (e) preserve any rights of the DIP Agents to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the DIP Documents, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens; (f) preserve the rights of the DIP Agent to appear and be heard in the Chapter 11 Cases to the extent such rights exist, and (g) permit the DIP Agents to perform any function necessary to effectuate the foregoing.

Notwithstanding the foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in <u>Article 5.9</u> of the Plan will be deemed null and void and will be of no force and effect.  In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged.

<u>Article 5.9</u> of the Plan further provides that, except for the foregoing, subsequent to the performance by the Administrative and Collateral Agents of their respective obligations pursuant to the Plan, all further duties, obligations, liability, and responsibilities of the Administrative and Collateral Agents related to the DIP Documents, as applicable, will terminate.

J.      Corporate Action

<u>Article 5.10</u> of the Plan provides that, upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) will be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action or approval by Holders of Claims or Interests, the Debtors, the Bankruptcy Court, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, will be deemed to have occurred and will be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

K.      Exemption from Transfer Taxes and Fees

<u>Article 5.11</u> of the Plan provides that, to the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer pursuant to, in contemplation of, or in connection with the Plan (including the Wind-Down), including pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in connection with the transactions contemplated hereby; (2) the creation, modification, consolidation, termination, refinancing, release or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral security for any or all of any indebtedness; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan and the transactions contemplated hereby, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or fee, or other similar tax, fee or governmental assessment, and the appropriate state or local government officials, recording officers or agents (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, will comply with the requirements of section 1146(a) of the Bankruptcy Code and will forego collection of any such tax or governmental assessment and accept for filing and recordation any

of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

L.     Effectuating Documents; Further Transactions

Article 5.12 of the Plan provides that, on and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

M.     Insurance Policies

Article 5.12 of the Plan provides that, notwithstanding anything to the contrary in the Plan, to the extent any Insurance Policies have not already been assumed and assigned pursuant to a 363 Sale Order, (i) on the Effective Date, the Debtors will be deemed to have assumed all such Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code identified on the Assumed Contracts List, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) neither Confirmation nor Consummation of the Plan will alter, impair or otherwise modify the terms and conditions of any such Insurance Policy or the coverage provided pursuant thereto (including any indemnity obligations assumed by the foregoing assumption of Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed) except that on and after the Effective Date, all Insurance Policies will vest unaltered and in their entireties in the Post-Effective Date Debtors or the Plan Administrator, as applicable, who will succeed to all of rights and obligations and will become and remain liable in full for all of the Debtors' obligations under such Insurance Policies, regardless of whether such obligations arise before or after the Effective Date and without the need for an Insurer to file a Proof of Claim or General Administrative Claim or to object to any Cure Notice; (iii) for the avoidance of doubt, neither Confirmation nor Consummation of the Plan, nor the vesting of the Insurance Policies in the Post-Effective Date Debtors and their Estates or the Plan Administrator, as applicable, will impair, alter, modify or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, or (y) any available defenses of the Debtors or the Plan Administrator or any Insurer under the Insurance Policies; and (iv) on the Effective Date, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 10 of the Plan, if and to the extent applicable, will be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) without altering clause (ii) and sub-clause (II), claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims solely as against the proceeds of the applicable Insurance Policies; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article 10 of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies and take other actions relating to

the Insurance Policies (including effectuating a setoff), in each instance to the extent permissible under applicable non-bankruptcy law and in accordance with the terms of such Insurance Policies.

N.      Preservation of Retained Causes of Action

Article 5.14 provides that, other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan, or by a Bankruptcy Court order, the Debtors reserve the Retained Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue the Retained Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Retained Causes of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Retained Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, will apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator will retain and will have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment the Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained in the Plan to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself will be resolved only by Confirmation of the Plan itself and the occurrence of the Effective Date.

O.      Closing of the Chapter 11 Cases

Article 5.15 provides that, after a Chapter 11 Case has been fully administered, the Plan Administrator will seek authority from the Bankruptcy Court to close that Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**VII.**
**CONFIRMATION OF THE PLAN**

The Bankruptcy Court will confirm the Plan only if all the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (a) accepted by all Impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) in the "best interests" of the holders of Claims and Interests Impaired under the Plan; and (c) feasible.

A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled for [**February 2, 2026], at [___]**, prevailing Central time.  The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any

subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket in the Chapter 11 Cases.

      B.      <u>Objections to Confirmation of the Plan</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature, and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge Christopher M. Lopez, together with proof of service thereof, and served upon all of the below parties so as to be received by [**January 26, 2026**], **at 4:00 p.m. (prevailing Central Time)** (the "***Confirmation Objection Deadline***").

| Debtors | Counsel to the Debtors |
|---|---|
| Pine Gate Renewables, LLC<br>130 Roberts Street<br>Asheville, North Carolina 28801<br>Attn: Judith Hall | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock, Andrew M. Parlen and, Alexander W. Welch<br><br>Latham & Watkins LLP<br>330 N. Wabash Avenue<br>Suite No. 2800<br>Chicago, IL 60611<br>Attn: Jason B. Gott and Jonathan C. Gordon<br><br>Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Attn: Timothy A. ("Tad") Davidson II, Philip Guffy, and Brandon Bell |
| **United States<br>Trustee** | **Counsel to the Creditors'<br>Committee** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Attn: Andrew Jimenez and C. Ross Travis | [ ● ] |

      C.      <u>Confirmation</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

1.      **Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- unless the Holder of a particular Claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such Claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is unlikely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

### i.    *Acceptance*

Claims in Classes 3(a), 3(b), 3(c) and 4 are Impaired under the Plan, and Holders thereof are entitled to vote to accept or reject the Plan; Claims in Classes 1 and 2 are Unimpaired, and therefore Holders thereof are conclusively presumed to accept the Plan; Claims and Interests in Classes 6 and 8, respectively, are Impaired and will receive no distribution under the Plan, and therefore Holders thereof are conclusively deemed to reject the Plan; and Claims in Classes 5 and 7 will either be Unimpaired or Impaired, and Holders thereof will be conclusively presumed to accept or deemed to reject the Plan, as applicable.

The Debtors also will seek confirmation of the Plan over the objection of any individual Holders of Claims who are members of an accepting Class.  There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### ii.    *Unfair Discrimination and Fair and Equitable Test*

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors, and holders of equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or

otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

### iii. *Feasibility*

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. The Plan provides for the Distribution of the proceeds from the sale of substantially all of the Debtors' assets and the subsequent dissolution of the Debtors. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### iv. *Best Interests Test*

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the Holders of Claims and Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would have received pursuant to the liquidation of the Debtors under chapter 7.

The Debtors, with the assistance of their restructuring and legal advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases are converted to cases under chapter 7 on [ ● ] (the "***Liquidation Analysis***"), which is attached hereto as **Exhibit C**. The Liquidation Analysis summarizes the liquidation value of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court liquidates the assets of the Debtors' Estates.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions related to liquidation decisions that are subject to change and significant economic uncertainties and contingencies beyond the control of the Debtors and their management. The chapter 7 liquidation

period is assumed to last a period of time following the appointment of a chapter 7 trustee, given that substantially all the assets will have been sold as part of the 363 Sale Transaction, but allowing for, among other things, evaluation of any other potential claims or causes of action. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

D.     Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

E.     Consummation

The Plan will be Consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan (*see* Article V.H hereof and Article 9.2 of the Plan) have been satisfied or waived pursuant to the Plan. The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

F.     Dissolution of Committee

The Committee will dissolve, and the current and former members of the Committee will be released from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided* that the Committee and its professionals will have the right to file, prosecute, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article 2.1 of the Plan.

G.     Modification of Plan

Article 12.5 of the Plan provides that, except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, if permissible under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any modification, alteration, or amendment made pursuant to Article 12.5 of the Plan will be in form and substance acceptable to the DIP Lenders, in each case solely to the extent such modification, alteration, or amendment materially and adversely affects such parties. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

H.     Revocation or Withdrawal of the Plan

Article 12.6 of the Plan provides that the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which the Plan was revoked or withdrawn or for which Confirmation or Consummation of the Plan did not occur: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

I.     Retention of Jurisdiction of the Bankruptcy Court

Article 11 of the Plan provides that, pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and in addition to the matters over which the Bankruptcy Court will have retained jurisdiction pursuant to the 363 Sale Order, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest, including equitable subordination or other subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

- resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

- ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes related thereto;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

- enforce all orders previously entered by the Bankruptcy Court;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person or Entity's obligations incurred in connection with the Plan;

- hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan;

- enforce the terms and conditions of the Plan and the Confirmation Order, and maintain the integrity of the Plan following Consummation;

- hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- resolve any cases, controversies, suits or disputes with respect to the Release, Exculpation, indemnification and other provisions contained in Article 10 of the Plan and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with the Plan;

- enter an order or orders concluding or closing the Chapter 11 Cases; and

- hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article 11 of the Plan, such provisions will not affect and will not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided in the Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court will have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose before the Effective Date.

# VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and their key constituents. The Debtors have determined that the Plan is the best alternative available to maximize value for all stakeholders. If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan, (b) a liquidation under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests eligible to pursue available non-bankruptcy remedies. These alternatives to the Plan, however, are unlikely to benefit Holders of Claims and Interests.

### A.  Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan. However, it is unclear whether the Debtors could secure the same settlements and funding negotiated in connection with the Plan in a subsequent plan.

### B.  Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. The effect that the Debtors believe a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in lower and more delayed distributions for creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7 and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals.

Substantially all of the Debtors' most valuable project assets will be sold through the 363 Sale Transaction, but certain unrelated assets will be retained and liquidated in the Plan administration process. The Debtors therefore believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation. A liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to Holders of Claims and increase the magnitude of claims to those proceeds. The Debtors believe that in a liquidation under chapter 7, before creditors receive any Distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets.

C.     Dismissal of Chapter 11 Cases

If the Chapter 11 Cases are dismissed, Holders of Claims or Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Interests in the Debtors. However, in that event, Holders of Claims or Interests would face the costs and difficulties of attempting, each on its own, to recover from a non-operating entity. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

**IX.**
**FACTORS TO CONSIDER BEFORE VOTING**

Before voting to accept or reject the Plan, holders of Claims entitled to vote should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

A.     Certain Bankruptcy Law Considerations

1.     **Risk of Non-Confirmation of Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for confirmation or that such modifications would not require re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes voted for the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization or otherwise.

2.     **Risk of Failing to Satisfy the Vote Requirement**

If the Debtors do not obtain sufficient votes from the Classes entitled to vote, the Debtors will seek to accomplish an alternative chapter 11 plan or seek to "cram down" (*i.e.*, achieve non-consensual confirmation of—see note 3 below) the Plan on non-accepting Classes. There can be no assurance

that the terms of any such alternative chapter 11 plan would be similar or as favorable to Holders of Allowed Claims as those proposed in the Plan.

### 3.   Non-Consensual Confirmation

If any impaired class of claims or interests does not accept or is deemed not to accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class(es).  The Debtors believe that the Plan satisfies these requirements.

### 4.   Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

### 5.   Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entire Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not object to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 6. Releases, Injunctions, Exculpation Provisions May Not Be Approved

Article 10 of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 7. Risk of Failure to Consummate the Plan

As of the date of this Disclosure Statement, there can be no assurance that the conditions precedent to Consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated. Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and the Closing Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article 9 of the Plan, then the Confirmation Order may be vacated, in which event no Distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 8. Conversion into Chapter 7 Cases

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 9. One or More Chapter 11 Cases May Be Dismissed

If the Bankruptcy Court finds that a Debtor has incurred substantial or continuing loss or diminution to its estate and lacks a reasonable likelihood of rehabilitation or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of these Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor, which may ultimately result in significantly lower recoveries for creditors that those provided for in the Plan.

### 10. The Debtors May Not Consummate the 363 Sale Transaction

The Plan contemplates the implementation of the 363 Sale Transaction pursuant to the 363 Sale Order of the Bankruptcy Court approving the 363 Sale Transaction.  However, in the unlikely event the conditions necessary to close the 363 Sale Transaction are not satisfied, including approvals of certain Governmental Units, or the 363 Sale Transaction is not otherwise timely consummated, the Debtors will evaluate all available options to maximize creditor recoveries, including converting these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

11. **Amendment of Plan Before Confirmation**

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and as needed or desirable for Confirmation. The potential impact of any such amendment or waiver on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. In addition, if the Debtors seek to modify or amend the Plan after receiving sufficient acceptances, but prior to Confirmation, re-solicitation may be required.

12. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

13. **The Debtors or Plan Administrator, as Applicable, May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors or Plan Administrator, as applicable, reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement. Further, the Committee or other parties in interest may object to the amount and/or classification of any Claim under the Plan in accordance with the Bankruptcy Code.

14. **Other Parties-in-Interest May Be Permitted to Propose Alternative Plans That Are Less Favorable to Certain Stakeholders**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative chapter 11 plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a chapter 11 plan for the first 120 days after filing. Such exclusivity period can be reduced or terminated, however, upon order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then be permitted to propose one or more alternative plans.

15. **Risk of Re-Solicitation of the Plan**

There can be no assurance that the Bankruptcy Court will not require modifications to the Plan that would require re-solicitation of votes from the Voting Classes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan if votes are re-solicited. Re-solicitation could delay confirmation of the Plan, and if the Plan is not confirmed,

it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan or other proceeding.

16.     **Insufficient Cash to Continue in Chapter 11**

The Debtors may not have sufficient Cash to continue operating in chapter 11 for a long time.  It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

17.     **Pro Rata Share Distributions**

The Debtors, with the assistance of their relevant advisors, have made certain assumptions regarding the Allowance and Disallowance of certain Claims entitled to Pro Rata Share distributions under the Plan.  If Claims in certain Classes entitled to Pro Rata Share distributions are Allowed in amounts that exceed the assumptions the Debtors and their relevant advisors have relied upon, the recoveries of Holders of Claims entitled to Pro Rata Share distributions in other Classes would be impacted.

B.     Additional Factors

1.     **Debtors Could Withdraw Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

2.     **Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.     **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the other Plan than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4.     **No Legal or Tax Advice Is Provided by This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5. **The Financial Information Contained in This Disclosure Statement Has Not Been Audited**

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

6. **No Admission Made**

Nothing in this Disclosure Statement or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

7. **Actual Amounts of Allowed Claims May Differ From Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims**

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.

Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan. Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

8. **The Debtors Cannot State With Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes**

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will `require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim Filed in these

Chapter 11 Cases.  As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review.  Accordingly, because certain Claims under the Plan will be paid on a pro rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

### 9.   The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries

It is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

### 10.   The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash

It is possible that Allowed General Administrative Claims, Professional Fee Claims, DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees, and the costs of the wind-down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

### 11.   Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases

The Debtors are involved in various litigation, claims, and other proceedings, including proceedings relating to the conduct of our business and employee relations, which so long as they remain unresolved represent a legal issue and potential Claims for monetary damages.  The occurrence of such contingencies could affect distributions to holders of Claims under the Plan, and/or result in protracted Chapter 11 Cases.

### 12.   The Debtors May Be Adversely Affected by Future Litigation

The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor.  In general, litigation can be expensive and time-consuming to bring or defend.  Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions.  It is also possible that certain parties will commence litigation over the treatment of their Claims under the Plan.  It is impossible to predict the potential litigation that the Debtors may become party to, nor the final resolution of any litigation.  The effect of any such litigation on the Debtors' business and financial stability, however, could be material.

