**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

------------------------------------------------------------ x
                                                   :

In re:                                           :    Chapter 11

PINE GATE RENEWABLES, LLC, *et al.*,  :    Case No. 25-90669 (CML)

        Debtors.[1]                              :    (Jointly Administered)

------------------------------------------------------------ x

**DECLARATION OF MARK RAJCEVICH IN SUPPORT OF THE <u>EMERGENCY MOTION OF DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 (A) APPROVING A SETTLEMENT BY AND AMONG THE DEBTORS AND BACK BAY SOLAR, LLC AND (B) GRANTING RELATED RELIEF</u>**

I, Mark Rajcevich, hereby declare as follows:

    1.    I submit this declaration (this "**Declaration**") in support of the *Emergency Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 9019 (A) Approving a Settlement By and Among the Debtors and Back Bay Solar, LLC and (B) Granting Related Relief* (the "***9019 Motion***"), filed on November 26, 2025 [Docket No. 509].[2]

    2.    By the 9019 Motion, the Debtors seek entry of an Order (the "***9019 Order***") (a) approving the Settlement, the terms of which are set forth in the 9019 Motion, by and between the Debtors and Back Bay Solar, LLC ("**Back Bay**"); and (b) granting related relief.

---

[1]  A complete list of each of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in these chapter 11 cases (the "**Chapter 11 Cases**") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/PGR. The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the (a) 9019 Motion and (b) *Declaration of Ray Shem, President and Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First-Day Relief* (the "**First Day Declaration**") [Docket No. 19], as applicable.

US-DOCS\166059423

3. I am the Chief Restructuring Officer ("**CRO**") of PGR Holdco GP, LLC, PGR Holdco LP, and Pine Gate Renewables, LLC ("**PGR**", and together with the above-captioned debtors, the "**Debtors**") and a Managing Director of Alvarez & Marsal North America, LLC ("**A&M**"). As CRO, I am responsible for, among other things, conducting financial and liquidity forecasting, developing restructuring plans and other strategic alternatives for maximizing value, and analyzing and negotiating the Debtors' use of cash collateral and debtor-in-possession financing.

4. I have more than 20 years of experience in the restructuring industry, focusing on assessing and modeling financial and operational restructuring strategies, cash flow forecasting, business plans and related financial projections, cost cutting, liquidity management, preparing and operating companies through the chapter 11 process, asset dispositions, and wind-downs. I have worked with clients across various industries, including those in the renewable energy sector. I have considerable experience advising clients on maximizing value, recovery, and financial returns in complex restructuring situations. This experience includes working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. I hold a Bachelor of Science with high honors in Finance from the University of Illinois.

5. I am not being specifically compensated for this testimony other than through payments received by A&M as a professional retained by the Debtors.

6. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge as the CRO of the Debtors, (b) my review of relevant documents, (c) information provided to me by my A&M colleagues, (d) information provided to me by, or in discussions with, the Debtors' management team and/or the Debtors' other advisors, and (e) my views based upon my experience and knowledge as a restructuring professional.

**BACKGROUND**

7.      The Debtors are a solar energy company focused on the development, construction, operation, and financing of utility-scale solar farms across the United States.

8.      The Debtors co-own and manage eighty-five (85) of their non-Debtor operating projects (the "***Projects***") through a joint venture—non-Debtor PGR Signature Fund 1, LLC ("***Signature Fund 1***"), the Projects' common parent—with Back Bay.  The Projects are mostly smaller-scale solar farms that were developed in the early years after the Debtors' business was founded, between 2016 and 2020.  In October 2018, the Debtors and Back Bay agreed on the terms of the joint venture and entered into a Limited Liability Company Agreement (the "***LLCA***") for Signature Fund 1 and an Equity Capital Contribution Agreement, which provide for, among other things, Back Bay's contribution of equity financing in exchange for certain predetermined priority distributions out of any excess cash from the Projects pursuant to its "Class B" membership interests (the "***Class B Interests***").  In other words, Back Bay's Class B Interests function similarly to preferred equity; while the Debtors' economic position in Signature Fund 1—the "Class A" membership interests (the "***Class A Interests***") owned by Debtor PGR Signature Fund 1 Manager, LLC ("***Fund 1 Manager***")—is more akin to common equity.

9.      Based on my conversations with the Debtors' management and advisors, including my colleagues at A&M, it is my understanding—and the Debtors' determination—that the Class A Interests have no economic value because of the senior priority rights of the Class B Interests and the thresholds governing distributions of excess cash from the Projects.  At the same time, the LLCA imposes substantial obligations on Debtor Fund 1 Manager as the managing member of Signature Fund 1 and for all of the Projects, by extension.

