# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

---------------------------------------------------------- x
                                                           :
In re:                                                     :     Chapter 11
                                                           :
PINE GATE RENEWABLES, LLC, *et al.*,                       :     Case No. 25-90669 (CML)
                                                           :
Debtors.[1]                                                :     (Jointly Administered)
                                                           :
---------------------------------------------------------- x

## FINAL ORDER (I) AUTHORIZING THE
## DEBTORS TO OBTAIN POSTPETITION FINANCING,
## (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING
## THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE
## PROTECTION TO THE PREPETITION SECURED PARTIES,
## (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF
### [Relates to Docket Nos. 46, 132]

Upon the motion (the "***DIP Motion***")[2] of each of the above-captioned debtors and debtors in possession (collectively the "***Debtors***," and each, a "***Debtor***") in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended (the "***Bankruptcy Code***") and rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules (the "***Local Rules***") for the United States Bankruptcy Court for the Southern District of Texas (this "***Court***") seeking entry of an interim order (the "***Interim Order***") and a final order (this "***Final Order***," and together with the Interim Order,

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in Annex 1, the DIP Motion or the DIP Documents, as applicable.

the "***DIP Orders***," and the period from entry of the Interim Order to entry of this Final Order, the

"***Interim Period***") granting the relief provided herein, including among other things:

(i)  Authorization and approval for the Debtors to obtain up to $**551,507,371.92** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "***Brookfield DIP Facility***"), consisting of (a) up to $**134,084,563.51** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "***Brookfield New Money DIP Loans***"), of which up to $**17,500,000** (the "***Brookfield Interim Draw***"), plus certain additional Brookfield Subsequent Draws, became available during the Interim Period, with the balance of such Brookfield New Money DIP Loans available upon entry of this Final Order in accordance with the Brookfield DIP Credit Agreement, and (b) (1) upon entry of the Interim Order, $**250,266,570.24** in principal amount of term loans was used to repay and refinance, on a dollar-for-dollar, cashless basis, Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement, subject to paragraph 17 of this Final Order (the "***Brookfield Interim Roll-Up DIP Loans***"); and (2) upon entry of this Final Order, $**167,156,238.18** in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis, all remaining Brookfield Prepetition Loans under the Brookfield Prepetition Credit Agreement, subject to paragraph 17 of this Final Order (the "***Brookfield Final Roll-Up DIP Loans***" and, together with the Brookfield Interim Roll-Up DIP Loans, the "***Brookfield Roll-Up DIP Loans***" and, together with the Brookfield New Money DIP Loans, collectively, the "***Brookfield DIP Loans***"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Superpriority Senior Secured Debtor-in-Possession Credit Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "***Brookfield Borrower***"), the other Debtors identified as guarantors of the Brookfield DIP Obligations in the Brookfield DIP Documents (each a "***Brookfield Debtor Guarantor***"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Brookfield DIP Obligations in the Brookfield DIP Documents (each a "***Brookfield Non-Debtor Guarantor***" and together with the Debtor Guarantors, collectively the "***Brookfield Guarantors***"), the lenders party thereto (collectively, the "***Brookfield DIP Lenders***"), and Bid Administrator LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "***Brookfield DIP Agent***" and, together with the Brookfield DIP Lenders, the "***Brookfield DIP Secured Parties***"), substantially in the form attached to the Interim Order as **Exhibit A** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***Brookfield DIP Credit Agreement***" and the funding commitments thereunder, the "***Brookfield DIP Commitments***");

(ii)  Authorization and approval for the Debtors to obtain up to $**373,965,652.75** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession notes and other financial accommodations (the "***Carlyle DIP Facility***"), consisting of (a) up to $**51,722,511.23** (excluding fees, premiums and other amounts payable-in-kind) in principal amount issuance of new money notes (the "***Carlyle New Money DIP Notes***"), of which up to $**16,559,056.06** (the "***Carlyle Interim Issuance***"), plus certain additional Carlyle Subsequent Draws, became available during the Interim

4924-1323-6092v.7

Period, with the balance of such issuance of Carlyle New Money DIP Notes available upon entry of this Final Order in accordance with the Carlyle DIP Note Purchase Agreement, and (b) (1) upon entry of the Interim Order, **$142,697,722.12** in principal amount of notes was issued to repay and refinance, on a dollar-for-dollar, cashless basis, Carlyle Prepetition Secured Obligations under the Carlyle Prepetition Note Purchase Agreement, subject to paragraph 17 of the Final Order (the "*Carlyle Interim Roll-Up DIP Notes*"); and (2) upon entry of this Final Order, **$179,545,419.39** in principal amount of notes shall be issued to repay and refinance, on a dollar-for-dollar, cashless basis, all remaining Carlyle Prepetition Secured Obligations under the Carlyle Prepetition Note Purchase Agreement, subject to paragraph 17 of the Final Order (the "*Carlyle Final Roll-Up DIP Notes*" and, together with the Carlyle Interim Roll-Up DIP Notes, the "*Carlyle Roll-Up DIP* Notes," and, together with the Carlyle New Money DIP Notes, collectively, the "*Carlyle DIP Notes*"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "*Carlyle Issuer*"), the other Debtors identified as guarantors of the Carlyle DIP Obligations in the Carlyle DIP Documents (each a "*Carlyle Debtor Guarantor*"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Carlyle DIP Obligations in the Carlyle DIP Documents (each a "*Carlyle Non-Debtor Guarantor*" and together with the Carlyle Debtor Guarantors, collectively the "*Carlyle Guarantors*"), the note purchasers party thereto (collectively, the "*Carlyle DIP Noteholders*"), and Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent (in such capacities, the "*Carlyle DIP Agent*" and, together with the Carlyle DIP Noteholders, the "*Carlyle DIP Secured Parties*"), substantially in the form attached to the Interim Order as **Exhibit B** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "*Carlyle DIP Note Purchase Agreement*" and the funding commitments thereunder, the "*Carlyle DIP Commitments*");

(iii)   Authorization and approval for the Debtors to obtain up to **$730,758,214.97** in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "*Fundamental DIP Facility*"), consisting of (a) up to **$64,633,622.97** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "*Fundamental New Money DIP Loans*" and, collectively with the Brookfield New Money DIP Loans and the Carlyle New Money DIP Notes, the "*New Money DIP Loans*"), of which up to **$21,304,328.11** (the "*Fundamental Interim Draw*"), plus certain additional Fundamental Subsequent Draws, became available during the Interim Period, with the balance of such Fundamental New Money DIP Loans available upon entry of this Final Order in accordance with the Fundamental DIP Credit Agreement, and (b) upon entry of the Interim Order, **$360,831,678.46** in principal amount of term loans was used to repay and refinance, on a dollar-for-dollar, cashless basis, Fundamental Prepetition Loans under the Fundamental Prepetition Credit Agreements, subject to paragraph 17 of this Final Order (the "*Fundamental Interim Roll-Up DIP Loans*"); and (2) upon entry of this Final Order, **$305,292,913.55** in principal amount of term loans shall be used to repay and refinance, on a dollar-for-dollar, cashless basis Fundamental Prepetition Loans under the Fundamental Prepetition Credit Agreement, subject to

3

paragraph 17 of this Final Order (the "***Fundamental Final Roll-Up DIP Loans***" and, together with the Fundamental Interim Roll-Up DIP Loans, the "***Fundamental Roll-Up DIP Loans***" and, together with the Fundamental New Money DIP Loans, collectively, the "***Fundamental DIP Loans***"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured Superpriority Debtor-in-Possession Loan Agreement*, by and among Debtor Pine Gate Renewables, LLC (the "***Fundamental Borrower***"), certain of the other Debtors identified as guarantors of the Fundamental DIP Obligations in the Fundamental DIP Documents (each a "***Fundamental Debtor Guarantor***"), the non-Debtor direct and indirect subsidiaries of the Debtors that are identified as guarantors of the Fundamental DIP Obligations in the Fundamental DIP Documents (each a "***Fundamental Non-Debtor Guarantor***" and together with the Debtor Guarantors, collectively the "***Fundamental Guarantors***"), the lenders party thereto (collectively, the "***Fundamental DIP Lenders***"), and FP Solar Development I, LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "***Fundamental DIP Agent***" and, together with the Fundamental DIP Lenders, the "***Fundamental DIP Secured Parties***"), substantially in the form attached to the Interim Order as **Exhibit C** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***Fundamental DIP Credit Agreement***" and the funding commitments thereunder, the "***Fundamental DIP Commitments***");

(iv)   Authorization for the Debtors to use the proceeds of the DIP Facilities in accordance with the terms of the DIP Orders and the DIP Documents, subject to the Approved Budget (as defined herein);

(v)   Approval of and authorization for the Debtors and the Non-Debtor Guarantors to (a) enter into, execute, and perform under the DIP Documents and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Documents and the DIP Orders;

(vi)   Subject to the applicable Carve Out (as defined below), granting to each DIP Agent, for itself and on behalf of the applicable DIP Secured Parties, valid, enforceable, nonavoidable, automatically perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code), junior solely to the applicable Carve Out, in and upon all of the applicable DIP Collateral held by the applicable DIP Loan Parties to secure the applicable DIP Obligations as provided by and more fully defined in the DIP Documents, which liens shall be secured by the DIP Collateral and have the priorities set forth in Annex 3;

(vii)   Subject to the applicable Carve Out, granting to each DIP Agent, for itself and on behalf of the applicable DIP Secured Parties, allowed superpriority administrative expense claim status (junior solely to the applicable Carve Out) for the applicable DIP Obligations in each of the Chapter 11 Cases of the DIP Borrower and each applicable Debtor Guarantor and any of their Successor Cases (as defined herein), pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the terms of the DIP Orders, which allowed superpriority administrative expense claims shall have the priorities set forth in Annex 3;

4

(viii) Approving the application of the proceeds of all of the DIP Collateral in the manner and on the terms set forth in the DIP Orders and the DIP Intercreditor Agreement;

(ix) Authorizing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, (A) in the case of the Brookfield DIP Credit Agreement, the Commitment Fee, the Exit Fee, and the Applicable Prepayment Premium (each as defined in the Brookfield DIP Credit Agreement) (the "***Brookfield Fees***"), (B) in the case of the Carlyle DIP Note Purchase Agreement, the Upfront Payment, the Exit Payment and the Applicable Prepayment Premium (each as defined in the Carlyle DIP Note Purchase Agreement) (the "***Carlyle Payments***"), and (C) in the case of the Fundamental DIP Credit Agreement, the Commitment/Funding Fee, the Exit Fee and the Applicable Prepayment Premium (each as defined in the Fundamental DIP Credit Agreement) (the "***Fundamental Fees***"), and (D) in the case of each DIP Document, all other commitment fees, closing fees, exit fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, and the reasonable and documented fees and disbursements of the applicable DIP Agent's and the other DIP Secured Parties' attorneys, financial advisors, accountants, consultants, and other advisors, all to the extent provided in, and in accordance with, the applicable DIP Documents;

(x) Authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral of each of the Prepetition Secured Parties under the Prepetition Documents, and providing adequate protection to each of the Prepetition Secured Parties for, among other things, any diminution in value of their respective interests in the Prepetition Collateral from and after the Petition Date to the extent permitted under the Bankruptcy Code ("***Diminution in Value***");

(xi) Except to the extent of the Carve Out, authorizing the Debtors to waive (a) any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of marshaling and other similar doctrines as provided herein, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xii) Subject to and upon consummation of a (a) Brookfield Sale Transaction, at the election of the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), a release of certain intercompany claims against or interests in the Brookfield Silo Entities, including the Brookfield Pledged Intercompany Claims, (b) Carlyle Sale Transaction, at the election of the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), a release of certain intercompany claims against or interests in the Carlyle Silo Entities, including the Carlyle Pledged Intercompany Claims, and (c) Fundamental Sale Transaction, at the election of the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), a release of certain intercompany claims against or interests in the Fundamental Silo Entities, including the Fundamental Pledged Intercompany Claims, subject to the Committee's challenge rights as set forth in paragraph 17 herein;

(xiii) Modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to

the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order and waiving the 14-day stay provisions of Bankruptcy Rule 4001(a)(3); and

(xiv) Waiving the notice requirements of Bankruptcy Rule 6004(a), and any applicable stay (including under Bankruptcy Rule 6004), and providing for immediate effectiveness of this Final Order.

Notice of the DIP Motion, the relief requested therein, the Interim Hearing (as defined herein), and the Final Hearing (as defined herein) ("***Notice***") having been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on: (a) the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***"); (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, and Norton Rose Fulbright US LLP, co-counsel to Brookfield; (d) Milbank LLP and Haynes and Boone, LLP, co-counsel to Carlyle; (e) Sidley Austin LLP, counsel to Fundamental; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) White & Case LLP and Pachulski Stang Ziehl & Jones LLP, proposed co-counsel to the Committee (as defined herein); and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Noticed Parties***"), and this Court finding that in light of the nature of the relief requested, no other or further notice is required.

This Court having considered the relief requested in the DIP Motion, the First Day Declaration, the DIP Declarations, and the arguments of counsel made at the interim hearing on the DIP Motion held on November 10, 2025 (the "***Interim Hearing***") and the final hearing on the DIP Motion having been held by this Court and concluded (the "***Final Hearing***"); this Court having entered the Interim Order on November 11, 2025 [Docket No. 132]; all objections and reservations of rights, if any, to the relief requested in the DIP Motion on a final basis having been withdrawn, resolved, or overruled by this Court; it appearing that approval of the relief

requested in the DIP Motion on a final basis is fair and reasonable and in the best interests of the Debtors and their Estates, and is necessary to manage and preserve the value of the Debtors and their Estates; it appearing that the Debtors' entry into and performance under the DIP Documents and the other transactions contemplated by this Final Order was and continues to be a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    <u>Disposition</u>.  The relief requested in the DIP Motion is **GRANTED** to the extent set forth herein on a final basis  in accordance with the terms of this Final Order.  The objections of the Committee (as defined below) to (a) the Brookfield DIP Facility have been settled among the Debtors, the Brookfield DIP Secured Parties and the Committee on the terms set forth in the term sheet attached hereto as <u>Exhibit A</u> (the "***Brookfield Settlement Term Sheet***"); (b) the Carlyle DIP Facility have been settled among the Debtors, the Carlyle DIP Secured Parties and the Committee on the terms set forth in the term sheet attached hereto as <u>Exhibit B</u> (the "***Carlyle Settlement Term Sheet***"); and (c) the Fundamental DIP Facility have been settled among the Debtors, the Fundamental DIP Secured Parties and the Committee on the terms set forth herein. Entry of this Final Order shall constitute approval by the Court of the settlements and agreements set forth in the Brookfield Settlement Term Sheet, the Carlyle Settlement Term Sheet, and as otherwise incorporated in this Final Order, and each of the Debtors, the Committee and the DIP Secured Parties are authorized to comply with the provisions set forth in the Brookfield

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4924-1323-6092v.7

Settlement Term Sheet, the Carlyle Settlement Term Sheet, and herein.  Any other objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    Petition Date.  On November 6, 2025, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

C.    Debtors in Possession.  The Debtors continue to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.  An official committee of unsecured creditors (the "*Committee*") was appointed in the Chapter 11 Cases on November 19, 2025 [Docket No. 225].  No other statutory committee has been appointed in the Chapter 11 Cases.

D.    Jurisdiction and Venue.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, this Final Order, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This Court's consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to this Court's entry of a final order in connection with the DIP Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and the DIP Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and procedural bases for the relief sought

4924-1323-6092v.7

in the DIP Motion and granted in this Final Order are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-1, 4002-1, and 9013-1.

E.    <u>Notice</u>.  Upon the record presented to this Court at the Interim Hearing and the Final Hearing, and under the exigent circumstances set forth therein and in the DIP Motion, the First Day Declaration, and the DIP Declaration, notice of the DIP Motion and the relief requested thereby and granted in this Final Order has been provided in accordance with Bankruptcy Rules 2002, 4001(b), and 4001(c)(1), and Local Rules 2002-1, 4001-1, 4002-1, and 9013-1, which notice was appropriate under the circumstances and sufficient for entry of this Final Order.  No other or further notice of the DIP Motion is required for entry of this Final Order.  The relief granted herein on a final basis is necessary to manage and preserve the value of the Debtors and their Estates.

F.    <u>Debtors' Stipulations and Releases</u>.  Without prejudice to the rights of other parties in interest, including the Committee, as set forth in paragraph 17 herein, the Debtors admit, stipulate, acknowledge, and agree to the statements set forth in paragraphs 49(c) and 50(c) and Annex 2 hereto and the granting of the releases of the Prepetition Secured Parties set forth in paragraph 20 herein (collectively, the "***Debtors' Stipulations and Releases***").

G.    <u>No Control</u>.  None of the DIP Secured Parties or, subject to the provisions of paragraph 17, the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their properties or operations, have authority to determine the manner in which any of the Debtors' operations are conducted or are control persons or insiders of any of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from any of the DIP Documents or the Prepetition Documents.

4924-1323-6092v.7

H.     <u>Findings Regarding the DIP Facility</u>.

(1)     *Request for DIP Financing*.   The Debtors have requested that the DIP Lenders purchase notes and extend loans, advances, and other financial accommodations, as applicable, and the DIP Lenders are only willing to do so as more particularly described, and subject to the terms and conditions set forth, in this Final Order and the applicable DIP Documents.

(2)     *Need for DIP Financing*.   As set forth in the DIP Declarations and the First Day Declaration, the Debtors do not have sufficient available sources of working capital to operate their business in the ordinary course without the DIP Facilities, or to fund the Chapter 11 Cases without access to the proceeds of the DIP Facilities, all on the terms set forth in the DIP Documents and this Final Order.   The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations is essential to the viability of the Debtors and the Chapter 11 Cases.   The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facilities on the terms set forth in the DIP Documents, the Interim Order, and this Final Order is vital to the preservation and maximization of the value of the Debtors' business pending consummation of a restructuring transaction, including a Sale Transaction.   Accordingly, the Debtors have an immediate and continuing need to obtain funds from each of the DIP Facilities for the purposes and on the terms and subject to the limitations set forth herein and in the applicable DIP Documents, including the Approved Budget, in order to, among other things: (a) maintain business relationships; (b) permit the continued operation of their business; (c) pay the costs of administration of the Chapter 11 Cases and satisfy their other working capital and general corporate purposes; (d) minimize disruption of their business operations; and (e) manage and

preserve the assets of the Debtors' Estates in order to maximize the value of such assets and the recoveries to creditors of the Estates.

(3)     *No Credit Available on More Favorable Terms*.  As stated in the DIP Declarations and the First Day Declaration, the Debtors are unable to procure financing or other financial accommodations on more favorable terms from sources other than from the DIP Lenders under the applicable DIP Documents and are unable to obtain satisfactory unsecured credit allowable under sections 364(a) or 364(b) and 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also are unable to obtain secured credit for the purposes set forth in the DIP Documents on more favorable terms without the grant of liens on all or substantially all of the Debtors' assets pursuant to section 364(c) of the Bankruptcy Code and the terms of this Final Order.  In the Debtors' business judgment, the Debtors cannot procure the necessary financing on terms more favorable than the financing offered by the DIP Secured Parties pursuant to the applicable DIP Documents and the DIP Orders.

(4)     *Budget*.  Based upon the record presented to this Court by the Debtors, (a) the Debtors have prepared and delivered the Initial Budget, in the form attached to the Interim Order as **Exhibit D**, (b) the Initial Budget (as the same may be amended or extended solely as provided for in the DIP Orders, including as set forth in the Brookfield Settlement Term Sheet and the Carlyle Settlement Term Sheet) was prepared by the Debtors with the assistance of their professional advisors and management, and (c) the Initial Budget (as the same may be amended or extended solely as provided for in the DIP Orders) sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.  The Initial Budget and any supplemental Approved Budget may be modified by the Debtors in accordance with this Final Order and the DIP Documents without further order of this Court; *provided*, that

no modification to the Approved Budget as it relates to the amounts budgeted for fees and expenses of Committee Professionals shall be permitted without the Committee's prior written consent, which may be granted or withheld in the Committee's sole and absolute discretion; *provided*, *further* that nothing in this Final Order, the Approved Budget or any changes to the Approved Budget, including any increases to pay fees and expenses of Debtor Professionals or Committee Professionals, shall (w) increase or impact the amount of the Brookfield DIP Commitments, the Carlyle DIP Commitments or the Fundamental DIP Commitments, (x) alter the allocation of the use of proceeds of DIP Loans among professional fees, including fees and expenses of Debtor Professionals and Committee Professionals, on the one hand, and operating and other disbursements, on the other hand, (y) alter or amend the allocation of (i) Brookfield DIP Commitments between DIP Interim Funding Commitments, DIP Final Funding Commitments, and DIP Subsequent Draw Commitments (as each is defined in the Brookfield DIP Credit Agreement), (ii) Carlyle DIP Commitments between DIP First Draw Commitments, DIP Second Draw Commitments, and DIP Delayed Draw Commitments (as each is defined in the Carlyle DIP Note Purchase Agreement), or (iii) Fundamental DIP Commitments between commitments to fund the First Draw, Second Draw, and Subsequent Draws (each as defined in the Fundamental DIP Credit Agreement) or (z) amend or waive any conditions precedent to the funding of any (i) Brookfield DIP Loans or require the Brookfield DIP Secured Parties to fund any DIP Subsequent Draw Loans (as defined in the Brookfield DIP Credit Agreement), (ii) Carlyle DIP Notes or require the Carlyle DIP Secured Parties to fund any DIP Delayed Draw Notes (as defined in the Carlyle DIP Note Purchase Agreement) or (iii) Fundamental DIP Loans or require the Fundamental DIP Secured Parties to fund any Subsequent Draw (as defined in the Fundamental DIP Credit Agreement).    Each of the DIP Secured Parties is relying upon the

Debtors' compliance with the Approved Budget, subject to such variances as permitted herein and in the applicable DIP Documents, in determining to enter into the applicable DIP Facility as provided for in the DIP Orders and the DIP Documents.

(5)     *Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.*  Based on the record before this Court, (a) the Debtors, the DIP Agents and the other DIP Secured Parties have negotiated at arm's length and in good faith regarding the terms of the DIP Orders, the DIP Credit Agreements, the other DIP Documents, and the DIP Facilities, (b) the terms of the DIP Credit Agreements, the other DIP Documents, the DIP Orders, and the DIP Facilities are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration, (c) the interest, fees, costs, and expenses incurred by the Debtors in connection with the DIP Facilities, including, without limitation, the Brookfield Fees, the Carlyle Payments, and the Fundamental Fees, are fair, reasonable, and necessary, and (d) each of the DIP Facilities, the DIP Liens, and the DIP Superpriority Claims (as defined herein) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order, or any provision thereof is vacated, reversed, or modified, on appeal or otherwise.  Each of the DIP Secured Parties and, subject to the provisions of paragraph 17, the Prepetition Secured Parties has acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Debtors' incurrence of the DIP Facilities and the use of Cash Collateral, including in respect of all of the terms of the Interim Order, this Final Order, all documents related thereto or hereto (as applicable), and all transactions contemplated by the foregoing.  Any credit extended under the terms of  the Interim

Order or this Final Order shall be deemed to have been extended in "good faith" (as that term is used in section 364(e) of the Bankruptcy Code) by the applicable DIP Secured Parties and their respective counsel, advisors, and consultants.

(6)    *Issuance of Roll-Up DIP Loans*.  As a condition to entry into each of the DIP Credit Agreements, the extension of credit under each of the DIP Facilities, and authorization to use the Cash Collateral of each of the Prepetition Secured Parties, the Debtors, each of the DIP Secured Parties, and each of the Prepetition Secured Parties has agreed that, (a) as of the Interim Order Effective Date, the Debtors shall have (i) repaid and refinanced $250,266,570.24 of the Brookfield Prepetition Secured Obligations with the proceeds of Brookfield Interim Roll-Up DIP Loans, which were exchanged, on a dollar-for-dollar and cashless basis, for the Brookfield Prepetition Secured Obligations, as set forth in the Brookfield DIP Credit Agreement and in accordance with the terms of the DIP Orders; (ii) repaid and refinanced $142,697,722.12 of the Carlyle Prepetition Secured Obligations through the issuance of the Carlyle Interim Roll-Up DIP Notes, which were exchanged, on a dollar-for-dollar and cashless basis, for the Carlyle Prepetition Secured Obligations as set forth in the Carlyle DIP Note Purchase Agreement and in accordance with the terms of the DIP Orders, and (iii) repaid and refinanced $360,831,678.46 of the Fundamental Prepetition Secured Obligations with the proceeds of Fundamental Interim Roll-Up DIP Loans, which were exchanged, on a dollar-for-dollar and cashless basis, for the Fundamental Prepetition Secured Obligations, to the extent and as set forth in the Fundamental DIP Credit Agreement and in accordance with the terms of the DIP Orders; and (b)  upon entry of this Final Order, the Debtors shall (i) repay and refinance $167,156,238.18 of the Brookfield Prepetition Secured Obligations with the proceeds of Brookfield Final Roll-Up DIP Loans, which shall be exchanged, on a dollar-for-dollar and

4924-1323-6092v.7

cashless basis, for the Brookfield Prepetition Secured Obligations, as set forth in the Brookfield DIP Credit Agreement and in accordance with the terms of this Final Order; (ii) repay and refinance $179,545,419.39 of the Carlyle Prepetition Secured Obligations through the issuance of the Carlyle Final Roll-Up DIP Notes, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Carlyle Prepetition Secured Obligations as set forth in the Carlyle DIP Note Purchase Agreement and in accordance with the terms of this Final Order, and (iii) repay and refinance $305,292,913.55 of the Fundamental Prepetition Secured Obligations with the proceeds of Fundamental Final Roll-Up DIP Loans, which shall be exchanged, on a dollar-for-dollar and cashless basis, for the Fundamental Prepetition Secured Obligations, to the extent and as set forth in the Fundamental DIP Credit Agreement and in accordance with the terms of this Final Order. The issuance of the Roll-Up DIP Loans reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Each of the Prepetition Secured Parties would not consent to the use of the Prepetition Collateral, including Cash Collateral or the subordination of its Prepetition Liens to the DIP Liens or the applicable Carve Out, and each of the DIP Secured Parties would not be willing to provide the applicable DIP Facility or extend credit to the Debtors thereunder without the repayment and refinancing of the applicable Prepetition Secured Obligations through the issuance of the Roll-Up DIP Loans in substitution of and in exchange for such Prepetition Secured Obligations. The issuance of the Roll-Up DIP Loans has and will continue to benefit the Debtors and their Estates because it has and will continue to enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations, which financing would not otherwise be available. Because the repayment and refinancing of the Prepetition Secured Obligations as set forth in each of the DIP Documents, the Interim Order, and this Final Order is aligned with the

Bankruptcy Code's priority of payments mandate, such repayment and refinancing will not prejudice the rights of any party in interest. Approval of the Roll-Up DIP Loans shall be subject to paragraph 17 hereof and, in the event of a successful Challenge (as defined herein), the Court may fashion an appropriate remedy. The issuance of the Roll-Up DIP Loans shall be final and irrevocable as to the Debtors upon entry of this Final Order but otherwise shall be subject to the provisions of paragraph 17 of this Final Order.

(7)    *Adequate Protection*. Each of the Prepetition Secured Parties was, under the Interim Order, and hereby continues to be, entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution in Value thereof as set forth herein.

(8)    *Sections 506(c) and 552(b) and Marshaling*. Subject to paragraph 19, in light of the DIP Secured Parties' and the Prepetition Secured Parties' undertakings as set forth herein, each of the DIP Secured Parties were, upon entry of the Interim Order, and each of the Prepetition Secured Parties is, upon entry of this Final Order, entitled to a waiver of (A) the provisions of section 506(c) of the Bankruptcy Code, (B) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (C) the equitable doctrine of "marshaling" or any other similar doctrine with respect to all DIP Collateral and Prepetition Collateral of any DIP Secured Party or Prepetition Secured Party, as applicable, in each case, except to the extent of the applicable Carve Out.

(9)    *No Responsible Person.* The Debtors stipulate that in making the decision to finance the Debtors' continued business operations through the DIP Facility and use of Cash Collateral, in administering any loans, in approving the Initial Budget, or in taking any actions

permitted by the Interim Order, this Final Order, the DIP Documents, or the Prepetition Documents, neither the DIP Agents, the DIP Lenders, nor, subject to the provisions of paragraph 17, the Prepetition Secured Parties, as applicable, shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "owner or operator," or part of any "control group" with respect to any of the Debtors or the management of the Debtors or owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or Estates.

(10)    *Good Cause*.  Good and sufficient cause has been shown for the entry of the Interim Order and this Final Order, and for authorizing the Debtors to obtain financing pursuant to each of the DIP Facilities.  The relief requested in the DIP Motion is necessary, essential, and appropriate, and is in the best interest of and will benefit the Debtors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to: (a) minimize disruption to the Debtors' efforts for the continued operations of their business; (b) preserve and maximize the value of the Debtors' Estates; and (c) avoid immediate and irreparable harm to the Debtors, their business, employees, and assets.

(11)    *No Obligation to Monitor*.  No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of any DIP Facility and each DIP Lender and each DIP Agent may rely upon each Debtor's representations that the extensions of credit under each DIP Facility requested at any time and the use thereof are in accordance with the requirements of the Interim Order, this Final Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

(12)    *Immediate Entry*.  Good and sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).  Absent the immediate grant by this Court of the relief sought by the DIP Motion on a final basis, each Debtor's Estate will be

immediately and irreparably harmed.  The Debtors' continued performance under each of the DIP Facilities in accordance with the terms of this Final Order, the Approved Budget, and the DIP Documents is in the best interests of the Debtors' Estates and is consistent with the Debtors' exercise of their fiduciary duties.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**I.   Authorization and Terms of Financing.**

1.   <u>DIP Motion Granted on Final Basis</u>.  The relief sought in the DIP Motion is granted on a final basis as provided herein, and the financing described herein is authorized and approved, on a final basis, subject to the terms and conditions set forth in each of the DIP Documents, the Approved Budget (subject to the Carve Out and the Permitted Variance as defined herein) and this Final Order.  All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry.

2.   <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.

