**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x
                                 :

In re:                        :    Chapter 11
                             :

PINE GATE RENEWABLES, LLC, *et al.*,   :    Case No. 25-90669 (CML)
                             :

         Debtors.[1]           :    (Jointly Administered)
                             :

---------------------------------------------------------- x

**ORDER (A) AUTHORIZING AND
APPROVING THE DEBTORS' ENTRY INTO AN
ASSET PURCHASE AGREEMENT WITH BII BID SOLAR II
AGGREGATOR, LP, (B) AUTHORIZING THE SALE OF THE
PURCHASED ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES,
(C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE
<u>DESIGNATED CONTRACTS, AND (D) GRANTING RELATED RELIEF</u>**

**[Relates to Docket Nos. 22, 128, 205, 694]**

Upon the motion [Docket No. 22] (the "***Motion***"),[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") for entry of an order (this "***Order***"), among other things:  (a) authorizing and approving the Debtors' entry into and performance under the Purchase Agreement with the Buyer (as defined below), (b) authorizing the Sale Transaction (as defined below), free and clear of any Encumbrances (as defined below), (c) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale Transaction, and (d) granting related relief; and this Court having previously entered the *Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the Purchase Agreement (as defined below), as applicable.

*for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief* [Docket No. 128] (the "**Bidding Procedures Order**"), authorizing and approving, among other things, Bidding Procedures for the Assets and the *Supplemental Order Approving Initial Stalking Horse Expense Reimbursements* [Docket No. 205] (the "**Expense Reimbursements Order**"), authorizing and approving the Expense Reimbursements; and the Debtors having executed that certain *Asset Purchase Agreement*, dated as of November 13, 2025 and attached hereto as **Exhibit 1A** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including in connection with the form of *First Amendment to Asset Purchase Agreement* attached hereto as **Exhibit 1B**, the "**Purchase Agreement**"), by and among certain of the Debtors and BII BID Solar II Aggregator, LP (together with any Buyer Designee, the "**Buyer**"), contemplating, among other things, the sale of the Purchased Assets identified therein (the "**Sale Transaction**") free and clear of any Encumbrances and the assumption and assignment to the Buyer of certain executory contracts and unexpired leases in connection with the Sale Transaction; and the Debtors having filed the *Notice of the Debtors' Designation of Brookfield as the Successful Bidder with Respect to the Brookfield Assets* [Docket No. 649] (the "**Notice of Successful Bid**"), announcing that, in accordance with the Bidding Procedures Order and after consultation with the Consultation Parties, the Debtors decided, in their reasonable business judgment, to designate the Buyer's stalking horse bid (the "**Brookfield Stalking Horse Bid**") as the highest or otherwise best bid for the Purchased Assets; and this Court having conducted a hearing on December 16, 2025, to consider approval of the Sale Transaction (the "**Sale Hearing**") in accordance with the Bidding Procedures Order; and this Court having reviewed and considered

(a) the Motion and the exhibits thereto, (b) the Bidding Procedures Order, (c) the Purchase Agreement, (d) the Declaration,[3] (e) the Notice of Successful Bid, (f) the objections and other responses to approval of the Sale Transaction, and (g) the arguments and representations of counsel made, and the evidence proffered or adduced at, the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in the Motion and provided in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances of the Chapter 11 Cases and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion and provided in this Order is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion, the Declaration, and at the Sale Hearing, establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.      **Jurisdiction and Venue.**  This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets, pursuant to 28 U.S.C. §§ 157 and 1334, and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, dated as of May 24, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order hereon under Article III of the United States Constitution.  Venue of these Chapter 11 Cases and approval of the Sale Transaction and

---

[3] The "***Declaration***" means the *Declaration of Jennifer Wild in Support of the Sale of Certain of the Debtors' Assets to BII BID Solar II Aggregator, LP*, [Docket No. 701].

the Debtors' entry into, and performance under, the Purchase Agreement is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     **Statutory and Legal Predicates.**   The statutory predicates for the relief granted herein are sections 105, 363 and 365 of the Bankruptcy Code.   The relief granted herein is also authorized under Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and the Complex Case Procedures.   The consummation of the transactions contemplated by the Purchase Agreement and this Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, and the Debtors and the Buyer have complied with all of the applicable requirements of such sections and rules with respect to such transactions.

C.     **Bankruptcy Rule 7052.**   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein to the extent not inconsistent herewith.

D.     **Final Order.**   This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).   To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and authorizes the closing of all transactions contemplated hereby, including, without limitation, the Sale Transaction, without regard to any stay or delay in its implementation.

E.        **Incorporation by Reference.**  Findings of facts and conclusions of law in the Bidding Procedures Order and the Expense Reimbursements Order are incorporated herein by reference.

F.        **Notice**.  On November 6, 2025 (the "***Petition Date***")**,** the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (this "***Court***").   The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

G.        On November 19, 2025, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed the official committee of unsecured creditors (the "***UCC***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 225].

H.        The Debtors gave due and proper notice of the proposed Sale, Auction (if any), and Sale Hearing on November 11, 2025 [Docket No. 135] (the "***Sale Notice***").   The Sale Notice constituted good, sufficient, and appropriate notice of the Sale Transaction under the particular circumstances and no further notice need be given with respect to the Sale Transaction.   As provided by the Sale Notice, a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.   Other parties interested in bidding on the Purchased Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid.

I.        As evidenced by the affidavits of service previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Order, the Expense Reimbursements Order, the Sale Hearing, the Assumption and Assignment Procedures, the Purchase Agreement, this Order, the

Notice of Successful Bid, and the Sale Transaction has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 9006, 9007, and 9014, Local Rules 2002-1 and 4002-1, and the Complex Case Procedures. The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Sale Hearing, the Assumption and Assignment Procedures, the Purchase Agreement, this Order, the Notice of Successful Bid, and the Sale Transaction as required by the Bidding Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures Order, the Assumption and Assignment Procedures, the Sale Hearing, the Purchase Agreement, this Order, the Notice of Successful Bid, or the Sale Transaction is or shall be required.

J.     A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

K.     **Compliance with the Bidding Procedures Order.** As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order. The Debtors and their professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties. Based upon the record of these proceedings, creditors, other parties in interest, and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.

L.     The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person

to make a higher or otherwise better offer to purchase the Purchased Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

M.     The Buyer is the designated Successful Bidder, and the Purchase Agreement is designated the Successful Bid for the Purchased Assets enumerated therein in accordance with the Bidding Procedures Order.

N.     The Sale Transaction, including the form and total consideration to be realized by the Debtors under the Purchase Agreement, (a) constitutes the highest or otherwise best offer received by the Debtors for the Purchased Assets; (b) is fair and reasonable, and (c) is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

O.     **Business Judgment.** The Debtors' determination that the consideration provided by the Buyer under the Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets is reasonable and constitutes a valid and sound exercise of the Debtors' business judgment.

P.     The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale Transaction and performing their obligations under the Purchase Agreement, including, but not limited to, the fact that (a) the consideration provided by the Buyer under the Purchase Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Purchased Assets; and (b) unless the Sale Transaction is concluded expeditiously as provided for in the Motion and pursuant to the Purchase Agreement, creditor recoveries will be diminished.

Q.     **Corporate Authority**. The Purchased Assets that are owned by the Debtor entities constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. The Debtors (a) have full corporate or

(if applicable) limited liability company power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (b) have all of the necessary corporate or (if applicable) limited liability company power and authority to consummate the Sale Transaction, (c) have taken all corporate or (if applicable) limited liability company action necessary to authorize and approve the Purchase Agreement, and the consummation of the Sale Transaction, and (d) subject to entry of this Order, need no consents or approvals, including any consents or approvals from any non-Debtor entities, other than those expressly set forth in the Purchase Agreement or this Order, to consummate the Sale Transaction.

R.   **Good Faith.**  The sale process and negotiation of the Purchase Agreement engaged in by the Debtors and the Buyer was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  None of the Debtors, the Buyer, nor any affiliates, members, partners, officers, directors, principals, professionals, or shareholders of the Buyer, nor any other persons has engaged in any conduct that would cause or permit the Purchase Agreement or the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

S.   The Debtors and the Buyer have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures.  The Debtors, and their management, boards of managers, employees, agents, advisors, and representatives, and the Buyer, its affiliates, and each of their respective employees, agents, advisors, and representatives, each actively participated in the bidding process, and each acted in good faith and without collusion or fraud of any kind.  The Buyer subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

T.      The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, each term of the Purchase Agreement (and any ancillary documents executed in connection therewith) and this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding, and is therefore entitled to the full protection of section 363(m) of the Bankruptcy Code in respect of the Sale Transaction.  Neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  The Debtors, on behalf of their estates, were free to deal with any other party interested in buying or selling some or all of the Purchased Assets.  The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and the Buyer and would not consummate the Sale Transaction without such protections.

U.      **Buyer is Not an Insider.**  Neither the Buyer nor any of its affiliates, officers, directors, managers, shareholders, members, or any of their respective successors or assigns is an "insider" of the Debtors, as that term is defined under section 101(31) of the Bankruptcy Code. No common identity of directors, managers, controlling shareholders, or members exists between the Debtors and the Buyer.

V.      **No Fraudulent Transfer.**  The consideration provided by the Buyer for the Purchased Assets pursuant to the Purchase Agreement (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Purchased Assets, (c) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and each state, territory, possession, and the District of Columbia.

W.      The Purchase Agreement was not entered into, and neither the Sellers nor the Buyer entered into the Purchase Agreement or propose to consummate the Sale Transaction, with fraudulent intent or for the purpose of (a) escaping liability for any of the Debtors' debts, or (b) hindering, delaying or defrauding the Debtors' present or future creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

X.      **Free and Clear.**  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title, and interest of the applicable Sellers in and to the Purchased Assets free and clear of all Claims (including, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), liens (including, without limitation, any statutory, mechanic's, builders, materialmen's or similar lien on real and/or personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, and encumbrances relating to, accruing, or arising any time prior to the Closing Date, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, contract rights, rights of setoff (except for setoffs exercised prior to the Petition Date), rights of recovery, reimbursement rights,

contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, to the greatest degree allowed by applicable law environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court (other than this Court) or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, senior or subordinated, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or related theories (all of the foregoing, but excluding Assumed Liabilities and the Permitted Encumbrances, collectively being referred to in this Order as "***Encumbrances***").

Y.      Those holders of Encumbrances who did not object or who withdrew their objections to the Motion, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

Z.      The Debtors, to the extent permitted by applicable law, may transfer the Purchased Assets free and clear of all Encumbrances, including, without limitation, rights or claims based

11

on any successor or transferee liability, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

AA.    The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction, if (a) the transfer of the Purchased Assets were not free and clear of all Encumbrances, or (b) the Buyer would, or in the future could, be liable for or subject to any such Encumbrances.

BB.    The Buyer will not consummate the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, unless this Court expressly orders that none of the Buyer, its respective affiliates, its respective present or contemplated members or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any Encumbrances.

CC.    Not transferring the Purchased Assets free and clear of all Encumbrances would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Encumbrances would be of substantially less benefit to the Debtors' estates.

DD.    **Equity Sale**.  Pursuant to Section 2.01(a)(i) of the Purchase Agreement, the Sale Transaction consists of the purchase of all of the Sellers' equity interests in the Purchased Companies.

EE.    **No Successor, Transferee, or Similar Liability**.  As a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the

Purchased Assets, (a) neither the Buyer nor any of its affiliates shall be deemed to be a mere continuation of any of Debtors or their estates, nor shall there be deemed to be a continuity or common identity between the Buyer, any of the Debtors, or any of their respective affiliates, or any continuity of enterprise between the Buyer, any of the Debtors, or any of their respective affiliates; (b) neither the Buyer nor any of its affiliates shall be deemed to be holding themselves out to the public as a continuation of any of the Debtors; and (c) neither the Buyer nor any of its affiliates are to be deemed a successor to any of the Debtors or their estates and none of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction amounts to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates with or into any of the Debtors.  There is not substantial continuity between the Buyer on the one hand, and the Debtors and/or their estates, on the other.  There is no continuity of enterprise between either the Buyer, on the one hand, and the Debtors and/or their estates, on the other.  The Buyer is not (a) a mere continuation of the Debtors or their estates or (b) a successor to the Debtors or their estates.

FF.     Without limiting the generality of the foregoing, and other than as may be set forth in the Purchase Agreement, none of the Buyer, its affiliates, the present or contemplated members or shareholders of the Buyer, and its affiliates, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any Encumbrances relating to any U.S. federal, state or local income tax liabilities, that the Debtors may incur in connection with consummation of the Sale Transaction, or that the Debtors have otherwise incurred prior to the consummation of the Sale Transaction.

GG.     **Validity of Transfer.**  The consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) thereof, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Purchase Agreement, including without limitation, the Sale Transaction.

HH.     The Purchase Agreement has been duly and validly executed and delivered by the Sellers and, subject to the terms of the Purchase Agreement, shall constitute valid and binding obligations of the Sellers, enforceable against the Sellers in accordance with its terms.  The Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

II.     **Compelling Circumstances for an Immediate Sale.**  To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the Purchase Agreement occur within the time constraints set forth therein.  Time is of the essence in consummating the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

JJ.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement and this Order, including, without limitation, the Sale Transaction.  The transactions contemplated by the Purchase Agreement

neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate the terms of a chapter 11 plan for the Debtors (any such chapter 11 plan, the "**Plan**"), and therefore, do not constitute a *sub rosa* plan.

KK.     **Assumption, Assignment and/or Transfer of the Designated Contracts**.  The Debtors have demonstrated (a) that it is an exercise of their sound business judgment to assume and assign the Designated Contracts to the Buyer, in connection with the consummation of the Sale Transaction and (b) that the assumption and assignment of the Designated Contracts to the Buyer is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Designated Contracts being assigned to the Buyer are an integral part of the Purchased Assets being purchased by the Buyer and, accordingly, such assumption, assignment and cure of any defaults under the Designated Contracts are reasonable and enhance the value of the Debtors' estates.  Each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code. Any non-Debtor counterparty to a Designated Contract that has not filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

LL.     To the extent necessary or required by applicable law, the Debtors have or will have as of the Closing: (a) cured, or provided adequate assurance of cure, of any default existing prior to the Closing with respect to the Designated Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (b) provided compensation, or adequate assurance

of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

MM.     The promise of the Buyer to perform the obligations first arising under the Designated Contracts after the assumption and assignment to the Buyer constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparty to the Designated Contract.

NN.     The legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Purchase Agreement attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, is authorized and approved.

2.      Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief granted herein, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

**A.      Approval of the Purchase Agreement**

3.      The Purchase Agreement, all other ancillary documents related thereto or contemplated thereby, all of the terms and conditions thereof, including, without limitation, the credit bid pursuant to section 363(k) of the Bankruptcy Code in an amount up to the full amount of the Credit Bid Amount, and all of the transactions contemplated therein including, without limitation, any amendment to the Purchase Agreement that the Debtors and the Buyer determine is necessary or desirable in connection with the transactions are hereby approved.   The consummation of the Sale Transaction is hereby authorized under sections 105, 363, and 365 of the Bankruptcy Code.

4.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and their respective officers, employees and agents are authorized and directed to take any and all actions necessary, appropriate or reasonable to perform, consummate, implement and close the Sale Transaction, including, without limitation, the (a) sale to the Buyer of all Purchased Assets, in accordance with the terms and conditions set forth in the Purchase Agreement and this Order, and (b) execution, acknowledgment, and delivery of such deeds, assignments, conveyances and other assurances, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer, or reducing to possession, the Purchased Assets, all without further order of this Court.  The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing Date, any expenses or costs that are required to be paid by the Debtors under the Purchase Agreement, this Order, or the Bidding Procedures Order, in order to consummate the Sale Transaction or perform their obligations under the Purchase Agreement.

5.      All persons and entities, including, without limitation, the Debtors, the Debtors'

estates, any and all debt security holders, equity security holders, governmental tax and regulatory

authorities, lenders, customers, vendors, employees, former employees, litigation claimants,

trustees, trade creditors, and any other creditors (or any affiliate, agent, successor, or assign of any

of the foregoing) who may or do hold claims or other Encumbrances against the Debtors or the

Purchased Assets, arising under or out of, in connection with, or in any way relating to, the Debtors,

the Purchased Assets, the operation or ownership of the Purchased Assets by the Debtors prior to

the Closing Date, or the Sale Transaction, are hereby prohibited, forever barred and estopped from

asserting or pursuing such claims or other Encumbrances against the Buyer, its affiliates,

successors, assigns, or property, or the Purchased Assets, including, without limitation, taking any

of the following actions with respect to any claims or other Encumbrances: (a) commencing or

continuing in any manner any action, whether at law or in equity, in any judicial, administrative,

arbitral, or any other proceeding, against the Purchased Assets, Buyer, and/or Buyer's properties,

affiliates, successors, and assigns; (b) enforcing, attaching, collecting, or recovering in any manner

any judgment, award, decree, or order against the Purchased Assets, Buyer, and/or Buyer's

properties, affiliates, successors, and assigns; (c) creating, perfecting, or enforcing any claim or

other Encumbrance against the Purchased Assets, Buyer, its affiliates, any of their respective

successors, assigns, and properties; (d) asserting a claim or other Encumbrance as a setoff (except

for setoffs exercised prior to the Petition Date), or right of subrogation, of any kind against any

obligation due against Purchased Assets, Buyer, its affiliates, any of their respective successors,

assigns, and properties; or (e) commencing or continuing any action in any manner or place that

does not comply, or is inconsistent, with the provisions of this Order, the Purchase Agreement, or

the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to

transfer the Purchased Assets to the Buyer in accordance with the terms of this Order and the Purchase Agreement.  No such Person shall assert or pursue any such claim or other Encumbrance against the Buyer or its affiliates, successors or assigns.  For the avoidance of doubt, nothing in this Order shall be deemed to release any direct claims (if any) of Back Bay Solar, LLC against Buyer and its affiliates (excluding the Purchased Companies).

6.      The sale of the Purchased Assets to the Buyer under the Purchase Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Purchased Assets are located, and the sale of the Purchased Assets to the Buyer may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**B.      Transfer of the Purchased Assets Free and Clear**

7.      For the avoidance of doubt and notwithstanding anything to the contrary in this Sale Order, the Purchase Agreement, or any exhibit or attachment to the Sale Order or Purchase Agreement, (i) only Purchased Assets sold by a Debtor are sold free and clear of Encumbrances, (ii) assets within a Purchased Company (or any subsidiary thereof) are not sold free and clear of any Encumbrances and any Encumbrances within such Purchased Company (or any subsidiary thereof), other than Brookfield Excluded Claims, shall continue in full force and effect, and (iii) notwithstanding the foregoing, the Brookfield Excluded Claims are Purchased Assets that are purchased and/or released in accordance with this Sale Order and Purchase Agreement.

8.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be sold free and clear of all Encumbrances, with all such Encumbrances to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto; *provided* that statutory and ad valorem tax liens of all Texas taxing jurisdictions within Bandera County, Tax Appraisal District of Bell County, Denton County, and Guadalupe County that encumber any Assets owned by a Purchased Company or Additional Purchased Entity (other than the Purchased Equity Interests and Brookfield Excluded Claims) shall be unaffected by the Sale Transaction.

9.      On the Closing Date, all of the Debtors' right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code free and clear of any and all Encumbrances. Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Buyer with, all of the Debtors' right, title and interest in and to, and possession of the Purchased Assets. All persons or entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets are authorized to surrender possession of the Purchased Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

10.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any

documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

11.     Except as otherwise expressly provided in the Purchase Agreement or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, any and all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, former employees, trade creditors, litigation claimants and other creditors holding claims or other Encumbrances against the Debtors or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or affiliates, the Purchased Assets, the ownership, sale or operation of the Purchased Assets prior to Closing Date or the transfer of the Purchased Assets to the Buyer, are hereby forever barred and estopped from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset (except for offsets exercised prior to the Petition Date), or recover on account of any claims or other Encumbrances against the Buyer, its successors or assigns, their property or the Purchased Assets. Following the Closing Date, no holder of any Claim, lien, or Interest in or against the Sellers or the Purchased Assets (excluding the Assumed Liabilities and Permitted Encumbrances) shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim, lien or Interest or based on any action or omission of any Debtor, including any action or omission of any Debtor in these Chapter 11 Cases or any successor cases. All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Sellers to transfer the Purchased Assets in accordance with the terms of the Purchase Agreement and this Order.

12.     The Debtors are authorized to execute such documents as may be necessary to release any Encumbrances of any kind against the Purchased Assets as such Encumbrances may have been recorded or may otherwise exist. If any person or entity that has filed financing statements, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances that such person or entity has with respect to the Purchased Assets, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets; (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Encumbrances against the Buyer and the applicable Purchased Assets; (c) the Debtors' creditors and the holders of any Encumbrances are authorized to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Encumbrances in the Purchased Assets; and (d) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Encumbrances with respect to the Purchased Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Order for filing or recording.  Notwithstanding the foregoing, but subject to paragraph 33 of this Order, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Buyer shall

be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

13.     To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, authorized to be transferred to the Buyer with respect to the Purchased Assets as of the Closing Date.  To the extent the Buyer cannot operate under any such license, permit, registration and governmental authorization or approval in accordance with the previous sentence, then to the maximum extent permitted under applicable law, such licenses, permits, registrations and governmental authorizations and approvals shall be in effect while the Buyer, with assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of such licenses, permits, registrations and governmental authorizations and approvals to the Buyer.

14.     No Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction to the extent that any such action by a Governmental Unit or any representative thereof would violate section 525 of the Bankruptcy Code.

15.     The acquisition or release, at the election of the Buyer, of the Brookfield Excluded Claims in connection with and as an integral component of the Sale Transaction authorized hereby is hereby approved with all such Brookfield Excluded Claims being free and clear of all claims

and interests to the same extent provided for the Purchased Assets under this Order.  The Brookfield Excluded Claims shall not include the Retained Avoidance Actions.

### C.     No Successor Liability

16.     Upon the Closing Date, except as provided in the Purchase Agreement, the entry of this Order and the approval of the terms of the Purchase Agreement shall mean that the Buyer (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, shall not be deemed to: (a) be a legal successor or successor employer to any Debtor (including with respect to any health or benefit plans), or otherwise be deemed a successor to any Debtor, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into any Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of any Debtor or the enterprise of any Debtor, including, in the case of each of (a)-(c), without limitation, (i) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.) ("***WARN***"), to the greatest degree allowed by applicable law, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (as amended) ("***CERCLA***"), the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (ii) in respect of (1) to the greatest degree allowed by applicable law, any environmental liabilities, debts, claims or

obligations arising from conditions first occurring or first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (2) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or (3) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

17.    Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement and this Order, neither the Buyer nor any of its affiliates shall have any responsibility for any (a) liability or other obligation of the Debtors related to the sale and transfer of the Purchased Assets to the Buyer or with respect to the Excluded Liabilities, other than the Assumed Liabilities, or (b) claims against the Debtors or any of their predecessors or affiliates. By virtue of the Buyer's purchase of the Purchased Assets, neither the Buyer nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or its predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, to the greatest degree allowed by applicable law environmental (including, but not limited to, CERCLA), successor or transferee liability, de facto merger or substantial continuity, labor and employment (including, but not limited to, WARN) or products liability law, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of the

Debtors' employment agreements or health or benefit plans, any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date (collectively, with the potential claims set forth in paragraph 16, "**_Successor Liability_**").  The Buyer would not have acquired the Purchased Assets but for the foregoing protections against Successor or Transferee Liability.

        D.      **Assumption and Assignment of Designated Contracts**

18.      Notwithstanding any provision of any contract governing the Purchased Assets, including any Designated Contract to be assumed and assigned to the Buyer as of the Closing, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchased Assets, including any Designated Contracts, at the Closing, the Debtors shall, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, (i) assign the Purchased Assets to the Buyer and (ii) assume and assign the Designated Contracts to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, subject to the terms of the Purchase Agreement, this Order, the Bidding Procedures Order, or as otherwise provided by a separate order of this Court; _provided, however_, that the foregoing is subject to paragraph 33 of this Order.   Notwithstanding anything to the contrary herein or in the Purchase Agreement, the Final DIP Order shall apply to and govern with respect to the payment of Cure Costs and nothing herein or in the Purchase Agreement is, or is intended to, modify the terms in of the Final DIP Order.

19.      To the fullest extent permitted by the Bankruptcy Code, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the counterparty to Designated Contract is forever barred from raising or asserting against Buyer any assignment fee, rent acceleration, rent increase on

account of assignment, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to a Designated Contract, existing as of the date that such Designated Contract is assumed, assigned and sold or arising by reason of the Closing. Notwithstanding any term of any Designated Contract to the contrary, any extension or renewal options or other rights contained in such Designated Contract that purport to be personal only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer subject to the other applicable terms of the Designated Contract.

   **E.**  **Good Faith; Arm's Length Sale**

   20.  The Purchase Agreement was negotiated and executed by the Sellers and the Buyer, and the transactions contemplated thereby, including, without limitation, the Sale Transaction, are and have been undertaken, by the Debtors, the Buyer and their respective representatives at arm's length, without collusion and in "good faith," as such term is defined in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction or any term of the Purchase Agreement (including the assumption and assignment by the Debtors of any Designated Contracts), and shall not permit the unwinding of the Sale Transaction. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections under section 363(m) of the Bankruptcy Code.

   21.  Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the transactions contemplated thereby, including, without limitation, the Sale Transaction, to be avoided, or for costs, or damages or costs, to be imposed,

under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Purchased Assets under the Purchase Agreement is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

**F.     Credit Bid**

22.     Pursuant to the Bidding Procedures and applicable law, including sections 363(b) and 363(k) of the Bankruptcy Code, and in accordance with the Final DIP Order,[4] the Buyer is validly authorized and directed to credit bid the Credit Bid Amount.  The credit bid is valid and proper consideration pursuant to sections 363(b) and 363(k) of the Bankruptcy Code, the Bidding Procedures Order, the Bidding Procedures, and the Final DIP Order.  There is no cause to limit the amount of the credit bid pursuant to section 363(k) of the Bankruptcy Code.

23.     Nothing herein shall prevent the Credit Bid Amount from being adjusted by the Sellers and Buyer in a mutually agreed manner for purposes of the Purchase Price; provided that, regardless of any such adjustments, upon the Closing of the Sale Transaction, (a) the full amount of the DIP Obligations outstanding as of the Closing and (b) any Encumbrances or Claims granted by the Sellers to the DIP Lenders as adequate protection for any diminution in value of the interests of the DIP Lenders in their collateral resulting from the use of cash collateral or otherwise shall be deemed fully and finally satisfied.

**G.     UCC Settlement**

24.     On the later of (a) the Closing, (b) the Effective Date of the Plan, and (c) if no Plan is confirmed in these Chapter 11 Cases, such other date as the Debtors, Brookfield and the UCC may agree, each in their respective reasonable discretion, Brookfield shall fund $3.75 million in

---

[4]     Capitalized terms used in this Credit Bid section but not otherwise defined shall have their respective meanings ascribed to such terms in the Final DIP Order.

cash consideration (the "***Cash Consideration***") (i) to a trust (the "***GUC Trust***"), or as otherwise

directed by the Debtors in accordance with the Plan (with the consent of the UCC) or (ii) if no Plan

is confirmed, to  such other distribution vehicle as may be directed by the Debtors, with the consent

of the UCC and consistent with the terms of the Brookfield Settlement Term Sheet (as defined in

the Final DIP Order) approved by the Final DIP Order.  The Cash Consideration may be paid by

Brookfield or any Purchased Company; *provided that* such Cash Consideration shall not be paid

with funds that are assets of the Debtors' estates after the Closing and the dismissal of the Chapter

11 Cases of any Debtor acquired in the Sale Transaction.  The Debtors and the UCC agree that the

Plan will not necessarily include any GUC Trust, and the final structure under the Plan is to be

determined and subject to agreement between the Debtors and UCC.  Subject to the foregoing, one

or more individuals shall serve as post-confirmation fiduciaries to administer and/or oversee

distributions to general unsecured creditors. The UCC shall have the exclusive right to select the

individual(s) who will serve as such fiduciary.

      25.     Upon, and effective as of, the Closing in accordance with the Purchase Agreement

and the acquisition of the Purchased Assets by the Buyer, the Brookfield DIP Facility shall be

deemed mutually terminated and the Brookfield DIP Secured Parties and Brookfield Prepetition

Secured Parties (as each is defined in the Final DIP Order) shall permanently waive any right to

assert any claim against the Debtors, their estates or the GUC Trust on account of the Brookfield

DIP Obligations and the Brookfield Prepetition Secured Obligations (as each is defined in the Final

DIP Order), whether such claims are entitled to administrative priority, unsecured or otherwise,

and the Debtors acknowledge and agree that (x) they shall not be permitted to draw on the

Brookfield DIP Facility (as defined in the Final DIP Order) following the Closing and (y) the

Brookfield DIP Secured Parties shall not be required to fund any amounts before or after the

Closing in connection with any winddown of the Debtors' estates (other than the Cash Consideration); *provided*, that the Brookfield DIP Facility shall not be terminated and no such Brookfield DIP Obligations shall be waived if (1) the claim is on account of a purchase price adjustment for any Purchased Assets that are not sold to the Buyer, including a Purchase Price Adjustment (as defined in the Purchase Agreement) made in accordance with Section 2.07 of the Purchase Agreement as a result of a Remedies Event occurring, at any time on or prior to the Closing, in respect of a Project or (2) the Debtors or the UCC breach the Brookfield Settlement Term Sheet (as defined in the Final DIP Order).

26.     Subject to diligence and agreement among the Debtors, the UCC, and Brookfield on the amount and scope of critical vendor claims to be paid, Brookfield shall not object to the Debtors' determinations concerning the payment of critical vendor claims as authorized and directed by the *Final Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Project Vendors; (B) Confirming Administrative Expense Priority; and (C) Granting Related Relief* [Docket No. 635].

27.     For the avoidance of doubt, and as provided in the Purchase Agreement, (a) the Purchased Assets expressly exclude any non-ordinary-course trade Avoidance Actions[5] and any proceeds thereof solely to the extent such Avoidance Actions are against persons or entities other than the Purchased Companies, the Additional Purchased Entities, and their respective stakeholders (including vendors and service providers) (the "***Retained Avoidance Actions***"), and such Retained Avoidance Actions and any proceeds thereof shall remain with the Sellers' estates; and (b) the Buyer shall acquire all commercial tort claims, the Brookfield Pledged Intercompany

---

[5]     "Avoidance Actions" means, collectively, any and all claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code or any other similar provision of applicable law.

Claims (as defined in the Final DIP Order), and Avoidance Actions against the Purchased Companies, the Additional Purchased Entities, and their respective stakeholders (including vendors and service providers) (the "***Acquired Avoidance Actions***"), in each case as provided in the Purchased Agreement and Final DIP Order; *provided*, however, that the Buyer shall not use any Acquired Avoidance Actions (including any such Avoidance Actions against ordinary-course trade vendors) in an offensive manner.  Nothing in this Order shall impair or diminish any rights of the Debtors' estates with respect to any Avoidance Actions or proceeds thereof retained by the estates.

28.     Effective as of the Closing, each Seller, for itself and on behalf of its past, present and future controlled Affiliates and its and such Affiliates' respective current or former directors, officers, members, partners, managers, employees, agents, lenders, investment bankers, attorneys, accountants, advisors and other representatives (collectively, "***Representatives***"), and each of its and their respective successors, assigns, heirs and executors (each, a "***Seller Releasor***"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all Claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Seller Releasor has, may have, or may assert now or in the future against (i) Buyer or any Buyer Designee, (ii) any Affiliates of Buyer or any Buyer Designee, (iii) any Representatives of Buyer or any Buyer Designee or their respective Affiliates, (iv) any current (as of the Closing Date) or former direct or indirect equity holder in Buyer or any Buyer Designee or any of their

31

respective Affiliates, (v) any Purchased Entity or its Subsidiaries, (vi) current or future direct or indirect equityholder of Buyer and its Affiliates and Representatives, (vii) any lenders of Buyer, any Buyer Designee or their respective Affiliates and (viii) with respect to (i)-(vii) each of their Representatives (collectively, the "***Buyer Released Parties***"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise.  In addition, notwithstanding the foregoing, nothing in this paragraph shall be deemed to release, waive or otherwise diminish in any respect any (i) rights or remedies of any Seller Releasor under this Agreement (including with respect to ITC recapture and obligations under the Tax Equity Documents), (ii) claims for willful misconduct or fraud, (iii) rights and remedies under the Surviving Post-Closing Covenants, or (iv) obligations of any party to a Tax Equity Document or under any Tax Equity Document.

29.     Effective as of the Closing, Buyer, for itself and on behalf of its past, present and future controlled Affiliates (including the Purchased Entities) and its and such Affiliates' respective Representatives, and each of its and their respective successors, assigns, heirs, and executors (each, a "***Buyer Releasor***" and, together with the Seller Releasors, the "***Releasors***"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all Claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative

or otherwise, which any Buyer Releasor has, may have, or may assert now or in the future against (i) each Seller, (ii) any Affiliates of Sellers and (iii) any Representatives of Sellers or their respective Affiliates (collectively, the "**Seller Released Parties**" and, together with the Buyer Released Parties, the "**Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise.  In addition, notwithstanding the foregoing, nothing in this paragraph shall be deemed to release, waive or otherwise diminish in any respect any (i) rights or remedies of any Buyer Releasor under this Agreement (including with respect to ITC recapture and obligations under the Tax Equity Documents), the TSA, if applicable, or any ancillary agreements, (ii) claims for willful misconduct or fraud, (iii) rights and remedies under the Surviving Post-Closing Covenants, or (iv) obligations of any party to a Tax Equity Document or under any Tax Equity Document.

30.     Solely in the event that Brookfield modifies or amends the acquisition structure of a Specified Development Project (as defined in the Purchase Agreement) in accordance with Section 7.17 of the Purchase Agreement, and as a result of such Restructuring the aggregate amount of non-priority general unsecured claims asserted against the Debtors' estates is increased (as compared to the amount of such claims that would have existed had the acquisition structure for such Specified Development Project taken the form of an equity sale) (the "**Baseline GUC Pool**"), then Brookfield shall increase the Cash Consideration (the "**True-Up Amount**") in an amount sufficient such that the Restructuring results in no net dilution to expected recoveries of general unsecured creditors on account of allowed general unsecured claims.  The True-Up Amount, if any, shall be calculated by the Debtors, the UCC (or, after the Effective Date, the

fiduciary appointed to administer / oversee distributions to holders of allowed general unsecured claims) and Brookfield in good faith, taking into account the Baseline GUC Pool, the actual allowed general unsecured claims, any disallowances or reductions by order of the Court, and any payments, setoffs, or recoveries from non-Debtor sources, and shall be implemented and funded pursuant to, and on the Effective Date of, the Plan (or on such other date as the Debtors, the UCC, and Brookfield may agree).

