*Solicitation Version*

> **THIS PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**
>
> **THIS PLAN REMAINS SUBJECT TO CONTINUING REVISIONS AS THE DEBTORS CONDUCT THEIR INTERNAL INVESTIGATION AND CONTINUE THE MARKETING PROCESS FOR A SALE OF ALL OR SUBSTANTIALLY ALL OF THEIR ASSETS. ALL RIGHTS OF THE DEBTORS ARE RESERVED.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

```
-------------------------------------------------------- x
                                              :
In re:                                        :   Chapter 11
                                              :
PINE GATE RENEWABLES, LLC, et al.,            :   Case No. 25-90669 (CML)
                                              :
            Debtors¹                          :   (Jointly Administered)
                                              :
-------------------------------------------------------- x
```

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## <u>PINE GATE RENEWABLES, LLC AND ITS DEBTOR AFFILIATES</u>

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' Balloting Agent at https://omniagentsolutions.com/PGR. The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

**LATHAM & WATKINS LLP**
Ray C. Schrock
Andrew M. Parlen
Alexander W. Welch
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
        andrew.parlen@lw.com
        alex.welch@lw.com

Jason B. Gott
Jonathan C. Gordon
330 N. Wabash Avenue
Suite No. 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: jason.gott@lw.com
        jonathan.gordon@lw.com

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II
Philip M. Guffy
Brandon Bell
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@Hunton.com
       pguffy@Hunton.com
       bbell@Hunton.com

*Counsel for Debtors and Debtors in Possession*
Dated: January 15, 2026
Houston, Texas

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ......................................................... 2
    A.    Defined Terms ......................................................................................... 2
    B.    Rules of Interpretation .......................................................................... 26
    C.    Computation of Time ............................................................................ 27
    D.    Consent Rights ...................................................................................... 27

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP
FACILITY CLAIMS ........................................................................................................... 28
    2.1.    Administrative Claims ........................................................................... 28
    2.2.    Priority Tax Claims ............................................................................... 30
    2.3.    DIP Facility Claims ............................................................................... 30

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ............................................................................................................... 31
    3.1.    Summary ................................................................................................ 31
    3.2.    Classification and Treatment of Claims ............................................... 32
    3.3.    Special Provision Governing Unimpaired Claims ............................... 36
    3.4.    Elimination of Vacant Classes .............................................................. 36
    3.5.    Controversy Concerning Impairment .................................................... 36

ARTICLE IV. ACCEPTANCE OR REJECTION OF THIS PLAN ...................................... 36
    4.1.    Acceptance or Rejection of this Plan ..................................................... 36
    4.2.    Nonconsensual Confirmation ................................................................ 37
    4.3.    Subordinated Claims ............................................................................. 37

ARTICLE V. MEANS FOR IMPLEMENTATION OF THIS PLAN .................................... 37
    5.1.    Transactions to Effectuate the Plan ....................................................... 37
    5.2.    363 Sale Transactions ........................................................................... 38
    5.3.    General Settlement of Claims and Interests .......................................... 38
    5.4.    Intercreditor Agreements ...................................................................... 39
    5.5.    Reverse TSA .......................................................................................... 39
    5.6.    Third-Party TSA .................................................................................... 39
    5.7.    Committee Settlements .......................................................................... 39
    5.8.    No Substantive Consolidation ............................................................... 41
    5.9.    Plan Administrator ................................................................................ 42
    5.10.    The Plan Administration Assets ............................................................ 44
    5.11.    GUC Trust .............................................................................................. 45
    5.12.    Merger of Debtors; Closing Cases of Debtor Affiliates ....................... 48
    5.13.    Cancellation of Existing Securities and Agreements ............................ 48

5.14.    Corporate Action.................................................................................49
5.15.    Exemption From Transfer Taxes and Fees .........................................49
5.16.    Effectuating Documents; Further Transactions ..................................50
5.17.    Insurance Policies ..............................................................................50
5.18.    Preservation of Retained Causes of Action .......................................51
5.19.    Closing of the Chapter 11 Cases ........................................................52

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................................52

6.1.    Assumption or Rejection of Executory Contracts and Unexpired Leases........52
6.2.    Preexisting Obligations to the Debtors Under Executory Contracts and
Unexpired Leases...............................................................................53
6.3.    Assumption of the D&O Policies .......................................................53
6.4.    Payments Related to Assumption of Executory Contracts and Unexpired
Leases.................................................................................................53
6.5.    Rejection Damages Claims .................................................................54
6.6.    Reservation of Rights..........................................................................54
6.7.    Nonoccurrence of Effective Date........................................................54

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS...........................54

7.1.    Timing and Calculation of Amounts to Be Distributed; Entitlement to
Distributions.......................................................................................54
7.2.    Disbursing Agent ...............................................................................55
7.3.    Distributions on Account of Claims Allowed After the Effective Date ..........55
7.4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .......56
7.5.    Compliance with Tax Requirement; Allocations.................................57
7.6.    Surrender of Cancelled Instruments or Securities ............................58
7.7.    Claims Paid or Payable by Third Parties ...........................................58
7.8.    Allocation of Plan Distributions between Principal and Interest.....................59

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,
AND DISPUTED CLAIMS ......................................................................59

8.1.    Allowance and Disallowance of Claims .............................................59
8.2.    Prosecution of Objections to Claims..................................................59
8.3.    Estimation of Claims ..........................................................................60
8.4.    Disputed Claims Reserves ..................................................................60
8.5.    Distributions After Allowance ...........................................................61
8.6.    Disallowance of Certain Claims .........................................................62

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THIS PLAN ........................................................62

9.1.    Conditions Precedent to Confirmation...............................................62
9.2.    Conditions Precedent to the Effective Date ......................................63
9.3.    Timing of Conditions Precedent ........................................................64

9.4.    Waiver of Conditions ................................................................. 64

9.5.    Effect of Non-Occurrence of Conditions to Confirmation or Consummation
......................................................................................................... 65

9.6.    Substantial Consummation ......................................................... 65

ARTICLE   X.   RELEASE,   EXCULPATION,   INJUNCTION   AND   RELATED
PROVISIONS ................................................................................... 65

10.1.   General ......................................................................................... 65
10.2.   Debtor Release ............................................................................. 65
10.3.   Third-Party Release by Holders of Claims and Interests ............ 67
10.4.   Exculpation .................................................................................. 69
10.5.   Permanent Injunction ................................................................... 70
10.6.   Setoffs .......................................................................................... 70
10.7.   Release of Liens ........................................................................... 71
10.8.   No Governmental Releases .......................................................... 71
10.9.   Preservation of All Causes of Action Not Expressly Settled or Released ........ 71
10.10.  Integral Part of Plan .................................................................... 72

ARTICLE XI. RETENTION OF JURISDICTION ................................................ 72

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................. 74

12.1.   Reservation of Rights ................................................................... 74
12.2.   No Government Releases .............................................................. 74
12.3.   Payment of Statutory Fees ........................................................... 74
12.4.   Statutory Committee ..................................................................... 75
12.5.   Modification of Plan ..................................................................... 75
12.6.   Revocation or Withdrawal of Plan ............................................... 75
12.7.   Successors and Assigns ................................................................ 76
12.8.   Further Assurances ....................................................................... 76
12.9.   Severability .................................................................................. 76
12.10.  Votes Solicited in Good Faith ...................................................... 77
12.11.  Service of Documents ................................................................... 77
12.12.  Governing Law ............................................................................. 79
12.13.  Tax Reporting and Compliance .................................................... 79
12.14.  Schedules ...................................................................................... 79
12.15.  Conflicts ....................................................................................... 79
12.16.  Entire Agreement .......................................................................... 80
12.17.  2002 Notice Parties ...................................................................... 80

**FIRST AMENDED JOINT CHAPTER 11 PLAN OF PINE GATE RENEWABLES, <u>LLC AND ITS DEBTOR AFFILIATES</u>**

Pine Gate Renewables, LLC and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each, a "***Debtor***" and, collectively, the "***Debtors***"), jointly propose the following chapter 11 plan for the resolution of the outstanding Claims (as defined below) against and Interests (as defined below) in each of the Debtors.  As reflected in <u>Article 12.6</u> of this Plan (as defined below), notwithstanding anything to the contrary herein, the Plan shall be deemed revoked, withdrawn, and otherwise ineffectual in all respects for those Debtors subject to the *Motion of the Debtors for Entry of an Order Dismissing the Chapter 11 Cases of Certain Debtors upon the Sale Thereof* [Docket No. 567] (the "***Dismissal Motion***") upon dismissal of the relevant Debtors' chapter 11 cases pursuant to the terms of the order entered by the Bankruptcy Court granting the relief requested therein.  The Plan provides for (a) the appointment of a GUC Trustee and establishment of a GUC Trust to pursue the GUC Trust Causes of Action and otherwise hold and distribute the GUC Trust Net Assets to Holders of General Unsecured Claims, after giving effect to the funding of the Professional Fee Escrow Account and the funding of the Wind-Down Reserve Amount, and (b) the appointment of a Plan Administrator to implement the Plan, make required distributions to Holders of Allowed Claims other than General Unsecured Claims, and wind down the Debtors' estates (including the wind-down and dissolution of their Non-Debtor Affiliates).  The Plan further provides for the grouping of all of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, and historical financial information, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters.  There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules (each as defined below).  All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation, upon consultation with the Committee as set forth in <u>Article 12.6</u> herein.

This Plan reflects the terms of the Committee Settlements (as defined below) to be implemented in conjunction with the consummation of the 363 Sale Transactions, as applicable.

---

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

---

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### A.    Defined Terms

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

*1.1.*    "*363 Purchaser*" means the Buyer as defined in the 363 Sale Orders.

*1.2.*    "*363 Sale Assumed Contract*" means any Executory Contract or Unexpired Lease assumed and assigned to a Successful Bidder (or Backup Bidder, if applicable) pursuant to a 363 Sale Order and/or the applicable 363 Sale Transaction Documentation in connection with a 363 Sale Transaction.

*1.3.*    "*363 Sale Assumed Liability*" means any liability of a Debtor that was assumed by a Successful Bidder (or Backup Bidder, if applicable) under such Successful Bidder's (or Backup Bidder's, if applicable) 363 Sale Transaction Documentation or the applicable 363 Sale Order, including to the extent assumed by a Successful Bidder (or Backup Bidder, if applicable), without limitation, (a) the Cure Claims for the applicable 363 Sale Assumed Contracts, and (b) Claims or Causes of Action.

*1.4.*    "*363 Sale Order*" means one or more orders of the Bankruptcy Court approving a 363 Sale Transaction, including, for the avoidance of doubt, the Brookfield Sale Order, Carlyle Sale Order, and the Fundamental Sale Order.

*1.5.*    "*363 Sale Transaction*" means one or more sales of assets of the Debtors' Estates pursuant to section 363 of the Bankruptcy Code, including, for the avoidance of doubt, (i) the Fundamental Credit Bid Transaction, (ii) the acquisition contemplated under the Brookfield Sale Order, and (iii) the acquisitions contemplated under the Carlyle Sale Order and Nofar Sale Order, as applicable.

*1.6.*    "*363 Sale Transaction Documentation*" means all motions, filings, documents, agreements, and related documents pursuant to which the Debtors have effectuated or will effectuate the 363 Sale Transactions, including without limitation, the Purchase Agreements, the 363 Sale Orders, and the Bidding Procedures Order.

*1.7.*    "*ACT Sale Proceeds*" means the cash proceeds from the sale of the equity interests in the Debtors' non-Debtor Affiliate ACT Power Services Holding Company Guarantor, LLC, after satisfaction of the Debtors' obligation to pay $1,725,000 of such cash proceeds in connection with the settlement described in that certain *Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 9019 (A) Approving a Settlement By and Among Blue Ridge Power Holding Company, LLC, The Hanover Insurance Company, ACT Power Services, LLC and Fundamental and (B) Granting Related Relief* [Docket No. 709].

*1.8.*    "*Adequate Protection Obligations*" has the meaning set forth in the DIP Order.

1.9.    "***Administrative and Collateral Agents***" means the DIP Agents.

1.10.    "***Administrative Claim***" means any Claim for costs and expenses of administration of the Debtors' Estates during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code other than Professional Fee Claims, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Claims pursuant to section 503(b)(9) of the Bankruptcy Code; (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; and (d) Independent Manager Fee Claims.  The term "Administrative Claims" expressly excludes any alleged claims that are not required to be paid in full in Cash prior to emergence pursuant to section 1129 of the Bankruptcy Code and any 363 Sale Assumed Liability.

1.11.    "***Administrative Claims Bar Date***" means the Business Day that is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court.

1.12.    "***Administrative Claims Objection Deadline***" means the Business Day that is 120 days after the Effective Date; *provided*, that the Administrative Claims Objection Deadline may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator after notice and a hearing.

1.13.    "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.14.    "***Allowed***" means, all or a portion of any Claim or Interest (a) that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Proof of Claim or proof of Interest has been timely filed as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is evidenced by a Proof of Claim or proof of Interest filed by the applicable Claims Bar Date as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors prior to the Effective Date, or the Plan Administrator or the GUC Trustee, as applicable, on or after the Effective Date or (iii) pursuant to the terms of the Plan.

1.15.    "***Assumed Contracts***" means those Executory Contracts and Unexpired Leases listed on the Assumed Contracts List that are to be assumed by the Debtors.

1.16.    "***Assumed Contracts List***" means the list or lists of Assumed Contracts, which will be included in preliminary form in the Plan Supplement.

1.17.    "***Avoidance Action***" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable nonbankruptcy law,

including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.18.   "**Backup Bidder(s)**" means any Entity or Entities whose bid for certain of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the next-highest and otherwise second-best bid as compared to the applicable Successful Bidder's bid pursuant to the Bidding Procedures Order or any designee of such Entity or Entities.

1.19.   "**Ballot**" means the ballots accompanying the Disclosure Statement Order upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

1.20.   "**Balloting Agent**" means Omni Agent Solutions, Inc. in its capacity as notice and balloting agent for the Debtors.

1.21.   "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended from time to time, as applicable to the Chapter 11 Cases.

1.22.   "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.23.   "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.24.   "**Bidding Procedures Order**" means, collectively, the *Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief* [Docket No. 128] and the *Supplemental Order Approving Initial Stalking Horse Expense Reimbursements* [Docket No. 205].

1.25.   "**BRGH**" has the meaning set forth in Article 2.3.

1.26.   "**Brookfield**" means Brookfield Asset Management, on behalf of itself and its Affiliates.

1.27.   "**Brookfield Agent**" means BID ADMINISTRATOR LLC, as administrative agent and collateral agent under the Brookfield Prepetition Credit Agreement.

1.28.   "**Brookfield Assets**" has the meaning set forth in the Bidding Procedures Order.

4

1.29. "***Brookfield Cash Consideration***" means $3,750,000 in Cash, as subject to upward adjustment as may be applicable pursuant to the Brookfield Committee Settlement.

1.30. "***Brookfield Committee Settlement***" means the settlement among the Debtors, the Committee, and Brookfield as set forth in Exhibit A to the Final DIP Order.

1.31. "***Brookfield DIP Facility***" means the debtor-in-possession financing facility provided by BII-BID AGGREGATOR A LP and BII BID SOLAR II AGGREGATOR LP.

1.32. "***Brookfield DIP Secured Parties***" means the lenders and the administrative and collateral agent of the Brookfield DIP Facility.

1.33. "***Brookfield Prepetition Credit Agreement***" means that certain Credit Agreement, dated as of January 30, 2025 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2025, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of April 17, 2025, as further amended by that certain Amendment No. 3 to Credit Agreement, dated October 6, 2025, and as further amended, supplemented, restated, replaced or otherwise modified from time to time).

1.34. "***Brookfield Prepetition Documents***" means (a) the Brookfield Prepetition Credit Agreement, (b) the Brookfield Prepetition Security Documents, and (c) each of the other "Credit Documents" (as defined in the Brookfield Prepetition Credit Agreement).

1.35. "***Brookfield Prepetition Facility***" means the financing facility pursuant to the Brookfield Prepetition Credit Agreement.

1.36. "***Brookfield Prepetition Security Documents***" has the meaning set forth in the DIP Order.

1.37. "***Brookfield Sale Order***" means the *Order (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement with BII Bid Solar II Aggregator, LP, (B) Authorizing the Sale of the Purchased Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Designated Contracts, and (D) Granting Related Relief* [Docket No. 782].

1.38. "***Brookfield Secured Claim***" means any Secured Claim derived from, based upon, related to, on account of, or arising under the Brookfield Prepetition Facility and the Brookfield Prepetition Credit Agreement that is not credit bid in accordance with section 363(k) of the Bankruptcy Code or rolled up pursuant to the 363 Sale Order.

1.39. "***Business Day***" means any day that is not a Saturday, Sunday, or other day on which banks are required or authorized by law to be closed in New York, New York.

1.40. "***Carlyle***" means, collectively, the affiliates of Carlyle Global Credit Investment Management LLC that are noteholders under the Carlyle DIP Facility or the Carlyle Prepetition Note Purchase Agreement (each as defined in the Final DIP Order) or are commitment parties under the commitment letter in respect of the Carlyle DIP Facility.

*1.41.* "**Carlyle APA**" has the meaning set forth in the Bidding Procedures Order.

*1.42.* "**Carlyle Assets**" has the meaning set forth in the Bidding Procedures Order.

*1.43.* "**Carlyle Cash Consideration**" means $2,750,000 in Cash, as subject to upward adjustment as may be applicable pursuant to the Carlyle Committee Settlement.

*1.44.* "**Carlyle Committee Settlement**" means the settlement among the Debtors, the Committee, and Carlyle as set forth in Exhibit B to the Final DIP Order.

*1.45.* "**Carlyle DIP Facility**" means the debtor-in-possession financing facility provided by Carlyle Global Credit Investment Management through one or more of its affiliates.

*1.46.* "**Carlyle DIP Secured Parties**" has the meaning set forth in the DIP Order.

*1.47.* "**Carlyle Prepetition Noteholders**" means each of the holders of the notes issued pursuant to the Carlyle Prepetition Note Purchase Agreement.

