United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 22, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

----------------------------------------------------------- x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
PINE GATE RENEWABLES, LLC, *et al.*,                        :    Case No. 25-90669 (CML)
                                                            :
Debtors.[1]                                                 :    (Jointly Administered)
                                                            :
----------------------------------------------------------- x

### ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT WITH OREGON SOLAR 1, LLC, (B) AUTHORIZING THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED CONTRACTS, AND (D) GRANTING RELATED RELIEF

### [Relates to Docket Nos. 22, 128, 1080]

Upon the motion [Docket No. 22] (the "***Motion***"),[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") for entry of an order (this "***Order***"), among other things: (a) authorizing and approving the Debtors' entry into and performance under the Purchase Agreement with the Buyer (as defined below), (b) authorizing the Sale Transaction (as defined below), free and clear of any Encumbrances (as defined below), (c) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale Transaction, and (d) granting related relief; and this Court having previously entered the *Order (A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures*

---

[1]   A complete list of each of the Debtors in these chapter 11 cases (the "**Chapter 11 Cases**") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/PGR.  The Debtors' mailing address for the purposes of the Chapter 11 Cases is 130 Roberts Street, Asheville, North Carolina 28801.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion, the Bidding Procedures Order (as defined below) or the Purchase Agreement (as defined below), as applicable.

for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief [Docket No. 128] (the "**Bidding Procedures Order**"), authorizing and approving, among other things, Bidding Procedures for the Assets; and the Debtors having negotiated that certain form of *Asset Purchase Agreement* attached hereto as <u>**Exhibit 1**</u> (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Purchase Agreement**"), by and among certain of the Debtors and Oregon Solar 1, LLC (together with any Buyer Designee, the "**Buyer**"),[3] contemplating, among other things, the sale of the Purchased Assets identified therein (the "**Sale Transaction**") free and clear of any Encumbrances and the assumption and assignment to the Buyer of certain executory contracts and unexpired leases in connection with the Sale Transaction; and the Debtors having filed the *Notice of the Debtors' Designation of Fundamental, Amazon Energy, and Thigpen Asset Management as the Successful Bidders with Respect to the Fundamental Assets, the Sunstone Assets, and the ACT Assets* [Docket No. 1080] (the "**Notice of Successful Bid**"), announcing that, in accordance with the Bidding Procedures Order and after consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors decided, in their reasonable business judgment, to designate (i) the Buyer's bid as the highest or otherwise best bid for the Purchased Assets and (ii) the bid from Puget Sound Energy, Inc. as the Backup Bid for the Purchased Assets; and this Court having

---

[3]    Oregon Solar 1, LLC is a newly formed special purpose vehicle owned by Amazon Energy LLC ("**Amazon Energy**"), a wholly owned subsidiary of Amazon.com, Inc. (and collectively referred to with their affiliates, subsidiaries and assigns as "**Amazon**"). Amazon Energy will be funding the acquisition of and remaining development costs for the Sunstone Assets, and Gallatin Power Partners, LLC (and collectively referred to with their affiliates, subsidiaries and assigns as "**Gallatin**") will be responsible for managing all remaining development tasks for the Sunstone Assets. Amazon Energy and Gallatin will have a separate agreement relating to Gallatin's efforts on the Sunstone Assets.

conducted a hearing on January 12, 2026, to consider approval of the Sale Transaction (the "***Sale Hearing***") in accordance with the Bidding Procedures Order; and this Court having reviewed and considered (a) the Motion and the exhibits thereto, (b) the Bidding Procedures Order, (c) the Purchase Agreement, (d) the Declaration,[4] (e) the Notice of Successful Bid, (f) the objections and other responses to approval of the Sale Transaction, and (g) the arguments and representations of counsel made, and the evidence proffered or adduced at, the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in the Motion and provided in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances of the Chapter 11 Cases and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion and provided in this Order is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion, the Declaration, and at the Sale Hearing, establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.      **<u>Jurisdiction and Venue.</u>**  This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets, pursuant to 28 U.S.C. §§ 157 and 1334, and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, dated as of May 24, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order hereon under Article III of the United

---

[4]     The "***Declaration***" means, collectively, (i) the *Declaration of Jennifer Wild in Support of the Sale of Certain of the Debtors Assets to FR Acquisition Holdings LLC (Fundamental), Oregon Solar 1, LLC (Amazon Energy), and Thigpen Asset Management* [Docket No. 1096] and (ii) the *Supplemental Declaration of Jennifer Wild in Support of the Sale of Certain of the Debtors' Assets to Oregon Solar 1, LLC (Amazon Energy)* [Docket No. 1109].

States Constitution.  Venue of these Chapter 11 Cases and approval of the Sale Transaction and the Debtors' entry into, and performance under, the Purchase Agreement is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

      B.    **Statutory and Legal Predicates.**  The statutory predicates for the relief granted herein are sections 105, 363 and 365 of the Bankruptcy Code.  The relief granted herein is also authorized under Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***").  The consummation of the transactions contemplated by the Purchase Agreement and this Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, and the Debtors and the Buyer have complied with all of the applicable requirements of such sections and rules with respect to such transactions.

      C.    **Bankruptcy Rule 7052.**  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein to the extent not inconsistent herewith.

      D.    **Final Order.**  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and

4

authorizes the closing of all transactions contemplated hereby, including, without limitation, the Sale Transaction, without regard to any stay or delay in its implementation.

E.  **Incorporation by Reference.**  Findings of facts and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

F.  **Notice.**  On November 6, 2025 (the "***Petition Date***"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (this "***Court***").  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

G.  On November 19, 2025, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed the official committee of unsecured creditors (the "***UCC***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 225].

H.  The Debtors gave due and proper notice of the proposed Sale Transaction, the Auction, and the Sale Hearing on November 11, 2025 [Docket No. 135] (the "***Sale Notice***").  The Sale Notice constituted good, sufficient, and appropriate notice of the Sale Transaction under the particular circumstances and no further notice need be given with respect to the Sale Transaction. As provided by the Sale Notice, a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.  Other parties interested in bidding on the Purchased Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid.

I.  As evidenced by the affidavits of service previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Order, the Sale Hearing, the Assumption and

Assignment Procedures, the Purchase Agreement, this Order, the Notice of Successful Bid, the notices of executory contracts and unexpired leases that may be assumed and proposed cure costs filed at ECF Nos. 518, 788, 1090 and 1166 (the "***Cure Notices***") and the Sale Transaction has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 9006, 9007, and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and the Complex Case Procedures.  The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Sale Hearing, the Assumption and Assignment Procedures, the Purchase Agreement, this Order, the Notice of Successful Bid, the Cure Notices and the Sale Transaction as required by the Bidding Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures Order, the Assumption and Assignment Procedures, the Sale Hearing, the Purchase Agreement, this Order, the Notice of Successful Bid, the Cure Notices or the Sale Transaction is or shall be required.

J.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

K.      **Compliance with the Bidding Procedures Order.**  As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors and the Buyer have complied in all material respects with the Bidding Procedures Order.  The Debtors and their professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties.  Based upon the record of these proceedings, creditors, other parties in interest, and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.

L.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

M.      The Buyer is the designated Successful Bidder, and the Purchase Agreement is designated the Successful Bid for the Purchased Assets enumerated therein in accordance with the Bidding Procedures Order.

N.      The Sale Transaction, including the form and total consideration to be realized by the Debtors under the Purchase Agreement, (a) constitutes the highest or otherwise best offer received by the Debtors for the Purchased Assets; (b) is fair and reasonable, and (c) is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

O.      **<u>Business Judgment.</u>**  The Debtors' determination that the consideration provided by the Buyer under the Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets is reasonable and constitutes a valid and sound exercise of the Debtors' business judgment.

P.      The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale Transaction and performing their obligations under the Purchase Agreement, including, but not limited to, the fact that (a) the consideration provided by the Buyer under the Purchase Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Purchased Assets; and (b) unless the Sale Transaction is concluded expeditiously as provided for in the Motion and pursuant to the Purchase Agreement, creditor recoveries will be diminished.

Q.     **Corporate Authority**.  The Purchased Assets that are owned by one or more of the Debtors constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code.  The Debtors (a) have full corporate or (if applicable) limited liability company power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (b) have all of the necessary corporate or (if applicable) limited liability company power and authority to consummate the Sale Transaction, (c) have taken all corporate or (if applicable) limited liability company action necessary to authorize and approve the Purchase Agreement, and the consummation of the Sale Transaction, and (d) subject to entry of this Order, need no consents or approvals, including any consents or approvals from any non-Debtor entities, other than those expressly set forth in the Purchase Agreement or this Order, to consummate the Sale Transaction.

R.     **Good Faith.**  The sale process and negotiation of the Purchase Agreement engaged in by the Debtors and the Buyer was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  None of the Debtors, the Buyer, nor any affiliates, members, partners, officers, directors, principals, professionals, or shareholders of the Buyer, nor any other persons has engaged in any conduct that would cause or permit the Purchase Agreement or the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

S.     The Debtors and the Buyer have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures.  The Debtors, and their management, boards of managers, employees, agents, advisors, and representatives, and the Buyer, its affiliates, and each of their respective employees, agents, advisors, and representatives, each actively participated in the bidding process, and each acted in good faith and without collusion or fraud of

any kind.  The Buyer subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

T.      The Buyer (including Amazon and Gallatin) is each a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, each term of the Purchase Agreement (and any ancillary documents executed in connection therewith) and this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding, and is therefore entitled to the full protection of section 363(m) of the Bankruptcy Code in respect of the Sale Transaction. Neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  The Debtors, on behalf of their estates, were free to deal with any other party interested in buying or selling some or all of the Purchased Assets.  The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and the Buyer would not consummate the Sale Transaction without such protections.

U.      At the start of the Auction, the Buyer (including through authorized representatives from Amazon and Gallatin) represented that it had not engaged in conduct prohibited by the Bidding Procedures, including not engaging in collusive conduct.  Prior to the Bid Deadline, Gallatin disclosed to the Debtors that they would submit a joint bid together with Amazon.  The Debtors, in consultation with the Consultation Parties, determined that the bid submitted by the Buyer constituted a Qualified Bid.  The Auction for the Sunstone Assets was conducted in an open and fair manner. The Buyer's participation at the Auction increased the purchase price for the Sunstone Assets.

V.      **Buyer Is Not an Insider.**  Neither the Buyer nor any of its affiliates, officers, directors, managers, shareholders, members, or any of their respective successors or assigns is an

"insider" of the Debtors, as that term is defined under section 101(31) of the Bankruptcy Code. No common identity of directors, managers, controlling shareholders, or members exists between the Debtors and the Buyer.

       W.    **No Fraudulent Transfer.**  The consideration provided by the Buyer for the Purchased Assets pursuant to the Purchase Agreement (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Purchased Assets, (c) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and each state, territory, possession, and the District of Columbia.

       X.    The Purchase Agreement was not entered into, and neither the Sellers nor the Buyer entered into the Purchase Agreement or propose to consummate the Sale Transaction, with fraudulent intent or for the purpose of (a) escaping liability for any of the Debtors' debts, or (b) hindering, delaying or defrauding the Debtors' present or future creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

       Y.    **Free and Clear.**  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title, and interest of the applicable Sellers in and to the Purchased Assets free and clear of all Claims (including, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), liens (including, without limitation, any

10

statutory, mechanic's, builders, materialmen's or similar lien on real and/or personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, and encumbrances relating to, accruing, or arising any time prior to the Closing Date, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, contract rights, rights of setoff (except for setoffs exercised prior to the Petition Date), rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, to the greatest degree allowed by applicable law environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court (other than this Court) or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, senior or subordinated, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding,

law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or related theories (all of the foregoing, but excluding Assumed Liabilities and the Permitted Encumbrances, collectively being referred to in this Order as "***Encumbrances***").

Z.      Those holders of Encumbrances who did not object or who withdrew their objections to the Motion, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

AA.     The Debtors, to the extent permitted by applicable law, may transfer the Purchased Assets free and clear of all Encumbrances, including, without limitation, rights or claims based on any successor or transferee liability, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

BB.     The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction, if (a) the transfer of the Purchased Assets were not free and clear of all Encumbrances, or (b) the Buyer would, or in the future could, be liable for or subject to any such Encumbrances.

CC.     The Buyer will not consummate the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, unless this Court expressly orders that none of the Buyer, its respective affiliates, its respective present or contemplated members or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any Encumbrances.

DD.     Not transferring the Purchased Assets free and clear of all Encumbrances would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Encumbrances would be of substantially less benefit to the Debtors' estates.

EE.     **No Successor, Transferee, or Similar Liability**.  As a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, (a) neither the Buyer nor any of its affiliates shall be deemed to be a mere continuation of any of Debtors or their estates, nor shall there be deemed to be a continuity or common identity between the Buyer, any of the Debtors, or any of their respective affiliates, or any continuity of enterprise between the Buyer, any of the Debtors, or any of their respective affiliates; (b) neither the Buyer nor any of its affiliates shall be deemed to be holding themselves out to the public as a continuation of any of the Debtors; and (c) neither the Buyer nor any of its affiliates are to be deemed a successor to any of the Debtors or their estates and none of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction amounts to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates with or into any of the Debtors.  There is not substantial continuity between the Buyer on the one hand, and the Debtors and/or their estates, on the other.  There is no continuity of enterprise between either the Buyer, on the one hand, and the Debtors and/or their estates, on the other.  The Buyer is not (a) a mere continuation of the Debtors or their estates or (b) a successor to the Debtors or their estates.

FF.     Without limiting the generality of the foregoing, and other than as may be set forth in the Purchase Agreement, none of the Buyer, its affiliates, the present or contemplated members

or shareholders of the Buyer, and its affiliates, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any Encumbrances relating to any U.S. federal, state or local income tax liabilities, that the Debtors may incur in connection with consummation of the Sale Transaction, or that the Debtors have otherwise incurred prior to the consummation of the Sale Transaction.

GG.    **Validity of Transfer.**  The consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) thereof, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Purchase Agreement, including without limitation, the Sale Transaction.

HH.    The Purchase Agreement has been duly and validly executed and delivered by the Sellers and, subject to the terms of the Purchase Agreement, shall constitute valid and binding obligations of the Sellers, enforceable against the Sellers in accordance with its terms.  The Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

II.    **Compelling Circumstances for an Immediate Sale.**  To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the Purchase Agreement occur within the time constraints set forth therein.  Time is of the essence in consummating the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale

Transaction.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

JJ.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement and this Order, including, without limitation, the Sale Transaction.  The transactions contemplated by the Purchase Agreement neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate the terms of a chapter 11 plan for the Debtors (any such chapter 11 plan, the "***Plan***"), and therefore, do not constitute a *sub rosa* plan.

KK.     **Assumption, Assignment and/or Transfer of the Designated Contracts**.  The Debtors have demonstrated (a) that it is an exercise of their sound business judgment to assume and assign the Designated Contracts to the Buyer, in connection with the consummation of the Sale Transaction and (b) that the assumption and assignment of the Designated Contracts to the Buyer is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Designated Contracts being assigned to the Buyer are an integral part of the Purchased Assets being purchased by the Buyer and, accordingly, such assumption, assignment and cure of any defaults under the Designated Contracts are reasonable and enhance the value of the Debtors' estates.  Each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code. Any non-Debtor counterparty to a Designated Contract that has not filed with

the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

LL.     To the extent necessary or required by applicable law, the Buyer has or will have as of the Closing: (a) cured, or provided adequate assurance of cure, of any default existing prior to the Closing with respect to the Designated Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2) of the Bankruptcy Code, and (b) provided compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

MM.   The promise of the Buyer to perform the obligations first arising under the Designated Contracts after the assumption and assignment to the Buyer constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparty to the Designated Contract.

NN.     The legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Purchase Agreement attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, is authorized and approved.

2.     Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief granted herein, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

### A.     Approval of the Purchase Agreement

3.     The Purchase Agreement, all other ancillary documents related thereto or contemplated thereby, all of the terms and conditions thereof, and all of the transactions contemplated therein including, without limitation, any amendment to the Purchase Agreement that the Debtors and the Buyer determine is necessary or desirable in connection with the transactions are hereby approved.  The consummation of the Sale Transaction is hereby authorized under sections 105, 363, and 365 of the Bankruptcy Code.

4.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and their respective officers, employees and agents are authorized and directed to take any and all actions necessary, appropriate or reasonable to perform, consummate, implement and close the Sale Transaction, including, without limitation, the (a) sale to the Buyer of all Purchased Assets, in accordance with the terms and conditions set forth in the Purchase Agreement and this Order, and (b) execution, acknowledgment, and delivery of such deeds, assignments, conveyances and other assurances, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer, or reducing to possession, the Purchased Assets, all without further order of this Court.  The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing Date, any expenses

or costs that are required to be paid by the Debtors under the Purchase Agreement, this Order, or the Bidding Procedures Order, in order to consummate the Sale Transaction or perform their obligations under the Purchase Agreement.

5.      All persons and entities, including, without limitation, the Debtors, the Debtors' estates, any and all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or any affiliate, agent, successor, or assign of any of the foregoing) who may or do hold claims or other Encumbrances against the Debtors or the Purchased Assets, arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation or ownership of the Purchased Assets by the Debtors prior to the Closing Date, or the Sale Transaction, are hereby prohibited, forever barred and estopped from asserting or pursuing such claims or other Encumbrances against the Buyer, its affiliates, successors, assigns, or property, or the Purchased Assets, including, without limitation, taking any of the following actions with respect to any claims or other Encumbrances: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against the Purchased Assets, Buyer, and/or Buyer's properties, affiliates, successors, and assigns; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchased Assets, Buyer, and/or Buyer's properties, affiliates, successors, and assigns; (c) creating, perfecting, or enforcing any Claim or other Encumbrance against the Purchased Assets, Buyer, its affiliates, any of their respective successors, assigns, and properties; (d) asserting a Claim or other Encumbrance as a setoff (except for setoffs exercised prior to the Petition Date), or right of subrogation, of any kind against any obligation due against Purchased Assets, Buyer, its affiliates, any of their respective successors,

assigns, and properties; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the Purchase Agreement, or the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to transfer the Purchased Assets to the Buyer in accordance with the terms of this Order and the Purchase Agreement.  No such Person shall assert or pursue any such claim or other Encumbrance against the Buyer or its affiliates, successors or assigns.

6.     The sale of the Purchased Assets to the Buyer under the Purchase Agreement is for the Purchase Price (as defined in the Purchase Agreement) which consists of, subject to the terms of the Purchase Agreement, (i) eighty three million dollars ($83,000,000) in cash, (ii) the amount of Reimbursable Expenses (as defined in the Purchase Agreement), and (iii) the assumption of the Assumed Liabilities (as defined in the Purchase Agreement) and constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Purchased Assets are located, and the sale of the Purchased Assets to the Buyer may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**B.     Transfer of the Purchased Assets Free and Clear**

7.     For the avoidance of doubt and notwithstanding anything to the contrary in this Sale Order, the Purchase Agreement, or any exhibit or attachment to the Order or Purchase Agreement, only Purchased Assets sold by a Debtor are sold free and clear of Encumbrances.

8.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be sold free and clear of all Encumbrances, with all such Encumbrances to attach to any proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

9.      As of the Closing, all of the Debtors' right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code free and clear of any and all Encumbrances. Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Buyer with, all of the Debtors' right, title and interest in and to, and possession of the Purchased Assets.  All persons or entities, currently or as of or after the Closing, in possession of some or all of the Purchased Assets are authorized and instructed to surrender possession of the Purchased Assets to the Buyer as of or following the Closing or at such time thereafter as the Buyer may request.

10.      This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

11.     Except as otherwise expressly provided in the Purchase Agreement or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, any and all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, former employees, trade creditors, litigation claimants and other creditors holding claims or other Encumbrances against the Debtors or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or affiliates, the Purchased Assets, the ownership, sale or operation of the Purchased Assets prior to Closing Date or the transfer of the Purchased Assets to the Buyer, are hereby forever barred and estopped from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset (except for offsets exercised prior to the Petition Date), or recover on account of any claims or other Encumbrances against the Buyer, its successors or assigns, their property or the Purchased Assets. Following the Closing Date, no holder of any Claim, lien, or interest in or against the Sellers or the Purchased Assets (excluding the Assumed Liabilities and Permitted Encumbrances) shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim, lien or interest or based on any action or omission of any Debtor, including any action or omission of any Debtor in these Chapter 11 Cases or any successor cases. All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Sellers to transfer the Purchased Assets in accordance with the terms of the Purchase Agreement and this Order.

12.     The Debtors are authorized to execute such documents as may be necessary to release any Encumbrances of any kind against the Purchased Assets as such Encumbrances may have been recorded or may otherwise exist. If any person or entity that has filed financing

statements, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances that such person or entity has with respect to the Purchased Assets, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets; (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Encumbrances against the Buyer and the applicable Purchased Assets; (c) the Debtors' creditors and the holders of any Encumbrances are authorized and instructed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Encumbrances in the Purchased Assets; and (d) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Encumbrances with respect to the Purchased Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Order for filing or recording.  Notwithstanding the foregoing, but subject to paragraph 24 of this Order, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

13.     To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, authorized to be transferred to the Buyer with respect to the Purchased Assets as of the Closing.  To the extent the Buyer cannot operate under any such license, permit, registration and governmental authorization or approval in accordance with the previous sentence, then to the maximum extent permitted under applicable law, such licenses, permits, registrations and governmental authorizations and approvals shall be in effect while the Buyer, with assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of such licenses, permits, registrations and governmental authorizations and approvals to the Buyer.

14.     No Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction to the extent that any such action by a Governmental Unit or any representative thereof would violate section 525 of the Bankruptcy Code.

15.     Notwithstanding anything to the contrary in this Order or the Purchase Agreement, the Purchased Assets expressly exclude all Avoidance Actions[5] owned or controlled by PGR,

---

[5] "**_Avoidance Actions_**" means, collectively, any and all claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code or any other similar provision of applicable law.

except for those Avoidance Actions solely relating to any Project (as defined in the Purchase Agreement).

### C.     No Successor Liability

16.     As of and following the Closing, except as provided in the Purchase Agreement, the entry of this Order and the approval of the terms of the Purchase Agreement shall mean that the Buyer (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, shall not be deemed to: (a) be a legal successor or successor employer to any Debtor (including with respect to any health or benefit plans), or otherwise be deemed a successor to any Debtor, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into any Debtor; (c) be an alter ego or a mere continuation or substantial continuation of any Debtor or the enterprise of any Debtor; or (d) be liable or have any liability for any acts or omissions of any Debtor in the conduct of their businesses or arising under or related to the Purchased Assets other than as express set forth and agreed in the Purchase Agreement, including, in the case of each of (a)-(d), without limitation, (i) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.) ("***WARN***"), to the greatest degree allowed by applicable law, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (as amended) ("***CERCLA***"), the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq.

or (ii) in respect of (1) to the greatest degree allowed by applicable law, any environmental liabilities, debts, claims or obligations arising from conditions first occurring or first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (2) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or (3) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

17.     Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement or this Order, neither the Buyer nor any of its affiliates shall have any responsibility for any (a) liability or other obligation of the Debtors related to the sale and transfer of the Purchased Assets to the Buyer or with respect to the Excluded Liabilities, other than the Assumed Liabilities, or (b) claims against the Debtors or any of their predecessors or affiliates. By virtue of the Buyer's purchase of the Purchased Assets, neither the Buyer nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or its predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, to the greatest degree allowed by applicable law environmental (including, but not limited to, CERCLA), successor or transferee liability, de facto merger or substantial continuity, labor and employment (including, but not limited to, WARN) or products liability law, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent,

liquidated or unliquidated, including any liabilities or non-monetary obligations on account of the Debtors' employment agreements or health or benefit plans, any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date (collectively, with the potential claims set forth in paragraph 16, "***Successor Liability***").  The Buyer would not have acquired the Purchased Assets but for the foregoing protections against Successor Liability or transferee liability.

### D.   Assumption and Assignment of Designated Contracts

18.   Notwithstanding any provision of any contract governing the Purchased Assets, including any Designated Contract to be assumed and assigned to the Buyer as of the Closing, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchased Assets, including any Designated Contracts, at the Closing, the Debtors shall, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, (i) assign the Purchased Assets to the Buyer and (ii) assume and assign the Designated Contracts to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, subject to the terms of the Purchase Agreement, this Order, the Bidding Procedures Order, or as otherwise provided by a separate order of this Court; *provided, however*, that the foregoing is subject to paragraph 24 of this Order; *provided, further that*, to the extent the Buyer identifies a Designated Contract before entry of the Confirmation Order that it seeks to have the Sellers assume and assign to the Buyer (such a contract, an "***Additional Designated Contract***"), the Buyer shall pay cure costs (if any) associated with Buyer's designation of such Additional Designated Contracts after entry of this Order.

19.     To the fullest extent permitted by the Bankruptcy Code, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the counterparty to Designated Contract is forever barred from raising or asserting against Buyer any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to a Designated Contract, existing as of the date that such Designated Contract is assumed, assigned and sold or arising by reason of the Closing. Notwithstanding any term of any Designated Contract to the contrary, any extension or renewal options or other rights contained in such Designated Contract that purport to be personal only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer subject to the other applicable terms of the Designated Contract.

**E.     Good Faith; Arm's Length Sale**

20.     The Purchase Agreement was negotiated and executed by the Sellers and the Buyer, and the transactions contemplated thereby, including, without limitation, the Sale Transaction, are and have been undertaken, by the Debtors, the Buyer and their respective representatives at arm's length, without collusion and in "good faith," as such term is defined in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction or any term of the Purchase Agreement (including the assumption and assignment by the Debtors of any Designated Contracts), and shall not permit the unwinding of the Sale Transaction. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections under section 363(m) of the Bankruptcy Code.

21.     Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the transactions contemplated thereby, including, without limitation, the Sale Transaction, to be avoided, or for costs, or damages or costs, to be imposed, under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Purchased Assets under the Purchase Agreement is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

**F.     Releases**

22.     Effective as of the Closing, each Seller, for itself and on behalf of its past, present and future controlled Affiliates and its and such Affiliates' respective current or former directors, officers, members, partners, managers, employees, agents, lenders, investment bankers, attorneys, accountants, advisors and other representatives (collectively, "***Representatives***"), and each of its and their respective successors, assigns, heirs and executors (each, a "***Seller Releasor***"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all Claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Seller Releasor has, may have, or may assert now or in the future against (i) Buyer or any Buyer Designee, (ii) any Affiliates of Buyer or any Buyer Designee, (iii) any Representatives of Buyer or any Buyer Designee or their respective Affiliates, (iv) any current (as of the Closing Date) direct or indirect equity holder in Buyer or any Buyer Designee or any of their respective Affiliates, (v) current direct or indirect equityholder of Buyer and its Affiliates and

Representatives, (vi) any lenders of Buyer, any Buyer Designee or their respective Affiliates and (vii) with respect to (i)-(vi) each of their Representatives (collectively, the "**Buyer Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise; *provided* that, notwithstanding the foregoing, nothing in this paragraph shall be deemed to release, waive or otherwise diminish in any respect any (i) rights or remedies of any Seller Releasor under the Purchase Agreement, (ii) claims for willful misconduct, gross negligence, or fraud, or (iii) rights and remedies under the Surviving Post-Closing Covenants.

23.     Effective as of the Closing, Buyer, for itself and on behalf of its past, present and future controlled Affiliates and its and such Affiliates' respective Representatives, and each of its and their respective successors, assigns, heirs, and executors (each, a "**Buyer Releasor**"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all Claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Buyer Releasor has, may have, or may assert now or in the future against (i) each Seller, (ii) any Affiliates of Sellers and (iii) any Representatives of Sellers or their respective Affiliates (collectively, the "**Seller Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to

act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise; *provided that*, notwithstanding the foregoing, nothing in this paragraph shall be deemed to release, waive or otherwise diminish in any respect any (i) rights or remedies of any Buyer Releasor under the Purchase Agreement or a Transition Services Agreement, (ii) claims for willful misconduct, gross negligence, or fraud, or (iii) rights and remedies under the Surviving Post-Closing Covenants.