## X.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN[24]

The following discussion is a summary of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are unimpaired, deemed to accept or reject the Plan, or otherwise entitled to payment in full in Cash under the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), regulations promulgated by the United States Department of the Treasury under the Tax Code (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. Accordingly, there can be no assurance that the IRS would not assert, or that a court would not sustain, a contrary position as to the U.S. federal income tax consequences described herein.

This summary does not address non-U.S., state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances, including the impact of the Medicare contribution tax on net investment income and the alternative minimum tax, or to a Holder that may be subject to special tax rules (such as persons who are related to any Debtor within the meaning of one of various provisions of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated investment companies, tax-exempt organizations, trusts, governmental authorities or agencies, dealers and traders in securities, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, Holders whose functional currency is not the U.S. dollar, dealers in foreign currency, persons who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, Holders using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and Holders who are accrual method taxpayers that report income on an "applicable financial statement"). In addition, this discussion does not address U.S. federal taxes other than income taxes.

The following discussion generally assumes that the Plan implements the liquidation of the Debtors other than Pine Gate Renewables, LLC ("**Parent**") for U.S. federal income tax purposes, that such Debtors themselves will be the Wind-Down Debtors (and not any successor, by merger, consolidation or otherwise, to the Debtors), and that all Distributions to Holders of Claims will be taxed accordingly. Thus, all references in this summary to the Debtors as relates to periods after

---

[24]   Subject to continuing review and revision.

the Effective Date should be considered references to the Wind-Down Debtors as a continuation of the Debtors.

Furthermore, this discussion assumes that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and that, except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, NON-U.S. AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A.  <u>Consequences to Debtors</u>

For U.S. federal income tax purposes, Debtor PGR Holdco, LP is classified as a partnership and owns directly all of the issued and outstanding membership interests in Parent. Parent is the common parent of an affiliated group of corporations that files a consolidated U.S. federal income tax return, of which certain other Debtors are members or are disregarded entities (or are otherwise owned by), directly or indirectly, wholly-owned by a member of such group (such group, together with BRP Construction, Inc., the "***PGR Group***"). The Debtors estimate that as of December 31, 2024, the PGR Group had approximately $540 million of consolidated U.S. federal net operating loss ("***NOL***") carryforwards, approximately $55 million of consolidated U.S. federal disallowed business interest expense carryforwards under section 163(j) of the Tax Code, and approximately $7 million of general business credits under section 38 of the Tax Code (collectively, the "***Tax Attributes***"). The PGR Group's ability to utilize its tax attributes could be subject to limitation if the PGR Group underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code after the Petition Date. Accordingly, the Debtors obtained an order from the Bankruptcy Court, effective shortly after the Petition Date, imposing certain restrictions with respect to transfers of beneficial ownership in the equity interests in PGR Holdco, LP so as to avoid such an ownership change.

#### 1.  363 Sale Transaction

The Debtors expect to sell all or substantially all of their assets in connection with the 363 Sale Transaction and, with the exception of Parent, to cease to conduct any business activities thereafter. The U.S. federal income tax liability of the PGR Group resulting from the consummation of the 363 Sale Transaction and the precise composition of the PGR Group's remaining Tax Attributes remain subject to determination and adjustment, depending on, among other things, the determination of the allocation of purchase price among the assets sold. The amount of any such tax liability and the amount of any such Tax Attributes remain subject to audit and potential adjustment by the IRS.

In addition, it is unclear when the Debtors will be deemed to liquidate for U.S. federal income tax purposes. For example, one or more of the Debtors may be deemed to liquidate for U.S. federal income tax purposes as a result of the consummation of the 363 Sale Transaction, the confirmation or implementation of the Plan, or the completion of the Wind-Down. In the event that any of the Debtors is deemed to liquidate for U.S. federal income tax purposes prior to or following the Effective Date, the consequences of the consummation of the Plan could be materially different than described herein. Although not free from doubt, the Debtors currently expect and the discussion herein assumes that the Debtors, other than Parent, will be deemed to liquidate for U.S. federal income tax purposes on the Effective Date as a result of the implementation of the Plan. All Holders of Claims are urged to consult their tax advisors regarding the consequences to them of the Plan in the event any or all Debtors were treated as having liquidated for U.S. federal income tax purposes prior to or following the Effective Date.

## 2. Cancellation of Debt and Reduction of Tax Attributes

In general, a debtor will realize and recognize cancellation of debt ("***COD***") income upon satisfaction (or deemed satisfaction) of its outstanding indebtedness for insufficient consideration. The amount of COD income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of cash paid, and (b) the fair market value of any consideration (including equity of a debtor or a party related to such debtor) provided, that is given in satisfaction, or as part of the discharge, of such indebtedness at the time of the settlement or discharge. However, COD income generally should not arise to the extent that payment of the indebtedness would have given rise to a deduction. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. One such exception to such income recognition is provided for any COD arising by reason of the discharge of the debtor's indebtedness in a bankruptcy case or to the extent of the debtor's insolvency immediately before the cancellation of the debt. In such case, the Tax Code generally requires the debtor to reduce certain of its tax attributes—such as current year NOLs and NOL carryforwards, tax credits, capital loss carryforwards, and tax basis in assets—by reference to the amount of any such excluded COD income. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

In general, any reduction in tax attributes under the COD rules does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year (in the case of asset basis reduction, the assets held on the first day of the taxable year following the tax year in which the COD occurs). Also, where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

Consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes in respect of the Debtors other than Parent, the Debtors expect that as a general matter no COD should be incurred by any Debtor as a result of the confirmation and implementation of the Plan prior to the disposition by such Debtor of all or substantially all of its assets and the Distribution of all of its assets (other than to the extent any Allowed Claim's Distribution is subject to a maximum amount or has been or is separately settled for an amount giving rise to COD under principles similar to those set forth above). In respect of Parent (which will continue to hold certain

assets following the Effective Date), the implementation of the Plan is not expected to result in the liquidation of Parent for U.S. federal income tax purposes. Accordingly, in connection with the implementation of the Plan, the Debtors expect that the PGR Group will realize a substantial amount of excluded COD income for U.S. federal income tax purposes and that a portion of the Tax Attributes will be reduced as a result of the COD attribute reduction. There can be no assurance that the IRS will agree to such characterization, due to, among other things, the lack of direct authoritative guidance as to when COD occurs in the context of a liquidating chapter 11 plan, and thus there can be no assurance that all or a substantial amount of the COD will not be incurred earlier.

### 3. Limitation on Tax Attributes

If a corporation undergoes an "ownership change" as defined under section 382 of the Tax Code, the amount of its "pre-change losses" (including, in certain circumstances, certain of the corporation's built-in losses) that may be utilized to offset future taxable income generally is subject to an annual limitation. Such limitation is generally equal to (subject to, in certain circumstances, adjustments for certain of the corporation's built-in gains) the product of the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) and the "long-term tax-exempt rate" (e.g., 3.58% for ownership changes occurring in December 2025). Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. If the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to certain built-in gains).

Pursuant to the Plan, a Single Unit of Parent will be issued for the benefit of former holders of Existing Equity Interests, pursuant to which the former holders of Existing Equity Interests will maintain their economic interests in any residual assets of the Debtors after the satisfaction of all Allowed Claims, which economic interests will be nontransferable except by operation of law. Accordingly, the Debtors do not expect that the Plan should result in an ownership change of the PGR Group. There is no assurance that the IRS will not challenge this position and, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, there is no assurance that the IRS would not successfully assert a contrary position (including with respect to the treatment for U.S. federal income tax purposes of the Holders of Claims as continuing creditors and not as, effectively, equity holders of Parent).

If, notwithstanding the Debtors' position, an ownership change were considered to occur (e.g., by reason of the creditors' contingent interest under the Plan in any sale proceeds being recharacterized as an equity interest), the availability of the Tax Attributes remaining following the COD attribute reduction described above would be severely limited and may be rendered effectively unavailable. Furthermore, it is unclear whether Parent would be treated as continuing its historic business or using a significant portion of its historic assets in a new business for at least two years after the Effective Date or other transaction resulting in an "ownership change."

### B.   <u>Consequences to Holders of Claims</u>

Except as otherwise discussed herein, the summary below generally assumes that Holders of the applicable Claims will, each as a class, vote to accept the Plan, and that the entry of the Final DIP Order and rollup of all Brookfield Secured Claims and Carlyle Secured Claims pursuant to the Brookfield DIP Facility and Carlyle DIP Facility, respectively, will be deemed to eliminate such Claims for purposes of receiving distributions under the Plan, voting to accept or reject the Plan, and determining acceptance or rejection of the Plan by Holders of such Claims pursuant to section 1129(a)(8) of the Bankruptcy Code.  As used herein, the term "U.S. Holder" means a beneficial owner of any Fundamental Secured Claims or any General Unsecured Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

A "Non-U.S. Holder" is a beneficial owner of any Fundamental Secured Claims or any General Unsecured Claims that is neither a U.S. Holder nor an entity or arrangement classified as a partnership for U.S. federal income tax purposes.

If an entity or arrangement classified as a partnership for U.S. federal income tax purposes holds any such Fundamental Secured Claims or General Unsecured Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner-level.  Each Holder that is a partnership or a partner in a partnership holding any of such instruments should consult its tax advisor.

### 1. U.S. Holders of Fundamental Secured Claims and U.S. Holders of General Unsecured Claims

#### a) *Recognition of Gain or Loss*

Pursuant to the Plan, a Holder of Allowed Fundamental Secured Claims or Allowed General Unsecured Claims will receive, in final satisfaction of its Claims, its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery.

Each U.S. Holder of Fundamental Secured Claims or General Unsecured Claims generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of any Cash and fair market value of any other property received in respect of the Claims and (ii) the U.S. Holder's adjusted tax basis in the Claims exchanged therefor.  If a U.S. Holder receives Distributions on multiple dates, such Holder should consult with its tax advisors as to the tax

consequences of such exchanges, including the application of the installment sale rules. In the event of the subsequent disallowance of any Fundamental Secured Claim or any General Unsecured Claim, a U.S. Holder of a previously Allowed Fundamental Secured Claims or Allowed General Unsecured Claim, as the case may be, may receive additional post-Effective Date Distributions subject to the treatment discussed above. U.S. Holders are urged to consult their tax advisors regarding the treatment of additional post-Effective Date Distributions.

<p style="text-align:center;"><em>b)</em>     <strong><em>Distributions with Respect to Accrued But Unpaid Interest or OID</em></strong></p>

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of an Allowed Claim is received in satisfaction of interest accrued or OID accrued, in each case during its holding period, such amount will be taxable to the U.S. Holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the Holder's normal method of accounting). Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. It is unclear whether a U.S. Holder would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

Article 7.8 of the Plan provides that, except as otherwise required by law, Distributions to U.S. Holders with respect to any Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

<p style="text-align:center;"><em>c)</em>     <strong><em>Character of Gain or Loss</em></strong></p>

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, whether, and to what extent, the Holder previously claimed a bad debt deduction, and whether (solely in respect of the Debtors other than Parent, as intended and herein assumed) the Plan implements the liquidation of any of the Debtors for U.S. federal income tax purposes.

A U.S. Holder that purchased certain Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a statutorily defined *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than with respect to a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount

<p style="text-align:center;">80</p>

accrued (on a straight line basis or, at the election of the Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the Holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the receipt of Cash and other consideration in satisfaction of such Claims.

### 2. Non-U.S. Holders of Fundamental Secured Claims and Non-U.S. Holders of General Unsecured Claims

#### a) *Recognition of Gain or Loss*

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders.

Whether a Non-U.S. Holder of Fundamental Secured Claims or General Unsecured Claims recognizes gain or loss on the exchange of Claims pursuant to the Plan and the amount of such gain or loss is determined in a similar manner as set forth above in connection with U.S. Holders of the applicable Claims. See "—U.S. Holders of Fundamental Secured Claims and U.S. Holders of General Unsecured Claims—Recognition of Gain or Loss" above. Any gain recognized (which, as discussed below, does not include amounts received in respect of accrued but unpaid interest or OID, if any) by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the gain is realized and certain other conditions are met, or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if required by an income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the exception in clause (i) above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or such lower rate under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year. If the exception in clause (ii) above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder with respect to such gain. In addition, if such a Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### b) *Distributions with Respect to Accrued But Unpaid Interest or OID*

In general, to the extent that any consideration received pursuant to the Plan by a Non-U.S. Holder of an Allowed Claim is received in satisfaction of interest accrued or OID accrued, in each case

during its holding period, such amount generally will be treated as interest for U.S. federal income tax purposes and generally will be subject to the rules described under "—U.S. Holders of Fundamental Secured Claims and U.S. Holders of General Unsecured Claims—Distributions with Respect to Accrued But Unpaid Interest or OID" above.  Any such amount that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income or withholding tax, provided that:

- the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of voting stock of the applicable Debtor;

- the Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Tax Code) with respect to the applicable Debtor; and

- either (a) the Non-U.S. Holder certifies in a statement provided to the applicable withholding agent under penalties of perjury that it is not a United States person and provides its name and address; (b) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the applicable Claims on behalf of the Non-U.S. Holder certifies to the applicable withholding agent under penalties of perjury that it, or the financial institution between it and the Non-U.S. Holder, has received from the Non-U.S. Holder a statement under penalties of perjury that such Holder is not a United States person and provides a copy of such statement to the applicable withholding agent; or (c) the Non-U.S. Holder holds the applicable Claims directly through a "qualified intermediary" (within the meaning of applicable Treasury Regulations) and certain conditions are satisfied.

A Non-U.S. Holder that does not qualify for the above exemption with respect to amounts treated as interest that are not effectively connected income generally will be subject to withholding of U.S. federal income tax on such interest at a 30% rate, unless such Non-U.S. Holder is entitled to a reduction in or exemption from withholding on such interest as a result of an applicable income tax treaty.  To claim such entitlement, the Non-U.S. Holder generally must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax on such payments of interest under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides for tax purposes.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If amounts treated as interest paid to a Non-U.S. Holder are effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, such amounts are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), the Non-U.S. Holder generally will not be subject to U.S. federal withholding tax but will be subject to U.S. federal income tax with respect to such amounts in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in

the United States under "—Non-U.S. Holders of Fundamental Secured Claims and Non-U.S. Holders of General Unsecured Claims—Recognition of Gain or Loss" above. To claim the exemption, the Non-U.S. Holder generally must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that such amounts are not subject to withholding tax because they are effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

Article 7.8 of the Plan provides that, except as otherwise required by law, Distributions with respect to any Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Non-U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as any consequences to such Non-U.S. Holders in respect of any amounts received with respect to accrued but unpaid interest or OID.