10.     In addition to Debtor Fund 1 Manager's role as managing member, Debtor Pine Gate Asset Management, LLC ("***PGAM***") provides asset management services (*e.g.*, treasury,

accounting, financial, tax, legal, and other general management services) to the Projects under an asset management agreement, and Debtor Pine Gate O&M, LLC (f/k/a Blue Ridge Power Services, LLC) ("**PGOM**"), procures the Projects' operations and maintenance services ("**O&M Services**") through subcontracts either with non-Debtor subsidiary ACT Power Services, LLC ("**ACT**") or with unaffiliated third parties. In light of the Debtors' distress and anticipated wind-down of their estates, Debtors Fund 1 Manager, PGAM and PGOM do not have the financial wherewithal nor resources to continue in their respective roles as managing member under the LLCA, asset manager of the Projects, and O&M provider for the Projects.

11. I understand that as a result of the foregoing and the chapter 11 filing of PGR, Fund 1 Manager, and PGAM, each of the Project level financing agreements are in default and subject to the rights and remedies of the applicable financiers to the Project level financing agreements (the "**Project Level Financing Parties**") to the detriment of Back Bay as the holder of the Class B Interests. If the Projects are not rapidly stabilized, Back Bay has indicated that it will move for affirmative relief and assert substantial damages claims against the Debtors.

12. In the weeks before the Petition Date, past-due amounts due to the Debtors from the Projects on account of these services and for allocation of shared insurance costs had accrued to approximately $9.6 million (collectively, the "**Prior Balances**"). The Prior Balances were generally not paid timely. As a result, on October 31, 2025, the Debtors caused the Projects to pay down approximately $4.7 million of those Prior Balances, leaving approximately $4.9 million outstanding. Back Bay has disputed the Prior Balances.

13. Presently, the Debtors continue to provide services to the Projects, and the Projects continue to incur costs and expenses for such services. As a result, the Projects are expected to

owe the Debtors amounts coming due from and after November 1, 2025 for to-be-provided and already-provided services (the "***Go-Forward Balances***").

15. The Projects are operational and generate revenue; however, much of the cash flow generated by the Projects is used entirely or almost entirely on Project loan debt service, especially during the winter months when they generate less revenue.

## THE SETTLEMENT

15. Beginning prepetition and through the opening days of these cases, the Debtors and Back Bay engaged in discussions regarding a potential separation of Signature Fund 1 and the Projects from the Debtors' management and operations due to the uncertainties created by and against the backdrop of the Debtors' distress and anticipated wind-down in these cases. These discussions continued postpetition, and the parties undertook good-faith, arm's-length, hard-fought negotiations regarding the future of the Projects, their respective positions in Signature Fund 1, disputes regarding the Prior Balance, damages and setoff claims assertable by Back Bay, certain matters relating to outstanding surety bond indemnities that may be owed by the Projects, and the resolution of their joint venture transaction and related contractual obligations thereunder.

16. Because of those efforts, the parties have reached a settlement (the "***Settlement***") that will, among other things, provide for (a) Back Bay consenting to the payment by the Projects to the Debtors of approximately $7 million out of approximately $9.6 million of amounts owed to the Debtors for prior-rendered services and overhead allocations, (b) transition of the Debtors' asset management services from PGAM to third party SunStrong Management, LLC ("***SunStrong***"), (c) assumption and assignment of the Debtors' O&M Services from ACT and other third parties from PGOM directly to the Projects or SunStrong, at the direction of Back Bay, (d) transfer of the Class A Interests and Fund 1 Manager's role as "managing member" to GoodFinch Management LLC or a designated subsidiary or affiliate thereof ("***GoodFinch***") as

5

directed by Back Bay, following regulatory approval, and (e) appropriately tailored, mutual releases between the parties, with a reservation, for now, as to certain surety bond indemnity-related matters that the parties will continue to navigate. A more detailed description of the Settlement is attached hereto as Annex I.

## **MERITS OF THE SETTLEMENT**

17. I have reviewed and discussed the impacts of the Settlement with the Debtors' advisors and I understand and believe it is a fair and reasonable compromise, is in the best interest of the Debtors' estates, and is a sound exercise of the Debtors' business judgment.

18. I understand that if the Settlement is not effectuated and the Projects are not quickly stabilized, Back Bay has indicated that it will move for affirmative relief and assert substantial claims against the Debtors, which will require the Debtors to expend significant resources. Based on discussions with the Debtors' advisors and my understanding of the Debtors' liquidity constraints, I believe litigation with Back Bay would pose a significant risk of further depleting the Debtors' limited liquidity given the costs, risks, and delays of pursuing collection against the Projects and litigating Back Bay's asserted claims and defenses.

19. The Settlement, on the other hand, offers a comprehensive resolution of all issues among the Debtors and Back Bay. Among other things:

- The Settlement was the product of good-faith, arms'-length, and hard-fought negotiations between the Debtors (including their counsel Latham & Watkins LLP) and Back Bay (including their counsel Greenberg Traurig, LLP).