(a)     The DIP Facilities are hereby approved on a final basis as set forth herein. The Debtors are hereby expressly authorized and empowered on a final basis to immediately (i) borrow, or guaranty, as applicable, and obtain, on a joint and several basis, the DIP Loans (including the DIP Loans incurred during the Interim Period), (ii) incur, on a joint and several basis, all obligations owing to the applicable DIP Agent and DIP Lenders on the terms and subject to the conditions and limitations set forth in the applicable DIP Documents and the DIP Orders, and (iii) cause each of the DIP Guarantors to guarantee the applicable DIP Obligations,

in each case in accordance with the terms of the applicable DIP Documents and the DIP Orders; *provided* that the DIP Secured Parties shall not be required to extend DIP Loans or other extensions of credit under the applicable DIP Facility to the extent that the applicable conditions for making such DIP Loans or other extensions of credit under such DIP Credit Agreement have not been satisfied or waived in accordance with the applicable DIP Documents.

(b)    Immediately upon the entry of this Final Order, but subject to the provisions and limitations contained in paragraph 17 hereof, the Debtors shall be deemed, automatically and without any further action, to incur on a final basis (i) the Interim Roll-Up DIP Loans and (ii) **$651,994,571.12** in Final Roll-Up DIP Loans consisting of (A) **$167,156,238.18** in Brookfield Final Roll-Up DIP Loans incurred to repay and refinance all remaining outstanding Brookfield Prepetition Secured Obligations as set forth in the Brookfield DIP Credit Agreement and this Final Order, (B) **$179,545,419.39** in Carlyle Final Roll-Up DIP Notes issued to repay and refinance all remaining outstanding Carlyle Prepetition Secured Obligations as set forth in the Carlyle DIP Note Purchase Agreement and this Final Order, and (C) **$305,292,913.55** in Fundamental Final Roll-Up DIP Loans incurred to repay and refinance **$305,292,913.55** in outstanding Fundamental Prepetition Secured Obligations as set forth in the Fundamental DIP Credit Agreement and this Final Order, in each case on a cashless basis. Subject to the provisions of paragraph 17, the Prepetition Secured Obligations deemed repaid and refinanced under the Interim Order through the issuance of Interim Roll-Up DIP Loans and this paragraph 2(b) shall (x) be deemed indefeasibly repaid as of the date of entry of the Interim Order or this Final Order, as applicable, and the Roll-Up DIP Loans issued to refinance the Prepetition Secured Obligations shall be deemed exchanged therefor by each DIP Lender in accordance with the terms of the applicable DIP Documents and (y) be authorized as compensation for, in consideration for, as a

necessary inducement for, and on account of the agreement of the DIP Lenders to fund the DIP Facilities and not as adequate protection for, or otherwise on account of, the Prepetition Secured Obligations.  Each Debtor, DIP Secured Party and Prepetition Secured Party is hereby authorized on a final basis to take any actions as may be necessary or advisable to effectuate the issuance of the Roll-Up DIP Loans.

(c)     In accordance with the terms of this Final Order and the DIP Documents, the proceeds of borrowings issued under the DIP Facilities and of Cash Collateral shall be used solely for purposes permitted under this Final Order and the applicable DIP Documents, and in accordance with the Approved Budget, subject to the Carve Out and the Permitted Variance (as defined below) as set forth in this Final Order and the DIP Documents.

(d)     The applicable DIP Loan Parties were, upon entry of the Interim Order, and hereby are on a final basis, authorized to cause the applicable Non-Debtor Guarantors to be party to the applicable DIP Documents to (i) jointly and severally guarantee the applicable DIP Obligations as set forth in the applicable DIP Documents, and (ii) execute, deliver, enter into and, as applicable, perform all of their obligations under the applicable DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.

3.     <u>Financing Documents</u>.

(a)     *Authorization*.  The Debtors' prior entry into and execution and delivery of the DIP Documents and their continued performance of all of their obligations under each of the DIP Documents is hereby approved on a final basis.  The Debtors were, by the Interim Order, and hereby are authorized, on a final basis, to incur and perform the DIP Obligations and borrow money pursuant to the applicable DIP Credit Agreements, which shall be used for all purposes permitted hereunder and under such DIP Documents, subject to the Approved Budget, subject to

the Carve Out and the Permitted Variance.  In furtherance of the foregoing and without further approval of this Court, the Debtors were, by the Interim Order, and hereby are, on a final basis, authorized and empowered themselves, and are authorized and empowered on a final basis to cause the Non-Debtor Subsidiaries, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified on a final basis solely to the extent necessary, to: (a) enter into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of the DIP Documents, including, without limitation, the DIP Credit Agreements, any fee letters with any of the DIP Secured Parties, and all security, guaranty, and pledge agreements; (b) execute and deliver all certificates, reports, statements, and other agreements, instruments and documents required or contemplated by the DIP Documents (including, without limitation, documents required for the Debtors' performance of their obligations under the DIP Documents and the creation and perfection of liens granted or contemplated therein); and (c) pay all obligations incurred under the DIP Documents in accordance herewith (whether principal, interest, fees, costs, expenses, indemnities, or other amounts described in the DIP Documents as such amounts become earned, due, and payable and without need to obtain further Court approval, including, without limitation, the Brookfield Fees, the Carlyle Payments, the Fundamental Fees, any other commitment fees or exit fees, administrative agent's fees, and the fees and disbursements of or incurred by (to the extent provided in the DIP Documents) each of the DIP Agent's and DIP Lenders' attorneys, financial advisors, accountants, consultants, and other advisors, whether or not such fees arose before, on, or after the Petition Date, to the extent provided under the applicable DIP Documents), and perform all other undertakings and acts required or contemplated by, the applicable DIP Documents.  Any actions taken by the Debtors

in accordance with the foregoing shall remain in full force and effect and are hereby ratified by this Final Order.

(b)     *Approval of Financing Documents*.   The DIP Documents (and all certificates, reports, statements, and other agreements and documents) constitute valid and binding obligations of the applicable Debtors enforceable in accordance with their terms and are approved on a final basis to the extent necessary to implement the terms and provisions of this Final Order.

(c)     *Amendment of DIP Documents*.   The Debtors and (x) the Brookfield DIP Secured Parties in the case of the Brookfield DIP Documents, (y) the Carlyle DIP Secured Parties in the case of the Carlyle DIP Documents, and (z) the Fundamental DIP Secured Parties in the case of the Fundamental DIP Documents are in each case hereby authorized on a final basis to approve and implement, in accordance with the terms of the applicable DIP Documents, any amendment, restatement, amendment and restatement, supplement, modification, extension or waiver (each, an "***Amendment***") of such DIP Documents; provided, however, that in the case of any Amendment to any of the DIP Documents, (i) the Debtors shall provide notice of any such Amendment (which may be provided through electronic email) to counsel to the Committee, the U.S. Trustee, and each DIP Agent and DIP Lender Advisor for the DIP Facilities not subject to such Amendment, (ii) the Committee shall have five (5) days from the date of such notice to object (email being sufficient) in writing to any Amendment (A) to the Brookfield DIP Documents and Carlyle DIP Documents and (B) to the Fundamental DIP Documents that is material and adverse to the interests of the Debtors or their Estates, and (iii) each of the U.S. Trustee, and the DIP Secured Parties not party to such Amendment shall have five (5) days from the date of such notice to object in writing to any Amendment that is material and is adverse to

the interests of the Debtors or their Estates.  With respect to any Amendment to the Fundamental DIP Documents that is not material and adverse to the interests of the Debtors or their Estates, the Debtors may proceed to execute such Amendment, which shall become effective immediately upon execution.  If the Committee indicates that it has no objection to any Amendment to the Brookfield DIP Documents or the Carlyle DIP Documents that is not material and adverse to the interests of the Debtors or their Estates, the Debtors may proceed to execute such Amendment, which shall become effective immediately upon execution.  Solely with respect to Amendments that are material and adverse to the interests of the Debtors or their Estates, if each of the Committee, the U.S. Trustee, and the DIP Secured Parties not party to such Amendment indicate that it has no objection to such Amendment (or if no objections are timely received), the Debtors may proceed to execute such Amendment, which shall become effective immediately upon execution. If (x) the Committee timely objects to any Amendment, or (y) any of the U.S. Trustee or any DIP Secured Party timely objects to any Amendment that is material and adverse to the interests of the Debtors or their Estates, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the Amendment.  The rights of each of DIP Secured Parties whose DIP Facilities are not subject to any such Amendment are fully preserved under the applicable DIP Documents notwithstanding any failure to object to any Amendment (including Amendments deemed not material and adverse to the interests of the Debtors or their Estates).   The foregoing requirements shall not apply to any amendment, modification, extension, update or approval of any Approved Budget (provided that, notice with respect to any Approved Budget shall be provided as set forth in paragraph 3(g) below; provided, further that no modification to the Approved Budget as it relates to the Professional Fees of the Committee shall be permitted without the Committee's prior written consent, which may be

granted or withheld in the Committee's sole and absolute discretion), and shall not limit any covenants or provisions of any of the DIP Documents that restrict or limit Amendments to the DIP Documents of any other DIP Facility.

(d)     *Application of DIP Facility Proceeds*.  The advances under each DIP Facility shall be used solely in a manner consistent with the terms and conditions of each of the DIP Documents and this Final Order and in accordance with and as may be limited by the Approved Budget (subject to the Carve Out and the Permitted Variance), solely as follows, (i) to effect the issuance of the Roll-Up DIP Loans, (ii) for the Debtors' working capital and other general corporate needs, (iii) for the payment of professional fees, costs and expenses in connection with the DIP Credit Agreements (as applicable) and the Chapter 11 Cases, (iv) for the payment of fees, costs, and expenses of the administration of the Chapter 11 Cases, (v) for the payment of other prepetition obligations approved by the Court, (vi) for the payment of adequate protection payments as authorized herein, (vii) for the payment of agency fees and fees, costs, and expenses of the DIP Agents and the DIP Lenders owed under the DIP Documents and in connection with the DIP Credit Agreements (as applicable) and the Chapter 11 Cases, and (viii) for the payment of obligations arising from or related to the Carve Out (in each case, other than in the case of clauses (iii) and (viii), in a manner consistent with the Approved Budget).

(e)     *Prohibited Uses of DIP Facility Proceeds*.  No proceeds of the DIP Facilities may be used for any purpose not set forth in the Approved Budget and no proceeds of (i) the Brookfield DIP Facility may be transferred to, or used to fund Projects owned by, the Carlyle Silo Entities or the Fundamental Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to Blue Ridge (other than the amounts explicitly provided to be funded to Blue Ridge in accordance with the Approved Budget), ACT,

the Carlyle Silo Entities or the Fundamental Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Brookfield Silo Entities or, as provided in the Approved Budget, corporate overhead costs) without the prior consent of the Brookfield Required DIP Lenders, (ii) the Carlyle DIP Facility may be transferred to, or used to fund Projects owned by, the Brookfield Silo Entities or the Fundamental Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to Blue Ridge (other than the amounts explicitly provided to be funded to Blue Ridge in accordance with the Approved Budget), ACT, the Brookfield Silo Entities or the Fundamental Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Carlyle Silo Entities or, as provided in the Approved Budget, corporate overhead costs) without the prior consent of the Carlyle Required DIP Noteholders, and (iii) the Fundamental DIP Facility may be transferred to or used to fund Projects owned by the Brookfield Silo Entities or the Carlyle Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to Blue Ridge (other than the amounts explicitly provided to be funded to Blue Ridge in accordance with the Approved Budget), ACT, the Brookfield Silo Entities or the Carlyle Silo Entities (and, for the avoidance of doubt, not directly related to and principally for the operations of the Fundamental Silo Entities or, as provided in the Approved Budget, corporate overhead costs) without the consent of the Fundamental Required DIP Lenders.

(f)     *Conditions Precedent; DIP Commitments*.  Notwithstanding anything to the contrary herein or in any DIP Documents, none of the DIP Agents or the DIP Lenders shall (i) have any obligation to make any loan or advance under any DIP Credit Agreement unless the conditions precedent to such loan or extension of credit under the applicable DIP Credit Agreement have been satisfied in full or waived in accordance with such DIP Credit Agreement,

which conditions precedent shall include the simultaneous funding under each other DIP Facility of (A) the amounts set forth in the DIP Documents to be funded following entry of the Interim Order or Final Order, as applicable and (B) the Escrow Account in the amounts set forth in paragraph 11(c), or (ii) be required to lend in excess of their DIP Commitments.

(g)     *Budget Maintenance.*

(i)     The Debtors shall deliver to each DIP Agent and the DIP Lender Advisors (for distribution to each DIP Lender), and simultaneously to the Committee's advisors on a privileged, "professional eyes only" basis (unless otherwise disclosed through a public filing with the Court; *provided*, that the Committee may not file such materials with the Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal), not later than 5:00 p.m. on every fourth Friday occurring after the Petition Date (each, an "***Updated Budget Delivery Date***"), commencing with the Friday of the fifth full calendar week occurring after the Petition Date (i.e., December 12, 2025), a supplement to the Initial Budget or the previously Approved Budget for the rolling 13-week period commencing on the Saturday immediately preceding the applicable Updated Budget Delivery Date (each, an "***Updated Budget***"), in form and substance acceptable to the Required DIP Lenders (after approval by the Required DIP Lenders, the "***Approved Budget***"); provided that: (i) such Updated Budget shall be deemed acceptable to the Required DIP Lenders if none of the Brookfield Required DIP Lenders, the Carlyle Required DIP Noteholders or the Fundamental Required DIP Lenders have objected in writing (which response may be provided by email by any of the applicable DIP Lender Advisors to the applicable DIP Borrower or its lead counsel or financial advisors) to such Updated Budget within three (3) Business Days after receipt by the DIP Agents and the DIP Lender Advisors of such Updated Budget; *provided* that such three-Business Day period shall be

tolled for so long as the Updated Budget is subject to a "professional eyes only" or similar designation; (ii) the failure of any Updated Budget to be accepted by the Required DIP Lenders, in and of itself and without limitation to the obligation to continue complying with the existing Approved Budget, shall not be deemed to be a violation of the DIP Orders, or the budget covenants in the DIP Documents or the DIP Orders and no Event of Default (as defined below) shall result solely from any objection by any DIP Lender to any proposed Updated Budget; (iii) for the avoidance of doubt, upon (and subject to) the acceptance (or deemed acceptance) by the Required DIP Lenders of any Updated Budget (and at no time prior thereto), such Updated Budget shall constitute the "Approved Budget"; and (iv) during any period where an Updated Budget has not been approved by the Required DIP Lenders, the Initial Budget or, if an Updated Budget has previously been approved by the Required DIP Lenders, the existing Approved Budget, as applicable, shall constitute the "Approved Budget" until the expiration of the period covered by such Approved Budget.  Notwithstanding anything to the contrary in the DIP Orders or the DIP Documents, in no event shall the line item for the professional fees of the Committee be modified in any Approved Budget without the prior written approval of the Committee.

        (ii)      Starting in the second full week after the Petition Date and every week thereafter, no later than 11:59 p.m. (Eastern time) on the Friday of each such week, the Debtors shall deliver to the DIP Agents and the DIP Lender Advisors (for distribution to each DIP Lender), and simultaneously to the Committee's advisors on a privileged, "professional eyes only" basis (unless otherwise disclosed through a public filing with the Court; *provided*, that the Committee may not file such materials with the Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal), a variance report comparing the

4924-1323-6092v.7

Debtors' actual receipts and disbursements for the prior week with the projected receipts and disbursements for such period as reflected in the applicable Approved Budget.

(iii)     The Debtors shall not permit aggregate disbursements as reported by the Debtors for such Budget Variance Test Period (excluding disbursements in respect of (x) professional fee disbursements for all advisors working on the Chapter 11 Cases, (y) interconnection costs, and (z) any Project spend that is either (1) incremental to the amounts set forth in the Approved Budget and/or (2) on a cadence that differs from the Approved Budget, provided, in the case of this clause (z), that the applicable DIP Lenders under the DIP Facility having DIP Liens on such Project (or on the Silo that owns such Project) have (A) consented to such incremental Project spend and/or change in timing in accordance with and to the extent required under the applicable DIP Documents and (B) funded, without any reduction in DIP Commitments under such DIP Facility (other than any reduction in DIP Commitments for DIP Loans the proceeds of which are required to be used solely for such Project spend), any amounts that are in excess of the amount set forth in the Approved Budget for such Project) to have a negative variance of (*i.e.*, to exceed) more than the greater of $2,000,000 and 15% of the forecasted aggregate disbursements as reported by the applicable DIP Borrower for such Budget Variance Test Period in the applicable Approved Budget (the "***Permitted Variance***").  It is agreed and understood that following an Updated Budget Delivery Date, if any of the DIP Lenders have objected in writing to the Updated Budget within three (3) Business Days after receipt by the DIP Agents and the DIP Lender Advisors of such Updated Budget and the existing Approved Budget remains in effect, any favorable variance from a prior Budget Variance Test Period may be carried forward and utilized in future Budget Variance Test Periods relating to

such existing Approved Budget to offset negative variances in such future Budget Variance Test Period at the election of the applicable DIP Borrower.

(iv)    Upon the consummation of a (i) Brookfield Sale Transaction and the sale of all Brookfield Silo Assets in accordance with the Brookfield APA and the acquisition of the Brookfield Silo Assets by the Buyer (as defined in the Brookfield APA), the Brookfield DIP Secured Parties shall no longer have approval rights over Updated Budgets, and (ii) Carlyle Sale Transaction and the sale of all Carlyle Silo Assets in accordance with the Carlyle APA and the acquisition of the Carlyle Silo Assets by the Carlyle Purchaser, the Carlyle DIP Secured Parties shall no longer have approval rights over Updated Budgets.

(v)    The "***Budget Variance Test Date***" means the Friday of every week (commencing with the Friday of the fifth full calendar week occurring after the Petition Date (i.e., December 12, 2025)) or, to the extent such Friday is not a Business Day, the next Business Day thereafter; and the "***Budget Variance Test Period***" shall mean, with respect to any Budget Variance Test Date, the four-week period ending on the last Business Day of the week immediately preceding the applicable Budget Variance Test Date; *provided* that the initial Budget Variance Test Period shall include the period beginning on the Petition Date through the end of the otherwise applicable four-week period.

4.    <u>Payments and Application of Payments</u>.  The Debtors were, upon entry of the Interim Order, and hereby are authorized on a final basis to make all payments and transfers of the Estates' property to the DIP Secured Parties as provided, permitted, or required under the DIP Documents and the DIP Orders, which payments, proceeds, and other amounts shall be applied to the applicable DIP Obligations in accordance with the DIP Documents and the DIP Intercreditor Agreement.  Upon entry of the Interim Order, and as ratified by this Final Order,

the DIP Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Final Order and the other DIP Documents, against each Debtor, their Estates and any successors thereto, including, without limitation, any Trustee or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "*Successor Cases*").  No obligation, payment, transfer, or grant of collateral or security under the Interim Order, this Final Order, or under any of the DIP Documents to the DIP Agents and/or the DIP Lenders (including any DIP Superpriority Claims or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law, section 724(a) of the Bankruptcy Code, or any other provision with respect to Avoidance Actions under the Bankruptcy Code or applicable federal, state or foreign law equivalents), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason; provided that the DIP Secured Parties shall be subject to the DIP Intercreditor Agreement.  Without limiting the generality of the foregoing, upon entry of the Interim Order, and as ratified by this Final Order, the Debtors are authorized, without further order of this Court, to (i) pay all principal, interest, fees, premiums, and indemnities when due, under the DIP Documents and (ii) pay or reimburse the DIP Secured

Parties, in accordance with the DIP Documents for all present and future costs and expenses, including, without limitation, all reasonable and documented pre- and post-Petition Date professional fees, financial advisor fees, legal fees, consultant fees and other advisor fees and expenses paid or incurred by the DIP Agents and DIP Lenders as provided in the applicable DIP Documents, the Interim Order, and this Final Order regardless of whether such amounts are in the Approved Budget.  None of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by this Court. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

5.     <u>Interest and Fees</u>.  The rates of interest to be charged for the DIP Loans shall be the rates set forth in the applicable DIP Credit Agreements and shall be calculated in the manner and payable at the times set forth therein.  The fees charged under the DIP Facilities shall be those set forth in the applicable DIP Credit Agreements and shall be unconditionally earned and payable in the amounts and at the times set forth in such DIP Credit Agreement.  The Debtors are hereby authorized and directed on a final basis to pay, in accordance with this Final Order, the principal, interest, fees, payments, expenses, and other amounts described above and in the DIP Documents, including, without limitation, the Brookfield Fees, the Carlyle Payments, and the Fundamental Fees, as such amounts become due and without need to obtain further Court approval, and the applicable Debtors shall be jointly and severally obligated to pay all such amounts, and satisfy all such obligations, which in each case shall constitute DIP Obligations hereunder and under the applicable DIP Documents.

6.     <u>DIP Obligations</u>.  The DIP Documents, the Interim Order, and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall

be enforceable against each of the Debtors to the extent provided by the applicable DIP Documents, along with their Estates, and any successors thereto, including, without limitation, against any Trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing. Upon entry of the Interim Order, and as ratified by this Final Order, the DIP Obligations will include all loans, notes, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Agents or the other DIP Secured Parties, in each case, under the applicable DIP Documents, the Interim Order, or this Final Order or secured by the applicable DIP Liens, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, indemnities, and other amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Documents, the Interim Order, and/or this Final Order) owing under the DIP Documents.

7.     _Use of Cash Collateral_.  Under the Interim Order, the Debtors were authorized as of the Interim Order Effective Date, and as ratified by this Final Order, hereby are authorized on a final basis to use all Cash Collateral of the Prepetition Secured Parties, the DIP Secured Parties, the Polaris B Secured Parties, the MUFG Secured Parties and the Zions Secured Parties, solely for the purposes and subject to the restrictions set forth in the Interim Order and this Final Order (in each case, subject to the Carve Out) and in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to make payments to the Prepetition Agents on account of the applicable Adequate Protection Obligations (as defined below) provided for in the Interim Order, this Final Order, and the DIP Documents, from the Interim

Order Effective Date through and including the DIP Termination Date (as defined below). Nothing in the DIP Orders shall authorize the Disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except pursuant to the Approved Budget (subject to the Carve Out and the Permitted Variance) as permitted in this Final Order (including with respect to the Carve Out), the DIP Facilities, and the DIP Documents.

**II.     Collateralization and Superpriority Administrative Claim Status.**

8.      <u>Collateralization</u>.

(a)     *DIP Lien Grant.*  To secure the prompt payment and performance of the applicable DIP Obligations of the Debtors to the applicable DIP Secured Parties of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, and subject and subordinate to the applicable Carve Out, and for the benefit of itself and the applicable DIP Lenders, and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar instruments or document, or the possession or control by the applicable DIP Agent or any other DIP Secured Party of, or over, any DIP Collateral, (i) the Brookfield DIP Agent was granted under the Interim Order, with such grant hereby ratified by this Final Order, valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Brookfield DIP Liens***") in and upon the Brookfield DIP Collateral held by the Brookfield Borrower or the Brookfield Debtor Guarantors and the Brookfield Pledged Intercompany Claims, (ii) the Carlyle DIP Agent was granted under the Interim Order, with such grant hereby ratified by this Final Order, valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***Carlyle***

**DIP Liens**") in and upon the Carlyle DIP Collateral held by the Carlyle Issuer or the Carlyle Debtor Guarantors and the Carlyle Pledged Intercompany Claims, and (iii) the Fundamental DIP Agent was granted under the Interim Order, with such grant hereby ratified by this Final Order, valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "**Fundamental DIP Liens**") in and upon the Fundamental DIP Collateral (provided that the Fundamental DIP Liens shall only attach to the Avoidance Actions and commercial tort claims that constitute Fundamental Silo Assets and only to the extent of the amount of the Fundamental DIP New Money Loans and the Fundamental Roll-Up DIP Loans used to repay and refinance the Fundamental Prepetition Bridge Loans; provided further that the Fundamental DIP Liens shall not attach to Brookfield Pledged Intercompany Claims or Carlyle Pledged Intercompany Claims) held by the Fundamental Borrower or the Fundamental Debtor Guarantors and the Fundamental Pledged Intercompany Claims.  For the avoidance of doubt, the DIP Collateral shall exclude the equity in or assets of ACT Power Services Holding Company Guarantor, LLC and its subsidiaries (collectively "**ACT**"), but shall include the proceeds of the equity in ACT Power Services Holding Company Guarantor, LLC and its direct and indirect subsidiaries, subject to the lien priority set forth in the DIP Intercreditor Agreement.  Any provision of any lease (except for nonresidential real property leases) or other license, contract or other agreement that requires (i) the consent or approval of one or more parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any interest in any such lease, license, contract, or other agreement, or the proceeds thereof, or other collateral related thereto, is deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no

force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens (as defined below) on such interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreements, the Interim Order, or this Final Order, subject to applicable law.

(b)  *DIP Lien Priority*.  The DIP Liens securing each DIP Facility were, under the Interim Order, and hereby shall continue to be, in all cases, subject to the Carve Out and have the priority set forth in Annex 3.  Other than as set forth herein (including with respect to the Carve Out and any Replacement Additional DIP Facility (as defined below) incurred in accordance with the terms of paragraph 23 hereof and the DIP Documents) or permitted under the DIP Documents, the DIP Liens (i) were not, under the Interim Order, and hereby shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and (ii) were, under the Interim Order, and hereby shall be valid and enforceable (A) against any Trustee, (B) upon the conversion of any of the Chapter 11 Cases to any Successor Case, (C) notwithstanding any abstention by the Court, and/or (D) upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases. The DIP Liens were not, under the Interim Order, and hereby shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens.

(c)  *Post-Petition Lien Perfection*.  Each of the Interim Order and this Final Order shall be sufficient and conclusive evidence of the priority, perfection, enforceability, and validity of the DIP Liens, Adequate Protection Liens and any other post-petition liens and security interests granted therein or herein (as applicable), effective as of the Petition Date,

without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral held by the DIP Borrowers or the Debtor Guarantors, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtors (a "**Perfection Act**").  Notwithstanding the foregoing, if any DIP Agent or Prepetition Agent elects for any reason to file, record, or otherwise effectuate any Perfection Act, subject to the DIP Intercreditor Agreement, such DIP Agent or Prepetition Agent, as applicable, in each case in its sole discretion, was authorized upon entry of the Interim Order and hereby is authorized on a final basis to perform such Perfection Act, and the Debtors are authorized to perform such Perfection Acts to the extent necessary or required by such DIP Agent or Prepetition Agent, as applicable, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record any document in regard to such act in accordance with applicable law.  Any DIP Agent or Prepetition Agent may, in each case in its sole discretion, choose to file, record, or present a certified copy of the Interim Order and/or this Final Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record such certified copy of the Interim Order and/or this Final Order in accordance with applicable law. Should any DIP Agent or Prepetition Agent so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the DIP Liens or the

Adequate Protection Liens, as applicable, granted in the Interim Order or this Final Order by virtue of the entry of the Interim Order or this Final Order.

9.      Superpriority Administrative Expense.

(a)      For the applicable DIP Obligations, whether now existing or hereafter arising pursuant to the Interim Order, this Final Order, the DIP Documents, or otherwise, subject and subordinate only to the applicable Carve Out as provided herein, each DIP Agent, for the benefit of itself and the DIP Secured Parties for which such DIP Agent serves as agent, was, upon entry of the Interim Order, and hereby is granted on a final basis an allowed superpriority administrative expense claim against each of the Debtors' Estates to the extent that such Debtors are DIP Loan Parties under the DIP Facility under which such DIP Agent serves as agent (without the need to file any proof of claim) pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors, of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code (the "***DIP Superpriority Claims***"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof to the extent provided in the DIP

4924-1323-6092v.7

Documents the Interim Order, and this Final Order, including, without limitation, all applicable DIP Collateral, subject and subordinate only to the payment of the applicable Carve Out as provided for herein.

(b)    Each DIP Superpriority Claim against each Debtor was, upon entry of the Interim Order, and hereby shall be senior in right of payment to the Adequate Protection Claims (as defined below) against such Debtor and junior in right of payment to the applicable Carve Out.  No Debtor may incur any financing with liens or claims senior or *pari passu* to the DIP Superpriority Claims against such Debtor (other than each of the DIP Facilities, as applicable, or a Replacement Additional DIP Facility incurred in accordance with the terms of paragraph 23 of this Final Order and the DIP Documents) without the consent of the applicable DIP Lenders holding DIP Superpriority Claims against such Debtor.

(c)    Notwithstanding anything to the contrary in the Interim Order or this Final Order, (A) the Brookfield DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the DIP Liens under the Brookfield DIP Facility against any asset of any Carlyle Silo Entity or Fundamental Silo Entity, or any equity interests in any such entity, other than the Brookfield Pledged Intercompany Claims, (B) the Carlyle DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the DIP Liens under the Carlyle DIP Facility against any asset of any Brookfield Silo Entity or Fundamental Silo Entity, or any equity interests in any such entity, other than the Carlyle Pledged Intercompany Claims, and (C) the Fundamental DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the DIP Liens under the Fundamental DIP Facility against any asset of any Brookfield Silo Entity or Carlyle Silo Entity, or any equity interests in any such entity, other than the

4924-1323-6092v.7

Fundamental Pledged Intercompany Claims.  For the avoidance of doubt, the DIP Superpriority

Claims under each DIP Facility shall be subject to the priorities set forth on Annex 3.

        (d)      With respect to rights preserved under section 506(c) of the Bankruptcy

Code, with the exception of the Carve Out, no costs or expenses of administration, including,

without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the

Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases or in

any Successor Cases, and no priority claims are, or will be, senior to, prior to, or *pari passu* with

the DIP Superpriority Claims or the DIP Obligations or with any other claims of the DIP Secured

Parties arising hereunder or under the DIP Documents.

## III.    Adequate Protection

       10.    <u>Adequate Protection for the Prepetition Secured Parties</u>. Subject to the provisions

of paragraph 17, until the Prepetition Secured Obligations are Paid in Full, the Prepetition

Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the

Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition

Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their

interests in the Prepetition Collateral, including in the amount of any unpaid portion of the

Prepetition Secured Obligations following the issuance of the Roll-Up DIP Loans and any

amount of the Prepetition Secured Obligations subsequently reinstated after the refinancing and

repayment thereof pursuant to paragraph 2(b) hereof because such refinancing or repayment is

rescinded or required to be returned or repaid pursuant to paragraph 17 hereof or otherwise. As

adequate protection, the Prepetition Secured Parties were, under the Interim Order, and hereby

are granted on a final basis the following (the "***Adequate Protection Obligations***"):

        (a)      <u>Adequate Protection Liens</u>. Subject to the provisions of paragraph 17, as

security for the payment of the Adequate Protection Obligations, each of the Prepetition Agents,

for the benefit of the applicable Prepetition Secured Parties, was, under the Interim Order, and hereby is granted on a final basis (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the applicable DIP Collateral (provided that the Adequate Protection Liens granted to the Fundamental Prepetition Agent shall not attach to the Avoidance Actions or commercial tort claims)  of the Debtors as set forth in Annex 3 (the "*Adequate Protection Liens*"), which security interests and liens shall be subject and subordinate to the applicable Carve Out and the applicable DIP Liens and have the priorities set forth in Annex 3.  The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date except to the extent set forth in Annex 3.  The Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Parties and not in substitution therefor.