31.     The Debtors shall file a notice with the Court stating their intent to modify or amend the acquisition structure of any Specified Development Project pursuant to Section 7.17 of the Purchase Agreement (the "***Modification Notice***") upon any such determination by Buyer, and in all events no later than five business days prior to consummating any such modification or amendment.  Such notice, which may be filed in separate documents, shall include a list of the contracts and leases that Seller and/or its Affiliates may assume and/or assign to Buyer or any Purchased Entity in connection with such modification or amendment, and the related proposed cure amounts.  Parties in interest (including but not limited to the UCC, LPL Solar LLC, Hypower LLC and Nextpower LLC) shall have five business days to object to any such modification or amendment and any and all objections related to the Modification Notice, and all aspects of the acquisition noticed thereby, are expressly preserved.

32.     The Buyer shall not have consent rights over the Plan after the Closing as long as the Plan is consistent with the Brookfield Term Sheet; *provided* that the Plan shall provide the Buyer and its related parties, including all members of the boards of managers of the Brookfield Silo Entities in their capacity as such, with a full release in all capacities in relation to the Debtors, their affiliates, and their estates, subject to exclusions for claims based on fraud or willful misconduct.

H.       **Special Provision Related to the United States of America**

33.      Notwithstanding anything in this Order, the Purchase Agreement or any related sale document (collectively, the "Documents"), nothing in the Documents shall: (1) affect the United States' rights and defenses of setoff and recoupment; (2) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit (as defined in section 101(27) of the Bankruptcy Code) ("***Governmental Unit***") that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; (3) confer exclusive jurisdiction to the Bankruptcy Court  except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (4) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Documents or to adjudicate any defense asserted under the Documents, or limit any Governmental Unit in the exercise of its police or regulatory powers in accordance with 11 U.S.C. § 362(b)(4) or 28 U.S.C. § 959; provided that the Bankruptcy Court shall retain jurisdiction regarding the interpretation or enforcement of the Documents or any other order entered by the Bankruptcy Court in the Chapter 11 Cases; (5) authorize the assumption, sale, assignment or other transfer of any federal (i) grants, (ii) grant funds, (iii) contracts, including, without limitation, any contract between a Debtor and a counterparty that is regulated by the Federal Energy Regulatory Commission ("***FERC***"), (iv) property, including but not limited to, intellectual property, data and patents, (v) leases, (vi) rights-of-way, (vii) agreements, (viii) applications, (ix) licenses, (x) permits, (xi) registrations, (xii) authorizations, or (xiii) approvals (collectively, "Federal Interests"), or the discontinuation of any obligations thereunder, without compliance with all terms of the Federal Interests and with all applicable non-bankruptcy law; (6) be interpreted to set cure amounts with respect to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption,

sale, assignment or transfer of any Federal Interests; (7) authorize any transaction pursuant to section 203 of the Federal Power Act, 16 U.S.C. §§ 791 et seq., and any FERC regulations or orders; (8) waive, alter or otherwise limit the United States' property rights; or (9) expand the scope of 11 U.S.C. § 525. In the event of an inconsistency or conflict between any provision of the Purchase Agreement and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern.

I.     **All-Surety Provisions**

34.     <u>Sureties</u>. Certain commercial surety companies (collectively, the "***Sureties***" and each, individually, a "***Surety***")[6] issued certain surety bonds (collectively, the "***Existing Surety Bonds***" and each individually, an "***Existing Surety Bond***") and/or issued surety backed letters of credit (collectively the "***Existing SBLCs***" and each individually, an "***Existing SBLC***") on behalf of the Debtors and certain non-Debtor affiliates (and, together with the Debtors, the "***Pine Gate Entities***"). Certain of the Pine Gate Entities have entered into, or are potentially otherwise liable under, certain indemnity agreements, amendments thereto, riders and/or related agreements with the Sureties (collectively, the "***Existing Indemnity Agreements***" and, each, an "***Existing Indemnity Agreement***").

35.     <u>Release of Intercompany Claims</u>. All rights, claims and defenses of a Surety with respect to the release of any intercompany claim are expressly preserved, and in no circumstance shall any Surety be deemed to have consented or waived any rights, claims or defenses with respect

---

[6] The "Sureties" are: (i) RLI Insurance Company, (ii) Philadelphia Indemnity Insurance Company, (iii) Atlantic Specialty Insurance Company, (iv) Siriuspoint America Insurance Company, (v) Continental Insurance Company, (vi) Argonaut Insurance Company, (vii) Swiss RE Corporate Solutions America Insurance Company, (viii) Arch Insurance Company, (ix) Markel Insurance Company/SureTec Insurance Company, (x) Axis Insurance Company, (xi) The Hanover Insurance Company, (xii) United States Fire Insurance Company, (xiii) XL Specialty Insurance Company; and (xiv) Ascot Casualty and Surety Company.

to any actions taken or not taken in accordance with any asset purchase agreement, related documents, or this Order, all of which are expressly preserved.

### J.    Surety Provisions Where Only Assets of a Pine Gate Entity Are Sold

36.    No Transfers or Assignments.  Nothing in this Order shall be deemed to be a sale, transfer, assumption or assumption and assignment of any Existing Surety Bond, Existing SBLC or any Existing Indemnity Agreement, or any documents or rights related to any Existing Surety Bond, Existing SBLC or any Existing Indemnity Agreement.

37.    Debtors' Bonded Obligations. Nothing in this Order shall alter, limit, modify, release, discharge, preclude or enjoin any obligation of the Pine Gate Entities or any other third party to the Sureties pursuant to the Existing Surety Bonds, Existing Indemnity Agreements, and obligations under the applicable non-bankruptcy law, including the common law of suretyship (as may be applicable under the circumstances) and any statutory law, and such obligations to Sureties shall not be released, discharged, precluded or enjoined by this Order.

38.    Existing Collateral and Related Agreements. All collateral upon which any Surety had a perfected security interest as of the Petition Date, and all control agreements, trust agreements, deposit accounts, letters of credit and/or proceeds therefrom issued to a Surety as security for any Debtor's obligations under the Existing Surety Bonds (collectively, the "***Existing Surety Collateral***") shall remain in place to secure all of the Pine Gate Entities' payment and performance obligations under the Existing Surety Bonds or obligations arising under the Existing Indemnity Agreements. Nothing in this paragraph is intended to affect, and shall not affect, the obligation of any Surety, if any, under the Existing Surety Bonds.  Nothing in this Order shall be deemed to apply to the Sureties' rights  to pursue the Existing Surety Collateral, nor shall these provisions be interpreted to bar, impair, prevent or otherwise limit the Sureties from exercising

their valid rights under or with respect to any of the Existing Surety Bonds, the Existing SBLCs, the Existing Indemnity Agreements, or any related indemnity agreements, deposit agreements, control agreements, trust agreements, deposit accounts, letters of credit or applicable non-bankruptcy law, including but not limited to the common law of suretyship (as may be applicable under the circumstances) and any statutory law.

39.     Substitution of Principal. Nothing herein shall be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Existing Surety Bond.

40.     Debtors' Affiliates. Nothing contained herein relieves any non-Debtor affiliate of any obligations under the Existing Indemnity Agreements or with regard to any Existing SBLC.

41.     Surety Rights as to Third Parties Unaffected; No Waiver. Nothing in this Order shall be interpreted to alter, diminish or enlarge the rights or obligations of the Sureties or Issuing SBLC Banks (defined below) in regard to state and federal agencies, third parties or otherwise under any Existing Surety Bonds, any Existing Indemnity Agreements or applicable law nor shall any of the foregoing be deemed to enjoin any Surety or Issuing SBLC Bank from asserting any rights, claims or defenses, in regard to or against any state and federal agencies, third parties including, without limitation, any of the Sureties' indemnitors, insurers, or otherwise under any Existing Surety Bonds, Existing Indemnity Agreements, Existing Surety Collateral, Existing SBLCs or applicable non-bankruptcy law, including but not limited to the common law of suretyship (as may be applicable under the circumstances) and statutory law.

**K.     Surety Provisions Where Equity of a Debtor is Sold**

42.     Equity Sale Provisions.  The provisions of this paragraph shall apply to any Surety, Existing Surety Bond, Existing SBLC, Existing Surety, and Existing Surety Collateral where the equity of any Pine Gate Entity is transferred to any Buyer or Buyer's designee or assigns under this

Order.  Notwithstanding any other provisions of this Order or any other order of this Court, on the Closing Date, all rights and obligations related to (a) Existing Surety Bonds issued by a Surety and maintained in the ordinary course of business; (b) any Surety payment and Existing Indemnity Agreement(s), if any, setting forth the Surety's rights against the Pine Gate Entities, and the Pine Gate Entities' obligations, if any, to pay, indemnify and hold the Surety harmless from any loss, cost, or expense that the Surety may incur, in each case, on account of the issuance of any Existing Surety Bonds on behalf of the Debtors; (c) any Existing Surety Collateral; (d) any Surety collateral agreements governing Existing Surety Collateral, if any, in connection with the Debtors' Existing Surety Bonds; and/or (e) any ordinary course premium payments to a Surety for the Debtors' Existing Surety Bonds and/or Existing SBLCs (collectively, the "*Surety Bond Program*" and the Debtors' obligations arising therefrom, the "*Surety Bond Obligations*") shall be reaffirmed and ratified by the applicable Pine Gate Entities, continue in full force and effect, and not be discharged, enjoined, impaired or released by this Order in any way. For the avoidance of doubt, nothing in this Order, including, without limitation, any release, injunction, exclusions and discharge provision, shall bar, alter, limit, impair, release, modify, enlarge, or enjoin any Surety Bond Obligations.

**L.    Additional All-Surety Provisions for Non-Debtor Affiliates**

43.    For the avoidance of doubt, any provision of this Order, any applicable Purchase Agreement, or any exhibits or schedules to any Purchase Agreement, including, but not limited to any sale deemed to be "free and clear of any liens, claims or encumbrances" within the meaning of section 363 of the Bankruptcy Code, shall not apply to the assets or equity of any non-Debtor affiliate, including non-Debtor subsidiaries, or to the rights of any Surety under any Existing Surety Bond, Existing Indemnity Agreement, Existing Surety Collateral, Existing SBLC, and

applicable non-bankruptcy law, including but not limited to the common law of suretyship (as may be applicable under the circumstances) and any statutory law.

        **M.**     **Banks Issuing Surety Backed Letters of Credit**

        44.    <u>Surety Backed Letters of Credit</u>.  Nothing in this Order shall alter, limit, modify, release, discharge, preclude or enjoin any obligation of the Pine Gate Entities to a bank issuing an SLBC ("***Issuing SBLC Bank***") under applicable non-bankruptcy law, and such obligations to the Issuing SBLC Bank shall not be released, discharged, precluded or enjoined by this Order. Nothing in the asset purchase agreements, related agreements, or this Order shall be deemed to waive any Surety's right to seek the return of any surplus bond proceeds, surety backed letter of credit proceeds or other surety proceeds.  All parties' rights to challenge any such rights or interests are expressly preserved.

        **N.**     **United States Fire Insurance Company (USFIC)**

        45.    USFIC's rights, claims and defenses with respect to Bond Nos. ended 8731 and 8716 are fully preserved, including but not limited to with regard to the timeliness and adequacy of notice, whether Catalina Solar, LLC is in default of the March 8, 2024 Engineering, Procurement and Construction Agreement (the "***Catalina EPC Contract***"), any change orders, amendments or modifications of the Catalina EPC Contract, the engagement of the "Catalina Independent Engineer" and "adjudication" of claims, any project accounting, the treatment of "Identified BRP Claims" and "Specified BRP Claims", the "Catalina Direct Payment Agreement," rights to trust funds if any, "DIP Intercreditor Agreement," intercompany releases, subrogation to any "adjudicated" claims, and payment of any "adjudicated" amounts.

### O.    Related Relief

46.    In connection with the Sale Transaction and pursuant to the Purchase Agreement, the Buyer and the Debtors may enter into a transition services agreement pursuant to which, effective as of the Closing, the Debtors may provide certain services to the Buyer for a transitional period following the Closing (the "***Transition Services Agreement***").  The Buyer and the Debtors are hereby authorized to execute and deliver the Transition Services Agreement and any additional documentation contemplated by the Purchase Agreement or in furtherance of the Sale, and to perform all such other and further acts as may be required in connection with the negotiation, execution, and performance of the Purchase Agreement, any ancillary documents or the Transaction Services Agreement, including providing transition services and making any applicable payments without further order of the Court.

47.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction contemplated by the Purchase Agreement.

48.    No Governmental Unit may revoke or suspend any right, license, copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Purchased Assets.

49.    Except as expressly provided in the Purchase Agreement, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment),

claim, cause of action, defense, offset or counterclaim in respect of any Purchased Assets or liabilities not constituting an Excluded Asset.

50.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Order, including, without limitation, the Purchase Agreement and the Sale Transaction.

51.     The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

52.     This Order and the Purchase Agreement shall be binding in all respects upon all pre-petition and post-petition creditors of the Debtors, all interest holders of the Debtors, the UCC, any Court-appointed committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Purchase Agreement and Sale Transaction shall not be subject to rejection or avoidance under any circumstances by any party.

53.     This Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

54.     The Purchase Agreement, the Transition Services Agreement, and any related agreements, documents, or other instruments may be modified, amended or supplemented by the

parties thereto and in accordance with the terms thereof, without further order of this Court; *provided*, that any such modification, amendment, or supplement that has a material adverse effect on the Debtors' estates shall require the consent of all persons or entities affected thereby or be approved by this Court upon further notice and hearing.

55.     This Order is intended to constitute a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors and the Buyer may, each in its discretion and without further delay, take any action and perform any act authorized under this Order.

56.     In the event of any inconsistency between this Order and the Purchase Agreement, and solely to the extent of such inconsistency, the terms of this Order shall control.

57.     The provisions of this Order are non-severable and mutually dependent.

58.      The provisions of this Order and any actions taken pursuant hereto shall survive and remain effective notwithstanding any order that may be entered (a) confirming any Plan in these Chapter 11 Cases; (b) converting any of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissing any of these Chapter 11 Cases.

59.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

## Exhibit 1A

## Purchase Agreement

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and among**

**BII BID SOLAR II AGGREGATOR, LP,**

**as Buyer,**

**THE SELLERS NAMED HEREIN,**

**as Sellers**,

**PINE GATE O&M, LLC,**

**solely for the purposes of <u>Section 7.16</u> hereto**

**and**

**PINE GATE RENEWABLES, LLC,**

**as Sellers' Representative and for the purposes of <u>Section 7.16</u> hereto**

**November 13, 2025**

# TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS ................................................................................................. 1

SECTION 1.01          Definitions................................................................. 1
SECTION 1.02          Construction ............................................................ 23

ARTICLE 2 PURCHASE AND SALE ................................................................................ 24

SECTION 2.01          Purchase and Sale ................................................... 24
SECTION 2.02          Assumed Liabilities ................................................ 26
SECTION 2.03          Excluded Assets. ..................................................... 26
SECTION 2.04          Excluded Liabilities ............................................... 27
SECTION 2.05          Assignment of Contracts and Rights...................... 29
SECTION 2.06          Purchase Price......................................................... 32
SECTION 2.07          Purchase Price Adjustment ..................................... 32
SECTION 2.08          Purchase Price Allocation ...................................... 32
SECTION 2.09          Closing .................................................................... 33
SECTION 2.10          Withholding ............................................................ 34

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS............................... 35

SECTION 3.01          Organization and Qualification............................... 35
SECTION 3.02          Authorization; Execution and Delivery; Enforceability .............. 35
SECTION 3.03          Noncontravention; Consents and Approvals ............... 36
SECTION 3.04          Purchased Entities................................................... 36
SECTION 3.05          Financial Statements; No Undisclosed Liabilities ....................... 37
SECTION 3.06          Title to and Sufficiency of Purchased Assets ............... 38
SECTION 3.07          Litigation................................................................. 38
SECTION 3.08          Permits .................................................................... 38
SECTION 3.09          Compliance with Laws ........................................... 39
SECTION 3.10          Material Contracts................................................... 41
SECTION 3.11          Intellectual Property................................................ 41
SECTION 3.12          Real Property .......................................................... 42
SECTION 3.13          Environmental Matters............................................ 43
SECTION 3.14          Taxes ....................................................................... 44
SECTION 3.15          Employee Benefits .................................................. 45
SECTION 3.16          Labor Matters.......................................................... 46
SECTION 3.17          Energy Regulatory .................................................. 47
SECTION 3.18          Absence of Certain Changes ................................... 48
SECTION 3.19          Insurance Policies ................................................... 48
SECTION 3.20          Affiliate Transactions............................................. 48
SECTION 3.21          Privacy and Security ............................................... 48
SECTION 3.22          Brokers .................................................................... 49
SECTION 3.23          Credit Support Obligations ..................................... 49

i

SECTION 3.24 International Trade Laws; Sanctions; CFIUS ............................... 49
SECTION 3.25 Renewable Energy Incentives ...................................................... 50
SECTION 3.26 Warranties ................................................................................... 51

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................... 51

SECTION 4.01 Corporate Existence and Power .................................................. 51
SECTION 4.02 Authorization; Execution and Delivery; Enforceability ............. 51
SECTION 4.03 Noncontravention; Consents and Approvals ............................... 52
SECTION 4.04 Brokers ....................................................................................... 52
SECTION 4.05 Litigation .................................................................................... 53
SECTION 4.06 Energy Regulatory ..................................................................... 53

ARTICLE 5 COVENANTS OF SELLERS .............................................................................. 53

SECTION 5.01 Conduct of the Business ............................................................. 53
SECTION 5.02 Access to Information .................................................................. 56
SECTION 5.03 Notice of Developments ............................................................. 56
SECTION 5.04 Bidding Procedures and Protections .......................................... 57

ARTICLE 6 COVENANTS OF BUYER ................................................................................... 58

SECTION 6.01 Preservation of and Access to Books and Records ..................... 58
SECTION 6.02 Insurance Matters ....................................................................... 58

ARTICLE 7 COVENANTS OF BUYER AND SELLERS ....................................................... 59

SECTION 7.01 Confidentiality ............................................................................ 59
SECTION 7.02 Further Assurances; Transition Services .................................... 59
SECTION 7.03 Certain Filings ............................................................................ 60
SECTION 7.04 Public Announcements ............................................................... 61
SECTION 7.05 Employee Matters ....................................................................... 61
SECTION 7.06 Tax Matters ................................................................................. 63
SECTION 7.07 Misallocated Assets and Liabilities ........................................... 66
SECTION 7.08 Support Obligations .................................................................... 66
SECTION 7.09 Payments from Third Parties after Closing ................................ 67
SECTION 7.10 Bulk Transfer Laws .................................................................... 68
SECTION 7.11 Bankruptcy Court Approval ....................................................... 68
SECTION 7.12 No Successor Liability ................................................................ 71
SECTION 7.13 Investigation; Purchased Assets ................................................. 71
SECTION 7.14 Releases ...................................................................................... 72
SECTION 7.15 Real Property Matters ................................................................. 74
SECTION 7.16 Cutover and Transition ............................................................... 74
SECTION 7.17 Restructuring ............................................................................... 75
SECTION 7.18 Intellectual Property Licenses .................................................... 75

ARTICLE 8 SELLERS' REPRESENTATIVE ........................................................................ 76

    SECTION 8.01        Appointment .................................................................. 76
    SECTION 8.02        Authorization ................................................................ 77
    SECTION 8.03        Sellers' Representative Expenses ................................. 77
    SECTION 8.04        Indemnification ............................................................. 77
    SECTION 8.05        Successor Sellers' Representative.................................. 78

ARTICLE 9 CONDITIONS TO CLOSING ........................................................................... 78

    SECTION 9.01        Conditions to Obligations of Buyer and Sellers ........... 78
    SECTION 9.02        Conditions to Obligation of Buyer................................ 78
    SECTION 9.03        Conditions to Obligation of Sellers.............................. 80
    SECTION 9.04        Waiver of Conditions.................................................... 80
    SECTION 9.05        Notice of Alternative Transaction................................. 80

ARTICLE 10 SURVIVAL ..................................................................................................... 81

    SECTION 10.01       Survival ........................................................................ 81

ARTICLE 11 TERMINATION .............................................................................................. 81

    SECTION 11.01       Grounds for Termination .............................................. 81
    SECTION 11.02       Effect of Termination.................................................... 83
    SECTION 11.03       Costs and Expenses ...................................................... 84

ARTICLE 12 MISCELLANEOUS ........................................................................................ 84

    SECTION 12.01       Notices ......................................................................... 84
    SECTION 12.02       Amendments and Waivers ............................................ 85
    SECTION 12.03       Successors and Assigns................................................. 85
    SECTION 12.04       Governing Law ............................................................. 86
    SECTION 12.05       Jurisdiction................................................................... 86
    SECTION 12.06       WAIVER OF JURY TRIAL.......................................... 86
    SECTION 12.07       Counterparts; Third-Party Beneficiaries ...................... 86
    SECTION 12.08       Specific Performance .................................................... 87
    SECTION 12.09       Entire Agreement ......................................................... 87
    SECTION 12.10       No Strict Construction .................................................. 87
    SECTION 12.11       Severability .................................................................. 88
    SECTION 12.12       Disclosure Schedules ................................................... 88
    SECTION 12.13       No Recourse.................................................................. 89

**EXHIBITS**

Exhibit A      Sellers and Purchased Companies
Exhibit B      Transition
Exhibit C      Completion

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT**, dated as of November 13, 2025 (this "**Agreement**"), is made and entered into by and among BII BID Solar II Aggregator, LP, a Delaware limited partnership ("**Buyer**"), Pine Gate Renewables, LLC, a North Carolina limited liability company ("**Pine Gate**"), the persons set forth as sellers in <u>Exhibit B</u> hereto (collectively, with Pine Gate, the "**Sellers**" and each entity individually, a "**Seller**"), and Pine Gate, solely in its capacity as the Sellers' Representative (as defined below), and, solely for purposes of <u>Section 7.16</u>, Pine Gate and Pine Gate O&M, LLC (f/k/a Blue Ridge Power Services, LLC), a North Carolina limited liability company ("**PG O&M**"). Sellers and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**." Capitalized terms used herein and not otherwise defined herein have the meanings set forth in <u>Article 1</u>.

### W I T N E S S E T H :

**WHEREAS**, on November 6, 2025 (the "**Petition Date**"), the Sellers, as debtors and debtors in possession (collectively, the "**Debtors**") sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (collectively, and together with any other cases under the Bankruptcy Code commenced prior to the Closing, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and the entry and terms of the Sale Order, the Parties desire to enter into this Agreement, pursuant to which Sellers shall sell, assign, transfer, and convey to Buyer, and Buyer shall purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets, the Purchased Entities and Buyer shall assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, §§ 101-1330, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

**WHEREAS**, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

### ARTICLE 1

### DEFINITIONS

SECTION 1.01          *Definitions*.

(a)      The following terms, as used herein, have the following meanings:

"**ACT**" means ACT Power Services Holding Company Guarantor, LLC and its Subsidiaries (including ACT Power Services, LLC).

"**Action**" means any claim, action, suit, charge, complaint, audit, investigation, arbitration or proceeding by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.  For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "control" for purposes of this definition.  For the avoidance of doubt, the Purchased Entities shall each be deemed to be an "Affiliate" of any Seller solely with respect to any period prior to the Closing, and the Purchased Entities shall each be deemed to be an "Affiliate" of Buyer solely with respect to the period from and after the Closing. In addition, other than for purposes of the definitions of "Non-Recourse Parties," "Buyer Released Parties," clause (a) of "Permitted Encumbrances," Section 7.13, Section 7.05(a), Section 7.05(e) and Section 12.13, in no event shall Buyer be considered an Affiliate of Brookfield Corporation, Brookfield Asset Management Ltd. or any investment funds, investment vehicles or portfolio companies controlled or managed directly or indirectly by Brookfield Corporation, Brookfield Asset Management Ltd. or their Affiliates, nor shall Brookfield Corporation, Brookfield Asset Management Ltd. or any investment fund, investment vehicles or portfolio company (other than Buyer and its subsidiaries) controlled or managed directly or indirectly by Brookfield Corporation, Brookfield Asset Management Ltd. or their Affiliates, be considered to be an Affiliate of Buyer.

"**Alternative Transaction**" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Buyer and its Affiliates) acquires (a) beneficial ownership of a majority of the Equity Interests of any Seller or (b) any Purchased Assets (other than a de minimis amount), in each case whether by merger, sale of assets or equity, transfer, exchange, recapitalization, plan of reorganization or otherwise.

"**Antitrust Laws**" means any antitrust, competition, trade regulation or merger control Laws promulgated by any Governmental Authority.

"**Applicable Law**" means, with respect to any Person, any domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), act, statute, constitution, treaty, convention, ordinance, code, rule, regulation, Order, or other similar binding requirement enacted, adopted, promulgated, enforced or applied by any Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**Asset Management Agreements**" means, collectively the following agreements: (i) Asset Management and Administrative Services Agreement, dated as of October 12, 2022, by and between PGR 2021 Lessee 18, LLC and Pine Gate Asset Management, LLC, (ii) Asset Management and Administrative Services Agreement, dated as of October 12, 2022, by and between PGR 2022 Lessee 1, LLC and Pine Gate Asset Management, LLC, (iii) Asset Management and Administrative Services Agreement, dated as of October 26, 2022, by and

between PGR 2022 Lessee 8, LLC and Pine Gate Asset Management, LLC, (iv) Asset Management and Administrative Services Agreement, dated as of July 12, 2024 (as amended by First Amendment to Asset Management and Administrative Services Agreement, dated as of August 5, 2025), by and between PGR 2023 Lessee 1, LLC and Pine Gate Asset Management, LLC, (v) Asset Management and Administrative Services Agreement, dated as of December 22, 2022, by and between PGR 2022 Lessee 2, LLC and Pine Gate Asset Management, LLC, (vi) Asset Management and Administrative Services Agreement, dated as of May 26, 2023, by and between PGR 2022 Lessee 9, LLC and Pine Gate Asset Management, LLC, (vii) Asset Management and Administrative Services Agreement, dated as of June 12, 2023, by and between PGR 2022 Lessee 4, LLC and Pine Gate Asset Management, LLC, (viii) Asset Management and Administrative Services Agreement, dated as of March 28, 2024, by and between PGR 2021 Lessee 9, LLC and Pine Gate Asset Management, LLC, (ix) Asset Management and Administrative Services Agreement, dated as of May 17, 2024, by and between PGR 2021 Lessee 13, LLC and Pine Gate Asset Management, LLC, (x) Asset Management and Administrative Services Agreement by and between PGR 2022 Lessee 5, LLC and Pine Gate Asset Management, LLC, (xi) Asset Management and Administrative Services Agreement, dated as of September 12, 2023, by and between PGR 2021 Lessee 4 School House, LLC and Pine Gate Asset Management, LLC, (xii) Asset Management and Administrative Services Agreement, dated as of November 17, 2023, by and between PGR 2021 Lessee 4 Viaduct, LLC and Pine Gate Asset Management, LLC, (xiii) Asset Management and Administrative Services Agreement, dated as of June 30, 2023, by and between PGR 2021 Lessee 4 Stratford, LLC and Pine Gate Asset Management, LLC, (xiv) Asset Management and Administrative Services Agreement, dated as of March 26, 2025, by and between Old Hayneville Solar, LLC and Pine Gate Asset Management, LLC, (xv) Asset Management and Administrative Services Agreement, dated as of March 26, 2025, by and between Rio Lago Solar, LLC and Pine Gate Asset Management, LLC and (xvi) Asset Management and Administrative Services Agreement, dated as of March 26, 2025, by and between Limewood Bell Renewables LLC and Pine Gate Asset Management, LLC.

"**Assets**" means, with respect to any Person, all assets (including Contracts) and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible and wherever situated), including the related goodwill, which assets and properties are operated, owned, leased, licensed, used or held for use by such Person.

"**Auction**" means an auction or auctions, if any, for the sale of Sellers' assets conducted pursuant to the terms and conditions of the Bidding Procedures Order.

"**Avoidance Actions**" means, collectively, any and all claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code or any other similar provision of Applicable Law.

"**Bidding Procedures**" has the meaning set forth in the Bidding Procedures Order and shall be in form and substance reasonably acceptable to Sellers and Buyer.

"**Bidding Procedures Order**" means the Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief, in such form as reasonably acceptable to Sellers and Buyer.

"**Bidding Procedures Motion**" means the Emergency Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief; and (II) (A) Approving and Authorizing Sale of Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief, filed by Sellers in the Bankruptcy Court on November 6, 2025, in form and substance reasonably acceptable to Sellers and Buyer.

"**Brookfield Assumed Claims**" means (a) claims in respect of the O&M Services Agreement (as defined in the DIP Credit Agreement), (b) the Brookfield Retained Liabilities (as defined in the DIP Credit Agreement) and (c) Other BRP Claims (as defined in the DIP Credit Agreement).

"**Brookfield Excluded Claims**" means (a) all claims, interests, intercompany receivables, obligations, liabilities and other intercompany balances or rights to payment (whether or not contingent, matured, unmatured, known, unknown, asserted or unasserted) that any Debtor or its Subsidiaries may have against or in any Brookfield Silo Entity or Brookfield Silo Asset (as each is defined in the DIP Credit Agreement), including any Tariff Claims (b) the Specified BRP Claims (as defined in the DIP Credit Agreement), and (c) any proceeds of the foregoing; provided that the Brookfield Excluded Claims shall exclude the Brookfield Assumed Claims.

"**Business**" means, with respect to the Purchased Entities, the direct or indirect ownership and operation of the Assets of such Purchased Entity, including the ownership, development, construction and operation of the applicable Projects, the generation, sale or storage of electricity, capacity and electricity-related products, including, but not limited to, the REC Operations, at or from such Projects, and the conduct of other activities and services by the Purchased Entities incidental or otherwise related to the foregoing.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"**Cash and Cash Equivalents**" means all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract that any Seller or any Affiliate of a Seller has entered into with any union, works council or collective bargaining agent ("**Labor Union**") with respect to terms and conditions of employment of any Employees.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of September 3, 2025, between Pine Gate and Brookfield Asset Management Ltd.

"**Contract**" means any legally-binding contract, agreement, license, sublicense, Lease, sublease, mortgage, guarantee, note, bond, sales order, purchase order, instrument, undertaking or other commitment, in each case, that purports to be binding upon a Person or its assets or property (or subjects any such assets or property to an Encumbrance).

"**Copyrights**" means, collectively, all copyrights (registered or unregistered), works of authorship, and software (including source code, object code and documentation therefor), including applications and registrations thereof.

"**Cure Costs**" means, with respect to any Purchased Contract, the Liabilities that must be paid or otherwise satisfied to cure all monetary defaults under such Purchased Contract to the extent required by Section 365(b) of the Bankruptcy Code in connection with the assignment and assumption of such Purchased Contract.

"**Cut-Off Date**" means the earlier of (a) twelve (12) months following the Closing and (b) the closing of the Chapter 11 Cases.

"**DIP Credit Agreement**" means that certain Superpriority Senior Secured Debtor-In-Possession Credit Agreement dated as of November 13, 2025, by and among Pine Gate, as borrower, BID Administrator LLC, as administrative agent and collateral agent, and the lenders party thereto from time to time.

"**DIP Facility**" means a super-priority senior secured new money debtor-in-possession financing facility as further described in the DIP Credit Agreement, as approved by the Bankruptcy Court.

"**DIP Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of October 5, 2025, among BID Administrator LLC, FP Solar Development I LLC and the other Persons party thereto.

"**DIP Obligations**" means all "Obligations" under and as defined in the DIP Credit Agreement.

"**DIP Order**" means the final order entered by the Bankruptcy Court.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers' Representative to Buyer on the date hereof, which form a part of this Agreement.

"**Employee**" means any individual employed by any Seller or Affiliate thereof (other than ACT Power Services, LLC) who primarily provides services in support of the Purchased Entities or the Business.

"**Encumbrance**" means any mortgage, charge, lien, pledge, deed of trust, assessment, security interest, charge, easement, restrictive covenant, purchase option, right of first refusal or offer, hypothecation, encroachment, right of way, option, claim, license, and other similar impositions, imperfections or restrictions on transfer or use or other encumbrance of any kind.

"**Environmental Attribute**" means any renewable energy credits, green tags, and any other credits, benefits, emissions reduction credits, offsets or allowances, howsoever entitled, named, registered, created, measured, allocated or validated by or under any applicable Environmental Law, or any voluntary or mandatory program of any Governmental Authority, excluding the ITC, that are attributable to the generation or storage of energy by any Project.

"**Environmental Laws**" means all Laws concerning or relating to worker/occupational health and safety (solely to the extent related to exposure to Hazardous Materials), or pollution or protection of natural resources, wildlife and the environment, including those relating to the regulation, manufacture, sale, processing, use, generation, handling, transportation, treatment, storage, distribution, labeling, Release of, or exposure to, any Hazardous Materials.

"**Environmental Liabilities**" means all Liabilities arising out of, pursuant to, or in connection with Environmental Laws, including any Permits issued thereunder and any Hazardous Materials.

"**Equipment**" means equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and other fixed Assets.

"**Equity Interest**" means, with respect to any Person that is not a natural person, (a) any share, interest (general or limited), participation, or other (however designated) equity or equity-based interest in such Person, including capital stock, membership interests, partnership interests or other equity interests or share capital, (b) any stock appreciation rights, distribution or dividend rights, liquidation rights, contingent value rights, phantom stock, profit participation rights or similar rights or other security, right, interest or instrument with any of the aforementioned features with respect to such Person or its business, or (c) any warrant, Contract, option, exercisable, convertible or exchangeable security (including any debt security exchangeable into any equity security), securities, instruments or other rights, however denominated, to directly or indirectly, with or without additional consideration in cash or property, either immediately or upon the occurrence of a specified date, a specified event, the passage of time or the satisfaction or occurrence of any other condition or contingency, purchase or otherwise acquire any of the foregoing.

"**ERCOT**" means the Electric Reliability Council of Texas.

"**ERCOT Protocols**" means the documents and directives adopted by ERCOT from time to time, including any attachments or exhibits referenced therein, that contain the scheduling, registration, operating, planning, reliability and settlement policies, rules, guidelines, procedures and standards implemented and followed by ERCOT. The ERCOT Protocols specifically include the ERCOT Nodal Protocols, Nodal Operating and Planning Guides and Other Binding Documents, each as defined by ERCOT. The version of the ERCOT Nodal Protocols in effect at

the time of the performance or non-performance of an action shall govern with respect to that action.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and the regulations promulgated thereunder, as amended.

"**ERISA Affiliate**" means any entity that, together with any Seller, would be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code.

"**EWG**" means an "exempt wholesale generator," as such term is defined in Section 1262(6) of PUHCA and FERC's implementing regulations promulgated thereunder.

"**FERC**" means the Federal Energy Regulatory Commission or any successor thereto.

"**Final Order**" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or the right to seek a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**FPA**" means the Federal Power Act, as amended, and FERC's implementing regulations promulgated thereunder.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Governmental Authority**" means any (a) multinational, tribal, federal, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner, tribunal, board, bureau, agency or instrumentality, domestic or foreign, (b) subdivision or authority of any of the foregoing or (c) regulatory or administrative authority, including FERC and any governmental, quasi-governmental, or non-governmental body administering, regulating or having general oversight over electricity, power or other markets, including transmission, such as NERC, and including ERCOT.