*1.48.* "**Carlyle Prepetition Documents**" means (a) the Carlyle Prepetition Note Purchase Agreement, (b) the Carlyle Prepetition Security Documents, and (c) each of the other "Financing Documents" (as defined in the Carlyle Prepetition Note Purchase Agreement).

*1.49.* "**Carlyle Prepetition Facility**" means the financing facility pursuant to the Carlyle Prepetition Note Purchase Agreement.

*1.50.* "**Carlyle Prepetition Note Purchase Agreement**" means that certain Amended and Restated Note Purchase Agreement, dated October 6, 2025 by and among certain affiliates of the Borrower, including NPA 2023 Holdco, LLC, a North Carolina limited liability company as the issuer, the Purchasers and the Holders (each as defined therein) from time to time party thereto, and Wilmington Trust, National Association, as collateral agent.

*1.51.* "**Carlyle Prepetition Security Documents**" has the meaning set forth in the DIP Order.

*1.52.* "**Carlyle Sale Order**" means the *Order (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement with Summit Infrastructure LLC as Backup Buyer, (B) Authorizing the Sale of the Purchased Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Designated Contracts, and (D) Granting Related Relief* [Docket No. 1048].

*1.53.* "**Carlyle Secured Claim**" means any Secured Claim derived from, based upon, related to, on account of, or arising under the Carlyle Prepetition Note Purchase Agreement that is not credit bid or rolled up pursuant to the Carlyle DIP Facility.

*1.54.* "**Carlyle Secured Parties**" means, collectively, the Carlyle Prepetition Secured Parties (as defined in the DIP Order) and the Carlyle DIP Secured Parties.

*1.55.* "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

*1.56.* "**Cash Collateral**" has the meaning set forth in the DIP Order.

*1.57.* "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Causes of Action also include (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to or otherwise contest Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any Avoidance Action or state law fraudulent transfer claim.

*1.58.* "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered and procedurally consolidated chapter 11 cases pending for all of the Debtors in the Bankruptcy Court.

*1.59.* "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code, and, as against the Debtors or the Estates, includes any such Claim whether or not asserted or Allowed.

*1.60.* "**Claims Bar Date**" means the applicable deadline by which Proofs of Claim must be filed under the Claims Bar Date Order.

*1.61.* "**Claims Bar Date Order**" means the *Order (A) Establishing (I) Bar Dates and (II) Related Procedures for Filing Proofs of Claim, (B) Approving the Form and Manner of Notice Thereof and (C) Granting Related Relief* entered by the Bankruptcy Court on December 10, 2025 [Docket No. 634].

*1.62.* "**Claims Objection Deadline**" means the date that is three hundred and sixty-five (365) days after the Effective Date with respect to General Unsecured Claims, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the GUC Trustee.

*1.63.* "**Claims Register**" means the official register of Claims maintained by the Balloting Agent.

*1.64.* "**Class**" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

*1.65.* "**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code pursuant to that certain *Notice of Appointment of Creditors' Committee* filed by the U.S. Trustee on November 19, 2025 [Docket No. 225], as such committee may be reconstituted from time to time.

*1.66.* "**Committee Settlement Consideration**" means all of the consideration to be received as outlined in <u>Article 5.7</u> herein, including the Brookfield Cash Consideration, the Carlyle Cash Consideration, the Fundamental Settlement Consideration, and the prepayment of the Parent Promissory Notes.

*1.67.* "**Committee Settlements**" means the Brookfield Committee Settlement, the Carlyle Committee Settlement, and the Fundamental Committee Settlement, and agreement of certain Persons to prepay the Parent Promissory Notes, the terms of which are set forth in the exhibits attached to the Final DIP Order, any 363 Sale Order, the applicable term sheets, and/or this Plan, as applicable.

*1.68.* "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in <u>Article 9.1</u> hereof having been: (a) satisfied; or (b) waived pursuant to <u>Article 9.4</u> hereof.

*1.69.* "**Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

*1.70.* "**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code.

*1.71.* "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*1.72.* "**Consummation**" means the occurrence of the Effective Date of this Plan.

*1.73.* "**Cure**" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

*1.74.* "**Cure Claim**" means the Claim of any counterparty to any Executory Contract or Unexpired Lease, based upon a monetary default, if any, by any Debtor on such Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

*1.75.* "**Cure Notice**" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, a notice that (a) sets forth the proposed amount to be paid on account of a Cure Claim in connection with the assumption

of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan; and (c) sets forth the procedures for objecting to the proposed assumption of Executory Contracts and Unexpired Leases, including the proposed objection deadline, and for the resolution by the Bankruptcy Court of any such disputes.

1.76.   "**Cure/Assumption Objection Deadline**" means the date that is fourteen (14) days after filing of the Assumed Contracts List and service of the Cure Notice; *provided*, that if any Executory Contract or Unexpired Lease is added to the Assumed Contracts List after the filing of the initial Assumed Contracts List, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors is proposed to be assigned to a third party after the filing of the initial Assumed Contracts List, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) fourteen (14) days after service of the amended Assumed Contracts List with such modification and (b) the date of the scheduled Confirmation Hearing; *provided further* that the foregoing shall not apply to any Executory Contract or Unexpired Lease that has been assumed and assigned pursuant to a Final Order of the Bankruptcy Court.

1.77.   "**D&O Insurance Coverage**" means coverage for insureds under any applicable D&O Policies.

1.78.   "**D&O Policies**" means all insurance policies (including policies providing D&O Insurance Coverage and D&O Tail Coverage) and related agreements of indemnity for directors', members', trustees' and officers' liability issued or providing coverage at any time to any of the Debtors or their Representatives and all agreements, documents or instruments relating thereto, for any policy period whatsoever.

1.79.   "**D&O Tail Coverage**" means the extension of the D&O Insurance Coverage for any period beyond the end of the applicable policy period, including but not limited to any extension for a period of six (6) years after the Effective Date for claims based on conduct occurring prior to the Effective Date.

1.80.   "**Debtor Release**" has the meaning set forth in Article 10.2 herein.

1.81.   "**DIP Agents**" means BID Administrator LLC, Wilmington Trust, National Association, and FP Solar, or any successors thereto, in their capacities as administrative and collateral agents under the DIP Facilities.

1.82.   "**DIP Budget**" means the "Approved Budget" as defined in the DIP Order.

1.83.   "**DIP Collateral**" has the meaning set forth in the DIP Order.

1.84.   "**DIP Credit Agreements**" has the meaning set forth in the DIP Order.

1.85.   "**DIP Documents**" has the meaning set forth in the DIP Order.

1.86.   "**DIP Facilities**" means, collectively, the Brookfield DIP Facility, the Carlyle DIP Facility, and the Fundamental DIP Facility.

1.87. "**DIP Facility Claim**" means any Claim held by the DIP Secured Parties derived from, based upon, related to, on account of, or arising under the DIP Facilities or the DIP Order, including claims for all principal amounts outstanding, interest, fees, and expenses under the DIP Facilities.

1.88. "**DIP Intercreditor Agreement**" has the meaning set forth in the DIP Order.

1.89. "**DIP Lenders**" has the meaning set forth in the DIP Order.

1.90. "**DIP Order**" means, until entry of the Final DIP Order, the Interim DIP Order, and, after entry of the Final DIP Order, the Final DIP Order.

1.91. "**DIP Secured Parties**" has the meaning set forth in the DIP Order.

1.92. "**Disallowed**" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (a) has been disallowed, in whole or part, by a Final Order; (b) has been withdrawn by agreement of the Holder thereof and the Debtors, Plan Administrator, or the GUC Trustee, as applicable, in whole or in part; (c) has been withdrawn, in whole or in part, by the Holder thereof; (d) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim or a proof of Interest, as applicable, has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order or other applicable law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of Claim or proof of Interest; (f) was not timely or properly filed; (g) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (h) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case, a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.93. "**Disbursing Agent**" means, as applicable, the Debtors, or the Entity or Entities chosen (at any time) by the Debtors, the Plan Administrator, or the GUC Trustee to make or facilitate Distributions pursuant to this Plan. For the avoidance of doubt, the Plan Administrator or the GUC Trustee may serve as the Disbursing Agent.

1.94. "**Disclosure Statement**" means the *Disclosure Statement for First Amended Joint Chapter 11 Plan of Pine Gate Renewables, LLC and Its Debtor Affiliates*, dated January 11, 2026, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to this Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

1.95. "**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for soliciting and tabulating votes on the Plan, which shall be in form and substance reasonably acceptable to the Committee.

*1.96.* "***Disputed***" means, with respect to any Claim or Interest, a Claim or Interest that (a) is neither Allowed nor Disallowed under this Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.

*1.97.* "***Disputed Administrative Claims Reserve***" means the reserve established with respect to Disputed Administrative Claims pursuant to and governed by Article 8.4 of the Plan.

*1.98.* "***Disputed Claims Reserves***" means, collectively, the Disputed Administrative Claims Reserve and the Disputed General Unsecured Claims Reserve.

*1.99.* "***Disputed General Unsecured Claims Reserve***" means the reserve established with respect to Disputed General Unsecured Claims pursuant to and governed by Article 8.4 of the Plan.

*1.100.* "***Distribution***" means a distribution made or facilitated by the Disbursing Agent, the Plan Administrator, or the GUC Trustee, as applicable, pursuant to this Plan.

*1.101.* "***Distribution Date***" means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of this Plan, on which the Disbursing Agent makes a Distribution to Holders of Allowed Claims.

*1.102.* "***Distribution Record Date***" means the record date for purposes of determining which Holders of Allowed Claims are eligible to receive Distributions under this Plan, which date shall be two (2) Business Days prior to the Effective Date.

*1.103.* "***Effective Date***" means the first Business Day on which all of the conditions specified in Article 9.2 hereof have been satisfied or waived pursuant to Article 9.4 hereof.

*1.104.* "***Entity***" means an entity as defined in section 101(15) of the Bankruptcy Code.

*1.105.* "***Estate***" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

*1.106.* "***Exculpated Parties***" means collectively: (a) the Debtors; (b) the Committee and each of its members (in their capacity as such); (c) the Independent Managers; and (d) to the extent permitted under applicable law, each of the foregoing parties' attorneys, financial advisors, and investment bankers.

*1.107.* "***Exculpation***" means the exculpation provision set forth in Article 10.4 hereof.

*1.108.* "***Executory Contract***" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*1.109.* "***Exhibit***" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

*1.110.* "***Existing Equity Interests***" means, collectively, the shares (or any class thereof), common stock, preferred stock, capital stock, limited liability company interests (including any common units or preferred units), contingent value rights (which shall be deemed equity interests for the purposes of the Plan), and any other equity, ownership, or profits interests in any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) common stock, preferred stock, limited liability company interests (including any common units or preferred units), or other equity, ownership, or profits interests in any Debtor (in each case whether or not arising under or in connection with any employment agreement) and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, other than any such Interests held by a Debtor.

*1.111.* "***Final DIP Order***" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 646] (as may be amended, modified or supplemented from time to time in accordance with the terms thereof).

*1.112.* "***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to sections 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

*1.113.* "***Forbearance Agreements***" means, collectively, (a) the Limited Forbearance Agreement, dated as of August 7, 2025 (as amended, modified, or supplemented from time to time), and (b) the Second Limited Forbearance Agreement & Second Amendment to Subscription Agreement, dated as of October 16, 2025, in each case, by and among the Partnership, PGR Holdco GP, LLC, Pine Gate Renewables, LLC, PGR Partners, LLC, Pine Gate Management Holdings LLC, GC PGR HoldCo Member, LLC, GC PGR HoldCo, LLC, and Healthcare of Ontario Pension Plan Trust Fund.

*1.114.* "***Forbearance Documents***" means the Partnership Agreement, the GP LLC Agreement, the Secured Promissory Note, the Securities Pledge Agreement, and the Forbearance Agreements.

*1.115.* "***FP Solar***" means FP Solar Development I LLC.

*1.116.* "***Fundamental***" means, collectively, FP Solar Development I LLC, Solar Construction Lending LLC, the Fundamental Prepetition Secured Parties, and the Fundamental DIP Secured Parties.

*1.117.* "***Fundamental Assets***" has the meaning set forth in the Bidding Procedures Order.

*1.118.* "***Fundamental Buyer***" means the "Buyer" as defined in the Fundamental DIP Order.

*1.119.* "***Fundamental Cash Consideration***" means $2,000,000 in Cash plus the first $500,000 of net ACT Sale Proceeds.

*1.120.* "***Fundamental Committee Settlement***" means the settlement among the Debtors, the Committee, and Fundamental as set forth herein.

*1.121.* "***Fundamental Credit Bid Transaction***" means the acquisition by or at the direction of the Fundamental DIP Secured Parties and the Fundamental Prepetition Secured Parties of collateral securing the obligations outstanding under the Fundamental DIP Facility and/or the Fundamental Prepetition Credit Agreements pursuant to a credit bid of such obligations.

*1.122.* "***Fundamental DIP Facility***" means the debtor-in-possession financing facility provided by FP Solar and Solar Construction Lending, LLC.

*1.123.* "***Fundamental DIP Obligations***" has the meaning set forth in the Fundamental Committee Settlement.

*1.124.* "***Fundamental DIP Secured Parties***" means the lenders and the administrative and collateral agent of the Fundamental DIP Facility.

*1.125.* "***Fundamental Prepetition Agent***" means FP Solar, and any successor thereto.

*1.126.* "***Fundamental Prepetition Bridge Agreement***" means that certain Amended and Restated Revolving Loan Agreement, dated October 6, 2025, as may be amended or modified, by and among FP 2021 Dev Holdco, LLC, as borrower, FP Solar, as lender, and Solar Construction Lending, LLC, as lender.

*1.127.* "***Fundamental Prepetition Borrower***" means FP 2021 Dev Holdco, LLC and/or Blue Ridge Power, LLC, as applicable, in their respective capacities as Borrower under the Fundamental Prepetition Credit Agreements.

*1.128.* "***Fundamental Prepetition Credit Agreements***" means (a) the Revolving Loan Agreement, dated as of December 10, 2021, as amended, restated, amended and restated,

13

supplemented, waived or otherwise modified from time to time, by and among the applicable Fundamental Prepetition Borrower, the Fundamental Prepetition Agent, and the Fundamental Prepetition Lender, (b) the Fundamental Prepetition Bridge Agreement, and (c) the Amended and Restated Loan Agreement, dated as of June 26, 2025, as may have further been amended or modified, by and among Blue Ridge Power, LLC, as borrower and Solar Construction Lending, LLC, as lender.

*1.129.* "**Fundamental Prepetition Documents**" means (a) the Fundamental Prepetition Credit Agreements, (b) the Fundamental Prepetition Security Documents, and (c) each of the other "Loan Documents" (as defined in the Fundamental Prepetition Credit Agreements).

*1.130.* "**Fundamental Prepetition Facility**" means the financing facility pursuant to the Fundamental Prepetition Credit Agreements.

*1.131.* "**Fundamental Prepetition Lenders**" means FP Solar, and any successor thereto, and/or Solar Construction Lending, LLC, and any successor thereto, as applicable, in their respective capacities as "Lender" under the Fundamental Prepetition Credit Agreements.

*1.132.* "**Fundamental Prepetition Secured Parties**" means the Fundamental Prepetition Agent and the Fundamental Prepetition Lenders.

*1.133.* "**Fundamental Prepetition Security Documents**" has the meaning set forth in the DIP Order.

*1.134.* "**Fundamental Remaining Claims**" has the meaning set forth in Article 2.3.

*1.135.* "**Fundamental Sale Order**" means the *Order (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement with FR Acquisition Holdings LLC, (B) Authorizing the Sale of the Purchased Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Designated Contracts, and (D) Granting Related Relief* [Docket No. 1125].

*1.136.* "**Fundamental Secured Claim**" means any Secured Claim derived from, based upon, related to, on account of, or arising under Fundamental Prepetition Documents that is not included in a successful credit bid or rolled up pursuant to the Fundamental DIP Facility.

*1.137.* "**Fundamental Secured Parties**" has the meaning set forth in the Final DIP Order.

*1.138.* "**Fundamental Settlement Consideration**" has the meaning ascribed to it in Article 5.7 herein.

*1.139.* "**Fundamental/Committee Shared Causes of Action**" has the meaning ascribed to it in Article 5.7 herein.

*1.140.* "**Funded Debt Secured Claim**" means, collectively, the Brookfield Secured Claim, the Carlyle Secured Claim, and the Fundamental Secured Claim.

*1.141.* "***General Administrative Claim***" means any Administrative Claim, other than a Claim for fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930, any DIP Facility Claim, or any Adequate Protection Obligations.

*1.142.* "***General Unsecured Claim***" means any Unsecured Claim against any of the Debtors (other than an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Intercompany Claim, or a Subordinated Claim), including, (a) Claims arising from the rejection of Unexpired Leases or Executory Contracts and (b) Claims arising from any litigation or other court, administrative, or regulatory proceeding, including damages or judgments entered against or settlement amounts owing by, a Debtor in connection therewith.  The term "General Unsecured Claim" expressly excludes any Claim that constitutes a 363 Sale Assumed Liability.

*1.143.* "***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

*1.144.* "***GP LLC Agreement***" means the Amended and Restated Limited Liability Company Agreement of PGR Holdco GP, LLC, dated as of April 16, 2024, by and among PGR Holdco GP, LLC, PGR Partners, LLC, GC PGR HoldCo Member, LLC, GC PGR HoldCo, LLC, and Healthcare of Ontario Pension Plan Trust Fund.

*1.145.* "***GUC Trust***" means the trust established on the Effective Date for the benefit of Holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement, which trust shall hold the GUC Trust Assets.

*1.146.* "***GUC Trust Agreement***" means the trust or similar agreement providing for the GUC Trust, consistent with the Plan and in form and substance reasonably acceptable to the Debtors and the Committee, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof and substantially in the form included in the Plan Supplement.

*1.147.* "***GUC Trust Assets***" means, collectively, (a) the GUC Trust Causes of Action, (b) the GUC Trust Cash, (c) the first $500,000 of net ACT Sale Proceeds, and (d) the GUC Trust Remainder Payment.