### G.   Special Provision Related to the United States of America

24.   Notwithstanding anything in this Order, the Purchase Agreement or any related sale document (collectively, the "Documents"), nothing in the Documents shall: (1) affect the United States' rights and defenses of setoff and recoupment; (2) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit (as defined in section 101(27) of the Bankruptcy Code) ("*Governmental Unit*") that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; (3) confer exclusive jurisdiction to the Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (4) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Documents or to adjudicate any defense asserted under the Documents, or limit any Governmental Unit in the exercise of its police or regulatory powers in accordance with 11 U.S.C. § 362(b)(4) or 28 U.S.C. § 959; provided that the Court shall retain jurisdiction regarding the interpretation or enforcement of the Documents or any other order entered by the Court in the Chapter 11 Cases; (5) authorize the assumption, sale, assignment or other transfer of any federal (i) grants, (ii) grant funds, (iii) contracts, including, without limitation, any contract between a Debtor and a counterparty that is regulated by the Federal Energy Regulatory Commission ("*FERC*"), (iv) property, including but not limited to, intellectual

30

property, data and patents, (v) leases, (vi) rights-of-way, (vii) agreements, (viii) applications, (ix) licenses, (x) permits, (xi) registrations, (xii) authorizations, or (xiii) approvals (collectively, "Federal Interests"), or the discontinuation of any obligations thereunder, without compliance with all terms of the Federal Interests and with all applicable non-bankruptcy law; (6) be interpreted to set cure amounts with respect to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption, sale, assignment or transfer of any Federal Interests; (7) authorize any transaction pursuant to section 203 of the Federal Power Act, 16 U.S.C. §§ 791 et seq., and any FERC regulations or orders; (8) waive, alter or otherwise limit the United States' property rights; or (9) expand the scope of 11 U.S.C. § 525.  In the event of an inconsistency or conflict between any provision of the Purchase Agreement and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern.

### H.    All-Surety Provisions

25.    Sureties. Certain commercial surety companies (collectively, the "**Sureties**" and each, individually, a "**Surety**")[6] issued certain surety bonds (collectively, the "**Existing Surety Bonds**" and each individually, an "**Existing Surety Bond**") and/or issued surety backed letters of credit (collectively the "**Existing SBLCs**" and each individually, an "**Existing SBLC**") on behalf of the Debtors and certain non-Debtor affiliates (and, together with the Debtors, the "**Pine Gate Entities**").  Certain of the Pine Gate Entities have entered into, or are potentially otherwise liable under, certain indemnity agreements, amendments thereto, riders and/or related agreements with

---

[6]    The "**Sureties**" are: (i) RLI Insurance Company, (ii) Philadelphia Indemnity Insurance Company, (iii) Atlantic Specialty Insurance Company, (iv) Siriuspoint America Insurance Company, (v) Continental Insurance Company, (vi) Argonaut Insurance Company, (vii) Swiss RE Corporate Solutions America Insurance Company, (viii) Arch Insurance Company, (ix) Markel Insurance Company/SureTec Insurance Company, (x) Axis Insurance Company, (xi) The Hanover Insurance Company, (xii) United States Fire Insurance Company, (xiii) XL Specialty Insurance Company; and (xiv) Ascot Casualty and Surety Company.

the Sureties (collectively, the "**Existing Indemnity Agreements**" and, each, an "**Existing Indemnity Agreement**").

26.     Release of Intercompany Claims and Treatment of Support Obligations.  All rights, claims and defenses of a Surety with respect to the release of any intercompany claim and treatment of Support Obligations are expressly preserved, and in no circumstance shall any Surety be deemed to have consented or waived any rights, claims or defenses with respect to any actions taken or not taken in accordance with any asset purchase agreement, related documents, or this Order with respect to intercompany claims and/or treatment of Support Obligations, all of which are expressly preserved.

**I.      Surety Provisions Where Only Assets of a Pine Gate Entity Are Sold**

27.     No Transfers or Assignments.  Nothing in this Order shall be deemed to be a sale, transfer, assumption or assumption and assignment of any Existing Surety Bond, Existing SBLC or any Existing Indemnity Agreement, or any documents or rights related to any Existing Surety Bond, Existing SBLC or any Existing Indemnity Agreement.

28.     Debtors' Bonded Obligations. Nothing in this Order shall alter, limit, modify, release, discharge, preclude or enjoin any obligation of the Pine Gate Entities or any other third party to the Sureties pursuant to the Existing Surety Bonds, Existing Indemnity Agreements, and obligations under the applicable non-bankruptcy law, including the common law of suretyship (as may be applicable under the circumstances) and any statutory law, and such obligations to Sureties shall not be released, discharged, precluded or enjoined by this Order.

29.     Existing Collateral and Related Agreements. All collateral upon which any Surety had a perfected security interest as of the Petition Date, and all control agreements, trust agreements, deposit accounts, letters of credit and/or proceeds therefrom issued to a Surety as

security for any Debtor's obligations under the Existing Surety Bonds (collectively, the "**_Existing_**

**_Surety Collateral_**") shall remain in place to secure all of the Pine Gate Entities' payment and

performance obligations under the Existing Surety Bonds or obligations arising under the Existing

Indemnity Agreements. Nothing in this paragraph is intended to affect, and shall not affect, the

obligation of any Surety, if any, under the Existing Surety Bonds.  Nothing in this Order shall be

deemed to apply to the Sureties' rights to pursue the Existing Surety Collateral, nor shall these

provisions be interpreted to bar, impair, prevent or otherwise limit the Sureties from exercising

their valid rights under or with respect to any of the Existing Surety Bonds, the Existing SBLCs,

the Existing Indemnity Agreements, or any related indemnity agreements, deposit agreements,

control agreements, trust agreements, deposit accounts, letters of credit or applicable non-

bankruptcy law, including but not limited to the common law of suretyship (as may be applicable

under the circumstances) and any statutory law.

      30.    <u>Substitution of Principal.</u> Nothing herein shall be deemed to provide a Surety's

consent to the involuntary substitution of any principal under any Existing Surety Bond.

      31.    <u>Debtors' Affiliates.</u> Nothing contained herein relieves any non-Debtor affiliate of

any obligations under the Existing Indemnity Agreements or with regard to any Existing SBLC.

      32.    <u>Surety Rights as to Third Parties Unaffected; No Waiver.</u> Nothing in this Order

shall be interpreted to alter, diminish or enlarge the rights or obligations of the Sureties or Issuing

SBLC Banks (defined below) in regard to state and federal agencies, third parties or otherwise

under any Existing Surety Bonds, any Existing Indemnity Agreements or applicable law nor shall

any of the foregoing be deemed to enjoin any Surety or Issuing SBLC Bank from asserting any

rights, claims or defenses, in regard to or against any state and federal agencies, third parties

including, without limitation, any of the Sureties' indemnitors, insurers, or otherwise under any

Existing Surety Bonds, Existing Indemnity Agreements, Existing Surety Collateral, Existing SBLCs or applicable non-bankruptcy law, including but not limited to the common law of suretyship (as may be applicable under the circumstances) and statutory law.

**J.      Banks Issuing Surety Backed Letters of Credit**

33.      <u>Surety Backed Letters of Credit</u>.  Nothing in this Order shall alter, limit, modify, release, discharge, preclude or enjoin any obligation of the Pine Gate Entities to a bank issuing an SLBC ("***Issuing SBLC Bank***") under applicable non-bankruptcy law, and such obligations to the Issuing SBLC Bank shall not be released, discharged, precluded or enjoined by this Order. Nothing in the asset purchase agreements, related agreements, or this Order shall be deemed to waive any Surety's right to seek the return of any surplus bond proceeds, surety backed letter of credit proceeds or other surety proceeds.  All parties' rights to challenge any such rights or interests are expressly preserved.

34.      To the extent of any conflict between the foregoing paragraphs 25-33, on the one hand, and any other paragraph of this Order or provision of the Purchase Agreement or any document executed in connection therewith, on the other hand, the foregoing paragraphs 25-33 shall govern and control.

**K.      Back Bay**

35.      Nothing in this Order or the Purchase Agreement shall impair or override the terms of the *Order Granting Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 9019 (A) Approving a Settlement by and Among the Debtors and Back Bay Solar, LLC and (B) Granting Related Relief* [Docket No. 672] (the "***Back Bay Settlement Order***"), including, but not limited to the preservation of the Back Bay Entities' (as defined in the Back Bay Settlement Order) (i) claims based on fraud, gross negligence, or willful misconduct, (ii) claims arising from any obligations

under or relating to, or any rights to enforce, the Settlement (as defined in the Back Bay Settlement Order), the Back Bay Settlement Order, or any agreements or documents implementing the terms of the Settlement or the Back Bay Settlement Order and (iii) claims related to any surety bonds or indemnities thereof (the foregoing claims in (i), (ii), and (iii), collectively, the "**Preserved Claims**") and the Preserved Claims shall not be released under this Order; *provided* further that the provisions of this paragraph, the Settlement and the Preserved Claims do not alter the relief, findings and protections granted by this Order to the Buyer, the Purchased Assets and Designated Contracts.

### L.    Cash Proceeds

36.    Promptly upon receipt thereof, consistent with the Fundamental Settlement Term Sheet (attached as Exhibit 2 to and defined in the Fundamental Sale Order[7]), the Sellers shall indefeasibly transfer or direct cash proceeds of the Sale Transaction to Fundamental (as defined in the Final DIP Order), including, as applicable, in accordance with the mandatory prepayment provisions of the DIP Documents (as defined in the Final DIP Order).

### M.    Umatilla

37.    Umatilla Electric Cooperative Association, dba Umatilla Electric Cooperative ("**Umatilla**") is an Oregon cooperative corporation.  Umatilla is a party to various contracts (collectively, the "**Umatilla Contracts**") with Sunstone Solar, LLC ("**Sunstone**"), one of the Debtors.  This includes the contracts among Umatilla and Sunstone reflected in the *Second Supplemental Notice of Executory Contracts and Unexpired Leases That may be assumed in connection with the Sale of the Debtors' Assets and Proposed Cure Costs with Respect Thereto*

---

[7]    The "**Fundamental Sale Order**" means the *Order (A) Authorizing and Approving the Debtors' Entry Into an Asset Purchase Agreement with FR Acquisition Holdings LLC, (B) Authorizing the Sale of the Purchased Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Designated Contracts, and (D) Granting Related Relief*, entered by the Court contemporaneously herewith.

("***Second Supplemental Notice***") [Docket No. 1090] and in the Sunstone APA [Docket No. 1080, Exhibit 2A, pages 160 through 254, Exhibit "A" at pages A-4 and A-5]. The Sunstone APA provides for the assumption and assignment of the Umatilla Contracts by Sunstone to the Buyer.[8]

38.     Umatilla has filed an Limited Objection ("***Umatilla Objection***") [Docket No. 1097] in relation to the proposed sale. Defined terms in the Umatilla Objection are given the same meaning in these paragraphs 37 through 42 herein.

39.     As of January 12, 2026, there are no existing defaults under any of the Umatilla Contracts. However, nothing in this Order shall apply to or prejudice any right of Umatilla as to any obligation or performance by the counterparty to any of the Umatilla Contracts arising or accruing after January 12, 2026.

40.     Consistent with the Purchase Agreement, nothing in this Order or arising out of the assumption and assignment of the Umatilla Contracts to the Buyer shall alter, change, amend, or reduce Umatilla's rights pursuant to any of the Umatilla Contracts. Without limiting the generality of the foregoing, the Buyer agrees to be and remain bound to provide Financial Security to Umatilla in accordance with Section 11.7 of the Interconnection Agreements and Article VI.(e) of the Transmission Agreements, when due.

41.     The Buyer agrees to provide to Umatilla new Financial Security in place of and in the same amounts and in replacement for the existing surety bonds posted by Sunstone within ten (10) days after the Closing of the sale of the Sunstone Solar Project to the Buyer in accordance with Section 11.7 of the Interconnection Agreements.

---

[8]     For the avoidance of doubt, United States Fire Insurance Company surety bond numbered 61208742 is deemed to be removed from the Second Supplemental Notice and shall not be designated as a contract that may be assumed and assigned under section 365 of the Bankruptcy Code.

42.     The provisions of these paragraphs 37 through 42 fully resolve the Umatilla Objection.

### N.     Related Relief

43.     Puget Sound Energy, Inc. shall serve as the Backup Bidder for the Purchased Assets, with a Backup Bid valued at $82 million in cash, pursuant to and in accordance with the Bidding Procedures Order; *provided* that any sale to the Backup Bidder shall be subject to further notice and an order from the Court.

44.     In connection with the Sale Transaction and pursuant to the Purchase Agreement, the Buyer and the Debtors may enter into a transition services agreement pursuant to which, effective as of the Closing, the Debtors may provide certain services to the Buyer for a transitional period following the Closing (the "***Transition Services Agreement***").  The Buyer and the Debtors are hereby authorized to execute and deliver the Transition Services Agreement and any additional documentation contemplated by the Purchase Agreement or in furtherance of the Sale Transaction, and to perform all such other and further acts as may be required in connection with the negotiation, execution, and performance of the Purchase Agreement, any ancillary documents or the Transition Services Agreement, including providing transition services and making any applicable payments without further order of the Court.

45.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction contemplated by the Purchase Agreement.

46.     No Governmental Unit may revoke or suspend any right, license, copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred or

conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Purchased Assets.

47.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Order, including, without limitation, the Purchase Agreement and the Sale Transaction.

48.     The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

49.     This Order and the Purchase Agreement shall be binding in all respects upon all pre-petition and post-petition creditors of the Debtors, all interest holders of the Debtors, the UCC, any Court-appointed committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Purchase Agreement and Sale Transaction shall not be subject to rejection or avoidance under any circumstances by any party.

50.     This Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

51.     The Purchase Agreement, the Transition Services Agreement, and any related agreements, documents, or other instruments may be modified, amended or supplemented by the

parties thereto and in accordance with the terms thereof, without further order of this Court; *provided*, that any such modification, amendment, or supplement (i) requires the reasonable consent of the UCC and Fundamental (as defined in the Fundamental Sale Order) and (ii) if it has a material adverse effect on the Debtors' estates, shall require the consent of all persons or entities affected thereby, or, in each case of (i) and (ii), be approved by this Court upon further notice and hearing.

52.     This Order is intended to constitute a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors and the Buyer may, each in its discretion and without further delay, take any action and perform any act authorized under this Order.

53.     In the event of any inconsistency between this Order and the Purchase Agreement, and solely to the extent of such inconsistency, the terms of this Order shall control.

54.     The provisions of this Order are non-severable and mutually dependent.

55.      The provisions of this Order and any actions taken pursuant hereto shall survive and remain effective notwithstanding any order that may be entered (a) confirming any Plan in these Chapter 11 Cases; (b) converting any of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissing any of these Chapter 11 Cases.

56.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).


Signed:  January 22, 2026

_____

Christopher Lopez
United States Bankruptcy Judge

## Exhibit 1

**Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and among**

**OREGON SOLAR 1, LLC,**

**as Buyer,**

**THE SELLERS NAMED HEREIN,**

**as Sellers**,

**and**

**PINE GATE RENEWABLES, LLC,**

**as Sellers' Representative**

**January 21, 2026**

# TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS ...............................................................................................2

    SECTION 1.01       Definitions.................................................................2
    SECTION 1.02       Construction ..........................................................17

ARTICLE 2 PURCHASE AND SALE ...........................................................................18

    SECTION 2.01       Purchase and Sale .................................................18
    SECTION 2.02       Assumed Liabilities ..............................................20
    SECTION 2.03       Excluded Assets ....................................................20
    SECTION 2.04       Excluded Liabilities .............................................22
    SECTION 2.05       Assignment of Contracts and Rights.....................24
    SECTION 2.06       Purchase Price.......................................................26
    SECTION 2.07       Purchase Price Allocation .....................................26
    SECTION 2.08       Closing..................................................................27
    SECTION 2.09       Withholding ..........................................................28
    SECTION 2.10       Deposits................................................................28

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS...............................29

    SECTION 3.01       Organization and Qualification..............................29
    SECTION 3.02       Authorization; Execution and Delivery; Enforceability .............29
    SECTION 3.03       Noncontravention; Consents and Approvals .................29
    SECTION 3.04       Reserved................................................................30
    SECTION 3.05       Financial Statements; No Undisclosed Liabilities ........................30
    SECTION 3.06       Title to Purchased Assets ......................................31
    SECTION 3.07       Litigation..............................................................32
    SECTION 3.08       Permits .................................................................32
    SECTION 3.09       Compliance with Laws .........................................33
    SECTION 3.10       Material Contracts.................................................33
    SECTION 3.11       Intellectual Property..............................................33
    SECTION 3.12       Real Property ........................................................34
    SECTION 3.13       Environmental Matters...........................................35
    SECTION 3.14       Taxes ...................................................................36
    SECTION 3.15       Employee Benefits ................................................37
    SECTION 3.16       Labor Matters.......................................................37
    SECTION 3.17       Energy Regulatory ................................................38
    SECTION 3.18       Absence of Certain Changes..................................38
    SECTION 3.19       Insurance Policies .................................................38
    SECTION 3.20       Affiliate Transactions............................................38
    SECTION 3.21       Privacy and Security .............................................39
    SECTION 3.22       Brokers.................................................................39
    SECTION 3.23       Credit Support Obligations ....................................39

SECTION 3.24      International Trade Laws; Sanctions ...............................................40
SECTION 3.25      Studies and Reports...........................................................................41
SECTION 3.26      Escheat and Unclaimed Property .......................................................41

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ...................................41

SECTION 4.01      Corporate Existence and Power..........................................................41
SECTION 4.02      Authorization; Execution and Delivery; Enforceability ...............41
SECTION 4.03      Noncontravention; Consents and Approvals ...................................42
SECTION 4.04      Availability of Funds; Solvency .......................................................42
SECTION 4.05      Brokers...............................................................................................43
SECTION 4.06      Litigation............................................................................................43
SECTION 4.07      Energy Regulatory ............................................................................43

ARTICLE 5 COVENANTS OF SELLERS ...............................................................................43

SECTION 5.01      Conduct of the Business.....................................................................43
SECTION 5.02      Access to Information .........................................................................46
SECTION 5.03      Notice of Developments .....................................................................46
SECTION 5.04      Safe Harbor Equipment; Additional Assigned Equipment............47

ARTICLE 6 COVENANTS OF BUYER .....................................................................................47

SECTION 6.01      Preservation of and Access to Books and Records.......................47
SECTION 6.02      Insurance Matters...............................................................................48
SECTION 6.03      Availability of Funds .........................................................................49
SECTION 6.04      Buyer Parent Guaranty.......................................................................49

ARTICLE 7 COVENANTS OF BUYER AND SELLERS .......................................................49

SECTION 7.01      Confidentiality ...................................................................................49
SECTION 7.02      Further Assurances.............................................................................50
SECTION 7.03      Certain Filings....................................................................................50
SECTION 7.04      Public Announcements .......................................................................51
SECTION 7.05      Employee Matters ..............................................................................52
SECTION 7.06      Tax Matters ........................................................................................52
SECTION 7.07      Misallocated Assets ...........................................................................53
SECTION 7.08      Support Obligations; Certain Permits ...............................................54
SECTION 7.09      Payments from Third Parties after Closing.....................................55
SECTION 7.10      Bulk Transfer Laws............................................................................55
SECTION 7.11      Bankruptcy Court Approval...............................................................55
SECTION 7.12      No Successor Liability .......................................................................58
SECTION 7.13      Transmission Service Requests..........................................................58
SECTION 7.14      Investigation; Purchased Assets........................................................59
SECTION 7.15      Releases..............................................................................................60

ARTICLE 8 SELLERS' REPRESENTATIVE ...........................................................................61

SECTION 8.01      Appointment ...................................................................61
SECTION 8.02      Authorization .................................................................62
SECTION 8.03      Sellers' Representative Expenses .................................62
SECTION 8.04      Indemnification ..............................................................62
SECTION 8.05      Successor Sellers' Representative..............................63
SECTION 8.06      Buyer Reliance ...............................................................63

ARTICLE 9 CONDITIONS TO CLOSING.............................................................63

SECTION 9.01      Conditions to Obligations of Buyer and Sellers ............63
SECTION 9.02      Conditions to Obligation of Buyer.................................64
SECTION 9.03      Conditions to Obligation of Sellers...............................65
SECTION 9.04      Waiver of Conditions .....................................................65

ARTICLE 10 SURVIVAL ...............................................................................65

SECTION 10.01     Survival ...........................................................................65

ARTICLE 11 TERMINATION .........................................................................66

SECTION 11.01     Grounds for Termination ................................................66
SECTION 11.02     Effect of Termination .....................................................67
SECTION 11.03     Costs and Expenses ........................................................68

ARTICLE 12 MISCELLANEOUS .....................................................................68

SECTION 12.01     Notices .............................................................................68
SECTION 12.02     Amendments and Waivers ..............................................69
SECTION 12.03     Successors and Assigns...................................................70
SECTION 12.04     Governing Law ...............................................................70
SECTION 12.05     Jurisdiction......................................................................70
SECTION 12.06     WAIVER OF JURY TRIAL...........................................70
SECTION 12.07     Counterparts; Third-Party Beneficiaries .......................71
SECTION 12.08     Specific Performance .....................................................71
SECTION 12.09     Entire Agreement ...........................................................72
SECTION 12.10     No Strict Construction ....................................................72
SECTION 12.11     Severability .....................................................................72
SECTION 12.12     Disclosure Schedules .....................................................72
SECTION 12.13     No Recourse.....................................................................73
SECTION 12.14     LIMITATION OF LIABILITY AND DAMAGES.....................73

**EXHIBITS**

Exhibit A      Sunstone Project Assets
Exhibit B      Sellers' Budget

Annex 1        Mid-C TSR List

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of January 21, 2026 (this "**Agreement**"), is made and entered into by and among Oregon Solar 1, LLC, a Delaware limited liability company ("**Buyer**"), Pine Gate Renewables, LLC, a North Carolina limited liability company ("**PGR**"), Sunstone Solar, LLC, an Oregon limited liability company, Sunstone Solar 1, LLC, an Oregon limited liability company, Sunstone Solar 2, LLC, an Oregon limited liability company, Sunstone Solar 3, LLC, an Oregon limited liability company, Sunstone Solar 4, LLC, an Oregon limited liability company, Sunstone Solar 5, LLC, an Oregon limited liability company, and Sunstone Solar 6, LLC, an Oregon limited liability company (collectively, the "**Sellers**" and each entity, individually, a "**Seller**"), and PGR, solely in its capacity as the Sellers' Representative (as defined below).  Sellers and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**."  Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

## W I T N E S S E T H :

**WHEREAS**, on November 6, 2025 (the "**Petition Date**"), the Sellers as debtors and debtors in possession (collectively, the "**Debtors**") sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (collectively, and together with any other cases under the Bankruptcy Code commenced prior to the Closing, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

**WHEREAS**, on November 10, 2025, the Bankruptcy Court entered the Bidding Procedures Order which required potential bidders to include a proposed form of asset purchase agreement as part of any submitted Qualified Bid (as defined therein);

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, the Parties desire to enter into this Agreement, pursuant to which Sellers shall sell, assign, transfer, and convey to Buyer, and Buyer shall purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets, and Buyer shall assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, §§ 101-1330, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order;

**WHEREAS**, Buyer has deposited an aggregate amount equal to the Deposit Escrow Amount into an escrow account (the "**Deposit Escrow Account**") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement;

**WHEREAS**, to induce Sellers to enter into this Agreement, Amazon.com, Inc (the "**Buyer Parent**"), which directly or indirectly owns one hundred percent (100%) of the equity interests of the Buyer, will execute and deliver a guaranty in favor of Sunstone Solar, LLC, pursuant to which,

subject to the terms and conditions therein, the Buyer Parent guarantees the obligations of the Buyer hereunder (the "**Buyer Parent Guaranty**"); and

**WHEREAS**, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01    *Definitions*.

(a)    The following terms, as used herein, have the following meanings:

"**Action**" means any claim, charge, audit, action, suit, arbitration, hearing, or other proceeding (including whether brought in contract, tort or otherwise, whether civil, criminal, administrative, investigative, appellate or arbitral and whether brought at law or in equity) by or before any Governmental Authority.

"**Additional Assigned Equipment**" means all of the equipment labeled as "Additional Assigned Equipment" set forth on Exhibit A.

"**AML Laws**" means all Laws of any jurisdiction applicable to any Person from time to time concerning or relating to anti-money laundering.

"**Affiliate**" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.  For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "control" for purposes of this definition.

"**Assets**" means, with respect to any Person, all assets (including Contracts) and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible and wherever situated), including the related goodwill, which assets and properties are operated, owned, leased, licensed, used or held for use by such Person.

"**Auction**" means an auction or auctions, if any, for the sale of Sellers' assets conducted pursuant to the terms and conditions of the Bidding Procedures Order.

"**Avoidance Actions**" means, collectively, any and all claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code or any other similar provision of applicable Law.

"**Bankruptcy and Equity Exception**" means any applicable Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar applicable Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in any Proceeding in equity or at Law).

"**Beginning of Construction Requirement**" means, the requirement that a Project will commence construction, within the meaning, and for purposes, of the RTCs, and the applicable Treasury Regulations, and IRS Notice 2018-59 or IRS Notice 2025-42, as applicable.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures Motion Docket No. 128.

"**Bidding Procedures Motion**" means the Emergency Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Establishing Procedures for Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (C) Scheduling Dates for an Auction and a Hearing to Consider Approval of Any Resulting Sale, (D) Approving Form and Manner of Notices Related Thereto, and (E) Granting Related Relief; and (II)(A) Approving and Authorizing Sale of Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief [Docket No. 22], dated as of November 6, 2025, filed by Sellers in the Bankruptcy Court.

"**BPA**" means Bonneville Power Administration.

"**Business**" means, with respect to the Purchased Assets and the Assumed Liabilities, the ownership and operation of such Purchased Assets and the Assumed Liabilities by the applicable Seller, and the conduct of other activities by such Seller incidental to the foregoing.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in the State of New York or the State of Texas are authorized or required by applicable Law to close.

"**Business Employee**" means those individuals employed by any Seller or its Affiliates (other than employees employed by ACT Power Services, LLC) and who are primarily engaged in the Business.

"**Business Service Provider**" means any (a) Business Employee, and (b) any independent contractor or other individual service provider of any Seller or Affiliate thereof who primarily provides services to or in connection with the operation of the Business.

"**Cash and Cash Equivalents**" means all cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract that any Seller or any Affiliate of a Seller has entered into with any union, works council or collective bargaining agent ("**Labor Union**") with respect to terms and conditions of employment of Employees.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of December 30, 2025, between Buyer, PGR Holdco, LP and PGR.

"**Contract**" means any legally-binding contract, agreement, license, sublicense, Lease, sales order, purchase order, undertaking or other commitment.

"**Copyrights**" means all copyrights (registered or unregistered), works of authorship, websites, website content, and software (including source code, object code and documentation therefor), including applications and registrations therefor and all renewals, extensions, restorations and reversions thereof.

"**Cure Costs**" means, with respect to any Purchased Contract, the Liabilities that must be paid or otherwise satisfied to cure all monetary defaults under such Purchased Contract to the extent required by Section 365(b) of the Bankruptcy Code in connection with the assignment and assumption of such Purchased Contract.

"**Cut-Off Date**" means the earlier of (a) twelve (12) months following the Closing and (b) the closing of the Chapter 11 Cases.

"**Deposit Escrow Amount**" means $8,300,000.00.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers' Representative to Buyer on the date hereof.

"**Employee**" means any individual employed by any Seller or an Affiliate thereof.

"**Encumbrance**" means any mortgage, lien, pledge, deed of trust, assessment, security interest, charge, easement, restrictive covenant, purchase option, right of first refusal or offer, right of way, option, claim, license, and other similar impositions, imperfections or restrictions on transfer or use or other encumbrance of any kind.

"**Environmental Laws**" means all applicable Laws concerning or relating to pollution or, the protection of the environment (including natural resources and endangered or threatened species), human health and safety (solely to the extent related to exposure to Hazardous Materials), or the use, generation, manufacture, handling, transportation, treatment, processing, storage, distribution, labeling, remediation, cleanup or Release of, or exposure to, any Hazardous Materials.

4

"**Environmental Liabilities**" means all Liabilities arising out of or in connection with Environmental Laws, any Permits issued thereunder, and any Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and the regulations promulgated thereunder, as amended.

"**ERISA Affiliate**" means any entity that, together with any Seller, would be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code.

"**Escrow Agent**" means Omni Agent Solutions, Inc.

"**Escrow Agreement**" means that certain Distribution Agreement between the Escrow Agent and PGR, dated December 18, 2026.

"**EWG**" means an "exempt wholesale generator," as such term is defined in Section 1262(6) of PUHCA and FERC's implementing regulations promulgated thereunder.

"**FERC**" means the Federal Energy Regulatory Commission or any successor thereto.

"**Final Order**" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or the right to seek a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**FPA**" means the Federal Power Act, as amended, and FERC's implementing regulations promulgated thereunder.

"**Fraud**" means with respect to any Person, an actual and intentional misrepresentation of material fact by such Person, made with actual knowledge of its falsity and with the intent to induce another Person to rely thereon, and upon which such other Person justifiably relies to its detriment, as determined under applicable Delaware Law (including, for the avoidance of doubt, as interpreted by the Delaware Court of Chancery and the Supreme Court of the State of Delaware).

"**FUCO**" means a "foreign utility company" as such term is defined under PUHCA.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied.

5

"**Governmental Authority**" means any multinational, tribal, federal, state, municipal, local or other governmental, quasi-governmental, administrative, regulatory or public department, central bank, court, commission, commissioner, tribunal, board, bureau, official, agency or instrumentality, domestic or foreign, or any other judicial or arbitral body or other similar authority or instrumentality, including FERC and any governmental, quasi-governmental, or non-governmental body administering, regulating or having general oversight over electricity, power or other markets, including transmission, such as NERC and any State Utility Commission, and including the Bankruptcy Court.