### C.  Information Reporting and Backup Withholding

All Distributions to Holders of Allowed Claims under or in connection with the Plan are subject to any applicable tax withholding and information reporting requirements. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information, fails properly to report interest or dividends, and, under certain circumstances, fails to provide a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a refund of or a credit against that recipient's U.S. federal income tax, provided that appropriate documentation is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as certain corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders are urged to consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

### D.  Foreign Account Tax Compliance Act

Under the Foreign Account Tax Compliance Act ("*FATCA*"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" generally are U.S.-source payments of fixed or

determinable, annual or periodical income.  Additionally, although FATCA withholding may also apply to gross proceeds of a disposition of property of a type that can produce U.S.-source interest or dividends, proposed Treasury Regulations suspend withholding on such gross proceeds payments indefinitely.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

# XI.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3(a), 3(b), 3(c) and 4 to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

**PINE GATE RENEWABLES, LLC**
**(on behalf of itself and all other Debtors)**

By:           */s/  Raymond Shem*

Name:       Raymond Shem

Title:         Authorized Signatory

## **Exhibit A**

Plan

<div style="border:1px solid black;">

**THIS PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THIS PLAN REMAINS SUBJECT TO CONTINUING REVISIONS AS THE DEBTORS CONDUCT THEIR INTERNAL INVESTIGATION AND CONTINUE THE MARKETING PROCESS FOR A SALE OF ALL OR SUBSTANTIALLY ALL OF THEIR ASSETS.  ALL RIGHTS OF THE DEBTORS ARE RESERVED.**

</div>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| PINE GATE RENEWABLES, LLC, *et al.*, | : | Case No. 25-90669 (CML) |
|  | : |  |
| Debtors[1] | : | (Jointly Administered) |
|  | : |  |

-------------------------------------------------------------- x

## JOINT CHAPTER 11 PLAN OF PINE GATE RENEWABLES, LLC
## AND ITS DEBTOR AFFILIATES

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' Balloting Agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

**LATHAM & WATKINS LLP**
Ray C. Schrock
Andrew M. Parlen
Alexander W. Welch
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
         andrew.parlen@lw.com
         alex.welch@lw.com

Jason B. Gott
Jonathan C. Gordon
330 N. Wabash Avenue
Suite No. 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: jason.gott@lw.com
         jonathan.gordon@lw.com

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II
Philip M. Guffy
Brandon Bell
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@Hunton.com
         pguffy@Hunton.com
         bbell@Hunton.com

*Proposed Counsel for Debtors and Debtors in Possession*
Dated: November 20, 2025
Houston, Texas

## TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ........................................................ 1

    A.    Defined Terms ....................................................................... 1
    B.    Rules of Interpretation ......................................................... 19
    C.    Computation of Time ........................................................... 20
    D.    Consent Rights ..................................................................... 20

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS,  AND DIP
    FACILITY CLAIMS ................................................................. 20

    2.1.    Administrative Claims. .......................................................... 20
    2.2.    Priority Tax Claims................................................................ 22
    2.3.    DIP Facility Claims............................................................... 22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
    AND INTERESTS ...................................................................... 23

    3.1.    Summary. ............................................................................... 23
    3.2.    Classification and Treatment of Claims................................ 24
    3.3.    Special Provision Governing Unimpaired Claims ................. 28
    3.4.    Elimination of Vacant Classes .............................................. 28
    3.5.    Controversy Concerning Impairment .................................... 28

ARTICLE IV. ACCEPTANCE OR REJECTION OF THIS PLAN ...................................... 28

    4.1.    Acceptance or Rejection of this Plan .................................... 28
    4.2.    Nonconsensual Confirmation................................................ 29
    4.3.    Subordinated Claims ............................................................. 29

ARTICLE V. MEANS FOR IMPLEMENTATION OF THIS PLAN ................................... 29

    5.1.    Transactions Effective as of the Effective Date.................... 29
    5.2.    363 Sale Transaction............................................................. 30
    5.3.    General Settlement of Claims and Interests .......................... 30
    5.4.    Intercreditor Agreements ...................................................... 30
    5.5.    No Substantive Consolidation............................................... 31
    5.6.    Plan Administrator ................................................................ 31
    5.7.    The Plan Administration Assets............................................ 33
    5.8.    Merger of Debtors; Closing Cases of Debtor Affiliates ....... 33
    5.9.    Cancellation of Existing Securities and Agreements............ 33
    5.10.    Corporate Action................................................................... 34
    5.11.    Exemption From Transfer Taxes and Fees ........................... 34
    5.12.    Effectuating Documents; Further Transactions .................... 35
    5.13.    Insurance Policies ................................................................. 35

5.14.   Preservation of Retained Causes of Action ....................................... 36
5.15.   Closing of the Chapter 11 Cases ..................................................... 36

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................ 36

6.1.   Assumption or Rejection of Executory Contracts and Unexpired Leases ........ 36
6.2.   Preexisting Obligations to the Debtors Under Executory Contracts and
Unexpired Leases ............................................................................ 37
6.3.   Assumption of the D&O Policies ...................................................... 37
6.4.   Payments Related to Assumption of Executory Contracts and Unexpired
Leases .......................................................................................... 38
6.5.   Rejection Damages Claims ............................................................... 38
6.6.   Reservation of Rights ..................................................................... 38
6.7.   Nonoccurrence of Effective Date ...................................................... 38

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ......................... 39

7.1.   Timing and Calculation of Amounts to Be Distributed; Entitlement to
Distributions .................................................................................. 39
7.2.   Disbursing Agent ........................................................................... 39
7.3.   Distributions on Account of Claims Allowed After the Effective Date. .......... 40
7.4.   Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...... 40
7.5.   Compliance with Tax Requirement; Allocations .................................... 41
7.6.   Surrender of Cancelled Instruments or Securities. ................................. 42
7.7.   Claims Paid or Payable by Third Parties ............................................. 42
7.8.   Allocation of Plan Distributions between Principal and Interest ................. 43

ARTICLE VIII. .................................................................................. 43

PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ........................................................................... 43

8.1.   Allowance and Disallowance of Claims .............................................. 43
8.2.   Prosecution of Objections to Claims .................................................. 44
8.3.   Estimation of Claims ...................................................................... 44
8.4.   Disputed Claims Reserves ............................................................... 44
8.5.   Distributions After Allowance .......................................................... 45
8.6.   Disallowance of Certain Claims ........................................................ 45

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THIS PLAN ....................................................... 46

9.1.   Conditions Precedent to Confirmation ................................................ 46
9.2.   Conditions Precedent to the Effective Date .......................................... 46
9.3.   All Statutory Fees due and payable prior to the Effective Date shall have
been paid by the Debtors.Timing of Conditions Precedent ......................... 47
9.4.   Waiver of Conditions ..................................................................... 47

ii

9.5.    Effect of Non-Occurrence of Conditions to Confirmation or
        Consummation ................................................................................... 48
9.6.    Substantial Consummation ................................................................. 48

ARTICLE X. RELEASE, EXCULPATION, INJUNCTION AND RELATED
        PROVISIONS ...................................................................................... 48

10.1.   General ............................................................................................... 48
10.2.   Debtor Release ................................................................................... 48
10.3.   Release by Holders of Claims and Interests ...................................... 50
10.4.   Exculpation ........................................................................................ 51
10.5.   Permanent Injunction ......................................................................... 52
10.6.   Setoffs ................................................................................................ 53
10.7.   Release of Liens ................................................................................. 53
10.8.   Preservation of All Causes of Action Not Expressly Settled or Released ........ 53
10.9.   Integral Part of Plan .......................................................................... 54

ARTICLE XI. RETENTION OF JURISDICTION .................................................... 54

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................................. 56

12.1.   Reservation of Rights ......................................................................... 56
12.2.   No Government Releases ..................................................................... 56
12.3.   Payment of Statutory Fees ................................................................. 56
12.4.   Statutory Committee .......................................................................... 56
12.5.   Modification of Plan .......................................................................... 56
12.6.   Revocation or Withdrawal of Plan ..................................................... 57
12.7.   Successors and Assigns ...................................................................... 57
12.8.   Further Assurances ............................................................................ 57
12.9.   Severability ........................................................................................ 58
12.10.  Votes Solicited in Good Faith ........................................................... 58
12.11.  Service of Documents ........................................................................ 58
12.12.  Governing Law .................................................................................. 59
12.13.  Tax Reporting and Compliance ......................................................... 59
12.14.  Schedules ........................................................................................... 59
12.15.  Conflicts ............................................................................................ 59
12.16.  Entire Agreement ............................................................................... 60
12.17.  2002 Notice Parties ........................................................................... 60

### JOINT CHAPTER 11 PLAN OF PINE GATE RENEWABLES, LLC AND <u>ITS DEBTOR AFFILIATES</u>

Pine Gate Renewables, LLC and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each, a "***Debtor***" and, collectively, the "***Debtors***," and the Debtors and their direct and indirect subsidiaries, collectively, "***Pine Gate***"), jointly propose the following chapter 11 plan (as may be amended, modified or supplemented from time to time in accordance with the terms hereof, this *"**Plan**"*) for the resolution of the outstanding Claims (as defined below) against and Interests (as defined below) in each of the Debtors. The Plan provides for the distribution of cash, the appointment of a plan administrator that will administer and liquidate certain property of the Debtors, including the Retained Causes of Action, and make certain distributions. The Plan further provides for the grouping of all of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, and historical financial information, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters. There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules (each as defined below). All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION.

### A.   Defined Terms

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

*1.1.* "***363 Sale Assumed Contract***" means any Executory Contract or Unexpired Lease assumed and assigned to a Successful Bidder pursuant to a 363 Sale Order and/or the applicable 363 Sale Transaction Documentation in connection with a 363 Sale Transaction.

*1.2.* "***363 Sale Assumed Liability***" means any liability of a Debtor that was assumed by a Successful Bidder under such Successful Bidder's 363 Sale Transaction Documentation or the applicable 363 Sale Order, including to the extent assumed by a Successful Bidder, without limitation, (a) the Cure Claims for the applicable 363 Sale Assumed Contracts, and (b) Claims or Causes of Action.

*1.3.* "***363 Sale Order***" means one or more orders of the Bankruptcy Court approving the 363 Sale Transaction.

*1.4.* "***363 Sale Transaction***" means one or more sales of assets of the Debtors' Estates pursuant to section 363 of the Bankruptcy Code.

*1.5.* "***363 Sale Transaction Documentation***" means all motions, filings, documents, agreements, and related documents pursuant to which the Debtors have effectuated or will effectuate the 363 Sale Transaction, including without limitation, 363 Sale Order and Bidding Procedures Order.

*1.6.* "***Administrative and Collateral Agents***" means the DIP Agents.

*1.7.* "***Administrative Claim***" means any Claim for costs and expenses of administration of the Debtors' Estates during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code other than Professional Fee Claims, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Claims pursuant to section 503(b)(9) of the Bankruptcy Code; (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; and (d) Independent Manager Fee Claims. The term "Administrative Claims" expressly excludes any alleged claims that are not required to be paid in full in Cash prior to emergence pursuant to section 1129 of the Bankruptcy Code and any 363 Sale Assumed Liability.

*1.8.* "***Administrative Claims Bar Date***" means (a) with respect to any Administrative Claim arising on or prior to [ ● ], 202[5], [ ● ], 202[5], and (b) with respect to any Administrative Claim arising after [ ● ], 202[5], the Business Day that is thirty (30) days after the Effective Date,

or such other date as approved by Final Order of the Bankruptcy Court, which shall be the deadline to file Administrative Claims.

1.9. "***Administrative Claims Objection Deadline***" means the Business Day that is 120 days after the Effective Date; provided that the Administrative Claims Objection Deadline may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator after notice and a hearing.

1.10. "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.11. "***Allowed***" means, all or a portion of any Claim or Interest (a) that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Proof of Claim or proof of Interest has been timely filed as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is evidenced by a Proof of Claim or proof of Interest filed by the applicable Claims Bar Date as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors prior to the Effective Date, or the Plan Administrator on or after the Effective Date or (iii) pursuant to the terms of the Plan.

1.12. "***Assumed Contracts***" means those Executory Contracts and Unexpired Leases listed on the Assumed Contracts List that are to be assumed by the Debtors.

1.13. "***Assumed Contracts List***" means the list or lists of Assumed Contracts, which will be included in preliminary form in the Plan Supplement.

1.14. "***Avoidance Action***" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable nonbankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.15. "***Ballot***" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

1.16. "***Balloting Agent***" means Omni Agent Solutions, Inc. in its capacity as notice and balloting agent for the Debtors.

1.17. "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended from time to time, as applicable to the Chapter 11 Cases.

*1.18.* "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*1.19.* "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*1.20.* "***Bidding Procedures Order***" means, collectively, the *Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief* [Docket No. 128] and the *Supplemental Order Approving Initial Stalking Horse Expense Reimbursements* [Docket No. 205].

*1.21.* "***Brookfield Agent***" means BID ADMINISTRATOR LLC, as administrative agent and collateral agent under the Brookfield Prepetition Credit Agreement.

*1.22.* "***Brookfield DIP Facility***" means the debtor-in-possession financing facility provided by BII-BID AGGREGATOR A LP and BII BID SOLAR II AGGREGATOR LP.

*1.23.* "***Brookfield Prepetition Credit Agreement***" means that certain Credit Agreement, dated as of January 30, 2025 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2025, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of April 17, 2025, as further amended by that certain Amendment No. 3 to Credit Agreement, dated October 6, 2025, and as further amended, supplemented, restated, replaced or otherwise modified from time to time).

*1.24.* "***Brookfield Prepetition Documents***" means (a) the Brookfield Prepetition Credit Agreement, (b) the Brookfield Prepetition Security Documents, and (c) each of the other "Credit Documents" (as defined in the Brookfield Prepetition Credit Agreement).

*1.25.* "***Brookfield Prepetition Facility***" means the financing facility pursuant to the Brookfield Prepetition Credit Agreement.

*1.26.* "***Brookfield Prepetition Security Documents***" has the meaning set forth in the DIP Order.

*1.27.* "***Brookfield Secured Claim***" means any Secured Claim derived from, based upon, related to, on account of, or arising under the Brookfield Prepetition Facility and the Brookfield Prepetition Credit Agreement that is not credit bid in accordance with section 363(k) of the Bankruptcy Code or rolled up pursuant to the 363 Sale Order.

*1.28.* "***Business Day***" means any day that is not a Saturday, Sunday, or other day on which banks are required or authorized by law to be closed in New York, New York.

*1.29.* "**Carlyle DIP Facility**" means the debtor-in-possession financing facility provided by Carlyle Global Credit Investment Management through one or more of its affiliates.

*1.30.* "**Carlyle Noteholders**" means each of the holders of the notes issued pursuant to the Carlyle Prepetition Note Purchase Agreement.

*1.31.* "**Carlyle Prepetition Documents**" means (a) the Carlyle Prepetition Note Purchase Agreement, (b) the Carlyle Prepetition Security Documents, and (c) each of the other "Financing Documents" (as defined in the Carlyle Prepetition Note Purchase Agreement).

*1.32.* "**Carlyle Prepetition Facility**" means the financing facility pursuant to the Carlyle Prepetition Note Purchase Agreement.

*1.33.* "**Carlyle Prepetition Note Purchase Agreement**" means that certain Amended and Restated Note Purchase Agreement, dated October 6, 2025 by and among certain affiliates of the Borrower, including NPA 2023 Holdco, LLC, a North Carolina limited liability company as the issuer, the Purchasers and the Holders (each as defined therein) from time to time party thereto, and Wilmington Trust, National Association, as collateral agent.

*1.34.* "**Carlyle Prepetition Security Documents**" has the meaning set forth in the DIP Order.

*1.35.* "**Carlyle Secured Claim**" means any Secured Claim derived from, based upon, related to, on account of, or arising under the Carlyle Prepetition Note Purchase Agreement that is not credit bid or rolled up pursuant to the Carlyle DIP Facility.