- The Settlement provides for cash payments to the Debtors aggregating approximately $7 million, inclusive of $2.3 million to be paid at Closing and approximately $4.7 million paid prepetition by the Projects that Back Bay otherwise could attempt to challenge, to settle approximately $9.6 million of Prior Balances. That settlement value is reasonable given the Projects' aggregate limited liquidity and cash flow, including when considering any costs associated with the expense and delay of pursuing collection against the Projects and the claims and defenses asserted by Back Bay.

- The Settlement provides for an orderly disposition of the Debtors' Class A Interests in Signature Fund 1, which have no economic value given Back Bay's Class B Interests and their preferred return, senior to the Class A Interests and sheds Fund 1 Manager's obligations under the LLCA.  Given the lack of value, the Debtors are not aware of any party interested in buying such equity, the Class A Interests are not part of the Debtors' broader sale process in these Chapter 11 Cases, nor do the Debtors have any reason to believe any party would be interested in doing so.

- The Settlement provides for an orderly and quick (or as-quick-as-possible) transition of the Debtors' asset management and O&M Services of the Projects.  That transition will help preserve the Debtors' liquidity by allowing them to minimize overhead costs and facilitate potential employee transitions.

- The Settlement provides for mutual releases between the Debtors and Back Bay, subject to certain carveouts.  The Debtors are not aware of any colorable claims against Back Bay that would otherwise be worth preserving from their estates' perspective.

- The Settlement contemplates the assumption/assignment and rejection of certain O&M Subcontracts and O&M Prime Contracts and the termination of certain contracts, including the AMA and certain other O&M Prime Contracts.

20. I understand that approval of the Settlement under sections 363 and 365 of the Bankruptcy Code requires a showing that the relief requested is supported by a sound exercise of business judgment.  Based on my personal knowledge and the facts set forth above, including the process undertaken with respect to the Settlement and for the foregoing reasons, that standard is readily satisfied here.

21. In addition, the relief requested by the 9019 Motion is necessary on an emergency basis to allow the Debtors to promptly begin the transfers and operational transitions contemplated by the Settlement.  Back Bay has expressly conditioned its agreement to the Settlement on timely entry of the 9019 Order as a material term in order to stabilize the Projects; any delay would jeopardize the Settlement, increase costs to the estates, and create unnecessary business and litigation risk.

22. For these reasons, I believe that the Settlement is a fair and equitable compromise and in the best interest of the Debtors, their estates, their creditors, and all stakeholders.

US-DOCS\166059423

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 5, 2025

*/s/ Mark Rajcevich*
Name: Mark Rajcevich
Title: Chief Restructuring Officer

**Annex I – Settlement Terms**

| | |
|---|---|
| **Transfer of Class A Interests** | • Fund 1 Manager's Class A Interests to be transferred to GoodFinch free and clear of liens, claims and encumbrances, following FERC approval (the "***Closing***"). |
| **Settlement Payment** | • At the Closing, Back Bay or its designee shall make a cash payment to Fund 1 Manager in the amount of $2,300,000. |
| **Prior Balances** | • All Prior Balances through and including October 31, 2025 shall be deemed satisfied in full. |
| **Cash Management & Tax Credits** | • All cash management for the Projects to be immediately turned over to SunStrong upon entry of the 9019 Order, including signature authority on each bank account related to Signature Fund 1 and the Projects.<br><br>• All tax credits generated or to be generated by the Projects (inclusive of all proceeds related thereto) are and shall remain the property of the Projects. |
| **Asset Management** | • Fund 1 Manager shall terminate the AMA without penalty at a time directed by Back Bay following entry of the 9019 Order.<br><br>• Upon entry of the 9019 Order, SunStrong shall be appointed as replacement asset manager for Signature Fund 1 and the Projects pursuant to one or more new Asset Management Agreements on terms acceptable to Back Bay, GoodFinch, SunStrong, and any other parties thereto, which shall provide SunStrong exclusive authority to manage the assets and affairs of Signature Fund 1 and the Projects, subject to customary limitations and consent requirements to be agreed as between the parties thereto; provided, however, that to the extent the ACT O&M Agreements (as defined below) remain in force and effect, SunStrong shall not be responsible for providing operations, maintenance and repair services to Signature Fund 1 or the Projects to the extent such entities are provided operations, maintenance and repair services pursuant to the ACT O&M Agreements.<br><br>• SunStrong, as asset manager under the new asset management agreement, shall provide information to both the holders of Class A Interests and Class B Interests of Signature Fund 1 subject to the consent and veto rights of the Class B Member to be reflected in the LLCA. Amendments to the LLCA |