(b)      Adequate Protection Claims. Subject to the provisions of paragraph 17, each of the Prepetition Agents, for the benefit of the applicable Prepetition Secured Parties, was, under the Interim Order, and hereby is granted on a final basis (effective as of the Petition Date) an allowed administrative expense claim against each Debtor on a joint and several basis, which shall (i) have recourse to and be payable from all prepetition and postpetition property of the applicable Debtors, and (ii) have priority over all other administrative claims in the Chapter 11 Cases, including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code, subject to the applicable Carve Out and the applicable DIP Superpriority

4924-1323-6092v.7

Claims with the priorities set forth in Annex 3 (the "**_Adequate Protection Claims_**"). Notwithstanding anything to the contrary in the Interim Order or this Final Order, (i) the Brookfield Prepetition Secured Parties shall not have recourse in respect of the Adequate Protection Claims granted in connection with the Brookfield Prepetition Secured Obligations against any asset of any Carlyle Silo Entity or Fundamental Silo Entity, or the respective equity interests in any such entity, other than the Brookfield Pledged Intercompany Claims, (ii) the Carlyle Prepetition Secured Parties shall not have recourse in respect of the Adequate Protection Claims granted in connection with the Carlyle Prepetition Secured Obligations against any asset of any Brookfield Silo Entity or Fundamental Silo Entity, or the respective equity interests in any such entity, other than the Carlyle Pledged Intercompany Claims, and (iii) the Fundamental Prepetition Secured Parties shall not have recourse in respect of the Adequate Protection Claims granted in connection with the Fundamental Prepetition Secured Obligations against any asset of any Brookfield Silo Entity or Carlyle Silo Entity, or the respective equity interests in any such entity, other than the Fundamental Pledged Intercompany Claims.  For the avoidance of doubt, the Adequate Protection Claims under each DIP Facility shall be subject to the priorities set forth on Annex 3.

(c)     <u>Postpetition Interest Payments</u>. Subject to the provisions of paragraph 17, from and after the Petition Date, each of (i) the Brookfield Prepetition Agent, on behalf of the Brookfield Prepetition Secured Parties, shall receive current payment of all accrued and unpaid interest on the Brookfield Prepetition Secured Obligations under the Brookfield Prepetition Credit Agreement, if any, (ii) the Carlyle Prepetition Agent, on behalf of the Carlyle Prepetition Secured Parties, shall receive current payment of all accrued and unpaid interest on the Carlyle Prepetition Secured Obligations under the Carlyle Prepetition Note Purchase Agreement, if any,

and (iii) the Fundamental Prepetition Agent, on behalf of the Fundamental Prepetition Secured Parties, shall receive current payment of all accrued and unpaid interest on the Fundamental Prepetition Secured Obligations under the Fundamental Prepetition Credit Agreement, if any, in each case paid in kind and compounded monthly.

(d)      <u>Adequate Protection Fees and Expenses</u>.   Subject to the provisions of paragraph 17, each of the Prepetition Agents and Prepetition Lenders shall receive from the Debtors current cash payments of all prepetition and postpetition accrued and unpaid fees and expenses, including professional fees and expenses, for (i) one primary counsel and one local counsel in each applicable jurisdiction for each of the Prepetition Agents and (ii)(A) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Norton Rose Fulbright LLP, and Porter & Hedges LLP, as co-counsel to the Brookfield Prepetition Lenders, FTI Consulting, Inc., as financial advisor to the Brookfield Prepetition Lenders, and any other local or special counsel or other professionals retained by the Brookfield Prepetition Lenders, (B) Milbank LLP and Haynes and Boone, LLP, as co-counsel to the Carlyle Prepetition Noteholders, Solomon Partners Securities, LLC, as financial advisor to the Carlyle Prepetition Noteholders, and any other local or special counsel or other professionals retained by the Carlyle Prepetition Noteholders, and (C) Sidley Austin LLP, as counsel to the Fundamental Prepetition Lenders, Guggenheim Securities, LLC, as financial advisor to the Fundamental Prepetition Lenders, and any other local or special counsel or other professionals retained by the Fundamental Prepetition Lenders.  None of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by this Court; *provided* that such fees and expenses shall be payable in compliance with paragraphs 25(b) and 25(c) hereof, as applicable (the "***Adequate Protection Fees and Expenses***").  No recipient of any such payment shall be required to file with respect

thereto any interim or final fee application with this Court.   Payments of professional fees pursuant to this paragraph 10(c) shall be subject to recharacterization as principal payments under the applicable Prepetition Documents in the event the applicable Prepetition Secured Party is determined by a final order of the Court to be undersecured.

(e)      Adequate Protection Information Rights. The Debtors shall provide to the Prepetition Agents, with a copy to the Committee (with respect to the Committee, on a privileged, "professional eyes only" basis, unless otherwise disclosed through a public filing with the Court; *provided*, that the Committee may not file such materials with the Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal), at the same time as such reporting is provided to the DIP Secured Parties, all reporting required to be provided to the DIP Secured Parties under the DIP Documents.   Upon any or all DIP Obligations being Paid in Full, the Prepetition Secured Parties shall continue to be entitled hereby to satisfaction of such reporting rights unless and until the applicable Prepetition Secured Obligations of the applicable Prepetition Secured Party are also Paid in Full.

(f)      Adequate Protection Reservation. Subject to the Carve Out, nothing herein or in the Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.   The receipt by the Prepetition Secured Parties of the adequate protection provided herein or in the Interim Order shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.   Further, neither the Interim Order nor this Final Order shall prejudice or limit the rights of (i) the Prepetition Secured Parties to request additional adequate

protection or similar relief from the Court; or (ii) the Debtors to object to or defend against such relief, notwithstanding any other provision of the Interim Order or this Final Order, as applicable.

## IV.    Carve Out.

11.    <u>Carve Out</u>.

(a)    As used in this Final Order, the "**Carve Out**" means a superpriority administrative expense claim, with priority over all other administrative expense claims in the Chapter 11 Cases, in the aggregate amount of the Pre-Carve Out Trigger Notice Cap and the Post-Carve Out Trigger Notice Cap, which claims shall be secured by a priming lien senior to all other liens, in each case, to the extent provided under this Final Order (for the avoidance of doubt, with respect to the priority position of the applicable Carve Out in the DIP Collateral and with respect to the DIP Superpriority Claims for each DIP Facility and the Prepetition Secured Obligations, as set forth in Annex 3 hereto, the applicable Carve Out shall be calculated on the basis of and limited by the Allocable Percentage with respect to such DIP Facility and the applicable Prepetition Secured Obligations).  The "**Pre-Carve Out Trigger Notice Cap**" means the Pre-Carve Out Trigger Notice Gross Amount (as defined herein) net of all amounts transferred to the Carve Out Account (as defined herein) prior to the first day following the delivery of a Carve Out Trigger Notice.  The "**Pre-Carve Out Trigger Notice Gross Amount**" means the aggregate amount of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (the "**U.S. Trustee Fees**"); (ii) all reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code incurred on any date in any Successor Cases; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, costs, and expenses (including Transaction Fees (as defined herein) to the extent reserved for in

the Carve Out Account in accordance with the Interim Order or this Final Order (as applicable) prior to the delivery of a Carve Out Trigger Notice but otherwise excluding any Transaction Fees or other transaction or success fees in excess of $3 million in the aggregate) incurred or earned by any persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") or any persons or firms retained by the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time (the "**Allowed Professional Fees**"), the fees in clauses (i) and (iii) to the extent that such U.S. Trustee Fees or Allowed Professional Fees are incurred or earned before the first day following delivery by any DIP Agent (acting at the direction of the applicable DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, in each case without regard to whether such fees, costs, or expenses are included or provided for in any Approved Budget or were invoiced on or after the Carve Out Trigger Date (as defined below).  The "**Post-Carve Out Trigger Notice Cap**" means the aggregate amount of (x) the fees in clause (i) of the definition of Pre-Carve Out Trigger Notice Gross Amount to the extent incurred on or after the first day following delivery of a Carve Out Trigger Notice; (y) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $4,500,000 incurred on or after the first day following delivery by any DIP Agent (acting at the direction of applicable DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Debtor Professional and not previously returned or applied to its respective fees and expenses; and (z) Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $500,000

incurred after the first day following delivery by the DIP Agent (acting at the direction of the applicable DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.  For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by email by any DIP Agent or DIP Lender Advisor (in each case acting at the direction of the applicable DIP Lenders) to the Debtors' restructuring co-counsel (Latham & Watkins LLP and Hunton Andrews Kurth LLP), the U.S. Trustee, counsel to the Committee (White & Case LLP and Pachulski Stang Ziehl & Jones LLP), and each DIP Agent, which notice (i) may be delivered only following the occurrence, and during the continuation of, an Event of Default and (ii) shall expressly state that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     <u>Delivery of Weekly Fee Statements</u>.  No later than 11:59 p.m. on the fifth Business Day of each week (or if such week does not have five Business Days, the first Business Day of the following week), beginning with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors, the DIP Agents and the DIP Lender Advisors a statement (each such statement, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (through the final day of such week, the "***Calculation Date***"), along with a good faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date (the "***Cumulative Total Unpaid Fees and Expenses***") and a statement of the amount of such fees and expenses that have been paid to date by the Debtors.  No later than five (5) Business Days after the delivery of a Carve Out Trigger Notice, each Professional Person shall deliver one additional statement to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Committee, the DIP Agents, and the DIP

Lender Advisors, setting forth a good faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of delivery of the Carve Out Trigger Notice.

(c)    Escrow Account.    Following    the    entry    of    the    Interim Order,  $**8,209,327.54** of the proceeds of the Brookfield DIP Loans from Brookfield Interim Draw, $**9,937,908.23** of the proceeds of the Carlyle DIP Notes from the Carlyle Interim Issuance, and $**9,937,908.23** of the proceeds of the Fundamental DIP Loans from the Fundamental Interim Draw, and, following the entry of this Final Order, $**16,604,352.46** of the proceeds of Brookfield DIP Loans, $**8,672,351.77** of the proceeds of the Carlyle DIP Notes, and $**8,172,351.77** of the proceeds of the Fundamental DIP Loans, shall, in each case, be funded into the escrow account with Ankura Trust Company, LLC (the "***Escrow Account***").  The DIP Secured Parties shall not be granted a lien on the Escrow Account unless and until (x) if a Carve Out Trigger Notice has been delivered, the Carve Out has been funded in full in accordance with this Final Order or (y) if no Carve Out Trigger Notice is delivered, all Allowed Professional Fees are Paid in Full (the earliest to occur of the immediately preceding clauses (x) and (y), the "***Escrow Springing Lien Event***"); *provided*, however, that, for the avoidance of doubt, upon the occurrence of the Escrow Springing Lien Event, each DIP Agent, for the benefit of the applicable DIP Secured Parties, shall be granted automatically perfected, first priority liens in the Debtors' interest in any residual amounts remaining in such Escrow Account, which liens shall be subject to the DIP Intercreditor Agreement and the priority position of the Carve Out, and such residual interest shall not be subject to any liens or claims of existing prepetition creditors (other than the Prepetition Secured Obligations which shall benefit from a lien on such residual interest junior

4924-1323-6092v.7

only to the Carve Out and the DIP Liens). The Debtors will be permitted to draw upon the Escrow Account solely (i) to pay (including by making transfers to the Carve Out Account (as defined below) as provided in subparagraph (d) below) (A) the fees earned and payable upon a financing, amendment, restructuring, sale, success, completion, or other transaction (collectively, a "*Transaction*") of any investment bankers or financial advisors to the Debtors or the Committee (collectively, the "*Transaction Fees*") and (B) the Allowed Professional Fees, including upon such amounts becoming earned and payable upon the closing of any Transaction (in each case, to the extent not paid to the applicable investment bankers, financial advisors to the Debtors or the Committee, or Professional Person upon the closing of a Transaction, out of the cash proceeds of such Transaction), including upon the effectiveness of an Acceptable Plan, and (ii) to fund the Carve Out, and the Debtors will not be permitted to draw on the Escrow Account other than for such purposes. The Debtors' obligations to pay Allowed Professional Fees and Transaction Fees shall not be limited or be deemed limited to funds held in the Escrow Account. For the avoidance of doubt, amounts held in the Escrow Account shall not in any way act as a cap on Allowed Professional Fees or Transaction Fees. Upon the delivery of a Carve Out Trigger Notice (or, if no Carve Out Trigger Notice is delivered, upon payment of all Allowed Professional Fees), all amounts remaining in the Escrow Account (upon the funding in full of the Pre-Carve Out Trigger Notice Gross Amount and the Post-Carve Out Trigger Notice Cap and after giving effect to any amounts in the Carve Out Account in the case of delivery of a Carve Out Trigger Notice) shall be promptly distributed to the DIP Agents in accordance with the percentages set forth in paragraph 11(j) hereof.

(d)     Carve Out Reserves. The Debtors shall, on a weekly basis or at such other times as they may determine appropriate, transfer from the Escrow Account or from other

available cash to a separate escrow account established with Ankura Trust Company, LLC that is subject to a first priority lien in favor of the DIP Agents for the benefit of the applicable DIP Secured Parties (subject to the DIP Intercreditor Agreement), and not any other liens or claims (other than the Prepetition Secured Obligations), but shall be subject to the Carve Out in all instances (the "***Carve Out Account***"), cash in an amount equal to (x) the Cumulative Total Unpaid Fees and Expenses (other than any Transaction Fees) included in the most recent Weekly Statement provided by all Professional Persons timely received by the Debtors, the DIP Agents, and the DIP Lender Advisors for the prior week set forth in the Approved Budget, plus a good faith estimate of any Transaction Fees that are fully earned and became due and payable in such prior week, less (y) the amount of cash already on deposit in the Carve Out Account, which shall be reported to the DIP Agents, the DIP Lender Advisors and the Prepetition Agents (with a copy provided substantially simultaneously to the Committee's advisors on a privileged, "professional eyes only" basis (unless otherwise disclosed through a public filing with the Court; *provided*, that the Committee may not file such materials with the Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal). Before the Carve Out Trigger Date, funds in the Carve Out Account may be used to pay such Allowed Professional Fees.

(e)   Notwithstanding the occurrence of an Event of Default, upon delivery of a Carve Out Trigger Notice to the Debtors (the "***Carve Out Trigger Date***"), such Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall, utilize all cash in the Escrow Account, and all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve Out Account in an amount equal to (i) the Pre-Carve Out Trigger Notice Cap and (ii) the Post-Carve Out Trigger Notice Cap. Following the Carve Out

4924-1323-6092v.7

Trigger Date, all funds in the Escrow Account and the Carve Out Account shall be used first to pay Allowed Professional Fees, subject to the Carve Out, and then, to the extent the Escrow Account or the Carve Out Account have not been reduced to zero, any such excess shall be promptly paid to the DIP Agents in accordance with the DIP Intercreditor Agreement for distribution to the applicable DIP Lenders, but amounts in the Carve Out Account shall not be swept or otherwise applied to repay DIP Loans unless and until all Allowed Professional Fees up to the amount of the Pre-Carve Out Trigger Notice Gross Amount and the Post-Carve Out Trigger Notice Cap are paid in full, regardless of when allowed.

(f)      Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order:  (i) following delivery of a Carve Out Trigger Notice, the DIP Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other Disposition of any assets) of the Debtors until the Carve Out has been fully funded in cash from such cash and the Escrow Account, but the DIP Agents (on behalf of the applicable DIP Secured Parties) shall have a lien on and security interest in the Debtors' interest in any residual cash balance remaining in the Escrow Account and in the Carve Out Account in excess of the Carve Out; (ii)(A) disbursements by the Debtors from the Escrow Account or the Carve Out Account shall not increase or reduce the balance of the DIP Obligations, (B) the failure of the Escrow Account or the Carve Out Account to satisfy in full in cash the Allowed Professional Fees shall not affect, alter, or impair the amount, scope, or priority of the Carve Out, (C) in no way shall any Approved Budget, proposed Approved Budget, Carve Out, Pre-Carve Out Trigger Notice Cap, Post-Carve Out Trigger Notice Cap, Weekly Statement, weekly estimate, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors; and (iii) the Allocable Percentage of the Carve Out for each DIP

Facility shall be senior to (1) the DIP Obligations and Prepetition Secured Obligations of each Debtor in favor of the applicable DIP Lenders and Prepetition Lenders, and (2) the Adequate Protection Liens, Adequate Protection Claims, and any claims arising under section 507(b) of the Bankruptcy Code against each Debtor in favor of the applicable DIP Lenders and Prepetition Lenders, and (3) all security interests and liens (as defined in Section 101(37) of the Bankruptcy Code) on property of the Debtors securing any of the claims or administrative expenses described in clauses (1) or (2) in favor of the applicable DIP Lenders and Prepetition Lenders.

(g)     <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  Other than with respect to the funding of the Escrow Account from the proceeds of their respective DIP Loans to the extent required under the DIP Documents, none of the DIP Agents, the DIP Lenders, or any other DIP Secured Party shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code regardless of whether such fee or expense has been allowed by this Court.  Other than with respect to the funding of the Escrow Account with the proceeds of their respective DIP Loans to the extent required under the DIP Documents, nothing in the Interim Order, this Final Order, or otherwise shall be construed to obligate any of the DIP Agents, the DIP Lenders, or other DIP Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(h)     <u>Payment of Allowed Professional Fees Prior to, on or After the Carve Out Trigger Date</u>.  Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees shall permanently reduce the Carve

Out on a dollar-for-dollar basis for those amounts that would otherwise be included in the Carve Out.

(i)      Allocable Percentage.   Notwithstanding anything to the contrary in the Interim Order or this Final Order, the amount (i) required to be funded by the DIP Lenders under each DIP Facility to the Escrow Account, including for funding the applicable Carve Out and (ii) of the applicable Carve Out that is senior to the applicable DIP Liens and applicable DIP Superpriority Claims of a DIP Facility and the applicable Prepetition Liens and applicable Prepetition Secured Obligations shall be calculated on the basis of and limited by the Allocable Percentage with respect to such DIP Facility and Prepetition Secured Obligations.  The Allocable Percentages shall otherwise in no way act as a cap or limitation on the aggregate amount of the Allowed Professional Fees against the Estates or the aggregate amount of the Carve Out.

(j)      Upon, and subject to, funding of the Carve Out in full, all amounts remaining in the Escrow Account shall be promptly distributed to the DIP Agents, with each DIP Agent receiving, for the benefit of the DIP Secured Parties under the applicable DIP Facility, a percentage of such residual amount equal to the ratio of (i) the aggregate amount of cash transferred to the Escrow Account from the proceeds of such DIP Facility to (ii) the aggregate amount transferred to the Escrow Account from the proceeds of all DIP Facilities, for application to the applicable DIP Obligations until Paid in Full (with any excess, including any excess in respect of any DIP Facility that has been Paid in Full (for the avoidance of doubt, including any Roll-Up DIP Loans, subject to the provisions of paragraph 17) prior to such distribution) being distributed to the remaining DIP Agents ratably in accordance with the aggregate amount of cash transferred to the Escrow Account from the proceeds of each remaining DIP Facility).

(k)      If no Carve Out Trigger Notice is delivered, upon payment of all Allowed Professional Fees in the Chapter 11 Cases, or, if a Carve Out Trigger Notice is delivered, upon payment of all Allowed Professional Fees up to the aggregate amount of the Pre-Carve Out Trigger Notice Gross Amount and the Post-Carve Out Trigger Notice Cap, all amounts remaining in the Carve Out Account shall be promptly distributed to the DIP Agents, with each DIP Agent receiving, for the benefit of the DIP Secured Parties under the applicable DIP Facility, a percentage of such residual amount equal to the ratio of (x) the aggregate amount of cash transferred to the Carve Out Account from the proceeds of such DIP Facility to (y) the aggregate amount transferred to the Carve Out Account from the proceeds of all DIP Facilities, for application to the applicable DIP Obligations until Paid in Full (with any excess, including any excess in respect of any DIP Facility that has been Paid in Full (for the avoidance of doubt, including any Roll-Up DIP Loans, subject to the provisions of paragraph 17) prior to such distribution) being distributed to the remaining DIP Agents ratably in accordance with the aggregate amount of cash transferred to the Carve Out Account from the proceeds of each remaining DIP Facility).

12.      <u>Excluded Professional Fees</u>.  Notwithstanding anything to the contrary in the Interim Order or this Final Order, no proceeds of any DIP Facility, the Carve Out, or any Cash Collateral may be used by any Debtor (or any subsidiary or affiliate thereof) or any other party in interest, including the Committee, any other statutory or non-statutory committee or any Trustee or any Representative of the foregoing, to: (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt or collateral position of any of the DIP Agents, the DIP Lenders, other DIP Secured Parties, or the Prepetition Secured Parties, whether by (i) challenging the validity, extent, amount,

perfection, priority or enforceability of the obligations under any DIP Facility, any DIP Documents, any of the Prepetition Secured Obligations or any of the Prepetition Documents, (ii) challenging the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect to any DIP Facility, any DIP Documents, any of the Prepetition Secured Obligations or any of the Prepetition Documents, (iii) seeking to subordinate or recharacterize the obligations under any DIP Facility or any of the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (iv) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent, DIP Lender, other DIP Secured Party, or any Prepetition Secured Party or any of their respective Representatives; (b) prevent, hinder or otherwise delay any DIP Agent's, DIP Lender's, other DIP Secured Party's, or Prepetition Secured Party's assertion, enforcement, or realization on any of the DIP Collateral or the Prepetition Collateral in accordance with the DIP Documents or the Prepetition Documents, as applicable; (c) seek to modify the rights granted to any DIP Agent, DIP Lender, other DIP Secured Party, or Prepetition Secured Party under any DIP Document or Prepetition Document, as applicable, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (which order may be the Interim Order or this Final Order) and (ii) permitted by the DIP Documents; *provided* that during the Challenge Period, an investigation budget in an aggregate amount of $500,000 of the DIP Loans and/or the Prepetition Collateral, including Cash Collateral, and the proceeds thereof, may be used by the Committee to

4924-1323-6092v.7

US-DOCS\165932148.16

investigate, but not to prepare, initiate, litigate, or prosecute, an objection to, or otherwise challenge, (x) the claims and liens of the Prepetition Secured Parties against the Debtors, and (y) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties; provided further that, for the avoidance of doubt, without waiving or limiting any defaults that may occur under the DIP Documents, any fees or expenses in excess of $500,000 incurred in connection with the foregoing investigation, or otherwise incurred in connection with preparing, initiating, litigating, or prosecuting an objection or challenge, and allowed by a final order of the Court under section 328, 330, 331, or 503(b) of the Bankruptcy Code, may be paid in accordance with any applicable orders of this Court, including any interim compensation orders; provided, further, that all parties rights to object to any such fees or expenses on the basis that such fees are in excess of such $500,000 budget are expressly preserved; *provided further* that, for so long as the (A) Brookfield Prepetition Secured Parties have not breached the Brookfield Settlement Term Sheet, no investigation budget may be used to investigate (x) claims or liens of any Brookfield Prepetition Secured Parties or (y) potential claims, counterclaims, causes of action, or defenses against any Brookfield Prepetition Secured Parties, and (B) Carlyle Prepetition Secured Parties have not breached the Carlyle Settlement Term Sheet, no investigation budget may be used to investigate (x) claims or liens of any Carlyle Prepetition Secured Parties or (y) potential claims, counterclaims, causes of action, or defenses against any Carlyle Prepetition Secured Parties.

**V.     Right to Credit Bid.**

       13.     Right to Credit Bid.

      (a)     Subject to the terms of the DIP Documents and the Prepetition Documents, as applicable, each of the DIP Agents and, subject to the provisions of paragraph 17 hereof, the Prepetition Agents shall have the unqualified right to credit bid (either directly or through one or

more acquisition vehicles), on a dollar-for-dollar basis up to the full amount of the applicable DIP Obligations and Prepetition Secured Obligations, if any, including any accrued interest, fees and expenses, including fees and expenses of the DIP Lender Advisors and Adequate Protection Fees and Expenses capitalized pursuant to paragraph 25(b) hereof and the Brookfield Fees, the Carlyle Payments, and the Fundamental Fees, as applicable, in any sale (including any deposit in connection with such sale) of all or any portion of the applicable DIP Collateral or Prepetition Collateral, including, without limitation, any Sale Transaction or any other sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan, including chapter 11 plans subject to confirmation under section 1129(b) of the Bankruptcy Code, and any sale or Disposition by a chapter 7 trustee for any of the Debtors, including under sections 363 or 725 of the Bankruptcy Code or otherwise, and such DIP Secured Parties and Prepetition Secured Parties shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code or otherwise.  Further, the Brookfield DIP Agent and the Brookfield Prepetition Agent may credit bid for the Debtors' claims against any employees to be hired in relation to a Brookfield Sale Transaction, the Carlyle DIP Agent and the Carlyle Prepetition Agent may credit bid for the Debtors' claims against any employees to be hired in relation to a Carlyle Sale Transaction, and, subject to paragraph 17, the Fundamental DIP Agent and the Fundamental Prepetition Agent may credit bid for the Debtors' claims against any employees to be hired in relation to a Fundamental Sale Transaction.

(b)     No bid for all or any portions of the (i) Brookfield Silo Assets shall be submitted by the Debtors as a Successful Bid (as defined in the Bidding Procedures Order) to be approved by an order of this Court unless such bid, together with any other bids for any portions of the Brookfield Silo Assets, provides for the Brookfield DIP Obligations and the Brookfield

Prepetition Secured Obligations to be Paid in Full on or before the closing date of the proposed sale transaction set forth in such bid with the proceeds of such sale (unless otherwise consented to by the Brookfield Required DIP Lenders), (ii) Carlyle Silo Assets shall be submitted by the Debtors as a Successful Bid to be approved by an order of this Court unless such bid, together with any other bids for any portions of the Carlyle Silo Assets, provides for the Carlyle DIP Obligations and the Carlyle Prepetition Secured Obligations to be Paid in Full on or before the closing date of the proposed sale transaction set forth in such bid with the proceeds of such sale (unless otherwise consented to by the Carlyle Required DIP Noteholders), and (iii) Fundamental Silo Assets shall be submitted by the Debtors as a Successful Bid to be approved by an order of this Court unless such bid, together with any other bids for any portions of the Fundamental Silo Assets, provides for the Fundamental DIP Obligations and the Fundamental Prepetition Secured Obligations to be Paid in Full on or before the closing date of the proposed sale transaction set forth in such bid with the proceeds of such sale (unless otherwise consented to by the Fundamental Required DIP Lenders).

(c)     Upon, and effective as of, the closing of the (i) Brookfield Sale Transaction in accordance with the Brookfield APA and the acquisition of the Brookfield Silo Assets by the Buyer (as defined in the Brookfield APA), the Brookfield DIP Facility shall be deemed mutually terminated and the Brookfield DIP Secured Parties and Brookfield Prepetition Secured Parties shall permanently waive any right to assert any claim against the Debtors, their Estates or the GUC Trust on account of the Brookfield DIP Obligations and the Brookfield Prepetition Secured Obligations, whether such claims are entitled to administrative priority, unsecured or otherwise, and the Debtors acknowledge and agree that (x) they shall not be permitted to draw on the Brookfield DIP Facility following the closing of the Brookfield Sale

Transaction and (y) the Brookfield DIP Secured Parties shall not be required to fund any amounts before or after the closing of the Brookfield Sale Transaction in connection with any winddown of the Debtors' Estates (other than the Brookfield Cash Consideration as set forth in the Brookfield Settlement Term Sheet); *provided*, further, that (A) the Brookfield DIP Facility shall not be terminated and no such Brookfield DIP Obligations shall be waived if (1) such claim is on account of a purchase price adjustment for any asset to be acquired pursuant to the Brookfield APA that is not sold to the Brookfield Secured Parties or one or more of their affiliates (*i.e.*, on account of a project lender exercising remedies as to project assets prior to closing) or (2) the Debtors or the Committee breach the Brookfield Settlement Term Sheet; and (B) to the extent that the Brookfield DIP Facility is terminated, all terms and provisions of the Brookfield DIP Documents that by their terms expressly survive a termination of the Brookfield DIP Facility shall survive, and (ii) Carlyle Sale Transaction and the acquisition of the Carlyle Silo Assets by the Carlyle Purchaser, the Carlyle DIP Facility shall be deemed mutually terminated and the Carlyle DIP Secured Parties and the Carlyle Prepetition Secured Parties shall permanently waive any right to assert a deficiency claim against the Debtors, their Estates or the GUC Trust on account of the Carlyle DIP Obligations and the Carlyle Prepetition Secured Obligations, whether such claims are entitled to administrative priority, unsecured or otherwise; *provided,* that (x) the Carlyle DIP Facility shall not be terminated and no deficiency claim shall be waived if (1) such claim is on account of a purchase price adjustment for any asset to be acquired pursuant to the Carlyle APA that is not sold to the Carlyle Secured Parties or one or more of their affiliates (*i.e.*, on account of a project lender exercising remedies as to project assets prior to closing) or (2) the Debtors or the Committee breach the Carlyle Settlement Term Sheet, and (y) to the extent that the Carlyle DIP Facility is terminated, all terms and provisions of

4924-1323-6092v.7

the Carlyle DIP Documents that by their terms expressly survive a termination of the Carlyle DIP Facility shall survive.

**VI.    Default; Rights and Remedies; Relief from Stay.**

14.    <u>Events of Default</u>.  (a) The failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Orders; or (b)(i) with respect to the Brookfield DIP Facility, the occurrence of any Event of Default as defined in and under the Brookfield DIP Credit Agreement (unless waived by the Brookfield Required DIP Lenders); (ii) with respect to the Carlyle DIP Facility, the occurrence of any Event of Default as defined in and under the Carlyle DIP Note Purchase Agreement (unless waived by the Carlyle Required DIP Noteholders); and (iii) with respect to the Fundamental DIP Facility, the occurrence of any Event of Default as defined in and under the Fundamental DIP Credit Agreement (unless waived by the Fundamental Required DIP Lenders), shall constitute an "***Event of Default***" under this Final Order with respect to the applicable DIP Facility, unless extended or otherwise waived by prior written consent from the applicable Required DIP Lenders.