"**Hazardous Material**" means (a) any material, substance or waste that is designated, defined, listed, classified or regulated as "hazardous," "toxic," "corrosive," "radioactive," or as a "pollutant" or "contaminant," under any Environmental Law, including any petroleum or petroleum products and by-products, radioactive materials, asbestos or asbestos-containing

materials, urea formaldehyde, lead, per- and polyfluoroalkyl substances, polychlorinated biphenyls, toxic mold, or radon gas or (b) any other substance, material or waste which is prohibited or otherwise regulated under any Environmental Law due to its deleterious properties or for which remedial action is required or for which liability or standards of conduct are imposed under any applicable Environmental Law.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the regulations promulgated thereunder, as amended.

"**Indebtedness**" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed, whether secured or unsecured, and (ii) indebtedness evidenced by notes, debentures, bonds, mortgages or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property or services, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course), including any earnout payments, seller notes, installment or similar payments, (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, surety or performance bonds, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations in respect of swap, derivative or other hedging contracts (valued at the net terminal value thereof), (g) all obligations of the type referenced in clauses (a) through (f) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guaranties of such obligations, (h) all obligations of the type referred to in clauses (a) through (g) of other Persons secured by any Encumbrance on any property or Asset of such Person (whether or not such obligation is assumed by such Person) and (i) constituting any accrued and unpaid interest owing by such Person with respect to any indebtedness of the type described in clauses (a) through (g) for the principal amount, breakage fees and other payment obligations (including any prepayment premiums, fees, penalties or make-whole or similar payments in respect of any obligations of the type that would be paid if such obligations are retired at the Closing).

"**Intellectual Property**" means any and all intellectual property of every kind, whether protected or arising under the Laws of the United States or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) all Trademarks, (b) all Patents, (c) all Copyrights, (d) all Trade Secrets, (e) domain names, (f) rights in software and (g) rights in drawings, schematics, and other technical plans.

"**Intermediate Holding Company**" means each of following Debtors: (a) PGR Guarantor, LLC, (b) Pine Gate Renewables, LLC, (c) Pine Gate Fund Management, LLC, (d) Pine Gate Development, LLC, (e) PGC Solar Holdings I Managing Member, LLC, (f) Cascade Pledgor, LLC, (g) PGR Blue Ridge Power Holdings, LLC, (h) PGR 2024 Sponsor Holdco, LLC, (i) PGR Signature Fund 1 Manager, LLC, (j) Pine Gate Assets, LLC, (k) Pine Gate Energy Capital, LLC, (l) Pine Gate Dev Holdco, LLC, (m) Pine Gate O&M, LLC, (n) PGR 2022 Sponsor Holdco, LLC, (o) Blue Ridge Power Holding Company, LLC, (p) BF Dev Holdco Pledgor, LLC, (q) PGC Solar Holdings I, LLC, and (r) NPA Polaris DevCo Pledgor, LLC.

"**International Trade Laws**" means all applicable U.S. and non-U.S. laws, statutes, rules, regulations, judgments, orders (including executive orders), decrees or restrictive measures relating to economic, financial, or trade sanctions, export control, or anti-boycott measures administered, enacted, or enforced by a relevant Sanctions Authority, as well as applicable customs laws.

"**Inventory**" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by any of Sellers or Purchased Entities, stored by any of Sellers or Purchased Entities or on behalf of any Purchased Entities, or in transit to, any Purchased Entities, including any such inventory, goods or materials (a) being held by customers of the Business pursuant to consignment arrangements, (b) being held by suppliers of the Business under tolling or similar arrangements , or (c) acquired on behalf of the Business by a third party, including PGR Procurement, LLC or any other affiliated third party.

"**IT Assets**" means all hardware, computers, storage media, databases, applications, websites, software, servers, workstations, routers, hubs, switches, circuits, networks, computer network equipment or systems, data communications lines, and all other information technology equipment including parts of any of the foregoing such as firmware, screens, terminals, disks, cabling, related infrastructure, and other peripheral and associated electronic equipment and services that are owned, licensed, leased or controlled by Sellers or any of their respective Affiliates.

"**ITC**" means the investment tax credit pursuant to Section 48 of the Code or Section 48E of the Code, as applicable.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge of Sellers**" means the actual knowledge of the individuals set forth on Section 1.01(b) of the Disclosure Schedules, after reasonable due inquiry of direct reports.

"**Law**" means any law (including common law), treaty, statute, ordinance, code, directive, decree, Order, rule or regulation of any Governmental Authority, including PURA and the ERCOT Protocols.

"**Lease**" means any lease, sublease or other similar agreement under which any Purchased Entity leases, uses or occupies, or has the right to use or occupy, any Leased Real Property.

"**Leased Real Property**" means any real property leased or subleased by a Purchased Entity or which a Purchased Entity has the right to use or occupy as tenant or subtenant.

"**Liability**" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any Contract or tort based on negligence or strict liability), including any fines, penalties, losses, costs, interest, charges, expenses, damages, assessments, deficiencies, judgments, awards or settlements and regardless of whether any of the foregoing would be required to be disclosed on a balance sheet prepared in accordance with GAAP.

"**Major Project Documents**" means, with respect to any Project (or the applicable Project Company), collectively and in each case together with all exhibits, schedules, attachments, appendices and ancillary instruments thereto, and as amended, supplemented, extended, renewed, waived, restated, replaced or otherwise modified from time to time:

(a) any Power Purchase Document (including confirmations, hedges relating to energy, capacity or related products, renewable energy certificates and reporting rights);

(b) all Contracts for electricity generation, generator interconnection, or electricity transmission;

(c) all site control arrangements, including ground leases, site leases, licenses, easements (including access, utility and crossing easements), rights-of-way, option agreements and memoranda of lease or easement, together with any associated title instruments;

(d) all engineering, procurement and construction agreements and balance-of-plant agreements;

(e) all operations and maintenance agreements, long-term service agreements, and warranty, performance or availability guarantee arrangements related thereto (including any service level schedules and spare parts obligations);

(f) all original equipment manufacturer supply agreements and warranties; and

(g) all supervisory control and data acquisition, metering, telemetry and information technology access and data rights agreements (including SCADA/EMS/DCS, network, cybersecurity credentialing, data sharing and meter ownership or access arrangements).

"**Material Adverse Effect**" means any change, effect, event, circumstance, occurrence or development that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or the Assumed Liabilities, or the business, financial condition or results of operations of the Purchased Entities, taken as a whole, or (b) prevents or materially impedes, or would reasonably be expected to prevent or materially impair, the consummation of the transactions contemplated by this Agreement and the other Transaction Documents; provided, however, that in the case of clause (a), in no event shall any change, effect, event, circumstance, occurrence or development that results from or arises out of the following after the date hereof be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) any change generally affecting the international, national, regional or local electric generating, transmission or distribution industry (including the international, national, regional or local wholesale or retail markets for electric power and any change in the international, national, regional or local electrical power market design, pricing or rules (including rules, systems, procedures, guidelines or requirements promulgated or modified by any RTO/ISO, NERC or any similar organization)); (ii) any change in general regulatory or political conditions, including any engagements of hostilities, acts of war, terrorist activities or changes imposed by a Governmental Authority; (iii) any change in any Laws (including Environmental Laws), GAAP, regulatory accounting principles or industry standards; (iv) any change in the financial condition or results of operation of Buyer or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of

Buyer or its Affiliates; (v) any change in the international or national financial, banking, securities or currency markets (including any increased costs for financing or suspension of trading in, or limitation on prices for, securities on any domestic or international securities exchange); (vi) any actions to be taken pursuant to or in accordance with the express terms of this Agreement; (vii) any failure, in and of itself, of the Purchased Entities to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings predictions or other financial performance measures or operating statistics (underlined: provided that any result, change, effect, event, circumstance, development, condition or occurrence giving rise or contributing to such failure that is not otherwise excluded from the definition of "Material Adverse Effect" may be taken into account in determining whether there has been a Material Adverse Effect); (viii) the announcement, pendency or consummation of the transactions contemplated by this Agreement (provided that this clause (viii) shall not apply to any representation or warranty (or any condition to any Party's obligation to consummate the transactions contemplated by this Agreement relating to such representation and warranty) to the extent the purpose of such representation and warranty is to address the consequences resulting from the execution and delivery of this Agreement, or the performance of the transactions contemplated by this Agreement); (ix) any labor strike, request for representation, organizing campaign, work stoppage, slowdown, or lockout or other labor dispute; (x) any effects of natural disasters, weather events and other acts of God, including earthquakes, hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, arctic frosts, mudslides, wildfires, pandemics or epidemics; (xi) acts taken or not taken at the specific request of, or with the written consent of, Buyer; or (xii) the Chapter 11 Cases, including (A) the Auction and any announced liquidation of Sellers or any of their respective Assets, (B) any objections in the Bankruptcy Court to this Agreement or any of the transactions contemplated hereby, the reorganization of Sellers, the Bidding Procedures Order or the assumption or rejection of any Purchased Contract otherwise in compliance with this Agreement, and (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries required to be taken (or not taken) to comply therewith; provided, further, that in the case of clause (i), (ii), (iii), (v), (ix) or (x), to the extent that such impact is disproportionately adverse to the Purchased Assets, the Assumed Liabilities, or the Purchased Entities, taken as a whole, relative to other similarly situated businesses in the industries in which Sellers and the Purchased Entities operate, then such change, effect, event, circumstance, occurrence or state of facts may be taken into account in determining whether there has been or will be a Material Adverse Effect.

"**Material Contracts**" means each (I) Purchased Contract (other than any purchase order or Seller Plan), or (II) Contract to which any Purchased Entity is a party or by which any such Purchased Entity or its Assets are subject, in each case, as of the date hereof, of a type described in the following clauses (a)-(q) of this definition:

(a)     all Major Project Documents;

(b)     other than Contracts of the nature addressed by subclause (a) above, Contracts for the purchase or sale of any material Assets of a Project or that grant a right or option to purchase or sell any material Assets of a Project;

(c)     any partnership, joint venture, strategic alliance or similar Contract involving a sharing of profits, losses, costs or liabilities with any other Person that has an impact on the operation of the Business or the Purchased Entities;

(d)     any Contract relating to any options, rights (preemptive or otherwise), warrants, calls, convertible securities or commitments or any other agreements or arrangements with respect to any equity securities of the Purchased Entities;

(e)     any Contract relating to (i) the indebtedness of any Purchased Entity for borrowed money (excluding, for the avoidance of doubt, any factoring arrangements) involving borrowings in excess of $100,000 or (ii) the mortgage or pledge of, or otherwise creating an Encumbrance (other than a Permitted Encumbrance) on, any of (A) the Purchased Assets or (B) Assets of any Purchased Entity, in each case, other than (x) intercompany Indebtedness between a Seller and the Purchased Entities, (y) Indebtedness which will be fully discharged under the Bankruptcy Code or (z) the Prepetition Credit Agreement and the DIP Credit Agreement;

(f)     any Contract relating to the acquisition or disposition of any business, Assets or properties relating to the Business or the Purchased Entities for consideration in excess of $1,000,000 (whether by merger, sale of stock, sale of Assets or otherwise) (i) entered into in the last three (3) years or (ii) pursuant to which any material earn-out, indemnification or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, purchase of Inventory or Equipment in the Ordinary Course);

(g)     any Lease with respect to the Leased Real Property;

(h)     any Contract for the lease of personal property (tangible or intangible) to or from any Person providing for lease payments in excess of $100,000 per annum that is not immaterial to the Business or the Purchased Entities;

(i)     any Contract with any Governmental Authority that is not immaterial to the Business or the Purchased Entities;

(j)     any Contract that contains a settlement, conciliation or similar agreement with any Person pursuant to which any Purchased Entity will be required, after the date hereof, to satisfy any monetary or material non-monetary obligations;

(k)     any Contract that (i) prohibits or limits in any material respect the freedom of the Business to compete in any line of business with any Person or in any geographic area, (ii) contains exclusivity obligations or restrictions binding on the Business or (iii) grants any right of first refusal or right of first offer obligations or restrictions on the Business to any Person;

(l)     any Contract to which any Seller or any Purchased Entity is a party (i) pursuant to which such Seller or Purchased Entity is granted a right to use any third-party Intellectual Property that is material to the Business, other than non-exclusive licenses for commercially available or off-the-shelf software on standard terms and conditions entered into by any Seller or Purchased Entity in the Ordinary Course, open source software licenses, invention assignment or employment-related agreements, or nonexclusive licenses that are incidental to any agreement with a customer, supplier or end user of any of a Purchased Entity's products or services which is

entered into by any Seller or Purchased Entity in the Ordinary Course, (ii) pursuant to which any Seller or Purchased Entity grants a third party the right to use any Intellectual Property owned by the Purchased Entities or included in the Purchased Assets, in each case that is material to the Business, other than any Contract with any customer, supplier or end user of any of Seller's or a Purchased Entity's products or services which is entered into in the Ordinary Course or any agreement which contains an incidental nonexclusive trademark license to use such Seller's or Purchased Entity's Trademarks, (iii) that contains a settlement of any claims related to any Intellectual Property owned by the Purchased Entities or included in the Purchased Assets, in each case that is material to the Business or (iv) which materially prohibits or restricts a Seller's or Purchased Entity's use of any Intellectual Property owned by the Purchased Entities or included in the Purchased Assets, in each case;

(m)    any Contract that contains any guaranty of any obligation for borrowed money, or other material guaranty by Sellers (with respect to the Purchased Entities or the Purchased Assets) or any Purchased Entity.

(n)    any Contract that is or contains any Credit Support Obligations;

(o)    any Contract that requires capital expenditures after the date hereof by the Sellers (with respect to the Purchased Entities or Purchased Assets) or the Purchased Entities in excess of $100,000, other than as set forth on the Approved Budget (as defined in the DIP Credit Agreement);

(p)    any Contract that is a Collective Bargaining Agreement and;

(q)    any Contract that is a commitment or agreement by the Sellers or the Purchased Entities to enter into any of the foregoing.

"**MBR Authority**" means, with respect to any Project, an order by FERC pursuant to Section 205 of the FPA (a) authorizing the Project Company that owns such Project to sell wholesale electric energy, capacity and specified ancillary services at market-based rates, (b) accepting a tariff for filing that provides for such sales, and (c) granting to such Project Company waivers of regulations and blanket authorizations customarily granted by FERC to an entity with market-based rate authority, including blanket authorization for the issuance of securities and assumption of liabilities under Section 204 of the FPA.

"**Multiemployer Plan**" means a "multiemployer plan" (within the meaning of Section 4001(a)(3) of ERISA).

"**NERC**" means the North American Electric Reliability Corporation, any regional entity exercising delegated authority therefrom, and any successor to any of the foregoing.

"**O&M Agreements**" means, collectively the following agreements: (a) (i) Operations and Maintenance Agreement dated as of October 12, 2022 (as amended by Amendment No. 1 to Operations and Maintenance Agreement, dated as of August 4, 2023) between Pine Gate O&M, LLC and PGR 2021 Lessee 18, LLC, (ii) Operations and Maintenance Agreement dated as of October 12, 2022 (as amended by Amendment No. 1 to Operations and Maintenance Agreement, dated as of June 16, 2023) between Pine Gate O&M, LLC and PGR 2022 Lessee 1, LLC, (iii)

Operations and Maintenance Agreement dated as of October 26, 2022 between Pine Gate O&M, LLC and PGR 2022 Lessee 8, LLC, (iv) Operations and Maintenance Agreement dated as of July 31, 2025 between Pine Gate O&M LLC and PGR 2023 Lessee 1, LLC, (v) Operations and Maintenance Agreement dated as of December 22, 2022 between Pine Gate O&M LLC and PGR 2022 Lessee 2, LLC, (vi) Operations and Maintenance Agreement dated as of December 22, 2022 between Pine Gate O&M LLC and PGR 2022 Lessee 2, LLC, (vii) Operations and Maintenance Agreement dated as of December 22, 2022 between Pine Gate O&M LLC and PGR 2022 Lessee 2, LLC (viii) Operations and Maintenance Agreement dated as of December 22, 2022 between Pine Gate O&M LLC and PGR 2022 Lessee 2, LLC, (ix) Operations and Maintenance Agreement dated as of May 26, 2023 between Pine Gate O&M LLC and PGR 2022 Lessee 9, LLC, (x) Operations and Maintenance Agreement dated as of June 12, 2023 between Pine Gate O&M, LLC and Cane Creek Solar, LLC, (xi) Operations and Maintenance Agreement dated as of April 5, 2022 between Blue Ridge Power Services, LLC and PGR 2021 Lessee 9, LLC, (xii) Operations and Maintenance Agreement dated as of April 5, 2022 between Blue Ridge Power Services, LLC and PGR 2021 Lessee 13, LLC, (xiii) Operations and Maintenance Agreement dated as of July 9, 2024 between Pine Gate O&M LLC and Moonshot Solar, LLC (xiv) Operations and Maintenance Agreement dated as of June 30, 2022 between Blue Ridge Power Services, LLC and PGR 2021 Lessee 4 School House, LLC, (xv) Operations and Maintenance Agreement dated as of June 30, 2022 between Blue Ridge Power Services, LLC and PGR 2021 Lessee 4 Viaduct, LLC, (xvi) Operations and Maintenance Agreement dated as of June 30, 2022 between Blue Ridge Power Services, LLC and PGR 2021 Lessee 4 Stratford, LLC, (xvii) Operations and Maintenance Agreement dated as of March 26, 2025 between Pine Gate O&M LLC and Old Hayneville Solar, LLC, (xviii) Operations and Maintenance Agreement dated as of March 26, 2025 between Pine Gate O&M LLC and Rio Lago Solar, LLC and (xix) Operations and Maintenance Agreement dated as of March 26, 2025 between Pine Gate O&M LLC and Limewood Bell Renewables LLC (((i) through (xix), the "**Project Level O&M Agreements**") and (b) the related operations and maintenance agreements entered into by ACT whereby ACT provides the operation and maintenance services contemplated under the Project Level O&M Agreements.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority.

"**Ordinary Course**" means the ordinary course of business consistent with past practice, including such actions as may be required or advisable in connection with the Material Contracts to the extent consistent with past practice.

"**Owned Real Property**" means any real property owned in fee by any Purchased Entity, or by Seller for the benefit of any Purchased Entity, in each case, together with any buildings and improvements located on or attached to such real property that constitute real property under applicable Law.

"**Partnership**" means any entity classified as a partnership for U.S. federal income tax purposes that is owned directly or indirectly by a Purchased Company.

"**Patents**" means, collectively, all patents and patent applications, and all continuations, continuations-in-part, reissues and divisionals related thereto.

"**Permits**" means any identification numbers, franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, exemptions, registrations, permissions, filings, publications, declarations, notices, waivers, and authorizations, of or with any Governmental Authority, including those issued or required under Environmental Laws.

"**Permitted Encumbrances**" means the following Encumbrances: (a) with respect to Owned Real Property or Leased Real Property, easements, declarations, covenants or rights of way, restrictions, title defects, matters that would be disclosed by a current survey of real property and all matters of record, in each case that do not secure monetary indebtedness and which do not, individually or in the aggregate, materially impair the use or occupancy of such Owned Real Property or Leased Real Property; (b) with respect to Owned Real Property or Leased Real Property, zoning ordinances, variances, conditional use permits and similar regulations, permits, approvals and conditions which do not, individually or in the aggregate, materially impair the use or occupancy of such Owned Real Property or Leased Real Property; (c) Encumbrances that will be released at the Closing with no Liability to Buyer or its Affiliates; (d) any Encumbrance granted or incurred pursuant to an Order of the Bankruptcy Court; (e) non-exclusive Intellectual Property licenses, covenants not to sue and rights or licenses that are subject to Section 365(n) of the Bankruptcy Code; (f) Encumbrances created by the execution and delivery of this Agreement, by or on behalf of Buyer or at Buyer's request; (g) Encumbrances of a lessor under any Lease; and (h) the Encumbrances disclosed on Section 1.01(c) of the Disclosure Schedules.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"**Power Purchase Documents**" means, with respect to each Project Company and the applicable Project, (a) any power purchase agreement, energy hedge, tolling agreement or other offtake agreement pursuant to which any electric energy, power, capacity, or related products or services (including Renewable Energy Certificates, Renewable Energy Incentives, and Reporting Rights) associated with the Project are sold or stored, whether such agreement is entered into by such Project Company or by any Seller, Affiliate, or other Person on behalf of, for the benefit of, in respect of, or that otherwise allocates rights or obligations to, such Project or Project Company, and (b) all confirmations, amendments, supplements, and side letters, entered into in connection therewith.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"**Prepetition Credit Agreement**" means that certain Credit Agreement, dated as of January 30, 2025, by and among BF Dev Holdco LLC, as borrower, BID Administrator LLC, as Administrative Agent and Collateral Agent, and the lenders from time to time party thereto, as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2025, as further amended by that certain Amendment No. 2 dated as of April 17, 2025, as further amended

by that certain Amendment No. 3, dated October 6, 2025, and as further amended, supplemented, restated, replaced or otherwise modified from time to time.

"**Prepetition Obligations**" means all "Obligations" under and as defined in the Prepetition Credit Agreement.

"**Preserved Procurement Claims**" means claims or interests of PGR Procurement, LLC in respect of equipment verified as delivered to the applicable Seller by an independent engineer approved by the Buyer, except to the extent of the amount of any financing extended to any Seller on account of an invoice relating to such equipment.

"**Proceedings**" means any legal, governmental or regulatory suits, proceedings, arbitrations or actions, related to Liabilities, preference actions and preferential transfers, Contracts, debts, breaches of fiduciary duties, accounts, bills, covenants, agreements, damages, judgments, third-party Claims, counterclaims, and cross-claims, whether reduced to judgment or not reduced to judgment, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in law or equity or otherwise.

"**Project**" means each solar photovoltaic generating facility or battery energy storage system, together with all related assets, rights, interests, and operations associated with such facility, that is or will be, directly or indirectly, developed, constructed, owned, operated, or maintained, by a Purchased Entity, as identified on Exhibit A.

"**Project Adjustment Amount**" means, with respect to any Purchased Company, the amount set forth opposite such Purchased Company's name on Exhibit A, or as otherwise mutually agreed between the Parties pursuant to Section 2.07.

"**Project Company**" means each Purchased Company that directly owns a Project, as identified on Exhibit A.

"**Project Senior Financing**" means, with respect to any Project, the applicable senior project debt financing, tax equity financing, back-leverage, letters of credit, surety or other senior financing arrangements (including the related documentation) to which such Project or its Purchased Company is subject.

"**Property Taxes**" means real, personal and intangible ad valorem property Taxes that are imposed on a periodic basis.

"**PUCT**" means the Public Utility Commission of Texas and any successor thereto.

"**PUHCA**" means the Public Utility Holding Company Act of 2005 and FERC's implementing regulations promulgated thereunder.

"**PURA**" means the Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001 – 43.152 and the regulations in 16 Tex. Admin. Code Chapter 25 of the PUCT.

"**Purchased Entities**" means, collectively, the Purchased Companies and their respective Subsidiaries (including, for the avoidance of doubt, interests in any Partnerships).

"**PURPA**" means the Public Utility Regulatory Policies Act of 1978 and FERC's implementing regulations promulgated thereunder.

"**QF**" means a "qualifying small power production facility," as defined in Section 3(17)(C) of the FPA and FERC's implementing regulations at 18 C.F.R. §§ 292.203(a) and 292.204, that also is a "qualifying facility" pursuant to Sections 201 and 210 of PURPA, as defined in 18 C.F.R. § 292.101(b)(1).

"**REC Operations**" means the registration, creation, reporting, monitoring, managing, transacting, transferring, monetizing, selling or contracting for the sale of, and retiring Renewable Energy Incentives, Renewable Energy Certificates, and Reporting Rights.

"**REC Operations Assets**" means (a) all Renewable Energy Incentives, (b) all Reporting Rights related to Renewable Energy Incentives, (c) all Renewable Energy Certificates, including all Renewable Energy Certificates created after the date hereof related to any electrical energy generation and any period of time before or after the date hereof, (d) all of the Registry Accounts, including all related login credentials, (e) all Third-Party REC Servicer Accounts, including all related login credentials, (f) all books and records of the Sellers, with respect to the Purchased Assets, in any form, related to the Reporting Rights, Renewable Energy Incentives, Registry Accounts, Third-Party REC Servicer Accounts, (g) all net proceeds received from any sale of Renewable Energy Certificates owned by Sellers, with respect to the Purchased Entities that occurs after the date hereof, (h) all Permits related to the registration, creation, reporting, monitoring, transacting, transferring, and retiring of Renewable Energy Certificates, and (i) all Purchased Contracts that support, facilitate, or involve the management, transfer, acquisition, or sale of Renewable Energy Incentives.

"**Registered Intellectual Property**" means all (a) Patents and Patent applications, (b) registered Trademarks, and applications therefor, (c) registered Copyrights, and (d) internet domain names, in each case, that are owned by the Purchased Entities or included in the Purchased Assets.

"**Registry Account**" means an account with a regional or national registry operator to manage and track Renewable Energy Certificate generation, issuance, ownership, transfer, and retirement.

"**Receivables**" means all receivables (including accounts receivable, loans receivable and advances) arising from or related to the Business or Purchased Assets.

"**Release**" means any releasing, spilling, emitting, leaking, pumping, injecting, depositing, disposing, leaching, escaping, seeping, migrating, or discharging into, through, or upon the indoor or outdoor environment.

"**Remedies Event**" means, with respect to any Project, (a) any acceleration of obligations under the applicable Project Senior Financing or (b) any other exercise of remedies by any lender or investor under the applicable Project Senior Financing arising from or in respect of any breach, default or event of default thereunder; provided that, in determining the extent to which a Remedies Event has occurred, there shall be taken into account (x) the effect of any applicable forbearance,

waiver or similar arrangement, and (y) the effect of any remedies that are limited to triggering cash sweeps or rapid amortization.

"**Renewable Energy Certificate**" means any credit, certificate, renewable energy certificate, allowance or similar right that is related to the Environmental Attributes of any Project, whether arising pursuant to law, regulation, certification, markets, trading, off set, private transaction, renewable portfolio standards, voluntary programs or otherwise, including electronic evidence of generation that is reported to a registry for the purpose of allowing the creation, transfer, and retirement of such credit, certificate, or allowance to support claims of renewable energy generation.

"**Renewable Energy Incentive**" means any federal, state, or local grants, rebates, subsidized financing, incentives, or any other subsidy relating to the Environmental Attributes of a Project, including, without limitation, rights to receive solar Renewable Energy Certificates or similar benefits, whether such rights exist as of the date hereof or arise in the future as a result of the operation of the Projects. For the avoidance of doubt, this includes any rights or entitlements to Renewable Energy Incentives that may be created, awarded, or allocated by applicable governmental programs or authorities, regardless of whether such incentives are in existence at the time of this Agreement or are subsequently established, and includes all contractual rights to such incentives as and when they become effective; provided, however, Renewable Energy Incentive shall not include ITCs.

"**Reporting Right**" means the right to report and register the exclusive ownership of Renewable Energy Incentives relating to the renewable energy property of a Project, in compliance with all Laws, and to a federal or state agency or any other party, and includes without limitation those Reporting Rights accruing under any present or future applicable Law or emissions trading policy program.

"**RTO/ISO**" means, with respect to any Project, the regional transmission organization or independent service provider applicable to such Project.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Order**" means an Order by the Bankruptcy Court, in form and substance acceptable to Buyer and Sellers, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Encumbrances (other than Permitted Encumbrances), (c) authorizing the assumption by, and assignment to, Buyer of the Purchased Contracts and the Assumed Liabilities pursuant to Section 365 of the Bankruptcy Code, (d) authorizing the other transactions contemplated by this Agreement, (e) approving Buyer's credit bid pursuant to Section 363(k) of the Bankruptcy Code with respect to the DIP Obligations and the Prepetition Obligations; and (f) directing and authorizing delivery, at or prior to Closing, of lien release deliverables, including executed UCC-3 termination statements, mortgage releases/satisfactions, control agreement terminations, intellectual property security interest releases, and any other instruments necessary to evidence discharge of liens on the Purchased Assets other than Permitted Encumbrances.

"**Sanctioned Jurisdiction**" means a country or territory which is, or during the past five (5) years has been, the subject or target of comprehensive U.S. sanctions.

"**Sanctioned Person**" means a Person (a) identified on the United States' Specially Designated Nationals and Blocked Persons List, the United States' Denied Persons List, Entity List or Debarred Parties List, the United Nations Security Council Sanctions List, the European Union's List of Persons, Groups and Entities Subject to Financial Sanctions, the United Kingdom's Consolidated List of Financial Sanctions Targets, or any other similar list maintained by any Sanctions Authority having jurisdiction over the parties to this Agreement; (b) located, organized or resident in a Sanctioned Jurisdiction or (c) owned, fifty percent (50%) or more, individually or in the aggregate by, controlled by, or acting on behalf of a Person described in clause (a) or (b) above.

"**Sanctions Authority**" means the United States government, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the Bureau of Industry and Security of the U.S. Department of Commerce, the United Nations Security Council, the European Union, any Member State of the European Union and the competent national authorities thereof, the United Kingdom, the Office of Financial Sanctions Implementation of His Majesty's Treasury, the Export Control Joint Unit of the UK Department of International Trade, and any other relevant governmental, intergovernmental or supranational body, agency or authority with jurisdiction over the parties to this Agreement.

"**Seller Plan**" means each "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA and all other material employee benefit and compensation plans, in each case, under which any Service Provider participates, that is sponsored, maintained, administered or contributed by any Seller or any Subsidiary of a Seller or in which any Purchased Entity has any current or potential Liability (including on account of any ERISA Affiliates), other than (a) any Multiemployer Plans and (b) any plans, policies or arrangements maintained or sponsored by, or to which contributions are mandated by, a Governmental Authority.

"**Seller Transaction Expenses**" means the fees, costs and expenses (including any advisors, experts, consultants and legal, accounting and financial advisory expenses) incurred or owed by any Seller in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement or any Transaction Document or the sale process relating to the potential sale of the Business and any other similar transactions being conducted simultaneously with the transactions contemplated by this Agreement with respect to other related businesses and sales of assets by the Sellers and their Affiliates including with respect to the Excluded Equity Interests.

"**Service Provider**" means any current or former (a) Employee or (b) consultant or contractor engaged directly by any Purchased Entity.

"**Straddle Period**" means any Tax period beginning on or before and ending after the Closing Date.

"**Subsidiary**" means, with respect to any Person, another Person in which such Person beneficially owns, directly or indirectly, capital stock or other equity securities representing more than fifty percent (50%) of the outstanding voting stock or other equity interests.

"**Tariff Claims**" means any claims or liabilities in respect of or directly or indirectly arising from, or relating to (a) duties, tariffs or trade remedies, including in respect of any anti-dumping or countervailing duty cash deposits, tariffs, duties, or other trade remedies imposed, assessed, or collectible by the U.S. Department of Commerce or the U.S. Customs and Border Protection as a result of, arising out of, or relating to the circumvention proceedings associated with the petition filed by Auxin Solar Inc. concerning crystalline silicon photovoltaic cells and modules, and (b) any claims by any person for indemnity or reimbursement of the foregoing.

"**Tax**" means all federal, state, local or non-U.S. income, gross receipts, franchise, estimated, ad valorem, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, fees, levies, severance real property, special assessment, personal property, capital, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, import, export, intangibles, or any other taxes or similar assessments in the nature of a tax, and including any interest, penalties or additions to tax or additional amounts in respect of the foregoing, and including any express or implied obligations to indemnify or otherwise assume or succeed to the liability of any other Person for such amounts.

"**Tax Equity Documents**" means, with respect to each Project Company, (a) the organizational documents of such Project Company, and (b) any other documents reflecting an agreement between a Subsidiary of a Seller and a party that is not a Subsidiary of a Seller relating to an investment in Project Companies.

"**Tax Return**" means any report, return, or similar document (including declarations, claims for refunds, information returns, schedules, any related or supporting information or amendments thereto) filed or required to be filed with respect to Taxes with any Governmental Authority or other authority.

"**Tax Sharing Agreements**" means all Tax sharing, allocation, indemnification or similar agreements that provide for the allocation, apportionment, sharing or assignment of any Tax Liability (other than, for the avoidance of doubt, this Agreement, any other Transaction Document, any Tax Equity Document, or any commercial agreement or arrangement not primarily related to Taxes).

"**Third-Party REC Servicer Account**" means any account with a third party vendor pursuant to which Sellers or the Purchased Entities, or contractors on behalf of the Sellers or the Purchased Entities, manage the registration, transfer or tracking of Renewable Energy Certificates, or pursuant to which any of Sellers or the Purchased Entities, or contractors on behalf of the Sellers or the Purchased Entities, obtain application programming interface access to any Registry Account on behalf of the Purchased Assets.

"**Trademarks**" means, collectively, all trademarks and service marks, and all registrations, renewals and applications therefor, and all brand names, product names, trade dress, logos, and other similar designations of source or origin.

"**Trade Secrets**" means, collectively, all trade secrets, know-how, specifications, product designs, blueprints, surveys, customer/vendor lists, sales plans, formulae, and other proprietary confidential information.

"**Transaction Document**" means this Agreement, the Assignment and Assumption Agreements, the TSA, if applicable, and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"**Transfer Taxes**" means any sales, use, purchase, direct or indirect real property, ad valorem, value added, filing, permit or authorization, leasing, license, lease, severance, fixed asset, documentary, stamp, property transfer or gains, registration, intangible, conveyance, recording or similar Tax (including, for certainty, harmonized sales Tax and land transfer Tax) and any recording costs or fees, however styled or designated, or other similar amounts in the nature of transfer Taxes payable in connection with the sale or transfer of the Purchased Assets, Purchased Entities or the Assumed Liabilities contemplated by this Agreement or any other Transaction Document.

"**Treasury Regulations**" means the United States income tax regulations, including temporary regulations and, to the extent taxpayers are permitted to rely on them, proposed regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 and all similar state and local Laws.

"**Wind-Down**" means the orderly wind down of Sellers in accordance with applicable Law.