*1.148.* "***GUC Trust Cash***" means all Cash held by the Estates, including the Brookfield Cash Consideration, the Carlyle Cash Consideration, the Fundamental Cash Consideration, and the prepayment of the Parent Promissory Notes by the Parent Promissory Note Obligors, less the amount of Cash necessary to fund the Wind-Down Reserve Amount and the Professional Fee Escrow Amount.

*1.149.* "***GUC Trust Causes of Action***" means Retained Causes of Action other than the Plan Administrator Causes of Action.

*1.150.* "***GUC Trust Fees and Expenses***" means the reasonable fees and expenses (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) incurred by the GUC Trust, the GUC Trustee, any professionals retained by the GUC Trust, and any additional amount determined to be necessary by the GUC

Trustee to adequately reserve for the operating expenses of the GUC Trust that shall be paid out of the GUC Trust Assets.

1.151. "**GUC Trust Interests**" means, collectively, non-certificated beneficial interests in the GUC Trust granted to each Holder of an Allowed General Unsecured Claim, which shall entitle such Holder to a Pro Rata share of the GUC Trust Net Assets, subject to the terms of the Plan and the GUC Trust Agreement.

1.152. "**GUC Trust Net Assets**" means the GUC Trust Assets less the GUC Trust Fees and Expenses.

1.153. "**GUC Trust Remainder Payment**" means all remaining Cash held by the Estates at the conclusion of the Wind-Down of the Post-Effective Date Debtors, the timing of which is expected to be completion of the Wind-Down and shall be reasonably determined by agreement of the Plan Administrator and GUC Trustee and which may occur after the closing of the Chapter 11 Cases or by Order of the Bankruptcy Court if no agreement can be reached.

1.154. "**GUC Trustee**" means, in its capacity as such, the Person selected by the Committee to serve as the trustee of the GUC Trust, and any successor thereto, in accordance with the GUC Trust Agreement.

1.155. "**Holder**" means a Person or Entity, as applicable, holding a Claim against or an Interest in any of the Debtors.

1.156. "**Impaired**" means, with respect to a Claim or Interest, or Class of Claims or Interests, a Claim or Class that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.157. "**Independent Managers**" means, collectively, Todd Arden, William Transier, Neal Goldman, Jonathan Zinman, Patrick Bartels, and Michael Wartell, each in his capacity as an independent and disinterested manager on the applicable Debtors' boards of managers.

1.158. "**Independent Manager Fee Claim**" means all unpaid fees and expenses as of the Effective Date due to the Independent Managers pursuant to their respective manager agreements with the Debtors. On the Effective Date, the Independent Manager Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

1.159. "**Initial Distribution**" means the first Distribution that the GUC Trustee makes to Holders of Allowed General Unsecured Claims.

1.160. "**Initial Distribution Date**" means the date selected by the GUC Trustee on which the Initial Distribution will occur.

1.161. "**Initial Stalking Horse Bidders**" means BII BID Solar II Aggregator, LP, Summit Infrastructure LLC, FP Acquisition Holdings LLC, and any affiliates of the foregoing.

*1.162.* "**Insurance Policies**" means all insurance policies and related agreements issued or providing coverage at any time to any of the Debtors or any of their predecessors and all agreements, documents, or instruments relating thereto, including any D&O Policies.

*1.163.* "**Insurer**" means any non-Debtor company or other Entity that issued or entered into an Insurance Policy (including any third-party administrator) and any respective predecessors and/or affiliates thereof.

*1.164.* "**Intercompany Claim**" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

*1.165.* "**Intercompany Interest**" means, collectively, (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity) in any Debtor, and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, earn-out rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor held by an Affiliate of such Debtor, which Affiliate may be another Debtor. The term "Intercompany Interest" expressly excludes any Existing Equity Interests.

*1.166.* "**Interests**" means, collectively, Existing Equity Interests and Intercompany Interests.

*1.167.* "**Interim Compensation Procedures Order**" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 693].

*1.168.* "**Interim DIP Order**" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 132] (as amended, modified or supplemented from time to time in accordance with the terms thereof).

*1.169.* "**Lender Nominee**" has the meaning ascribed to it in the *Declaration of Ray Shem, President and Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First-Day Relief* [Docket No. 19].

*1.170.* "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.171.* "**Nofar Sale Order**" means the *Order (A) Authorizing and Approving the Debtor's Entry into an Asset Purchase Agreement with Nofar USA Energy Investments and Management LLC, (B) Authorizing the Sale of the Purchased Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Designated Contracts, and (D) Granting Related Relief* [Docket No. 1047].

*1.172.* "***Opt-Out Release Form***" has the meaning set forth in the Disclosure Statement Order.

*1.173.* "***Other Priority Claim***" means any Claim against any of the Debtors entitled to priority in payment as specified in sections 507(a)(4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

*1.174.* "***Other Secured Claim***" means any Secured Claim, other than a DIP Facility Claim and a Funded Debt Secured Claim.  The term "Other Secured Claim" expressly excludes any Claim that constitutes a 363 Sale Assumed Liability.

*1.175.* "***Parent***" means Pine Gate Renewables, LLC.

*1.176.* "***Parent Promissory Notes***" means those certain promissory notes owed to Debtor Pine Gate Renewables, LLC, by the Parent Promissory Notes Obligors, dated November 8, 2019, and July 28, 2020.

*1.177.* "***Parent Promissory Notes Obligors***" means the four founders of the Debtors, each of whom are identified in the First Day Declaration as the indirect equity owners of PGR Holdco, LP.

*1.178.* "***Partnership***" means PGR Holdco, LP, a Delaware limited partnership.

*1.179.* "***Partnership Agreement***" means the Limited Partnership Agreement of the Partnership, dated as of April 16, 2024 (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms), by and among the Partnership, PGR Holdco GP, LLC, GC PGR HoldCo, LLC, GC PGR HoldCo Member, LLC, Healthcare of Ontario Pension Plan Trust Fund, PGR Partners, LLC, and Pine Gate Management Holdings LLC.

*1.180.* "***Person***" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*1.181.* "***Petition Date***" means November 6, 2025.

*1.182.* "***Plan***" means this First Amended Joint Chapter 11 Plan of Pine Gate Renewables, LLC and Its Debtor Affiliates and all exhibits, supplements, appendices, and schedules, as may be altered, amended, supplemented, or otherwise modified, from time to time in accordance with the terms hereof and in all respects in form and substance reasonably acceptable to the Committee.

*1.183.* "***Plan Administration Agreement***" means the agreement, consistent with this Plan and in form and substance reasonably acceptable to the DIP Lenders and the Committee, to be entered into by and among the Debtors and the Plan Administrator with respect to the Plan Administration Process, which shall be included in the Plan Supplement.

*1.184.* "***Plan Administration Assets***" has the meaning set forth in Article 5.10 of this Plan.

*1.185.* "**Plan Administration Expenses**" means all reasonable and documented fees, expenses, and costs incurred by the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement, including the maintenance or disposition of the Plan Administration Assets (including, but not limited to, Plan Administrator fees, attorneys' fees, the fees of professionals, and other Persons retained by the Plan Administrator, personnel-related expenses, any taxes imposed in respect of the Plan Administration Assets), which shall be funded as part of the Wind-Down Reserve Amount in accordance with the terms of this Plan.

*1.186.* "**Plan Administration Process**" means the process for resolving and paying Claims described in Article 5.9 of this Plan.

*1.187.* "**Plan Administrator**" means the Person disclosed in the Plan Supplement, or any successor(s) thereto, to be the representative of the Estates and the Post-Effective Date Debtors on and after the Effective Date as selected jointly by the Debtors and the Committee, and who shall have the rights, powers, duties and responsibilities set forth in the Plan and Plan Administration Agreement.

*1.188.* "**Plan Administrator Causes of Action**" means any Retained Causes of Action that can be asserted and are assertable as any right of setoff, counterclaim, or recoupment with respect to an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, or a Secured Claim.

*1.189.* "**Plan Schedule**" means a schedule annexed to this Plan or an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

*1.190.* "**Plan Supplement**" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise (including, but not limited to, the Assumed Contracts List, GUC Trust Agreement, Plan Administration Agreement, Schedule of Retained Causes of Action, the Wind-Down Reserve Amount (if available), and Wind-Down Transactions Memorandum), which in each case, shall be in form and substance reasonably acceptable to the Committee, and all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time, which in each case, shall be in form and substance reasonably acceptable to the Committee.

*1.191.* "**Polaris Claim**" means a claim in the amount of $5 million, secured by a validly perfected exclusive first-priority lien over the Retained Polaris Interest.

*1.192.* "**Polaris SPV**" means a newly-formed, bankruptcy-remote special purchase company, which shall (a) be governed by a single independent manager selected by Parent from a slate of two candidates proposed by the Successful Bidder or Backup Buyer, as applicable, under the 363 Sale Transaction contemplated by the Nofar APA or the Carlyle APA, whichever is consummated, and (b) otherwise be subject to governance documentation acceptable to such Successful Bidder or Backup Buyer, as applicable.

*1.193.* "**Post-Effective Date Debtors**" means the Debtors after the Effective Date.

*1.194.* "**Purchased Companies**" means, collectively, (a) the Brookfield Purchased Companies [Docket No. 782]:  Catalina Solar Holdings, LLC; GA Solar 5, LLC; GH Pledge

Borrower, LLC; Grande Holdco LLC; Lotus Solar LLC; Magnolia Solar Development, LLC; PGR 2021 Fund 13, LLC; PGR 2021 Fund 9, LLC; PGR 2021 Holdco 18, LLC; PGR 2021 Holdco 4, LLC; PGR 2021 Manager 13, LLC; PGR 2021 Manager 9, LLC; PGR 2022 Fund 2, LLC; PGR 2022 Fund 8, LLC; PGR 2022 Holdco 1, LLC; PGR 2022 Manager 2, LLC; PGR 2022 Manager 8, LLC; Polaris DevCo Pledgor B, LLC; and Polaris OpCo Pledgor B, LLC; (b) the Carlyle Purchased Companies [Docket Nos. 1047 and 1048]:  PGR 2021 Fund 11, LLC; PGR 2021 Manager 11, LLC; any other subsidiaries of PGR 2021 Holdco 11, LLC; PGR 2021 Fund 12, LLC; PGR 2021 Manager 12, LLC; PGR 2021 Fund 15, LLC; PGR 2021 Manager 15, LLC; any other subsidiaries of PGR 2021 Holdco 15, LLC; PGR 2021 Fund 19, LLC; any other subsidiaries of PGR 2021 Holdco 19, LLC; PGR 2021 Manager 19, LLC; Polaris OpCo Borrower A, LLC; Foley Solar, LLC; Lavender Solar LLC; NPA 2023 Holdco, LLC; any other subsidiaries of NPA 2023 Holdco, LLC; NPA Polaris DevCo Holdco, LLC; any other subsidiaries of NPA Polaris DevCo Pledgor, LLC; Polaris DevCo Pledgor A, LLC; PGR 2023 Manager 6, LLC; PGR 2023 Fund 6, LLC; any other subsidiaries of NPA Polaris DevCo Holdco, LLC; PGR 2021 Holdco 11, LLC; PGR 2021 Holdco 12, LLC; any other subsidiaries of PGR 2021 Holdco 12, LLC; PGR 2021 Holdco 15, LLC; and PGR 2021 Holdco 19, LLC; and (c) the Fundamental Purchased Companies [Docket No. 1125]:  Alabaster Solar, LLC; Amphion Solar, LLC (f/k/a Blue Heron Solar, LLC); Anchors Aweigh Solar, LLC; Andromeda Solar, LLC; Baltzer Solar, LLC (f/k/a Beaver Bayou LLC); Banjo Solar, LLC; Barksdale Branch Solar, LLC; Bayou Solar, LLC; Beacon Solar, LLC; Bear Creek Solar, LLC; Bedlam Solar, LLC; Bell Song Solar, LLC; Berrien Solar, LLC; Black Swamp Solar, LLC; Blue Granite Solar, LLC; Blue Hen Storage, LLC; Brown Rabbit Solar, LLC; Broxton Solar, LLC; Buffalo Grass Solar, LLC; Bush Knob Solar, LLC; Buttercup Solar, LLC; Caelum Solar, LLC; Camelot Solar, LLC; Camelot Storage, LLC; Carolina Wren Solar, LLC; Cassia Solar, LLC; Cherry Tree Solar, LLC; Chicory Solar, LLC (f/k/a Le Printemps Solar, LLC); Claxton Solar Project, LLC; Clovis Storage, LLC; Cochran Storage, LLC; Corvus Solar, LLC; Coxton Lake Solar, LLC; Coyote Prowl Solar, LLC; Crossvine Solar, LLC; Desert Willow Solar, LLC; Drawhorn Solar, LLC; Dwiggins Place LLC; Elevate Solar, LLC; Emerson Solar, LLC; Fairgrounds Solar, LLC; Falling Feather Solar, LLC; Flycatcher Solar, LLC; Flywheel Solar, LLC; Freight Line Solar, LLC; Grapefruit Solar LLC; Gray Fox Solar, LLC; Hawkeye Solar, LLC; Hawkins Energy LLC; Heath Storage, LLC; Hematite Solar, LLC; Ho-Fel Solar, LLC; Hook Storage, LLC; House Solar, LLC; Infinity Storage, LLC; Jefferson Solar, LLC; Journey Solar, LLC; Keystone Crest Solar, LLC; Kingfisher Solar, LLC; Knotty Pine Solar, LLC; Leatherwood Solar, LLC; Linden Solar, LLC; Little Bluestem Solar, LLC; Longleaf Solar, LLC; Macon County Solar Project, LLC; Magenta Solar, LLC; Mallard Solar, LLC; Mariette Solar, LLC; Mesquite Solar, LLC; Midland-Wiregrass Solar Project, LLC; Monarch Energy LLC; Moon Glow Solar, LLC; Morgan Solar, LLC; Napier Storage, LLC; Osprey Solar, LLC; Oxbow Solar, LLC; Panther Creek Solar, LLC (f/k/a Indian Lake Solar, LLC); Parker Branch Solar, LLC; Peanut Solar, LLC; Pelham Solar, LLC; PGR 2021 Fund 17, LLC; PGR 2021 Manager 17, LLC; PGR ITC Holdco, LLC; PGR Procurement, LLC; PGR Wind, LLC; Piccolo Solar, LLC; Pinto Solar, LLC; Promise Solar, LLC; Quaker Creek Farm Solar, LLC; Quayside Solar, LLC; Rainbow Solar, LLC; Rebecca Solar, LLC; Roan Solar, LLC; Sagebrush Solar, LLC; Sandersville Solar, LLC; Sandhills Solar, LLC; Shamrock Solar, LLC; Silverthorn Solar, LLC; Sirius Devco Pledgor, LLC; Sirius OpCo Pledgor, LLC; Skyway Solar, LLC; Solar Carver 1, LLC; Solar Carver 3, LLC; Solheim Solar, LLC; Splendid Glow Solar, LLC; Stargaze Solar, LLC; Sundance Solar, LLC; Sunstone Solar 1, LLC; Sunstone Solar 2, LLC; Sunstone Solar 3, LLC; Sunstone Solar 4, LLC; Sunstone Solar 5, LLC; Sunstone Solar 6, LLC; Sunstone Solar, LLC; Swiftwater Solar, LLC; Tarvos Solar, LLC;

Themisto Solar, LLC; Tordillo Creek Solar, LLC; Twin Oaks Solar, LLC; Vero Solar, LLC; Vista Solar, LLC; Wild Horse Solar, LLC; Wild Indigo Solar, LLC; Wildflower Solar, LLC; Winterberry Solar, LLC; Wolf Pit Branch Solar, LLC; Wood Duck Solar, LLC; Yellow Bear Storage, LLC; and Zephyr Solar, LLC.

*1.195.* "***Purchased Company Released Parties***" means each of the Purchased Companies and its Related Parties.

*1.196.* "***Prepetition Credit Agreements***" means, collectively, the Brookfield Prepetition Credit Agreement, the Carlyle Prepetition Note Purchase Agreement, and the Fundamental Prepetition Credit Agreements.

*1.197.* "***Prepetition Documents***" means the Brookfield Prepetition Documents, the Carlyle Prepetition Documents, and the Fundamental Prepetition Documents.

*1.198.* "***Prepetition Funded Debt Facilities***" means, collectively, the Brookfield Prepetition Facility, the Carlyle Prepetition Facility, and the Fundamental Prepetition Facility.

*1.199.* "***Prepetition Intercreditor Agreement***" means, individually or collectively, each of (a) that certain Intercreditor Agreement, dated October 6, 2025 among FP Solar, the Brookfield Agent and the Carlyle Prepetition Noteholders and (b) that certain Junior Lien Intercreditor and Subordination Agreement, dated October 6, 2025 among FP Solar, the Brookfield Agent and the Carlyle Prepetition Noteholders.

*1.200.* "***Prepetition Secured Parties***" has the meaning set forth in the DIP Order.

*1.201.* "***Priority Tax Claim***" means any Secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*1.202.* "***Pro Rata Share***" means, with respect to any Distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

*1.203.* "***Professional Fee Claim***" means a Claim (a) by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date and on or before the Effective Date under sections 328, 330, 331, 503(b)(2), or 1102 of the Bankruptcy Code, as applicable; or (b) by an ordinary course professional for compensation for services rendered or reimbursement of expenses incurred after the Petition Date and on or before the Effective Date pursuant to any order approving the retention of ordinary course professionals.

*1.204.* "***Professional Fee Escrow Account***" means a segregated interest-bearing account to be established by the Debtors into which the Professional Fee Escrow Amount shall be deposited on or prior to the Effective Date, which, for the avoidance of doubt, may be an escrow account for professional fees established under the DIP Order.

*1.205.* "**Professional Fee Escrow Amount**" means (a) the aggregate amount of Professional Fee Claims incurred or estimated in good faith to be incurred in connection with the Chapter 11 Cases prior to and as of the Effective Date less the aggregate amount of the funds in the Professional Fee Escrow Account, the Escrow Account (as defined in the DIP Order), and Carve Out Account (as defined in the DIP Order) (as applicable) and (b) a good faith estimate of Professional Fee Claims to be incurred following the Effective Date, consistent with the terms of the Plan.