"**Hazardous Material**" means (a) any substance, material or waste that is designated, defined, listed, classified or regulated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law, (b) any petroleum or petroleum products, radioactive materials, asbestos or asbestos-containing materials, urea formaldehyde, lead or lead-containing materials, radon, per- and polyfluoroalkyl substances, or polychlorinated biphenyls, or (c) any other substance, material or waste that is regulated by or for which liability or standards of conduct may be imposed under any Environmental Law.

"**Indebtedness**" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed, whether secured or unsecured, and (ii) indebtedness evidenced by notes, debentures, bonds, mortgages or other similar instruments for the payment of which such Person is responsible or liable and (iii) any off balance sheet financings, (b) all obligations of such Person issued or assumed as the deferred purchase price of property or services, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course), including any earnout payments, seller notes, installment or similar payments, (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, surety or performance bonds, banker's acceptance, Support Obligations, or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations in respect of swap, derivative or other hedging contracts (valued at the net terminal value thereof), (g) all obligations of the type referenced in clauses (a) through (f) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guaranties of such obligations, (h) all obligations of the type referred to in clauses (a) through (g) of other Persons secured by any Encumbrance on any property or Asset of such Person (whether or not such obligation is assumed by such Person) and (i) constituting any accrued and unpaid interest owing by such Person with respect to any indebtedness of the type described in clauses (a) through (g) for the principal amount, breakage fees and other payment obligations (including any prepayment premiums, fees, penalties or make-whole or similar payments in respect of any obligations of the type that would be paid if such obligations are retired at the Closing).

"**Intellectual Property**" means any and all intellectual property of every kind, whether protected or arising under the Laws of the United States or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) all Trademarks, (b) all Patents, (c) all Copyrights, (d) all Trade Secrets, (e) domain names, and social media accounts, and (f) other intellectual property and proprietary rights recognized under applicable Law, including all

claims for past infringement, misappropriation, or other violation of intellectual property rights, with the right to sue for and collect damages resulting from such claims.

"**International Trade Laws**" means all applicable U.S. and non-U.S. laws, statutes, rules, regulations, judgments, orders (including executive orders), decrees or restrictive measures relating to economic, financial, or trade sanctions, export control, or anti-boycott measures administered, enacted, or enforced by a relevant Sanctions Authority, as well as applicable customs laws.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge of Sellers**" means the actual knowledge of the individuals set forth on Section 1.01(a) of the Disclosure Schedules, after reasonable inquiry.

"**Law**" means any law, constitution, principle of common law, resolution, requirement, treaty, statute, legislation, resolution, ordinance, code, directive, decree, proclamation, convention, pronouncement, Order, rule or regulation of any Governmental Authority.

"**Lease**" means any lease, sublease or other similar agreement under which any Seller, in each case, leases, uses or occupies, or has the right to use or occupy, any Leased Real Property.

"**Leased Real Property**" means any real property leased or subleased (a) by a Seller or which a Seller has the right to use or occupy as tenant or subtenant, in each case, and used by such Seller in connection with the Business (excluding any Leased Real Property that constitutes an Excluded Asset).

"**Liability**" means any and all debts, liabilities, Encumbrances, adverse claims, damages, demands, fines, duties, expenses, commitments and obligations of any kind, whether fixed, contingent or absolute, direct or indirect, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any Contract or tort based on negligence or strict liability), including any fines, penalties, losses, costs, interest, charges, expenses, damages, assessments, deficiencies, judgments, awards or settlements and regardless of whether any of the foregoing would be required to be disclosed on a balance sheet prepared in accordance with GAAP.

"**Malicious Code**" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have any of the following functions: (a) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (b) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent.

"**Material Adverse Effect**" means any change, effect, event, circumstance, state of facts, occurrence or development that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or the Assumed Liabilities, or the Assets, condition (financial or otherwise) or results of operations of the Business (excluding

the Excluded Assets and the Excluded Liabilities), in each case, taken as a whole, or (b) prevents or materially impairs, or would reasonably be expected to prevent or materially impair, the ability of the Sellers to consummate the transactions contemplated by this Agreement and the other Transaction Documents or to perform their obligations hereunder or thereunder; provided, however, that in the case of clause (a), in no event shall any change, effect, event, circumstance, occurrence or development that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) any change generally affecting the U.S. national, regional or local electric generating, transmission or distribution industry (including the U.S. national, regional or local wholesale or retail markets for electric power) and any change in the international, national, regional or local electrical power market design, pricing or applicable Law; (ii) any change in general regulatory or political conditions, including any engagements of hostilities, acts of war, terrorist activities or cyber-attacks; (iii) any change in any Laws (including Environmental Laws) or GAAP occurring after the date hereof; (iv) any change in the general international or national financial, banking, securities or currency markets (including any increased costs for financing or suspension of trading in, or limitation on prices for, securities on any domestic or international securities exchange); (v) any actions to be taken pursuant to or in accordance with the express terms of this Agreement; (vi) any change in the financial condition or results of operation of Buyer or its Affiliates, including its ability to access capital and equity markets and changes due to a change in the credit rating of Buyer or its Affiliates; (vii) the announcement, pendency or consummation of the transactions contemplated by this Agreement (provided that this clause (vii) shall not apply to any representation or warranty (or any condition to any Party's obligation to consummate the transactions contemplated by this Agreement relating to such representation and warranty) to the extent the purpose of such representation and warranty or condition is to address the consequences resulting from the execution and delivery of this Agreement, or the performance of the transactions contemplated by this Agreement); (viii) any labor strike, request for representation, organizing campaign, work stoppage, slowdown, or lockout or other labor dispute; (ix) any effects of natural disasters, weather events and other acts of God, including earthquakes, hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, arctic frosts, mudslides, wildfires, pandemics or epidemics; (x) acts taken or not taken at the specific written request of, or with the written consent of, Buyer; or (xi) the Chapter 11 Cases, including any announced liquidation of Sellers or any of their respective Assets; provided, further, that in the case of clause (i), (ii), (iii), (iv), (ix) or (x), to the extent that such impact is disproportionately adverse to the Purchased Assets, the Assumed Liabilities, or the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, relative to other similarly situated businesses in the industries in which Sellers operate, then such change, effect, event, circumstance, occurrence or state of facts may be taken into account in determining whether there has been or will be a Material Adverse Effect.

"**Material Contracts**" means each Purchased Contract, as of the date hereof, of a type described in the following clauses of this definition or otherwise listed in Exhibit A:

(a)     any and all Contracts for the purchase, exchange or sale of electric power in any form, including energy, capacity or any ancillary services and interconnection Contracts;

(b)     all Contracts for the transmission of electric power;

8

(c)　　all generator interconnection Contracts;

(d)　　Contracts for the purchase or sale of any material Assets of the Project or that grant a right or option to purchase or sell any material Assets of a Project;

(e)　　any partnership, joint venture, joint development, strategic alliance, stockholders' agreement or similar Contract involving a sharing of profits, losses, costs or liabilities with any other Person that has an impact on the operation of the Business;

(f)　　any Contract or group of Contracts relating to the acquisition or disposition of any business, Assets or properties relating to the Business for consideration in excess of $1,000,000 (whether by merger, sale of stock, sale of Assets or otherwise) (i) entered into in the last three (3) years or (ii) pursuant to which any material earn-out, indemnification or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, purchase of inventory or equipment in the Ordinary Course);

(g)　　any Lease with respect to the Leased Real Property;

(h)　　any option for any Seller (other than PGR to the extent not relating to the Business) to purchase or lease any real property pursuant to a Lease or other agreement with any owner of real property;

(i)　　any Contract for the lease of personal property (tangible or intangible) to or from any Person providing for lease payments in excess of $10,000 per annum that is not immaterial to the Business, and/or the Purchased Assets;

(j)　　any Contract with any Governmental Authority that is not immaterial to the Business;

(k)　　any Contract that contains a settlement, conciliation or similar agreement with any Person pursuant to which any Seller will be required, after the date hereof, to satisfy any monetary or material non-monetary obligations;

(l)　　any Contract that (i) prohibits or limits in any material respect the freedom of the Business to engage or compete in any line of business with any Person or in any geographic area, (ii) contains exclusivity obligations or restrictions binding on the Business, (iii) grants any right of first refusal or right of first offer obligations or restrictions on the Business to any Person or (iv) obligates the Business to make a minimum amount of purchases of goods or services or maintain a minimum amount of inventory or goods;

(m)　　any Contract that contains any guaranty of any obligation for borrowed money, or other material guaranty by Sellers (with respect to the Purchased Assets).

(n)　　any Contract that is or contains any Support Obligations;

(o)　　any Contract that requires capital expenditures after the date hereof by or to the Sellers (with respect to the Purchased Assets) in excess of $250,000;

(p)      any Contract to which any Seller is a party (A) pursuant to which such Seller is granted a license to, sublicense to or a right to use any third-party Intellectual Property that is material to the Business, other than (I) nonexclusive licenses for commercially available or off-the-shelf software entered into by any Seller in the Ordinary Course, (II) non-exclusive open source software licenses, (III) invention assignment or employment-related agreements entered into in the Ordinary Course, or (IV) non-exclusive licenses that are incidental to any agreement to the transaction contemplated in the Contract that are entered in the Ordinary Course, (B) pursuant to which any Seller grants a third party a license to, sublicense to or a right to use any Purchased Intellectual Property that is material to the Business, other than any Contract with any customer, supplier or end user of any of Seller's products or services which is entered into in the Ordinary Course or any agreement which contains an incidental trademark license to use such Seller's Trademarks, (C) that contains a settlement of any claims related to any Intellectual Property that is material to the Business or (D) which materially prohibits or restricts a Seller's use of any Purchased Intellectual Property that is material to the Business;

(q)      any Contract that is a conciliation, settlement or similar agreement with outstanding material Liabilities related to any Proceeding;

(r)      any Tax Sharing Agreement;

(s)      any Contract for, or in connection with, the purchase, fabrication and manufacturing of the Safe Harbor Equipment or the Additional Assigned Equipment;

(t)      each contract between any Seller, on the one hand, and any other Seller or Affiliate thereof, on the other hand, that would be required for Buyer to own and operate the Business in all material respects as currently conducted following the Closing; and

(u)      any Contract that is a commitment or agreement by the Sellers to enter into any of the foregoing.

"**Multiemployer Plan**" means a "multiemployer plan" (within the meaning of Section 3(37) or 4001(a)(3) of ERISA).

"**NERC**" means the North American Electric Reliability Corporation, any regional entity exercising delegated authority therefrom, and any successor to any of the foregoing.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree, settlement or similar determination or finding entered, issued, made or rendered, whether preliminary, interlocutory or final, by any Governmental Authority.

"**Ordinary Course**" means the ordinary course of business consistent with the past practice of the Business within the twelve (12) months prior to the filing of the Chapter 11 Cases.

"**Owned Real Property**" means any real property owned in fee by any Seller and used by such Seller in connection with the Business (excluding any Owned Real Property that constitutes an Excluded Asset).

"**Partnership**" means any entity classified as a partnership for U.S. federal income tax purposes that is owned directly or indirectly by a Seller.

"**Patents**" means all patents, utility models, statutory invention registrations, industrial designs and all registrations or applications for any of the foregoing, and all provisionals, continuations, continuations-in-part, reissues, reexaminations, renewals, extensions and divisionals related thereto, and all rights to claim priority of any of the foregoing.

"**Permits**" means any franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, exemptions, registrations, permissions, filings, publications, declarations, notices, waivers, and authorizations, including permits required under Environmental Laws, of or with any Governmental Authority held, used or made by any Seller or its Subsidiaries in connection with or relating to the Business.

"**Permitted Encumbrances**" means the following Encumbrances: (a) statutory Encumbrances for current Taxes, assessments or other governmental charges or levies that are not yet delinquent or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP or the non-payment of which is permitted or required by the Bankruptcy Code; (b) any Encumbrance (i) being contested in good faith to the extent adequate cash reserves, bonds or other security have been established and (ii) to the extent the same arose in the Ordinary Course; (c) mechanics', materialmen's, repairmen's and other statutory Encumbrances incurred in the Ordinary Course, in each case for amounts not yet delinquent or that are being contested in good faith and for which adequate reserves have been established in accordance with GAAP; (d) with respect to Owned Real Property or Leased Real Property, easements, declarations, covenants or rights-of-way, restrictions, title defects, matters that would be disclosed by a current survey of real property and all matters of record, in each case that do not secure monetary indebtedness and which do not, individually or in the aggregate, materially impair the value, use or occupancy of such Owned Real Property or Leased Real Property; (e) zoning ordinances, variances, conditional use permits and similar regulations, permits, approvals and conditions which do not, individually or in the aggregate, materially impair the use or occupancy of such Owned Real Property or Leased Real Property for its current use in connection with the Business; (f) recorded imperfections or irregularities of title, and other Encumbrances on Owned Real Property or Leased Real Property, that do not and would not, individually or in the aggregate, reasonably be expected to materially impair the development, operation or maintenance of any of the Projects for the conduct of the Business; (g) any Encumbrance that will be removed or released by operation of the Sale Order; (h) outbound Intellectual Property licenses and covenants not to sue that are subject to Section 365(n) of the Bankruptcy Code; and (i) the Encumbrances disclosed on Section 1.01(b) of the Disclosure Schedules.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"**Proceeding(s)**" means any legal, governmental or regulatory suits, proceedings, arbitrations or Actions, related to Liabilities, preference actions and preferential transfers, Contracts, debts, breaches of fiduciary duties, accounts, bills, covenants, agreements, damages, judgments, third-party Claims, counterclaims, and cross-claims, whether reduced to judgment or not reduced to judgment, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in law or equity or otherwise.

"**Project**" means the Sunstone Solar (formerly referred to as Echo Solar, Bombing Range Solar I, and Bombing Range Solar II) energy development in Morrow County, Oregon.

"**Project Company**" means each Seller that directly owns the Project.

"**Property Taxes**" means real, personal and intangible ad valorem property Taxes that are imposed on a periodic basis.

"**PUHCA**" means the Public Utility Holding Company Act of 2005 and FERC's implementing regulations promulgated thereunder.

"**QF**" means a "qualifying small power production facility," as defined in Section 3(17)(C) of the FPA and FERC's implementing regulations at 18 C.F.R. §§ 292.203(a) and 292.204, that also is a "qualifying facility" pursuant to PURPA, as defined in 18 C.F.R. § 292.101(b)(1).

"**Real Property**" means, collectively, the Owned Real Property and Leased Real Property.

"**Receivables**" means any and all receivables (including accounts receivable, loans receivable, advances, notes receivable, trade accounts, unbilled receivables, contract billings, license and royalty receivables, rebate receivables from suppliers or vendors, and other amounts, and any and all claims, remedies or other rights relating to any of the foregoing, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable) arising from or related to the Business, Purchased Assets or Assumed Liabilities.

"**Registered Intellectual Property**" means all (a) Patents and Patent applications, (b) registered Trademarks, and applications therefor, (c) registered Copyrights, and (d) internet domain names, in each case, that are included in the Purchased Assets.

"**Reimbursable Expenses**" means any reasonable and documented out-of-pocket costs and expenses actually incurred by a Seller or any of its Affiliates set forth in the Sellers' Budget during the period on or following the date of this Agreement and prior to close-of-business on the day of Closing, but not to exceed $4,058,182.40 (such amount to be increased by any costs approved by Buyer pursuant to the proviso in Section 5.01(a)).

"**Release**" means any releasing, spilling, emitting, leaking, pumping, injecting, depositing, disposing, leaching, escaping, seeping, migrating, or discharging into, through, or upon the indoor or outdoor environment.

"**RTC**" means the tax credits provided under Sections 45, 45Y, 48 and 48E of the Code.

"**Safe Harbor Equipment**" means all equipment labeled as "Safe Harbor Equipment" set forth in <u>Exhibit A</u>.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Order**" means an Order by the Bankruptcy Court, in form and substance acceptable to Buyer and Sellers, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Encumbrances (other than Permitted Encumbrances), (c) authorizing the assumption by, and assignment to, Buyer of the Purchased Contracts and the Assumed Liabilities pursuant to Section 365 of the Bankruptcy Code, and (d) authorizing the other transactions contemplated by this Agreement.

"**Sanctioned Jurisdiction**" means a country or territory which is, or during the past five (5) years has been, the subject or target of comprehensive U.S. sanctions.

"**Sanctioned Person**" means a Person (a) identified on the United States' Specially Designated Nationals and Blocked Persons List, the United States' Denied Persons List, Entity List or Debarred Parties List, the United Nations Security Council Sanctions List, the European Union's List of Persons, Groups and Entities Subject to Financial Sanctions, the United Kingdom's Consolidated List of Financial Sanctions Targets, or any other similar list maintained by any Sanctions Authority having jurisdiction over the Parties; (b) located, organized or resident in a Sanctioned Jurisdiction or (c) owned, fifty percent (50%) or more, individually or in the aggregate by, controlled by, or acting on behalf of a Person described in clause (a) or (b) above.

"**Sanctions Authority**" means the United States government, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the Bureau of Industry and Security of the U.S. Department of Commerce, the United Nations Security Council, the European Union, any Member State of the European Union and the competent national authorities thereof, the United Kingdom, the Office of Financial Sanctions Implementation of His Majesty's Treasury, the Export Control Joint Unit of the UK Department for Business and Trade, and any other relevant governmental, intergovernmental or supranational body, agency or authority with jurisdiction over the parties to this Agreement.

"**Seller Fundamental Representations**" means the representations and warranties of the Sellers set forth in <u>Section 3.01</u>, <u>Section 3.02</u>, <u>Section 3.03(a)(i)-(ii)</u>, <u>Section 3.06(a)-(b)</u>, and <u>Section 3.22</u>.

"**Seller Plan**" means each "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA and all other material employee benefit and compensation plans, in each case, under which any Service Provider participates, that is sponsored, maintained, administered or contributed by any Seller or any Subsidiary of a Seller or in which any Seller has any current or potential Liability (including on account of any ERISA Affiliates), other than (a) any Multiemployer Plans and (b) any plans, policies or arrangements maintained or sponsored by, or to which contributions are mandated by, a Governmental Authority.

13

"**Sellers**" has the meaning set forth in the preface and shall constitute each and every Person that has any right, title and/or interest in and to the Purchased Assets, other than the Excluded Assets.

"**Sellers' Budget**" means the budget attached hereto as <u>Exhibit B</u>.

"**Service Provider**" means any current or former (a) Employee or (b) consultant or contractor engaged directly by any Seller.

"**Software**" means computer software programs and software systems, including applications software (including mobile apps), software made available as a service (SaaS), programming tools, scripts and interfaces, libraries, databases, compilations, tool sets, compilers, applications, higher level "proprietary" languages, and documentation and materials relating to any of the foregoing (including designs, descriptions, schematics, flow charts, specifications, developers notes, comments, annotations, user manuals, systems manuals and training materials), and with respect to each of the foregoing, whether in source code, object code, firmware, or human readable form.

"**State Utility Commission**" means a "state commission" (as that term is defined in 18 C.F.R. § 1.101(k)) within the state a Project is located.

"**Straddle Period**" means any Tax period beginning on or before and ending after the Closing Date.

"**Subsidiary**" means, with respect to any Person, another Person in which such Person beneficially owns, directly or indirectly, capital stock or other equity securities representing more than fifty percent (50%) of the outstanding voting stock or other equity interests.

"**Systems**" means computers, workstations, servers, routers, hubs, switches, circuits, networks, data communications lines and all other computer telecommunications and information technology and equipment, including all third-party Software.

"**Tax**" means all federal, state, local or non-U.S. income, gross receipts, franchise, estimated, ad valorem, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, severance real property, special assessment, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, import, export, intangibles, or any other taxes or similar assessments in the nature of a tax, and including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Tax Return**" means any report, return, or similar document (including declarations, claims for refunds, information returns, schedules, any related or supporting information or amendments thereto) required to be filed with respect to Taxes with any Governmental Authority or other authority in connection with the determination, assessment or collection of any Tax.

"**Tax Sharing Agreements**" means all Tax sharing, allocation, indemnification or similar agreements that provide for the allocation, apportionment, sharing or assignment of any Tax Liability (other than, for the avoidance of doubt, this Agreement, any other Transaction Document, any document in connection with a tax equity investment by a third-party with respect to any Project Company, or any commercial agreement or arrangement not primarily related to Taxes).

"**Trademarks**" means, collectively, all trademarks and service marks, and all registrations, renewals and applications therefor, and all brand names, product names, trade dress, logos, and other similar designations of source or origin.

"**Trade Secrets**" means, collectively, all trade secrets, know-how, specifications, product designs, blueprints, surveys, customer/vendor lists, sales plans, formulae, and other proprietary confidential information.

"**Transaction Document**" means this Agreement, the Assignment and Assumption Agreements, and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"**Transfer Taxes**" means any sales, use, purchase, direct or indirect real property, ad valorem, value added, filing, permit or authorization, leasing, license, lease, severance, fixed asset, documentary, stamp, property transfer or gains, registration, intangible, conveyance, recording or similar Tax (including, for certainty, harmonized sales Tax and land transfer Tax) and any recording costs or fees, however styled or designated, or other similar amounts in the nature of transfer Taxes payable in connection with the sale or transfer of the Purchased Assets, or the Assumed Liabilities contemplated by this Agreement or any other Transaction Document.

"**Treasury Regulations**" means the United States income tax regulations, including temporary regulations and, to the extent taxpayers are permitted to rely on them, proposed regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 and all similar state and local applicable Laws.

"**Wind-Down**" means the orderly wind down of Sellers in accordance with applicable Law.

Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Acquired Claims | Section 2.01(k) |
| Agreement | Preamble |
| Allocation Schedule | Section 2.07 |
| AREF Nos. | Section 7.13 |
| Assigned BPA Mid-C Agreement | Section 7.13 |
| Assignment and Assumption Agreements | Section 2.08(a)(i) |
| Assumed Liabilities | Section 2.02 |
| Balance Sheet Date | Section 3.05(a) |
| Bankruptcy Code | Recitals |

15

| | |
|---|---|
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 12.05 |
| Bills of Sale | Section 2.08(a)(ii) |
| Business Insurance Policies | Section 3.19 |
| Buyer | Preamble |
| Buyer Designee | Section 2.01 |
| Buyer Funding Amount | Section 4.04 |
| Buyer Released Parties | Section 7.15(a) |
| Buyer Releasor | Section 7.15(b) |
| Buyer Parent | Recitals |
| Buyer Parent Guaranty | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Closing Date Payment | Section 2.06 |
| Conditional Firm Service Agreement | Section 7.13 |
| Continuing Support Obligations | Section 7.08(b) |
| Contract & Cure Update Schedule | Section 2.05(a) |
| Debtors | Recitals |
| Deposit Escrow Account | Recitals |
| Disputed Amount Contract | Section 2.05(e) |
| End Date | Section 11.01(b) |
| Excluded Assets | Section 2.03 |
| Excluded Contracts | Section 2.03(c) |
| Excluded Liabilities | Section 2.04 |
| Excluded Records | Section 2.03(b) |
| Financial Statements | Section 3.05(a) |
| Interim Financial Statements | Section 3.05(a) |
| Latest Balance Sheet Date | Section 3.05(a) |
| Mid-C TSR | Section 7.13 |
| Non-Recourse Parties | Section 12.13 |
| Original Contract & Cure Schedule | Section 2.05(a) |
| Party or Parties | Preamble |
| Permit Approvals | Section 7.03(b) |
| Personal Information | Section 3.21(a) |
| Petition Date | Recitals |
| PGR | Preamble |
| Privacy Laws | Section 3.21(a) |
| Privacy Requirements | Section 3.21(a) |
| Purchase Price | Section 2.06 |
| Purchased Assets | Section 2.01 |
| Purchased Contracts | Section 2.01(b) |
| Purchased Intellectual Property | Section 2.01(d) |
| Related Party Agreement | Section 3.20 |
| Released Parties | Section 7.15(b) |
| Representatives | Section 7.15(a) |
| Seller or Sellers | Preamble |

| Seller Released Parties | Section 7.15(b) |
| Seller Releasor | Section 7.15(a) |
| Sellers' Representative | Section 8.01 |
| Support Obligations | Section 3.23 |
| Surviving Post-Closing Covenants | Section 10.01 |
| Transfer Consent | Section 2.05(c) |
| Transmission Service Agreement | Section 7.13 |
| TSRs | Section 7.13 |
| UEC | Section 11.01(g) |

SECTION 1.02     *Construction.*  In construing this Agreement, including the Exhibits and Schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed unless otherwise specified; (b) except as otherwise set forth herein, references to Articles, Sections, Disclosure Schedules, Schedules and Exhibits refer to the Articles, Sections, Disclosure Schedules, Schedules and Exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's successors and assigns; (d) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions; (e) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any Schedule; (f) the word "dollar" and the symbol "$" refer to the lawful currency of the United States of America; (g) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa; (h) the words "to the extent" shall mean "the degree by which" and not "if"; (i) the word "will" will be construed to have the same meaning and effect as the word "shall," and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive; (j) where a word is defined herein, references to the singular will include references to the plural and vice versa; (k) all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless Business Days are expressly specified; (l) any reference to any Contract will be a reference to such Contract, as amended, modified, supplemented, waived, or otherwise modified; provided, that all such amendments, restatements, supplements, waivers and/or other modifications to Contracts set forth on the Disclosure Schedules shall be scheduled by Sellers on the Disclosure Schedules; (m) any reference to any particular Code section or any applicable Law will be interpreted to include any amendment to, revision of or successor to that section or applicable Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or applicable Law, the reference to such Code section or applicable Law means such Code section or applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance; (n) references to "written" or "in writing" include in electronic form; (o) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (p) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement,

the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (q) the word "or" shall not be exclusive, and (r) "make available to Buyer" or "deliver to Buyer" shall mean uploaded to the "Project Nexus - Sunstone (EXT - Gallatin)" virtual data room hosted by Pine Gate SharePoint or in such other manner as mutually and reasonably agreed by Buyer and Seller's Representative.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01     *Purchase and Sale*.  Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer or one or more affiliates of Buyer or an entity designated by Buyer (a "**Buyer Designee**"), and Buyer shall, and/or shall cause its Buyer Designees (if any) to, purchase, acquire and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Sellers' right, title and interest in and to the properties, interests, rights and other Assets of the Sellers of every kind and nature, in each case, to the extent relating to the Business, whether tangible or intangible (including goodwill), real, personal or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other Assets acquired by any Seller after the date hereof and prior to the Closing in accordance with Section 2.08, including the following properties, rights, interests and other Assets of Sellers (collectively, the "**Purchased Assets**"), other than the Excluded Assets, which, notwithstanding the foregoing provisions of this Section 2.01 to the contrary, will remain, as applicable, the Assets, properties, interests and rights of Sellers and their Affiliates:

(a)     all Assets described in Exhibit A hereto;

(b)     subject to Section 2.05, all Contracts (including Leases to which a Seller is a Party with respect to Leased Real Property, any option to purchase or lease an interest in real property pursuant to a Lease or other agreement with any owner of real property and licenses and other Contracts with respect to Intellectual Property) entered into by any Seller and used or held for use in or relating to the Business or the Project, including (i) any confidentiality or non-disclosure agreements executed by any Person for the benefit of any Seller to the extent relating to the Purchased Assets or the Assumed Liabilities, (ii) all purchase orders and (iii) all Contracts relating to the Assets described in Exhibit A (collectively, the "**Purchased Contracts**"), except for any Related Party Agreements or any other contracts of any Seller or any Affiliate of any Seller that do not involve an unrelated third party;

(c)     all tangible Assets owned by any Seller, including any such property on order to be delivered to any Seller, in each case, used in connection with the Business including the Safe Harbor Equipment, Additional Assigned Equipment and any other equipment;

(d)     all Intellectual Property owned by any Seller that is used or held for use by such Seller in the conduct of the Business, including all usernames, passwords, and credentials used to

18

access, use, manage, maintain, or renew any of the domain names or social media accounts included in the foregoing, and all Intellectual Property owned by any Seller that are in the same patent family as, claim or are entitled to claim priority from, or otherwise constitute foreign counterparts or continuations, divisionals, continuations-in-part, reissues, reexaminations, extensions or renewals of, the foregoing (collectively, the "**Purchased Intellectual Property**");

(e)     all insurance proceeds solely to the extent receivable in respect of the Purchased Assets;

(f)     all Permits (to the extent transferable to Buyer pursuant to applicable Law) held by any Seller;

(g)     all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Contracts;

(h)     all Receivables related to the Purchased Contracts;

(i)     all goodwill related to the Purchased Assets (including the goodwill associated with the Trademarks included in the Purchased Assets);

(j)     other than the Excluded Records, all of each Seller's current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, databases, studies, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, etc.), consulting materials, opinions and other documents commissioned by or on behalf of any Seller, development, quality control, quality assurance, regulatory, records draft and final material prepared in connection with obtaining any Permits or submitting any applications for any Permits or to any Governmental Authority having jurisdiction over the Project, and other regulatory documents, and other books and records of any Seller and any rights thereto owned by any Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media, and in each case, solely to the extent relating to the Business; and

(k)     subject to Section 2.03(m), all Avoidance Actions, including all of the rights and claims of the Sellers available under the Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, against the Buyer, any Seller's Subsidiary, any supplier, vendor, merchant, manufacturer, or other counterparty to any Purchased Contract or any Contract with any Seller's Subsidiary or with respect to trade obligations paid prior to the Petition Date, and any related claim and action arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing ("**Acquired Claims**").