*1.36.* "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

*1.37.* "**Cash Collateral**" has the meaning set forth in the Interim DIP Order.

*1.38.* "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Causes of Action also include (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any Avoidance Action or state law fraudulent transfer claim.

4

1.39. "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered and procedurally consolidated chapter 11 cases pending for all of the Debtors in the Bankruptcy Court.

1.40. "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code, and, as against the Debtors or the Estates, includes any such Claim whether or not asserted or Allowed.

1.41. "***Claims Bar Date***" means the applicable deadline by which Proofs of Claim must be filed under the Claims Bar Date Order.

1.42. "***Claims Bar Date Order***" means the [*Order (I) Establishing (A) Bar Dates and (B) Related Procedures for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief*] entered by the Bankruptcy Court on [ ● ], 2025 [Docket No. [ ● ]].

1.43. "***Claims Objection Deadline***" means the date that is ninety (90) days after the Effective Date, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator.

1.44. "***Claims Register***" means the official register of Claims maintained by the Balloting Agent.

1.45. "***Class***" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

1.46. "***Committee***" means the Official Committee of Unsecured Creditors (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code pursuant to that certain *Notice of Appointment of Creditors' Committee* filed by the U.S. Trustee on November 19, 2025 [Docket No. 225], as such committee may be reconstituted from time to time.

1.47. "***Committee Professionals***" means [ ● ].

1.48. "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in <u>Article 9.1</u> hereof having been: (a) satisfied; or (b) waived pursuant to <u>Article 9.4</u> hereof.

1.49. "***Confirmation Date***" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.50. "***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code.

1.51. "**Confirmation Order**" means the final, non-appealable order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, supplemented, or modified from time to time.

1.52. "**Consummation**" means the occurrence of the Effective Date of this Plan.

1.53. "**Cure**" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

1.54. "**Cure Claim**" means the Claim of any counterparty to any Executory Contract or Unexpired Lease, based upon a monetary default, if any, by any Debtor on such Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

1.55. "**Cure Notice**" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, a notice that (a) sets forth the proposed amount to be paid on account of a Cure Claim in connection with the assumption of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan; and (c) sets forth the procedures for objecting to the proposed assumption of Executory Contracts and Unexpired Leases, including the proposed objection deadline, and for the resolution by the Bankruptcy Court of any such disputes.

1.56. "**Cure/Assumption Objection Deadline**" means the date that is fourteen (14) days after filing of the Assumed Contracts List and service of the Cure Notice; provided that if any Executory Contract or Unexpired Lease is added to the Assumed Contracts List after the filing of the initial Assumed Contracts List, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors is proposed to be assigned to a third party after the filing of the initial Assumed Contracts List, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) fourteen (14) days after service of the amended Assumed Contracts List with such modification and (b) the date of the scheduled Confirmation Hearing; provided further that the foregoing shall not apply to any Executory Contract or Unexpired Lease that has been assumed and assigned pursuant to a Final Order of the Bankruptcy Court.

1.57. "**D&O Insurance Coverage**" means coverage for insureds under any applicable D&O Policies.

1.58. "**D&O Policies**" means all insurance policies (including policies providing D&O Insurance Coverage and D&O Tail Coverage) and related agreements of indemnity for directors', members', trustees' and officers' liability issued or providing coverage at any time to any of the Debtors or their Representatives and all agreements, documents or instruments relating thereto, for any policy period whatsoever.

1.59.   "**D&O Tail Coverage**" means the extension of the D&O Insurance Coverage for any period beyond the end of the applicable policy period, including but not limited to any extension for a period of six (6) years after the Effective Date for claims based on conduct occurring prior to the Effective Date.

1.60.   "**Debtor Release**" has the meaning set forth in Article 10.2 herein.

1.61.   "**DIP Agents**" means BID Administrator LLC, Wilmington Trust, National Association, and FP Solar, or any successors thereto, in their capacities as administrative and collateral agents under the DIP Facilities.

1.62.   "**DIP Budget**" means the "Approved Budget" as defined in the DIP Credit Agreement.

1.63.   "**DIP Collateral**" has the meaning set forth in the DIP Order.

1.64.   "**DIP Credit Agreements**" has the meaning set forth in the DIP Order.

1.65.   "**DIP Documents**" has the meaning set forth in the DIP Order.

1.66.   "**DIP Facility Claim**" means any Claim held by the DIP Secured Parties derived from, based upon, related to, on account of, or arising under the DIP Facilities or the DIP Order, including claims for all principal amounts outstanding, interest, fees, and expenses under the DIP Facilities.

1.67.   "**DIP Facilities**" means, collectively, the Brookfield DIP Facility, the Carlyle DIP Facility, and the Fundamental DIP Facility.

1.68.   "**DIP Intercreditor Agreement**" has the meaning set forth in the DIP Order.

1.69.   "**DIP Lenders**" has the meaning set forth in the DIP Order.

1.70.   "**DIP Order**" means, until entry of the Final DIP Order, the Interim DIP Order, and, after entry of the Final DIP Order, the Final DIP Order.

1.71.   "**DIP Secured Parties**" has the meaning set forth in the DIP Order.

1.72.   "**Disallowed**" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or Plan Administrator, as applicable, in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim or a proof of Interest, as applicable, has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been filed, or which has been deemed to be filed under applicable law or

7

order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case, a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.73.    "**Disbursing Agent**" means the Debtors, or the Entity or Entities, chosen (at any time) by the Debtors or the Plan Administrator to make or facilitate Distributions pursuant to this Plan. For the avoidance of doubt, the Plan Administrator may serve as the Disbursing Agent.

1.74.    "**Disclosure Statement**" means the *Disclosure Statement for Joint Chapter 11 Plan of Pine Gate Renewables, LLC and Its Debtor Affiliates, dated November 20, 2025*, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to this Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

1.75.    "**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for soliciting and tabulating votes on the Plan.

1.76.    "**Disputed**" means, with respect to any Claim or Interest, a Claim or Interest that (a) is neither Allowed nor Disallowed under this Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.

1.77.    "**Disputed Administrative Claims Reserve**" means the reserve established with respect to Disputed Administrative Claims pursuant to and governed by Article 8.4 of the Plan.

1.78.    "**Disputed Claims Reserves**" means the Disputed Administrative Claims Reserve and the Disputed General Unsecured Claims Reserve.

1.79.    "**Disputed General Unsecured Claims Reserve**" means the reserve established with respect to Disputed General Unsecured Claims pursuant to and governed by Article 8.4 of the Plan.

1.80.    "**Distributable Proceeds**" means all Cash of the Debtors on or after the Effective Date, including the proceeds of any Retained Causes of Action and the proceeds of all non-Cash assets of the Debtors' Estates, after funding the Professional Fee Escrow Account and the Wind-Down Reserve.

1.81.    "**Distribution**" means a distribution made or facilitated by the Disbursing Agent pursuant to this Plan.

*1.82.* "**Distribution Date**" means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of this Plan, on which the Disbursing Agent makes a Distribution to Holders of Allowed Claims.

*1.83.* "**Distribution Record Date**" means the record date for purposes of determining which Holders of Allowed Claims are eligible to receive Distributions under this Plan, which date shall be two (2) Business Days prior to the Effective Date.

*1.84.* "**Effective Date**" means the first Business Day on which all of the conditions specified in Article 9.2 hereof have been satisfied or waived pursuant to Article 9.4 hereof.

*1.85.* "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

*1.86.* "**Estate**" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

*1.87.* "**Exculpated Parties**" means collectively: (a) the Debtors; and (b) the Independent Managers.

*1.88.* "**Exculpation**" means the exculpation provision set forth in Article 10.4 hereof.

*1.89.* "**Executory Contract**" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*1.90.* "**Exhibit**" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

*1.91.* "**Existing Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, capital stock, limited liability company interests (including any common units or preferred units), contingent value rights (which shall be deemed equity interests for the purposes of the Plan), and any other equity, ownership, or profits interests in any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) common stock, preferred stock, limited liability company interests (including any common units or preferred units), or other equity, ownership, or profits interests in any Debtor (in each case whether or not arising under or in connection with any employment agreement) and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, other than any such Interests held by a Debtor or an Affiliate of a Debtor.

*1.92.* "**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. [ ● ]] (as amended, modified or supplemented from time to time in accordance with the terms thereof).

1.93.   "**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to sections 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.94.   "**Forbearance Agreements**" means, collectively, (i) the Limited Forbearance Agreement, dated as of August 7, 2025 (as amended, modified, or supplemented from time to time), and (ii) the Second Limited Forbearance Agreement & Second Amendment to Subscription Agreement, dated as of October 16, 2025, in each case, by and among the Partnership, PGR Holdco GP, LLC, Pine Gate Renewables, LLC, PGR Partners, LLC, Pine Gate Management Holdings LLC, GC PGR HoldCo Member, LLC, GC PGR HoldCo, LLC, and Healthcare of Ontario Pension Plan Trust Fund.

1.95.   "**Forbearance Documents**" means the Partnership Agreement, the GP LLC Agreement, the Secured Promissory Note, the Securities Pledge Agreement, and the Forbearance Agreements.

1.96.   "**FP Solar**" means FP Solar Development I LLC.

1.97.   "**Fundamental DIP Facility**" means the debtor-in-possession financing facility provided by FP Solar and Solar Construction Lending, LLC.

1.98.   "**Fundamental Prepetition Agent**" means FP Solar, and any successor thereto.

1.99.   "**Fundamental Prepetition Borrower**" means FP 2021 Dev Holdco, LLC and/or Blue Ridge Power, LLC, as applicable, in their respective capacities as Borrower under the Fundamental Prepetition Credit Agreements.

1.100.   "**Fundamental Prepetition Credit Agreements**" means (a) the Revolving Loan Agreement, dated as of December 10, 2021, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the applicable Fundamental Prepetition Borrower, the Fundamental Prepetition Agent, and the Fundamental Prepetition Lender, (b) Bridge Agreement, and (c) the Amended and Restated Loan Agreement, dated as of June 26, 2025, as may have further been amended or modified, by and among Blue Ridge Power, LLC, as borrower and Solar Construction Lending, LLC, as lender.

*1.101.* "**Fundamental Prepetition Documents**" means (a) the Fundamental Prepetition Credit Agreements, (b) the Fundamental Prepetition Security Documents, and (c) each of the other "Loan Documents" (as defined in the Fundamental Prepetition Credit Agreements).

*1.102.* "**Fundamental Prepetition Facility**" means the financing facility pursuant to the Fundamental Prepetition Credit Agreements.

*1.103.* "**Fundamental Prepetition Lender**" means the "Lender" (as defined in the Fundamental Prepetition Credit Agreements).

*1.104.* "**Fundamental Prepetition Security Documents**" has the meaning set forth in the DIP Order.

*1.105.* "**Fundamental Secured Claim**" means any Secured Claim derived from, based upon, related to, on account of, or arising under Fundamental Prepetition Documents that is not included in a successful credit bid or rolled up pursuant to the Fundamental DIP Facility.

*1.106.* "**Funded Debt Deficiency Claim**" means any Unsecured Claim arising from the Prepetition Credit Agreements that is not credit bid in accordance with section 363(k) of the Bankruptcy Code or rolled up pursuant to the DIP Facilities.

*1.107.* "**Funded Debt Secured Claim**" means, collectively, the Brookfield Secured Claim, the Carlyle Secured Claim, and the Fundamental Secured Claim.

*1.108.* "**General Administrative Claim**" means any Administrative Claim, other than a Claim for fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

*1.109.* "**General Unsecured Claim**" means any Unsecured Claim (other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Intercompany Claim, or a Subordinated Claim), including, (a) Claims arising from the rejection of Unexpired Leases or Executory Contracts, (b) Claims arising from any litigation or other court, administrative, or regulatory proceeding, including damages or judgments entered against or settlement amounts owing by, a Debtor in connection therewith, and (c) the Funded Debt Deficiency Claim.  The term "General Unsecured Claim" expressly excludes any Claim that constitutes a 363 Sale Assumed Liability.

*1.110.* "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

*1.111.* "**GP LLC Agreement**" means the Amended and Restated Limited Liability Company Agreement of PGR Holdco GP, LLC, dated as of April 16, 2024, by and among PGR Holdco GP, LLC, PGR Partners, LLC, GC PGR HoldCo Member, LLC, GC PGR HoldCo, LLC, and Healthcare of Ontario Pension Plan Trust Fund.

*1.112.* "**Holder**" means a Person or Entity, as applicable, holding a Claim against or an Interest in any of the Debtors.

*1.113.* "**Impaired**" means, with respect to a Claim or Interest, or Class of Claims or Interests, a Claim or Class that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*1.114.* "**Independent Managers**" means, collectively, Todd Arden, William Transier, Neal Goldman, Jonathan Zinman, Patrick Bartels, and Michael Wartell, each in his capacity as an independent and disinterested manager on the applicable Debtors' boards of managers.

*1.115.* "**Independent Manager Fee Claim**" means all unpaid fees and expenses as of the Effective Date due to the Independent Managers pursuant to their respective manager agreements with the Debtors. On the Effective Date, the Independent Manager Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

*1.116.* "**Initial Distribution**" means the first Distribution that the Disbursing Agent, makes to Holders of Allowed Claims.

*1.117.* "**Initial Distribution Date**" means the date selected by the Debtors on or as soon as reasonably practicable after the Effective Date on which the Initial Distribution occurs.

*1.118.* "**Initial Stalking Horse Bidders**" means BII BID Solar II Aggregator, LP, Summit Infrastructure LLC, FP Acquisition Holdings LLC, and any affiliates of the foregoing.

*1.119.* "**Insurance Policies**" means all insurance policies and related agreements issued or providing coverage at any time to any of the Debtors or any of their predecessors and all agreements, documents, or instruments relating thereto, including any D&O Policies.

*1.120.* "**Insurer**" means any non-Debtor company or other Entity that issued or entered into an Insurance Policy (including any third-party administrator) and any respective predecessors and/or affiliates thereof.

*1.121.* "**Intercompany Claim**" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

*1.122.* "**Intercompany Interest**" means, collectively, (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity) in any Debtor, and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, earn-out rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor held by an Affiliate of such Debtor, which Affiliate may be another Debtor.

*1.123.* "**Interests**" means, collectively, Existing Equity Interests and Intercompany Interests.

*1.124.* "**Interim Compensation Procedures Order**" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. [ ● ]].

*1.125.* "**Interim DIP Order**" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 132] (as amended, modified or supplemented from time to time in accordance with the terms thereof).

*1.126.* "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.127.* "**Opt-Out Release Form**" has the meaning set forth in the Disclosure Statement Order.

*1.128.* "**Other Priority Claim**" means any Claim against any of the Debtors entitled to priority in payment as specified in section 507(a)(4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

*1.129.* "**Other Secured Claim**" means any Secured Claim, other than a DIP Facility Claim and a Funded Debt Secured Claim.  The term "Other Secured Claim" expressly excludes any Claim that constitutes a 363 Sale Assumed Liability.

*1.130.* "**Parent**" means Pine Gate Renewables, LLC.

*1.131.* "**Partnership**" means PGR Holdco, LP, a Delaware limited partnership.

*1.132.* "**Partnership Agreement**" means the Limited Partnership Agreement of the Partnership, dated as of April 16, 2024 (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms), by and among the Partnership, PGR Holdco GP, LLC, GC PGR HoldCo, LLC, GC PGR HoldCo Member, LLC, Healthcare of Ontario Pension Plan Trust Fund, PGR Partners, LLC, and Pine Gate Management.