| | |
|---|---|
| | necessary to reflect the settlement set forth herein shall be in the sole discretion of the Class B Member.<br><br>• At Closing, without prejudice to the rights and obligations of SunStrong as asset manager, GoodFinch shall be appointed as the "managing member" of Signature Fund 1, with all the right and obligations of managing member under the LLCA. |
| **O&M Contracts** | • Debtors shall assume and assign all O&M Subcontracts between PGOM and ACT relating to the Projects to each applicable Project (or another designee of SunStrong), without amendment or modification, upon entry of the 9019 Order (the "*ACT O&M Agreements*").<br><br>• Each O&M Subcontract between PGOM and unaffiliated third parties (*i.e.*, ACT) shall be neither assumed nor rejected until the earlier of (a) SunStrong delivering notice to the Debtors of its determination on whether to have such subcontracts assumed and assigned to the applicable Projects and (b) confirmation of a chapter 11 plan. If SunStrong notifies the Debtors it has determined such subcontracts should be assumed and assigned to the applicable Projects, the Debtors will do so without further action of the Court, subject to the provision of reasonable notice (including proposed cure costs) to the applicable counterparties and an opportunity to object (and if any objection cannot be resolved, the parties will bring such dispute to the Court). If SunStrong notifies the Debtors it has determined not to cause the applicable Projects to take assignment of such subcontracts or if confirmation of a chapter 11 plan occurs, the Debtors may determine in their discretion whether and when to assume or reject such subcontracts, subject to applicable law.<br><br>• O&M Prime Contracts between PGOM and the Project entities shall be (i) to the extent associated with an O&M Subcontract with ACT, deemed terminated by the parties (or the extent needed, rejected by PGOM), upon entry of the 9019 Order, with any rejection claims, penalties, fees, costs, or other damages waived by each party and (ii) to the extent associated with an O&M Subcontract with an unaffiliated third party (*i.e.*, excluding ACT), upon entry of the 9019 Order, deemed amended by the parties thereto to delete and waive any termination claims, penalties, fees, costs, or other damages and assumed by PGOM. |

2

|  |  |
|---|---|
|  | - Debtors, Back Bay, and SunStrong to coordinate and cooperate in good faith to effectuate an orderly transition of O&M services for the Projects to replacement providers other than the ACT O&M Agreements.<br><br>- All payments owed by the Projects and Signature Fund 1 to the Debtors for Go-Forward Balances, including O&M expenses shall be made in accordance with a cash disbursement schedule to be mutually agreed by the Parties prior to entry of the 9019 Order or such later date as mutually agreed among the Parties. Signature Fund 1 shall provide a financial backstop to pay such expenses to the extent not paid by the applicable Project. |
| **Cooperation** | - Debtors to provide Back Bay, GoodFinch, and SunStrong with diligence information about the Debtors' employees that provide services to Signature Fund 1 and/or the Projects; *provided*, that Back Bay, GoodFinch, and SunStrong will not be permitted to communicate with such employees until entry of the 9019 Order. Debtors will deliver accurate messaging to relevant employees about potential employment. Upon entry of the 9019 Order, notwithstanding anything to the contrary in any nondisclosure or other agreement between SunStrong and the Debtors, SunStrong shall be permitted to make offers of employment to the Debtors' employees that provide services to Signature Fund 1 and/or the Projects.<br><br>- Debtors (or their successors, where applicable) shall provide customary transition services, including but not limited to turnover of all proceeds, accounts, and account records related to tax credits and other incentives generated by or arising from Signature Fund 1 and/or the Projects, the transfer of all utility relationships related to the Projects and coordination with each of the depository institutions related to Signature Fund 1 and/or the Projects, to SunStrong, Signature Fund 1, and the Projects at cost pursuant to a transition services agreement, which shall remain in effect through the Closing; *provided*, that the services may be terminated at any time at the direction of SunStrong without penalty.<br><br>- Debtors and Back Bay to meet and confer in good faith to determine the timing and scope of discovery under Bankruptcy Rule 2004 in respect of certain surety claims. |

3

| | |
|---|---|
| **Releases** | - Effective upon entry of the 9019 Order and subject to the terms thereof, Debtors and Back Bay to provide mutual releases other than (i) claims for fraud, gross negligence or willful misconduct and (ii) claims related to any surety bonds or indemnities thereof; *provided* that, notwithstanding the foregoing, in the event that the Projects' indemnification liabilities to Intact Financial Corporation and its affiliates (the "***Intact Liabilities***") are settled and released in a manner authorized and approved in writing by Back Bay, the foregoing mutual releases shall automatically include a release of any and all claims related to the Intact Liabilities (including any related claims for fraud, gross negligence, or willful misconduct), without further action by any party or the Court and shall thereupon be final and binding. |