15.    <u>Rights and Remedies Upon Event of Default/Relief from Stay</u>.

(a)    Without requiring further order from this Court and without the need for filing any motion for relief from the automatic stay or any other pleading, immediately upon the date of delivery of a written notice (a "***Default Notice***," and the date of delivery of such Default Notice, the "***Default Termination Date***") by any DIP Agent (acting at the direction of the applicable Required DIP Lenders) to the Debtors, the U.S. Trustee, each other DIP Agent, each Prepetition Agent and the Committee,[4] of the occurrence of the Maturity Date (as defined in the

---

[4]    The Debtors shall promptly file any such Default Notice with the Court.

applicable DIP Credit Agreement) or an Event of Default, the automatic stay shall be modified, without further order of the Court, solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the applicable DIP Agent (acting at the direction of the applicable Required DIP Lenders, in their sole discretion): (i) the Debtors' authority to use the Cash Collateral of the applicable DIP Secured Parties shall immediately terminate (subject only to the applicable Carve Out and except as set forth in this paragraph 15 hereof); (ii) the applicable DIP Obligations shall (subject only to the applicable Carve Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (iii) the termination, reduction, or restriction of any further DIP Commitments under the applicable DIP Facility to the extent any such DIP Commitments remain outstanding; (iv) the applicable DIP Facility shall be terminated with respect to any future liability or obligation of the applicable DIP Agent and DIP Lenders, but, for the avoidance of doubt, without affecting any of the applicable DIP Liens, DIP Superpriority Claims or DIP Obligations; and (v) the application of the applicable Carve Out through the delivery of the Carve Out Trigger Notice (the date that is the earliest to occur of the election of any of the foregoing under clauses 15(a)(i) through (v) a "**DIP Termination Date**").

(b) Notwithstanding anything to the contrary in clause (a) above, during the continuation of an Event of Default and following the delivery of a Default Notice, but prior to exercising the remedies set forth in this paragraph 15(b), the applicable DIP Agent, on behalf of the applicable DIP Secured Parties, shall be required to file a motion with the Court seeking emergency relief (a "**Stay Relief Motion**" and the hearing on such motion, the "**Stay Relief Hearing**") on not less than five (5) Business Days' notice (the "**Notice Period**") for a further

order of the Court modifying the automatic stay to permit the applicable DIP Agent, on behalf of the applicable DIP Secured Parties, to exercise any other right or remedy with respect to the applicable DIP Collateral or the applicable DIP Liens permitted under the DIP Documents or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition Documents.  In the event the Court determines at the Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which remedy may include the exercise of any and all rights available to the applicable DIP Secured Parties.  The Notice Period shall be automatically extended (without further notice, hearing, motion, order or other action) until three (3) Business Days after the date that the Court rules on the Stay Relief Motion.  During the Notice Period, the Debtors shall be permitted to cure any Event of Default and to use Cash Collateral to (i) make payroll and fund critical expenses necessary to continue the operation of their business or to maximize and maintain the value of the DIP Collateral, in each case in accordance with the terms of the Approved Budget (subject to any Permitted Variance) and this Final Order or as otherwise agreed by the applicable DIP Agent (acting at the direction of the applicable Required DIP Lenders), without prejudice to the rights of any of the other DIP Secured Parties or Prepetition Secured Parties, (ii) fund the Carve Out, and (iii) contest whether an Event of Default has occurred or is continuing.  Notwithstanding the foregoing, the DIP Lenders shall not be obligated to provide any DIP Loans or advances at any time an Event of Default has occurred and is continuing, including during the Notice Period, or after the Maturity Date.

(c)     For the avoidance of doubt, following a DIP Termination Date under a DIP Facility, unless otherwise ordered by the Court, the applicable DIP Agent, on behalf of the applicable DIP Secured Parties, may exercise remedies as to any applicable Non-Debtor Guarantor or its property or assets, including property or assets of Non-Debtor Guarantors that

constitute DIP Collateral, without the requirement of delivering a Default Notice or complying with the Notice Period, and such exercise of remedies shall be permitted under the DIP Orders and not constitute a violation of the automatic stay under section 362 of the Bankruptcy Code; *provided* that any such exercise of remedies shall be in accordance with the applicable DIP Documents.

16.     Relief from Stay.   Subject to paragraph 15 and, to the extent required by paragraph 15(b) of this Final Order, the expiration of the Notice Period and entry of an order granting the relief requested in a Stay Relief Motion, for the purpose of exercising rights, options, and remedies set forth in this Article VI, unless otherwise ordered by this Court, each DIP Agent (acting at the direction of the applicable DIP Lenders), on behalf of the DIP Secured Parties, shall be automatically relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to them, or any of them, solely to the extent necessary to exercise their rights and remedies pursuant to the terms and conditions of the DIP Documents, the Interim Order, and this Final Order.

## VII.    Challenges to the Prepetition Secured Obligations

17.     Effect of Stipulations on Third Parties.

(a)      The Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order (including the stipulations and releases in connection with the Roll-Up DIP Loans, which were or shall, as applicable, be final and irrevocable as to the Debtors upon entry of the Interim Order with respect to the Interim Roll-Up DIP Loans and upon entry of this Final Order with respect to the Final Roll-Up DIP Loans, subject to the provisions of this paragraph 17) were under the Interim Order and hereby are irrevocably binding upon the Debtors and any and all of the Debtors' successors-in-interest and

assigns in all circumstances and for all purposes upon entry of the Interim Order, and the Debtors were, under the Interim Order, and hereby are deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date.

(b)      Upon the expiration of the Challenge Period, the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order shall also be binding upon the Debtors' Estates and all creditors and other parties in interest and all of their respective successors and assigns, including the Committee and any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any Trustee, in each case in all circumstances and for all purposes, unless and solely to the extent that (i) during the Challenge Period, the Committee or any other party in interest with proper standing granted by an order of the Court prior to the expiration of the Challenge Period and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding, has timely and properly filed an appropriate proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this Final Order, including this paragraph 17) challenging any of the Debtors' Stipulations and Releases or other admissions, agreements, and releases contained in this Final Order with respect to the Fundamental Prepetition Secured Obligations (including the Fundamental Roll-Up DIP Loans), including, without limitation, any proceeding or contested matter (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Fundamental Prepetition Loan Documents, the Fundamental Prepetition Secured Obligations, the Fundamental Prepetition Liens, the Adequate Protection Claims of the Fundamental Prepetition Secured Parties, the Adequate Protection Liens

of the Fundamental Prepetition Secured Parties, or the Fundamental Roll-Up DIP Loans and any DIP Liens securing such Fundamental Roll-Up DIP Loans, (B) alleging any basis to impair, restrict, limit, deny or otherwise challenge the right of the Fundamental DIP Secured Parties or the Fundamental Prepetition Secured Parties to credit bid, in whole or in part, the Fundamental DIP Liens, the Fundamental DIP Obligations, the Fundamental Prepetition Liens, or the Fundamental Prepetition Secured Obligations, or (C) otherwise asserting or prosecuting any claim or cause of action with respect to the Fundamental Prepetition Secured Obligations, including any action for preferences, fraudulent transfers or conveyances, recharacterization, subordination, disgorgement, offset, objections, contests, defense, or other challenges (each such proceeding or contested matter, a "***Challenge***"), and (ii) the Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely and properly filed Challenge (a "***Successful Challenge***"); <u>provided</u>, <u>however</u>, that, (x) any pleadings filed in a proceeding asserting any Challenge shall set forth with specificity the basis for such Challenge, and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred; *provided*, that, solely with respect to the Committee, the filing of a standing motion prior to the expiration of the Challenge Period shall toll the expiration of the Challenge Period as set forth below, and (y) if the Chapter 11 Cases are converted to chapter 7, or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, any such estate representative or trustee shall receive the full benefit of any remaining time before the expiration of the Challenge Period.  The Court may fashion any appropriate remedy upon a Successful Challenge.

(c)     If no Challenge is timely and properly filed by a party-in-interest with the requisite standing and authority as contemplated herein prior to the expiration of the Challenge

4924-1323-6092v.7

Period or to the extent that the Court enters a final, non-appealable order that does not rule in favor of the plaintiff, then:  (i) the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order shall be binding and preclusive on all parties in interest, including the Debtors, the Debtors' Estates, the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Trustee, or other successors and assigns of the Debtors and the Debtors' Estates, and on any other person or entity; (ii) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, claim, subordination, recoupment, demands, offset, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases, including, without limitation, any subsequent chapter 7 case; (iii) the Prepetition Liens on the Prepetition Collateral held by the Prepetition Secured Parties shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected, security interests and liens and with the priority specified in the Debtors' Stipulations and Releases or in this Final Order, not subject to defense, counterclaim, recharacterization, subordination, avoidance or other defense; (iv) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral held by the Prepetition Secured Parties, and the Prepetition Secured Parties (and their respective Representatives), shall not be subject to any other or further Challenge or other proceeding by the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee, or any successors and assigns of the Debtors and the Debtors' Estates, or by any other person or entity, and all such parties shall be enjoined from seeking to exercise the rights of the Debtors or the Debtors' Estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge

Period); and (v) any and all Challenges by any party (including the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Trustee, or other successors and assigns of the Debtors and the Debtors' Estates, and any other person or entity) and any right to bring a Challenge shall be deemed forever waived, released, and barred, in each case except to the extent that such Debtors' Stipulations and Releases and any other admissions, agreements, and releases contained in this Final Order were subject to a Successful Challenge.

(d)     If any Challenge is timely and properly filed prior to the expiration of the Challenge Period (as defined below) by the Committee, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee or any other person or entity, in each case, with requisite standing and authority, (i) any claim or action that is not brought shall be forever barred, and (ii) the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order shall nonetheless remain binding and preclusive on the Committee, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee, and any other person or entity, as applicable, except as to any such stipulations, admissions, agreements, and releases that either are subject to a timely and properly filed Challenge that remains pending or were subject to a Successful Challenge.

(e)     Nothing in this Final Order vests or confers on any person, including the Committee or any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, any Trustee, or any other party in interest, standing or authority to pursue any claim or cause of action belonging to the Debtors or their Estates, including, without limitation, Challenges with respect to (x) the Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order, which became final and irrevocable as to

the Debtors upon entry of the Interim Order, (y) the Interim Roll-Up DIP Loans, which became final and irrevocable as to the Debtors upon entry of the Interim Order, or (z) the Final Roll-Up DIP Loans, which became final and irrevocable as to the Debtors upon entry of this Final Order (in each case subject to the provisions of this paragraph 17), and (i) a separate order of the Court conferring such standing on the Committee or other person shall be a prerequisite for the prosecution of a Challenge by the Committee or such other person and (ii) all rights to object or to oppose such standing or any Challenge in any manner are expressly reserved.

(f)     The "***Challenge Period***" shall mean with respect to the Debtors' Stipulations and Releases in favor of the Fundamental Prepetition Secured Parties, the earliest to occur of (i) the commencement of a hearing to consider confirmation of a chapter 11 plan, (ii) three (3) Business Days' prior to the hearing for approval of a Fundamental Sale Transaction, which hearing shall not occur before the week of January 5, 2025, (iii) for any party in interest other than the Committee, no later than January 12, 2026, (iv) for the Committee, no later than January 20, 2026; and (v) any such later date by agreement of the Fundamental Prepetition Agent (at the direction of the Fundamental Prepetition Lenders) or as ordered by the Court for cause upon a motion filed and served within the time period established by the foregoing clauses (i)-(iv); provided that the filing of a motion by the Committee seeking standing with a respect to such Challenge prior to the expiration of the Challenge Period shall toll the Committee's Challenge Period until such motion is adjudicated by this Court, or to such later date as agreed by the Debtors, the Committee, and the Fundamental DIP Secured Parties, provided, however, that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period ending on the later of January 12, 2026, and forty-five (45) days after the date of

such conversion or appointment, as applicable, in each case solely with respect to any such trustee.    For the avoidance of doubt, the Challenge Period with respect to the Debtors' Stipulations and Releases in favor of the (i) Brookfield Prepetition Secured Parties shall terminate upon entry of this Final Order, and (ii) Carlyle Prepetition Secured Parties shall terminate upon entry of this Final Order.

(g)    For the avoidance of doubt, notwithstanding anything to the contrary in the Interim Order or this Final Order, upon the entry of the Interim Order, (i) the Challenge Period was automatically deemed to have lapsed solely as to the Debtors with respect to the Debtors' Stipulations and Releases, (ii) such stipulations, admissions, agreements, and other releases became binding upon the Debtors, and (iii) any Challenges by the Debtors with respect to the Prepetition Secured Parties (including on account of the Roll-Up DIP Loans), were deemed forever waived, released, and barred.

(h)    Any successor to the Debtors (including, without limitation, any Trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be bound by the terms of the Interim Order and this Final Order to the same extent as the Debtors, including with respect to the Debtors' Stipulations and Releases.

## VIII.  Debtors' Waivers and Releases.

18.    Section 506(c) Claims and 552(b) Equities.

(a)    Without affecting, modifying or limiting the scope or priority of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against or recovered from any of (i) the DIP Secured Parties, their respective claims, or the DIP Collateral or (ii) the Prepetition Secured Parties, their respective claims, or the Prepetition Collateral, in each case pursuant to

68

sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the applicable DIP Agent (acting at the direction of the applicable DIP Lenders) or the applicable Prepetition Agent (at the direction of the applicable Prepetition Lenders), as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Secured Party.

(b)    Each of the DIP Secured Parties and  the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, to the extent applicable, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the DIP Secured Parties or the Prepetition Secured Parties, with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable.

19.    <u>Marshaling</u>.  In no event shall any DIP Agent, DIP Lender, or any Prepetition Agent or Prepetition Lender, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable, and the proceeds of the DIP Collateral and the Prepetition Collateral shall be received and applied pursuant to the DIP Orders, including Annex 3, and the DIP Documents and the Prepetition Documents, including the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements, notwithstanding any other agreement or provision to the contrary; provided, however, that each DIP Agent and each DIP Lender shall use commercially reasonable efforts to first obtain recoveries from the applicable DIP Collateral other than, (x) with respect to the Brookfield DIP Secured Parties and the Carlyle DIP Secured Parties, the proceeds of Avoidance Actions and commercial tort claims, and (y) with respect to the Fundamental DIP

Secured Parties, the Avoidance Actions and commercial tort claims and any proceeds of the foregoing, that are in each case with respect to clauses (x) and (y), not Brookfield Silo Assets, Carlyle Silo Assets or Fundamental Silo Assets, as applicable.

20.    Release of the DIP Secured Parties and Prepetition Secured Parties.

(a)    Subject to subparagraph (b) below, in consideration of and as a condition to each DIP Agent and each DIP Lender making the DIP Facilities available under the DIP Credit Agreements and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Interim Order, this Final Order, and the DIP Documents (including the Carve Out provisions), each Prepetition Agent and each other Prepetition Secured Party consenting to the priming of the Prepetition Liens by the DIP Liens and the applicable Carve Out and permitting the use of the Prepetition Collateral and Cash Collateral pursuant to the provisions of the Interim Order and this Final Order, and the Polaris B Agent and each other Polaris B Secured Party consenting to the priming of the Polaris B Liens by the Carve Out and permitting the use of the Polaris B Collateral and Cash Collateral pursuant to the provisions of the Interim Order and this Final Order, each Debtor and each Estate, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present, and future subsidiaries and assigns (collectively, the "**_Releasors_**"), hereby absolutely, unconditionally and irrevocably and forever releases, acquits, absolves, and discharges (i) each DIP Secured Party (solely in their capacity as such), (ii) each Prepetition Secured Party (solely in their capacity as such), (iii) each Polaris B Secured Party (solely in their capacity as such), and (iv) with respect to each of the foregoing (solely in their capacities as such), each of their respective Representatives (the persons and entities described in these clauses (i) through (iv), each a "**_Released Party_**") and their respective property and assets from any and all acts and omissions of the Released Parties,

and from any and all claims, interests, demands, liabilities, responsibilities, disputes, remedies, causes of action (including causes of action in the nature of "lender liability"), Avoidance Actions, suits, judgments, costs, debts, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, bonds, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, recoupment, demands, controversies, other rights of disgorgement or recovery, and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or such entities' successors or assigns, whether individually or collectively) that exist on the date hereof, at law or in equity, by statute or common law, in contract, or in tort, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, (C) any and all offsets, defenses, claims, counterclaims, set-off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement or recovery, and (D) any defense, right of counterclaim, right of set-off, or deduction on the payment of the Prepetition Secured Obligations, the Roll-Up DIP Loans, the DIP Obligations, or the Polaris B Secured Obligations, in each case that any Releasor may now or hereafter own, hold, have, or claim to have against the Released Parties, or any of them for, upon, or by reason of any nature,

cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of this Final Order, arising out of, relating to, or in connection with, any of the DIP Obligations, the Prepetition Secured Obligations, the Polaris B Secured Obligations, the DIP Liens, the Prepetition Liens, the Polaris B Liens, any sale process, any Sale Transaction, the payment of any fees and expenses, including the DIP Lender Advisors, the DIP Documents, the Prepetition Documents, the Polaris B Documents, or other financial accommodations under the DIP Documents, the Prepetition Documents, or the Polaris B Documents, the negotiations concerning the same, or the Chapter 11 Cases (individually, a "***Released Claim***" and collectively, the "***Released Claims***"); provided, however, that the foregoing release shall not release any (x) claims, liabilities or obligations arising on or after the date of this Final Order, including claims against or obligations of the DIP Lenders under each DIP Facility, and (y) claims against a Released Party to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud or willful misconduct of such Released Party.

(b)      As of the entry of the Interim Order and reaffirmed upon entry of this Final Order, the releases granted solely to the DIP Secured Parties and their Representatives (in each case, solely in their capacities as such) in this paragraph 20 are final and binding and are not subject to a Challenge pursuant to paragraph 17 of this Final Order or otherwise.  For the avoidance of doubt, notwithstanding anything to the contrary, the releases granted to all other parties, other than the DIP Secured Parties and their Representatives (in each case, solely in their capacities as such), in this paragraph 20 shall be subject to Challenge pursuant to paragraph 17 of this Final Order.

(c)     Subject to paragraphs 17 and 20(b) of this Final Order, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Released Party that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Released Party on the basis of any Released Claim or other claim or cause of action that has been released and discharged by any Releasor pursuant to clause (a) above (and upon the granting of such release, clause (b) above).  If any Releasor violates the foregoing covenant, such Releasor agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

## IX.    Intercompany Claims Settlement

21.    <u>Preserved Procurement Claims</u>.

(a)     None of Debtor PGR Procurement, LLC or any secured party with respect to any Preserved Procurement Claim shall, directly or indirectly, exercise any remedial or enforcement action in respect of any Preserved Procurement Claim until 90 days after the closing of a Sale Transaction or other Disposition with respect to a material portion of the assets of or equity interests of the entity against which such Preserved Procurement Claim has been asserted. None of the provisions in Article IX of the Interim Order or this Final Order shall in any way limit, alter, or affect any defenses, setoffs, recoupments, or other rights or defenses of any person or entity against whom the Preserved Procurement Claims may be asserted.

(b)     The Debtors shall cause Catalina to engage the Catalina Independent Engineer to review and adjudicate the Identified BRP Claims under customary procedures; *provided* that the scope of the Catalina Independent Engineer's review and adjudication shall be acceptable to the Brookfield Required DIP Lenders and the Fundamental Required DIP Lenders.

4924-1323-6092v.7

22.    <u>Release of Pledged Intercompany Claims</u>.    Upon the consummation of a (a) Brookfield Sale Transaction, all Brookfield Pledged Intercompany Claims held by any Debtor or any subsidiary or affiliate thereof shall, at the election of the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), be fully and finally released (other than Preserved Procurement Claims and Other BRP Claims), including by such Debtor agreeing to release any claims or interests it may have against or in or that may attach to such Brookfield Pledged Intercompany Claims as of the closing of such sale, (b) Carlyle Sale Transaction, all Carlyle Pledged Intercompany Claims held by any Debtor or any subsidiary or affiliate thereof shall, at the election of the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), be fully and finally released (other than the Preserved Procurement Claims), including by such Debtor agreeing to release any claims or interests it may have against or in or that may attach to such Carlyle Pledged Intercompany Claims as of the closing of such sale, and (c) Fundamental Sale Transaction, all Fundamental Pledged Intercompany Claims held by any Debtor or any subsidiary or affiliate thereof shall, at the election of the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), be fully and finally released, including by such Debtor agreeing to release any claims or interests it may have against or in or that may attach to such Fundamental Pledged Intercompany Claims as of the closing of such sale.  For the avoidance of doubt, no Brookfield Pledged Intercompany Claims, Carlyle Pledged Intercompany Claims or Fundamental Pledged Intercompany Claims shall be released pursuant to this Final Order; *provided* that, for the avoidance of doubt, such claims may be Disposed of or released pursuant to further order of the Court.

**X.      Other Rights and Obligations.**

23.      <u>Replacement Additional DIP Facilities</u>.  Following the entry of the Interim Order, the Debtors shall be permitted to enter into one or more new debtor-in-possession financing facilities (each, a "***Replacement Additional DIP Facility***") solely for the purpose of refinancing and replacing one or more of the existing DIP Facilities (each, a "***Replaced DIP Facility***"); *provided* that, each such Replacement Additional DIP Facility shall (a) repay in full in cash and refinance the applicable Replaced DIP Facility and cause such Replaced DIP Facility to be Paid in Full, and (b) be on identical terms to the Replaced DIP Facility (other than with respect to covenants, pricing and fees; *provided* that (i) any covenants contained in such Replacement Additional DIP Facility that are more favorable to the lenders thereunder shall have been incorporated into the remaining DIP Facilities at the election of the applicable DIP Lenders, (ii) the pricing and fees in respect of the remaining DIP Facilities shall be increased to the same extent that such pricing and fees under such Replacement Additional DIP Facility represent an increase relative to the Replaced DIP Facility, in each case pursuant to an Amendment pursuant to paragraph 3(c) of this Final Order (as applicable) to the remaining DIP Facilities entered into on or prior to the closing date of such Replacement Additional DIP Facility, (iii) each Replacement Additional DIP Facility shall have identical provisions related to funding the applicable Carve Out as the Replaced DIP Facility and shall be obligated to fund the Allocable Percentage of the Carve Out of each applicable Replaced DIP Facility.

24.      <u>Blue Ridge Surety Bonds</u>.  Upon any Debtor or any subsidiary or affiliate thereof, including Blue Ridge, obtaining any proceeds of any Blue Ridge Surety Bond, such proceeds shall be immediately applied to pay amounts outstanding to, or to cash collateralize, the applicable beneficiary thereof; provided, however, that nothing herein shall modify the terms,

conditions and/or provisions of any such bonds and/or any surety defenses under such bonds, or under contract, common law or statute.

25.     <u>Payment of Fees and Expenses</u>.

(a)     The Debtors were, upon entry of the Interim Order, and hereby are authorized on a final basis to and shall pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of each DIP Agent and each other DIP Secured Party, including the fees and expenses of the DIP Lender Advisors, in connection with each DIP Facility, including in connection with (i) the discussion, negotiation, preparation, execution and delivery of any DIP Documents and the funding of the DIP Loans, (ii) the administration of the DIP Facilities and any amendment, modification or waiver of any provision of any DIP Document, (iii) the interpretation, enforcement or protection of any of the rights and remedies of the DIP Secured Parties under the DIP Documents, (iv) the Chapter 11 Cases, and (v) the Sale Transactions, in each case as provided in the applicable DIP Documents.  No attorney or advisor to any of the Prepetition Secured Parties, the DIP Agents or the other DIP Secured Parties, including the fees and expenses of the DIP Lender Advisors, shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agents, the other DIP Secured Parties, or the DIP Lender Advisors in connection with any of the DIP Facilities were, upon entry of the Interim Order, and hereby are approved in full on a final basis.

(b)     Notwithstanding the foregoing, to the extent the fees, costs, disbursements and expenses of any of the Brookfield DIP Lender Advisors, the Carlyle DIP Noteholder Advisors or the Fundamental DIP Lender Advisors or the payment of any Adequate Protection

Fees and Expenses exceed the aggregate amount budgeted for such DIP Lender Advisors or Adequate Protection Fees and Expenses in the Initial Budget (or, with the consent or deemed consent of the Required DIP Lenders, the Approved Budget), the DIP Loan Parties shall not be obligated to pay such excess to the DIP Lender Advisors or the advisors to the Prepetition Secured Parties in cash, but to the extent the applicable DIP Lenders pay such amounts to the applicable DIP Lender Advisors or the advisors to the Prepetition Secured Parties in accordance with this paragraph 25(b), the outstanding amount of the applicable DIP Obligations shall automatically be increased (for the avoidance of doubt, without any reduction of the applicable DIP Commitments) by such amount, with no further action by any party, upon notice to the DIP Loan Parties.  For the avoidance of doubt, no proceeds of any DIP Facility or Cash Collateral solely of any DIP Secured Party under a DIP Facility may be used to pay fees and expenses of DIP Lender Advisors for any other DIP Facility or the advisors to Prepetition Secured Parties for any other Prepetition Secured Obligations.

(c)     Any time that the advisors to the Prepetition Secured Parties or the DIP Lender Advisors seek payment (whether in cash or in additional applicable DIP Obligations pursuant to paragraph 25(b) hereof) of Adequate Protection Fees and Expenses from the Debtors, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine or other privilege) by electronic mail to the U.S. Trustee and counsel to the Committee contemporaneously with the delivery of such fee and

expense statements to the Debtors' primary restructuring counsel.  The Debtors, the Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "***Disputed Invoiced Fees***") by notifying the submitting party in writing, within ten (10) days of the receipt of such fee and expense statement or invoice (the "***Review Period***"), setting forth the specific objections to the Disputed Invoiced Fees.  If such objection cannot be consensually resolved, the objecting party may file with the Court a motion or other pleading to resolve such dispute prior to the expiration of the Review Period (which such deadline may be extended by the applicable submitting party in writing), with at least ten (10) days' prior written notice to the submitting party of any hearing on such motion or other pleading.  The Debtors shall promptly pay at the expiration of the applicable Review Period in full in cash (or, in the case of any payment pursuant to paragraph 25(b) hereof, the Debtors shall automatically be deemed to have paid at the expiration of the Review Period in full in the form of additional applicable DIP Obligations) all such invoiced fees and expenses other than the Disputed Invoiced Fees, and this Court shall have jurisdiction to determine the Disputed Invoiced Fees if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors shall pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of each Prepetition Agent and each other Prepetition Secured Party incurred on or prior to such date without the need for any professional engaged by any Prepetition Agent or other Prepetition Secured Party to first deliver a copy of its invoice as provided for herein (other than to the Debtors).  No attorney or advisor to any of the Prepetition Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to any Prepetition Agent or the other Prepetition Secured Party in connection with the Prepetition

Secured Obligations, the DIP Facility, the Chapter 11 Cases or otherwise are hereby approved in full.

26.    <u>ACT Provisions</u>.  The Debtors are expressly authorized on a final basis to enter into, and the DIP Documents shall be deemed to include, the following covenants for the benefit of the DIP Secured Parties:

(a)    "The Debtors shall not, and shall not permit ACT to, Dispose of, or enter into any agreement to Dispose of, in one transaction or a series of transactions, all or any part of ACT's business, assets or property of any kind whatsoever, either real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed (the foregoing transactions, collectively, an "***ACT Disposition***"), except on terms and conditions and with a counterparty reasonably acceptable to the Required DIP Lenders, it being understood that any refusal to consent to an ACT Disposition by (i) the Brookfield Required DIP Lenders shall be deemed reasonable if (A) such ACT Disposition is proposed to occur before the consummation of a Brookfield Sale Transaction, (B) the Brookfield Required DIP Lenders in good faith determine that such ACT Disposition could adversely affect the operation and maintenance services provided to the Brookfield Silo Entities or the Brookfield Silo Assets (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Brookfield Borrower or its subsidiaries or affiliates; (ii) the Carlyle Required DIP Noteholders shall be deemed reasonable if (A) such ACT Disposition is proposed to occur before the consummation of a Carlyle Sale Transaction, (B) the Carlyle Required DIP Noteholders in good faith determine that such ACT Disposition could adversely affect the operation and maintenance services provided to the Carlyle Silo Entities or the Carlyle Silo Assets (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Carlyle Issuer or its subsidiaries or affiliates; and (iii) the Fundamental Required DIP Lenders shall be deemed reasonable if (A) such ACT Disposition is proposed to occur before the consummation of a Fundamental Sale Transaction, (B) the Fundamental Required DIP Lenders in good faith determine that such ACT Disposition could adversely affect the operation and maintenance services provided to the Fundamental Silo Entities or the Fundamental Silo Assets (including the cost or quality thereof and including based on the reputation of the provider), or (C) if the counterparty holds existing investments in the Fundamental Borrower or its subsidiaries or affiliates.

(b)    The Debtors shall not permit ACT or its direct or indirect subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise

become directly or indirectly liable with respect to any funded indebtedness, including any DIP Obligations (such indebtedness, "**ACT Indebtedness**"), except on terms and conditions and funded by counterparties reasonably acceptable to the Required DIP Lenders, it being understood that any refusal to consent to such indebtedness by (i) the Brookfield Required DIP Lenders shall be deemed reasonable if (A) such financing provides for milestones, events of default, or the ability of the lender thereunder to exercise remedies, in each case prior to the consummation of a Brookfield Sale Transaction, (B) the Brookfield Required DIP Lenders in good faith determine that such indebtedness could adversely affect the operation and maintenance services provided to any Brookfield Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (as each is defined in the Brookfield DIP Credit Agreement) (including based on the cost or quality thereof and the reputation of the provider) or (C) if the financing is provided by parties with existing investments in the Brookfield Borrower or any of its subsidiaries or affiliates, (ii) the Carlyle Required DIP Noteholders shall be deemed reasonable if (A) such financing provides for milestones, events of default, or the ability of the lender thereunder to exercise remedies, in each case prior to the consummation of a Carlyle Sale Transaction, (B) the Carlyle Required DIP Noteholders in good faith determine that such indebtedness could adversely affect the operation and maintenance services provided to any Carlyle Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (as each is defined in the Carlyle DIP Note Purchase Agreement) (including based on the cost or quality thereof and the reputation of the provider) or (C) if the financing is provided by parties with existing investments in the Carlyle Issuer or any of its subsidiaries or affiliates, and (iii) the Fundamental Required DIP Lenders shall be deemed reasonable if (A) such financing provides for milestones, events of default, or the ability of the lender thereunder to exercise remedies, in each case prior to the consummation of a Fundamental Sale Transaction, (B) the Fundamental Required DIP Lenders in good faith determine that such indebtedness could adversely affect the operation and maintenance services provided to any Fundamental Silo Entity, including pursuant to the O&M Services Agreements or the Transition Services Agreement (as each is defined in the Fundamental DIP Credit Agreement) (including based on the cost or quality thereof and the reputation of the provider) or (C) if the financing is provided by parties with existing investments in the Fundamental Borrower or any of its subsidiaries or affiliates (such Indebtedness to which the Requisite Lenders consent, "**Permitted ACT Indebtedness**").