(b)      Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Applicable Seller Prepared Returns | Section 7.06(j) |
| Allocation Schedule | Section 2.08 |
| Assignment and Assumption Agreements | Section 2.09(a)(i) |
| Assumed Liabilities | Section 2.02 |
| Auxin Circumvention Tariffs | Section 3.09(b) |
| Available Contracts | Section 2.05(a) |
| Balance Sheet Date | Section 3.05(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 12.05 |
| Business Insurance Policies | Section 3.19 |

| | |
|---|---|
| Buyer | Preamble |
| Buyer Designee | Section 2.01 |
| Buyer Released Parties | Section 7.14(a) |
| Buyer Releasor | Section 7.14(b) |
| Chapter 11 Cases | Recitals |
| Close of the Auction | Section 9.05 |
| Closing | Section 2.09 |
| Completion of the Transition | Section 7.16 |
| Continuing Support Obligations | Section 7.08 |
| Contract & Cure Update Schedule | Section 2.05(a) |
| Contract Designation Date | Section 2.05(a) |
| Credit Bid | Section 2.06 |
| Debtors | Recitals |
| Disputed Amount Contract | Section 2.05(f) |
| Employee Census | Section 7.05(a) |
| End Date | Section 11.01(b) |
| Excluded Assets | Section 2.03 |
| Excluded Cash | Section 2.03(a) |
| Excluded Contracts | Section 2.03(d) |
| Excluded Equity Interests | Section 2.03(f) |
| Excluded Liabilities | Section 2.04 |
| Excluded Records | Section 2.03(c) |
| Expense Reimbursement Amount | Section 11.02(b) |
| Financial Statements | Section 3.05(a) |
| First Renewal Period | Section 11.01(b) |
| Goods | Section 3.09(b) |
| Intended Tax Treatment | Section 7.06(m) |
| Interim Financial Statements | Section 3.05(a) |
| Known Claims | Section 6.02 |
| Latest Balance Sheet Date | Section 3.05(a) |
| Lien Release Deliverables | Section 2.09(a)(vi) |
| Non-Recourse Parties | Section 12.13 |
| Offered Employee | Section 7.05(a) |
| Original Contract & Cure Schedule | Section 2.05(a) |
| Parent | Recitals |
| Party or Parties | Preamble |
| Permit Approvals | Section 7.03(b) |
| Personal Information | Section 3.21(a) |
| Petition Date | Recitals |
| PGR | Section 3.05(a) |
| Pine Gate | Preamble |
| Privacy Laws | Section 3.21(a) |

| | |
|---|---|
| Privacy Requirements | Section 3.21(a) |
| Purchase Price | Section 2.06 |
| Purchased Assets | Section 2.01 |
| Purchased Companies | Section 2.01(a) |
| Purchased Company | Section 2.01(a) |
| Purchased Contract | Section 2.01(b) |
| Purchased Equity Interests | Section 2.01(a) |
| Registered Intellectual Property | Section 3.11(a) |
| Released Parties | Section 7.14(b) |
| Releasors | Section 7.14(b) |
| Renewal Periods | Section 11.01(b) |
| Representatives | Section 7.14(a) |
| Required Information | Section 5.03(c) |
| Restructuring | Section 7.17 |
| Second Renewal Period | Section 11.01(b) |
| Section 1542 | Section 7.14(c) |
| Seller or Sellers | Preamble |
| Seller Released Parties | Section 7.14(b) |
| Seller Releasor | Section 7.14(a) |
| Sellers' Representative | Section 8.01 |
| Services Related Sale | Section 7.16 |
| Specified Development Projects | Section 7.17 |
| Specified Development Projects | Section 7.17 |
| Subsequent Transferee | Section 7.16 |
| Support Obligations | Section 3.23 |
| Surviving Post-Closing Covenants | Section 10.01 |
| Transfer Consent | Section 2.05(c) |
| Transferred Employee | Section 7.05(a) |
| Transfer Offer | Section 7.05(a) |
| Transition | Section 7.16 |
| TSA | Section 2.09(a)(iii) |

SECTION 1.02   *Construction*.  In construing this Agreement, including the Exhibits and Schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed unless otherwise specified; (b) except as otherwise set forth herein, references to Articles, Sections, Disclosure Schedules, Schedules and Exhibits refer to the Articles, Sections, Disclosure Schedules, Schedules and Exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's successors and assigns; (d) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions;

(e) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any Schedule; (f) the word "dollar" and the symbol "$" refer to the lawful currency of the United States of America; (g) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa; (h) the words "to the extent" shall mean "the degree by which" and not "if"; (i) the word "will" will be construed to have the same meaning and effect as the word "shall," and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive; (j) where a word is defined herein, references to the singular will include references to the plural and vice versa; (k) all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless Business Days are expressly specified; (l) any reference to any Contract will be a reference to such Contract, as amended, modified, supplemented or waived; (m) any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance; (n) references to "written" or "in writing" include in electronic form; (o) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (p) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; and (q) the word "or" shall not be exclusive.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01        *Purchase and Sale*. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date:

(a)        Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer or one or more affiliates of Buyer or an entity designated by Buyer (a "**Buyer Designee**"), and Buyer shall, and/or shall cause its Buyer Designees (if any) to, purchase, acquire and accept from Sellers, free and clear of all Liabilities, Claims and Encumbrances (other than Permitted Encumbrances), all of Sellers' right, title and interest in and to, subject to Section 2.05, the following properties, rights, interests and other Assets of Sellers (for the avoidance of doubt, the transfer of the Purchased Equity Interests held by any Seller to Buyer or a Buyer Designee will constitute the transfer of any Assets owned by such Purchased Company (and by any Subsidiary of such Purchased Company) and such Assets shall not be separately transferred other than as required by applicable Law), other than the Excluded Assets, which, notwithstanding the foregoing provisions of this Section 2.01 to the contrary, will remain, as applicable, the Assets, properties, interests and rights of Sellers and their Affiliates:

(i)      all of Sellers' interests (the "**Purchased Equity Interests**") in the Persons listed as Purchased Companies in <u>Exhibit A</u> hereto (each, a "**Purchased Company**," and collectively, the "**Purchased Companies**")

(ii)      the Brookfield Excluded Claims;

(iii)      all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Contracts;

(iv)      all preference claims, Avoidance Actions, and other actions arising under the Bankruptcy Code or other applicable Law, and all other rights against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, or licensors of any Seller and (ii) Buyer, Buyer's Affiliates, Sellers or Sellers' Affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or other Representatives), including those arising under or related to any Purchased Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise;

(v)      all Receivables related to the Purchased Contracts;

(vi)      all (A) Cash and Cash Equivalents held by such Seller and their respective Subsidiaries other than any Excluded Cash; (B) all bank accounts; and (C) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise) or prepaid or deferred charges and expenses (including all lease and rental payments) that have been prepaid by such Seller or any of its respective Subsidiaries, other than Excluded Cash.

(b)      Pine Gate shall or shall cause the Intermediate Holding Companies to sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer or one or more Buyer Designees, and Buyer shall, and shall cause its Buyer Designees (if any), in each case subject to the DIP Intercreditor Agreement to, purchase, acquire and accept from Pine Gate, free and clear of all Liabilities, Claims and Encumbrances (other than Permitted Encumbrances), all of Pine Gate's or such Intermediate Holding Company's right, title and interest in any Contract (i) to which Pine Gate or such Intermediate Holding Company is a party, (ii) which, unless sold, conveyed and delivered to Seller hereunder, would impair Buyer's or any Purchased Entity's ability to conduct the Business from and after the Closing, and (iii) which Buyer has identified to Sellers' Representative, by written notice, no later than the Bid Deadline (each such Contract, a "**Purchased Contract**" and, together with the items described in clauses (a)(i) through (a)(vi), collectively, the "**Purchased Assets**").

SECTION 2.02        *Assumed Liabilities*.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, Buyer agrees, effective at the time of the Closing, to assume without duplication and only to the extent not paid on or prior to the Closing, (i) all Liabilities of each Seller relating to or arising out of the Purchased Contracts, solely following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing, and only such Liabilities, of Sellers and (ii) the Brookfield Assumed Claims (the "**Assumed Liabilities**").

SECTION 2.03        *Excluded Assets*.  Notwithstanding any provision in this Agreement to the contrary, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and Sellers will retain all right, title and interest to, in and under the following Assets, properties, interests and rights of Sellers (whether owned, licensed, leased or otherwise) (the "**Excluded Assets**"):

(a)        all (i) Cash and Cash Equivalents held in escrow for the benefit of professional service providers to the bankruptcy estates of the Debtors and (ii) any retainers or similar amounts paid to advisors or other professional service providers (the "**Excluded Cash**");

(b)        the original organizational documents, corporate records and minute books, in each case to the extent solely pertaining to the organization, existence or capitalization of Sellers, provided that Sellers shall provide true, correct and complete copies of the aforementioned documents to the Buyer;

(c)        any (i) records, documents or other information solely to the extent relating to any current or former Employee who is not or does not become a Transferred Employee and any materials to the extent containing information about any Employee, disclosure of which would violate applicable Law, and (ii) all attorney-client privilege and attorney work-product protection of Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of Sellers or their Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the other Transaction Documents (such documents described in clauses (i) and (ii), collectively, the "**Excluded Records**");

(d)        subject to Section 2.05, any Contract that is not a Purchased Contract or a Contract acquired by virtue of Section 2.01(a) (collectively, the "**Excluded Contracts**");

(e)        all rights, avoidance, recovery, subordination claims or causes of action (i) that accrue or will accrue to any Seller or any of their Subsidiaries pursuant to this Agreement or any of the other Transaction Documents and (ii) of any Seller under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or under applicable Law (including, for the avoidance of doubt, any such claims settled during the Chapter 11 Cases), and the proceeds of such claims and causes of action;

(f)        other than the Purchased Equity Interests or the equity interests of any Purchased Entity, all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller (the "**Excluded Equity Interests**");

(g)        any Seller Plans, together with all funding arrangements related thereto (including all Assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(h)        all proceeds received from the sale or liquidation of any other Excluded Assets;

(i)        any deposits, escrows, surety bonds or other financial assurances and any Cash and Cash Equivalents securing any surety bonds or financial assurances, in each case, to the extent solely relating to the Excluded Assets or the Excluded Liabilities;

(j)        (i) all bids and expressions of interest received from third parties with respect to the acquisition of any Excluded Entity's businesses or Assets (including any bids and expressions of interest unrelated to the sale process undertaken by the Sellers in connection with this Agreement), (ii) all privileged materials, documents and records of any Excluded Entity, including any privileged materials, documents and records that are in the possession of any Purchased Entity, and (iii) any other files or records to the extent relating exclusively to any Excluded Assets or Excluded Liabilities;

(k)        all current and prior insurance policies of any Excluded Entity, including all director and officer insurance policies, and, subject to Section 6.02, all rights and benefits of any nature of any Excluded Entity with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and the sponsorship of, and all rights, interests and Assets associated with, any benefit or compensation plan, program, policy, contract, or arrangement of any Excluded Entity and the Seller Plans;

(l)        all Tax refunds, overpayments, credits or other attributes with respect to Taxes that are Excluded Liabilities of Sellers other than (i) any such Tax refunds, overpayments, credits or other attributes that transfer by operation of Law, and (ii) any such Tax refunds, overpayments, credits or other attributes that are Purchased Assets; and

(m)        the other property and Assets set forth on Section 2.03(m) of the Disclosure Schedules.

SECTION 2.04        *Excluded Liabilities*.    Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, or undertake any contractual obligation hereunder to pay, perform or discharge, or be liable hereunder for, any Liabilities of any Seller, of whatever nature, whether presently in existence or arising hereafter, whether or not related to the Business or the Purchased Assets, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission or circumstances taking place prior to the Closing, other than the Assumed Liabilities, and Sellers shall retain and shall not contractually assign or otherwise transfer to Buyer, any other Liabilities of Sellers (other than the Assumed Liabilities), including the following (collectively, the "**Excluded Liabilities**"):

(a)        all Liabilities arising with respect to (i) Taxes of the Sellers or their Affiliates, (ii) Taxes of or relating to the Excluded Assets, (iii) Taxes of or relating to the Purchased Assets or Assumed Liabilities for a Pre-Closing Tax Period (as determined in accordance with

Section 7.06(a)), and (iv) Transfer Taxes allocable to the Sellers pursuant to Section 7.06(f) (provided that, for the avoidance of doubt and notwithstanding anything else to the contrary, in no event will Property Taxes allocable to any Post-Closing Tax Period (as determined in accordance with Section 7.06(a)) constitute Excluded Liabilities);

(b)     all Liabilities of the Sellers or any of their Subsidiaries incurred in connection with the recapture of any ITCs pursuant to the transactions contemplated by this Agreement or any transaction that occurred prior to the Closing Date;

(c)     all Liabilities arising under any Excluded Contract;

(d)     all Cure Costs to the extent related to or arising from the Purchased Contracts;

(e)     except to the extent of any Liabilities expressly assumed pursuant to Section 2.02, all Liabilities of Sellers or of any of their predecessors for Indebtedness, including any intercompany Indebtedness among Sellers, including any mitigation reimbursement or any obligation related to tariffs;

(f)     except as expressly allocated to Buyer under Section 7.05, all Liabilities of the Sellers or their Affiliates arising under or in connection with any Seller Plan;

(g)     except as expressly allocated to Buyer under Section 7.05, all Liabilities of the Sellers or their Affiliates arising out of or relating to the employment or termination of employment of (i) any Transferred Employee, to the extent arising at any time prior to the Closing, (ii) any individual who is not a Transferred Employee, and (iii) any former Service Provider;

(h)     all Liabilities arising in connection with any violation of any applicable Law (by Sellers) relating to the period prior to the Closing;

(i)     all Liabilities arising under, in connection with, or pursuant to any Environmental Laws attributable to any facts or circumstances first occurring or existing on or prior to the Closing, including such Liabilities (x) that are dischargeable pursuant to Section 363 of the Bankruptcy Code, (y) that are otherwise dischargeable pursuant to Section 1141 of the Bankruptcy Code, and (z) from which the Purchased Assets are otherwise released as of the Closing pursuant to an Order of the Bankruptcy Court;

(j)     all Liabilities arising out of, relating to or with respect to any Order or Proceeding or threatened Proceeding involving, against or affecting any Purchased Asset, the Business, any Seller, or any Assets or properties of any Seller (i) commenced, filed, initiated or threatened in writing as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing;

(k)     all Liabilities in respect of warranties associated with the Business or Purchased Assets or otherwise (whether known or unknown, and whether recorded or reported), relating to facts, events or circumstances arising or occurring before the Closing (including with respect to products manufactured and sold by the Sellers prior to the Closing);

(l)      all Liabilities arising out of any Permit held by a Seller or any Purchased Entity or relating to the Business, whether or not transferred to Buyer hereunder, which Liability arose prior to the Closing or relates to an event, act or omission that occurred prior to the Closing;

(m)      any regulatory fees, including any late fees, penalties and interest arising from the foregoing which have not been timely or fully paid related to the Business or the ownership, operation or use of the Purchased Assets for any period prior to Closing; provided, however, that this clause (k) shall not include any filing fees that Buyer is expressly obligated to bear pursuant to Section 7.03(c);

(n)      any Liabilities arising out of any investigation, inquiry, audit, enforcement action, or similar proceeding by a Government Authority primarily related to the operation of the Business, including in connection with the operation of the Purchased Assets, for any period prior to Closing;

(o)      all Seller Transaction Expenses;

(p)      the Brookfield Excluded Claims;

(q)      all Liabilities relating to an Excluded Asset, whether arising prior to or after the Closing Date; and

(r)      all other Liabilities of Sellers that are not expressly included as Assumed Liabilities.

SECTION 2.05      *Assignment of Contracts and Rights.*

(a)      Consistent with the requirements of the Bidding Procedures Order, the Debtors shall file a Notice of Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to which the Debtors shall annex a list of each Purchased Contract of Pine Gate identified by the name or appropriate description, counterparty to each Purchased Contract and the address of such counterparty for notice purposes, Sellers' good faith estimate of the amount of Cure Costs applicable to each such Purchased Contract as determined by Pine Gate based on its books and records or as otherwise determined by the Bankruptcy Court, and summarizing the procedures for objecting thereto (the "**Original Contract & Cure Schedule**") and shall serve notice on the counterparties to each such Contract in accordance with the Bidding Procedures Order.  From the date hereof until the date which is five (5) days prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Purchased Contract), or as reasonably requested by Buyer, Sellers shall provide Buyer with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**").  Sellers shall verify all Cure Costs for each Purchased Contract and shall, in consultation with and subject to the consent of Buyer, establish proper Cure Costs for each Purchased Contract prior to the Closing Date.

(b)      Pine Gate shall use commercially reasonable efforts to take all actions required to assign the Purchased Contracts to Buyer, including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Purchased Contracts and to obtain an

Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Buyer satisfies all requirements of Section 365 of the Bankruptcy Code.

(c)     Except as to Purchased Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to contribute, transfer, assign or deliver any Purchased Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted contribution, transfer, assignment, or delivery thereof without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would conflict with, violate, constitute a breach or default under any related Contract or violate any applicable Law.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, each Seller and Buyer will reasonably cooperate in a mutually agreeable arrangement (at Buyer's cost and expense) under which Buyer would obtain the claims, rights or benefits and assume the obligations thereunder in accordance with this Agreement without any further additional consideration; provided, however, that subject to Buyer receiving the claims, rights or benefits of, or under, the applicable Purchased Asset under any such arrangement, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform, all payment and other obligations under such Purchased Asset (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Purchased Asset had been assigned or transferred at the Closing.  For the avoidance of doubt, the failure to obtain any Transfer Consent with respect to any Purchased Asset shall not delay the Closing; provided that, from and after the Closing, each Seller and Buyer shall use commercially reasonable efforts to obtain such Transfer Consent with respect to such Purchased Asset. Notwithstanding the foregoing, Sellers' obligations under this Section 2.05(c) shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.  Sellers' obligations under this Section 2.05(c) shall terminate upon the Cut-Off Date; provided that, if the Transfer Consent in respect of a Purchased Asset has not been obtained by the Cut-Off Date, then following written notice by Buyer prior to the Cut-Off Date, and with the prior written consent of Sellers, Sellers shall use their commercially reasonable efforts to ensure that Buyer shall (at Buyer's cost and expense) continue to have the benefit of this Section 2.05(c) following the Cut-Off Date; provided that the obligations of each Seller under this Section 2.05(c) shall expire upon the completion of the Wind-Down of such Seller.  Upon obtaining any such Transfer Consent with respect to the applicable Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer or a Buyer Designee in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code without any further additional consideration.  Buyer may request certain modifications and amendments to any Contract as a condition to such Contract being designated as a Purchased Contract, and Sellers shall use their commercially reasonable efforts to obtain such modifications or amendments.

(d)     Buyer shall have the right to notify Sellers in writing of any Contract that would have constituted a Purchased Contract pursuant to Section 2.01(b) had it been identified prior to the Bid Deadline, to which PGR or any Intermediate Holding Company is a party that it wishes to add as a Purchased Asset up to the time the Bankruptcy Court enters the Confirmation Order.  Any such previously considered Excluded Asset that Buyer wishes to acquire and assume as a Purchased Asset shall be automatically deemed added as a Purchased Asset hereunder (and added

to the applicable Disclosure Schedules related to Purchased Assets) and, notwithstanding anything to the contrary herein, automatically deemed removed as an Excluded Asset hereunder (and removed from the applicable Disclosure Schedules related to Excluded Assets), and sold and assigned by Sellers and/or the applicable Excluded Entities to Buyer and accepted and assumed by Buyer, in each case, without any adjustment to the Purchase Price. Any action of Buyer permitted under this Section 2.05(d) shall be made in Buyer's sole and absolute discretion (subject to the terms hereof).

(e)     At Closing, pursuant to the Sale Order and the Assignment and Assumption Agreements, Pine Gate shall assume and assign or cause to be assigned to Buyer (the consideration for which is included in the Purchase Price) and Buyer shall accept and assume each of the Purchased Contracts that is capable of being assigned pursuant to Section 363 and 365 of the Bankruptcy Code.

(f)     If any Purchased Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different from the amount of Cure Costs proposed by Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "**Disputed Amount Contract**"), then Sellers shall provide Buyer, not less than three (3) days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty; provided that Sellers shall agree to any Cure Costs for any Contract irrevocably designated by Buyer in writing as a Purchased Contract if instructed to do so by Buyer. If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract within five (5) Business Days following the Closing Date, solely upon Buyer's written request, Sellers shall seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court. Upon final determination of such Cure Costs, Buyer may elect to re-designate such Purchased Contract as an Excluded Contract. If such Purchased Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Purchased Contract, and (y) Seller shall pay the Cure Costs with respect to such Purchased Contract either (i) concurrently with Sellers' assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Purchased Contract, and execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Purchased Contract. Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, Sellers shall, to the extent Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer such Contract.

SECTION 2.06        *Purchase Price*.  On the terms and subject to the conditions contained herein including any adjustment pursuant to Section 2.07, the aggregate consideration for the Purchased Assets (the "**Purchase Price**") to be paid by Buyer for the purchase of the Purchased Assets shall be (a) a credit bid pursuant to Section 363(k) of the Bankruptcy Code for (i) all DIP Obligations, including any and all costs, fees, expenses, interest, premiums and other amounts under the DIP Credit Agreement and (ii) all Prepetition Obligations under the Prepetition Credit Agreement (collectively, the "**Credit Bid**") and (b) the assumption of the Assumed Liabilities. At the Closing, Buyer shall retain all Cash and Cash Equivalents held at the Closing by any Seller and Purchased Entity. For the avoidance of doubt, the Purchase Price does not include any of the Sellers' obligations under the DIP Credit Agreement to pay or reimburse the professional fees or expenses of the Lenders (as defined in the DIP Credit Agreement) or the fees and expenses of the Agents. The Sellers shall pay any such outstanding fees or expenses in cash immediately prior to the Closing in accordance with the DIP Credit Agreement. Buyer shall satisfy the Credit Bid at Closing by discharging Sellers, and Sellers shall be deemed to be discharged, from the obligations under the Prepetition Credit Agreement and the DIP Credit Agreement in an aggregate amount equal to the Credit Bid.

SECTION 2.07        *Purchase Price Adjustment*. If, at any time on or prior to the Closing, a Remedies Event occurs with respect to any Project, then the Purchase Price shall be reduced by the applicable Project Adjustment Amount for each such affected Project on a dollar-for-dollar basis. Sellers shall promptly, and in any event within two (2) Business Days, notify Buyer in writing upon becoming aware of any event, notice or circumstance that could reasonably be expected to constitute or result in a Remedies Event for any Purchased Company's Project and shall deliver copies of all relevant notices, demands and correspondence with the applicable Project Senior Financing counterparties. The applicable Project Adjustment Amount for each Project shall be agreed as between the Sellers and Buyer prior to November 20, 2025.

SECTION 2.08        *Purchase Price Allocation*.  The Parties agree to allocate for applicable Tax purposes (and, as applicable, to cause their Affiliates to allocate for Tax purposes) the Purchase Price and any other amounts, in each case, to the extent properly treated as consideration for applicable Tax purposes by the Parties among the Purchased Assets, including any assets attributable to interests in any Partnership or disregarded entity, in accordance with the following procedures and, to the extent applicable, in accordance with the applicable provisions of the Code and the Treasury Regulations promulgated thereunder.  No later than sixty (60) days after the Closing Date, Buyer shall deliver to Sellers' Representative a schedule allocating the amounts treated as consideration for U.S. federal income tax purposes among the Purchased Assets and any other Assets acquired or deemed acquired in connection with the transactions contemplated hereby for applicable Tax purposes (the "**Allocation Schedule**").  The Allocation Schedule shall be deemed final unless Sellers' Representative notifies Buyer in writing that Sellers' Representative objects to one or more items reflected in the Allocation Schedule within fifteen (15) Business Days after delivery of the Allocation Schedule to Sellers' Representative.  In the event of any such objection, Buyer and Sellers' Representative shall negotiate in good faith to resolve such dispute and, if any such dispute cannot be resolved within fifteen (15) Business Days from delivery of the notice of disagreement by Sellers' Representative to Buyer, such dispute shall be submitted to a mutually agreed nationally recognized accounting firm.  The Parties shall file all income Tax Returns reporting the transactions contemplated hereby, including Form 8594 (Asset Acquisition Statement under Code Section 1060), in a manner consistent with the Allocation

Schedule and shall not take any position inconsistent therewith upon examination of any income Tax Return, in any income Tax refund claim, in any Action related to income Taxes, or otherwise, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of applicable state, local or non-U.S. Law).

SECTION 2.09     *Closing*.  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place via the exchange of documents by mail or electronic delivery services as soon as possible following entry of the Sale Order, but in no event later than three (3) Business Days after satisfaction of the conditions set forth in Article 9 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other time or place as Buyer and Sellers' Representative may agree in writing (email being sufficient).  At or prior to the Closing:

(a)     Sellers' Representative shall deliver, or cause to be delivered, to Buyer, or one or more Buyer Designees:

(i)     one or more assignment and assumption agreements, including Intellectual Property assignment agreements, each in a form and substance reasonably acceptable to Buyer (the "**Assignment and Assumption Agreements**"), duly executed by each applicable Seller;

(ii)     a letter of direction directing the administrative agent of the DIP Facility to release to Buyer (or a Buyer Designee) original stock, unit or interest certificates evidencing the equity interests of any Purchased Entity (including the Purchased Equity Interests) (if any) duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, with any required stock transfer tax stamps affixed thereto;

(iii)     a TSA; provided, that the TSA shall not be required to be delivered to the extent (A) the Completion of the Transition has occurred or (B) the Buyer has waived the condition set forth in Section 9.02(k);

(iv)     instruments of transfer of each Registry Account and Third-Party REC Servicer Account, together with login credentials in secure electronic form;

(v)     instruments of appointment that designate Buyer (or any other parties designated by Buyer) as the sole entities to provide instructions to all applicable Renewable Energy Certificate registries (or third party vendors managing an applicable Renewable Energy Certificate registry), in each case with respect to any of the Purchased Entities or Purchased Assets, on a form provided by such registry or third party vendor, or otherwise in customary form, together with durable limited powers of attorney as required by the applicable Renewable Energy Certificate registries (or third party vendors managing an applicable Renewable Energy Certificate registry);

(vi)     the lien release deliverables, including executed UCC-3 termination statements, mortgage releases/satisfactions, control agreement terminations, intellectual

property security interest releases, and any other instruments necessary to evidence discharge of liens on the Purchased Assets other than Permitted Encumbrances (collectively, the "**Lien Release Deliverables**");

(vii)     a payoff/release letter from each applicable secured party or Agent (as defined in the DIP Credit Agreement) confirming the credit bid treatment and authorizing the filing of the applicable Lien Release Deliverables;

(viii)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of Sellers' Representative certifying that the conditions set forth in Section 9.02(a) and Section 9.02(b) have been satisfied; and

(ix)     each third-party consent, waiver, authorization or approval set forth on Section 2.09(a)(ix) of the Disclosure Schedules, each in form and substance reasonably acceptable to Buyer.

(b)     Buyer shall deliver, or cause to be delivered, to Sellers' Representative or to such other Person(s) as may be entitled to payment therefrom (for the satisfaction and discharge of the DIP Obligations), as applicable:

(i)      the Purchase Price;

(ii)     the Assignment and Assumption Agreements, duly executed by Buyer or the applicable Buyer Designee;

(iii)    the TSA, duly executed by Buyer; provided, that the TSA shall not be required to be delivered to the extent (A) the Completion of the Transition has occurred or (B) the Buyer has waived the condition set forth in Section 9.02(k);

(iv)     a certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Section 9.03(a) and Section 9.03(b) have been satisfied; and

(v)      a letter of direction (i) directing the administrative agent of the DIP Facility to make the Credit Bid (as to the DIP Obligations) and (ii) directing the administrative agent under the Prepetition Credit Agreement to make the Credit Bid (as to the Prepetition Obligations).

SECTION 2.10     *Withholding*.  Buyer shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement to any Person such amounts (and only such amounts) as Buyer is required to deduct and withhold under the Code or other applicable Tax Law with respect to the making of such payment; provided, however, that at least five (5) Business Days prior to any such withholding, Buyer shall (other than with respect to any withholding arising as a result of Sellers' failure to provide the documentation described in Section 7.06(d) or in respect of payments properly treated as compensation) use commercially reasonable efforts to notify Sellers of any potentially applicable withholding requirement and cooperate to eliminate or reduce any such withholding. To the extent that amounts are withheld, such withheld amounts shall be treated for all purposes

of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, each Seller hereby jointly and severally represents and warrants to Buyer as follows:

SECTION 3.01    *Organization and Qualification*.

(a)    Each Seller is duly organized, validly existing and in good standing (where applicable) under the Laws of its respective jurisdiction of formation or organization. Each Seller, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties and conduct its business (including the Business) as currently conducted, except in the case of good standing, where the failure to be in good standing would not, individually or in the aggregate, have a Material Adverse Effect. Each Seller is duly qualified to do business and is in good standing (where applicable) as a foreign entity in each jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, be material to the Business, taken as a whole.

(b)    Each Purchased Entity is duly organized, validly existing and in good standing (where applicable) under the Laws of its respective jurisdiction of formation or organization. Each Purchased Entity, subject to the provisions of the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and conduct its business (including the Business) as currently conducted, except in the case of good standing, where the failure to be in good standing would not, individually or in the aggregate, have a Material Adverse Effect. Each Purchased Entity is duly qualified to do business and is in good standing (where applicable) as a foreign entity in each jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, be material to the Business, taken as a whole.

SECTION 3.02    *Authorization; Execution and Delivery; Enforceability*. The execution, delivery and performance of this Agreement and each other Transaction Document to which each Seller is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of such Seller, as applicable and no other organizational proceedings on such Seller's part will be necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Documents to which such Seller is a party and the consummation by it of the transactions contemplated hereby and thereby. Each Seller has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which such Seller is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the

Closing, each other Transaction Document to which each Seller is a party will be, duly and validly executed and delivered by such Seller and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.

SECTION 3.03    *Noncontravention; Consents and Approvals.*

(a)    Neither the execution and delivery by Sellers of this Agreement and each other Transaction Document to which any Seller is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of any Seller or Purchased Entity, (ii) violate any Law or Order to which any Seller or Purchased Entity, or its Assets or properties, or any of the Purchased Assets may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, any Material Contract, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of any such Material Contract hereunder, or (iv) result in the creation of any Encumbrance (other than Permitted Encumbrances) on any Purchased Assets, except, in the case of clause (ii), (iii) or (iv), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(b)    Except for (i) the entry of the Sale Order, (ii) compliance with any applicable requirements of the HSR Act, ERCOT or any other Antitrust Laws (to the extent applicable), (iii) the Permit Approvals, (iv) FERC approval pursuant to Section 203 of the FPA, and (v) as set forth on <u>Section 3.03(b)</u> of the Disclosure Schedules, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller or Purchased Entity in connection with the execution and delivery of this Agreement or any other Transaction Document which any Seller is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by any Seller contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

SECTION 3.04    *Purchased Entities.*

(a)    <u>Section 3.04(a)</u> of the Disclosure Schedules sets forth, with respect to each Purchased Entity, (i) the name, (ii) the jurisdiction of formation or organization, (iii) the authorized, issued and outstanding Equity Interests and (iv) each owner of record of the Equity Interests of such Purchased Entity (including, in the case of the Purchased Companies, the Purchased Equity Interests).  The Equity Interests of each Purchased Entity have been duly authorized and validly issued, are fully paid and non-assessable (where applicable) and have not been issued in violation of any preemptive rights, rights of first offer, rights of first refusal or

similar rights, and are owned beneficially, of record and with good and valid title by the applicable Seller as set forth on Section 3.04(a) of the Disclosure Schedules, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)      Section 3.04(b) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, any Subsidiary or any other Person in which such Purchased Entity owns, of record or beneficially, any direct or indirect Equity Interests or similar interests or any right (contingent or otherwise) to acquire any direct or indirect Equity Interests or similar interests.

(c)      No Purchased Entity is under any obligation, or is bound by any Contract (other than the organizational documents of any Purchased Entity) pursuant to which such Purchased Entity may become obligated to, (i) declare, make or pay any dividends or distributions, whether current or accumulated or due or payable (excluding any Tax distributions) or (ii) make any loan to, investment in, or capital contribution to, any Person.  There are no outstanding options, warrants, calls, rights, subscriptions, arrangements, claims, commitments (contingent or otherwise) or any other agreement or Contract to which any Purchased Entity is a party, or is otherwise subject, that requires the issuance, sale or transfer of any additional shares of capital stock or other equity securities of any Purchased Entity convertible into, exchangeable for or evidencing the right to subscribe for or purchase capital stock or other equity securities of any Purchased Entity.  No Seller or any Purchased Entity is a party, or is otherwise subject, to any voting trust or other voting agreement with respect to the Equity Interests of any Purchased Entity or to any agreement or Contract relating to the issuance, sale, redemption, transfer, acquisition, disposition or registration of the Equity Interests of any Purchased Entity.

SECTION 3.05      *Financial Statements; No Undisclosed Liabilities*.

(a)      True and complete copies of the audited consolidated balance sheet of Pine Gate and its Affiliates (collectively, "**PGR**") as of December 31, 2024 (the "**Balance Sheet Date**"), and the related audited consolidated statements of results of operations, changes in member's equity and cash flows of PGR, together with all related notes and schedules thereto (collectively referred to as the "**Financial Statements**"), and the unaudited consolidated balance sheet of PGR, in each case, as of September 30, 2025 (the "**Latest Balance Sheet Date**") and the related consolidated statements of results of operations, changes in members' equity and cash flows of PGR, together with all related notes and schedules thereto (collectively referred to as the "**Interim Financial Statements**"), are attached hereto as Part I of Section 3.05(a) of the Disclosure Schedules.  Except as set forth in Part II of Section 3.05(a) of the Disclosure Schedules, each of the Financial Statements and the Interim Financial Statements (i) are correct and complete in all material respects and have been prepared in accordance with the books and records of PGR or the other Persons covered thereby, as applicable, in all material respects, (ii) have been prepared in all material respects in accordance with GAAP (except as may be indicated in the notes thereto) and (iii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of PGR or the other Persons covered thereby (including the Purchased Entities), as applicable, as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments and the absence of notes thereto throughout the periods covered thereby.

(b)     Except as and to the extent adequately accrued or reserved against in Financial Statements or the Interim Financial Statements, since the Balance Sheet Date, PGR nor the other Persons covered by such Financial Statements or Interim Financial Statements, as applicable, do not have any liability or obligation of any nature arising out of, relating to or affecting (i) the Purchased Entities or (ii) the Purchased Assets that is an Assumed Liability, in each case, whether accrued, absolute, contingent or otherwise, whether known or unknown and whether or not required by GAAP to be reflected in a consolidated balance sheet of the applicable Person or disclosed in the notes thereto, except for liabilities and obligations incurred in the Ordinary Course since the Balance Sheet Date.

(c)     The books of account and financial records of Sellers pertaining to the Business are true and correct in all material respects and have been prepared and are maintained in accordance with sound accounting practice in all material respects.

SECTION 3.06     *Title to and Sufficiency of Purchased Assets*.  Except as set forth on Section 3.06 of the Disclosure Schedules, Sellers have good and valid title to, valid leasehold interests in, or other valid right to use, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order and obtaining any Transfer Consent, Sellers will transfer, convey and assign good and valid title to, valid leasehold interests in, or other valid right to use, the Purchased Assets (including record and beneficial ownership of the Equity Interests of the Purchased Entities (including the Purchased Equity Interests)) free and clear of all Encumbrances (other than Permitted Encumbrances).  The Assets of the Purchased Entities, together with the Purchased Contracts, constitute all of the assets, properties and rights held for use or necessary to operate and conduct the Business in the Ordinary Course and in all material respects (including in the event of (i) a sale of all or substantially all of the assets of ACT or PG O&M or (ii) a Services Related Sale).

SECTION 3.07     *Litigation*.  Except as set forth on Section 3.07 of the Disclosure Schedules, there are no Proceedings pending, or, to the Knowledge of Sellers, threatened against any Seller, the Purchased Entities, the Purchased Assets, the Assumed Liabilities or the Business, or any Order threatened in writing or outstanding, which, in each case, would adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby or otherwise would, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole.

SECTION 3.08     *Permits*.