*1.206.* "**Proof of Claim**" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

*1.207.* "**Purchase Agreements**" means one or more asset purchase agreements or purchase and sale agreements which the Debtors have effectuated or will effectuate in connection with the 363 Sale Transaction.

*1.208.* "**Reinstate**," "**Reinstated**," or "**Reinstatement**" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by the Plan in accordance with section 1124(1) of the Bankruptcy Code.

*1.209.* "**Related Parties**" means with respect to an Entity, in each case solely in its capacity as such, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, members, equity holders (including preferred equity holders and regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, trustees, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders (including preferred equity holders), officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, trustees, and other professionals.

*1.210.* "**Released Parties**" means, each of, and in each case solely in its capacity as such (except as expressly noted below): (a) each Debtor and each Post-Effective Date Debtor; (b) the Debtors' current and former officers and employees, each in all capacities related solely to the operation of the Debtors and their businesses; (c) each Lender Nominee; (d) each DIP Secured Party (including, but not limited to, for each, in their capacities as lenders); (e) each Prepetition Secured Party (including, but not limited to, for each, in their capacities as prepetition lenders); (f) the administrative and collateral agents under the Prepetition Credit Agreements and DIP Credit Agreements; (g) the Successful Bidder(s) and Backup Bidders; (h) the Initial Stalking Horse Bidders; (i) the Plan Administrator; (j) the GUC Trustee; (k) the GUC Trust; (l) the Committee and each of its members; and (m) with respect to each of the foregoing Persons in clauses (a) through (l), such Person and its Related Parties (except as expressly noted herein); *provided*, that, notwithstanding anything to the contrary in the Plan, in no event shall a Purchased Company be a Released Party or a Related Party to a Released Party; *provided*, *further*, that, in each case, a Person shall not be a Released Party if such Person: (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by

22

electronic mail, and such objection is not resolved or withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation; *provided*, *further*, that solely to the extent that the Parent Promissory Note Obligors prepay in accordance with the Fundamental Committee Settlement within thirty (30) days of the Effective Date, such Parent Promissory Note Obligors and their wholly owned Entities shall be Released Parties.

 *1.211.* "**Releasing Parties**" means collectively, and in each case solely in its capacity as such: (a) the Released Parties; (b) all Holders of Claims and Interests who, in each case, do not affirmatively opt out of the releases provided by the Plan by checking the applicable box on the Ballot or the Opt-Out Release Form, as applicable, indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Disclosure Statement Order and who (i) vote to accept the Plan, (ii) are presumed to accept the Plan, (iii) abstain from voting on the Plan, (iv) vote to reject the Plan, or (v) are deemed to reject the Plan; and (c) each Related Party of any of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Persons in clauses (a) through (b), solely to the extent such Related Party (I) would be obligated to grant a release under the principles of agency if it were so directed by the Debtors, the Post-Effective Date Debtors, or the Entity in the foregoing clauses (a) through (b) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through the Debtors, the Post-Effective Date Debtors or an Entity in the foregoing clauses (a) through (b).  A Person shall not be a Releasing Party if such Person timely objects to the Third-Party Release, either through (i) formal objection filed on the docket of the Chapter 11 Cases or (ii) informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not resolved or withdrawn from the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation.

 *1.212.* "**Representatives**" means, with respect to a Person, such Person's current and former (a) officers, (b) directors, (c) managers, (d) principals, (e) members, (f) employees, (g) agents, (h) advisory board members, (i) financial advisors, (j) partners, (k) attorneys, (l) accountants, (m) investment bankers, (n) consultants, (o) representatives, and (p) other professionals, each in their capacity as such.

 *1.213.* "**Retained Causes of Action**" means all Causes of Action owned by the Debtors' Estates that are not released, waived, or transferred pursuant to the Plan or any 363 Sale Transaction, including, but not limited to those listed on the Schedule of Retained Causes of Action, which, for the avoidance of doubt, shall include the Fundamental/Committee Shared Causes of Action.

 *1.214.* "**Retained Polaris Interest**" means the interest in Polaris OpCo Borrower A, LLC retained by Polaris OpCo Pledgor A, LLC immediately following the closing of the 363 Sale Transaction contemplated by the Nofar APA or the Carlyle APA, whichever is consummated, together with any cash distributions and any other proceeds with respect to such interest.

 *1.215.* "**Retained Professional**" means any Person or Entity retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*1.216.* "**Reverse TSAs**" means the transition services agreements between the Fundamental Buyer and the Debtors, consistent with the Plan and in form and substance reasonably acceptable to the Debtors, the applicable Successful Bidder(s) (and Backup Bidders, if applicable), and the Committee, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof and substantially in the form included in the Plan Supplement.

*1.217.* "**Sale Transaction Proceeds**" means all proceeds from the consummation of the 363 Sale Transaction that are distributable or payable to the Estates, and such proceeds may consist of Cash or non-Cash consideration.

*1.218.* "**Schedule of Retained Causes of Action**" means the schedule of Retained Causes of Action included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

*1.219.* "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

*1.220.* "**Secured**" means, when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

*1.221.* "**Secured Claim**" means a Claim that is Secured.

*1.222.* "**Secured Promissory Note**" means the Secured Promissory Note, dated as of March 15, 2024, issued by PGR Partners, LLC.

*1.223.* "**Securities Pledge Agreement**" means the Securities Pledge Agreement, dated as of March 15, 2024, by and between PGR Partners, LLC and Pine Gate Renewables, LLC.

*1.224.* "**Single Unit**" has the meaning set forth in Article 3.2(h)(ii)(1) hereof.

*1.225.* "**Solicitation**" means the solicitation of votes on this Plan.

*1.226.* "**Solicitation Procedures**" means the procedures concerning Solicitation established pursuant to the Disclosure Statement Order.

*1.227.* "**Special Committee**" means the committee composed of three of the Independent Managers established by the board of managers of PGR Holdco GP, LLC on August 20, 2025.

*1.228.* "**Statutory Fees**" means all fees and charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

*1.229.* "**Subordinated Claim**" means any Claim (a) arising from: (i) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (ii) purchase or sale of such a security; or (iii) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim; or (b) subject to subordination in accordance with section 510(c) of the Bankruptcy Code or otherwise.

*1.230.* "**Successful Bidder(s)**" means any Entity or Entities whose bid for certain of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures Order.  For the avoidance of doubt, a Successful Bidder may be more than one Entity, submitting one or more bids, and, if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders."  References to Successful Bidder(s) shall also include any Entities designated as a "Buyer Designee" under any 363 Sale Transaction Documentation.

*1.231.* "**Sunstone APA**" has the meaning set forth in the Fundamental Sale Order.

*1.232.* "**Sunstone Assets**" has the meaning set forth in the Fundamental Sale Order.

*1.233.* "**Sunstone Equity Interests**" has the meaning set forth in the Fundamental Sale Order.

*1.234.* "**Tax Code**" means the Internal Revenue Code of 1986, as amended.

*1.235.* "**Third-Party Release**" means the releases by the Holders of Claims and Interests as set forth in Article 10.3 herein.

*1.236.* "**Third-Party TSA**" means any transition services agreement between any Debtor or any of its Affiliates, on the one hand, and any purchaser of assets of the Debtors or their Affiliates in the Chapter 11 Cases, on the other hand.  For the avoidance of doubt, any Reverse TSA shall not constitute a Third-Party TSA.

*1.237.* "**Treasury Regulations**" means the regulations promulgated by the United States Department of Treasury under the Tax Code.

*1.238.* "**U.S. Trustee**" means the Office of the United States Trustee for the Southern District of Texas.

*1.239.* "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*1.240.* "**Unimpaired**" means, with respect to a Claim, or Class of Claims, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*1.241.* "**United States Government**" means the federal government of the United States.

*1.242.* "***Unsecured Claim***" means any Claim that is not a Secured Claim.

*1.243.* "***Voting Classes***" means Classes 3 and 4.

*1.244.* "***Voting Deadline***" means February 13, 2026 at 4:00 p.m. (Prevailing Central Time).

*1.245.* "***Voting Record Date***" means January 9, 2026.

*1.246.* "***Wind-Down***" means the process of winding down the Debtors' businesses, affairs, and Estates, and winding down and dissolving the Debtor entities and their indirect and indirect subsidiaries, including any residual assets and Entities not transferred to the Successful Bidder(s) (or Backup Bidder(s), if applicable), after the Effective Date, and all actions related to, necessary for, or otherwise appropriate to effectuate the foregoing.

*1.247.* "***Wind-Down Reserve Amount***" means Cash in an amount to be determined by the Debtors and agreed to by the Committee prior to the Effective Date and specified in the Plan Supplement (to the extent available), to be retained by the Post-Effective Date Debtors to satisfy Allowed Other Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and projected costs for winding down the Estates and affairs of the Debtors and their indirect and indirect subsidiaries, including any residual assets and Entities not transferred to the Successful Bidder(s) (or Backup Bidder(s), if applicable), which amount shall be funded from Cash on hand as of the Effective Date or received on account of receivables required to be paid to the Estates under this Plan on or about the Effective Date.  Any remaining amounts upon completion of the Wind-Down shall be remitted to the GUC Trust.

*1.248.* "***Wind-Down Transactions Memorandum***" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Wind-Down, the form of which shall be included in the Plan Supplement.

B.    **Rules of Interpretation**.

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item will be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, or other agreement or document will mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of a Claim or an Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles," "Exhibits", and "Plan Schedules" are references to Articles, Exhibits, and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided herein, the rights and

26

obligations arising pursuant to this Plan will be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein will, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) references to "shareholders," "directors," and/or "officers" will also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (m) all references to statutes, regulations, orders, rules of courts, and the like will mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

## C.     Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day.

## D.     Consent Rights

Notwithstanding anything in the Plan to the contrary, any and all consultation, information, notice, and consent rights set forth in the DIP Order and the DIP Credit Agreement, with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be (a) incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and (b) fully enforceable as if stated in full herein; *provided*, that notwithstanding anything herein to the contrary, upon the closing of their respective 363 Sale Transaction and in the absence of any purchase price adjustment under the applicable Purchase Agreement, any and all approval, consultation, information, notice, and consent rights of Brookfield, Carlyle, and Fundamental with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement shall terminate as and to the extent set forth in the Committee Settlements, unless such documents adversely affect such parties, respectively.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS,
## AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, General Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

2.1.   *Administrative Claims*.

(a)   *General Administrative Claims*.  Except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, that Allowed General Administrative Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously filed or paid, requests for payment of General Administrative Claims must be filed and served on the Debtors or Plan Administrator, as applicable, pursuant to the procedures specified herein, in the Confirmation Order, in the notice of entry of the Confirmation Order, in the notice of occurrence of the Effective Date, or in any other order entered by the Bankruptcy Court by no later than the Administrative Claims Bar Date, as applicable; *provided*, that the foregoing shall not apply to either (a) the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or (b) the Bankruptcy Court or U.S. Trustee as Holders of General Administrative Claims.  Holders of General Administrative Claims that are required to file and serve a request for payment of such General Administrative Claims that do not file and serve such request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such General Administrative Claims against the Debtors and their respective Estates and property, and such General Administrative Claims shall be deemed satisfied as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article 10.5 hereof.  Nothing in this Article 2.1 shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to requests for payment of General Administrative Claims must be filed and served on the Debtors or Plan Administrator, as applicable, and the requesting party by the Administrative Claims Objection Deadline.

(b)     *Professional Fee Claims*.  All Retained Professionals seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims, the Plan Administrator shall pay such amounts from the Wind-Down Reserve Amount within five (5) Business Days after entry of the order approving such Professional Fee Claims.  The Debtors and the Plan Administrator, as applicable, are authorized to pay Retained Professionals for services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course from the Professional Fee Escrow Account, without the need for Bankruptcy Court approval.

On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Plan Administrator.  On and after the Effective Date, the Professional Fee Escrow Account shall be held by the Plan Administrator on behalf of the Post-Effective Date Debtors for Retained Professionals and for no other parties until all Professional Fee Claims (other than any Professional Fee Claims that have been Disallowed by the Bankruptcy Court) have been paid in full.  Professional Fee Claims owing to the applicable Retained Professionals shall be paid in full, in Cash, to such Retained Professionals from funds held in the Professional Fee Escrow Account when such Claims are (a) Allowed by an order of the Bankruptcy Court or (b) authorized to be paid under (i) the Interim Compensation Procedures Order or (ii) with respect to Professional Fee Claims incurred after the Effective Date, this Plan.  The Post-Effective Date Debtors' obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account as of the Effective Date.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way, other than (i) customary Liens in favor of the depository bank at which the Professional Fee Escrow Account is maintained and (ii) Liens securing DIP Facility Claims to the extent not released or terminated and solely with respect to the Debtors' interest in any residual amounts remaining in the Professional Fee Escrow Account.

Objections to any final requests for payment of Professional Fee Claims must be filed no later than twenty-one (21) days from the date of the filing of such final requests for payment of Professional Fee Claims.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and applicable orders of the Bankruptcy Court.

In the event any Cash remains in the Professional Fee Escrow Account after the payment of all Allowed Professional Fee Claims in full, such Cash shall be transferred at the direction of the Plan Administrator and held as part of the Wind-Down Reserve Amount.

(c)    *Statutory Fees*. All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Disbursing Agent, which may be the Plan Administrator, shall pay any and all such fees when due and payable from the Wind-Down Reserve Amount. After the Effective Date, the Disbursing Agent, which may be the Plan Administrator, shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of quarterly fees.

### 2.2.    **Priority Tax Claims**.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.

### 2.3.    **DIP Facility Claims**.

Prior to, and as a condition precedent to, the Effective Date, the 363 Sale Transactions for the Brookfield Assets and the Carlyle Assets and the Fundamental Credit Bid Transaction shall have closed; and, except as stated in this Article 2.3, (a) any DIP Facility Claims shall be cancelled, released, and extinguished and the DIP Facilities shall be deemed mutually terminated as of such time and (b) any Holders of such DIP Facility Claims shall permanently waive the right to recover on account of any deficiency claim against the Debtors or their estates (and the GUC Trust) on account of such DIP Facility Claims on the Effective Date.

As contemplated by the Fundamental Committee Settlement, the Fundamental DIP Secured Parties shall be deemed to have retained their Liens or Claims (including, but not limited to, entitlement to proceeds) relating to (w) the proceeds of PGR Blue Ridge Power Holdings, LLC and its direct and indirect subsidiaries (collectively, "***BRGH***"), and each of its and their respective assets, to the extent such Liens and Claims exist under the Fundamental DIP Facility or the Fundamental Prepetition Documents, (x) any sale of projects or project companies securing and/or guaranteeing the obligations under the Fundamental DIP Facility or Fundamental Prepetition Loan

Documents if not yet consummated, (y) the ACT Sale Proceeds in excess of $500,000, and (z) 50% of the net proceeds of the Fundamental/Committee Shared Causes of Action (collectively, clauses (w) through (z), the "***Fundamental Remaining Claims***").  For the avoidance of doubt, the Fundamental Secured Parties' liens on the Sunstone Assets and the Sunstone Equity Interests shall only terminate upon the consummation of the sale transaction for the Sunstone Assets between the Debtors and Oregon Solar 1, LLC or Puget Sound Energy, Inc. and Fundamental's receipt in full in cash of proceeds therefrom, or, if both such transactions fail to consummate, then upon the consummation of Fundamental's acquisition of the Sunstone Equity Securities.  For the further avoidance of doubt, none of the terminations or lien releases in respect of any of the Fundamental DIP Obligations or the Fundamental DIP Facility shall be effective to the extent they impair Fundamental's right to credit bid (i) the Fundamental DIP Obligations in full with respect to the Fundamental Credit Bid or (ii) to the extent that neither the transaction with Oregon Solar 1, LLC or Puget Sound Energy, Inc. for the Sunstone is consummated in accordance with the terms of the Sunstone APA, to acquire the Sunstone Equity Interests.  As contemplated by the Fundamental Committee Settlement, Fundamental shall receive payment of the Fundamental Remaining Claims as and when proceeds are available to be distributed, including in accordance with the mandatory prepayment provision of the DIP Documents, as applicable.

Notwithstanding anything in the Plan to the contrary, as contemplated by the Brookfield Committee Settlement, the Carlyle Committee Settlement, and the Fundamental Committee Settlement, (i) the applicable DIP Facility shall not be terminated in the event and to the extent that there is a purchase price adjustment under the applicable Purchase Agreement, and no such DIP Facility Claim shall be waived and any DIP Facility Claim shall be paid in full in Cash on the Effective Date except as otherwise agreed between the Debtors and the applicable Holder of such DIP Facility Claim if such Claim is on account of a purchase price adjustment for any asset to be acquired pursuant to the applicable Purchase Agreement that is not sold to or at the direction of the applicable DIP Secured Parties (*i.e.*, on account of a project lender exercising remedies as to project assets prior to closing), (ii) the Carlyle DIP Facility, the Brookfield DIP Facility, and the Fundamental DIP Facility shall not be terminated and no such DIP Facility Claim shall be waived if the Debtors or the Committee breach the Carlyle Committee Settlement, the Brookfield Committee Settlement, or the Fundamental Committee Settlement, and (iii) to the extent that the Carlyle DIP Facility, the Brookfield DIP Facility, or the Fundamental DIP Facility is terminated, all terms and provisions of the Carlyle DIP Documents, the Brookfield DIP Documents, or the Fundamental DIP Documents (each as defined in the DIP Order), as applicable, that by their terms expressly survive a termination of the Carlyle DIP Facility, the Brookfield DIP Facility, or the Fundamental DIP Facility shall survive and shall remain obligations of the applicable DIP Loan Parties.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

### 3.1.   *Summary*.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a

particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions, if any, pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of this Plan for that Debtor.