SECTION 2.02     *Assumed Liabilities*.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, Buyer agrees, effective at the time of the Closing, to assume the following Liabilities without duplication, and only such Liabilities, of Sellers (the "**Assumed Liabilities**"):

(a)     all Liabilities, including Environmental Liabilities, exclusively relating to or arising exclusively out of the ownership or operation of the Purchased Assets by Buyer solely for periods that first arise, and solely result from facts and circumstances that first occur, after the Closing;

(b)     all Cure Costs to the extent exclusively related to or arising exclusively from the Purchased Contracts and which have not been paid on or prior to the Closing;

(c)     all Liabilities of each Seller exclusively relating to or arising exclusively out of the Purchased Contracts, first arising following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing; provided that the foregoing shall not limit Buyer's obligation to assume Cure Costs pursuant to Section 2.02(b); and

(d)     all Liabilities for (i) Property Taxes allocable to any Post-Closing Tax Period (as determined in accordance with Section 7.06(a)) and (ii) Transfer Taxes allocable to Buyer pursuant to Section 7.06(d) (and, for the avoidance of doubt, any Liabilities for Taxes of the Sellers allocable to any Post-Closing Tax Period shall transfer as a matter of law).

SECTION 2.03     *Excluded Assets*.  Notwithstanding any provision in this Agreement to the contrary, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Sellers will retain all right, title and interest to, in and under the following Assets, properties, interests and rights of Sellers (whether owned, licensed, leased or otherwise) and only the following assets, properties, interests and rights (the "**Excluded Assets**"):

(a)     the organizational documents, corporate records and minute books, in each case to the extent solely pertaining to the organization, existence or capitalization of Sellers prior to the Closing;

(b)     any (i) records, documents or other information solely to the extent exclusively relating to any current or former Employee and any materials to the extent containing information about any Employee, disclosure of which would violate applicable Law, (ii) income Tax Returns of a Seller (or, as the case may be, its regarded owner), and (iii) all attorney-client privilege and attorney work-product protection of any Seller or its Affiliates solely to the extent arising with respect to legal counsel representation of any such Seller or their Affiliates related to the transactions contemplated by this Agreement or any of the other Transaction Documents, but not including any such records related to the filing, prosecution, or maintenance of any Registered Intellectual Property, including, without limitation, prosecution files, docketing data, specimens, and original assignment chains (such documents described in clauses (i) and (ii), collectively, the "**Excluded Records**");

(c)     subject to Section 2.05, any Contract that is not a Purchased Contract, including any Related Party Agreements and Collective Bargaining Agreements and any Contract or group of Contracts relating to Indebtedness of any Seller or the mortgage or pledge of, or otherwise

20

creating an Encumbrance on, any of the Purchased Assets or Assets of any Seller (collectively, the "**Excluded Contracts**");

(d)     other than the Acquired Claims or as expressly set forth in <u>Section 2.01</u>, all rights, avoidance, recovery, subordination claims or causes of action (i) that accrue or will accrue to any Seller or any of their Subsidiaries pursuant to this Agreement or any of the other Transaction Documents and (ii) of any Seller under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or under applicable Law (including, for the avoidance of doubt, any such claims settled during the Chapter 11 Cases), and the proceeds of such claims and causes of action;

(e)     all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;

(f)     any Seller Plans, together with all funding arrangements solely related thereto (including all Assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder and all other assets solely relating to Seller Plans;

(g)     all (i) Cash and Cash Equivalents held in the accounts of any Seller; (ii) all bank accounts of any Seller; (iii) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise) or prepaid or deferred charges and expenses (including all lease and rental payments) that have been prepaid by any Sellers that do not relate to the Purchased Assets; and (iv) any retainers or similar amounts paid to advisors or other professional service providers;

(h)     all proceeds received from the sale or liquidation of any other Excluded Assets;

(i)     any deposits, escrows, surety bonds or other financial assurances and any Cash and Cash Equivalents securing any surety bonds or financial assurances, in each case, of any Seller that solely relate to the Excluded Assets or the Excluded Liabilities;

(j)     (i) all bids and expressions of interest received from third parties exclusively with respect to the acquisition of any Excluded Assets (including any bids and expressions of interest unrelated to the sale process undertaken by the Sellers in connection with this Agreement), and (ii) all privileged materials, documents, files and records relating exclusively to any Excluded Assets or Excluded Liabilities;

(k)     (i) subject to <u>Section 6.02</u>, all current and prior insurance policies, including all director and officer insurance policies, and all rights and benefits of any nature exclusively relating to such insurance policies, including all recoveries thereunder and rights to assert claims with respect to any such recoveries (to the extent not included as Purchased Assets), and (ii) the sponsorship of, and all rights, interests and Assets exclusively relating to any Seller Plans;

(l)     Sellers' claims, causes of action or other rights of the Sellers enforceable against Buyer or its Affiliates expressly set forth under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Sellers or their Affiliates, on the one hand, and Buyer or its Affiliates, on the other hand, in connection with the transactions contemplated hereby, or any other agreement between Sellers or their

21

Affiliates, on the one hand, and Buyer or its Affiliates, on the other hand, entered into on or after the date hereof;

(m)     (i) Avoidance Actions and any claims and causes of action related to or against the Debtors' current and former directors, officers, managers, members, shareholders or any other insiders or Affiliates (excluding Affiliates that are Sellers' Subsidiaries), including any breach of fiduciary duty or similar claims; (ii) Avoidance Actions arising under sections 544 through 553 of the Bankruptcy Code that are (a) against a counterparty to a Contract that is not a Purchased Contract or a Contract with any Seller's Subsidiary or (b) trade vendor that is not a go-forward trade vendor of primarily the Purchased Assets; (iii) any commercial tort claim(s) (excluding those related to the Purchased Assets); and (iv) any and all causes of action constituting a Challenge (as defined in the Final DIP Order); provided, further, that neither the Buyer, nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an action based on, assert, sell, convey, assign or file any claim that relates to, or otherwise seeks recovery on account of, the purchased Avoidance Actions; and

(n)     all Tax refunds, overpayments, credits or other attributes solely with respect to Taxes that are Excluded Liabilities.

SECTION 2.04     *Excluded Liabilities*.     Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, or undertake any obligation to pay, perform or discharge, or be liable for, any Liabilities of or Action against the Sellers or their Affiliates, of whatever nature, whether presently in existence or arising hereafter, whether or not related to the Business or the Purchased Assets, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter, other than the Assumed Liabilities, and Sellers shall retain and shall not contractually assign or otherwise transfer to Buyer, any other Liabilities of Sellers (other than the Assumed Liabilities), including the following (collectively, the "**Excluded Liabilities**"):

(a)     all Liabilities for Taxes of the Sellers or their Affiliates; provided that, for the avoidance of doubt and notwithstanding anything else to the contrary, in no event will (i) Property Taxes allocable to any Post-Closing Tax Period (as determined in accordance with Section 7.06(a); and (ii) Transfer Taxes allocable to Buyer pursuant to Section 7.06(d), in each case, be Excluded Liabilities);

(b)     all Liabilities arising under any Excluded Contract, including, for the avoidance of doubt, any Cure Costs related to any and all Excluded Contracts;

(c)     except to the extent of any Liabilities expressly assumed pursuant to Section 2.02(c), all Liabilities of any Sellers for Indebtedness, including any intercompany Indebtedness among Sellers;

(d)     all Liabilities of the Sellers or their ERISA Affiliates arising under or in connection with any Seller Plan;

(e)     *reserved*.

(f)      all Liabilities arising in connection with any violation of any applicable Law (by Sellers);

(g)      all Liabilities, including Environmental Liabilities, arising under or pursuant to any Environmental Laws arising out of or relating in any way to the ownership or operation of the Purchased Assets or the Business on or prior to the Closing, including any Liabilities arising out of or relating in any way to (i) any noncompliance with or violation of any Environmental Laws, (ii) any Release or threatened Release of, or exposure to, any Hazardous Materials, or (iii) any disposal, transportation or arrangement for transportation or disposal of any Hazardous Materials sent to any third-party site for treatment, storage, processing, recycling, incineration or disposal, in each case, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(h)      all Liabilities arising out of, relating to or with respect to any Order or Proceeding or threatened Proceeding involving, against or affecting any Purchased Asset, the Business, any Seller, or any Assets or properties of any Seller (i) commenced, filed, initiated or threatened in writing as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing;

(i)      all Liabilities in respect of warranties associated with the Business or Purchased Assets or otherwise (whether known or unknown, and whether recorded or reported), relating to facts, events or circumstances arising or occurring before the Closing (including with respect to products manufactured and sold by the Sellers prior to the Closing);

(j)      all Liabilities relating to an Excluded Asset, whether arising prior to or after the Closing Date;

(k)      any and all Liabilities for: (i) costs and expenses incurred by the Sellers or their Affiliates owed in connection with the administration of the Chapter 11 Cases (including the U.S. trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Sellers or their Affiliates, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of the Sellers or their Affiliates incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement and the other Transaction Documents; and (iii) all costs and expenses arising out of or related to any third party claims against the Sellers, pending or threatened, including any warranty or product claims; and all other Liabilities of Sellers that are not expressly included as Assumed Liabilities;

(l)      all Liabilities relating to any existing claim, demand, action or proceeding by any current or former Business Service Provider arising from or relating to such Business Service Provider's employment or service relationship with, or termination from, the Sellers or their Affiliates prior to or at the Closing;

(m)      all Liabilities arising under or relating to any employment, offer, retention, change in control, consulting or severance agreement with any Business Employee;

(n)     all Liabilities, including Environmental Liabilities, arising under or pursuant to any Environmental Laws arising out of or relating in any way to the ownership or operation of the Purchased Assets or the Business on or prior to the Closing, including any Liabilities arising out of or relating in any way to (i) any noncompliance with or violation of any Environmental Laws, (ii) any Release or threatened Release of, or exposure to, any Hazardous Materials, or (iii) any disposal, transportation or arrangement for transportation or disposal of any Hazardous Materials sent to any third-party site for treatment, storage, processing, recycling, incineration or disposal, in each case, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing; and

(o)     all other Liabilities of Sellers that are not expressly included as Assumed Liabilities.

SECTION 2.05     *Assignment of Contracts and Rights.*

(a)     Consistent with the requirements of the Bidding Procedures Order, on November 28, 2025 and December 19, 2025 the Debtors filed notices of Contracts that may be assumed and assigned in connections with the Debtors' sales and the proposed cure costs with respect thereto Docket Nos. 518, 788, and 1090 to which the Debtors annexed a list of certain Contracts of the Debtors and the Debtors' good faith estimate of the amount of Cure Costs applicable to each such Contract (the "**Original Contract & Cure Schedules**") and have served notice on the counterparties to each such Contract in accordance with the Bidding Procedures Order. From the date hereof until the date which is five (5) days prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure Schedules (including any new Contracts and any change in the Cure Cost of any Purchased Contract), or as reasonably requested by Buyer (including any and all executory Contracts and unexpired leases listed on <u>Exhibit A</u> hereto) Sellers shall use commercially reasonable efforts to provide Buyer with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**"). Sellers shall use commercially reasonable efforts to verify all Cure Costs for each Purchased Contract and shall, in consultation with and subject to the consent of Buyer, use commercially reasonable efforts to establish proper Cure Costs for each Purchased Contract prior to the Closing Date.

(b)     Sellers and Buyer shall use commercially reasonable efforts to take all actions required to assign the Purchased Contracts to Buyer, including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Purchased Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Buyer satisfies all requirements of Section 365 of the Bankruptcy Code.

(c)     Except as to Purchased Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to contribute, transfer, assign or deliver any Purchased Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted contribution, transfer, assignment, or delivery thereof without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would conflict with, violate, constitute a breach or default under any related Contract or violate any applicable Law. If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the

24

Bankruptcy Court that may be required, each Seller and Buyer will reasonably cooperate in a mutually agreeable arrangement (at Buyer's cost and expense) under which Buyer would obtain the claims, rights or benefits and assume the obligations thereunder in accordance with this Agreement without any further additional consideration; provided, however, that subject to Buyer receiving the claims, rights or benefits of, or under, the applicable Purchased Asset under any such arrangement, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform, all payment and other obligations under such Purchased Asset (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Purchased Asset had been assigned or transferred at the Closing. For the avoidance of doubt, the failure to obtain any Transfer Consent with respect to any Purchased Asset shall not delay the Closing; provided that, from and after the Closing, each Seller and Buyer shall use commercially reasonable efforts (at Buyer's cost and expense) to obtain such Transfer Consent with respect to such Purchased Asset. Notwithstanding the foregoing, Sellers' obligations under this Section 2.05(c) shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing. Sellers' obligations under this Section 2.05(c) shall terminate upon the Cut-Off Date; provided that, if the Transfer Consent in respect of a Purchased Asset has not been obtained by the Cut-Off Date, then following written notice by Buyer prior to the Cut-Off Date, and with the prior written consent of Sellers, Sellers shall use their commercially reasonable efforts to ensure that Buyer shall (at Buyer's cost and expense) continue to have the benefit of this Section 2.05(c) following the Cut-Off Date; provided that the obligations of each Seller under this Section 2.05(c) shall expire upon the completion of the Wind-Down of such Seller. Upon obtaining any such Transfer Consent with respect to the applicable Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer or a Buyer Designee in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code without any further additional consideration.

(d)     At Closing, pursuant to the Sale Order and the Assignment and Assumption Agreements, Sellers shall assign or cause to be assigned to Buyer (the consideration for which is included in the Purchase Price) and Buyer shall accept and assume each of the Purchased Contracts that is capable of being assigned pursuant to Section 363 and 365 of the Bankruptcy Code.

(e)     If any Purchased Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different from the amount of Cure Costs proposed by Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "**Disputed Amount Contract**"), then Sellers shall provide Buyer, not less than three (3) days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty; provided that Sellers shall agree to any Cure Costs for any Contract irrevocably designated by Buyer in writing as a Purchased Contract if instructed to do so by Buyer (provided that Buyer shall pay the applicable Cure Cost related thereto). If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract within five (5) Business Days following the Closing Date, solely upon Buyer's written request, Sellers shall, at the expense of Buyer, seek to have the amount of Cure Costs related to such

Disputed Amount Contract determined by the Bankruptcy Court.  Upon final determination of such Cure Costs, Buyer may elect to re-designate such Purchased Contract as an Excluded Contract.  If such Purchased Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Purchased Contract, and (y) Buyer shall pay the Cure Costs with respect to such Purchased Contract either (i) concurrently with Sellers' assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Purchased Contract, and execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Purchased Contract.  Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, Sellers shall, to the extent Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer such Contract, provided that Buyer shall pay the applicable Cure Cost.

SECTION 2.06    *Purchase Price*.  On the terms and subject to the conditions contained herein, the aggregate consideration for the Purchased Assets (the "**Purchase Price**") shall consist of (a) (i) eighty-three million ($83,000,000) in cash (the "**Closing Date Payment**") *plus* (ii) the amount of any Reimbursable Expenses and (b) the assumption of the Assumed Liabilities.

SECTION 2.07    *Purchase Price Allocation*.  The Parties agree to allocate for applicable Tax purposes (and, as applicable, to cause their Affiliates to allocate for Tax purposes) the Purchase Price and any other amounts, in each case, to the extent properly treated as consideration for applicable Tax purposes by the Parties among the Purchased Assets, including any assets attributable to interests in any Partnership or disregarded entity, in accordance with the following procedures and, to the extent applicable, in accordance with the applicable provisions of the Code and the Treasury Regulations promulgated thereunder.  No later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Sellers' Representative a schedule allocating the amounts treated as consideration for U.S. federal income tax purposes (a) among Sellers and (b) among the Purchased Assets and any other Assets acquired or deemed acquired in connection with the transactions contemplated hereby for applicable Tax purposes (the "**Allocation Schedule**").  The Allocation Schedule shall be deemed final unless Sellers' Representative notifies Buyer in writing that Sellers' Representative objects to one or more items reflected in the Allocation Schedule within fifteen (15) Business Days after delivery of the Allocation Schedule to Sellers' Representative.  In the event of any such objection, Buyer and Sellers' Representative shall negotiate in good faith to resolve such dispute and, if any such dispute cannot be resolved within fifteen (15) Business Days from delivery of the notice of disagreement Sellers' Representative to Buyer, such dispute shall be submitted to a mutually agreed nationally recognized accounting firm.  The Parties shall file all income Tax Returns

26

reporting the transactions contemplated hereby, including Form 8594 (Asset Acquisition Statement under Code Section 1060), in a manner consistent with the Allocation Schedule and shall not take any position inconsistent therewith upon examination of any income Tax Return, in any income Tax refund claim, in any Action related to income Taxes, or otherwise, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of applicable state, local or non-U.S. applicable Law).

SECTION 2.08    *Closing*.  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place via the exchange of documents by mail or electronic delivery services as soon as possible following entry of the Sale Order, but in no event later than three (3) Business Days after satisfaction of the conditions set forth in Article 9 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other time or place as Buyer and Sellers' Representative may agree in writing (email being sufficient).  At or prior to the Closing:

(a)    Sellers' Representative shall deliver, or cause to be delivered, to Buyer:

(i)    one or more assignment and assumption agreements in respect of the Purchased Assets, in a form and substance reasonably acceptable to Buyer (the "**Assignment and Assumption Agreements**"), duly executed by each applicable Seller;

(ii)    one or more bills of sale in respect of the Purchased Assets, in a form and substance reasonably acceptable to Buyer (the "**Bills of Sale**"), duly executed by each applicable Seller;

(iii)    a properly completed and validly executed IRS Form W-9 from each Seller; provided, that Buyer's sole recourse for not receiving such Form W-9 shall be the ability to apply any applicable withholding in accordance with Section 2.09;

(iv)    a certificate, dated and effective as of the Closing Date, executed by a duly authorized officer of Sellers' Representative certifying that the conditions set forth in Section 9.02 have been satisfied;

(v)    each third-party consent, waiver, authorization or approval set forth on Section 2.08(a)(v) of the Disclosure Schedules, each in form and substance reasonably acceptable to Buyer;

(vi)    if applicable, copies of the executed assignment and assumption agreements, in a form and substance reasonably acceptable to Buyer, assigning the applicable Safe Harbor Equipment and Additional Assigned Equipment to the applicable Seller, consistent with Section 5.04 and Exhibit A;

(vii)    one or more customary special warranty deeds or local law equivalents in respect of the Purchased Assets, in form and substance reasonably acceptable to Buyer, duly executed and acknowledged by each applicable Seller; and

(viii)   the physical work certificates supporting the fabrication and manufacturing of the Safe Harbor Equipment intended to be used to satisfy the Beginning of Construction Requirement, in 2025, for the Project.

(b)   Buyer shall deliver, or cause to be delivered, to Sellers' Representative or to such other Person(s) as may be entitled to payment therefrom (for the satisfaction and discharge of the Cure Costs), as applicable:

(i)   the Purchase Price *minus* the Deposit Escrow Amount, which shall be released to Sellers by the Escrow Agent pursuant to Section 2.10, by irrevocable wire transfer of immediately available funds in accordance with payment instructions delivered by Sellers to Buyer prior to the Closing;

(ii)   the Assignment and Assumption Agreements, duly executed by Buyer or the applicable Buyer Designee;

(iii)   the Bills of Sale, duly executed by Buyer; and

(iv)   a certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Section 9.03 have been satisfied.

SECTION 2.09      *Withholding*.  Buyer shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement to any Person such amounts (and only such amounts) as Buyer is required to deduct and withhold under the Code or other applicable Law in respect of Taxes (other than any Transfer Taxes) with respect to the making of such payment; provided, however, that at least five (5) Business Days prior to the Closing, Buyer shall (other than with respect to any withholding arising as a result of Sellers' failure to provide the documentation described in Section 7.06(b) or in respect of payments properly treated as compensation) notify Sellers of any potentially applicable withholding requirement and cooperate to eliminate or reduce any such withholding. To the extent that amounts are withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

SECTION 2.10      *Deposits*.  At the Closing, the Deposit Escrow Amount shall be used to satisfy a portion of the payment obligations of Buyer pursuant to Section 2.08(b)(i).  Upon the final release of all of the Deposit Escrow Amount pursuant to the terms of this Agreement and the Escrow Agreement, the Escrow Agreement shall automatically terminate.  Any fees owed to the Escrow Agent and obligations under the Escrow Agreement shall be borne equally by Buyer and Seller.  The Deposit Escrow Amount shall be held in trust for the benefit of Seller and shall not be subject to any encumbrance, attachment, trustee process or any other judicial process of

28

any creditor of any party hereto, and shall be held and disbursed solely for the purposes of and in accordance with the terms of this Agreement and the Escrow Agreement.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, each Seller hereby jointly and severally represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

SECTION 3.01    *Organization and Qualification*.    Each Seller is duly organized, validly existing and in good standing (where applicable) under the applicable Laws of its respective jurisdiction of organization, formation or incorporation and, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties and conduct its business (including the Business) as currently conducted, except in the case of good standing, where the failure to be in good standing would not, individually or in the aggregate, be material to the Business taken as a whole. Each Seller is duly qualified to do business and is in good standing (where applicable) as a foreign entity in each jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.02    *Authorization; Execution and Delivery; Enforceability*.    The execution, delivery and performance of this Agreement and each other Transaction Document to which each Seller is a party and the consummation of the transactions contemplated hereby and thereby have been, or, if entered into after the date hereof, prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of the Sellers. The Sellers have all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which any Seller is party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement and each Transaction Document to which any Seller is party, has been, and, if entered into after the date hereof, at or prior to the Closing, each other Transaction Document to which each Seller is a party will be, duly and validly executed and delivered by the applicable Sellers and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of the Sellers, enforceable against Sellers in accordance with its terms, subject to the Bankruptcy and Equity Exception (which exception shall exclude, for the avoidance of doubt, any Chapter 11 Cases or any related Proceedings).

SECTION 3.03    *Noncontravention; Consents and Approvals*.

(a)    Neither the execution, delivery and performance by Sellers of this Agreement and each other Transaction Document to which any Seller is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i)

29

conflict with or result in any violation or breach of, or default under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation, to any put or call or similar rights or to loss of a benefit under, any term, condition or provision of the organizational documents of any Seller, (ii) conflict with or result in a violation or breach of any Law or Order to which any Seller, or any of the Purchased Assets, may be subject, or (iii) conflict with, result in a violation or breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) on, any Purchased Asset, or under any Material Contract or Permit, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of any such property or Asset of any Seller, or any Material Contract hereunder, except, in the case of clauses (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Except for (i) the entry of the Sale Order, (ii) the Permit Approvals, and (iii) as set forth on <u>Section 3.03(b)</u> of the Disclosure Schedules, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by or on behalf of the Sellers in connection with the execution, delivery and performance of this Agreement or any other Transaction Document to which any Seller or other Debtor is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by any Seller contemplated hereby or thereby (with or without notice or lapse of time, or both).

SECTION 3.04      *Reserved*.

SECTION 3.05      *Financial Statements; No Undisclosed Liabilities*.

(a)      True and complete copies of the audited consolidated balance sheet of PGR and its Affiliates as of December 31, 2024 (the "**Balance Sheet Date**"), and the related audited consolidated statements of results of operations, changes in member's equity and cash flows of PGR, together with all related notes and schedules thereto (collectively referred to as the "**Financial Statements**"), and the unaudited consolidated balance sheet of PGR, in each case, as of September 30, 2025 (the "**Latest Balance Sheet Date**") and the related consolidated statements of results of operations, changes in members' equity and cash flows of PGR, together with all related notes and schedules thereto (collectively referred to as the "**Interim Financial Statements**"), are attached hereto as Part I of <u>Section 3.05(a)</u> of the Disclosure Schedules. Except as set forth in Part II of <u>Section 3.05(a)</u> of the Disclosure Schedules, each of the Financial Statements and the Interim Financial Statements (i) are correct and complete in all material respects and have been prepared in accordance with the books and records of PGR or the other Persons covered thereby, as applicable, in all material respects, (ii) have been prepared in all material respects in accordance with GAAP (except as may be indicated in the notes thereto) and (iii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of PGR or the other Persons covered thereby, as applicable, as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end

adjustments and the absence of notes thereto throughout the periods covered thereby that, in each case, if presented would not be material to the Purchased Assets or the Assumed Liabilities.

(b)     Except as and to the extent adequately accrued or reserved against in Financial Statements or the Interim Financial Statements, since the Balance Sheet Date, PGR and the other Persons covered by such Financial Statements or Interim Financial Statements, as applicable, do not have any material liability or material obligation of any nature arising out of, relating to or affecting the Purchased Assets that is an Assumed Liability, in each case, whether accrued, absolute, contingent or otherwise, whether known or unknown and whether or not required by GAAP to be reflected in a consolidated balance sheet of the applicable Person or disclosed in the notes thereto, except for any such liabilities and obligations that were incurred in the Ordinary Course since the Balance Sheet Date none of which result from or arise out of any breach of contract, breach of warranty, tort, infringement or violation of Law or Order and that are not, and would not reasonably be expected to be, material to the Purchased Assets taken as a whole or materially adverse to the Project.

(c)     The books of account and financial records of Sellers pertaining to the Business are true, complete and correct in all material respects and have been prepared and are maintained in accordance with sound accounting practice.

SECTION 3.06     *Title to Purchased Assets.*

(a)     Except as set forth on <u>Section 3.06</u> of the Disclosure Schedules, Sellers have good and valid title to, valid leasehold interests in, or other valid right to use, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order and obtaining any Transfer Consent, Sellers will transfer, convey and assign good and valid title to, valid leasehold interests in, or other valid right to use, the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     The Sellers constitute each and every Person that has any right, title and/or interest in and to the Purchased Assets, other than the Excluded Assets.  The Purchased Assets constitute substantially all of the Assets, properties and rights held for use or necessary to operate and conduct the Business in the Ordinary Course as currently conducted.

(c)     This Agreement and the instruments and documents to be delivered by the Sellers to Buyer at the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances) claims and interests (other than Assumed Liabilities) and (ii) to Buyer, good title to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims and interests, other than Assumed Liabilities, subject to entry of the Sale Order.

(d)     All Purchased Assets, which constitute tangible assets, are (i) in good working order and condition in all material respects, ordinary wear and tear excepted, (ii) have been operated and maintained in accordance with customary industry practices, and (iii) are suitable in all material respects for the uses for which they are being utilized, as applicable, in the Business as conducted by Sellers, as applicable, as of the date hereof (excluding with respect to Excluded Assets, and in such case solely to such extent).

SECTION 3.07     *Litigation*.  Except as set forth on <u>Section 3.07</u> of the Disclosure Schedules, there are not any Actions or Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller, the Purchased Assets, the Assumed Liabilities or the Business, or any Order outstanding, which, in each case, would adversely affect the ability of any Seller to enter into this Agreement and the other Transaction Documents, or to consummate the transactions contemplated hereby or thereby or otherwise would, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole.  None of the Sellers or any of their respective Affiliates has received written notice of any such Order described in this Section.

SECTION 3.08     *Permits*.

(a)     Each Seller (or another Person on behalf of any Seller as allowable under Environmental Law) is in possession of all Permits legally required for such Seller to own, lease, operate and use the Purchased Assets (in the case of each Seller) as currently owned, leased or used and to carry on and operate the Business as currently conducted, except where the failure to possess such Permit, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business, taken as a whole.  No Seller has received written notice related to the Permits that would cause a Governmental Authority to deny or refrain from issuing any Permit Approval.