*1.133.* "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*1.134.* "**Petition Date**" means November 6, 2025.

*1.135.* "**Plan Administration Agreement**" means the agreement, consistent with this Plan and in form and substance reasonably acceptable to the DIP Lenders, to be entered into by and among the Debtors and the Plan Administrator with respect to the Plan Administration Process, which shall be included in the Plan Supplement.

*1.136.* "**Plan Administration Assets**" has the meaning set forth in Article 5.7 of this Plan.

*1.137.* "**Plan Administration Expenses**" means all reasonable and documented fees, expenses, and costs incurred by the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement, including the maintenance or disposition of the Plan Administration Assets (including, but not limited to, Plan Administrator fees, attorneys'

fees, the fees of professionals, and other Persons retained by the Plan Administrator, personnel-related expenses, any Taxes imposed in respect of the Plan Administration Assets), which shall be funded as part of the Wind-Down Reserve in accordance with the terms of this Plan.

1.138. "**Plan Administration Process**" means the process for resolving and paying Claims described in Article 5.6 of this Plan.

1.139. "**Plan Administrator**" means the individual disclosed in the Plan Supplement, or any successor(s) thereto, to be the representative of the Wind-Down Debtors on and after the Effective Date, and who shall have the rights, powers, duties and responsibilities set forth in the Plan and Plan Administration Agreement.

1.140. "**Plan Schedule**" means a schedule annexed to this Plan or an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

1.141. "**Plan Supplement**" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, which in each case, shall be in form and substance reasonably acceptable to the DIP Lenders, and all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

1.142. "**Post-Effective Date Debtors**" means the Debtors after the Effective Date.

1.143. "**Prepetition Credit Agreements**" means, collectively, the Brookfield Prepetition Credit Agreement, the Carlyle Prepetition Note Purchase Agreement, and the Fundamental Prepetition Credit Agreements.

1.144. "**Prepetition Documents**" means the Brookfield Prepetition Documents, the Carlyle Prepetition Documents, and the Fundamental Prepetition Documents.

1.145. "**Prepetition Funded Debt Facilities**" means, collectively, the Brookfield Prepetition Facility, the Carlyle Prepetition Facility, and the Fundamental Prepetition Facility.

1.146. "**Prepetition Intercreditor Agreement**" means, individually or collectively, each of (a) that certain Intercreditor Agreement, dated October 6, 2025 among FP Solar, the Brookfield Agent and the Carlyle Noteholders and (b) that certain Junior Lien Intercreditor and Subordination Agreement, dated October 6, 2025 among FP Solar, the Brookfield Agent and the Carlyle Noteholders.

1.147. "**Prepetition Secured Parties**" has the meaning set forth in the DIP Order.

1.148. "**Priority Tax Claim**" means any Secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.149. "**Professional Fee Claim**" means a Claim (a) by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of

expenses incurred after the Petition Date and on or before the Effective Date under sections 328, 330, 331, or 503(b)(2) of the Bankruptcy Code, as applicable; or (b) by an ordinary course professional for compensation for services rendered or reimbursement of expenses incurred after the Petition Date and on or before the Effective Date pursuant to any order approving the retention of ordinary course professionals.

1.150. "**Professional Fee Escrow Account**" means a segregated interest-bearing account to be established by the Debtors into which the Professional Fee Escrow Amount shall be deposited on or prior to the Effective Date, which, for the avoidance of doubt, may be the escrow account for professional fees established under the DIP Order.

1.151. "**Professional Fee Escrow Amount**" means the aggregate amount of Professional Fee Claims incurred or estimated in good faith to be incurred in connection with the Chapter 11 Cases prior to and as of the Effective Date less the aggregate amount of the Professional Fee Escrow Account, the Escrow Account (as Defined in the DIP Order), and Carve Out Account (as defined in the DIP Order) (as applicable) and (b) a good faith estimate of Professional Fee Claims to be incurred following the Effective Date, consistent with the terms of the Plan.

1.152. "**Proof of Claim**" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.153. "**Pro Rata Share**" means, with respect to any Distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

1.154. "**Reinstate**," "**Reinstated**," or "**Reinstatement**" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by the Plan in accordance with section 1124(1) of the Bankruptcy Code.

1.155. "**Related Parties**" means with respect to an Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (including preferred equity holders and regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders (including preferred equity holders), officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

1.156. "**Released Parties**" means, each of, and in each case solely in its capacity as such: (a) each Debtor and each Post-Effective Date Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the DIP Secured Parties and the Prepetition Secured Parties (including, but not limited to, for each, in their capacities as prepetition lenders); (d) the administrative and collateral agents under the Prepetition Credit Agreements; (e) the Successful Bidder(s); (f) the Plan Administrator; and (g) with respect to each of the foregoing Entities in clauses (a) through (g), such Entity and its Related Parties; *provided*, that, in each case, a Person

shall not be a Released Party if such Person: (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

*1.157.* "***Releasing Parties***" means collectively: (a) the Released Parties; (b) all Holders of Claims who vote to accept the Plan; (c) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims and Interests who, in each case do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Disclosure Statement Order, (i) vote to reject the Plan, (ii) are deemed to reject the Plan, or (iii) are presumed to accept the Plan; and (e) each Related Party of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Entities in clauses (a) through (d), solely to the extent such Related Party (I) would be obligated to grant a release under the principles of agency if it were so directed by the Debtors, the Post-Effective Date Debtors, or the Entity in the foregoing clauses (a) through (d) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through the Debtors, the Post-Effective Date Debtors or an Entity in the foregoing clauses (a) through (d). A Person shall not be a Releasing Party if such Person timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

*1.158.* "***Representatives***" means, with respect to a Person, such Person's current and former (i) officers, (ii) directors, (iii) managers, (iv) principals, (v) members, (vi) employees, (vii) agents, (viii) advisory board members, (ix) financial advisors, (x) partners, (xi) attorneys, (xii) accountants, (xiii) investment bankers, (xiv) consultants, (xv) representatives, and (xvi) other professionals, each in their capacity as such.

*1.159.* "***Retained Causes of Action***" means all Causes of Action owned by the Debtors' Estates that are not released, waived, or transferred pursuant to the Plan and listed on the Schedule of Retained Causes of Action.

*1.160.* "***Retained Professional***" means any Person or Entity retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*1.161.* "***Reverse TSAs***" means the transition services agreements, whereby [ ● ] and its Affiliates shall provide (A) reasonable services to the Debtors and their Affiliates for a reasonable amount of time to the extent reasonably required for the Wind-Down (at cost, but in no event in excess of the amount attributable to such service in the DIP Budget, as determined in good faith) and (B) services for the period required and at the cost negotiated in good faith and contemplated under any Third-Party TSA (taking into account the amount attributable to such services in the

DIP Budget or, if greater, at the amount received by any Debtor or its Affiliate in respect of the performance of the analogous service under such Third-Party TSA).

*1.162.* "**Sale Transaction Proceeds**" means all proceeds from the consummation of the 363 Sale Transaction that are distributable or payable to the Estates, and such proceeds may consist of Cash or non-Cash consideration.

*1.163.* "**Schedule of Retained Causes of Action**" means the schedule of Retained Causes of Action included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

*1.164.* "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

*1.165.* "**Secured**" means, when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

*1.166.* "**Secured Claim**" means a Claim that is Secured.

*1.167.* "**Secured Promissory Note**" means the Secured Promissory Note, dated as of March 15, 2024, issued by PGR Partners, LLC.

*1.168.* "**Securities Pledge Agreement**" means the Securities Pledge Agreement, dated as of March 15, 2024, by and between PGR Partners, LLC and Pine Gate Renewables, LLC.

*1.169.* "**Single Unit**" has the meaning set forth in Article 3.2(j) hereof.

*1.170.* "**Solicitation**" means the solicitation of votes on this Plan.

*1.171.* "**Solicitation Procedures**" means the procedures concerning Solicitation established pursuant to the Disclosure Statement Order.

*1.172.* "**Statutory Fees**" means all fees and charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

*1.173.* "**Subordinated Claim**" means any Claim (i) arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim or (ii) subject to subordination in accordance with section 510(c) of the Bankruptcy Code or otherwise.

*1.174.* "***Successful Bidder(s)***" means any Entity or Entities whose bid for certain of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures Order.  For the avoidance of doubt, a Successful Bidder may be more than one Entity, submitting one or more bids, and, if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders."

*1.175.* "***Third-Party Release***" means the releases by the Holders of Claims as set forth in Article 10.3 herein.

*1.176.* "***Third-Party TSA***" means any transition services agreement between any Debtor or any of its Affiliates, on the one hand, and any purchaser of assets of the Debtors or their Affiliates in the Chapter 11 Cases, on the other hand.

*1.177.* "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

*1.178.* "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*1.179.* "***Unimpaired***" means, with respect to a Claim, or Class of Claims, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

*1.180.* "***Unsecured Claim***" means any Claim that is not a Secured Claim.

*1.181.* "***Voting Classes***" means Classes 3 and 4.

*1.182.* "***Voting Deadline***" means [January 26], 2026 at 4:00 p.m. (Prevailing Central Time).

*1.183.* "***Voting Record Date***" means [December 18], 2025.

*1.184.* "***Waterfall Recovery***" means the priority distribution of Distributable Proceeds, which shall be allocated and paid to the Holders of Claims or Interests, as applicable, until paid in full from time to time in the following priority (in each case on a pro rata basis and subject in all respects to the waterfall provisions of the DIP Order, Prepetition Intercreditor Agreement and DIP Intercreditor Agreement): (a) first, on account of DIP Facility Claims; (b) second, on account of Allowed Other Secured Claims; (c) third, on account of Allowed Administrative Claims; (d) fourth, on account of Allowed Priority Tax Claims; (d) fifth, on account of Allowed Other Priority Claims; (e) sixth, on account of Allowed Funded Debt Secured Claims; (f) seventh, on account of any Allowed General Unsecured Claims that are not assumed by the Successful Bidder(s); and (g) eighth, on account of Allowed Section 510(b) Claims and Existing Equity Interests.

*1.185.* "***Wind-Down***" means the process of winding down the Debtors' businesses and Estates, and winding down and dissolving the Debtor-entities, after the Effective Date, and all actions related to, necessary for, or otherwise appropriate to effectuate the foregoing.

*1.186.* "***Wind-Down Debtors***" means the post-Effective Date Debtors.

*1.187.* "***Wind-Down Reserve***" means Cash in an amount to be determined by the Debtors, to be retained by the Wind-Down Debtors to wind down the Estates, including any residual assets and Entities not transferred to the Successful Bidder(s), which amount shall be funded from the Sale Transaction Proceeds and/or Cash on hand. To the extent of any remaining funds after payment of Professional Fee Claims in full, such funds shall constitute the Wind-Down Reserve.

*1.188.* "***Wind-Down Transactions Memorandum***" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Wind-Down, the form of which shall be included in the Plan Supplement.

### B.     Rules of Interpretation.

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item will be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, or other agreement or document will mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of a Claim or an Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles," "Exhibits", and "Plan Schedules" are references to Articles, Exhibits, and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided herein, the rights and obligations arising pursuant to this Plan will be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein will, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) references to "shareholders," "directors," and/or "officers" will also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (m) all references to statutes, regulations, orders, rules of courts, and the like will mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.     **Computation of Time.**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day.

D.     **Consent Rights**

Notwithstanding anything in the Plan to the contrary, any and all consultation, information, notice, and consent rights set forth in the DIP Order and the DIP Credit Agreement, with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be (a) incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and (b) fully enforceable as if stated in full herein.

For the avoidance of doubt, nothing in this Article I.D shall be deemed to modify the consultation, information, notice, and consent rights set forth in the Bidding Procedures Order.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, General Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

2.1.     ***Administrative Claims.***

(a)     *General Administrative Claims*. Except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that Allowed General Administrative Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously filed or paid, requests for payment of General Administrative Claims must be filed and served on the Debtors or Plan Administrator, as applicable, pursuant to the procedures specified herein, in the Confirmation Order, the notice of entry of the Confirmation Order, the notice of occurrence of the Effective Date, or any other order entered by the Court (as applicable) no later than the Administrative Claims Bar Date; *provided*, that the foregoing shall not apply to either (a) the Holders of Claims under section 503(b)(1)(D) of the Bankruptcy Code or (b) the Bankruptcy Court or U.S. Trustee as Holders of General Administrative Claims. Holders of General Administrative Claims that are required to file and serve a request for payment of such General Administrative Claims that do not file and serve such request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such General Administrative Claims against the Debtors and their respective Estates and property, and such General Administrative Claims shall be deemed satisfied as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in <u>Article 10.5</u> hereof. Nothing in this <u>Article 2.1</u> shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to requests for payment of General Administrative Claims must be filed and served on the Debtors or Plan Administrator, as applicable, and the requesting party by the Administrative Claims Objection Deadline.

(b)      *Professional Fee Claims*. All Retained Professional Persons seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims, the Plan Administrator shall pay such amounts from Distributable Proceeds within five (5) Business Days after entry of the order approving such Professional Fee Claims. The Plan Administrator is authorized to pay Professional Fee Claims incurred after the Effective Date in the ordinary course from the Professional Fee Escrow Account, without the need for Bankruptcy Court approval.

On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. Funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Plan Administrator. On and after the Effective Date, the Professional Fee Escrow Account shall be held by the Plan Administrator on behalf of the Post-Effective Date Debtors for Retained Professional Persons and for no other parties until all Professional Fee Claims (other than any Professional Fee Claims that have been Disallowed by the Bankruptcy Court) have been paid in full. Professional Fee Claims owing to the applicable Retained Professional Persons shall be paid in full, in Cash, to such Retained Professional Persons from funds held in the Professional Fee Escrow Account when such Claims

are (a) Allowed by an order of the Bankruptcy Court or (b) authorized to be paid under (i) the Interim Compensation Procedures Order or (ii) with respect to Professional Fee Claims incurred after the Effective Date, this Plan.  The Post-Effective Date Debtors' obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account as of the Effective Date.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account in any way, other than customary liens in favor of the depository bank at which the Professional Fee Escrow Account is maintained.

Objections to any final requests for payment of Professional Fee Claims must be filed no later than twenty-one (21) days from the date of the filing of such final requests for payment of Professional Fee Claims.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and applicable orders of the Bankruptcy Court.

(c)    *Statutory Fees*. All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Disbursing Agent, which may be the Plan Administrator, shall pay any and all such fees when due and payable from the Wind-Down Reserve.  After the Effective Date, the Disbursing Agent, which may be the Plan Administrator, shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

## 2.2.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.

## 2.3.    *DIP Facility Claims.*

All DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Documents, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facilities on such date, (ii) all interest accrued and unpaid thereon through and including the date of payment, (iii) all accrued and unpaid

fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the DIP Order, and (iv) any and all other DIP Obligations.  On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a DIP Facility Claim shall receive its payment in full in Cash from the Distributable Proceeds, except to the extent such DIP Facility Claim was included in a successful credit bid pursuant to the terms of the 363 Sale Transaction Documentation.  All Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility shall be of no further force or effect; *provided*, that until all Allowed DIP Claims have been indefeasibly paid in full pursuant to the DIP Credit Agreements and the DIP Order, the DIP Secured Parties' Liens and security interests in the DIP Collateral shall remain valid, perfected, and enforceable.  For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.  For the avoidance of doubt, nothing herein shall modify the timing of any payments required by the DIP Documents.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

### 3.1.  *Summary.*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions, if any, pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of this Plan for that Debtor.