(c)     The Debtors shall not permit ACT or its direct or indirect subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any lien on or security interest in or with respect to any of ACT's assets or property, in each case in respect of funded indebtedness, except liens and security

interests incurred in the ordinary course of business and liens and security interests securing Permitted ACT Indebtedness (such prohibited liens and security interests, "***Unpermitted ACT Liens***").

(d)     Upon the incurrence of (x) Unpermitted ACT Liens or (y) the occurrence of an ACT Disposition or the incurrence of ACT Indebtedness that was not reasonably acceptable to the (i) Brookfield Required DIP Lenders, an Event of Default shall occur with respect to the Brookfield DIP Facility and, in addition to all rights and remedies available under Article VI of this Final Order, any or all of the O&M Services Agreements (as defined in the Brookfield DIP Credit Agreement) between any Brookfield Silo Entity and ACT, whether such contractual relationship is direct or through an intermediary, including Pine Gate O&M, LLC, shall, at the election of the Brookfield Required DIP Lenders, be terminated and of no further force or effect and each of ACT and any intermediary party, including Pine Gate O&M, LLC, shall waive any and all claims arising from such termination and shall not be permitted to recover on account of such claims from any Brookfield Silo Entity or Brookfield Silo Asset; (ii) Carlyle Required DIP Noteholders, an Event of Default shall occur with respect to the Carlyle DIP Facility and, in addition to all rights and remedies available under Article VI of this Final Order, any or all of the O&M Services Agreements (as defined in the Carlyle DIP Note Purchase Agreement) between any Carlyle Silo Entity and ACT, whether such contractual relationship is direct or through an intermediary, including Pine Gate O&M, LLC, shall, at the election of the Carlyle Required DIP Noteholders, be terminated and of no further force or effect and each of ACT and any intermediary party, including Pine Gate O&M, LLC, shall waive any and all claims arising from such termination and shall not be permitted to recover on account of such claims from any Carlyle Silo Entity or Carlyle Silo Asset; and (iii) Fundamental Required DIP Lenders, an Event of Default shall occur with respect to the Fundamental DIP Facility and, in addition to all rights and remedies available under Article VI of this Final Order, any or all of the O&M Services Agreements (as defined in the Fundamental DIP Credit Agreement) between any Fundamental Silo Entity and ACT, whether such contractual relationship is direct or through an intermediary, including Pine Gate O&M, LLC, shall, at the election of the Fundamental Required DIP Lenders, be terminated and of no further force or effect and each of ACT and any intermediary party, including Pine Gate O&M, LLC, shall waive any and all claims arising from such termination and shall not be permitted to recover on account of such claims from any Fundamental Silo Entity or Fundamental Silo Asset."

27.     <u>No Modification or Stay of This Final Order</u>.

(a)      Based upon the record presented to this Court by the Debtors, notwithstanding (i) any stay, modification, amendment, supplement, vacatur, revocation, or reversal of the Interim Order or this Final Order, the DIP Documents or any term hereunder or thereunder, or (ii) the dismissal or conversion of one or more of the Chapter 11 Cases, each DIP Agent and each DIP Lender shall retain and be entitled to all of the rights, remedies, privileges, and benefits in favor of the DIP Agents and the DIP Lenders pursuant to section 364(e) of the Bankruptcy Code, this Final Order, and the applicable DIP Documents as of the date any event referred to in clauses (i) or (ii) shall have occurred.

(b)      Unless and until all DIP Obligations are indefeasibly Paid in Full (in the case of Roll-Up DIP Loans, subject to the provisions of paragraph 17), and all DIP Commitments are terminated, other than with respect to a Replacement Additional DIP Facility incurred in accordance with the terms of paragraph 23 of this Final Order and the DIP Documents, the Debtors irrevocably waive the right to seek and shall be prohibited from seeking or consenting to, directly or indirectly, (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of each DIP Agent (at the direction of the applicable DIP Lenders), as applicable (and no such consent shall be implied by any action or inaction of any DIP Agent): (A) any reversal, modification, stay, vacatur, or amendment of the Interim Order or this Final Order or any provision thereof or hereof (as applicable), (B) a priority claim for any administrative expense, priority claim, secured claim, unsecured claim, or any other claims against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, pari passu with or senior to the DIP Liens or the DIP Superpriority Claims, or (C) any order, other

than the Interim Order or this Final Order, allowing the use of Cash Collateral constituting or resulting from DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out and the DIP Intercreditor Agreement), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens; or (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents, the Interim Order, or this Final Order.  The Debtors irrevocably waive any right to seek any Amendment of the DIP Orders without the prior written consent, as provided in the foregoing, of each DIP Agent (at the direction of the applicable DIP Lenders) and no such consent shall be implied by any other action, inaction, or acquiescence of any DIP Agent or DIP Lender.

28.     _Power to Waive Rights; Duties to Third Parties; No Waiver by Failure to Seek Relief_.  Each DIP Secured Party and Prepetition Secured Party shall have the right, in its respective sole discretion, to waive any of the terms, rights, and remedies provided or acknowledged in the DIP Orders or the applicable DIP Documents or Prepetition Documents ("**_Lender Rights_**") with respect to such party, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by any such party of any Lender Rights shall apply solely to such party and to the Lender Rights so waived and shall not be or constitute a continuing waiver, except that any waiver by (a) a DIP Agent, on behalf of the applicable DIP Secured Parties, shall bind such DIP Lenders in accordance with the applicable DIP Documents and (b) a Prepetition Agent, on behalf of the applicable Prepetition Secured Parties, shall bind such Prepetition Lenders in accordance with the applicable Prepetition Documents.  Any delay in or failure by any DIP Secured Party or Prepetition Secured Party to seek relief or otherwise exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, nor cause or enable any

other party to rely upon or in any way assert a defense based upon such delay or failure. No delay on the part of any party in the exercise of any Lender Right or remedy under the Interim Order or this Final Order shall preclude any other or further exercise of any such Lender Right or remedy or the exercise of any other Lender Right or remedy. None of the rights or remedies of any party under the Interim Order or this Final Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing, and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required under the Interim Order or hereunder, any DIP Document, or any Prepetition Document from any of the DIP Secured Parties or Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

29.     <u>Modification of the Automatic Stay</u>. The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified solely as necessary to effectuate all of the terms and provisions of the Interim Order, this Final Order, and the DIP Documents, including, without limitation, the incurrence of obligations, the authorization to make payments, the granting of liens and the perfection of liens.

30.     <u>Binding Effect</u>.

(a)     The provisions of the Interim Order, this Final Order, the DIP Documents, the DIP Superpriority Claims, the DIP Liens, the DIP Obligations, and any and all rights, remedies, privileges, protections, liens, priorities, and benefits, in favor of the DIP Agents, the DIP Lenders, any other DIP Secured Party, and/or any Prepetition Secured Party, respectively, provided or acknowledged in the Interim Order or this Final Order, and any actions taken pursuant thereto, were effective immediately upon entry of the applicable DIP Order, pursuant to

4924-1323-6092v.7

Bankruptcy Rule 6004(h), are reaffirmed pursuant to this Final Order, shall continue in full force and effect, shall survive entry of any other order, and shall not be modified, impaired, or discharged by the entry of any order (i) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to a chapter 7 case, (iii) dismissing any of the Chapter 11 Cases or any Successor Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases or any Successor Cases, (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases or Successor Cases in this Court, (vi) terminating the joint administration of the Chapter 11 Cases, or (vii) approving the sale of any DIP Collateral or Prepetition Collateral, including pursuant to section 363(b) of the Bankruptcy Code, or by any other act or omission.  The terms and provisions of the Interim Order and this Final Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following the dismissal of the Chapter 11 Cases or any Successor Cases, notwithstanding the entry of any such order, and such protections, rights, remedies, liens, priorities, privileges, and benefits, shall continue in full force and effect in these proceedings and after any dismissal thereof, and shall maintain their respective priorities as provided by the Interim Order, this Final Order, and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations have been Paid in Full.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code (and pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations), unless the DIP Obligations have been Paid in

Full on or before the effective date of such plan of reorganization or the DIP Agents (at the direction of the applicable Required DIP Lenders) have otherwise agreed in writing.

(b)       Any order dismissing one or more of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) each DIP Agent's, DIP Lender's, and other DIP Secured Party's respective liens on, and security interests in, the applicable DIP Collateral and the Adequate Protection Liens, the Adequate Protection Obligations and the other administrative claims granted pursuant to the Interim Order or this Final Order shall continue in full force and effect (in each case, subject to the Carve Out) notwithstanding such dismissal and shall maintain their priorities as provided in the Interim Order or this Final Order until the DIP Obligations and Adequate Protection Obligations have been Paid in Full (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations, and the other administrative claims granted pursuant to the Interim Order or this Final Order, shall, notwithstanding such dismissal, remain binding on all parties-in-interest), and (ii) this Court shall retain jurisdiction, to the maximum extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claims, the DIP Liens and the claims, liens, and security interests referred to in the foregoing clause (i), as applicable.

(c)       The provisions of the Interim Order and this Final Order shall be binding upon and inure to the benefit of the Debtors, their Estates, the Committee, all other creditors of any of the Debtors, and all other parties in interest in the Chapter 11 Cases, and in each case their respective successors and assigns, including any Trustee in the Chapter 11 Cases or any Successor Cases or otherwise in respect of any Debtors or any property of the Estate of any of the Debtors, and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition

Secured Parties, and their respective successors and assigns. Such binding effect is an integral part of the DIP Orders.

31. <u>Indemnification</u>. Each of (a) the DIP Secured Parties and their Representatives and (b) subject to the provisions of paragraph 17, the Prepetition Secured Parties and their Representatives, respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, each of the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the applicable Prepetition Documents and DIP Documents, as applicable. The Debtors agree that no exception or defense in contract, law, or equity existed as of the date of the Interim Order or exists as of the date of this Final Order to any obligation set forth, as the case may be, in the Interim Order, this Final Order, the DIP Documents, or the Prepetition Documents to indemnify and/or hold harmless the DIP Agents, any other DIP Secured Party, the Prepetition Agents, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

32. <u>Limits on Lender Liability</u>.

(a)      Nothing in the Interim Order, this Final Order, any of the DIP Documents, any of the Prepetition Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties

(in their capacities as such) or, subject to the provisions of paragraph 17, the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors or their affiliates in the operation of their business or in connection with the Debtors' or their affiliates' restructuring efforts or the administration of the Chapter 11 Cases or any Successor Cases.

(b)  Solely with respect to determining to make any loan under the DIP Documents or the Prepetition Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order, the DIP Documents, or the Prepetition Documents, the DIP Secured Parties and, subject to the provisions of paragraph 17, the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or their affiliates, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their affiliates (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. as amended, or any similar federal or state statute).

(c)  Furthermore, nothing in the Interim Order, this Final Order, the DIP Documents, or the Prepetition Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, any other DIP Secured Party, or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors or their affiliates or any fiduciary duties owed to the Debtors, their affiliates, or the Debtors' or their affiliates' respective creditors, shareholders, or Estates. Nothing in the Interim Order, this Final Order, or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or, subject to the provisions of paragraph 17, the Prepetition Secured Parties of any liability for

any claims arising from the prepetition or postpetition activities of any of the Debtors or their affiliates.  The DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, (v) any payments to any vendors, contractors or service providers to any Debtor or any subsidiary or affiliate thereof, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors, except to the extent caused by the gross negligence or willful misconduct of any DIP Secured Parties or the Prepetition Secured Parties, in which case the DIP Secured Party or Prepetition Secured Party at fault shall not be exculpated under this sentence solely with respect to its conduct that was grossly negligent or constituted willful misconduct.

  33. <u>Proofs of Claim</u>.

   (a) Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a bar date or deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code in any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, none of the DIP Agents, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders or the Polaris B Secured Parties shall be required to file proofs of claim or requests for payment of administrative expenses in any of the Chapter 11 Cases or any Successor Cases with respect to, as applicable, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Obligations, the Polaris B Secured Obligations, the Prepetition Liens, the Polaris B Liens, the

Adequate Protection Claims, the Adequate Protection Liens or any other claims or liens granted under or created by the Interim Order, this Final Order, the DIP Documents, or the Prepetition Documents.   Upon entry of the Interim Order, each of the DIP Secured Parties and the Prepetition Secured Parties was, under the Interim Order, and hereby shall continue to be treated under section 502(a) of the Bankruptcy Code as if it filed a proof of claim in the full amount of the applicable DIP Obligations, Prepetition Secured Obligations and Polaris B Secured Obligations.  All of the DIP Obligations, the remaining Prepetition Secured Obligations, if any, and the Polaris B Secured Obligations shall be and shall remain due and payable in accordance with the applicable DIP Documents, Prepetition Documents and Polaris B Documents, as applicable, without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents, the Prepetition Documents, the Polaris B Documents or any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect any DIP Agent's, DIP Lender's, other DIP Secured Party's, Prepetition Secured Party's or Polaris B Secured Party's rights, remedies, powers, or privileges under any of the DIP Documents, the Prepetition Documents, the Interim Order, this Final Order, or applicable law.  Each DIP Agent, for the benefit of the applicable DIP Lenders, each Prepetition Agent, for the benefit of the applicable Prepetition Lenders, and the Polaris B Agent, for the benefit of the Polaris B Lenders, is authorized (but not directed), in its sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit) proofs of claim in each of the Chapter 11 Cases on behalf of the applicable DIP Secured Parties in respect of the applicable DIP Obligations, the applicable Prepetition Secured Parties in respect of the applicable Prepetition Secured

Obligations, or the Polaris B Secured Parties in respect of the Polaris B Secured Obligations. Any proofs of claim so filed shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, or Polaris B Secured Party.

(b)     In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' Estates, each DIP Agent, each Prepetition Agent and the Polaris B Agent is authorized (but not directed), in its sole discretion, to file in the Debtors' lead Chapter 11 Case *In re Pine Gate Renewables, LLC*, Case No. 25-90669 (CML), a master proof of claim on behalf of the applicable DIP Secured Parties, Prepetition Secured Parties or Polaris B Secured Parties on account of any and all of their respective claims arising under the applicable DIP Documents, Prepetition Documents or Polaris B Documents and hereunder (as applicable) (each, a "***Master Proof of Claim***") against each of the applicable Debtors. Upon the filing of any such Master Proof of Claim, the DIP Agent, the Prepetition Agent or the Polaris B Agent filing such Master Proof of Claim shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims of any type or nature whatsoever with respect to the applicable DIP Documents, Prepetition Documents or Polaris B Documents, and the claims of each applicable DIP Secured Party, Prepetition Secured Party or Polaris B Secured Party (and each of its successors and assigns), asserted or described in such Master Proof of Claim shall be treated as if a separate proof of claim had been filed in each of the Chapter 11 Cases of the Debtors identified as having liability in such Master Proof of Claim. The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by the applicable Debtors to the DIP Secured Parties, the Prepetition Secured Parties or the Polaris B Secured Parties, as applicable.

4924-1323-6092v.7

Any Master Proof of Claim so filed by any DIP Agent, Prepetition Agent or Polaris B Agent shall be deemed to be in addition to and not in lieu of any other Master Proof of Claim that may be filed by any other DIP Secured Party, Prepetition Secured Party or Polaris B Secured Party.

34.    <u>Waiver of Bankruptcy Rule 6004(a) and 6004(h)</u>.  The notice requirements of Bankruptcy Rule 6004(a) and the 14-day stay of Bankruptcy Rule 6004(h) are hereby waived.

35.    <u>Insurance</u>. Until the DIP Obligations and Prepetition Secured Obligations have been Paid in Full, and prior to the consummation of the applicable Sale Transaction with respect to such Prepetition Collateral or DIP Collateral, the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and otherwise in accordance with the DIP Documents. To the fullest extent provided by applicable law, each DIP Agent and Prepetition Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors to the extent that such policy in any way relates to the DIP Collateral securing the obligations under the credit facility for which such DIP Agent or Prepetition Agent, as applicable, serves as agent.

36.    <u>Cash Management</u>. Until such time as all DIP Obligations and Prepetition Secured Obligations are Paid in Full, unless otherwise agreed to by each DIP Agent and Prepetition Agent, the Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by the DIP Orders and any Cash Management Order. The Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of the applicable DIP Agent, for the benefit of the applicable DIP Lenders (in which case they shall be subject to the lien priorities and other provisions set forth in the DIP Orders), and no bank account pledged in favor of any DIP Agent or Prepetition Agent will be closed

during the Chapter 11 Cases without the prior written consent of the applicable DIP Agent, and nothing in the Interim Order or this Final Order will alter or impair any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date. Until the DIP Obligations and Prepetition Secured Obligations are Paid in Full, the Debtors shall (a) maintain accurate records of all transfers (including intercompany transactions) within their cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, and (b) provide reasonable access to such records to each DIP Agent, the other DIP Secured Parties, and the DIP Lender Advisors.

37.    <u>Intercreditor Provisions</u>. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Documents (including, for the avoidance of doubt, the Prepetition Intercreditor Agreements) shall remain in full force and effect; *provided*, that to the extent there exists any conflict among the terms and conditions of the Prepetition Documents and the Interim Order or this Final Order, the terms and conditions of this Final Order shall govern and control.

38.    <u>Final Order Controls</u>.  In the event of a conflict between (a) the terms and provisions of the DIP Documents or the Interim Order, and (b) the terms and provisions of this Final Order, then in each case the terms and provisions of this Final Order shall govern. Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Final Order, including compliance with the Approved Budget and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this

4924-1323-6092v.7

Final Order, this Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

39.   <u>Committee Settlements</u>. The Brookfield Settlement Term Sheet and the Carlyle Settlement Term Sheet are incorporated as though fully set forth herein and approved.  Both the Brookfield Settlement Term Sheet and the Carlyle Settlement Term Sheet shall become effective upon entry of this Final Order.  To the extent of any inconsistency between the terms set forth in this Final Order or the Brookfield Settlement Term Sheet, the Brookfield Settlement Term Sheet shall govern.  To the extent of any inconsistency between the terms set forth in this Final Order or the Carlyle Settlement Term Sheet, the Carlyle Settlement Term Sheet shall govern.

40.   The Committee's objections with respect to the Fundamental DIP Facility have been settled between the Debtors, Fundamental, and the Committee pursuant to the terms incorporated herein.  In addition, Fundamental agrees to support the Debtors' reasonable determination as to vendors qualifying for critical vendor status pursuant to the interim and final orders approving the *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Project Vendors; (B) Confirming Administrative Expense Priority; and (C) Granting Related Relief* [Docket No. 7], which consent shall not be unreasonably withheld.  Fundamental also agrees to work in good faith with the Committee promptly to discuss a global resolution of the Committee's outstanding issues with respect to the Chapter 11 Cases.

41.   <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

4924-1323-6092v.7

42.     <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to or for the benefit of any of the DIP Secured Parties pursuant to the provisions of the Interim Order, this Final Order, any subsequent order of this Court, or the DIP Documents, shall, subject to the terms of this paragraph, be irrevocable, received free and clear of any claims, charges, assessments, or other liabilities, including, without limitation, any such claims or charges arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of the Carve Out Trigger Notice, subject to the applicable Carve Out in all respects.

43.     <u>Joint and Several Liability</u>. Nothing in the Interim Order or this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' Estates or any subset thereof, it being understood, however, that the applicable Debtors shall be jointly and severally liable for the obligations hereunder and the DIP Obligations in accordance with the terms hereof and of the DIP Documents (including the DIP Intercreditor Agreement).

44.     <u>Necessary Action</u>. The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Final Order.

45.     <u>Intercompany Claims</u>. For the avoidance of doubt, any claim against a Debtor or Non-Debtor Guarantor held by a Debtor, and any Lien securing any such claim held by a Debtor, shall be junior and subordinate to the DIP Superpriority Claims, DIP Liens, Adequate Protection Claims, Adequate Protection Liens, and the Carve Out.

46.     <u>Treatment of DIP Obligations</u>. On the Maturity Date of each DIP Facility, to the extent not otherwise satisfied pursuant to a credit bid, the applicable DIP Borrower shall pay the

then unpaid and outstanding amount of the applicable DIP Obligations pursuant to the provisions

of the applicable DIP Documents or as otherwise provided in an Acceptable Plan.

47.     <u>Preservation of Rights Granted Under this Final Order</u>.  Notwithstanding anything

herein to the contrary, and subject to the DIP Intercreditor Agreement, the entry of this Final

Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) any

DIP Agent's, DIP Secured Party's or Prepetition Secured Party's rights to seek any other or

supplemental relief in respect of the Debtors (including, the right to seek additional or different

adequate protection); (b) the rights of any of the Prepetition Secured Parties to seek the payment

by the Debtors of post-petition interest or fees pursuant to section 506(b) of the Bankruptcy Code;

(c) any of the rights of any of the DIP Agents, the other DIP Secured Parties and/or the

Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law,

including, without limitation, the right to (i) request modification of or relief from the automatic

stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter

11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7,

or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an

injunction, (iv) oppose any request for use of Cash Collateral or any request for the use of

proceeds of any DIP Facility (other than as permitted under the Interim Order, this Final Order,

and the DIP Documents), (v) object to any sale of assets, including any DIP Collateral or

Prepetition Collateral, (vi) object to the granting of any interest in the DIP Collateral or

Prepetition Collateral (other than as contemplated herein or permitted under the DIP Documents),

(vii) object to any application for either or both allowance and payment of compensation of

Professional Persons or other parties seeking compensation or reimbursement from the Estates,

or (viii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11

plan or plans; or (d) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agents, the other DIP Secured Parties or the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Final Order. Other than as expressly set forth in this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties and the Prepetition Secured Parties are preserved.

48. <u>Replacement Agent</u>. Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including any DIP Agent or Prepetition Agent, or the appointment of a new DIP Agent or Prepetition Agent, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral and the Adequate Protection Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral or administrative agent.

49. <u>Zions Adequate Protection</u>.

(a) Until the Zions Secured Obligations are Paid in Full, the Zions Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Zions Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Zions Collateral. As adequate protection, and as security for the payment of the Zions Secured Obligations, the Zions Agent, for the benefit of the Zions Secured Parties, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the

Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the Zions Collateral of each Debtor that is a Zions Obligor (the "***Zions Adequate Protection Liens***"), which security interests and liens shall be subject to the Carve Out and senior in priority to any DIP Liens that encumber the Zions Collateral. The Zions Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Zions Secured Parties and not in substitution therefor.

(b)     The Debtors shall deliver to the Zion Agent's counsel on a "professionals' eyes only" basis, any Updated Budget or Approved Budget containing the applicable line items showing receipts and disbursements related to the Zions Obligors, at the same time that any such Updated Budget or Approved Budget is delivered to any of the DIP Agents, DIP Lender Advisors and the Committee's advisors on a privileged, "professional eyes only" basis (unless otherwise disclosed through a public filing with the Court; *provided*, that the Committee may not file such materials with the Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal); *provided* that the foregoing will not be construed as requiring any alteration of the agreed-upon form of budget as between the Debtors, the DIP Lenders and the Committee.

(c)     *Validity, Perfection and Priority of Zions Prepetition Liens*.  Each Zions Obligor that is a Debtor hereby stipulates that, as of the Petition Date, pursuant to and in connection with the Zions Documents, the Zions Obligors granted to the Zions Agent, for the benefit of itself and the other Zions Secured Parties, a security interest in and continuing lien (the "***Zions Prepetition Liens***") on the Zions Collateral to secure the payment of the Zions Secured Obligations, which Zions Prepetition Liens on the Zions Collateral were (a) valid,

binding, enforceable, non-avoidable, properly perfected and granted to, or for the benefit of, the Zions Secured Parties for fair consideration and reasonably equivalent value; and (b) senior in priority over any and all other liens on the Zions Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Zions Documents, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Zions Liens. The stipulations set forth in this paragraph 48(c) are subject to the provisions of paragraph 17 hereof.

(d)    As used in this paragraph 47, (i) "*Zions Agent*" means Zions Bancorporation, N.A., in its capacity as "Collateral Agent" under the Zions Documents; (ii) "*Zions Credit Agreement*" means the Financing Agreement, dated as of July 12, 2024, by and among Catalina Solar Borrower, LLC as Borrower, the financial institutions party thereto as Lenders, Zions Bancorporation, N.A., as Administrative Agent and Collateral Agent, and Lloyds Bank PLC, as Joint Lead Arranger and LC Issuing Bank as amended, restated, amended and restated, supplemented or otherwise modified from time to time on or prior to the Petition Date; (iii) "*Zions Collateral*" means the "Collateral" as defined in the Zions Documents; (iv) "*Zions Documents*" means the Zions Credit Agreement and each of the "Collateral Documents" (as defined in the Zions Credit Agreement); (v) "*Zions Obligors*" means Catalina Solar Borrower, LLC, in its capacity as "Borrower" under the Zions Credit Agreement; (vi) "*Zions Secured Parties*" means the "Secured Parties" as defined in the Zions Documents; and (vii) "*Zions Secured Obligations*" means each of the "Obligations" (as defined in the Zions Documents).

50.    <u>MUFG Adequate Protection</u>.

4924-1323-6092v.7
US-DOCS\165932148.16

(a)     Until the MUFG Secured Obligations are Paid in Full, the MUFG Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the MUFG Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the MUFG Collateral. As adequate protection, and as security for the payment of the MUFG Secured Obligations, the MUFG Agent, for the benefit of the applicable MUFG Secured Parties, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the MUFG Collateral of each Debtor that is an MUFG Obligor (the "*MUFG Adequate Protection Liens*"), which security interests and liens shall be subject to the Carve Out and senior in priority to any DIP Liens that encumber the MUFG Collateral.  The MUFG Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the MUFG Secured Parties and not in substitution therefor.

(b)     The Debtors shall deliver to the MUFG Agent's counsel on a "professionals' eyes only" basis, any Updated Budget or Approved Budget containing the applicable line items showing receipts and disbursements related to the MUFG Obligors, at the same time that any such Updated Budget or Approved Budget is delivered to any of the DIP Agents, DIP Lender Advisors and the Committee; *provided* that the foregoing will not be construed as requiring any alteration of the agreed-upon form of budget as between the Debtors, the DIP Lenders and the Committee.

(c)     *Validity, Perfection and Priority of MUFG Prepetition Liens*. Each MUFG Obligor that is a Debtor hereby stipulates that, as of the Petition Date, pursuant to and in

connection with the MUFG Documents, the MUFG Obligors granted to the MUFG Agent, for the benefit of itself and the other MUFG Secured Parties, a security interest in and continuing lien (the "**MUFG Prepetition Liens**") on the MUFG Collateral to secure the payment of the MUFG Secured Obligations, which MUFG Prepetition Liens on the MUFG Collateral were (a) valid, binding, enforceable, non-avoidable, properly perfected and granted to, or for the benefit of, the MUFG Secured Parties for fair consideration and reasonably equivalent value; and (b) senior in priority over any and all other liens on the MUFG Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the MUFG Documents, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the MUFG Liens.  The stipulations set forth in this paragraph 48(c) are subject to the provisions of paragraph 17 hereof.

(d)     As used in this paragraph 48, (i) "**MUFG Agent**" means U.S. Bank National Association (as successor to MUFG Union Bank, N.A.) and Wilmington Trust, National Association, in their capacities as "Collateral Agent" under the applicable MUFG Documents; (ii) "**MUFG Credit Agreements**" means the (A) Financing Agreement, dated as of March 29, 2023, by and among Grande Holdco Borrower, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd., as the Administrative Agent, and the other agents party thereto; (B) Credit Agreement, dated as of October 12, 2022, by and among Virginia Line Solar, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd. as Administrative Agent, and the other agents party thereto; (C) Credit Agreement, dated as of October 12, 2022, by and among Landrace Holdings, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd., as Administrative Agent,

and the other agents party thereto; and (D) Financing Agreement, dated as of May 26, 2023, by and among Grande Holdco Borrower II, LLC, as Borrower, the financial institutions party thereto as Lenders, MUFG Bank, Ltd., as Administrative Agent, and the other agents party thereto, in each case, as amended, restated, amended and restated, supplemented, extended, waived or otherwise modified from time to time on or prior to the Petition Date; (iii) "***MUFG Collateral***" means the "Collateral" as defined in the MUFG Documents; (iv) "***MUFG Documents***" means each of the MUFG Credit Agreements and each of the respective "Financing Documents as defined in the MUFG Credit Agreements; (v) "***MUFG Obligors***" means PGR 2021 Manager 18, LLC; PGR 2021 Fund 18, LLC; PGR 2022 Manager 1, LLC; PGR 2022 Fund 1, LLC; Grande Holdco Borrower II, LLC; and Grande Holdco Borrower, LLC, each in their capacity as "Borrower," "Pledgor," or "Guarantor" under the applicable MUFG Credit Agreements; (vi) "***MUFG Secured Parties***" means the "Secured Parties" as defined in each of the MUFG Documents; and (vii) "***MUFG Secured Obligations***" means each of the "Obligations" as defined in the applicable MUFG Documents.

51.     <u>Polaris B. Secured Parties Adequate Protection</u>.   Until the Polaris B Secured Obligations are Paid in Full, the Polaris B Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Polaris B Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Polaris B Collateral. As adequate protection, the Polaris B Secured Parties are hereby granted the following:

(a)     <u>Polaris B Adequate Protection Liens</u>. As security for the payment of the Polaris B Secured Obligations, the Deutsche Bank Trust Company Americas, in its capacity as Administrative  Agent  and  Collateral  Agent  under  the  Polaris  B  Credit  Agreement  (the

4924-1323-6092v.7
US-DOCS\165932148.16

"**Polaris B Agent**"), for the benefit of the Polaris B Secured Parties, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the Polaris B Collateral of each Debtor that is a Polaris B Loan Party (the "**Polaris B Adequate Protection Liens**"), which security interests and liens shall be subject to the Carve Out and senior in priority to any DIP Liens and Polaris B Liens that encumber the Polaris B Collateral. The Polaris B Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date other than with respect to the Carve Out. The Polaris B Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Polaris B Secured Parties and not in substitution therefor.