(a)     Each Seller and Purchased Entity, or another Person on behalf of any Seller or Purchaser Entity as allowable under Environmental Law with respect to a Project, is in possession of all Permits legally required for such Purchased Entity to own, lease, operate and use (i) the Purchased Assets (in the case of each Seller), or (ii) its Assets (in the case of each Purchased Entity), in each case, as currently owned, leased or used and to carry on and operate the Business as currently conducted, except where the failure to possess such Permit, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business, taken as a whole.  Section 3.08(a) of the Disclosure Schedules is a true, correct and complete list of all material Permits held by Sellers and each Purchased Entity. To the Knowledge of Sellers, no Seller

or Purchased Entity has received written notice related to the Permits that would cause a Governmental Authority to deny or refrain from issuing any Permit Approval.

(b)    Except as set forth on Section 3.08(b) of the Disclosure Schedules, (i) all Permits held by Sellers or any Purchased Entity, or another Person on behalf of any Seller or Purchaser Entity allowable under Environmental Law with respect to a Project, are valid and in full force and effect, except where such failure to be valid or in full force and effect would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (ii) each Seller and Purchased Entity is, and in the last three (3) years has been, in compliance with the terms of all Permits except where the failure to comply with the terms of such Permit would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, and there are no Proceedings pending or, to the Knowledge of Sellers, threatened that seek the revocation, cancellation, suspension, failure to renew or adverse modification of any Permits or that would reasonably be expected to result in the imposition of a substantial fine, forfeiture, or civil penalty against any Seller or Purchased Entity except as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (iii) the applicable Seller or Purchased Entity, or other Person on behalf of any Seller or Purchaser Entity as allowable under Environmental Law with respect to a Project, has timely filed applications to renew all Permits held by such Person other than any failure to timely file to renew that would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole and no Governmental Authority has commenced, or given written notice to any Seller or Purchased Entity that it intends to commence, any Proceeding to revoke, or suspend, rescind, adversely modify or not renew, or to impose any adverse condition on, any Permit, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (iv) all reports and filings required to be filed with any Governmental Authority by any Seller or Purchased Entity with respect to any Permit have been timely filed, and all regulatory fees, contributions and surcharges required to be paid by any Seller or Purchased Entity with respect to the Permits held by such Person have been timely paid, except, in each case, where such failure to be filed or paid have now been remedied or would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole and (v) no Permits required to carry on and operate the Projects and Business as currently conducted are held by any Person other than a Purchased Entity.

SECTION 3.09    *Compliance with Laws.*

(a)    Each Seller and Purchased Entity is in compliance with applicable Laws (in the case of such Seller, with respect to the Purchased Assets and Assumed Liabilities), except where any non-compliance, individually or in the aggregate, has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole. No Seller or Purchased Entity has received any written notice from any Governmental Authority relating to violations or alleged violations of, failure to comply with or defaults under, any Law, Order or Permit (in the case of any Seller, with respect to the applicable Purchased Assets and Assumed Liabilities), except where any non-compliance or default, individually or in the aggregate, has not been or would not reasonably be expected to be, material to the Business taken as a whole.

(b)    *Auxin Circumvention Tariffs.*

(i)     Other than as set forth on <u>Section 3.09(b)(i)</u> of the Disclosure Schedules, no Purchased Entity has commercialized any Inventory or products or raw materials, components, subassemblies, or intermediate goods incorporated therein (together, the "**Goods**"), nor were any Goods manufactured, completed, assembled, exported, transferred or assigned, in each case, in a manner that would cause a Purchased Entity to be subject to, directly or indirectly, any anti-dumping or countervailing duty cash deposits, tariffs, duties, or other trade remedies imposed, assessed, or collectible by the U.S. Department of Commerce or U.S. Customs and Border Protection as a result of, arising out of, or relating to the circumvention proceedings associated with the petition filed by Auxin Solar Inc. concerning crystalline silicon photovoltaic cells and modules (the "**Auxin Circumvention Tariffs**"). For the avoidance of doubt, the foregoing includes any such measures applicable to goods completed or assembled in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-origin inputs, as well as any successor, continuation, modification, reinstatement, or replacement of such measures, and any related cash deposit requirements, certifications, or country-of-origin / circumvention findings.

(ii)     Without limiting the generality of the foregoing, Sellers represent and warrant that directly or indirectly: (A) Sellers have not taken, and will not take, any action in the supply chain that would reasonably be expected to cause any Purchased Entities to become subject to liability for Auxin Circumvention Tariffs (it being agreed that the mere act of placing and fulfilling purchase orders shall not constitute an action proscribed by the foregoing) and (B) all information, documentation, and certifications provided by or on behalf of Sellers to Buyer in connection with customs entry, origin, classification, valuation, and duty assessment for the Goods, including any Auxin-related certifications, are true, correct, and complete in all material respects.

(iii)     Other than as set forth on <u>Section 3.09(b)(iii)</u> of the Disclosure Schedules, none of the Purchased Entities, directly or indirectly, are potentially responsible or otherwise potentially liable for any Auxin-related obligations, including with respect to indemnification, in connection with the import or export of Goods to any other Person, including the Sellers or their Affiliates.

(iv)     Other than as set forth on <u>Section 3.09(b)(iv)</u> of the Disclosure Schedules, Sellers represent and warrant that Sellers maintain any documentation required by law to be maintained by Seller to substantiate the status of the Goods as being "Applicable Entries" as that term is defined in the U.S. Department of Commerce's final affirmative determinations of circumvention, 88 Fed. Reg. 57419  (Aug. 23, 2023), including with respect to their utilization in the Projects.

(v)     Sellers further represent and warrant that, as of the date of delivery and entry of the Goods into the United States, there are no pending audits, inquiries, questionnaires, verifications, scope or circumvention reviews, administrative reviews, or other proceedings to which any of the Sellers are subject that would reasonably be expected to result in the Goods being subject to Auxin Circumvention Tariffs or any related cash deposit requirements, and Sellers have not received any notice or communication alleging noncompliance with any Auxin-related measure with respect to the Goods.

SECTION 3.10        *Material Contracts*.

(a)        Section 3.10 of the Disclosure Schedules sets forth a true, correct and complete list of the following (x) Purchased Contracts (other than with respect to purchase orders or any Seller Plans), and (y) the Material Contracts. Sellers have caused to be made available to Buyer true, correct and complete copies of all Purchased Contracts and Material Contracts, together with all amendments, modifications or supplements thereto.

(b)        With respect to each Material Contract, (i) such Contract is in full force and effect and constitutes the legal, valid and binding obligation of the Sellers or Purchased Entity party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller or Purchased Entity, as applicable, and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, (ii) neither the Sellers or Purchased Entity party thereto nor, to the Knowledge of Sellers, the counterparty thereto is in material breach or default thereof, (iii) the Sellers or Purchased Entity that is a party thereto, and, to the Knowledge of Sellers, the counterparty thereto, has performed all obligations required to be performed by it under such Contract and (iv) no Seller nor Purchased Entity and, to the Knowledge of Sellers, no counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (ii) through (iv), for breaches or defaults (A) caused by or resulting from the Chapter 11 Cases or (B) which are not, and would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

SECTION 3.11        *Intellectual Property*.

(a)        Each item of Registered Intellectual Property is subsisting, and to the Knowledge of the Sellers, valid and enforceable.  No Claim is pending or, to the Knowledge of Sellers, threatened, challenging the validity, enforceability, registration, ownership or scope of any Registered Intellectual Property (excluding office actions issued in connection with the prosecution of applications for the Registered Intellectual Property).  To the Knowledge of Sellers, all currently due maintenance fees, renewal fees, or similar fees for the purpose of maintaining the Registered Intellectual Property have been paid and all necessary documents and certificates in connection with Registered Intellectual Property have been filed with the U.S. Patent and Trademark Office, the U.S. Copyright Office, similar authorities in foreign jurisdictions, as the case may be, and domain name registrars.

(b)        The Purchased Entities exclusively own, free and clear of all Encumbrances (other than Permitted Encumbrances), or have licenses or rights to use all material Intellectual Property used in the Business as currently conducted.  The Purchased Entities exclusively own, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Intellectual Property owned by the Purchased Entities or included in the Purchased Assets, in each case, including the Registered Intellectual Property.

(c)        For the past three (3) years, the Purchased Entities and the operation of the Business have not infringed, misappropriated, diluted or otherwise violated any Intellectual Property of a third party in any material respect. For the past three (3) years, to the Knowledge of Sellers, no

third party has infringed, misappropriated, diluted or otherwise violated any Intellectual Property owned by the Purchased Entities or included in the Purchased Assets, in each case, in any material respect.  In the past three (3) years, no third-party Claims have been received by or on behalf of the Sellers or a Purchased Entity alleging that any Seller in connection with the Business, or such Purchased Entity, has infringed, misappropriated, diluted or otherwise violated the Intellectual Property of such third party.

(d)     Sellers and their Affiliates have taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all Trade Secrets included in the Intellectual Property owned by the Purchased Entities or included in the Purchased Assets, and to the Knowledge of the Sellers, and there have been no unauthorized uses or disclosures of any such Trade Secrets, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(e)     Except as set forth in <u>Section 7.18</u>, and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not result in the grant of any right or license to any third party of any Intellectual Property owned by the Purchased Entities or included in the Purchased Assets.

SECTION 3.12     *Real Property*.

(a)     The Purchased Entities have good and marketable fee simple title to the Owned Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Each Purchased Entity, as applicable, holds a good and valid leasehold, subleasehold or similar interest in each parcel of Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).  Sellers have delivered to Buyer a true and complete copy of each Lease pursuant to which the Purchased Entities hold their interests in the Leased Real Property.

(c)     Each Lease is (i) valid, in full force and effect, and constitutes a valid and legally binding obligation of the Purchased Entity party thereto, as applicable, and, to the Knowledge of Sellers of each other Person party thereto, and (ii) enforceable against such Purchased Entity party thereto and, to the Knowledge of Sellers, each other party thereto, in accordance with its terms, in each case of clauses (i) and (ii), except as the same may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, arrangement, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles.  Except as set forth on <u>Section 3.12(c)</u> of the Disclosure Schedules, no Purchased Entity, nor, to the Knowledge of Sellers, any other party to any Lease, is (or is alleged to be) in any existing or continuing material default, material breach, material violation or event of material default thereunder, nor does any condition or circumstance exist which, with notice and/or passage of time, would constitute a material default, material breach, material violation, termination, modification or acceleration by any Purchased Entity or, to the Knowledge of Sellers, any other party, under such Lease.

(d)     Except for Permitted Encumbrances, no Purchased Entity has leased, subleased, licensed or otherwise granted any Person the right to use or occupy any Real Property or any portion thereof.  No Purchased Entity has granted any purchase option, right of first offer or right

of first refusal to purchase an interest in the Real Property to any third party, or entered into a contractual arrangement to sell, assign, encumber or dispose of such interest.

(e)    There is no pending or, to the Knowledge of Sellers, threatened or contemplated condemnation or similar proceeding affecting the Owned Real Property, Leased Real Property or any portion thereof or interest therein.

(f)    The Owned Real Property and the Leased Real Property constitute all of the real property owned, leased, licensed, occupied or otherwise used by Sellers and the Purchased Entities.

SECTION 3.13    *Environmental Matters*.

(a)    Sellers and the Purchased Entities have made available to Buyer copies of all material third-party environmental reports, audits, assessments, investigations, studies, and analyses regarding any Project, or otherwise relating to the Purchased Entities' or their affiliates' or predecessors' past or current businesses, operations or assets, in each case in the reasonable possession or custody of Sellers or the Purchased Entities, including the most recent Phase I environmental site assessment report for each Project.

(b)    Except as described on Section 3.13 of the Disclosure Schedules:

(i)    each Seller and Purchased Entity is, and each of the Projects are, and for the past three (3) years have been, in material compliance with all applicable Environmental Laws, including obtaining, possessing, and being in material compliance with all Permits required under all applicable Environmental Laws, and, no Purchased Entity has received written notice that could reasonably be expected to result in the revocation, cancellation, suspension, or modification of any such Permit;

(ii)    to the Knowledge of Sellers, with respect to any Project that is currently under development or construction by a Purchased Entity, or otherwise not yet fully operational, each Project Company, or another Person on behalf of a Project Company as allowable under Environmental Law, will be able to obtain all material Permits that are required under applicable Environmental Laws for the operation of such Project by the date by which such material Permits become required by Law and without effecting any material delay to the operations of such Project;

(iii)    no Seller nor Purchased Entity has been served with or received any written or, to the Knowledge of Sellers, oral notice of any material Environmental Liability or violation of Environmental Law that is currently outstanding, and no material Claims for Environmental Liabilities are pending or, to the Knowledge of Sellers, threatened, against any Seller or Purchased Entity, in each case with respect to the Purchased Assets;

(iv)    with respect to the Purchased Assets, no Seller nor Purchased Entity is the subject of a pending, or to the Knowledge of Sellers, threatened material environmental Claim or Action, or a Claim or Action that would reasonably be expected to give rise to any material Liability of the Purchased Entities;

(v)     with respect to the Purchased Assets, Sellers and the Purchased Entities are not subject to any Order imposed by any Governmental Authority pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller or any Purchased Entity that could reasonably be expected to give rise to any material Liability of the Purchased Entities;

(vi)     with respect to the Purchased Assets, there has been no Release of any Hazardous Material by any Seller or Purchased Entity or, to the Knowledge of Sellers, by any other Person, at, from, under, upon, or to any Project, and there has been no Release of any Hazardous Material by Sellers or any Purchased Entity at any other location, in a manner that has subjected or would reasonably subject any Seller or Purchased Entity to any material Liability under any Environmental Law; and

(vii)     with respect to the Purchased Assets, no Seller or Purchased Entity has, whether expressly, by operation of Law, or otherwise, assumed, undertaken, agreed to indemnify any other Person, or otherwise become subject to, any material Liability under any Environmental Law, except for contractual indemnities entered into by the Sellers or the Purchased Entities in the Ordinary Course of their businesses and that are customary for similarly situated parties.

SECTION 3.14     *Taxes*.

(a)     All income and other material Tax Returns of Sellers (with respect to the Business or the Purchased Assets) and the Purchased Entities required to be filed before the Closing Date with respect to Pre-Closing Tax Periods have been or will be timely filed, and all such Tax Returns are, or will be when filed, true, complete and correct in all material respects.

(b)     All Taxes of Sellers (with respect to the Business or the Purchased Assets) and the Purchased Entities required to be paid before the Closing Date with respect to Pre-Closing Tax Periods have been or will be timely paid in full.

(c)     The are no Encumbrances for Taxes on any of the Purchased Assets or assets of the Purchased Entities other than for current Taxes not yet due and payable.

(d)     All Tax deficiencies asserted, or assessments made, against Sellers (relating to the Business or the Purchased Assets) or the Purchased Entities by any taxing authority have been fully paid and, to the Knowledge of Sellers, there are no Tax deficiencies threatened with respect to Sellers (relating to the Business or the Purchased Assets) or the Purchased Entities.

(e)     There are no pending, or to the Knowledge of Sellers, threatened, audits, examinations, investigations, administrative proceedings or Tax litigation concerning Sellers (relating to the Business or the Purchased Assets) or the Purchased Entities.

(f)     There are no outstanding agreements, or requests with respect to, extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, Taxes of the Sellers (relating to the Business or the Purchased Assets) or the Purchased Entities.

(g)     None of the Purchased Entities has participated in any "listed transaction" as set forth in Treasury Regulations Section 1.6011-4(b)(2) or any analogous provision of state, local or non-U.S. Law.

(h)     No Purchased Entity will be required to include any material item of income in or exclude any material item of deduction from, taxable income for, or otherwise be required to pay any material Tax in, any Post-Closing Tax Period as a result of any: (i) change in, or use of, an improper method of tax accounting for any Pre-Closing Tax Period; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Law) executed prior to the Closing; (iii) prepaid amount received or deferred revenue accrued prior to the Closing; (iv) installment sale made prior to the Closing or (v) any action taken prior to Closing that results in a recapture within the meaning of Section 50 of the Code (including as applied through Section 6418 of the Code).

(i)     Each Purchased Entity has materially complied with, and no Purchased Entity has material amounts due and owing to any Governmental Authority in respect of, any applicable Law governing escheat or unclaimed property.

(j)     Each Purchased Entity is classified as a disregarded entity for U.S. federal or applicable state or local income tax purposes. No Purchased Entity that is or has ever been classified as a partnership for U.S. federal income tax purposes is or has ever been classified as a "publicly traded partnership" within the meaning of Treasury Regulations Section 1.7704-1.

(k)     None of the Purchased Assets or Purchased Entities is currently nor has been a party to or the beneficiary of any Tax holiday (or similar arrangement).

(l)     All material Taxes that any Seller (relating to the Business or the Purchased Assets) or any Purchased Entity is required to withhold or to collect with respect to the Purchased Assets or any Purchased Entity have been duly withheld and collected and have been timely paid over to the proper Governmental Authorities and agencies to the extent due and payable.

(m)     No Purchased Entity is or has ever been a member of an affiliated, combined, consolidated or unitary Tax group and no Purchased Entity has any liability for Taxes of any Person (other than a Purchased Entity) arising from the application of Treasury Regulations Section 1.1502-6 or any analogous provision of state, local or non-U.S. Law applicable to the Purchased Entities, or as a transferee or successor or by Contract (other than (i) a Contract entered into in the ordinary course of business the principal subject matter of which is not Taxes and (ii) any Tax Equity Documents).

(n)     No written claim has been made in a jurisdiction where any Purchased Entity or any Seller (with respect to the Purchased Assets), as applicable, does not file Tax Returns that such Purchased Entity or such Seller (with respect to the Purchased Assets) is subject to taxation in that jurisdiction.

(o)     No Purchased Entity is a party to, is bound by, or has any obligation under, any Tax Sharing Agreement that will be in effect after Closing.

SECTION 3.15          *Employee Benefits*.

(a)      No Purchased Entity sponsors or maintains a Seller Plan, nor has in the past three (3) years. No Purchased Entity has any Liability with respect to a Seller Plan.

(b)      Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event: (i) materially increase the amount of any compensation or benefits due to any Service Provider, (ii) accelerate the timing of payment, vesting or funding of any material compensation or benefits to any Service Provider, (iii) entitle any Service Provider to any payment of compensation or (iv) result in any "disqualified individual" with respect to any Purchased Entity receiving any "excess parachute payment" (as each such term is defined in Section 280G of the Code), determined without regard to any arrangements that may be implemented by, or at the direction of, Buyer or any of its Affiliates.

SECTION 3.16      *Labor Matters.*

(a)      No Purchased Entity employs any employee, nor has in the past three (3) years. No Purchased Entity has any Liability with respect to any Employee.

(b)      (i) No Seller or Purchased Entity is a party to any Collective Bargaining Agreement in respect of the Business or covering any Employee, (ii) no Employee as of the date hereof is represented by any Labor Union in connection with their employment with Sellers or the Purchased Entities, (iii) to the Knowledge of Sellers, no Labor Union as of the date hereof has made a written demand for recognition as the bargaining unit representative of any group of Employees that is pending as of the date hereof, nor have there been any such demands in the last three (3) years, (iv) to the Knowledge of Sellers, there are no representation or certification Proceedings presently pending or threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller or its Subsidiaries or any Purchased Entity in respect of the Business or covering any Employees, nor have there been any such proceedings in the last three (3) years, and (v) there are no material labor strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller or any Purchased Entity or covering any Employees, and there have been no such events in the past three (3) years.

(c)      There are no material Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller or any Purchased Entity relating to the employment or termination of employment of any individual or group of individuals by any Seller or any Purchased Entity.

(d)      In the past three (3) years, no Seller or any Purchased Entity has experienced a "plant closing" or "mass layoff" (as defined in the WARN Act) with respect to which there is any unsatisfied Liability with respect to any Employees or the Business or the Purchased Entities.

(e)      Sellers are in compliance in all material respects with all applicable Laws respecting employment practices and labor, including those related to wages and hours (including minimum wage and overtime Laws and wage payment Laws), collective bargaining, unemployment insurance, workers' compensation, immigration, retaliation, harassment and discrimination, disability rights and benefits, affirmative action, and employee layoffs, employee

notification, leave, health and safety, and child labor, as they relate to the Business or the Purchased Entities.

(f)      Except as would not result in material Liability, Sellers currently properly classify, and for the past three (3) years have properly classified, each Employee as exempt or non-exempt for the purposes of the Fair Labor Standards Act.

(g)      There is no Action pending or, to the Knowledge of Sellers, threatened in writing against Sellers or any Purchased Entity alleging a violation of any labor or employment law that if adversely determined against Sellers or any Purchased Entity, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, nor have any such Actions been brought in the last three (3) years.

(h)      To Sellers' Knowledge, no Affiliate of Sellers has entered into any Contract prohibiting or limiting the right of Buyer or any Affiliate of Buyer from soliciting for employment, hiring or otherwise engaging any Person employed by ACT Power Services, LLC.

SECTION 3.17      *Energy Regulatory*.

(a)      Each Project Company that owns directly or operates an energized electric generation or storage facility is either (i) a "public utility" under Section 201(e) of the FPA and either has MBR Authority, which is in full force and effect, or owns or operates one or more QFs and is exempt from Section 205 of the FPA, or (ii) sells power exclusively within the market operated by ERCOT and is a "power generation company" subject to regulation under Texas Law.

(b)      Each Project Company that owns directly or operates an energized electric generation or storage facility is an EWG or owns only Projects that are QFs and eligible for the PUHCA exemption in 18 C.F.R. § 292.602.

(c)      Each Purchased Entity (other than any Project Company) is either (i) not a "holding company" under Section 1262(8) of PUHCA, or (ii) a "holding company" under Section 1262(8) of PUHCA solely as a result of its direct or indirect ownership interest in a Project Company and is exempt from PUHCA to the extent set forth in 18 C.F.R. § 366.3(a).

(d)      No Project Company that sells power exclusively within the ERCOT market has made any sales of electricity without having been registered as a "power generation company".

(e)      Each Project Company that sells power exclusively within the ERCOT market is in compliance with the ERCOT Protocols and the Lone Star Infrastructure Protection Act.

(f)      None of the Project Companies is, or solely as the result of the siting, development, construction, ownership, or operation of a Project (including the charging, storage, discharging, and sale of electric energy at wholesale and the provision and sale of ancillary services therefrom), or by entering into this Agreement or consummating the Transaction Documents contemplated hereby or thereby, will become subject to or not exempt from, regulation as a "public utility", "electric utility", "retail electric provider", "transmission and distribution utility", or similar entity by the PUCT or any other applicable state utility commission or other rate regulation or financial

or organizational regulation with respect to public utilities by the PUCT under PURA or other state utility commission.

SECTION 3.18    *Absence of Certain Changes*.  Except as set forth on <u>Section 3.18</u> of the Disclosure Schedules, and other than as a result of the commencement of the Chapter 11 Cases, (a) since the Latest Balance Sheet Date, there has not been or occurred any Material Adverse Effect and (b) from the Latest Balance Sheet Date through the date of this Agreement there has not been, occurred or arisen any agreement, condition, action, omission or event which, if occurred or existed after the date hereof, would be prohibited (or require consent from Buyer) under <u>Section 5.01</u>.

SECTION 3.19    *Insurance Policies*.  All material insurance policies (other than any insurance policy that funds or relates to any Seller Plans) held by (a) any Seller relating to the Purchased Assets or the Assumed Liabilities, or (b) any Purchased Entity (the "**Business Insurance Policies**") have been made available to Buyer.  With respect to each Business Insurance Policy, (i) such Business Insurance Policy is in full force and effect and constitutes the legal, valid and binding obligation of the Sellers or Purchased Entity party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller or Purchased Entity and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, (ii) no Seller or Purchased Entity has received any written notice of cancellation or termination with respect to such Business Insurance Policy, (iii) premiums due and payable by any Seller, Purchased Entity or their Affiliates under such Business Insurance Policy prior to the date hereof have been duly paid, (iv) such Business Insurance Policy is adequate for the Business and is consistent with industry practice and (v) there is no material claim pending under such Business Insurance Policy, except in the case of the foregoing clauses (i) through (iii) as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

SECTION 3.20    *Affiliate Transactions*.  A true, correct and complete list of all Contracts (including any amendments, supplements, restatements or modifications thereto) between a Seller or an Affiliate thereof, on the one hand, and a Purchased Entity, on the other, relating to the Purchased Assets, Assumed Liabilities or the Business will be provided in accordance with <u>Section 5.03(c)</u>.  Except as set forth in <u>Section 3.20</u> of the Disclosure Schedules, no Affiliate of any Seller or Purchased Entity (other than any other Seller, any Purchased Entity, or any of their Subsidiaries) or any officer, director or employee of any Seller or Purchased Entity (a) is a party to any Contract or arrangement with any Seller or Purchased Entity having a potential or actual value or a contingent or actual Liability exceeding $100,000, other than (i) employment and indemnification arrangements in the Ordinary Course and (ii) the Seller Plans, or (b) has any interest in any property (tangible or intangible) used by (i) any Seller in the operation of any Purchased Asset, or (ii) any Purchased Entity.

SECTION 3.21    *Privacy and Security*.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, each Seller and Purchased Entity is in compliance with all applicable U.S., state, foreign and multinational Laws relating to privacy or data security of Personal Information ("**Privacy Laws**"), binding reputable industry practice, standards, self-governing rules and policies and their own published policies, and contractual obligations to which such Seller or Purchased Entity is bound in each case relating to privacy or data security of

Personal Information (all of the foregoing collectively, "**Privacy Requirements**") with respect to personally identifiable information (including name, address, telephone number, electronic mail address, social security number, bank account number or credit card number), sensitive personal information and any special categories of personal information regulated under any Privacy Laws ("**Personal Information**").

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, each Seller, to the extent included in the Purchased Assets, and Purchased Entity has taken all commercially reasonable steps designed to protect the security of their respective IT Assets and the Personal Information processed thereby against any unauthorized or improper use, access, transmittal, interruption, modification or corruption, and to the Knowledge of Sellers, in the past one (1) year there have been no breaches of same that has triggered a notification or reporting requirement under any Privacy Laws or resulted in any material liability to Sellers. In the past three (3) years, to the Knowledge of the Sellers, there have been no failures, breakdowns, outages, unavailability or material disruptions of any IT Assets included in the Purchased Assets or owned, licensed, leased or controlled by any Purchased Entity that materially affected the operations of any Seller (with respect to the Business) or any Purchased Entity.  To the Knowledge of Sellers, such IT Assets do not contain any virus, malware, trojan horse, worm, back door, time bomb, drop dead device or other program, routine, instruction, device, code, contaminant, logic or effect designed or intended to disable, disrupt, erase, enable any Person to access without authorization, or otherwise affect the functionality of, any such IT Asset.

SECTION 3.22     *Brokers*.  Except as set forth on <u>Section 3.22</u> of the Disclosure Schedules, the fees and expenses of which, in each case, will be paid by any Seller or Purchased Entity on or prior to the Closing Date, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of any Seller or their Affiliates, Purchased Company or any of their respective Subsidiaries.

SECTION 3.23     *Credit Support Obligations*.  <u>Section 3.23</u> of the Disclosure Schedules sets forth a complete and accurate list of all cash deposits, guarantees, letters of credit, treasury securities, surety bonds and other forms of credit assurances or credit support ("**Support Obligations**") provided by or on behalf of Sellers, any Affiliates of Seller or any Purchased Entity in support of (a) the obligations of a Purchased Entity, or (b) any Purchased Asset, in each case, to any Governmental Authority, Contract counterparty or other Person related to the Business. Except for the Support Obligations set forth on <u>Section 3.23</u> of the Disclosure Schedules, none of the Purchased Entities, Sellers or any of their respective Affiliates (other than the Purchased Entities) or any other Person has any obligation to post any Support Obligations in respect of the Purchased Entities, the Projects, the Business or the Purchased Assets.

SECTION 3.24     *International Trade Laws; Sanctions; CFIUS*.

(a)     Each Seller and Purchased Entity is and for the past five (5) years has been in compliance with International Trade Laws, and has not taken any action that violates, evades or avoids, or attempts to violate, evade or avoid International Trade Laws, except, in each case, as

would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as whole.  No Seller or Purchased Entity, any of their respective Subsidiaries, nor any of their directors, executives, or employees, or, to the Knowledge of Sellers or the Purchased Entities, any representative or agent acting on behalf of Sellers or the Purchased Entities, currently or during the past five (5) years: (i) is or has been a Sanctioned Person or has acted, directly or indirectly, on behalf of a Sanctioned Person; (ii) is unlawfully conducting or has unlawfully conducted any business or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; or (iii) is unlawfully dealing in or has unlawfully dealt in, or otherwise engaged in, any transaction relating to, any property or interests in property of any Sanctioned Person, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as whole.

(b)     No Seller or Purchased Entity has received and, to the Knowledge of Sellers or the Purchased Entities, no Seller or Purchased Entity is aware of, any current or threatened investigation, inquiry, complaint, lawsuit, voluntary or involuntary disclosure, warning letter, penalty notice, or other regulatory action, by a Governmental Authority, alleging any material violation of International Trade Laws, and no Seller or Purchased Entity, nor, to the Knowledge of Sellers or the Purchased Entities, any of their respective employees or representatives, has been convicted by a Governmental Authority of violating any International Trade Laws.

(c)     Each Seller and Purchased Entity has adopted and implemented policies and procedures reasonably designed to prevent, detect and deter violations of applicable International Trade Laws.

SECTION 3.25     *Renewable Energy Incentives*

(a)     Except for all contractual arrangements with respect to Renewable Energy Incentives that are included in the definition of Major Project Documents, Section 3.25(a) of the Disclosure Schedules sets forth a list of all Renewable Energy Incentives and any contractual arrangements related thereto, including (i) any rights, entitlements, requirements, obligations, responsibilities or other contractual arrangements to acquire or obtain future Renewable Energy Incentives or (ii) any requirements, obligations, responsibilities or other contractual arrangements to divest or deliver Renewable Energy Incentives (including, without limitation, all Power Purchase Documents), in each case, for clauses (i) and (ii), that are held by Sellers (with respect to the Business), the Projects, or the Purchased Entities as of the Closing.

(a)     No Renewable Energy Incentives received or sold by Sellers or a Purchased Entity (i) have been the subject of any conflicting, duplicative or double sale, transfer, assignment, pledge or retirement, and subject to the Major Project Documents, are not subject to any outstanding option, right of first refusal or offer, assignment or other agreement granting any Person any right, title or interest therein and (ii) are not subject to any pending or, to the Knowledge of Sellers, threatened cancellation, revocation, termination, or suspension.

(b)     Sellers (with respect to the Business) and the Purchased Entities are, and for the past three (3) years have been, in compliance in all material respects with all terms and conditions applicable to the Renewable Energy Incentives that such Purchased Entity has applied for and received, and to the Knowledge of Sellers, no event has occurred or condition exists that, with or

without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, termination, or material adverse modification of any Renewable Energy Incentive or any contractual right to receive future Renewable Energy Incentives.

(c)     Subject to any Major Project Documents, the Project Companies have good and valid title to all Renewable Energy Incentives associated with such Project, free and clear of all material Encumbrances and claims, other than Permitted Encumbrances.

(d)     For the past three (3) years (or earlier if unresolved), no Seller (with respect to the Business) or Purchased Entity has received any written notice, or to the Knowledge of Sellers oral notice, report, or other information from any Governmental Authority of any actual or alleged material violation or non-compliance with respect to any Renewable Energy Incentives.

Sellers and the Purchased Entities have made available to Buyer all information and documentation with respect to the operation of the REC Operations within their possession or under their reasonable control, including, without limitation, with respect to each relevant Project, (x) the date such Project commenced service, (y) the name of the state Renewable Energy Incentive for which such Project has qualified (or, with respect to any Project that has not qualified, information on the status of such qualification), and (z) whether each such Project, to the extent already in operation, has failed to report generation, as applicable, to the applicable registry in the twelve (12) months prior to the date of this Agreement.

SECTION 3.26     *Warranties*. All material warranties provided by the module suppliers in respect of modules installed at any Project (a) have been transferred to the applicable Project (b) shall continue in effect with respect to all applicable Purchased Assets, and (c) Buyer shall be able to enforce such warranties against such manufacturers, except, in each case, (x) for breaches or defaults caused by or resulting from the Chapter 11 Cases or (y) where the failure to transfer such warranty, or for such warranty to be in effect, would not be expected to be material to such Project.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller as follows:

SECTION 4.01     *Corporate Existence and Power*.  Buyer is a limited partnership duly formed, validly existing and in good standing under the laws of the State of Delaware and has all power and authority to carry on its business as presently conducted, other than that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

SECTION 4.02     *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer, as applicable and no other organizational proceedings on Buyer's part will be necessary to authorize the execution, delivery and performance by Buyer of this Agreement or the

other Transaction Documents to which Buyer is a party and the consummation by it of the transactions contemplated hereby and thereby. Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which Buyer is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each other Transaction Document to which each Seller is a party will be, duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.03     *Noncontravention; Consents and Approvals*.

(a)     Subject to entry of the Sale Order, neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of Buyer, (ii) violate any Law or Order to which Buyer or its Assets and properties may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which Buyer is a party or by which Buyer or its Assets and properties is bound, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)     Other than (i) the entry of the Sale Order, (ii) compliance with any applicable requirements of the HSR Act or any other Antitrust Laws (to the extent applicable), (iii) FERC approval pursuant to Section 203 of the FPA and (iv) the Permit Approvals, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document to which Buyer is a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by Buyer contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

SECTION 4.04     *Brokers*. No broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

SECTION 4.05        *Litigation*.   Other than the Chapter 11 Cases, there are no Proceedings to which Buyer is a party pending, or, to the knowledge of Buyer, threatened against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

SECTION 4.06        *Energy Regulatory*. Buyer is not a "public utility" as defined in Section 201(e) of the FPA.  Buyer is not a "holding company" under Section 1262(8) of PUHCA.

COVENANTS OF SELLERS

SECTION 5.01        *Conduct of the Business*.

(a)        Except (x) as expressly consented to by Buyer in writing or contemplated by this Agreement, (y) as prohibited, required or approved by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases prior to the date of this Agreement or (z) as otherwise necessary to comply with applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), Sellers shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause the Purchased Entities to:

(i)        conduct the Business in the Ordinary Course and in accordance with applicable Law;

(ii)        preserve and maintain all Permits and material Intellectual Property required to operate the Business, and Business Insurance Policies;

(iii)        preserve the material commercial relationships of the Business and perform all of their respective material obligations under all Material Contracts; and

(iv)        pay their respective debts and other obligations as and when due, including administrative claims.