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes distinct chapter 11 plans, one for each Debtor. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any of the Debtors' assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

### Summary of Classification and Treatment of Claims

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3. | **Fundamental Secured Claims** | **Impaired** | **Entitled to Vote** |
| 4. | **General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| 5. | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 6. | Subordinated Claims | Impaired | Deemed to Reject |
| 7. | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept or Deemed to Reject |
| 8. | Existing Equity Interests | Impaired | Deemed to Reject |

3.2.    *Classification and Treatment of Claims*.

(a)    *Class 1 — Other Priority Claims*.

(i)    *Classification*: Class 1 consists of all Other Priority Claims.

(ii)     *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

(iii)     *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(b)     *Class 2 — Other Secured Claims*.

(i)     *Classification*: Class 2 consists of all Other Secured Claims.

(ii)     *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtor against which such Allowed Other Secured Claim is asserted agree to less favorable treatment for such Holder, each Allowed Other Secured Claim shall, at the option of the applicable Debtor (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such Claim Unimpaired.

(iii)     *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(c)     *Class 3 — Fundamental Secured Claims*.

(i)     *Classification*: Class 3 consists of Fundamental Secured Claims.

(ii)     *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of a Fundamental Secured Claim shall receive the right to a distribution of (1) its Pro Rata Share of the ACT Sale Proceeds in excess of $500,000, (2) fifty percent (50%) of the net proceeds of the Fundamental/Committee Shared Causes of Action, and (3) its Pro Rata Share of Remaining Claims against BRGH; *provided*, for the avoidance of doubt, that in no event shall the Holder of a Fundamental Secured Claim receive any other GUC Trust Assets or any Committee Settlement Consideration; *provided*, *further*, that Fundamental shall receive no other recovery on account of any Claims, whether secured or unsecured, under the Plan, except as set forth in Article 2.3 hereof and the Fundamental Committee Settlement.

(iii)     *Voting*: Class 3 is Impaired under the Plan. Holders of Fundamental Secured Claims are entitled to vote on the Plan and shall receive Ballots.

(d)     *Class 4 — General Unsecured Claims*.

(i)     *Classification*: Class 4 consists of all General Unsecured Claims.

(ii)     *Treatment*: In full and final satisfaction, compromise, settlement, and release of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed General Unsecured Claim shall receive GUC Trust Interests, entitling it to receive its Pro Rata Share of the GUC Trust Net Assets.

(iii)     *Voting*: Class 4 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote on the Plan and shall receive Ballots.

(e)     *Class 5 — Intercompany Claims*.

(i)     *Classification*: Class 5 consists of all Intercompany Claims.

(ii)     *Treatment*: Each Holder of an Allowed Intercompany Claim shall receive, in full and final satisfaction of its Allowed Intercompany Claim, no distribution under the Plan, and all Intercompany Claims shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion.

(iii)     *Voting*: Class 5 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

(f)     *Class 6 — Subordinated Claims*.

(i)     *Classification*: Class 6 consists of all Subordinated Claims.

(ii)     *Treatment*: Allowed Subordinated Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(iii)     *Voting*: Class 6 is Impaired and not receiving any distribution under this Plan, and Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.  Holders of Subordinated Claims shall be provided an Opt-Out Release Form solely for purposes of providing an opportunity to such Holders to affirmatively opt out of the Third-Party Release.

(g)     *Class 7 — Intercompany Interests*.

(i)     *Classification*: Class 7 consists of all Intercompany Interests.

(ii)     *Treatment*: Each Holder of an Allowed Intercompany Interest shall receive, in full and final satisfaction of its Allowed Intercompany Interest, no distribution under the Plan, and all Intercompany Interests shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion.

(iii)     *Voting*: Class 7 is either (i) Unimpaired, in which case Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired, and not receiving any distribution under this Plan, in which case Holders of Allowed Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, in each case, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

(h)     *Class 8 — Existing Equity Interests*.

(i)     *Classification*: Class 8 consists of all Existing Equity Interests.

(ii)     *Treatment*: Holders of Existing Equity Interests shall receive no distribution on account of their Existing Equity Interests.  On the Effective Date, all Existing Equity Interests will be canceled and extinguished and will be of no further force or effect.

1.     On the Effective Date, all Existing Equity Interests shall be cancelled and except as set forth in the Wind-Down Transactions Memorandum, one share of the Parent (the "***Single Unit***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Existing Equity Interests, consistent with their former relative priority and economic entitlements. The Single Unit shall be recorded on the books and records maintained by the Plan Administrator;

2.     Each former holder of Existing Equity Interests (through their interest in the Single Unit, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Existing Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of Existing Equity Interests may receive its share of any remaining assets of the Parent consistent with such holder's rights of payment existing immediately prior to the Petition Date.  The Single Unit issued on the Effective Date shall be deemed cancelled and of no further force and effect upon completion of the Wind-Down; *provided*, that such cancellation does not directly or indirectly adversely impact the Retained Polaris Interest, the Successful Bidder(s) (or Backup Bidder(s), as applicable), or any of the assets purchased under their respective Purchase Agreements; *provided*, *further* that the Plan Administrator shall provide the Successful Bidder(s) (and Backup Bidders, as applicable) with thirty (30) days' prior written notice before the Single Unit is deemed cancelled; and

3.     The continuing rights of former holders of Existing Equity Interests (including through their interest in the Single Unit or otherwise) shall be nontransferable except by operation of law, or, subject to the Plan Administrator's consent, for administrative transfers where the ultimate beneficiary has not changed.

(iii)    *Voting*: Class 8 is Impaired and not receiving any distribution under this Plan, and Holders of Existing Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject this Plan.  Holders of Existing Equity Interests shall be provided an Opt-Out Release Form solely for purposes of providing an opportunity to such Holders to affirmatively opt out of the Third-Party Release.

### 3.3.    *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under this Plan shall affect, diminish, or impair the rights of the Debtors, as applicable, with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 3.4.    *Elimination of Vacant Classes*.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3.5.    *Controversy Concerning Impairment*.

If a controversy arises as to whether any Claim or any Class is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Hearing.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THIS PLAN

### 4.1.    *Acceptance or Rejection of this Plan*.

(a)    *Presumed Acceptance of Plan*. Claims in Classes 1 and 2 are Unimpaired under this Plan and, therefore, Holders of such Claims are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 1 and 2 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

(b)    *Voting Classes*.  Claims in Classes 3 and 4 are Impaired under this Plan, and the Holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject this Plan.

(c)    *Deemed Rejection of this Plan*. Claims and Interests in Classes 6 and 8 are Impaired under this Plan and Holders of such Claims or Interests shall receive no Distributions under this Plan on account of their Claims or Interests (as applicable) and are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 6 and 8 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

(d)    *Presumed Acceptance of this Plan or Deemed Rejection of this Plan*. Claims and Interests in Classes 5 and 7 are either (a) Unimpaired and, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and shall receive no distributions under this Plan and, therefore, deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 5 and 7 are not entitled to vote on this Plan and votes of such Holders shall not be solicited.

### 4.2.    *Nonconsensual Confirmation*.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### 4.3.    *Subordinated Claims*.

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective Distributions (if any) and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Plan Administrator reserves the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THIS PLAN

### 5.1.    *Transactions to Effectuate the Plan*.

Before, on, and after the Effective Date, the applicable Debtors or the Plan Administrator, as applicable, shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including taking any actions set forth in the Wind-Down Transactions Memorandum, which transactions may include, as applicable, any of the following: (a) the execution and delivery of appropriate agreements or other documents of merger, division, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Wind-Down Transactions Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, division, consolidation, conversion,

amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; (d) such other transactions that, in the reasonable business judgment of the Debtors or the Plan Administrator, as applicable, are required to effectuate the Plan and the Wind-Down Transactions Memorandum; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

The Confirmation Order shall authorize the Debtors and the Plan Administrator, as applicable, to undertake the transactions contemplated in the Wind-Down Transactions Memorandum, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

### 5.2. *363 Sale Transactions*.

Pursuant to the 363 Sale Orders, to the extent not consummated before the Effective Date, the acquired assets shall be transferred to and vest in the Successful Bidder(s) (or Backup Bidder(s), if applicable) free and clear of all Liens, Claims, charges, Interests, or other encumbrances (except for those Liens, Claims, charges, Interests, or other encumbrances expressly assumed by the Successful Bidder(s) (or Backup Bidder(s), if applicable) pursuant to the terms of the 363 Sale Transaction Documentation) pursuant to section 363 of the Bankruptcy Code, the 363 Sale Orders, and the 363 Sale Transaction Documentation, and in accordance with the terms of the 363 Sale Transaction Documentation. In exchange, the Successful Bidder(s) (or Backup Bidder(s), if applicable) shall pay to the Debtors the sale proceeds in accordance with the terms of the 363 Sale Transaction Documentation; *provided*, that with respect to the sale of any collateral of the DIP Secured Parties or the Prepetition Secured Parties, such proceeds shall be first applied against the DIP Facility Claims or the Funded Debt Secured Claims, as applicable.

The Debtors and the Successful Bidder(s) (or Backup Bidder(s), if applicable) shall be authorized to take all actions as may be deemed necessary or appropriate in furtherance of the 363 Sale Transactions pursuant to the terms of the 363 Sale Transaction Documentation, the 363 Sale Orders, and the Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court; act or action under applicable law, regulation, order, rule; or the vote, consent, authorization, or approval of any Entity.

### 5.3. *General Settlement of Claims and Interests*.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the

Plan. For the avoidance of doubt, such settlement and compromise shall not include or affect any Causes of Action listed in the Schedule of Retained Causes of Action.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VII hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### 5.4.  *Intercreditor Agreements*.

Except as expressly provided in the Plan, all rights, entitlements, and distributions shall be subject to the DIP Order, the Prepetition Intercreditor Agreement and the DIP Intercreditor Agreement, the priorities and payment waterfalls of which shall be incorporated, preserved, and enforced by the Plan, the Debtors, GUC Trustee, the Plan Administrator and, as applicable, the Post-Effective Date Debtors, pursuant to section 510 of the Bankruptcy Code; *provided*, that in the event of any inconsistency between the DIP Order, on one hand, and the Prepetition Intercreditor Agreement and/or the DIP Intercreditor Agreement, on the other hand, the DIP Order shall control.

### 5.5.  *Reverse TSA*

Notwithstanding anything herein to the contrary, the Debtors' rights and obligations under any Reverse TSA shall be assumed on the Effective Date and the Plan Administrator shall take any actions as may be necessary or appropriate to cause the Debtors to satisfy any obligations thereunder. For the avoidance of doubt, any Claims against the Debtors under any Reverse TSA arising prior to the Effective Date, including on account of any failure of the Debtors to satisfy their respective obligations thereunder, shall constitute Administrative Claims.

### 5.6.  *Third-Party TSA*

Notwithstanding anything herein to the contrary, the Debtors' rights and obligations under any Third-Party TSA shall be assumed on the Effective Date and the Plan Administrator shall take any actions as may be necessary or appropriate to cause the Debtors to satisfy any obligations thereunder. For the avoidance of doubt, any Claims against the Debtors under any Third-Party TSA arising prior to the Effective Date, including on account of any failure of the Debtors to satisfy their respective obligations thereunder, shall constitute Administrative Claims.

### 5.7.  *Committee Settlements*.

The Plan incorporates all applicable terms of the Committee Settlements, which are compromises and settlements of numerous issues and disputes among the Debtors, the DIP Lenders, and the Committee designed to achieve a reasonable and effective resolution of the Chapter 11 Cases. Except as expressly set forth herein or the Confirmation Order, the Committee

Settlements constitute a settlement of all potential issues and Claims among the Debtors, the DIP Lenders, and the Committee.

        (a)     *Brookfield Committee Settlement*

Under the Brookfield Committee Settlement, among other terms, on the latest of (i) the closing of Brookfield's credit bid transaction or (ii) the Effective Date, Brookfield shall remit the Brookfield Cash Consideration to the Estates or the GUC Trust in accordance with the direction of the Debtors and with the agreement of the Committee. The Brookfield Cash Consideration shall not be paid with funds that are estate assets following the closing of the 363 Sale Transaction involving the Brookfield Assets and the dismissal of the chapter 11 cases of the acquired entities. If, in connection with its 363 Sale Transaction, Brookfield elects to implement any applicable acquisition as an asset sale rather than a purchase of Interests and such election increases the aggregate amount of General Unsecured Claims to receive distributions under the Plan, Brookfield shall increase the Brookfield Cash Consideration to avoid any net dilution to recoveries of Allowed General Unsecured Claims, which increase may be paid in more than one installment if necessary based on the claims administration process.

        (b)     *Carlyle Committee Settlement*

Under the Carlyle Committee Settlement, among other terms, on the later of (i) the closing of (a) Carlyle's credit bid transaction in accordance with the Carlyle APA or (b) a sale of the Carlyle Assets to Nofar USA Energy Investments and Management LLC or its designees pursuant to the Nofar Sale Order and the Purchase Agreement attached thereto (the "***Nofar APA***"), and (ii) the Effective Date, Carlyle shall remit the Carlyle Cash Consideration to the Estates or the GUC Trust in accordance with the direction of the Debtors and with the agreement of the Committee. The Carlyle Cash Consideration may be paid by Carlyle, Summit Infrastructure LLC, in its capacity as the purchaser under Carlyle's credit bid, or any Carlyle Silo Entity to the extent that Carlyle's credit bid has been consummated; *provided*, that the Carlyle Cash Consideration shall not be paid with funds that are Estate assets following the closing of the 363 Sale Transaction involving the Carlyle Assets and the dismissal of the Chapter 11 Cases of the acquired entities. If, in connection with its 363 Sale Transaction, if any, Carlyle elects to implement any applicable acquisition as an asset sale rather than a purchase of Interests and such election increases the aggregate amount of General Unsecured Claims to receive distributions under the Plan, Carlyle shall increase the Carlyle Cash Consideration to avoid any net dilution to recoveries of Allowed General Unsecured Claims, which increase may be paid in more than one installment if necessary based on the claims administration process.

Notwithstanding anything in this Plan, the Confirmation Order, the Plan Supplement, or any related documentation to the contrary, (i) the Retained Polaris Interest shall not (a) be a GUC Trust Asset or Plan Administration Asset, or otherwise be cancelled or part of the Single Unit or (b) be available to make distributions (other than in respect of the Polaris Claim) until the later of (1) the expiration of the five-year period following the closing of the 363 Sale Transaction contemplated by the Nofar APA or the Carlyle APA, whichever is consummated, and (2) the repayment of the Polaris Claim in full in Cash, (ii) in the event that the 363 Sale Transaction contemplated by the Carlyle APA is consummated, the Backup Buyer (as defined in the Carlyle Sale Order) shall receive the Polaris Claim, (iii) simultaneously with and subject to the closing of

the 363 Sale Transaction contemplated by the Nofar APA or the Carlyle APA, whichever is consummated, 100% of the interests in Polaris OpCo Pledgor A, LLC shall be deemed to have been transferred to the Polaris SPV, and (iv) subject to the closing of the 363 Sale Transaction contemplated by the Nofar APA or the Carlyle APA, whichever is consummated, and notwithstanding any covenant or other requirement set forth under the DIP Order, the DIP Documents, or the Prepetition Documents, neither the Polaris SPV nor any of its direct or indirect subsidiaries shall be subject to any liens or Claims in respect of any of the DIP Facilities or Prepetition Funded Debt Facilities.

      (c)    *Fundamental Committee Settlement*

Under the Fundamental Committee Settlement, among other terms, on the later to occur of (i) the closing of the Fundamental Credit Bid Transaction and (ii) the Effective Date, Fundamental shall remit to the Estates, in accordance with the direction of the Debtors and with the agreement of the Committee, the Fundamental Cash Consideration (together with Brookfield Cash Consideration and the Carlyle Cash Consideration, the "***Committee Settlement Cash Consideration***"). In addition, the Estates shall assign to the GUC Trust, and the Fundamental Secured Parties shall release any Lien on, any and all Avoidance Actions or Causes of Action on account of commercial torts that (w) constitute Fundamental's DIP Collateral and Retained Causes of Action and (x) are not acquired by Fundamental pursuant to the applicable Purchase Agreement (the "***Fundamental/Committee Shared Causes of Action***," and all the foregoing consideration described in this paragraph, the "***Fundamental Settlement Consideration***"). Fundamental shall receive payment from the GUC Trust of fifty percent (50%) of net proceeds of the Fundamental/Committee Shared Causes of Action promptly as and when proceeds are available to be distributed, including in accordance with the mandatory prepayment provisions of the DIP Documents, as applicable.

Further, on or promptly following the Effective Date, but not later than thirty (30) days after the Effective Date, Benjamin Catt and Raymond Shem shall prepay to the Estates or the GUC Trust in accordance with the direction of the Debtors and with the agreement of the Committee, the then-outstanding principal and interest owed by each of them, as borrower, to Parent under the Parent Promissory Notes, in full and final satisfaction of any and all obligations and Claims owed thereunder and in connection with the releases provided to them by the Estates under the applicable order approving the Fundamental Credit Bid Transaction and hereunder.

    *5.8.*    ***No Substantive Consolidation***.

The Plan's treatment shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Post-Effective Date Debtors or Plan Administrator to seek to have any Claim subordinated in accordance with section 510 of the Bankruptcy Code or other applicable law.

On the Effective Date, and solely for administrative purposes to facilitate distributions: (a) all General Unsecured Claims against each of the Debtors shall be deemed merged or treated as liabilities of the GUC Trust to the extent Allowed; (b) all General Unsecured Claim guaranties by a Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by

any Debtor and any joint or several General Unsecured Claim against any of the Debtors shall be deemed to be one obligation of the GUC Trust; (c) each and every General Unsecured Claim filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the GUC Trust.  For the avoidance of doubt, for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as separate entities so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may not be set off against the liabilities of any of the other Debtors.  Such administrative consolidation is solely for the purpose of facilitating distributions to holders of General Unsecured Claims under this Plan and shall not affect the legal and corporate structures of the Post-Effective Date Debtors.  Moreover, such administrative consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

5.9.    *Plan Administrator*.