(b)     Except as set forth on <u>Section 3.08(b)</u> of the Disclosure Schedules, (i) all Permits held by Sellers or another Person on behalf of any Seller allowable under Environmental Law, with respect to the Project, are valid and in full force and effect, except where such failure to be valid or in full force and effect would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (ii) each Seller is, and in the last three (3) years has been, in compliance with the terms of all Permits except where the failure to comply with the terms of such Permit would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, and there are no Proceedings pending or, to the Knowledge of Sellers, threatened, that seek the revocation, cancellation, suspension, failure to renew or adverse modification of any Permits or that would reasonably be expected to result in the imposition of a fine, forfeiture, or civil penalty against any Seller except as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (iii) the applicable Seller, or another Person on behalf of any Seller allowable under Environmental Law, with respect to the Project, has timely filed applications to renew all Permits held by such Person other than any failure to timely file to renew that would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole and no Governmental Authority has commenced, or given written notice to any Seller that it intends to commence, any Proceeding to revoke, or suspend, rescind, adversely modify or not renew, or to impose any adverse condition on, any Permit, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, and (iv) all reports and filings required to be filed with any Governmental Authority by any Seller with respect to any Permit have been timely filed, and all regulatory fees, contributions and surcharges required to be paid by any Seller with respect to the Permits held by such Person have been timely paid, except, in each case, where such failure to be filed or paid have now been remedied or would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

SECTION 3.09    *Compliance with Laws*.  Each Seller is, and for the past three (3) years has been, in compliance with applicable Laws and Orders relating to the Purchased Assets and the Assumed Liabilities (excluding with respect to the Excluded Assets, and in such case solely to such extent), except where any non-compliance, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business, taken as a whole. No Seller has received any written notice or Action from any Governmental Authority relating to violations or alleged violations of, failure to comply with or defaults under, any applicable Law, Order or Permit (in the case of any Seller, with respect to the applicable Purchased Assets and Assumed Liabilities), except where such violation or alleged violation, non-compliance or default, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business, taken as a whole.

SECTION 3.10    *Material Contracts*.

(a)    Section 3.10(a) of the Disclosure Schedules sets forth a true, correct and complete list of the Material Contracts.  Sellers have caused to be made available to Buyer true, correct and complete copies of all Material Contracts, together with all amendments, modifications or supplements thereto.

(b)    With respect to each Material Contract, (i) such Contract is in full force and effect and constitutes the legal, valid and binding obligation of the Sellers and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller, as applicable, and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception, (ii) neither the Sellers nor, to the Knowledge of Sellers, the counterparty thereto is in material breach or default thereof, (iii) the Sellers and, to the Knowledge of Sellers, the counterparty thereto, has performed all obligations required to be performed by it under such Contract and (iv) no Seller and, to the Knowledge of Sellers, no counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (ii) through (iv), for breaches or defaults (A) caused by or resulting from the Chapter 11 Cases or (B) which are not, and would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

(c)    (i) None of the Material Contracts to which any Seller is party or by which any of their Assets or liabilities are bound, have been canceled or otherwise terminated, and (ii) none of the Sellers have received any written notice from any Person regarding any such cancellation or termination or of any reduction thereunder.  There are no Proceedings pending or threatened against any Seller by the counterparty to any Material Contract.

SECTION 3.11    *Intellectual Property*.

(a)    Each item of Registered Intellectual Property is subsisting, and to the Knowledge of Sellers, valid and enforceable.  No Claim is pending or, to the Knowledge of Sellers, threatened, challenging the validity, enforceability, registration, ownership or scope of any Registered Intellectual Property (excluding office actions issued in connection with the prosecution of applications for the Registered Intellectual Property).  To the Knowledge of Sellers, all currently

33

due maintenance fees, renewal fees, or similar fees for the purpose of maintaining the Registered Intellectual Property have been paid and all necessary documents and certificates in connection with Registered Intellectual Property have been filed with the U.S. Patent and Trademark Office, the U.S. Copyright Office, similar authorities in foreign jurisdictions, as the case may be, and domain name registrars. To the Knowledge of Sellers, there are no Permitted Encumbrances related to outbound Intellectual Property licenses or covenant not to sue that are subject to Section 365(n) of the Bankruptcy Code, except for those listed in Schedule 1.01(c) in the Disclosure Schedule.

(b)     The Sellers exclusively own, free and clear of all Encumbrances (other than Permitted Encumbrances), or have licenses or rights to use all material Intellectual Property used in the Business as currently conducted.  The Sellers exclusively own, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Intellectual Property owned by the Sellers or included in the Purchased Assets, in each case, including the Registered Intellectual Property.

(c)     For the past three (3) years, the Sellers and the operation of the Business have not infringed, misappropriated, diluted or otherwise violated any Intellectual Property of a third party in any material respect.  For the past three (3) years, to the Knowledge of Sellers, no third party has infringed, misappropriated, diluted or otherwise violated any Intellectual Property of the Sellers in any material respect.  In the past three (3) years, no third-party Claims have been received by or on behalf of a Seller alleging that such Seller has infringed, misappropriated, diluted or otherwise violated the Intellectual Property of such third party.

(d)     Sellers and their Affiliates have taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all Trade Secrets included in the Intellectual Property owned by any Seller or their Affiliates, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.12     *Real Property*.

(a)     The Sellers have good and marketable fee simple title to the Owned Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Each Seller, as applicable, holds a good and valid leasehold, subleasehold or similar interest in each parcel of Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).  Sellers have delivered to Buyer a true and complete copy of each Lease pursuant to which the Sellers hold their interests in the Leased Real Property.

(c)     Each Lease is (i) valid, in full force and effect, and constitutes a valid and legally binding obligation of the Seller party thereto, as applicable, and, to the Knowledge of Sellers of each other Person party thereto, and (ii) enforceable against such Seller party thereto and, to the Knowledge of Sellers, each other party thereto, in accordance with its terms, in each case of clauses (i) and (ii), except as the same may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, arrangement, moratorium or other similar applicable Laws relating to or affecting the rights of creditors generally, or by general equitable principles.  Except as set forth on Section 3.12(c) of the Disclosure Schedules, no Seller, nor, to the Knowledge of Sellers, any

other party to any Lease, is (or is alleged to be) in any existing or continuing material default, material breach, material violation or event of material default thereunder, nor does any condition or circumstance exist which, with notice and/or passage of time, would constitute a material default, material breach, material violation, termination, modification or acceleration by any Seller or, to the Knowledge of Sellers, any other party, under such Lease.

(d)     Except for Permitted Encumbrances, no Seller has leased, subleased, licensed or otherwise granted any Person the right to use or occupy any Real Property including, without limitation, any Real Property associated with or comprising the Project or any portion thereof.  No Seller has granted any purchase option, right of first offer or right of first refusal to purchase an interest in the Real Property to any third party, or entered into a contractual arrangement to sell, assign, encumber or dispose of such interest.

(e)     There is no pending or, to the Knowledge of Sellers, threatened or contemplated condemnation or similar proceeding affecting the Owned Real Property, Leased Real Property or any portion thereof or interest therein.

(f)     The Owned Real Property and the Leased Real Property constitute all of the real property owned, leased, licensed, occupied or otherwise used by Sellers.

SECTION 3.13     *Environmental Matters*.

(a)     Sellers have made available to Buyer copies of all material third-party environmental reports, audits, assessments, investigations, studies, and analyses regarding the any Project, or otherwise relating to the Purchased Assets, and/or Sellers, their affiliates' or predecessors' past or current businesses, operations or assets, in each case in the reasonable possession or custody of Sellers, including the most recent Phase I environmental site assessment report for the Project.

(b)     Except as described on Section 3.13 of the Disclosure Schedules:

(i)     each Seller and the Purchased Assets are, and for the past three (3) years have been, in material compliance with all applicable Environmental Laws;

(ii)     no Seller has received any written notice of any material environmental Claims that are currently outstanding, and no material environmental Claims are pending or, to the Knowledge of Sellers, threatened in writing against any Seller or relating to the Purchased Assets asserting any material violation of or material Liability under any Environmental Law;

(iii)     there is no site to which any Seller transports Hazardous Materials which, to the Knowledge of Sellers, is the subject of a material environmental Action or material environmental Claim which would reasonably be expected to give rise to any material Liability;

(iv)     there has been no Release or threatened Release of any Hazardous Material by any Seller or, to the Knowledge of Sellers, by any other Person, on, at, under, upon, or from the Purchased Assets, the Owned Real Property or the Leased Real Property, or, to

the Knowledge of Sellers, any other location, in a manner that has subjected or would reasonably be expected to subject any Seller to any material Liability under any Environmental Law; and

(v)     no Seller has, whether expressly, by operation of Law, or otherwise, assumed, undertaken, or agreed to indemnify any other Person for any material Liability under any Environmental Law, except for contractual indemnities entered into by the Sellers in the Ordinary Course of their businesses and that are customary for similarly situated parties.

SECTION 3.14     *Taxes*.

(a)     All material Tax Returns of Sellers (with respect to the Business or the Purchased Assets) required to be filed before the Closing Date with respect to Pre-Closing Tax Periods have been or will be timely filed, and all such Tax Returns are, or will be when filed, true, complete and correct in all material respects.

(b)     All material Taxes of Sellers (with respect to the Business or the Purchased Assets) required to be paid before the Closing Date with respect to Pre-Closing Tax Periods have been or will be paid.

(c)     There are no Encumbrances for Taxes on any of the Purchased Assets other than for current Taxes not yet due and payable.

(d)     All Tax deficiencies asserted, or assessments made, against Sellers (relating to the Business or the Purchased Assets) by any taxing authority have been fully paid and, to the Knowledge of Sellers, there are no Tax deficiencies threatened with respect to Sellers (relating to the Business or the Purchased Assets).

(e)     There are no pending, or to the Knowledge of Sellers, threatened, audits, examinations, investigations, administrative proceedings or Tax litigation concerning Sellers (relating to the Business or the Purchased Assets).

(f)     There are no outstanding agreements extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, material Taxes of the Sellers (relating to the Business or the Purchased Assets)

(g)     The Safe Harbor Equipment was fabricated and manufactured in 2025, as reflected in Exhibit A, pursuant to a "binding agreement", within the meaning and for purposes of the Beginning of Construction Requirement, by satisfying the Physical Work Test in IRS Notice 2018-59 and IRS Notice 2025-42, as applicable.

(h)     No part of the Safe Harbor Equipment was, or is expected to be, repaired, altered, modified or replaced.

(i)     No work related to the Safe Harbor Equipment was done prior to January 1, 2025.

(j)     No Project satisfied the Beginning of Construction Requirement prior to January 1, 2025.

SECTION 3.15     *Employee Benefits*. No Seller Plan is subject to Section 302 or Title IV of ERISA or Section 412 of the Code and no Seller has any Liability with respect to a Multiemployer Plan.

SECTION 3.16     *Labor Matters*.

(a)     No Seller employs any employee, nor has in the past three (3) years.  No Seller has any Liability with respect to any Employee.

(b)     As of the date of this Agreement or within the previous three (3) years, (i) no Seller is a party to any Collective Bargaining Agreement in respect of the Business or covering any Employee, (ii) no Employee as of the date hereof is represented by any Labor Union in connection with their employment with Sellers, (iii) to the Knowledge of Sellers, no Labor Union as of the date hereof has made a written demand for recognition as the bargaining unit representative of any group of Employees that is pending as of the date hereof, nor have there been any such demands in the last three (3) years, (iv) to the Knowledge of Sellers, there are no representation or certification Proceedings presently pending or threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller or its Subsidiaries in respect of the Business or covering any Employees, nor have there been any such proceedings in the last three (3) years, and (v) there are no material labor strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller or covering any Employees, and there have been no such events in the past three (3) years.

(c)     There are no material Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller relating to the employment or termination of employment of any individual or group of individuals by any Seller.

(d)     In the past three (3) years, no Seller has experienced a "plant closing" or "mass layoff" (as defined in the WARN Act) with respect to which there is any unsatisfied Liability with respect to any Employees or the Business.  For the avoidance of doubt, any claims or administrative expense liability based upon layoffs or terminations arising in connection with the transaction contemplated by this Agreement shall be an Excluded Liability.

(e)     Sellers are in compliance in all material respects with all applicable Laws regarding employment practices and labor, including, but not limited to, those related to wages and hours (including minimum wage and overtime applicable Laws and wage payment applicable Laws), collective bargaining, unemployment insurance, workers' compensation, immigration, retaliation, harassment and discrimination, disability rights and benefits, affirmative action, and employee layoffs, employee notification, leave, health and safety, and child labor, as they relate to the Business.

(f)     Except as would not result in material Liability, Sellers currently properly classify, and for the past three (3) years have properly classified, each Employee as exempt or non-exempt for the purposes of the Fair Labor Standards Act.

37

(g)     There is no Action pending or, to the Knowledge of Sellers, threatened in writing against Sellers alleging a violation of any labor or employment law that if adversely determined against Sellers, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, nor have any such Actions been brought in the last three (3) years.

SECTION 3.17      *Energy Regulatory*.

(a)     No Seller has filed any application seeking or claiming status as an EWG or to establish the rates, terms or conditions to sell power at wholesale under the FPA.

(b)     No Seller is a "holding company" under PUHCA.

(c)     As of the date hereof and as of the Closing Date, each Project Company is not a "public utility" under Section 201(e) of the FPA, 16 U.S.C. § 824(e), or a "public utility" as defined under Oregon law, including Oregon Revised Statutes Chapter 757, and is not otherwise subject to regulation as a public utility by FERC or the Public Utility Commission of Oregon.

SECTION 3.18      *Absence of Certain Changes*.  Except as set forth on Section 3.18 of the Disclosure Schedules, and other than as a result of the commencement of the Chapter 11 Cases, (a) since the Latest Balance Sheet Date, there has not been or occurred any Material Adverse Effect; (b) each Seller has used the same book or Tax accounting methods, except as required by GAAP and (c) from the Latest Balance Sheet Date through the date of this Agreement, there has not been, occurred or arisen any agreement, condition, action, omission or event which, if occurred or existed after the date hereof, would be prohibited (or require consent from Buyer) under Section 5.01.

SECTION 3.19      *Insurance Policies*.  All material insurance policies (other than any insurance policy that funds or relates to any Seller Plans) held by any Seller relating to the Purchased Assets, the Project, or the Assumed Liabilities (the "**Business Insurance Policies**") have been made available to Buyer.  With respect to each Business Insurance Policy, (i) such Business Insurance Policy is in full force and effect and constitutes the legal, valid and binding obligation of the Sellers party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, (ii) no Seller has received any written notice of cancellation or termination with respect to such Business Insurance Policy, (iii) premiums due and payable by any Seller or their Affiliates under such Business Insurance Policy prior to the date hereof have been duly paid, (iv) such Business Insurance Policy is adequate for the Business and is consistent with industry practice and (v) there is no material claim pending or unpaid claim under such Business Insurance Policy, except in the case of the foregoing clauses (i) through (iii) as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

SECTION 3.20      *Affiliate Transactions*.  Except as set forth in Section 3.20 of the Disclosure Schedules, no Seller or any Affiliate of any Seller or any officer, director, employee or consultant thereof (a) is a party to any Contract or arrangement with any Seller or any Affiliate of any Seller having a potential or actual value or a contingent or actual Liability exceeding

$100,000 relating to the Business ("**Related Party Agreement**"), other than (i) employment and indemnification arrangements in the Ordinary Course and (ii) the Seller Plans, or (b) has any material interest in any property (tangible or intangible) used by any Seller in the operation or ownership of any Purchased Asset or the Business.

SECTION 3.21    *Privacy and Security*.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, each Seller has for the past three (3) years and is in compliance with all applicable U.S., state, foreign and multinational Laws relating to privacy or data security of Personal Information ("**Privacy Laws**"), binding reputable industry practice, standards, self-governing rules and policies and their own published policies, and contractual obligations to which such Seller is bound in each case relating to privacy or data security of Personal Information (all of the foregoing collectively, "**Privacy Requirements**") with respect to personally identifiable information (including name, address, telephone number, electronic mail address, social security number, bank account number or credit card number), sensitive personal information and any special categories of personal information regulated under any Privacy Laws ("**Personal Information**").

(b)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, each Seller has taken all commercially reasonable steps designed to protect the security of their respective Systems and the Personal Information processed thereby against any unauthorized or improper use, access, transmittal, interruption, modification or corruption, and to the Knowledge of Sellers, in the past three (3) years there have been no breaches of same that has triggered a notification or reporting requirement under any Privacy Laws or resulted in any material liability to Sellers.

(c)    All Systems of the Sellers: (i) operate and perform in a manner that permits such Sellers to conduct the Business and is otherwise sufficient for the Business as currently conducted in all material respects, (ii) have not in the three (3) years prior to the date hereof been subject to any material bugs, defects, malfunctions, or nonconformities, or failures, breakdowns, or continued substandard performance that have materially or adversely affected the operation of the Business that have not been remediated in all material respects as of the date hereof, and (iii) to the Knowledge of Sellers, are substantially free of any material defects, bugs and errors, and do not contain any Malicious Code.

SECTION 3.22    *Brokers*.    Except as set forth on Section 3.22 of the Disclosure Schedules, the fees and expenses of which, in each case, will be paid by Sellers on or prior to the Closing, no broker, finder, financial advisor, investment banker or other Person is entitled to any broker's, finder's, financial advisor's, investment banker's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of any Seller or any of their respective Subsidiaries.

SECTION 3.23    *Credit Support Obligations*.    Section 3.23 of the Disclosure Schedules, sets forth a true, complete and correct list of all cash deposits, guarantees, letters of credit, treasury securities, surety bonds and other forms of credit assurances or credit support

("**Support Obligations**") provided, by or on behalf of any Seller or any Affiliates of a Seller in support of any Purchased Asset, in each case, to any Governmental Authority, Contract counterparty or other Person related to the Business.  Except for the Support Obligations set forth on Section 3.23 of the Disclosure Schedules, none of the Sellers or any of their respective Affiliates or any other Person has any obligation to post any Support Obligations in respect of the Projects, the Business or the Purchased Assets.  Except as set forth on Section 3.23 of the Disclosure Schedules, no Seller has pledged or deposited, and no Seller is required to pledge or deposit, any cash, property or other collateral with any surety or other provider of any of the Support Obligations in respect thereof, and no Seller has been notified by any such surety or other provider that it is required or will be required to pledge or deposit any such cash, property or other collateral.  To the Knowledge of Sellers, none of the sureties or other providers of any of the Support Obligations has made any payment under the Support Obligations.

SECTION 3.24    *International Trade Laws; Sanctions.*

(a)    Each Seller is and for the past five (5) years has been in compliance with International Trade Laws, and has not taken any action that violates, evades or avoids, or attempts to violate, evade or avoid International Trade Laws, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as whole.  No Seller, any of their respective Subsidiaries, nor any of their directors, officers, executives, or employees, or, to the Knowledge of Sellers, any Representative acting on behalf of Sellers, currently or during the past five (5) years: (i) is or has been a Sanctioned Person or has acted, directly or indirectly, on behalf of a Sanctioned Person; (ii) is unlawfully conducting or has unlawfully conducted any business or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; or (iii) is unlawfully dealing in or has unlawfully dealt in, or otherwise engaged in, any transaction relating to, any property or interests in property of any Sanctioned Person, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as whole.

(b)    No Seller has received and, to the Knowledge of Sellers, no Seller is aware of, any current or threatened investigation, inquiry, complaint, lawsuit, voluntary or involuntary disclosure, warning letter, penalty notice, or other regulatory action, by a Governmental Authority, alleging any material violation of International Trade Laws, and no Seller, nor, to the Knowledge of Sellers, any of their respective Representatives, has been convicted by a Governmental Authority of violating any International Trade Laws.

(c)    Each Seller has adopted and implemented policies and procedures reasonably designed to prevent, detect and deter violations of applicable International Trade Laws.

(d)    Each Seller has conducted their businesses in compliance, in all material respects, with applicable anti-corruption Laws and AML Laws and have instituted and maintained policies and procedures reasonably designed to promote and achieve compliance with such Laws.

(e)    (i) The operations of the Sellers and their respective Affiliates are and have been conducted in compliance, in all material respects, with all applicable financial recordkeeping and reporting requirements of Law, anti-corruption Laws, AML Laws and Sanctions Authority; (ii) no demand, claim, action, legal proceeding or investigation by or before any court or Governmental

40

Authority or any arbitrator involving the Sellers or their respective Affiliates with respect to any AML Laws or applicable anti-corruption Laws is pending or, to the Knowledge of Sellers, threatened; and (iii) the Seller have in the past three (3) years (A) maintained in place and implemented controls and systems reasonably designed to promote and achieve compliance with applicable Sanctions Authority and (B) not engaged in a transaction or dealing, direct or indirect, with or involving a sanctioned country or Sanctioned Person.

SECTION 3.25    *Studies and Reports*.  As of the Closing, each Seller has delivered to Buyer true, complete and correct copies of (i) any material final, third-party written studies and reports, and (ii) with respect to any material third-party, written study or report for which a final version has not yet been delivered to Sellers, the most recent draft version thereof, in the case of clause (i) or (ii), related to the design, development, siting, permitting, construction, commissioning, testing, operation, maintenance or ownership of each Project (other than any environmental report) that are in the possession or control of Sellers or any of their Affiliates.

SECTION 3.26    *Escheat and Unclaimed Property*.  Except where any such non-compliance would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as whole, each Seller is in compliance with all escheat and unclaimed property Laws.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller, as of the date hereof and as of the Closing Date, as follows:

SECTION 4.01    *Corporate Existence and Power*.  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all power and authority to carry on its business as presently conducted.

SECTION 4.02    *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer.  Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which Buyer is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each other Transaction Document to which Buyer is a party will be, duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer,

enforceable against Buyer in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 4.03    *Noncontravention; Consents and Approvals*.

(a)    Subject to entry of the Sale Order, neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of Buyer, (ii) violate any Law or Order to which Buyer or its Assets and properties may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which Buyer is a party or by which Buyer or its Assets and properties is bound, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)    Other than (i) the entry of the Sale Order and (ii) the Permit Approvals, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document to which Buyer is a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by Buyer contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

SECTION 4.04    *Availability of Funds; Solvency*.  Buyer has, and as of Closing will have, sufficient immediately available funds to pay (a) the cash components of the Purchase Price, (b) the Reimbursable Expenses and (c) any other costs, fees and expenses which may be required to be paid by or on behalf of Buyer under this Agreement and the other Transaction Documents (collectively, the "**Buyer Funding Amount**").  The availability of the full amount of the Buyer Funding Amount on the date hereof and at the Closing, and the funding of the Buyer Funding Amount at the Closing, is not subject to any contingencies, is not subject to the provision of financing by any third party, does not require a capital call or funding by any of Buyer's Affiliates and does not violate or conflict with any of Buyer's or any of its Affiliates' organizational documents or any other Contract to which Buyer or its Affiliates is a party or bound.  Upon consummation of the transactions contemplated by this Agreement, (a) Buyer will not be "insolvent" as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left

with unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Buyer will not be impaired.

SECTION 4.05     *Brokers*.   No broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

SECTION 4.06     *Litigation*.   There are no Proceedings to which Buyer is a party pending, or, to the knowledge of Buyer, threatened in writing against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

SECTION 4.07     *Energy Regulatory*.   Buyer is not a "public utility" as defined in Section 201 of the FPA.  Buyer is either not a "holding company" under PUHCA, or is a "holding company" under PUHCA solely with respect to one or more "public-utility companies" within the United States, each of which is an EWG, FUCO or QF.

ARTICLE 5

COVENANTS OF SELLERS

SECTION 5.01     *Conduct of the Business*.

(a)     Except (x) as consented to by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or contemplated by this Agreement, (y) as prohibited, required or approved by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases prior to the date of this Agreement or (z) as otherwise necessary to comply with applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), Sellers shall, and shall cause each of their Subsidiaries (as applicable) to:

(i)     conduct the Business in the Ordinary Course in accordance with applicable Law and shall maintain, preserve and protect the tangible Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course;

(ii)     use commercially reasonable efforts to make expenditures substantively in accordance with the amount and purposes set forth on the Sellers' Budget;

(iii)     maintain their books, accounts and records in the Ordinary Course;

(iv)     pay all post-petition trade payables or similar Liabilities and collect all Receivables after the Petition Date (subject to any applicable Orders) in the Ordinary Course;

(v)     use commercially reasonable efforts to preserve and maintain all Permits held by a Seller;

43

(vi)    use commercially reasonable efforts to maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers in all material respects (it being understood that no increases to any payments shall be required other expenditures of funds (other than pursuant to the existing terms of any Contracts));

(vii)    perform all of their respective material obligations under all Material Contracts; and

(viii)    pay their respective debts and other obligations when due;

provided, Sellers' Representative will provide notice to Buyer in the event Sellers or their Affiliates will be required to incur costs in excess of the amounts set forth in the Sellers' Budget in order to comply with this Section 5.01(a), along with any supporting documentation as reasonably requested by Buyer, which amounts shall be subject to Buyer's approval (not to be unreasonably withheld, conditioned or delayed); provided, further, that upon such approval by Buyer of any such costs, such costs shall be reimbursed at the Closing by Buyer as part of the payment of the Purchase Price pursuant to Section 2.08(b)(i); provided, further, however, any such additional costs not so approved by Buyer pursuant to the foregoing shall not be required to be incurred or paid by Sellers or their Affiliates and failure of Seller to incur such additional costs shall not constitute a breach of Sellers' obligations under this Agreement.

(b)    Except as otherwise contemplated by Section 5.01(a), as required by applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules or expressly contemplated by this Agreement, without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or express prior written direction of Buyer, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), the Sellers shall not, and shall cause each of their Subsidiaries not to:

(i)    sell, transfer, dispose of, lease or license on an exclusive basis or otherwise create or incur any Encumbrance (other than Permitted Encumbrances) or dispose of (A) any Purchased Assets, other than (x) in the Ordinary Course, (y) sales and dispositions of obsolete or worn-out Assets or (z) Intellectual Property, which is addressed in Section 5.01(b)(xi) below;

(ii)    renew, amend or modify in any adverse or material respect, terminate (other than automatically pursuant to its terms), cancel, let lapse or waive any material rights under, or create any Encumbrance (other than Permitted Encumbrances) on, (A) any Purchased Contract, (B) any Related Party Agreement, or (C) any Permits, in each case, other than renewals in the Ordinary Course;

(iii)    enter into any Contract which would be a Material Contract or any Related Party Agreement or enter into any joint venture or similar Contract affecting the Business, the Purchased Assets or the Assumed Liabilities;

(iv)    change in any material respect their policies or practices regarding payables or Receivables, or any other changes in any accounting methods, principles or practices in connection with the Business, the Purchased Assets or the Assumed Liabilities, except as

44

required by Law, a change in GAAP (or binding interpretation thereof) or by a Governmental Authority;

(v)     make any capital expenditures outside of the Ordinary Course;

(vi)     acquire any material Assets of any Person or make any other investment or acquire equity securities in any Person;

(vii)     incur, assume or guarantee any Indebtedness for borrowed money or guarantee the Indebtedness obligations of any other Person in connection with the Business, the Purchased Assets or the Assumed Liabilities, other than any Indebtedness or Liability that would constitute an Excluded Liability;

(viii)     merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(ix)     concede, settle, pay, discharge or satisfy any Proceedings that would reasonably be expected to result in an adverse effect on the Business, the Purchased Assets or the Assumed Liabilities;

(x)     terminate, let lapse or materially amend or modify or fail to renew any insurance policy maintained by any Seller or any of its Affiliates with respect to the Business, any Purchased Assets, or any Assumed Liability;

(xi)     (A) sell, transfer, assign, abandon or cancel, any Intellectual Property owned by any Seller, in each case, that is material to the Business (other than expiration of registered Intellectual Property of any Seller at the end of its statutory period) or (B) grant any license to use any Intellectual Property of any Seller, in each case, that is material to the Business, other than non-exclusive license agreements in the Ordinary Course;

(xii)     (A) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire or (B) enter into any Contract for the material sublease of Leased Real Property;

(xiii)     make any changes in any accounting methods, principles or practices in connection with the Purchased Assets or the Assumed Liabilities, except as required by Law, by a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(xiv)     except in connection with an affiliated, consolidated, combined or unitary Tax Return, make or enter into any Tax election materially affecting the Business or the Purchased Assets;

(xv)     enter into, amend, extend or terminate any Collective Bargaining Agreement relating to, impacting, or binding on the Business;

(xvi)     except in accordance with any Orders issued under the Chapter 11 Cases, adopt a plan of liquidation, dissolution, merger, consolidation or other reorganization; or

(xvii) agree, commit or seek Bankruptcy Court approval to do any of the foregoing.

Notwithstanding the foregoing, nothing contained in this Agreement is intended to give Buyer, directly or indirectly, the right to control Sellers' operations prior to the Closing Date.

SECTION 5.02 *Access to Information*. From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), subject to the terms and conditions set forth in Section 7.01(a), Buyer shall be entitled, through its Affiliates and Representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records (including making copies), properties (subject to the terms of any Lease), Assets, operations and personnel of Sellers relating (and solely to the extent relating) to the Business, the Purchased Assets and the Assumed Liabilities as Buyer may reasonably request; provided, however, that such investigations shall not include any sampling or analysis of soil, groundwater, building materials or other environmental media of the sort generally referred to as a Phase II environmental investigation. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and in a manner not to unreasonably interfere with the Business. Such access may include access to any information in electronic form to the extent reasonably available. Each Seller shall use commercially reasonable efforts to cause its applicable Representatives to reasonably cooperate with Buyer and its Affiliates and Representatives in connection with such investigations and examinations. Notwithstanding the foregoing, no Seller shall be required to afford such access to the extent that such Seller reasonably believes that doing so, on the advice of counsel, would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law, provided that in the case of each of subclauses (A) and (B), such Seller shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law.

SECTION 5.03 *Notice of Developments*.