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes distinct chapter 11 plans, one for each Debtor. Each Class will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the

transfer of any of the Debtors' assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

**Summary of Classification and Treatment of Claims**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3(a). | **Brookfield Secured Claims** | **Impaired** | **Entitled to Vote** |
| 3(b). | **Carlyle Secured Claims** | **Impaired** | **Entitled to Vote** |
| 3(c). | **Fundamental Secured Claims** | **Impaired** | **Entitled to Vote** |
| 4. | **General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| 5. | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 6. | Subordinated Claims | Impaired | Deemed to Reject |
| 7. | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 8. | Existing Equity Interests | Impaired | Deemed to Reject |

    *3.2.*   ***Classification and Treatment of Claims.***

        (a)    *Class 1 — Other Priority Claims.*

            (i)    *Classification*: Class 1 consists of all Other Priority Claims.

            (ii)    *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

            (iii)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

        (b)    *Class 2 — Other Secured Claims.*

            (i)    *Classification*: Class 2 consists of all Other Secured Claims.

            (ii)    *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtor against which such Allowed Other Secured Claim is asserted agree to less favorable treatment for such Holder, each Allowed Other Secured Claim shall, at the option of the applicable Debtor (i) be paid in full in Cash,

(ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such Claim Unimpaired.

(iii)     *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(c)     *Class 3(a) — Brookfield Secured Claims*.

(i)     *Classification*: Class 3(a) consists of Brookfield Secured Claims.

(ii)     *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a Brookfield Secured Claim shall receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery.  **Upon entry of the Final DIP Order and rollup of all Brookfield Secured Claims pursuant to the Brookfield DIP Facility, Class 3(a) will be deemed eliminated from this Plan for purposes of receiving distributions under this Plan, voting to accept or reject this Plan, and determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.**

(iii)     *Voting*: Class 3(a) is Impaired under the Plan. Holders of Brookfield Secured Claims are entitled to vote on the Plan and shall receive Ballots.

(d)     *Class 3(b) — Carlyle Secured Claims*.

(i)     *Classification*: Class 3(b) consists of Carlyle Secured Claims.

(ii)     *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a Carlyle Secured Claim shall receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery.  **Upon entry of the Final DIP Order and rollup of all Carlyle Secured Claims pursuant to the Carlyle DIP Facility, Class 3(b) will be deemed eliminated from this Plan for purposes of receiving distributions under this Plan, voting to accept or reject this Plan, and determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.**

(iii)     *Voting*: Class 3(b) is Impaired under the Plan. Holders of Carlyle Secured Claims are entitled to vote on the Plan and shall receive Ballots.

(e)     *Class 3(c) — Fundamental Secured Claims*.

(i)     *Classification*: Class 3(c) consists of Fundamental Secured Claims.

(ii)     *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a Fundamental Secured Claim shall receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery; *provided*,

for the avoidance of doubt, that until all Allowed Fundamental Secured Claims have been indefeasibly paid in full, the applicable Holder's Liens and security interests on account of the Fundamental Prepetition Documents shall remain valid, perfected, and enforceable.

(iii)    *Voting*: Class 3(c) is Impaired under the Plan. Holders of Fundamental Secured Claims are entitled to vote on the Plan and shall receive Ballots.

(f)    *Class 4 — General Unsecured Claims*.

(i)    *Classification*: Class 4 consists of all General Unsecured Claims.

(ii)    *Treatment*: In full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Distributable Proceeds pursuant to the Waterfall Recovery.

(iii)    *Voting*: Class 4 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote on the Plan and shall receive Ballots.

(g)    *Class 5 — Intercompany Claims*.

(i)    *Classification*: Class 5 consists of all Intercompany Claims.

(ii)    *Treatment*: Each Holder of an Allowed Intercompany Claim shall receive, in full and final satisfaction of its Allowed Intercompany Claim, no distribution under the Plan, and all Intercompany Claims shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion.

(iii)    *Voting*: Class 5 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

(h)    *Class 6 — Subordinated Claims*.

(i)    *Classification*: Class 6 consists of all Subordinated Claims.

(ii)    *Treatment*: Allowed Subordinated Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(iii)    *Voting*: Class 6 is Impaired and not receiving any distribution under this Plan, and Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.  Holders of Subordinated Claims

26

shall be provided an Opt-Out Release Form solely for purposes of providing an opportunity to such Holders to affirmatively opt out of the Third-Party Release.

      (i)    *Class 7 — Intercompany Interests*.

          (i)    *Classification*: Class 7 consists of all Intercompany Interests.

          (ii)    *Treatment*: Each Holder of an Allowed Intercompany Interest shall receive, in full and final satisfaction of its Allowed Intercompany Interest, no distribution under the Plan, and all Intercompany Interests shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion.

          (iii)    *Voting*: Class 7 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

      (j)    *Class 8 — Existing Equity Interests*.

          (i)    *Classification*: Class 8 consists of all Existing Equity Interests.

          (ii)    *Treatment*: Holders of Existing Equity Interests shall receive no distribution on account of their Existing Equity Interests. On the Effective Date, all Existing Equity Interests will be canceled and extinguished and will be of no further force or effect.

              1.    On the Effective Date, all Existing Equity Interests shall be cancelled and one share of the Parent (the "***Single Unit***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Existing Equity Interests, consistent with their former relative priority and economic entitlements. The Single Unit shall be recorded on the books and records maintained by the Plan Administrator;

              2.    Each former holder of Existing Equity Interests (through their interest in the Single Unit, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Existing Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of Existing Equity Interests may receive its share of any remaining assets of the Parent consistent with such holder's rights of payment existing immediately prior to the Petition Date. Unless otherwise determined by the Plan Administrator, on the date that the final Chapter 11 Case is closed in accordance with the Plan, the Single Unit issued on the Effective Date shall be deemed cancelled and of no further force and effect; *provided*, that such cancellation does not adversely impact the Estates; and

3.       The continuing rights of former holders of Existing Equity Interests (including through their interest in the Single Unit or otherwise) shall be nontransferable except by operation of law, or, subject to the Plan Administrator's consent, for administrative transfers where the ultimate beneficiary has not changed.

(iii)      *Voting*: Class 8 is Impaired and not receiving any distribution under this Plan, and Holders of Existing Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject this Plan.  Holders of Existing Equity Interests shall be provided an Opt-Out Release Form solely for purposes of providing an opportunity to such Holders to affirmatively opt out of the Third-Party Release.

### 3.3. *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under this Plan shall affect, diminish, or impair the rights of the Debtors, as applicable, with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 3.4. *Elimination of Vacant Classes*.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3.5. *Controversy Concerning Impairment*

If a controversy arises as to whether any Claim or any Class is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Hearing.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THIS PLAN

### 4.1. *Acceptance or Rejection of this Plan*.

(a)      *Presumed Acceptance of Plan*. Claims in Classes 1 and 2 are Unimpaired under this Plan and, therefore, Holders of such Claims are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

(b)      *Voting Classes*. Claims in Classes 3 and 4 are Impaired under this Plan, and the Holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject this Plan; *provided*, that, as detailed in Article III, upon entry of the Final DIP Order and rollup of all

applicable Funded Debt Secured Claims pursuant to the applicable DIP Facility, if any, the applicable Class will be deemed eliminated from this Plan for purposes of receiving distributions under this Plan, voting to accept or reject this Plan, and determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(c)     *Deemed Rejection of this Plan*. Claims and Interests in Classes 6 and 8 are Impaired under this Plan and Holders of such Claims or Interests shall receive no Distributions under this Plan on account of their Claims or Interests (as applicable) and are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 6 and 8 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

(d)     *Presumed Acceptance of this Plan or Deemed Rejection of this Plan*. Claims and Interests in Classes 5 and 7 are either (a) Unimpaired and, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and shall receive no distributions under this Plan and, therefore, deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 5 and 7 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

### 4.2.    *Nonconsensual Confirmation*.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### 4.3.    *Subordinated Claims*.

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective Distributions (if any) and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Plan Administrator reserves the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THIS PLAN

### 5.1.    *Transactions Effective as of the Effective Date*.

The transactions contemplated by this Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, managers, members, their stockholders, or any other Person or Entity.

5.2.    *363 Sale Transaction*.

Pursuant to the 363 Sale Order, to the extent not consummated before the Effective Date, the acquired assets shall be transferred to and vest in the Successful Bidder(s) free and clear of all Liens, Claims, charges, Interests, or other encumbrances (except for those Liens, Claims, charges, Interests, or other encumbrances expressly assumed by the Successful Bidder(s) pursuant to the terms of the 363 Sale Transaction Documentation) pursuant to section 363 of the Bankruptcy Code and in accordance with the terms of the 363 Sale Transaction Documentation.  In exchange, the Successful Bidder(s) shall pay to the Debtors the sale proceeds in accordance with the terms of the 363 Sale Transaction Documentation; *provided*, that with respect to the sale of any collateral of the DIP Secured Parties or the Prepetition Secured Parties, such proceeds shall be first applied against the DIP Facility Claims or the Funded Debt Secured Claims, as applicable.

The Debtors and the Successful Bidder(s) shall be authorized to take all actions as may be deemed necessary or appropriate in furtherance of the 363 Sale Transaction pursuant to the terms of the 363 Sale Transaction Documentation, the 363 Sale Order, and the Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court; act or action under applicable law, regulation, order, rule; or the vote, consent, authorization, or approval of any Entity.

5.3.    *General Settlement of Claims and Interests*.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. For the avoidance of doubt, such settlement and compromise shall not include or affect any Causes of Action listed in the Schedule of Retained Causes of Action.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VII hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

5.4.    *Intercreditor Agreements*.

Except as expressly provided in the Plan, all rights, entitlements, and distributions shall be subject to the Prepetition Intercreditor Agreement and the DIP Intercreditor Agreement, the priorities and payment waterfalls of which shall be incorporated, preserved, and enforced by the

Plan, the Debtors, the Plan Administrator and, as applicable, the Post-Effective Date Debtors, pursuant to section 510 of the Bankruptcy Code.

### 5.5.    *No Substantive Consolidation.*

Moreover, the Plan's treatment shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Post-Effective Date Debtors or Plan Administrator to seek to have any Claim subordinated in accordance with section 510 of the Bankruptcy Code or other applicable law.

The Plan is being proposed as a joint plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 5.6.    *Plan Administrator*.

On and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors shall be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors and post-Effective Date Debtors, as applicable.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Transactions Memorandum.  The Plan Administrator shall carry out any necessary functions required by the 363 Sale Transaction Documentation.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors, including: (a) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the 363 Sale Transaction; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (c) making distributions as contemplated under the Plan; (d) establishing and maintaining bank accounts in the name of the Debtors; (e) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors; (g) administering and paying taxes of the Debtors, including filing tax returns; (h) representing the interests of the Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit and completing and filing, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; (i) except to the extent Claims have been Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and

all Claims against the Debtors; (j) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors' Estates; and (k) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court, provided that such resignation shall only become effective upon the appointment of a successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors shall be terminated.

      (a)    *Appointment of the Plan Administrator*. The Plan Administrator shall be appointed by the Debtors with the reasonable consent of the DIP Lenders.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

      (b)    *Retention of Professionals*. The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Debtors solely from the Wind-Down Reserve, upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

      (c)    *Compensation of the Plan Administrator*. The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Administration Agreement, which will be included in the Plan Supplement.

      (d)    *Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation*. The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for actual fraud, willful misconduct, or gross negligence, in all respects by the Debtors.  The Plan Administrator may obtain, at the expense of the Debtors and solely from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

5.7.    *The Plan Administration Assets*.

On the Effective Date, the Plan Administrator shall sign the Plan Administration Agreement and accept the Wind-Down Reserve, the Professional Fee Escrow Account, and the Cash therein (the "***Plan Administration Assets***").  As of the Effective Date, all Plan Administration Assets and all assets dealt with in this Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise further provided in this Plan or in the Confirmation Order.  The Plan Administrator shall be authorized to use any proceeds of the Wind-Down Reserve in connection with the Wind-Down and use the Professional Fee Escrow Account solely for the purposes as explicitly set forth in the Plan.

5.8.    *Merger of Debtors; Closing Cases of Debtor Affiliates*.

On or after the Effective Date, the Plan Administrator (i) may merge or dissolve any Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; *provided* that upon any merger with another Debtor, all Claims filed or scheduled in the non-surviving Debtor's Chapter 11 Case shall be deemed to have been filed in the surviving Debtor's Chapter 11 Case; (ii) may merge or dissolve Affiliates of the Debtors and complete the winding up of Affiliates of a Debtor without the necessity for any other or further actions to be taken by or on behalf of such Affiliates or their shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; and (iii) may seek authority from the Bankruptcy Court to close any Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.9.    *Cancellation of Existing Securities and Agreements*.

On the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest shall be cancelled and of no further force and effect, except that each of the foregoing, including without limitation the Prepetition Credit Agreements, shall continue in effect solely to the extent necessary to (a) allow Holders of such Claims or Interests to receive Distributions under this Plan; (b) allow the Debtors, the Plan Administrator, and the Administrative and Collateral Agents, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to this Plan on account of such Claims; (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or Interests pursuant to any such applicable document or instrument; (d) allow the Administrative and Collateral Agents to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnification rights or any rights with respect to priority or payment or to exercise charging liens; (e) preserve any rights of the DIP Agents to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the DIP Documents, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens; (f) preserve the rights of the DIP Agent to appear and be heard in the Chapter 11 Cases to the extent such rights exist, and (g) permit the DIP Agents to perform any function necessary to effectuate the foregoing.

Notwithstanding the foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in this <u>Article 5.9</u> shall be deemed null and void and shall be of no force and effect.  In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged.

Except for the foregoing, subsequent to the performance by the Administrative and Collateral Agents of their respective obligations pursuant to this Plan, all further duties, obligations, liability, and responsibilities of the Administrative and Collateral Agents related to the DIP Documents, as applicable, shall terminate.

5.10.   *Corporate Action*.

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action or approval by Holders of Claims or Interests, the Debtors, the Bankruptcy Court, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

5.11.   ***Exemption From Transfer Taxes and Fees***.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer pursuant to, in contemplation of, or in connection with this Plan (including the Wind-Down), including pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in connection with the transactions contemplated hereby; (2) the creation, modification, consolidation, termination, refinancing, release or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral security for any or all of any indebtedness; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan and the transactions contemplated hereby, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or fee, or other similar tax, fee or governmental assessment, and the appropriate state or local government officials, recording officers or agents (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code and shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

5.12.   *Effectuating Documents; Further Transactions*.

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

5.13.   *Insurance Policies*.