(b)     Polaris B Adequate Protection Claims. The Polaris B Agent, for the benefit of the Polaris B Secured Parties, is hereby granted an allowed administrative expense claim against each Polaris B Loan Party that is a Debtor on a joint and several basis with priority over all other administrative claims in the Chapter 11 Cases (except the Carve Out), including the DIP Superpriority Claims and all other claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code (the "**Polaris B Adequate Protection Claims**"), which Polaris B Adequate Protection Claims shall have recourse to and be payable from all prepetition and postpetition property of the Polaris B Loan Parties that are Debtors, subject to the applicable Carve Out. Notwithstanding anything to the contrary in the DIP Orders, the Polaris B Secured Parties shall not have recourse in respect of the Polaris B Adequate Protection Claims or Polaris

B Adequate Protection Liens against any Debtor or the assets of any Debtor that is not a Polaris B Loan Party, including any Carlyle Silo Entity or Fundamental Silo Entity, or the respective equity interests in any such entity.

(c)     Polaris B Interest. From and after the Petition Date, subject to further agreement among the Brookfield DIP Secured Parties and the Polaris B Secured Parties, the Polaris B Agent, on behalf of the Polaris B Secured Parties, shall receive current payment of all accrued and unpaid interest on the Polaris B Secured Obligations under the Polaris B Credit Agreement (which shall be funded solely from Brookfield Subsequent Draws or other Brookfield Silo Assets).

(d)     Polaris B Adequate Protection Information Rights. The Debtors shall provide to the Polaris B Agent at the same time as such reporting is provided to the DIP Secured Parties all reporting that relates to Polaris B Loan Parties or the Polaris B Collateral required to be provided to the DIP Secured Parties under the DIP Documents; provided that the Debtors shall not provide the Polaris B Agent with any reporting that relates to the Carlyle Silo Entities, the Fundamental Silo Entities or any Debtor or Subsidiary thereof that is not a Polaris B Loan Party.

(e)     The Debtors shall deliver to the Polaris B Agent's counsel on a "professionals' eyes only" basis, any Updated Budget or Approved Budget containing the applicable line items showing receipts and disbursements related to the Polaris B Loan Parties, at the same time that any such Updated Budget or Approved Budget is delivered to any of the DIP Agents, DIP Lender Advisors and the Committee's advisors on a privileged, "professional eyes only" basis (unless otherwise disclosed through a public filing with the Court; *provided*, that the Committee may not file such materials with the Court unless otherwise authorized to publicly

4924-1323-6092v.7

disclose such materials or such materials are filed under seal); *provided* that the foregoing will not be construed as requiring any alteration of the agreed-upon form of budget as between the Debtors, the DIP Lenders and the Committee.

(f)     Section 506(c) Claims and 552(b) Equities.

(i)     Without affecting, modifying or limiting the scope or priority of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against or recovered from any of the Polaris B Secured Parties, their respective claims, or the Polaris B Collateral, in each case pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the Polaris B Agent (acting at the direction of the applicable Polaris B Lenders) and no such consent shall be implied from any other action, inaction or acquiescence by any Polaris B Secured Party.

(ii)     Each of the Polaris B Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, to the extent applicable, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Polaris B Secured Parties, with respect to proceeds, products, offspring, or profits of any of the Polaris B Collateral.

(g)     As used in this section, (i) "***Polaris B Secured Obligations***" means the "Secured Obligations" as defined in the Polaris B Credit Agreement, dated as of March 26, 2025 (as amended, restated, amended and restated, supplemented, extended, waived or otherwise modified from time to time on or prior to the Petition Date), by and among Polaris DevCo Borrower B, LLC, the Polaris B Agent, and the lenders party thereto (the "***Polaris B Credit Agreement***"); (ii) "***Polaris B Secured Parties***" means each of the Polaris B Agent, the "Lenders"

defined in the Polaris B Credit Agreement, and each of the other "Secured Parties" as defined in the Polaris B Credit Agreement; (iii) "***Polaris B Collateral***" means the "Collateral" as defined in the Polaris B Credit Agreement and the "Security Documents" as defined in the Polaris B Credit Agreement; (iv) "***Polaris B Loan Party***" means each of the Polaris B Borrower and each of the "Loan Parties" as defined in the Polaris B Credit Agreement (other than the Polaris B Borrower); and (v) "***Polaris B Liens***" mean each of the liens and security interests granted by the Polaris B Loan Parties in the Polaris B Collateral to secure the Polaris B Secured Obligations.

52.     <u>Back Bay Solar, LLC</u>.

(a)     Notwithstanding anything to the contrary in the Interim Order, this Final Order, or any other order, no funds generated by or deposited in the bank accounts of PGR Signature Fund 1, LLC ("***Signature Fund 1***") and any of its direct and indirect subsidiaries (collectively, the "***BBS Silo Entities***") shall be transferred to, or used to fund Projects owned by the Carlyle Silo Entities, the Fundamental Silo Entities, the Brookfield Silo Entities or other expenses related thereto, or used to fund operations or other expenses that are related to any of the Debtors, Blue Ridge or ACT, without the prior consent of Back Bay Solar, LLC ("***BBS***"); *provided* that the foregoing will not restrict in any way the payment of any debts owed by the BBS Silo Entities as they come due, regardless of to whom such debts are owed.

(b)     The Debtors shall deliver to BBS's counsel on a "professionals' eyes only" basis, any Updated Budget or Approved Budget containing the applicable line items showing receipts and disbursements related to the BBS Silo Entities, at the same time that any such Updated Budget or Approved Budget is delivered to any of the DIP Agents and DIP Lender Advisors; *provided* that the foregoing will not be construed as requiring any alteration of the agreed-upon form of budget as between the Debtors and the DIP Lenders.

4924-1323-6092v.7

(c)     For the avoidance of doubt, any cash generated by or held in the bank accounts of any of the BBS Silo Entities on and after the Petition Date shall be segregated at non-Debtor bank accounts and shall not constitute Cash Collateral for any purpose under the DIP Orders.

(d)     The Debtors shall also (i) maintain accurate records of all transfers (including intercompany transactions) within their cash management system so that all postpetition transfers and transactions between the Debtors and their non-Debtor affiliates, on the one hand and the BBS Silo Entities, on the other hand, shall be adequately and promptly documented in, and readily ascertainable from, their books and records, and (ii) provide reasonable access to such records to BBS and its counsel.

(e)     Other than as expressly set forth in the Interim Order or this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of BBS, the DIP Secured Parties and the Prepetition Secured Parties are preserved.

(f)     Notwithstanding anything to the contrary in the Interim Order, this Final Order, or the DIP Documents, to the extent that any funds received or held by the Debtors are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors (with the consent of the DIP Secured Parties and the Prepetition Secured Parties as to any agreement entered into on or after the Petition Date) and Signature 1 Fund, to be the property of or held in trust for Signature 1 Fund or any of the other BBS Silo Entities as of the Petition Date (the "Disputed Funds"), the Interim Order, this Final Order, and the DIP Documents shall not be deemed to grant liens, claims, or encumbrances in favor of any current or future lienholder, including the DIP Liens or the Adequate Protection Liens, on such Disputed Funds.  If the Court rules, pursuant to a final non-appealable order, that Signature 1 Fund or any of the other BBS

Silo Entities owns the Disputed Funds and that the Debtors held such funds in trust for Signature 1 Fund or any of the other BBS Silo Entities as of the Petition Date, then entry of this Final Order and the subsequent use of such funds shall not prejudice Signature 1 Fund's alleged trust claims and any remedies in connection therewith. The Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and Signature 1 Fund reserve all of their rights and remedies with respect to the Disputed Funds under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and federal laws, including, but not limited to, their rights to file any objections, motions, or adversary proceedings as may be appropriate.

53. <u>Sureties</u>.

(a) Nothing in the Interim Order, the Final Order, and/or the DIP Documents shall: (i) alter, modify, impair or change any of the terms and provisions of any surety bonds, indemnity agreements, or obligations relating to any surety bonds; or (ii) limit any subrogation, restitution or other common law rights of any Surety (defined below); or (iii) limit or impair any rights of any Surety or bond claimant as a beneficiary of any trust granted or created under any indemnity agreement, common law, by statute or other contract, if any; or (iv) alter any Surety's rights, defenses, payment and/or performance obligations under any bonds, and/or the parties to whom any such payment and/or performance must be provided; or (v) release, discharge, preclude, or enjoin any obligations of the Debtors, or any non-Debtor Guarantors, and non-Debtor indemnitors to the Sureties arising out of, or granted or created under any bonds, indemnity agreements, common law, and/or statute, including but not limited with respect to any trust. All parties' rights to challenge any such rights or interests are expressly preserved.

(b) Additionally, (i) no Brookfield Pledged Intercompany Claims, Carlyle Pledged Intercompany Claims or Fundamental Pledged Intercompany Claims shall be released

pursuant to this Final Order, provided, however, that any rights, claims and defenses of a Surety with respect to any release of a Pledged Intercompany Claim in accordance with Paragraph 22 of this Final Order are expressly preserved; and (ii) in no circumstance shall any Surety be deemed to have consented or waived any rights, claims or defenses with respect to any actions taken or not taken in accordance with the DIP Credit Agreements, Interim Order or Final Order, all of which are expressly preserved; and (iii) none of the DIP Credit Agreements, Interim Order or Final Order shall be deemed to waive any Surety's right to seek the return of any surplus bond proceeds, surety backed letter of credit proceeds or other surety proceeds.  All parties' rights to challenge any such rights or interests are expressly preserved.

(c)     For purposes of this paragraph, the term "***Surety***" shall mean Siriuspoint America Insurance Company, Continental Indemnity Company, Argonaut Insurance Company, Pennsylvania Insurance Company, The Hanover Insurance Company, United States Fire Insurance Company, Ascot Surety & Casualty Company, Swiss Re Corporate Solutions America Insurance Company and Atlantic Specialty Insurance, each in its capacity as an issuer of a surety bond or surety supporting a surety backed letter of credit issued to, for the benefit of, or related to the operations of any Debtor or non-Debtor Guarantor obligated under any of the DIP Documents.

54.     <u>United States Fire Insurance Company ("***USFIC***")</u>.  USFIC's rights, claims and defenses with respect to Bond Nos. ended 8731 and 8716 are fully preserved, including but not limited to with regard to the timeliness and adequacy of notice, whether Catalina Solar, LLC is in default of the March 8, 2024 Engineering, Procurement and Construction Agreement (the "***Catalina EPC Contract***"), any change orders, amendments or modifications of the Catalina EPC Contract, the engagement of the "Catalina Independent Engineer" and "adjudication" of

claims, the treatment of "Identified BRP Claims" and "Specified BRP Claims", the "Catalina Direct Payment Agreement," rights to trust funds if any, "DIP Intercreditor Agreement," intercompany releases, subrogation to any "adjudicated" claims, and payment of any "adjudicated" amounts.

55.     Pathward Entities.  For the avoidance of doubt, the DIP Secured Parties agree that none of (a) PW Blocker Holdco, LLC, (b) PW Revolver Borrower, LLC or (c) West River Solar, LLC (collectively, the "***Pathward Entities***") are DIP Loan Parties.  Each of the DIP Agents reserves all rights with respect to the Pathward Entities.

56.     PGR Procurement, LLC Assets.  Except as otherwise set forth in the Interim Order, this Final Order, or the DIP Intercreditor Agreement (including, for the avoidance of doubt, with respect to the Brookfield Pledged Intercompany Claims, Carlyle Pledged Intercompany Claims, and Fundamental Pledged Intercompany Claims), during the Interim Period, without the prior written consent of the Fundamental Required DIP Lenders, Debtor PGR Procurement, LLC shall not sell, transfer, assign or otherwise convey any of its assets (including all equipment, wherever located) to any Person.

57.     Texas Taxing Authorities.[5]  Notwithstanding any provisions in the Interim Order, this Final Order, the DIP Documents, or the Prepetition Documents, the statutory tax liens of the Texas Taxing Authorities shall retain their pre- and post-petition lien priority as provided by applicable non-bankruptcy law and will not be primed by nor subordinated to any liens granted pursuant to this Final Order to the extent such tax liens are valid, senior, perfected, and

---

[5]   "***Texas Taxing Authorities***" are defined as all ad valorem taxing authorities of Bell County (including Bell County Road, Troy ISD, Clearwater UWCD, Elm Creek Watershed), Denton County (including Krum ISD), Guadalupe County (including Lateral Roads and Navarro ISD); Bandera County, Brookshire MWD and City of Brookshire, Webb CISD; Brazoria County et al, Waller County et al.

unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.

58.     <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

59.     <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction to resolve any disputes arising from or related to the interpretation or enforcement of this Final Order.

## Annex 1

## Definitions

(a)  "***Acceptable Plan***" means a chapter 11 plan of reorganization or liquidation for any of the Debtors or their Estates that provides for (a) the termination of all DIP Commitments, (b) all DIP Obligations and Prepetition Secured Obligations (but not, for the avoidance of doubt, any unsecured deficiency claims (including unsecured superpriority and/or administrative expense claims) resulting from the value of the applicable Prepetition Collateral or DIP Collateral, as applicable, being less than the amount of the applicable DIP Obligations and Prepetition Secured Obligations) to be Paid in Full on or prior to the effective date thereof, (c) a release of the Brookfield Secured Parties and their Representatives as set forth in the Brookfield Settlement Term Sheet, (d) a release of Carlyle, the Purchaser, and their respective Related Parties (each as defined in the Carlyle Settlement Term Sheet) as set forth in the Carlyle Settlement Term Sheet, and (e) treatment otherwise consented to by the applicable DIP Agent (acting at the direction of the applicable DIP Lenders) and the applicable Prepetition Agent (acting at the direction of the applicable  Prepetition Lenders) in each case in their sole discretion.

"***ACT***" means ACT Power Services Holding Company Guarantor, LLC, a North Carolina limited liability company and its direct and indirect subsidiary.

"***Allocable Percentage***" means, with respect to (a) the Brookfield DIP Facility and the Brookfield Prepetition Secured Obligations, 40%, (b) the Carlyle DIP Facility and the Carlyle Prepetition Secured Obligations, 30%, (c) the Fundamental DIP Facility and the Fundamental Prepetition Secured Obligations, 30%, and (d) any Replacement Additional DIP Facility, the Allocable Percentage of the DIP Facility or DIP Facilities refinanced and replaced by such Replacement Additional DIP Facility.

"***Avoidance Actions***" means any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code).

"***Bidding Procedures Order***" means the *Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief* entered by the Bankruptcy Court on November 10, 2025.

"***Blue Ridge***" means PGR Blue Ridge Power Holdings, LLC and its subsidiaries, excluding ACT Power Services Holding Company Guarantor, LLC and its direct and indirect subsidiaries.

"***Blue Ridge Surety Bond***" means any letter of credit, surety bond, or similar instrument for the benefit of any subcontractor of Blue Ridge in connection with work performed by Blue Ridge or any subcontractor in connection with any Project.

"**Brookfield APA**" means the "Brookfield APA" as defined in the Bidding Procedures Order, as may be amended, restated, amended and restated, supplemented or otherwise modified, including in accordance with the terms of the Brookfield Settlement Term Sheet.

"**Brookfield DIP Collateral**" means (a) all DIP Collateral Assets held by any (i) Pari Guarantor Debtor, (ii) Priority Guarantor Debtor, or (iii) Debtor or Non-Debtor Guarantor that is a Brookfield Silo Entity, and (b) the Brookfield Pledged Intercompany Claims.   For the avoidance of doubt, the Brookfield DIP Collateral includes all of the Brookfield Exclusive DIP Collateral and excludes the Carlyle Exclusive DIP Collateral and the Fundamental Exclusive DIP Collateral.

"**Brookfield DIP Documents**" means (a) the Brookfield DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the Brookfield DIP Agent and/or the Brookfield DIP Lenders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"**Brookfield DIP Lender Advisors**" means (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Norton Rose Fulbright LLP, and Porter & Hedges LLP, as co-counsel to the Brookfield DIP Lenders, (b) FTI Consulting, Inc., as financial advisor to the Brookfield DIP Lenders, and (c) any other local or special counsel or other professionals retained by the Brookfield DIP Lenders.

"**Brookfield DIP Obligations**" means (a) the "Secured Obligations" as defined in the Brookfield DIP Credit Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the Brookfield DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the Brookfield DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"**Brookfield Exclusive DIP Collateral**" means (a) the equity interests of Debtors (i) BF Dev Holdco, LLC, (ii) PGC Solar Holdings Holdco II, LLC, (iii) Cascade NTP Holdco, LLC, (iv) PGR Blocker Holdco, LLC, and (v) Polaris OpCo Pledgor B, LLC, (b) the Brookfield Silo Assets, (c) the Brookfield Pledged Intercompany Claims, (d) the Specified BRP Claims (but not, for the avoidance of doubt, any Other BRP Claims); and (e) any cash deposit funded by or on behalf of any potential purchaser, whether pursuant to the Bidding Procedures Order or otherwise, in connection with any purchase or acquisition (or bid to purchase or acquire) any Brookfield Silo Assets; *provided* that, in no event, shall the Brookfield Retained Liabilities be Brookfield Exclusive DIP Collateral.

"**Brookfield Pledged Intercompany Claims**" means (x) all claims, including commercial tort claims, interests, intercompany receivables, obligations, liabilities and intercompany balances or rights (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Brookfield Silo Entity

ii

(or against any third-parties that are stakeholders of any Brookfield Silo Entity (including the Brookfield Silo Entities' vendors and service providers)) or Brookfield Silo Asset, and any proceeds of the foregoing, including any Tariff Claims, (other than in respect of the O&M Services Agreement (as defined in the Brookfield DIP Credit Agreement) and the Brookfield Retained Liabilities), and (y) the Specified BRP Claims; *provided* that, in no event shall the Other BRP Claims be Brookfield Pledged Intercompany Claims.

"***Brookfield Prepetition Agent***" means Bid Administrator LLC, in its capacity as Administrative Agent and Collateral Agent under the Brookfield Prepetition Credit Agreement, and any successor thereto.

"***Brookfield Prepetition Borrower***" means BF Dev Holdco, LLC, in its capacity as Borrower under the Brookfield Prepetition Credit Agreement.

"***Brookfield Prepetition Collateral***" means (a) the "Collateral" as defined in the Brookfield Prepetition Documents and (b) all other assets and property that secure the Brookfield Prepetition Secured Obligations.

"***Brookfield Prepetition Credit Agreement***" means the Credit Agreement, dated as of January 30, 2025, as amended by that certain Amendment No. 1, dated as of March 26, 2025, that certain Amendment No. 2, dated as of April 17, 2025, that certain Amendment No. 3, dated as of October 6, 2025, and as may be further amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the Brookfield Prepetition Borrower, the Brookfield Prepetition Agent, and the Brookfield Prepetition Lenders.

"***Brookfield Prepetition Documents***" means (a) the Brookfield Prepetition Credit Agreement, (b) the Brookfield Prepetition Security Documents, and (c) each of the other "Credit Documents" (as defined in the Brookfield Prepetition Credit Agreement).

"***Brookfield Prepetition Guarantors***" means Pine Gate Renewables, LLC and each subsidiary thereof party to the Brookfield Prepetition Documents as a guarantor or secondary obligor of the Brookfield Prepetition Secured Obligations.

"***Brookfield Prepetition Lenders***" means the "Lenders" (as defined in the Brookfield Prepetition Credit Agreement).

"***Brookfield Prepetition Liens***" means each of the liens and security interests granted by the Grantors (as defined in the Brookfield Prepetition Security Documents) in the Brookfield Prepetition Collateral pursuant to the Brookfield Prepetition Security Documents to secure the Brookfield Prepetition Secured Obligations.

"***Brookfield Prepetition Loan Parties***" means the Brookfield Prepetition Borrower and the Brookfield Prepetition Guarantors.

"***Brookfield Prepetition Loans***" means the "Loans" as defined in the Brookfield Prepetition Credit Agreement and all other loans and other financial accommodations provided by the Brookfield Prepetition Lenders to the Brookfield Prepetition Loan Parties pursuant to the Brookfield Prepetition Documents.

"**_Brookfield Prepetition Secured Obligations_**" means the "Secured Obligations" as defined in the Brookfield Prepetition Credit Agreement.

"**_Brookfield Prepetition Secured Parties_**" means each of the Brookfield Prepetition Agent, the Brookfield Prepetition Lenders, and each of the other "Secured Parties" as defined in the Brookfield Prepetition Credit Agreement.

"**_Brookfield Prepetition Security Documents_**" means (a) the Collateral Documents (as defined in the Brookfield Prepetition Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Brookfield Prepetition Agent has been granted a security interest in and continuing liens on the Brookfield Prepetition Collateral.

"**_Brookfield Required DIP Lenders_**" means the "Requisite Lenders" as defined in the Brookfield DIP Credit Agreement.

"**_Brookfield Retained Liabilities_**" means any liabilities (a) as of October 6, 2025 and (b) thereafter, any amounts permitted to be incurred in accordance with the then-applicable Approved Budget (prior to the entry of the Interim Order, as defined in the Brookfield Prepetition Credit Agreement), in each case, in respect of any equipment purchased or to be purchased by or on behalf of any Brookfield Silo Entity from PGR Procurement, LLC, to the extent (i) such equipment has been physically delivered to the Project site of a Brookfield Silo Entity and (ii) an independent engineer has verified in writing that such equipment has been so delivered; _provided_ that the Brookfield Retained Liabilities shall exclude (x) the Funded Brookfield Procurement Claims and (y) Tariff Claims against any Brookfield Silo Entity or Brookfield Silo Asset.

"**_Brookfield Sale Transaction_**" means, at the election of the Brookfield Required DIP Lenders, a sale of all or substantially all or a material portion of the Brookfield Silo Assets pursuant to (a) a credit bid of the Brookfield DIP Obligations, (b) a cash purchase pursuant to which the Brookfield DIP Obligations are Paid in Full, or (c) such other treatment of the Brookfield DIP Obligations acceptable to the Brookfield DIP Agent (acting at the direction of the Brookfield Required DIP Lenders), which transaction may be consummated pursuant to an order of the Court.

"**_Brookfield Silo Assets_**" means (a) the assets of, and the equity interests in, the Brookfield Silo Entities and (b) the Brookfield Pledged Intercompany Claims.

"**_Brookfield Silo Entities_**" means each of (a) BF Dev Holdco, LLC, (b) PGC Solar Holdings Holdco II, LLC, (c) Cascade NTP Holdco, LLC, (d) PGR Blocker Holdco, LLC, (e) Polaris OpCo Pledgor B, LLC, and (f) each direct or indirect subsidiary of the foregoing.

"**_Brookfield Subsequent Draws_**" has the meaning ascribed to "Subsequent Draws" in the Brookfield DIP Documents.

"**_BRP_**" means Debtor Blue Ridge Power, LLC.

"**_BRP Claims Conditions_**" means the following conditions with respect to claims held by BRP:  (a) such claims are Identified BRP Claims (b) such claims are determined to be valid and

iv

payable by the Catalina Independent Engineer, and (c) such claims (together with the aggregate amount of Identified BRP Claims paid after October 5, 2025 and prior to such date of determination) do not at any time exceed in the aggregate $7,000,000.

"***Business Day***" shall mean any day that is not a Saturday, Sunday or other day on which banking institutions in New York City are authorized or required by law to be closed.

"***Carlyle APA***" means the "Carlyle APA" as defined in the Bidding Procedures Order, as may be amended, restated, amended and restated, supplemented or otherwise modified, including in accordance with the terms of the Carlyle Settlement Term Sheet.

"***Carlyle DIP Collateral***" means (a) all DIP Collateral Assets held by any (i) Pari Guarantor Debtor, (ii) Priority Guarantor Debtor, or (iii) Debtor or Non-Debtor Guarantor that is a Carlyle Silo Entity, and (b) the Carlyle Pledged Intercompany Claims. For the avoidance of doubt, the Carlyle DIP Collateral includes all of the Carlyle Exclusive DIP Collateral and excludes the Brookfield Exclusive DIP Collateral and the Fundamental Exclusive DIP Collateral.

"***Carlyle DIP Documents***" means (a) the Carlyle DIP Note Purchase Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the Carlyle DIP Agent and/or the Carlyle DIP Noteholders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"***Carlyle DIP Noteholder Advisors***" means (a) Milbank LLP and Haynes and Boone, LLP, as co-counsel to the Carlyle DIP Noteholders, (b) Solomon Partners Securities LLC, as financial advisor to the Carlyle DIP Noteholders, and (c) any other local or special counsel or other professionals retained by the Carlyle DIP Noteholders.

"***Carlyle DIP Obligations***" means (a) the "Obligations" as defined in the Carlyle DIP Note Purchase Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the Carlyle DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the Carlyle DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"***Carlyle Exclusive DIP Collateral***" means (a) the equity interests of (i) NPA 2023 Holdco, LLC, (ii) NPA PGR Blocker Holdco, LLC, (iii) NPA Polaris OpCo Holdco, LLC, and (iv) NPA Polaris DevCo Holdco, LLC, (b) the Carlyle Silo Assets, (c) the Carlyle Pledged Intercompany Claims; and (d) any cash deposit funded by or on behalf of any potential purchaser, whether pursuant to the Bidding Procedures Order or otherwise, in connection with any purchase or acquisition (or bid to purchase or acquire) any Carlyle Silo Assets; *provided* that, in no event shall the Carlyle Retained Liabilities or the Identified BRP Claims (including the Specified BRP Claims and the Other BRP Claims) be Carlyle Exclusive DIP Collateral.

"***Carlyle Pledged Intercompany Claims***" means all claims, including commercial tort claims, interests, intercompany receivables, obligations, liabilities and other intercompany

v

balances or rights (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Carlyle Silo Entity (or against any third-parties that are stakeholders of any Carlyle Silo Entity (including the Carlyle Silo Entities' vendors and service providers)) or Carlyle Silo Asset, including any Tariff Claims, and any proceeds of the foregoing (other than in respect of the O&M Services Agreement (as defined in the Carlyle DIP Note Purchase Agreement) and the Carlyle Retained Liabilities).

"***Carlyle Prepetition Agent***" means Wilmington Trust, National Association, in its capacity as Collateral Agent under the Carlyle Prepetition Note Purchase Agreement, and any successor thereto.

"***Carlyle Prepetition Collateral***" means (a) the "Collateral" as defined in the Carlyle Prepetition Documents and (b) all other assets and property that secure the Carlyle Prepetition Secured Obligations.

"***Carlyle Prepetition Documents***" means (a) the Carlyle Prepetition Note Purchase Agreement, (b) the Carlyle Prepetition Security Documents, and (c) each of the other "Financing Documents" (as defined in the Carlyle Prepetition Note Purchase Agreement).

"***Carlyle Prepetition Guarantors***" means Pine Gate Renewables, LLC and each subsidiary thereof party to the Carlyle Prepetition Documents as a guarantor or secondary obligor of the Carlyle Prepetition Secured Obligations.

"***Carlyle Prepetition Issuer***" means NPA 2023 Holdco, LLC, in its capacity as Issuer of the Carlyle Prepetition Notes under the Carlyle Prepetition Note Purchase Agreement.

"***Carlyle Prepetition Liens***" means each of the liens and security interests granted by the Securing Parties (as defined in the Carlyle Prepetition Security Documents) in the Carlyle Prepetition Collateral pursuant to the Carlyle Prepetition Security Documents to secure the Carlyle Prepetition Secured Obligations.

"***Carlyle Prepetition Note Parties***" means the Carlyle Prepetition Issuer and the Carlyle Prepetition Guarantors.

"***Carlyle Prepetition Note Purchase Agreement***" means the Amended and Restated Note Purchase Agreement, dated as of October 6, 2025, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the Carlyle Prepetition Issuer, the Carlyle Prepetition Agent, and the Carlyle Prepetition Noteholders.

"***Carlyle Prepetition Noteholders***" means the holders of the "Notes" as defined in the Carlyle Prepetition Note Purchase Agreement.

"***Carlyle Prepetition Notes***" means the "Notes" as defined in the Carlyle Prepetition Note Purchase Agreement and all other loans and other financial accommodations provided by the Carlyle Prepetition Noteholders to the Carlyle Prepetition Note Parties pursuant to the Carlyle Prepetition Documents.

"*Carlyle Prepetition Secured Obligations*" means the "Secured Obligations" as defined in the Carlyle Prepetition Note Purchase Agreement.

"*Carlyle Prepetition Secured Parties*" means each of the Carlyle Prepetition Agent, the Carlyle Prepetition Noteholders, and each of the other "Secured Parties" as defined in the Carlyle Prepetition Note Purchase Agreement.

"*Carlyle Prepetition Security Documents*" means (a) the "Security Documents" (as defined in the Carlyle Prepetition Note Purchase Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Carlyle Prepetition Agent has been granted a security interest in and continuing liens on the Carlyle Prepetition Collateral.

"*Carlyle Purchaser*" means "Purchaser" as defined in the Carlyle Settlement Term Sheet.

"*Carlyle Required DIP Noteholders*" means the "Required Holders" as defined in the Carlyle DIP Note Purchase Agreement.

"*Carlyle Retained Liabilities*" means any liabilities (a) as of October 6, 2025 and (b) thereafter, any amounts permitted to be incurred in accordance with the then-applicable Approved Budget (prior to the entry of the Interim Order, as defined in the Carlyle Prepetition Note Purchase Agreement), in each case, in respect of any equipment purchased or to be purchased by or on behalf of any Carlyle Silo Entity from PGR Procurement, LLC, to the extent (i) such equipment has been physically delivered to the Project site of a Carlyle Silo Entity and (ii) an independent engineer has verified in writing that such equipment has been so delivered; *provided* that the Carlyle Retained Liabilities shall exclude (x) the Funded Carlyle Procurement Claims and (y) Tariff Claims against any Carlyle Silo Entity or Carlyle Silo Asset.