(b)        Except as otherwise contemplated by Section 5.01(a), as required by applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules or contemplated by this Agreement, without the prior written consent of Buyer or express prior written direction of Buyer, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), Sellers shall not, and shall cause each of the Purchased Entities not to:

(i)        sell, lease or license on an exclusive basis or otherwise create any Encumbrance (other than Permitted Encumbrances) or dispose of (A) any Purchased Assets, or (B) any Asset of any Purchased Entity, in each case, other than (x) in the Ordinary Course, (y) sales and dispositions of obsolete or worn-out Assets or (z) Intellectual Property, which is addressed in Section 5.01(b)(xiv) below;

(ii)        renew, amend or modify in any adverse respect, terminate (other than automatically pursuant to its terms), cancel, let lapse or waive any material rights under, or create any Encumbrance (other than Permitted Encumbrances) on, (A) any Purchased

Contract, (B) any Material Contract, or (C) any Permits, in each case, other than in the Ordinary Course;

(iii)     change in any material respect their policies or practices regarding accounts receivable or accounts payable, except as required by Law, a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(iv)     make or authorize any capital expenditures including for property, plant and equipment, outside of the Ordinary Course that are not contemplated by the Approved Budget (as defined in the DIP Credit Agreement);

(v)     acquire any Person or all or substantially all of the Assets of any Person or make any acquisition or other investment, including the acquisition of any material assets that would be Purchased Assets;

(vi)     incur, assume or guarantee any indebtedness for borrowed money (excluding, for the avoidance of doubt, any factoring arrangements) or guarantee the indebtedness obligations of any other Person in connection with (A) the Purchased Assets or (B) the Assets of any Purchased Entity, other than any Indebtedness or Liability that will be repaid or assumed by Buyer under the terms hereof at or prior to the Closing or constitute an Excluded Liability;

(vii)     sweep any funds out of any bank accounts owned by the Purchased Entities or those owned for the benefit of the Purchased Entities;

(viii)     enter into (A) any Contract that would have been a Material Contract if entered into prior to the date hereof or (B) any Contract with a term or commitment greater than six (6) months;

(ix)     resolve any Liability that would be an Assumed Liability, other than in the Ordinary Course;

(x)     satisfy any Excluded Liability with a Purchased Asset;

(xi)     concede, settle, pay, discharge or satisfy any Proceedings relating to the Business, the Purchased Assets or Assumed Liabilities;

(xii)     terminate, intentionally let lapse or materially amend or modify any Business Insurance Policy;

(xiii)     enter into, establish, adopt, or seek Bankruptcy Court approval of a key employee retention plan and/or key employee incentive plan in which any Employee is a participant (other than an existing plan that has been disclosed to Buyer);

(xiv)     (A) sell, transfer, assign, abandon or cancel, any Intellectual Property owned by any Purchased Entity, in each case, that is material to the Business (other than expiration of registered Intellectual Property of any Purchased Entity at the end of its statutory period) or (B) grant any license to use any Intellectual Property of any Purchased

Entity, in each case, that is material to the Business, other than non-exclusive license agreements in the Ordinary Course;

(xv)     (A) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire or (B) enter into any Contract for the sublease of Leased Real Property;

(xvi)     (A) enter into or adopt any Seller Plan that is maintained or sponsored by a Purchased Entity or in regard of which a Purchased Entity could have any Liability, (B) hire any employee for employment with a Purchased Entity, or directly engage any other individual service provider for engagement with a Purchased Entity, (C) materially change the compensation of any Service Provider (whether increasing or decreasing the amount of compensation payable or the composition of such compensation, and including by accelerating vesting and funding or otherwise securing any right to compensation, (D) forgive any loans or issue any loans (other than routine travel or other business expense or similar advances issued in the Ordinary Course) to any Service Provider, or (E) terminate the employment or engagement of any Service Provider (other than for terminations for cause);

(xvii)   make any changes in any accounting methods, principles or practices in connection with (A) the Purchased Assets or the Assumed Liabilities, or (B) any Purchased Entity, except as required by Law, by a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(xviii)  make, change or rescind any material Tax election, change any annual tax accounting period, prepare and file any Tax Return or take any position with respect to Taxes in a manner inconsistent with past practice with respect to a material item unless required by applicable Law or a change in facts, amend any material Tax Return, adopt or change any Tax accounting method, consent or agree to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes, surrender any right to claim a refund of material Taxes, enter into any closing agreement, Tax partnership agreement or any Tax Sharing Agreement that would be binding on Buyer or any of its Affiliates (including the Purchased Entities after Closing), settle any material Tax claim or assessment;

(xix)    except in connection with an affiliated, consolidated, combined or unitary Tax Return, make or enter into any material Tax election materially affecting the Business, the Purchased Assets or the Purchased Entities;

(xx)     amend, supplement or modify the official collection policy;

(xxi)    engage in any communications with customers outside the Ordinary Course without consulting with Buyer in advance thereof;

(xxii)   enter into, amend, extend or terminate any Collective Bargaining Agreement relating to, impacting, or binding on the Business; or

(xxiii)  agree or commit to do any of the foregoing.

Notwithstanding the foregoing, nothing contained in this Agreement is intended to give Buyer, directly or indirectly, the right to control Sellers' operations prior to the Closing Date.

SECTION 5.02     *Access to Information.*  From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), Buyer shall be entitled, through its Affiliates and representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties (subject to the terms of any Lease), Assets, operations and personnel of Sellers relating (and solely to the extent relating) to the Purchased Assets and the Assumed Liabilities as Buyer may reasonable request; provided, however, that such investigations shall not include any sampling or analysis of soil, groundwater, building materials or other environmental media of the sort generally referred to as a Phase II environmental investigation.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and in a manner not to unreasonably interfere with the Business.  Each Seller shall use commercially reasonable efforts to cause its applicable representatives to reasonably cooperate with Buyer and its Affiliates and representatives in connection with such investigations and examinations.  Notwithstanding the foregoing, no Seller shall be required to afford such access to the extent that such Seller reasonably believes that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law, provided that in the case of each of subclauses (A) and (B), such Seller shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law.

SECTION 5.03     *Notice of Developments.*

(a)     From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11):

(i)     Sellers will promptly provide Buyer with copies of all material documents, written reports, written status updates and similar materials that are prepared by third parties for the benefit of, or concerning, the Purchased Entities or the Projects;

(ii)     Sellers will promptly provide Buyer copies of any material written notice or other material written communication from any Governmental Authority received by Sellers, their Affiliates or any Purchased Entity in connection with the transactions contemplated by this Agreement in respect of the Projects;

(iii)     Sellers will promptly notify Buyer in writing of any fact, circumstance, event or action the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Sellers hereunder not being true and correct or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions relating to the Closing to be satisfied; and

(iv)     Sellers will promptly provide Buyer with written notice of any material Action initiated, filed, commenced or to the Knowledge of Sellers, threatened in writing, against or directly or indirectly relating to the Purchased Entities or the Projects.

(b)     Buyer's receipt of information pursuant to <u>Section 5.03(a)</u> shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

(c)     No later than November 21, 2025, the Sellers shall make available to Buyer, true, correct and complete copies (including all amendments, restatements, supplements and modifications) and lists, if applicable, of the following as of the date hereof (collectively, the "**Required Information**"):

> (i)     all Material Contracts;
>
> (ii)     all Leases in respect of Leased Real Property;
>
> (iii)     all Owned Real Property (if any);
>
> (iv)     all Registered Intellectual Property owned by the Purchased Entities;
>
> (v)     all insurance policies for the benefit of the Purchased Entities;
>
> (vi)     the organizational documents of each Purchased Entity; and
>
> (vii)     a true and complete list of all bank accounts held in the name of or for the benefit of any Purchased Entity or that otherwise relate to the Business.

(d)     Notwithstanding anything to the contrary herein, but without limiting <u>Section 12.12</u>, in no event shall the information provided pursuant to this <u>Section 5.03</u> be deemed to (i) modify any representation or warranty hereunder or (ii) be included as a supplement to the Disclosure Schedules.

SECTION 5.04     *Bidding Procedures and Protections*.  Buyer agrees that its purchase of the Purchased Assets hereunder is subject to the Bidding Procedures Order and the Sale Order. Subject to <u>Section 9.05</u> Buyer may, in its sole discretion, serve as a "Backup Bidder" and keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the auction) open and irrevocable, in each case to the extent Sellers designate (with the prior consent of Buyer) Buyer as a "Backup Bidder" and for such period of time as set forth for "Backup Bidders" in the Bidding Procedures Order until the earlier of the date the Bankruptcy Court enters the Sale Order or when this Agreement is otherwise terminated as set forth herein.  In connection with the Auction, and as set forth in the Bidding Procedures Order, Sellers agree that any higher bid with respect to some or all of the Purchased Assets shall be no less than the Purchase Price (including if and as may be increased by Buyer at the Auction), plus the minimum overbid amount as set forth in the Bidding Procedures.

ARTICLE 6

COVENANTS OF BUYER

SECTION 6.01        *Preservation of and Access to Books and Records*.   Until the completion of the Wind-Down of all Sellers, but in no event later than twelve (12) months after the Closing, Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours) commercially reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, and, after reasonable advance notice and during regular business hours, so long as such access does not unreasonably interfere with the conduct of the Business, to Buyer's and its Affiliates' personnel, to the extent relating to their respective rights and obligations hereunder, to any Proceeding or to any Pre-Closing Tax Period (for example, for purposes of any Tax or accounting audit or any claim or litigation matter), or to the Wind-Down.  Buyer shall not, until the completion of the Wind-Down destroy, alter, or otherwise dispose of any books and records included in and otherwise related to the Purchased Assets without first offering to surrender to Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.  Notwithstanding the foregoing, Buyer shall not be required to afford such access to the extent that Buyer reasonably believes that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law, provided that in the case of each of subclauses (A) and (B), Buyer shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law.

SECTION 6.02        *Insurance Matters*.   From and after the Closing, the Purchased Assets, the Assumed Liabilities and the operations and Assets and Liabilities in respect thereof, shall cease to be insured by any insurance policies or self-insurance programs maintained by Sellers or any of their respective Affiliates (excluding the Purchased Entities), and neither Buyer nor its Affiliates (including the Purchased Entities) shall have any access, right, title or interest to or in any such insurance policies or self-insurance programs (including to all claims and rights to make claims and all rights to proceeds) to cover the Purchased Assets, the Assumed Liabilities or the operations or Assets or Liabilities in respect thereof; provided, however, that Buyer shall have the right to make claims and shall have the right to any proceeds (if any) with respect to the Purchased Assets or the Assumed Liabilities under any Business Insurance Policy for occurrence-based claims pertaining to, arising out of and inuring to the benefit of any Seller for all periods prior to the Closing, and such Seller shall use commercially reasonable efforts to seek the maximum recovery or allow Buyer to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Buyer may reasonably request to seek such recovery) under such Business Insurance Policy, in each case, at Buyer's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Sellers or to the insurer in connection therewith), and such Seller shall cooperate with Buyer's reasonable requests if Buyer seeks recovery, with respect to such matters and shall remit (or, at Buyer's request, direct any such insurer to pay directly to Buyer) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Buyer) to Buyer or a Buyer Designee.  Notwithstanding the foregoing, Sellers' obligations under this

Section 6.02 shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation or limit their ability to close the Chapter 11 Cases after the Closing. Sellers' obligations under this Section 6.02 shall terminate upon the Cut-Off Date; provided that, if elected by Buyer in writing prior to the Cut-Off Date, Sellers shall use their commercially reasonable efforts to ensure that Buyer shall (at Buyer's cost and expense) continue to have the benefit of this Section 6.02 following the Cut-Off Date; provided that the obligations of each Seller under this Section 6.02 shall expire upon the completion of the Wind-Down of such Seller.

ARTICLE 7

COVENANTS OF BUYER AND SELLERS

SECTION 7.01       *Confidentiality*.

(a)      Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 5.02 is subject to the Confidentiality Agreement.

(b)      Sellers acknowledge that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Buyer and its Affiliates.  Sellers agree that, from and after the Closing, unless disclosure is requested or required under applicable Law, no Seller will, and Sellers will cause their Affiliates not to, disclose to any Person any confidential information regarding Buyer and its Affiliates, the Purchased Assets or the Assumed Liabilities; provided that (x) confidential information shall not include information that becomes generally available to the public other than through any action by any Seller or any of its Affiliates in violation of this Section 7.01(b) and (y) confidential information may be used by Sellers solely to the extent necessary to defend any claims against any Seller; provided that, Sellers shall (i) disclose only that portion of such information which such Seller is advised by its counsel is legally required to be disclosed, (ii) other than in connection with any claims involving Buyer or its Affiliates, cooperate with Buyer (at its expense) to obtain a protective order or other confidential treatment with respect to such information and (iii) other than in connection with any claims involving Buyer or its Affiliates, provide Buyer with a reasonable opportunity to review and comment on such disclosure.

SECTION 7.02       *Further Assurances; Transition Services*.

(a)      At and after the Closing, and without further consideration therefor, each of Sellers and Buyer shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement and the other Transaction Documents.

(b)      At and after the Closing and subject to the other terms of this Agreement, the Parties agree to and shall cause their Affiliates to reasonably cooperate to provide each other with such

information and assistance as is necessary (i) to facilitate the Wind-Down and (ii) for the preparation of any Tax Returns or for the defense of any Tax claim, in each case, relating to the Purchased Assets, the Purchased Entities, the Assumed Liabilities, or the transactions contemplated hereby and in the Transaction Documents.

(c)     During the period of thirty (30) days following the date hereof, Buyer and Sellers shall coordinate, each acting reasonably and in good faith, to draft, negotiate and finalize a form of transition services agreement, whereby Pine Gate or its Affiliates shall provide reasonable services to Sellers and their Affiliates necessary to transition the Business to Buyer and to effect the Completion of the Transition (the "**TSA**").  Buyer agrees that, with respect to any such Transition Services Agreement, Pine Gate or its Affiliates shall be permitted to assign its obligations thereunder to any other purchaser of assets of the Sellers or their Affiliates in the Chapter 11 Cases.

SECTION 7.03     *Certain Filings*.

(a)     Sellers and Buyer shall cooperate with one another (i) with respect to their obligations set forth in Section 7.03(b), (ii) in determining whether any other action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents and (iii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)     Buyer and each Seller shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including filing, or causing to be filed, as promptly as practicable, (i) any required notification and report forms under the HSR Act or any other Antitrust Laws with the applicable Governmental Authority (to the extent applicable); (ii) any required applications to, notifications to and filings with FERC and (iii) any applications, notices, reports, disclosures or other filings related to the Permits with the applicable Governmental Authority that are necessary or legally required in connection with the consummation of the transactions contemplated by this Agreement (such applications, notices, reports, disclosures or other filings related to the Permits referenced in this clause (ii), including, but not limited to, those as set forth on Section 7.03(b) of the Disclosure Schedules, the "**Permit Approvals**"); provided, however, that no Party shall be obligated to pay any consideration to any third party from whom consent or approval is requested under any Contract.  Buyer and each Seller shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.

(c)     Subject to appropriate confidentiality safeguards, each Party shall (i) respond promptly to any request for additional information, documents or other materials made by any Governmental Authority with respect to any filings or any of the transactions contemplated by this Agreement, (ii) promptly notify counsel to the other Party of, any communications from or with any Governmental Authority in connection with any of the transactions contemplated by this Agreement and, to the extent reasonably practicable, enable counsel to the other Party to participate

in any such communications, (iii) not participate in any prescheduled telephonic or in-person meeting with any Governmental Authority in connection with any of the transactions contemplated by this Agreement unless such Party consults with counsel to the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party a reasonable opportunity to attend, participate and speak thereat, (iv) furnish such information and assistance as may be reasonably requested in connection with the preparation of necessary filings or submission of information to the applicable Governmental Authority and provide counsel to the other Party the opportunity to review in advance any document, opinion or proposal to be made or submitted to any Governmental Authority, and (v) use reasonable best efforts to resolve any objection or assertion by any Governmental Authority challenging this Agreement or the transactions contemplated hereby. Sellers and Buyer shall use their reasonable best efforts to cause the waiting periods under the HSR Act and any other Antitrust Laws to terminate or expire at the earliest possible date after the date of filing (to the extent applicable) and to obtain all FERC approvals and Permit Approvals as promptly as practicable. All filing fees relating to this Section 7.03 shall be borne and paid fully by Sellers.

SECTION 7.04    *Public Announcements*. Neither Sellers nor Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party (which approval will not be unreasonably conditioned, withheld, or delayed) unless, in the reasonable judgment of the applicable disclosing Party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Buyer or Sellers (or their respective Affiliates) lists securities; provided that notwithstanding the foregoing, Buyer and Sellers shall be entitled to disclose information regarding this Agreement or the transactions contemplated hereby to their respective Affiliates and its and their respective employees, direct or indirect equity owners, partners, prospective partners, investors, prospective investors, professional advisors and lenders who have a reasonable need to know the information or to whom there is an obligation to disclose such information and who are bound to confidentiality obligations.

SECTION 7.05    *Employee Matters*.

(a)    No later than thirty (30) days following the date of this Agreement, Sellers' Representative will provide to Buyer a list, prepared by the Sellers in good faith, of the Employees (such list, the "**Employee Census**") and such list shall specify, as applicable and to the extent permitted by applicable Law, each Employee's (i) title or position, (ii) base salary, (iii) date of hire, (iv) working location, (v) accrued but unpaid PTO, vacation, and/or sick leave balances, as applicable, (vi) bonus and/or commission (A) opportunity and (B) amount earned to date in the current applicable period, (vii) classification as exempt or non-exempt under the Fair Labor Standards Act of 1938, (viii) leave status, (ix) work authorization or permit type, (x) union membership, (xii) employing entity, and (xiii) Project(s) on which the individual regularly provides services. No later than the Bid Deadline and contingent on the occurrence of the Closing, Buyer or a Buyer Designee, in its sole discretion, may extend an offer of employment (a "**Transfer Offer**") to one or more Employees selected by Buyer in its sole discretion (each such Employee, an "**Offered Employee**") Each such offer of employment shall be on such terms and conditions as established by Buyer or a Buyer Designee in its sole discretion. The Sellers and their Affiliates

shall cooperate in good faith with and provide reasonable assistance to Buyer and its Affiliates in its or their efforts to make Transfer Offers pursuant to this Section 7.05(a), including by (i) making the Employees reasonably accessible to meet and interview with Buyer or its Affiliates, and (ii) otherwise facilitating Buyer's and its Affiliates' interview and evaluation processes. Each Offered Employee who receives and accepts such a Transfer Offer and commences employment with Buyer or a Buyer Designee and each Employee whose employment transfers by operation of Law (including any individual employed by a Purchased Entity) is referred to herein as a "**Transferred Employee**". Buyer shall notify Sellers in a reasonable timeframe (but in any event within three (3) Business Days of receiving a response from the applicable Employee and no later than immediately prior to the Closing) with respect to whether each such Transfer Offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any Employees will accept the Transfer Offer, or that any Transferred Employee will continue in employment with Buyer or a Buyer Designee following the Closing for any period of time. Buyer shall carry out all necessary actions to effect the timely employment by it of each Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee previously employed by Sellers shall cease to be an employee of the applicable Seller, and the Transferred Employees (and their eligible dependents and beneficiaries) shall cease active participation in the Seller Plans.

(b)    Buyer shall assume, pay and discharge the Liabilities (including, without limitation, the Liabilities of Sellers for all current and deferred salary, wages, accrued but unused vacation, sick days, personal days and/or leave earned or accrued) for each Transferred Employee arising after the Closing. For the avoidance of doubt, all Liabilities arising in respect of periods on or prior to the Closing, relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities with respect to any current or former employee or other service provider of Sellers and their Affiliates shall be retained by Sellers and their Affiliates on the Closing Date, and Sellers and their Affiliates shall be solely responsible for such Liabilities.

(c)    On or before the Closing Date, Sellers shall provide a list of the names and sites of employment of any and all employees of Sellers who have experienced, or are expected to experience, an employment loss or layoff (as defined by the WARN Act) within ninety (90) days prior to the Closing Date. Sellers shall update this list as reasonably requested up to and including the Closing Date. Except with respect to any Transferred Employee whose employment is terminated by Buyer or an Affiliate of Buyer following the Closing Date, (i) Sellers shall be solely responsible for any and all Liabilities arising under the WARN Act relating to any Employees (excluding Transferred Employees) whose employment is terminated by Sellers prior to, upon, or following the Closing and (ii) each Seller shall be solely responsible for any and all Liabilities arising under the WARN Act and relating to any Employee (excluding Transferred Employees) whose employment is terminated by such Seller following the Closing.

(d)    Sellers and Affiliates shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Code with respect to all "M&A qualified beneficiaries", as defined in 26 C.F.R. § 54.4980B-9, to the extent a "selling group", as defined in 26 C.F.R. § 54.4980B-9, of which the individual's employer immediately prior to Closing is a member continues to maintain any group health plan.

(e)     No provision in this Section 7.05 or otherwise in this Agreement, whether express or implied, shall (i) create any third-party beneficiary or other rights in any Person including any employee or former employee of Sellers or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Seller Plan (or other employee benefit or compensation plans or arrangements) or any other Person; (ii) create any rights to continued employment with Sellers, Buyer or any of their respective subsidiaries or Affiliates or in any way limit the ability of Sellers, Buyer or any of their respective subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Seller Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Sellers, Buyer or any of their subsidiaries or Affiliates.

SECTION 7.06     *Tax Matters*.

(a)     For all purposes of this Agreement, in the case of any Straddle Period, (i) Property Taxes allocable to the Pre-Closing Tax Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of calendar days in the entire Straddle Period, and (ii) Taxes other than Property Taxes shall be allocated to the Pre-Closing Tax Period on the basis of a "closing of the books," as if such Tax period ended as of the end of the day on the Closing Date; provided (x) that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in proportion to the number of days in each period; and (y) for the purposes of allocating items of income, gain, loss, deduction, expense, credit and any other items between the Sellers and the Buyer for the taxable year of the any Partnership that includes the Closing Date, such items in respect of any such Partnership shall be allocated using the "interim closing of the books" method as of the Closing Date and the calendar day convention under Section 706 of the Code and Treasury Regulations thereunder (and any corresponding provision of state, local and other applicable Law); provided that for the avoidance of doubt, nothing contained in this Section 7.06(a) shall be construed so as to cause an Assumed Liability to become an Excluded Liability or *vice versa*.

(b)     Any existing Tax Sharing Agreement between any Purchased Entity, on the one hand, and any Sellers or any of their Affiliates, on the other hand, shall be terminated as of the Closing Date.

(c)     The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price as an adjustment to the Purchase Price for all income Tax purposes to the extent permitted by applicable Law.

(d)     Prior to the Closing, each Seller (or, as the case may be, its regarded owner for U.S. federal income tax purposes) shall cause to be delivered to Buyer a properly completed and validly executed IRS Form W-9.

(e)     For the avoidance of doubt, notwithstanding anything else in this Agreement, (i) ownership of any Tax refunds, Tax overpayments or Tax attributes of the Purchased Entities shall

transfer indirectly to Buyer as a result of the purchase of the Purchased Equity Interests pursuant to this Agreement as provided under applicable Law (but such Assets shall not constitute Purchased Assets or be separately purchased by Buyer); (ii) the Purchased Assets shall include any prepaid Property Taxes apportioned to Buyer under Section 7.06(a); and (iii) the Purchased Assets shall exclude all Tax payments made by the Sellers and Tax attributes of the Sellers (and the Parties intend that such attributes will be available to the Sellers to offset Taxes incurred in connection with the transfer of the Purchased Assets).

(f)     All Transfer Taxes imposed on or with respect to the transactions contemplated hereby shall be borne and timely paid one hundred percent (100%) by Sellers.  The Party responsible under applicable Law for filing a Tax Return with respect to such Transfer Taxes shall prepare and timely file such Tax Return and promptly provide a copy of such Tax Return to the other Party; provided, that if the Sellers do not provide a copy of any such Tax Return to Buyer within five (5) Business Days prior to the applicable due date, Buyer shall be permitted to prepare and file such Tax Return on behalf of Sellers.  Buyer and Sellers shall use commercially reasonable efforts and cooperate in good faith to reduce or eliminate any Transfer Taxes to the extent permitted by applicable Law.

(g)     In connection with the direct or indirect transfer of the interests in any Partnership pursuant to this Agreement, notwithstanding anything herein to the contrary (i) Buyer shall be permitted to make, and Sellers shall cooperate in making, in respect of any Partnership (or take any action that would result in any Partnership making), an election under Section 6226 of the Code and Treasury Regulation Sections 301.6226-1 (and any similar or corresponding provision of state or local Law) with respect to any Pre-Closing Tax Period and (ii) except to the extent such an election is validly in effect, the Sellers shall reasonably cooperate in connection with any Partnership making any election pursuant to Section 754 of the Code (and any similar or corresponding provision of state or local Law) for the taxable year of the applicable Partnership that includes the Closing Date.

(h)     Buyer and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, (i) in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; provided that in providing such information, assistance and access, each Party shall be entitled to redact information that is not reasonably related to the Business; and (ii) to amend the structure of the transactions undertaken pursuant to this Agreement in order to qualify for the Intended Tax Treatment or otherwise achieve a Tax-efficient outcome for the Parties.

(i)     Sellers shall cooperate with Buyer from and after the date hereof to determine the amount of ITCs, if any, that are eligible for transfer pursuant to Section 6418 of the Code and the applicable Treasury Regulations thereunder to Buyer as a Purchased Asset and shall, in connection with Closing, take all steps necessary to effectuate the transfer of such eligible ITCs to Buyer; provided that such transfer to Buyer would not, upon consummation of the transactions contemplated herein, result in a recapture to any Seller or any of its affiliates pursuant to Section 50(a) of the Code or otherwise. To the extent that any ITCs are not yet eligible for sale to Buyer as of the Closing Date (whether because the pre-filing registrations have not yet been completed, registration numbers have not yet been assigned, or otherwise), Sellers shall take all steps reasonably necessary to permit the transfer of such ITCs to Buyer as soon as reasonably practicable

following the Closing Date, and shall provide the applicable "Transfer Election Statements" meeting the requirements of Treasury Regulations Section 1.6418-2(b)(5) to Buyer as and when available after Closing. To the extent that it is determined that Buyer is not eligible (and will not become eligible, even after the applicable pre-filing registration and Transfer Election Statement requirements have been satisfied) to acquire an ITC of Sellers pursuant to Section 6418 of the Code and the applicable Treasury Regulations thereunder, then Sellers shall use their respective commercially reasonable efforts to sell or transfer, or cause to be sold or transferred, such ITC, and all net proceeds thereof shall be transferred to Buyer; provided, that any such sale shall be subject to the prior written consent of Buyer.

(j)      Sellers shall prepare and timely file all Tax Returns with respect to the Purchased Assets, the Business, and the Purchased Entities for any Tax period ending on or before the Closing Date (the "**Applicable Seller Prepared Returns**") (and Buyer shall cooperate with Sellers in causing such Tax Returns to be filed). Sellers shall provide Buyer with a draft of all Applicable Seller Prepared Returns at least thirty (30) days prior to the filing of any such Applicable Seller Prepared Returns to the extent such Applicable Seller Prepared Returns relate to any Purchased Asset, Assumed Liabilities, Purchased Entity or the Business. Sellers shall incorporate any changes reasonably requested by Buyer with respect to such Applicable Seller Prepared Returns. As between Sellers and Buyer, unless such Taxes are an Assumed Liability as set forth in Section 2.02, Buyer shall not be responsible for paying any Taxes shown on any Applicable Seller Prepared Return a Seller is obligated to file under this Section 7.06(j).

(k)      Except as otherwise provided by Section 7.06, Buyer shall prepare and timely file all Tax Returns required to be filed by the Purchased Entities for any Tax period ending after the Closing Date in accordance with past practice of the applicable Purchased Entity (except as otherwise required by applicable Law). Sellers shall be responsible for paying any Taxes reflected on any Tax Return that Buyer is obligated to prepare and file under this Section 7.06 that are Excluded Liabilities. To the extent that any such Tax Return reflects Taxes that are Excluded Liabilities, Buyer shall deliver to Seller a copy of such Tax Return at least fifteen (15) days prior to the applicable due date thereof, together with an accounting of the amount of Taxes required to be paid by Sellers in respect of such Tax Return. Sellers shall remit such Taxes to Buyer no later than five (5) days prior to the due date of the applicable Tax Return.

(l)      The Parties agree that for purposes of filing any Tax Return related to the transactions contemplated by this Agreement the Parties shall not apply the principles of Pierce v. Commissioner, 326 F. 2d 67 (8th Cir. 1964) with respect to any prepaid amount received or deferred revenue accrued prior to the Closing in connection with the Purchased Assets, the Purchased Entities or the Business unless otherwise required by a "final determination" within the meaning of Section 1313(a) of the Code.

(m)      Each Party agrees that, for U.S. federal (and applicable state and local) income Tax purposes, (i) the purchase and sale or assumption, as the case may be, of the Purchased Assets and Assumed Liabilities contemplated by this Agreement shall be treated as a taxable exchange governed by Section 1001 of the Code, and (ii) Buyer shall be treated for U.S. federal income tax purposes as acquiring assets underlying the Purchased Entities (and, for the avoidance of doubt, as acquiring no stock of any entity classified as a "C corporation" for U.S. federal income tax purposes) (the "**Intended Tax Treatment**"). Each party hereto shall file any federal, state and

local income Tax Returns on a basis consistent with the foregoing treatment, and each party hereto will assert the correctness of that treatment, and each party will not adopt any treatment that is contrary to or inconsistent with that treatment, in all dealings with the Internal Revenue Service unless otherwise required by a "final determination" within the meaning of Section 1313(a) of the Code.

SECTION 7.07       *Misallocated Assets and Liabilities*.

(a)       If, following the Closing, Buyer or its Affiliates own or hold any Excluded Asset (including by having an Excluded Asset located at any Owned Real Property or any Leased Real Property that is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer, at no cost to Sellers, such Excluded Asset as soon as practicable to any Sellers designated by Sellers' Representative.  If, following the Closing, Sellers or any of their respective Affiliates own any Purchased Asset, the applicable Seller shall transfer, or shall cause its respective Affiliate to transfer, at no cost to any Seller, such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer.  Notwithstanding the foregoing, Sellers' obligations under this <u>Section 7.07</u> shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.

(b)       If, following the Closing, Buyer or its Affiliates own or hold any Excluded Liability, Buyer shall transfer, or shall cause its Affiliate to transfer, such Excluded Liability as soon as practicable to any Sellers designated by Sellers' Representative.  If, following the Closing, Sellers or any of their respective Affiliates own any Assumed Liability, the applicable Seller shall transfer, or shall cause its respective Affiliate to transfer, such Assumed Liability as soon as practicable to Buyer or an Affiliate designated by Buyer.  Notwithstanding the foregoing, Sellers' obligations under this <u>Section 7.07</u> shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.

SECTION 7.08       *Support Obligations*.

(a)       Buyer shall use commercially reasonable efforts (at Buyer's sole cost and expense) to (i) replace all Support Obligations in a form, for an amount and on terms that satisfy all requirements of the applicable Contracts or Laws under which such Support Obligation was or is required and (ii) effect the full and unconditional release of the Sellers and each of their respective Affiliates (other than the Purchased Entities) from all Support Obligations and all obligations and liabilities in respect thereof, in form and substance reasonably satisfactory to Sellers, in each case of the foregoing clauses (i) and (ii) effective as of the Closing. Sellers shall, and shall cause their applicable Affiliates to, reasonably cooperate with Buyer with respect to the foregoing.

(b)       To the extent any Support Obligation is not replaced and the Sellers and each of their respective Affiliates (other than the Purchased Entities) are not fully and unconditionally released therefrom, in each case at or prior to the Closing, in accordance with this <u>Section 7.08</u> (such Support Obligations, collectively, the "**Continuing Support Obligations**"):

(i)　　　such Seller or such applicable Affiliate shall, subject to Buyer's compliance with this Section 7.08, maintain such Continuing Support Obligation in effect after the Closing to the extent so permitted;

(ii)　　　Buyer shall continue to use, and shall cause the Purchased Entities to use, commercially reasonable efforts (at Buyer's sole cost and expense) to, as promptly as practicable after the Closing, (A) replace all Continuing Support Obligations then-outstanding in a form, for an amount and on terms that satisfy all requirements of the applicable Contracts or Laws under which each such Continuing Support Obligation was or is required, and (B) effect a full and unconditional release of the Sellers and each of their respective Affiliates (other than the Purchased Entities ) from all such Continuing Support Obligations and all obligations and liabilities in respect thereof, in form and substance reasonably satisfactory to Sellers;

(iii)　　　Buyer shall, or shall cause the Purchased Entities to, (A) indemnify, defend and hold harmless each of the Sellers and their respective Affiliates against, and reimburse each of them for, any and all amounts paid or incurred after the Closing in respect of any Continuing Support Obligation, and (B) in any event, if any Continuing Support Obligation is, after the Closing, drawn upon, called, required to be performed or otherwise requires the payment of any Liability, Buyer shall, or shall cause the Purchased Entities to, promptly (in any event within thirty (30) days of the occurrence thereof) pay to or fully reimburse the Sellers and its Affiliates to the extent any of the Sellers or any of their respective Affiliates is required to make or makes any payment or is obligated to reimburse or reimburses the party issuing such Continuing Support Obligation for the applicable drawn upon, called or required amount or Liability (including any related fees, penalties or interest that may be incurred in connection with the drawing, calling or performance of any such Continuing Support Obligation).

SECTION 7.09　　　*Payments from Third Parties after Closing*.  In the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Purchased Contracts (or with respect to the operation by Buyer of the business of Sellers or any Purchased Asset during the post-Closing period) and to the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, Sellers shall, at no cost to Sellers, forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers) and notify such third party to remit all future payments (in each case, to the extent such payment is in respect of any post-Closing period with respect to the business of Sellers and is not in respect of an Excluded Asset or an Excluded Liability) pursuant to the Purchased Contracts to Buyer (or such other entity).  Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection with, any Excluded Asset, Buyer shall forward such payment, at no cost to Buyer, as promptly as practicable but in any event within thirty (30) days after such receipt, to the applicable Seller (or other entity nominated by Sellers' Representative in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the applicable Seller (or such other entity as Sellers' Representative may designate).  Notwithstanding the foregoing, Sellers' obligations under this Section 7.09 shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in

each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.

SECTION 7.10 *Bulk Transfer Laws*. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer Laws, and the Parties shall take all reasonable steps as may be necessary or appropriate to so provide in the Sale Order.

SECTION 7.11 *Bankruptcy Court Approval*.

(a)     On the Petition Date, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order approving, among other things, the execution, delivery, and performance of this Agreement by the Parties hereto and the parties to the other Transaction Documents, other than the performance of those obligations to be performed at or after the Closing. The form and substance of such motion and the Bidding Procedures contained therein shall be reasonably acceptable to Buyer.

(b)     The Bidding Procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Buyer agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Chapter 11 Cases, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Chapter 11 Cases, or any other party in interest, with such modifications being reasonably acceptable to Buyer.

(c)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article 11 and (ii) the Closing, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order.

(d)     Sellers shall comply with the Asset Sale Milestones (as defined in the DIP Credit Agreement).

(e)     Sellers shall serve on all non-Debtor counterparties to all of their Purchased Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Purchased Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than seven (7) days prior to the Sale Hearing.