On and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors shall be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors and Post-Effective Date Debtors, as applicable.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Transactions Memorandum.  The Plan Administrator shall carry out any necessary functions required by the 363 Sale Transaction Documentation.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors, including: (a) liquidating, receiving, holding, investing, supervising, and protecting the Plan Administration Assets; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (c) making distributions as contemplated under the Plan; (d) establishing and maintaining bank accounts in the name of the Debtors; (e) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors; (g) administering and paying taxes of the Debtors, including filing tax returns; (h) representing the interests of the Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit and completing and filing, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (i) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator shall provide written or telephonic updates to the GUC Trustee no less frequently than every quarter regarding the cash position of the Debtors, the status of review and reconciliation of Other Secured Claims, Administrative Claims, Priority Tax Claims, and Other Priority Claims, the Wind-Down, and such other information as the GUC Trustee might reasonably request from time to time.

The Plan Administrator shall consult in good faith with the GUC Trustee regarding the Wind-Down Reserve Amount on a quarterly basis.  In connection with such consultation, solely to the extent that the GUC Trustee's information requests are feasible and cost effective and only upon such request, (a) the Plan Administrator shall inform the GUC Trustee of the total Cash held by the Post-Effective Date Debtors, (b) the Plan Administrator shall advise the GUC Trustee of the amount of Cash, if any, that the Plan Administrator proposes to remit to the GUC Trust, together with reasonable supporting detail regarding the Cash the Plan Administrator intends to retain (including anticipated remaining expenses, amounts contained in the Disputed Administrative Claims Reserve, and projected Wind-Down timeline), (c) the GUC Trustee may either agree to the Plan Administrator's proposal or object, and (d) if the GUC Trustee objects, the Plan Administrator and GUC Trustee shall engage in good faith discussions to resolve the disagreement. If the Plan Administrator and GUC Trustee are unable to mutually resolve any such disagreement, either party may seek resolution by the Bankruptcy Court. For the avoidance of doubt, upon conclusion of the Wind-Down, the GUC Remainder Payment shall be transmitted to the GUC Trust.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided*, that such resignation shall only become effective upon the appointment of a successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors shall be terminated.

(a)     *Appointment of the Plan Administrator*.  The Plan Administrator shall be selected by the Debtors and the Committee.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

(b)     *Retention of Professionals*.  The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Debtors solely from the Wind-Down Reserve Amount, upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

(c)     *Compensation of the Plan Administrator*.  The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Administration Agreement, which will be included in the Plan Supplement.

(d)     *Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation*.  The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for actual fraud, willful misconduct, or gross negligence, in all respects by the Debtors.  The Plan Administrator may obtain, at the expense of the Debtors and solely from the Wind-Down Reserve Amount, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

5.10.    ***The Plan Administration Assets***.

On the Effective Date or as soon as reasonably practicable thereafter, the Committee Settlement Cash Consideration shall be remitted to the Estates, including the prepayment of the Parent Promissory Notes.  On the Effective Date, the Debtors shall fund the Wind-Down Reserve Amount and the Professional Fee Escrow Account with Cash in possession of the Estates.  The amount of Cash held on the Effective Date by the Estates in excess of the amount required to fund the Wind-Down Reserve Amount and the Professional Fee Escrow Account, as agreed by the Debtors and the Committee, shall be transferred to the GUC Trust.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims, the Plan Administrator shall pay such amounts from the Wind-Down Reserve Amount promptly but no later than five (5) Business Days after entry of the order approving such Professional Fee Claims.  In the event any Cash remains in the Professional Fee Escrow Account after the payment of all Allowed Professional Fee Claims in full, such Cash shall be transferred to the Plan Administrator and held as part of the Wind-Down Reserve Amount.  Upon completion of the Wind-Down, any GUC Trust Remainder Payment shall be remitted to the GUC Trust.

On the Effective Date, the Plan Administrator shall sign the Plan Administration Agreement and accept the Wind-Down Reserve Amount, the Professional Fee Escrow Account, the Cash in such reserve and account, respectively, and all other assets of the Estates, except (i) assets sold by the Estates pursuant to the 363 Sale Orders and (ii) GUC Trust Assets (the "***Plan Administration Assets***").  As of the Effective Date, all Plan Administration Assets and all assets dealt with in this Plan shall be free and clear of all Liens, Claims, and Interests, except as otherwise further provided in this Plan or in the Confirmation Order.  The Plan Administrator shall be authorized to use the Plan Administration Assets and any proceeds thereof solely for the purposes set forth in this Plan.

5.11. **_GUC Trust_**.

    (a)    *Establishment of the GUC Trust*

On or prior to the Effective Date, the GUC Trust shall be established, and the GUC Trust Assets shall vest directly in, and be transferred, including pursuant to section 1123(a)(5)(B) of the Bankruptcy Code, to the GUC Trust automatically, without further action of the Bankruptcy Court or any Person, free and clear of all Claims and Liens. Under no circumstance shall the Debtors or any other party be required to contribute any assets to the GUC Trust other than the GUC Trust Assets, except as set forth in the Plan, the Confirmation Order, the Committee Settlements, or agreed to by the applicable parties.

Upon and following the Effective Date, the Plan Administrator shall transfer and assign to the GUC Trust all its right, title, and interest in and to all of the GUC Trust Assets reasonably promptly after so received, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the GUC Trust free and clear of all Claims and Liens.

The GUC Trust shall be established to liquidate the GUC Trust Assets and make distributions in accordance with the Plan, Confirmation Order, and GUC Trust Agreement, and in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust. The GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code. Accordingly, Holders of General Unsecured Claims shall be treated for U.S. federal income tax purposes (1) as direct recipients of undivided interests in the GUC Trust Assets (other than to the extent the GUC Trust Assets are allocable to Disputed Claims) and as having immediately contributed such assets to the GUC Trust, and (2) thereafter, as grantors and deemed owners of the GUC Trust and thus, the direct owners of an undivided interest in the GUC Trust Assets (other than such GUC Trust Assets that are allocable to Disputed Claims).

    (b)    *The GUC Trustee and the GUC Trust Agreement*

The GUC Trust will be administered by the GUC Trustee. The GUC Trustee shall be selected by the Committee and identified in a notice to be filed along with the final form of GUC Trust Agreement in the Plan Supplement. The GUC Trust, acting by and through the GUC Trustee, shall be the exclusive administrator of the GUC Trust Assets for purposes of 31 U.S.C. section 3713(b) and 26 U.S.C. section 6012(b)(4), as well as a party in interest under section 1109(b) of the Bankruptcy Code and representative of the Estates under section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement with respect to General Unsecured Claims.

The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to take the actions set forth in this section. The GUC Trustee shall hold and distribute the GUC Trust Assets in

accordance with the provisions of the Plan and the GUC Trust Agreement.  After the Effective Date, the Debtors and the Post-Effective Date Debtors shall have no interest in the GUC Trust Assets except as set forth in the Plan, the Confirmation Order, or the GUC Trust Agreement.

The GUC Trust Agreement will be filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the GUC Trust Assets to the GUC Trust; (2) the payment of certain GUC Trust Fees and Expenses of the GUC Trust from the GUC Trust Assets; (3) distributions to Holders of Allowed General Unsecured Claims, as provided herein and in the GUC Trust Agreement; (4) certain cooperation obligations of the Plan Administrator and the Debtors or Post-Effective Date Debtors, as applicable; (5) the identity of the GUC Trustee; (6) the terms of the GUC Trustee's engagement; (7) the identity of any parties who will supervise the fees of the GUC Trustee; (8) whether the GUC Trustee shall be bonded; and (9) reasonable and customary provisions that allow for limitation of liability and indemnification of the GUC Trustee and its professionals by the GUC Trust.  The GUC Trust will be subject to a termination date not more than five (5) years from the date of its creation, subject to extension in accordance with the GUC Trust Agreement.  Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets, except as otherwise provided in the Plan, the Confirmation Order, or the GUC Trust Agreement.

The Debtors, the Post-Effective Date Debtors, the Plan Administrator, and the GUC Trustee shall cooperate to, among other things, determine the rights and obligations with respect to the sharing of documents and related privileges, including as set forth in the GUC Trust Agreement.  For the avoidance of doubt, the GUC Trust shall be entitled to, in its sole discretion, stand in the shoes of the Debtors with respect to any provisions in the Reverse TSA or Purchase Agreements with respect to accessing the Debtors' books and records and information sold to a third party, including any cooperation clauses.

(c)     *GUC Trust Fees and Expenses*

The GUC Trust Fees and Expenses shall be paid from the GUC Trust Assets in accordance with the Plan and GUC Trust Agreement.  The GUC Trustee, on behalf of the GUC Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the GUC Trust Assets in accordance with the Plan and the GUC Trust Agreement.  The GUC Trust Agreement will require the GUC Trustee to annually send to each holder of a GUC Trust Interest a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes.  In its sole discretion, the GUC Trustee on behalf of the GUC Trust may also retain professionals on a contingency basis with fees payable from a percentage portion of proceeds received from the prosecution of GUC Trust Causes of Action or enter into litigation funding agreements as may be necessary and in the best interest of the GUC Trust in order to pursue GUC Trust Causes of Action.

(d)     *GUC Trust Interests*

Any and all GUC Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of Law.  In addition, any and all GUC Trust Interests will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

(e)     *Dissolution of the GUC Trust*

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement, as appropriate.  To the extent the GUC Trust retains any residual GUC Net Trust Assets, but such assets are insufficient to effectuate any further distribution pursuant to the GUC Trust Agreement in the sole discretion of the GUC Trustee, the GUC Trustee shall donate such residual GUC Trust Assets to an unrelated Tax Code section 501(c)(3) non-profit organization selected by the GUC Trustee.

(f)     *Certain Tax Matters*

The GUC Trustee shall file tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) and in accordance with the Plan. The GUC Trust's items of taxable income, gain, loss, deduction, and credit (other than such items in respect of any assets allocable to, or retained on account of, Disputed Claims) will be allocated to each Holder in accordance with their relative ownership of GUC Trust Interests.  As soon as possible after the Effective Date, the GUC Trustee shall make a good faith valuation of the GUC Trust Assets and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

The GUC Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the GUC Trust for all taxable periods through the dissolution thereof.  Nothing in this <u>Article 5.11</u> shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.  The GUC Trustee (1) may timely elect to treat any GUC Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the GUC Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing.  The GUC Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.  The Post-Effective Date Debtors and the GUC Trustee shall cooperate to ensure that any distributions made in respect of Claims that are in the nature of compensation for services ("***Wage Distributions***") are processed through appropriate payroll processing systems or arrangements and are subject to appropriate payroll tax

withholding and reporting, and that any applicable payroll taxes associated therewith are properly remitted to the applicable taxing authorities. The Post-Effective Date Debtors and the GUC Trustee shall, if so requested by the GUC Trustee, cooperate in good faith to agree to such procedures so as to permit such Wage Distributions to be processed through the Post-Effective Date Debtors' payroll processing systems (which may, for the avoidance of doubt, be administered by a third party) with the Post-Effective Date Debtors acting a "disbursing agent" on behalf of the GUC Trust (or any applicable disputed ownership fund).

### 5.12.   *Merger of Debtors; Closing Cases of Debtor Affiliates*.

On or after the Effective Date, the Plan Administrator (a) may, other than with respect to any entities that have been acquired pursuant to any 363 Sale Transaction Documentation and any subsidiaries thereof, merge or dissolve any Debtor and complete the Wind-Down of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; *provided*, that upon any merger with another Debtor, all Claims filed or scheduled in the non-surviving Debtor's Chapter 11 Case shall be deemed to have been filed in the surviving Debtor's Chapter 11 Case; (b) may, other than with respect to any entities that have been acquired pursuant to any 363 Sale Transaction Documentation and any subsidiaries thereof, merge or dissolve Affiliates of the Debtors and complete the Wind-Down of Affiliates of a Debtor without the necessity for any other or further actions to be taken by or on behalf of such Affiliates or their shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; and (c) may seek authority from the Bankruptcy Court to close any Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case, upon consent of the GUC Trustee (not to be unreasonably withheld).

### 5.13.   *Cancellation of Existing Securities and Agreements*.

On the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest shall be cancelled and of no further force and effect, except that each of the foregoing, including, without limitation, the Prepetition Credit Agreements, shall continue in effect solely to the extent necessary to: (a) allow Holders of such Claims or Interests to receive Distributions under this Plan; (b) allow the Debtors, the Plan Administrator, and the Administrative and Collateral Agents, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to this Plan on account of such Claims; (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or Interests pursuant to any such applicable document or instrument; (d) allow the Administrative and Collateral Agents to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnification rights or any rights with respect to priority or payment or to exercise charging liens; (e) preserve any rights of the DIP Agents to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the DIP Documents, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens; (f) preserve the rights of the DIP Agent to appear and be heard in the Chapter 11 Cases to the extent such rights exist,

and (g) permit the DIP Agents to perform any function necessary to effectuate the foregoing. Notwithstanding the foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article 5.13 shall be deemed null and void and shall be of no force and effect.  In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Debtors thereunder will be discharged.

Except for the foregoing, subsequent to the performance by the Administrative and Collateral Agents of their respective obligations pursuant to this Plan, all further duties, obligations, liability, and responsibilities of the Administrative and Collateral Agents related to the DIP Documents, as applicable, shall terminate, except as otherwise provided in Article 2.3.

Notwithstanding the foregoing, any Third-Party TSA shall not be terminated or cancelled on the Effective Date.

### 5.14.  *Corporate Action*.

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action or approval by Holders of Claims or Interests, the Debtors, the Bankruptcy Court, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

### 5.15.  *Exemption From Transfer Taxes and Fees*.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer pursuant to, in contemplation of, or in connection with this Plan (including the Wind-Down), including pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in connection with the transactions contemplated hereby, including the transfer of the GUC Trust Assets to the GUC Trust; (2) the creation, modification, consolidation, termination, refinancing, release or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral security for any or all of any indebtedness; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan and the transactions contemplated hereby, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or fee, or other similar tax, fee or governmental assessment, and the appropriate federal, state, or local government officials, recording officers or

agents (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code and shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee or governmental assessment.

### 5.16.   *Effectuating Documents; Further Transactions*.

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

### 5.17.   *Insurance Policies*.

Before the Petition Date, the Debtors obtained the D&O Tail Coverage for their current and former directors, officers, and managers.  After the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Tail Coverage for the full term of such D&O Policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage and the D&O Policies in all respects.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, to the extent any Insurance Policies have not already been assumed and assigned pursuant to a 363 Sale Order, (i) on the Effective Date, the Debtors shall be deemed to have assumed all such Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code identified on the Assumed Contracts List, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) neither Confirmation nor Consummation of this Plan shall alter, impair or otherwise modify the terms and conditions of any such Insurance Policy or the coverage provided pursuant thereto (including any indemnity obligations assumed by the foregoing assumption of Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed) except that on and after the Effective Date, all Insurance Policies shall vest unaltered and in their entireties in the Post-Effective Date Debtors or the Plan Administrator, as applicable, who shall succeed to all of rights and obligations and shall become and remain liable in full for all of the Debtors' obligations under such Insurance Policies, regardless of whether such obligations arise before or after the Effective Date and without the need for an Insurer to file a Proof of Claim or General Administrative Claim or to object to any Cure Notice; (iii) for the avoidance of doubt, neither Confirmation nor Consummation of this Plan, nor the vesting of the Insurance Policies in the Post-Effective Date Debtors and their Estates or the Plan Administrator, as applicable, shall impair, alter, modify or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, or (y) any available defenses of the Debtors or the Plan Administrator or any Insurer under the Insurance Policies; and (iv) on the Effective Date, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in <u>Article X</u> of this Plan, if and to the extent applicable, shall be deemed

lifted without further order of the Bankruptcy Court, solely to permit: (I) without altering clause (ii) and sub-clause (II) hereof, claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law or claimants with prepetition pending personal injury actions to proceed with their claims solely as against the proceeds of the applicable Insurance Policies; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (C) claims for which an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in <u>Article X</u> of the Plan to proceed with its claim, (D) claims where a claimant asserts a personal injury claim that was pending in a non-bankruptcy forum as of the Petition Date, and (E) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies and take other actions relating to the Insurance Policies (including effectuating a setoff), in each instance to the extent permissible under applicable non-bankruptcy law and in accordance with the terms of such Insurance Policies. Notwithstanding the foregoing, any claimant that wishes to proceed under this paragraph against the proceeds of the applicable Insurance Policies shall be deemed to expressly waive the right to any recovery against the Debtors' Estates or the GUC Trust Assets and any claim filed by such claimant shall be deemed automatically waived without the need for a further order of the Bankruptcy Court.

> ### *5.18. Preservation of Retained Causes of Action*.

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in this Plan, the Committee Settlements, or by a Bankruptcy Court order, the Debtors reserve the Retained Causes of Action. On and after the Effective Date, (i) the GUC Trustee may pursue the GUC Trust Causes of Action in its sole discretion and (ii) the Plan Administrator may pursue the Plan Administrator Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors, the Plan Administrator, or the GUC Trustee will not pursue any and all available Retained Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the GUC Trustee and Plan Administrator shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment the Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself and the occurrence of the Effective Date.

5.19.   *Closing of the Chapter 11 Cases*.

After a Chapter 11 Case has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close that Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1.   *Assumption or Rejection of Executory Contracts and Unexpired Leases*.

Except as otherwise provided herein or in the 363 Sale Orders,[2] on the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (a) have not been previously rejected, assumed, or assumed and assigned, and are not the subject of a pending motion or notice to reject, assume, or assume and assign as of the Effective Date, (b) are not identified on the Assumed Contracts List, and (c) have not expired under their own terms prior to the Effective Date.  For the avoidance of doubt, any Third-Party TSA shall not be deemed automatically rejected on the Effective Date.