(a) From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 11):

(i) Sellers will promptly provide Buyer with copies of all material documents, written reports, written status updates and similar materials that are prepared by third parties for the benefit of, or concerning, the Business, the Purchased Assets and the Assumed Liabilities;

(ii) Sellers will promptly provide Buyer copies of any material written notice or other material written communication from any Governmental Authority received by Sellers or their Affiliates in connection with the transactions contemplated by this Agreement in respect of the Projects concerning, the Business, the Purchased Assets, and the Assumed Liabilities;

(iii) Sellers will promptly notify Buyer in writing of any fact, circumstance, event or action the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) has

46

resulted in, or could reasonably be expected to result in, any representation or warranty made by Sellers hereunder not being true and correct or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions relating to the Closing to be satisfied; and

(iv)     Sellers will promptly provide Buyer with written notice of any Proceeding initiated, filed, commenced or to the Knowledge of Sellers, threatened in writing, against or directly or indirectly relating to the Business, the Purchased Assets, or the Assumed Liabilities.

(b)     Buyer's receipt of information pursuant to Section 5.03(a) shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules or otherwise affect the conditions set forth in Article 9.

SECTION 5.04     *Safe Harbor Equipment; Additional Assigned Equipment*.

(a)     From the date hereof until the Closing Date, Sellers shall, and shall cause their applicable Affiliates to, ensure that (i) the Safe Harbor Equipment and Additional Assigned Equipment is not repaired, altered, modified or replaced, except as required pursuant to a recapture event and (ii) the Project continues to be able satisfy the Beginning of Construction Requirement utilizing the Safe Harbor Equipment.

(b)     Prior to the Closing Date, PGR Procurement, LLC, Blue Ridge Power, LLC and/or PGR, and any of their applicable Affiliates that acquired any Safe Harbor Equipment or any Additional Assigned Equipment, as applicable, will execute separate assignment and assumption agreements with the applicable Seller, with respect to the assignment (or partial assignment) of the applicable Safe Harbor Equipment and Additional Assigned Equipment in accordance with Exhibit A (as revised), together with any related work, components and applicable agreements (other than lease or other storage agreements), with such assignment agreements to be in form and substance reasonably acceptable to Buyer.  The Parties agree to reasonably cooperate to finalize a sublease or other arrangement for the continued storage of the HV Breaker PO OPRME-1817 in Sellers' Kinston, North Carolina warehouse facility within 30 days post-Closing.  Until such agreement is in place, Sellers agree to maintain the HV Breaker PO OPRME-1817 in its current location and condition.

ARTICLE 6

COVENANTS OF BUYER

SECTION 6.01     *Preservation of and Access to Books and Records*.  Until the completion of the Wind-Down of all Sellers, but in no event later than twelve (12) months after the Closing, Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours) commercially reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, and, so long as such access does not unreasonably interfere with the conduct of the Business, to Buyer's and its Affiliates personnel, to the extent relating to their

respective rights and obligations hereunder, to any Proceeding or to any Pre-Closing Tax Period (for example, for purposes of any Tax or accounting audit or any claim or litigation matter), to the Wind-Down, or otherwise related to the Excluded Assets or Excluded Liabilities, and shall preserve such books and records until the latest of (a) such retention period as shall be consistent with Buyer's records retention policy in effect from time to time, (b) the retention period required by applicable Law, (c) the completion of the Wind-Down of all Sellers and (d) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Buyer shall use commercially reasonable efforts to cause its applicable representatives to reasonably cooperate with Sellers and their Affiliates and representatives in connection with the Wind-Down. Such access may include access to any information in electronic form to the extent reasonably available. Notwithstanding the foregoing, Buyer shall not be required to afford such access to the extent that Buyer reasonably believes that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law; provided that in the case of each of subclauses (A) and (B), Buyer shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law.

SECTION 6.02     *Insurance Matters*.    From and after the Closing, the Purchased Assets, the Assumed Liabilities and the operations and Assets and Liabilities in respect thereof, shall cease to be insured by any insurance policies or self-insurance programs maintained by Sellers or any of their respective Affiliates, and neither Buyer nor its Affiliates shall have any access, right, title or interest to or in any such insurance policies or self-insurance programs (including to all claims and rights to make claims and all rights to proceeds) to cover the Purchased Assets, the Assumed Liabilities or the operations or Assets or Liabilities in respect thereof; provided, however, that Buyer and its Representatives shall have the right to make claims and shall have the right to any proceeds (if any) with respect to the Purchased Assets or the Assumed Liabilities under any insurance policy for claims pertaining to, arising out of and inuring to the benefit of any Seller or otherwise relating to the Business, the Purchased Assets or the Assumed Liabilities for all periods prior to the Closing, and such Seller shall use commercially reasonable efforts to seek the maximum recovery or allow Buyer to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Buyer may reasonably request to seek such recovery) under such insurance policy, in each case, at Buyer's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Sellers or to the insurer in connection therewith), and such Seller shall cooperate with Buyer's reasonable requests if Buyer seeks recovery, with respect to such matters and shall remit (or, at Buyer's request, direct any such insurer to pay directly to Buyer) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Buyer) to Buyer or a Buyer Designee. Notwithstanding the foregoing, Sellers' obligations under this Section 6.02 shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation or limit their ability to close the Chapter 11 Cases after the Closing. Sellers' obligations under this Section 6.02 shall terminate upon the Cut-Off Date; provided that, if elected by Buyer in writing prior to the Cut-Off Date, Sellers shall use their commercially reasonable efforts to ensure that Buyer shall (at Buyer's cost and expense) continue to have the benefit of this

Section 6.02 following the Cut-Off Date and, prior to the Cut-Off Date, Sellers shall not take an actions that would reasonably be expected to be adverse to Buyer's ability to make a claim against such insurance policies; provided that the obligations of each Seller under this Section 6.02 shall expire upon the completion of the Wind-Down of such Seller. Notwithstanding the foregoing, this Section 6.02 shall not apply to any insurance policies of the Sellers or any of their respective Affiliates which were intended by the Parties to constitute Purchased Assets, either through Buyer's direct acquisition of such policies or proceeds in accordance with this Agreement.

SECTION 6.03    *Availability of Funds*.  Buyer shall take such actions as are necessary to ensure that at the Closing, and at all times between the date hereof and the Closing Date (or the earlier termination of this Agreement pursuant to Article 11), the Buyer Funding Amount is fully available to Buyer.

SECTION 6.04    *Buyer Parent Guaranty*.  Within five (5) Business Days of the execution of this Agreement, the Buyer Parent will have duly executed the Buyer Parent Guaranty and delivered to the Sellers a correct and complete copy thereof.  Upon such execution and delivery, the Buyer Parent Guaranty will be in full force and effect, not subject to any contingencies or conditions that are not expressly set forth therein, and, in the form provided to the Sellers, will (a) constitute the legal, valid and binding obligations of Buyer Parent and (b) be enforceable against Buyer Parent in accordance with its terms, subject to the Bankruptcy and Equity Exception.

ARTICLE 7

COVENANTS OF BUYER AND SELLERS

SECTION 7.01    *Confidentiality*.

(a)    Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 5.02 is subject to the Confidentiality Agreement.

(b)    Sellers acknowledge that from and after the Closing, all non-public information relating to the Business, the Project, the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Buyer and its Affiliates.  Sellers agree that, from and after the Closing, unless disclosure is required under applicable Law, no Seller will, and Sellers will cause their Affiliates and Representatives not to, disclose to any Person any confidential information regarding Buyer and its Affiliates, the Business, the Project, the Purchased Assets or the Assumed Liabilities; provided that (x) confidential information shall not include information that becomes generally available to the public other than through any action by any Seller or any of its Affiliates or Representatives in violation of this Section 7.01(b) and (y) confidential information may be used by Sellers solely to the extent necessary to defend any claims against any Seller; provided that in the case of clause (y), Sellers shall (i) disclose only that portion of such information which such Seller is advised by its counsel is legally required to be disclosed, (ii) other than in connection with any claims involving Buyer or its Affiliates, cooperate with Buyer (at its expense) to obtain a protective order or other confidential treatment with respect to such information and (iii) other

49

than in connection with any claims against Buyer or its Affiliates, provide Buyer with a reasonable opportunity to review and comment on such disclosure. In the event any Seller or any of their respective Affiliates or Representatives is required by applicable Law to disclose any such information or materials, such Seller shall to the extent practicable and not prohibited by applicable Law, promptly notify Buyer in writing of such required disclosure, which notification shall include the nature of the legal requirement and the extent of the required disclosure in sufficient detail, and shall reasonably cooperate with Buyer, at Buyer's sole expense, to obtain a protective order and otherwise preserve the confidentiality of such information or materials consistent with applicable Law. At any time that such protective order or remedy has not been obtained, such Seller or such Affiliate or Representative may disclose only that portion of such information or materials which such Person is required by applicable Law to disclose.

SECTION 7.02     *Further Assurances*.

(a)     At and after the Closing, and without further consideration therefor, each of Sellers and Buyer shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement and the other Transaction Documents.

(b)     From and after the date hereof, Sellers shall use commercially reasonable efforts to assist Buyer in accomplishing a good faith transition of the Business from Sellers to Buyer by engaging in discussions as reasonably requested by Buyer regarding policies and procedures and other operational matters relating to the Business and, in connection therewith, Sellers shall use commercially reasonable efforts to provide Buyer and its Affiliates and Representatives all documents, Contracts, records and materials reasonably requested by Buyer in connection therewith, subject to the limitations set forth in Section 5.02.

(c)     At and after the Closing, the Parties agree to (and shall cause each of their respective Subsidiaries to) reasonably cooperate to provide each other with such information and assistance as is reasonably necessary (i) to facilitate the Wind-Down and (ii) for the preparation of any Tax Returns or for the defense of any Tax claim, in each case, relating to the Purchased Assets, the Assumed Liabilities, or the transactions contemplated hereby and in the Transaction Documents.

SECTION 7.03     *Certain Filings*.

(a)     Sellers and Buyer shall reasonably cooperate with one another (i) with respect to their obligations set forth in Section 7.03(b), (ii) in determining whether any other action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents and (iii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)      Buyer and each Seller shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including filing, or causing to be filed, as promptly as practicable, any applications, notices, reports, disclosures or other filings related to the Permits with the applicable Governmental Authority that are necessary or advisable in connection with the consummation of the transactions contemplated by this Agreement (such applications, notices, reports, disclosures or other filings related to the Permits referenced in this clause, including, but not limited to, those as set forth on Section 7.03(b) of the Disclosure Schedules, the "**Permit Approvals**"); provided, however, that no Party shall be obligated to pay any consideration to any third party from whom consent or approval is requested under any Contract.  Buyer and each Seller shall reasonably consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.

(c)      Subject to appropriate confidentiality safeguards, including Section 7.01, each Party shall (i) respond promptly to any request for additional information, documents or other materials made by any Governmental Authority with respect to any filings or any of the transactions contemplated by this Agreement, (ii) promptly notify counsel to the other Party of, and provide copies of, any communications from or with any Governmental Authority in connection with any of the transactions contemplated by this Agreement or the other Transaction Documents and, to the extent reasonably practicable, enable counsel to the other Party to participate in any such communications, (iii) not participate in any prescheduled telephonic or in-person meeting with any Governmental Authority in connection with any of the transactions contemplated by this Agreement unless such Party consults with counsel to the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party a reasonable opportunity to attend, participate and speak thereat, (iv) furnish such information and assistance as may be reasonably requested in connection with the preparation of necessary filings or submission of information to the applicable Governmental Authority and provide counsel to the other Party the opportunity to review in advance any document, opinion or proposal to be made or submitted to any Governmental Authority, (v) defend all Proceedings to which it or any of its affiliates is a party challenging or affecting this Agreement or the consummation of the transactions contemplated hereby, in each case until the issuance of a final, non-appealable Order with respect to each such Proceeding, (vi) seek to have lifted or rescinded any injunction or restraining order which may adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement, in each case until the issuance of a final, non-appealable Order with respect thereto, and (vii) use reasonable best efforts to resolve any objection or assertion by any Governmental Authority challenging this Agreement or the transactions contemplated hereby.  Sellers and Buyer shall use commercially reasonable efforts to obtain all Permit Approvals as promptly as practicable.  All filing fees relating to this Section 7.03 shall be borne and paid fully by Buyer.

SECTION 7.04      *Public Announcements*.  On and after the date hereof, the Parties shall reasonably consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and no Party shall, except as may be required to comply with applicable Law, issue any press release or make any public statement prior to obtaining, with respect to Sellers, Buyer's, and with respect to Buyer, Sellers' Representative's, prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed); provided that notwithstanding

51

the foregoing, Buyer and Sellers shall be entitled to disclose information regarding this Agreement or the other Transaction Documents the transactions contemplated hereby or thereby to their respective Affiliates and its and their respective employees, direct or indirect equity owners, partners, prospective partners, investors, prospective investors, professional advisors and lenders who have a reasonable need to know the information or to whom there is an obligation to disclose such information and who agree to keep such information confidential or are otherwise bound to confidentiality obligations; provided, further, that following the Closing Date, Buyer shall not be required to obtain such prior consent from Sellers or Sellers' Representative and shall have the unrestricted right to issue any press release or make any public statements with respect to this Agreement or the transactions contemplated hereby.

SECTION 7.05     *Employee Matters*.

(a)     For the avoidance of doubt, all Liabilities arising in respect of period on or prior to the Closing, relating to the employment with, termination of employment with, application for employment with or any other employment or labor-related Liabilities with respect to any former employee or other service provider of Sellers and their Affiliates shall be retained by Sellers and their Affiliates on the Closing Date, and Sellers and their Affiliates shall be solely responsible for such Liabilities.

(b)     Sellers shall be solely responsible for any and all Liabilities arising under the WARN Act relating to any Employees whose employment is terminated by Sellers prior to, upon, or following the Closing.

SECTION 7.06     *Tax Matters*.

(a)     For all purposes of this Agreement, in the case of any Straddle Period, (i) Property Taxes allocable to the Pre-Closing Tax Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of calendar days in the entire Straddle Period, and (ii) Taxes other than Property Taxes shall be allocated to the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the end of the day on the Closing Date; provided (x) that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in proportion to the number of days in each period; and (y) for the purposes of allocating items of income, gain, loss, deduction, expense, credit and any other items between the Sellers and the Buyer for the taxable year of the any Partnership that includes the Closing Date, such items in respect of any such Partnership shall be allocated using the "interim closing of the books" method as of the Closing Date and the calendar day convention under Section 706 of the Code and Treasury Regulations thereunder (and any corresponding provision of state, local and other applicable Law).

(b)     The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price as an adjustment to the Purchase Price for all income Tax purposes to the extent permitted by applicable Law.

(c)     For the avoidance of doubt, notwithstanding anything else in this Agreement, (i) the Purchased Assets shall include any prepaid Property Taxes apportioned to Buyer under Section 7.06(a); and (ii) the Purchased Assets shall exclude all Tax payments made by the Sellers and Tax attributes of the Sellers (and the Parties intend that such attributes will be available to the Sellers to offset Taxes incurred in connection with the transfer of the Purchased Assets).

(d)     All Transfer Taxes imposed on or with respect to the transactions contemplated hereby shall be borne and paid one hundred percent (100%) by Buyer.  The Party responsible under applicable Law for filing a Tax Return with respect to such Transfer Taxes shall prepare and timely file such Tax Return and promptly provide a copy of such Tax Return to the other Party.  Buyer and Sellers shall use commercially reasonable efforts and cooperate in good faith to reduce or eliminate any Transfer Taxes to the extent permitted by applicable Law.

(e)     In connection with the direct or indirect transfer of the interests in any Partnership pursuant to this Agreement, notwithstanding anything herein to the contrary (i) Buyer shall not make in respect of any Partnership (or take or fail to take any action that would result in any Partnership making) an election under Section 6226 of the Code and Treasury Regulation Sections 301.6226-1 (and any similar or corresponding provision of state or local Law) with respect to any Pre-Closing Tax Period and (ii) except to the extent such an election is validly in effect, the Sellers shall reasonably cooperate in connection with any Partnership making any election pursuant to Section 754 of the Code (and any similar or corresponding provision of state or local Law) for the taxable year of the applicable Partnership that includes the Closing Date.

(f)     Sellers shall reasonably cooperate, and cause their respective Affiliates, employees and agents to reasonably cooperate, with Buyer, in connection with (i) the satisfaction of the Beginning of Construction Requirement, including as it relates to the implementation of the plan to assign the Safe Harbor Equipment to the Buyer, in support of the satisfaction of such Beginning of Construction Requirement and (ii) the documentation and collecting and providing evidence regarding the Safe Harbor Equipment and the satisfaction of the Beginning of Construction Requirement, in connection with the future financing of the Projects and the monetization of any RTCs.

SECTION 7.07     *Misallocated Assets*.

(a)     If, following the Closing, Buyer or its Affiliates own or hold any Excluded Asset (including by having an Excluded Asset located at any Owned Real Property or any Leased Real Property that is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer, at no cost to Sellers, such Excluded Asset as soon as practicable to any Sellers designated by Sellers' Representative.

(b)     If, following the Closing, Sellers or any of their respective Affiliates owns or holds any Purchased Asset, the applicable Seller shall transfer, or shall cause its respective Affiliate to transfer, at no cost to Buyer or its Affiliates, such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer and such Seller shall notify Buyer in writing of such Asset, and Buyer may elect to have such Asset assigned to Buyer at no additional cost or purchase price. Notwithstanding the foregoing, Sellers' obligations under this Section 7.07 shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case,

53

after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.  Following the Closing, Sellers shall with Buyer and provide all usernames, login IDs, passwords, security questions and answers, recovery email addresses and telephone numbers, authentication and verification devices (including any physical tokens and mobile authentication apps), and other credentials and access information necessary for Buyer to administer, manage, renew, and fully control all Purchased Intellectual Property.

SECTION 7.08    *Support Obligations; Certain Permits*.

(a)    Buyer shall use commercially reasonable efforts (at Buyer's sole cost and expense) to (i) replace or assume all Support Obligations in a form, for an amount and on terms that satisfy all requirements of the applicable Contracts or Laws under which such Support Obligation was or is required and (ii) effect the full and unconditional release of the Sellers and each of their respective Affiliates from all Support Obligations and all obligations and liabilities in respect thereof, in form and substance reasonably satisfactory to Sellers, in each case of the foregoing clauses (i) and (ii) effective as of the Closing.  Sellers shall, and shall cause their applicable Affiliates to, reasonably cooperate with Buyer with respect to the foregoing.

(b)    To the extent any Support Obligation is not replaced and the Sellers and each of their respective Affiliates are not fully and unconditionally released therefrom, in each case at or prior to the Closing, in accordance with this Section 7.08 (such Support Obligations, collectively, the "**Continuing Support Obligations**"):

(i)    such Seller or such applicable Affiliate shall, subject to Buyer's compliance with this Section 7.08, maintain such Continuing Support Obligation in effect after the Closing to the extent so permitted;

(ii)    Buyer shall continue to use commercially reasonable efforts (at Buyer's sole cost and expense) to, as promptly as practicable after the Closing, but in no event later than two (2) Business Days following the Closing, replace all Continuing Support Obligations then-outstanding in a form, for an amount and on terms that satisfy all requirements of the applicable Contracts or Laws under which each such Continuing Support Obligation was or is required; and

(iii)    Buyer shall, if any Continuing Support Obligation is, after the Closing, drawn upon, called, required to be performed or otherwise requires the payment of any Liability as a result of any action or inaction of Buyer, promptly (in any event within thirty (30) days of the occurrence thereof) pay to or fully reimburse the Sellers and its Affiliates to the extent any of the Sellers or any of their respective Affiliates is required to make or makes any payment or is obligated to reimburse or reimburses the party issuing such Continuing Support Obligation for the applicable drawn upon, called or required amount or Liability (including any related fees, penalties or interest that may be incurred in connection with the drawing, calling or performance of any such Continuing Support Obligation).

(c)     Sellers shall use their commercially reasonable efforts to obtain transfer approval from the State of Oregon the Energy Facility Siting Council with respect to the Project for the benefit of the Buyer; provided that in no event shall receipt of such transfer approval constitute a condition to Closing.

SECTION 7.09     *Payments from Third Parties after Closing.*

(a)     In the event that any Seller or its Affiliates receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Purchased Contracts, or Purchased Assets (or with respect to the operation by Buyer of the Business or any Purchased Asset or Assumed Liability during the post-Closing period) and to the extent such payment is not made solely in connection with an Excluded Asset or an Excluded Liability, Sellers shall, at no cost to Buyer, forward such payment, as promptly as practicable but in any event within ten (10) Business Days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers' Representative) and notify such third party to remit all future payments (in each case, to the extent such payment is in respect of any post-Closing period with respect to the Business or any Purchased Asset or Assumed Liability, and is not solely in respect of an Excluded Asset or an Excluded Liability) pursuant to the Purchased Contracts or Purchased Assets to Buyer (or such other entity).

(b)     Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing solely on account of, or solely in connection with, any Excluded Asset, Buyer shall forward such payment, at no cost to any Seller, as promptly as practicable but in any event within ten (10) Business Days after such receipt, to the applicable Seller (or other entity nominated by Sellers' Representative in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the applicable Seller (or such other entity as Sellers' Representative may designate).

(c)     Notwithstanding the foregoing, Sellers' obligations under this Section 7.09 shall not restrict or limit their ability to complete the Wind-Down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.

SECTION 7.10     *Bulk Transfer Laws*.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any claims, interests, and Encumbrances in the Purchased Assets, including, as applicable, any claims, interests, and Encumbrances arising out of the bulk transfer Laws, and the Parties shall take all reasonable steps as may be necessary or appropriate to so provide in the Sale Order.

SECTION 7.11     *Bankruptcy Court Approval*.

(a)     Sellers shall serve on all non-Debtor counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than seven (7) days prior to the Sale Hearing.

55

(b)     Sellers and Buyer shall cooperate in good faith to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such applicable respective Representatives of Buyer and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer and/or the Buyer Designee(s) as required under Section 365 of the Bankruptcy Code, demonstrating that Buyer and/or the Buyer Designee(s), as applicable, is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Sellers and Buyer acknowledge that in order to obtain such approval Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets and that such demonstration shall include serving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(c)     Each Seller and Buyer (or their applicable respective Representatives), in each case, shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(d)     Subject to entry of the Sale Order and upon consummation of the Closing, Buyer shall pay, or cause the payment of, the Cure Costs and cure any and all other defaults and breaches under the Purchased Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

(e)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Buyer and/or the Buyer Designee(s) on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by Sellers of their respective obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer and/or the applicable Buyer Designee(s) the Purchased Contracts, (iii) find that Buyer and/or the Buyer Designee(s), as applicable, is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that neither Buyer nor the Buyer Designee(s) is a successor to any Seller and grant Buyer and/or the Buyer Designee(s) the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer and the Buyer Designee(s) shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement or as required under applicable non-bankruptcy Law, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (v) find that Buyer and/or the Buyer Designee(s), as applicable, has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Purchased Contracts

56

and (vi) find that neither Buyer nor any Buyer Designee shall have any Liability for any Excluded Liability. Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer and/or the Buyer Designee(s), as applicable, is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. Nothing in this Agreement shall require Buyer, a Buyer Designee, Sellers or their respective Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(f)     Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 2.03, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, claims, interests, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Buyer or to the applicable Buyer Designee, as applicable, free and clear of all obligations, claims, interests, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(g)     In the event the entry of the Bidding Procedures Order, the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such Order), Buyer and Sellers shall use commercially reasonable efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(h)     Notwithstanding anything contained herein to the contrary, during the pendency of the Chapter 11 Cases, Sellers shall not intentionally reject or transfer any Excluded Contract without first obtaining Buyer's prior written consent. In the event that any of the Parties to this Agreement discovers a Contract related to the business of any Seller or its Subsidiaries, the Purchased Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on Section 2.01(a) (ii) is a Contract of which Buyer wishes to assume the rights and obligations, and (iii) has not been rejected by Sellers (with Buyer's prior written consent in compliance with the immediately preceding sentence), Buyer and the applicable Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Buyer or the applicable Buyer Designee to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 2.05.

SECTION 7.12    *No Successor Liability*.  The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, neither Buyer nor any Buyer Designee shall be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that neither Buyer nor any Buyer Designee shall have any Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Purchased Assets) against Sellers or any of Sellers' predecessors or Affiliates, and neither Buyer nor any Buyer Designee shall have any successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Purchased Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date.  The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this <u>Section 7.12</u>.

SECTION 7.13    *Transmission Service Requests*.

(a)    With respect to the six (6) individual BPA Transmission Services Requests ("**TSRs**") with delivery to Portland General Electric (PGE) totaling 440MW and all associated agreements, including but not limited to those identified in <u>Exhibit A</u>, PGR shall take all necessary actions to assign and transfer such TSRs and agreements to Amazon Energy LLC immediately upon the Closing.

(b)    Solely with respect to the sixteen (16) individual BPA TSRs from G0678 to MIDC Remote totaling 760MW identified <u>Annex 1</u> (each a "**Mid-C TSR**"), immediately upon the Closing PGR shall inform BPA of the pending transfer of such Mid-C TSRs to Amazon Energy LLC and designate representatives of Buyer to be the main point of contact for BPA with respect to such Mid-C TSRs.  At such time as is permitted by BPA, PGR shall, (i) execute the earlier of a conditional firm service agreement between PGR and BPA (the "**Conditional Firm Service Agreement**") and a transmission service agreement between PGR and BPA (the "**Transmission Service Agreement**"), with respect to the Mid-C TSRs, both in form and substance reasonably satisfactory to Buyer, and (ii) within thirty (30) days of the execution of the Conditional Firm Service Agreement or the Transmission Service Agreement, as applicable, assign (each an "**Assigned BPA Mid-C Agreement**") (A) the Conditional Firm Service Agreement or the Transmission Service Agreement, as applicable, associated with AREF Nos. 97303804, 97303727, 97303722, 97303708, 97303699, 97303692, 97303686, 97303682, 97303678, 97303671, 97303663, 97303626, 97303563, 97303555, 97303526, and 97303495 (the "**AREF Nos.**"), (B) the Preliminary Engineering Agreements associated with the AREF Nos., (C) the associated transmission service requests with the AREF Nos. submitted by PGR to BPA and (D) any agreement(s) executed between PGR and BPA associated with the AREF Nos., to Buyer or its Affiliate, at Buyer's direction.  Until such time as PGR is able to assign the Assigned BPA Mid-C Agreements, Buyer shall assume all costs associated with the Assigned BPA Mid-C Agreements. PGR shall not execute any further agreements regarding the AREF Nos. without Buyer's prior

written consent. With respect to each Mid-C TSR, following the Closing and until BPA approves the transfer of such Mid-C TSR to Buyer (or its designee), PGR shall not withdraw such Mid-C TSR and shall comply with all of its obligations thereunder.

(c)     References in this Section to PGR shall also include any other Seller who then holds any rights to any TSRs.

SECTION 7.14     *Investigation; Purchased Assets*.

(a)     Buyer acknowledges for the benefit of Sellers (and their respective financial and other professional advisors) that it has conducted its own independent investigation and analysis of the business, operations, Assets, liabilities, results of operations, condition (financial or otherwise) and prospects of the Business, the Purchased Assets, and the Assumed Liabilities, and that it and its representatives have received access to certain of the books and records, facilities, equipment, Contracts and other Assets of the Business (including the Purchased Assets) for such purpose. Buyer further acknowledges and agrees for the benefit of Sellers (and their respective financial and other professional advisors) that, except for the representations and warranties contained in Article 3 (as modified by the Disclosure Schedules) and the acknowledgements and agreements set forth in Section 7.11(e) and Section 7.11(f), no Seller nor any of its respective Affiliates or financial or other professional advisors, nor its or their respective Representatives, makes or has made any representation or warranty, either express or implied, or other statements or information concerning the Business, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities in connection with the transactions contemplated by this Agreement and Sellers hereby disclaim any other representations made by any Seller or any other Person concerning the Business, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities in connection with the transactions contemplated by this Agreement. No Seller makes any representations or warranties regarding the probable success or profitability of the Business. Buyer has not relied on any representation, warranty or other statement by any Person on behalf of Sellers, other than the representations and warranties of Sellers expressly contained in Article 3 (as modified by the Disclosure Schedules) and the acknowledgements and agreements set forth in Section 7.11(e) and Section 7.11(f). Notwithstanding the foregoing, nothing in this Section 7.14 shall limit or alter the rights of Buyer under any other agreement with Sellers.

(b)     Buyer agrees, warrants and represents that Buyer is purchasing the Purchased Assets "AS IS" and "WITH ALL FAULTS" based solely on the representations and warranties set forth in Article 3 (as modified by the Disclosure Schedules), and the acknowledgements and agreements set forth in Section 7.11(e) and Section 7.11(f) and Buyer's own investigation of the Sellers, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Business. Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS." Buyer agrees, warrants and represents that, except for the express representations and warranties set forth in Article 3 (as modified by the Disclosure Schedules) and the acknowledgements and agreements set forth in Section 7.11(e) and Section 7.11(f), Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN ARTICLE 3 (AS MODIFIED BY

THE DISCLOSURE SCHEDULES) AND THE ACKNOWLEDGEMENTS AND AGREEMENTS SET FORTH IN SECTION 7.11(e) AND SECTION 7.11(f), NO SELLER MAKES ANY EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES OR THE BUSINESS.