Before the Petition Date, the Debtors obtained the D&O Tail Coverage for their current and former directors, officers, and managers.  After the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Tail Coverage for the full term of such D&O Policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage and the D&O Policies in all respects.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, to the extent any Insurance Policies have not already been assumed and assigned pursuant to a 363 Sale Order, (i) on the Effective Date, the Debtors shall be deemed to have assumed all such Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code identified on the Assumed Contracts List, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) neither Confirmation nor Consummation of this Plan shall alter, impair or otherwise modify the terms and conditions of any such Insurance Policy or the coverage provided pursuant thereto (including any indemnity obligations assumed by the foregoing assumption of Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed) except that on and after the Effective Date, all Insurance Policies shall vest unaltered and in their entireties in the Post-Effective Date Debtors or the Plan Administrator, as applicable, who shall succeed to all of rights and obligations and shall become and remain liable in full for all of the Debtors' obligations under such Insurance Policies, regardless of whether such obligations arise before or after the Effective Date and without the need for an Insurer to file a Proof of Claim or General Administrative Claim or to object to any Cure Notice; (iii) for the avoidance of doubt, neither Confirmation nor Consummation of this Plan, nor the vesting of the Insurance Policies in the Post-Effective Date Debtors and their Estates or the Plan Administrator, as applicable, shall impair, alter, modify or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, or (y) any available defenses of the Debtors or the Plan Administrator or any Insurer under the Insurance Policies; and (iv) on the Effective Date, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article X of this Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) without altering clause (ii) and sub-clause (II) hereof, claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims solely as against the proceeds of the applicable Insurance Policies; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct

claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting claimant relief from the automatic stay or the injunctions set forth in Article X of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies and take other actions relating to the Insurance Policies (including effectuating a setoff), in each instance to the extent permissible under applicable non-bankruptcy law and in accordance with the terms of such Insurance Policies.

### 5.14.   *Preservation of Retained Causes of Action*.

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in this Plan, or by a Bankruptcy Court order, the Debtors reserve the Retained Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue the Retained Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Retained Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment the Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself and the occurrence of the Effective Date.

### 5.15.   *Closing of the Chapter 11 Cases*.

After a Chapter 11 Case has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close that Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1.   *Assumption or Rejection of Executory Contracts and Unexpired Leases*.

Except as otherwise provided herein or in the 363 Sale Order, on the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, and are not the subject of a pending motion or notice to reject, assume, or assume and assign as of the Effective Date, (2) are not identified on the Assumed Contracts List, and (3) have not expired under their own terms prior to the Effective Date.

Notwithstanding anything to the contrary contained herein, the Debtors reserve the right to alter, amend, modify, or supplement (i) the Assumed Contracts List and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to any 363 Sale Transaction Documentation, with the consent of the Successful Bidder(s), at any time up to the earlier of (x) 90 days following the closing date of a 363 Sale Transaction, and (y) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the written consent (email being sufficient) of the applicable landlord counterparty, consistent with any 363 Sale Transaction Documentation, as applicable.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing assumptions, assumptions and assignments, and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date; *provided*, that neither the Plan nor the Confirmation Order is intended to limit or shall be construed as limiting the Debtors' authority under the 363 Sale Order to assume and assign Executory Contracts and Unexpired Leases to the Successful Bidder(s) pursuant to the 363 Sale Transaction Documentation. The Debtors shall have the right to amend the Schedules of Assumed Executory Contracts and Unexpired Leases.

### 6.2. *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*.

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

### 6.3. *Assumption of the D&O Policies*.

The Debtors, and upon the Effective Date, the Post-Effective Date Debtors, shall assume all of the D&O Policies pursuant to section 365(a) of the Bankruptcy Code that have not been assumed pursuant to a 363 Sale Order. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Policies and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Policies.

In addition and for the avoidance of doubt, after the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under the D&O Policies covering the Debtors' current boards of directors in effect on or after the Petition Date and, subject to the terms of the applicable D&O Policies, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

6.4.    ***Payments Related to Assumption of Executory Contracts and Unexpired Leases***.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan, as reflected on the Assumed Contracts List, as applicable, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date in accordance with the 363 Sale Transaction Documentation or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving any such dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided, however*, that the Debtors or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

6.5.    ***Rejection Damages Claims***.

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under this Plan must be filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Article 6.1 above, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court shall be the applicable deadline under such order or the Claims Bar Date Order, as applicable. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim shall be classified and treated as a General Unsecured Claim against the applicable Debtor.

6.6.    ***Reservation of Rights***.

Neither the exclusion nor inclusion of any contract or lease on the Assumed Contracts List, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

6.7.    ***Nonoccurrence of Effective Date***.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

     *7.1.*     ***Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions***.

        (a)    *Timing and Calculation of Amounts to Be Distributed and Date of Distributions*. Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ninety (90) days after the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the amount of the Distribution that this Plan provides for Allowed Claims in the applicable Class. Subsequent Distributions shall be made, if determined by the Plan Administrator to be practicable and appropriate, on a quarterly basis thereafter; *provided* that the Plan Administrator may refrain from making an interim Distribution to the extent the Plan Administrator reasonably determines that the costs of making such Distribution are not reasonable in comparison to the amount of such Distribution and instead may reserve making any subsequent Distributions until a future Distribution date. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII. Except only for DIP Facility Claims, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on their Claims, regardless of whether Distributions on account of such Claims are delivered before, on or at any time after the Effective Date.

        (b)    *Entitlement to Distributions*. On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date.

     *7.2.*     ***Disbursing Agent***.

     Except as otherwise provided herein, all Distributions under this Plan shall be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date, which may be the Plan Administrator.

7.3.   ***Distributions on Account of Claims Allowed After the Effective Date.***

(a)   *Payments and Distributions on Disputed Claims*. Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(b)   *Special Rules for Distributions to Holders of Disputed Claims*. Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Disbursing Agent, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.  Any Distributions to Holders of Allowed Claims in a Class under this Plan shall be made, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to Holders of Allowed Claims in such Class.

7.4.   ***Delivery of Distributions and Undeliverable or Unclaimed Distributions.***

(a)   *Delivery of Distributions in General*. Except as otherwise provided herein, the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holders' address on its Proof of Claim, if applicable, (b) such Holders' address listed on a notice filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' Schedules.

(b)   *Undeliverable Distributions and Unclaimed Property*.

(i)   *Failure to Claim Undeliverable Distributions*. In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date the Distribution was returned.  After such date, all unclaimed property or interests in property shall revert to the Post-Effective Date Debtors and their Estates (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be cancelled and forever barred.

(ii)   *Failure to Present Checks*. Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim for which such check was originally issued.  Any Holder of an Allowed Claim

holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check cancelled, forever barred, and estopped, and such Holder shall be enjoined from asserting any such Claim against the Post-Effective Date Debtors and their Estates.  In such cases, any Cash held for payment on account of such Claims shall be property of the Post-Effective Date Debtors and their Estates as Plan Administration Assets free of the Claims of such Holder with respect thereto.  Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(c)  *Record Date for Distributions*. For purposes of making Distributions on the Initial Distribution Date only, the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business on the Distribution Record Date.  If a Claim is transferred (a) twenty-one (21) or more days before the Distribution Record Date and reasonably satisfactory documentation evidencing such transfer is filed with the Bankruptcy Court, the Disbursing Agent shall make the applicable Distributions to the applicable transferee, or (b) twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make Distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is filed with the Bankruptcy Court and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(d)  *Fractional Distributions*. Notwithstanding anything in this Plan to the contrary, no payment of fractional cents shall be made pursuant to this Plan.  Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

(e)  *De Minimis Distributions*. Notwithstanding anything to the contrary contained in this Plan, the Disbursing Agent shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $50 shall be forever barred from asserting such Claim against the Estates.

### 7.5.  *Compliance with Tax Requirement; Allocations*.

In connection with this Plan and all Distributions hereunder, the Debtors and any other applicable Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed on them, and all Distributions hereunder and under all related agreements shall be subject to any such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Debtors and any other applicable Disbursing Agent have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (i) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, (ii) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay

applicable withholding taxes (or to reimburse the distributing party for any advance payment of the withholding tax) or to permit a relevant party to pay the withholding tax using its own funds and retain such withheld property, and (iii) making distributions conditional on the receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate.  Notwithstanding any provision in this Plan to the contrary, prior to withholding on a Distribution to a Holder, the Debtors and any other applicable Disbursing Agent shall cooperate to (i) provide written notice to such Holder of its intent to withhold such amount and the basis for such withholding and (ii) provide a reasonable opportunity for such Holder to provide forms and other evidence that would mitigate, reduce or eliminate such withholding. Notwithstanding any provision in this Plan to the contrary, all Persons and Entities holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of applicable taxes (or establish eligibility for an exemption from or reduction of withholding taxes), and each Holder of an Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations associated therewith, including income, withholding, and other tax obligations.  Any amounts withheld or reallocated pursuant to this <u>Article VII</u> shall be treated as if distributed to the Holder of the Allowed Claim.  The Debtors and other applicable Disbursing Agent reserve the right to allocate all Distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Debtors, the Plan Administrator, or the Disbursing Agent may require, as a condition to the receipt of a Distribution, that a Holder furnish to the Debtors, Plan Administrator, or Disbursing Agent, as applicable, any necessary or appropriate tax documentation and information, including a Form W-8 or Form W-9, as applicable, and including any other forms or documents reasonably required by the Debtors, the Plan Administrator, or the Disbursing Agent, to effect information reporting and the withholding of applicable taxes (or establish eligibility for an exemption from or reduction of withholding taxes).  If any Holder fails to comply with such a request within three (3) months thereof, such Distribution in respect of such Holder may be withheld and in such event shall be deemed an undeliverable Distribution and shall be treated in accordance with <u>Article 7.4(b)</u> hereof.

### 7.6.   *Surrender of Cancelled Instruments or Securities.*

As a condition precedent to receiving any Distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

### 7.7.   *Claims Paid or Payable by Third Parties*.

(a)   *Claims Paid by Third Parties*. The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed upon an order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Plan Administrator.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan

Administrator to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the Distribution Date.

(b)      *Claims Payable to Third Parties*. No Distributions under this Plan shall be made on account of a Claim that is payable: (i) pursuant to one of the Insurance Policies until the Holder of such Claim has exhausted all remedies with respect to such Insurance Policy; and/or (ii) by one or more Successful Bidder(s) because such Claim constitutes a 363 Sale Assumed Liability. To the extent that one or more Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon satisfaction by such Insurer, such Claim may be expunged to the extent of such satisfaction upon an order or approval of the Bankruptcy Court or deemed satisfied in full or in part, as applicable. The Debtors or the Plan Administrator, as applicable, may expunge any Claim that constitutes a 363 Sale Assumed Liability without notice to, action, order, or approval by the Bankruptcy Court or any other party in interest.

(c)      *Applicability of Insurance Policies*. Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

### 7.8.    *Allocation of Plan Distributions between Principal and Interest*.

To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall, except as required by law (as reasonably determined by the Debtors), be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### 8.1.    *Allowance and Disallowance of Claims*.

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code or this Plan or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Plan Administrator after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

*8.2.* **Prosecution of Objections to Claims**.

The Plan Administrator shall have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. From and after the Effective Date, the Plan Administrator, may settle or compromise any Disputed Claim and may administer and adjust the Claims Register to reflect such settlements or compromises, without notice to, action, order, or approval of the Bankruptcy Court.  The Plan Administrator may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided*, *however*, that for the avoidance of doubt, the underlying Claim shall remain under the jurisdiction of the Bankruptcy Court and shall not be Disallowed other than by order of the Bankruptcy Court.

With respect to the foregoing duties of the Plan Administrator to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator, as the case may be, shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the Plan Administrator shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

*8.3.* **Estimation of Claims**.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the applicable Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

*8.4.* **Disputed Claims Reserves**.

On or after the Effective Date, the Plan Administrator shall have the right, but is not required, to establish a Disputed Administrative Claims Reserve and a Disputed General Unsecured Claims Reserve, and to determine the amount of any Disputed Claims Reserves (based on good faith estimates, as applicable) or an order of the Bankruptcy Court estimating such Disputed Claims, net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserves.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator shall treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state

and local income tax purposes.  All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator and Holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing.

The Plan Administrator shall hold in any Disputed Claims Reserve all payments to be made on account of Disputed Claims for the benefit of Holders of Disputed Claims whose Claims are subsequently Allowed.  All taxes imposed on the assets or income of any Disputed Claims Reserve shall be payable by the Plan Administrator from the assets of such Disputed Claims Reserve.

The Disputed Claims Reserves shall be funded from the Wind-Down Reserve.  In the event Cash in any Disputed Claims Reserve is insufficient to satisfy all of the applicable Disputed Claims that have become Allowed, such Allowed Claims shall be satisfied from the Wind-Down Reserve.  After all Cash has been distributed from a Disputed Claims Reserve, no further distributions shall be made in respect of the applicable Disputed Claims.  At such time as all Disputed Claims have been resolved, any remaining Cash in the applicable Disputed Claims Reserve shall be remitted to the Wind-Down Reserve.

The Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims Reserves for all taxable periods through the date on which final distributions are made.

### 8.5.   *Distributions After Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim as a Claim other than a Subordinated Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

### 8.6.   *Disallowance of Certain Claims*.

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed pursuant to this Plan, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Post-Effective Debtors.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THIS PLAN

### 9.1. *Conditions Precedent to Confirmation*.

Unless satisfied or waived pursuant to the provisions of Article 9.4 hereof, the following are conditions precedent to Confirmation of this Plan:

(a)     The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the DIP Lenders.

(b)     The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the DIP Lenders, and shall not have been vacated, amended or otherwise modified.

(c)     The Reverse TSAs shall have been executed and delivered by all of the parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Reverse TSAs shall otherwise be in form and substance reasonably acceptable to the Debtors.

(d)     The Third-Party TSA, if any, shall have been executed and delivered by all of the parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Third-Party TSA, if any, shall otherwise be in form and substance reasonably acceptable to the Debtors.

### 9.2. *Conditions Precedent to the Effective Date*.

In addition to the satisfaction of the provisions of Article 9.1 hereof, unless satisfied or waived pursuant to the provisions of Article 9.4 hereof, the following are conditions precedent to the occurrence of the Effective Date of this Plan:

(a)     The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the DIP Lenders, and shall not have (i) been vacated, amended or otherwise modified and (ii) not be subject to a stay pending appeal.

(b)     The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate this Plan and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by this Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by this Plan.

(c)     The Plan Administrator shall have been appointed and vested with the authority under this Plan.

(d)     The Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement shall otherwise be in form and substance reasonably acceptable to the Debtors and the DIP Lenders.

(e)     The Reverse TSAs shall be in full force and effect.

(f)     The Third-Party TSA, if any, shall be in full force and effect.

(g)     All actions, documents, certificates, and agreements necessary to implement this Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

(h)     The Wind-Down Reserve shall have been established and funded.

(i)     The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount.

### 9.3.     *All Statutory Fees due and payable prior to the Effective Date shall have been paid by the Debtors.Timing of Conditions Precedent*.

Notwithstanding when a condition precedent to Confirmation or Consummation of this Plan occurs, for the purposes of this Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the other conditions precedent; *provided*, that to the extent a condition precedent (the "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of this Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### 9.4.     *Waiver of Conditions*.

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may be waived by the Debtors, with the consent of the DIP Lenders, with or without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; *provided*, that the waiver of the condition precedent in Article 9.2(i) shall require the consent of the affected Retained Professionals.  If this Plan is confirmed for fewer than all of the Debtors as provided for in Article 5.5 of this Plan, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

9.5.    ***Effect of Non-Occurrence of Conditions to Confirmation or Consummation***.

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

9.6.    ***Substantial Consummation***.