"*Carlyle Sale Transaction*" means, at the election of the Carlyle Required DIP Noteholders, a sale of all or substantially all or a material portion of the Carlyle Silo Assets pursuant to (a) a credit bid of the Carlyle DIP Obligations, (b) a cash purchase pursuant to which the Carlyle DIP Obligations are Paid in Full, or (c) such other treatment of the Carlyle DIP Obligations acceptable to the Carlyle DIP Agent (acting at the direction of the Carlyle Required DIP Noteholders), which transaction may be consummated pursuant to an order of the Court.

"*Carlyle Silo Assets*" means (a) the assets of, and the equity interests in, the Carlyle Silo Entities and (b) the Carlyle Pledged Intercompany Claims.

"*Carlyle Silo Entities*" means each of (a) NPA 2023 Holdco, LLC, (b) NPA PGR Blocker Holdco, LLC, (c) NPA Polaris OpCo Holdco, LLC, (d) NPA Polaris DevCo Holdco, LLC and (e) each direct or indirect subsidiary of the foregoing.

"*Carlyle Subsequent Draws*" has the meaning ascribed to "Subsequent Draws" in the Carlyle DIP Documents.

"*Cash Collateral*" means "cash collateral" (as defined in section 363(a) of the Bankruptcy Code) that is, as applicable, (a) the property of the DIP Loan Parties or is the traceable proceeds of DIP Collateral, in each case in which one or more of the DIP Secured Parties have an interest, or (b) the property of the Prepetition Loan Parties or is the traceable

proceeds of Prepetition Collateral, in each case in which one or more of the Prepetition Secured Parties have an interest.

"***Cash Management Motion***" means (a) the *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Operating Their Existing Cash Management System, (II) Honor Certain Related Prepetition Obligations, and (III) Continue Intercompany Transactions; (B) Waiving Certain Deposit Requirements; and (C) Granting Related Relief* filed with the Court on November 6, 2025 [Docket No. 11] and (b) any other motion of the Debtors seeking interim or final approval of the Debtors' cash management system.

"***Cash Management Orders***" means (a) the *Interim Order (A) Authorizing the Debtors to (I) Continue Operating Their Existing Cash Management System, (II) Honor Certain Related Prepetition Obligations, and (III) Continue Intercompany Transactions; (B) Waiving Certain Deposit Requirements; and (C) Granting Related Relief* entered by the Bankruptcy Court on November 10, 2025 [Docket No. 119], (b) the order of the Court approving the Cash Management Motion on a final basis, and (c) any other interim and final orders of the Court entered in the Chapter 11 Cases that authorize the Debtors to maintain their cash management system and treasury arrangements, in each of the foregoing cases in form and substance acceptable to the Required DIP Lenders.

"***Catalina***" means Catalina Solar, LLC.

"***Catalina Independent Engineer***" means an independent engineer (which may be Catalina's existing independent engineer, that is mutually acceptable to Catalina and the Brookfield Required DIP Lenders.

"***Closing Date***" means, with respect to any DIP Facility, the date on which the conditions precedent to the closing of the DIP Facility have been satisfied or waived in accordance with the applicable DIP Documents and the effectiveness of the applicable DIP Documents and the DIP Facility has occurred.

"***Debtor Guarantors***" means each of the Brookfield Debtor Guarantors, the Carlyle Debtor Guarantors and the Fundamental Debtor Guarantors.

"***DIP Agents***" means each of the Brookfield DIP Agent, the Carlyle DIP Agent and the Fundamental DIP Agent.

"***DIP Borrowers***" means each of the Brookfield Borrower, the Carlyle Issuer and the Fundamental Borrower.

"***DIP Collateral***" means each of the Brookfield DIP Collateral, the Carlyle DIP Collateral and the Fundamental DIP Collateral.

"***DIP Collateral Assets***" means all property and rights and interests in property of the Debtors or their Estates of any kind or nature whatsoever, whether tangible or intangible, in existence as of the Petition Date as well as thereafter created or acquired, and wherever located, including, without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts,

accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), tax credits, rights to the payment of money (including tax refunds, interconnection deposit refunds, equipment refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all other claims including commercial tort claims; (c) all proceeds of leased real property; (d) if not otherwise described above, all of the property or rights in property identified as Collateral (as defined in any of the DIP Credit Agreements); (e) proceeds of Avoidance Actions, *provided* that, with respect to Brookfield DIP Collateral and Carlyle DIP Collateral, the Avoidance Actions are not DIP Collateral Assets; (f) with respect to the Fundamental DIP Collateral, the Avoidance Actions are DIP Collateral Assets to the extent set forth in paragraph 8 of this Final Order; (g) the proceeds of any exercise of the Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code; (h) the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (i) all proceeds from the sale, assignment, or other Disposition of any commercial real estate leases and the Debtors' right to select, identify, and designate which commercial leases may be assumed or assumed and assigned under section 365 of the Bankruptcy Code; (j) any security deposits refunded to the Debtors after application by a landlord of non-residential real property; (k) all intercompany claims held by any Debtor against one or more of its affiliates and the entitlement of such Debtor thereunder to receive payment on such claims, including all collateral for such claims, subject to the terms set forth in this Final Order, and (l) except as provided above, all other personal property of the Debtors and their Estates of every kind and nature.

"***DIP Commitments***" means the Brookfield DIP Commitments, the Carlyle DIP Commitments and the Fundamental DIP Commitments.

"***DIP Credit Agreements***" means the Brookfield DIP Credit Agreement, the Carlyle DIP Note Purchase Agreement and the Fundamental DIP Credit Agreement.

"***DIP Documents***" means the Brookfield DIP Documents, the Carlyle DIP Documents and the Fundamental DIP Documents.

"***DIP Facilities***" means the Brookfield DIP Facility, the Carlyle DIP Facility and the Fundamental DIP Facility.

"***DIP Guarantors***" means the Brookfield Guarantors, the Carlyle Guarantors and the Fundamental Guarantors.

"***DIP Intercreditor Agreement***" means that certain (a) Amended and Restated Debtor-in-Possession Intercreditor Agreement among the Brookfield DIP Agent, the Carlyle DIP

Noteholders and the Fundamental DIP Agent and (b) Amended and Restated Junior Lien Debtor-in-Possession Intercreditor and Subordination Agreement among the Brookfield DIP Agent, the Carlyle DIP Noteholders and the Fundamental DIP Agent.

"***DIP Lender Advisors***" means each of the Brookfield DIP Lender Advisors, the Carlyle DIP Noteholder Advisors and the Fundamental DIP Lender Advisors.

"***DIP Lenders***" means each of the Brookfield DIP Lenders, the Carlyle DIP Noteholders and the Fundamental DIP Lenders.

"***DIP Liens***" means each of the Brookfield DIP Liens, the Carlyle DIP Liens and the Fundamental DIP Liens.

"***DIP Loan Parties***" means each of the DIP Borrowers and the Debtor Guarantors.

"***DIP Loans***" means each of the Brookfield DIP Loans, the Carlyle DIP Notes and the Fundamental DIP Loans.

"***DIP Obligations***" means each of the Brookfield DIP Obligations, the Carlyle DIP Obligations and the Fundamental DIP Obligations.

"***DIP Secured Parties***" means each of the Brookfield DIP Secured Parties, the Carlyle DIP Secured Parties and the Fundamental DIP Secured Parties.

"***Disposition***" means the sale, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction) of any property by any person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith. "***Dispose***", "***Disposed***" and "***Disposal***" have correlative meanings.

"***Estate***" means, with respect to a Debtor, their bankruptcy estate (as defined under section 541 of the Bankruptcy Code), and "***Estates***" means the bankruptcy estates (as defined under section 541 of the Bankruptcy Code) of each Debtor.

"***Final Roll-Up DIP Loans***" means each of the Brookfield Final Roll-Up DIP Loans, the Carlyle Final Roll-Up DIP Notes and the Fundamental Final Roll-Up DIP Loans.

"***Fundamental DIP Collateral***" means (a) all DIP Collateral Assets held by any (i) Pari Guarantor Debtor, (ii) Priority Guarantor Debtor, or (iii) Debtor or Non-Debtor Guarantor that is a Fundamental Silo Entity, and (b) the Fundamental Pledged Intercompany Claims. For the avoidance of doubt, the Fundamental DIP Collateral includes all of the Fundamental Exclusive DIP Collateral and excludes the Brookfield Exclusive DIP Collateral and the Carlyle Exclusive DIP Collateral.

"***Fundamental DIP Documents***" means (a) the Fundamental DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with to, or filed by,

the Fundamental DIP Agent and/or the Fundamental DIP Lenders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"*Fundamental DIP Lender Advisors*" means (a) Sidley Austin LLP, as counsel to the Fundamental DIP Lenders, (b) Guggenheim Securities, LLC, as investment banker to the Fundamental DIP Lenders, and (c) any other local or special counsel or other professionals retained by the Fundamental DIP Lenders.

"*Fundamental DIP Obligations*" means (a) the "Obligations" as defined in the Fundamental DIP Credit Agreements and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the Fundamental DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the Fundamental DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"*Fundamental Exclusive DIP Collateral*" means (a) the equity interests of (i) FP 2021 Dev Holdco, LLC, (ii) Sirius OpCo Pledgor, LLC, (iii) Cascade Dev Holdco, LLC, (iv) PGR 2021 Holdco 17, LLC, (v) PG Dev Carver Holdco, LLC, (vi) PGR Carver Holdco, LLC and (viii) Blue Ridge Power, LLC, (b) the Fundamental Silo Assets, (c) the Fundamental Pledged Intercompany Claims, the Carlyle Retained Liabilities, the Brookfield Retained Liabilities, the Other BRP Claims, and the Preserved Procurement Claims; and (d) any cash deposit funded by or on behalf of any potential purchaser, whether pursuant to the Bidding Procedures Order or otherwise, in connection with any purchase or acquisition (or bid to purchase or acquire) any Fundamental Silo Assets; *provided* that, in no event shall the Specified BRP Claims be Fundamental Exclusive DIP Collateral.

"*Fundamental Pledged Intercompany Claims*" means (x) all claims, interests, intercompany receivables, obligations, liabilities and other intercompany balances or rights (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Fundamental Silo Entity or Fundamental Silo Asset, including any Tariff Claims, and any proceeds of the foregoing (other than in respect of the O&M Services Agreement (as defined in the Fundamental DIP Credit Agreement)) and (y) the Other BRP Claims and the Preserved Procurement Claims; *provided* that, in no event shall the Specified BRP Claims be Fundamental Pledged Intercompany Claim.

"*Fundamental Prepetition Agent*" means FP Solar Development I LLC, and any successor thereto.

"*Fundamental Prepetition Borrowers*" means (a) FP 2021 Dev Holdco, LLC and/or Blue Ridge Power, LLC, as applicable, in their respective capacities as Borrower under the Fundamental Prepetition Credit Agreements.

"*Fundamental Prepetition Bridge Agreement*" means "that certain Amended and Restated Revolving Loan Agreement, dated October 6, 2025, as may have been amended or

modified prior to the date hereof, by and among FP 2021 Dev Holdco, LLC, as borrower, FP Solar Development I LLC, as lender, and Solar Construction Lending, LLC, as lender.

"***Fundamental Prepetition Bridge Loans***" means the "New Money Loans," as defined and actually incurred under the Fundamental Prepetition Bridge Agreement.

"***Fundamental Prepetition Collateral***" means (a) the "Collateral" as defined in the Fundamental Prepetition Documents and (b) all other assets and property that secure the Fundamental Prepetition Secured Obligations.

"***Fundamental Prepetition Credit Agreements***" means (a) the Revolving Loan Agreement, dated as of December 10, 2021, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the applicable Fundamental Prepetition Borrower, the Fundamental Prepetition Agent, and the applicable Fundamental Prepetition lender, (b) the Fundamental Prepetition Bridge Agreement, and (c) the Amended and Restated Loan Agreement, dated as of June 26, 2025, as may have further been amended or modified prior to the date hereof, by and among Blue Ridge Power, LLC, as borrower and Solar Construction Lending, LLC, as lender.

"***Fundamental Prepetition Documents***" means (a) the Fundamental Prepetition Credit Agreements, (b) the Fundamental Prepetition Security Documents, and (c) each of the other "Loan Documents" (as defined in the Fundamental Prepetition Credit Agreements).

"***Fundamental Prepetition Guarantors***" means Pine Gate Renewables, LLC and each subsidiary thereof party to the Fundamental Prepetition Documents as a guarantor or secondary obligor of the Fundamental Prepetition Secured Obligations.

"***Fundamental Prepetition Lenders***" means FP Solar Development I LLC, and any successor thereto and/or Solar Construction Lending, LLC, and any successor thereto as applicable, in their respective capacities as Lender under the Fundamental Prepetition Credit Agreements

"***Fundamental Prepetition Liens***" means each of the liens and security interests granted by the Grantors (as defined in the Fundamental Prepetition Security Documents) in the Fundamental Prepetition Collateral pursuant to the Fundamental Prepetition Security Documents to secure the Fundamental Prepetition Secured Obligations.

"***Fundamental Prepetition Loan Parties***" means the Fundamental Prepetition Borrowers and the Fundamental Prepetition Guarantors.

"***Fundamental Prepetition Loans***" means the "Loans" as defined in the Fundamental Prepetition Credit Agreements and all other loans and other financial accommodations provided by the Fundamental Prepetition Lenders to the Fundamental Prepetition Loan Parties pursuant to the Fundamental Prepetition Documents.

"***Fundamental Prepetition Secured Obligations***" means the "Secured Obligations" as defined in the Fundamental Prepetition Credit Agreements.

"**Fundamental Prepetition Secured Parties**" means each of the Fundamental Prepetition Agent, the Fundamental Prepetition Lenders, and each of the other "Secured Parties" as defined in the Fundamental Prepetition Credit Agreements.

"**Fundamental Prepetition Security Documents**" means (a) the Security Documents (as defined in the Fundamental Prepetition Credit Agreements) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Fundamental Prepetition Agent has been granted a security interest in and continuing liens on the Fundamental Prepetition Collateral.

"**Fundamental Required DIP Lenders**" means the "Required Lenders" as defined in the Fundamental DIP Credit Agreement.

"**Fundamental Sale Transaction**" means, at the election of the Fundamental Required DIP Lenders, a sale of all or substantially all or a material portion of the Fundamental Silo Assets pursuant to (a) a credit bid of the Fundamental DIP Obligations, (b) a cash purchase pursuant to which the Fundamental DIP Obligations are Paid in Full, or (c) such other treatment of the Fundamental DIP Obligations acceptable to the Fundamental DIP Agent (acting at the direction of the Fundamental Required DIP Lenders), which transaction may be consummated pursuant to an order of the Court.

"**Fundamental Silo Assets**" means (a) the assets of, and the equity interests in, the Fundamental Silo Entities and (b) the Fundamental Pledged Intercompany Claims.

"**Fundamental Silo Entities**" means (a) FP 2021 Dev Holdco, LLC, (b) Sirius OpCo Pledgor, LLC, (c) Cascade Dev Holdco, LLC, (d) PGR 2021 Holdco 17, LLC, (e) PG Dev Carver Holdco, LLC, (f) PGR Carver Holdco, LLC, (g) Blue Ridge Power, LLC, and (h) each direct or indirect subsidiary of the foregoing.

"**Fundamental Subsequent Draws**" has the meaning ascribed to "Subsequent Draws" in the Fundamental DIP Documents.

"**Funded Brookfield Procurement Claims**" means claims or interests held by Debtor PGR Procurement, LLC in respect of equipment to the extent of the amount of any financing extended to any Brookfield Silo Entity (whether under the Brookfield Prepetition Credit Agreement or under any Project financing of such entity) on account of an invoice relating to such equipment.

"**Funded Carlyle Procurement Claims**" means claims or interests held by Debtor PGR Procurement, LLC in respect of equipment to the extent of the amount of any financing extended to any Carlyle Silo Entity (whether under the Carlyle Prepetition Note Purchase Agreement or under any Project financing of such entity) on account of an invoice relating to such equipment.

"**GUC Trust**" means a trust to be established under an Acceptable Plan and to be funded (a) upon the closing of a Brookfield Sale Transaction in the amount and as contemplated in the Brookfield Settlement Term Sheet (the "**Brookfield Cash Consideration**") and (b) as contemplated in the Carlyle Settlement Term Sheet; *provided* that the Brookfield Cash Consideration may be paid by the Brookfield DIP Secured Parties, the Buyer (as defined in the Brookfield APA) or any Brookfield Silo Entity following the closing of a Brookfield Sale

Transaction so long as such Brookfield Cash Consideration is not paid with funds that are assets of the Debtors' Estates following the closing of a Brookfield Sale Transaction.

"*Identified BRP Claims*" has the meaning given to such term in the DIP Intercreditor Agreement.

"*Initial Budget*" means the 13-week consolidated weekly operating budget of the Debtors and their subsidiaries setting forth, among other things, projected disbursements, liquidity and net cash flow for the period described therein prepared by the DIP Borrowers' management and advisors and approved by the Required DIP Lenders on or prior to the Interim Order Effective Date and attached to the Interim Order as **Exhibit D**.

"*Interim Draws*" means each of the Brookfield Interim Draw, the Carlyle Interim Issuance and the Fundamental Interim Draw.

"*Interim Order Effective Date*" means the date of entry of the Interim Order.

"*Interim Roll-Up DIP Loans*" means each of the Brookfield Interim Roll-Up DIP Loans, the Carlyle Interim Roll-Up DIP Notes and the Fundamental Interim Roll-Up DIP Loans.

"*Non-Debtor Guarantors*" means each of the Brookfield Non-Debtor Guarantors, the Carlyle Non-Debtor Guarantors and the Fundamental Non-Debtor Guarantors.

"*Other BRP Claims*" means Identified BRP Claims that meet the BRP Claims Conditions.

"*Other Collateral*" means the assets and property of the Debtors other than Prepetition Collateral, Brookfield Silo Assets, Carlyle Silo Assets and Fundamental Silo Assets.

"*Paid in Full*" means (a) the indefeasible payment in full in cash of the obligations (including principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) and all other amounts due and owing by the Debtors, any Non-Debtor Guarantors or any other obligors thereunder (with such payment being without prejudice to any terms or provisions contained in such credit facility that survive such discharge by their terms) under the applicable credit facility and this Final Order, (b) the termination of all commitments to make loans or extend other financial accommodations under such facility, (c) the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of all letters of credit, in each case, in accordance with the terms of the applicable facility, and (d) in the case of the Prepetition Secured Obligations, no Challenge has been timely and properly asserted in accordance with this Final Order (including any Challenge against the applicable Prepetition Secured Parties or their Representatives), or if such a Challenge is timely and properly commenced, upon the disposition of such Challenge pursuant to a final, non-appealable order of a court of competent jurisdiction in favor of such Prepetition Secured Parties and Representatives and consistent with the Debtors' Stipulations and Releases; *provided*, that in accordance with the Brookfield Settlement Term Sheet, the Carlyle Settlement Term Sheet and as otherwise may be agreed by the Fundamental Prepetition Secured Parties,

4924-1323-6092v.7

Paid in Full shall also include a credit bid or other voluntary release of the full amount of (x) with respect to any reference to Paid in Full in relation to a DIP Facility, all applicable DIP Obligations, and (y) with respect to any reference to Paid in Full in relation to any Prepetition Secured Obligations, all applicable Prepetition Secured Obligations (including, in the case of each of the preceding clauses (x) and (y), principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) owing by the Debtors and any other DIP Loan Party in connection with consummation of a sale of any or all of the Brookfield Silo Assets, Carlyle Silo Assets or Fundamental Silo Assets, as applicable.

"*Pari Guarantor Debtors*" means each of following Debtors: (a) PGR Guarantor, LLC, (b) Pine Gate Renewables, LLC, (c) Pine Gate Fund Management, LLC, (d) Pine Gate Development, LLC, (e) PGC Solar Holdings I Managing Member, LLC, (f) Cascade Pledgor, LLC, (g) PGR Blue Ridge Power Holdings, LLC, (h) PGR 2024 Sponsor Holdco, LLC, (i) PGR Signature Fund 1 Manager, LLC, (j) Pine Gate Assets, LLC, (k) Pine Gate Energy Capital, LLC, (l) Pine Gate Dev Holdco, LLC, (m) Pine Gate O&M, LLC, and (n) any Debtor that is not a Priority Guarantor Debtor or a Debtor that is a Brookfield Silo Entity, a Carlyle Silo Entity, or a Fundamental Silo Entity.

"*Permitted Prior Liens*" means any valid and non-avoidable senior lien in existence and perfected immediately prior to the Petition Date or any valid and non-avoidable lien in existence immediately prior to the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. For the avoidance of doubt, Permitted Prior Liens shall not include any Prepetition Liens or any DIP Liens.  Solely with respect to the Brookfield Silo Assets that constitute Polaris B Collateral, Permitted Prior Liens shall include the Polaris B Liens.

"*Petition Date*" means the date on which the Debtors file chapter 11 petitions with the Court.

"*Polaris B Agent*" means Deutsche Bank Trust Company Americas, in its capacity as Administrative Agent and Collateral Agent under the Polaris B Credit Agreement and any successor thereto.

"*Polaris B Borrower*" means Polaris DevCo Borrower B, LLC, in its capacity as Borrower under the Polaris B Credit Agreement.

"*Polaris B Collateral*" means (a) the "Collateral" as defined in the Polaris B Documents and (b) all other assets and property that secure the Polaris B Secured Obligations.

"*Polaris B Credit Agreement*" means the Credit Agreement, dated as of March 26, 2025, as may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, by and among the Polaris B Borrower, the Polaris B Agent, and the Polaris B Lenders.

"***Polaris B Documents***" means (a) the Polaris B Credit Agreement, (b) the Polaris B Security Documents, and (c) each of the other "Loan Documents" (as defined in the Polaris B Credit Agreement).

"***Polaris B Guarantors***" means each of the "Loan Parties" as defined in the Polaris B Credit Agreement (other than the Polaris B Borrower).

"***Polaris B Lenders***" means the "Lenders" as defined in the Polaris B Credit Agreement.

"***Polaris B Liens***" means each of the liens and security interests granted by the "Grantors" (as defined in the Polaris B Security Documents) in the Polaris B Collateral pursuant to the Polaris B Security Documents to secure the Polaris B Secured Obligations.

"***Polaris B Loan Parties***" means each of the Polaris B Borrower and the Polaris B Guarantors.

"***Polaris B Loans***" means the "Loans" as defined in the Polaris B Credit Agreement and all other loans and other financial accommodations provided by the Polaris B Lenders to the Polaris B Loan Parties pursuant to the Polaris B Documents.

"***Polaris B Secured Obligations***" means the "Secured Obligations" as defined in the Polaris B Credit Agreement.

"***Polaris B Secured Parties***" means each of the Polaris B Agent, the Polaris B Lenders, and each of the other "Secured Parties" as defined in the Polaris B Credit Agreement.

"***Polaris B Security Documents***" means (a) the "Security Documents" (as defined in the Polaris B Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Polaris B Agent has been granted a security interest in and continuing liens on the Polaris B Collateral.

"***Prepetition Agents***" means each of the Brookfield Prepetition Agent, the Carlyle Prepetition Agent and the Fundamental Prepetition Agent.

"***Prepetition Collateral***" means the Brookfield Prepetition Collateral, the Carlyle Prepetition Collateral and the Fundamental Prepetition Collateral.

"***Prepetition Documents***" means the Brookfield Prepetition Documents, the Carlyle Prepetition Documents and the Fundamental Prepetition Documents.

"***Prepetition Intercreditor Agreements***" means (a) that certain Junior Lien Intercreditor and Subordination Agreement, dated October 6, 2025, by and among each Carlyle Prepetition Noteholder, the Brookfield Prepetition Agent and the Fundamental Prepetition Lenders and (b) that certain Intercreditor Agreement, dated as of October 6, 2025, by and among each Carlyle Prepetition Noteholder, the Brookfield Prepetition Agent and the Fundamental Prepetition Lenders.

"***Prepetition Lenders***" means the Brookfield Prepetition Lenders, the Carlyle Prepetition Noteholders and the Fundamental Prepetition Lenders.

"***Prepetition Liens***" means the Brookfield Prepetition Liens, the Carlyle Prepetition Liens and the Fundamental Prepetition Liens.

"***Prepetition Loan Parties***" means the Brookfield Prepetition Loan Parties, the Carlyle Prepetition Note Parties and the Fundamental Prepetition Loan Parties.

"***Prepetition Secured Obligations***" means the Brookfield Prepetition Secured Obligations, the Carlyle Prepetition Secured Obligations and the Fundamental Prepetition Secured Obligations.

"***Prepetition Secured Parties***" means the Brookfield Prepetition Secured Parties, the Carlyle Prepetition Secured Parties and the Fundamental Prepetition Secured Parties.

"***Preserved Procurement Claims***" means the Brookfield Retained Liabilities and the Carlyle Retained Liabilities.

"***Priority Guarantor Debtors***" means each of (a) PGR 2022 Sponsor Holdco, LLC, (b) Blue Ridge Power Holding Company, LLC, (c) BF Dev Holdco Pledgor, LLC, (d) PGC Solar Holdings I, LLC, and (e) NPA Polaris DevCo Pledgor, LLC.

"***Project***" means any solar power generating, storage or generating and storage project, and, in each case, any associated facilities owned, leased or operated by any of the Debtors or their subsidiaries or affiliates.

"***Representative***" means, as to any Person, its current and former affiliates, and its and each such entity's current and former directors, officers, managers, participants and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect parents, subsidiaries and divisions, and its and each of such entity's current and former officers, members, managers, directors, controlling persons, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys, accountants, investment bankers, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, legal advisors, consultants, and partners (including both general and limited partners).

"***Required DIP Lenders***" means each of the Brookfield Required DIP Lenders, the Carlyle Required DIP Noteholders and the Fundamental Required DIP Lenders.

"***Roll-Up DIP Loans***" means each of the Brookfield Roll-Up DIP Loans, the Carlyle Roll-Up DIP Notes and the Fundamental Roll-Up DIP Loans.

"***Sale Transaction***" means each of the Brookfield Sale Transaction, the Carlyle Sale Transaction and the Fundamental Sale Transaction.

"***Shared Prepetition Collateral***" means the assets and property of the Pari Guarantor Debtors and the Priority Guarantor Debtors that constitute Prepetition Collateral.

"***Silo***" means each of the Brookfield Silo Entities, the Carlyle Silo Entities, and the Fundamental Silo Entities.

"***Specified BRP Claims***" means Identified BRP Claims that do not meet the BRP Claims Conditions.

"***Tariff Claims***" means any claims or liabilities in respect of or directly or indirectly arising from, or relating to (a) duties, tariffs or trade remedies, including in respect of any anti-dumping or countervailing duty cash deposits, tariffs, duties, or other trade remedies imposed, assessed, or collectible by the U.S. Department of Commerce or the U.S. Customs and Border Protection as a result of, arising out of, or relating to the circumvention proceedings associated with the petition filed by Auxin Solar Inc. concerning crystalline silicon photovoltaic cells and modules, and (b) any claims by any person for indemnity or reimbursement of the foregoing.

"***Trustee***" means any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors and/or any examiner or other estate representative or other fiduciary appointed or elected in the Chapter 11 Cases or any Successor Case, and any other person acting or seeking to act on behalf of the Debtors' Estates in the Chapter 11 Cases or any Successor Case.

"***U.S. Trustee***" means Office of the United States Trustee for the Southern District of Texas.

4924-1323-6092v.7

## Annex 2

## The Debtors' Stipulations and Releases

Without prejudice to the rights of all parties in interest other than the Debtors, but subject to the limitations contained in paragraph 17 of this Final Order, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate, acknowledge and agree that:

**Stipulations as to Brookfield Prepetition Secured Parties**.

1.      Brookfield Prepetition Credit Agreement.  Prior to the commencement of the Chapter 11 Cases, the Brookfield Prepetition Secured Parties made the Brookfield Prepetition Loans to the Brookfield Prepetition Loan Parties pursuant to the Brookfield Prepetition Documents.  Pursuant to the Brookfield Prepetition Documents, each of the Brookfield Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Brookfield Prepetition Secured Obligations to the Brookfield Prepetition Agent for the benefit of the Brookfield Prepetition Lenders.

2.      Brookfield Prepetition Secured Obligations. As of the Petition Date, the Brookfield Prepetition Borrower and the other Brookfield Prepetition Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Brookfield Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $**417.422 million** on account of the Brookfield Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Brookfield Prepetition Secured Obligations were

automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Brookfield Prepetition Documents, and all commitments of the Brookfield Prepetition Secured Parties to extend Brookfield Prepetition Loans or make other financial accommodations were terminated on the Petition Date.

3.      <u>Validity and Priority of Brookfield Prepetition Secured Obligations</u>. (a) The Brookfield Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Brookfield Prepetition Loan Parties and such Brookfield Prepetition Secured Obligations are enforceable in accordance with the terms of the Brookfield Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Brookfield Prepetition Secured Obligations exist, and no portion of the Brookfield Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Brookfield Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Brookfield Prepetition Documents, or the Brookfield Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Brookfield Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

4.      <u>Validity, Priority and Perfection of Brookfield Prepetition Liens</u>: As more fully

set forth in the Brookfield Prepetition Credit Agreement, prior to the Petition Date, the Brookfield Prepetition Loan Parties became parties to the Brookfield Prepetition Security Documents pursuant to which the Brookfield Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Brookfield Prepetition Collateral in favor of the Brookfield Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Brookfield Prepetition Liens on the Brookfield Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Brookfield Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Brookfield Prepetition Liens were senior in priority over any and all other liens on the Brookfield Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Brookfield Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.

5.      No Challenges/Claims as to Brookfield Prepetition Secured Parties. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Brookfield Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Brookfield Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Brookfield Prepetition Documents, the Brookfield Prepetition Secured Obligations, or the Brookfield Prepetition Liens, whether arising at law or at

equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Carlyle Prepetition Secured Parties**.

6.      <u>Carlyle Prepetition Note Purchase Agreement</u>.  Prior to the commencement of the Chapter 11 Cases, the Carlyle Prepetition Secured Parties purchased the Carlyle Prepetition Notes from the Carlyle Prepetition Issuer pursuant to the Carlyle Prepetition Documents. Pursuant to the Carlyle Prepetition Documents, each of the Carlyle Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Carlyle Prepetition Secured Obligations to the Carlyle Prepetition Agent for the benefit of the Carlyle Prepetition Noteholders.

7.      <u>Carlyle Prepetition Secured Obligations</u>. As of the Petition Date, the Carlyle Prepetition Issuer and the other Carlyle Prepetition Note Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Carlyle Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $**322.2million** on account of the Carlyle Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Carlyle Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in

4

accordance with the terms of the Carlyle Prepetition Documents, and all commitments of the Carlyle Prepetition Secured Parties to purchase Carlyle Prepetition Notes or make other financial accommodations were terminated on the Petition Date.