(f)     Sellers and Buyer shall cooperate in good faith to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such applicable respective Representatives of Buyer and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer

and/or the Buyer Designee(s) as required under Section 365 of the Bankruptcy Code, demonstrating that Buyer and/or the Buyer Designee(s), as applicable, is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and demonstrating that the Credit Bid was validly directed under the DIP Credit Agreement and the Prepetition Credit Agreement.  Sellers and Buyer acknowledge that in order to obtain such approval Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets and that such demonstration shall include serving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(g)     Each Seller and Buyer (or their applicable respective Representatives), in each case, shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(h)     Subject to entry of the Sale Order and upon consummation of the Closing, Seller shall pay, or cause the payment of, the Cure Costs and cure any and all other defaults and breaches under the Purchased Contracts (except, for the avoidance of doubt, in the case of any Restructuring pursuant to Section 7.17) so that such Purchased Contracts may be assumed by the applicable Seller and assigned to the Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

(i)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Buyer and/or the Buyer Designee(s) on the terms set forth herein and free and clear of all Liabilities, Claims and Encumbrances (other than Liabilities, Claims and Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the execution, delivery, and performance by Sellers of their respective obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer and/or the applicable Buyer Designee(s) the Purchased Contracts, (iii) find that Buyer and/or the Buyer Designee(s), as applicable, is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, find that neither Buyer nor the Buyer Designee(s) is a successor to any Seller and grant Buyer and/or the Buyer Designee(s) the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer and the Buyer Designee(s) shall have no Liability or responsibility for any Excluded Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement or as required under applicable non-bankruptcy Law, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, environmental, or substantial continuity, (v) find that Buyer and/or the Buyer Designee(s), as applicable, has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Purchased Contracts, (vi) to the extent that an Order of the Bankruptcy Court has not already done so, find that the Credit Bid was validly directed under the DIP Credit Agreement and the Prepetition Credit Agreement, (vii) approve Buyer's credit bid pursuant to Section 363(k) of the

Bankruptcy Code with respect to the DIP Obligations and the Prepetition Obligations, and (viii) direct and authorize delivery, at or prior to Closing, of lien release deliverables, including executed UCC-3 termination statements, mortgage releases/satisfactions, control agreement terminations, intellectual property security interest releases, and any other instruments necessary to evidence discharge of liens on the Purchased Assets other than Permitted Encumbrances.  Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer and/or the Buyer Designee(s), as applicable, is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code and in accordance with the Bidding Procedures Order.  Nothing in this Agreement shall require Buyer, a Buyer Designee, Sellers or their respective Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(j)      Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 2.03, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Claims, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets.  On the Closing Date, the Purchased Assets shall be transferred to Buyer or to the applicable Buyer Designee, as applicable, free and clear of all obligations, Claims, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(k)      In the event the entry of the Bidding Procedures Order, the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such Order), Buyer and Sellers shall use commercially reasonable efforts to defend such appeal.  Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(l)      Notwithstanding anything contained herein to the contrary, during the pendency of the Chapter 11 Cases, Sellers shall not intentionally reject or transfer any Excluded Contract without first obtaining Buyer's prior written consent.  In the event that any of the Parties to this Agreement discovers a Contract related to the business of any Seller or its Subsidiaries, the Purchased Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i)(A) was not set forth on Section 2.01(b) of the Disclosure Schedules and (B) no Purchased Entity is a party to such Contract, (ii) is a Contract of which Buyer wishes to assume the rights and obligations, and (iii) has not been rejected by Sellers (obtaining Buyer's prior written consent), Buyer and the applicable Sellers shall execute, acknowledge and deliver such other

instruments and take such further actions as are reasonably practicable for Buyer or the applicable Buyer Designee to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 2.05.

(m)     For the avoidance of doubt, the Sale Order shall expressly approve Buyer's exercise of its right to credit bid pursuant to Section 363(k) of the Bankruptcy Code and authorize the Agent (as defined in the DIP Credit Agreement) to satisfy the Credit Bid and deliver all related payoff and release documentation.

SECTION 7.12     *No Successor Liability*.  The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, neither Buyer nor any Buyer Designee shall be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that neither Buyer nor any Buyer Designee shall have any Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Purchased Assets) against Sellers or any of Sellers' predecessors or Affiliates, and neither Buyer nor any Buyer Designee shall have any successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Purchased Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date.  The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in Section 7.11(m).

SECTION 7.13     *Investigation; Purchased Assets*.

(a)     Buyer acknowledges for the benefit of Sellers (and their respective financial and other professional advisors) that it has conducted its own independent investigation and analysis of the business, operations, Assets, liabilities, results of operations, condition (financial or otherwise) and prospects of the Business, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Purchased Entities, and that it and its representatives have received sufficient access to certain of the books and records, facilities, Contracts and other Assets of the Business (including the Purchased Assets and the Purchased Entities) for such purpose.  Buyer further acknowledges and agrees for the benefit of Sellers (and their respective financial and other professional advisors) that, except for the representations and warranties contained in Article 3 (as modified by the Disclosure Schedules), no Seller nor any of its respective Affiliates or financial or other professional advisors, nor its or their respective Representatives, makes or has made any representation or warranty, either express or implied, or other statements or information concerning the Business, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Purchased Entities in connection with the transactions contemplated by this Agreement and Sellers hereby disclaim any other representations made by any Seller or any other Person concerning the Business, the Purchased

Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Purchased Entities in connection with the transactions contemplated by this Agreement. No Seller makes any representations or warranties regarding the probable success or profitability of the Business. Buyer has not relied on any representation, warranty or other statement by any Person on behalf of Sellers, other than the representations and warranties of Sellers expressly contained in <u>Article 3</u> (as modified by the Disclosure Schedules). Notwithstanding the foregoing, nothing in this <u>Section 7.13</u> shall limit or alter the rights of Buyer under any other agreement with Sellers, including the DIP Credit Agreement and the DIP Facility.

(b)      Buyer agrees, warrants and represents that Buyer is purchasing the Purchased Assets "<u>AS IS</u>" and "<u>WITH ALL FAULTS</u>" based solely on the representations and warranties set forth in <u>Article 3</u> (as modified by the Disclosure Schedules) and Buyer's own investigation of the Sellers, the Purchased Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Business. Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "<u>AS IS</u>" and "<u>WITH ALL FAULTS</u>." Buyer agrees, warrants and represents that, except for the express representations and warranties set forth in <u>Article 3</u> (as modified by the Disclosure Schedules), Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN <u>ARTICLE 3</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES), NO SELLER MAKES ANY EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS, THE PURCHASED ENTITIES, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES OR THE BUSINESS.

SECTION 7.14      *Releases*.

(a)      Effective as of the Closing, each Seller, for itself and on behalf of its past, present and future controlled Affiliates and its and such Affiliates' respective current or former directors, officers, members, partners, managers, employees, agents, lenders, investment bankers, attorneys, accountants, advisors and other representatives (collectively, "**Representatives**"), and each of its and their respective successors, assigns, heirs and executors (each, a "**Seller Releasor**"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all Claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Seller Releasor has, may have, or may assert now or in the future against (i) Buyer or any Buyer Designee, (ii) any Affiliates of Buyer or any Buyer Designee, (iii) any Representatives of Buyer or any Buyer Designee or their respective Affiliates, (iv) any current (as of the Closing Date) or former direct or indirect equity holder in Buyer or any Buyer Designee or any of their respective Affiliates, (v) any Purchased Entity or its Subsidiaries, (vi) current or future direct or indirect equityholder of Buyer and its Affiliates and Representatives, (vii) any lenders of Buyer,

any Buyer Designee or their respective Affiliates and (viii) with respect to (i)-(vii) each of their Representatives (collectively, the "**Buyer Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise.  In addition, notwithstanding the foregoing, nothing in this Section 7.14 shall be deemed to release, waive or otherwise diminish in any respect any (i) rights or remedies of any Seller Releasor under this Agreement (including with respect to ITC recapture and obligations under the Tax Equity Documents), (ii) claims for willful misconduct or fraud, (iii) rights and remedies under the Surviving Post-Closing Covenants, or (iv) obligations of any party to a Tax Equity Document or under any Tax Equity Document.

(b)        Effective as of the Closing, Buyer, for itself and on behalf of its past, present and future controlled Affiliates (including the Purchased Entities) and its and such Affiliates' respective Representatives, and each of its and their respective successors, assigns, heirs, and executors (each, a "**Buyer Releasor**" and, together with the Seller Releasors, the "**Releasors**"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all Claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Buyer Releasor has, may have, or may assert now or in the future against (i) each Seller, (ii) any Affiliates of Sellers and (iii) any Representatives of Sellers or their respective Affiliates (collectively, the "**Seller Released Parties**" and, together with the Buyer Released Parties, the "**Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise.   In addition, notwithstanding the foregoing, nothing in this Section 7.14 shall be deemed to release, waive or otherwise diminish in any respect any (i) rights or remedies of any Buyer Releasor under this Agreement (including with respect to ITC recapture and obligations under the Tax Equity Documents), the TSA, if applicable, or any ancillary agreements, (ii) claims for willful misconduct or fraud, (iii) rights and remedies under the Surviving Post-Closing Covenants, or (iv) obligations of any party to a Tax Equity Document or under any Tax Equity Document.

(c)        THE RELEASORS UNDERSTAND THAT THIS RELEASE AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.  In giving the release herein, which includes claims which may be unknown to the Releasors at present, the Releasors acknowledge that they have read and understand Section 1542 of the California Civil Code ("**Section 1542**"), which read as flows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."  The Releasors hereby expressly waive and relinquish all rights and benefits under Section 1542 and any law of any other jurisdiction of similar effect with respect to the Releasors' release of any unknown or unsuspected claims herein.

SECTION 7.15        *Real Property Matters*. Upon a request by Buyer, Sellers shall use commercially reasonable efforts to obtain a customary form of estoppel certificate in a form reasonably acceptable to Buyer with respect to each lease encumbering the Owned Real Property and each Lease specified in such request, duly executed by each counterparty thereto.  For the avoidance of doubt, the receipt of such an estoppel shall not be a condition precedent to the obligations of Buyer under this Agreement. Sellers shall cooperate reasonably, at Buyer's expense, with Buyer in obtaining commitments, reports and/or policies of title insurance (in forms reasonably acceptable to Buyer) with respect to any Owned Real Property, but, for the avoidance of doubt, Sellers shall not be required to offer any indemnities or incur any liabilities in connection therewith. For the avoidance of doubt, none of the receipt of a title commitment, report or title policy shall be a condition precedent to the obligations of Buyer under this Agreement.

SECTION 7.16        *Cutover and Transition*. Sellers, PG O&M, ACT and Buyer shall, and Pine Gate shall cause all of its Subsidiaries to, cooperate with one another, to the extent such Person provides the below services to the Purchased Entities in the Ordinary Course or such services are otherwise required for Completion of the Transition, to implement the transition of the operations, maintenance, asset management and repair services currently provided under the O&M Agreements and the Asset Management Agreements to Buyer or its designee, which transition shall consist of the implementation of any back-end, operational or any other support systems, the coordination of ongoing financing and tax equity transactions and any knowledge transfer reasonably required in connection with the transition services and associated deliverables set forth on Exhibit B (such transition the "**Transition**").  The completion of the Transition for purposes of this Agreement shall be deemed to have occurred upon Buyer's good faith determination that the requirements set forth on Exhibit C have been satisfied (the "**Completion of the Transition**"). Upon the Completion of the Transition, Buyer may, and may cause each of its respective Affiliates, to terminate the Project Level O&M Agreements and the Asset Management Agreements and pay any termination fees in accordance therewith. To the extent Buyer has waived the condition set forth in Section 9.02(k) to consummate the Closing, the terms of this Section 7.16 shall be incorporated into the TSA by reference *mutatis mutandis*.  Upon a Services Related Sale (as defined below) to a Person that Buyer determines, in its reasonable discretion, is not an acceptable service provider for the O&M Agreements and the Asset Management Agreements, Buyer may terminate such Contracts without regard to any notice requirements thereunder and without liability for any termination fees thereunder.  To the extent Sellers or any of their Affiliates have sold, transferred, assigned, conveyed, or delivered (or entered into a Contract to sell, transfer, assign, convey, or deliver) the Equity Interests of ACT or PG O&M, the Asset Management Agreements and the O&M Agreements ("**Services Related Sale**"), PG O&M, ACT, Pine Gate Renewables or the applicable service provider and the Sellers shall use commercially reasonable efforts to, and shall cause their Affiliates to use commercially reasonable efforts to, require as a condition to the consummation of such Services Related Sale that the purchaser thereof (A) expressly assume in writing the due and punctual performance and observance of all terms, covenants, agreements, and conditions of the O&M Agreements and the Asset Management Agreements, as applicable, (B) comply with the terms of this Section 7.16 and the TSA, if applicable, and (C) covenant that, if such purchaser subsequently sells, transfers, assigns, conveys, or delivers (or enters into a Contract to sell, transfer, assign, convey, or deliver) the Equity Interests of ACT or PG O&M, the Asset Management Agreements or the O&M Agreements, as applicable, to any other Person (a "**Subsequent Transferee**"), it shall use commercially reasonable efforts to require, as a condition to such subsequent transaction, that the

Subsequent Transferee expressly assume in writing the due and punctual performance and observance of all terms, covenants, agreements, and conditions of the Asset Management Agreements or the O&M Agreements, as applicable, this <u>Section 7.16</u> and the TSA.

SECTION 7.17     *Restructuring.*  From the date hereof until the Closing Date, Buyer may, upon written notice to the Sellers' Representative, modify or amend the acquisition structure for any of the Magnolia Project, Lotus Project, GA Solar 5 Project, Limewood Project, Cane Creek Project, Moon Shot Project, Rio Lago Project or Old Hayneville Project (each, a "**Specified Development Project**" and collectively, the "**Specified Development Projects**") so that the subject of the purchase thereof, whether by Buyer or an affiliate of Buyer, is either the Purchased Entities that own such Specified Development Project or the Assets of the Purchased Entities relating to such Specified Development Project (a "**Restructuring**"). Sellers shall, and shall cause the applicable Purchased Entities to, effect any Restructuring (including by executing and delivering customary instruments of transfer and assignment, seeking and supporting entry of any necessary Orders of the Bankruptcy Court, and using commercially reasonable efforts to obtain any required third-party consents); <u>provided</u> that, no Restructuring shall delay the Closing or require modification of any milestones under, this Agreement, the DIP Credit Agreement or any Order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, with respect to any Restructuring, Buyer shall pay, or cause the payment of, all incremental Transfer Taxes and all incremental Cure Costs (other than any Cure Costs incurred in accordance with <u>Section 2.01(b)</u>, which shall be paid by Sellers), in each case, arising directly as a result of any such Restructuring. The Parties agree to amend this Agreement to reflect the terms of any Restructuring including with respect to the inclusion of customary terms and conditions with respect to assumed and excluded assets and liabilities related to the Purchased Entities and, to the extent applicable, the Parties shall cooperate in good faith to update the Allocation Schedule and related deliverables to reflect the modified structure. Within thirty (30) days of the date hereof, Sellers shall provide a good faith estimate of Cure Costs related to the Contracts for the Specified Development Projects and any incremental Transfer Taxes that would be incurred directly as a result of a Restructuring.

SECTION 7.18     *Intellectual Property Licenses.*

(a)     Effective as of the Closing Date, Sellers, on behalf of themselves and their Affiliates, hereby grant to Buyer and its Affiliates a perpetual, irrevocable, royalty-free, fully-paid up, sublicensable, transferrable (in connection with a transfer of the Business), worldwide, non-exclusive license under all Intellectual Property (excluding Trademarks) owned or controlled by Sellers or their Affiliates that is used in the Business as of Closing, solely for use in connection with the Business and natural evolutions thereof.

(b)     Effective as of the Closing Date, Sellers, on behalf of themselves and their Affiliates, hereby grant to Buyer and its Affiliates a royalty-free, fully-paid up, sublicensable, transferrable (in connection with a transfer of the Business), worldwide, non-exclusive license under all Trademarks owned by Sellers  or their Affiliates that are used in the Business as of Closing for use in connection with the Business, solely for a period of six (6) months following Closing; <u>provided</u> that Buyer and its Affiliates shall have no obligation to rebrand any existing deployed inventory or non-public facing materials included in the Purchased Assets. Buyer and its Affiliates agree that their use of any such licensed Trademarks shall be of a quality commensurate with the prestige of such licensed Trademarks and substantially similar to the quality of the goods

and services in connection with which such Trademarks are used in the Business as of the Closing Date. All rights accruing from Buyer's and its Affiliates' use of such licensed Trademarks (and any goodwill resulting from such uses) shall inure solely to the benefit of Sellers or their Affiliates, as applicable.

(c)     Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates (including the Purchased Entities), hereby grants to Sellers and their Affiliates a perpetual, irrevocable, royalty-free, fully-paid up, sublicensable, transferrable (in connection with the business retained by them), worldwide, non-exclusive license under all Intellectual Property owned by the Purchased Entities (excluding Trademarks), in each case, that is used as of the Closing in the business retained by Sellers and their Affiliates, solely for use in connection with such business and natural evolutions thereof.

## ARTICLE 8

## SELLERS' REPRESENTATIVE

SECTION 8.01     *Appointment*.   Effective as of the date hereof, each Seller, for himself, herself or itself, and for his, her or its respective successors and assigns, hereby irrevocably makes, constitutes and appoints Pine Gate (the "**Sellers' Representative**") as such Seller's true and lawful attorney-in-fact, with full power of substitution, to exercise such powers under this Agreement and any other agreement or instrument entered into in connection with the transactions contemplated by this Agreement that require any form of Seller approval or consent, together with all such powers as are reasonably incidental thereto, to act on behalf of such Seller with respect to the Purchased Assets in any litigation or arbitration or other dispute involving this Agreement or any of the other documents or agreements entered into in connection with the transactions contemplated hereby, to do or refrain from doing all such further acts and things, and to execute and deliver all such documents as the Sellers' Representative shall deem necessary or appropriate in his, her or its sole discretion in connection with the transactions contemplated hereby, including, without limitation, to: (a) execute and deliver all amendments, waivers, ancillary agreements, instruments of assignment, notices, certificates and documents that the Sellers' Representative deems necessary or appropriate in connection with the transactions contemplated hereby (including the consummation thereof) and any and all other agreements referenced herein, and to exercise all rights hereunder and thereunder; (b) act for and on behalf of each Seller with respect to any claim or matter arising on or after the Closing Date under this Agreement, including in respect of giving and receiving notices, requests, demands, claims, or other communications under Section 12.01; (c) accept service of process on behalf of Sellers pursuant to Section 12.05; (d) update and revise the Allocation Schedule; (e) engage counsel, and such accountants and other representatives for such Seller and incur such other expenses on behalf of such Seller in connection with this Agreement as the Sellers' Representative may, in each case, and in the Sellers' Representative's sole discretion, deem appropriate; (f) interpret any and all of the terms and provisions of this Agreement; (g) consent to any amendment or waiver of any of the terms or provisions of this Agreement; and (h) to receive funds for the payment of expenses of such Seller or the Sellers' Representative and to apply such funds in payment for such expenses. The execution of any documents permitted by the immediately preceding sentence by Pine Gate, acting as Sellers' Representative, shall be conclusive evidence of its authority as attorney-in-fact hereunder, and generally to say, do, act, transact, determine, accomplish and finish all matters and

things whatsoever, relating to the powers granted herein, as fully, amply and effectually as though such Seller, if present, ought or might personally do and Buyer shall be able to rely conclusively on the instructions and decisions of Sellers' Representative in all respects. Each Seller acknowledges that the appointment of Pine Gate as the Sellers' Representative herein is coupled with an interest and may not be revoked and will survive insolvency or bankruptcy of any Seller. The Sellers' Representative accepts its appointment and authorization to act as attorney-in-fact and agent of the Sellers. The power and authority granted hereunder will be exclusive and no Seller shall be entitled to exercise any right under this Agreement except through the Sellers' Representative.

SECTION 8.02        *Authorization*.   In furtherance of the appointment of the Sellers' Representative herein made and to the extent of the authority granted to the Sellers' Representative pursuant to <u>Section 8.01</u>, each Seller, fully and without restriction: (a) agrees to be bound by all notices received and agreements and determinations made by and documents executed and delivered by the Sellers' Representative under this Agreement and (b) authorizes the Sellers' Representative to (i) perform the transactions to be performed by any Seller under this Agreement, (ii) dispute or refrain from disputing any claim made by the Buyer under this Agreement, (iii) negotiate and compromise any dispute that may arise under this Agreement, (iv) exercise or refrain from exercising any remedies available to any Seller under this Agreement, (v) sign any releases or other documents with respect to any such dispute or remedy, (vi) waive any condition contained in, or execute any amendment to, this Agreement, (vii) give such instructions and do such other things and refrain from doing such other things as the Sellers' Representative, in his, her or its sole discretion, deems appropriate to carry out the provisions of this Agreement, (viii) give and receive notices, requests, demands, claims or other communications under <u>Section 12.01</u>, (ix) accept service of process on behalf of the Sellers pursuant to <u>Section 12.05</u> and (x) retain such counsel, accountants and other professional advisors as the Sellers' Representative reasonably deems necessary to assist it in the performance of his, her or its duties hereunder.

SECTION 8.03        *Sellers' Representative Expenses*.   All of Sellers' Representative's reasonable out-of-pocket expenses incurred in serving in that capacity and any costs and expenses incurred by Sellers' Representative pursuant to this <u>Article 8</u> shall be borne by Sellers in accordance with their respective Pro Rata Shares. Sellers' Representative shall have the right to setoff Sellers' Representative's reasonable out-of-pocket expenses incurred in serving in that capacity and any costs and expenses incurred by Sellers' Representative pursuant to this <u>Article 8</u> against any distribution to Sellers.

SECTION 8.04        *Indemnification*.   Each Seller hereby agrees to indemnify the Sellers' Representative (in his, her or its capacity as such), and to hold the Sellers' Representative (in his, her or its capacity as such) harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of whatever kind which may at any time be imposed upon, incurred by or asserted against the Sellers' Representative in such capacity in any way relating to or arising out of the Sellers' Representative's action or failure to take action pursuant to this Agreement or any other document or agreement contemplated herein or in connection herewith in such capacity; <u>provided</u>, <u>however</u>, that no Seller shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the gross negligence, bad faith or willful misconduct of the Sellers' Representative.

SECTION 8.05        *Successor Sellers' Representative*.  The Sellers' Representative may resign at any time by giving notice thereof to Sellers and Buyer at least two (2) Business Days prior to such resignation, upon which time a successor Sellers' Representative shall be appointed by a majority of the Sellers or the Sellers' Representative.  Upon the acceptance of its appointment as the Sellers' Representative hereunder by a successor Sellers' Representative, such successor Sellers' Representative shall thereupon succeed to and become vested with all the rights and duties of the resigning Sellers' Representative, and the resigning Sellers' Representative shall be discharged from its duties and obligations hereunder.  After the resigning Sellers' Representative's resignation hereunder as the Sellers' Representative, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Sellers' Representative.

ARTICLE 9

CONDITIONS TO CLOSING

SECTION 9.01        *Conditions to Obligations of Buyer and Sellers*.  The respective obligations of each of Buyer and Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the party receiving the benefits of such obligation) at or prior to the Closing of the following conditions:

(a)        all approvals or consents of Governmental Authorities required prior to Closing applicable to the purchase and sale of the Purchased Assets and the Purchased Entities shall have been obtained, including under the HSR Act or any other Antitrust Laws (to the extent applicable);

(b)        authorization for the transactions contemplated by this Agreement shall have been obtained from FERC;

(c)        no provision of any Applicable Law and no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing; and

(d)        the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order and this Agreement shall become effective in accordance with its terms, and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties.

SECTION 9.02        *Conditions to Obligation of Buyer*.  The obligations of Buyer to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Buyer in their sole discretion) at or prior to the Closing of the following further conditions:

(a)        (i) the representations and warranties of Sellers in Article 3 (in each case, other than the representations and warranties in Section 3.01, Section 3.02, Section 3.03(a)(i), Section 3.04(a) and (b), Section 3.06, Section 3.09(b) and Section 3.22) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein), has not had or would not reasonably be expected to have a Material

Adverse Effect, and (ii) the representations and warranties set forth in <u>Section 3.01</u>, <u>Section 3.02</u>, <u>Section 3.03(a)(i)</u>, <u>Section 3.04(a)</u> and <u>(b)</u>, <u>Section 3.06</u>, <u>Section 3.09(b)</u> and <u>Section 3.22</u> shall be true and correct in all respects (other than *de minimis* inaccuracies; <u>provided</u>, that such de minimis inaccuracy exception shall not apply to the representations and warranties contained in <u>Section 3.06 and Section 3.09(b)</u>) on and as of the Closing (and in the case of <u>Section 3.06 and Section 3.09(b)</u> on and as of the date hereof), except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects (other than *de minimis* inaccuracies; <u>provided</u>, that such de minimis inaccuracy exception shall not apply to the representations and warranties contained in <u>Section 3.06 and Section 3.09(b)</u>) as of such earlier date;

(b)     the covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)     there shall not have been a Material Adverse Effect since the Balance Sheet Date;

(d)     the Sale Order and the provisions of the Confirmation Order relating to the terms of this Agreement (if any) and the authorization of the consummation of the transactions contemplated hereby shall be in form and substance acceptable to Buyer and consistent with the terms of this Agreement;

(e)     the Brookfield Excluded Claims shall have been sold, transferred, assigned and conveyed, by the holder thereof, to Buyer;

(f)     Sellers shall have paid all Cure Costs arising directly as a result of any Purchased Contract (except, for the avoidance of doubt, in the case of any Restructuring);

(g)     consummation of the foreclosure or other release of all backleverage liens encumbering the Purchased Equity Interests and delivery of evidence reasonably satisfactory to Buyer, including UCC-3s and any equity interest releases, or establishment of an escrow closing with lien releases to be recorded promptly upon satisfaction of specified conditions;

(h)     there shall be no termination or material default notices outstanding in connection with the Tax Equity Documents;

(i)     Sellers shall have paid all outstanding fees and expenses in cash in accordance with the DIP Credit Agreement, including the professional fees and expenses of the Lenders (as defined in the DIP Credit Agreement);

(j)     Sellers' Representative shall have delivered, or cause to be delivered, to Buyer each item set forth in <u>Section 2.09(a)</u>;

(k)     ACT and PG O&M shall have agreed to waive any termination or similar fees or other claims or damages arising under any O&M Agreement or Asset Management Agreement in the event of a Services Related Sale to a Person that Buyer determines, in its reasonable discretion, is not an acceptable service provider for the O&M Agreements or the Asset Management Agreements; and

(l)      the Completion of the Transition has occurred.

SECTION 9.03      *Conditions to Obligation of Sellers*.  The obligation of Sellers to consummate the Closing is subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in its sole discretion) at or prior to the Closing of the following further conditions:

(a)      the representations and warranties of Buyer in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein) in all respects as of such earlier date, except where such failures to be true and correct would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)      the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)      Buyer shall have paid the Cure Costs arising directly as a result of any Restructuring pursuant to and accordance with Section 7.17; and

(d)      Buyer shall have delivered, or cause to be delivered, to Sellers' Representative each item set forth in Section 2.09(b).

SECTION 9.04      *Waiver of Conditions*.  Upon the occurrence of the Closing, any condition set forth in this Article 9 that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Buyer or Sellers may rely on the failure of any condition set forth in this Article 9, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement or otherwise comply with any provision of this Agreement, in all material respects.

SECTION 9.05      *Notice of Alternative Transaction*.  From and after the date that the Auction is declared closed by the Sellers, which shall be no later than 5:00 p.m. (prevailing Central time) on the date that is one day prior to the Sale Hearing (as defined in the Bidding Procedures Motion) (the "**Close of the Auction**"), Sellers will not, directly or indirectly, and will not permit any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) to initiate contact with or solicit or knowingly encourage submission of any inquiries, proposals or offers by any Person with respect to an Alternative Transaction, otherwise facilitate any effort or attempt to make a proposal or offer to Sellers or any of their respective Affiliates or Representatives (or Representatives of any of their respective Affiliates) with respect to an Alternative Transaction, pursue or agree to any Alternative Transaction, or continue discussions or participate in negotiations with any Person with respect to an Alternative Transaction.

# ARTICLE 10

## SURVIVAL

SECTION 10.01     *Survival*.  The Parties, intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "**Surviving Post-Closing Covenants**") until the earliest of (i) full performance of such covenant in accordance with its terms, (ii) three (3) years following the Closing Date and (iii) with respect to each Seller individually, the completion of the Wind-Down of such Seller.  Except with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by Buyer, and Buyer shall cause its Affiliates not to assert or seek any other remedy, against Sellers or any of their respective Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law.  Notwithstanding any of the forgoing, nothing in this Section 10.01 shall limit the Buyer's or its Affiliates' right to (i) seek specific performance of the other Parties' obligations hereunder that contemplate performance following the Closing in accordance with Section 12.08 or (ii) bring a claim (and, if successful, recover damages) for fraud or willful misconduct. Buyer and Sellers acknowledge and agree, on their own behalf and on behalf of their Affiliates that the agreements contained in this Section 10.01 are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.01, none of the Parties would enter into this Agreement.

# ARTICLE 11

## TERMINATION

SECTION 11.01     *Grounds for Termination*.  This Agreement may be terminated only in accordance with this Section 11.01. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Sellers' Representative and Buyer;

(b)     by written notice of either Sellers' Representative or Buyer, if the Closing shall not have been consummated on or before January 31, 2026 (the "**End Date**"); provided, however, that the (i) End Date shall be deemed extended, on the first occasion, by ninety (90) days after the End Date to obtain regulatory and other approvals of governmental entities necessary to consummate the Closing (the, "**First Renewal Period**") and (ii) if the Closing has not been consummated by the end of the First Renewal Period and if (A) the condition to Closing contained in Section 9.01(a) or Section 9.01(b) has not been satisfied and (B) all of the other conditions to Closing contained in Section 9.01 and Section 9.02 have been satisfied (but subject to the satisfaction or waiver of

such conditions at or prior to Closing), the End Date (as so extended) shall be further extended, by sixty (60) days after the end of the First Renewal Period (the "**Second Renewal Period**", and together with the First Renewal Period, the "**Renewal Periods**"); and the End Date, as so extended to the end of the applicable Renewal Period, shall be deemed the End Date; provided, further, that the right to terminate this Agreement pursuant to this Section 11.01(b) shall not be available to a Party whose breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of the Closing to occur on or before the End Date;

(c)      by Sellers' Representative, if Sellers' Representative or Sellers are not then in material breach of their obligations under this Agreement and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 9.01 or Section 9.03, (ii) cannot be, or has not been, cured within fifteen (15) days following delivery of written notice to Buyer of such breach or failure to perform and (iii) has not been waived by Sellers' Representative;

(d)      by Buyer, if Buyer is not then in material breach of its obligations under this Agreement and Sellers or Sellers' Representative breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 9.01 or Section 9.02, (ii) cannot be, or has not been, cured within fifteen (15) days following delivery of written notice to Sellers' Representative of such breach or failure to perform and (iii) has not been waived by Buyer;

(e)      by Buyer or Sellers' Representative, if any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 11.01(e) shall not be available to a Party that failed to use its reasonable best efforts to contest, resolve or lift such Order; provided, further, that the right to terminate this Agreement under this Section 11.01(e) shall not be available to any Party if such Order was primarily caused by (i) such Party's (or in the case of Sellers' Representative, any Seller's) material breach of any provision of this Agreement or (ii) such Party's (or in the case of Sellers' Representative, any Seller's) failure to comply in any material respect with its obligations hereunder;

(f)      by Buyer if any of the Chapter 11 Cases are converted to a case under Chapter 7 of the Bankruptcy Code;

(g)      by Buyer if any Seller shall default for a period beyond any applicable grace period in the observance or performance of any agreement, covenant or condition set forth in the DIP Credit Agreement;

(h)      by Buyer, if Sellers withdraw or seek to withdraw a notice or motion to approve the Stalking Horse Protections (as defined in the Bidding Procedures Order) and do not cure within two (2) Business Days;

(i)      by Buyer upon the failure of the Sellers to fulfill the conditions precedent set forth in Section 3.1 or Section 3.2 of the DIP Credit Agreement;

(j)      by Buyer or Sellers' Representative, if an Order of the Bankruptcy Court is entered denying approval of the Sale Order and such Order shall have become a Final Order;

(k)      by Buyer if the Auction for the Purchased Assets (if any) is not closed by the Auction Close Deadline (as defined in the Bidding Procedures Order);

(l)      by Buyer if the Auction for the Purchased Assets (if any) has been closed and the Sellers or Sellers' Representative seeks to re-open the Auction; or

(m)      by Buyer or Sellers' Representative, if (i) at the end of the Auction for the Purchased Assets (if any), Buyer is not determined by Sellers' Representative to be either the "Successful Bidder" or in Buyer's sole discretion the "Backup Bidder" (each as defined in the Bidding Procedures Order) or (ii) Buyer is the "Backup Bidder" at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder.

The Party desiring to terminate this Agreement pursuant to this Section 11.01 (other than pursuant to Section 11.01(a)) shall give written notice of such termination to the other Party in accordance with Section 12.01.  For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 11.01 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 11.01 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

SECTION 11.02      *Effect of Termination*.

(a)      If this Agreement is terminated as permitted by Section 11.01, (i) this Agreement shall become null and void and of no further force and effect, except for the provisions of Section 7.01(a), this Section 11.02, Section 11.03 and Article 12, which shall survive such termination of this Agreement and (ii) no Party (nor any stockholder, director, officer, employee, agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder; provided that nothing in this Section 11.02 shall be deemed to release any Party from any Liability (x) for any breach of this Agreement occurring prior to its termination and (y) that may otherwise be provided in, or contemplated by, the provisions of Section 7.01(a).

(b)      If (1) this Agreement is validly terminated in accordance with the terms set forth in Sections 11.01(a), (b), (d), (f), (j) or (m) and (2) an Alternative Transaction is consummated, then the Sellers, jointly and severally, shall pay to the Buyer in cash not later than three (3) Business Days following the consummation of an Alternative Transaction, an amount equal to the aggregate amount of reasonable and documented out-of-pocket costs, fees and expenses incurred by the Buyer and its Affiliates (including fees and expenses of legal, accounting, financial and other advisors) in connection with this Agreement, any of the ancillary agreements, the transactions contemplated hereby and thereby and the approval by the Bankruptcy Court of the foregoing, in an amount not to exceed Three Million Dollars ($3,000,000.00) (the "**Expense Reimbursement Amount**"), by wire transfer of immediately available funds to an account specified by the Buyer to the Sellers in writing; provided that, if an Alternative Transaction is consummated with respect

to some (but not all) of the Purchased Assets or Purchased Entities, the amount of the Expense Reimbursement Amount shall be ratably reduced based upon the value of the Assets or Equity Interests sold in connection with such Alternative Transaction as compared to the value of Purchased Assets and Purchased Equity Interests contemplated to have been sold hereunder.

SECTION 11.03     *Costs and Expenses*.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense; provided that Cure Costs will be allocated pursuant to Section 7.11.

ARTICLE 12

MISCELLANEOUS

SECTION 12.01     *Notices*.  All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer, to:

> c/o Brookfield Asset Management Inc.
> Brookfield Place
> 250 Vesey Street
> New York, NY 10281-1023
> Attention:  Michael Rudnick and Eric Wittleder
> Email:  michael.rudnick@brookfield.com and
> eric.wittleder@brookfield.com

with a copy, which shall not constitute notice, to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attention:     Robert A. Britton
>                Ravi Purohit
> Email:         rbritton@paulweiss.com;
>                rpurohit@paulweiss.com

if to Sellers, to:

> c/o Pine Gate Renewables, LLC
> 130 Roberts Street
> Asheville, North Carolina 28801
> Attention: Judith Hall
> Email: judithhall@pgrenewables.com

with a copy, which shall not constitute notice, to:

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention:     Ethan Schultz, Andrew Parlen and Jason Gott
> Email:          ethan.schultz@lw.com;
>                     andrew.parlen@lw.com;
>                     jason.gott@lw.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if personally delivered after 5:00 p.m. New York time, then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the third (3rd) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

SECTION 12.02     *Amendments and Waivers*.