Notwithstanding anything to the contrary contained herein, the Debtors reserve the right to alter, amend, modify, or supplement (i) the Assumed Contracts List and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to any 363 Sale Transaction Documentation, with the consent of the Successful Bidder(s) (or Backup Bidder(s), if applicable), at any time up to (x) solely in connection with the 363 Sale Transaction with respect to the Brookfield Assets, the time the Bankruptcy Court enters the Confirmation Order, and (y) the earlier of (i) 90 days following the closing date of a 363 Sale Transaction, and (ii) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the written consent (email being sufficient) of the applicable landlord counterparty, consistent with any 363 Sale Transaction Documentation, as applicable.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing assumptions, assumptions and assignments, and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date; *provided*, that neither the Plan nor the Confirmation Order is intended to limit or shall be construed as limiting the Debtors' authority under the 363 Sale Orders to assume or assume and assign any Executory Contracts or Unexpired Leases to the Successful Bidder(s) (or Backup Bidder(s), if applicable) pursuant to the 363 Sale Transaction Documentation, or the Successful Bidder(s)' (or Backup Bidder(s)', if applicable) right, pursuant to the 363 Sale Transaction Documentation, to designate any Executory Contracts or Unexpired Leases for assumption or assumption and assignment.

---

[2]   For the avoidance of doubt, all assumption, assignment, and Cure cost obligations for any Executory Contracts or Unexpired Leases assumed or assumed and assigned in connection with a 363 Sale Transaction shall be governed by the applicable 363 Sale Transaction Documentation and 363 Sale Order.

6.2.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*.

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

6.3.    **Assumption of the D&O Policies**.

The Debtors, and upon the Effective Date, the Post-Effective Date Debtors, shall assume all of the D&O Policies pursuant to section 365(a) of the Bankruptcy Code that have not been assumed pursuant to a 363 Sale Order. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Policies and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Policies.

In addition and for the avoidance of doubt, after the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under the D&O Policies covering the Debtors' current boards of directors in effect on or after the Petition Date and, subject to the terms of the applicable D&O Policies, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

6.4.    **Payments Related to Assumption of Executory Contracts and Unexpired Leases**.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan, as reflected on the Assumed Contracts List, as applicable, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date in accordance with the 363 Sale Transaction Documentation or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Post-Effective Date Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving any such dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided*, *however*, that the Debtors or the Post-Effective Date Debtors, as applicable, may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

Notwithstanding anything herein to the contrary, any Cure obligations arising in connection with a 363 Sale Transaction shall be satisfied in accordance with the terms of the applicable 363 Sale Order and 363 Sale Transaction Documentation.

### 6.5. *Rejection Damages Claims*.

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under this Plan must be filed with the Balloting Agent and served upon the GUC Trustee and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of <u>Article 6.1</u> above, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court shall be the applicable deadline under such order or the Claims Bar Date Order, as applicable.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim shall be classified and treated as a General Unsecured Claim against the applicable Debtor.

### 6.6. *Reservation of Rights*.

Neither the exclusion nor inclusion of any contract or lease on the Assumed Contracts List, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Post-Effective Date Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

### 6.7. *Nonoccurrence of Effective Date*.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1. *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions*.

(a)  *Timing and Calculation of Amounts to Be Distributed and Date of Distributions*.  Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ninety (90) days after the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the amount of the Distribution that this Plan

provides for Allowed Claims in the applicable Class. Subsequent Distributions shall be made, if determined by the Disbursing Agent to be practicable and appropriate, on a quarterly basis thereafter; *provided*, that the Disbursing Agent may refrain from making an interim Distribution to the extent the Disbursing Agent reasonably determines that the costs of making such Distribution are not reasonable in comparison to the amount of such Distribution and instead may reserve making any subsequent Distributions until a future Distribution date. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this <u>Article VII</u>. Except only for DIP Facility Claims, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on their Claims, regardless of whether Distributions on account of such Claims are delivered before, on, or at any time after the Effective Date.

(b) *Entitlement to Distributions*. On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date.

### 7.2. *Disbursing Agent*.

Except as otherwise provided herein, all Distributions under this Plan shall be made by the Debtors or such other Entity designated by the Debtors as Disbursing Agent or the Plan Administrator, or the GUC Trustee as Disbursing Agent on the Effective Date.

### 7.3. *Distributions on Account of Claims Allowed After the Effective Date*.

(a) *Payments and Distributions on Disputed Claims*. Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(b) *Special Rules for Distributions to Holders of Disputed Claims*. Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Disbursing Agent, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order. Any Distributions to Holders of Allowed Claims in a Class under this Plan shall be made, in the applicable amounts, to any Holder of a Disputed Claim in such Class

that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to Holders of Allowed Claims in such Class.

7.4.    ***Delivery of Distributions and Undeliverable or Unclaimed Distributions***.

(a)    *Delivery of Distributions in General*.  Except as otherwise provided herein, the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holders' address on its Proof of Claim, if applicable, (b) such Holders' address listed on a notice filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' Schedules.

(b)    *Undeliverable Distributions and Unclaimed Property*.

(i)    *Failure to Claim Undeliverable Distributions*.  In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, that such Distributions on account of Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of Distribution.  After such date, all unclaimed property or interests in property shall revert to the Post-Effective Date Debtors and their Estates or to the GUC Trust, as applicable (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be cancelled and forever barred.

(ii)    *Failure to Present Checks*.  Checks issued by the Disbursing Agent on account of Allowed Claims (other than General Unsecured Claims) shall be null and void if not negotiated within one hundred and eighty (180) days or ninety (90) days for General Unsecured Claims administered by the GUC Trust after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim for which such check was originally issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within the 180-calendar day or 90-calendar day period, as applicable, shall have its Claim for such un-negotiated check cancelled, forever barred, and estopped, and such Holder shall be enjoined from asserting any such Claim against the Post-Effective Date Debtors and their Estates or the GUC Trust, as applicable.  In such cases, any Cash held for payment on account of such Claims shall be either (i) property of the Post-Effective Date Debtors and their Estates as Plan Administration Assets free of the Claims of such Holder with respect thereto or (ii) property of the GUC Trust as GUC Trust Assets free of the Claims of such Holder with respect thereto.  Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(c)    *Record Date for Distributions*.  For purposes of making Distributions on the first Distribution Date only, the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business

on the Distribution Record Date.  If a Claim is transferred (a) twenty-one (21) or more days before the Distribution Record Date and reasonably satisfactory documentation evidencing such transfer is filed with the Bankruptcy Court, the Disbursing Agent shall make the applicable Distributions to the applicable transferee, or (b) twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make Distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is filed with the Bankruptcy Court and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(d)     *Fractional Distributions*.  Notwithstanding anything in this Plan to the contrary, no payment of fractional cents shall be made pursuant to this Plan.  Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

(e)     *De Minimis Distributions*.  Notwithstanding anything to the contrary contained in this Plan, the Disbursing Agent shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $250.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $250 shall be forever barred from asserting such Claim against the Estates.

### 7.5.     *Compliance with Tax Requirement; Allocations*.

In connection with this Plan and all Distributions hereunder, the Debtors and any other applicable Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed on them by any federal, state, or local taxing authority, and all Distributions hereunder and under all related agreements shall be subject to any such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Debtors and any other applicable Disbursing Agent have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (i) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, (ii) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay applicable withholding taxes (or to reimburse the distributing party for any advance payment of the withholding tax) or to permit a relevant party to pay the withholding tax using its own funds and retain such withheld property, and (iii) making distributions conditional on the receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate.  Notwithstanding any provision in this Plan to the contrary, prior to withholding on a Distribution to a Holder, the Debtors and any other applicable Disbursing Agent shall cooperate to (i) provide written notice to such Holder of its intent to withhold such amount and the basis for such withholding and (ii) provide a reasonable opportunity for such Holder to provide forms and other evidence that would mitigate, reduce or eliminate such withholding.  Notwithstanding any provision in this Plan to the contrary, all Persons and Entities holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of applicable taxes (or establish eligibility for an exemption from or reduction of withholding taxes), and each Holder of an

Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations associated therewith, including income, withholding, and other tax obligations. Any amounts withheld or reallocated pursuant to this Article VII shall be treated as if distributed to the Holder of the Allowed Claim. The Debtors and other applicable Disbursing Agent reserve the right to allocate all Distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Debtors, the Plan Administrator, the GUC Trustee, or the Disbursing Agent may require, as a condition to the receipt of a Distribution, that a Holder furnish to the Debtors, Plan Administrator, GUC Trustee, or Disbursing Agent, as applicable, any necessary or appropriate tax documentation and information, including an applicable Form W-8 or Form W-9, as applicable, and including any other forms or documents reasonably required by the Debtors, the Plan Administrator, GUC Trustee, or the Disbursing Agent, to effect information reporting and the withholding of applicable taxes (or establish eligibility for an exemption from or reduction of withholding taxes). If any Holder fails to comply with such a request within three (3) months thereof, such Distribution in respect of such Holder may be withheld and in such event shall be deemed an undeliverable Distribution and shall be treated in accordance with Article 7.4(b) hereof.

### 7.6.   *Surrender of Cancelled Instruments or Securities*.

As a condition precedent to receiving any Distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

### 7.7.   *Claims Paid or Payable by Third Parties*.

(a)   *Claims Paid by Third Parties*. The Debtors, the GUC Trust, or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed upon an order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the GUC Trust, or the Plan Administrator. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, the GUC Trust, or the Plan Administrator on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administrator or GUC Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the Distribution Date.

(b)   *Claims Payable to Third Parties*. No Distributions under this Plan shall be made on account of a Claim that is payable: (i) pursuant to one of the Insurance Policies until the Holder of such Claim has exhausted all remedies with respect to such Insurance Policy; and/or (ii) by one or more Successful Bidder(s) (or Backup Bidder(s), if applicable) because such Claim constitutes a 363 Sale Assumed Liability. To the extent that one or more Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon satisfaction by such Insurer, such Claim may be expunged to the extent of such satisfaction upon an order or approval of the Bankruptcy Court or deemed satisfied in full or in part, as applicable. The Debtors, the GUC Trustee, or the Plan

Administrator, as applicable, may expunge any Claim that constitutes a 363 Sale Assumed Liability without notice to, action, order, or approval by the Bankruptcy Court or any other party in interest.

(c)     *Applicability of Insurance Policies*.  Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

### 7.8.    *Allocation of Plan Distributions between Principal and Interest*.

To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall, except as required by law (as reasonably determined by the Debtors), be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

# ARTICLE VIII.

# PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### 8.1.    *Allowance and Disallowance of Claims*.

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code or this Plan or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim.  Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Plan Administrator or GUC Trust, as applicable, after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

### 8.2.    *Prosecution of Objections to Claims*.

The Plan Administrator (with respect to all Claims other than General Unsecured Claims) and the GUC Trustee (with respect to General Unsecured Claims) shall have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  From and after the Effective Date, the Plan Administrator (with respect to all Claims other than General Unsecured Claims) and the GUC Trustee (with respect to General Unsecured Claims), may settle or compromise any Disputed Claim.  The Plan Administrator and the GUC Trustee, as applicable, may administer and adjust the Claims Register to reflect such settlements or compromises, without notice to, action, order, or approval of the Bankruptcy Court.  The Plan Administrator (with respect to all Claims other than General Unsecured Claims) and the GUC

Trust (with respect to General Unsecured Claims) may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided*, *however*, that for the avoidance of doubt, the underlying Claim shall remain under the jurisdiction of the Bankruptcy Court and shall not be Disallowed other than by order of the Bankruptcy Court.  Prior to the filing of any objections to reclassify Claims as General Unsecured Claims or from General Unsecured Claims to secured, administrative, or priority status, the Plan Administrator or GUC Trustee shall provide each other with not less than ten (10) days' advanced notice.

With respect to the foregoing duties of the Plan Administrator (with respect to all Claims other than General Unsecured Claims) and the GUC Trust (with respect to General Unsecured Claims) to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator or GUC Trust, as the case may be, shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the Plan Administrator or GUC Trust, as applicable, shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

### 8.3.    *Estimation of Claims*.

The Plan Administrator or, solely with respect to General Unsecured Claims, the GUC Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator or the GUC Trustee, as applicable, has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.   If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator or, solely with respect to General Unsecured Claims, the GUC Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

### 8.4.    *Disputed Claims Reserves*.

On or after the Effective Date, the Plan Administrator and the GUC Trustee shall have the right, but are not required, to establish a Disputed Administrative Claims Reserve and a Disputed General Unsecured Claims Reserve, respectively, and to determine the amount of any such Disputed Claims Reserve (based on good faith estimates, as applicable) or an order of the Bankruptcy Court estimating such Disputed Claims, net of any taxes imposed thereon or otherwise payable by any such Disputed Claims Reserve.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, (a) the Plan Administrator shall treat any Disputed Administrative Claims Reserve as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes and (b) the GUC Trustee shall treat any

Disputed General Unsecured Claims Reserve as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes. All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator, the GUC Trustee, and Holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing.

The Plan Administrator shall hold in the Disputed Administrative Claims Reserve all payments to be made on account of Disputed Claims (other than Disputed General Unsecured Claims) for the benefit of Holders of Disputed Claims (other than Disputed General Unsecured Claims) whose Claims are subsequently Allowed. All taxes imposed on the assets or income of any Disputed Administrative Claims Reserve shall be payable by the Plan Administrator from the assets of the Disputed Administrative Claims Reserve.

The GUC Trustee shall hold in the Disputed General Unsecured Claims Reserve all payments to be made on account of Disputed General Unsecured Claims for the benefit of Holders of Disputed General Unsecured Claims whose Claims are subsequently Allowed. All taxes imposed on the assets or income of any Disputed General Unsecured Claims Reserve shall be payable by the GUC Trustee from the assets of the Disputed General Unsecured Claims Reserve.

The Disputed Administrative Claims Reserve shall be funded from the Wind-Down Reserve Amount. In the event Cash in any Disputed Administrative Claims Reserve is insufficient to satisfy all of the applicable Disputed Claims (other than Disputed General Unsecured Claims) that have become Allowed, such Allowed Claims shall be satisfied from the Wind-Down Reserve Amount. At such time as all Disputed Claims (other than Disputed General Unsecured Claims) have been resolved, any remaining Cash in the Disputed Administrative Claims Reserve shall be remitted to the Wind-Down Reserve Amount.

The Disputed General Unsecured Claims Reserve shall be funded from the GUC Trust Net Assets. In the event Cash in the Disputed General Unsecured Claims Reserve is insufficient to satisfy all of the applicable Disputed General Unsecured Claims that have become Allowed, such Allowed General Unsecured Claims shall be satisfied from the GUC Trust Net Assets. At such time as all Disputed General Unsecured Claims have been resolved, any remaining Cash in the Disputed General Unsecured Claims Reserve shall be remitted to the GUC Trust.

The Plan Administrator and the GUC Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Administrative Claims Reserve and the Disputed General Unsecured Claims Reserve, respectively, for all taxable periods through the date on which final distributions are made.

8.5.    *Distributions After Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim as a Claim other than a Subordinated Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator or the GUC Trustee, to the extent applicable, shall provide to

the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

### 8.6. *Disallowance of Certain Claims*.

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed pursuant to this Plan, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors or the GUC Trust, as applicable, by that Entity have been turned over or paid to the Post-Effective Debtors or the GUC Trust, as applicable.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THIS PLAN

### 9.1. *Conditions Precedent to Confirmation*.

Unless satisfied or waived pursuant to the provisions of <u>Article 9.4</u> hereof, the following are conditions precedent to Confirmation of this Plan:

(a)     The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, the DIP Lenders, and the Committee.

(b)     The Confirmation Order shall have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Committee Settlements and the 363 Sale Transaction Documentation, and otherwise be in form and substance reasonably acceptable to the Debtors, the DIP Lenders, the 363 Purchasers, and the Committee, and shall not have been vacated, amended or otherwise modified.

(c)     The Reverse TSAs shall have been executed and delivered by all of the parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Reverse TSAs shall otherwise be in form and substance reasonably acceptable to the Debtors, the applicable Successful Bidder(s) (and Backup Bidders, if applicable), and the Committee.

(d)     The Third-Party TSA, if any, shall have been executed and delivered by all of the parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Third-Party TSA, if any, shall otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, and the applicable Successful Bidder(s) (and Backup Bidders, if applicable).

(e)   This Plan, including any amendments, modifications, or supplements thereto, shall be materially consistent with the Committee Settlements and otherwise be in form and substance reasonably acceptable to the Committee.

### 9.2.   *Conditions Precedent to the Effective Date*.

In addition to the satisfaction of the provisions of Article 9.1 hereof, unless satisfied or waived pursuant to the provisions of Article 9.4 hereof, the following are conditions precedent to the occurrence of the Effective Date of this Plan:

(a)   The Confirmation Order shall have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Committee Settlements, the 363 Sale Transaction Documentation, and otherwise be in form and substance reasonably acceptable to the Debtors, the DIP Lenders, the 363 Purchasers, and the Committee, and shall not have (i) been vacated, amended or otherwise modified and (ii) not be subject to a stay pending appeal.

(b)   The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate this Plan and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by this Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by this Plan.

(c)   The Plan Administrator shall have been appointed and vested with the authority under this Plan.

(d)   The Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement shall otherwise be in form and substance reasonably acceptable to the Debtors, the DIP Lenders, and the Committee.

(e)   The Committee Settlements shall be in full force and effect, neither the Debtors nor the Committee shall be in breach thereof, and the Committee Settlement Cash Consideration shall have been funded.

(f)   This Plan, including any amendments, modifications, or supplements thereto, shall be materially consistent with the Committee Settlements and otherwise be in form and substance reasonably acceptable to the Committee.

(g)   The GUC Trust Agreement shall have been executed and the GUC Trust Assets shall have vested or be deemed to have vested in the GUC Trust.

(h)   The Reverse TSAs shall be in full force and effect.

(i)   The Third-Party TSA, if any, shall be in full force and effect.

(j)     All actions, documents, certificates, and agreements necessary to implement this Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

(k)     The Wind-Down Reserve Amount shall have been established and funded.

(l)     The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount.

(m)     All Statutory Fees due and payable prior to the Effective Date shall have been paid by the Debtors.

(n)     Closing of the 363 Sale Transactions pursuant to the applicable Purchase Agreements with respect to the Brookfield Assets and the Carlyle Assets and closing of the Fundamental Credit Bid Transaction shall have occurred.

### 9.3.    *Timing of Conditions Precedent*.

Notwithstanding when a condition precedent to Confirmation or Consummation of this Plan occurs, for the purposes of this Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the other conditions precedent; *provided*, that to the extent a condition precedent (the "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of this Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred; for the avoidance of doubt, however, the foregoing does not eliminate the requirement for each condition precedent to be satisfied in accordance with the terms of this Plan.

### 9.4.    *Waiver of Conditions*.

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may be waived by the Debtors, with the consent of the DIP Lenders and the Committee, with or without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; *provided*, that the waiver of the condition precedent in Article 9.2(l) shall require the consent of the affected Retained Professionals; *provided*, *further*, that in the absence of any purchase price adjustment under the applicable Purchase Agreement (*i.e.*, on account of a project lender exercising remedies as to project assets prior to closing), the waiver of any condition precedent in Article IX shall not, other than with respect to Articles 9.1(b), 9.2(a), and 9.2(e), require the consent of Brookfield or Carlyle after the closing of the 363 Sale Transactions for the Brookfield Assets or the Carlyle Assets, respectively, or of Fundamental after the closing of the Fundamental Credit Bid Transaction, in accordance with the terms of the Fundamental Committee Settlement. If this Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

9.5.    *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*.

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

9.6.    *Substantial Consummation*.

On the Effective Date, this Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## ARTICLE X.

## RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS

10.1.    *General*.

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan and the Committee Settlements, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, (a) the Plan Administrator may compromise and settle Claims (other than General Unsecured Claims) against the Debtors and their Estates and Plan Administrator Causes of Action against other Entities and (b) the GUC Trustee may compromise and settle General Unsecured Claims against the Debtors and their Estates and the GUC Trust Causes of Action against other Entities.  Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

10.2.    *Debtor Release*[3].

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by this Plan and the**

---

[3]    The Special Committee's investigation is ongoing.  The releases, including without limitation, the scope of the Released Parties, are subject in all respects to the conclusion of the investigation and the Special Committee's determination with respect to any potential Claims or Causes of Action, if any, identified therein, and the Debtors

documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties and the Purchased Company Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, including the Plan Administrator and their respective assigns and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their respective Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person (collectively, the "*Debtor Released Claims*"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan (including related to the Prepetition Funded Debt Facilities and the DIP Facilities), the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring, sale, and recapitalization efforts (including related to the Forbearance Documents), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, any 363 Sale Transaction, any 363 Sale Order, the 363 Sale Transaction Documentation, the Disclosure Statement, the DIP Order and the DIP Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, the distribution of property under this Plan, or any other act or omission; *provided, however,* that the foregoing "*Debtor Release*" shall not operate to waive or release, and the "Debtor Released Claims" shall not include, any Cause of Action of any Debtor or Post-Effective Date Debtor or its Estate: (1) against a Released Party arising from any obligations owed to the Debtors or Post-Effective Date Debtors pursuant to an Executory Contract or Unexpired Lease that is not otherwise rejected by the Debtors

---

expressly reserve the right to determine prior to Confirmation of the Plan not to release and to bring any such Claims or Causes of Action. Nothing herein shall constitute or be deemed a waiver of any Causes of Action that the Debtors may hold against any Entity. No Parent Promissory Note Obligor who has not repaid the applicable Parent Promissory Note shall be a Released Party unless and until such Person prepays Parent Promissory Note to the Estates in accordance with the direction of the Debtors pursuant to the Fundamental Committee Settlement within thirty (30) days of the Effective Date, in which event such Person shall be a Released Party.

pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2) expressly set forth in and preserved by this Plan, including in <u>Article 3.2</u> with respect to Intercompany Claims, or related documents or the 363 Sale Transaction Documentation; (3) that is of a commercial nature arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (4) against a Holder of a Disputed Claim to the extent necessary to administer and resolve such Disputed Claim solely in accordance with this Plan; (5) arising in connection with any obligations under, any rights to enforce, or any other rights, claims, remedies, or defenses under the 363 Sale Transaction Documentation, any Third-Party TSA, or any Reverse TSA; (6) against a Released Party arising from an act or omission by that Released Party that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; (7) the Retained Causes of Action; or (8) against a Parent Promissory Note Obligor and until such Person prepays the applicable Parent Promissory Note to the Estates or to the GUC Trust within thirty (30) days of the Effective Date in accordance with the direction of the Debtors and with the agreement of the Committee. Notwithstanding anything to the contrary in the foregoing, the "Debtor Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed in connection with this Plan or the implementation thereof with respect to the Debtors, the Post-Effective Date Debtors, or the Estates.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Debtors' Estates, or the Plan Administrator asserting any Claim or Cause of Action released pursuant to the Debtor Release.

    *10.3.*   ***Third-Party Release by Holders of Claims and Interests***.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, and the obligations contemplated by this Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal

or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Releasing Parties or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert or on behalf of or in a derivative capacity by or through the Releasing Party (collectively, the "*Third-Party Released Claims*"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the Post-Effective Date Debtors, or the Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan (including related to the Prepetition Funded Debt Facilities and the DIP Facilities), the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring, sale, and recapitalization efforts (including related to the Forbearance Documents), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, any 363 Sale Transaction, any 363 Sale Order, the 363 Sale Transaction Documentation, the Committee Settlements, the Disclosure Statement, the DIP Order and the DIP Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, the distribution of property under this Plan, or any other act or omission; *provided, however,* that the foregoing Third-Party Release shall not operate to waive or release, and the "Third-Party Released Claims" shall not include, any Cause of Action of any Releasing Party: (1) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Post-Effective Date Debtors; (2) against a Released Party arising from any obligations owed to the Releasing Parties pursuant to an Executory Contract or Unexpired Lease that has been or is assumed or assumed and assigned; (3) that is of a commercial nature arising in the ordinary course of business, including any statutory and/or mechanic's liens held by Holders of Claims against a Debtor that is subject to an order approving the Dismissal Motion or accounts receivable and accounts payable on account of goods and services being performed; (4) expressly set forth in and preserved by this Plan or related documents; (5) arising in connection with any obligations under, any rights to enforce, or any other rights, claims, remedies, or defenses under the 363 Sale Transaction Documentation, any Third-Party TSA, or any Reverse TSA; (6) against a Released Party arising from an act or omission of that Released Party that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; or (7) against a Released Party arising from or relating to the Fundamental/Committee Shared Causes of Action. For the avoidance of doubt, Brookfield Excluded Claims (as defined in the 363 Sale Order in connection with the 363 Sale Transaction for the Brookfield Assets) and Carlyle Pledged Intercompany Claims (as defined in the Final DIP Order and unless otherwise released pursuant to such 363 Sale Transaction Documentation) shall be acquired pursuant to the Purchase Agreements with respect to the Brookfield Assets and the Carlyle Assets, respectively, and the related 363 Sale

Transaction Documentation.  For the avoidance of doubt, the Fundamental Pledged Intercompany Claims (as defined in the Final DIP Order and unless otherwise released consistent with the Fundamental Sale Order) shall be acquired pursuant to the applicable Purchase Agreement and the related 363 Sale Transaction Documentation.  Notwithstanding anything to the contrary in the foregoing, the "*Third-Party Release*" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed in connection with this Plan or the implementation thereof.  Notwithstanding anything to the contrary contained herein, for the avoidance of doubt, no Purchased Company nor any of its Related Parties shall be a Released Party nor a Related Party to a Released Party under the Third-Party Release set forth in this Article 10.3.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release; (4) in exchange for good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the 363 Sale Transaction and implementing this Plan; (5) fair, equitable, and reasonable; and (6) essential to the Confirmation of the Plan.

10.4.  *Exculpation*.

To the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in Article 10.2 or Article 10.3 of this Plan, effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or entity for any claims, causes of action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and Consummation of this Plan, making Distributions, implementing the Wind-Down, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the 363 Sale Transaction, this Plan, the Plan Supplement, the Committee Settlements, or any contract, instrument, release, or other agreement or document created or entered into in connection therewith, or the solicitation of votes for, or Confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions in furtherance of any of the foregoing; *provided*, *however*, that none of the foregoing provisions shall operate to waive or release (i) any Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations arising on or after the Effective Date under this Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this

**Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on this Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 10.5. *Permanent Injunction*.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article 10.2, Article 10.3, Article 10.4, and Article 10.5 hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable; *provided* that the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if such Person or Entity bringing such Claim or Cause of Action is a Releasing Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Post-Effective Date Debtor, Exculpated Party, Released Party, the GUC Trust, the GUC Trustee, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.**

### 10.6. *Setoffs*.

Except as otherwise expressly provided for in this Plan, each Debtor, the GUC Trust (solely as it relates to reconciliation of General Unsecured Claims), and the Plan Administrator, as

applicable, pursuant to the Bankruptcy Code (including section 558 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to this Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights and Causes of Action of any nature that such Debtor, the GUC Trust (solely as it relates to reconciliation of General Unsecured Claims), or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by such Debtor or the GUC Trust (solely as it relates to reconciliation of General Unsecured Claims) of any such Claims, rights and Causes of Action that such Debtor or the GUC Trust may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor the GUC Trust (solely as it relates to reconciliation of General Unsecured Claims) unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.  For the avoidance of doubt, the filing of a Proof of Claim is sufficient to preserve a right of set off hereunder.

### 10.7. *Release of Liens*.

Except as otherwise provided in this Plan or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and cancelled, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their Estates.

### 10.8. *No Governmental Releases*.

Except as expressly provided for in this Plan, nothing in this Plan, the Confirmation Order, or other related Plan documents shall affect a release or limit any Claim arising solely under the enforcement of the police powers or regulatory activities of the United States Government or any of its agencies, or any state and local authority.

### 10.9. *Preservation of All Causes of Action Not Expressly Settled or Released*.

The Debtors expressly reserve all Retained Causes of Action not released hereunder for later adjudication by, as applicable, the Debtors, the GUC Trustee, or the Plan Administrator (including, without limitation, Retained Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion,

claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan, or the Confirmation Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article 10.2, the Third-Party Release contained in Article 10.3, and the Exculpation contained in Article 10.4 hereof) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors, the GUC Trustee, and the Plan Administrator, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, in each case, to the extent such claim is not acquired or released pursuant to any 363 Sale Transaction Documentation or this Plan.

> ### 10.10.  *Integral Part of Plan*.

Each of the provisions set forth in this Plan with respect to the settlement, release, cancellation, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action is an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the 363 Sale Orders, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest, including equitable subordination or other subordination of any Claim or Interest pursuant to 11 U.S.C. § 510;

(b)     grant or deny any applications for allowance of Professional Fee Claims authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

(c)     resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

(d)     resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(e)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(f)     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes related thereto;

(g)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Retained Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(h)     enforce all orders previously entered by the Bankruptcy Court;

(i)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(j)     adjudicate any and all matters relating to the GUC Trust and the GUC Trust Assets;

(k)     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person or Entity's obligations incurred in connection with this Plan, including the Plan Administrator's obligation to remit the GUC Remainder Payment and any Cash that is no longer needed for the Wind-Down or satisfaction of the Estates' obligations under the Plan to the GUC Trust and any disputes between the Plan Administrator and the GUC Trustee;

(l)     hear and determine all Retained Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

(m)     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

(n)     enforce the terms and conditions of this Plan and the Confirmation Order, and maintain the integrity of this Plan following Consummation;

(o)     hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(p)       resolve any cases, controversies, suits or disputes with respect to the Release, Exculpation, indemnification and other provisions contained in <u>Article X</u> hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such provisions;

(q)       enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(r)       resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan;

(s)       enter an order or orders concluding or closing the Chapter 11 Cases; and

(t)       hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

Notwithstanding the foregoing, the 363 Sale Transaction Documentation (excluding the 363 Sale Orders over which the Bankruptcy Court shall have retained jurisdiction) shall be subject to the applicable venue and jurisdiction provisions set forth therein.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### 12.1.   *Reservation of Rights*.

Except as expressly set forth herein, this Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Until the Effective Date, neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan will be or will be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or other Entity; or (2) any Holder of a Claim or an Interest or other Entity.

### 12.2.   *No Government Releases*.

Except as expressly provided for in this Plan, nothing herein, or in the Confirmation Order or other related Plan documents shall affect a release or limit any claim arising solely under the enforcement of the police powers or regulatory activities of the United States Government or any of its agencies, or any state and local authority, whatsoever.

### 12.3.   *Payment of Statutory Fees*.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or

(c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

### 12.4. *Statutory Committee*.

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; *provided*, *however*, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the limited purposes of (i) pursuing claims and final fee applications filed in accordance with Article 2.1 and (ii) any appeals of the Confirmation Order. Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

### 12.5. *Modification of Plan*.

Except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, if permissible under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any modification, alteration, or amendment made pursuant to this Article 12.5 shall be in form and substance acceptable to the Committee and the DIP Lenders, and, in the case of the DIP Lenders, solely to the extent such modification, alteration, or amendment adversely affects the DIP Lenders solely in their capacity as such.

A Holder of a Claim that has accepted this Plan will be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not adversely change the treatment of the Claim of such Holder.

### 12.6. *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw this Plan, upon consultation with the Committee (and subject to the rights of the Committee to seek relief from the Bankruptcy Court related to any such decision to revoke or withdraw the Plan), prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors, upon consultation with the Committee. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for

which Confirmation or Consummation of this Plan did not occur: (1) this Plan will be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors, the Committee, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

Notwithstanding anything to the contrary herein, the Plan shall be deemed revoked, withdrawn, and otherwise ineffectual in all respects for those Debtors subject to an Order of the Bankruptcy Court approving the Dismissal Motion with respect to such Debtor upon dismissal of the relevant Debtor's chapter 11 case in accordance with the terms thereof.

### 12.7.   *Successors and Assigns*.

This Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### 12.8.   *Further Assurances*.

The Debtors, all Holders of Claims receiving Distributions hereunder, and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

### 12.9.   *Severability*.

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted; *provided, however,* that notwithstanding the foregoing, the terms of the Committee Settlements and this Plan are integrated with one another and are non-severable.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.10.  **Votes Solicited in Good Faith**.

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125 of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, each of the Released Parties and Exculpated Parties and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the solicitation of votes and the offer, issuance, sale, and purchase of securities, if any, offered and sold under this Plan and any previous plan, and, therefore, none of such parties or individuals or the Post-Effective Date Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities, if any, offered and sold under this Plan or any previous plan.

12.11.  **Service of Documents**.

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail or courier, and addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Pine Gate Renewables, LLC<br>130 Roberts Street<br>Asheville, North Carolina 28801<br>Attn: Judith Hall | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Ray C. Schrock, Andrew M. Parlen, and Alexander W. Welch<br><br>Latham & Watkins LLP<br>330 N. Wabash Avenue<br>Suite No. 2800<br>Chicago, IL 60611<br>Attn: Jason B. Gott and Jonathan C. Gordon<br><br>Hunton Andrews Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Attn: Timothy A. ("Tad") Davidson II, Philip Guffy, and Brandon Bell |

| United States Trustee | Counsel to the Creditors' Committee |
|---|---|
| Office of the United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Attn: Andrew Jimenez and C. Ross Travis | White & Case LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br>Attn: Philip M. Abelson and Samuel P. Hershey<br><br>White & Case LLP<br>111 South Wacker Drive, Suite 5100<br>Chicago, IL 60606<br>Attn: Gregory F. Pesce and Laura E. Baccash<br><br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>Attn: Jeffrey N. Pomerantz and Cia H. Mackle<br><br>Pachulski Stang Ziehl & Jones LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>Attn: Bradford J. Sandler<br><br>Pachulski Stang Ziehl & Jones LLP<br>700 Louisiana Street, Suite 4500<br>Houston, TX 77002<br>Attn: Michael D. Warner |
| **Carlyle** | **Counsel to Carlyle** |
| c/o Carlyle Infrastructure Credit Fund, L.P.<br>1 Vanderbilt Avenue Suite 3400<br>New York, NY 10017<br>Email: CICPGRDealTeam@carlyle.com<br>DL-InfraCreditOps@carlyle.com | Milbank LLP<br>55 Hudson Yards,<br>New York, NY 10001<br>Attn: Tyson Lomazow, Andrew Harmeyer, and Justin Cunningham |
| **Fundamental** | **Counsel to Fundamental** |
| Fundamental Advisors LP<br>745 5th Avenue, 25th Floor<br>New York, NY 10151<br>Attn: Chief Legal Officer | Sidley Austin LLP<br>1000 Louisiana Street, Suite 5900<br>Houston, TX 77002<br>Attn: Duston K. McFaul and Maegan Quejada |

| Brookfield | Counsel to Brookfield |
|---|---|
| Brookfield Asset Management Inc.<br>Brookfield Place<br>250 Vesey Street<br>New York, NY 10281-1023<br>Attn: Jiri Honajzer, Max MacRitchie, and Sarah Bellamy | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn: Brian Hermann, Robert Britton, and Brian Bolin |

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided*, that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Article XII. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

### 12.12. *Governing Law*.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

### 12.13. *Tax Reporting and Compliance*.

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

### 12.14. *Schedules*.

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

### 12.15. *Conflicts*.

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way

inconsistent with any provision of this Plan, this Plan shall govern and control; *provided*, that, in the event of any conflict with any provision of this Plan and/or the Confirmation Order, the Confirmation Order shall govern; *provided*, *further*, that, in the event of any conflict with any provision of this Plan and/or the Confirmation Order on the one hand, and the 363 Sale Transaction Documentation, on the other hand, the 363 Sale Transaction Documentation shall govern; *provided*, *further*, that, in the event of any inconsistency between the Plan, the Confirmation Order, or the GUC Trust Agreement, the GUC Trust Agreement shall control.

### 12.16. *Entire Agreement*.

Except as otherwise provided herein or therein, this Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.17. *2002 Notice Parties*.

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

*[Remainder of page intentionally left blank.]*

Respectfully submitted, as of the date first set forth above,

Dated: January 15, 2026

**PINE GATE RENEWABLES, LLC**
on behalf of itself and the other Debtor Entities


*/s/ Raymond Shem*
Raymond Shem
Authorized Signatory