SECTION 7.15     *Releases.*

(a)     Effective as of the Closing, each Seller, for itself and on behalf of its past, present and future controlled Affiliates and its and such Affiliates' respective current or former directors, officers, members, partners, managers, employees, agents, lenders, investment bankers, attorneys, accountants, advisors and other representatives (collectively, "**Representatives**"), and each of its and their respective successors, assigns, heirs and executors (each, a "**Seller Releasor**"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Seller Releasor has, may have, or may assert now or in the future against (i) Buyer or any Buyer Designee, (ii) any Affiliates of Buyer or any Buyer Designee, (iii) any Representatives of Buyer or any Buyer Designee or their respective Affiliates, (iv) any current (as of the Closing Date) or former direct or indirect equity holder in Buyer or any Buyer Designee or any of their respective Affiliates, or (v) any lenders of Buyer, any Buyer Designee or their respective Affiliates (collectively, the "**Buyer Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing; provided, that, notwithstanding the foregoing, nothing in this Section 7.15 shall be deemed to release, waive or otherwise diminish in any respect any rights or remedies of any Seller Releasor (i) under this Agreement or other Transaction Document or the Sale Order, (ii) claims in the event of Fraud, (iii) claims that may not be released by Law, or (iv) claims any Seller Releasors may have under any Seller's then existing director and officer liability insurance policy or other similar insurance policies with respect to facts, circumstances and events solely arising or occurring prior to the date hereof.

(b)     Effective as of the Closing, Buyer, for itself and on behalf of its past, present and future controlled Affiliates and its and such Affiliates' respective Representatives, and each of its and their respective successors, assigns, heirs, and executors (each, a "**Buyer Releasor**"), hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, Actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured,

60

liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which any Buyer Releasor has, may have, or may assert now or in the future against with respect to the transaction contained by this Agreement (i) each Seller, (ii) any Affiliates of Sellers and (iii) any Representatives of Sellers or their respective Affiliates (collectively, the "**Seller Released Parties**" and, together with the Buyer Released Parties, the "**Released Parties**"), in each case solely in its capacity as such, arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing; provided, that, notwithstanding the foregoing, nothing contained in this Section 7.15 shall be deemed to release, waive or otherwise diminish in any respect any rights or remedies of any Buyer Releasor (i) under this Agreement or other Transaction Document or the Sale Order, (ii) claims in the event of Fraud, (iii) claims that may not be released by Law, (iv) claims against the Seller Released Parties in their capacities as employees of the Sellers or their respective Affiliates, solely to the extent such claims are covered under applicable director and officer liability insurance policy, or (v) to enforce or interpret the Sale Order or to assert any rights, claims, or defenses arising under or relating to the Bankruptcy Code, including §§ 363 and 365.

ARTICLE 8

SELLERS' REPRESENTATIVE

SECTION 8.01    *Appointment*.   Effective as of the date hereof, each Seller, for himself, herself or itself, and for his, her or its respective successors and assigns, hereby irrevocably makes, constitutes and appoints PGR (the "**Sellers' Representative**") as such Seller's true and lawful attorney-in-fact, with full power of substitution, to exercise such powers under this Agreement and any other agreement or instrument entered into in connection with the transactions contemplated by this Agreement and the other Transaction Documents that require any form of Seller approval or consent, together with all such powers as are reasonably incidental thereto, to act on behalf of such Seller with respect to the Purchased Assets in any litigation or arbitration or other dispute involving this Agreement or any of the other documents or agreements entered into in connection with the transactions contemplated hereby, to do or refrain from doing all such further acts and things, and to execute and deliver all such documents as the Sellers' Representative shall deem necessary or appropriate in his, her or its sole discretion in connection with the transactions contemplated hereby, including, without limitation, to, solely or on behalf of the Sellers: (a) execute and deliver all amendments, waivers, ancillary agreements, instruments of assignment, notices, certificates and documents that the Sellers' Representative deems necessary or appropriate in connection with the transactions contemplated hereby (including the consummation thereof) and any and all other agreements referenced herein, and to exercise all rights hereunder and thereunder; (b) act for and on behalf of each Seller with respect to any claim or matter arising on or after the Closing Date under this Agreement, including in respect of giving and receiving notices, requests, demands, claims, or other communications under Section 12.01; (c) accept service of process on behalf of Sellers pursuant to Section 12.05; (d) update and revise the Allocation Schedule; (e) engage counsel, and such accountants and other representatives for such Seller and incur such other expenses on behalf of such Seller in connection with this Agreement as the Sellers' Representative may, in each case, and in the Sellers' Representative's sole discretion, deem appropriate; (f) interpret any and all of the terms and provisions of this Agreement; (g) consent to any amendment or waiver

of any of the terms or provisions of this Agreement; and (h) to receive funds for the payment of expenses of such Seller or the Sellers' Representative and to apply such funds in payment for such expenses.  The execution of any documents permitted by the immediately preceding sentence by PGR, acting as Sellers' Representative, shall be conclusive evidence of its authority as attorney-in-fact hereunder, and generally to say, do, act, transact, determine, accomplish and finish all matters and things whatsoever, relating to the powers granted herein, as fully, amply and effectually as though such Seller, if present, ought or might personally do.  Each Seller acknowledges that the appointment of PGR as the Sellers' Representative herein is coupled with an interest and may not be revoked and will survive insolvency or bankruptcy of any Seller.  The Sellers' Representative accepts its appointment and authorization to act as attorney-in-fact and agent of the Sellers.  The power and authority granted hereunder will be exclusive and no Seller shall be entitled to exercise any right under this Agreement except through the Sellers' Representative.

SECTION 8.02      *Authorization*.  In furtherance of the appointment of the Sellers' Representative herein made and to the extent of the authority granted to the Sellers' Representative pursuant to Section 8.01, each Seller, fully and without restriction: (a) agrees to be bound by all notices received and agreements and determinations made by and documents executed and delivered by the Sellers' Representative under this Agreement and (b) authorizes the Sellers' Representative to (i) perform the transactions to be performed by any Seller under this Agreement, (ii) dispute or refrain from disputing any claim made by the Buyer under this Agreement, (iii) negotiate and compromise any dispute that may arise under this Agreement, (iv) exercise or refrain from exercising any remedies available to any Seller under this Agreement, (v) sign any releases or other documents with respect to any such dispute or remedy, (vi) waive any condition contained in, or execute any amendment to, this Agreement, (vii) give such instructions and do such other things and refrain from doing such other things as the Sellers' Representative, in his, her or its sole discretion, deems appropriate to carry out the provisions of this Agreement, (viii) give and receive notices, requests, demands, claims or other communications under Section 12.01, (ix) accept service of process on behalf of the Sellers pursuant to Section 12.05 and (x) retain such counsel, accountants and other professional advisors as the Sellers' Representative reasonably deems necessary to assist it in the performance of his, her or its duties hereunder.

SECTION 8.03      *Sellers' Representative Expenses*.  All of Sellers' Representative's reasonable out-of-pocket expenses incurred in serving in that capacity and any costs and expenses incurred by Sellers' Representative pursuant to this Article 8 shall be borne by Sellers in accordance with their respective pro rata shares.  Sellers' Representative shall have the right to setoff Sellers' Representative's reasonable out-of-pocket expenses incurred in serving in that capacity and any costs and expenses incurred by Sellers' Representative pursuant to this Article 8 against any distribution to Sellers.

SECTION 8.04      *Indemnification*.  Each Seller hereby agrees to indemnify the Sellers' Representative (in his, her or its capacity as such), and to hold the Sellers' Representative (in his, her or its capacity as such) harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of whatever kind which may at any time be imposed upon, incurred by or asserted against the Sellers' Representative in such capacity in any way relating to or arising out of the Sellers'

Representative's action or failure to take action pursuant to this Agreement or any other document or agreement contemplated herein or in connection herewith in such capacity; provided, however, that no Seller shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the gross negligence, bad faith or willful misconduct of the Sellers' Representative.

SECTION 8.05    *Successor Sellers' Representative*.  The Sellers' Representative may resign at any time by giving notice thereof to Sellers and Buyer at least two (2) Business Days prior to such resignation, upon which time a successor Sellers' Representative shall be appointed by a majority of the Sellers or the Sellers' Representative.  Upon the acceptance of its appointment as the Sellers' Representative hereunder by a successor Sellers' Representative, such successor Sellers' Representative shall thereupon succeed to and become vested with all the rights and duties of the resigning Sellers' Representative, and the resigning Sellers' Representative shall be discharged from its duties and obligations hereunder.  After the resigning Sellers' Representative's resignation hereunder as the Sellers' Representative, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Sellers' Representative.

SECTION 8.06    *Buyer Reliance*.  Buyer shall be entitled to rely exclusively upon any action taken or omitted to be taken, any consent given, notice received or delivered, or any document executed or purported to be executed by the Sellers' Representative as being fully binding upon all Sellers, and Buyer shall have no liability or obligation whatsoever to any Seller or any other Person in relying on such action, omission, consent, notice, or document of the Sellers' Representative.  Buyer shall be entitled to assume that the appointment of the Sellers' Representative remains in full force and effect and has not been revoked, and that the Sellers' Representative has full power and authority to act on behalf of the Sellers hereunder until Buyer has received written notice from the Sellers of the appointment of a successor Sellers' Representative in accordance with Section 8.05, and such notice has become effective.

ARTICLE 9

CONDITIONS TO CLOSING

SECTION 9.01    *Conditions to Obligations of Buyer and Sellers*.  The respective obligations of each of Buyer and Sellers to consummate the Closing are subject to the satisfaction or valid waiver in writing by Buyer and Sellers (to the extent permitted by applicable Law) at or prior to the Closing of the following conditions:

(a)    no provision of any applicable Law and no judgment, injunction or Order shall then be in effect, enjoining, preventing, prohibiting or making illegal the consummation of the Closing; and

(b)    the Bankruptcy Court shall have declared the Buyer as the "Successful Bidder" (as defined in the Bidding Procedures Order) and shall have entered the Sale Order and the Sale Order shall be a Final Order.

SECTION 9.02 *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction (or valid waiver in writing by Buyer to the extent permitted by applicable Law) at or prior to the Closing of the following further conditions:

(a) each Seller Fundamental Representation shall be true and correct (except for any de minimis inaccuracies) on and as of the Closing as if made on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct (except for any *de minimis* inaccuracies) as of such earlier date;

(b) the representations and warranties of Sellers in this Agreement which are not Seller Fundamental Representations shall be true and correct on and as of the Closing as if made on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein), has not had or would not reasonably be expected to have a Material Adverse Effect;

(c) from and after the date of this Agreement, there shall not have occurred and be continuing any event, change, condition, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(d) the covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(e) the Sellers shall have complied with Section 5.04 in all respects;

(f) following execution of this Agreement, Sellers shall have delivered, or cause to be delivered, written notice to the Oregon Energy Facility Siting Council of the sale and the transactions contemplated by this Agreement in compliance with Oregon Administrative Rule 345-027-0400(2), and shall have delivered a copy of such notice to Buyer together with reasonable evidence of the delivery thereof;

(g) Sellers shall (i) have designated Travis Metcalfe (tjmets@amazon.com). Kirsten Eliassen (kirsten@gallatinpower.com), Marian Bonar (marian@gallatinpower.com) and Adam Schumaker (adam@gallatinpower.com) (each of whom is a Representative of Amazon Energy LLC or Gallatin Power Partners, LLC) as additional points of contact with the BPA with respect to the Mid-C TSRs, and such designation shall be effective as of or prior to the Closing, and (ii) have provided Buyer with reasonable evidence that such designation has been accepted by BPA; and

(h) Sellers shall have delivered, or cause to be delivered, to Buyer each item set forth in Section 2.08(a).

SECTION 9.03    *Conditions to Obligation of Sellers*.  The obligation of Sellers to consummate the Closing is subject to the satisfaction (or valid waiver in writing by the Sellers' Representative) at or prior to the Closing of the following further conditions:

(a)    the representations and warranties of Buyer in this Agreement shall be true and correct on and as of the Closing as if made on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein) as of such earlier date, except where such failures to be true and correct would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)    the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)    Buyer shall have paid any Cure Costs;

(d)    the Buyer Parent Guaranty is in full force and effect; and

(e)    Buyer shall have delivered, or cause to be delivered, to Sellers' Representative each item set forth in Section 2.08(b).

SECTION 9.04    *Waiver of Conditions*.  Upon the occurrence of the Closing, any condition set forth in this Article 9 that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.  None of Buyer or Sellers may rely on the failure of any condition set forth in this Article 9, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement or otherwise comply with any provision of this Agreement, in all material respects.

ARTICLE 10

SURVIVAL

SECTION 10.01    *Survival*.  Except in the case of Fraud, the Parties, intending to modify any applicable statute of limitations, agree that (a) (i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "**Surviving Post-Closing Covenants**") until the earliest of (i) full performance of such covenant in accordance with its terms, (ii) three (3) years following the Closing Date and (iii) with respect to each Seller individually, the completion of the Wind-Down of such Seller; provided, that the

covenants in <u>Section 7.13</u> shall survive the Closing in accordance with their respective terms until the full performance of such covenant in accordance with its terms. Except in the case of Fraud or with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by any Party with respect to any representations and warranties in this Agreement or any covenants in this Agreement only requiring performance prior to the Closing, and each Party shall cause its Affiliates not to assert or seek any other remedy, against the other Parties or any of their respective Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise with respect thereto, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law.  Buyer and Sellers acknowledge and agree, on their own behalf and on behalf of their Affiliates that the agreements contained in this <u>Section 10.01</u> are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.01</u>, none of the Parties would enter into this Agreement.

ARTICLE 11

TERMINATION

SECTION 11.01     *Grounds for Termination*.  This Agreement may be terminated only in accordance with this <u>Section 11.01</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Sellers' Representative and Buyer;

(b)     by written notice of either Sellers' Representative or Buyer, if the Closing shall not have been consummated on or before February 28, 2026 (the "**End Date**"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 11.01(b)</u> shall not be available to a Party whose breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of the Closing to occur on or before the End Date;

(c)     by Sellers' Representative, if Sellers are not then in material breach of their representations, warranties, covenants or agreements under this Agreement and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in <u>Section 9.01</u> or <u>Section 9.03</u>, (ii) cannot be, or has not been, cured prior to the End Date, and in any event, within thirty (30) days following delivery of written notice to Buyer of such breach or failure to perform and (iii) has not been waived by Seller;

(d)     by Buyer, if Buyer is not then in material breach of its representations, warranties, covenants or agreements under this Agreement and Sellers breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in <u>Section 9.01</u> or <u>Section 9.02</u>, (ii) cannot be, or has not been, cured prior to the End Date, and in any event, within thirty (30) days following delivery of written notice to Seller of such breach or failure to perform and (iii) has not been waived by Buyer;

66

(e)     by Buyer or Sellers' Representative, if any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement or any other Transaction Document and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 11.01(e) shall not be available to a Party that failed to use its reasonable best efforts to contest, resolve or lift such Order; provided, further, that the right to terminate this Agreement under this Section 11.01(e) shall not be available to any Party if such Order was primarily caused by (i) such Party's (or in the case of Sellers' Representative, any Seller's) material breach of any provision of this Agreement or (ii) such Party's (or in the case of Sellers' Representative, any Seller's) failure to comply in any material respect with its obligations hereunder;

(f)     by Buyer or Sellers' Representative, if an Order of the Bankruptcy Court is entered denying approval of the Sale Order and such Order shall have become a Final Order;

(g)     by Buyer or Sellers' Representative, if, on or prior to the fifth (5th) Business Day following the date hereof, Buyer has not delivered written notice to Seller confirming that Buyer or its Affiliates have obtained all necessary internal approvals with respect to the incurrence of expenditures pursuant to the UEC Large Generator Interconnection Agreement No.1 (LGIA) and No. 3 (LGIA)   set forth under the heading "Umatilla Electric Cooperative ("**UEC**") Interconnection Assets" in Exhibit A;

(h)     by Buyer, if the Sale Order is not entered on or prior to the date that is seven (7) Business Days following the Sale Hearing; provided, that if the approval of the Sale Order is delayed due to the unavailability of the Bankruptcy Court, the next Business Day on which the Bankruptcy Court is available;

(i)     by Buyer, if the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions under this Agreement; or

(j)     by Buyer, if there shall have occurred any event, change, condition, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

The Party desiring to terminate this Agreement pursuant to this Section 11.01 (other than pursuant to Section 11.01(a)) shall give written notice of such termination to the other Party in accordance with Section 12.01.  For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 11.01 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 11.01 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

SECTION 11.02     *Effect of Termination*.

(a)     If this Agreement is terminated as permitted by Section 11.01, (i) this Agreement shall become null and void and of no further force and effect, except for the provisions of Section 7.01(a), this Section 11.02, Section 11.03 and Article 12, which shall survive such termination of this Agreement and (ii) no Party (nor any stockholder, director, officer, employee,

agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder; provided that nothing in this Section 11.02 shall be deemed to release any Party from any Liability (x) for any breach of this Agreement occurring prior to its termination, (y) for Fraud and (y) that may otherwise be provided in, or contemplated by, the provisions of Section 7.01(a).

(b)     In the event of a termination of this Agreement pursuant to Section 11.01(c) or Section 11.01(g), the Escrow Agent shall, within two (2) Business Days after receiving notice of such termination (and Buyer and Sellers each agree to promptly deliver such notice following any such termination), disburse the Deposit Escrow Amount to an account designated by Sellers by wire transfer of immediately available funds to be retained by Sellers for their own account; provided that disbursement of the Deposit Escrow Amount shall not constitute liquidated damages or otherwise limit Sellers' remedies against Buyer in any respect of any claim against Buyer arising under this Agreement or otherwise (except that any damages that may be awarded against Buyer by any court shall be reduced by the amount of the Deposit Escrow Amount).

(c)     In the event of a termination of this Agreement pursuant to this Article 11 (other than as set forth in Section 11.02(b)), Sellers and Buyer shall instruct the Escrow Agent to, and the Escrow Agent shall, promptly (but in any event within two (2) Business Days of such instruction) return to Buyer the Deposit Escrow Amount by wire transfer of immediately available funds and the return thereof shall constitute the sole and exclusive remedy of Buyer in the event of a termination hereunder.

SECTION 11.03     *Costs and Expenses*.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

ARTICLE 12

MISCELLANEOUS

SECTION 12.01     *Notices*.  All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer, to:

Oregon Solar 1, LLC
410 Terry Avenue North
Seattle, Washington 98109-5210
Attention:     Amazon Energy LLC; General Counsel (AWS Energy)
Email:         contracts-energylegal@amazon.com;
               amazon-renewables-notices@amazon.com

with a copy, which shall not constitute notice, to:

68

> Dentons US LLP
> 1900 K Street NW
> Washington, DC 20006
> Attention:      Andrew P. Mina
> Email:           andrew.mina@dentons.com

if to Sellers, to:

> c/o Pine Gate Renewables, LLC
> 130 Roberts Street
> Asheville, North Carolina 28801
> Attention:      Judith Hall
> Email:           judithhall@pgrenewables.com

> with a copy, which shall not constitute notice, to:

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention:      Ethan Schultz, Andrew Parlen and Jason Gott
> Email:           ethan.schultz@lw.com;
>                       andrew.parlen@lw.com;
>                       jason.gott@lw.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if personally delivered after 5:00 p.m. New York time, then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

SECTION 12.02      *Amendments and Waivers*.

(a)      Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each of Buyer and Sellers' Representative (on behalf of itself and each Seller) or, in the case of a waiver, by the Party against whom the waiver is to be effective; provided that any waiver asserted against any Seller shall be valid if given by Sellers' Representative on behalf of such Seller.  For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)      No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by applicable Law.

69

SECTION 12.03    *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that subject to Buyer's right to designate a Buyer Designee as set forth in Section 2.01 and any assignment of this Agreement to an Affiliate of Buyer, Buyer, on the one hand, may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of Sellers' Representative, and each Seller, on the other hand, may not assign, delegate or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of Buyer.  Any attempted assignment in violation of this Section 12.03 shall be null and void, *ab initio*.  Notwithstanding anything herein to the contrary, (a) in no event shall the designation of a Buyer Designee result in incremental Taxes that would be borne by or otherwise reduce any amounts available to Sellers and (b) Buyer shall provide Sellers with a reasonable advance notice prior to the designation of a Buyer Designee and shall cooperate in good faith with Sellers in connection therewith.

SECTION 12.04    *Governing Law*.  This Agreement, and all disputes, claims and causes of action (whether in contract or tort) arising out of, relating to or in connection with this Agreement, or the negotiation, execution or performance of this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, including with respect to the application of the State of Delaware's statute of limitations to any such disputes, claims or causes of action, without regard to the conflicts of law rules of such State.

SECTION 12.05    *Jurisdiction*.  The Parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The Parties further agree that, following the Bankruptcy Period, any Action with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Action (including any Proceeding) and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action (including any Proceeding) in such courts or that any such Action (including any Proceeding) which is brought in such courts has been brought in an inconvenient forum.  Process in any such Action (including any Proceeding) may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware.  Without limiting the foregoing, each Party agrees that service of process on such Party in the manner as provided in Section 12.01 for notices shall be deemed effective service of process on such Party.

SECTION 12.06    *WAIVER OF JURY TRIAL*.   TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN

CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.06 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

SECTION 12.07  *Counterparts; Third-Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of a .pdf version (or other electronic means) of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Parties. Except as otherwise expressly stated or referred to herein, and except for the Released Parties under Section 7.15 and the Non-Recourse Parties under Section 12.13, no other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder.

SECTION 12.08  *Specific Performance*. It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Sellers or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Sellers and Buyer shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Sellers, as may be applicable, to comply promptly with any of their obligations hereunder. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order. For the avoidance of doubt, (i) it is hereby acknowledged and agreed that Sellers' Representative and each Seller shall be entitled to specific performance to enforce, including against anticipatory breach, the Buyer's obligation to consummate the Closing and (ii) to the extent Sellers' Representative or any Seller brings an action to enforce specifically Buyer's obligation to consummate the Closing, the End Date shall automatically be extended to the tenth (10th) Business Day following the final resolution of such action or proceeding. Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that the equitable remedy of specific performance shall be available solely upon satisfaction of all of the following conditions precedent: (a) this Agreement has been finalized and executed by all Parties, including receipt of all required counterpart signatures; (b) all exhibits, schedules, annexes, attachments, and other documents expressly referenced in, or required by, this Agreement have been completed in final form, agreed upon, and executed by the applicable parties, if necessary; and (c) all other conditions, if any, expressly stated in this

71

Agreement as prerequisites to specific performance have been satisfied or waived in writing by the Party entitled to the benefit thereof.

SECTION 12.09    *Entire Agreement*.   This Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter.  No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parole evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

SECTION 12.10    *No Strict Construction*.   Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 12.11    *Severability*.   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 12.12    *Disclosure Schedules*.   The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures in the Disclosure Schedules.  Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of Sellers or their respective businesses, in whole or in part, or as an admission of Liability or obligation of Sellers to any Person who is not a Party.  The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will apply to and will be deemed to be disclosed with respect to any other representation and warranty, so long as the applicability of such disclosure is reasonably apparent on its face.  Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an

admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law. The Disclosure Schedules and the information and disclosures contained therein are intended only to modify the representations or warranties of Sellers contained in this Agreement. Where the terms of a contract or document have been summarized or described in the Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract or document, and all such summaries and descriptions are qualified in their entirety by reference to the contract or document being summarized or described to the extent such contract or other document has been made available to Buyer prior to the date hereof. Sellers may (but shall not be obligated to), upon the written consent of Buyer, supplement or amend the Disclosure Schedules to reflect any fact, event or condition which was or would have been required to be described in the Disclosure Schedules in order to avoid any representation or warranty of the Sellers contained in this Agreement from being untrue or inaccurate as of the date hereof or as of the Closing. Any such supplement or amendment of the Disclosure Schedules in accordance with this Section 12.12 shall be deemed to cure the breach of any such representation or warranty and amend and/or supplement the Disclosure Schedules, as applicable, for all purposes hereunder, except for purposes of determining whether or not the condition set forth in Section 9.02(a) or Section 9.02(b) has been satisfied.

SECTION 12.13     *No Recourse*.  Notwithstanding anything in this Agreement or in any other Transaction Document, the Parties hereby acknowledge and agree that, except to the extent a Person is a named party to this Agreement, no Person, including any current, former or future director, officer, employee, incorporator, member, manager, director, partner, investor, shareholder, agent, Representative, or Affiliate thereof (collectively, the "**Non-Recourse Parties**"), shall have any liability to the other Party, and each Party shall have no recourse against, any Non-Recourse Party or any other Person other than the other Party in connection with any liability, claim or cause of action arising out of, or in relation to, this Agreement, any other Transaction Document or the transactions contemplated hereby and thereby, other than in the case of Fraud.

SECTION 12.14     *LIMITATION OF LIABILITY AND DAMAGES*.  EXCEPT IN THE CASE OF FRAUD OR INTENTIONAL BREACH ON THE PART OF BUYER OR ANY AFFILIATE OF BUYER, BUYER AND ANY BUYER-RELATED PARTIES WILL IN NO EVENT (a) BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY, OR (b) HAVE TOTAL AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEEDING (i) FOLLOWING ANY TERMINATION OF THIS AGREEMENT PRIOR TO THE OCCURRENCE OF THE CLOSING, (A) $83,000,000 PLUS (B) THE AMOUNT OF ALL REIMBURSABLE EXPENSES MINUS (C) THE DEPOSIT ESCROW AMOUNT, AND (ii) FOLLOWING THE CONSUMMATION OF THE CLOSING (INCLUDING PAYMENT BY BUYER OF ALL AMOUNTS DUE PURSUANT TO Section 2.06), THE AMOUNT, IN THE AGGREGATE, OF ANY SUCH LIABILITY ARISING UNDER ANY EXPRESS POST-CLOSING OBLIGATIONS OF BUYER SET FORTH HEREIN (INCLUDING UNDER Section 7.02, Section 7.06(d), Section 7.08, Section 7.09(b), Section 7.13, AND Section 7.15).

*[Signature Pages Follow.]*

73

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<u>**SELLERS**</u>

**Pine Gate Renewables, LLC**

By: _____

Name:  Raymond Shem
Title:    President and Chief Financial Officer

**Sunstone Solar, LLC**

By: _____

Name:  Raymond Shem
Title:    Authorized Signatory

**Sunstone Solar 1, LLC**

By: _____

Name:  Raymond Shem
Title:    Authorized Signatory

**Sunstone Solar 2, LLC**

By: _____

Name:  Raymond Shem
Title:    Authorized Signatory

**Sunstone Solar 3, LLC**

By: _____

Name:  Raymond Shem
Title:    Authorized Signatory

**Sunstone Solar 4, LLC**

By: _____
Name:   Raymond Shem
Title:    Authorized Signatory


**Sunstone Solar 5, LLC**

By: _____
Name:   Raymond Shem
Title:    Authorized Signatory


**Sunstone Solar 6, LLC**

By: _____
Name:   Raymond Shem
Title:    Authorized Signatory

**<u>BUYER</u>**

**OREGON SOLAR 1, LLC**

By: _Brandon Oyer_____
Name:  Brandon Oyer
Title:   President

**SELLERS' REPRESENTATIVE**

**Pine Gate Renewables, LLC**

By: _____
Name:   Raymond Shem
Title:    President and Chief Financial Officer

## Exhibit A

### Sunstone Project Assets

**Real Estate**

1. Option Agreement for Ground Lease for Solar Energy System by and between William J. Doherty Ranch, LLC and Bombing Range Solar I, LLC, dated April 23, 2021, for 2,600 leasable acres (and 3,221 total acres), a Memorandum of Option Agreement recorded on May 18, 2021, at Doc. 2021-48842 in the records of the County Clerk for Morrow County, Oregon ("Morrow County") and that certain Corrected and Restated Memorandum of Option Agreement recorded on November 16, 2022, at Doc. 2022-52233 in the records of Morrow County, as amended by the First Amendment to Option Agreement dated November 2, 2022, the Second Amendment to Option Agreement dated February 18, 2023, and the Third Amendment to Option Agreement dated November 15, 2023 and the First Amendment to Memorandum of Option Agreement recorded on December 5, 2023 at Doc. 2023-53885 in the records of the Morrow County.

    a) Notice of Name Change submitted to William J. Doherty Ranch, LLC notifying Grantor of the name change from Bombing Range Solar I, LLC to Echo Solar, LLC dated April 19, 2022.

    b) Notice of Tenant Change of Name submitted to William J. Doherty Ranch, LLC notifying Grantor of the name change from Echo Solar, LLC to Sunstone Solar, LLC dated May 30, 2023.

    c) Subordination, Non-Disturbance and Attornment Agreement between Banner Bank and Sunstone Solar, LLC undated and not signed by Sunstone Solar.

2. Option Agreement for Ground Lease for Solar Energy System by and between Matheny Property, LLC and Bombing Range Solar I, LLC, dated August 16, 2021, for no less than 500 acres and no more than 1,280 acres (per below referenced First Amendment), a Memorandum of Option Agreement for Ground Lease for Solar Energy System recorded on August 30, 2021 at Doc. 2021-49642 in the records of Morrow County and that certain Corrected and Restated Memorandum of Option Agreement recorded on August 23, 2022 at Doc. 2022-51827 in the records of Morrow County, as amended by the First Amendment to Option Agreement dated November 15, 2023 and the First Amendment to Memorandum of Option Agreement recorded on December 5, 2023 at Doc. 2023-53886 in the records of Morrow County.

    a) Notice of Name Change submitted to Matheny Property LLC notifying Grantor of the name change from Bombing Range Solar I, LLC to Echo Solar, LLC dated July 12, 2022.

    b) Notice of Tenant Change of Name to Matheny Property LLC notifying Grantor of the change of name from Echo Solar, LLC to Sunstone Solar, LLC dated May 30, 2023.

    c) Release of Oil, Gas and Mineral Lease by Husky Exploration (CRB) Inc. with an Effective Date of October 9, 2023 for the Matheny property.

3. Real Estate Purchase and Sale Agreement between Ken and Carri Grieb and Grieb Farms, Inc. as Seller and Bombing Range Solar II, LLC as Buyer, dated February 16, 2022, for 4,370 total acres, a Memorandum of Real Estate Purchase & Sale Agreement recorded on April 11, 2022 at Doc. 2022-51004 in the records of the Morrow County, as amended by the First Amendment to Real Estate Purchase and Sale Agreement dated March 23, 2022, the Second Amendment to Real Estate Purchase and Sale Agreement dated January 16th, 2023, the Third Amendment to Real Estate Purchase and Sale Agreement dated December 5th, 2023 and the Fourth Amendment to Real Estate Purchase and Sale Agreement dated October 28th, 2025.

    a) Assignment and Assumption of Sale Agreement by and between Bombing Range Solar II, LLC, as assignor, and Echo Solar, LLC, as assignee, dated September 21, 2022 and a Memorandum of Assignment and Assumption of Release Estate Purchase and Sale Agreement recorded on June 5, 2024 at Doc. 2024-54565 in the records of Morrow County.

    b) Notice of Assignment and Assumption of Real Estate Purchase and Sale Agreement submitted by Echo Solar, LLC to Grieb Farms, Inc. dated October 5, 2022.

    c) Notice of Tenant Change of Name submitted to Grieb Farms, Inc. notifying Seller of the name change from Echo Solar, LLC to Sunstone Solar, LLC dated May 30, 2023

    d) Notice of Collateral Assignment of Purchase and Sale Agreement from Sunstone Solar, LLC (as grantee) to FP Solar Development I LLC (as lender) submitted by Sunstone Solar, LLC to Grieb Farms, Inc. dated June 4, 2024.

4. Option Agreement for Solar Energy System Ground Lease between Tony Robert Ashbeck and Gerald Thomas Ashbeck and Bombing Range Solar II, LLC dated October 26, 2021 for 1,543 total acres, a Memorandum of Option Agreement For Ground Lease for Solar Energy System recorded on November 5th, 2021 in the records of the Morrow County at Doc No. 2021-50132, as amended by the First Amendment to Option Agreement dated November 15th, 2023 and the First Amendment to Memorandum of Option Agreement recorded on December 5th, 2023 at Doc. 2023-53883 in the records of the Morrow County.

    a) Assignment and Assumption of Option Agreement by and between Bombing Range Solar II, LLC (as assignor) and Echo Solar, LLC (as assignee) dated September 21, 2022.

    b) Notice of Assignment of Option Agreement submitted by Echo Solar, LLC to Tony Ashbeck and Gerald Ashbeck dated October 5, 2022.

    c) Notice of Tenant Change of Name submitted to Tony Ashbeck and Gerald Ashbeck notifying Grantor of the name change from Echo Solar, LLC to Sunstone Solar, LLC dated May 30, 2023.

    d) Notice of Option Agreement Extension submitted to Tony & Gerald Ashbeck from Sunstone Solar, LLC dated October 11, 2024.

5. Option Agreement for Solar Energy System Ground Lease between William J. Doherty Ranch, LLC and Bombing Range Solar II, LLC, dated February 2, 2022, for 318 total acres, a Memorandum of Option Agreement for Ground Lease for Solar Energy System recorded on

February 7th, 2022 at Doc. 2022-50676 in the records of Morrow County, as amended by the First Amendment to Option Agreement dated November 15th, 2023 and the First Amendment to Memorandum of Option Agreement recorded on December 5th, 2023 at Doc. 2023-53884 in the records of the Morrow County.

a)  Assignment and Assumption of Option Agreement by and between Bombing Range Solar II, LLC, as assignor, and Echo Solar, LLC, as assignee dated September 21, 2022.

b)  Notice of Assignment and Assumption of Option Agreement submitted by Echo Solar, LLC to William J. Doherty Ranch, LLC dated October 6, 2022.

c)  Notice of Tenant Change of Name submitted to William J. Doherty Ranch, LLC notifying Grantor of the name change from Echo Solar, LLC to Sunstone Solar, LLC dated May 30, 2023.

d)  Notice of Collateral Assignment of Option Agreement from Echo Solar, LLC (as grantee) to FP Solar Development I LLC (as lender) submitted by Sunstone Solar, LLC to William J. Doherty Ranch, LLC dated June 4, 2024.

6.  Option Agreement for Solar Energy System Ground Lease between John and Patricia Anne Monagle, William J. Doherty and Teresa Ann Sanderson and Bombing Range Solar II, LLC, dated February 11, 2022, for 159 total acres, a Memorandum of Option Agreement For Ground Lease for Solar Energy System recorded on February 15th, 2022, at Doc. 2022-50722 in the records of Morrow County, as amended by the First Amendment to Option Agreement dated November 15th, 2023 and the First Amendment to Memorandum of Option Agreement recorded on December 5th, 2023 at Doc. 2023-53887 in the records of the Morrow County.

a)  Assignment and Assumption of Option Agreement by and between Bombing Range Solar II, LLC (as assignor) and Echo Solar, LLC (as assignee) dated September 21, 2022.

b)  Notice of Assignment and Assumption of Option Agreement submitted by Echo Solar, LLC to John Monagle dated October 6, 2022.

c)  Notice of Tenant Change of Name submitted to John Monagle notifying Grantor of the name change from Echo Solar, LLC to Sunstone Solar, LLC dated May 30, 2023.

d)  Notice of Collateral Assignment of Option Agreement from Echo Solar, LLC (as grantee) to FP Solar Development I LLC (as lender) submitted by Sunstone Solar, LLC to John Monagle dated June 4, 2024.

7.  Easement Agreement between Stanley M Rauch and Sunstone Solar, LLC dated October 24th, 2025.

8.  Pre-Construction Seeding Agreement by and between Grieb Farms, Inc. and Ken and Carrie Grieb, and Sunstone Solar, LLC dated October 17, 2025.

9.  Real Estate Purchase and Sale Agreement by and between Grieb Farms, Inc. and Ken and Carrie Grieb (Seller), and Sunstone Solar, LLC (Buyer) dated April 1st, 2025.  The buyer's

intended use for this acquired land is for it to be transferred to Umatilla Electric Cooperative to construct and operate the 230 kV Pioneer Switchyard required to interconnect Buyer's planned solar photovoltaic power array.

**Umatilla Electric Cooperative ("UEC") Interconnection Assets**

1. Interconnection Application with UEC for 300 MW AC, dated April 16, 2021 assigned Queue #17/20210416-1 and revised on June 23rd, 2021 to 440 MW, submitted by Gallatin Power Partners, LLC

   a. Eventually downsized to 200 MW.

2. System Impact Study Agreement for "440 MW – Bombing Range Solar Project" by and between UEC and Gallatin Power Partners, LLC**,** dated June 15, 2021

3. Interconnection Application with Umatilla Electric Coop for 810 MW AC, dated June 23, 2021 assigned Queue Position #18/20210624-1 submitted by Gallatin Power Partners, LLC

   a. Eventually downsized to 200 MW.

4. System Impact Study Agreement for "810 MW – Bombing Range Solar II Project" by and between Gallatin Power Partners, LLC and UEC executed October 2021.

5. Transfer and Release Agreement by and between Gallatin Power Partners, LLC, Pine Gate Renewables, LLC, Sunstone Solar LLC, and UEC fully executed 5/3/24 documenting the transfer of Queue #17/20210416-1 (Phase 1) and  #18/20210624-1 (Phase 2).

6. Phase 3 Interconnection Application with UEC for 200 MW assigned Queue #23/20221014-1

7. Phase 4 Interconnection Application with UEC for 200 MW assigned Queue #24/20221014-1

8. Phase 5 Interconnection Application with UEC for 200 MW assigned Queue #25/20221014-1

9. Phase 6 Interconnection Application with UEC for 200 MW assigned Queue #26/20221014-1

10. All System Impact Study Agreements and Reports and all Facility Study Agreements and Reports for all six UEC Interconnection Applications referenced above.

11. Phase 1 200 MW Sunstone Large Generator Interconnection Agreement No.1 (LGIA) for Queue Position #17/20210416-1 executed by and between UEC and Sunstone Solar, LLC dated August 17, 2024.

12. Phase 2 200 MW Sunstone Large Generator Interconnection Agreement No. 2 (LGIA)  for Queue #18/20210624-1 executed by and between UEC and Sunstone Solar, LLC dated December 20th, 2024.

13. Phase 3 200 MW Sunstone Large Generator Interconnection Agreement No. 3 (LGIA) for Queue #23/20221014-1 executed by and between UEC and Sunstone Solar, LLC dated May 30, 2024.

14. Phase 4 200 MW Sunstone Large Generator Interconnection Agreement No. 4 (LGIA) for Queue #24/20221014-1 pending execution.

15. Phase 5 200 MW Sunstone Large Generator Interconnection Agreement No. 5 (LGIA) for Queue #25/20221014-1 pending execution.

16. Phase 6 200 MW Sunstone Larger Generator Interconnection Agreement No. 6 (LGIA) for Queue #26/20221014-1 pending execution.

**Umatilla Electric Cooperative ("UEC") Transmission Assets**

1. Phase 1 200 MW Sunstone Transmission Service Agreement No. 1 executed by UEC and Sunstone Solar, LLC dated August 17, 2024

2. Phase 2 200 MW Sunstone Transmission Service Agreement No. 2 executed by UEC and Sunstone Solar, LLC dated December 20, 2024

3. Phase 3 200 MW Sunstone Transmission Service Agreement No. 3 executed by UEC and Sunstone Solar, LLC dated June 13, 2025

4. Phase 4 200 MW Sunstone Transmission Service Agreement No. 4 pending execution

5. Phase 5 200 MW Sunstone Transmission Service Agreement No. 5 pending execution

6. Phase 6 200 MW Sunstone Transmission Service Agreement No. 6 pending execution

**Bonneville Power Administration ("BPA") Interconnection Assets**

1. Interconnection Application with BPA for 1,250MW AC, dated June 17, 2021 assigned Queue Position Number G0678, submitted by Gallatin Power Partners, LLC.

   a. August 26, 2021 Assignment Notice Memo submitted to BPA notifying them of the intent to transfer the Interconnection Application for 1,250 MWAC, dated June 17, 2021 and assigned Queue Position Number G0678 from Gallatin Power Partners, LLC to Bombing Range Solar I, LLC.

   b. September 14, 2021 BPA confirmed that the Assignment Notice Memo was sufficient.

2. Feasibility Study Agreement with BPA for 1,250MW AC, dated July 26, 2021, Queue Position Number G0678 signed by Gallatin Power Partners, LLC.

   a. Subsequently assigned to Echo Solar, LLC by the Assignment and Assumption Agreement between Gallatin Power Partners, LLC and Echo Solar, LLC.

Exhibit A - 5

3. Feasibility Study (FES) G0678 dated January 27, 2022 prepared by BPA Transmission Planning.

    b. Gallatin Power coordinated directly with BPA to have a cost and time saving solution studied in the Revised Interconnection Feasibility Study, which is why the Revised Interconnection Feasibility Study was completed.

4. Revised Interconnection Feasibility Study (IFES) G0678 dated May 27, 2022 prepared by BPA Transmission Planning.

5. Interconnection System Impact Study Agreement between Echo Solar, LLC and BPA executed June 2022.

6. Interconnection System Impact Study (SIS) G0678 dated 6/27/2023 and prepared by BPA Transmission Planning.

7. Interconnection Facilities Study Agreement for G0678.

8. Interconnection Facilities Study (IFAS) G0678 dated 9/10/25 prepared by BPA Transmission Planning.

9.  All draft and pending agreements with BPA related to G0678 including, but not limited to, the Engineering & Procurement Agreement, Environmental Study Agreement, and Large Generator Interconnection Agreement.

**BPA Transmission Service Requests ("TSR") with delivery to Portland General Electric ("PGE")**

1. Service Agreement No. 21TX-17125 Service Agreement for Point-to-Point Transmission Service executed by BPA and Gallatin Power Partners, LLC fully executed July 7, 2021.

2. TSR 94761421, submitted by Gallatin Power Partners, LLC to BPA and funded by Pine Gate Renewables, LLC on August 17, 2021 for 80 MW, linked to G0678.

3. TSR 94761930, submitted by Gallatin Power Partners, LLC to BPA and funded by Pine Gate Renewables, LLC on August 17, 2021 for 80 MW, linked to G0678.

4. TSR 94761945, submitted by Gallatin Power Partners, LLC to BPA and funded by Pine Gate Renewables, LLC on August 17, 2021 for 80 MW, linked to G0678.

5. TSR 94761951, submitted by Gallatin Power Partners, LLC to BPA and funded by Pine Gate Renewables, LLC on August 17, 2021 for 80 MW, linked to G0678.

6. TSR 94761959, submitted by Gallatin Power Partners, LLC to BPA and funded by Pine Gate Renewables, LLC on August 17, 2021 for 80 MW, linked to G0678.

7. TSR 94761975, submitted by Gallatin Power Partners, LLC to BPA and funded by Pine Gate Renewables, LLC on August 17, 2021 for 40 MW, linked to G0678.

8.  2022 Cluster Study Agreement made and entered into October 26, 2021 by and between BPA and Gallatin Power Partners, LLC.

9.  2020 Cluster Study Election Form submitted by Gallatin Power Partners, LLC for all six TSRs to BPA on June 29, 2022.

10. Preliminary Engineering Agreement executed by BPA and Gallatin Power Partners, LLC Agreement No. 22TP-12693 with an effective date of September 13, 2022.

11. Affected System Impact Study Agreement by and between Gallatin Power Partners, LLC and Portland General Electric with an effective date of April 4, 2023 referencing the Original Parent TSRs: 94761421, 94761930, 94761945, 94761951, 94761959, and 94761975.

12. Portland General Electric Company BPA 2022 Transmission Service Request and Expansion Process Affected System Cluster Study dated April 30, 2024.

13. Amendment No. 1 and Exhibit F (Specifications for Conditional Firm Service) for Pre-Confirmed Conformance TSR 100843130 associated with Original Parent TSR 94761421, Pre-Confirmed Conformance TSR 100843159 associated with Original Parent TSR 94761930, Pre-Confirmed Conformance TSR 100843180 associated with Original Parent TSR 94761945, Pre-Confirmed Conformance TSR 100843195 associated with Original Parent TSR 94761951, Pre-Confirmed Conformance TSR 100843209 associated with Original Parent TSR 94761959, and Pre-Confirmed Conformance TSR 100843239 associated with Original Parent TSR 94761975, to PTP Transmission Service Agreement NO. 21TX-17125 (Service Agreement) between BPA and Gallatin Power Partners, LLC executed October 2023.

    a.  Original Parent TSRs remain in the Long-term Firm pending Queue. Pre-Confirmed Conformance TSRs are the Bridge Conditional Firm TSRs.

14. Environmental Study Agreement executed by BPA and Gallatin Power Partners, LLC with an effective date of March 25, 2024 referencing the Original Parent TSRs: 94761421, 94761930, 94761945, 94761951, 94761959, and 94761975.

15. April 16, 2024 Gallatin Power Partners, LLC transferred the TSRs to Pine Gate Renewables, LLC through the BPA OASIS system using Transfer TSRs.

    a.  Transfer TSR 102629428 = Pre-Confirmed Conformance TSR 100843130

    b.  Transfer TSR 102629450 = Pre-Confirmed Conformance TSR 100843159

    c.  Transfer TSR 102629458 = Pre-Confirmed Conformance TSR 100843180

    d.  Transfer TSR 102629521 = Pre-Confirmed Conformance TSR 100843195

    e.  Transfer TSR 102630245 = Pre-Confirmed Conformance TSR 100843209

Exhibit A - 7

      f.   Transfer TSR 102630260 = Pre-Confirmed Conformance TSR 100843239 (40 MW)

16. Six Exhibit F Specifications for Bridge Conditional Firm Point to Point Transmission Service Table No. 1, Revision No. 1 Transmission Service Request each signed by BPA and Gallatin Power Partners, LLC with a fully executed date of June 10, 2024 for transferring each Pre-Confirmed Conformance TSR to Pine Gate Renewables, LLC: 100843130, 100843159, 100843180, 100843195, 100843209, and 100843239.

17. Six Exhibit F Specifications for Conditional Firm Point to Point Transmission Service each signed by BPA and Pine Gate Renewables, LLC dated December 11, 2024.

18. Environmental Study Agreement executed by BPA and Pine Gate Renewables, LLC around September 11, 2025 requiring a deposit of $1,807,520 referencing the Original Parent TSRs: 94761421, 94761930, 94761945, 94761951, 94761959, and 94761975

19. Exhibit F, Specifications for Conditional Firm Point-to-Point Transmission Service, Table 7, Revision No. 2, Transmission Service Request (Assign Ref. 107275899), between Pine Gate Renewables, LLC ("PGR") and United States Department of Energy Bonneville Power Administration ("US DOE"), dated as of November 18, 2025.

20. Exhibit F, Specifications for Conditional Firm Point-to-Point Transmission Service, Table 8, Revision No. 2, Transmission Service Request (Assign Ref. 107275855), between PGR and US DOE, dated as of November 18, 2025.

21. Exhibit F, Specifications for Conditional Firm Point-to-Point Transmission Service, Table 9, Revision No. 2, Transmission Service Request (Assign Ref. 107275957), between PGR and US DOE, dated as of November 18, 2025.

22. Exhibit F, Specifications for Conditional Firm Point-to-Point Transmission Service, Table 10, Revision No. 2, Transmission Service Request (Assign Ref. 107275963), between PGR and US DOE, dated as of November 18, 2025.

23. Exhibit F, Specifications for Conditional Firm Point-to-Point Transmission Service, Table 11, Revision No. 2, Transmission Service Request (Assign Ref. 107275967), between PGR and US DOE, dated as of November 18, 2025.

24. Exhibit F, Specifications for Conditional Firm Point-to-Point Transmission Service, Table 12, Revision No. 2, Transmission Service Request (Assign Ref. 107276033), between PGR and US DOE, dated as of November 18, 2025.

**Additional Assets**

1. Environmental Study Agreement dated November 8, 2025 between Pine Gate Renewables, LLC and Bonneville Power Administration

2. Environmental Study Agreement dated November 8, 2025 between Pine Gate Renewables, LLC and United States of America Department

3. Energy Facility Siting Council of the State of Oregon Site Certificate for the Sunstone Solar Project issued on November 18, 2024 to Sunstone Solar, LLC.

4. Request for Amendment 1 for Sunstone Solar Project submitted to Oregon Energy Facility Siting Council ("OR EFSC") on July 24, 2025 prepared for Sunstone Solar, LLC, a subsidiary of Pine Gate Renewables, LLC.

5. All studies and material documentation related to the EFSC Site Certificate (#3 above) and Request for Amendment 1 for Sunstone Solar Project (#4 above).

6. Payment in Lieu of Taxes Agreement by and between Echo Solar, LLC and Morrow County, Oregon effective November 2, 2022, as recorded in Morrow County Oregon Records instrument 2025-55973.

7. Memorandum of Agreement for Agricultural Mitigation Fund by and between Sunstone Solar, LLC and the Morrow County Board of Commissioners dated March 20th, 2024.

8. Agreement with Confederated Tribes of Umatilla Indian Reservation

9. All title commitments and title proformas prepared for the Project

10. Mineral ownership reports, runsheet and maps prepared for the Project

11. Affidavit of Nonproduction dated November 13, 2023 signed by Ken Grieb and Carri Grieb

12. Affidavit of Nonproduction dated March 28, 2024 signed by Tony Robert Ashbeck and Gerald Thomas Ashbeck

13. All easements, crossing consents, mineral rights waivers and any other title curative agreements associated with the Project

14. ALTA surveys and survey work completed for the Project

15. Environmental Studies with respect to the Project

16. Cultural Resource Reports and supporting site evaluations, documentation and data with respect to the Project

17. Wetland Delineation Report and supporting site evaluations, documentation and data with respect to the Project

18. Geotechnical Reports and supporting site evaluations, documentation and data with respect to the Project

19. Hydrology Reports and supporting site evaluations, documentation and data with respect to the Project

Exhibit A - 9

20. Critical Issue Analysis Reports and supporting site evaluations, documentation and data with respect to the Project

21. Phase I ESAs with respect to the Project

22. CPP Site Specific Wind Study Report Review Sunstone Solar Power Plant Project dated June 15, 2023

23. July 10, 2025 OE/AAA Pre-screening Results determination that the Project is not required to file notice with the FAA and all other FAA correspondence and submissions related to the Project

24. EIA 860 Form submitted December 20, 2024 resulting in the assignment of Utility ID: Sunstone Solar, LLC 66778 and Plant ID: Sunstone Solar 68396 on January 10, 2025

25. All Energy Models and Reports with respect to the Project

26. All Solar Resource Measurement Reports and supporting met data collected on site with respect to the Project

27. **Safe Harbor Equipment**: The equipment and associated Purchase Orders/Invoices (in whole or in part) listed below:

| Item Number | Description | Req. Date | Qty | Ext. Price | Reference Document | PO# and Serial Numbers |
|---|---|---|---|---|---|---|
| SG4400UD-MV-US | Sungrow SH – SG4400UD-MV-US-PCS (including-Freight, Night Var, High-Temp Rating, and 200BIL Winding Upgrade) | 04/15/2026 | 12 | $200,945/unit | Sungrow_PO0000198_Safe_Harbor_7.17.2025_rev1-_executed | PO0000198 – partial assignment solely with respect to the following units:<br><br>Serial Numbers:<br>MYY2508009<br>MYY2508010<br>MYY2508011<br>MYY2508012<br>MYY2508013<br>MYY2508014<br>MYY2508015<br>MYY2508016<br>MYY2508017<br>MYY2508018<br>MYY2508019<br>MYY2508020 |

28. **Additional Assigned Equipment**: The equipment and associated with Purchase Orders/Invoices (in whole or in part) listed below:

| Item Number | Description | Req. Date | Qty | Ext. Price | Reference Document | PO# |
|---|---|---|---|---|---|---|
| GSU-150/200/250 MVA@65C, 230-34.5kV, Underground | GSU-150/200/250MVA@65C,230-34.5kV, Ungrounded | 01/31/2025 | 1 | $6,568,306 | Purchase-Order-PO0000168-Sunstone Solar Phase 1-GSU-WEG-PGR-1-31-2025 Executed | PO0000168 – full assignment |
| | Service for Unit (Non-Inventory Item) | 1/31/2025 | 1 | $275,000 | Purchase-Order-PO0000168-Sunstone Solar Phase 1-GSU-WEG-PGR-1-31-2025 Executed | PO0000168 – full assignment |
| GSU-150/200/250 MVA@65C, 230-34.5kV, Underground | GSU-150/200/250MVA@65C,230-34.5kV, Underground | 06/10/2027 | 1 | $6,670,598 | Sunstone Phase 2 - PO0000185 - WEG.PGR 6.6.20_executed PGR PKJ (1) | PO0000185 – full assignment |
| | Service for Unit (Non-Inventory Item) | 06/10/2027 | 1 | $275,000 | Sunstone Phase 2 - PO0000185 - WEG.PGR 6.6.20_executed PGR PKJ (1) | PO0000185 – full assignment |
| DT1-245 P 63 F1 | HV Breaker, 230kV, 2000A, 63kA, 865kV BIL | 7/16/2024 | 1 | $290,000 | PO0000125 Rebecca GE 2-Fully Executed | PO0000125 – partial assignment solely with respect to one HV Breaker, 230kV, 2000A, 63kA, 865kV BIL |
| DT1-245-P63 F1 | HV Breaker, 230kV, 2000A, 63kA, 865kV BIL | 11/15/2026 | 1 | $290,000 | PO0000000126 Sunstone Phase 1 GE-Fully Executed | PO0000126 – full assignment |

Exhibit A - 11

| Item Number | Description | Req. Date | Qty | Ext. Price | Reference Document | PO# |
|---|---|---|---|---|---|---|
| DT1-245 P 63 F1 | HV Breaker, 230kV, 2000A, 63kA, 865kV BIL | 7/16/2024 | 1 | $290,000 | PO0000127 – GE Grid Sunstone 2 | PO0000127 – full assignment |
| DT1-245 P F1 | Orangeburg County HV Breaker | 6/1/23 | 1 | $131,090 | Orangeburg_HV Breaker_GEGrid Solutions_OPR ME-1817_2023.13.7_ FullyExecuted.p df | OPRME-1817 – full assignment |
| OPRME-1817-4 | Orangeburg County HV Breaker – Request to Change the Frame From Low Seismic to High Seismic | 10/11/2023 | 1 | $2,600 | OrangeburgCoun ty_HVBreaker_ GEGridSolutions _OPRME-1817_Rev1_202 3.10.11_Full… | OPRME-1817 – full assignment |

29. All engineering and design documents in all formats (PDF, CAD, etc.), including but not limited to 10%, 30%, design drawings and all pre-engineering documents, such as 2025.01.22_SUNSTN_PV_E_G100.VerDD-MARKUP LHR_BT and 2025.02.06_SUNSTN_PV_E_G100.VerDE with respect to the Project

30. All EPC quotes and proposals with respect to the Project

31. All O&M quotes and proposals with respect to the Project

32. All equipment quotes and proposals solely to the extent of the equipment procured (or to be procured) in respect of the Project

33. All benchmark bidding agreements with Portland General Electric and all submissions relating to Portland General Electric RFPs and bilateral negotiations with respect to the Project

34. All proposals prepared and presented to potential offtakers, including all supporting documentation and deliverables with respect to the Project

35. All other reports, documents, studies, agreements, contracts, permits, entitlements and rights pertaining to the Project

**Exhibit B**

**Sellers' Budget**

**Subject to FRE 408 & Equivalents**
**Illustrative | For Discussion Purposes Only**
**Confidential | Subject to Applicable NDA**
**Draft – Subject to Material Change**

**Pine Gate Renewables**
**Sunstone Budget through February 2026***

| Forecasted Payment Date | Amount | Item Code Name | Type |
|---|---|---|---|
| 1/23/2026 | $  1,313,661.20 | WEG Transformers USA Phase 1 Design Drawing Submittal Milestone Payment | Transformers |
| 1/23/2026 | 2,664,521.20 | BPA ESA (Ross River) | Interconnection |
| 2/16/2026 | 80,000.00 | Land Option Payments due in February | Dev Ex / Zoning |
| **Total** | **$  4,058,182.40** | | |

**Note**:
(*) Amounts and timing subject to change; Assumes BPA E&P agreement is signed in early February and payable 30 days thereafter ($3.2 million).

**Annex 1**

**Mid-C TSR List**

| AREF | Service Type | Start Date | Stop Date | POR | POD | Demand (MWs) |
|---|---|---|---|---|---|---|
| 97303495 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303526 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303555 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303563 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303626 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303663 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303671 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303678 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303682 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303686 | LTF-YEARLY PTP | 12/1/2026 | 12/1/2031 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303692 | LTF-YEARLY PTP | 12/1/2025 | 12/1/2030 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303699 | LTF-YEARLY PTP | 12/1/2025 | 12/1/2030 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303708 | LTF-YEARLY PTP | 12/1/2025 | 12/1/2030 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303722 | LTF-YEARLY PTP | 12/1/2025 | 12/1/2030 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |

| AREF | Service Type | Start Date | Stop Date | POR | POD | Demand (MWs) |
|---|---|---|---|---|---|---|
| 97303727 | LTF-YEARLY PTP | 12/1/2025 | 12/1/2030 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 50 |
| 97303804 | LTF-YEARLY PTP | 12/1/2027 | 12/1/2032 | NEWPOINT (Coyote Springs 500) | MIDWAY230MIDCR | 10 |