On the Effective Date, this Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## ARTICLE X.

## RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS

10.1.    ***General***.

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

10.2.    ***Debtor Release***[2].

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by this Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the**

---

2    Any and all releases by the Debtors and their Estates remain subject to the ongoing internal investigation. Nothing herein shall constitute or be deemed a waiver of any Causes of Action that the Debtors may hold against any Entity.

Estates, in each case on behalf of themselves and their respective successors, including the Plan Administrator, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "**Debtor Released Claims**"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan (including related to the Prepetition Funded Debt Facilities and the DIP Facilities), the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring, sale, and recapitalization efforts (including related to the Forbearance Documents), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, any 363 Sale Order, the 363 Sale Transaction Documentation, the Disclosure Statement, the DIP Order and the DIP Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, the distribution of property under this Plan, or any other act or omission; _provided_, _however_, that the foregoing "**Debtor Release**" shall not operate to waive or release, and the "**Debtor Released Claims**" shall not include, any Cause of Action of any Debtor or Post-Effective Date Debtor or its Estate: (1) against a Released Party arising from any obligations owed to the Debtors or Post-Effective Date Debtors pursuant to an Executory Contract or Unexpired Lease that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2) expressly set forth in and preserved by this Plan or related documents or the 363 Sale Transaction Documentation; (3) that is of a commercial nature and arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (4) against a Holder of a Disputed Claim to the extent necessary to administer and resolve such Disputed Claim solely in accordance with this Plan; or (5) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed in connection with

this Plan or the implementation thereof with respect to the Debtors, the Post-Effective Date Debtors, or the Estates.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Debtors' Estates, or the Plan Administrator asserting any Claim or Cause of Action released pursuant to the Debtor Release.

10.3.    *Release by Holders of Claims and Interests*.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, and the obligations contemplated by this Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "Third Party Released Claims"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the Post-Effective Date Debtors, or the Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan (including related to the Prepetition Funded Debt Facilities and the DIP Facilities), the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring, sale, and recapitalization efforts (including related to the Forbearance Documents), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the restructuring of any Claim or Interest before or

during the Chapter 11 Cases, the documents in the Plan Supplement, any 363 Sale Order, the 363 Sale Transaction Documentation, Disclosure Statement, the DIP Order and the DIP Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, the distribution of property under this Plan, or any other act or omission; **provided**, **however**, that the foregoing Third-Party Release shall not operate to waive or release, and the "Third-Party Released Claims" shall not include, any Cause of Action of any Releasing Party: (1) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Post-Effective Date Debtors; (2) expressly set forth in and preserved by this Plan or related documents; or (3) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the "**Third-Party Release**" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed in connection with this Plan or the implementation thereof.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release; (4) in exchange for good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the 363 Sale Transaction and implementing this Plan; (5) fair, equitable, and reasonable; and (6) essential to the Confirmation of the Plan.

### 10.4.  *Exculpation*.

To the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article 10.2 or Article 10.3 of this Plan, effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and Consummation of this Plan, making Distributions, implementing the Wind-Down, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the 363 Sale Transaction, this Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection therewith, or the solicitation of votes for, or Confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions in furtherance of any of the foregoing; **provided**, **however**, that none of the foregoing provisions shall operate to waive or release (i) any Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes

51

**intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations arising on or after the Effective Date under this Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on this Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 10.5. *Permanent Injunction*.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to <u>Article 10.2</u>, <u>Article 10.3</u>, <u>Article 10.4</u>, and <u>Article 10.5</u> hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party, as applicable.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Post-Effective Date Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.**

10.6. **Setoffs**.

Except as otherwise expressly provided for in this Plan, each Debtor and the Plan Administrator, pursuant to the Bankruptcy Code (including section 558 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to this Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by such Debtor of any such Claims, rights and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.  For the avoidance of doubt, the filing of a Proof of Claim is sufficient to preserve a right of set off hereunder.

10.7. **Release of Liens**.

Except as otherwise provided in this Plan or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and cancelled, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their Estates.

10.8. **Preservation of All Causes of Action Not Expressly Settled or Released**.

The Debtors expressly reserve all Retained Causes of Action not released hereunder for later adjudication by, as applicable, the Debtors or the Plan Administrator (including, without limitation, Retained Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan, or the Confirmation Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article 10.2, the Third-Party Release contained in Article 10.3 and the Exculpation contained in Article 10.4 hereof) or any other Final Order (including, without limitation, the Confirmation Order).  In

addition, the Debtors and the Plan Administrator, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

10.9.    *Integral Part of Plan*.

Each of the provisions set forth in this Plan with respect to the settlement, release, cancellation, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action is an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the 363 Sale Order, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest, including equitable subordination or other subordination of any Claim or Interest pursuant to 11 U.S.C. § 510;

(b)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

(c)    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

(d)    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(e)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(f)    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes related thereto;

(g)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(h)    enforce all orders previously entered by the Bankruptcy Court;

(i)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(j)    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person or Entity's obligations incurred in connection with this Plan;

(k)    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

(l)    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

(m)    enforce the terms and conditions of this Plan and the Confirmation Order, and maintain the integrity of this Plan following Consummation;

(n)    hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(o)    resolve any cases, controversies, suits or disputes with respect to the Release, Exculpation, indemnification and other provisions contained in Article X hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such provisions;

(p)    enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(q)    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan;

(r)    enter an order or orders concluding or closing the Chapter 11 Cases;

(s)    hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### 12.1.    *Reservation of Rights*.

Except as expressly set forth herein, this Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan will be or will be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or other Entity; or (2) any Holder of a Claim or an Interest or other Entity prior to the Effective Date.

### 12.2.    *No Government Releases*.

Except as expressly provided for in this Plan, nothing herein, or in the Confirmation Order or other related Plan documents shall affect a release or limit any claim arising solely under the enforcement of the police powers or regulatory activities of the United States Government or any of its agencies, or any state and local authority, whatsoever.

### 12.3.    *Payment of Statutory Fees*.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

### 12.4.    *Statutory Committee*.

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; *provided*, *however*, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the limited purposes of pursuing claims and final fee applications filed pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article 2.1.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

### 12.5.    *Modification of Plan*.

Except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, if permissible under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, not re-solicit votes on such modified Plan.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any modification, alteration, or amendment made pursuant to this Article 12.5 shall be in form and substance acceptable to the DIP Lenders, in each case solely to the extent such modification, alteration, or amendment materially and adversely affects such parties.

A Holder of a Claim that has accepted this Plan will be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### 12.6.   *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan will be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

### 12.7.   *Successors and Assigns*.

This Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### 12.8.   *Further Assurances*.

The Debtors, all Holders of Claims receiving Distributions hereunder, and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

12.9.    *Severability*.

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.10.   *Votes Solicited in Good Faith*.

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125 of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, each of the Released Parties and Exculpated Parties and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, none of such parties or individuals or the Post-Effective Date Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan or any previous plan.

12.11.   *Service of Documents*.

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "*Notice*") must be in writing, sent by personal delivery, electronic mail or courier, and addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Pine Gate Renewables, LLC<br>130 Roberts Street<br>Asheville, North Carolina 28801<br>Attn: Judith Hall | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock, Andrew M. Parlen, and Alexander W. Welch<br><br>Latham & Watkins LLP<br>330 N. Wabash Avenue<br>Suite No. 2800<br>Chicago, IL 60611<br>Attn: Jason B. Gott and Jonathan C. Gordon |

| | Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Attn: Timothy A. ("Tad") Davidson II,<br>Philip Guffy, and Brandon Bell |
|---|---|
| **United States<br>Trustee** | **Counsel to the Creditors'<br>Committee** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Attn: Andrew Jimenez and C. Ross Travis | [ ● ] |

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Article XII.  Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

### 12.12.  *Governing Law*.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

### 12.13.  *Tax Reporting and Compliance*.

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

### 12.14.  *Schedules*.

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

### 12.15.  *Conflicts*.

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control; *provided* that, in the event of any conflict with any provision of this Plan and/or the Confirmation Order, the Confirmation Order shall govern.

### 12.16. *Entire Agreement*.

Except as otherwise provided herein or therein, this Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.17. *2002 Notice Parties*.

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

[*Remainder of page intentionally left blank.*]

Respectfully submitted, as of the date first set forth above,

Dated: November 20, 2025

**PINE GATE RENEWABLES, LLC**
on behalf of itself and the other Debtor
Entities


_/s/ Raymond Shem_____
Raymond Shem
Authorized Signatory

## **Exhibit B**

Simplified Organizational Chart of Debtors and Non-Debtor Affiliates



**PINE GATE RENEWABLES**

**NOTES**
1. All entities depicted with full legal names are Debtors, but not all Debtors are depicted here. Refer to text in red-dashed box near the middle of the chart for further explanation.
2. Depictions of debt obligations exclude limited guarantees and equity pledges by certain holding companies of their subsidiaries that are debt obligors, due to limited economic relevance.

**Legend:**
- Fundamental Dev Borrower/Guarantor
- Tax Equity Financed Fundamental Project
- Carlyle Borrower/Guarantor
- Tax Equity Financed Carlyle Project
- Brookfield Borrower/Guarantor
- Tax Equity Financed Brookfield Project
- Pathward Borrower/Guarantor/ProjectCo Lien Grantor
- Non-Filing Business / Asset
- BRP Surety Indemnitor
- Fundamental BRP Borrower/Guarantor
- Pari First Lien Bridge/DIP Guarantor

Dark grey boxes are simplifying depictions of Company's multi-entity "inverted lease" or "partnership flip" tax equity structures and related holding companies. Managing member and borrower entities, along with their respective direct and indirect parent entities, generally will file chapter 11 cases.

For the avoidance of doubt, legal entities at the project level that are subject to bankruptcy filing consent rights in favor of tax equity investors will not file chapter 11 cases.

**<u>Exhibit C</u>**

Liquidation Analysis

**(To Come)**

**<u>Exhibit D</u>**

Listing of Debtors

| ENTITY NAME |
|---|
| BF Dev Holdco Pledgor, LLC |
| BF Dev Holdco, LLC |
| Blue Northern Power, LLC |
| Blue Ridge Power Holding Company, LLC |
| Blue Ridge Power, LLC |
| Blue Ridge Solar, LLC |
| BRP Construction, Inc. |
| BRP HBC Guarantor, LLC |
| BRP HBC Holdco, LLC |
| Cascade Dev Holdco, LLC |
| Cascade NTP Holdco, LLC |
| Cascade Pledgor, LLC |
| Catalina Solar Borrower, LLC |
| Catalina Solar Holdings, LLC |
| FP 2021 Dev Holdco, LLC |
| GA Solar 5, LLC |
| GH Pledge Borrower, LLC |
| Grande Holdco Borrower II, LLC |
| Grande Holdco Borrower, LLC |
| Grande Holdco, LLC |
| Limewood Bell Renewables LLC |
| Lotus Solar, LLC |
| Magnolia Solar Development LLC |

| |
|---|
| NPA 2023 Holdco, LLC |
| NPA PGR Blocker Holdco, LLC |
| NPA Polaris DevCo Holdco, LLC |
| NPA Polaris DevCo Pledgor, LLC |
| NPA Polaris OpCo Holdco, LLC |
| Old Hayneville Solar, LLC |
| PG Dev Carver Holdco, LLC |
| PGC Solar Holdings Holdco I, LLC |
| PGC Solar Holdings Holdco II, LLC |
| PGC Solar Holdings I Managing Member, LLC |
| PGC Solar Holdings I, LLC |
| PGR 2020 Lessor 7, LLC |
| PGR 2021 Fund 13, LLC |
| PGR 2021 Fund 17, LLC |
| PGR 2021 Fund 18, LLC |
| PGR 2021 Fund 4, LLC |
| PGR 2021 Fund 9, LLC |
| PGR 2021 Holdco 11, LLC |
| PGR 2021 Holdco 12, LLC |
| PGR 2021 Holdco 13, LLC |
| PGR 2021 Holdco 15, LLC |
| PGR 2021 Holdco 17, LLC |
| PGR 2021 Holdco 18, LLC |
| PGR 2021 Holdco 19, LLC |

| |
|---|
| PGR 2021 Holdco 4, LLC |
| PGR 2021 Holdco 9, LLC |
| PGR 2021 Manager 13, LLC |
| PGR 2021 Manager 17, LLC |
| PGR 2021 Manager 18, LLC |
| PGR 2021 Manager 4, LLC |
| PGR 2021 Manager 9, LLC |
| PGR 2022 Fund 1, LLC |
| PGR 2022 Fund 2, LLC |
| PGR 2022 Fund 4, LLC |
| PGR 2022 Fund 5, LLC |
| PGR 2022 Fund 8, LLC |
| PGR 2022 Fund 9, LLC |
| PGR 2022 Holdco 1, LLC |
| PGR 2022 Holdco 2, LLC |
| PGR 2022 Holdco 8, LLC |
| PGR 2022 Holdco 9, LLC |
| PGR 2022 Manager 1, LLC |
| PGR 2022 Manager 2, LLC |
| PGR 2022 Manager 4, LLC |
| PGR 2022 Manager 5, LLC |
| PGR 2022 Manager 8, LLC |
| PGR 2022 Manager 9, LLC |
| PGR 2022 Sponsor Holdco, LLC |

| |
|---|
| PGR 2023 Fund 1, LLC |
| PGR 2023 Fund 6, LLC |
| PGR 2023 Holdco 1, LLC |
| PGR 2023 Lessee 6, LLC |
| PGR 2023 Manager 1, LLC |
| PGR 2023 Manager 6, LLC |
| PGR 2024 Sponsor Holdco, LLC |
| PGR Blocker Holdco, LLC |
| PGR Blue Ridge Power Holdings, LLC |
| PGR Carver Holdco, LLC |
| PGR CC Affiliate Purchaser LLC |
| PGR Guarantor, LLC |
| PGR Holdco GP, LLC |
| PGR Holdco, LP |
| PGR MS Affiliate Purchaser LLC |
| PGR Procurement, LLC |
| PGR Signature Fund 1 Manager, LLC |
| Pine Gate Asset Management, LLC |
| Pine Gate Assets, LLC |
| Pine Gate Carver Holdings, LLC |
| Pine Gate Dev Holdco, LLC |
| Pine Gate Development, LLC |
| Pine Gate Energy Capital, LLC |
| Pine Gate EPC, LLC |

| |
|---|
| Pine Gate Fund Management, LLC |
| Pine Gate O&M, LLC |
| Pine Gate Renewables, LLC |
| Polaris DevCo Borrower A, LLC |
| Polaris DevCo Borrower B, LLC |
| Polaris DevCo Pledgor A, LLC |
| Polaris DevCo Pledgor B, LLC |
| Polaris OpCo Borrower B, LLC |
| Polaris OpCo Pledgor A, LLC |
| Polaris OpCo Pledgor B, LLC |
| PW Blocker Holdco, LLC |
| PW Revolver Borrower, LLC |
| Rio Lago Solar, LLC |
| Solar Carver 1, LLC |
| Solar Carver 3, LLC |
| Stowe Solar, LLC |
| Sunstone Solar 1, LLC |
| Sunstone Solar 2, LLC |
| Sunstone Solar 3, LLC |
| Sunstone Solar 4, LLC |
| Sunstone Solar 5, LLC |
| Sunstone Solar 6, LLC |
| Sunstone Solar, LLC |
| West River Solar, LLC |