8.      <u>Validity and Priority of Carlyle Prepetition Secured Obligations</u>. (a) The Carlyle Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Carlyle Prepetition Note Parties and such Carlyle Prepetition Secured Obligations are enforceable in accordance with the terms of the Carlyle Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Carlyle Prepetition Secured Obligations exist, and no portion of the Carlyle Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Carlyle Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Carlyle Prepetition Documents, or the Carlyle Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Carlyle Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

9.      <u>Validity, Priority and Perfection of Carlyle Prepetition Liens</u>: As more fully set forth in the Carlyle Prepetition Note Purchase Agreement, prior to the Petition Date, the Carlyle Prepetition Note Parties became parties to the Carlyle Prepetition Security Documents pursuant

4924-1323-6092v.7

to which the Carlyle Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Carlyle Prepetition Collateral in favor of the Carlyle Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Carlyle Prepetition Liens on the Carlyle Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Carlyle Prepetition Noteholders for fair consideration and reasonably equivalent value; (b) the Carlyle Prepetition Liens were senior in priority over any and all other liens on the Carlyle Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Carlyle Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.

10.    <u>No Challenges/Claims as to Carlyle Prepetition Secured Parties</u>. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Carlyle Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Carlyle Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Carlyle Prepetition Documents, the Carlyle Prepetition Secured Obligations, or the Carlyle Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable

state law equivalents.

**Stipulations as to Fundamental Prepetition Secured Parties**.

11.     <u>Fundamental Prepetition Credit Agreement</u>.  Prior to the commencement of the Chapter 11 Cases, the Fundamental Prepetition Secured Parties made the Fundamental Prepetition Loans to the Fundamental Prepetition Loan Parties pursuant to the Fundamental Prepetition Documents.  Pursuant to the Fundamental Prepetition Documents, each of the Fundamental Prepetition Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Fundamental Prepetition Secured Obligations to the Fundamental Prepetition Agent for the benefit of the Fundamental Prepetition Lenders.

12.     <u>Fundamental Prepetition Secured Obligations</u>. As of the Petition Date, the Fundamental Prepetition Borrower and the other Fundamental Prepetition Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Fundamental Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $**843.3 million** on account of the Fundamental Prepetition Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Fundamental Prepetition Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Fundamental Prepetition Documents, and all commitments of the Fundamental Prepetition Secured Parties to

7

extend Fundamental Prepetition Loans or make other financial accommodations were terminated on the Petition Date.

13.    <u>Validity and Priority of Fundamental Prepetition Secured Obligations</u>. (a) The Fundamental Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Fundamental Prepetition Loan Parties and such Fundamental Prepetition Secured Obligations are enforceable in accordance with the terms of the Fundamental Prepetition Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Fundamental Prepetition Secured Obligations exist, and no portion of the Fundamental Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Fundamental Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Fundamental Prepetition Documents, or the Fundamental Prepetition Secured Obligations; and (d) the Debtors waive, discharge, and release any right to challenge any of the Fundamental Prepetition Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

14.    <u>Validity, Priority and Perfection of Fundamental Prepetition Liens</u>: As more fully set forth in the Fundamental Prepetition Credit Agreement, prior to the Petition Date, the Fundamental Prepetition Loan Parties became parties to the Fundamental Prepetition Security

Documents pursuant to which the Fundamental Prepetition Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Fundamental Prepetition Collateral in favor of the Fundamental Prepetition Agent.  The Debtors acknowledge and agree that as of the Petition Date (a) the Fundamental Prepetition Liens on the Fundamental Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Fundamental Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Fundamental Prepetition Liens were senior in priority over any and all other liens on the Fundamental Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Fundamental Prepetition Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Liens.

15.     <u>No Challenges/Claims as to Fundamental Prepetition Secured Parties</u>. No claims or causes of action exist that are held by the Debtors or their Estates against, or with respect to, any Fundamental Prepetition Secured Party or any of their respective Representatives. The Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Fundamental Prepetition Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Fundamental Prepetition Documents, the Fundamental Prepetition Secured Obligations, or the Fundamental Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising

under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Polaris B Secured Parties.**

16.     <u>Polaris B Credit Agreement</u>. Prior to the commencement of the Chapter 11 Cases, the Polaris B Secured Parties made the Polaris B Loans to the Polaris B Loan Parties pursuant to the Polaris B Documents. Pursuant to the Polaris B Documents, each of the Polaris B Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Polaris B Secured Obligations to the Polaris B Agent for the benefit of the Polaris B Lenders.

17.     <u>Polaris B Secured Obligations</u>. As of the Petition Date, the Polaris B Borrower and the other Polaris B Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Polaris B Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $546 million on account of the Polaris B Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.

18.     <u>Validity and Priority of Polaris B Secured Obligations</u>. (a) The Polaris B Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Polaris B Loan Parties and such Polaris B Secured Obligations are enforceable in accordance with the terms of the Polaris B Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Polaris B Secured

4924-1323-6092v.7

Obligations exist, and no portion of the Polaris B Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Debtors that are Polaris B Loan Parties and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Polaris B Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Polaris B Documents, or the Polaris B Secured Obligations; and (d) the Debtors that are Polaris B Loan Parties waive, discharge, and release any right to challenge any of the Polaris B Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

19.     <u>Validity, Priority and Perfection of Polaris B Liens</u>: As more fully set forth in the Polaris B Credit Agreement, prior to the Petition Date, the Polaris B Loan Parties became parties to the Polaris B Security Documents pursuant to which the Polaris B Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Polaris B Collateral in favor of the Polaris B Agent. The Debtors acknowledge and agree that as of the Petition Date (a) the Polaris B Liens on the Polaris B Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Polaris B Lenders for fair consideration and reasonably equivalent value; (b) the Polaris B Liens were senior in priority over any and all other liens on the Polaris B Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Polaris B Documents, solely to the extent any such permitted liens were, as of

the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), and non-avoidable.

20.     <u>No Challenges/Claims as to Polaris B Secured Parties</u>. No claims or causes of action exist that are held by the Debtors that are Polaris B Loan Parties or their Estates against, or with respect to, any of the Polaris B Secured Parties or any of their respective Representatives. The Debtors that are Polaris B Loan Parties and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Polaris B Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Polaris B Documents, the Polaris B Secured Obligations, or the Polaris B Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

4924-1323-6092v.7

# Annex 3

## Lien/Claim Priority Annex

| Priority | Brookfield Exclusive DIP Collateral | | Carlyle Exclusive DIP Collateral | | Fundamental Exclusive DIP Collateral | | Shared Prepetition Collateral | Other Collateral |
|---|---|---|---|---|---|---|---|---|
| | Brookfield Borrower and Brookfield Debtor Guarantors | Brookfield Non-Debtor Guarantors | Carlyle Issuer and Carlyle Debtor Guarantors | Carlyle Non-Debtor Guarantors | Fundamental Borrower and Fundamental Debtor Guarantors | Fundamental Non-Debtor Guarantors | | |
| 1st | Allocable Percentage of Carve Out | Permitted Prior Liens | Allocable Percentage of Carve Out | Permitted Prior Liens | Allocable Percentage of Carve Out | Permitted Prior Liens | Carve Out (solely with respect to Debtor property) | Carve Out (solely with respect to Debtor property) |
| 2nd | Permitted Prior Liens | Brookfield DIP Liens | Permitted Prior Liens | Carlyle DIP Liens | Permitted Prior Liens | Fundamental DIP Liens | Permitted Prior Liens | Permitted Prior Liens |
| 3rd | Brookfield DIP Liens | Brookfield Prepetition Liens | Carlyle DIP Liens | Carlyle Prepetition Liens | Fundamental DIP Liens | Fundamental Prepetition Liens | DIP Liens, subject to DIP Intercreditor Agreement | DIP Liens, subject to DIP Intercreditor Agreement |
| 4th | Adequate Protection Liens, subject to DIP Intercreditor Agreement | | Adequate Protection Liens, subject to DIP Intercreditor Agreement | | Adequate Protection Liens, subject to DIP Intercreditor Agreement | | Adequate Protection Liens, subject to DIP Intercreditor Agreement | Adequate Protection Liens (solely with respect to Debtor property) |
| 5th | Brookfield Prepetition Liens | | Carlyle Prepetition Liens | | Fundamental Prepetition Liens | | Prepetition Liens (subject to Prepetition Intercreditor Agreements) | |

## Exhibit A

**Brookfield Settlement Term Sheet**

[Attached]

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS WITH RESPECT TO THE UCC/BROOKFIELD/DEBTORS SETTLEMENT DESCRIBED HEREIN, WHICH SHALL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY AND NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.  THIS TERM SHEET IS SUBJECT IN ALL RESPECTS TO FEDERAL RULE OF EVIDENCE 408 AND ANY STATE LAW EQUIVALENTS.

### Unsecured Creditors' Committee/Brookfield Settlement Term Sheet

This Settlement Term Sheet (this "**Term Sheet**"), between the  Official Committee of Unsecured Creditors (the "**UCC**"), Pine Gate Renewables, LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), Brookfield Asset Management, on behalf of itself and its affiliates ("**Brookfield**," and, collectively with the Debtors and the UCC, the "**Parties**") describes the terms of a proposed settlement (the "**UCC/Brookfield/Debtors Settlement**") in connection with the Debtors' chapter 11 cases, currently pending in the U.S. Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") under the case caption *In re PINE GATE RENEWABLES, LLC, et al.*, Case No. 25-90669 (the "**Chapter 11 Cases**").  This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.   Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings assigned to them in the *Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* [Docket No. 46] or the Final DIP Order.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the UCC/Brookfield/Debtors Settlement, which remains subject to negotiation in all respects in accordance herewith.

| Settlement | The Parties agree that the UCC/Brookfield/Debtors Settlement proposed in this Term Sheet shall be approved by the Final DIP Order. |
|---|---|
| **Cash Consideration** | On the latest of (a) the date on which Brookfield's credit bid transaction closes, (b) the effective date of a chapter 11 plan in the Chapter 11 Cases (the "**Plan**") and (iii) if no Plan is confirmed, such other date as the Debtors, Brookfield and the Committee may agree, each in their respective reasonable discretion, Brookfield shall fund a trust (the "**GUC Trust**"), or as otherwise directed by the Debtors in accordance with the Plan (with the consent of the Committee), to be established under the Plan with $3.75 million in cash (the "**Cash Consideration**"). The Cash Consideration may be paid by Brookfield or any Brookfield Silo Entity acquired in the sale transaction. The GUC Trust shall assume and administer all non-priority general unsecured claims in accordance with the powers, duties, and obligations set forth in its governing trust agreement.  The Parties agree that the Plan will not necessarily include any GUC Trust, and the final structure under the Plan is to be determined and subject to agreement between the Debtors and UCC. |
| **Post Confirmation GUC Fiduciary** | Subject to the row above entitled "Cash Consideration," one or more individuals shall serve as post confirmation fiduciaries to administer and/or oversee distributions to General Unsecured Creditors. The UCC shall have the exclusive right to select the individual(s) who will serve as such fiduciary (the "**GUC Fiduciary**"). The proposed GUC Fiduciary shall be identified in connection with the Plan and shall be subject to approval by the Bankruptcy Court. |

| | |
|---|---|
| **Waiver of Deficiency Claim** | Upon, and effective as of, the closing of Brookfield's credit bid transaction in accordance with the asset purchase agreement entered into by Brookfield (in its capacity as purchaser, the "***Purchaser***") in connection with the Chapter 11 Cases (the "***Brookfield APA***") and the acquisition of the Brookfield Silo Assets, the Brookfield DIP Facility shall be deemed mutually terminated, Brookfield shall permanently waive any right to assert any claim against the Debtors or their estates (and the GUC Trust) on account of the Brookfield DIP Obligations and the Brookfield Prepetition Secured Obligations, whether such claims are entitled to administrative priority, unsecured or otherwise; *provided,* that no such Brookfield DIP Obligations shall be waived if such claim is on account of a purchase price adjustment for any asset to be acquired pursuant to the Brookfield APA that is not sold to Brookfield (i.e., on account of a project lender exercising remedies as to project assets prior to closing). |
| **Support for Critical Vendor Payments** | Subject to diligence and agreement among the Debtors, the Committee, and Brookfield on the amount and scope of critical vendor claims to be paid, Brookfield shall not object to the Debtors' determinations concerning the payment of critical vendor claims, as permitted and directed by the Bankruptcy Court's orders authorizing such payments. |
| **DIP Budget for UCC Professionals** | Brookfield shall not object to increasing the budget approved in connection with the DIP Financing (the "***DIP Budget***") related to the allocation of fees for UCC professionals to $15 million, it being understood that the Debtors are not bound and have not agreed to such an increase. No modification to the DIP Budget as it relates to UCC professionals shall be permitted without the UCC's express written consent, which may be granted or withheld in the UCC's sole discretion.<br><br>Any change to the DIP Budget shall not impact (a) the amount of Brookfield's DIP Commitments, (b) the allocation of the use of proceeds of DIP Loans among professional fees and other estate costs, or (c) the allocation of DIP Commitments between mandatory and discretionary DIP Commitments or any conditions precedent to the Debtors' ability to draw on the DIP Facility, or require the Brookfield DIP Secured Parties to fund any DIP Subsequent Draw Loans (as defined in the Brookfield DIP Credit Agreement).  Brookfield takes no position on allocation between the Debtors' and the UCC's professional fees. |
| **Liens on Commercial Tort Claims and Avoidance Actions and Proceeds Thereof** | The Brookfield APA shall be amended to (i) expressly exclude the purchase of non-ordinary-course trade avoidance actions and the proceeds thereof against non-Brookfield Silo Entities and third-parties that are not stakeholders of the Brookfield Silo Entities (i.e., the Brookfield Silo Entities' vendors and service providers) and (ii) include a covenant prohibiting the Purchaser from using any acquired avoidance actions, including avoidance actions against ordinary-course trade vendors, offensively.  Claims that are not against the Brookfield Silo Entities or its stakeholders (including vendors and service providers) are to be retained by the Debtors and treated in accordance with the Plan.<br><br>For the avoidance of doubt, Brookfield shall acquire all Pledged Intercompany Claims, including commercial tort claims, and non-ordinary-course trade avoidance actions, against the Brookfield Silo Entities and their stakeholders (including vendors and service providers) (subject to the exception of Brookfield Assumed Claims (as defined in the Brookfield APA)). |

2

| | |
|---|---|
| **Other DIP Terms** | The UCC shall be provided and copied on all budget and variance reporting related to the DIP Financing, including all details and support for the DIP Budget; *provided, however*, that any such materials shall be provided to the UCC on a privileged, professionals'-eyes-only basis. |
| | Any oversight by Brookfield of the DIP Budget and compliance requirements with the DIP Budget shall terminate upon consummation of the Purchaser's credit bid and the acquisition of the Brookfield Silo Assets. |
| | Brookfield shall have no discretion or oversight with respect to wind-down amounts under the Plan, in each case, subject to the limitation that Brookfield will not be required to fund any wind-down amounts other than the Cash Consideration as expressly set forth in this Term Sheet. |
| | The UCC shall be given at least five (5) days' prior written notice of any and all amendments to the DIP Documents (excluding updates to or replacement of the Approved Budget), regardless of materiality. During such period, the UCC shall be allowed to object to any such amendments. |
| | All notices and reporting requirements related to the DIP Financing shall be provided to the UCC at the same time as the DIP Lenders; *provided, however*, that any such notices or reporting documents shall be provided to the UCC on a privileged, professionals'-eyes-only basis. |
| | Subject to the terms and conditions of the Final DIP Order, the DIP Lenders, including Brookfield, shall not be granted a lien on the Escrow Account unless and until an Escrow Springing Lien Event has occurred; *provided, however,* that, for the avoidance of doubt, Brookfield shall maintain a perfected lien on any residual amounts in the Escrow Account. |
| | Pledged Intercompany Claims shall not be released pursuant to the Final DIP Order; *provided, however*, that such claims shall be released or acquired pursuant to an order approving the sale of equity to the Purchaser. |
| | Upon entry of the Final DIP Order, the Challenge Period with respect to Brookfield shall terminate. |
| | The UCC will file statements in support of the entry of the Final DIP Order and the entry of an order approving the sale of the Brookfield Silo Assets to Brookfield. |
| | At or prior to the final hearing on the DIP Motion, each of the UCC and the Debtors shall (a) make a public announcement of the UCC/Brookfield/Debtors Settlement and the completion of the Brookfield sale process with Brookfield as the "Successful Bidder," (b) agree to bring forward the sale hearing on the sale of the Brookfield Silo Assets to Brookfield to December 16, 2025 and (c) seek and obtain entry of a Final  DIP Order approving the UCC/Brookfield/Debtors Settlement. |
| **506(c) and 552(b) Waivers** | The UCC shall support the inclusion of section 506(c) and 552(b) waivers in favor of Brookfield under the DIP Financing. |

| | |
|---|---|
| **Mutual Releases** | The Parties shall grant customary mutual releases to one another and to their respective related parties, including all the members of the boards of managers of the Brookfield Silo Entities in their capacity as such, effective upon entry of the Final DIP Order; *provided, however*, that the releases shall not extend to claims based on fraud or willful misconduct; *provided, further*, that such releases of Brookfield shall be in all capacities in relation to the Debtors, their affiliates, and their estates, including, without limitation, as DIP Secured Party, Prepetition Secured Party, Purchaser, and stalking horse bidder. |
| **Asset Purchase Agreement** | The UCC shall support an equity sale of the applicable Debtors (and their subsidiaries) to the Purchaser; *provided, however,* subject to final diligence, if Brookfield opts for an asset sale by any Debtor, it shall increase the Cash Consideration (including by delayed "true up" payments under the Plan) so that any resulting increase in the unsecured claim pool is net zero dilution to the general unsecured creditors. |
| **Plan** | Brookfield shall not have consent rights over the Plan after consummation of the Purchaser's credit bid as long as the Plan is consistent with the terms of this Term Sheet; *provided*, that the Plan shall provide Brookfield and its related parties, including all the members of the boards of managers of the Brookfield Silo Entities in their capacity as such, with a full release in all capacities in relation to the Debtors, their affiliates, and their estates, including, without limitation, as DIP Secured Party, Prepetition Secured Party, Purchaser, and stalking horse bidder, by the releasing parties (including the Debtors, the UCC, and their related parties), subject to exclusions for claims based on fraud or willful misconduct. <br><br> The UCC will recommend that third parties opt into, or not opt out of, as applicable, the release provisions of the Plan in favor of Brookfield. |

## Exhibit B

**Carlyle Settlement Term Sheet**

[Attached]

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS WITH RESPECT TO THE UCC/CARLYLE/DEBTORS SETTLEMENT DESCRIBED HEREIN, WHICH SHALL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY AND NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.  THIS TERM SHEET IS SUBJECT IN ALL RESPECTS TO FEDERAL RULE OF EVIDENCE 408 AND ANY STATE LAW EQUIVALENTS.**

<u>**Unsecured Creditors' Committee/Carlyle/Debtors Settlement Term Sheet**</u>

This Settlement Term Sheet (this "***Term Sheet***"), between the  Official Committee of Unsecured Creditors (the "***UCC***"), the affiliates of Carlyle Global Credit Investment Management LLC that are noteholders under the Carlyle DIP Facility or the Carlyle Prepetition Note Purchase Agreement or are commitment parties under the commitment letter in respect of the Carlyle DIP Facility (collectively, in such capacities, "***Carlyle***"), and Pine Gate Renewables, LLC and its affiliated debtors and debtors in possession (collectively, the "***Debtors***" and, together with the UCC and Carlyle, the "***Parties***"), describes the terms of a proposed settlement (the "***UCC/Carlyle/Debtors Settlement***") in connection with the chapter 11 cases of the Debtors currently pending in the U.S. Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under the case caption *In re PINE GATE RENEWABLES, LLC, et al.*, Case No. 25-90669 (the "***Chapter 11 Cases***").  This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.   Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings assigned to them in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 132] (the "***Interim DIP Order***").

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the UCC/Carlyle/Debtors Settlement, which remains subject to negotiation in all respects in accordance herewith.

| Settlement | The Parties agree that the UCC/Carlyle/Debtors Settlement proposed in this Term Sheet shall be approved by the order approving entry into the Carlyle DIP Facility on a final basis (the "***Final DIP Order***"). |
|---|---|
| **Cash Consideration** | On the later of (a) the closing date of either (i) the Carlyle credit bid transaction or (ii) the sale of Carlyle Exclusive DIP Collateral to a third-party purchaser for cash consideration in excess of the amount of Carlyle's credit bid (a "***Topping Bidder***"), and (b) (i) the effective date of a chapter 11 plan in the Chapter 11 Cases (the "***Plan***") or (ii) if no Plan has been confirmed, such other date as the Debtors, Carlyle, and the UCC may agree each in their reasonable discretion, Carlyle shall fund $2.75 million in cash (the "***Cash Consideration***") to a trust to be established under the Plan (the "***GUC Trust***"), or as otherwise directed by the Debtors in accordance with the Plan (with the consent of the UCC). The Cash Consideration may be paid by Carlyle, Summit Infrastructure LLC, in its capacity as the purchaser under Carlyle's credit bid (the "**Purchaser**"), or any Carlyle Silo Entity to the extent that Carlyle's credit bid has been consummated; *provided* that the Cash Consideration shall not be paid with funds that are estate assets following the closing of the sale transaction and the dismissal of the chapter 11 cases of the acquired entities.  The GUC Trust shall assume and administer |

| | |
|---|---|
| | all non-priority general unsecured claims in accordance with the powers, duties, and obligations set forth in its governing trust agreement.  The Parties agree that the Plan will not necessarily include any GUC Trust, and final structure for resolution of general unsecured claims under the Plan is to be determined and subject to agreement between the Debtors and UCC (and Carlyle, to the extent that Carlyle retains an unsecured claim in accordance with this Term Sheet). |
| **Post Confirmation GUC Fiduciary** | Subject to the row above entitled "Cash Consideration" one or more individuals shall serve as post confirmation fiduciaries to administer and/or oversee distributions to General Unsecured Creditors. The UCC shall have the exclusive right to select the individual(s) who will serve as such fiduciary (the "***GUC Fiduciary***"). The proposed GUC Fiduciary shall be identified in connection with the Plan and shall be subject to approval by the Bankruptcy Court. |
| **Waiver of Deficiency Claim** | Upon, and effective as of, the closing of Carlyle's credit bid transaction in accordance with the asset purchase agreement entered into by Purchaser in connection with the Chapter 11 Cases (the "***Carlyle APA***"), the Carlyle DIP Facility shall be deemed mutually terminated and Carlyle shall permanently waive any right to assert any claim against the Debtors or their estates (and the GUC Trust) on account of the Carlyle DIP Obligations and the Carlyle Prepetition Secured Obligations, whether such claims are entitled to administrative priority, unsecured or otherwise; *provided,* that the Carlyle DIP Facility shall not be terminated in the event that there is a purchase price adjustment under the Carlyle APA and no such claim shall be waived if such claim is on account of a purchase price adjustment for any asset to be acquired pursuant to the Carlyle APA that is not sold to Carlyle (i.e., on account of a project lender exercising remedies as to project assets prior to closing).  For the avoidance of doubt, nothing in this Term Sheet shall require Carlyle to waive the Polaris Claim (as defined in the Debtors' 9019 Motion related to Carlyle (DI 522) (the "***9019 Motion***")). |
| **9019 Support** | UCC shall support the 9019 Motion; provided, however, the 9019 Motion shall be continued to the sale hearing related to the sale of Carlyle Exclusive DIP Collateral. |
| **Support for Critical Vendor Payments** | Subject to diligence and agreement between the Parties on the amount and scope of critical vendor claims to be paid, Carlyle shall not object to the Debtors' determinations concerning the payment of critical vendor claims, as permitted and directed by the Bankruptcy Court's orders authorizing such payments. |
| **DIP Budget for UCC Professionals** | Carlyle shall not object to increasing the budget approved in connection with the DIP Financing (the "***DIP Budget***") related to the allocation of fees for UCC professionals to $15 million, it being understood that the Debtors are not bound and have not agreed to such an increase. No modification to the DIP Budget as it relates to UCC professionals shall be permitted without the UCC's express written consent, which may be granted or withheld in the UCC's sole discretion. <br><br> Any change to the DIP Budget shall not impact (a) the amount of Carlyle's DIP Commitments, (b) the allocation of the use of proceeds of DIP Loans among professional fees and other estate costs, or (c) the allocation of DIP Commitments between mandatory and discretionary DIP Commitments or any conditions precedent to the Debtors' ability to draw on the Carlyle DIP Facility.  Carlyle shall take no position on allocation between the Debtors' and the UCC's professional fees. |

| Liens on Commercial Tort Claims and Avoidance Actions and Proceeds Thereof | The Carlyle APA shall be amended to (i) expressly exclude the purchase of non-ordinary-course trade avoidance actions and the proceeds thereof against non-Carlyle Silo Entities and third-parties that are not stakeholders of the Carlyle Silo Entities (i.e., the Carlyle Silo Entities' vendors and service providers) and (ii) include a covenant prohibiting the Purchaser from using any acquired avoidance actions, including avoidance actions against ordinary-course trade vendors, offensively. Claims that are not against any of the Carlyle Silo Entities or their respective stakeholders (including vendors and service providers) are to be retained by the Debtors and treated in accordance with the Plan.<br><br>For the avoidance of doubt, the Purchaser shall acquire (and the UCC shall not object to any Topping Bidder acquiring) all (x) Carlyle Pledged Intercompany Claims and (y) commercial tort claims and avoidance actions against any of the Carlyle Silo Entities or their respective stakeholders (including vendors and service providers). |
|---|---|
| Other DIP Terms | The UCC shall be provided and copied on all budget and variance reporting related to the DIP Financing, including all details and support for the DIP Budget; *provided, however,* that any such materials shall be provided to the UCC on a privileged, professionals'-eyes-only basis, unless otherwise disclosed through a public filing with the Bankruptcy Court; provided that the UCC may not file such materials with the Bankruptcy Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal.<br><br>Any oversight by Carlyle of the DIP Budget and compliance requirements with the DIP Budget shall terminate upon consummation of the Purchaser's credit bid.<br><br>Carlyle shall have no discretion or oversight with respect to wind-down amounts under the Plan, in each case, subject to the limitation that Carlyle will not be required to fund any wind-down amounts other than as expressly set forth in this Term Sheet. The UCC shall be given at least five (5) days' prior written notice of any and all amendments to the DIP Documents (excluding updates to or replacement of the Approved Budget), regardless of materiality. During such period, the UCC shall be allowed to object to any such amendments.<br><br>All notices and reporting requirements related to the DIP Financing shall be provided to the UCC at the same time as the DIP Lenders; *provided, however*, that any such notices or reporting documents shall be provided to the UCC on a privileged, professionals'-eyes-only basis, unless such reporting is disclosed through a public filing with the Bankruptcy Court; provided that the UCC may not file such reporting with the Bankruptcy Court unless otherwise authorized to publicly disclose such materials or such materials are filed under seal.<br><br>The DIP Lenders, including Carlyle, shall not be granted a lien on the Escrow Account unless and until all Allowed Professional Fees to the extent provided in the Final DIP Order are paid in full; *provided, however,* that, for the avoidance of doubt, Carlyle shall maintain a perfected lien on any residual amounts in the Escrow Account.<br><br>Carlyle Pledged Intercompany Claims shall not be released pursuant to any order approving the DIP Financing; *provided, however*, that such claims shall be released or |

| | |
|---|---|
| | acquired pursuant to an order approving the sale of Carlyle Exclusive DIP Collateral to the Purchaser or to a Topping Bidder.<br><br>Upon the entry of the Final DIP Order by the Bankruptcy Court approving the UCC/Carlyle/Debtors Settlement (the "**Approval Order**") and such Approval Order becoming final and non-appealable, any and all Challenges to the Debtors' Stipulations and Releases contained in paragraphs 6 – 10 of Annex 2 of the Interim DIP Order shall be barred on a final and irrevocable basis.  The UCC will file statements in support of (i) the entry of the Final DIP Order relating to Carlyle, (ii) the approval of the rule 9019 settlement between the Debtors and Carlyle filed at [Docket No. 522] in the Chapter 11 Cases, and (iii) the entry of an order approving the sale of Carlyle Exclusive DIP Collateral to the Purchaser or to a Topping Bidder. |
| **506(c) and 552(b) Waivers** | The UCC shall support the inclusion of section 506(c) and 552(b) waivers, as well as a waiver of the doctrine of marshalling, in favor of Carlyle under the DIP Financing. |
| **Mutual Releases** | The Parties, including the UCC, shall grant customary mutual releases to one another and to their respective Related Parties (as defined in the Carlyle APA) ("**Related Parties**"), including the Purchaser, effective upon the Approval Order becoming final and non-appealable; *provided, howe*ver, that the releases shall not extend to claims based on fraud or willful misconduct; *provided, further*, that such releases of Carlyle and its Related Parties shall be in all of their respective capacities in relation to any of the Debtors, their  estates, or any of the Debtors' respective Related Parties, including, without limitation, as DIP Secured Party, Prepetition Secured Party, Purchaser, and stalking horse bidder. |
| **Asset Purchase Agreement** | The UCC shall support a sale of Carlyle Exclusive DIP Collateral to the Purchaser or to a third-party purchaser for cash consideration in excess of the amount of Carlyle's credit bid, which cash consideration shall first be used to fully prepay the Carlyle DIP Obligations and the Carlyle Prepetition Secured Obligations in accordance with the Carlyle DIP Documents and Carlyle Prepetition Documents, as applicable; *provided, however,* subject to final diligence, if Carlyle opts to acquire assets (other than equity interests) of any of the Carlyle Silo Entities, it shall increase the Cash Consideration (including by delayed "true up" payments under the Plan) so that any resulting increase in the unsecured claim pool is net zero dilution to the general unsecured creditors. |
| **Plan** | The Plan shall provide for a full release of Carlyle, the Purchaser, and their respective Related Parties in all of their respective capacities in relation to any of the Debtors, their estates, or any of the Debtors' respective Related Parties, including, without limitation, as DIP Secured Party, Prepetition Secured Party, Purchaser, and stalking horse bidder, by the releasing parties (including the Debtors, their estates, the UCC, and their Related Parties), subject to exclusions for claims based on fraud or willful misconduct.<br><br>The UCC will recommend that third parties opt into, or not opt out of, as applicable, the release provisions of the Plan in favor of Carlyle, the Purchaser, and their respective Related Parties. |