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each of Buyer and Sellers' Representative (on behalf of itself and each Seller) or, in the case of a waiver, by the Party against whom the waiver is to be effective; provided that any waiver asserted against any Seller shall be valid if given by Sellers' Representative on behalf of such Seller. For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

SECTION 12.03     *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that subject to Buyer's right to designate a Buyer Designee as set forth in Section 2.01, Buyer, on the one hand, may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of Sellers' Representative, and each Seller, on the other hand, may not assign, delegate or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of Buyer. Any attempted assignment in violation of this Section 12.03 shall be null and void, *ab initio*. Notwithstanding anything herein to the contrary, (a) in no event shall the designation of a Buyer Designee result in incremental Taxes that would be borne by or otherwise reduce any amounts available to Sellers and (b) Buyer shall provide Sellers with a reasonable advance notice prior to the designation of a Buyer Designee and shall cooperate in good faith with Sellers in connection therewith.

SECTION 12.04    *Governing Law*.  This Agreement, and all disputes, claims and causes of action (whether in contract or tort) arising out of, relating to or in connection with this Agreement, or the negotiation, execution or performance of this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, including with respect to the application of the State of Delaware's statute of limitations to any such disputes, claims or causes of action, without regard to the conflicts of law rules of such State.

SECTION 12.05    *Jurisdiction*.  The Parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The Parties further agree that, following the Bankruptcy Period, any Action with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Action (including any Proceeding) and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action (including any Proceeding) in such courts or that any such Action (including any Proceeding) which is brought in such courts has been brought in an inconvenient forum.  Process in any such Action (including any Proceeding) may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware.  Without limiting the foregoing, each Party agrees that service of process on such Party in the manner as provided in Section 12.01 for notices shall be deemed effective service of process on such Party.

SECTION 12.06    *WAIVER OF JURY TRIAL*.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.06 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

SECTION 12.07    *Counterparts; Third-Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Delivery of a .pdf version (or other electronic means) of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Parties.  Except as otherwise expressly stated or referred to herein, and except for the Released Parties under Section 7.14 and the Non-

Recourse Parties under <u>Section 12.13</u>, no other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder.

SECTION 12.08    *Specific Performance*.  It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Sellers or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Sellers and Buyer shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Sellers, as may be applicable, to comply promptly with any of their obligations hereunder.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.  Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.  For the avoidance of doubt, (i) it is hereby acknowledged and agreed that Sellers' Representative and each Seller shall be entitled to specific performance to enforce, including against anticipatory breach, the Buyer's obligation to consummate the Closing and (ii) to the extent Sellers' Representative or any Seller brings an action to enforce specifically Buyer's obligation to consummate the Closing, the End Date shall automatically be extended to the tenth (10th) Business Day following the final resolution of such action or proceeding.

SECTION 12.09    *Entire Agreement*.  This Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter.  No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

SECTION 12.10    *No Strict Construction*.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 12.11        *Severability*.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 12.12        *Disclosure Schedules*.  The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures in the Disclosure Schedules.  Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of Sellers or their respective businesses, in whole or in part, or as an admission of Liability or obligation of Sellers to any Person.  The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will apply to and will be deemed to be disclosed with respect to any other representation and warranty, so long as the applicability of such disclosure is reasonably apparent on its face.  It is understood and agreed that the specification of any dollar amount in the representations and warranties or covenants contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party or other Person shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy as to whether any obligation, item or matter not described in this Agreement or included in the Disclosure Schedules is or is not material for purposes of this Agreement.  Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law.  The Disclosure Schedules and the information and disclosures contained therein are intended only to modify the representations or warranties of Sellers contained in this Agreement.  Where the terms of a contract or document have been summarized or described in the Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract or document, and all such summaries and descriptions are qualified in their entirety by reference to the contract or document being summarized or described to the extent such contract or other document has been made available to Buyer prior to the date hereof.  Sellers may (but shall not be obligated to), upon the written consent of Buyer, supplement or amend the Disclosure Schedules to reflect any fact, event or condition which was or would have been required to be described in the Disclosure Schedules in order to avoid any representation or warranty of the Sellers contained in this Agreement from being untrue or inaccurate as of the date hereof or as of Closing.  Any such supplement or amendment of the Disclosure Schedules in accordance with this Section 12.12 shall be deemed to cure the breach of any such representation or warranty and amend and/or supplement the Disclosure Schedules, as applicable, for all purposes hereunder, except for purposes of determining whether or not the condition set forth in Section 9.02(a) has been satisfied.

SECTION 12.13      *No Recourse.*  Notwithstanding anything in this Agreement or in any other Transaction Document, the Parties hereby acknowledge and agree that, except to the extent a Person is a named party to this Agreement, no Person, including any current, former or future director, officer, employee, incorporator, member, manager, director, partner, investor, shareholder, agent, Representative, or Affiliate of any (collectively, the "**Non-Recourse Parties**"), shall have any liability to the other Party, and each Party shall have no recourse against, any Non-Recourse Party or any other Person other than the other Party in connection with any liability, claim or cause of action arising out of, or in relation to, this Agreement, any other Transaction Document or the transactions contemplated hereby and thereby, whether pursuant to any attempt to pierce the corporate veil, any claims for fraud, negligence or misconduct or any other claims otherwise available or asserted at law or in equity, in each case.

[*Signature Pages Follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<u>SELLERS</u>

**PGR 2022 HOLDCO 8, LLC**

By: _____
Name: Raymond Shem
Title:   Authorized Signatory

**PGR BLOCKER HOLDCO, LLC**

By: _____
Name: Raymond Shem
Title:   Authorized Signatory

**PGR 2021 HOLDCO 9, LLC**

By: _____
Name: Raymond Shem
Title:   Authorized Signatory

**PGR 2021 HOLDCO 13, LLC**

By: _____
Name: Raymond Shem
Title:   Authorized Signatory

*[Signature Page to Asset Purchase Agreement – Brookfield]*

**PGR 2022 HOLDCO 2, LLC**

By: _____
Name: Raymond Shem
Title:  Authorized Signatory

**PGC SOLAR HOLDINGS HOLDCO II, LLC**

By: _____
Name: Raymond Shem
Title:  Authorized Signatory

**BF DEV HOLDCO, LLC**

By: _____
Name: Raymond Shem
Title:  Authorized Signatory

**CASCADE NTP HOLDCO, LLC**

By: _____
Name: Raymond Shem
Title:  Authorized Signatory

**PGR 2024 SPONSOR HOLDCO, LLC**

By: _____
Name: Raymond Shem
Title:  Authorized Signatory

**<u>SELLERS' REPRESENTATIVE</u>**

**PINE GATE RENEWABLES, LLC**

By: _____

Name: Raymond Shem

Title:   President and Chief Financial Officer

[*Signature Page to Asset Purchase Agreement – Brookfield*]

**<u>BUYER</u>**

**BII BID SOLAR II AGGREGATOR LP**

By its general partner, BID III GP, LTD By
its administrator, BID Administrator LLC

By: _____

    Name:  Fred Day
    Title:   Senior Vice President

Solely for purposes of Section 7.16 hereto:

**PINE GATE RENEWABLES, LLC**

By: _Ray Shem_ _____
Name:  Ray  Shem
Title:    President and Chief Financial Officer

Solely for purposes of Section 7.16 hereto:

**PINE GATE O&M, LLC**

By: _Ray Shem_

Name:  Ray  Shem

Title:   Authorized Signatory

**Exhibit A**
**Sellers and Purchased Companies**

| Seller | Purchased Companies | Additional Purchased Entities | Project(s) |
|---|---|---|---|
| PGR 2022 Holdco 8, LLC | PGR 2022 Manager 8, LLC<br>PGR 2022 Fund 8, LLC | PGR 2022 Lessee 8, LLC<br>PGR 2022 Lessor 8, LLC<br>Porter Solar, LLC | Porter |
| PGR Blocker Holdco, LLC | PGR 2021 Holdco 18, LLC | PGR 2021 Manager 18, LLC<br>PGR 2021 Fund 18, LLC<br>PGR 2021 Lessee 18, LLC<br>PGR 2021 Lessor 18, LLC<br>Landrace Holdings, LLC | Landrace |
| | PGR 2022 Holdco 1, LLC | PGR 2022 Manager 1, LLC<br>PGR 2022 Fund 1, LLC<br>PGR 2022 Lessee 1, LLC<br>PGR 2022 Lessor 1, LLC<br>Virginia Line Solar, LLC | Virginia Line |
| | Catalina Solar Holdings, LLC | Catalina Solar Borrower, LLC<br>PGR 2023 Holdco 1, LLC<br>PGR 2023 Manager 1, LLC<br>PGR 2023 Fund 1, LLC<br>PGR 2023 Lessee 1, LLC<br>PGR 2023 Lessor 1, LLC<br>Catalina Solar, LLC | Catalina |
| PGR 2021 Holdco 9, LLC | PGR 2021 Manager 9, LLC<br>PGR 2021 Fund 9, LLC | PGR 2021 Lessee 9, LLC<br>PGR 2021 Lessor 9, LLC<br>Bulldog Solar, LLC | Bulldog |
| PGR 2021 Holdco 13, LLC | PGR 2021 Manager 13, LLC | PGR 2021 Lessee 13, LLC | Sonny |

| Seller | Purchased Companies | Additional Purchased Entities | Project(s) |
|---|---|---|---|
| | PGR 2021 Fund 13, LLC | PGR 2021 Lessor 13, LLC | |
| | | Sonny Solar, LLC | |
| PGR 2022 Holdco 2, LLC | PGR 2022 Manager 2, LLC<br>PGR 2022 Fund 2, LLC | PGR 2022 Lessee 2, LLC<br>PGR 2022 Lessor 2, LLC<br>Thigpen Farms Solar, LLC<br>Fresh Air Energy XXXVII, LLC<br>Fresh Air Energy XXIII, LLC<br>Cathcart Solar, LLC | Thigpen Fresh Energy (East Nash / Pleasant Hill) & Cathcart |
| PGC Solar Holdings Holdco II, LLC | Grande Holdco LLC | Grande Holdco Borrower, LLC<br>PGR CC Affiliate Purchaser LLC<br>PGR 2022 Manager 4, LLC<br>PGR 2022 Fund 4, LLC<br>PGR 2022 Lessee 4, LLC<br>PGR 2022 Lessor 4, LLC<br>Cane Creek Solar, LLC | Cane Creek |
| | | PGR MS Affiliate Purchaser LLC<br>PGR 2022 Manager 5, LLC<br>PGR 2022 Fund 5, LLC<br>PGR 2022 Lessee 5, LLC<br>PGR 2022 Lessor 5, LLC<br>Moonshot Solar, LLC | Moonshot |
| | GH Pledge Borrower, LLC | Grande Holdco Borrower II, LLC<br>PGR 2022 Holdco 9, LLC<br>PGR 2022 Manager 9, LLC<br>PGR 2022 Fund 9, LLC<br>PGR 2022 Lessee 9, LLC | Glover Creek |

| Seller | Purchased Companies | Additional Purchased Entities | Project(s) |
|---|---|---|---|
| | | PGR 2022 Lessor 9, LLC<br>Glover Creek Solar, LLC | |
| | PGR 2021 Holdco 4, LLC | PGR 2021 Manager 4, LLC<br>PGR 2021 Fund 4, LLC<br>PGR 2021 Lessee 4 Viaduct, LLC<br>PGR 2021 Lessee 4 School House, LLC<br>PGR 2021 Lessee 4 Stratford, LLC<br>PGR 2021 Lessor 4 Viaduct, LLC<br>PGR 2021 Lessor 4 School House, LLC<br>PGR 2021 Lessor 4 Stratford, LLC<br>CL-Viaduct LLC<br>UN-School House LLC<br>Stratford Solar Center, LLC | Viaduct / School House / Stratford |
| BF Dev Holdco, LLC | Magnolia Solar Development, LLC<br>Lotus Solar LLC<br>GA Solar 5, LLC | | Magnolia / Lotus / GA Solar 5 |
| Cascade NTP Holdco, LLC | Polaris DevCo Pledgor B, LLC | Polaris DevCo Borrower B, LLC<br>Limewood Bell Renewables LLC<br>Rio Lago Solar, LLC<br>Old Hayneville, LLC | Limewood / Rio Lago / Old Hayneville |
| PGR 2024 Sponsor Holdco, LLC | Polaris OpCo Pledgor B, LLC | Polaris OpCo Borrower B, LLC<br>Polaris OpCo Holdco B, LLC | |

**Exhibit B**
**Transition**

This Exhibit B sets forth the deliverables and process requirements to implement the Transition described in Section 7.16 of the Agreement. Capitalized terms used but not defined in this Exhibit have the meanings set forth in the Agreement.

All deliverables shall be provided (a) to Buyer or its designee(s), (b) in searchable electronic format (PDF and native/source as applicable), and (c) organized by Project and Purchased Entity, unless expressly stated otherwise.

In each case, the deliverables and requirements set forth herein shall apply only to the extent (a) related exclusively to the Business and (b) Sellers or ACT own, license, operate or control the applicable IT Assets and other resources and use the same in the ordinary course of business as of the date hereof.

*1. Governance, Planning & Handover Mechanics*

**1.1 Transition Governance.** A joint transition team (Buyer and Sellers) with named day-to-day leads and a weekly steering cadence until Completion of the Transition.

**1.2 Master Transition Plan.** A consolidated plan identifying milestones, dependencies, critical paths, and responsible parties, including a per-Project cutover plan and back-out plan. Revised plan to be updated each week with status of key tasks.

**1.3 Knowledge Transfer Sessions.** Sellers will provide knowledge time which may incorporate the following topics (i) portfolio overview; (ii) per-Project technical deep-dives; (iii) O&M processes; (iv) asset management and commercial processes; (v) REC Operations; (vi) incident response; (vii) change control; and (viii) any other material program (including HSSE at Site) and NERC-CIP related processes as applicable.

*2. Operational Technology (OT), SCADA/EMS/DCS & Cybersecurity*

The following, to the extent provision of the same does not negatively impact ACT real-time system control operations (including as such are used for other ACT customers) and compliance with applicable Law, including NERC and CIP compliance.

**2.1  Administrative Access.** Transfer of administrator-level credentials and role-based access control (RBAC) rights to Buyer (or designee) for:

- SCADA/EMS/DCS platforms (including historian servers), HMI consoles, application servers, gateways/RTUs, PLCs, protective relays where applicable;

- Network infrastructure (firewalls, routers, L2/L3 switches, VPN concentrators, jump hosts, domain controllers if present);

- Transfer of data circuits, public/static IP ranges, domains, DNS, and ISP contracts;

- Remote access platforms (e.g., secure VPN, bastions, privileged access management tools).

Provide evidence of admin-level credential transfer (e.g., screenshots/access logs).

**2.2 Network Artefacts.** Current as-operated network topology diagrams (logical and physical), IP addressing plan, firewall rulesets, NAT and ACL configs, VLAN assignments, port maps, rack elevations, runbooks and SOPs for change control, in each case as such exists as of the date hereof and as expected to exist as of the Closing Date.

**2.3 Identity & Secrets.** Transfer of accounts and credentials (service accounts, API keys, certificates, SSH keys, vault entries) with rotation plan and evidence of successful rotation post-transfer.

**2.4 Cyber Handover Package.** Latest vulnerability scans, patch levels, endpoint protection status, SIEM alerting runbooks, incident history (24 months), current exceptions/waivers, and open actions with third parties (OEMs/ISPs), in each case as such exists as of the date hereof and as expected to exist as of the Closing Date. Written confirmation that no shared infrastructure (e.g., VPN, domain controllers, cloud subscriptions) remains with Sellers post-Close.

**2.5 Functional Cutover Test.** Joint test to demonstrate Buyer can (a) authenticate to SCADA/EMS/DCS; (b) issue non-energized commands in a test environment or approved maintenance window; (c) retrieve real-time and historical data; and (d) failover/recover per SOPs.

*3. OEM Systems, Portals & Technical Documentation*

**3.1 OEM Portal Access.** Admin access and transfer of ownership for portals and monitoring tools for inverters, trackers, transformers, BESS and metering (as applicable), including service history, open tickets, warranty claims, spare parts entitlements, in each case to the extent provision of the same does not negatively impact ACT real-time system control operations (including as such are used for other ACT customers) and compliance with applicable Law, including NERC and CIP compliance.

**3.2 Technical Dossier (per Project**).  The following, in each case as such exists as of the date hereof and as expected to exist as of the Closing Date:

- As-built drawings (electrical one-lines, layout, civil, structural, DC/AC collection, communications);
- Commissioning & performance test reports (including E-BOP/BOP, COD tests and punchlists);
- Manufacturer data (manuals, IOMs, serial number logs, firmware baselines);
- Operating procedures (normal/abnormal, switching, lock-out/tag-out, work permits);
- Maintenance plans (PM schedules, CM records, backlog).

**3.3 Spare Parts & Tools.** Inventory register of critical spares and consumables, with (i) location, (ii) quantity, (iii) condition, (iv) min/max thresholds, (v) warranties; plus physical turnover at the designated warehouse or site stores (documented by a signed count).

*4. Asset Management, Commercial & Market Interfaces*

**4.1 Major Project Documents Package.**

- True, correct and complete copies (with all amendments) of the following Major Project Documents, together with active contact matrices at counterparties: design documentation, SWPPP permits, as-constructed drawings, EPC contracts, performance tests, commissioning documents and IE reports;

- Historical performance and degradation reports;

- An open commercial issues list (e.g., metering disputes, curtailment claims, liquidated damages).

Sellers will notify all vendors and counterparties of the new billing and remittance contacts/addresses and provide confirmation of these notifications.

**4.2 Scheduling/Market Systems.** Transfer of credentials and dispatch protocols with the relevant RTO/ISO or TDSP/utility portals, meter owners, telemetry providers, and balancing authorities (as applicable), in each case to the extent provision of the same does not negatively impact ACT real-time system control operations (including as such are used for other ACT customers) and compliance with applicable Law, including NERC and CIP compliance.

**4.3 Billing & Settlements.**

- Templates and SOPs for invoice issuance and validation to the extent such exist as of the date hereof;

- Open receivables/payables aging (by counterparty and Project);

- Back-up data for the last 24 months of settlements (charge codes, meter reads, shadow calcs);

- Status of any billing disputes.


*5. REC Operations & Regulatory*

**5.1 Registry Accounts & Servicers.** Delivery and execution of instruments needed to transfer (or appoint Buyer as the sole instructing party for) Registry Accounts and Third-Party REC Servicer Accounts, together with login credentials in secure form, consistent with Section 2.09(a)(iv)–(v) of the Agreement.

**5.2 REC Inventory & Chain of Custody.**

- Complete ledger of Renewable Energy Certificates (by Project, vintage, program/registry, serials) including pending issuances and retirements;

- Evidence of title/chain of custody and any encumbrances, delivery obligations or forward sales;

- Open applications and required actions to maintain eligibility and continuous reporting.

- Confirmation of REC eligibility compliance post-transfer and evidence of continuing reporting obligations and their status.

**5.3 Permits & Compliance.** Permit register and EHS compliance matrix (including renewal dates, transfer status, reporting calendars, outstanding notices, corrective actions, and contact details at issuing authorities) and a matrix of regulatory approvals/notifications required for transfer.

*6. Transitional Services & Continuity*

**6.1 Minimum Service Levels.** Incident response and restoration SLAs for Emergencies and High Priority Material Malfunctions during the transition window:

- Designate personnel and ensure representative shall be available at all times, twenty-four (24) hours per day, including weekends and holidays capable of identifying and/or responding to Emergencies and High Priority Material malfunctions

- Emergency: Events that pose an actual or risk of: (i) serious personal injury, or (ii) material physical damage to the Project; and (B) requires, in the good faith determination immediate preventative or remedial action. Immediately and in all cases within (4) hours following discovery, dispatch personnel if required to provide local response and support.

- High Priority Material Malfunction: (i) any loss of power to Major Equipment (e.g., central inverters, MV transformers, GSU transformers, POI equipment (CT, PT, relay, or other such equipment designed to facilitate injection of energy to the grid at the POI), switchgear, or other equipment reasonably deemed necessary for the isolation of the Project from the electric grid) and (ii)any communication loss which causes or may cause the status of the Project to become unknown.  Respond remotely in accordance with standard operating procedures, utility requirements, and/or NERC GOP requirements and begin on site troubleshooting with twenty-four (24) hours following discovery.

*7. Deliverable Evidence & Acceptance Artifacts*

**7.1 Signed Site Books.** Site access lists, contact rosters, emergency procedures, switching authorities, LOTO registers, and energization boundaries.

**7.2 Form of Certificates.** Buyer to deliver executed Transition Completion Certificate (Annex A) upon satisfaction of acceptance criteria in Exhibit C.

**7.3 Evidence Standards.** For each deliverable in Sections 2–5, the Handover Pack will include objective evidence (e.g., screenshots of admin access, portal access confirmations, count sheets, registry/servicer instruments, and DR/backup restore logs).

*8. Cooperation; Costs; No Prejudice*

**8.1 Cooperation.** Sellers will provide reasonable cooperation, including reasonable access to personnel, systems, and vendors.

**8.2 Costs.** Each Party bears its own costs unless otherwise expressly allocated in the Agreement or TSA.

**8.3 No Prejudice.** Delivery of any item under this Exhibit does not expand any representation, warranty or covenant beyond those expressly set forth in the Agreement.

*Annex A – Form of Transition Completion Certificate*

Reference is made to that certain Asset Purchase Agreement (the "Agreement"), dated as of [●] 2025, by and among Buyer, the Sellers party thereto, and Sellers' Representative. Capitalized terms used but not defined herein have the meanings given in the Agreement.

**1. Certification.** Buyer hereby certifies that the Completion of the Transition (as defined in Exhibit C) has occurred effective as of [●] (the "Completion Date") with respect to: Portfolio: [All Projects in scope] OR Project(s): [List specific Project(s)].

**2. Evidence.** Buyer has reviewed the Completion Evidence Package and determined that the Completion Criteria have been satisfied, subject only to the permitted open High issues listed in Exhibit 1 hereto (if any), each with agreed workarounds and resolution plans.

**3. Reservations.** This certificate (a) is delivered solely for purposes of Section 7.16 and Section 9.02(j) of the Agreement, (b) does not waive, limit or expand any rights or obligations under the Agreement, and (c) does not constitute a waiver of any Excluded Liability or of any covenant continuing post-Closing.

**BUYER**

By: _____

Name: _____

Title: _____

Date: _____

**Acknowledged and Agreed (for record purposes only):**

**SELLERS' REPRESENTATIVE**

By: _____     Date: _____

**ACT** (solely for purposes of Section 7.16)

By: _____     Date: _____

**Exhibit 1:** Permitted Open High Issues (with workarounds and target resolution dates)

## Exhibit C
## Completion

This Exhibit C defines the objective criteria and procedure for determining when the Completion of the Transition has occurred for purposes of Section 9.02(j) of the Agreement (a condition to Buyer's obligation to consummate the Closing unless waived by Buyer). Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

*A. Objective Criteria for Completion of the Transition*

Completion of the Transition shall be deemed to have occurred when the following criteria (the "Completion Criteria") have been satisfied:

### A.1 Operational Control & Systems Access

1. Buyer (or its designee) holds administrator-level access and effective control over SCADA/EMS/DCS, historian, network infrastructure, remote access, and identity/secrets for each Project (Exhibit B, §2.1–2.3).
2. Buyer has successfully executed the Functional Cutover Test (Exhibit B, §2.5) for each Project or, where a test window is not reasonably available, has executed an approved simulation/test-mode procedure evidencing command and data path control.

### A.2 Technical Documentation & Spares

1. The Technical Dossier (as-built, commissioning, performance test reports, manuals) has been delivered in full for each Project (Exhibit B, §3.2).
2. The physical critical spares and tools inventory has been counted, receipted, and placed under Buyer's control (Exhibit B, §3.3).

### A.3 Commercial & Market Readiness

1. Buyer has active credentials and access to market/scheduling and settlement portals, meter data sources, and utility interfaces as applicable (Exhibit B, §4.2–4.3).
2. Buyer has received the Major Project Documents Package and current contact matrices in each case which are complete in all material respects (Exhibit B, §4.1).

### A.4 REC Operations Control

1. Instruments of appointment have been executed such that Buyer is the sole instructing party to all applicable Registry Accounts and Third-Party REC Servicer Accounts, with admin credentials delivered (Agreement §2.09(a)(v)–(vi); Exhibit B, §5.1).
2. Buyer has received a reconciled REC ledger (inventory and chain of custody) and any open actions to preserve eligibility are documented with due dates, in each case which are complete in all material respects (Exhibit B, §5.2).

### A.5 Compliance & EHS

1. Buyer has received the Permit register and EHS compliance matrix (Exhibit B, §5.3).

## A.6 Cybersecurity Baseline

1. Cyber handover items (vulnerability status, patch baselines, SIEM alerting runbooks) have been delivered and are complete in all material respects (Exhibit B, §2.4).
2. Default/legacy credentials and shared secrets identified for turnover have been rotated, or compensating controls are in place.

## A.7 Transitional Services Continuity

1. Where any services must continue post-Completion, they are captured in the TSA or an agreed run-out plan with clear exit criteria (Exhibit B, §6.1–6.3).

## A.8 Defect Thresholds

1. No Critical issues remain open on the Transition Issue Log for any Project.
2. High severity items may remain open provided (i) a documented workaround is active, (ii) there is no material risk to safety, grid compliance, or REC/billing integrity, and (iii) a mutually agreed resolution plan with due dates ($\leq$ 5 Business Days unless otherwise agreed) is in place, (iv) each such item has a named owner, and (v) no more than two (2) High issues per Project remain open at Completion.

**Severity Definitions (for this Exhibit):**

■ Critical: An issue that (i) poses a material and immediate risk to personnel safety or equipment integrity, (ii) prevents compliance with grid codes, interconnection, or law, or (iii) causes sustained loss of command/visibility that prevents safe operations of a Project or entire site.

■ High: An issue that materially degrades availability, reliability, data integrity, settlements/REC issuance, or cyber posture, but is not Critical.

*B. Acceptance Procedure and Evidence*

**B.1 Evidence Package.** Sellers shall deliver a Completion Evidence Package consisting of the following:

■ The Deliverable Index and per-Project Handover Pack (Exhibit B, §7.1–7.3);

■ Executed registry/servicer instruments and proof of credential transfer;

■ Signed spare parts count sheets;

■ Confirmation of portal access (screenshots or access logs) for SCADA/EMS/DCS and market/utility systems;

**B.2 Review Window.** Buyer will review and either (i) identify in writing any deficiency in satisfaction of the Completion Criteria  or (ii) provide written acceptance within five (5) Business Days after receipt of the Completion Evidence Package for the last Project in scope (or such other period as the Parties may agree in writing).

**B.3 Cure of Deficiencies.** Any deficiency identified by Buyer pursuant to Section B.2 above preventing satisfaction of the Completion Criteria shall be recorded on the Issue Log with a mutually agreed action plan and timeline. Sellers shall use commercially reasonable efforts to cure such deficiencies promptly in line with Exhibit B, §6.2 SLAs.

**B.4 Certification.** Upon satisfaction of the Completion Criteria (taking into account any permitted open High items with workarounds), Buyer will execute the Transition Completion Certificate in the form attached as Annex A, identifying the effective date of Completion of the Transition (the "Completion Date").

**B.5 Partial Acceptance.** Buyer may, in its sole discretion, issue per-Project completion certificates; in such case, portfolio-level Completion of the Transition occurs when all Projects have achieved per-Project completion or Buyer confirms portfolio completion in writing.

**B.6 No Waiver.** Execution of the Transition Completion Certificate is solely for the purposes of Section 7.16 and Section 9.02(j) and does not waive or expand any other rights, obligations, or remedies under the Agreement.

*C. Interplay with TSA and Closing Mechanics*

**C.1 TSA Incorporation.** If Completion of the Transition has not occurred as of Closing and Buyer has waived Section 9.02(j), the remaining Completion Criteria and acceptance mechanics in Exhibits B and C shall be incorporated into the TSA schedules mutatis mutandis, with TSA services terminating upon the Completion Date.

**C.2 Survival of Work-Off.** Any permitted open High issues (with agreed workarounds) shall remain on the Issue Log post-Completion and be worked off in accordance with the agreed plan; resolution of such issues is not a condition to Completion unless specifically designated Critical.

*Annex A – Form of Transition Completion Certificate*

See Annex A to Exhibit B to the Agreement, incorporated herein by reference.

## Exhibit 1B

**First Amendment**

**FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT**

THIS **FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT**, dated as of December [16], 2025 (this "**Amendment**"), by and among BII BID Solar II Aggregator, LP, a Delaware limited partnership ("**Buyer**") and Pine Gate Renewables, LLC, a North Carolina limited liability company ("**Pine Gate**"), on behalf of itself and each Seller (as defined in the Agreement), amends that certain Asset Purchase Agreement, dated as of November 13, 2025 (the "**Agreement**"), by and among Buyer, the persons set forth as sellers in Exhibit A thereto, Sellers' Representative, and solely for purposes of Section 7.16 thereto, Pine Gate and Pine Gate O&M, LLC (f/k/a Blue Ridge Power Services, LLC), a North Carolina limited liability company. Buyer and Sellers' Representative are referred to herein as the "**Parties**" and each individually a "**Party**". Capitalized terms used herein and not otherwise defined herein have the meanings set forth in the Agreement.

**W I T N E S S E T H:**

**WHEREAS**, pursuant to Section 12.02 of the Agreement, the Agreement may be amended only in a writing signed by the Buyer and Sellers' Representative (on behalf of itself and each Seller); and

**WHEREAS**, the Parties desire to amend the Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

Section 1.01        *Amendments.*

(a)        Section 2.01(a)(iv) of the Agreement is hereby deleted and replaced in its entirety with the following:

> (iv)        all preference claims, Avoidance Actions and other actions arising under the Bankruptcy Code or other Applicable Law, and all other rights against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, or licensors of any Seller and (ii) Buyer, Buyer's Affiliates, Sellers or Sellers' Affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or other Representatives), including those arising under or related to any Purchased Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise; provided that the foregoing shall expressly

exclude (x) non-ordinary-course trade Avoidance Actions (and the proceeds thereof) against any Debtor or Seller Affiliate that is not a Purchased Entity and (y) non-ordinary-course trade Avoidance Actions (and the proceeds thereof) against any third party that is not a stakeholder of any Purchased Entity; provided further that, for the avoidance of doubt, the Purchased Assets shall include commercial tort claims and non-ordinary-course trade Avoidance Actions (and the proceeds thereof) against the Purchased Entities and their stakeholders (including vendors and service providers) and all Brookfield Excluded Claims;

(b)     Section 2.01(a)(vi) of the Agreement is hereby deleted and replaced in its entirety with the following:

(vi)     all (A) Cash and Cash Equivalents held by such Seller (other than Pine Gate) and their respective Subsidiaries other than any Excluded Cash; (B) all bank accounts; and (C) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise) or prepaid or deferred charges and expenses (including all lease and rental payments) that have been prepaid by such Seller (other than Pine Gate) or any of its respective Subsidiaries, other than Excluded Cash.

(c)     Section 2.05(d) of the Agreement is hereby deleted and replaced in its entirety with the following:

(d) Buyer shall have the right to notify Sellers in writing of any Contract that would have constituted a Purchased Contract pursuant to Section 2.01(b) had it been identified prior to the Bid Deadline, to which PGR or any Intermediate Holding Company is a party that it wishes to add as a Purchased Asset up to the time the Bankruptcy Court enters the Confirmation Order (an "Additional Purchased Contract").  Without any further Court order (except in circumstances where there is any material change in cost to the Debtors), any such previously considered Excluded Asset that Buyer wishes to acquire and assume as a Purchased Asset shall be automatically deemed added as a Purchased Asset hereunder (and added to the applicable Disclosure Schedules related to Purchased Assets) and, notwithstanding anything to the contrary herein, automatically deemed removed as an Excluded Asset hereunder (and removed from the applicable Disclosure Schedules related to Excluded Assets), and sold and assigned by Sellers and/or the applicable Excluded Entities to Buyer and accepted and assumed by Buyer, in each case, without any adjustment to the Purchase Price. Notwithstanding the foregoing, Buyer shall have the right to notify Sellers in writing, by no later than the time the Bankruptcy Court enters the Confirmation Order, of any Additional Purchased Contracts that it no longer desires to acquire – which, for the avoidance of doubt, will be considered an Excluded Asset and be reflected as such on the applicable Disclosure Schedules. Any action of Buyer permitted under this Section 2.05(d) shall be made in Buyer's sole and absolute discretion (subject to the terms hereof).

(d)     The following Section 7.19 is added to the Agreement in its entirety:

SECTION 7.19         [*Exclusion of Certain Purchased Entities.* From the date hereof until the earlier of (x) such time as the Bankruptcy Court enters the Confirmation Order and (y) the Closing Date, Buyer may modify or amend the acquisition structure to exclude Polaris DevCo Pledgor B, LLC and/or Polaris DevCo Borrower B, LLC, while still acquiring Limewood Bell Renewables LLC, Rio Lago Solar, LLC, and Old Hayneville Solar, LLC; <u>provided</u>, that if such exclusion results in the failure of any of the conditions relating to the Closing to be satisfied, Buyer may not rely on such failure as a basis to delay or prevent Closing. Any such Purchased Entity that Buyer wishes to exclude will, upon Seller's consent, (a) be deemed an Excluded Asset hereunder (and added to the applicable Disclosure Schedules related to Excluded Asset) and (b) notwithstanding anything to the contrary herein, be deemed removed as a Purchased Asset hereunder (and removed from Exhibit A and the applicable Disclosure Schedules related to Purchased Assets). Notwithstanding the foregoing, any such modification or amendment of the acquisition structure will not result in  any incremental Transfer Taxes or incremental Cure Costs.]

Section 1.02         *Continued Effectiveness of Agreement*. Except as expressly provided in this Amendment, the Agreement shall remain unchanged and in full force and effect. From and after the execution of this Amendment, any reference to the Agreement shall be deemed to be a reference to the Agreement as amended by this Amendment.

Section 1.03         *Counterparts*. This Amendment may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Amendment. Signatures transmitted by facsimile or other electronic means shall be effective the same as original signatures for execution of this Agreement.

Section 1.04         *Miscellaneous*. Section 12.02 (*Amendments and Waivers*), Section 12.03 (*Successors and Assigns*), Section 12.04 (*Governing Law*), Section 12.05 (*Jurisdiction*), Section 12.06 (*Waiver of Jury Trial*), Section 12.07 (*Counterparts; Third-Party Beneficiaries*), Section 12.08 (*Specific Performance*) and Section 12.10 (*No Strict Construction*) of the Agreement are hereby incorporated by reference *mutatis mutandi*s.

[*Signature Pages Follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

<u>**BUYER**</u>

BII BID SOLAR II AGGREGATOR LP

By its general partner, BID III GP, LTD
By its administrator, BID Administrator LLC

By: _____
Name: Fred Day
Title: Senior Vice President

**<u>SELLERS' REPRESENTATIVE</u>**

PINE GATE RENEWABLES, LLC


By: _____
Name:
Title: